**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MONUMENT REALTY LLC, et al.,    ) | |
|                     ) | |
|       Plaintiffs,        ) | |
|                     ) | |
|       v.             ) | |
|                     ) | Civil Action No. _____ |
| WASHINGTON METROPOLITAN  ) | |
| AREA TRANSIT AUTHORITY,   ) | |
|                     ) | |
|       Defendant.      ) | |

## PLAINTIFFS' EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Pursuant to Fed. R. Civ. P. 65, LCvR 7, and LCvR 65.1, Plaintiffs Monument Realty LLC and MR Ballpark 7 LLC (collectively, "Monument") hereby respectfully request that this Court enter a Temporary Restraining Order pending a hearing on Plaintiffs' motion for Preliminary Injunction. This case involves real property and improvements located in Southeast Washington, D.C. known as the Southeast Bus Garage (the "Property"). Defendant Washington Metropolitan Area Transit Authority ("WMATA") is the record owner of the Property, and is currently involved in efforts to arrange a conveyance of the Property in violation of Monument's rights and interests.

Pursuant to agreements between the parties, Monument holds vested real property interests either to acquire the Property or, at the very least, to negotiate exclusively to acquire the Property from WMATA. These agreements were part of the Master Development Plan for the Ballpark District of Washington, D.C., adjacent to the new Washington Nationals baseball stadium under construction in anticipation of Major League Baseball's 2008 season. Monument was awarded the right to negotiate exclusively for the Property, as a result of, among other

things, being named a Master Developer of the Area in which the Property is located.  WMATA has embarked upon an effort to dispose of the Property without regard for Monument's rights and interests.  Making matters worse, WMATA has done so through an unlawful effort to solicit bids, an effort in which WMATA acknowledged it did not follow its published Procurement Procedures Manual ("PPM") for property disposition.  Instead of following its PPM, WMATA followed an unpublished and informal process apparently created and known only internally to WMATA staff.  Highlighting WMATA's own state of confusion surrounding which procedures govern the sale, at a recent WMATA Board of Directors' hearing, the General Manager of WMATA, John B. Catoe, Jr., publicly stated that the PPM did not apply and then stated that some other procedures did not apply, prompting one Principal Director, Jim Graham, to state that "[t]here's a little bit of a mixed message here" as to what procedures did, in fact, apply.

Monument participated in the bidding process in its ongoing effort to protect its interests, noting WMATA's representation that it would decide among the competing bids by determining "[t]he bid which represents the best net return to WMATA."  WMATA's bidding process, however, has been infected with a complete lack of policies, procedures, rules, or regulations – despite its own Compact which *requires* it to have such a structure in place – and by WMATA's decision to disregard Monument's alternate bid for the Property.  Monument submitted an escalator bid, which is common in situations involving acquisition of real estate and which would have resulted in the best net return to WMATA, but WMATA decided arbitrarily not to consider it.  One of WMATA's own Board Members, Principal Director Emeka C. Moneme, noted that the use of escalator provisions is "quite common" in real estate transactions, that WMATA "may have left some money on the table" by rejecting Monument's bid, and that this

problem was created by the absence of any formal WMATA policy treating property dispositions of this nature.

The Property is unique and valuable, and Monument is without an adequate remedy at law. The threat of the loss of the real property rights and interests involved in this case furnishes irreparable harm for which injunctive relief is appropriate. Monument therefore respectfully asks this Court to enter a temporary restraining order as set forth herein. For further support for this Motion, Monument respectfully refers this Court to the attached Memorandum of Points and Authorities.

WHEREFORE, Plaintiffs Monument Realty LLC and MR Ballpark 7 LLC respectfully ask this Court to:

(a)    Enter a temporary restraining order immediately prohibiting WMATA from any further action to dispose of the Property, to pursue the bidding process concerning the Property, to solicit bids for the Property, to contract to convey the Property, and/or to convey legal title to the Property;

(b)    Schedule a hearing on Plaintiffs' motion for preliminary injunction;

(c)    Direct that the temporary restraining order remain in effect until the conclusion of the hearing on Plaintiffs' motion for preliminary injunction; and

(d)    Grant such other and further relief as justice may require.

Dated:  October 10, 2007

Respectfully submitted,

NIXON PEABODY, LLP

Louis E. Dolan, Jr. (#442881)
Vernon W. Johnson, III (#423756)
401 9th Street, N.W.
Washington, D.C. 20001
202.585.8000
202.585.8080 (fax)
ldolan@nixonpeabody.com
vjohnson@nixonpeabody.com

Counsel for Plaintiffs

## CERTIFICATION PURSUANT TO LCvR 7(m)

Undersigned counsel for Plaintiffs hereby certifies, pursuant to LCvR 7(m), that a good faith effort was made to discuss the subject of this motion, and the relief requested herein, with counsel for Defendant.  Defendant opposes the relief sought on this motion.

Respectfully submitted,

NIXON PEABODY, LLP

Louis E. Dolan, Jr. (#442881)
Vernon W. Johnson, III (#423756)
401 9th Street, N.W.
Washington, D.C. 20001
202.585.8000
202.585.8080 (fax)
ldolan@nixonpeabody.com
vjohnson@nixonpeabody.com

Counsel for Plaintiffs

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

MONUMENT REALTY LLC, et al.,　　　）
　　　　　　　　　　　　　　　　）
　　　　　　　Plaintiffs,　　　　　）
　　　　　　　　　　　　　　　　）
　　　v.　　　　　　　　　　　　　）
　　　　　　　　　　　　　　　　）　Civil Action No. _____
WASHINGTON METROPOLITAN　　　）
AREA TRANSIT AUTHORITY,　　　　）
　　　　　　　　　　　　　　　　）
　　　　　　　Defendant.　　　　　）
　　　　　　　　　　　　　　　　）

---

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFFS' EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION**

## I.　**Introduction**

Plaintiffs Monument Realty LLC and MR Ballpark 7 LLC (collectively, "Monument"), have filed this motion to maintain the status quo and to protect valuable and unique real property rights and interests.　The real estate is located in the Ballpark District of Washington, D.C., specifically in the Half Street Area, and is known as Lots 857 and 866, Square 700.　It consists of the WMATA Southeast Bus Garage and an adjacent surface parking lot, and is referred to herein as the "Property."

Defendant Washington Metropolitan Area Transit Authority ("WMATA") is the record owner of the Property and is currently involved in efforts to arrange a conveyance of the Property in violation of Monument's rights and interests.　From publicly available information, Monument has learned that WMATA apparently plans to present a contract to its Board for approval on October 11, 2007.　Threatened with the loss of its rights and interests, having exhausted all administrative remedies available under the circumstances, and without an

adequate remedy at law, Monument asks the Court to provide injunctive relief to maintain the status quo, as provided by Fed. R. Civ. P. 65, LCvR 7, LCvR 65.1, and the applicable law.

## II.   Statement of Facts

WMATA was created by an interstate Compact among Virginia, Maryland, and the District of Columbia to construct and operate a transit system, consisting of buses and subways, for the Washington, D.C. metropolitan area. *Md. Code Ann., Transp.* § 10-204 *et seq.* (2004); *Va. Code Ann.* § 56-529 *et seq.* (2004); *D.C. Code Ann.* § 9-1107.01 *et seq.* (2004). Its Compact authorizes WMATA to enter into contracts to dispose of real property that it owns. *D.C. Code Ann.* § 9-1107.01, sec. 12(d) (2004).

The Property owned by WMATA in this case is squarely in the center of the "Half Street Area," adjacent to the new baseball stadium under construction on the Anacostia River Waterfront near South Capitol Street, Southeast, Washington D.C. *See* Declaration of F. Russell Hines ("Hines Decl."), attached hereto as Exhibit 1, at ¶ 3 and Exhibit A. The Half Street Area is the designation that has been given by Monument Realty to the area bounded by M Street, S.E. to the North, South Capitol Street, S.W. to the West, 1st Street, S.E. to the East, and N Street, S.E. to the South. Hines Decl. at ¶ 4 and Exhibit A. It is in an area where Monument already owns many properties, including most of those surrounding the Property, and for which Monument was designated the Master Developer by the District of Columbia's Anacostia Waterfront Corporation ("AWC"). *See* Hines Decl. at ¶¶ 8, 12 and Exhibit B.

The baseball stadium construction and the surrounding development in the Half Street Area are high priority items for the District of Columbia. *See, e.g.,* Hines Decl. at Exhibit C ("The goals of the Corporation are extremely important ones for the District to pursue. The Anacostia Waterfront represents a huge and largely untapped economic development resource

for the District. . . . Creation of a new independent instrumentality of the District is necessary to achieve the redevelopment and revitalization of the Anacostia Waterfront. It is important that the responsibility for this redevelopment and revitalization be placed in an independent agency to ensure that the District has the resources and flexibility to achieve the goals and complex projects with which it has been tasked.").

As an indication of the important public policy to foster a coordinated development of the Ballpark District, of which the Half Street Area is an integral part, the District of Columbia formed the AWC in 2004. *D.C. Code Ann.* § 12-1223 *et seq.* (2004) (Repealed).[1]  Its mission was the development and revitalization of underutilized public lands along the Anacostia River. *Id.*   AWC intended to accomplish these goals, in part, by causing the development of a comprehensive Master Development Plan for the Ballpark District, acquiring property through sale, lease, or exchange in the Ballpark District, and conveying that property to Master Developers selected by AWC to develop and implement the Master Development Plan. *Id.*

In December 2005, AWC designated Monument the Master Developer for the Half Street Area, which includes the Property and the surrounding real estate that Monument owns.  Hines Decl. at ¶¶ 8, 12 and Exhibit B.  WMATA was fully aware of Monument's designation as Master Developer, and WMATA worked extensively with Monument over a several year period as part of implementing the Master Development Plan. Hines Decl. at ¶¶ 12-16. *See also* Declaration of Amy Phillips ("Phillips Decl.") at ¶¶ 5-9, attached hereto as Exhibit 2.

By May 2006, Monument and WMATA had become frustrated at the slow pace of progress AWC was making in implementing the Master Development Plan, particularly with

---

[1]    Effective October 1, 2007, AWC became a part of the Office of the Deputy Mayor for Planning and Economic Development for the District of Columbia, through enactment of the "Fiscal Year 2008 Budget Support Act of 2007." 54 D.C. Reg. 7079-85 (July 27, 2007).

respect to WMATA property in the Half Street Area. Hines Decl. at ¶ 14, Phillips Decl. at ¶ 7. Therefore, WMATA and Monument began working together jointly on the sale of WMATA's property to Monument in the Half Street Area. *Id.* Both parties understood that the acquisition process between WMATA and Monument would be accomplished in phases. Hines Decl. at ¶¶ 15-16, Phillips Decl. at ¶ 8. This was due in part to: (a) WMATA's need to focus first on the Navy Yard Metro Station site, so that a smoothly operating transit system in and around the soon-to-be-opened baseball stadium would be in place on opening day, 2008; and (b) WMATA's uncertainty with respect to a new location to garage the buses and other equipment occupying the WMATA Bus Garage in the development site. *See id. .* Only after WMATA identified and secured a replacement bus depot site could WMATA commence negotiations for the WMATA Bus Garage with Monument. *Id.*

Thus, Monument moved forward in stages to implement the Master Development Plan. In the first phase, Monument acquired the Navy Yard Metro Station from WMATA and began developing that real estate at considerable expense and effort. Hines Decl. at ¶ 16. In the next phase, Monument began other development in the Half Street Area, including closing alleyways and granting WMATA an easement for its direct benefit in using and accessing the WMATA Bus Garage. Hines Decl. at ¶¶ 17-19, Phillips Decl. at ¶ 9. In these two phases, Monument paid substantial amounts to acquire and develop the Navy Yard Metro Station site from WMATA, and granted numerous concessions and rights to WMATA, valued in the millions of dollars, based on its agreement with WMATA that it would also later purchase the Southeast Bus Garage. Hines Decl. at ¶¶ 16-19. Monument would have significantly discounted the price it paid had it not obtained any rights or interests in the Bus Garage. Hines Decl. at ¶ 18.

During this time, Monument met repeatedly with representatives of WMATA, AWC, and the District of Columbia to discuss development of the Half Street Area, which included Monument's plans for development of the Property. Hines Decl. at ¶¶ 12-14, 20, Phillips Decl. at ¶ 5. Monument also publicly discussed its development plans for the Half Street Area, which included the WMATA Bus Garage. *Id.* WMATA never objected. *Id.*

In 2007, however, when Monument was prepared to move forward with the next phase and acquire the Property, WMATA refused to comply with its obligations. Instead, WMATA proceeded with a bid process that was unlawful *ab initio*, because WMATA either never established or maintained any rules, policies, or procedures for the related contracting and procurement practices, or because WMATA did not follow the rules and procedures outlined in its Procurement Procedures Manual ("PPM") for the disposal of its real property. *See* Hines Decl. at Exhibit D. WMATA was required by the Compact to have such rules, policies, and procedures. *D.C. Code Ann.* § 9-1107.01, sec. 73(g) (2004) ("The Board shall adopt policies and procedures to implement this Section").

In the summer of 2007, WMATA issued an Invitation for Bids ("IFB") for the Property. *See* Hines Decl. at Exhibit E. Specifically, WMATA indicated in its IFB that there would be one criterion used to choose the winning bid: "The bid which represents the bet net return to WMATA." *Id.* In order to protect its rights in the Property, Monument submitted two bids, including an escalator bid, indicating that it would pay $250,000 more than any higher price offered by another bidder. Hines Decl. at ¶ 21 and Exhibit F. WMATA, however, refused to consider the bid, although its own Board has acknowledged that such a bid is common in situations involving acquisition of real estate and that the bid would have resulted in the best net return to WMATA. Hines Decl. at Exhibit G.

5

In addition, although the Compact requires that WMATA have established procedures for dispositions of real property and although the PPM itself explicitly states that it applies to dispositions of real property, WMATA has admitted publicly that the PPM did not apply to the sale of the Property. Hines Decl. at Exhibits D and G. In fact, WMATA has stated publicly that other procedures may or may not apply. Hines Decl. at Exhibit G. Even WMATA's General Manager, John B. Catoe, Jr., could not identify with specifically which procedures applied, prompting Principal Director and D.C. Councilmember Jim Graham to state that a "mixed message" was being sent in that regard. *Id.*

Now, WMATA appears to be continuing in its effort to consummate a conveyance which is the product of an unlawful and invalid bid process, and ignores Monument's vested and unique real property rights and interests. Monument has had no viable alternative but to file this lawsuit, since such a conveyance would irreparably harm Monument. Hines Decl. at ¶ 23.

## ARGUMENT

### III.  **Standards Governing this Motion**

Requests for injunctive relief in the federal courts are governed by Fed. R. Civ. P. 65. Motions brought under Rule 65 are assessed by a well-known test applying four factors: (1) the likelihood of irreparable harm to the movants if the injunctive relief is denied; (2) the likelihood of harm to the defendant if the injunctive relief is granted; (3) the likelihood that the movants will succeed on the merits; and (4) the public interest. *See Mova Pharmaceutical Corp. v. Shalala,* 140 F.3d 1060, 1066 (D.C. Cir. 1998); *CityFed Fin. Corp. v. Office of Thrift Supervision,* 58 F.3d 738, 746 (D.C. Cir. 1995). Those same standards typically apply in the context of a motion for a temporary restraining order. *See Adair v. England,* 217 F. Supp. 2d 1, 3 n.7 (D.D.C. 2002) (Urbina, J.) (applying four factor test to motion for temporary restraining

order). A particularly strong showing on one or more of the elements may excuse a lesser showing on others. *See Ellipso, Inc. v. Mann,* 480 F.3d 1153, 1157 (D.C. Cir. 2007).

## IV.    Monument Meets the Test for Obtaining a Temporary Restraining Order

In each instance, Monument satisfies the four-part test for obtaining a temporary restraining order. Each of the required elements is discussed in turn.

### A.    Irreparable Harm to Monument

Monument has filed this motion to protect real estate rights and interests. The substantive law of the District of Columbia dictates that injunctive relief is appropriate – and, indeed, required – to protect such rights and interests. *See Simpson v. Lee,* 499 A.2d 889 (D.C. 1985). Injunctive relief is required to protect real estate interests, since the law recognizes that such interests are unique. *See id.* at 896; *Flack v. Laster,* 417 A.2d 393, 400 (D.C. 1980).

The loss of such rights and interests establishes the required irreparable harm as a matter of law. For instance, this Court has recognized that irreparable harm is likely to result where denial of an injunction will cause a change in ownership or possession of real estate interests. In *Perpetual Bldg. Ltd. P'ship v. District of Columbia,* this Court found that the termination of a commercial lease by the lessee would likely cause irreparable harm to the lessor, in that such termination would ultimately result in the lessor losing its real property. 618 F. Supp. 603 (D.D.C. 1985). Likewise, in *Bennett v. Dunn,* the Court granted a preliminary injunction prohibiting an execution sale pending trial on the merits on the ground that "property is always unique under the general principles of the law of equity and its possible loss or destruction usually constitutes irreparable harm." 504 F. Supp. 981, 986 (D. Nev. 1980). *See also Chestnut Real Estate P'ship v. Huber,* 811 A.2d 389, 398 (2002) (noting the frequent application of injunctive relief to disputes involving real property).

7

Because of the unique nature of real estate interests, specific performance is the presumed remedy on the merits of such claims. *See, e.g., Coburn v. Heggestad,* 817 A.2d 813, 823 (D.C. 2003) (holding that this type of remedy is "necessary and appropriate in order to enforce the rights that relate to realty"); *1010 Potomac Assocs. v. Grocery Mfrs. of Am., Inc.,* 485 A.2d 199, 212 (D.C. 1984) ("When real property is the subject matter of the agreement, the legal remedy of damages is assumed to be inadequate, since each parcel of land is unique; specific performance is warranted in such a case") citing *Flack,* 417 A.2d at 400 and *City Stores Co. v. Ammerman,* 266 F. Supp. 766, 776 (D.D.C. 1967), *aff'd,* 394 F.2d 950 (D.C. Cir. 1968). Obviously, in order for the specific performance remedy to be available at trial, the disposition of the Property must, in the meanwhile, be prohibited by the grant of temporary, and ultimately preliminary, injunctive relief. *Cf. Ellipso, Inc.,* 480 F.3d at 1159-1160 (injunctive relief was appropriate where, in the absence of such relief, defendants could dispose of only assets available from which to satisfy a judgment in the case). *Cf. Thorn v. Walker,* 912 A.2d 1192 (D.C. 2006) (appeal from trial court's grant of specific performance denied as moot because real estate at issue had already been sold).

**B.    Relative Lack of Harm to the Defendants**

On the other hand, there would be no cognizable harm to WMATA from the grant of injunctive relief and the maintenance of the status quo so as to prevent WMATA from moving forward with a purported conveyance of the Property. WMATA would simply be required to recognize its binding obligations to Monument and to comply with its own Compact. There is no particular time issue here with respect to WMATA, as it has indicated a desire to lease back the Property for as long as thirty-six months following a conveyance. *See* Hines Decl. at Exhibit E.

### C.    Monument's Likelihood of Success on the Merits

There is a substantial likelihood that Monument will prevail on the claims in this case. Given Monument's rights and interests, it will be entitled to the relief requested and to specific performance by WMATA. Under District of Columbia law, where, as here, parties by agreement provide a right to acquire real property interests, such an undertaking will be upheld. *Flack,* 417 A.2d at 400-01. *See also Entrepreneur, Ltd. v. Yasuna,* 498 A.2d 1151, 1164-65 (D.C. 1985) (holding that forfeitures of such contractual rights are disfavored).

Where there is a breach of such agreement, specific performance is the presumed remedy. This is because real estate is unique, and our law therefore recognizes that a failure to convey real property interests must be remedied by specific performance for the contract to be upheld as the parties intended. *See Coburn, supra,* 817 A.2d at 823 (holding that this type of remedy is "necessary and appropriate in order to enforce the rights that relate to realty"); *1010 Potomac Assocs.,* 485 A.2d at 212. The presumption in favor of granting specific performance under these circumstances is so strong that it is available even where the parties did not reach a meeting of the minds on all material terms of their transaction – in which case the trial court has the power to define such missing terms. *See Ammerman v. City Stores Co.,* 394 F.2d 950 (1968).

In a case directly on point, the D.C. Circuit affirmed this Court's grant of specific performance where the parties entered into both a written and an oral agreement for the sale of a tract of land containing ten separate lots. *See Brewood v. Cook,* 207 F.2d 439, 440 (D.C. Cir. 1953). Eight of the lots were sold under the written contract, which was performed fully, and this Court ordered specific performance and conveyance of the two remaining lots under "a further agreement that the remaining two lots would also be conveyed to [appellees], at a price

and on terms respecting taxes agreed upon, at such time as appellant's wife became reconciled to parting with all of the land." *See id.*

This Court found, and the D.C. Circuit affirmed, that the buyer would not have purchased the original eight lots, thereby partially performing the obligations concerning the sale of the entire tract, but for the oral agreement. *Id.*, at 441-42. Such is the case here. *See* Hines Decl. at ¶¶ 16-19. The D.C. Circuit recognized, under the similar circumstances extant in *Brewood, supra,* that, "The situation created by appellant's failure to convey could not be rectified by rescission or by an action for damages for breach of contract." *See* 207 F.2d at 442. The same result should obtain in this case.

Monument Realty also has a substantial likelihood of success on the merits given WMATA's violation of its Compact. WMATA's violations in this regard are clear and undeniable. WMATA's authority to sell its real estate derives from Article 12(d) of its Compact. *D.C. Code Ann.* § 9-1107.01, sec. 12(d) (2004). Article 73(h) of the Compact requires that WMATA's Board "shall adopt policies and procedures to implement this section [of the Compact]." *D.C. Code Ann.* § 9-1107.01, sec. 73. This section of the Compact is entitled "Contracting and Purchasing" and deals specifically with "procurement of property" (73(a)(1)), and "contracting" (73(f)(1)). *Id.* Presumably then, in compliance with this requirement, WMATA adopted its Procurement Procedures Manual, which explicitly outlines the requirements for disposal of real property. *See* Hines Decl. at Exhibit D, Chapter 1503.

WMATA, however, did not apply the PPM, but applied secret procedures known only to its own staff in violation of the Compact. WMATA has admitted publicly that the PPM does not apply to the sale of this Property. Hines Decl. at Exhibit G. Paradoxically, WMATA has also stated that other procedures may or may not apply to the disposition of this Property. *Id.* In fact,

at a recent hearing of the WMATA Board of Directors, the General Manager of WMATA, John B. Catoe, Jr., stated that the PPM did not apply and then stated that some other procedures did not apply, prompting one Principal Director and D.C. Councilmember, Jim Graham, to state that "[t]here's a little a bit of a mixed message here" as to what procedures did in fact apply, highlighting WMATA's own state of confusion surrounding which procedures govern the sale. *Id.* In other words, WMATA has no policy about whether such disposition must be conducted in the form of an auction, through a Joint Development Solicitation, through a sealed bid, through a sole source negotiation, or through some or all of the foregoing. Were it to follow the Compact and adopt such procedures, it would have to do so properly and by valid and formal action of its Board, with appropriate notice to the public.

Thus, WMATA has violated the Compact, eit her by not formulating, adopting, and publishing such a policy, or by simply not following its established policy, as detailed in its PPM. Monument has a substantial likelihood of success on the merits to its challenge to the decisions made coming out of such a flawed process. *See Elcon Enters. Inc. v. Washington Metro. Area Transit Auth.*, 977 F.2d 1472, 1478 (D.C. Cir. 1992) (requiring rational basis for decisions and holding that WMATA's decisions may be challenged in court for clear and prejudicial violation of applicable statutes and regulations). Courts have also recognized a private right of action to hold WMATA to its Compact. *See id.,* at 1479 n. 2, citing *Seal & Co. v. Washington Metro. Area Transit Auth.,* 768 F. Supp. 1150 (E.D. Va. 1991). *Seal & Co.* explains why such a private right of action must exist in order for the Compact to function as intended. *See* 768 F. Supp. at 1153-1157.

Such a cause of action is implicit in the Compact, and provides a necessary means of holding WMATA to the Compact's requirements. *See Seal & Co., supra,* 768 F. Supp. at 1156

11

("Moreover, the existence of a cause of action for disappointed bidders is arguably implicit in Section 73 and in the scheme of the Compact, for if private bidders on WMATA's contracts lacked standing to challenge WMATA's awards, it is hard to see how Section 73's mandate . . . would be monitored and enforced."). On this independent basis, WMATA's actions in soliciting bids for the Property and purporting to approve an award are void.

### D.    The Public Interest

In this case, the public interest also supports the injunctive relief sought. Monument has filed this motion to enforce valid rights and interests in real estate and to require WMATA to adhere to the applicable law, including the Compact. The public interest is therefore aligned with the basis for Monument's request for injunctive relief. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Wertz,* 298 F. Supp. 2d 27, 34-35 (D.D.C. 2002) (recognizing that the public interest is served by enforcing valid contractual provisions to which parties have entered voluntarily). The Compact itself evidences a public policy in favor of setting standards for WMATA's actions – not to permit WMATA to ignore its obligations arbitrarily, capriciously, and with no applicable policies, procedures, rules, or regulations.

Furthermore, there is an obvious public interest in recognizing Monument's status as Master Developer for the Half Street Area, in which the Property is located, and its exclusive right to acquire and development property in that Area. The District has recognized repeatedly how important the development of the Ballpark District and the Anacostia Waterfront is to the City. In addition, the Compact compels WMATA "to serve such other regional purposes and to perform such other regional functions as the signatories may authorize by appropriate legislation," such as the AWC. *See D.C. Code Ann.* § 9-1107.01, sec. 3. There is a strong public interest to be served by restraining the Defendant's improper and unlawful conduct.

12

## V.    Conclusion

For the foregoing reasons, Plaintiffs Monument Realty LLC and MR Ballpark 7 LLC respectfully ask this Court to:

(a)    Enter a temporary restraining order immediately prohibiting WMATA from any further action to dispose of the Property, to pursue the bidding process concerning the Property, to solicit bids for the Property, to contract to convey the Property, and/or to convey legal title to the Property;

(b)    Schedule a hearing on Plaintiffs' motion for preliminary injunction;

(c)    Direct that the temporary restraining order remain in effect until the conclusion of the hearing on Plaintiffs' motion for preliminary injunction; and

(d)    Grant such other and further relief as justice may require.

Dated:  October 10, 2007                    Respectfully submitted,

                                            NIXON PEABODY, LLP

                                            _____
                                            Louis E. Dolan, Jr. (#442881)
                                            Vernon W. Johnson, III (#423756)
                                            401 9th Street, N.W.
                                            Washington, D.C. 20001
                                            202.585.8000
                                            202.585.8080 (fax)
                                            ldolan@nixonpeabody.com
                                            vjohnson@nixonpeabody.com

                                            Counsel for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MONUMENT REALTY LLC, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. _____ |
| ) | |
| WASHINGTON METROPOLITAN ) | |
| AREA TRANSIT AUTHORITY, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## <u>TEMPORARY RESTRAINING ORDER</u>

Upon consideration of the Emergency Motion of Plaintiffs Monument Realty LLC and

MR Ballpark 7 LLC for a Temporary Restraining Order and Preliminary Injunction, the

Memorandum of Points and Authorities in support of the Motion, any opposition to the Motion,

and the entire record herein, and this Court having heard the argument of counsel thereon, it is

hereby

ORDERED, that this Court concludes that the facts, for the limited purposes of the

Motion, are as stated in Plaintiffs' supporting exhibits; and it is further

ORDERED, that this Court finds that the criteria set forth in the applicable law, *see*

*CityFed Fin. Corp. v. Office of Thrift Supervision,* 58 F.3d 738, 746 (D.C. Cir. 1995) and *Mova*

*Pharmaceutical Corp. v. Shalala,* 140 F.3d 1060, 1066 (D.C. Cir. 1998), have been satisfied; and

it is further

ORDERED, that this Court finds and holds that the Plaintiffs have suffered and will

suffer irreparable harm in the absence of this temporary restraining order, that the harm to the

Plaintiffs outweighs any relative harm to the Defendant, that the Plaintiffs are substantially likely

to prevail on the merits of this case, and that the public interest favors the grant of this Temporary Restraining Order; and it is further

ORDERED, that Plaintiff's Motion for Temporary Restraining Order is granted; and it is further

ORDERED, that Defendant Washington Metropolitan Transit Authority be, and it hereby is, prohibited from any further action to dispose of the real property and improvements located in the District of Columbia, designated as Lots 857 and 866, Square 700, and also known as the WMATA Southeast Bus Garage (the "Property"), to pursue any bidding process concerning the Property, to solicit bids for the Property, to contract to convey the Property, and/or to convey legal title to the Property; and it is further

ORDERED, that this Temporary Restraining Order will take effect immediately and will remain in effect until this Court holds a hearing and rules on Plaintiffs' Motion for Preliminary Injunction; and it is further

ORDERED, that this Court will hold a hearing on Plaintiff's Motion for Preliminary Injunction on _____ in Courtroom _____; and it is further

ORDERED, that Plaintiffs shall post a bond with the Clerk of this Court in the amount of $10,000.00 within two business days of the entry of this Order, or this Temporary Restraining Order shall dissolve without further order of this Court.

