IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                    )
MONUMENT REALTY LLC, *et al.*,                      )
                                                    )
          *Plaintiffs*                              )
                                                    )
v.                                                  )          Civil Action No. 1:07-CV-01821 (EGS)
                                                    )
WASHINGTON METROPOLITAN AREA                        )
TRANSIT AUTHORITY,                                  )
                                                    )
          *Defendant*                               )
_____ )

### MOTION TO DISMISS OF
### WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY

Pursuant to Fed. R. Civ. P. 12(b)(6) and 12(b)(1) and Local Rule 7, Defendant Washington Metropolitan Area Transit Authority ("WMATA"), by undersigned counsel, respectfully moves to dismiss the Complaint on the grounds that the Complaint fails to state a claim upon which relief can be granted and, as to certain counts, the Court has no subject matter jurisdiction due to WMATA's sovereign immunity.

A memorandum of points and authorities setting out the grounds more fully accompanies this motion. For the reasons set forth in the memorandum, WMATA respectfully prays that the Court dismiss the Complaint in its entirety, without leave to amend, award WMATA its costs and expenses including legal fees and grant WMATA such other and further relief as is proper.

Pursuant to Local Rule 7(m), undersigned counsel conferred with Plaintiffs' counsel in connection with the report filed October 15, 2007, and based on that consultation and report, WMATA believes that Plaintiffs intend to oppose this motion.

Dated this 17th day of October 2007.

4604491

Respectfully submitted,

     /s/ Harvey A. Levin
Harvey A. Levin (D.C. Bar No. 203869)
THOMPSON COBURN LLP
1909 K Street, N.W. Ste. 600
Washington, D.C.  20006-1167
T: (202) 585-6942 (direct)
F: (202) 508-6969 (direct)
email:hlevin@thompsoncoburn.com

     /s/ Donald A. Laffert
Carol B. O'Keeffe
General Counsel
Donald A. Laffert
Associate General Counsel
Washington Metropolitan Area Transit Authority
600 Fifth Street, N.W.
Washington, DC 20001
T: (202) 962-1499
F: (202) 962-2550
Email:dlaffert@wmata.com

Counsel for Defendant Washington Metropolitan
Area Transit Authority

**CERTIFICATE OF SERVICE**

I hereby certify that on this 17th day of October, 2007, true and correct copies of the foregoing Motion and accompanying Memorandum of Points and Authorities and Order were served by ECF and by electronic mail on:

> Louis E. Dolan, Jr., Esquire
> Vernon W. Johnson, III, Esquire
> NIXON PEABODY, LLP
> 401 Ninth Street, N.W.
> Washington, D.C.  20001

_____ /s/ Harvey A. Levin

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
)
MONUMENT REALTY LLC, *et al.*,                )
)
       *Plaintiffs*                )
)
v.                                             )      Civil Action No. 1:07-CV-01821 (EGS)
)
WASHINGTON METROPOLITAN AREA           )
TRANSIT AUTHORITY,                             )
)
       *Defendant*                )
_____ )

**MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF MOTION TO DISMISS OF**
**WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY**

Harvey A. Levin (D.C. Bar No. 203869)
THOMPSON COBURN LLP
1909 K Street, N.W. Ste. 600
Washington, D.C.  20006-1167
T: (202) 585-6942 (direct)
F: (202) 508-1013 (direct)
email:hlevin@thompsoncoburn.com


Carol B. O'Keeffe
General Counsel
Donald A. Laffert
Associate General Counsel
Washington Metropolitan Area Transit Authority
600 Fifth Street, N.W.
Washington, DC 20001
T: (202) 962-1499
F: (202) 962-2550
Email:dlaffert@wmata.com


Counsel for Defendant Washington Metropolitan
Area Transit Authority

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................... 1

THE COMPLAINT ................................................................................................ 2

ARGUMENT .......................................................................................................... 7

    I.     The Complaint Fails To State A Claim Against WMATA Upon
           Which Relief Can Be Granted ............................................................... 7

          1.     Standard of Review Under Rule 12(b)(6) ................................ 7

          2.     The Complaint Fails to State a Claim For Breach of Contract or
                Agreement Against WMATA .................................................. 8

          3.     The Complaint Fails to State a Claim on Behalf of MRB 7 For
                Breach of Any Agreement, Understanding, Promise or
                Commitment With Respect to the Bus Garage Property ...................... 11

          4.     The Complaint Fails to State a Claim on Behalf of Monument
                Realty With Respect to WMATA's Bid Procedures Regarding, and
                WMATA's Acceptance of the Winning Bid For, the Bus Garage
                Property Because Monument Realty Did Not Bid and Does Not
                Have Standing ......................................................................... 12

          5.     The Complaint Fails to State a Claim on Behalf of Monument
                Realty and MRB 7 With Respect to WMATA's Bid Procedures
                Regarding, and WMATA's Acceptance of the Winning Bid For,
                the Bus Garage Property Because Monument Realty and MRB 7
                Waived Whatever Rights They Might Have Had to Object .................. 14

          6.     The Complaint Fails to State a Claim on Behalf of Monument
                Realty and MRB 7 With Respect to MRB 7's Alternate Bid
                Because the Alternate Bid Was Not Responsive or Acceptable, and
                Under Long Established Law WMATA Acted Rationally and Did
                Not Act Arbitrarily or Capriciously in Rejecting the Alternate Bid ........ 15

               A.     Rational Basis In Law ................................................ 16

                B.     Rational Basis In Fact ............................................... 19

    II.     The Noncontract Claims Must Be Dismissed By Reason of
           WMATA's Sovereign Immunity ......................................................... 23

          1.     Standard of Review Under Rule 12(b)(1) ............................. 23

          2.     WMATA's Sovereign Immunity .......................................... 23

3.    This Court Does Not Have Subject Matter Jurisdiction Over
      Claims Relating to the Creation and Content of the IFB and the
      Compact By Reason of WMATA's Sovereign Immunity ...................... 25

4.    This Court Does Not Have Subject Matter Jurisdiction Over Any
      Fraud, Breach of Fiduciary Duty Or Other Tort Claims By Reason
      of WMATA's Sovereign Immunity ....................................................... 26

      A.    The Decisions At Issue Here Are Quintessentially
            Governmental ........................................................................... 26

      B.    In the Alternative, WMATA Is Immune Because
            the Decisions At Issue Here Involve Discretionary
            Matters ..................................................................................... 28

III.    Because Amendment Would Be Futile, the Court Should Dismiss
        the Complaint Without Leave to Amend .......................................... 30

CONCLUSION.................................................................................................. 31

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                    )
MONUMENT REALTY LLC, *et al.*,                      )
                                                    )
          *Plaintiffs*                              )
                                                    )
v.                                                  )          Civil Action No. 1:07-CV-01821 (EGS)
                                                    )
WASHINGTON METROPOLITAN AREA                        )
TRANSIT AUTHORITY,                                  )
                                                    )
          *Defendant*                               )
_____           )

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF MOTION TO DISMISS OF
## WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY

Pursuant to Fed. R. Civ. P. 12(b)(6) and 12(b)(1) and Local Rule 7, Defendant Washington Metropolitan Area Transit Authority ("WMATA"), by undersigned counsel, respectfully moves to dismiss the Complaint on the grounds that the Complaint fails to state a claim upon which relief can be granted and, as to certain counts, the Court has no subject matter jurisdiction due to WMATA's sovereign immunity.

## INTRODUCTION

The subject matter of this action, buried inside a prolix, redundant, 199-paragraph Complaint, is a garden-variety bid protest. WMATA owns and operates a bus garage on property in Southeast Washington adjacent to the site of the new Washington Nationals baseball stadium (the "Property"). Plaintiffs contend that they and WMATA had agreed that Plaintiffs had the exclusive right to negotiate for and to acquire the Property. In August of this year, WMATA issued an Invitation for Bids for the sale of the Property. After receiving three bids, in late September the WMATA Board authorized the sale to John Akridge Development Company ("Akridge"), a prominent District of Columbia developer, as the highest bidder. Plaintiffs contend that the Invitation for Bids and the award to Akridge breached an alleged but

nonexistent agreement under which Plaintiffs claim to have had the exclusive right to acquire the Property and that WMATA wrongfully rejected an "alternate bid" with a contingent escalation clause from Plaintiff MR Ballpark 7 LLC, which Plaintiffs claim was higher than the Akridge bid.

