**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

MONUMENT REALTY LLC, et al.,    )
    )
       Plaintiffs,    )
    )
    v.    )
    )   **Civil Action No. 1:07-cv-01821 (EGS)**
    )   **Judge Emmet G. Sullivan**
WASHINGTON METROPOLITAN    )
AREA TRANSIT AUTHORITY,    )
    )
       Defendant.    )
_____)

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO WMATA'S MOTION TO DISMISS**

## I.    INTRODUCTION

Over a several year period, Plaintiff Monument Realty LLC ("Monument Realty") has invested tens of millions of dollars in the acquisition and development of a number of properties in and around the Ballpark District, advancing the express public policy interests of the District of Columbia Government in creating a vibrant mixed-used neighborhood surrounding the new baseball stadium, spearheading a coordinated and unified development program as "Master Developer" of the Half Street Area, and promoting economic development and prosperity in a once blighted area of the City. Although the Washington Metropolitan Area Transit Authority ("WMATA") goes to great lengths to disassociate itself from the District, the Anacostia Waterfront Corporation, Monument Realty, and the development of the Baseball District, WMATA has been a direct participant in, and beneficiary of, these efforts.

On its part, Monument Realty would never have made such a vast investment in these development efforts had it not enjoyed the exclusive rights to negotiate for and acquire the Bus

Garage Property at issue in this case.  As WMATA well knows, none of the parties ever agreed or intended that Monument Realty would not have the opportunity to negotiate with WMATA to acquire all of the adjacent properties marked on Exhibit B to the First Amended Complaint ("Amd. Compl.") in order to complete the comprehensive plan for the Half Street Area, which was endorsed by all parties.  Now, however, after years of working with Monument Realty, and accepting the benefits Monument Realty conferred on it with respect to the Property, and executing and closing on contracts with respect to other phases of the development, WMATA has taken the maverick step of attempting to sell the Property – which is located squarely in the center of Monument Realty's holdings in the Half Street Area – to another party, thereby leaving Monument Realty with a disconnected set of attenuated real estate and thwarting the plan for coordinated development.  Whatever the reason for WMATA's recent decision to disavow Monument Realty's rights, Monument Realty can and does advance viable contract and real property rights that have long been recognized under District of Columbia law.  *See, e.g., Brewood v. Cook,* 207 F.2d 439 (D.C. Cir. 1953) (affirming award of specific performance in case where parties had a previous and fully performed written contract for eight of ten lots of real estate, and this Court had enforced a collateral oral contract providing that the remaining two lots would be conveyed later).

In addition, in WMATA's haste to trample the rights of Monument Realty and its affiliate, MR Ballpark 7 LLC ("MR Ballpark 7"; both entities are sometimes referred to collectively herein as "Monument"), it has followed a bid process that breaches its Compact and is otherwise arbitrary, capricious, without a rational basis, and in violation of the law.  Ironically, the end result of the illegal process followed by WMATA would cause not only irreparable harm to the Plaintiffs, but would realize less than the "best net return to WMATA after leaseback

monthly rent," even though this was the sole criterion in the Invitation for Bids. This is because subtracting the vigorous monthly rent stated in the purported winning bid submitted by the John Akridge Development Company (the "Akridge Bid") over the full thirty-six month leaseback term renders the "net return" indisputably below that of even Monument's minimum bid. For these and other reasons, WMATA's flawed process itself cannot stand, even if Monument had no contract and real property rights in the Property.

In seeking dismissal of the Complaint, WMATA also advances its standard technical objections on the basis of sovereign immunity and lack of standing despite their own characterization of Monument's Complaint as a "garden variety bid protest," which plainly involves matters of contract, as well as other claims not subject to any defense of sovereign immunity. WMATA's position on these issues is without merit. At this stage of the case, Plaintiffs' factual allegations must be taken as true, and Plaintiffs must be given the benefit of all inferences that can be drawn from those facts. Applying those standards, Plaintiffs have more than met the threshold test of stating claims that are viable and plausible on their face. The motion should be denied in its entirety.

## ARGUMENT

## II.     THE STANDARDS GOVERNING THIS MOTION

WMATA brings this motion under Fed. R. Civ. P. 12(b)(6) and 12(b)(1), and Local Rule 7. In asserting Rule 12(b)(6), WMATA contests the legal sufficiency of the First Amended Complaint based on the applicable pleading standards. *See, e.g., Browning v. Clinton,* 292 F.3d 235, 242 (D.C. Cir. 2002). The Supreme Court has indicated that the pleading standards require assertion of "enough facts to state a claim to relief that is plausible on its face," and "above the speculative level." *See Bell Atlantic Corp. v. Twombly,* 127 S. Ct. 1955, 1965 (2007). In

applying the Rule 12(b)(6) standards, this Court must accept as true all of the factual allegations set forth in the Complaint, and afford Plaintiffs the benefit of all inferences that can be drawn from the facts alleged. *See id.* at 1974.

The Rule 12(b)(1) standards applicable to WMATA's claim of lack of subject matter jurisdiction are slightly different. Although the Plaintiffs have the burden to establish subject matter jurisdiction when it is challenged under Rule 12(b)(1), the burden is not a heavy one and can be carried by a preponderance of the evidence. *APWU v. Potter,* 343 F.3d 619, 623 (2d Cir. 2003) ("Plaintiffs bear the burden of showing by a preponderance of the evidence that subject matter jurisdiction exists.") (citation omitted); *see also Doe v. Metro. Police Dep't,* 445 F.3d 460, 467 (D.C. Cir. 2005) (dismissal is appropriate under 12(b)(1) only if claim is "wholly insubstantial or frivolous"); *Garcia v. Copenhaver, Bell & Assocs.,* 104 F.3d 1256, 1260-61 (11th Cir. 1997) (stating that it is "extremely difficult" to dismiss a claim for lack of subject matter jurisdiction); *Best v. Kelly,* 39 F.3d 328, 330 (D.C. Cir. 1994) (noting that "jurisdiction is lacking [under Rule 12(b)(1)] when the complaint is patently insubstantial, presenting no federal question suitable for decision" and "that the claims [must] be flimsier than 'doubtful or questionable' – they must be essentially fictitious").

In this opposition, Monument has addressed the allegations in the First Amended Complaint to WMATA's arguments. On October 26, 2007, Monument filed its First Amended Complaint pursuant to Fed. R. Civ. P. 15(a), which permits a party to amend a pleading once as a matter of course at any time before a responsive pleading is served (responsive "pleadings" are defined by Fed. R. Civ. P. 7(a) and do not include a motion to dismiss). In significant part, the newly added allegations involve matters disclosed to Plaintiffs for the first time on October 18, 2007, including specific provisions of the competing bid selected by WMATA for an award.

Given the time constraints and the briefing schedule agreed upon in this case, Monument is assuming that WMATA would assert the same challenges to the First Amended Complaint as it advanced in its motion to dismiss the Complaint.

Where, as here, the factual allegations, taken as true, and the inferences that can be drawn therefrom demonstrate claims that are plausible on their face, the Rule 12(b)(6) challenge must be denied. Where, as here, the Plaintiffs' submissions demonstrate that this Court has subject matter jurisdiction, the request for dismissal based on alleged sovereign immunity concerns must also be denied.

### III. PLAINTIFFS STATE VIABLE CLAIMS FOR BREACH OF CONTRACT, DECLARATORY JUDGMENT, SPECIFIC PERFORMANCE, AND IMPOSITION OF CONSTRUCTIVE TRUST

Plaintiff Monument Realty has stated viable claims for breach of contract (Count Four), declaratory judgment as to its rights in and to the Property (Count One), specific performance by WMATA of its obligations (Count Two) and imposition of constructive trust (Count Five) with respect to the Property. The argument advanced by WMATA to contest Monument Realty's rights asserted in each of these counts is to challenge Monument Realty's factual allegations that there was an agreement between Monument and WMATA with respect to the right to negotiate for, and ultimately acquire, the Property. WMATA essentially denies the existence of the agreement – a strategy which, at the Rule 12(b)(6) stage, is ineffectual.

No doubt recognizing that Plaintiffs' factual allegations must be taken as true at this stage of the case, WMATA also asserts that there could have been no agreement with Monument as a matter of law. WMATA argues that its Compact authorizes only its Board of Directors to enter into such agreements to negotiate for and/or acquire property, and that there is no allegation that

WMATA's Board authorized such an agreement. (*See* WMATA's Memorandum of Points and Authorities ("Mem.") 8-11.)

WMATA bases its argument principally on the Compact (*see id.* 9), referring the Court to several sections of the Compact which, WMATA suggests, support its legal conclusion that only its Board may bind it to agreements like the ones alleged in this case. (*See id.* 9-10.) The principles stated by WMATA, however, are not found in the cited sections of its Compact. The provisions cited by WMATA state only the following: (1) WMATA was created as an instrumentality and agency of each of its constituent jurisdictions (Art. III, sec. 4); (2) WMATA shall be governed by a Board of Six Directors who shall take an oath of office (Art. III, sec. 5); (3) WMATA "may" own and sell real and personal property by contract (Art. III, sec. 12(d)); (4) WMATA "may" receive payments, funds, properties and services (Art. III, sec. 12(e)); and (4) WMATA "may" enter into and perform contracts, leases, and agreements (Art. III, sec. 12(e)). *See also D.C. Code Ann.* § 9-1107.01, *et seq.* (2004). (WMATA also references a Section "8(c)" of the Compact, but there is no such provision.) These sections of the Compact do not state that only the Board can authorize an agreement to negotiate exclusively for the sale of real estate or authorize the sale of real estate.