Entered this _____ day of _____, 2007.

_____
United States District Judge

COPIES TO:

Louis E. Dolan, Jr.
Vernon W. Johnson, III
Nixon Peabody, LLP
401 9th Street, N.W.
Washington, D.C. 20001

Carol B. O'Keeffe
Washington Metropolitan Area Transit Authority
600 Fifth Street, N.W.
Washington, D.C. 20001

# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MONUMENT REALTY LLC, et al., )<br><br>Plaintiffs, )<br><br>v. )<br><br>WASHINGTON METROPOLITAN )<br>AREA TRANSIT AUTHORITY, )<br><br>Defendant. )<br> ) | Civil Action No. _____ |

## <u>DECLARATION OF F. RUSSELL HINES</u>

F. Russell Hines, being duly sworn, deposes and states as follows:

1.      My name is F. Russell Hines.  I am over the age of eighteen and competent to testify in this case.  I make this declaration based on my personal knowledge.

2.      I am Executive Vice President of Monument Realty LLC, one of the Plaintiffs in this case.  I have served in that role at Monument Realty since October 1998.

3.      While in that role at Monument Realty, I have been involved from the very beginning in our efforts starting in 2004 to acquire and develop property in the area designated by the District of Columbia as the "Ballpark District."  The Ballpark District is located in Southeast Washington and includes the property known as the "Half Street Area."

4.      The Half Street Area is the designation that has been given by Monument Realty to the area bounded by M St., S.E. to the North, South Capitol Street, S.W. to the West, 1st Street, S.E. to the East, and N Street, S.E. to the South.  The map, attached hereto as Exhibit A, is a true and accurate rendition of the Half Street Area.

5.    In 2004, Monument Realty began acquiring real estate in and around the Half Street Area.

6.    In March 2005, WMATA issued a Joint Development Solicitation ("JDS"), for the joint development of the WMATA-owned properties in the Half Street Area, which included three parcels in Squares 700 and 701. These parcels included the properties known as the Navy Yard Metro Station site and the WMATA Southeast Bus Garage, which is the "Property" that is the subject of this lawsuit. The JDS linked all of these sites owned by WMATA and indicated that that any proposals submitted for the development had to include all of these properties jointly. Proposals were due to be submitted in May 2005. Monument Realty registered and prepared a response to the JDS; however, on the day before proposals were due, WMATA notified potential respondents that it was withdrawing the JDS.

7.    At the time, WMATA informed Monument Realty that it was withdrawing the JDS at the request of then Mayor Anthony Williams.

8.    By May 2005, Monument and its affiliates already owned or had under contract most of the sites surrounding the WMATA Southeast Bus Garage and the Navy Yard Metro Station site in the Half Street Area.

9.    After the withdrawal of the JDS, on September 16, 2005, the Anacostia Waterfront Corporation ("AWC") issued a Request for Expressions of Interest ("RFEI") for a mixed use development in the Ballpark District. The RFEI was an invitation for qualified developers with experience in large scale, mixed use, retail, sports-related, and waterfront developments to submit proposals to AWC for the development of the Ballpark District pursuant to a comprehensive master plan.

2

10.    AWC's RFEI stated that having a coordinated and unified development program, particularly with regard to the retail program and streetscape, was critical to achieving the District's requirement for creating a vibrant mixed-used neighborhood within the Ballpark District. The baseball stadium construction and the surrounding development in the Half Street Area are high priority items for the District of Columbia. A true and accurate copy of the comments from former Member of the Council of the District of Columbia, Harold Brazil, on the AWC is attached hereto as Exhibit C.

11.    Monument submitted a proposal to AWC in response to the RFEI in October 2005. At this time Monument owned or controlled nearly all of the privately-held parcels of land in Square 700 and the western half of Square 701.

12.    In December 2005, AWC and Mayor Williams' office announced the selection of the Monument team and its affiliates as the "Master Developer" for the Half Street Area (i.e., the area encompassing Monument's property, the Navy Yard Metro Station site, and the Southeast Bus Garage). The AWC Press Release dated December 12, 2005, attached hereto as Exhibit B, is a true and accurate copy of the press release reflecting that announcement. The District of Columbia and AWC held a major news conference at the Anacostia Waterfront to make this announcement, at which time the Master Development Plan as well as the inclusion within that Plan of the WMATA properties in Square 700 and 701 were discussed. This included the WMATA Southeast Bus Garage. WMATA offered no objection to this announcement.

13.    AWC then issued a press release indicating that the Monument team had been given the right to enter into exclusive negotiations to acquire and develop mixed-use projects within the Half Street Area, which AWC had been given the statutory authority to confer. AWC publicly held Monument out as having this exclusive right, and Monument proceeded in its

3

acquisition and development plans based on this right. WMATA was aware of AWC's actions
in that regard, as well as the fact that AWC's actions included the disposition of, among other
things, real estate owned by WMATA. WMATA did not object to the statements made by
AWC.

14.    By May 2006, Monument and WMATA began moving to complete the
acquisition of some of the WMATA-owned properties in the Half Street Area. We had
numerous discussions with officials from WMATA, including Edward J. Maginnis, WMATA
Associate General Counsel; Gary Malasky, WMATA Managing Director, Property Development
and Management; and members of WMATA's Board of Directors.

15.    At the time, Monument Realty was prepared and able to complete the acquisition of
all of the WMATA-owned properties in the Half Street Area, including the Navy Yard Metro
Station site and the Southeast Bus Garage.

16.    Monument Realty agreed to finalize the acquisition of the Southeast Bus Garage
later, and agreed to WMATA's request to focus first on the Navy Yard Metro Station site so that it
would be ready for the 2008 baseball season. Monument Realty acquired the Navy Yard Metro
Station site in late 2006 through a sole-source acquisition process.

17.    Monument Realty's development plans for the Half Street Area were part of a
coordinated effort. Monument Realty has spent considerable amounts of money and performed
significant work in those development efforts, including planning and construction costs, legal
fees, closing alleyways, and granting easements and other rights to WMATA.

18.    Monument Realty would never have expended these amounts unless it had the right
to obtain a number of properties from WMATA, including the Southeast Bus Garage.
Monument Realty paid a premium for the properties it acquired, based on the agreement that it

4

would obtain all of the WMATA-owned properties in the Half Street Area. Monument Realty would have discounted significantly the price it paid had it not obtained any rights or interests in the Southeast Bus Garage. Nor would Monument have granted various concessions, worth several millions of dollars, to WMATA.

19.    These concessions included providing an affordable housing restriction on 8 percent of adjacent properties owned by Monument's affiliates without any offsetting additional development density, which in and of itself was worth in excess of $5 million.

20.    The January 2007 groundbreaking ceremony at the Navy Yard Metro Station was attended by many prominent local leaders, including the Mayor and WMATA officials. Jeffrey T. Neal, a principal of Monument Realty, specifically addressed Monument's plans with respect to the reminder of the Half Street Area, including the Southeast Bus Garage. WMATA did not object.

21.    Monument Realty's affiliate, MR Ballpark 7 LLC (the other Plaintiff in this case) submitted two bids to WMATA in response to IFB 08-01 solely to protect its rights. A true and accurate copy of IFB No. 08-1 is attached hereto as Exhibit E. In one bid, we indicated that we would pay $250,000 more than any higher price offered by another bidder, and we were and are ready, willing, and able to complete an acquisition for such a payment. A true and accurate copy of this alternate bid is attached hereto as Exhibit F. WMATA, however, indicated that it was not considering that bid and was determined to award the acquisition rights to another bidder.

22.    At the meeting of the WMATA Board of Directors on September 27, 2007, WMATA publicly stated that procedures for disposition of real property as outlined in its Procurement Procedures Manual did not apply to this Property. A true and accurate copy of WMATA's Procurement Procedures Manual is attached hereto as Exhibit D. A transcript from

the Board meeting, prepared by a professional Court Reporting service, is attached hereto as Exhibit F.

23.    Monument Realty views its rights and interests in the Bus Garage as unique and irreplaceable. Depriving Monument Realty of those rights and interests constitutes irreparable harm. Those rights and interests are not only unique real estate rights and interests, but it would be extremely difficult to determine the actual monetary damages to Monument Realty if those rights and interests were taken away.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on October 9, 2007.

F. Russell Hines

# EXHIBIT A



Adapted from map located at: www.jdland.com/dc

# EXHIBIT B



**The**
# Anacostia
Waterfront Corporation

**FOR IMMEDIATE RELEASE:**
**MONDAY, DECEMBER 12, 2005**

**CONTACT: DAVID HOWARD**
(202) 468-0898

## ANACOSTIA WATERFRONT CORPORATION ANNOUNCES DESIGNATED DEVELOPERS FOR BASEBALL DISTRICT DEVELOPMENT

(Washington DC) On Monday, December 12, 2005 the Anacostia Waterfront Corporation (AWC) announced the selection of designated developers for sites in the area surrounding the new Washington Nationals ballpark that will be built on the banks of the Anacostia River in southeast Washington DC. The team of Forest City Washington, Inc., Western Development Corporation, The Jarvis Company, The Jair Lynch Companies and MacFarlane Partners-DC and the team of Monument Realty, LLC, the Cordish Company, and Triden Development Group will both have the opportunity to enter into exclusive negotiations with AWC to develop different mixed-use projects on two publicly owned sites that AWC is presently seeking to acquire near the ballpark.

AWC released a Request for Expressions of Interest (RFEI) for mixed-use development in the area surrounding the new Washington Nationals ballpark on September 16, 2005. The RFEI was issued as an open invitation to qualified developers with experience in large scale mixed use, retail, sports-related and waterfront development. AWC received nine proposals from nationally recognized groups to develop the area into a one-of-a-kind mixed use residential, retail, and office district.

"These are great teams with strong local capacity and extensive retail and mixed-use development credentials," said Adrian Washington, AWC's new President and CEO. "This brings us one step closer to fulfilling AWC's mission of creating new waterfront districts that increase neighborhood amenities and create exciting new destinations at the river" Washington also noted.

The twelve-week selection process represents the first developer solicitation facilitated by the newly formed AWC, an independent instrumentality of the District Government "The ballpark and development program proposed by the development teams is expected to bring millions of people annually to the waterfront, generate new tax revenue, create thousands of permanent jobs and provide a range of affordable and market-rate housing—all helping to fulfill the promise of the Anacostia Waterfront Initiative and accelerate economic benefits for the entire city" said Stephen Goldsmith, AWC Board Chair.

"The development envisioned by the Anacostia Waterfront Corporation and the development teams will result in tens of millions of dollars in tax revenue to the District, said Mayor Anthony A. Williams. "This tax revenue is a direct result of building a ballpark in Southeast, and it will significantly benefit the entire city. I applaud the speed with which AWC designated this 'All Star

Team' of developers who will participate in the waterfront district development. We need to keep up the pace set by the construction of the ballpark to ensure that the area supports new retail and entertainment venues and provides tax revenues that contribute to the Community Benefit Fund."

The two developer teams will work with AWC to create a comprehensive Development Strategy for the area over the next 90 days and negotiate exclusive rights agreements for the development of parcels to be acquired by AWC with the goal of Council approval by July, 2006.

The power point presentation from the today's announcement is available on the Anacostia Waterfront Corporation website at www.anacostiawaterfront.net.

*About the Anacostia Waterfront Corporation: The Anacostia Waterfront Corporation is an instrumentality of the Government of the District of Columbia charged with the development and revitalization of underutilized public lands along the Anacostia River and the advocacy and coordination of environmental and programming initiatives that promote river clean up and public awareness and enjoyment of the river. Further information about the Corporation and the Anacostia Waterfront Initiative framework plan can be found on our website (http://www.anacostiawaterfront.net). AWC is governed by a Board of Directors consisting of nine public citizens, two District of Columbia officials and four non-voting Federal Government ex-officio representatives.*

XXX

# EXHIBIT C



## Home   News   Calendar   Columns
## Government   Elections   Organizations
## Links   Bibliography   Photos   Search

Back to Office of Planning main page — Back to Anacostia Waterfront Act of 2003, Bill 15-616

# Councilmember Harold Brazil
## Comments in Council Committee on Economic Development Hearing on the District of Columbia Anacostia Waterfront Act of 2003, Bill 15-616
*June 1, 2004*

Home                    6/1/2004

Bibliography            **HB Talking Points**

Calendar                **Anacostia Waterfront Corporation Act**

Columns
Dorothy Brizill         Good afternoon.
Bonnie Cain
Jim Dougherty           I am Harold Brazil, chairman of the Council's Committee on Economic Development.
Gary Imhoff
Phil Mendelson
Mark David Richards     Today is Tuesday, June 1, 2004. The time is now
Sandra Seegars

DCPSWatch               We are in the Council Chamber at the John A. Wilson Building, 1350 Pennsylvania
                        Avenue, NW.
DCWatch
Archives                I am calling to order this additional meeting of the Committee on Economic
Council Period 12       Development.
Council Period 13
Council Period 14
Election 1998           There is a quorum present, consisting of myself and Councilmembers _____ and
Election 2000           _____.
Election 2002

Elections               The sole item on the agenda for today's meeting is consideration and vote on Bill 15-
Election 2004           616, the Anacostia Waterfront Corporation Act of 2004.
Election 2006

Government              This legislation, introduced by Chairman Cropp on behalf of the Mayor, would
and People              establish the Anacostia Waterfront Corporation as a new independent instrumentality of
ANC's                   the District.
Anacostia Waterfront
Corporation
Auditor                 The Corporation would be responsible for the redevelopment and revitalization of the
Boards and Com          lands adjacent to the Anacostia River.
BusRegRefCom
Campaign Finance
Chief Financial

Officer
Chief Management Officer
City Council
Congress
Control Board
Corporation Counsel
Courts
DC2000
DC Agenda
Elections and Ethics
Fire Department
FOI Officers
Inspector General
Health
Housing and Community Dev.
Human Services
Legislation
Mayor's Office
Mental Health
Motor Vehicles
Neighborhood Action
National Capital Revitalization Corp.
Planning and Econ. Dev.
Planning Office of Police Department
Property Management
Public Advocate
Public Libraries
Public Schools
Public Service Commission
Public Works
Regional Mobility Panel
Sports and Entertainment Com.
Taxi Commission
Telephone Directory
University of DC
Water and Sewer Administration
Youth Services Administration
Zoning Commission

Issues in DC Politics

Budget issues
DC Flag
DC General, PBC
Gun issues
Health issues
Housing initiatives
Mayor's mansion
Public Benefit Corporation
Regional Mobility
Reservation 13
Tax Rev Comm
Term limits repeal
Voting rights, statehood
Williams's Fundraising Scandals

Links

Organizations
Appleseed Center

The establishment of this Corporation is a significant milestone in the economic revitalization of the District, and our efforts to bring jobs and business opportunities to our residents.

The Corporation, and the Anacostia Waterfront Revitalization Plan which it will carry out, will bring thousands of new jobs to District residents and construction projects and community development to underserved areas of the District.

It will bring billions of dollars in investment; millions of dollars annually in tax dollars; and reconnect, rather than divide, the District through this waterway.

More specifically, the Plan includes 100 acres of new waterfront public spaces with a 20-mile Riverwalk and Trail System; over 600,000 square feet of new retail space; more than 4,500 new residences; and over 3 million square feet of new commercial uses.

The changes will be most evident in eight targeted areas, including: Southwest Waterfront, South Capitol Street corridor, Near Southeast, Hill East, Poplar Point, East of the River Gateways, Kingman and Heritage Islands, and Anacostia Riverwalk and RiverParks.

The Corporation will be governed by a 12-member board of directors consisting of six public members appointed by the Mayor with the advice and consent of the Council; one member of the Board of Directors of the National Capital Revitalization Corporation, two ex-officio members (the Mayor and the Chief Financial Officer); the Secretary of the United States Department of the Interior; the Chairman of the National Capital Planning Commission; and the Administrator of the United States General Services Administration. The Interior Secretary, NCPC Chairman, and GSA Administrator would be non-voting members of the Board.

In order to achieve the goals of bringing about the development, redevelopment, and revitalization of the Anacostia Waterfront, the Corporation would be authorized to provide economic assistance to eligible projects through the making of loans and grants.

In addition, the Corporation would be authorized to exercise eminent domain in the Anacostia Waterfront area and to establish subsidiaries. The Corporation would also have the authority to issue revenue bonds, but would have no taxing authority.

The legislation also contains LSDBE and District resident hiring requirements.

Finally, the legislation contains provisions related to the transfer of certain properties along the Southwest Waterfront from the National Capital Revitalization Corporation to the Corporation and the distribution of income from former Redevelopment Land Agency properties between the District and the RLA Revitalization Corporation. These provisions are elements of an agreement entered into between the Mayor and NCRC to compensate NCRC for the value of properties transferred to the Corporation and to strengthen the ability of NCRC to carry out its mission of revitalizing District neighborhoods.

In the Committee Print, we have made many changes based on concerns raised by

Cardozo Shaw
Neigh.Assoc.
Committee of 100
Fed of Citizens
Assocs
League of Women
Voters
Parents United
Shaw Coalition

Photos

Search

What Is
DCWatch?

themail
archives

Councilmembers and the public.

For example, the activities of the Corporation are now strictly limited to the Waterfront area; the purposes of the Corporation include the environmental revitalization of the Anacostia River itself; the Anacostia Waterfront Framework Plan is now incorporated into the legislation and shall act as the guiding document for the Corporation; the powers of the Corporation are limited to facilitating certain actions (such as zoning and planning), rather than taking on these actions on its own; the Board of the Corporation now contains non-voting federal representation, to reflect federal agencies' large land-ownings in this area; Council review of Corporation actions is more consistently applied; and, very importantly, there are very specific and strong LSDBE and District resident hiring provisions.

The goals of the Corporation are extremely important ones for the District to pursue. The Anacostia Waterfront represents a huge and largely untapped economic development resource for the District.

The Southwest Waterfront, Poplar Point, the Southeast Federal Center, Reservation 13, and the Stadium-Armory Complex present significant opportunities for creating new and vibrant neighborhoods and increasing and broadening the District's tax base.

Moreover, revenue from these projects can and will be leveraged to subsidize and catalyze projects at neighborhood gateways east of the Anacostia River.

In addition, the Anacostia Riverfront represents an underutilized natural and recreational resource, which can be enhanced through a coordinated program to increase access points, create a contiguous river walk, increase or improve recreational spaces, and improve the environmental integrity of the Anacostia River.

Through these improvements, the Anacostia River can become a landmark which unites the District, rather than the current view of the River as a waterway that divides the District.

Creation of a new independent instrumentality of the District is necessary to achieve the redevelopment and revitalization of the Anacostia Waterfront. It is important that the responsibility for this redevelopment and revitalization be placed in an independent agency to ensure that the District has the resources and flexibility to achieve the goals and complex projects with which it has been tasked.

In addition, it is important that a new, separate entity be created to achieve these goals in order to ensure that the entity will have a singular and long-term focus, with a board and staff that is not responsible for other plans or projects which will siphon energy and resources from the Corporation's core mission.

I move Bill 15-616, the Committee Print and Committee Report, with leave for staff to make technical corrections and conforming changes.

Is there any discussion?

Back to top of page

Send mail with questions or comments to webmaster@dcwatch.com
Web site copyright ©DCWatch (ISSN 1546-4296)

EXHIBIT D

# PROCUREMENT PROCEDURES MANUAL
## TENTH EDITION (2004)





**WMATA PROCUREMENT PROCEDURES MANUAL**
**TABLE OF CONTENTS**


**TABLE OF CONTENTS**
**AND GENERAL STRUCTURE**

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

W.M.A.T.A. PROCUREMENT PROCEDURES MANUAL (PPM) . . . . . . . . . . . . . . . . . . . xiii
    PURPOSE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xiii
    AUTHORITY AND APPLICABILITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xiii
    HOW TO USE AND TO RECOMMEND CHANGES TO THE MANUAL . . . . . . xiii
    REVISIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xiv
    DISCLAIMER   (Rev. 10) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xv

**CHAPTER 1 - PROCUREMENT POLICY STATEMENT** . . . . . . . . . . . . . . . . . . . . Ch. 1  Pg. 3
  I.    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 1  Pg. 3
  II.    Procurement Regulations Background . . . . . . . . . . . . . . . . . . . . . . . Ch. 1  Pg. 3
  III.    General Policy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 1  Pg. 3
  IV.    Procurement Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 1  Pg. 6
  V.    Competition Requirements and Methods of Procurement . . . . . . . . Ch. 1  Pg. 8
  VI.    Contracting  with Disadvantaged Business Enterprise (DBE) . . . . Ch. 1  Pg. 10
  VII.    Cost and Price Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 1  Pg. 11
  VIII.    Bonding Requirements  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 1  Pg. 11
  IX.    Options . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 1  Pg. 11
  X.    Advance Payments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 1  Pg. 11
  XI.    Progress Payments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 1  Pg. 11
  XII.    Liquidated Damages Provisions . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 1  Pg. 12
  XIII.    Statutory and Regulatory Requirements . . . . . . . . . . . . . . . . . . . Ch. 1  Pg. 12
  XIV.    Contracting Officer Authority . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 1  Pg. 12
  XV.    Contract Approval Requirements . . . . . . . . . . . . . . . . . . . . . . . . Ch. 1  Pg. 12
  XVI.    Reports . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 1  Pg. 14
  XVII.    Special Agreements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 1  Pg. 14
  XVIII.    Implementation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 1  Pg. 14
  XIX.    Deviation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 1  Pg. 14

**CHAPTER 2 - PROCUREMENT INTEGRITY AND CONTROL** . . . . . . . . . . . . . Ch. 2  Pg. 1
  200    PURPOSE AND SCOPE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 2  Pg. 1
  201    BACKGROUND AND AUTHORITY . . . . . . . . . . . . . . . . . . . . . . . Ch. 2  Pg. 1
  202    FEDERAL CONTROLS AND LIMITATIONS . . . . . . . . . . . . . . . . Ch. 2  Pg. 1
  203    AUTHORITY CONTROLS AND LIMITATIONS . . . . . . . . . . . . . . Ch. 2  Pg. 2
  204    AMENDMENTS AND DEVIATIONS . . . . . . . . . . . . . . . . . . . . . . Ch. 2  Pg. 2
  205    PROCUREMENT PROCEDURES MANUAL . . . . . . . . . . . . . . . . . Ch. 2  Pg. 2
  206    CONTRACTING OFFICER AUTHORITY . . . . . . . . . . . . . . . . . . . Ch. 2  Pg. 3
  207    AUTHORITY AND RESPONSIBILITIES OF CONTRACTING OFFICERS
    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 2  Pg. 3
  208    SYSTEM FOR CONTRACTING OFFICER DELEGATIONS . . . . . . Ch. 2  Pg. 4

i

## WMATA PROCUREMENT PROCEDURES MANUAL
## TABLE OF CONTENTS

209    UNAUTHORIZED PROCUREMENTS ....................... Ch. 2 Pg. 5
210    STANDARDS OF CONDUCT  (Rev. 2) ..................... Ch. 2 Pg. 6
211    REPORTING OF SUSPECTED IMPROPER OR UNLAWFUL CONDUCT
       ..................................................... Ch. 2 Pg. 8
212    PROHIBITION AGAINST CONTINGENT FEES ............... Ch. 2 Pg. 9
213    ADDITIONAL STANDARDS OF CONDUCT  ................. Ch. 2 Pg. 9

CHAPTER 3 - DISADVANTAGED BUSINESS ENTERPRISE REQUIREMENTS  (Rev. 8)
       ..................................................... Ch. 3 Pg. 1
300    PURPOSE AND SCOPE  (Rev. 8) ........................ Ch. 3 Pg. 1
301    DEFINITIONS  (Rev. 8) ............................... Ch. 3 Pg. 1
302    DBE POLICIES  (Rev. 8) .............................. Ch. 3 Pg. 2
303    DBE GOAL-SETTING PROCEDURES  (Rev. 8) ............. Ch. 3 Pg. 3
304    RACE-CONSCIOUS AND RACE-NEUTRAL EFFORTS  (Rev. 8) . Ch. 3 Pg. 4
305    SOLICITATION REQUIREMENTS  (Rev. 8) ............... Ch. 3 Pg. 4
306    BID AND PROPOSAL REQUIREMENTS  (Rev. 8) ........... Ch. 3 Pg. 5
307    CONTRACT ADMINISTRATION REQUIREMENTS  (Rev. 8) ..... Ch. 3 Pg. 6
308    PROCEDURAL STEPS BY DEPARTMENT  (Rev. 8) .......... Ch. 3 Pg. 7
309    CONTRACT FILES  (Rev. 8) ........................... Ch. 3 Pg. 8

CHAPTER 4 - PROCUREMENT PLANNING AND METHODS  ............... Ch. 4 Pg. 1
400    PURPOSE AND SCOPE  ................................ Ch. 4 Pg. 1
401    RESPONSIBILITIES .................................. Ch. 4 Pg. 1
402    CONTACTS WITH PROSPECTIVE CONTRACTORS  (Rev. 2) ... Ch. 4 Pg. 1
403    PUBLICIZING CONTRACT ACTIONS  (Rev. 10) ........... Ch. 4 Pg. 2
404    INITIATION AND APPROVAL OF PROCUREMENT ACTIONS  (Rev. 4, 5 and 10)
       ..................................................... Ch. 4 Pg. 3
405    SPECIFICATIONS AND PURCHASE DESCRIPTIONS  (Rev. 4 and 10)
       ..................................................... Ch. 4 Pg. 4
406    AUTHORIZED METHODS OR PROCUREMENT  (Rev. 5) ....... Ch. 4 Pg. 6
407    MULTI-YEAR CONTRACTS  (Rev. 5 and 10) ............. Ch. 4 Pg. 7
408    INDEFINITE DELIVERY CONTRACTS ..................... Ch. 4 Pg. 9
409    USE OF OPTIONS  (Rev. 5) ........................... Ch. 4 Pg. 10
410    SOLICITATION OF CONTRACTS WITH OPTIONS  (Rev. 3 and 5)
       ..................................................... Ch. 4 Pg. 12
411    EXERCISE OF OPTIONS  (Rev. 4 and 5) ............... Ch. 4 Pg. 13
412    ADVANCE PROCUREMENT PLANNING  (Rev. 2) ........... Ch. 4 Pg. 14
413    STOCK REPLENISHMENT PROCUREMENT GUIDELINES  (Rev. 5)
       ..................................................... Ch. 4 Pg. 15
414    COMPETITION  (Rev. 5) .............................. Ch. 4 Pg. 16
415    PRE-QUALIFICATION CRITERIA  (Rev. 5) .............. Ch. 4 Pg. 17
416    ORDERING FROM FEDERAL SUPPLY SCHEDULES  (Rev. 9) . Ch. 4 Pg. 17
417    ORDERING FROM COUNCIL OF GOVERNMENTS CONTRACTS  (Rev. 9)
       ..................................................... Ch. 4 Pg. 20
418    ORGANIZATIONAL CONFLICTS OF INTEREST  (New Rev. 10)
       ..................................................... Ch. 4 Pg. 20

ii

WMATA PROCUREMENT PROCEDURES MANUAL
TABLE OF CONTENTS

419    REVENUE CONTRACTS   (New Rev. 10) . . . . . . . . . . . . . . . . . . . Ch. 4  Pg. 21

**CHAPTER 5 - PROCUREMENT BY COMPETITIVE SEALED BIDDING** . . . . . . . Ch. 5  Pg. 1
500    PURPOSE AND SCOPE   (Rev. 5) . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 5  Pg. 1
501    INVITATION FOR BIDS   (Rev. 5) . . . . . . . . . . . . . . . . . . . . . . . . Ch. 5  Pg. 1
502    PREPARATION OF THE INVITATION FOR BIDS . . . . . . . . . . . . . Ch. 5  Pg. 2
503    BID REQUIREMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 5  Pg. 3
504    TIME FOR SUBMISSION OF BIDS . . . . . . . . . . . . . . . . . . . . . . . Ch. 5  Pg. 4
505    TELEGRAPHIC BIDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 5  Pg. 4
506    BID SAMPLES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 5  Pg. 4
507    DESCRIPTIVE LITERATURE . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 5  Pg. 5
508    FACSIMILE BIDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 5  Pg. 6
509    NOTICES OF INVITATIONS FOR BIDS . . . . . . . . . . . . . . . . . . . . Ch. 5  Pg. 6
510    RECORDS OF INVITATIONS FOR BIDS AND BIDS . . . . . . . . . . . Ch. 5  Pg. 7
5l1    SOLICITATION  MAILING LISTS . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 5  Pg. 7
512    EXCESSIVELY LONG MAILING LISTS . . . . . . . . . . . . . . . . . . . . Ch. 5  Pg. 7
513    PRE-BID CONFERENCES . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 5  Pg. 7
514    AMENDMENT OF INVITATIONS FOR BIDS   . . . . . . . . . . . . . . . Ch. 5  Pg. 8
515    CANCELLATION OF INVITATIONS FOR BIDS BEFORE OPENING
       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 5  Pg. 8
516    SUBMISSION OF BIDS:  GENERAL PROVISIONS . . . . . . . . . . . . Ch. 5  Pg. 9
517    MODIFICATION OF WITHDRAWAL OF BIDS . . . . . . . . . . . . . . . Ch. 5  Pg. 9
518    LATE BIDS, LATE MODIFICATIONS, AND LATE WITHDRAWALS
       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 5  Pg. 10
519    NOTICE TO BIDDERS OF LATE ACTIONS . . . . . . . . . . . . . . . . Ch. 5  Pg. 11
520    RECEIPT AND SAFEGUARDING OF BIDS . . . . . . . . . . . . . . . . Ch. 5  Pg. 12
521    OPENING OF BIDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 5  Pg. 12
522    POSTPONEMENT OF BID OPENING . . . . . . . . . . . . . . . . . . . . Ch. 5  Pg. 13
523    RECORDING OF BIDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 5  Pg. 13
524    CANCELLATION OF AN INVITATION FOR BIDS AFTER OPENING   (Rev. 5)
       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 5  Pg. 14
525    REJECTION OF INDIVIDUAL BIDS   (Rev. 5) . . . . . . . . . . . . . . . Ch. 5  Pg. 15
526    ALL OR NONE QUALIFICATIONS . . . . . . . . . . . . . . . . . . . . . . . Ch. 5  Pg. 16
527    MINOR INFORMALITIES OR IRREGULARITIES IN BIDS . . . . . . Ch. 5  Pg. 16
528    MISTAKES IN BIDS BEFORE AWARD   (Rev. 6) . . . . . . . . . . . . . Ch. 5  Pg. 17
529    MISTAKES IN BIDS AFTER AWARD . . . . . . . . . . . . . . . . . . . . . Ch. 5  Pg. 18
530    BID EVALUATION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 5  Pg. 19
531    CONTRACT AWARDS   (Rev. 2) . . . . . . . . . . . . . . . . . . . . . . . . Ch. 5  Pg. 19
532    ECONOMIC PRICE ADJUSTMENT . . . . . . . . . . . . . . . . . . . . . . Ch. 5  Pg. 20
533    RESOLVING TIE BIDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 5  Pg. 20
534    INFORMATION TO BIDDERS . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 5  Pg. 21
535    TWO-STEP SEALED BIDDING . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 5  Pg. 21
536    CONDITIONS FOR USE OF TWO-STEP SEALED BIDDING . . . . Ch. 5  Pg. 21
537    SOLICITATION-STEP ONE . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 5  Pg. 22
538    RECEIPT AND EVALUATION OF STEP ONE PROPOSALS . . . . Ch. 5  Pg. 23
539    STEP-TWO PROCEDURES . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 5  Pg. 24