Plaintiffs' Complaint must be dismissed because, based on the application of prevailing law to the allegations and inferences in the Complaint, (i) as a matter of law, Plaintiffs had no agreement with WMATA regarding the bus garage Property; (ii) under well established, longstanding procurement law, Plaintiffs waived their rights, if any, to challenge the Invitation for Bids and the bid process; (iii) the only Plaintiff that was a bidder, MR Ballpark 7 LLC, had no agreement with WMATA, for exclusivity or otherwise; (iv) WMATA correctly rejected MR Ballpark 7 LLC's "alternate bid" as not responsive, unfair and anti-competitive; and (v) WMATA is immune from this action in all remaining respects based on WMATA's sovereign immunity.

## THE COMPLAINT

Ignoring Rule 8(a)'s direction that a claim contain only a "short and plain statement of the grounds showing that the pleader is entitled to relief," the Complaint alleges as follows.

There are two plaintiffs: Monument Realty LLC ("Monument Realty") and MR Ballpark 7 LLC ("MRB 7"). Monument Realty is a Delaware LLC that evidently has been established and operating at least since December 2005. Monument Realty was not a bidder in response to WMATA's Invitations for Bids (collectively, "IFBs" and individually, an "IFB") for the Property.

MRB 7 also is a Delaware LLC but has been in existence only since July 18, 2007. *See* Compl. ¶ 2 & Ex. I.[1]  According to Exhibit I to the Complaint, which includes MRB 7's

---

[1] Notwithstanding the separate legal, factual and juridical existences and statuses of Monument Realty and MRB 7, the Complaint identifies both singularly as "Monument."

- 2 -

Operating Agreement, MRB 7 has only two members, both of whom are individuals (Jeffrey T. Neal and Michael J. Darby) and has only $1,000 in capital.   MRB 7's Operating Agreement provides also that Messrs. Neal and Darby and their capital contributions are not and will not be liable to third-party creditors (which WMATA would have been had MRB 7 been the high and successful bidder) and that third-party creditors cannot compel any additional capital contributions above the initial aggregate $1,000.  *See* Compl. Ex. I, § 9(b).  The Complaint does not allege, or give rise to any inference, that in its few months of existence MRB 7 has accumulated any additional capital or that MRB 7 has any assets, operations, income or any source of income.  Unlike Monument Realty, MRB 7 did submit a bid, in fact two bids, to acquire the Property.   The first bid was a low-ball bid, offering only the IFB-mandated Minimum Bid Price.  The second or "alternate" bid was not a set sum but instead included a contingent escalator clause proposing a narrative formula, purporting to exceed a bid of more than the $60 million Minimum Bid Price by $250,000.  MRB 7 further qualified its alternate bid as follows:

> If WMATA's rules and regulations regarding the acceptance of bids for the sale of real property do not permit WMATA to consider escalation clauses, then this addendum shall be disregarded and MR Ballpark 7 LLC's Bid Amount shall be as shown on the Bid Form above [*i.e.*, the Minimum Bid Price of $60 million].

*See* Compl. ¶¶ 70-72 & Ex. I at 11.  It is this alternate, contingent bid that gives rise to this action.

The Complaint begins with the District's 2004 announcement of plans to build the new baseball stadium and formation of the Anacostia Waterfront Corporation ("AWC") as an instrumentality of the District and as the District's "economic development entity for the entire Ballpark District."  *See* Compl. ¶¶ 10-11.

Anticipating economic development, in October 2004 Monument (as defined in the Complaint) began acquiring land in the Ballpark District.  Monument's efforts "paved the way

for the master planning process," and in particular a Master Development Plan for which Plaintiffs claim credit: "The Master Development Plan ultimately agreed upon for the Half Street Area would never have happened but for Monument's efforts and undertakings."  *See* Compl. ¶¶ 11-12.  By May 2005, Monument owned or had under control most of the privately held property surrounding the WMATA bus garage and the Navy Yard Metro Station sites. *See* Compl. ¶ 19.

In December 2005, the District selected Monument as Master Developer for the Half Street Area, which includes WMATA's bus garage Property.  The Complaint alleges that the District's AWC – not WMATA – gave Monument an exclusive right to negotiate with WMATA to acquire and to develop WMATA-owned real property in the Half Street Area.  At some unspecified later point, WMATA "began working with Monument to implement … and endorsed the Master Development Plan."  WMATA and Monument "understood that the acquisition process … would be accomplished in phases," focusing first on the Navy Yard Metro Station.  Monument agreed to structure the purchases in phases "only because it had exclusive rights [from the District] as Master Developer and otherwise to negotiate for and acquire the remaining WMATA parcels in the Half Street Area."  *See* Compl. ¶¶ 23-33.

At some point in 2006, Monument submitted an unsolicited bid to WMATA for the Navy Yard Metro Station property.  Following its receipt of Monument's bid, WMATA advertised this property for sale to the public but received no bids other than Monument's. Following this unsuccessful public advertising, WMATA sold the Navy Yard Metro Station property to Monument through a sole-source negotiation.  "During completion of this transaction, WMATA … understood that Monument would continue to have the exclusive right to negotiate for and acquire … the WMATA Bus Garage."  *See* Compl. ¶¶ 34-39.   The Complaint, however, does *not* allege, as it cannot allege in good faith, that the purchase-and-sale agreement for the Navy Yard Metro Station property contained any condition or term

relating to, or in fact any reference to, the bus garage Property or to Plaintiffs' alleged exclusive right to negotiate for and to acquire the Property.

Following Monument's acquisition of the Navy Yard Metro Station property, "in consideration for the promises made to it with respect to its right to negotiate exclusively for the WMATA Bus Garage, Monument agreed to certain conditions benefiting the District of Columbia" and "agreed to provide additional consideration to WMATA." The District and WMATA accepted these benefits "in full recognition of Monument's rights and interests for the exclusive right to acquire and/or negotiate for the acquisition of the WMATA Bus Garage." *See* Compl. ¶¶ 40-45, 51-54.

On April 6, 2007, Monument sent WMATA an unsolicited offer to buy the bus garage Property. As WMATA had done with respect to the Navy Yard Metro Station property, WMATA began advertising the Property for sale on June 8, 2007 and issued IFB No. 07-3 with a bid deadline of July 23, 2007. After WMATA set this first bid deadline, the District and AWC advised WMATA that the District wanted to buy the Property. Without objection before or after from Monument, WMATA announced publicly that the District intended to buy the Property, but the District and the AWC later withdrew their offer to purchase the Property. *See* Compl. ¶¶ 56-63.[2]

Following that withdrawal, WMATA re-issued an IFB for the Property, IFB 08-1, which is the subject of this suit. Just as Plaintiffs had not protested WMATA's issuance of IFB 07-3

---

[2] Inconsistent with its position in this suit, Monument alleges that before the District withdrew its request to purchase the bus garage Property, the District had advised WMATA that the District "wanted to assign *its* rights to Monument *or* have WMATA sell the Property directly to Monument. *See* Compl. ¶¶ 63 (emphasis added). It is thus unclear from the Complaint who, as among the District, the AWC and Monument, Monument alleges had the exclusive right to acquire the bus garage Property, and there is no allegation as to what the source of that alleged right was.

(and evidently had not protested the IFB for the Navy Yard Metro Station property), Monument Realty and MRB 7 did not protest WMATA's issuance of IFB 08-1.

The same three bidders that had responded to IFB 07-3 responded to IFB 08-1. Monument Realty was not among the three bidders. Newly formed MRB 7 was, however, submitting two bids. MRB 7 submitted a firm bid for the Minimum Bid Price of $60 million and submitted an "Alternate Bid" that had a base of $60 million but included the following contingent escalator:

> In the event WMATA receives a bid, conforming to WMATA's Invitation to Bids, from a qualified bidder, which is more than Sixty Million Dollars and 00/100 ($60,000,000), in terms of purchase price and leaseback rental, then MR Ballpark 7 LLC's Bid Amount shall increase to such bidder's Bid Amount plus Two Hundred Fifty Thousand and 00/000 ($250,000).

See Compl. ¶¶ 65-72 & Ex. I.

WMATA declined to consider MRB 7's alternate bid to the extent that it relied on this contingent escalation clause and accepted a competing bid for the highest sum certain of $69.25 million (the "Akridge bid"). See Compl. ¶¶ 75-80. Following WMATA's opening the bids and its announcement that WMATA had selected the Akridge bid as the winning bid, MRB 7 filed bid protests. Neither Monument Realty nor MRB 7 had filed a protest prior to submission of bids, prior to WMATA's opening bids or prior to WMATA's announcement of the Akridge bid as the winning bid. WMATA denied MRB 7's protest. See Compl. ¶¶ 82-89. This suit followed.