Moreover, there is ample contrary authority stating that WMATA's General Manager and others had the authority to bind WMATA to the agreements with Monument. First, the Compact itself states that WMATA's General Manager shall be responsible for "all [of WMATA's] activities." *D.C. Code Ann.* § 9-1107.01, sec. 9(b). Second, WMATA's own Procurement Procedures Manual ("PPM") contains a Chapter dealing expressly with WMATA's sale of its

real property.[1]  It provides that the General Manager, after screening the property among the constituent jurisdictions, must authorize the disposition of the Property.  PPM, at sec. 1503.5 (attached at Amd. Compl., Exhibit D.)  Third, the PPM, at Chapter 1, part XIV, states that the authority and responsibility to enter into contracts for the Authority is vested in the General Manager, and that the General Manager may delegate Contracting Officer authority to qualified employees.  *See also* Federal Acquisition Regulations ("FAR"), at sec. 1.601 (stating that certain high level officials can be "designated contracting officers solely by virtue of their positions"); FAR, at sec. 2.101 (stating that contracting officers include "certain representatives of the contracting officer.").  Hence, there is ample authority to suggest that the WMATA Board can, and has, delegated authority to others within WMATA to discuss, negotiate, and contract for the disposition of real property.  While the WMATA Board may ultimately have responsibility for approving a negotiated disposition, that is a far cry from claiming that only the Board may negotiate for a disposition or authorize a WMATA employee to negotiate for the disposition.  It is readily apparent on the face of the PPM, as well as the facts alleged with respect to this Property, that any such necessary authorization existed in this case.

Further, even if the WMATA personnel with whom Monument dealt did not possess actual express authority, this does not mean that these individuals did not have authority to bind WMATA.  First, WMATA personnel can bind WMATA if they possess implied actual authority. *See, e.g., SGS-92-X003 v. United States*, 74 Fed. Cl. 637, 652 (2006) ("A government official with implied actual authority can bind the government when such authority is considered to be an integral part of the duties assigned to a government employee.").  Second, WMATA officials

---

[1]    WMATA has expressly disavowed the PPM in these circumstances, claiming, despite the plain language in Chapter 15 of the PPM to the contrary, that it does not apply to the disposition of this Property.  (*See* Amd. Compl. ¶ 83.)

can ratify an unauthorized act and give it effect as if it had been authorized. *See, e.g., Silverman v. United States*, 230 Ct. Cl. 701, 710 (1982) ("Although the senior FTC official was not a contracting officer for the FTC, with expressly delegated authority to make contracts for the Government, the FTC retained and utilized the transcripts which the plaintiff released to the FTC on the basis of the official's promise. By accepting the benefits flowing from the senior FTC official's promise of payment, the FTC ratified such promise and was bound by it."). Finally, the actual authority requirement is premised largely on the notion that "restrictions on government agents are accomplished in the open, through laws and regulations." *Brunner v. United States*, 70 Fed. Cl. 623, 629 (2006). WMATA's alleged restrictions on its agents' authority, however, are not similarly open, through laws and regulations, since WMATA is a quasi-governmental Compact-entity – an entity that can more easily conceal restrictions on the scope of an agent's authority, particularly in light of the fact that WMATA's own Compact does not expressly state the limitation on its agents' authority that it now suggests. Moreover, WMATA has taken directly contrary positions as to which, if any, of its internal regulations or procedures apply.

In this regard, Plaintiffs have alleged that the property disposition involved in this case was handled by WMATA's Office of Property Development and Management (apparently commonly referred to within WMATA as "LAND"). Plaintiffs have alleged, *inter alia,* that the now-former Director of LAND, Gary Malasky, and others, were acting within the scope of their authority during the negotiations with Monument and throughout this development process. (Amd. Compl. ¶¶ 151, 153.) Moreover, Plaintiffs have alleged that the properties owned by WMATA in the Ballpark District were all authorized by the Board for disposition as a part of the Joint Development Solicitation ("JDS") issued by WMATA in March 2005 (Amd. Compl. ¶ 16), and that negotiations surrounding the property disposition were conducted by the Office of

Property Development and Management. (Amd. Compl. ¶¶ 58, 197.)  The PPM plainly gives personnel other than the Board the authority to negotiate Joint Development Solicitations. *See, e.g.,* PPM, at sec. 1508.4 (dealing with Contracting Officer and Evaluation Team authority to negotiate JDS agreements).  Moreover, Monument Realty alleges specifically that the Property was never formally removed from the JDS.  (Amd. Compl. ¶ 18.)

Because WMATA never formally removed the Property from the JDS, WMATA remained empowered to act under the JDS guidelines and the PPM provisions dealing with Joint Development Solicitation, which include specifically the right to negotiate with neighboring landowners such as Monument Realty.  (Amd. Compl. ¶ 18; PPM, at sec. 1508.6.)  It is a reasonable inference from these factual allegations, taken as true, that that the Board did, in fact, authorize disposition of these properties in precisely the manner in which Plaintiffs allege – to one Master Developer who would acquire the properties and then develop the properties under a comprehensive development plan, just as Monument agreed to do.  It is a further reasonable inference, and it is pled in the Complaint, that, as a result of such Board activity, WMATA personnel had the requisite authority to agree to and enter into exclusive negotiations with Monument.  Indeed, WMATA at all times after the AWC award, continued to cooperate and work in concert with Monument as Master Developer with rights in the Property.  WMATA accepted all benefits conferred on it by Monument in this relationship, but now refuses to recognize Monument's Rights.  (Amd. Compl. ¶¶ 44-45.)

Further, Plaintiffs allege that WMATA in fact entered into sole-source negotiations with Monument with respect to one phase of the development property, the Navy Yard Metro Station site, and that a contract was completed for the acquisition of that site.  (Amd. Compl. ¶ 35.) WMATA officials plainly had the requisite authority to carry out the conveyances involved in

the Navy Yard Metro Station portion of the development, and WMATA does not assert to the contrary. Those negotiations were conducted on a "sole-source" basis, just as Plaintiffs allege was required to happen here. Plaintiffs allege that the Navy Yard Metro Station transaction was part of a larger whole (Amd. Compl. ¶¶ 23-34), that the Navy Yard Metro Station portion of the transaction moved forward separately at an earlier date for several reasons, including the need to complete construction of the Metro station in time for the start of the 2008 baseball season (*Id.* ¶¶ 35-50), and that the portion of the transaction involving the Bus Garage was deferred until later, at WMATA's request, based on several grounds, including the need to finalize its plans for the relocation of the Bus Garage. (*Id.* ¶ 30.)

WMATA makes the additional contention that neither AWC nor the District of Columbia could have bound WMATA "to anything." (*See* Mem. 10.) This sweeping assertion is incorrect however. Agencies such as AWC can, in fact, possess apparent authority to act on behalf of other agencies. *See, e.g., Williams v. WMATA,* 721 F.2d 1412, 1416-18 (D.C. Cir. 1983) (remanding case to this Court for failing to consider issue of whether the District of Columbia Office of Human Rights possessed the apparent authority to act on behalf of the Equal Employment Opportunity Commission, noting that "the apparent authority of OHR . . . may have sprung from the negligence of EEOC in failing to correct representations made by the local agency"). Plaintiffs' allegations in this case implicate precisely the sort of issues referenced in *Williams* and involve allegations that cannot be dismissed at the pleading stage. (Amd. Compl. ¶¶ 11, 13-14, 16-18, 20-26, 28-34, 37-47, 49-50, 53-54, 55-56, 151-158.) Monument also alleges that AWC and WMATA reached an agreement for Monument's benefit. (Amd. Compl. ¶¶ 44, 57, 62, 63, 138). Such an agreement certainly could bind WMATA and Monument would have rights as a third party beneficiary of that agreement. *See, e.g.,*

*Christiansen v. Nat'l Sav. and Trust Co.,* 683 F.2d 520, 530 (D.C. Cir. 1982) ("If property is transferred from one person to another who agrees to assume a personal liability to a third person, the resulting relationship is that of a third party beneficiary contract . . . ."). This is the case here. The District acquired equitable title and the right to acquire the Property from WMATA; WMATA subsequently decided not to fulfill its obligations, without any legitimate basis for doing so. In fact, Plaintiffs have alleged that WMATA's actions were based on improper motives, including its mistaken belief that Monument was behind schedule on the Navy Yard construction and its lack of a policy to capture the windfall that the District might earn by flipping the Property to Monument. (*See* Amd. Compl. ¶ 63.) Monument is entitled to enforce WMATA's agreement with the District as a third party beneficiary.