**WMATA PROCUREMENT PROCEDURES MANUAL**
**TABLE OF CONTENTS**

540   UNBALANCED BIDS ................................. Ch. 5 Pg. 24

**CHAPTER 6 - PROCUREMENT BY COMPETITIVE NEGOTIATIONS** ......... Ch. 6 Pg. 1
600   SCOPE AND PURPOSE .............................. Ch. 6 Pg. 1
601   AUTHORITY TO NEGOTIATE  (Rev. 5) ..................... Ch. 6 Pg. 1
602   CANCELLATION OF A REQUEST FOR PROPOSAL  (Rev. 5) ... Ch. 6 Pg. 1
603   SOLICITATION OF PROPOSALS .......................... Ch. 6 Pg. 2
604   PRESOLICITATION NOTICES AND CONFERENCES .......... Ch. 6 Pg. 2
605   PRE-PROPOSAL CONFERENCES ........................ Ch. 6 Pg. 3
606   AMENDMENT OF SOLICITATIONS BEFORE CLOSING DATE ... Ch. 6 Pg. 4
607   RECEIPT OF PROPOSALS ............................. Ch. 6 Pg. 4
608   LATE PROPOSALS, LATE MODIFICATIONS, AND LATE WITHDRAWALS
      ................................................ Ch. 6 Pg. 5
609   DISCLOSURE AND USE OF INFORMATION BEFORE AWARD .. Ch. 6 Pg. 5
610   UNSOLICITED PROPOSALS ............................ Ch. 6 Pg. 6
611   EVALUATION OF UNSOLICITED PROPOSALS ............... Ch. 6 Pg. 7
612   SOURCE SELECTION  (Rev. 5) .......................... Ch. 6 Pg. 8
613   RESPONSIBILITIES  (Rev. 5) ........................... Ch. 6 Pg. 9
614   EVALUATION FACTORS ............................... Ch. 6 Pg. 10
615   CHANGES IN AUTHORITY REQUIREMENTS ............... Ch. 6 Pg. 11
616   DISCLOSURE OF MISTAKES BEFORE AWARD ............. Ch. 6 Pg. 12
617   PROPOSAL EVALUATION  (Rev. 4 and 5) .................. Ch. 6 Pg. 12
618   COMPETITIVE RANGE ............................... Ch. 6 Pg. 13
619   DISCUSSIONS WITH OFFERORS ........................ Ch. 6 Pg. 14
620   BEST AND FINAL OFFERS ............................ Ch. 6 Pg. 15
621   PRICE NEGOTIATION ................................ Ch. 6 Pg. 16
622   PRE-NEGOTIATION OBJECTIVES ........................ Ch. 6 Pg. 17
623   SUMMARY NEGOTIATION MEMORANDUM ................. Ch. 6 Pg. 17
624   PROFIT OR FEES .................................. Ch. 6 Pg. 18
625   PROFIT ANALYSIS FACTORS .......................... Ch. 6 Pg. 18
626   NOTIFICATIONS AND DEBRIEFING ...................... Ch. 6 Pg. 20
627   DESIGN-BUILD SELECTION PROCEDURES  (Rev. 7) ........ Ch. 6 Pg. 21

**CHAPTER 7 - SOLE SOURCE, EMERGENCY AND OTHER NON-COMPETITIVE PROCUREMENTS** ............................................ Ch. 7 Pg. 1
700   PURPOSE AND SCOPE  (Rev. 10) ........................ Ch. 7 Pg. 1
701   GENERAL PROVISIONS  (Rev. 5 and 10) .................. Ch. 7 Pg. 1
702   SOLE SOURCE PROCUREMENT  (Rev. 5 and 10) ........... Ch. 7 Pg. 3
703   SINGLE AVAILABLE SOURCE  (Rev. 5 and 10) ............. Ch. 7 Pg. 4
704   NEGOTIATED SOLE SOURCE DETERMINATION AND FINDINGS  (Rev. 4 and
      10) ............................................ Ch. 7 Pg. 5
705   SOLE SOURCE PROCUREMENT PROCEDURES  (Rev. 10) .... Ch. 7 Pg. 5
706   EMERGENCY PROCUREMENTS .......................... Ch. 7 Pg. 6
707   EMERGENCY PROCUREMENT DETERMINATIONS AND FINDINGS  (Rev. 4)
      ................................................ Ch. 7 Pg. 7
708   EMERGENCY PROCUREMENT PROCEDURES .............. Ch. 7 Pg. 8

iv

**WMATA PROCUREMENT PROCEDURES MANUAL**
**TABLE OF CONTENTS**

**CHAPTER 8 - ARCHITECT-ENGINEER AND RELATED SERVICES** . . . . . . . . . . Ch. 8 Pg. 1
    800    PURPOSE AND SCOPE  (Rev. 5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 8 Pg. 1
    801    ARCHITECT ENGINEER POLICY  (Rev. 5) . . . . . . . . . . . . . . . . . . Ch. 8 Pg. 1
    802    SELECTION OF FIRMS FOR ARCHITECT-ENGINEER CONTRACTS
          . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 8 Pg. 2
    803    EVALUATION BOARDS  (Rev. 5) . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 8 Pg. 2
    804    NEGOTIATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 8 Pg. 4
    805    RELEASE OF INFORMATION ON FIRM SELECTION . . . . . . . . . . Ch. 8 Pg. 5
    806    SIMPLIFIED PROCEDURES  (Rev. 5) . . . . . . . . . . . . . . . . . . . . . . Ch. 8 Pg. 5
    807    EVALUATION OF CONTRACTORS . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 8 Pg. 5
    808    RETENTION OF RECORDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 8 Pg. 6
    809    AUTHORITY COST ESTIMATE . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 8 Pg. 6
    810    ARCHITECT-ENGINEER LIABILITY . . . . . . . . . . . . . . . . . . . . . . . . Ch. 8 Pg. 7
    811    ADDITIONAL A-E CONTRACT GUIDELINES . . . . . . . . . . . . . . . . Ch. 8 Pg. 7

**CHAPTER 9 - CONSTRUCTION CONTRACTS** . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 9 Pg. 1
    900    PURPOSE AND SCOPE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 9 Pg. 1
    901    CONSTRUCTION CONTRACTS  (Rev. 5) . . . . . . . . . . . . . . . . . . . Ch. 9 Pg. 1
    902    CONSTRUCTION LABOR STANDARDS . . . . . . . . . . . . . . . . . . . . Ch. 9 Pg. 3
    903    VALUE ENGINEERING  (Rev. 2 and 5) . . . . . . . . . . . . . . . . . . . . Ch. 9 Pg. 5

**CHAPTER 10 - CONTRACT MANAGEMENT AND ADMINISTRATION** . . . . . . . Ch. 10 Pg. 1
    1000   PURPOSE AND SCOPE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 10 Pg. 1
    1001   AUTHORITY AND RESPONSIBILITY . . . . . . . . . . . . . . . . . . . . . Ch. 10 Pg. 1
    1002   APPROVAL OF AWARD ACTIONS  (Rev. 3) . . . . . . . . . . . . . . . Ch. 10 Pg. 1
    1003   PRE-AWARD ORIENTATION . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 10 Pg. 2
    1004   POST-AWARD CONFERENCE . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 10 Pg. 3
    1005   POST-AWARD CONFERENCE WITH SUBCONTRACTORS . . . . Ch. 10 Pg. 4
    1006   CONTRACT EXECUTION BY THE AUTHORITY . . . . . . . . . . . . Ch. 10 Pg. 4
    1007   CONTRACT EXECUTION BY CONTRACTORS . . . . . . . . . . . . Ch. 10 Pg. 5
    1008   CONTRACT DISTRIBUTION . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 10 Pg. 5
    1009   CONTRACT FILES  (Rev. 2) . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 10 Pg. 5
    1010   CONTRACT MODIFICATIONS  (Rev. 2) . . . . . . . . . . . . . . . . . . Ch. 10 Pg. 7
    1011   CHANGE ORDERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 10 Pg. 8
    1012   SUSPENSION OF WORK/STOP ORDER . . . . . . . . . . . . . . . . . Ch. 10 Pg. 10
    1013   TERMINATION  (Rev. 5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 10 Pg. 11
    1014   DELIVERY AND PERFORMANCE . . . . . . . . . . . . . . . . . . . . . . . Ch. 10 Pg. 12
    1015   ADDITIONAL CONTRACT COMPLIANCE . . . . . . . . . . . . . . . . . Ch. 10 Pg. 14
    1016   LIQUIDATED DAMAGES  (Rev. 10) . . . . . . . . . . . . . . . . . . . . . Ch. 10 Pg. 15
    1017   SUBCONTRACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 10 Pg. 16
    1018   CLOSEOUT OF CONTRACTS  (Rev. 2) . . . . . . . . . . . . . . . . . . Ch. 10 Pg. 19
    1019   AUTHORITY PROPERTY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 10 Pg. 20
    1020   DELEGATION OF AUTHORITY TO COTR/COR  (Rev. 5) . . . . Ch. 10 Pg. 20
    1021   LOCATION OF NEGOTIATION MEETINGS  (Rev. 5) . . . . . . . Ch. 10 Pg. 22

**WMATA PROCUREMENT PROCEDURES MANUAL**
**TABLE OF CONTENTS**

**CHAPTER 11 - SIMPLIFIED ACQUISITION PROCEDURES** . . . . . . . . . . . . . . Ch. 11  Pg. 1
   1100  PURPOSE AND SCOPE  (Rev. 5) . . . . . . . . . . . . . . . . . . . . . . . Ch. 11  Pg. 1
   1101  USE OF SIMPLIFIED ACQUISITION PROCEDURES   (Rev. 5) . . Ch. 11  Pg. 1
   1102  SIMPLIFIED ACQUISITION PROCEDURES AUTHORITY . . . . . . Ch. 11  Pg. 1
   1103  NON-COMPETITIVE SIMPLIFIED ACQUISITION PROCEDURES  (Rev. 5)
      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 11  Pg. 1
   1104  COMPETITIVE SIMPLIFIED ACQUISITIONS   (Rev. 5) . . . . . . . . Ch. 11  Pg. 2
   1105  DETERMINATION OF REASONABLE PRICE AND AWARD . . . . Ch. 11  Pg. 3
   1106  BLANKET PURCHASE AGREEMENTS . . . . . . . . . . . . . . . . . . . Ch. 11  Pg. 4
   1107  BLANKET PURCHASE PROCEDURES . . . . . . . . . . . . . . . . . . . Ch. 11  Pg. 5
   1108  IMPREST FUNDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 11  Pg. 7
   1109  PURCHASE ORDERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 11  Pg. 7
   1110  UNPRICED PURCHASE ORDERS . . . . . . . . . . . . . . . . . . . . . . Ch. 11  Pg. 8
   1111  MODIFICATION OF PURCHASE ORDERS . . . . . . . . . . . . . . . Ch. 11  Pg. 8
   1112  TERMINATION AND CANCELLATION OF PURCHASE ORDERS
      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 11  Pg. 8
   1113  HANDBOOK FOR SIMPLIFIED ACQUISITIONS . . . . . . . . . . . . Ch. 11  Pg. 9

**CHAPTER 12 - TYPES OF CONTRACTS** . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 12  Pg. 1
   1200  PURPOSE AND SCOPE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 12  Pg. 1
   1201  GENERAL PROVISIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 12  Pg. 1
   1202  SELECTING CONTRACT TYPES . . . . . . . . . . . . . . . . . . . . . . Ch. 12  Pg. 1
   1203  FIXED-PRICE CONTRACTS . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 12  Pg. 2
   1204  FIXED-PRICE CONTRACTS WITH ECONOMIC PRICE ADJUSTMENTS
      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 12  Pg. 3
   1205  FIXED-PRICE CONTRACTS WITH PROSPECTIVE PRICE REDETERMINATION
      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 12  Pg. 4
   1206  COST-REIMBURSEMENT CONTRACTS . . . . . . . . . . . . . . . . . Ch. 12  Pg. 5
   1207  INCENTIVE CONTRACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 12  Pg. 6
   1208  TYPES OF INCENTIVES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 12  Pg. 7
   1209  FIXED-PRICE INCENTIVE CONTRACTS . . . . . . . . . . . . . . . . Ch. 12  Pg. 7
   1210  COST-PLUS-AWARD-FEE CONTRACTS . . . . . . . . . . . . . . . . Ch. 12  Pg. 8
   1211  DEFINITE-QUANTITY CONTRACTS . . . . . . . . . . . . . . . . . . . . Ch. 12  Pg. 9
   1212  TIME-AND--MATERIALS CONTRACT . . . . . . . . . . . . . . . . . . . Ch. 12  Pg. 9
   1213  LABOR-HOUR CONTRACTS . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 12  Pg. 10
   1214  LETTER CONTRACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 12  Pg. 10
   1215  INDEFINITE DELIVERY CONTRACTS  (Rev. 5) . . . . . . . . . . . . Ch. 12  Pg. 11

**CHAPTER 13 - COST PRINCIPLES AND PROPOSAL ANALYSIS** . . . . . . . . . Ch. 13  Pg. 1
   1300  PURPOSE AND SCOPE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 13  Pg. 1
   1301  ADVANCE COST AGREEMENTS . . . . . . . . . . . . . . . . . . . . . . Ch. 13  Pg. 2
   1302  DEVIATION FROM COST PRINCIPLES . . . . . . . . . . . . . . . . . . Ch. 13  Pg. 2
   1303  TOTAL COSTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 13  Pg. 3
   1304  DETERMINING ALLOWABILITY . . . . . . . . . . . . . . . . . . . . . . . Ch. 13  Pg. 3
   1305  DETERMINING REASONABLENESS . . . . . . . . . . . . . . . . . . . . Ch. 13  Pg. 3
   1306  DETERMINING ALLOCABILITY . . . . . . . . . . . . . . . . . . . . . . . Ch. 13  Pg. 4

vi

**WMATA PROCUREMENT PROCEDURES MANUAL**
**TABLE OF CONTENTS**

1307   CREDITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 13  Pg. 4
1308   ACCOUNTING FOR UNALLOWABLE COSTS . . . . . . . . . . . . . . . Ch. 13  Pg. 4
1309   DIRECT COSTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 13  Pg. 5
1310   INDIRECT COSTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 13  Pg. 5
1311   SELECTED COSTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 13  Pg. 6
1312   PROPOSAL ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 13  Pg. 6
1313   COST OR PRICING DATA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 13  Pg. 7
1314   CERTIFIED COST OR PRICING DATA . . . . . . . . . . . . . . . . . . . . Ch. 13  Pg. 7
1315   PRICE ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 13  Pg. 11
1316   COST ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 13  Pg. 11
1317   DETERMINATION AND FINDINGS APPROVAL  (Rev. 4) . . . . . Ch. 13  Pg. 13
1318   PREPARING THE COST ANALYSIS . . . . . . . . . . . . . . . . . . . . . . Ch. 13  Pg. 14
1319   TECHNICAL ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 13  Pg. 14
1320   CONTRACT AUDIT AS A PRICING AID  (Rev. 2) . . . . . . . . . . . Ch. 13  Pg. 14
1321   ADDITIONAL COST AND PRICE ANALYSIS GUIDELINES  (Rev. 2)
       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 13  Pg. 15

**CHAPTER 14 - CONTRACTOR RESPONSIBILITY AND DEBARMENT** . . . . . . . Ch. 14 Pg. 1
1400   PURPOSE AND SCOPE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 14  Pg. 1
1401   RESPONSIBLE PROSPECTIVE CONTRACTORS . . . . . . . . . . . Ch. 14  Pg. 1
1402   SPECIAL STANDARD OF RESPONSIBILITY . . . . . . . . . . . . . . . Ch. 14  Pg. 2
1403   APPLICATION OF WALSH-HEALEY ACT . . . . . . . . . . . . . . . . . Ch. 14  Pg. 2
1404   APPLICATION OF OTHER REQUIREMENTS . . . . . . . . . . . . . . . Ch. 14  Pg. 3
1405   SUBCONTRACTOR RESPONSIBILITY . . . . . . . . . . . . . . . . . . . Ch. 14  Pg. 4
1406   OBTAINING INFORMATION FOR DETERMINATION OF RESPONSIBILITY
       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 14  Pg. 4
1407   DETERMINATIONS AND DOCUMENTATION . . . . . . . . . . . . . . . Ch. 14  Pg. 5
1408   PRE-AWARD SURVEYS  (Rev. 4) . . . . . . . . . . . . . . . . . . . . . . . Ch. 14  Pg. 6
1409   LIST OF EXCLUDED PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 14  Pg. 6
1410   DEBARMENT AND SUSPENSION  (Rev. 1) . . . . . . . . . . . . . . . . Ch. 14  Pg. 7
1411   DEFINITIONS  (Rev. 1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 14  Pg. 7
1412   EFFECT OF LISTING  (Rev. 1) . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 14  Pg. 8
1413   CONTINUATION OF CURRENT CONTRACTS  (Rev. 1) . . . . . . . Ch. 14  Pg. 9
1414   RESTRICTIONS ON SUBCONTRACTING  (Rev. 1) . . . . . . . . . Ch. 14  Pg. 9
1415   DEBARMENT  (Rev. 1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 14 Pg. 10
1416   DEBARMENT PROCEDURES  (Rev. 1) . . . . . . . . . . . . . . . . . . . Ch. 14 Pg. 11
1417   PERIOD OF DEBARMENT  (Rev. 1) . . . . . . . . . . . . . . . . . . . . . . Ch. 14 Pg. 12
1418   SCOPE OF DEBARMENT  (Rev. 1) . . . . . . . . . . . . . . . . . . . . . . Ch. 14 Pg. 13
1419   SUSPENSION  (Rev. 1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 14 Pg. 13
1420   SUSPENSION PROCEDURES  (Rev. 1) . . . . . . . . . . . . . . . . . . . Ch. 14 Pg. 14
1421   PERIOD OF SUSPENSION  (Rev. 1) . . . . . . . . . . . . . . . . . . . . . Ch. 14 Pg. 16
1422   SCOPE OF SUSPENSION  (Rev. 1) . . . . . . . . . . . . . . . . . . . . . . Ch. 14 Pg. 16
1423   CERTIFICATION REGARDING DEBARMENT OR INELIGIBILITY  (Rev. 2)
       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 14 Pg. 16

**CHAPTER 15 - SPECIAL AGREEMENTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 15 Pg. 1

**WMATA PROCUREMENT PROCEDURES MANUAL**
**TABLE OF CONTENTS**

| | | |
|---|---|---|
| 1500 | PURPOSE AND SCOPE | Ch. 15 Pg. 1 |
| 1501 | MASTER AGREEMENTS | Ch. 15 Pg. 1 |
| 1502 | REAL PROPERTY ACQUISITIONS | Ch. 15 Pg. 3 |
| 1503 | REAL PROPERTY DISPOSAL | Ch. 15 Pg. 4 |
| 1504 | PERMITS AND EASEMENTS | Ch. 15 Pg. 5 |
| 1505 | BUS CHARTER SERVICE AGREEMENTS | Ch. 15 Pg. 5 |
| 1506 | OTHER CONTRACTS AND AGREEMENTS | Ch. 15 Pg. 5 |
| 1507 | ASSURANCE FOR USE OF REAL PROPERTY | Ch. 15 Pg. 6 |
| 1508 | JOINT DEVELOPMENT PROCUREMENT REGULATIONS  (Rev. 5) | |
| | | Ch. 15 Pg. 6 |

**CHAPTER 16 - BOND, OTHER SECURITY, AND INSURANCE**  ......... Ch. 16 Pg. 1

| | | |
|---|---|---|
| 1600 | PURPOSE AND SCOPE | Ch. 16 Pg. 1 |
| 1601 | GENERAL PROVISIONS | Ch. 16 Pg. 1 |
| 1602 | BID BONDS AND OTHER SECURITY | Ch. 16 Pg. 2 |
| 1603 | NONCOMPLIANCE WITH BID SECURITY REQUIREMENTS | Ch. 16 Pg. 3 |
| 1604 | PERFORMANCE AND PAYMENT SECURITY  (Rev. 10) | Ch. 16 Pg. 3 |
| 1605 | SURETY BONDS AND OTHER SECURITY | Ch. 16 Pg. 5 |
| 1606 | SURETIES | Ch. 16 Pg. 6 |
| 1607 | INSURANCE REQUIREMENTS  (Rev. 4) | Ch. 16 Pg. 6 |

**CHAPTER 17 - QUALITY ASSURANCE AND WARRANTIES**  ......... Ch. 17 Pg. 1

| | | |
|---|---|---|
| 1700 | PURPOSE AND SCOPE | Ch. 17 Pg. 1 |
| 1701 | AUTHORITY RESPONSIBILITIES | Ch. 17 Pg. 1 |
| 1702 | CONTRACTOR RESPONSIBILITIES | Ch. 17 Pg. 2 |
| 1703 | CONTRACT QUALITY REQUIREMENTS | Ch. 17 Pg. 3 |
| 1704 | WMATA QUALITY ASSURANCE | Ch. 17 Pg. 4 |
| 1705 | CONTRACT QUALITY ASSURANCE AT SOURCE | Ch. 17 Pg. 5 |
| 1706 | CONTRACT QUALITY ASSURANCE AT DESTINATION | Ch. 17 Pg. 5 |
| 1707 | CONTRACT QUALITY ASSURANCE FOR SMALL PURCHASES | |
| | | Ch. 17 Pg. 6 |
| 1708 | CONTRACT QUALITY ASSURANCE OF SUBCONTRACTS | Ch. 17 Pg. 6 |
| 1709 | NONCONFORMING SUPPLIES, SERVICES, OR CONSTRUCTION | |
| | | Ch. 17 Pg. 7 |
| 1710 | ACCEPTANCE | Ch. 17 Pg. 8 |
| 1711 | RESPONSIBILITY FOR ACCEPTANCE | Ch. 17 Pg. 8 |
| 1712 | PLACE OF ACCEPTANCE | Ch. 17 Pg. 9 |
| 1713 | CERTIFICATION OF CONFORMANCE | Ch. 17 Pg. 9 |
| 1714 | TRANSFER OF TITLE AND RISK OR LOSS | Ch. 17 Pg. 9 |
| 1715 | WARRANTIES | Ch. 17 Pg. 10 |

**CHAPTER 18 - PATENTS, COPYRIGHTS, AND PROPRIETARY INFORMATION**
......... Ch. 18 Pg. 1

| | | |
|---|---|---|
| 1800 | PURPOSE AND SCOPE | Ch. 18 Pg. 1 |
| 1801 | GENERAL PROVISIONS | Ch. 18 Pg. 1 |
| 1802 | NOTICE AND ASSISTANCE | Ch. 18 Pg. 1 |

**WMATA PROCUREMENT PROCEDURES MANUAL**
**TABLE OF CONTENTS**

| | | |
|---|---|---|
| 1803 | INDEMNIFICATION | Ch. 18 Pg. 2 |
| 1804 | LICENSING AND ROYALTY INFORMATION | Ch. 18 Pg. 2 |
| 1805 | PATENT RIGHTS UNDER CONTRACTS | Ch. 18 Pg. 4 |
| 1806 | PATENT RIGHTS PROCEDURES | Ch. 18 Pg. 5 |
| 1807 | RIGHTS TO COPYRIGHTED MATERIAL AND PROPRIETARY INFORMATION | Ch. 18 Pg. 7 |
| 1808 | PROPRIETARY OR CONFIDENTIAL INFORMATION IN BIDS AND PROPOSALS | Ch. 18 Pg. 7 |
| 1809 | SOLICITATION AND CONTRACT PROVISION | Ch. 18 Pg. 9 |

**CHAPTER 19 - CONTRACT FINANCING, FUNDING, AND PAYMENT** ....... Ch. 19 Pg. 1

| | | |
|---|---|---|
| 1900 | PURPOSE AND SCOPE | Ch. 19 Pg. 1 |
| 1901 | PROVIDING CONTRACT FINANCING | Ch. 19 Pg. 1 |
| 1902 | USES OF CONTRACTING FINANCING | Ch. 19 Pg. 1 |
| 1903 | DESCRIPTION OF CONTRACT FINANCING METHODS | Ch. 19 Pg. 2 |
| 1904 | ADVANCE PAYMENTS | Ch. 19 Pg. 2 |
| 1905 | PROGRESS PAYMENTS BASED ON COSTS  (Rev. 10) | Ch. 19 Pg. 2 |
| 1906 | PROGRESS PAYMENTS BASED ON A PERCENTAGE OR STAGE OF COMPLETION | Ch. 19 Pg. 4 |
| 1907 | CONSIDERATION FOR PROGRESS PAYMENTS | Ch. 19 Pg. 4 |
| 1908 | SUPERVISION OF PROGRESS PAYMENTS | Ch. 19 Pg. 5 |
| 1909 | REVIEW OR AUDIT OF PROGRESS PAYMENTS | Ch. 19 Pg. 6 |
| 1910 | SUSPENSION OR REDUCTION OF PROGRESS PAYMENTS | Ch. 19 Pg. 6 |
| 1911 | LIQUIDATION RATES | Ch. 19 Pg. 7 |
| 1912 | PROTECTION OF AUTHORITY TITLE | Ch. 19 Pg. 8 |
| 1913 | RISK OF LOSS | Ch. 19 Pg. 8 |
| 1914 | PROGRESS PAYMENTS TO SUBCONTRACTORS | Ch. 19 Pg. 8 |
| 1915 | CONTRACT DEBT DETERMINATION AND COLLECTION | Ch. 19 Pg. 9 |
| 1916 | DEMAND FOR PAYMENT OF CONTRACT DEBT | Ch. 19 Pg. 9 |
| 1917 | NEGOTIATION OF REFUND TO RESOLVE CONTRACT | Ch. 19 Pg. 10 |
| 1918 | SETOFF AND WITHHOLDING OF PAYMENTS | Ch. 19 Pg. 10 |
| 1919 | DEFERRED PAYMENT AGREEMENTS | Ch. 19 Pg. 10 |
| 1920 | CONTRACT DEBT INTEREST CHARGES AND CREDITS | Ch. 19 Pg. 11 |
| 1921 | CONTRACT FUNDING | Ch. 19 Pg. 12 |
| 1922 | LIMITATION OF COST OR FUNDS | Ch. 19 Pg. 13 |
| 1923 | ASSIGNMENT OF CONTRACT PAYMENTS BY CONTRACTORS | Ch. 19 Pg. 14 |
| 1924 | PROCEDURES FOR ASSIGNMENT OF CONTRACT PAYMENTS | Ch. 19 Pg. 15 |
| 1925 | AUTHORITY PAYMENT PROCESS  (Rev. 2) | Ch. 19 Pg. 16 |