The Complaint has nine counts, five of which plead claims and four of which merely plead remedies. Counts Four (breach of contract), Six (breach of fiduciary duty), Seven (fraud), Eight (breach of the Compact) and Nine (arbitrary and capricious decision) purport to plead claims for relief. Counts One (declaratory judgment), Two (specific performance), Three (injunction) and Five (constructive trust) plead only remedies.

# ARGUMENT

## SUMMARY

Counts One, Two, Three, Four and Nine should be dismissed for failure to state a claim upon which relief can be granted, and Counts Five, Six, Seven and Eight should be dismissed on the ground of WMATA's sovereign immunity or, in the alternative, for failure to state a claim upon which relief can be granted.

### I. The Complaint Fails To State A Claim Against WMATA Upon Which Relief Can Be Granted

### 1. Standard of Review Under Rule 12(b)(6)

The Rule 12(b)(6) standard is well known. Presuming the truth of all well pleaded facts, and giving Plaintiff the benefit of reasonable inferences grounded in and flowing from the well pleaded facts, the Court should grant this motion to dismiss if the Complaint on its face fails to state a legally sufficient claim for relief. The Court may not sustain the Complaint based on conclusory allegations, speculation or strategic pleading decisions. *See, e.g., Tnaib v. Document Technologies, LLC*, 450 F. Supp. 2d 87, 90-91 (D.D.C. 2006).

No longer, however, may a plaintiff sustain a complaint against a motion to dismiss by asserting the "no set of facts" standard for Rule 12(b)(6) motions of the United States Supreme Court's *Conley v. Gibson* decision and its progeny. The Supreme Court recently put that test to its final rest in *Bell Atlantic Corp. v. Twombley*, 127 S. Ct. 1955, 1969 (2007).[3]  More so

---

[3] The Court concluded:

> We could go on, but there is no need to pile up further citations to show that *Conley*'s "no set of facts" language has been questioned, criticized, and explained away long enough. To be fair to the *Conley* Court, the passage should be understood in light of the opinion's preceding summary of the complaint's concrete allegations, which the Court quite reasonably understood as amply stating a claim for relief. But the passage so often quoted fails to mention this understanding on the part of the Court, and after puzzling the profession for 50 years, this famous observation has earned its retirement. The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard:

than ever after *Bell Atlantic Corp. v. Twombley*, the Court may not sustain the Complaint based on conclusory allegations, speculation or strategic pleading decisions.  Only after passing the *Twombley* thresholds may Plaintiffs then show that the Complaint adequately states a claim for relief and that there are facts, well pleaded, upon which if proved relief could be granted.

The Supreme Court also advanced the requirement of plausibility from the summary judgment stage, where it had been a requirement previously, *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 595 (1986), to the pleading stage as a criterion that the Complaint must meet in order to survive a Rule 12(b)(6) motion:

> Asking for plausible grounds does not impose a probability requirement at the pleading stage;  it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.  The need at the pleading stage for allegations plausibly suggesting (not merely consistent with) agreement reflects Rule 8(a)(2)'s threshold requirement that the "plain statement" possess enough heft to "sho[w]" that the pleader is entitled to relief."

127 S. Ct. at 1959.  To prevail over WMATA's motion, Monument Realty and MRB 7 must demonstrate both that that Complaint states claims for relief on its face, without hypothesizing about what facts may show, and that the claims are plausible on their face.

**2. The Complaint Fails to State a Claim For Breach of Contract or Agreement Against WMATA**

Plaintiffs fill the Complaint with allegations of silence, understanding and acquiescence of unnamed WMATA personnel to allege that WMATA entered into an agreement with Plaintiffs according them the exclusive right to negotiate for and to acquire the bus garage Property.  Notwithstanding their efforts, however, Plaintiffs cannot state a claim for the

---

once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint. … *Conley*, then, described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival.

existence of an agreement or for breach of an alleged agreement because as a matter of law, there was no agreement and there could be no agreement.

WMATA is a *sui generis* statutory "body corporate and politic" established under the Compact among the District of Columbia, Maryland and Virginia.  WMATA's existence, authority, mission and rights are, however, independent of and separate from the existence, authority and rights of the District of Columbia, Maryland and Virginia, and these component jurisdictions are not agents of, and cannot bind, WMATA.  "Furthermore, pursuant to the WMATA Compact, one signatory may not impose its legislative enactment upon the entity created by it without the express consent of the other signatories and of the Congress of the United States." *Lucero-Nelson v. Wash. Metro. Area Transit Auth.*, 1 F. Supp. 2d 1, 7 (D.D.C. 1998).  The Compact, moreover, deems WMATA a sovereign in conferring on WMATA sovereign immunity equal to that of the signatories.  *See* the Compact, Compl. Ex. C & Compl. ¶¶ 3-4; *Abdulwali v. Wash. Metro. Area Transit Auth.*, 315 F.3d 302, 304 (D.C. Cir. 2003); *KiSKA Constr. Co. v. Wash. Metro. Area Transit Auth.*, 321 F.3d 1151, 1158 (D.C. Cir. 2002), *cert. denied*, 540 U.S. 939 (2003).

The Complaint acknowledges the separate statutory, legal and juridical status of WMATA, on the one hand, and of the District and the AWC, on the other hand.   Paragraph 3 of the Complaint and Exhibit C (the Compact) plead WMATA's creation in 1966 by and in the interstate Compact among the District, Virginia and Maryland.   Paragraph 11 pleads the formation of the AWC in 2004, almost 40 years later, "as an independent instrumentality of the District of Columbia."

WMATA's independence and sole authority extend to the capability and authority to enter into agreements.  When exercising that authority, and when entering into agreements, WMATA acts by and through its Board, and *only* its Board can authorize and/or enter into agreements such as the ones the Complaint alleges.  *See* Compl. Ex. C, the Compact, Art. III,

§§ 4, 5, 8(c) & 12(d), (e) & (f).  But the Complaint does *not* allege – as it could not allege in good faith – that the WMATA Board entered into or even authorized any agreement, of any nature whatsoever, promising Plaintiffs the exclusive right to negotiate for and to acquire the Property.  Accordingly, the Complaint's allegations of approval of and/or acquiescence in statements and actions of the District, AWC or Monument (as identified in the Complaint) fail to state a claim on which relief can be granted.

The Complaint fails also because it does not allege, again as it cannot allege, that the District or the AWC had any authority or ability to bind or commit WMATA to any action, inaction or contract.  As the respective enabling acts show, WMATA is a statutory and juridical entity wholly separate from and independent of the District and the AWC.  Neither could bind or commit WMATA to any action, inaction or contract.

The District and the AWC may have let Monument down, and the District and the AWC may have misled Monument.  But the District and the AWC were not WMATA, nor were they WMATA's agents, and they had no authority to bind WMATA to anything and certainly had no authority to commit WMATA to be responsible for Monument's disappointment in the outcome of the District's and the AWC's representations.  WMATA's alleged failures to respond to or dissent from public statements and actions of the District and the AWC – essentially strangers for legal purposes – no matter how prominent and how vocal these others' statements and actions were, do not and cannot give rise to any claim for relief against WMATA.[4]  *See First Fed. Lincoln Bank v. United States*, 54 Fed. Cl. 446, 452 (2002):

---

[4] Paragraph 156 of the Complaint illustrates the extreme nature of Plaintiffs' claim.  There, Plaintiffs allege that in January 2007, WMATA and Monument held a groundbreaking ceremony for the Navy Yard Metro Station property.  Plaintiffs fault unnamed WMATA personnel for not standing up in the middle of this public relations event to challenge Monument, alleging: "Jeffrey T. Neal, a principal of Monument Realty, specifically addressed Monument's plans with respect to the remainder of  the Half Street Area.  WMATA did not object."

"Government employees hold express actual authority to bind the government in contract only when the Constitution, a statute, or a regulation grants them such authority in unambiguous terms." *Starflight Boats v. United States*, 48 Fed.Cl. 592, 598 (2001); *Roy v. United States*, 38 Fed.Cl. 184, 188 (1997).