In addition, given the preexisting obligation of AWC (now the District) to recognize Monument Realty as Master Developer of the Half Street Area and to convey title to Monument Realty, Monument Realty is also entitled to enforce those rights under the doctrine of after acquired title. *Id.*; *See, also, Miller-Long v. John Hanson Sav. & Loan, Inc.,* 676 F. Supp. 298, 299 (D.D.C. 1987) (recognizing that the doctrine of after acquired title has long been recognized in the District of Columbia); *Douglas v. Lyles,* 841 A.2d 1, 5 (D.C. 2004) ("Further guidance on the general principle that one can validly contract to sell that which he does not yet own comes from the doctrine of after-acquired title, which holds that 'if a grantor purports to transfer ownership of real property to which he lacks legal title at the time of transfer, but subsequently acquires legal title to the property, the after-acquired title inures, by operation of law, to the benefit of the grantee.'" (citations omitted).

Plaintiffs have also alleged that Monument Realty had an agreement with WMATA to ensure Monument Realty the exclusive right to negotiate for and to acquire the Property as part

of the overall AWC process.  Although WMATA has obviously chosen to contest those factual

allegations (*see* Mem. 10-11 and accompanying footnote 4), at the motion to dismiss stage there

is no mechanism for accepting WMATA's protestations that there was no such agreement.

Plaintiffs' allegations must be taken as true, and Plaintiffs have plainly set forth all requisite

elements establishing an enforceable agreement and for breach of that agreement: "In general,

against a motion to dismiss, once a claim has been stated adequately, it may be supported by

showing any set of facts consistent with the allegations in the complaint, construing the

complaint liberally in the plaintiff's favor with the benefit of all reasonable inferences derived

from the facts alleged." *In re Sealed Case,* 494 F.3d 139, 145 (D.C. Cir. 2007) (citations

omitted).

Indeed, it is not only plausible, but eminently logical, that Monument had such an

agreement with WMATA, either to negotiate exclusively with WMATA for the Property, or to

acquire the Property, or both, given that Monument had been designated as Master Developer for

the Half Street Area, had already negotiated exclusively with WMATA (and consummated a

transaction with WMATA) for a portion of the development (*i.e.,* the Navy Yard Metro Station),

and had received promises and assurances that completion of the AWC process, specifically

including Monument's rights to negotiate for and acquire the Southeast Bus Garage, would be

honored.  These allegations are central to Plaintiffs' claims.  (Amd. Compl. ¶¶ 17, 25-26, 28, 39,

43.)

Monument conferred substantial consideration upon WMATA that it would not have

provided but for the rights granted to Monument as Master Developer and WMATA's

acquiescence in those rights.  (*Id.* ¶¶ 41-45.)  This consideration related directly to, and

benefited, the Property in which Monument holds its interests.  (*Id.* ¶ 42.)  The benefits afforded

by Monument included obtaining a zoning variance for WMATA's benefit so that WMATA employees could park on an adjacent surface parking lot owed by Monument through the cessation of WMATA operations at the Bus Garage (thereby tying up Monument's real estate for WMATA's benefit in the interim), efforts to prevent the Property from being designated as an historic site (thereby enhancing its value to WMATA), closure of an alleyway (generating additional development rights and thereby enhancing the value of WMATA's real estate) and provision of an alleyway easement directly benefiting the Bus Garage Property through the end of WMATA's operations there, and other considerations. (*Id.* ¶¶ 41-43.)

District of Columbia law recognizes precisely such an arrangement, and confirms that Plaintiffs have a viable real estate interest in the Property. In a case on point, the D.C. Circuit affirmed this Court's grant of specific performance where the parties entered into both a written and an oral agreement for the sale of a tract of land containing ten separate lots. *See Brewood,* 207 F.2d at 440. Eight of the lots were sold under the written contract, which was performed fully, and this Court ordered specific performance and conveyance of the two remaining lots under "a further agreement that the remaining two lots would also be conveyed to [appellees], at a price and on terms respecting taxes agreed upon, at such time as appellant's wife became reconciled to parting with all of the land." *See id.*

This Court found, and the D.C. Circuit affirmed, that the buyer would not have purchased the original eight lots, and invested in their development, without the right to acquire the other two. *See id.* at 440-42. The acquisition of the first eight lots was a partial performance of the obligations concerning the sale of the entire tract, and the buyer would not have incurred the initial expense without the oral agreement conferring the rights in the entire tract. *Id.* at 441-42. Monument is entitled to pursue claims in this case that it never would have made its multimillion

dollar acquisition and development efforts including purchasing the Navy Yard Metro Station site, or taken the other actions that it did in the Half Street Area, without the agreement concerning the Property. The D.C. Circuit confirmed in *Brewood* that these principles are well-recognized under District of Columbia law:

> That this resulted directly from the contract and is directly and immediately traceable to it, there can be no particle of doubt. Nothing is shown to account for it otherwise. It is just as obvious as the placing of a building on land by one who has a contract to purchase. Not only was this a part performance of the contract, but its circumstances lead inevitably to the contract as the reason.

*Id.* at 442 n.5 (citations omitted).

This is precisely what is alleged, and what Monument Realty is entitled to prove, in this lawsuit. The D.C. Circuit recognized, under the similar circumstances in *Brewood,* that, "[t]he situation created by appellant's failure to convey could not be rectified by rescission or by an action for damages for breach of contract." *Id.* at 442. As in *Brewood*, Monument Realty has an identifiable property interest that it is entitled to protect with the remedies it seeks in this case.

It should also be noted that Monument has alleged specifically not only WMATA's assent to the terms of the agreement, but, further, that WMATA decided at some point arbitrarily to ignore and violate Monument Realty's rights based on the erroneous belief that Monument Realty is behind schedule in the development of the Navy Yard Metro Station. (Amd. Compl. ¶¶ 61-64, 88.) This erroneous belief was expressly stated immediately prior to the Board of Directors awarding a contract for the purchase to Akridge, and in the face of acknowledgement by WMATA staff that WMATA had accepted a recovery schedule from Monument. *See* Amd. Compl. Exh. "E". Thus, Monument Realty has stated viable and plausible claims for breach of contract, declaratory judgment, specific performance, and imposition of a constructive trust.

Monument Realty is entitled to pursue these claims and to seek the remedies prayed for in Counts One, Two, Four, and Five of its Complaint.

## IV.    PLAINTIFFS HAVE NOT WAIVED THEIR RIGHTS WITH RESPECT TO COUNTS EIGHT AND NINE

WMATA next argues that Plaintiffs waived their right to challenge the bid process as set forth in Counts Eight and Nine of the Complaint. (*See* Mem. 14-15.) WMATA simply has its facts wrong; here, it again seeks to disagree with allegations made expressly in the Complaint, which it cannot do at this stage of the litigation.

The facts as pled are that Monument submitted a written complaint regarding the impropriety of WMATA's entire property disposition process, setting forth a number of concerns that included Monument Realty's rights in and to the Property. That written complaint was provided to WMATA on August 24, 2007, *prior* to bid opening on August 28, 2007. (Amd. Compl. ¶ 102.) WMATA chose not to respond to the letter until August 31, 2007, after the bid opening. (Amd. Compl., ¶ 102, Exhibits K and L.)

Monument included references to its August 24, 2007 letter in MR Ballpark 7's second bid protest, sent to WMATA on September 28, 2007. (Amd. Compl. ¶ 102, Exhibit K.) The August 24, 2007 letter from Jeffrey T. Neal of Monument to John B. Catoe, Jr. was sent before the bids were submitted or opened, and before WMATA made its award. (*See id.*) The letter stated, in part, Monument Realty's position as to its rights to negotiate for and acquire the Property, and its objection to the bid process WMATA was pursuing. (*See id.*) Bids were opened on August 28, 2007, after receipt by WMATA of the letter from Mr. Neal. (*Id.* ¶ 68.) WMATA did not respond to the August 24, 2007 letter until August 31, 2007, after the bids were opened. (*Id.* ¶¶ 102, 162, Exhibits K and L.) On August 31, 2007, WMATA's General Counsel responded to Mr. Neal's letter. This was the first time that WMATA, albeit halfheartedly,

informed Monument Realty formally that it believed it had no obligation to negotiate with it exclusively for the Property. (*Id.* ¶ 162.)

Further, WMATA's Contracting Officer, Nat Bottigheimer, acknowledged, addressed, and rejected the August 24, 2007 letter from Mr. Neal as a bid protest under the PPM on the stated grounds that it was not addressed to the Contracting Officer as required under the PPM. This position, of course, conflicts directly with Mr. Bottigheimer's and Mr. Catoe's insistence in other circumstances that the bid protest procedures for this Property were not covered by the PPM. (*Id.* ¶¶ 83, 84.)