**CHAPTER 20 - PROTESTS** .......................................... Ch. 20 Pg. 1

| | | |
|---|---|---|
| 2000 | PURPOSE AND SCOPE | Ch. 20 Pg. 1 |
| 2001 | WRITTEN SUBMISSION | Ch. 20 Pg. 1 |
| 2002 | TIME FOR FILING | Ch. 20 Pg. 2 |
| 2003 | PRE-AWARD/POST-AWARD PROTESTS  (Rev. 10) | Ch. 20 Pg. 2 |

ix

**WMATA PROCUREMENT PROCEDURES MANUAL**
**TABLE OF CONTENTS**

2004   CLOSING THE RECORD-DECISION . . . . . . . . . . . . . . . . . . . . . . . .   Ch. 20  Pg. 3
2005   ACTION PENDING PROTEST DECISION . . . . . . . . . . . . . . . . . . .   Ch. 20  Pg. 4
2006   REMEDY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   Ch. 20  Pg. 4
2007   PROTESTS FILED WITH FTA   (Rev. 10) . . . . . . . . . . . . . . . . . .   Ch. 20  Pg. 5
2008   AUTHORITY ADMINISTRATION OF PROTESTS . . . . . . . . . . . .   Ch. 20  Pg. 5
2009   NOTICE OF PROTEST POLICY REQUIREMENT   (Rev. 4 and 10)
       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   Ch. 20  Pg. 5

**CHAPTER 21 - CLAIMS AND LITIGATION ACTIONS** . . . . . . . . . . . . .   Ch. 21  Pg. 1
2100   PURPOSE AND SCOPE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   Ch. 21  Pg. 1
2101   FTA AND AUTHORITY REQUIREMENTS   (Rev. 3) . . . . . . . . . .   Ch. 21  Pg. 1
2102   CONTRACT DISPUTES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   Ch. 21  Pg. 2
2103   APPEALS TO THE BCA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   Ch. 21  Pg. 3
2104   AUTHORITY CLAIMS AGAINST THE CONTRACTOR . . . . . . . .   Ch. 21  Pg. 3
2105   LITIGATION ACTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   Ch. 21  Pg. 4
2106   COST OR PRICE ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . .   Ch. 21  Pg. 4

**CHAPTER 22 - SPECIAL FEDERAL GRANTEE REQUIREMENTS** . . . . . . . . . .   Ch. 22  Pg. 1
2200   PURPOSE AND SCOPE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   Ch. 22  Pg. 1
2201   CONTRACTOR LABOR REQUIREMENTS . . . . . . . . . . . . . . . . .   Ch. 22  Pg. 1
2202   LABOR SURPLUS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   Ch. 22  Pg. 3
2203   FEDERAL POLICIES FOR ELDERLY AND HANDICAPPED   (Rev. 2)
       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   Ch. 22  Pg. 3
2204   FEDERAL FOREIGN TRADE REQUIREMENTS . . . . . . . . . . . . .   Ch. 22  Pg. 3
2205   ENVIRONMENTAL AND CONSERVATION REQUIREMENTS . . .   Ch. 22  Pg. 4
2206   RESTRICTION ON LOBBYING . . . . . . . . . . . . . . . . . . . . . . . . .   Ch. 22  Pg. 4
2207   ENERGY EFFICIENCY STANDARDS . . . . . . . . . . . . . . . . . . . . .   Ch. 22  Pg. 5
2208   USE OF FLY ASH . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   Ch. 22  Pg. 5
2209   AUDITS OF ROLLING STOCK PURCHASES . . . . . . . . . . . . . .   Ch. 22  Pg. 5
2210   PRIVACY ACT REGARDING FEDERAL RECORDS   (Rev. 2) . . .   Ch. 22  Pg. 5
2211   ADDITIONAL FEDERAL INTEGRITY PROVISIONS   (Rev. 2) . . .   Ch. 22  Pg. 5
2212   DRUG AND ALCOHOL TESTING   (Rev. 4) . . . . . . . . . . . . . . .   Ch. 22  Pg. 6

**CHAPTER 23 - RESERVED** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   Ch. 23  Pg. 1

**CHAPTER 24 - RESERVED** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   Ch. 24  Pg. 1

**CHAPTER 25 - PROCUREMENT FORMS AND PROVISIONS** . . . . . . . . . . . .   Ch. 25  Pg. 1
2500   PURPOSE AND SCOPE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   Ch. 25  Pg. 1
2501   LIMITATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   Ch. 25  Pg. 1
2502   CONTRACT PROVISIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . .   Ch. 25  Pg. 1
2503   ADDITIONAL CONTRACT FORMS . . . . . . . . . . . . . . . . . . . . . .   Ch. 25  Pg. 1
2504   INTERNAL AUTHORITY FORMS . . . . . . . . . . . . . . . . . . . . . . . .   Ch. 25  Pg. 2
2505   DISTRIBUTION OF FORMS AND PROVISIONS . . . . . . . . . . . . .   Ch. 25  Pg. 2

**CHAPTER 26 - DEFINITIONS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   Ch. 26  Pg. 1

x

**WMATA PROCUREMENT PROCEDURES MANUAL**
**TABLE OF CONTENTS**

2600    PURPOSE AND SCOPE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 26  Pg. 1
2601    DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 26  Pg. 1

\* \* \*

xi

# W.M.A.T.A. PROCUREMENT PROCEDURES MANUAL (PPM)

## PURPOSE

**(Third Edition)**

This is the Procurement Procedures Manual (PPM) which consolidates all Authority procurement policies and procedures into a comprehensive reference book for Authority personnel and outside parties having interest in the Authority's procurement process. This PPM includes a Procurement Policy Statement (Chapter One) adopted by the Board of Directors on July 24, 1997, and implementing procedures (Chapter 2-26) issued by the Director, Department of Procurement. <u>Copies of this Manual may be made available for a reasonable handling fee to outside parties.</u> This PPM is intended as a guide to good procurement practices and is to be used as a supplement to sound business judgment in procurement and contracting. Other good sources for procurement information and guidance are the Federal Acquisition Regulations (FAR) and FTA procurement circulars.

## AUTHORITY AND APPLICABILITY

The PPM is issued in accordance with Policy/Instruction 8.4/5 which authorizes a Procurement Manual and Policy/Instruction 1.1/0 which authorizes Departmental manuals to deal with matters affecting the entire Authority, but in areas of responsibility clearly within the authority of an Assistant General Manager or GMGR Staff Office Director.

## HOW TO USE AND TO RECOMMEND CHANGES TO THE MANUAL

As shown in the GENERAL STRUCTURE, the PPM is divided into chapters with Chapter One as the Board Procurement Policy Statement and the remaining chapters based upon selected subject areas. Each chapter has its own page numbers. Some chapters have been reserved for subjects to be added later as the need arises.

As indicated in Chapter One, only the Board of Directors may make changes to the Procurement Policy Statement. Proposed changes, corrections or additions to the PPM should be sent to the Director of Procurement who is responsible for maintaining the PPM and will assign or coordinate as necessary the proposed changes or additions with the appropriate offices.

**CHAPTER 15**
**SPECIAL AGREEMENTS**

## CHAPTER 15 - SPECIAL AGREEMENTS

**1500    PURPOSE AND SCOPE**

1500.1    This Chapter provides regulations and policy required for the effective administration of special agreements including but not limited: utility contracts, marketing agreements, bus charter service agreements, employee benefits contracts, or contracts for the purchase, lease or sale of real property, insurance contracts, and other agreements between the Authority and other entities that are not covered by other chapters of this Manual.

1500.2    Contracting Officers will be delegated responsibility for the sufficiency of the special agreements and shall secure necessary legal, engineering, technical or other appropriate advice within legal, engineering, technical or other appropriate advice within WMATA in fulfilling this responsibility.    They are also responsible for administering special agreements including the assuring of performance on the part of the second parties of these agreements.

1500.3    In accordance with P/I 8.7, "Management Approval Process for Procurement Actions", all special covered by this Chapter shall be treated as procurement transactions and will require clearance and approval as indicated in the P/I 8.7.

**1501    MASTER AGREEMENTS**

1501.1    Master Agreements include service agreements with members of the COMPACT and agreements with the various utility companies, with the railroads, and with other agencies in the COMPACT jurisdictions or the Federal government.

1501.2    The Office of Procurement (PROC) shall maintain a Central Register for recording filing all master utility, bond service and other agreements entered into by the Authority.  The large majority of master agreements will involve utility work during construction.  Master agreements and other similar non-expenditure agreements are to be numbered within the Central Register.   Agreement numbers will be assigned by PROC.

1501.3    Originals of all master agreements processed in accordance with Section 1501 shall be maintained by PROC.

1501.4    Master agreements shall be executed on behalf of the Authority by a Contracting Officer within PROC. The Contracting Officer may appoint a representative from other Authority offices to monitor and direct technical performance and to coordinate the work in accordance with Section 1020 of this Manual.

1501.5    The Department of Transit System Development (TSDV) has responsibility for initiating utility master agreements, work authorizations, and payment authorizations under work authorizations which recommend, where appropriate, payment of utility invoices.

## CHAPTER 15
## SPECIAL AGREEMENTS

1501.6   Master agreements will contain standard Authority contract clauses unless their use is prevented by conflicting utility regulatory requirements.

1501.7   Where the situation indicates that only a single project will be performed by a utility, a specific agreement, as opposed to a master agreement, may be appropriate.

1501.8   Where there is insufficient time for a master agreement, a letter contract executed by Contracting Officer, may be used when the project is deemed urgent.

1501.9   For procedural purposes, a work authorization is regarded as a modification of its master agreement, rather than new procurement.

1501.10  Each work authorization shall be based on an estimate of the cost to perform the work, either supplied by the utility and determined by TSDV to be reasonable, or supplied by TSDV.  TSDV must include in each request for a work authorization determination whether it includes utility betterments.

1501.11  TSDV will prepare modifications to work authorizations where original work authorizations prove insufficient to fund required utility projects.

1501.12  A non-final utility invoice will be paid only if it is part of a sequential series of invoices numbered as such, identifies the work authorization number, the reasons for the charges (including the work performed), and the time period of the service.

A final invoice must be clearly marked "FINAL" and must cite the amount of the contract, the amount previously paid, and the balance due; it need not have a time period of the services identified.

A recapitulation invoice submitted by a utility prior to Authority audit which asks for a small additional Authority payment as a net amount due after the utility has comprehensively reviewed its charges, may be paid without a specific identification by the utility of the reasons for each adjustment.  A large (as a percentage of project cost) recapitulation adjustment will not be paid prior to Authority audit without specific utility justification of each adjustment.

1501.13  TSDV is responsible for certifying on payment authorizations that the invoiced services have been performed, and materials and equipment supplied, and to that end will monitor the presence of utility personnel, material, and equipment on work sites or obtain records of manhour charges by the utility.  TSDV will examine each invoice for possible backcharge to the Authority's construction contractor on the site of the utility work.  In situations where a utility seeks a payment before work can be performed, as for example for a permit, the Project Manager will certify that payment is necessary for required utility work to proceed.

1501.14  Final payment will not be made on any work authorization, and closeout will not be completed, until audit requirements have been met.  For master agreements with work

# CHAPTER 15
## SPECIAL AGREEMENTS

authorizations totaling $100,000 or less, the Contracting Officer may elect to proceed with closeout audit after consultation with the Auditor General and obtaining his consent. Audit is required when the value of the total number of work authorizations issued under a master agreement exceeds $100,000.

1501.15 Orders for services may be placed under master agreements by the Contracting Officer. Orders for services or work authorizations under master agreements for relocation of utility facilities will be processed and administered in accordance with procedures issued by the Assistant General Manager for Transit System Development and approved by the Director of Procurement.

## 1502    REAL PROPERTY ACQUISITIONS

1502.1    Section 12(d) of the Authority's COMPACT, as amended, gives WMATA authority to acquire real property generally by the methods enumerated in this Section, including condemnation.

1502.2    Action to acquire any interest in real property will not be initiated until the real property to be acquired has been certified in accordance with the requirements of Policy Instruction No. 4.9/0.

1502.3    Real property certified pursuant to Section 1502.2 above, shall be acquired in accordance with the policies and procedures set forth in Part 24 - Uniform Relocation Assistance and Real Property Acquisition for Federal and Federally Assisted Programs (49 CFR Part 24). The cited regulations implement the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, as amended, and were promulgated by the Secretary of Transportation through delegation to the Federal Highway Administration. Real Property to be acquired with internally generated funds shall follow the guidance of the Regulations in Part 24, as applicable. The Office of LAND will insure that the Contracting Officer is supplied with current versions of the above referenced statutes and regulations and all other statutes and regulations necessary to evaluate its submittals for Contracting Officer action.

1502.4    The Contracting Officer will prescribe the form to be used (and the required supporting documentation) in requesting approval to initiate the real property acquisition process and for approving other actions related to real property. Each request for Contracting Officer action on real property acquisitions will include explicit identification of the land being acquired with that certified in accordance with the requirements of Policy Instruction No. 4.9/1. Real property acquisitions require concurrence as follows: by the Director of the Office of LAND, the Assistant General Manager, TSDV, the Comptroller for fund availability, and by COUN for legal sufficiency.

1502.5    Acquisition of real property where the fair market value of the property exceeds one million dollars requires approval by FTA. Acquisition of real property where the purchase price exceeds the Authority offer by fifty thousand dollars or more requires approval by FTA.

## CHAPTER 15
## SPECIAL AGREEMENTS

1502.6    The Office of LAND will keep the Contracting Officer informed on pending acquisitions of real property so that he may appoint for each such pending action a Representative, with such authority and duties that the Contracting Officer may set forth in writing. The Contracting Officer's Technical Representative will report to the Contracting Officer no less often than monthly the status of each such pending action, and will report to the Contracting Officer when each pending action is completed so as to require no further action or attention by the Contracting Officer.

1502.7    Whenever possible acquisitions will be by master forms approved by COUN and by the Contracting Officer.

**1503**    **REAL PROPERTY DISPOSAL**

1503.1    Section 12(d) of the Authority's COMPACT, as amended, gives WMATA authority to dispose of real property by sale, exchange, lease, easement, license (or permit).

1503.2    Section 1503 and the following subparagraphs thereof do not apply to the disposal of real property within a Joint Development area.

1503.3    Action to dispose of any interest in real property whether on a permanent or temporary basis (by sale, exchange, lease, easement, license or lesser interests) will not be initiated until the real property interest to be disposed of has been certified for disposition in accordance with the existing Authority policy.

1503.4    Action to dispose of real property acquired under a federal grant or subgrant shall be accomplished in accordance with Section 18.31, Real Property, subpart C - Post-Award Requirements, Part 18 - Uniform Administrative Requirements for Grants and Cooperative Agreements to State and Local Governments (49 CFR Part 18), promulgated by the Secretary of Transportation. Similarly, the Disposal of real property acquired by use of WMATA internally generated funds shall also follow procedures that implement the policy of Section 18.31 to obtain the highest possible economic return under competitive participation to the extent practicable.

1503.5    Action to dispose of any fee interest or any permanent interest in Real property which is tantamount to a fee will not be initiated until the real property has been screened throughout the Authority and the jurisdictions and the General Manager determines that the property is excess and authorizes disposition in accordance with an approved disposal plan.

1503.6    Disposition of real property by sale or by other authorized methods of disposal requires either FTA approval or notification. (Approval is required if property was acquired with grant funds and notification is given if property was acquired with 2/3 - 1/3 appropriated funds).

## CHAPTER 15
## SPECIAL AGREEMENTS

**1504     PERMITS AND EASEMENTS**

1504.1     Permits, easements, revenue producing instruments, and other rights as described in P/I 4.7, "Permits or Easements in WMATA Property" are to be executed by a Contracting Officer in accordance with paragraph 5.2 of P/I 4.7.

**1505     BUS CHARTER SERVICE AGREEMENTS**

1505.1     FTA Regulation, 49 CFR, Part 604, permits the Authority to operate as a subcontractor for bus charter service. The Department of Bus Service shall coordinate and develop policies and procedures for providing bus charter service.

1505.2     The Authority shall enter into written agreements with charter service customers in a standard format with terms and conditions acceptable to the Director of Procurement and the General Counsel. Each agreement shall be prepared by the Department of Bus Service and signed for the Authority by a designated Contracting Officer in the Department of Procurement.

1505.3     Charter Service Orders completed in accordance with the Charter Service Agreements shall be processed and administered by the Department of Bus Service (Bus Subcontract Section).

**1506     OTHER CONTRACTS AND AGREEMENTS**

1506.1     This Section applies to all other contracts and special agreements (including marketing and insurance) prepared for signature by the Contracting Officer under authority delegated by the General Manager. This Section does not apply to marketing documents which do not require a Contracting Officer's signature, such as Fare Media Order Forms, Metrorail One Day Pass Order Forms, Bonus Fares Farecard Request and orders issued under indefinite delivery-indefinite quantity and requirements-type contracts.

1506.2     Prior to entering into any type of contract or special agreement not previously authorized by other provisions of this Regulation, the requesting office will provide the Contracting Officer with an acquisition plan and will comply with existing Authority policies and procedures pertaining to General Manager or Board approval. The requirement for an acquisition plan does not apply to routine marketing agreements, such as Metrochek Voucher Program agreements, blanket purchase agreements with government agencies, WMATA advertising contracts, both A and B versions, Metrochek Voucher Program Farecard Reader Equipment Agreements, Metropool Sales Consignment Agreements, and Retail (off-site) Sale Consignment Agreements. Notwithstanding the waiver of the acquisition plan requirement for these documents, it is required that they be executed by a Contracting Officer.

1506.3     The designated Contracting Officer or his designated representative must be party to all discussions/negotiations with the individual, organization or contractor intended to be a party to the Authority agreement.

CHAPTER 15
SPECIAL AGREEMENTS

1506.4    All contracts and special agreements entered into pursuant to this Section shall:

(a)    Comply with appropriate Authority regulations and laws applicable to the Authority;

(b)    Be coordinated with the Office of General Counsel prior to requesting Contracting Officer signature;

(c)    Be properly coordinated with the Department of Finance if the agreement constitutes a financial commitment on the part of the Authority or revenue to the Authority.

(d)    Be properly documented as to the need for the agreement and the reasons for selecting the source if services or products available from a competitive marketplace are being obtained; and

(e)    Be executed by an authorized Contracting Officer from the Office of Procurement.

**1507    ASSURANCE FOR USE OF REAL PROPERTY**

1507.1    The use of Authority real property by others is to be permitted only upon adequate assurance by the user against loss by WMATA arising out of such use. Additionally, WMATA may not provide assurances against loss arising out of WMATA use of property owned by others without Board approval. Refer to Board Resolution #93-23, adopted May 13, 1993, for further guidance.

**1508    JOINT DEVELOPMENT PROCUREMENT REGULATIONS    (Rev. 5)**

1508.1    The Washington Metropolitan Area Transit Authority (WMATA) defines joint development as a public/private land development program designed to blend WMATA's transit facilities with office, retail and residential development. WMATA's joint development opportunities consist of property interests owned or controlled by WMATA and approved by inclusion in the Joint Development Work Program by the WMATA Board of Directors.

1508. 2    Joint Development is a unique form of procurement and, except as provided in this Chapter or in other, separately published, WMATA regulations which may be issued from time to time, the other provisions of this Manual do not apply.

1508.3    In order to promote the objectives of the Joint Development Program and to provide fair and equitable consideration of all proposals for each joint development opportunity, the guidelines set forth will be followed:

(a)    WMATA will periodically publicize its joint development opportunities in the local and national media and, as necessary, through formal solicitation documents.

(b)    WMATA will entertain proposals for long-term lease, sale, combination lease/sale, or other arrangements. (WMATA prefers transactions other than the sale of its property, but will consider a sale, if it is determined to be in WMATA's best interest.)

Ch. 15  Pg. 6

CHAPTER 15
SPECIAL AGREEMENTS

(c)    WMATA will have a contractor selection process that focuses on achieving a designated developer based on the objectives using good business practices.

(d)    The Disadvantaged Business Enterprise provisions of Chapter 3 will apply to joint development projects.

(e)    WMATA will negotiate final terms with the selected developer within applicable guidelines and conditions of initial selection.

(f)    In evaluating proposals the criteria used by WMATA will generally include the following:

  ••  Enhanced Metrorail and Metrobus ridership;
  ••  Financial benefits accruing to WMATA and the local jurisdiction;
  ••  Market/financial viability of the joint development project;
  ••  Development team experience and prior performance;
  ••  Innovation and creativity;
  ••  Joint development project completion time-line; and
  ••  Compatibility of development with local requirements and transit area.

1508.4    Proposals will be processed as follows:

(a)    The Contracting Officer reviews the proposals, identifies those proposals reasonably susceptible of being selected of being selected for award and informs the Rail Capital Program Committee of receipt of the proposals.

(b)    The Contracting Officer or a designated Evaluation Team conducts a preliminary analysis and evaluation of each proposal.

(c)    The Evaluation Team meets with each developer to receive a developer presentation and conduct specific discussions about the proposal. The discussions will include identifying areas of the proposal that require clarification, improvement, or do not comply with the solicitation document. The developers may be requested to submit revised proposals based on the discussions. (Local jurisdiction representatives may be participate in evaluating a proposer's development concept and provide questions/comments to WMATA staff.)

(d)    A final analysis and evaluation of proposals will be conducted and a report and recommendation of selection of a developer will be submitted to the Rail Capital Program Committee and Board.

(e)    Upon approval of a selected developer, the final terms of an agreement will be negotiated and submitted to the Rail Capital Program Committee and Board for approval.

1508.5    Proposals received which were not in response to a specific solicitation (unsolicited

# CHAPTER 15
## SPECIAL AGREEMENTS

Proposals) will be processed as follows:

(a)   If the site was advertised within the previous year, WMATA may entertain the proposal and proceed solely with that developer provided the initial advertisement gave notice to that effect.

(b)   If the site was never advertised or not advertised within; the previous year, WMATA must advertise the site for at least four weeks and invite additional proposals before it can proceed with the developer who submitted the unsolicited proposal.

(c)   If after advertising the site, WMATA receives no additional proposals, WMATA may entertain the proposal  initially submitted and proceed solely with that developer.

1508.6   WMATA may negotiate a joint development contract with an adjacent property owner without competition and without advertising the availability of WMATA site provided that there is only one adjacent property owner or only one interested adjacent property owner.

1508.7   WMATA hold the contents of all proposals in confidence until developer selection.  The execution of any agreement negotiated between WMATA and the selected developer is contingent upon the approval of WMATA's Board of Directors and the Federal Transit Administration of the U.S. Department of Transportation (FTA).

* * *

# EXHIBIT E



# FOR SALE
# (WITH LEASEBACK)

### PROPERTY OF
### THE WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY
### (WMATA)
**Office of Property Development and Management**
**600 Fifth Street, NW**
**Washington, DC 20001**

Bid No. 08-1
Invitation For Bids For Sale,
With Leaseback,
of
WMATA Property
Lots 857 and 866, Square 700
District of Columbia

**Bid No. 08-1**
**INVITATION FOR BIDS FOR SALE,**
**WITH LEASEBACK,**
**OF**
**WMATA PROPERTY**
Lots 857 and 866, Square 700
District of Columbia

## A.    INVITATION FOR BIDS

1.    **Invitation for Bids.**   The Washington Metropolitan Area Transit Authority ("WMATA") invites interested parties to submit sealed bids in accordance with the terms of this Invitation For Bids For Sale, With Leaseback, of WMATA Property ("Invitation for Bids"). Sealed bids will be received at the Office of Property Development and Management, Washington Metropolitan Area Transit Authority, 600 Fifth Street, NW, Washington, DC 20001 starting **July 30, 2007,** and closing on **August 28, 2007** at **2:00 P.M.** ("Bid Deadline") at which time bids will be opened. The bid opening will not be open to the public. Bids may be mailed or hand-carried, but must be **received** by WMATA prior to the Bid Deadline.

All bids submitted must comply with this Invitation for Bids, including its General Terms of Sale and Leaseback, Special Terms of Sale, Instructions to Bidders and Bid for Purchase of WMATA Property (the "Bid Form"), all of which are attached. WMATA may reject any noncomplying bid.  WMATA will not be responsible for any expenses incurred by bidders.

2.    **Property Description.**    The property comprises two separate parcels consisting of approximately 69,607 square feet (Square 700, Lot 857) and approximately 27,558 square feet (Square 700, Lot 866) (hereinafter "the Property").  Improvements include asphalt paving and a 60,200-square-foot industrial building used as a bus maintenance facility. The bus facility is a one-story brick building constructed in 1936 and renovated in 2002.

3.    **Zoning.** The Property is believed to be zoned CG-CR. The bidder, at its own risk, is required to verify zoning and to make all determinations as to whether the Property can be used for whatever purpose bidder wishes. WMATA makes no warranties or representations regarding zoning or the Property's suitability for any use or purpose.

4.    **Utilities.**  WMATA believes all usual services and utilities are available to the Property. The bidder, at its own risk, is required to verify services and utilities and to make all determinations as to whether such services and utilities can be used by the bidder.

1

5.    **Title Documentation and Closing**.  WMATA acquired the property from the DC Transit System by Declaration of Taking No. CA-79-73 dated January 12, 1973, recorded in the Land Records of the District of Columbia in Book 4178, Page 920. WMATA will not obtain or provide a title report or title insurance. The bidder is exclusively responsible for investigating title and determining whether the state of title suits bidder's purposes. WMATA will convey the Property by special warranty deed subject to all encumbrances of record.

6.    **Inspection**.  Bidders are invited and encouraged to inspect the Property prior to submitting a bid. Inspections will be scheduled through WMATA. Walk-through inspections will be permitted without a permit or other formal documentation. Inspection of the Property must be coordinated through the WMATA contact person indicated in Section C, Paragraph 5. Due diligence is the bidder's responsibility, to be done at bidder's sole expense. WMATA will provide bidders the opportunity to review environmental documents and reports in WMATA's possession by appointment, but makes no warranty or representation as to the accuracy or completeness of such documentation.

7.    **Effect of Submitting Bid**.  By submitting a bid, the bidder is deemed to have agreed to, and accepted, all terms in this Invitation for Bids. Notwithstanding the foregoing, WMATA reserves the right to amend or modify any of the terms and conditions set forth herein. After the bid opening, WMATA will select the Successful Bidder and may also select one or more Alternate Bidders based upon the terms offered. WMATA's obligations hereunder are expressly contingent upon WMATA obtaining the approvals described in Section B, Paragraph 13. You will become the Successful Bidder (with the corresponding obligation and risk of performance hereunder) as soon as WMATA notifies you of your selection.

B.    **GENERAL TERMS OF SALE AND LEASEBACK**

1.    **Invitation for Bids**.  "Invitation for Bids" refers collectively to this Invitation for Bids (including its general and special terms of sale and leaseback and instructions) as well as the accompanying Bid Form, form of Real Estate Permit, form of Lease, and Underground Storage Tank Real Estate Disclosure Form, all as may be modified and supplemented by any addenda thereto.

2.    **Descriptions in Invitation for Bids**.  Information provided in the Invitation for Bids is based on information available to WMATA and is believed to be correct, but any error or omission, including but not limited to the omission of any information available to WMATA, will not constitute grounds or reason for nonperformance under this Invitation for Bids, or claim by bidder for allowance, refund or deduction from the purchase price. The foregoing disclaimer does not apply to the legal description of the Property as Square 700, Lot 857 and Lot 866 in the District of Columbia.

2

3.   **Condition of Property**.  The Property is being sold **"AS IS, WHERE IS."**  Except for statutory disclosures expressly provided in this Paragraph, WMATA disclaims any warranty or representation, express or implied, as to, or concerning, the following: (a) the condition or state of repair of the Property, including the possible presence of hazardous substances on, under, or in the vicinity of the Property; (b) suitability of the Property for any use; or (c) compliance with any applicable laws, including without limitation, land use, wetland, zoning, or environmental laws.  No claim for any allowance or deduction upon such grounds will be considered after the bid opening.   Notwithstanding the foregoing, pursuant to the Underground Storage Tank Management Act of 1990, WMATA makes the disclosures set forth in the Underground Storage Tank Real Estate Transfer Disclosure Form.  The Successful Bidder agrees to execute and deliver the Underground Storage Tank Real Estate Transfer Disclosure Form (Attachment 3) at settlement.  In addition, the characteristics of soil on the Property as described by the Soil Conservation Service of the United States Department of Agriculture in the Soil Survey of the District of Columbia and as shown on the Soil Maps of the District of Columbia is Urban (Ub).  For further information, any bidder may contact a soil-testing laboratory, the District of Columbia Department of Environmental Services or the Soil Conservation Service of the Department of Agriculture.

4.   **Continuing Offers**.  Each bid received will be a continuing irrevocable offer for one hundred twenty (120) calendar days after the date of the bid. WMATA reserves the right to consider, and accept, late modification of the successful bid that makes its terms more favorable to WMATA.

5.   **Possession**.  Title to the Property will pass to the Successful Bidder at settlement upon payment of the purchase price; possession of the Property, after settlement, will be governed by the terms of the Lease.