If Monument erroneously believed otherwise, it did so at its peril. *See Gary v. United States*, 67 Fed. Cl. 202, 212 (2005):

"It is well established that the government is not bound by the acts of its agents beyond the scope of their actual authority." *Harbert/Lummus Agrifuels Projects v. United States*, 142 F.3d 1429, 1432 (Fed. Cir. 1998) (citing *Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384, 68 S.Ct. 1, 92 L.Ed. 10 (1947)). Anyone asserting the existence of a contractual relationship with the United States has the burden of discovering whether the government agent has contracting authority. *See id.* Moreover, "anyone entering into an agreement with the Government takes the risk of accurately ascertaining the authority of the agents who purport to act for the Government, and this risk remains with the contractor even when the government agents themselves may have been unaware of the limitations on their authority." *Id.* (citation omitted).

Thus, all the allegations about WMATA's silence in the face of statements and actions by the District or the AWC, and all the allegations about WMATA's implicit acquiescence in and/or agreement with statements and actions by the District or the AWC, fail to state a claim upon which relief can be granted. Accordingly, the Court should dismiss Counts One, Two, Three, Four, Five, Six and Seven as to both Plaintiffs.

**3. The Complaint Fails to State a Claim on Behalf of MRB 7 For Breach of Any Agreement, Understanding, Promise or Commitment With Respect to the Bus Garage Property**

MRB 7 did not come into existence until July 18, 2007. *See* Compl. Ex. I (the MRB 7 Operating Agreement accompanying MRB 7's alternate bid) & Compl. ¶¶ 2 & 70. *None* of the alleged agreements binding WMATA to exclusivity in negotiating the sale and selling the Property occurred on or after July 18, 2007. Rather, all such alleged agreements predated MRB 7's existence. *See* Compl. ¶¶ 17, 25, 28-30, 32-37, 40-42, 44-45. Thus, MRB 7 was not and could not have been party or beneficiary to the alleged agreements upon which Plaintiffs base

their claims.  Accordingly, the Complaint fails to state a claim, as it in good faith cannot state

a claim, on behalf of MRB 7 for the existence of or breach of any agreement, promise,

commitment or understanding.  MRB 7's only claim – if any – is with respect to its alternate

bid to acquire the Bus Garage Property.   Accordingly, the Court should dismiss Counts One,

Two, Three, Four, Five, Six and Seven with respect to MRB 7.

    **4. The Complaint Fails to State a Claim on Behalf of Monument Realty With Respect to WMATA's Bid Procedures Regarding, and WMATA's Acceptance of the Winning Bid For, the Bus Garage Property Because Monument Realty Did Not Bid and Does Not Have Standing**

    As the Complaint correctly pleads and shows in Ex. I (MRB 7's alternate bid),

Monument Realty did not submit a bid to purchase the Property, and Monument Realty could

not have received the award of the right to purchase the Property as a result of the bid process.

Accordingly, Monument Realty has no standing to challenge the bid process, has no standing

to challenge the IFB and has no standing to challenge the Akridge bid or the award to Akridge.[5]

*See Info Tech. & Applications Corp. v. United States*, 316 F.3d 1312 (Fed. Cir. 2003):

> In order to establish standing, ITAC must show that it is an "actual or prospective bidder[ ] or offeror[ ] whose direct economic interest would be affected by the award of the contract or by failure to award the contract," *i.e.*, that ITAC was an interested party, prejudiced by the award to RSIS. *Am. Fed'n of Gov't Employees v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001), *cert. denied*, 534 U.S. 1113, 122 S.Ct. 920, 151 L.Ed.2d 885 (2002).

*See also Myers Investigative and Sec. Servs., Inc. v. United States*, 275 F.3d 1366 (Fed. Cir.

2002):

---

[5] Courts generally apply federal procurement law.  *See Elcon Enters., Inc. v. Wash. Metro. Area Transit Auth.*, 977 F.2d 1472 (D.C. Cir. 1992) (applying federal procurement regulations and decisions of the courts and the Comptroller General in deciding merits of a disappointed bidder's suit against WMATA's decision to award a contract to a higher bidder); *China Trade Ctr., L.L.C. v. Wash. Metro. Area Transit Auth.*, 34 F. Supp. 2d 67 (D.D.C. 1999) (applying federal procurement law in deciding merits of a disappointed bidder's suit against WMATA award decision); *Seal and Co., Inc. v. Wash. Metro. Area Transit Auth.*, 768 F.Supp. 1150 (E.D. Va. 1991) (applying federal procurement regulations and decisions of the courts and the Comptroller General in deciding merits of a disappointed bidder's suit against WMATA award decision).

In *Impresa, Alfa Laval*, and *Statistica, Inc. v. Christopher*, 102 F.3d 1577 (Fed.Cir. 1996), we held that a potential bidder must establish that it had a substantial chance of securing the award in order to establish standing, without deciding whether the Administrative Disputes Resolution Act of 1996, Pub.L. No. 104-320, 110 Stat. 3870, which amended section 1491, might have liberalized the rules for standing by adopting the broader standards of the Administrative Procedure Act ("APA").    However, in our recent decision in *American Federation*, we held that section 1491(b)(1) did not adopt the APA's liberal standing standards, and that the narrower standards--consistent with the Competition in Contracting Act, 31 U.S.C. § § 3551-56 ("CICA")-- continued to apply. 258 F.3d at 1300-02.    In bid protests under the Tucker Act, "we ... construe the term 'interested party' in section 1491(b)(1) in accordance with the [standing requirements of the] CICA and hold that standing under § 1491(b)(1) is limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract." *Am. Fed'n*, 258 F.3d at 1302.    Thus, the substantial chance rule continues to apply.

*See also Bannum, Inc. v. United States*, 404 F.3d 1346 (Fed. Cir. 2005); *Baltimore Gas And Elec. Co. v. United States*, 290 F.3d 734 (4th Cir. 2002); *MCI Telecomms. Corp. v. United States*, 878 F.2d 362 (Fed. Cir. 1989); *Waste Mgt. of N. Am., Inc. v. Weinberger*, 862 F.2d 1393, 1397-98 (9th Cir. 1988); GAO Bid Protest Regulations, 4 C.F.R. § 21.0(a).  Monument Realty, accordingly, does not have standing to contest, sue over or obtain relief arising out of the IFBs and the resulting award to Akridge.

The Complaint does allege, however, that MRB 7 was "Monument Realty's affiliate." Compl. ¶ 70.  As the cases cited above show, the allegation of affiliation does not make Monument Realty an "interested party" with standing to pursue this bid protest.   "[T]he standing doctrine embraces the general prohibition against a litigant's raising another entity's legal rights." *Eagle Design & Mgmt., Inc. v. United States*, 62 Fed.Cl. 106, 109 (2004).  *See Gravely & Rodriguez*, B-256506, March 28, 1994, 94-1 CPD ¶ 234 (protest dismissed because protester, a partnership, was a different legal entity from the named bidder, a sole proprietorship and subsequent partner in the protester, and therefore did not qualify as an interested party).

Because Monument Realty does not have standing to contest or to seek relief as a result of the bid process and award, the Complaint fails to state a claim for Monument Realty upon which relief can be granted.  Accordingly, as to Monument Realty the Court should dismiss Counts One, Two, Three, Four, Five, Six and Seven to the extent that they depend on or include the bid process and Counts Eight and Nine in their entirety.

**5. The Complaint Fails to State a Claim on Behalf of Monument Realty and MRB 7 With Respect to WMATA's Bid Procedures Regarding, and WMATA's Acceptance of the Winning Bid For, the Bus Garage Property Because Monument Realty and MRB 7 Waived Whatever Rights They Might Have Had to Object**

With respect to both Monument Realty (assuming, *arguendo*, that Monument Realty had standing) and MRB 7, the Complaint fails to state an actionable claim for relief arising out of the IFBs and the bid process.  This is because, as the Complaint alleges by implication and inference, neither Monument Realty nor MRB 7 protested the IFBs themselves or the process the IFB's manifested before MRB 7 submitted its bid or before WMATA opened the bids and selected Akridge's as the winning bid.