WMATA invites the inference that Plaintiffs simply "[sat] on their rights" and decided to "roll the dice and see" if they would win the award, before making their objections known to WMATA. (*See* Mem. 15.) This is false, but, more importantly, it is contrary to Plaintiffs' factual allegations and the inferences that may be drawn from them. Indeed, WMATA's formal response to Monument on August 31, 2007 is plain evidence that WMATA knew Monument was leveling objections to the process it was following and was not waiving any of its rights. (Amd. Compl., Exhibits K and L.) Although WMATA now chooses to characterize Mr. Neal's letter as something less than a formal "protest," Monument was clearly challenging WMATA's actions and was not sitting by in silence while WMATA was trampling Plaintiffs' legal rights. (*Id.,* Exhibit K.)

MR Ballpark 7 filed its first formal bid protest – by a document, in fact, that states that it was contesting the "possible award" of a contract to Akridge and that "WMATA apparently plans to award the contract to Akridge" – with WMATA on September 26, 2007, the day *before* the purported award was made by WMATA's Board on September 27, 2007. (Amd. Compl. ¶¶ 82, 99.) MR Ballpark 7 filed its second formal bid protest – entitled a "post award" bid protest –

on September 28, 2007, the day after the purported award was made, based on facts that had been disclosed by WMATA for the first time on the previous day.  (*Id.* ¶ 102.)

There was no way that MR Ballpark 7 could have lodged its second formal bid protest any earlier than it did, since the grounds for the second formal bid protest were not revealed by WMATA until its September 27, 2007 Board meeting.  At that meeting, WMATA disclosed, for the first time, that it had no policy regarding property disposition, that it did not follow its PPM for this solicitation, and that it instead followed some secret, unknown, and not fully explicated procedure.  (*Id.* ¶¶ 84, 86-87.) Before WMATA discussed the disposition of the Property at the September 27, 2007 Board meeting, MR Ballpark 7 was in no position to know that WMATA was acting in a procedural and policy vacuum, contrary to its statutory mandate to do otherwise. (*Id.* ¶ 98.)  Upon learning of these facts, MR Ballpark 7 filed its second bid protest the very next day.  (*Id.* ¶ 102.)

WMATA's shifting positions are also directly contradictory and inconsistent.  (*Id.* ¶ 104.) At times, WMATA argues for a formalistic application of its solicitation procedures, and at other times, it argues to the contrary. (*See id.* ¶¶ 83, 84, 104.)

It should also be noted that, although the thrust of WMATA's argument is that Plaintiffs were inactive and did not make their objections known to WMATA before the award, a substantial portion of the September 27, 2007 Board meeting (at which the purported award was made) was devoted to a discussion by WMATA's General Counsel, General Manager, and Principal Directors of the bid protest that had been received the day before from MR Ballpark 7, as well as WMATA staff's recommendation – which had not yet been approved by the Board – that the contract be awarded to Akridge.  (*Id.* ¶ 84.)

Indeed, this discussion, and the acknowledgement by WMATA that no policies existed to handle the bid protest or the disposition of the Property, formed part the basis for MR Ballpark 7's second bid protest (*see id.*), which set forth verbatim the acknowledgement by WMATA's General Manager and General Counsel regarding the lack of policies and procedures to deal with a protest regarding the disposition of real property, the fact that (according to WMATA) its PPM did not apply and that WMATA's General Manager was providing a "mixed message" on the topic of whether procedures even existed to deal with the bid protest in this context. (*See id.* ¶¶ 86-87.) That colloquy also included plain statements by at least one Principal Director that there was no policy in place at WMATA to deal with the disposition of real property in these circumstances. (*See id.* ¶¶ 87, 94-96, Exhibit E.)

Thus, all of Monument's and MR Ballpark 7's bid protests were timely submitted, including, specifically, the second bid protest, and there has been no waiver of the Plaintiffs' rights. This is not a situation in which the factual allegations demonstrate an intentional relinquishment of a known right by Plaintiffs, so as to support a dismissal on waiver grounds, as a matter of law. *See Grunley Constr. Co. v. District of Columbia,* 704 A.2d 288, 291 n.5 (D.C. 1997).

## V.   MR BALLPARK 7 IS A PROPER PARTY PLAINTIFF WITH RESPECT TO COUNTS ONE (DECLARATORY JUDGMENT), TWO (SPECIFIC PERFORMANCE), THREE (INJUNCTIVE RELIEF), FIVE (CONSTRUCTIVE TRUST), EIGHT (BREACH OF COMPACT) AND NINE (VIOLATION OF ESTABLISHED PROCEDURES)

WMATA also claims that MR Ballpark 7 is not a proper party to certain Counts of the lawsuit, because it had no agreement with WMATA insofar as MR Ballpark 7 did not exist at the time of the related negotiations and dealings. (*See* Mem. 11-12.) MR Ballpark 7 cannot allege that it was a party to the exclusivity negotiations that were required to take place with WMATA.

Therefore, MR Ballpark 7 is not a proper party with respect to Count Four (Breach of Contract) as it is currently pled. However, MR Ballpark 7 is a proper party Plaintiff with respect to Count One, which seeks a declaratory judgment with respect to the rights of the parties. MR Ballpark 7's rights, along with those of Monument Realty, have been harmed by WMATA in connection with the bidding process and breach of WMATA's Compact (Counts Eight and Nine). There are actual controversies between MR Ballpark 7 and WMATA, including those relating to the flawed bid process WMATA has pursued (Amd. Compl. ¶ 110), making it appropriate for MR Ballpark 7 to join in the request for a declaratory judgment in this case.

MR Ballpark 7 is also a proper party to assert that it is entitled to specific performance (Count Two) in accordance with its bid, which for a variety of reasons, would have yielded the best net return to WMATA and therefore met WMATA's sole stated bid criterion. Likewise, MR Ballpark 7 is plainly entitled to seek injunctive relief to protect its interests in the Property that arose as a result of it submitting the superior bid to WMATA (Count Three) and is also entitled to assert a claim for constructive trust over the Property for the same reasons (Count Five). Finally, even WMATA cannot dispute that  MR Ballpark 7 is a proper party with standing to assert the claims set forth in Counts Eight and Nine (violation of WMATA's Compact and PPM) as a result of improprieties in the bidding process. Counts Ten through Twelve of the Amended Complaint are similar, and there can be no dispute that MR Ballpark 7 can properly seek relief under those claims, as well.

Moreover, although MR Ballpark 7 was not formed until July, 2007, Monument Realty was in existence at all relevant times and had the exclusivity dealings and agreements alleged with WMATA. Therefore, Monument Realty is also a proper party plaintiff with respect to all

counts of the Complaint except Nine through Twelve, and did, in fact, complain to WMATA about the flawed bid process that it has been pursuing.  (Amd. Compl., Exhibit K.)

At best, WMATA's argument amounts only to an assertion as to *which* of the two Plaintiffs are entitled to assert certain claims; not that the claims should be dismissed altogether. Therefore, no counts should be dismissed, since one or both of the Plaintiffs are entitled to the relief asserted in each and every Count of the Complaint.

## VI.  MONUMENT HAS STANDING TO ASSERT ALL CLAIMS AND CAUSES OF ACTION SET FORTH IN THE COMPLAINT, WITH THE EXCEPTION OF COUNTS NINE THROUGH TWELVE; MR BALLPARK 7, HOWEVER, HAS STANDING TO ASSERT THE CLAIMS IN THOSE COUNTS

WMATA also asserts that since Monument did not submit a bid, it has no standing to "contest or to seek relief as a result of the bid process and award."   (See Mem. 12-14.) Therefore, WMATA somehow concludes that Counts One through Seven should be dismissed "to the extent they depend on the bid process" (see Mem. 14) and that Counts Eight and Nine should be dismissed in their entirety.  (Id.)

As an initial matter, to the extent that Counts One through Seven pertain to the bid process followed by WMATA, MR Ballpark 7 has standing to assert those Counts, as discussed above.  To the extent that those counts pertain to activities that preceded the bid process, such as the exclusivity negotiations, Monument Realty has standing to assert the claims set forth in those counts; therefore, there is no basis, and none has been asserted, for WMATA's erroneous conclusion that these counts should be dismissed on "standing" grounds.  Indeed, Counts One through Seven pertain largely to events leading up to the bid process, all of which Monument Realty was centrally engaged in to its detriment and injury.  Therefore, Monument Realty has standing to assert these claims.  It is axiomatic that a party who suffers injury has standing to sue for that injury.  *See Mountain States Legal Found. v. Glickman,* 92 F.3d 1228, 1234-35 (D.C.

Cir. 1996) ("[E]ven a small probability of injury is sufficient to create a case or controversy – to take a suit out of the category of the hypothetical – provided of course that the relief sought would, if granted, reduce the probability.").