6.   **Leaseback Provision**.  At settlement, the Successful Bidder shall lease the Property back to WMATA for a period of thirty-six (36) months at the rental rate specified in the Bid Form.  The lease of the Property from the Successful Bidder to WMATA shall be pursuant to the form Lease (Attachment 1), attached hereto and made a part hereof.    The Bid Form shall set forth a monthly rent.  You may set a single monthly rent to be paid for each month of the 36 month term.  You may also set forth a different fixed monthly rent for a different portion of the lease term; that is, by way of illustration, the fixed monthly rent for months 25 through 36 may be higher (or lower) than that for months 13 through 24, which, in turn, may be higher (or lower) than that for months 1 through 12.  You must, however, identify a certain fixed rent amount for each month of the lease term; that is, rent cannot be calculated by reference to any index, including a CPI index.  You may propose modification to the form Lease, but you are discouraged from doing so, and bids submitted proposing a landlord-tenant relationship other than that described in the form Lease will be disfavored and may be rejected solely on that ground.

3

7. **Taxes.** As of the date of settlement, the Successful Bidder will assume responsibility for all general and special, real and personal property taxes and any other impositions on the Property. The lease must remain a gross lease, with WMATA to pay only the fixed monthly rent amount(s) identified in your Bid Form and no portion of real estate taxes.

8. **Insurance.** WMATA is not imposing any insurance requirements on the Successful Bidder for the time period between bid acceptance and settlement except as required in WMATA's Real Estate Permit, attached hereto as Exhibit B, for due diligence entry upon the Property (either before bidding or by the Successful Bidder pursuant to Paragraph B.11, below).

9. **Default.** If the Successful Bidder defaults on any of the terms of this Invitation for Bids, including failing to timely proceed to settlement, the Bid Deposit, together with the Security Deposit and any payments subsequently made on account, will be forfeited, as liquidated damages, in which event the Successful Bidder will be relieved from further liability, except for its indemnification obligations under the Real Estate Permit.

10. **WMATA Liability.** If a bid is accepted by WMATA and: (1) WMATA fails for any reason to perform its obligation as set forth herein; or (2) title does not transfer or vest in the Successful Bidder for any reason although the Successful Bidder is ready, willing, and able to settle, then the Successful Bidder's sole remedy shall be for specific performance and the Successful Bidder shall have no right to monetary damages. Neither party shall be entitled to recover attorneys' fees.

11. **Due Diligence Period.** The Successful Bidder shall have forty-five (45) days from the date it receives WMATA's notification of designation as Successful Bidder to perform any necessary environmental and title due diligence. Upon expiration of this forty-five (45) day period (the "Due Diligence Period"), the Successful Bidder, by written notice to WMATA, shall either a) withdraw its bid and this Invitation for Bids shall be of no further force and effect and the Security Deposit (but *not* the Bid Deposit, which becomes non-refundable upon designation as Successful Bidder, unless WMATA fails to obtain the Approvals required under Paragraph B.13, below) shall be returned; or b) proceed to settlement in accordance with the terms of this Invitation for Bids. Prior to Successful Bidder's entry on the Property for any testing or work more intrusive or prolonged than a walk-through inspection, the Successful Bidder will execute and deliver to WMATA a Real Estate Permit in the form shown in Attachment 2. The Successful Bidder may elect, in its Bid Form, to waive the Due Diligence Period. WMATA reserves the right to select a bid where the Due Diligence Period is waived over another bid, even where the other bid is otherwise more economically favorable to WMATA. In the event the Successful Bidder waives the Due Diligence Period, then settlement will occur not later than five (5) business days after WMATA satisfies the conditions precedent identified in Paragraph B.13, below.

12. **Alternate Bidders.** WMATA, in its sole discretion, may select Alternate Bidder(s) in response to this Invitation for Bids. If the initial Successful Bidder defaults or terminates

4

pursuant to Paragraph B.11, above, WMATA may select an Alternate Bidder as the Subsequent Successful Bidder which shall be treated in all respects as a Successful Bidder, except that the Subsequent Successful Bidder shall be afforded the full 45-day Due Diligence Period set forth in Paragraph B.11, above, commencing on the date the Alternate Bidder receives written notice from WMATA that it has been designated as a Subsequent Successful Bidder.

13. **Approvals**. WMATA's offer of the Property for sale, and its authority to sell the Property, is contingent upon approval by the WMATA Board of Directors and any required approval by the Federal Transit Administration (FTA). During the Due Diligence Period (which will run to the benefit of WMATA under this Paragraph even if waived by the Successful Bidder under Paragraph B.11, above), WMATA will make best efforts to obtain the required approvals. If WMATA fails to timely obtain the required approvals, WMATA, by written notice delivered to the Successful Bidder (and any Alternate Bidder(s)), shall withdraw this bid and the offer of the Property, and return the Security Deposit and the Bid Deposit. WMATA and the Successful Bidder may agree to extend the 45-day Due Diligence Period and/or the approval period described in this Paragraph as well as the settlement date.

14. **Settlement**. The balance of the purchase price (by certified or cashier's check) is due at settlement. Settlement is to be held on November 30, 2007, at a location within ten (10) miles of WMATA's headquarters building. The Successful Bidder shall select the title company. The Successful Bidder will notify WMATA by written notice of the time and place of settlement not less than two (2) weeks in advance. WMATA may extend the settlement date for a reasonable amount of time to obtain approvals or prepare conveyance documents. Title examination, conveyancing, notary and other fees, state and local revenue stamps, transfer and recording taxes and all recording charges, and fees necessary to secure the loan, if any, are to be paid by the Successful Bidder.

15. **Contract of Sale**. This Invitation for Bids, and the bid when accepted, will constitute an enforceable contract between the Successful Bidder and WMATA. No oral statements or representations made by, or on behalf of either party will be a part of such contract; nor will the contract, or any interest therein, be transferred or assigned by the Successful Bidder without the consent of WMATA, and any assignment transaction without such consent will be void, except that the Successful Bidder may assign the contract to a special purpose entity controlled by the Successful Bidder. WMATA will not pay brokerage commissions.

16. **Officials Not to Benefit**.     No member of or delegate to Congress, or resident commissioner, will be admitted to any share or part of the sale transaction or to any benefit that may arise therefrom. This provision will not be construed, however, to extend to a corporation if it is entering into this transaction for its general benefit.

5

17. **FTA Compliance**.  WMATA is required to provide the Federal Transit Administration (FTA) with notice of the sale and conveyance of the Property. By submitting a Bid Form, the bidder is certifying to WMATA that it is not debarred under any federal procurement regulation. The special warranty deed will require the Successful Bidder to covenant that it will not exclude any person, or otherwise discriminate against any person, on the grounds of race, color, national origin, sex, or disability in connection with construction upon, or operations on the Property and that any construction upon the Property will comply with the "Americans with Disabilities Act" (ADA), 42 U.S.C. §12101, et seq., as amended, and any regulations promulgated thereunder.

C.  **SPECIAL TERMS OF SALE**

1. **Bid Deposits**.  A Bid Deposit is required. **Bid Forms not accompanied by a Bid Deposit will be disqualified.**  The Bid Deposit must be tendered by a cashier's check or certified check only. No interest will accrue on the Bid Deposit. All checks are to be made payable to "WMATA". The full balance of the purchase price is due and payable at settlement.

**Bid Deposit**

**THREE HUNDRED THOUSAND DOLLARS ($300,000)**

2. **Return of Bid Deposits**.  The Bid Deposit of the Successful Bidder and any Alternate Bidders will be held until the Property is sold and the Successful Bidder's deposits are applied to the purchase price. The bid deposits of the Successful Bidder is non-refundable unless WMATA fails to obtain any approval required as a condition of sale in Section B, Paragraph 13, above.  The Bid Deposit for all other bidders will be returned, via express carrier, within five (5) business days after the date of settlement.

3. **Security Deposit**.  In addition to the Bid Deposit, which is a prerequisite of bidding, the Successful Bidder will also have to post a Security Deposit, which along with the Bid Deposit, will be applied toward the purchase price at settlement.  Within five (5) business days after a bidder's designation as the Successful Bidder, the Successful Bidder must deliver the Security Deposit to WMATA in the form of a cashier's check or certified check. No interest will accrue on the Security Deposit.

**Security Deposit**

**THREE MILLION DOLLARS ($3,000,000)**

The Successful Bidder's failure to timely transmit the Security Deposit to WMATA will

result in a default and, in addition to its rights under Section B, Paragraph 9, WMATA may immediately thereupon designate a Subsequent Successful Bidder.

4.   **Minimum Bid Price**.  The minimum bid amount for this Property is:

**SIXTY MILLION DOLLARS ($60,000,000).**

5.   **Bidding in General**.  Bids extending the settlement date will not be accepted.  Bid Forms must be delivered to the WMATA Office of Property Development and Management either in person, by mail, or express delivery and received by WMATA by the Bid Deadline, **August 28, 2007 at 2:00 p.m.** Immediately after the Bid Deadline, WMATA will open bids and select the Successful Bidder and any Alternate Bidders. The bid opening will not be open to the public. All bids are irrevocable for one hundred twenty (120) calendar days from the date of the bid. The bid which represents the best net return to WMATA after leaseback monthly rent for WMATA's anticipated lease term (which may, in WMATA's sole discretion be less than 36 months) is deducted from the Bid Amount. The Successful Bidder and any Alternate Bidders will be notified in writing at the address they provide on the Bid Form.  WMATA reserves the right to reject any and all bids at any time for any reason. Additional Bid Forms are available from WMATA's Office of Property Development and Management.  Bid Forms may be photocopied and used.

If you wish to hand deliver a bid, enter the Jackson Graham Building at 600 Fifth Street, NW, Washington, DC 20001 and request that the receptionist call extension 2392 or 1588 to be directed to the appropriate location to deliver the bid.

Questions about this Invitation for Bids should be submitted to Mr. Bob Burns at rlburns@wmata.com. Questions will be answered publicly; that is, WMATA will post all questions and answers on its website: www.wmata.com (About Metro/Business Opportunities, Metro Real Estate, Southeastern Bus Garage Sale). Mr. Burns may be also reached for general comments at 202-962-2393.

## D.   INSTRUCTIONS TO BIDDERS

1.   **Bid Form.**

   a.  Bids must be submitted only on a fully-completed Bid Form.

   b.  Bids must be legible with corrections initialed and the bid manually signed.

7

c. In submitting a bid, only return the Bid Form. Retain all other documents, including one copy of the Bid Form, for your records.

2.  **Bid Envelopes**.  Envelopes containing bids must be sealed and addressed to the bid receiving office stated in this Invitation for Bids. The name and address of the bidder must be shown in the upper left corner of the bid envelope, and the invitation number, the date and the phrase **"Bid for Real Property"** must be shown in the lower left corner of the envelope. No responsibility will attach to any officer of WMATA for the premature opening of or failure to open a bid not properly addressed and identified.

3.  <u>**Bid Executed on Behalf of Bidder**</u>.

    a. Attorney or Agent:  A bid may be executed by an attorney or agent on behalf of the bidder if the Bid Form is accompanied by an original, notarized Power of Attorney.

    b. Corporation:  If the bidder is a corporation, the Bid Form must be signed under the corporate seal by a duly authorized officer of the corporation. The bidder must submit evidence of corporate authorization to bid on behalf of the corporation.

    c. Partnership: If the bidder is a partnership, the Bid Form must be signed by an authorized general partner or some other authorized agent.   The bidder must submit evidence of the signatory's authorization.

    d.   Limited Liability Company: If the bidder is a limited liability company, the Bid Form must be signed by all Members or the bidder must provide evidence that all Members consented to the execution and delivery of the Bid Form, including but not limited to satisfactory evidence of the authority of a "Manager" or limited number of Members to execute and deliver the Bid Form.

4.  **Bid Deposit**.  Each bid must be accompanied by a Bid Deposit in the form of a certified check or cashier's check only, payable to the order of WMATA. See "Special Terms of Sale, Bid Deposits" (Section C, Paragraph 1) for further clarification.

    Failure to provide the Bid Deposit will result in rejection of the bid. Upon acceptance of a bid, the Bid Deposit of the Successful Bidder will be applied toward payment of the Successful Bidder's obligation.

5.  **Additional Information**.  WMATA will, upon request, provide additional copies of this Invitation for Bids and Bid Form. Requests for additional available information and all questions regarding this Invitation for Bids must be submitted via e-mail to Mr. Burns in accordance with Section C, Paragraph 6, above. WMATA will post all questions and answers on its website: www.wmata.com (About Metro/Business Opportunities, Metro Real Estate, Southeastern Bus Garage Sale. Each bid submitted will be deemed to have

been made **with full knowledge of all terms,** conditions and requirements contained in this Invitation for Bids.

6.   **Waiver of Informalities or Irregularities.**   WMATA may, at its election, waive any minor informality or irregularity in bids received.

7.   **Acceptable Bid.**   A bid received from a responsible bidder whose bid, conforming to this Invitation for Bids, will be most advantageous to WMATA, in terms of purchase price and leaseback rental.   If two or more acceptable bids are received that are equal in all respects, the selection will be made by a drawing by lot limited to such equal bids.

8.   **Notice of Acceptance or Rejection.**   Notice by WMATA of acceptance or rejection of a bid will be deemed to have been sufficiently given when hand delivered, sent by overnight courier or mailed, via certified mail, return receipt requested, or mailed, via first-class mail, with a copy sent by facsimile, to the bidder, or his/her duly authorized representative, at the address (and facsimile number) indicated in the bid. WMATA's processing of a bid deposit will not, in itself, constitute acceptance of such bid.   WMATA reserves the right to reject any or all bids or portions thereof.

**BID NO. 08-1**

**WMATA Property**

**Lots 857 and 866, Square 700**

**District of Columbia**

<u>BID FOR PURCHASE OF WMATA PROPERTY</u> (Bid Form)

TO:   Office of Property Development and Management

Washington Metropolitan Area Transit Authority

600 Fifth Street, NW

Washington, DC  20001

**SUBJECT TO:**  The terms and conditions of the Invitation for Bids; the General Terms of Sale; the Special Terms of Sale and Leaseback; and the Instructions to Bidders, the Right of Entry Permit, Lease Form, and Underground Storage Tank Real Estate Transfer Disclosure Form, all of which are incorporated as part of this bid. The undersigned bidder hereby offers and agrees, if this bid is accepted, to purchase the identified Property at the bid price entered below by November 30, 2007 and to lease the Property back to WMATA at the Leaseback Rental entered below pursuant to the Lease form (or an alternate form submitted with this Bid Form (disfavored)).

The bid must be accompanied by a Bid Deposit in the amount of Three Hundred Thousand Dollars ($300,000).  The Bid Deposit must be in the form of a certified or cashier's check, payable to "WMATA".

Bid Amount: $_____

Bid Spelled-out: _____

Leaseback Rental (Per Month): $ _____

Leaseback Rental (Per Month) Spelled-out: $ _____

10

If I am selected as the Successful Bidder (or an Alternate Bidder), WMATA may notify me by courier, overnight delivery or certified mail, return receipt requested, at the address listed below.

If this bid is accepted, the deed should name the following as grantee(s) and the lease should identify the following as landlord:

You may designate an alternate grantee/landlord at settlement, provided it is controlled by the person or entity identified above.

Bidder represents that bidder operates as an individual / partnership / corporation / limited liability company / other: _____.    Evidence of authority to sign and submit this Bid Form (for any entity other than an individual) is attached. If signed by a trustee or agent, a copy of the power of attorney or other authorizing document is attached.

If selected, I waive / do not waive the Due Diligence Period set forth in Section B, Paragraph 11 [circle the appropriate choice].

Initial: _____

11

Signature of bidder: _____    Date_____

Name (Print)_____

Title_____

Address_____City/State/Zip_____

Telephone_____

Facsimile Number _____

Signature of WMATA indicating acceptance of bid:


_____    Date_____

Nat Bottigheimer
Contracting Officer

12

# EXHIBIT F

## ** ALTERNATE BID **

### BID NO. 08-1
### WMATA Property
### Lots 857 and 866, Square 700
### District of Columbia

### BID FOR PURCHASE OF WMATA PROPERTY (Bid Form)

TO:    Office of Property Development and Management
       Washington Metropolitan Area Transit Authority
       600 Fifth Street, NW
       Washington, DC  20001

**SUBJECT TO:**  The terms and conditions of the Invitation for Bids; the General Terms of Sale; the Special Terms of Sale and Leaseback; and the Instructions to Bidders, the Right of Entry Permit, Lease Form, and Underground Storage Tank Real Estate Transfer Disclosure Form, all of which are incorporated as part of this bid. The undersigned bidder hereby offers and agrees, if this bid is accepted, to purchase the identified Property at the bid price entered below by November 30, 2007 and to lease the Property back to WMATA at the Leaseback Rental entered below pursuant to the Lease form (or an alternate form submitted with this Bid Form (disfavored)).

The bid must be accompanied by a Bid Deposit in the amount of Three Hundred Thousand Dollars ($300,000).  The Bid Deposit must be in the form of a certified or cashier's check, payable to "WMATA".

Bid Amount: $60,000,000.00*_____

Bid Spelled-out:  Sixty Million Dollars and 00/100_____

Leaseback Rental (Per Month): $0.00_____

Leaseback Rental (Per Month) Spelled-out:  Zero Dollars and 00/100_____

10

If I am selected as the Successful Bidder (or an Alternate Bidder), WMATA may notify me by courier, overnight delivery or certified mail, return receipt requested, at the address listed below.

If this bid is accepted, the deed should name the following as grantee(s) and the lease should identify the following as landlord:

MR Ballpark 7 LLC

You may designate an alternate grantee/landlord at settlement, provided it is controlled by the person or entity identified above.

Bidder represents that bidder operates as an individual / partnership / corporation / limited liability company / other: _____limited liability company_____ .     Evidence of authority to sign and submit this Bid Form (for any entity other than an individual) is attached. If signed by a trustee or agent, a copy of the power of attorney or other authorizing document is attached.

If selected, I waive / do not waive the Due Diligence Period set forth in Section B, Paragraph 11 [circle the appropriate choice].

Initial: _____

* Bid Amount Addendum:

In the event WMATA receives a bid, conforming to the WMATA's invitation to Bids, from a qualified bidder, which is more than Sixty Million Dollars and 00/100 ($60,000,000.00), in terms of purchase price and leaseback rental, then MR Ballpark 7 LLC's Bid Amount shall increase to such bidder's Bid Amount plus Two Hundred Fifty Thousand Dollars and 00/100 ($250,000.00).

For example, if such other bidder offers a bid amount of Sixty Million Five Hundred Thousand Dollars and 00/100 ($60,500,000.00) and a Leaseback Rental rate of zero dollars ($0.00) per month, then MR Ballpark 7 LLC's Bid Amount shall be Sixty Million Seven Hundred Fifty Thousand Dollars and 00/100 ($60,750,000.00) and its Leaseback Rental rate shall remain zero dollars ($0.00) per month.

If WMATA's rules and regulations regarding the acceptance of bids for the sale of real property do not permit WMATA to consider escalation clauses, then this addendum shall be disregarded and MR Ballpark 7 LLC's Bid Amount shall be as shown on the Bid Form above.

Signature of bidder:    MR BALLPARK 7 LLC

By: _____    Date: August 28, 2007
Jeffrey T. Neal
Managing Member

By: _____    Date: August 28, 2007
Michael J. Darby
Managing Member

Address:    c/o Monument Realty
1700 K Street, NW
Suite 600
Washington, DC 20006

Telephone:    (202) 777-2000

Facsimile Number:    (202) 777-2020

Signature of WMATA indicating acceptance of bid:

_____    Date_____

Nat Bottigheimer
Contracting Officer

12

SPXCH965

OFFICIAL BANK CHECK

**UNITED BANK**
FAIRFAX, VA 22030

MEMBER FDIC

2004038406

PAY
TO THE
ORDER OF ___ *** WMATA

MONUMENT REALTY

Three Hundred Thousand Dollars and 00 cents

ISSUED BY MONEYGRAM PAYMENT SYSTEMS, INC.
P.O. BOX 9476, MINNEAPOLIS, MN 55440
RESTON SAFE DEPOSIT & TRUST CO.
BOSTON, MASSACHUSETTS

DRAWER, UNITED BANK

DRAWEE

DATE
07/19/2007

$   ***$300,000.00

V O I D   O V E R
***$300,000.00

AUTHORIZED SIGNATURE

⑈2004038406⑈ ⑆051100709⑆ 051160897 0⑈

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## MR BALLPARK 7 LLC

This Limited Liability Company Agreement (the "Agreement") of MR Ballpark 7 LLC, is entered into by the persons named as members on Annex A hereto (the "Members") as of the 18th day of July, 2007 (the "Effective Date").

WHEREAS, the LLC was formed as a limited liability company under the Delaware Limited Liability Company Act (6 Del. C. § 18-101, et seq.), as amended from time to time (the "Act") on July 18, 2007 pursuant to a Certificate of Formation filed with the Secretary of State of the State of Delaware;

WHEREAS, the Members now wish to adopt an Agreement to set forth the terms and conditions by which the LLC will be governed.

1.      **Name.**

    (a)      The name of the limited liability company is MR Ballpark 7 LLC (the "LLC"). The business of the LLC may be conducted under any other name deemed necessary or desirable by the Managing Members (as defined below) in order to comply with local law.

    (b)      The parties hereto agree to form the LLC as a limited liability company pursuant to the provisions of the Act and of this Agreement and agree that the rights and liabilities of the Members and the Managing Members shall be as provided in the Act for members and managers, respectively, except as provided herein.

2.      **Purpose.** The LLC is formed for the object and purpose of, and the nature of the business to be conducted and promoted by the LLC is, engaging in any lawful act or activity for which limited liability companies may be formed under the Act and engaging in any and all activities necessary or incidental to the foregoing.

3.      **Registered Office; Registered Agent.** The address of the registered office of the LLC in the State of Delaware is c/o Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, New Castle County, Delaware 19808. The name and address of the registered agent of the LLC for service of process on the LLC in the State of Delaware is Corporation Service Company, 2711 Centerville Road, Wilmington, Delaware 19808.

4.      **Principal Office.** The principal office address of the LLC shall be c/o Monument Realty LLC, 1700 K Street, N.W., Suite 600, Washington, D.C. 20006, or such other place as the Managing Members may determine from time to time.

5.      **Members.** The names, mailing addresses, capital contributions to the LLC and percent of ownership interests in the LLC (the "Percentage Interest(s)") of the Members (the "Schedule of Members") are as set forth in Annex A hereto, as such Annex A may be amended from time to time. Each of the Members is hereby admitted as a member of the LLC and agrees to be bound by the terms of this Agreement.

6.    **Powers.**  Except as otherwise provided in this Agreement, the Members shall have the power to do any and all acts necessary or convenient to or for the furtherance of the purposes described herein, including all powers, statutory or otherwise, possessed by members under the laws of the State of Delaware.  Charles Welch Tiedemann is hereby designated as an authorized person, within the meaning of the Act, to execute, deliver and file the Certificate of Formation of the LLC (and any amendments and/or restatements thereof) and any other certificates (and any amendments and/or restatements thereof) necessary for the LLC to qualify to do business in any jurisdiction in which the LLC may wish to conduct business as well as such other agreements and instruments in connection with matters and transactions otherwise approved by the LLC with respect to conduct of its business.

7.    **Management.**

(a)    In accordance with Section 18-402 of the Act, management of the LLC shall be vested in one or more members who shall be designated "Managing Members."  The Members hereby appoint Jeffrey T. Neal and Michael J. Darby, jointly, as the Managing Member(s) of the LLC for purposes of the Act.  To the extent permitted by law, any one Managing Member shall be authorized to act on behalf of and to bind the LLC, including the completion, execution and delivery of any and all agreements, deeds, instruments, receipts, certificates and other documents, and to take all such other action as they may consider necessary or advisable in connection with the management of the LLC.

(b)    The Members agree that all determinations, decisions and actions made or taken by any Managing Member in accordance with this Agreement shall be conclusive and absolutely binding upon the LLC, the Members and their respective successors, assigns and personal representatives.

(c)    The Managing Members may (but need not) adopt procedures relating to meetings of the Managing Members (if more than one) and the taking of actions and may exercise their respective authority hereunder by resolution.  A written resolution or consent of the Managing Members shall be conclusive evidence of the act of the Managing Members set forth therein.

(d)    Persons dealing with the LLC are entitled to rely conclusively upon the power and authority of the Managing Members as herein set forth.

8.    **Capital Contributions.**    The Members have made or will make initial contributions to the capital of the LLC in the amounts and proportions set forth in <u>Annex A</u> hereto.

9.    **Additional Contributions.**

(a)    Each Member shall make such additional capital contributions to the LLC (which additional capital contributions shall always be made by each Member in proportion to such Member's Percentage Interest set forth on <u>Annex A</u> hereto) as the Managing Members, acting unanimously, may deem necessary or advisable in connection with the business of the LLC.

(b)    The provisions of Section 8 and this Section 9 are intended solely to benefit the Members of the LLC and, to the fullest extent permitted by law, shall not be construed as conferring any benefit upon any creditor of the LLC other than the Members (and no such creditor of the LLC other than the Members shall be a third party beneficiary of this Agreement), and no Member of the LLC shall have a duty or obligation to any creditor of the LLC (other than to the Members of the LLC) to make any contribution to the LLC and no Member of the LLC shall have any duty or obligation to any creditor of the LLC (other than to the Members of the LLC) to issue any call for capital pursuant to this Section 9.

10.    Capital Accounts.    The LLC shall maintain for each Member a separate capital account (the "Capital Account(s)") in accordance with this Section 10, the specific provisions set forth on Annex B hereto and in accordance with the rules of Treasury Regulation Section 1.704-1(b)(2)(iv). Each Member's Capital Account shall have an initial balance equal to the amount of cash constituting such Member's initial contribution to the capital of the LLC. Each Member's Capital Account shall be increased by the sum of (a) the amount of cash constituting additional contributions by such Member to the capital of the LLC, plus (b) the portion of any profits allocated to such Member's Capital Account pursuant to Section 11. Each Member's Capital Account shall be reduced by the sum of (a) the amount of cash and the fair value of any property distributed by the LLC to such Member, plus (b) the portion of any losses allocated to such Member's Capital Account pursuant to Section 11. No Member shall be required to pay to the LLC any deficit in his/her/its Capital Account upon liquidation or otherwise, except to the extent provided in the Act.

11.    Allocation of Profits and Losses.    The LLC's income, profits, gains, losses, deductions and credits for tax and accounting purposes shall be determined by the LLC in accordance with generally accepted accounting principles and shall be allocated to the Members in accordance with the specific provisions set forth in Annex B hereto.

12.    Distributions.

(a)    No Member shall (i) be entitled to interest on his/her/its capital contributions to the LLC, or (ii) have the right to distributions or the return of any contribution to the capital of the LLC except (A) for distributions in accordance with this Section 12 or (B) upon dissolution of the LLC. The entitlement to any such return at such time shall be limited to the value of the Capital Account of the Member. No Member shall be liable for the return of any such amounts.

(b)    Distributions, whether arising from or attributable to current operations, the sale of all or any part of the property or assets of the LLC, the dissolution of the LLC or otherwise, shall be made to the Members at the times and in the aggregate amounts determined by the Managing Members. Such distributions shall be allocated among the Members (i) first, in the same proportion as the Members then Capital Account balances until each Member has received an amount equal to his/her/its total capital contributions to the LLC and (ii) the balance, in proportion to each Member's Percentage Interest set forth on Annex A hereto.

13.    Fiscal Year; Tax Matters.

3

(a)     The Fiscal Year of the LLC for accounting and tax purposes shall begin on January 1 and end on December 31 of each year, except for the short taxable years in the years of the LLC's formation and termination and as otherwise required by the Internal Revenue Code of 1986, as amended (the "Code"),

(b)     Proper and complete records and books of account of the business of the LLC, including the Schedule of Members, shall be maintained at the LLC's principal place of business. Each of the Members acknowledges and agrees that the LLC is intended to be classified and treated as a partnership for income tax purposes. The LLC's books of account shall be maintained on a basis consistent with such treatment and on the same basis utilized in preparing the LLC's United States federal income tax return. Each Member and his/her/its duly authorized representatives may, for any reason reasonably related to his/her/its interest as a Member of the LLC, examine the LLC's books of account and make copies and extracts therefrom at his/her/its own expense. The Managing Members shall maintain the records of the LLC for three years following the termination of the LLC.

(c)     Jeffrey T. Neal shall act as the "Tax Matters Partner" as defined in the Code and shall make such elections under the Code and other relevant tax laws as to the treatment of items of the LLC income, gain, loss, deduction and credit, and as to all other relevant matters, as the Tax Matters Partner deems necessary or appropriate.

(d)     The Members hereby agree to take any measures necessary (or, if applicable, refrain from any action) to ensure that the LLC is treated as a partnership for federal income tax purposes.

14.     **Assignments and Transfers of Interests.**  A Member may not assign or transfer all or ay portion of his/her/its interest in the LLC without the unanimous consent of the Managing Members, which consent may be withheld in their sole discretion.

15.     **Admission of Additional Members.**  One (1) or more additional persons may be admitted to the LLC as new Members with the unanimous consent of the Managing Members.

16.     **Liability of Members.**  The Members shall not have any liability for the obligations or liabilities of the LLC except to the extent provided in the Act. Nothing express or implied shall be construed to confer upon or to give any person except the Members or Managing Members, any rights or remedies under or by reason of this Agreement.