By failing to lodge timely protests, *i.e.*, before bidding and before award, Plaintiffs waived their right to challenge the process and the IFBs setting out that process.  *See Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313-14 (Fed. Cir. 2007) (holding, the waiver rule requires that a party object to solicitation terms during the bidding process):

> Section 1491(b) of title 28 U.S. Code provides the Court of Federal Claims with "jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency."  28 U.S.C. § 1491(b)(1).  In doing so, the statute mandates that "the courts shall give due regard to the interests of national defense and national security and *the need for expeditious resolution of the action*."  *Id*. § 1491(b)(3) (emphasis added).  Recognition of a waiver rule, which requires that a party object to solicitation terms during the bidding process, furthers this statutory mandate.
>
> * * * *
>
> In the absence of a waiver rule, a contractor with knowledge of a solicitation defect could choose to stay silent when submitting its first proposal.  If a first proposal loses to another bidder, the contractor could then come forward with

the defect to restart the bidding process, perhaps with increased knowledge of its competitors. A waiver thus prevents contractors from taking advantage of the government and other bidders, and avoids costly after-the-fact litigation. Accordingly, the same reasons underlying application of the patent ambiguity doctrine against parties to a government contract speak to recognizing a waiver rule against parties challenging the terms of a government solicitation.

* * * *

"Vendors cannot sit on their rights to challenge what they believe is an unfair solicitation, roll the dice and see if they receive award [sic] and then, if unsuccessful, claim the solicitation was infirm." [Citation omitted][6]
Accordingly, the Court should dismiss all Counts.

**6. The Complaint Fails to State a Claim on Behalf of Monument Realty and MRB 7 With Respect to MRB 7's Alternate Bid Because the Alternate Bid Was Not Responsive or Acceptable, and Under Long Established Law WMATA Acted Rationally and Did Not Act Arbitrarily or Capriciously in Rejecting the Alternate Bid**

The Court may disturb WMATA's decision to reject MRB 7's alternate bid only if WMATA acted arbitrarily and capriciously and without any rational basis. *See, e.g., CRC Marine Services, Inc. v. United States*, 41 Fed. Cl. 66 (1998); *Elcon Enters., Inc., supra*, 977 F.2d 1472 (holding, (i) the district court cannot award any relief short of irrationality or clear and prejudicial violation of applicable law; (ii) there is a strong presumption that government officials act correctly, honestly and in good faith when considering bids; and (iii) the standard of review is highly deferential and assumes validity of agency action).

---

[6] Plaintiffs do not allege, as they cannot allege in good faith, that they lacked sufficient information for a pre-award protest. To the contrary, as the Complaint clearly alleges, Plaintiffs possessed all the information they needed to protest WMATA's issuance of the IFB as being contrary to the alleged agreements and commitments giving Monument the exclusive right to purchase the Property well before the August 28, 2007 bid deadline.

Section 2002.1 of WMATA's benchmark Procurement Procedures Manual (the "PPM," Exhibit D to the Complaint) requires that WMATA receive any protest "directed to the terms, conditions, or form of a proposed procurement action" prior to bid opening. Though this particular provision does not apply directly to WMATA's disposition of surplus real property (§ 1503.4, invoking the general open competition provisions of 49 C.F.R. Part 18, governs this sale), § 2002.1 does reflect, and WMATA follows, generally applicable procurement law and common sense in requiring that bid protests precede the opening of the bids.

In evaluating the bids in general and MRB 7's alternate bid in particular, as these cases show, WMATA enjoyed a great deal of discretion.  *See Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345 (Fed. Cir. 2004):

> It is well-established that contracting officers have a great deal of discretion in making contract award decisions, particularly when, as here, the contract is to be awarded to the bidder or bidders that will provide the agency with the best value.  *See TRW, Inc. v. Unisys Corp.*, 98 F.3d 1325, 1327-28 (Fed. Cir. 1996); *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996);  *Lockheed Missiles & Space Co. v. Bentsen*, 4 F.3d 955, 958-59 (Fed. Cir. 1993).  The issue here is whether the contracting officer acted within the scope of that discretion.

*See also ABF Freight System, Inc. v. United States*, 55 Fed. Cl. 392, 409 n.13 (2003) (holding, "the law is well-settled that the determination of an agency's procurement needs and the best method for accommodating them are matters primarily within the agency's discretion.").

In both law and in fact, WMATA clearly had a rational basis for rejecting the alternate bid and did not act arbitrarily and capriciously.

### A. Rational Basis In Law

The law of this District is that MRB 7's alternate bid was nonresponsive.  *See Trump v. Mason*, 190 F. Supp. 887 (D.D.C. 1961) (holding, bid to acquire real property of stated amount or $20,000 more than any other bid was not a firm bid and agency could reject it as nonresponsive):

> The Court is of the opinion that to accept a bid such as plaintiff's 'would destroy the integrity of the bidding system by establishing a precedent which would invite a repetition of this type of bidding in the future so as to completely defeat the sealed bid procedure' (as argued by defendant).  *Holliday v. Higbee*, 10 Cir., 1949, 172 F.2d 316.
>
> * * *
>
> . . .  The plaintiff's bid not being firm or one which could 'independently' (and by 'independently' the Court means one not subject to or reliant on the bids of others) guarantee, within its four corners, a sum-certain offer which could be accepted and so ripen into a contract, the defendant acted within the bounds of his sound discretion in refusing to accept the bid as responsive to the invitation to bid.

*Id*. at 889.

WMATA's rejection of MRB 7's alternate bid, and this Court's earlier decision in *Trump v. Mason*, manifest the consistent judicial and agency views of bids like MRB 7's. *See Holliday v. Higbee*, 172 F.2d 316, 318 (10th Cir. 1949) (footnotes omitted):

> As pointed out, pursuant to the published invitation for sealed bids, he submitted Bid Number two set out in footnote one, on which he predicated his cause of action. This bid was not a direct bid in any specified amount. Merely bidding $10 more than any other bid is not a bona fide valid bid. It was not a fair bid and the Government was not required to give it consideration, especially under a bidding invitation in which the right was reserved to accept or reject any or all bids.[7]

> The Government was under no legal duty to accept appellant's bid. It follows that his complaint failed to state a cause of action and the judgment of the trial court is, therefore, affirmed.

A Comptroller General decision coming after *Trump v. Mason* and *Holliday v. Higbee* explains very well the reasoning – *i.e.*, the rationality – behind rejecting MRB 7's alternate bid and bids like that:

> The proposed procedure is novel to us and we have not found any cases in which the identical matter was considered. Under the proposal each bidder is offering to purchase the timber involved at either the administratively determined price or some fixed percentage or amount in excess of the bid next highest to his. But while the precise procedure is novel similar bidding practices have been litigated and the courts have uniformly held that bids not complete in themselves are not *bona fide* valid bids. In *Casey* v. *Independence County*, 159 S.W. 24 (1913), a bank proposed to pay the county interest at a rate "one-quarter of 1 percent" higher than any other bid. The court, citing the case of *Webster, et al.* v. *French, et al.,* 11 Ill. 254, stated that:

>> * * * a proposal to be recognized as a bid must contain a distinct proposition, which can be acted upon taken alone and without reference to anything out of itself. * * * if this form of bidding is allowed, one man, by offering a nominal sum above all others, might appropriate to his own advantage the judgment of others who might have gone to great trouble and expense to form a correct opinion, when the intention was to give each bidder the benefit only of his own judgment. The court further said that the

---

[7] Like the IFB in *Holliday*, WMATA's solicitation, at ¶¶ C.5 and D.8, expressly reserved the right to reject any and all bids, or portions thereof, at any time and for any reason.

effect of it would be to drive away all prudent and reasonable men and destroy all fair competition in the bidding * * * .

\*\*\*\*

For the defect lies in the introduction of such elements of chance and wagering which we believe have no place in the competitive bidding system.

Certainly chance also plays a part under sealed bidding procedures. There each bidder is faced with the problem of "guessing" what other bidders will offer. However, each bidder determines for himself the prices at which he is willing to contract. And he states in submitting his bid that the price offered is the price for which he is bargaining. The only chance involved is whether the bidder is over or underestimating his competition. In one event he will be paying a price greater than was necessary to obtain his contract; in the other event he, of course, will not obtain a contract. But it is this very element which the sealed bid procedure relies upon to assure real and fair competition.

The procedure we are asked to consider goes considerably beyond what may be reasonably considered to be fair risks.

*Comptroller General to Sec'y of Agriculture*, 44 Comp. Gen. 292, Nov. 19, 1964, B-154978, CPD ¶ 43.