But, in addition, WMATA is incorrect that Monument Realty lacks standing to challenge WMATA's bid procedures. It may be true that standing is limited to actual or prospective bidders in certain bid protest forums in certain contexts. *See Scott v. United States*, 78 Fed. Cl. 151, 154 (2007) ("The governing precedent thus requires plaintiff to establish that he is an interested party by demonstrating that he is an actual or prospective bidder with a direct economic interest in the procurement.") (citation omitted). This Court should not, however, apply this standard in assessing Monument Realty's standing to assert its claims against WMATA. *See Bootery Inc. v. WMATA*, 326 F. Supp. 794, 797 (D.D.C. 1971). Rather, general standing criteria applies, and Monument Realty meets those standards handily. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *see also See Shays v. FEC*, 414 F.3d 76, 91 (D.C. Cir. 2007) (noting that "so long as the procedures in question are designed to protect some threatened concrete interest of [the plaintiff's] that is the ultimate basis of his standing, the party invoking jurisdiction may establish injury in fact by showing that the government act performed without the procedure in question will cause a distinct risk to a particularized interest of [that party].") (citations omitted). Whether parties have standing to sue under WMATA's Compact turns on the extent to which the provisions of the Compact and its rules affect the interests of the parties. *Borough of Morrisville v. Del. River Basin Comm'n*, 399 F. Supp. 469, 479 n.3 (E.D. Pa. 1975) ("To hold that the Compact is an agreement between the political signatories imputing only to those signatories standing to challenge actions pursuant to it would be unduly narrow in view of the direct impact on plaintiffs and other taxpayers.").

In *Bootery Inc. v. Washington Metropolitan Area Transit Authority,* for example, two plaintiff taxpayers filed suit against WMATA alleging that WMATA failed "to fulfill properly its statutory obligations regarding public hearings concerned with the location and design of subway stations and regarding a plan for financing the proposed subway system." 326 F. Supp. at 797. WMATA filed a motion to dismiss challenging, among other things, plaintiffs' standing to challenge WMATA's compliance with its Compact. *Id.* This Court found that "[i]n view of the federal interest in the Compact, there appears no reason why the general criteria for standing to challenge action under a federal statute should not be employed." *Id.* at 799. This Court found that the plaintiffs had standing to sue because "[t]he actions of the Authority in condemning their leaseholds would cause them injury in fact; the plaintiffs have alleged that the Authority acted arbitrarily and contrary to its statutory authority; there is no clear and convincing indication of a legislative intent to withhold judicial review and the interest of the plaintiffs is arguably within the zone of interests to be protected or regulated by the statute." *Id.* at 798 (citation omitted).

Count Eight asserts that WMATA breached Section 73(g) of its Compact, by failing to adopt policies relating to the disposition of its property as it was required to do. (Amd. Compl. ¶¶ 169-178.) The injury to Monument and MR Ballpark 7 that is fairly traceable to the absence of the required policy is painfully evident in this case. First, WMATA issued a JDS for the joint development of this property in cooperation with WMATA. (*See id.* ¶¶ 16-18.) The JDS expressly included the Navy Yard Metro Station and the Bus Garage and solicited *one* developer to jointly develop all of these properties. (*See id.* ¶ 16.) The JDS was then apparently withdrawn, or simply not completed. (*Id.* ¶ 17.) Second, WMATA entered into sole-source negotiations with Monument with respect to the first phase of the development property, the

Navy Yard Metro Station site, and all parties understood that WMATA would subsequently negotiate exclusively with Monument for the remainder of the Property after it secured a relocation site. (*Id.* ¶ 30.)  Those sole source negotiations resulted in a contract between Monument and WMATA.  (*Id.* ¶ 35.)  Third, the Property at issue here was included in an IFB process (No. 07-3) that was subsequently pulled or withdrawn or suspended by WMATA in deference to the AWC process that Monument has alleged.  (*Id.* ¶¶ 59-60.)  Fourth, Monument was informed that an agreement had been reached between the District of Columbia and WMATA for disposition of the property to the District for Monument's benefit, apparently in accordance with a secret one-page disposition procedures sheet promulgated by LAND that no one outside WMATA was aware of that *required* disposition to the local jurisdiction.  (*Id.* ¶ 62.) Fifth, and finally, the Property again became the subject of an IFB – this time No. 08-1.  (*Id.* ¶¶ 65-68.)

The absence of a Policy in this regard – as required by the Compact – was acknowledged by Principal Director Moneme at the September 27, 2007 Board Meeting (*id.* ¶ 94, Exhibit E) and formed the basis, in part, of MR Ballpark 7's second bid protest.  Monument has been injured as a result of the lack of a policy.  Instead of presenting a constantly moving target, WMATA had a statutory obligation to establish a policy, known and available to all interested parties, regarding how it would dispose of the Property.  With such a policy, Monument could have determined whether the Property would be offered solely as part of a JDS, whether it would have to be offered to the local jurisdiction, or what specific procedures would be followed as part of the disposition.

Armed with knowledge, Monument could have acted to protect its interests instead of being left to the vagaries and whims of arbitrary decision making by WMATA.  The absence of

any such policy manifestly harmed Monument, which had exclusive rights in the Property. Only after having relied on those rights was Monument surprised by WMATA's decision to offer the Property for bid to the public at large. Monument plainly has standing to assert a breach of the Compact as it has done in Count Eight.

WMATA's violations in this regard are clear and undeniable. WMATA's authority to sell its real estate derives from Article 12(d) of its Compact. *D.C. Code Ann.* § 9-1107.01, sec. 12(d) (2004). Article 73(g) of the Compact requires that WMATA's Board "shall adopt policies and procedures to implement this section [of the Compact]." *D.C. Code Ann.* § 9-1107.01, sec. 73. This section of the Compact is entitled "Contracting and Purchasing" and deals specifically with "procurement of property" (73(a)(1)), and "contracting" (73(f)(1)). *Id.* Presumably then, in compliance with this requirement, WMATA adopted its PPM, which explicitly outlines the requirements for disposal of real property in Chapter 15. Chapter 15 of the PPM expressly states that it applies to agreements to sell real property and states that such agreements shall be considered procurement transactions. *See* PPM, at sec. 1500.3.

Procurement transactions include the disposition of real property. *Catholic Univ. of Am. v. United States*, 49 Fed. Cl. 795, 799-800 (2001) (holding that "procurement" encompasses the sale of real property). However, WMATA's rejection of MR Ballpark 7's second bid protest disavows the express language of the PPM that states that agreements for the sale of property shall be "procurement transactions," preferring instead to rely on a *Black's Law Dictionary* definition of procurement.

WMATA, however, admittedly did not apply the PPM, but instead may have applied secret procedures known only to its own staff, in violation of the Compact. WMATA has stated publicly that the PPM does not apply to the sale of this Property. (Amd. Compl. ¶¶ 83, 84.) In

fact, at the September 27, 2007 hearing of the WMATA Board of Directors, the General Manager of WMATA, John B. Catoe, Jr., stated that the PPM did not apply and then stated that some other procedures did not apply.    This prompted one Principal Director and D.C. Councilmember, Jim Graham, to state that "[t]here's a little bit of a mixed message here" as to what procedures did in fact apply.  That exchange highlighted WMATA's own state of confusion surrounding which procedures, if any, govern the sale.  (*See id.* ¶¶ 84, 86, 87.)  In other words, WMATA has no policy about whether such disposition must be conducted in the form of an auction, through a Joint Development Solicitation, through a sealed bid, through a sole-source negotiation, or through some or all of the foregoing.

Thus, WMATA has violated the Compact, either by not formulating, adopting, and publishing such a policy, or by simply not following its established policy, as detailed in its PPM.  Monument has standing to challenge such a flawed process.  *See Elcon Enters. Inc. v. WMATA*, 977 F.2d 1472, 1478 (D.C. Cir. 1992) (WMATA's decisions may be challenged in court for clear and prejudicial violation of applicable statutes and regulations).  Courts have also recognized a private right of action to hold WMATA to its Compact.  *See id.,* at 1479 n.2, *citing Seal & Co. v. WMATA,* 768 F. Supp. 1150 (E.D. Va. 1991).

In *Seal v. Washington Area Metropolitan Transit Authority*, the court explained why such a private right of action must exist in order for the Compact to function as intended.  768 F. Supp. at 1153-1157.  Such a cause of action is implicit in the Compact, and provides a necessary means of holding WMATA to the Compact's requirements.  *See Seal*, 768 F. Supp. at 1156 ("Moreover, the existence of a cause of action for disappointed bidders is arguably implicit in Section 73 and in the scheme of the Compact, for if private bidders on WMATA's contracts lacked standing to challenge WMATA's awards, it is hard to see how Section 73's mandate . . .

would be monitored and enforced.").  On this independent basis, WMATA's actions in soliciting bids for the Property and purporting to approve an award are invalid.

## VII.    PLAINTIFFS ARE ENTITLED TO PURSUE THEIR CLAIM THAT WMATA'S ACTIONS WERE ARBITRARY, CAPRICIOUS, AND OTHERWISE UNLAWFUL AND INVALID

Monument has alleged that WMATA's actions in pursuing its flawed bid process were arbitrary, capricious, and otherwise unlawful and invalid.  (Amd. Compl. ¶¶ 79, 101, 110, 176, 177, 198, 214, 222.)   WMATA asks the Court to ignore those allegations and to find that WMATA acted within its lawful discretion and with a rational basis for its actions, as a matter of law.  (*See* Mem. 15-23.)

More specifically, WMATA states that its decision to "reject" MR Ballpark 7's Alternate Bid has both a rational basis in law and a rational basis in fact.  (*See id.* 16-23.)   WMATA, however, never "rejected" MR Ballpark 7's Alternate Bid.  It simply chose not to consider it.  (Amd. Compl. ¶ 85.)   Nowhere in WMATA's bid procedures and processes, let alone in WMATA's IFB, is there any indication that WMATA would not consider such a bid.