17.     **Dissolution.**

(a)     Subject to the occurrence of an event of dissolution pursuant to Section 17(b), the LLC shall have perpetual existence.

(b)     The LLC shall dissolve, and its affairs shall be wound up upon the first to occur of the following: (i) the unanimous written consent of the Managing Members, together with the written consent of Members holding at least 75% of the Percentage Interests, (ii) the death, retirement, resignation, expulsion, bankruptcy or dissolution of a Member or the occurrence of any other event which terminates the continued membership of a Member in the LLC, including the disposition of all or a portion of a Member's interest in the LLC, unless the

4

business of the LLC is continued by the prior written consent of all of the Managing Members and the prior written consent of the other/remaining Members holding at least 75% of the Percentage Interests of all other/remaining Members, within 90 days following the occurrence of any such event, or (iii) the entry of a decree of judicial dissolution under Section 18-802 of the Act.

18.    **Indemnification.**    To the full extent permitted by law, the LLC shall (a) indemnify any person or such person's heirs, distributees, next of kin, successors, appointees, executors, administrators, legal representatives or assigns who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative by reason of the fact that such person is or was a Member, Managing Member, director, officer, employee or agent of the LLC or is or was serving at the request of the LLC or its Members as a member, manager, director, officer, employee or agent of another corporation, limited liability company, partnership, joint venture, trust or other enterprise, domestic or foreign, against expenses, attorneys' fees, court costs, judgments, fines, amounts paid in settlement and other losses actually and reasonably incurred by such person in connection with such action, suit or proceeding and (b) advance expenses incurred by a manager, officer or director in defending such civil or criminal action, suit or proceeding to the full extent authorized or permitted by the laws of the State of Delaware. A Managing Member shall have no personal liability to the LLC or its Members for monetary damages for breach of fiduciary duty as a Managing Member; provided, however, that the foregoing provision shall not eliminate the liability of a Managing Member for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law or for any transaction from which the Managing Member derived an improper personal benefit.

19.    **Amendments.**  Any amendments to this Agreement shall be in writing signed and approved by all of the Managing Members; provided, however, that any such amendment that materially adversely affects any Member shall also be signed and approved by all of such adversely affected Members.

20.    **Governing Law.**  This Agreement shall be governed by, and construed under, the laws of the State of Delaware, all rights and remedies being governed by said laws. The Members intend the provisions of the Act to be controlling as to any matters not set forth in this Agreement.

21.    **Uniform Commercial Code.**  Each membership interest in the Company shall constitute a "security" within the meaning of, and shall be governed by, (i) Article 8 of the Uniform Commercial Code (including Section 8-102(a)(15) thereof) as in effect from time to time in the State of Delaware (6 Del. C. § 8-101, et seq.) and (ii) Article 8 of the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995.

**IN WITNESS WHEREOF,** the undersigned, intending to be legally bound hereby, have duly executed this Limited Liability Company Agreement as of the Effective Date first above written.

Jeffrey T. Neal

Michael J. Darby

6

ANNEX A

TO THE

LIMITED LIABILITY COMPANY AGREEMENT

OF

MR BALLPARK 7 LLC

Schedule of Members

| Name and Address of Members | Initial Capital Contribution ($) | Percentage Interest (%) |
|---|---|---|
| Jeffrey T. Neal<br>1700 K Street, N.W.<br>Suite 600<br>Washington, D.C.  20006 | $ 500.00 | 50% |
| Michael J. Darby<br>1700 K Street, N.W.<br>Suite 600<br>Washington, D.C.  20006 | $ 500.00 | 50% |
| TOTALS | $1,000.00 | 100% |

# 3076524_v2

# EXHIBIT G

Washington Metropolitan Area Transit Authority

Board of Directors Meeting

September 27, 2007

11:00 AM

Page 2

1                    P R O C E E D I N G S

2        MS. HEWLETT:   Good afternoon everyone.

3        MALE VOICE:   Good afternoon.

4        MS. HEWLETT:       I think this is the first time

5 I came in and said good afternoon instead of good

6 morning.  But it's been that kind of day.  The 1,322

7 meeting of the Washington Metropolitan Area Transit

8 Authority Board of Directors will now come to order.

9                    First my apologizes for those of you

10 who may have been waiting.  We had a special committee

11 meeting that took a little longer, but was very

12 productive in the end.  We're getting there.  So please

13 accept our apologizes for that.

14 First order of business is approval of the agenda.

15        MR. ZIMMERMAN:  Move approval.

16        MS. HEWLETT:  The second?

17        MALE VOICE:  Second.

18        MS. HEWLETT:  Is there any discussion?  All in

19 favor?

20        GROUP:  Aye.

21        MS. HEWLETT:  Opposed?  The ayes have it.  We have

22 before us the minutes of the July 26, 2007 Board

Page 3

1 Meeting.

2      MR. ZIMMERMAN:  Move approval as presented.

3      MS. HEWLETT:  Second?  Any discussion?

4      MR. ZIMMERMAN:  One comment.

5      MS. HEWLETT:  Oh, comment?  I'm sorry.

6      MR. ZIMMERMAN:  That's okay.  Madam Chairman, I

7 note that on page three of the minutes of the July

8 meeting it is noted that I had asked the general manager

9 about a response to the RAC's recommendation regarding

10 recycling.  And the general manager had replied that it

11 could be provided at the next meeting, which I think we

12 are at.  I'm not going to ask for that now, but I'm

13 noting this ahead of time, since the general manager has

14 a report and he will want to address that.  Thank you,

15 Madam Chairman.

16      MS. HEWLETT:      Thank you.  Is there any

17 additional comment or discussion?  All in favor?

18      GROUP:  Aye.

19      MS. HEWLETT:      Opposed?  The ayes have it.

20 Mr. Snyder, we have the report of the Riders' Advisory

21 Council.

22      MR. SNYDER:  Good afternoon.  I'll try to be brief

Page 4

1 as we're running way behind.  In both my rate and report

2 and my oral report that you have with you, you should

3 see a discussion of railcar configuration, the language

4 assistance plan, the Thirty's Metro Bus Line study.  And

5 I'll go on to some of the other ones.

6 While at the Greenbelt Station, I spoke with a

7 station manager who asked about the benefits for

8 expanding credit card program to parking at all

9 stations.  They have a significant number of visitors to

10 this region and so they'd like to know when that pilot

11 program is going to be expanded to other stations.

12 The emergency communications, Mr. Gerald Francis,

13 presented a detailed account of the 20 plus events that

14 occurred in the rail system on August 26th and 27th.

15 RAC members also participated in an emergency

16 communication subcommittee meeting where we recommended

17 more timely dissemination of information to customers

18 and station managers, greater deployment of Metro

19 employees throughout the system, using existing staff,

20 posting of station specific emergency plans and services

21 systems wide and immediate implementation of service

22 improvements through training and empowerment of

Page 5

1 frontline workers.

2 In the matter of the 2009 budget, I'm very concerned

3 that the RAC was excluded from receiving information to

4 advise the Board when this current round of fare policy

5 discussion, by direction of canceling the Metro budget

6 briefing to the RAC.  I have asked Mr. Harkum (phonetic)

7 to meet with the RAC at our October meeting and discuss

8 the current recommendations.  And with your approval I

9 hope he'll be able to come.

10 In our letter to Mr. Graham this morning, I included

11 a number of questions.  First of all, why is the Metro

12 forecast for passenger revenue growing at only one

13 percent when 12 percent is what the average has been

14 over the last five years? When we've seen a five percent

15 growth in reported ridership over the last six months?

16 When we've had five of the top ten ridership days in

17 Metro's history occurring in the last six months?  When

18 a record 19.2 million riders used Metro in July? So is

19 the forecast of one percent really represent only $5

20 million, when actually there's a $6.5 million, because

21 we have $650 million, one percent of that should be 6.5

22 million.  So I don't know where the 5 million figure

Page 6

1 comes from.

2 And then in another place you mentioned that it

3 would be 8 million.  It would be nice if they could

4 clarify that.

5 But what I really think is that the ridership is

6 probably growing at a more significant rate than one

7 percent. There were other ways to balance this budget

8 besides just making cuts in service or cuts in

9 expenditures.  You can also grow this system.  Why can't

10 Metro market public transit in the second worst transit

11 region in the country?  We should be seeing significant

12 growth.

13 We have -- we're moving from six car trains to eight

14 car trains.  That's a 33 percent improvement in

15 capacity.  We should be able to fill those trains.  So

16 why are we rushing to a fare increase (inaudible) or at

17 all for 2008 without exploring all these other options?

18 Finally, I'd like to quote from the letter that I

19 sent to Mr. Graham for the budget meeting this morning.

20 "More money does not and will not cure all that ails

21 Metro.  As a board you must identify measured business

22 targets and goals with how Metro should be operated.

1 You need to establish a policy on sustained ridership

2 growth, increased off-peak ridership, improved customer

3 service, expanded service offerings and competitive

4 transit value.  The Washington, DC region was just

5 ranked as having the second worst traffic in the

6 country.  In this region, at a time of environmental

7 consciousness, a service-oriented public transit entity

8 should be able to produce tangible results through

9 efficient operations and effective marketing of transit

10 options.

11 In conclusion, as a board advisory committee, the

12 RAC would appreciate timely opportunities to offer

13 feedback on operating and budgetary initiatives so that

14 we may achieve a higher level of rider satisfaction and

15 public confidence in WMATA, as it states in our bylaws.

16 I'd like to thank those Metro staff who included the

17 RAC in preplanning, and ask what would the Metro's

18 customers on the RAC think of an idea.  Thank you.

19       MR. ZIMMERMAN:  Question, (inaudible).

20       MS. HEWLETT:       Thank you.  Mr. Zimmerman.

21       MR. ZIMMERMAN:  Mr. Snyder noted the recent

22 reports, the latest study that shows we've moved from, I

Page 8

1 guess clearly from number three to number two, we kind

2 of bounced around between number two and number three

3 for worst congestion in the country.

4 What should be borne in mind is those studies are

5 basically for

6 people who are literally in traffic.  If you do studies

7 that say commuting time for all people by all means, we

8 improve significantly.  And the reason, of course, is

9 Metro.  So, I mean, let's not forget that.

10      MR. SNYDER:  Do you want to move people off the

11 roads on to the Metro.

12      MR. ZIMMERMAN:  And we are in fact doing that to a

13 considerable degree in this city.  Not enough, but more

14 in this metropolitan area than most other areas of the

15 country.  Mr. Snyder, you in your report refer to -- on

16 the budget section I'm looking at here, that it says,

17 "The Board went as far as to exclude the RAC by

18 directing the cancellation of a budget briefing to the

19 RAC."  I -- when did the Board do that?

20      MR. SNYDER:  At the last budget and finance

21 meeting on the -- not this emergency one, the one two

22 weeks ago.  Mr. Harkum was supposed to come and brief

Page 9

1 the RAC on the current budget process, and Mr. Graham

2 asked that he not go forward with that particular

3 presentation.

4        MR. ZIMMERMAN:  I guess I missed that.  And I

5 don't remember the Board voting.  If there was such a

6 vote Madam Chairman, I don't know that I was part of

7 that.

8        MR. SNYDER:  (inaudible).

9        MS. HEWLETT:  I don't --

10       MR. GRAHAM:  I know what it was.  I know Madam

11 Chair.

12       MS. HEWLETT:       -- that's not exactly what

13 happened.

14       MR. GRAHAM:  Since my name has been mentioned,

15 what happened there was I did not want the RAC to be

16 briefed on a proposal, and that was the first proposal

17 of the general manager, because it was clear to me at

18 that point that that proposal had no support.  And it

19 would seem to have been -- it seemed to me to be, you

20 know, an exercise in just upsetting everybody over

21 something that, you know, there was no real reality

22 attached to it.

Page 10

1 And it was in no way means -- no way meant to be

2 excluding the RAC from participation in this process.  I

3 just wanted to save you some time, because the specifics

4 of that proposal were kind of more or less DOA.  And

5 sure enough it proved to be that.  And so that was my

6 only point.  I hope you understand that.

7        MR. SNYDER:  May I?

8        MS. HEWLETT:      Yes, Mr. Snyder.

9        MR. SNYDER:  The issue was that we didn't get the

10 opportunity to even discuss that proposal, much less the

11 proposal that was offered today, much less talk about

12 the fare policy that you were going to be briefed on,

13 because Mr. Harkum felt that he was given direction to

14 not come and talk to the RAC about the budget issues.

15      MR. GRAHAM:  Well that is a mistake.  And I'm very

16 happy to take to heart what you've said and that -- it

17 was no way my intention was to exclude the RAC from this

18 process.  I just simply didn't want a lot of agitation

19 over something that was not a realistic proposal.  Do

20 you understand that?

21      MS. HEWLETT:      I'm sorry.

22      MR. SNYDER:  I understand it.  But, maybe it

Page 11

1 wasn't made clear to staff that that's what you

2 intended.

3         MS. HEWLETT:        Okay, hold on.  Mr. Zimmerman

4 --

5         MALE VOICE:  Madam Chairman --

6         MS. HEWLETT:        -- wasn't finished by --

7         MR. GRAHAM:  Oh, I'm sorry.

8         MS. HEWLETT:        -- if you're -- are you

9 finished?

10        MR. GRAHAM:  I guess.

11        MS. HEWLETT:        Okay.  Mr. Zimmerman, followed

12 by Ms. Hudgins, followed by Mr. Kauffman, unless you

13 were done.

14        MR. GRAHAM:  No, I'm done.

15        MR. ZIMMERMAN:  Thank you, Madam Chairman.  I

16 appreciate Mr. Graham's helping to clarify that.  And I

17 trust Mr. Snyder that you'll explain what actually

18 happened, what the Board did and didn't direct and

19 perhaps you can get that corrected on the record in the

20 future.

21 There are two important points here.  One is that I

22 think the Board very definitely wants to hear from the

Page 12

1 Riders' Advisory Council and it was a point we didn't

2 get to that I had hoped to discuss at the meeting

3 earlier.  But there most certainly needs to be input, as

4 just as we will need to do public hearings before we do

5 anything, from the Riders' Advisory Council.  I found it

6 disquieting, if I may use the term, the resolution that

7 the RAC passed, the RAC on behalf of riders.

8 And I appreciate that, of course, you know, there

9 are other folks who represent riders too, "Find the

10 proposal of mid-fiscal year fare increase disquieting.

11 The RAC does not believe any such (inaudible) should be

12 considered without any full public hearing, including

13 consultation with the RAC."  Now, why -- it's not clear

14 to me why you would be under the impression that any way

15 that a proposal would be considered without a full

16 public hearing, since in fact we, by law, have to go to

17 public hearing.  And what we're debating at this point

18 is when to go to public hearing, whether there should

19 actually be any consideration for a fare proposal.  Is

20 that -- I mean if the RAC really is being kept in the

21 dark in that, then I have to worry about whether we're

22 getting, you know -- maybe we're not getting

1  presentations to the Riders' Advisory Council that they

2  should have.

3  I mean how can they be laboring under the impression

4  that somehow we were going to consider increasing fares

5  without going to public hearing?  Did they get no staff

6  presentation, Mr. Catoe on budget matters?

7      MR. CATOE:  You were looking at me and I was

8  wondering if that was the question.  I am not aware of

9  us ever telling the RAC we would not have a public

10 hearing.  You must have a public hearing for fare

11 increases.

12     MR. ZIMMERMAN:  Oh no, my concern is that you

13 weren't telling them anything.  But I'm just asking if

14 that's the case, I don't know.

15     MR. CATOE:  Oh.

16     MR. ZIMMERMAN:  But we -- you know, on the one

17 hand we heard that, you know, they were told that the

18 staff couldn't present to them because we had directed

19 them, which obviously was a mistake.  But, are they

20 getting no, you know, no input about -- because I mean

21 it would be the most basic question.  If there's a fare

22 increase, what happens well we'd have to go to public

Page 14

1 hearing.  So, you know, when I see a resolution passed

2 after presumably some deliberation, it suggests to me

3 that they really haven't been given basic information

4 about how the process works.

5       MR. CATOE:  Oh, I believe what's missing here, it

6 just depends on how you define participation.  Whether

7 we have had a detailed briefing with the RAC on the

8 specifics of every detail of the recommendations and

9 asked for feedback on every detail that did not occur.

10 The broader discussion on fare increases, it's been a

11 topic of discussion back and forth between all riders

12 groups as well as the Board, and that has not been

13 something that we have withheld.

14             I have to agree, we didn't go into the

15 specificities, and we will do that.  But again, how you

16 define participation might be debated.

17       MR. ZIMMERMAN:  Well let me say, Madam Chairman as

18 one board member, my view is that we -- as we go forward

19 with this discussion of the budget and the fare issues,

20 that we very much need the Riders' Advisory Council to

21 be working along with us, being educated as we are, and,

22 you know, on the specific here, working through those

Page 15

1 things, learning about it and giving us feedback.

2 I would hope that they would be getting the same

3 kind of briefings that we've been getting and having the

4 same discussions, and struggling with us over the

5 question of how do we make the numbers work in the end.

6 And they need the opportunity to do that, and I really

7 hope that we're sure that they get the staff support

8 that's necessary for that, that they're encouraged to

9 have that discussion.

10 And at the same time, I would say, Mr. Snyder also

11 to understand that we do all have to make the numbers

12 work here.

13  And so we need constructive input as well.

14     MS. HEWLETT:     Okay.

15     MR. ZIMMERMAN:  Thank you.

16     MS. HEWLETT:     I'm sorry.

17     MALE VOICE:  I just want to add to the comment

18 though that there also seems to be some assumption that

19 they're getting less information than some of us are

20 getting.  And I want to make it sure -- make it clear

21 that that is not necessarily true.  And two, that it

22 doesn't make sense to provide you with information, as

Page 16

1 Mr. Graham stated, when in fact the information is not

2 going to even be considered.  That would be a waste of

3 your time as well.

4 So I think there's kind of a process of what's

5 needed information, when do you need it, and all those

6 kinds of things are things that have to be considered as

7 well.

8      MS. HEWLETT:      Ms. Hudgins followed by Mr.

9 Kauffman.

10      MS. HUDGINS:  Thank you.  Mr. Snyder, thank you

11 for your comment, because I think it probably goes to a

12 larger concern. I think it's unfortunate that you may

13 feel that you were left out of some critical

14 information.  I just wanted to ask staff a question.

15 When was the last time we had a Town Hall meeting?

16      MR. CATOE:  I'm trying to think of the date.  It

17 was a few months -- a couple of months ago.  I'm kind of

18 lost for dates, to be honest with you.  But it's been

19 with --

20      MR. ZIMMERMAN:  (inaudible) we did one, so the one

21 after that.

22      MR. CATOE:  Yes, and we had some later than that

Page 17

1 in the district.

2        MS. HUDGINS:  The reason I raise it, it was raised

3 to me and the question I would is are we utilizing the

4 tool to our benefit in order to better disseminate

5 information?  And I think that really when you have

6 something as drastic as major policy changes, it's an

7 opportunity to unconstrain us from the public hearing

8 process and be able to disseminate information that

9 allows folks to more freely have a discussion.

10 And I think we should probably think about that as

11 we try and move forward through this process.  I think

12 the Riders' Advisory Council is one aspect of it, but

13 there is a larger public and we did see more people

14 engaged in that process.

15        MS. HEWLETT:  Mr. Kauffman?

16        MR. KAUFFMAN:  Just for --

17        MS. HEWLETT:        Followed by Mr. Linton.

18        MR. KAUFFMAN:        -- for clarification, Mr.

19 Snyder, is October 3rd your next RAC meeting?

20        MR. SNYDER:  The first Wednesday of the month,

21 yes.

22        MR. KAUFFMAN:        Well then Madam Chair, I would

Page 18

1 think, without objection that we would request that the

2 RAC be briefed on fare policy and the fare proposal and

3 so we can have the benefit of their opinion and their

4 comments before our meeting on the 11th.

5        MR. GRAHAM:  To the extent that it's known.

6        MR. KAUFFMAN:  To the extent that it's known.

7        MALE VOICE:  Could you restate your --

8        MR. KAUFFMAN:  Basically at their October 3rd

9 meeting be given a briefing on the fare policy and the

10 fare proposals we discussed today.

11        MS. HEWLETT:  (inaudible).

12        MR. KAUFFMAN:  Because they may not be, you know,

13 this is one of the chicken/egg --

14        MS. HEWLETT:  Bring them up-to-date.

15        MR. KAUFFMAN:  -- discussions and bring them up-

16 to-date and whatever they have, as far along as they

17 are, because the concern being we are trying our best to

18 presage with the public reaction will be, as individual

19 members here.  Here's an opportunity to get it.

20        MS. HEWLETT:  Mr. Linton.

21        MR. LINTON:  I was actually going to follow up

22 with Mrs. Hudgins' remark and suggest that as we have

Page 19

1 some information and discussions about fare policy, that

2 we might want to take that to a Town Hall meeting.  But

3 that's when you talk about all the variables, which we

4 don't have right now. But that's where you will get a

5 chance to really talk with the public about what all the

6 issues are and challenges there are in funding this

7 system long term and what the fare policy considerations

8 would be.  But I wouldn't want to do that until we have

9 it more flushed out, so they have some variables and

10 information that they can absorb.

11 Going to them now without having that you really

12 don't give them the full magnitude of what the

13 possibilities are.

14      MS. HEWLETT:  Well they're not mutually exclusive

15 really. You could go -- someone could go with Mr. Snyder

16 who's been paying attention as well, and say -- just so

17 that RAC gets a flavor of what we've been struggling

18 with.  And that we don't have the answers yet, but

19 we're working diligently to get the answers and figure

20 out -- and that would sort of, you know, we could talk

21 about some of the issues that we've been grappling with.

22  And then as we get some of these policies, go back then

Page 20

1 you can do it --

2    MR. SNYDER:  Well one of our roles is to provide

3 you all on how we think the riders will feel about a

4 particular initiative.  And this is a good opportunity

5 for staff to be able to run things by us and see if

6 something is necessarily a nonstarter from a rider's

7 perspective, as opposed to the Board's perspective.

8 And that's all we're asking.  We understand that

9 things have not been worked out.  And we want to be a

10 partner in helping you to be able to formulate the

11 direction that Metro goes.

12    MS. HEWLETT:  I think the sentiment here is that

13 we're in agreement --

14    MR. GRAHAM:  Yes.

15    MS. HEWLETT:   -- with that.

16    MR. GRAHAM:  That's right, that's right.

17    MS. HEWLETT:  So --

18    MR. LINTON:  Madam Chair --

19    MS. HEWLETT:  Mr. Linton, followed by Mr. Catoe.

20    MR. LINTON:  -- one other question I had.  I noted

21 that the -- you made reference to this 1 percent, 12

22 percent, 5 percent and you were suggesting that the

Page 21

1 staff's recommendation of passenger revenue growth was

2 small compared to what it had been.  I was wondering,

3 Mr. Catoe, have you and your staff looked at that and

4 see whether or not there's some validity there, or?

5         MR. CATOE:  Yes, we've looked at past year revenue

6 growth. You know, in '07 it was 1 percent over the prior

7 year, if you

8 go to the two years preceding that it averaged about 12

9 percent -- or 6 percent per year.  And then if you go

10 back several years, many years, it's in the 2 1/2, 3

11 percent range over time.

12 So clearly growth has fallen off from what it was even

13 two to

14 three years ago.

15        MR. LINTON:  I thought that was the case, but

16 these numbers here don't seem to suggest it.

17        MR. CATOE:  Yeah, we would have to look at these

18 numbers. I'm not sure of the source of these.

19        MR. LINTON:  That's why I'm trying to get to see

20 if we can get some consistency of this, because the

21 numbers on this statement from the RAC doesn't seem to

22 be consistent with the numbers that I've seen in reports

Page 22

1 over the last -- particularly the last year where that

2 growth had greatly reduced.  Their numbers here don't

3 seem to reflect that.  So I'm trying to see --

4        MR. CATOE:  And we'll look at that.  The numbers I

5 just said are the numbers from our report.

6        MR. LINTON:      -- reconcile the differences

7 here.

8        MR. CATOE:  Yes, sir.

9        MS. HEWLETT:  Are there any other questions or

10 comments? Mr. Catoe, did you have anything else to add?

11       MR. CATOE:  We're fine, I understand the

12 direction.

13       MS. HEWLETT:  Okay.  Thank you very much, Mr.

14 Snyder.

15       MR. SNYDER:  (inaudible).

16       MS. HEWLETT:  Okay.  Okay, we now have the public

17 comment period.  We have a number of people signed up.

18 I'm going to remind everyone, thank them for coming

19 today, remind everyone that we have a two minute time

20 limit.  So as I call your name take that into

21 consideration as you're coming up to the podium so that

22 you'll know when your comments have to -- to wrap up

Page 23

1 your comments.  Sarah Green?  No?  Gone?

2        MALE VOICE:  I think she's gone, she's coming.

3        MS. HEWLETT:  Okay, coming, okay.  To be followed

4 by Seth Grimes.

5        SARA GREEN:  Good afternoon my name is Sara Green,

6 I'm an advisory neighborhood commissioner for the 01

7 (phonetic) in the District of Columbia.  And the

8 community that elected me to that position is the

9 community that lives all -- very close to your metro

10 station.  The metro station is within my single member

11 district.

12 And you've gotten this in the public hearing record,

13 but this is way more than a 1,000 signatures.  Your

14 riders who are District of Columbia residents, and the

15 community surrounding the Metro station all telling you,

16 "Please do not build the current proposal for 85 --

17 roughly 85 town homes at Takoma Metro Station."

18 Also, during your October 11, 2006 public hearing

19 between the spoken comments and the submitted comments

20 you had about 90 -- over 90 percent of those comments,

21 roughly 200 comments saying no, no, no.  There were very

22 few, if any, yeses to this proposal.  Why do you think

Page 24

1 that is?  Well it's because you're going to be selling

2 about 2/3 of the land at one of the very smallest

3 stations you have and you're going to be doing it to

4 build town homes with private, two car garages.  And in

5 order to build these town homes, which are 150 feet from

6 the fare (inaudible) you're going to have a network of

7 driveways and streets that are very, very land wasteful,

8 all at one of the smallest stations, to get those cars

9 into the private two car garages.

10 And you've been ignoring an alternative development

11 proposal that your staff refuses to look at, that the

12 staff report for that public hearing does not

13 acknowledge.  So, what we've been hearing time and time

14 again, from your staff, from elected officials years

15 ago, is that this is a done deal.  Don't come with any

16 alternatives, don't come opposing this, a public hearing

17 doesn't matter.

18        MALE VOICE:  Ms. Green.

19        SARA GREEN:  It's done deal.

20        MALE VOICE:  Your time is up.

21        SARA GREEN:  Thank you very much.  You have the

22 ability to do the right thing here and we're asking you

Page 25

1 to do that.

2        MS. HEWLETT:  Thank you Miss Green.  Seth Grimes

3 followed by Robert Diedrick (phonetic), did I --

4        SETH GRIMES:  Good afternoon Chairman Hewlett,

5 board members, Mr. Catoe and staff.  I'm Seth Grimes,

6 7300 Willow Avenue, Takoma Park, Maryland.  I'm

7 President of the Old Time Residents Association and a

8 member of an ad hoc group of Takoma Park residents, both

9 from the District of Columbia and Maryland who seek to

10 better our shared neighborhood.  In that respect we are

11 like many communities throughout the Washington, DC

12 area.

13        We are similarly considered with -- you are

14 similarly concerned with regional issues that cross

15 jurisdictional boundaries.  Joint development at the

16 Takoma Metro site is one such issue.  We in the

17 community appreciate the process that allows us to

18 comment at meetings such as this one, to testify at

19 compact hearings and in particular to offer our

20 reactions to a site design that affects the livability

21 and especially the transit usability and accessibility

22 of the Takoma Metro site, adversely affects it.

Page 26

1  We regret that we in the community have been an

2  after thought in the joint development process.  That

3  process has had many flaws and has culminated in a site

4  design that negatively limits transit access and

5  capacity.  We urge very significant design changes that

6  will transform developer EYA's plan even as recently

7  revised into two true transit oriented developments.

8  To this end we in the community have organized an

9  outreach effort to encourage our neighbors to make

10  comments in response to the staff report on the last

11  October's compact hearing.  And I think that you will

12  find those comments are overwhelmingly opposed to EYA

13  developer current plans.  I appreciate that you will

14  take into your consideration the comments that you

15  receive, all of you, without regard to jurisdictional

16  boundaries and the comment interests that we all have.

17  Thank you.

18      MS. HEWLETT:  Thank you very much.  Mr. Diedrick,

19  followed by Richard Holsage (phonetic).

20      MR. DIEDRICK:  -- board members and staff, I have

21  three quick points that I'll make on two interrelated

22  themes, cost efficiency and operational efficiency.

Page 27

1 (inaudible) procurement of the hybrid electrical buses

2 which I understand will be discussed today, it is very

3 important for the both cost efficiency and the

4 operational efficiency of the model, particularly with

5 hybrid buses which are very important to our system.

6 And I hope that this issue isn't being complated with

7 the separate procurement of the 22 articulated

8 compressed natural gas buses, which I also saw in the

9 little link below the item on the agenda.