Furthermore, Plaintiffs allege and rely on only the thinnest of arguments, that the IFB did not prohibit alternate bids, the implication being that the IFB allows any form of bid not expressly prohibited. But that allegation does not eliminate WMATA's discretion. If anything, the allegation that the bidding allowances were so wide open mandates enhanced discretion, particularly to assure adherence to the heavily favored principles of full and open competition and a level playing field for all bidders.[8]

---

[8]  *Cf* WMATA's enabling act, the Compact (Compl. Ex. C), Art. XVI, § 73, entitled "Contracting and Purchasing" for procurement of property, services and construction:

(a)(1) Except as provided in subsections (b), (c), and (f) of this section and except in the case of procurement procedures otherwise expressly authorized by statute, the Authority in conducting a procurement of property, services or construction shall:

(A) obtain full and open competition through the use of competitive procedures in accordance with the requirements of this Section; and

Nor does the allegation render MRB 7's alternate bid responsive or acceptable. MRB 7's alternate bid, in and of itself, did not contain a sum certain. Rather, MRB 7's alternate bid was contingent upon the amounts bid by others. Thus, WMATA could not ascertain the amount of the alternate bid without consulting and integrating materials outside the bid itself. Under *Trump v. Mason*, *Holliday v. Higbee*, the Comptroller General's decision and other well established law, WMATA properly rejected the alternate bid for failing to provide an independent, firm, fixed-price. *See also Fire-Trol Holdings, LLC v. United States*, 68 Fed. Cl. 281, 286 (2005) (upholding the rejection of plaintiff's alternate bid because it did not provide a firm fixed-price for fire retardants); *National Ambulance And Escort Service, Inc.*, B-196511, Nov. 8, 1979, 79-2 CPD ¶ 342 (denying protest on ground, *inter alia*, that bid providing for a change in price of services to be furnished if certain circumstances occur did not offer a firm fixed-price and was non-responsive).

## B. Rational Basis In Fact

There are many reasons grounded in fact why WMATA's decision not to accept MRB 7's alternate bid was rational. First, MRB 7's alternate bid was an attempt to get "two bites at the apple," a construct that reviewing decisions reject out-of-hand as not fair and not competitive. In addition to the cases cited above in Point I. 6. A., Rational Basis in Law, *see generally Matter of RO Contracting Co.*, B-235496, Aug. 31, 1989, 89-2 CPD ¶ 200; *Matter of Waste Conversion, Inc.*, B-224425, Nov. 7, 1986, 86-2 CPD ¶ 534.

---

(B) use the competitive procedure or combination of competitive procedures that is best suited under the circumstances of the procurement.

****

(e) If the Authority uses procedures other than competitive procedures to procure property, services, or construction under subsection (c)(2) of this section, the Authority shall request offers from as many potential sources as is practicable under the circumstances.

Second, if MRB 7 is right and can make this alternate bid, then IFB 08-1 is inherently and fatally unfair and uncompetitive. The right to make an alternate bid would be a singular right available to MRB 7 that would guarantee MRB 7 that it would be the successful bidder. MRB 7's guarantee would come, moreover, without the necessity of having to make a fair evaluation and bid and without any of the risks of the competitive bidding process. It would allow MRB 7 to do exactly what it did, or at least tried to do: manipulate the process by bidding the lowest possible amount to enter the process and guarantee success by tacking on a minimal, almost insignificant escalator. MRB 7 bid the Minimum Bid Price, $60 million, and proposed a minimal escalator of $250,000. That $250,000 represents a mere 0.4% addition to the $60 million Minimum Bid Price and an even smaller 0.36% addition to the winning bid price of $69.25 million. MRB 7 was gaming the bid process, and WMATA was *right* – not just rational, not merely non-arbitrary and non-capricious – in maintaining the integrity of the process and in not capitulating to MRB 7's abuse of the process.

Third, allowing alternate bids with contingent escalation clauses negates the bid process altogether. If more than one bidder were to submit alternate bids, with each purporting to top the highest bid by some increment, the bidding process would be a never ending, linear arithmetic progression to infinity, as each alternate bid topped each initial bid and each preceding alternate bid. No bid ever would be the highest, and no bidder ever could prevail.

Fourth, MRB 7 simply arrogated to itself the prerogative to employ this noncompetitive and destructive alternate bid without doing any due diligence or making any inquiry into the propriety of an alternate bid. Rather, as MRB 7 alleges in its Complaint, MRB 7 relies on the mere premise that the IFB did not expressly prohibit alternate bids and thus contained a "latent ambiguity." *See* Compl. ¶ 78. The IFB also, however, invited MRB 7 to ask WMATA about this "latent ambiguity":

> Additional Information: "Requests for additional available information and all questions regarding this Invitation for Bids must be submitted via e-mail to Mr. Burns in accordance with Section C, paragraph 6, above.  WMATA will post all questions and answers on its website …."

IFB § D. 5. at 8.[9]  MRB 7 could have asked about submitting an alternate bid but did not.  That MRB 7, knowing that the IFB did not request or authorize alternate bids, or at the least knowing that the IFB allegedly was ambiguous, did not inquire of WMATA further evidences the gamesmanship on MRB 7's part and the rationality on WMATA's part.[10]

Plaintiffs obviously were concerned with the propriety of the alternate bid, so much so that they qualified their already contingent bid with the following

> If WMATA's rules and regulations regarding the acceptance of bids for the sale of real property do not permit WMATA to consider escalation clauses, then this addendum shall be disregarded and MR Ballpark 7 LLC's Bid Amount shall be as shown on the Bid Form above [*i.e.*, the Minimum Bid Price of $60 million].

Compl. Ex. I at 11.  Plaintiffs wanted to create and to preserve options in a bid process that as matters of fact and law permitted no such options.

Fifth, the alternate bid does not conform to the IFB Bid Form.  The Bid Form, Compl. Ex. I, has this one line for the bid: "Bid Amount $_____."  That clearly calls for a fixed number, not a narrative.  Common sense and common experience alone make clear that numbers follow dollar signs and that where there is a dollar sign followed by a line to be completed, only a number fits.  There is not, and there cannot be, any plausible ambiguity in this request for a bid amount.  Further proof of the clarity of the IFB, as the

---

[9] IFB No. 08-1 is Exhibit 1.E. to Plaintiffs' Emergency Motion for Temporary Restraining Order and Preliminary Injunction.  Because the Complaint references and relies on the IFB for critical allegations regarding the bid process and MRB 7's bid, WMATA's reference to the IFB here does not constitute reliance on materials beyond the pleadings and does not prevent consideration under Rule 12(b)(6).  *See In re Cheney*, 406 F.3d 723, 728 (D.C. Cir 2005).

[10]  As section D. 5. of the IFB indicates, in order to maintain fairness and equality in the bidding process, WMATA would have had to make both the inquiry and the response available to all bidders, thereby exposing and defeating MRB 7's tactic.

Complaint inferentially alleges, is that neither the winning Akridge bid nor the unnamed third bidder had any problem understanding how and what to bid, namely a fixed dollar amount.

Sixth, allowing the alternate bid because, as the Complaint alleges, the IFB did not explicitly prohibit alternate bids leads to dangerous and unacceptable consequences. The IFB also did not explicitly prohibit innumerable other variances such as bids in currencies other than United States dollars or, in fact, bids using some form of consideration other than currency. Under Plaintiffs' theory, for example, a bidder could have bid 1,000 shares of Berkshire Hathaway and argued that (i) the IFB did not prohibit this bid, (ii) the value of the bid was readily ascertainable and (iii) the shares trade 24/7 in a liquid market, and therefore WMATA could calculate and realize the cash almost immediately and certainly well before closing, making it a permissible response to the IFB. The consequences of "what is not expressly prohibited is allowed" are too varied and too numerous to summarize, but this much is clear: Introduction of "what is not expressly prohibited is allowed" as a principle of government contracting is untenable. Inserting this latitude into bids would vitiate agencies' discretion and confer that discretion on the bidders and would replace reason and certainty with anarchy.

Seventh, the alternate bid with the contingent escalator raised and contained many ambiguities. For example, the alternate bid stated that should WMATA receive "a bid" greater than $60 million, MRB 7 would offer $250,000 more than that bid. But the alternate bid did not address WMATA's receiving more than one bid greater than $60 million, as happened. As a result, the alternate bid offered (and could have offered more than) two prices, $250,000 over the next highest bidder and $250,000 over the highest bidder. And if, for example, one bid had come in at $60,100,000 and one at $60,300,000, what was MRB 7's bid price, $60,350,000 or $60,550,000? Also, the alternate bid was ambiguous in failing to explain how to calculate MRB 7's bid if another bidder offered more than $60 million net but with a

leaseback rent of greater than $0 (the leaseback and leaseback rental were an integral part of the IFB), as in fact was the case.  The manifold ambiguities, confusion and unfairness to other bidders inherent in this alternate bid justified – in fact required – WMATA to decline it.  *See, e.g., Don's Wheelchair & Ambulance Svc., Inc.*, B-216790, Jan. 22, 1985, 85-1 CPD ¶ 82; *B&P Printing, Inc.*, B-188511, June 2, 1977,  77-1 CPD ¶ 387.