Indeed, the fact that "escalator bids" or alternate bids such as that submitted by MR Ballpark 7 were common prompted remarks by Principal Director Emeka Moneme at the September 27, 2007 Board meeting.   Director Moneme stated that receipt of such bids is commonplace and an accepted practice in the real estate industry and that the Board had no policy in place to deal with such a situation.  (Amd. Compl. ¶ 94.)   Under these circumstances, MR Ballpark 7 submits that if WMATA had followed its statutory mandate to adopt a policy, this situation would not have arisen and Plaintiffs would not have been damaged.

In defending its actions, WMATA employs a cacophony of attacks on MR Ballpark 7's Alternate Bid: it was "not a firm bid" and was "nonresponsive" (*see* Mem. 16); "WMATA could

not ascertain the amount of the alternate bid without consulting and integrating materials outside the bid itself" (*see id.* 19); it was "an attempt to get 'two bites at the apple,'" (*see id.*); it conferred a "singular right" only upon MR Ballpark 7 (*see id.* 20); and that, in any event, WMATA had unfettered discretion to "reject any and all bids, or portions thereof, at any time and for any reason." (*See id.* 17 n.7, 18.) Plaintiffs have made a series of allegations to demonstrate WMATA's improper actions, and those assertions must be taken as true at this stage of the case. (Amd. Compl. ¶¶ 79, 101, 110, 176, 177, 198, 214, 222.) These are factual disputes that will require trial to resolve.

This conclusion is further compelled when one examines the Akridge Bid that WMATA determined to accept. As Plaintiffs learned only recently, the Akridge Bid stated a Bid Amount of $69,250,000.00, but had several very interesting characteristics: (1) it was "submitted conditionally" on terms set forth in a letter from Akridge's counsel to WMATA, (2) it provided for an exorbitant leaseback rental to WMATA, amounting to $11,640,000 over the 36 month leaseback period mandated in the IFB which put the total amount of the bid at less than the minimum required amount; and (3) it included an offer to "immediately commence negotiations with WMATA to establish an arrangement pursuant to which WMATA would be able to use [nearby real estate owned by Akridge] as a temporary site for locating assets presently located on the Property during the period WMATA is contemplating relocation of the operations presently conducted at the Property." (*Id.* ¶¶ 76-77.)

WMATA makes much hay of the fact that its Bid Form "clearly calls for a fixed number, not a narrative." (*See* Mem. 21.) Yet the Akridge Bid contained several narrative provisions, including its conditional submission and the concession involving nearby real estate owned by Akridge. (Amd. Compl. ¶¶ 76-77.) Although WMATA says that "where there is a dollar sign

followed by a line to be completed, only a number fits." (*See* Mem. 21.) On this basis, it asks

the Court to rubber stamp its actions as a matter of law. WMATA, however, cannot legitimately

explain how it could decide to "reject" MR Ballpark 7's submission while finding the Akridge

Bid conforming and responsive in all respects. If "only a number fits," then the Akridge Bid was

nonresponsive by WMATA's own admission.

WMATA makes the remarkable assertion in its papers that "neither the winning Akridge

bid nor the unnamed third bidder had any problem understanding how and what to bid, namely a

fixed dollar amount." (*See* Mem. 22.) Such a claim is untenable, as an examination of the

Akridge Bid confirms. (Amd. Compl., Exhibit J.) The Akridge Bid was not a "number" or a

"firm bid." By WMATA's reasoning, it had no choice but to reject the Akridge Bid as

"nonresponsive."

Similarly, WMATA cannot aver that it could ascertain the amount of the Akridge Bid

without consulting and integrating materials outside the bid itself. The Akridge Bid itself was

submitted only "conditionally," and subject to terms of a side letter. The Akridge Bid included

items relating to the use of additional property not part of the IFB. Not only was this

nonresponsive, but it allowed Akridge "two bites at the apple" by permitting it the "singular

right" to include benefits to WMATA that could not have been known to any of the other

bidders.

WMATA cannot even claim credibly that the Akridge Bid resulted in the "best net

return" to WMATA or was the best offer it received. Subtracting the leaseback rental results in a

net return to WMATA of no more than $57,610,000, far less than even MR Ballpark 7's

minimum bid (notwithstanding WMATA's denigration of it as a "low-ball bid" (*see* Mem. 3),

even though accepting it would have resulted in a net return to WMATA of several million

dollars more than the Akridge Bid).  Likewise, WMATA failed to consider that MR Ballpark 7 waived the 45 day Due Diligence Period, a fact that the contracting officer was entitled to give great weight, but clearly did not, since no other bidder, including Akridge, waived it.

Perhaps the drafter of WMATA's motion to dismiss did not have the Akridge Bid in hand when those papers were drafted.  Taking WMATA at its word, that the only factors that common sense and common experience permit after a dollar sign is a number (*see* Mem. 21), the Akridge Bid had to be disqualified.  Lest "reason and certainty" be replaced with "anarchy" (*see id.* 22), the Akridge Bid must too be rejected.  WMATA unilaterally rejecting one bid that it alleges suffers from these flaws, but accepting another, more egregious bid, is the essence of arbitrariness and capriciousness.

## VIII.  SOVEREIGN IMMUNITY DOES NOT PROTECT WMATA FROM EITHER MONUMENT'S CONTRACT OR NON-CONTRACT CLAIMS

Under the Rule 12(b)(1) portion of its Motion, WMATA seeks to shield itself in a broad cloak of sovereign immunity, asserting that Monument's "non-contract" claims are subject to an absolute defense of sovereign immunity.  WMATA pushes the sovereign immunity envelope, however, by further asserting that claims involving its bid procedures are protected by sovereign immunity, that it enjoys sovereign immunity against claims that it did not comply with its own Compact, and against claims that it did not follow its own published procurement procedures. (*See* Mem. 25-26.)

With respect to contract claims, WMATA has no sovereign immunity.  *D.C. Code Ann.* § 9-1107.01, sec. 80 (2004).  For tort claims, sovereign immunity does not lie in this case, either because the activities alleged are not discretionary (in that they involve ministerial acts directed by applicable statute or regulations), or because the activities alleged are not fraught with public policy considerations.

It must be noted that in no event can WMATA's immunity be viewed as absolute. *Chester v. WMATA*, 335 F. Supp. 2d 57, 61 (D.D.C. 2004). Section 80 of the Compact expressly waives WMATA's sovereign immunity from suits for contracts and for torts "committed in the conduct of any proprietary function," but preserves WMATA's immunity only for "any torts occurring in the performance of a governmental function." *Id., citing D.C. Code Ann.* § 9-1107.01, sec. 80 (2004). Unless there is some "good reason to believe" that immunity was intended to be conferred upon multi-state entities like WMATA, they are generally not accorded governmental immunity. *Morris v. WMATA*, 781 F.2d 218, 224 (D.C. Cir. 1986) (*quoting Lake Country Estates v. Tahoe Reg'l Planning Agency*, 440 U.S. 391, 401 (1979)).

To identify "governmental" functions under the Compact, the Court must engage a two-step analysis, developed by the D.C. Circuit to analyze the discretionary/ministerial dichotomy employed by the Federal Tort Claims Act. *Burkhart v. WMATA*, 112 F.3d 1207, 1216 (D.C. Cir. 1997). First, the Court inquires whether WMATA is engaged in "quintessential governmental functions" – activities that fall within the scope of WMATA's immunity. *Id.* Second, if WMATA is not engaged in a quintessential governmental function, the Court must determine whether the activity is discretionary or ministerial. *Chester*, 335 F. Supp. 2d at 61. If the challenged activity is discretionary in nature, then it falls within section 80's retention of sovereign immunity for governmental acts. *Id.*

In *Beebe v. Washington Metropolitan Area Transit Authority*, the D.C. Circuit held that:

> To determine whether a function is discretionary, and thus shielded by sovereign immunity, we ask whether any statute, regulation, or policy specifically prescribes a course of action for an employee to follow. If no course of action is prescribed, we then determine whether the exercise of discretion is grounded in social, economic, or political goals. If so grounded, the activity is governmental, thus falling within section 80s retention of sovereign immunity.

129 F.3d at 1287.  The first part of this test reflects the notion that "conduct cannot be discretionary unless it involves an element of judgment or choice."  *Berkovitz v. United States*, 486 U.S. 531, 536 (1988).  "If such a binding directive exists, then the employee has no rightful option but to adhere to the directive." *Loughlin v. United States***,** 393 F.3d 155, 163 (D.C. Cir. 2004) (citation omitted).

Yet, even if the activity involves an element of judgment, the Court must make a secondary determination that the "judgment is of the kind that the discretionary function exception was designed to shield."  *Id.* at 537.  For example, there is no governmental immunity in the negligent operation of motor vehicles.  *United States v. Gaubert*, 499 U.S. 315, 325 n.7 (1991) ("Although driving requires the constant exercise of discretion, the official's decisions in exercising that discretion can hardly be said to be grounded in regulatory policy.").  Both discretion and room for a policy judgment must be present for immunity to attach: "[w]here there is room for policy judgment and decision there is discretion."  *Dalehite v. United States*, 346 U.S. 15, 28 (1953).