10 In these times of budgetary issues and proposed fare

11 hikes, I hope the Board will thoroughly consider whether

12 riders will be best served and the cost efficiency of

13 WMATA will be served in the award of these hybrid buses.

14  I understand that there is a company that has extensive

15 experience having delivered early 400 buses to five

16 different transit authorities nationwide and has

17 submitted a proposal that delivers the most value at the

18 lowest cost to Metro riders and WMATA.  I understand

19 that this company is called NABI.  I don't know what

20 decision the Board plans to take today, but I urge the

21 board to table any decision until it carefully considers

22 and investigate why buses are not being purchased in the

Page 28

1 best interest of the riders and the efficiency of WMATA.

2 My second point is a little different track, but

3 it's still focused on efficiency.  The train track

4 between the airport and Braddock Road, the little yellow

5 lines, is running very slowly.  And it hinders the

6 commute both in the morning and at night.  And then

7 returning to both themes together, I know that, you

8 know, the budgetary issues and I know the proposed fare

9 hikes that you all are considering and I imagine that

10 you take your slogan, "Metro Open Doors," seriously.

11 And I hope you ensure that the cost of walking through

12 those doors is not prohibitive.

13            We can do that by managing our resources and

14 procurements to ensure cost effectiveness and

15 operational --

16       MALE VOICE:  Diedrick, your time is up.

17       MR. DIEDRICK:  Thank you, sir.

18       MR. ZIMMERMAN:  Question for the speaker, Madam

19 Chairman?

20       MS. HEWLETT:  Okay, Mr. Zimmerman, thank you.  Mr.

21 Diedrick, on your first point, the award of the contract

22 or procurement for buses, you're suggesting that it was

Page 29

1 somehow what's recommended to us is not the basis -- has

2 not been on the basis of competitive bid and it's not

3 the lowest cost?  And I was wondering what you were

4 basing that on?

5        MR. DIEDRICK:  My understanding is that there was

6 a competitive bid process.  What I do understand is that

7 it may not be the lowest bid.  And I don't know what the

8 considerations staff took into account when deciding

9 which recommendation to make to you all.  Frankly, I

10 don't think that is a matter of public record, at least

11 at this point.  So I'm kind of operating in the dark

12 here.

13 But I know, or at least I have reason to believe,

14 that it may not be the option that was in the best

15 interest of riders.

16        MR. ZIMMERMAN:  And grant it, it's not necessarily

17 on low bid, 'cause you know, we often use best value

18 procurement in these situations, because of course the

19 lowest price is not necessarily the best product.

20        MR. DIEDRICK:   (inaudible) that works too.

21        MR. ZIMMERMAN:  But what would lead you to

22 question, in this case, whether the recommendation is in

Page 30

1 the best interest of riders?

2      Mr. DIEDRICK:  Well frankly, just what I said,

3 that I understand that there is a provider that has

4 offered to an option that has a lot of experience behind

5 it, the company which I understand is NABI, has a lot of

6 experience --

7      MR. ZIMMERMAN:  Quite a few bus vendors and

8 they're one of them.

9      MR. DIEDRICK:  -- I'm sure.  And they have a lot

10 of experience in providing this type of service and I

11 don't know what the process was and the final decision

12 making, because that's not public.  But I am concerned

13 that there is such a vendor out there that has a lot of

14 experience, that has submitted a low cost bid.  I don't

15 know if it was the lowest or not, because that's not

16 public information, but I don't know if it was

17 considered and I don't know if that decision making

18 process can be made public.

19      MR. ZIMMERMAN:  And we -- when we get to that item

20 you can certainly ask those questions.  I just was

21 trying to understand what basis there might be for you

22 having such a suspicion.  In any case, when there's a

Page 31

1 procurement there are always bidders and there's always

2 people who lose the bid.  And my experience, those who

3 lose the bid always say theirs was better, but in the

4 end you have to evaluate it based on price and other

5 factors that are in the best value procurement are laid

6 out beforehand.

7 And so in any case, I mean it's always a fair

8 question to ask about any procurement, why this one and

9 not another one.  But usually there's a pretty

10 straightforward answer to that.  And I just wondered

11 whether there was something about this one that would

12 lead you to think something else was going on.  You

13 know, again, I know the names of the major bus

14 manufacturers and several of them might have been

15 interested and one of them is being recommended.  Why

16 should I, as a board member, be concerned that one of

17 the ones that didn't get the bid would be better for us?

18     MR. DIEDRICK:  Well other than what I've said I

19 can't point to anything specific in this case that might

20 raise more suspicions than others.  But as you said,

21 it's always a fair question, procurements, you know, why

22 this one and not the other one.  And when we have a

Page 32

1 company that at least -- I mean and you probably have

2 access to far more information than I do about who

3 submitted bids and who didn't.  I don't have all that

4 information.

5       MR. ZIMMERMAN:  Not necessarily, no.

6       MR. DIEDRICK:  Not necessarily, but maybe the

7 staff does. I'm just aware that there's a company with

8 an extensive amount of experience that my understanding

9 put in a low cost bid and I just don't know was that

10 cost effective?  Was that decision made in the best

11 interest of the riders?  And I think that warrants the

12 Board's consideration.

13       MR. ZIMMERMAN:  Okay.  Thank you.

14       MS. HEWLETT:  Are there any other questions?  Mr.

15 Holsager (phonetic) followed by Faith Wheeler.

16       MR. HOLSAGER:  My name is Richard Holsager, I live

17 on Pine Branch Road in DC, about three blocks from

18 Takoma Metro.  Given where I live it's no surprise that

19 I want to talk about a topic spoken of by two of my

20 predecessors, one of whom happens to be my wife, I

21 should disclose.

22 I want to talk about the response to the report on

1 the compact hearing on the planned joint development

2 (inaudible) and I have my response to that hearing here

3 that I plan to turn in and as long as I'm here I thought

4 I would try to emphasize my main point, which is that I

5 think that the report is highly selective, which leads

6 to a foregone conclusion and is basically not really a

7 report but testimony by an advocate of the (inaudible)

8 plan.

9 As far as I can telling, having read through it, I

10 think I saw the whole thing.  It fails to even mention

11 the fact mentioned by my wife already, that the oral and

12 the written testimony was overwhelmingly in opposition

13 to this plan, both from DC and Maryland people, that

14 that opposition has been uniform throughout all the

15 public hearings that have occurred throughout the

16 process.  And also, I think it greatly understates the

17 amount of noncompliance of this plan with the Takoma

18 Central District plan, which forms the basis of the

19 official support for this plan by DC.

20 So in fact, I think in terms of either public or

21 official support, it really is misleading to think that

22 DC supports this plan.  Thank you.

Page 34

1       MS. HEWLETT:   Thank you.   Are there any questions?

2   Okay. Ms. Wheeler followed by -- I may no say this

3   correctly, Joe--Jiocchi (phonetic).   Is that right?

4   Perry?   Thank you. Ms. Wheeler.

5       MS. WHEELER:   Good afternoon ladies and gentlemen,

6   WMATA board members and staff.   My name is Faith

7   Wheeler, an advisor and neighborhood commissioner (tape

8   damage) off peak ridership, we in Takoma want Metro to

9   continue to be the best ride in the nation.   We in

10  Takoma are an original cross jurisdictional, transit-

11  oriented community since it was first established in the

12  1880's, that's the 19th century, around the D&O

13  Metropolitan Branch tracks, which is exactly the same

14  rail bed that the Red Line of WMATA uses today.

15  In the 1960's the Takoma community, DC and Maryland,

16  were instrumental in stopping the North Central Freeway

17  which was to bring some 12,000 cars into the city.   We

18  urged that the federal highway funds be transferred to

19  establish a rail system, a rapid rail system, a Metro,

20  the WMATA Metro.   We are a great supporter of WMATA, we

21  are an initiator in supporting and establishing WMATA,

22  our Metro.

Page 35

1            In the 1970's our Takoma station (inaudible)

2 community and it's taken hundreds of drivers off our

3 streets. Now in 2007 we're looking at a new (inaudible)

4 terminal --

5        MALE VOICE:  Ms. Wheeler, your time is up.  Thank

6 you.

7        MS. HEWLETT:  Thank you Miss Wheeler.  Mr. Perry?

8 If you have comments in writing you can submit them.

9 Followed by Norman --

10       MR. PERRY:  Good afternoon.  My name is Giocat

11 (phonetic) Perry and I'm visiting you here from Atlanta,

12 Georgia.  I'm a member of the Atlanta Jobs for Justice

13 (inaudible) campaign, our transit agency.  I'm here

14 pretty much alluding to the sign on the wall that the

15 previous speaker (tape damage) because that always held

16 Metro system out as a national example.

17 We are visiting this week considering a return to

18 the DC area.  So on Tuesday I got information that there

19 any be a fare increase.  I've done some transit justice

20 work in Atlanta with (inaudible) and we're a coalition

21 in 40 cities, in 12 states across America with over

22 5,000 members.  (tape damage) national office here on

Page 36

1 (tape damage) local office, it's on (tape damage)

2 concerned about this proposed fare increase (tape

3 damage) my efforts and work that I found that a severely

4 transit dependant community (tape damage) burden cost

5 for transit, and that's all across America and it's

6 unjust and it's unfair.

7 You're having (inaudible) transit racism (inaudible)

8 Dr. Robert Bullard's book, Transit: Highway Robbery,

9 (tape damage).  So for democracy of all these transit

10 (inaudible) that include transportation employees (tape

11 damage).

12       MALE VOICE:  Mr. Perry, your time is up.

13       MR. PERRY:  Thank you, transit justice for all.

14       MS. HEWLETT:  Thank you.  Norman, is it Book?  No?

15  Beeke (phonetic)?  Okay, are there any other speakers

16 who've signed up today, because I might not be

17 pronouncing it correctly.  No? Hearing none, I'll

18 declare that potion of the agenda to be over, the public

19 comment period.

20 Okay, we now have the report by the Chair.  I only

21 have two things to address really, one on a more

22 pleasant note. The 31st Annual Metro Bus Roadeo, R-O-A-

Page 37

1 D-E-O, took place on September 15th.  And this event, as

2 you may know, is a great way to encourage our bus

3 operators and maintenance teams to take pride in their

4 work.  And we just wanted to congratulate two folks.

5 Well actually a couple of folks here.  First, Robert

6 Miles of the Landover Bus Division in Prince Richard's

7 County, for winning the operator competition for the

8 19th time, the 19th time.  Miles is a 37 year veteran

9 with Metro Bus.  He competed against 69 fellow bus

10 drivers on an obstacle course that included every

11 conceivable maneuver a bus operator would ever encounter

12 on the street.  So we congratulate Miles.

13 In the maintenance competition there is a team of

14 Don Rich, David Swearman (phonetic), and Kim Pe Trin

15 (phonetic) from the technical support service branch, in

16 Washington, DC, who took first place.  And this was just

17 their second year of competition.  So we wanted to

18 congratulate all those winners and wish them the best of

19 luck when they represent WMATA at the American Public

20 Transit Transportation Association International Bus

21 Roadeo in May, 2008 in Austin, Texas.  So we want to

22 congratulate them.

Page 38

1 Now the second item I have to take the chair's

2 privilege in addressing something that we have been

3 addressing but I was fairly silent today.  So -- but not

4 right now.  I just want to make it clear that we take

5 the proposed fare increase very, very, very seriously.

6 It's a comment that has been the topic of the day and

7 it's clear -- and it will be the topic of many, many

8 days to come.  But the things that I wanted to point out

9 were that we all feel very, very strongly about this

10 issue. We may not come down the same way, but we all, on

11 this board, feel very, very strongly about this issue.

12 And we recognize, as one of our goals, that one of

13 our primary goals to provide quality, dependable and

14 affordable transportation.  This board understands that

15 Metro's operating costs are rising, that we are

16 grappling with this as are many other transit operations

17 in all the jurisdictions throughout. Like everyone else,

18 we recognize that it's a problem and we're grappling

19 with how do we fix this budget, this eminent budget

20 dilemma without placing the burden unfairly on the backs

21 of our riders.

22 We all care about our riders.  We all recognize how

1 -- the extent to which this could affect our customers,

2 particularly those who ride the rail system, those who

3 ride the bus system and those who use our parking

4 facilities, and particularly those who use all of the

5 above.  It can have enormous impact on them and we care

6 about all of those riders.

7 We want to ensure the public that the board members

8 and I do not take this decision lightly, we are acutely

9 aware of our responsibility and we recognize that

10 ultimately -- and I have faith that ultimately we will

11 all do the right thing, even if that right thing is not

12 the popular thing.  We will all do the right thing, but

13 not before analyzing all the information that comes to

14 us from our staff, from our professionals there, not

15 before analyzing all the information and the testimony

16 that we hear at our public hearings, not before getting

17 all the input that we can from the Riders' Advisory

18 Council, and not before getting all the board questions

19 answered.

20 We are going to take all that stuff, synthesize it,

21 distill it and try to make the best decision that we

22 possibly can after soliciting the rest of the

1 information via public hearing process.  So I want to

2 make it clear that right now we are still in that stage

3 of analyzing information that comes to us.  And we're

4 just really at the beginning still.  And we will have

5 public hearings, and no decision has been made.  And I

6 really wanted to take the opportunity to thank Mr. Catoe

7 and staff.  You know, we are all bombarding you with

8 questions, not just at these special sessions, we had a

9 special session, finance committee meeting today, we are

10 going to have a special board meeting.  I mean we are

11 really, really engaged and interested here, because we

12 recognize how serious this is.  So we wanted to thank

13 you for your constant feedback and for all of your

14 efforts.  And the e-mails that have gone back and forth,

15 I mean we all have questions for you.

16 And I'd also like to the citizens who have e-mailed

17 and called and those who've come here today to speak on

18 this subject, because your input is invaluable as well.

19 And I think the Board has been truly engaged and even

20 though we have differences on how we come down, I think

21 we're all concerned about our riders and making sure

22 that our fare policy is just that, fair, F-A-I-R.

Page 41

1 So I did want to mention that.  I think we are on as

2 Mayor Yul (phonetic) said, we are on the right track

3 here, but we've got to keep going.  So thank you so

4 much.  And with that we have the report of the general

5 manager, Mr. Catoe.

6      MR. CATOE:  Thank you Madam Chair, and Madam

7 Chair, members of the board, I'm going to make my report

8 very short given the lateness of the day.  From a safety

9 standpoint I just want to notify you that we have moved

10 into a new phase of our safety improvement program.  And

11 our contractor has completed work on the safety

12 assessment and is now briefing the results to our

13 employees.  And we will keep this board informed of the

14 results of that.

15 In addition, we ended the last day of service for

16 the Nationals at RFK, and we provided services for over

17 246 home games.  And we're very successful in doing

18 that, in moving a lot of commuters.

19 Today there was an article concerning the possible

20 delay in the completion of the Navy Yard Station

21 expansion or the new entry to the Metro rail system.

22 There's two pieces of construction going on at that

Page 42

1 location, one that's being handled by Metro staff and

2 the internal configuration of the station, and the other

3 that's being handled by the developer putting up a

4 complex there.  That is behind schedule, the developer's

5 work schedule is delayed by, I think, approximately

6 seven weeks. We've been assured, and our observation has

7 been they're putting in extra efforts in order to get

8 that project completed on time.

9 But I wanted to ensure this board as well the Nationals,

10 that

11 we are and have contingency plans to be able to provide

12 those services at the beginning of the baseball season.

13          The other is concerning our services that a

14 gentleman brought up today about the slowness of trains

15 between National and other stations --

16          MALE VOICE:  Braddock.

17          MR. CATOE:  -- and Braddock station.  We have

18 replaced the main transformer at the Pacific Yard's

19 electric substation. That was the transformer that was

20 the major cause of our power problems on August 26th.

21 And we've also reconfigured the substation at National

22 Airport to improve that efficiency.

Page 43

1 In addition, there was a question from the Riders'

2 Advisory Committee at the last meeting, concerning

3 recycle bins for newspapers.  And we do have recycle

4 containers that, I believe, were provided by the

5 Washington Post, that are at our stations.  And we

6 recycle the newspapers.  There are a couple locations

7 where we find that they become an overload because of

8 the number of passengers.  And so we're working to

9 secure additional bins there.  But we do recycle the

10 newspapers.  As I mentioned, we handle those very well.

11 There's a couple of stations where it's slightly going

12 over the capacity of the bins themselves.

13        MR. ZIMMERMAN:  Question on that, Madam Chair?

14        MR. CATOE:  Yes.

15        MS. HEWLETT:  Yes, Mr. Zimmerman?

16        MR. ZIMMERMAN:  Well that report be given to the

17 Riders' Advisory Council since they raised the question

18 in the first place?

19        MR. CATOE:  Yes, we will give a report and a

20 response back to them.  I believe you say you have a

21 meeting on October 3rd, we'll make that presentation to

22 them on October 3rd.

Page 44

1        MR. ZIMMERMAN:  Okay.  Thank you.

2        MR. CATOE:  Also, before I get into recognizing

3 one of our employees, I do have to let the board know

4 there are pending protests on two items before you today

5 for approval.  There are two protests on the bus award,

6 one from Design Line International and North American

7 Bus Industries, or NABI, N-A-B-I, to the award of a bus

8 contract in New Flyer.  Should you authorize the award

9 to New Flyer our procurement regulations require a delay

10 of the actual award for five days following the

11 contracting officer's review and also decisions on the

12 protest. And we will follow our normal procedures should

13 you approve that award.

14 The second protest is brought by NR Ballpark Seven,

15 LLC concerning the sale of the Southeastern bus garage.

16 The procurement regulations do not apply to the sale of

17 our property.  However, should the Board approve the

18 sale today, the award would be made as soon as possible

19 following review of the protest.  Are there any

20 questions on that?

21        MALE VOICE:  -- update?

22        MS. HEWLETT:  Are you just -- if you want to

Page 45

1 answer your question.

2          MALE VOICE:  If you'd like to (inaudible).

3          MR. GRAHAM:  Are we interrupting or doing this

4 now?  Or waiting to the end of the report?

5          MR. CATOE:  I have some more but it is a separate

6 issue. If you are bringing up -- if you have a question

7 I will try my best to answer it.

8          MR. GRAHAM:  Well, I am struck by something he's

9 just said, I mean since you already asked the question.

10         MR. ZIMMERMAN:  Which question?

11         MR. GRAHAM:  I don't know, whatever you asked.

12 But anyway, I'm surprised, well maybe not surprised,

13 I'm struck, that's what I wanted to say.  You said that

14 in the case of the Southeastern bus garage, that even

15 though there was no delay required by our procurement

16 regulations you would delay the decision until -- what

17 did you say about that?

18         MR. CATOE:  No, no.  I said should the board award

19 the garage to the successful bidder, that we would go

20 through the normal review process to ensure that we

21 followed all the procedures, and our procedures for

22 procurement generally is a five day delay of the release

Page 46

1 of the property itself, it would delay it five days,

2 just for the review process.

3     MR. GRAHAM:  But I thought I heard you say that

4 that didn't apply to dispositions.

5     MS. O'KEEFE:  Just as a clarification, the

6 disposition of surplus property is not governed by

7 procurement regulations. Both FTA regs and our

8 procurement regulations require a delay of five days of

9 an award after a protest has been resolved.  That does

10 not apply to the sale of the Southeastern bus garage,

11 but we would, of course, respond to the protest and then

12 move forward with the award should the board approve it

13 today as quickly as possible after the protest has been

14 answered.  The protest was just received late yesterday.

15     MR. GRAHAM:  The question, you know, the question

16 Madam Chair that I was going to ask at the conclusion of

17 your remarks, but I'll ask now, you know, does pertain

18 to these delays, because, you know, I appreciate the

19 comment that you made on the delays at the Navy Yard.

20 But I think we need something more specific to assure us

21 that if the improvements at the Navy Yard Station are

22 not made -- are not to be completed by opening game day,

Page 47

1 I think we need a Plan B in place for how to handle that

2 opening day crowd.

3 And so I would like to ask, if I may, for more

4 detailed consideration of what our options are there

5 because we may end up with delays there.  And I am also

6 concerned about whatever decision this board makes on

7 the disposition of the Southeastern bus garage that we

8 move as expeditiously as possible because again that

9 particular property has great relevance to the opening

10 day, as well, of the baseball season because the owners

11 of the team and the District of Columbia are

12 anticipating that there would be 350 parking spaces in

13 that garage.  And we're also concerned about pedestrian

14 safety which is one of the reasons we are moving the

15 garage.  So that all of these buses moving at the same

16 time as people are arriving for a baseball game is

17 obviously not a situation that we want to have happen.

18         And so on both cases I want to be assured, and I

19 was a little bit taken aback about your comment, that

20 you know, it seemed as though there is going to be an

21 extended process.  I mean we should follow our

22 procedures precisely.  And if they involve a delay we

Page 48

1 should have the delay and if they don't involve a delay

2 we ought not have it.  Do you understand what I am

3 saying?

4      MR. CATOE:  I understand, that's very clear to me.

5      MR. GRAHAM:  There was a little bit of a mixed

6 message here.

7      MR. CATOE:  That's very clear.

8      MR. GRAHAM:  I mean whatever our policies, are I

9 definitely want to abide by them.  But I don't want to

10 create a new consideration that involves delays relating

11 to this property, 'cause we just can't afford it.  Are

12 we on the same page?

13      MR. CATOE:  Yes we are.

14      MR. GRAHAM:  Okay, great.  Thank you.

15      MR. CATOE:  Thank you.  At each board meeting we

16 like to recognize the outstanding work our employees do

17 each and every day.  Today I would like to talk about

18 Cynthia Champion one of our Red Line station managers.

19 And she is here this morning. Better yet I am going to

20 let you hear about what had happened in the words of one

21 of our customers and I will be paraphrasing the letter

22 we received from the customer who was visiting from Ohio

Page 49

1 two months ago.  "On July 19th my ten year old daughter

2 and I were separated after we departed from DuPont

3 Circle.  We arrived at Farragut North and I stepped off

4 the train assuming my daughter was right behind me.  She

5 was not.  I turned and saw the train take off, all the

6 while my daughter's face was glued to the window, as we

7 watched each other vanish, seemingly forever.

8 Can you imagine the panic and horror in our minds.

9 I had no idea what to do at this point.  I ran to the

10 upstairs platform where I approached a woman, a Metro

11 employee, and explained what has happened.  She quickly

12 gathered the facts and called in the troops and managed

13 to stay on top of every aspect of what was transpiring

14 on the Red Line.  She stayed near me and assumed that my

15 daughter would be found no mater what.  She was right.

16 She had already orchestrated many other security

17 teams at various points of the Red Line, particularly

18 Metro Center.  I was impressed that she also had

19 contingency plans in the event that she was not found

20 there.  My daughter was found at Metro Center by your

21 security team, where she was held until I was able to

22 get to her.  I cried twice in the last 20 years. And

Page 50

1 this is one of those occasions whereby I let loose with

2 tears of joy when this woman conveyed to me that my

3 daughter was found at Metro Center.

4 It is people like this Metro employee that makes the

5 world a safer place.  Her attention to detail and her

6 attention to others concern should be rewarded with the

7 highest praise.  I thank the entire Metro Subway System

8 for their organization and professionalism during such

9 stressful moments."

10 The actions of station manager Cynthia Champion are

11 a reminder of just how seriously our employees take

12 their responsibilities.  I am grateful and proud of Ms.

13 Champion for the example that she has set for all of us.

14  And now I would like to present to Ms. Champion a

15 certificate acknowledging her excellent work and ask

16 that the board also thank her for the outstanding

17 performance she demonstrated on July 19th.

18 (inaudible) Washington Metropolitan Area Transit

19 Authority (inaudible) as a general manager, recognizes

20 the station manager ,Cynthia Champion, for

21 professionalism and outstanding service to our

22 customers.

Page 51

1 Do you have any comments you want -- I know your

2 husband's here also.   (tape damage) Madam Chair, that

3 completes my presentation.

4      MS. HEWLETT:   Thank you.   Ms. Champion, on behalf

5 of the board we thank you so very much for your

6 responsiveness, for being so quick on your feet and

7 deflecting what could have been a really tragic

8 circumstance.   So thank you so very much on behalf of

9 everyone.

10 Okay.   We have item number 8 on the report of

11 Customer Service Operations Safety Committee, Mr.

12 Benjamin.

13      MR. BENJAMIN:   My staff is requesting approval to

14 award a one year base and four one year options for the

15 purchase of 474 buses over a period of five years.   This

16 was brought to us in committee and we requested a

17 detailing of what buses would be bought and the funding

18 associated with them.   The information that we have

19 received shows that 125 buses would be part of the base

20 buy and 100 buses in FY '09 as the first option.   There

21 are no funds available for the remaining 249 buses in

22 this order. So I am therefore moving that we approve

Page 52

1 this request for an award of these buses for the base

2 year and the one year option and the remaining options

3 based on availability of funds.  Are there additional

4 follow-ups, or do you need a second and also --

5        MS. HEWLETT:  Yeah. We need a second

6        MR. BENJAMIN:  -- we need to follow up --

7        MALE VOICE:  I'll second it.

8        MS. HEWLETT:  Second.  And any discussion.

9        MR. BENJAMIN:  And we need a follow up on the

10 issue brought up earlier

11        MS. HEWLETT:  Okay.  Mr. Moneme, oh I thought you

12 had something.

13        MR. MONEME:  Oh, I'm sorry.

14        MS. HEWLETT:  Go ahead.  Mr. Zimmerman.

15        MR. ZIMMERMAN:  Okay.  Mr. Catoe, can you address

16 the question about, well first just tell me generally

17 how this procurement recommendation was made?  How did

18 you come to the award that you are asking us to approve?

19        MR. CATOE:  We went out for requests for best

20 value proposals to various firms to provide buses.  And

21 the various bids came in, we reviewed those via

22 committee, which I was not a part of and I purposely

Page 53

1 stayed out of that process.  The committee and their

2 best judgment based upon the technical requirements of

3 the specifications as well as what was submitted,

4 recommended that we procured 22 articulated buses from

5 NABI and that the additional vehicles be obtained from

6 New Flyer.  And we have staff here who could go into the

7 actual details of that procurement process if necessary.

8        MR. ZIMMERMAN:  What I want to know is did -- and

9 you said, you didn't yourself participate directly, but

10 you have reviewed it.

11        MR. CATOE:  Yes I did.

12        MR. ZIMMERMAN:  And so first, are you satisfied

13 that the process conformed to our own regulations and

14 those of the Federal Transit Administration?

15        MR. CATOE:  I am completely satisfied that the

16 process conforms to our Metro requirements as well as

17 those requirements of the Federal Transit

18 Administration.

19        MR. ZIMMERMAN:  And the protest that you referred

20 to earlier, is that concerning the entire procurement or

21 one aspect, one component of it?

22        MR. CATOE:  I have not had the chance to look at

Page 54

1 the details of the protest.  The protest though, I

2 believe, is from one provider is the entire award and

3 from the other provider is a portion of the award,

4 because one of the protesters we are procuring buses

5 from them.  It is the second piece that they are

6 protesting, every vehicle -- the non-articulated

7 vehicles.

8        MR. ZIMMERMAN:  They got one award, They didn't

9 get the other.  They are objecting to the part they

10 didn't get?

11        MR. CATOE:  Right.

12        MR. ZIMMERMAN:  And just briefly what is the basis

13 for the protest.

14        MR. CATOE:  I have not had a chance to read the

15 protest, I don't know if you?

16        MS. O'KEEFE:  Well essentially they are saying

17 they provided the lowest price and it should have been

18 awarded on that basis.

19        MR. ZIMMERMAN:  Okay.  And the procurement was on

20 the basis of best value?

21        MR. CATOE:  Yes.

22        MR. ZIMMERMAN:  Because it is not like buying

1 number 2 pencils, there are actually different

2 characteristics of the product we're purchasing?  Yes?

3     MR. CATOE:  Yes.

4     MR. ZIMMERMAN:  And how significant a price

5 difference are we talking about?

6     MR. CATOE:  I am going to ask the staff to respond

7 to that.

8     MALE VOICE:  I would have to defer to Mr. Griswall

9 on that one.  Well from what I know initially the

10 pricing came in, I think there was a $2 million

11 discrepancy between one of the protesters and the one

12 the staff recommended.  Subsequent to that, the way the

13 buses were scheduled to be delivered the pricing was

14 adjusted and they're virtually the same.  That has to do

15 with the tie in of the (inaudible) procurements being

16 awarded concurrently.

17     MR. ZIMMERMAN:  Okay.  I'm not sure I follow that.

18  All I wanted to know was are these guys saying there

19 price is five percent lower, 10 percent lower, 50

20 percent lower?

21     MALE VOICE:  They didn't give us any (tape damage)

22 percentage differential between the two proposals.

1 Because I am not sure that they are aware of the one

2 that was -- you know, one is aware of what the other has

3 submitted at this point in time.

4        MR. ZIMMERMAN:  But you are.

5        MALE VOICE:  Yes.

6        MR. ZIMMERMAN:  So, Since you know what they were

7 saying that they would sell us X number buses and you

8 divided by, you know how much it is per bus?

9        MALE VOICE:  Yes.

10        MR. ZIMMERMAN:  So you can say, these guys bus --

11 their bus cost five percent more than these.