In sum, not only was WMATA well within its discretion in rejecting the alternate bid; as a matter of both law and fact, WMATA's rejecting MRB 7's alternate bid was absolutely the correct action.  Accordingly, the Court should dismiss Counts One, Two, Three, Four, Five, Six and Seven to the extent that they depend on or include the bid process and Counts Eight and Nine in their entirety.

### II. The Noncontract Claims Must Be Dismissed By Reason of WMATA's Sovereign Immunity

#### 1. Standard of Review Under Rule 12(b)(1)

On this Rule 12(b)(1) motion, Plaintiffs have the burden of persuasion.  *See Smith v. Wash. Metro. Area Transit Auth.*, 290 F.3d 201, 205 (4th Cir. 2002) (citation omitted): "[I]f the governmental entity challenges jurisdiction under Rule 12(b)(1), the plaintiff bears the burden of persuasion, and the court is free to consider exhibits outside the pleadings 'to resolve factual disputes concerning jurisdiction.'"

#### 2. WMATA's Sovereign Immunity

WMATA possesses sovereign immunity from suit for torts occurring in the performance of a governmental function.  *See Abdulwali, supra*, 315 F.3d at 304; D.C. Code Ann. § 9-1107.01(80).  WMATA's tort immunity initially turns on whether the challenged activity is "quintessentially governmental."  If so, the activity falls within WMATA's immunity.  *Abdulwali, supra*, 315 F.3d at 304.

If the activity is not quintessentially governmental, the inquiry then becomes whether WMATA's actions were "discretionary," as opposed to ministerial.  *Id.*; *see KiSKA Constr. Co., supra,* 321 F.3d at 1158-59.  To determine whether a WMATA action is discretionary, the Court must look to (i) whether a statute, regulation or policy specifically prescribes a course of action for the employee to follow and (ii) in the absence of a prescribed course of action, or if governing statutes or regulations leave room for the exercise of discretion, whether the exercise of discretion is grounded in social, economic or political goals.  *See Abdulwali, supra,* 315 F.3d at 304; *KiSKA Constr. Co., supra,* 321 F.3d at 1158-59.  The "room for the exercise of discretion" is wide and includes:

> more than the initiation of programs and activities.  It also includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations.  Where there is room for policy judgment and decision there is discretion. . . . The core of the *Dalehite* idea is that WMATA should be immune . . . from judicial 'second guessing' via tort suits 'of legislative and administrative decisions grounded in social, economic and political policy.'

*Sanders v. Wash. Metro. Area Transit Auth.,* 819 F.2d 1151, 1153-54 (D.C. Cir. 1987) (citation omitted).  More recently, this Circuit again cautioned against cabining WMATA's immunity:

> By insulating from liability, decisions involving the balancing of 'social, political, and economic factors' – whether under the WMATA Compact, the FTCA, or elsewhere – Congress presumably *did* intend to allow government to 'create' immunity by carefully considering a question in policy terms. It is true, as appellants argue, that such immunity could have substantial and even on occasion undesirable impact if those policies are ill-considered. But the hard fact remains that insulating policy determinations, good and bad, is the *raison d'etre* of the discretionary function exception.

*Souders v. Wash. Metro. Area Transit Auth.,* 48 F.3d 546, 549 (D.C. Cir. 1995).

Plaintiffs' tort claims are barred as based on quintessentially governmental action, or if not quintessentially governmental, then barred as based on discretionary action.

### 3. This Court Does Not Have Subject Matter Jurisdiction Over Claims Relating to the Creation and Content of the IFB and the Compact By Reason of WMATA's Sovereign Immunity

Plaintiffs seek relief, articulated particularly in Counts Eight and Nine but woven throughout other counts as well, based on (i) WMATA's alleged breach of the Compact by failing to formulate policies, procedures, rules and regulations governing the disposition of real property[11] and (ii) ambiguity in the IFB over the propriety and acceptance of alternate bids (as to the latter, *see* Point I. 6. above).  These claims, however, come within WMATA's sovereign immunity and are outside this Court's subject matter jurisdiction.

These Counts challenge a sovereign's determination of if, how and when to issue policies and procedures.  These determinations, WMATA respectfully submits, are quintessentially governmental.  Only governments and government bodies issue the kind of policies, procedures and regulations that are the subject of Counts Eight and Nine, and when governments do so, they act pursuant to statutory allowances, not pursuant to rules of the proprietary marketplace.

Even if not quintessentially governmental, however, WMATA's actions with respect to if, how and when to issue policies and procedures are discretionary and within WMATA's immunity, thus barring Counts Eight and Nine.  *See KiSKA Constr. Co.*, *supra*, 321 F.3d at 1159-1162 (holding, the contents of WMATA's bid packages and the decisions in a procurement as to what is desired as matters of social, economic or political policies are discretionary determinations protected by the sovereign immunity).  Accordingly, the Court must dismiss for lack of subject matter jurisdiction all claims emanating from or premised on

---

[11] WMATA assumes for purposes of this argument only, but does not concede, that Plaintiffs would have standing to assert such a claim.  WMATA believes that its sovereign immunity disposes of the claim.

acts and omissions of WMATA with respect to the IFBs and the Compact and the social, economic and political choices within and pursuant to the IFBs and the Compact.

There are other reasons why Counts Eight and Nine fail to state claims upon which relief can be granted. The lack of standing and waiver arguments set forth in Point I. 4. above pertain here as well. Monument Realty did not participate in the bid process and has no standing whatsoever to complain about any absence of, breach of or abuse of discretion concerning bid policies and procedures or the application of the Compact to the bid process. MRB 7 was obligated to raise the claims in Counts Eight and Nine in the bid process itself prior to WMATA's opening the bids. MRB 7's failure to do so waived its right to bring these after-the-fact counts against the IFB and WMATA's conduct of the entire bid process. Accordingly, the Court should dismiss Counts Eight and Nine.

### 4. This Court Does Not Have Subject Matter Jurisdiction Over Any Fraud, Breach of Fiduciary Duty Or Other Tort Claims By Reason of WMATA's Sovereign Immunity

Under *Abdulwali*, *supra*, 315 F.3d at 304 and *KiSKA Constr. Co.*, *supra*, 321 F.3d at 1158-59, the conduct of which Plaintiffs complain is "quintessentially governmental" and therefore protected from suit by WMATA's sovereign immunity. One need look no further than the Complaint to establish this.

### A.  The Decisions At Issue Here Are Quintessentially Governmental

The Complaint's entire context is governmental, not proprietary. Congress approved the Compact "to deal with growing traffic problems in the Washington area" and made WMATA "[r]esponsible for creating a coordinated transportation system for the region." *Beebe v. Wash. Metro. Area Transit Auth.*, 129 F.3d 1283, 1285 (D.C. Cir. 1997). Unquestionably, WMATA's function and responsibility, as this Circuit expressly recognizes, are quintessentially governmental. Like police and firefighters, public transportation serves essential governmental interests, here providing the necessary mobility for all the area's citizenry and dealing with

major "problems in the Washington area" impacting, in one way or another, the lives of virtually every resident, business and government agency.   In fact, leaving the police and firefighters aside, the "coordinated transportation system for the region" is as comprehensive, integral and necessary a governmental service as any.

At issue here is an important element of this public transportation service, the consummation of WMATA's longstanding goal of relocating a bus garage from a cramped, outdated facility off South Capitol street to a state of the art facility in a less congested part of the District of Columbia.   WMATA determined that it would be able to achieve this goal once the District of Columbia identified a property elsewhere in Southeast Washington, on the D.C. Village campus, where the new, expanded garage could be located.  An essential element of this plan was the decision to sell the existing property and to use the proceeds from the sale to fund the construction of the new facility.