A.     **The Umbrella of Sovereign Immunity Does Not Protect WMATA From Plaintiff's Contract Claims, Including Counts Eight and Nine**

1.     WMATA's Conduct Implicated by Counts Eight and Nine Does Not Sound in Tort and Is, Therefore, Not Shielded by Sovereign Immunity

The challenged activities that give rise to Counts Eight and Nine include, respectively, WMATA's failure to comply with the Compact's requirement to formulate policies, procedures, rules or regulations governing the disposition of its real property, and WMATA's arbitrary decision not to follow its own binding procurement procedures manual or other unpublished internal procedures.  (*See* Amd. Compl. ¶¶ 169-78, 179-99.)  As an initial matter, these activities do not sound in tort.  And the Compact only preserves WMATA's immunity for "torts occurring in the performance of a governmental function." *D.C. Code Ann.* § 9-1107.01, sec. 80 (2004);

*Chester*, 335 F. Supp. 2d at 61.  In *Seal v. Washington Metropolitan Area Transit Authority,* for example, WMATA never took the position that a challenge to a bid procedure is subject to a sovereign immunity defense, demonstrating that even WMATA does not seriously contend that sovereign immunity attaches to issues surrounding whether it has followed proper bid procedures or its own Compact.  768 F. Supp. at 1155.   WMATA's motion to dismiss ignores this critical issue.

Instead, WMATA leaps immediately into a discussion of whether the challenged activities that give rise to Counts Eight and Nine are "quintessentially governmental."  (*See* Mem. 26-27.)  Before WMATA can reach that argument, however, it must overcome a hurdle that it cannot: the claims sound in contract and are claims that WMATA did not follow statutorily mandated conduct.

> 2.    Even if the Challenged Activities that Give Rise to Counts Eight and Nine Sound in Tort, the Challenged Activities are Proprietary, Not Quintessentially Governmental.

Even assuming, *arguendo*, that the challenged activities that give rise to Counts Eight and Nine sound in tort, which they do not, the challenged activities that give rise to these claims are not "quintessentially governmental activities."   (Amd. Compl. ¶¶ 169-178, 179-199.) WMATA's disposition of its property is certainly not a quintessential government function. Certain functions that WMATA undertakes are, by definition, quintessentially governmental functions.  The primary example is the operation of WMATA's police force.  *See, e.g., Morris*, 781 F.2d at 220 ("The principle is well-established that operation of a police force is a governmental rather than a proprietary function."); *Hawthorne v. WMATA*, 702 F. Supp. 285 (D.D.C. 1988) (holding that WMATA was immune from tort liability for allegations of false arrest and imprisonment, malicious prosecution, assault and battery, negligence and deprivation of constitutional rights because the claims arose out of the operation of WMATA's police force,

which is a quintessential governmental activity.).    The sale of a property is not such a governmental function.  *See, e.g., E. 56th St. Corp. v. Mobil Oil Corp.*, 906 F. Supp. 669 (D.D.C. 1995) (holding that WMATA is not immune from claims arising out of the operation and maintenance of property it owns, since such activity is proprietary; making this determination without even considering whether WMATA's activities are "quintessentially governmental").

Indeed, in most cases the courts gloss over the "quintessentially governmental" analysis and move directly into the consideration of whether the challenged activity is discretionary. This nearly uniform approach to analyzing sovereign immunity under Section 80 of the Compact strongly suggests that the quintessential governmental prong of the sovereign immunity analysis should be read narrowly and confined to activities involving the operations of a police force or similar conduct that is *only* conducted by a government.  Property ownership, operations, and sales clearly do not fall into the category of conduct that only governments can perform.

Yet, without citing any authority, WMATA submits that counts Eight and Nine arose out of quintessentially governmental activities.  (*See* Mem. 26.)  While it is obviously true that only WMATA can issue its own procedures, that fact alone does not make the activities that gave rise to Counts Eight and Nine "quintessentially governmental."  For example, the maintenance of governmental park roads is not a quintessentially governmental activity. *See Cope v. Scott,* 45 F.3d 445 (D.C. Cir. 1995) (holding there is no immunity under the Federal Tort Claims Act where the government allegedly failed to post warnings at certain points along a park road). Private companies and corporations, for example, can also issue procedures to govern disposal of property they own.  Private companies and corporations cannot, however, operate a police force. *See Leshko v. Servis*, 423 F.3d 337, 347 (3d Cir. 2005) (stating that "[t]he power that a state

exercises over a person whose liberty is restricted as a result of a criminal conviction or involuntary civil commitment is a quintessentially governmental function).

Turning to the discretion analysis, there can be no real argument by WMATA – and none is made – that it has discretion *not* to adopt a policy at all and discretion not to follow its own published guidelines and manuals regarding the property disposition process. Those requirements are mandated by statute and regulation and must be adopted and followed. (Amd. Compl. ¶¶ 179-199.) WMATA has failed to do so.

3.    Where a Statute, Regulation, or Policy Specifically Prescribes a Course of Action for WMATA to Follow, WMATA has no Choice but to Adhere to These Binding Directives.

It is well-settled that immunity does not attach where there are binding statutory and/or regulatory directives that prescribe a course of conduct for the governmental actor. In *Warren v. WMATA*, 880 F. Supp. 14, 15 (D.D.C. 1995) for example, a passenger injured by shattered glass on WMATA's bus filed a personal injury suit alleging that the glass did not meet safety regulations applicable to WMATA vehicles. WMATA contended that it was entitled to summary judgment because it had discretion to choose the glass used on its buses and that WMATA is immunized under the Compact for any torts occurring in the performance of governmental functions. *Id.* at 16. After recognizing that WMATA's providing mass transit is generally considered a proprietary function, this Court held that "if a statute or regulation prescribes a particular course of action, then WMATA has *no discretion* and the sole question is whether WMATA did or did not follow the directive." *Id.* at 17; *see also Berkovitz*, 486 U.S. at 531 (no immunity when suit charges agency with failing to act in accord with specific binding directives).

As alleged in the First Amended Complaint, WMATA's Compact requires WMATA to establish policies and procedures relating to its contracting and procurement practices, which

includes the disposition of WMATA's real property.  (Amd. Compl. ¶¶ 4, 5, 169-178.)  In addition, WMATA's PPM prescribes a course of conduct for WMATA to follow when disposing of its real property.  (*Id.* ¶¶ 179-199.)  The First Amended Complaint alleges that WMATA has breached its own Compact by failing to follow a binding statutory directive to adopt policies and procedures governing the contracting for disposition of its real property.  (*Id.* ¶¶ 169-78.)  In the alternative, the Complaint alleges that WMATA failed to follow the PPM's specifically prescribed course of conduct that governs the disposition of WMATA's real property.  (*Id.* ¶¶ 179-199.)

The challenged activities that give rise to Counts Eight and Nine, therefore, flow from a binding statute and regulation.  WMATA's motion to dismiss does not address this argument but merely asserts that WMATA had discretion to decide if, how, and when to issue policies and procedures.  (*See* Mem. 25.)  This position ignores the reality that, whatever discretion WMATA might enjoy to decide if, how, and when to issue policies and procedures, such discretion vanishes in the face of a specifically prescribed course of conduct.  WMATA can sometimes decide *what* policy to adopt; but it cannot elect *not* to adopt a policy where its Compact requires it to do so.  WMATA cannot and does not seriously challenge these assertions.

    4.    <u>Even if WMATA has Discretion, that Discretion is not Grounded in Social, Economic, or Political Goals.</u>

Even if this Court were to decide that WMATA has discretion regarding whether to adopt policy under Compact Section 73(g), or regarding whether to follow the disposition of real property procedures in the PPM – a conclusion that the Court should not and cannot reach based on the plain language of the statute and PPM – that discretion is not protected by the doctrine of sovereign immunity.  *See, e.g., United States v. Gaubert*, 499 U.S. 315, 325 n.7 (1991)

("Although driving requires the constant exercise of discretion, the official's decisions in exercising that discretion can hardly be said to be grounded in regulatory policy.").

As stated by the Supreme Court of the United States, the basis for the discretionary function exception was Congress's desire to "prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *United States v. Varig Airlines*, 467 U.S. 797, 814 (1984). Thus, the discretionary function exception "protects only governmental actions and decisions based on considerations of public policy." *Berkovitz*, 486 U.S. at 537; *accord Cope*, 45 F.3d at 446 ("The mere association of a decision with regulatory concerns is not enough; exempt decisions are those 'fraught with . . . public policy considerations."); *Shansky v. United States*, 164 F.3d 688, 694 (1st Cir. 1999) (identifying a line of cases where there is no immunity for "judgments that embody a professional assessment undertaken pursuant to a policy of settled priorities.").