12        MALE VOICE:  Well initially there was a

13 differential of about that amount, five percent.  But

14 like I was saying, subsequent to that, when the award

15 was -- the proposal was addressed, and the final pricing

16 was provided based on the award information, they both

17 were within, I think, .09 percent they ended up.

18        MR. ZIMMERMAN:  One went up or the other went

19 down?

20        MALE VOICE:  One went down.  One of them went

21 down.

22        MR. ZIMMERMAN:  The one you were awarding --

Page 57

1       MALE VOICE:  Yes, went down.

2       MR. ZIMMERMAN:  -- appeared to be?

3       MALE VOICE:  It came down.

4       MR. ZIMMERMAN:  Now how could that be if it's a

5 bid?

6       MALE VOICE:  Well what happened, the delivery

7 dates of the buses remained the same starting in the

8 fall -- the beginning of fiscal year '08 and being

9 completed in fiscal year '09.  But if you made the award

10 concurrently, economies of scale, even though the

11 expenditure didn't change, the fact is if they were

12 awarded upfront, the price went down instead of --

13      MR. ZIMMERMAN:  You know, it sounds like as if

14 there was a negotiation subsequent to the award being

15 determined --

16      MALE VOICE:  It was --

17      MR. ZIMMERMAN:  -- to change the terms of the

18 offer?  Is that what I'm hearing?

19      MALE VOICE:  -- there was no negotiation.

20      MR. ZIMMERMAN:  Well how does the bid change after

21 -- I mean if you have a sealed bid process --

22      MS. O'KEEFE:  (inaudible) it was a request for

Page 58

1 proposals. So under an RP, you can have a type of

2 negotiation, it's not a direct negotiation, but there

3 can be discussions and the proposers can be given the

4 opportunity to provide a best and final offer after t

5 discussions, all proposers of course are given that

6 option, as I understand it.

7    MR. ZIMMERMAN:  Thank you for that clarification.

8    MS. O'KEEFE:  Yes.

9    MR. ZIMMERMAN:  So under the process, the initial

10 bid is not the best and final offer and there's give and

11 take with the various proposers.  And if, in the course

12 of that discussion they modify it, the cost number can

13 change?

14    MS. O'KEEFE:  Yes.

15    MR. ZIMMERMAN:  Do secondary -- I mean again,

16 suppose you have that back and forth with one bidder of

17 say three, I don't know what there were, but I image

18 there were three.  And you know, you have that back and

19 forth and one bidder's numbers get better then.  Is

20 there any way -- do you then go and try to determine

21 from the other bidders whether theirs would change?

22    MS. O'KEEFE:  I can't speak to this specific

Page 59

1 process, but generally, in a request for a proposal if

2 there are true discussions that lead to, for example,

3 one proposer improving their bid, then all proposers are

4 allowed to do so.  So you don't just pick out one person

5 or one proposer and treat them differently.

6 But I'm not familiar with the procedures.  I haven't

7 had a chance to review the protest yet.  But I'm talking

8 generally, the difference between a request for proposal

9 and an invitation for bids.

10     MR. ZIMMERMAN:  Couple of questions.  First, Mr.

11 Catoe, are you confident that anyone who wanted to had

12 the same opportunity as the firm that you're

13 recommending be awards the contract?

14     MR. CATOE:  Had the same opportunity if they met

15 the specifications, outlined in the original request,

16 yes.

17     MR. ZIMMERMAN:  (inaudible) what it is you want to

18 see in the product they're going to sell you, and they

19 have to be responsive to that?

20     MR. CATOE:  I'm sorry, I missed that question.

21     MR. ZIMMERMAN:  Specify --

22     MR. CATOE:  Yes.

Page 60

1      MR. ZIMMERMAN:  -- what it is you want to buy and

2 bidders have to be responsive to that.  If they're not

3 --

4      MR. CATOE:  Have to be responsive to that and they

5 have to have a product that meets our needs and the

6 product has to have been certified for use in the United

7 States.

8      MR. ZIMMERMAN:  In this case, the award -- the

9 difference seems not to have been really around price

10 anyway, ultimately.

11      MR. CATOE:  Right.

12      MR. ZIMMERMAN:  So there's a difference between

13 the one you're recommending and the ones you're not

14 recommending, in terms of what kind of characteristics?

15 Are you saying the others were nonresponsive?  Are you

16 saying that this one is superior in some specific

17 features or?

18      MR. CATOE:  There are different degrees of detail

19 and I know some of it, but let me --

20      MR. ZIMMERMAN:  A simple one.

21      MR. CATOE:  -- go into detail.  For an example,

22 one of the providers have not had their vehicle that

Page 61

1 they proposed tested. And Pennsylvania is required by FT

2 -- Altoona testing site -- and there is no vehicles in

3 operation in the United States and there's some

4 questions about the percentage of the Buy America

5 Regulations, whether they met that, that's one example.

6        MR. ZIMMERMAN:  Okay.

7        MR. CATOE:  The example on the second one I'm

8 going to have to --

9        MALE VOICE:  Well the example on the second one,

10 they had no real experience in the Harvard electric

11 propulsion portion of their vehicle as they proposed.

12 They did have the background and technical expertise in

13 the BRT portion.  But they, to date, had only built one

14 bus, that was their test bus.  And there were also some

15 concerns about some structural issues that had occurred.

16  We met with them and discussed them.  They did have

17 some resolutions in place, but we didn't feel

18 comfortable that enough mileage had accrued since the

19 repairs had been made, that the bus would perform well

20 in our duty cycle.

21        MR. ZIMMERMAN:  Thank you.  Madam Chairman, I

22 think this illustrated, in part, the reason why

Page 62

1 procurement becomes complex as you're buying a complex

2 product.  And the fact that, you know, you can't do

3 something as simple as low bid, because the nature of

4 whatever you buy is different from different providers.

5 And I've seen this in the past where you'll have a bid

6 process and somebody will object, and what they're

7 objecting to is they essentially want to sell you

8 something different than you said you wanted to buy.

9 And they say, "Well you really shouldn't be asking

10 me for that.  You should be asking me for this, which

11 (inaudible) what I sell."  I don't know if that's the

12 case here, but I know that's often at the heart of a lot

13 of dissatisfaction by unsuccessful bidders.  I'm

14 satisfied that, you know, the process here is followed

15 here as it is in every such bid and at some point we

16 have to trust the experts who do this for us to evaluate

17 the criteria that's most important.

18 And (inaudible) support the recommendation with the

19 understanding that, as we heard, the usually process

20 will also apply afterwards.  And the general manager and

21 staff will have to review the award once more and

22 determine that in fact all the requirements are

1 satisfied, and then it would go forward.  Thank you,

2 Madam Chairman.

3       MS. HEWLETT:  Thank you.  Are there any other

4 questions? Okay, right now we have a --

5       MALE VOICE:  A vote.

6       MS. HEWLETT:  -- a motion and a second.  All in

7 favor of the report?

8       GROUP:  Aye.

9       MS. HEWLETT:  Opposed?

10      GROUP:  The ayes have it.  Okay, Mr. Graham, we

11 had the report of the Finance Administration and --

12      MALE VOICE:  Oh, you're not with the (inaudible).

13      MS. HEWLETT:  Oh, we're on B.  I'm sorry, B.  Mr.

14 Benjamin?

15      MR. BENJAMIN:  There's a staff request for the

16 Board to authorize a public hearing to discontinue

17 service on Route C7 and C9 from Greenbelt to Glenmont.

18 And to reinvest those funds within Montgomery and Prince

19 George's County.  This was before the Board once before,

20 was postponed.  I believe Prince George's and Montgomery

21 County have determined how they wish to move forward and

22 would like us to reconsider this at this time.  So I

Page 64

1 move authorization to conduct a public hearing.

2      MS. HEWLETT:  We have the motion.  Is there a

3 second?

4      MALE VOICE:  If you want to second.

5      MS. HEWLETT:  I'll second.  Okay.  All in favor?

6      GROUP:  Aye.

7      MS. HEWLETT:  Opposed?  The ayes have it.  Now,

8 Mr. Graham, report of the Finance Administration and

9 Oversight Committee.

10      MR. GRAHAM:  Thank you very much, Madam Chair.

11 The following actions, well I should say that the

12 Finance Administration and Oversight Committee met on

13 September the 13th, and the following actions were

14 referred to the Board by the committee.  First, use of

15 the operating reserve and refund of jurisdictional

16 balances on account, staff requested approval to use the

17 authorized contingency reserve totaling 10.4 million to

18 fund a portion of the FY '07 operating budget deficit

19 expected to be 19.9 million.

20 Committee members from all three jurisdictions

21 requested the jurisdictional balances, totaling 8.3

22 million be held on account.  I move approval.

Page 65

1          MALE VOICE:   Second.

2          MS. HEWLETT:   We have a motion and a second.   Is

3 there any discussion?   All in favor?

4          GROUP:   Aye.

5          MS. HEWLETT:   Opposed?   The ayes have it.

6          MR. GRAHAM:   Staff also requested approval to

7 reward a contract for consulting services to develop a

8 comprehensive plan to reduce energy consumption in Metro

9 facilities.   I move approval.

10          MALE VOICE:   Second.

11          MS. HEWLETT:   We have a motion and a second.   Is

12 there any discussion?   All in favor?

13          GROUP:   Aye.

14          MS. HEWLETT:   Opposed?   The ayes have it.

15          MR. GRAHAM:   Staff also requested approval of

16 procurement streamlining initiatives to improve business

17 functions and implement best procurement practices.   The

18 Inspector General has no issues with this proposed

19 procedures, but I do.   And I voted no.   This is the

20 purchase card.   But I was in the distinct minority,

21 since there was no one else voting no.   And I will vote

22 no again today, but I'll move approval.

Page 66

1      MALE VOICE:  Second.

2      MS. HEWLETT:  You very a motion and a second.  Is

3 there any discussion?  All in favor?

4      GROUP:  Aye.

5      MS. HEWLETT:  Opposed?

6      MR. GRAHAM:  No.

7      MS. HEWLETT:  One no.

8      MR. GRAHAM:  Please record me as voting no.

9      MS. HEWLETT:  Any abstentions?  Okay.  Mr. Graham

10 has (inaudible) --

11     MR. GRAHAM:  And I just want to say, that's a

12 result of the purchase card experience that we had in

13 the District of Columbia, which I know everyone doesn't

14 share.

15     MS. HEWLETT:  Okay.

16     MR. GRAHAM:  I'm not going to -- we talked a lot

17 about fares.  Staff did request approval to amend the

18 capital budget by 68 million.  And we'll bring that back

19 to our October 11th meeting.  And there was also

20 discussion of the issuance of Metro debt, but that will

21 also be reappearing at our October the 11th meeting.

22 And we've had updates on the monthly operating financial

Page 67

1 report and the quarterly CIP financial report, all of

2 which is available to members of the board.  Thank you.

3      MS. HEWLETT:  Thank you.  Are there any questions

4 of Mr. Graham?  Okay.  So for the Planning, Development

5 and Real Estate Committee we have --

6      MR. ZIMMERMAN:  Madam Chairman?

7      MS. HEWLETT:  (inaudible) report, okay?

8      MR. ZIMMERMAN:  The Planning, Development and Real

9 Estate Committee met on September 13th, discussed what

10 is one part of really a two part action item, the

11 discussion at that time all around the Southeastern bus

12 garage.  The discussion concerned essentially what to do

13 in the interim and assigning buses. There is the related

14 question of the sale of the property itself,  which

15 wasn't the subject of that meeting, but is the subject

16 of the action item before you today.

17 The result of the discussion on September 13th was

18 that the matter was moved forward to the Board without

19 recommendation.  Since that time, more work has been

20 done.  The manager has a revised recommendation that

21 relates both to the assignment of the buses and the sale

22 of the garage property. And I would like to turn to Mr.

Page 68

1 Catoe to summarize his revised recommendation.

2      MR. CATOE:  Thank you Mr. Zimmerman.  We are

3 asking the board to approve the sale of the Southeastern

4 bus garage company to the John Acridge (phonetic)

5 Development Company.  And that the allocation of the

6 proceeds from the sale of the garage be applied to the

7 capital cost of the replacement garage, lease back

8 rentals and any additional denhead (phonetic) costs and

9 other interim costs contingent upon 1), the acquisition

10 of the replacement bus garage property at DC village

11 from the District of Columbia; and 2) board approval of

12 the Southeastern bus garage replacement project and

13 amendment of the mass transit plan in accordance with

14 the Ramada Compact.

15 So basically in summary we are asking that we

16 approve the sale of the garage to John Acridge

17 Development Company for $69,250,000 and that $9,250,000

18 be set aside to be allocated for the cost of temporary

19 lease back as well as the additional denhead and other

20 interim costs for that facility.

21      MR. ZIMMERMAN:  The recommendations are summed up

22 -- or really I should say, that you've just summed up

Page 69

1 are contained specifically in the proposed resolution

2 that is attached to the report here before us?

3        MR. CATOE:  Yes. That is true.

4        MR. ZIMMERMAN:  Thank you.

5        MS. HEWLETT:  Okay.  Are there any questions of

6 Mr. Zimmerman?

7        MR. GRAHAM:  I have.

8        MS. HEWLETT:  Okay.  Mr. Graham

9        MR. GRAHAM:  I have two questions and then I am

10 prepared to move approval of this.  First, pardon of me?

11        MS. HEWLETT:  (inaudible) there's more questions

12 to look ahead.

13        MALE VOICE:  But he can move it.

14        MR. GRAHAM:  I can move at and then you can --

15        MS. HEWLETT:  Yeah, uh-huh.  Okay.

16        MR. GRAHAM:  -- is that all right?

17        MS. HEWLETT:  Mm-hmm.

18        MR. GRAHAM:  Okay good.  First, Mr. Catoe, is it

19 the position of the staff that it is both fully

20 appropriate and legal that we award the disposition of

21 this particular property to the applicant, I mean to the

22 bidder in this case?

Page 70

1        MR. CATOE:  Yes.

2        MR. GRAHAM:  This matter has been the subject of

3 some controversy in the District of Columbia.  And part

4 of that controversy has related to the fact that one of

5 the bidders had what is known as an escalator clause,

6 And the bid that they introduced for consideration by

7 the authority.  Does our general counsel have legal

8 advice of the efficacy of an escalator clause in this

9 particular form of bidding?  Is it effective?  Is it

10 efficacious or not?

11        MS. O'KEEFE:  Well.  Let me say that the procedure

12 that was used for the sale of the Southeastern bus

13 garage site was not a request for proposal as was just

14 discussed concerning the bus reward.  It was a request

15 for sealed bids that asked for price for purchase of the

16 site and a lease back amount.

17            One of the proposers came forward with an

18 alternative bid.  And the alternative bid was structured

19 that if there were a bid higher, and this bid by the way

20 was the lowest bid of the three that were received, if

21 there were a higher bid, and our procedures allowed it,

22 then that particular proposers bid would be increased to

1 $250,000 above the higher bid.  It did not, I might

2 point out, in the bid say above the highest bid. So even

3 in the alternative there was a bit of a discrepancy.

4 However, our procedures in this type of solicitation

5 do not allow for alternative bids.  And I think if you

6 look at these types of transactions as always requiring

7 fairness to all proposers you can immediately see why

8 there would be a problem in giving one proposer, one

9 bidder two bites at the apple while the others have only

10 one.  It wasn't -- this particular solicitation again

11 was not structured to embrace either negotiations, best

12 and final offers, or -- or nor was it structured as an

13 auction.

14 In order to give the facts to the alternative

15 proposer, or alternative bid, the authority would have

16 had to given the other bidders the same opportunity.

17 And that would escalate this, or change, or convert this

18 process mid-stream into an auction.  And it was a

19 process that was not structured as an auction.  There

20 were other considerations to take into account that

21 didn't lend this process, this sale to an auction type

22 arrangement.

Page 72

1          That was why the alternative proposal, the

2 alternative bid I should say, could not be considered

3 and it would not have been fair or appropriate to do so

4 in the context of this type of sale.  So yes, the

5 alternative bid was not considered.  I might also point

6 out that that bidder, which was MR Ballpark, LLC, stated

7 that if our procedures did not allow alternative bids

8 then their original bid, $60 million was to be

9 reinstated.  And that was what we did, that's the

10 process that was followed.

11     MR. GRAHAM:  Just for the sake of absolute

12 clarity, it is your considered legal opinion that the

13 attempt to have an escalator clause, an escalator bid in

14 this particular competition was not valid?

15     MS. O'KEEFE:  Yes.  That is my opinion.

16     MR. GRAHAM:  And madam chair, I move approval.

17     MALE VOICE:  Second.

18     MS. HEWLETT:  It has been properly motioned and

19 seconded. Mr. Moneme --

20     MALE VOICE:  (inaudible).

21     MS. HEWLETT:  -- and followed by Mr. Benjamin.

22     MR. MONEME:  This is more of a comment then a

Page 73

1 question.  I think that the questions posed by Mr.

2 Graham are fair questions.

3 And I think it properly would be in the best interest

4 for this

5 board to have some sort of a policy to deal with this,

6 because just like the real estate market this is quite

7 common.  We are all aware that people do put in

8 escalation clauses as it relates to property.

9 And in light of the discussion we just had in the

10 next room about budget constraints, it would be

11 unfortunate, in the future, if you left money on the

12 table.  And this is a little bit of the feeling that I

13 have about this deal that we may have potentially left

14 some money on the table as it would have benefit the

15 Authority.  I would suggest that we -- and I know this

16 is a very complex issue and it is not as straight

17 forward as it may seem, but it may be worth while to at

18 least consider something to address a similar situation.

19 And then my final point is as we do other

20 transactions like this near Metro Rail facilities, or

21 anywhere close to a Metro Rail facility, I think it

22 would be wise to consider a joint development.  And I

Page 74

1 think there's an opportunity here for the Authority and

2 the jurisdictions associated with that Metro Rail

3 station to have some input into what happens there, a

4 greater input into what happens there versus just the

5 sale of property.  You would hope that the wishes and

6 dreams of any jurisdictions is considered when you

7 dispose of property near a valuable piece of real 9tape

8 damage) comments for the record.

9       MS. HEWLETT:  Thank you Mr. Benjamin

10      MR. BENJAMIN:  I'd just like to focus on the very

11 last comment that Mr. Catoe made and just make sure that

12 I understand that the provision in here is that we will

13 not go to settlement until such time as we have approved

14 the replacement project and have funding in place for

15 that.  Is that correct?

16      MR. CATOE:  I will read the resolution and that's

17 my understanding of the intent of the resolution, is

18 that true (inaudible)?

19      MS. O'KEEFE:  Yes.

20      MS. HEWLETT:  Is there any other questions?  Okay,

21 it's --

22      MR. GRAHAM:  I just want to say --

Page 75

1      MS. HEWLETT:  -- Mr. Graham.

2      MR. GRAHAM:  -- again, this harkens back to my

3 earlier comments.  I would hope that we would move as --

4 and I know Mr. Moneme is very much involved in this,

5 but I would hope that we move with -- as rapidly as

6 possible regarding the DC Village arrangement and any

7 other matter that is contained, envisioned by the last

8 paragraph of the resolution.  Again, it is of the utmost

9 urgency that this building be ready for parking and for

10 avoiding a pedestrian hazards by the opening day of the

11 new baseball season.  And so I again, would ask you Mr.

12 Catoe to move with as much rapidity as you can muster on

13 this.

14      MR. CATOE:  I can muster it, sir.

15      MS. HEWLETT:  Are there any other questions?  All

16 in favor of the motion?

17      GROUP:  Aye.

18      MS. HEWLETT:  Opposed?  The ayes have it.

19      MR. ZIMMERMAN:  Move (inaudible).

20      MS. HEWLETT:  Thank you.  Okay.  We have 17

21 administrative action items.

22      MR. ZIMMERMAN:  Madam Chairman?

Page 76

1      MS. HEWLETT:  Yes?

2      MR. ZIMMERMAN:  I would move approval on block of

3 administrative actions, numbered 1 through 17 minus item

4 9.

5      MS. HEWLETT:  Okay.

6      MALE VOICE:  (inaudible).

7      MR. ZIMMERMAN:  And so that's items 1 through 8

8 and 10 through 17.

9      MS. HEWLETT:  Okay.  Okay.  We have a motion.  Is

10 there a second?

11     MALE VOICE:  Second.

12     MS. HEWLETT:  Any discussion?  All in favor?

13     GROUP:  Aye.

14     MS. HEWLETT:  Opposed?  The ayes have it.  Item 9.

15     MR. ZIMMERMAN:  (inaudible).

16     MS. HEWLETT:  Item 9, I did, I called item 9.

17     MALE VOICE:  Who's going to comment?

18     MALE VOICE:  I'd like to comment real quick.

19     MR. ZIMMERMAN:  Why don't we say what it is?

20     MS. HEWLETT:  Okay, item 9 is --

21     MR. ZIMMERMAN:  (INAUDIBLE).

22     MS. HEWLETT:  -- the approval to initiate and

Page 77

1 award and contract for parking meters.  Mr. Moneme?

2      MR. MONEME:  I just had a quick question a little

3 bit about what type of meters are we talking about

4 procuring here. We're talking about replacing

5 essentially what proportion of our entire population of

6 meters?

7      MR. REQUA:  All right, we have approximately 3,800

8 parking meters in the system, and we're asking for a

9 replacement of up to 3,500 of those that will provide

10 acceptance of the dollar coin, a larger vault, allow

11 them to be programmable for fare changes.

12      MR. MONEME:  So for the most part, replacement in

13 kind, some modifications to accept new --

14      MR. REQUA:  Yes.

15      MR. MONEME:  -- money, new medium?

16      MR. REQUA:  Yes.

17      MR. MONEME:  I think it might be beneficial for us

18 to consider something that might be more friendly for

19 credit card use, or in addition some sort of multi-

20 space meters, cheaper, you can use solar power, you can

21 use credit cards, you can use your cell phone.  It would

22 seem like it would be very customer friendly and

Page 78

1 customer focused.

2      MR. REQUA:  We certainly can consider that prior

3 to going out for the initiation of the contract.

4      MR. CATOE:  I think that's a good recommendation,

5 similar to the ones that are on certain segments of K

6 Street I've seen in the District and also in Virginia.

7 We will -- if the Board approves it, take that as a

8 modification to this and we will include that to seek

9 other types of meters that are -- will accept credit

10 cards and could handle multiple space.

11      MS. HEWLETT:  Mr. Benjamin?

12      MR. BENJAMIN:  May I suggest that as you do that,

13 proximity cards are being used for many of these meters,

14 and we have one.  Our smart card is a proximity card.

15 We might want to have these work with proximity cards.

16      MR. CATOE:  We could.

17      MS. HEWLETT:  Mr. Zimmerman?

18      MR. ZIMMERMAN:  Is it not assumed that whatever

19 meters we procure would be smart trip compatible?

20      MR. CATOE:  The details of the bid, I have to ask

21 Jack that question.

22      MR. REQUA:  I'm not sure I'll have to go back to

Page 79

1 staff.  I don't believe they were.

2        MR. CATOE:  It's assumed now, sir.

3        MR. ZIMMERMAN:  I mean, you know, there may be

4 reasons you can't do it, but I just would assume that in

5 anything we're looking at doing that we'd be saying,

6 "Yeah, can we use our own card that we've --"

7        MR. REQUA:  We'll take a look at all of those

8 prior to, you know, any action.

9        MR. ZIMMERMAN:  I almost took that for granted.

10 Thank you.

11        MR. REQUA:  It would require at this point a tri-

12 reader.

13        MR. ZIMMERMAN:  Okay.

14        MR. REQUA:  Okay.

15        MR. CATOE:  Thank you.

16        MR. MONEME:  So based -- we can incorporate those

17 amendments to the --

18        MR. CATOE:  They will be incorporated to

19 (inaudible).

20        MR. MONEME:  I move for approval.

21        MS. HEWLETT:  Okay.  We have a motion.

22        MALE VOICE:  Second.

Page 80

1    MS. HEWLETT:  And a second.  Is there any

2 additional discussion?  All in favor?

3    GROUP:  Aye.

4    MS. HEWLETT:  Opposed?  The ayes have it.  Okay.

5 Do we have any jurisdictional reports for the District

6 of Columbia?

7    MR. GRAHAM:  None.

8    MS. HEWLETT:  For Maryland?

9    MALE VOICE:  Nope.

10    MS. HEWLETT:  No.  From Virginia?

11    MALE VOICE:  Nope.

12    MS. HEWLETT:  Nope.  Hearing none I move that the

13 Board recess and convene in executive session to discuss

14 personnel issues and board matters consistent with Board

15 Procedure Roman Numeral 6.3.

16    MALE VOICE:  Second.

17    MS. HEWLETT:  Okay, all in favor?

18    GROUP:  Aye.

19    MS. HEWLETT:  Opposed?  The ayes have it.

20        (Whereupon, the public session was

21 concluded.)

22

## Capital Reporting Company

Page 1

CERTIFICATE OF TRANSCRIBER

I, Susan LaPooh, do hereby certify that this transcript was prepared from tape to the best of my ability.

I am neither counsel nor party to this action nor am I interested in the outcome of this action.

Susan LaPooh

# EXHIBIT 2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MONUMENT REALTY LLC, et al.,     )
     )
     Plaintiffs,     )
     )
     v.     )
     )     Civil Action No. _____
WASHINGTON METROPOLITAN     )
AREA TRANSIT AUTHORITY,     )
     )
     Defendant.     )
     )

### DECLARATION OF AMY C. PHILLIPS

Amy C. Phillips, being duly sworn, deposes and states as follows:

1.     My name is Amy C. Phillips. I am over the age of eighteen and competent to testify in this case. I make this declaration based on my personal knowledge.

2.     I am a Vice President of Monument Realty LLC, one of the Plaintiffs in this case. I have served in that role at Monument Realty since September 24, 2007. Prior to September 24, 2007 and beginning on February 21, 2006, I was a Development Manager of Monument Realty LLC. The other Plaintiff, MR Ballpark 7 LLC, is an affiliate of Monument Realty.

3.     While in that role at Monument Realty, I have been intimately and continually involved in Monument Realty's activities in the Ballpark District of Southeast Washington, D.C., and Monument's acquisition and development activities in the "Half Street Area."

4.     The Half Street Area is the designation that has been given by the District of Columbia to the area bounded by M St., S.E. to the North, South Capitol Street S.W. to the West, 1st Street, S.E. to the East and N Street, S.E. to the South.

5.     There were at least six times when, in the presence of WMATA personnel, we had discussions about the Master Development Plan, the rights of Monument Realty and its affiliates to acquire all of the WMATA-owned properties in the Half Street Area, and Monument Realty's exclusive rights to negotiate for and acquire the Southeast Bus Garage and an adjacent surface parking lot. These were: the December 2005 news conference at the Anacostia Waterfront, at which Monument Realty's selection as "Master Developer" for the Half Street Area was announced; several meetings during the negotiations leading up to the December 2006 acquisition of the Navy Yard Metro Site and several adjacent properties; and the January 2007 groundbreaking ceremony held by Monument Realty and WMATA, at the start of construction of the Navy Yard Metro Station improvements.

6.     Each time, there were direct references by myself and other Monument Realty personnel concerning Monument Realty's status as Master Developer for the Half Street Area, and the fact that our status conferred upon us certain rights in the WMATA-owned properties in the Half Street Area, including the Southeast Bus Garage.

7.     In May 2006, WMATA and Monument Realty started working together on the sale of WMATA's property in the Half Street Area, including the Southeast Bus Garage.

8.     During the negotiations leading up to the Navy Yard Metro Site acquisition, Monument Realty expressed that it was ready, willing, and able to move forward with an acquisition that would include the Southeast Bus Garage. WMATA personnel, including WMATA's agent Gary Malasky (who was our day-to-day contact, and was at that time Managing Director of Property Development and Management for WMATA), indicated to us that the Southeast Bus Garage acquisition would have to be delayed because, at the time, WMATA had not yet identified an alternative location for the functions it was performing there.

9.    As part of our deal with WMATA regarding the Southeast Bus Garage, Monument Realty agreed to certain conditions, one of which was that Monument would provide an easement to WMATA in an alleyway between Van Street and Half Street, so that WMATA could use and access the WMATA Bus Garage.  On January 11, 2007, I testified before the District of Columbia Zoning Commission in connection with our efforts to accommodate WMATA's employee parking requirements in Square 700.  In Zoning Commission Case Number 06-46, Monument Realty asked for and obtained, at its own expense, a zoning variance with respect to the Capitol Gateway Overlay Zoning Ordinance.  WMATA was aware of and asked Monument Realty to pursue this application, and was a signatory to the application (through its agent, Mr. Malasky).  At the hearing, my testimony included the following statement: "In the fall of 2005, we participated in the Request for Proposal issued by the Anacostia Waterfront Corporation for development rights surrounding the stadium.  We were awarded the exclusive right to negotiate for the properties owned by WMATA and that land included two employee parking lots, the bus maintenance facility site and the Half Street Station area, all adjacent to properties that we already owned."  WMATA was aware of our application and this testimony, which was made at a public hearing and was a matter of public record.  No one from WMATA ever responded or objected in any way, or indicated that the testimony was inaccurate.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on October 9, 2007.

_Amy C. Phillips_
Amy C. Phillips