WMATA's basic mandate, as the Compact explicitly spells out, is "to plan, develop, finance and cause to be operated improved transit facilities."   Compact, Section 2.  Carrying out this mandate is the essence of a governmental function.  The decision to relocate, and all of the subsidiary decisions involved in achieving that goal, including the decisions regarding publication of the offering and use of sealed bid procedures in connection with the sale, are all barred from review because of the governmental nature of the activity at issue.   Thus, for example, this Court is foreclosed from reviewing the decision to solicit bids under a sealed bid process because such review would undermine WMATA's ability to carry out its basic mission under the Compact of constructing improved transit facilities. Creating improved transit facilities to benefit large segments of the population of this region is the *raison d'etre* of WMATA.  The Compact granted WMATA sovereign immunity to assure its ability to achieve this mandate.

**B.  In the Alternative, WMATA Is Immune Because the Decisions At Issue Here Involve Discretionary Matters**

Under *United States v. Gaubert*, 499 U.S. 315 (1991), the Supreme Court's most recent comprehensive analysis of this matter, the touchstone of the discretionary function exception is the existence of policy decisions that may be analyzed in terms of social, economic, or political considerations.  It is the nature of the conduct, rather than the status of the actor, that governs whether the exception applies.  *Gaubert*, 499 U.S. at 322.  A discretionary function is one that involves choice or judgment; it is not necessary that it involve planning or policy-making functions.  *Id*. at 325.  In assessing the "discretionary" nature of the decision, the analysis does not focus on what the decision-maker in a particular case was thinking, but rather on "whether the *type* of decision being challenged" implicates policy judgments.  *See Cope v. Scott*, 45 F.3d 445, 449 (D.C. Cir. 1995).

The cases are legion in which the federal courts have applied the discretionary function doctrine to hold WMATA immune from common law claims.  Most recently, in *Beebe v. Wash. Metro. Area Transit Auth., supra*, this Circuit applied WMATA's sovereign immunity bar to tort claims, including misrepresentation and fraud, for decisions involving the reorganization of WMATA's procurement office.  In *Souders v. Wash. Metro. Area Transit Auth., supra*, WMATA's immunity barred nuisance claims involving vibrations and noise from passing Metrorail trains.  In *Dant v. District of Columbia*, 829 F.2d 69 (D.C. Cir. 1987), claims involving negligent design of the fare card system were barred.  In *Sanders v. Wash. Metro. Area Transit Auth., supra*, WMATA's immunity barred constitutional claims involving drug testing of employees.  In *Smith v. Wash. Metro. Area Transit Auth., supra*, the Fourth Circuit relied heavily on D.C. Circuit law and remanded a partial denial of immunity in regard to claims arising out of the death of a patron who climbed the stairs at the Bethesda station.  The court

held that WMATA's decision not to reassemble, for rush-hour use, an escalator that was out of service, was an immunized governmental decision.  290 F.3d at 209.

The actions and decisions at issue here fall well within the definition of discretionary. The determinations of where, when and how to relocate the bus garage and what to do with the old garage are economic for sure, requiring consideration of, for example, the cost of acquiring a new site, the costs of relocation, the costs of changes in the transportation system to accommodate the move and maximizing the return on the old property.

The determinations of where, when and how to relocate are also deeply discretionary decisions based on social and political considerations, for example: (i) assessing and reaching decisions on the interests and concerns of the residents and businesses in the areas under consideration for the new location; (ii) assessing and reaching decisions on the political consequences both within and among the three jurisdictions comprising WMATA; (iii) assessing and reaching decisions on the best and the preferred method for WMATA to go about disposing of the old garage site; (iv) assessing and reaching decisions on the best form of the disposition transaction; (v) assessing and reaching decisions on WMATA's needs in anticipation of and during the move; and (vi) assessing and reaching decisions on the terms and conditions of any disposition of the old site.

In sum, a decision such as this one, to relocate a major public transportation facility, with all the ramifications on the communities, the transportation schedules, the costs and the requirements to maintain a smoothly operating public transportation system, invokes prototypical social, economic and political policies and considerations, all intended for the benefit of the public.[12]

---

[12] *See generally* Point I. 6. above; *ABF Freight System, Inc., supra*, 55 Fed. Cl. at 409 n.13 (holding, "the law is well-settled that the determination of an agency's procurement needs and the best method for accommodating them are matters primarily within the agency's discretion.").

Furthermore, as a practical matter these considerations and decisions are best left to WMATA. WMATA alone has the political base to make these often difficult determinations. Courts are not equipped, nor should they be, to direct determinations on these matters. And certainly private parties should not be given the prerogative to dictate, direct or preempt WMATA's statutory mandate to make these determinations or to sue if the private parties feel slighted by the result. That is the clear message of the cases cited above. Accordingly, the Court must dismiss Counts Six and Seven in their entirety and dismiss all Counts to the extent they sound in tort.

### III. Because Amendment Would Be Futile, the Court Should Dismiss the Complaint Without Leave to Amend

An exception to the Fed. R. Civ. P. 15(a)'s direction that "leave to amend shall be freely given when justice requires" is where an amendment would be futile. *See Foman v. Davis*, 371 U.S. 178, 182 (1962). That exception applies here. Plaintiffs cannot allege that the WMATA Board authorized or entered into any exclusivity agreement and certainly cannot allege that the July 2007-born MRB 7 had an agreement with WMATA for the exclusive – or any – right to negotiate for or acquire the Property. Plaintiffs cannot overcome their waiver of rights with respect to protesting or suing over the IFBs. Plaintiffs cannot allege that Monument Realty has any standing or other rights with respect to the IFBs for the Property. Neither Plaintiff can overcome WMATA's sovereign immunity from suit over the preparation and content of the IFBs or for any tort action. In short, any attempt to amend to state claims arising out of these matters would be futile. Accordingly, the Court should not grant leave to amend but should make the dismissal with prejudice and final.

---

**CONCLUSION**

For the foregoing reasons, Counts One, Two, Three, Four and Nine should be dismissed for failure to state a claim upon which relief can be granted, and Counts Five, Six, Seven and Eight should be dismissed on the ground of WMATA's sovereign immunity or, in the alternative, for failure to state a claim upon which relief can be granted.

Accordingly, WMATA respectfully prays that the Court dismiss the Complaint in its entirety, without leave to amend, award WMATA its costs and expenses including legal fees and grant WMATA such other and further relief as is proper.

Dated this 17th day of October 2007.

Respectfully submitted,

    /s/ Harvey A. Levin
Harvey A. Levin (D.C. Bar No. 203869)
THOMPSON COBURN LLP
1909 K Street, N.W. Ste. 600
Washington, D.C.  20006-1167
T: (202) 585-6942 (direct)
F: (202) 508-1013 (direct)
email:hlevin@thompsoncoburn.com

    /s/ Donald A. Laffert
Carol B. O'Keeffe
General Counsel
Donald A. Laffert
Associate General Counsel
Washington Metropolitan Area Transit Authority
600 Fifth Street, N.W.
Washington, DC 20001
T: (202) 962-1499
F: (202) 962-2550
Email:dlaffert@wmata.com

Counsel for Defendant Washington Metropolitan
Area Transit Authority

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

MONUMENT REALTY LLC, *et al.*,          )
                                        )
        *Plaintiffs*                    )
                                        )
v.                                      )        Civil Action No. 1:07-CV-01821 (EGS)
                                        )
WASHINGTON METROPOLITAN AREA            )
TRANSIT AUTHORITY,                      )
                                        )
        *Defendant*                     )
_____ )

**ORDER GRANTING
MOTION TO DISMISS OF
WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY**

On motion of Defendant Washington Metropolitan Area Transit Authority ("WMATA"), pursuant to Fed. R. Civ. P. 12(b)(6) and 12(b)(1) and Local Rule 7, to dismiss the Complaint on the grounds that the Complaint fails to state a claim upon which relief can be granted and, as to certain counts, the Court has no subject matter jurisdiction due to WMATA's Eleventh Amendment sovereign immunity, it is this _____ day of _____ 2007 ORDERED that:

1. WMATA's motion be, and hereby is granted.

2. Counts One, Two, Three, Four and Nine are dismissed for failure to state a claim upon which relief can be granted.

3. Counts Five, Six, Seven and Eight are dismissed on the ground of WMATA's sovereign immunity or, in the alternative, for failure to state a claim upon which relief can be granted.

4. The Court finds that amendment would be futile and therefore the foregoing dismissals are without leave to amend.

_____
Emmet G. Sullivan
United States District Judge


Copies to:


Harvey A. Levin
Donald A. Laffert
Louis E. Dolan, Jr.
Vernon W. Johnson, III