In *Cope*, for example, the plaintiff sued the National Park Service after suffering an accident on a rainy evening while rounding a curve on one its roads. 45 F.3d at 446. The plaintiff alleged that the Park Service was negligent in failing to maintain the road and failing to place and maintain proper and adequate warning signs along the roadway. *Id.* at 446-47. The D.C. Circuit held that "any discretion exercised by the government with respect to where and how to post signs warning of dangerous road conditions did not implicate 'political, social, or economic' policy choices of the sort that Congress intended to protect." *Id.* at 446. In so holding, the D.C. Circuit found that this Court had "jurisdiction over the allegations that the Park Service failed adequately to warn of the dangers on Beach Drive." *Id.* at 452.

Monument submits that any discretion to implement policies under Compact Section 73(g) or the discretion to follow the disposition of real property procedures in the PPM –

assuming, *arguendo*, that such discretion exists – is not the type of discretion "fraught with public policy considerations." *Id.* at 446.

### B.    The Umbrella of Sovereign Immunity Does Not Protect WMATA From Plaintiff's Only Non-Contract Claims: Counts Six and Seven

Further, the Complaint only contains two non-contract counts: Count Six (Fraud) and Count Seven (Breach of Fiduciary Duty).  All other allegations and counts, despite WMATA's characterizations otherwise (Mem. 27), pertain to contracts and agreements that existed between and among WMATA, Monument and AWC (Counts One-Five) and the bid process and procedures (Counts Eight and Nine; now joined by Counts Ten through Twelve), to which there can plainly be no claim of sovereign immunity.

WMATA is not immune to Monument's claims of fraud and breach of fiduciary duty, because the challenged activities that give rise to these claims are based on WMATA's breach of its agreements with Monument and are also proprietary functions.  The conduct that gives rise to these claims encompasses a number of WMATA's activities.  It includes, but is not limited to, the following: (1) the formation of agreements and promises for Monument's direct benefit, which are supported by consideration, (2) the creation and breach of a fiduciary duty to, among other things, act in good faith and in fair dealings with Plaintiffs, and to engage in open and fair dealing with the Plaintiffs – a condition at least implicit in the agreements between Monument Realty and WMATA, and include the obligation to act with the utmost candor and disclosure, loyalty, and due care (Amd. Compl. ¶¶ 143-48); (3) the failure of WMATA to advise or otherwise inform Monument that WMATA was going to affect the position that Monument would not be and was not entitled to the exclusive right to negotiate with WMATA and/or AWC for acquisition of the Southeastern Bus Garage (*id.* ¶¶ 149-168); (4) aspects of the manner in which WMATA disposed of the Southeastern Bus Garage facility (*id.* ¶¶ 1-104); (5) WMATA's

failure to implement its Compact (*id.* ¶¶ 169-78); (6) WMATA's arbitrary decision not to follow its own binding procurement procedures manual or other unpublished internal procedures (*id.* ¶¶ 179-199); and (7) the activities that give rise to Monument's breach of contract claim (*id.* ¶¶ 128-138).

        1.    <u>The Challenged Activities are not "Quintessentially Governmental."</u>

The conduct that gives rise to Counts Six and Seven is not quintessentially governmental, for reasons similar to those stated above.  First, the conduct clearly does not involve the operation of WMATA's police force or similar governmental function.  But, more fundamentally, if WMATA is correct that carrying out the Compact mandate to "plan, develop, finance and cause to be operated improved transit facilities" constitutes a quintessentially governmental activity, then it is difficult to imagine a single instance in which WMATA's activities would not be considered quintessentially governmental.  WMATA's reading guts Section 80's limited sovereign immunity waiver of any meaning because there would exist *no* set of circumstances that would expose WMATA to tort liability.  Indeed, this reading is impossible to reconcile with the host of cases where courts have held that WMATA is exposed to tort liability.  *See, e.g., Heffez v. WMATA*, 569 F. Supp. 1551 (D.D.C. 1983) (WMATA is not protected by sovereign immunity for the allegedly tortious acts of station attendant).  WMATA's position, in other words, would require this Court to "import immunity back into a statue designed to limit it."  *Indian Towing Co. v. United States*, 350 U.S. 61, 69 (1955).

And finally, in case there is any lingering doubt, WMATA misstates the law when it asserts, without any citation, that WMATA's function and responsibility are quintessentially governmental.  (*See* Mem. 28.)  In *Warren*, for example, this Court expressly stated that "WMATA's provision of mass transit is generally considered a proprietary function that would not be protected by sovereign immunity."  880 F. Supp. at 16; *see also Qasim v. WMATA*, 455

A.2d 904, 906 (D.C. 1983) ("Section 80 of the Compact waives each signatory's immunity from suit in its own courts for 'any proprietary functions, in accordance with the laws of the applicable signatory.' Provision of mass transportation under the auspices of three governmental bodies is such a function.").

> 2.    A Statute, Regulation, or Policy Specifically Prescribes a Course of Action For WMATA to Follow; WMATA Has no Choice But to Adhere to These Binding Directives.

As indicated above, the conduct that has given rise to Monument's breach of fiduciary duty claim and fraud claim touch on a number of areas including the activities that give rise to Counts Eight and Nine.  Thus, to the extent this Court finds that WMATA had no choice but to adhere to the binding directives set forth in the Compact and/or the PPM, this Court should similarly find that statutes, regulations or policies prescribe a course of action for WMATA to follow with respect to the activities that underpin Counts Eight and Nine.

Yet, even if this Court finds that the activities that gave rise to Counts Eight and Nine do not give rise to Counts Six and Seven, the challenged activities that gave rise to Counts Six and Seven also include WMATA's breach of an express or implied agreement.  Performance under a contract does not leave any room for discretion.  *See, e.g., Casco Marina Dev. v. District of Columbia Redevelop. Land Agency*, 834 A.2d 77, 81-82 (D.C. 2003) ("While [an agency] is free to exercise discretion in initially entering a contract, or in deciding to seek to alter the terms of a contract, it is ministerially bound as a contracting party by the terms of a valid, existing contract unless and until both parties to the contract agree to amend it.").  Accordingly, WMATA's conduct is not discretionary but prescribed by a course of action for WMATA to follow.

3.     <u>Even if WMATA Has Discretion, That Discretion is not Grounded in Social, Economic, or Political Goals.</u>

As discussed above, even if the challenged activity involves an element of judgment, this Court must make a secondary determination that the "judgment is of the kind that the discretionary function exception was designed to shield."  Monument submits that the element of judgment involved in the challenged activities that give rise to Counts Six and Seven – assuming that such judgment exists – is not the type of discretion that is "fraught with public policy considerations" so as to support the defense of sovereign immunity.  *Cope*, 45 F.3d at 446.

## CONCLUSION

For the foregoing reasons, the motion to dismiss should be denied in its entirety.  In the alternative, to the extent that this Court were inclined to grant the motion, in whole or in part, Plaintiffs would respectfully ask any that dismissal be without prejudice, and with leave for Plaintiffs to amend the Complaint to address any deficiencies found by the Court.

Dated:  October 26, 2007

Respectfully submitted,

NIXON PEABODY, LLP


/s/ ***Vernon W. Johnson, III***
_____
Louis E. Dolan, Jr. (#442881)
Vernon W. Johnson, III (#423756)
401 9th Street, N.W.
Washington, D.C. 20001
202.585.8000
202.585.8080 (fax)
ldolan@nixonpeabody.com
vjohnson@nixonpeabody.com

Counsel for Plaintiffs


## REQUEST FOR ORAL ARGUMENT

Pursuant to LCvR 78.1, Plaintiffs respectfully request oral argument on this motion.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 26th day of October, 2007, a true and correct copy of the foregoing Opposition to Motion to Dismiss, with appended Request for Oral Argument and Proposed Form of Order was served by ECF upon:

> Harvey A. Levin, Esquire
> Thompson Coburn LLP
> 1909 K Street, Suite 600
> Washington, D.C. 20006-1167
>
> Counsel for Defendant

                                        /s/ ***Vernon W. Johnson, III***
                                        _____
                                        Vernon W. Johnson, III

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

MONUMENT REALTY LLC, et al.,    )
    )
    Plaintiffs,    )
    )
    v.    )    **Civil Action No. 1:07-cv-01821 (EGS)**
    )    **Judge Emmet G. Sullivan**
WASHINGTON METROPOLITAN    )
AREA TRANSIT AUTHORITY,    )
    )
    Defendant.    )
_____)

### ORDER DENYING DEFENDANT'S MOTION TO DISMISS

Upon consideration of Defendant's motion to dismiss, the memoranda of points and authorities in support of and in opposition to the motion, and the entire record herein, and this Court having considered the argument of counsel thereon, it is, this ___ day of _____, 2007, hereby

ORDERED, that the motion be, and it hereby is, denied in its entirety.

_____
Emmet G. Sullivan
United States District Judge

COPIES TO:

Louis E. Dolan, Jr.
Vernon W. Johnson, III
Nixon Peabody LLP
401 9th Street, N.W.
Washington, D.C. 20001

Harvey A. Levin
Thompson Coburn LLP
1909 K Street, Suite 600
Washington, D.C. 20006-1167