**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| MONUMENT REALTY LLC, et al., | ) | |
| | ) | JURY TRIAL DEMANDED |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 1:07-CV-01821 (EGS) |
| | ) | Judge Emmet G. Sullivan |
| WASHINGTON METROPOLITAN | ) | |
| AREA TRANSIT AUTHORITY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## FIRST AMENDED COMPLAINT

NOW COME Monument Realty LLC and MR Ballpark 7 LLC (collectively, "Plaintiffs"), through counsel and pursuant to Fed. R. Civ. P. 15(a), and for their First Amended Complaint against the Washington Metropolitan Area Transit Authority ("WMATA") for declaratory judgment, specific performance, temporary restraining order, preliminary and permanent injunction, breach of contract, imposition of constructive trust, breach of fiduciary duty, fraud, violation of agency Compact, violation of other applicable law, damages, and other relief, state and allege as follows:

## INTRODUCTION

This is an action pertaining to improved real property located in the "Ballpark District" in Southeast, Washington, D.C. The property at issue is located at Lots 857 and 866, Square 700, commonly known as the WMATA Southeast Bus Garage and which includes an adjacent surface parking lot (hereinafter, collectively, "the Property" or the "WMATA Bus Garage"). The Ballpark District is a planning area in Southeast, Washington, D.C., directly adjacent to and including the new Washington Nationals baseball stadium currently under construction. It is

bounded by the Southwest-Southeast Freeway to the North, South Capitol Street to the West, New Jersey Avenue, S.E. to the East, and the Anacostia River to the South. See Map of Ballpark District, attached hereto as Exhibit A.

Within the Ballpark District is an area referred to herein as the "Half Street Area," which is bounded by M St., S.E. to the North, South Capitol Street to the West, 1st Street, S.E. to the East and N Street, S.E. to the South. See Map of Half Street Area, attached hereto as Exhibit B. The Property at issue in this case, i.e., the WMATA Bus Garage, is located in the Half Street Area. Monument has vested and viable rights and interests in the Property, yet WMATA has embarked on an effort to convey the Property without regard for its obligations to Monument. Monument has had no alternative but to file this suit to protect its rights and interests.

This First Amended Complaint is filed as a matter of right, pursuant to Fed. R. Civ. P. 15(a) (which permits a party to amend a pleading once as a matter of course at any time before a responsive pleading is served; responsive "pleadings" are defined by Fed. R. Civ. P. 7(a) and do not include a motion to dismiss). In significant part, the newly added allegations involve matters disclosed to Plaintiffs for the first time on October 18, 2007, including specific provisions of the competing bid selected by WMATA for an award. For ease of reference, the Paragraphs of the First Amended Complaint which are amended or contain new allegations are those numbered 18, 30, 62-65, 75-79, 91-92, 102, 104, 138, 200-223; the "WHEREFORE" Clauses of Counts Four and Nine are also modified; and Exhibits J-L are also newly-added with this pleading.

## THE PARTIES

1.     Monument Realty LLC ("Monument Realty" or "Monument") is a limited liability company formed pursuant to the laws of the State of Delaware which maintains its

principal place of business in the District of Columbia.  Monument Realty is a developer of real property.

2.      MR Ballpark 7 LLC ("MR Ballpark 7") is a Delaware limited liability company affiliated with Monument that was formed for the purpose of completing the acquisition of the WMATA Bus Garage and which maintains its principal place of business in the District of Columbia.  (Plaintiffs Monument Realty and MR Ballpark 7 are referred to collectively herein as "Monument.")

3.      WMATA was created by an interstate Compact among Virginia, Maryland, and the District of Columbia to construct and operate a transit system, consisting of buses and subways, for the Washington, D.C. metropolitan area.  Md. Code Ann., Transp. § 10-204 et seq. (2004); Va. Code Ann. § 56-529 et seq. (2004); D.C. Code Ann. § 9-1107.01 et seq. (2004). WMATA has the power to sue and be sued, D.C. Code Ann. § 9-1107.01, sec. 12(a), and has waived sovereign immunity with respect to the subject matters of this suit. Id., at § 9-1107.01, sec. 80.  See WMATA Compact, attached hereto as Exhibit C.

4.      Among other things, the Compact authorizes WMATA to dispose of excess real property that it owns by contract. D.C. Code Ann. § 9-1107.01, sec. 12(d).

5.      The Compact also requires WMATA to establish policies and procedures relating to its contracting and procurement practices. D.C. Code Ann. § 9-1107.01, sec. 73(g) ("The Board shall adopt policies and procedures to implement this Section").

6.      WMATA has promulgated a Procurement Procedures Manual ("PPM") that purports to govern the disposition of real property by WMATA.  See Procurement Procedures Manual, at §1503, attached hereto as Exhibit D.  However, WMATA has taken conflicting and contradictory positions with respect to the issue of whether the PPM applies to the disposition of

the Property.  In some instances, WMATA has asserted that the PPM does not apply to the

disposition of its real property and that it has no specific policies, procedures, rules, or

regulations in place regarding the disposition of the Property at issue in this case. See Transcript

of WMATA Board of Directions Meeting, September 27, 2007, at pp. 44-46, attached hereto as

Exhibit E.  WMATA has also asserted that other, undisclosed regulations do apply. E.g., id., at

71.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this matter pursuant to D.C. Code Ann. §§ 9-

1107.01, sec. 81 and 1107.10.

8.      Venue is appropriate in this judicial district.

## FACTUAL BACKGROUND

9.      In the summer of 2004, Major League Baseball was considering relocating the

Montreal Expos baseball franchise to Washington, D.C.

10.      In September 2004, District of Columbia officials disclosed plans to build a

publicly-financed baseball stadium costing in excess of $400 million on the Anacostia River

waterfront near South Capitol Street, Southeast, Washington D.C.

11.      In 2004, the Anacostia Waterfront Corporation ("AWC") was formed as an

independent instrumentality of the District of Columbia. D.C. Code Ann. § 12-1223 et seq.

(2004) (the "AWC Statute") (Repealed).[1]  Its mission was the development and revitalization of

underutilized public lands along the Anacostia River.  AWC intended to accomplish these goals,

in part, by causing the development of a comprehensive master plan for the development of parts

---

[1]      Effective October 1, 2007, AWC became a part of the Office of the Deputy Mayor for Planning and
Economic Development for the District of Columbia, through enactment of the "Fiscal Year 2008 Budget Support
Act of 2007." 54 D.C. Reg. 7079-85 (July 27, 2007).

of the Ballpark District including the Half Street Area; acquiring property through sale, lease, or exchange, and conveying that property, or causing the disposition of property by others, to Master Developers selected by AWC to develop and implement a Master Development Plan for areas within the Ballpark District. AWC had the requisite powers and authorities granted to it under the AWC Statute to accomplish its mission. The AWC's mission and goals were heartily endorsed and supported by the highest level District of Columbia government officials, including Mayor Anthony Williams and the City Council of the District of Columbia, which in some cases included the same individuals who are or were at relevant times Principal Directors or Alternate Directors of the WMATA Board. The AWC was the District of Columbia's appointed economic development entity for the entire Ballpark District.

12.    Anticipating the potential for economic development in the Ballpark District, Monument began acquiring parcels of real property in the vicinity of the to-be-constructed baseball stadium, identifying the first group of properties for acquisition in October 2004. In total, Monument invested approximately $80 million in land acquisitions in this area. Monument's efforts in this regard (assembling land from seventeen different owners) paved the way for the master planning process that ultimately was implemented in the Ballpark District with a focus on Half Street, which is a primary street leading directly to the main entrance of the new stadium. In fact, the Master Development Plan ultimately agreed upon for the Half Street Area would never have happened but for Monument's efforts and undertakings. Monument's financial commitment to the Area was also a primary consideration in the selection of Monument as the Master Developer for all of the Half Street Area.

13.    Monument reasonably relied upon the fact that AWC had these statutory powers, rights, and duties, and had been created for the purpose of developing a Master Development

- 6 -

Plan for the Ballpark District when entering into and consummating negotiations and agreements with AWC and WMATA.

14.    Indeed, the AWC's Board included the District's Deputy Mayor for Planning and Economic Development and WMATA's Board of Directors included members of the City Council of the District of Columbia and the Director of the Department of Transportation.  In fact, D.C. Councilmember Jim Graham voted repeatedly for the creation of the AWC (voting "yes" to the first reading, reconsideration, and final vote), and is also a WMATA Board member.

15.    WMATA was the owner of multiple properties within the Half Street Area of the Ballpark District, including the Navy Yard Metro Station site and the WMATA Bus Garage.

16.    In March 2005, WMATA issued a Joint Development Solicitation ("JDS"), for the joint development of the WMATA-owned properties in the Ballpark District, which included three parcels in Squares 700 and 701, including the WMATA Bus Garage and the Navy Yard Metro Station site.  The JDS clearly linked all of these sites owned by WMATA and indicated that any proposals submitted for the development must include all of these properties jointly. Proposals were due to be submitted in May 2005.  Monument registered and prepared a response to the JDS; however, on the day before proposals were due, WMATA notified potential respondents that it was withdrawing the JDS.

17.    Upon information and belief, WMATA withdrew the JDS because the District and specifically Mayor Williams requested that WMATA participate in the master planning process that the District had initiated through AWC for the development of the Ballpark District and Half Street Area.   By withdrawing its JDS, WMATA either expressly or impliedly acquiesced in the master planning process for the Ballpark District and Half Street Area established by AWC and the District.

18.    WMATA never reissued its JDS.  Upon information and belief, WMATA also never formally removed the Property from the Joint Development program.  WMATA's PPM allows it to sell a property designated as a Joint Development property to neighboring landowners, such as Monument, without competition and without advertising the site to the public. Exh. D, at § 1508.6.  See also WMATA Joint Development Policies and Guidelines, dated July 21, 2005, at § 7.5.

19.    By May 2005, Monument already owned or had under contract most of the privately held property surrounding the WMATA Bus Garage and the Navy Yard Metro Station site.

20.    On September 16, 2005, AWC issued a Request for Expressions of Interest ("RFEI") for a mixed use development in the Ballpark District.  The RFEI was intended as an invitation for qualified developers with experience in large scale, mixed use, retail, sports-related, and waterfront developments to submit proposals to AWC for the development of the Ballpark District pursuant to a comprehensive master plan.

21.    AWC's RFEI stated that having a coordinated and unified development program, particularly with regard to the retail program and streetscape, was critical to achieving the District's requirement for creating a vibrant mixed-used neighborhood within the Ballpark District.

22.    Monument submitted a proposal to AWC in response to the RFEI in October 2005. At this time Monument owned or controlled nearly all of the privately-held land in Square 700 and the western half of Square 701.  See Exhibit B.

23.    In December 2005, AWC and Mayor Williams' office announced the selection of the Monument team and its affiliates as the "Master Developer" for the Half Street Area (i.e., the

area encompassing Monument's property, the WMATA Bus Garage, and the Navy Yard Metro Station site). See Press Release of AWC, dated December 12, 2005, attached hereto as Exhibit F. The Mayor's press release read:

> "The ballpark and development program proposed by the development teams is expected to bring millions of people annually to the waterfront, generate new tax revenue, create thousands of permanent jobs and provide a range of affordable and market-rate housing – all helping to fulfill the promise of the Anacostia Waterfront Initiative and accelerate economic benefits for the entire city."

24.    In December 2005, Monument signed a Letter of Intent with AWC that memorialized, in part, the rights, duties, and obligations of Monument and AWC with respect to the Master Development Plan for the Half Street Area.  The Master Development Plan submitted by Monument encompassed over 2 million square feet of property and, given the size and complexity of the undertaking, all parties understood that it was to be – and could only be – completed in phases.  Monument's marketing materials related to the Master Development Plan reflected this phased approach.  For example, page 45 of the Development Report 2006/2007 Edition, for the Washington, D.C. Economic Partnership, lists Monument's development as taking place in two phases, and the rendering shows Monument's development of the entire Half Street Area, including portions of the Property.  The District publicly and intentionally utilized and relied on these same renderings and marketing materials.

25.    AWC then issued a press release indicating that the Monument team had been given the right to enter into exclusive negotiations to acquire and develop mixed-use projects within the Half Street Area, which AWC was seeking – and had been given the statutory authority - to acquire from WMATA.  AWC publicly held Monument out as having this exclusive right.  WMATA was aware of AWC's actions in that regard, as well as the fact that AWC's actions included the disposition of, among other things, real estate owned by WMATA.

WMATA did not object to the statements made by AWC and participated openly and fully in this process.

26.    The District of Columbia and AWC held a major news conference at the Anacostia Waterfront to make this announcement, at which time the Master Development Plan as well as the inclusion within that Plan of the WMATA properties in Square 700 and 701 were discussed. WMATA officers were in attendance and offered no objection.

27.    Monument worked to implement its Master Development Plan for the Half Street Area of the Ballpark District, including making substantial financial contributions and commitments to the process, hiring master planners, agreeing to meet, and meeting, certain benchmarks, and undertaking numerous related actions.

28.    At all times WMATA was aware of AWC's and Monument's Master Development Plan, that the Plan included real property owned by WMATA in the Half Street Area of the Ballpark District, including the WMATA Bus Garage, and WMATA did not object to the Master Development Plan.

29.    In fact, WMATA began working with Monument to implement the Master Development Plan and endorsed the Master Development Plan because, in part, its implementation substantially increased the value of the WMATA properties in the Half Street Area of the Ballpark District, including the Property at issue herein.

30.    By May 2006, however, in light of AWC's slow pace of progress with respect to implementing the Master Development Plan, particularly with respect to WMATA's property in the Half Street Area, WMATA and Monument began working together on the conveyance to Monument of WMATA's property in the Half Street Area. Both parties understood that the acquisition process between WMATA and Monument would be accomplished in phases. This

was due in part to: (a) WMATA's need to focus first on the Navy Yard Metro Station site, which WMATA needed to address immediately in order that a smoothly operating metro station near the new baseball stadium would be ready by opening day, 2008; and (b) WMATA's uncertainty with respect to a new location to garage the buses and other equipment occupying the WMATA Bus Garage. According to WMATA, only after WMATA identified and secured a replacement bus garage site could Monument's acquisition of the WMATA Bus Garage be finalized. At all times, District of Columbia government officials, WMATA, AWC, and Monument participated actively in discussions regarding the development of this portion of the Ballpark District by Monument and WMATA was fully aware of all activities between and among the parties in this regard.

31. AWC stated publicly that it had no objection to WMATA dealing directly with Monument in implementation of the Master Development Plan. When questioned about Monument's direct negotiations with WMATA, Adrian Washington, President and CEO of AWC, stated, "Our goal is to redevelop the Ballpark District. We're fine either way (i.e. with or without AWC's involvement in the negotiations)." However, in reality, AWC insisted on staying involved in the direct negotiations between WMATA and Monument and, in fact, did so.

32. With a full understanding of the phasing necessary to satisfy WMATA's concerns and requirements regarding disposition of its property in the Ballpark District, Monument agreed to cooperate with WMATA, to its significant detriment. Indeed, such practices are customary in the master planning and development process: developers frequently work on master projects in phases, often offering significant concessions in the early phases of the project in reliance on the satisfaction of their business expectations and realization of additional promised benefits in the

later phases. Monument's Master Development Plan was no different in its phasing and implementation.

33. Monument agreed to structure the purchase transactions in phases only because it had exclusive rights as Master Developer and otherwise to negotiate for and acquire the remaining WMATA parcels in the Half Street Area, including the Property.

34. Therefore, Monument submitted an unsolicited bid to WMATA for the purchase of WMATA's Navy Yard Metro Station property as the first phase of implementing its Master Development Plan with WMATA. WMATA advertised the sale of this property but due at least in part to the nature of the advertisement WMATA received no responsive bids.

### The First Phase of Master Development Plan Is Implemented Between WMATA and Monument

35. In December 2006, Monument and WMATA implemented the first phase of the Master Development Plan between themselves when Monument completed the purchase of the Navy Yard Metro Station site from WMATA. The purchase was completed through a sole-source negotiation between WMATA and Monument.

36. Monument paid WMATA $15.2 million, which was fair market value for the Navy Yard Metro Station site, as supported by WMATA's own appraisal, and substantially more than WMATA would have received from any other purchaser given the limited ability of any other buyer to develop the property.

37. During the completion of this transaction, WMATA, AWC, the District of Columbia, and Monument all understood that Monument would continue to have the exclusive right to negotiate for and acquire the remaining WMATA properties, including the WMATA Bus Garage, after completing this first phase of the Master Development Plan. These understandings and agreements were openly discussed and repeated at meetings at which representatives of

AWC, the District of Columbia, Monument, and WMATA were present, including meetings that took place within the Deputy Mayor's office.

38.     These meetings included discussions regarding the completion of the Navy Yard Metro Station site by Monument, and all parties present understood that Monument would continue to have the exclusive right to negotiate for the acquisition of the WMATA Bus Garage, once a replacement site had been located for that facility.     Indeed, District of Columbia government officials had committed to WMATA that the District government would find such a replacement site. WMATA either sent its own representatives to these meetings or allowed AWC and the District of Columbia government to act in a representative capacity on its behalf.

39.     Likewise, fully aware that such meetings and discussions were taking place with respect to the WMATA Bus Garage, WMATA did nothing to notify or advise Monument that it was not committed to the AWC process, which included the disposition of the WMATA Bus Garage to Monument. Indeed, Emeka C. Moneme, a Principal Director on WMATA's Board of Directors and current Director of Transportation of the District of Columbia government, was fully aware of and supportive of Monument's exclusive right to negotiate for acquisition of the WMATA Bus Garage at this time. Notably, Mr. Moneme, who was instrumental in assuring Monument of its exclusive right to negotiate, also reports to the City Administrator in his role as Director of Transportation.  He was in constant communication with the Deputy Mayor's Office with respect to the development of the Ballpark District and the Half Street Area.

40.     Highlighting the nature of the negotiations among WMATA, the District of Columbia, AWC, and Monument, and in consideration for the promises made to it with respect to its right to negotiate exclusively for the WMATA Bus Garage, Monument agreed to certain conditions benefiting the District of Columbia when it acquired the Navy Yard Metro Station

site, including agreeing: (a) to provide an affordable housing restriction on 8 percent of adjacent properties owned by Monument's affiliates without any offsetting additional development density; and (b) to meet LSDBE and First Source employment goals on the Navy Yard Metro Station site and other adjacent properties owned by Monument affiliates. These concessions and considerations were granted by Monument at the insistence of members of the Council of the District of Columbia, representatives of Mayor Williams, and representatives of AWC. .

41.    Likewise, Monument agreed to provide additional consideration to WMATA in return for the commitment to allow Monument to negotiate exclusively for, and acquire, the WMATA Bus Garage, including agreeing: (a) to complete the WMATA Navy Yard Metro Station expansion in time for opening day of the 2008 Washington Nationals' baseball season, a concession that even WMATA agreed was based on an "aggressive" construction schedule that WMATA would not have been able to accomplish itself; (b) to accommodate WMATA's employee parking requirements in Square 700 through obtaining a zoning variance with respect to the Capitol Gateway Overlay Zoning Ordinance; and (c) to grant WMATA the exclusive right to purchase certain of the units in Monument's adjacent residential building, once completed, for designation as "affordable housing units," at the insistence of D.C. Councilmember Marion Barry and other representatives from AWC. In this capacity, Mr. Barry was acting both as a representative of the District of Columbia government (D.C. Councilmember for Ward 8) as well as in his role as an Alternate Member of WMATA's Board of Directors, thereby highlighting the interconnections between AWC, the District of Columbia government, and WMATA throughout this process. Providing affordable housing was a stated goal of AWC, not WMATA; therefore, WMATA was acting in this regard to implement the AWC process with respect to the development of the Ballpark District and the Half Street Area when it negotiated for and

obtained from Monument the exclusive right to acquire additional affordable housing units on to-be-completed properties owned by Monument affiliates adjacent to the Navy Yard Metro Station site.

42.    In addition, Monument agreed to undertake, and did undertake, the following actions in consideration for the promises made to it by WMATA, AWC, and the District of Columbia regarding its exclusive right to negotiate for and acquire the WMATA Bus Garage:

(a)    Alleyway closures in the Half Street Area, including specifically closing the alley between Van Street and Half Street, which WMATA expressly agreed to and which materially benefited WMATA;

(b)    Preparation of curbless streetscape designs on Half Street itself, which could not be completed unless Monument owned the property on both sides of Half Street, including the WMATA Bus Garage, and which Monument never would have undertaken but for Monument's exclusive right to negotiate for the acquisition of the WMATA Bus Garage;

(c)    Substantially increased public relations and marketing activities for the development of the Ballpark District and the Half Street Area, which, in turn, enhanced the value of WMATA's remaining properties in the Half Street Area, including the WMATA Bus Garage;

(d)    Ensuring that the WMATA Bus Garage would not be designated as a historical site by the Office of Historic Preservation, which inured to WMATA's benefit in enhancing the fair market value of the Property.

43.    Monument agreed to and undertook these actions, concessions, and proffers and gave this consideration in reliance on its right to negotiate exclusively for the WMATA Bus

Garage in another phase of the overall development plan. Monument granted these concessions and gave these considerations with the understanding and agreement of all parties that the Navy Yard Metro Station site was the first phase of its 2 million-square-foot Master Development Plan, which also included the acquisition by Monument of the WMATA Bus Garage at issue here, and that Monument would have the exclusive right to negotiate for and acquire the WMATA Bus Garage.

44.    These concessions and considerations by Monument were critical concessions – the affordable housing concessions alone were valued in excess of $5 million – that Monument would not have made if it did not have real property and contractual rights and interests, as well as a reasonable business expectancy, that WMATA would convey the Property or negotiate with Monument in good faith for the completion of the acquisition by Monument of the remaining WMATA properties in the Half Street Area, namely the WMATA Bus Garage. All parties, including WMATA, AWC, and District of Columbia government officials, understood and agreed to Monument's rights and interests in this regard, and WMATA specifically allowed Monument to labor under the belief that WMATA would honor its and AWC's obligations and commitments with respect to allowing Monument to negotiate exclusively for the WMATA Bus Garage. Monument has kept its end of the bargain. WMATA has not.

45.    WMATA, the District of Columbia, and AWC accepted all of these benefits conferred upon them by Monument in full recognition of Monument's rights and interests for the exclusive right to acquire and/or negotiate for the acquisition of the WMATA Bus Garage in order to complete another phase of the Master Development Plan. Monument conferred these benefits because of the rights and interests that it obtained and because of its status as Master

Developer, and Monument would not have conferred these benefits absent these rights and interests and this status.

46.    In this regard, WMATA held the District of Columbia government and AWC out and allowed the AWC and the District of Columbia government to hold themselves out as having custodial rights over WMATA's property in the Half Street Area of the Ballpark District, including the Property.

47.    In January 2007, WMATA and Monument held a groundbreaking ceremony for the Navy Yard Metro Station improvements, which was attended by many prominent local leaders, including the Mayor and WMATA officials.  WMATA invited Monument to speak at the groundbreaking ceremony.  Jeffrey T. Neal, a principal of Monument Realty, spoke at the groundbreaking ceremony and specifically addressed Monument's plans with respect to the reminder of the Half Street Area.  WMATA did not object.

48.    Monument then started construction on the first phase of its Master Development Plan, a $350 million project, which consists of a 275,000 square foot office building, a 196 room hotel, 340 residential units, and associated underground parking.  To date, Monument has invested over $160 million on the acquisition and construction of the first phase based on the promises and reasonable expectation that it had the exclusive right to negotiate for and acquire the WMATA Bus Garage from WMATA.

49.    Throughout this process, Monument has had discussions with numerous District government officials during the transition period between Mayor Williams and Mayor Adrian Fenty's administration.  Monument was always assured, by District of Columbia officials and others, that the AWC award would be honored.  Likewise, WMATA was aware of this award, Monument's exclusive rights, and these assurances, and did not object.

50.    Monument marketed its Master Development Plan without protest or objection from WMATA, which efforts inured to WMATA's benefit.  Furthermore, for over two years, Monument has undertaken an aggressive marketing campaign by placing dozens of advertisements in numerous local publications, by constructing highly-visible signage all around the Property and by distributing all variety of promotional material, including at the aforementioned groundbreaking.    This marketing campaign has at all times promoted Monument's Master Development Plan, including the WMATA Bus Garage, and enhanced the value of that Property for WMATA.

**Phase Two of Monument's Master Development Plan
With Respect to WMATA Is Implemented**

51.    Next, Monument, in furtherance of the next phase of its Master Development Plan implementation with WMATA, and in consideration for the agreements, rights, and interests that existed between and among Monument, AWC, and WMATA, granted WMATA an easement in an alleyway between Van Street and Half Street (the "Easement") and closed other various alleyways in the Ballpark District, for WMATA's direct benefit.  See Easement Agreement, attached hereto as Exhibit G.

52.    The Easement was recorded among the land records of the District of Columbia, and WMATA derived and will derive substantial benefit from it.  WMATA provided Monument with a letter of support for the Easement, which Monument presented to the Council of the District of Columbia.

53.    Closing alleyways was accomplished after appropriate actions were taken by Monument before the representative Area Neighborhood Commission, the Council of the District of Columbia, and the applicable zoning authorities.  WMATA acquiesced fully in the closings, which inured to its benefit.  The alleyway closings were completed at substantial cost to

Monument and without any monetary contribution from WMATA, although WMATA participated in, consented to, and facilitated this process. Monument incurred all of these costs in consideration for the promises it had obtained and the rights and interests that it had with respect to the acquisition of the WMATA Bus Garage.

54.     These actions taken by Monument were in partial consideration for WMATA's obligation and commitment to convey and/or negotiate in good faith with Monument for the conveyance of the WMATA Bus Garage. This consideration included rights and interests in real property and was granted in exchange for rights and interests in real property, namely the right that Monument bargained for to acquire and/or to negotiate exclusively for the right to acquire the WMATA Bus Garage, in which Monument had actual, legitimate, and intended property interests and contractual rights.

### Phase Three of Monument's Master Development Plan Commences between WMATA and Monument

55.     Next, Monument began implementing another phase of its approved Master Development Plan with WMATA, the acquisition of the remaining property owned by WMATA, i.e. the WMATA Bus Garage. Monument commenced this phase once it learned that the pre-condition established by WMATA for the commencement of this phase, the selection of a replacement site for the Bus Garage, had been completed by WMATA. WMATA and the District of Columbia had jointly selected a site owned by the District of Columbia, called D.C. Village, as its replacement site for transferring the buses and related equipment currently garaged at the WMATA Bus Garage.

56.     Just as it had done with respect to the Navy Yard Metro Station site acquisition, and in full reliance on the rights and interests that Monument had obtained as a result of the AWC process and its prior dealings with, and consideration given to, WMATA as well as

WMATA's commitment to negotiate with Monument exclusively for the acquisition of the Property, on April 6, 2007, Monument sent an unsolicited offer to WMATA to purchase the WMATA Bus Garage. This was in furtherance of Monument's goal of completing the next phase of the Master Development Plan that WMATA and AWC endorsed and promised to Monument.

57.    WMATA, in violation of Monument's rights and interests concerning the WMATA Bus Garage, which rights and interests were supported by substantial consideration given by Monument, did not respond to Monument's offer.  Instead, WMATA was apparently authorized by the WMATA Board of Directors on or after May 27, 2007 to dispose of the WMATA Bus Garage.   WMATA failed and refused to offer the Property to the AWC and failed and refused to honor its commitment to negotiate and deal exclusively with Monument.

58.    Upon information and belief, the disposition by WMATA of its Property was to be handled by WMATA's Office of Property Development and Management pursuant to internal procedures known at the time only to WMATA, and in complete disregard for WMATA's published procedures manual, adopted pursuant to the WMATA Compact, that expressly describes how WMATA is required to dispose of its real property.  WMATA also acted in contravention of its precedent in selling the Navy Yard Metro Station site to Monument in a sole -source acquisition process.

59.    Advertisement for the sale began on or about June 8, 2007. Unlike the advertisement of the sale of the Navy Yard Metro Station site that WMATA had conducted earlier, however, WMATA's advertisement for the sale of the WMATA Bus Garage was designed by WMATA to elicit responses and bids.

60.    WMATA issued Invitation for Bid No. 07-3.  The bid deadline was set for July 23, 2007.

61.     However, after the first offer deadline was set, District of Columbia and AWC officials advised WMATA that the District wanted to buy the Property.  The District wanted to buy the Property with the intention of transferring it to Monument in fulfillment of AWC's obligations, and to continue the process of developing the Ballpark District and the Half Street Area in accordance with Monument's approved Master Development Plan.

62.     Upon information and belief, WMATA initially agreed to sell the Property to the District of Columbia, subject to a Board of Directors vote.  In furtherance of that decision and agreement, WMATA posted a public announcement that the District intended to buy the Property, thereby again acknowledging WMATA's acquiescence in and agreement with the AWC process and its obligations to AWC and Monument.  This was consistent with WMATA's obligation to offer the Property for sale to the District which, upon information and belief, its own internal, unpublished, procedures required.  Monument has the right to enforce the agreement announced by WMATA, whereby the District would buy the Property, as a third party beneficiary of the agreement, under the doctrine of after acquired title, or otherwise.

63.     However, upon information and belief, when the District explained that it wanted to assign its rights to Monument or have WMATA sell the Property directly to Monument, WMATA again reneged on its commitments.  Upon information and belief, WMATA reneged on this commitment due, in part, to its erroneous belief that Monument was behind schedule on its construction of the Navy Yard Metro Station site. In fact, there would have been no material difference to WMATA if it had sold the Bus Garage to the District, which then conveyed the Property to Monument, or if WMATA conveyed the Property directly to Monument. On the other hand, if WMATA had first sold to the District, and the District had conveyed to Monument for a higher price, then WMATA would have foregone the resultant economic benefit.  On

information and belief, WMATA was also motivated by this concern, and WMATA has acknowledged subsequently that it has no policy in place to allow it to capture the economic benefit under such circumstances. The absence of such a policy, in this instance, caused injury to Monument.

64.    The efforts of District and AWC to purchase the Property were thereby frustrated by WMATA.

## Invitation for Bids No. 08-1 Issues

65.    Apparently believing that the District of Columbia's actions with respect to the initial invitation for bids had limited the number of bidders, WMATA initiated another invitation for bids ("IFB"), IFB No. 08-1, for the sale or disposition of its Bus Garage. See IFB Bid No. 08-01, attached hereto as Exhibit H.

66.    Consistent with the relevant provisions of the PPM, WMATA's IFB No. 08-1 established that the sole criterion for the winning bid would be:

> The bid which represents the best net return to WMATA after leaseback monthly rent for WMATA's anticipated lease term (which may, in WMATA's sole discretion be less than 36 months) is deducted from the Bid Amount.[2]

See Exh. H, at C(5).

67.    IFB No. 08-1 did not restrict or otherwise prohibit bidders from submitting a bid that included a so-called "relative" or "escalator" bid.

68.    The bid deadline under IFB No. 08-1 was August 28, 2007. Before the bid deadline, Monument protested the entire process, through submission of the correspondence attached as Exhibit K hereto and in other ways.

---

[2]    WMATA stated in the IFB that it intends to lease back the Bus Garage from the successful bidder for a period of thirty-six months, until the alternative location it found is ready for WMATA's use.

69.    Upon information and belief, the same three bidders that bid on the initial invitation for bids for the Property also bid under IFB No. 08-1.   Indeed, it was common knowledge within the District of Columbia developer and real estate community that Monument had the exclusive right to negotiate for and acquire the WMATA Property.   As a result, very few developers even bid.

70.    In order to protect its rights and interests in the Property in the face of WMATA's refusal to honor its commitments to Monument and AWC's unilateral action in abandoning Monument, on August 28, 2007, MR Ballpark 7, Monument Realty's affiliate, submitted two bids to WMATA in accordance with IFB 08-1.

71.    The first bid by MR Ballpark 7 was for the minimum bid price of $60 million.

72.    MR Ballpark 7 submitted an alternate bid pursuant to which it offered to pay $250,000 more than any other qualified, responsive bid (the "Alternate Bid").   See Alternate Bid, attached hereto as Exhibit I.

73.    "Relative" or "escalator" bids of this type are common practice in the real estate industry and neither WMATA nor any other bidders were or should have been surprised that responsive bids could employ such a provision.   The bid was submitted by MR Ballpark 7 in the spirit of good faith and in an effort to ensure that WMATA understood Monument was prepared to pay the highest price for the Property, as Monument had stated it would on numerous occasions in dealing with various public officials.   The Alternate Bid was submitted in recognition of Monument's substantial investment in the Half Street Area and its belief that WMATA would honor its commitment and promise to convey the WMATA Bus Garage to Monument after it completed its bidding process, as well as Monument's desire to pay WMATA the highest price.

74.    Notably, there was nothing in the IFB or any WMATA procurement manual, policy, rules, or regulations prohibiting such a bid.  Indeed, no such materials exist with respect to bids for the disposition of WMATA's Property.

75.    Bids were also received by WMATA from two other bidders.  One of those bidders was the John Akridge Development Company ("Akridge") located in Washington, D.C.  Akridge was a disappointed participant in the original RFEI process initiated by AWC for selection of Master Developers for the Ballpark District.

76.    Akridge submitted a bid to WMATA in response to IFB No. 08-1 (the "Akridge Bid").  A copy of the cover letter transmitting the Akridge Bid and the Akridge Bid itself is attached as Exhibit J.  In the Akridge Bid, a Bid Amount of $69,250,000.00 was stated.  In addition, however, the cover letter stated as follows: "This bid is submitted conditionally as set forth in the enclosed letter from our counsel, Williams & Connolly LLP, to Carol B. O'Keeffe, WMATA's general counsel."  Furthermore, and in contrast with MR Ballpark 7's bids (which provided that WMATA would be charged *no* leaseback rental for the 36 month period specified in the IFB and which met the stated minimum bid amount), the Akridge Bid provided that WMATA would be charged rent of $110,000.00 per month for months 1-12 of the leaseback and $430,000.00 per month for months 13-36 of the leaseback.  In addition, the Akridge Bid included an offer to "immediately commence negotiations with WMATA to establish an arrangement pursuant to which WMATA would be able to use [nearby real estate owned by Akridge] as a temporary site for locating assets presently located on the Property during the period WMATA is contemplating relocation of the operations presently conducted at the Property."

77.    Even ignoring the leaseback rental specified in the Akridge Bid, MR Ballpark 7's Alternate Bid was valued at $69.5 million, $250,000 higher than the Akridge Bid.  Over the full

36 month leaseback period specified in the IFB, the Akridge Bid provided for rental charges totaling $11,640,000, resulting in a net return to WMATA of no more than $57,610,000, thereby rendering a full net benefit to WMATA less than the stated minimum bid amount of $60,000,000. Taking into account the leaseback rental specified in the Akridge Bid, MR Ballpark 7's bid and Alternate Bid provided a higher net return to WMATA.

78.    MR Ballpark 7's bid and Alternate Bid should have been so valued by WMATA in its consideration of bids, but were not. This was due, in part, to a latent ambiguity in the IFB which resulted in bidders submitting different types of responses to the bid solicitation.

79.    Notwithstanding the higher bid amount set forth in MR Ballpark 7's bid and Alternate Bid, WMATA and/or its contracting officer illegally and arbitrarily disregarded MR Ballpark 7's Alternate Bid and did not even consider it. See Exh. E, at p. 72. WMATA and/or its contracting officer also illegally and arbitrarily determined not to consider the full amount of the leaseback rental specified in the Akridge Bid, manipulating the amounts to create the illusion that the Akridge Bid provided "best net return" to WMATA. WMATA's rejection of MR Ballpark 7's bid and Alternate Bid is illegal and contrary to the provisions of the PPM that govern the disposition of real property. WMATA's contracting officer instead improperly selected the Akridge Bid as the highest and successful bid and disregarded MR Ballpark 7's bid and Alternate Bid.

80.    On September 24, 2007, WMATA publicly posted the recommendation its staff would make to the WMATA Board of Directors and its proposed draft resolution awarding the contract for the sale of the WMATA Bus Garage to Akridge pursuant to IFB No. 08-1 and the Akridge Bid.

81.    The RFEI process conducted by AWC weighed many important factors in the selection of a Master Developer and was completed after the submission of a detailed proposal by the respondents and multiple interviews in front of expert panels. In contrast, WMATA's IFB No. 08-1 provided none of the customary screening of the bidder's qualifications, including the amount of due diligence conducted by bidders or their ability to pay the proposed bid amount. All of this highlights the arbitrary nature of the invitation for bids issued by WMATA for a property that is critical to the economic success of the Ballpark District.

82.    On September 26, 2007, MR Ballpark 7 filed a pre-award bid protest with WMATA. The pre-award bid protest was filed in accordance with WMATA's PPM that states that it applies to and governs WMATA's disposition of real estate. See Exh. D, at § 1503.

83.    On September 26, 2007, WMATA asserted that the PPM was inapplicable to the sale by WMATA of the Property, bids for WMATA's Bus Garage, and bid protests for the disposition by WMATA of its Property. In fact, WMATA apparently has no rules, regulations, or policies governing the disposition of the Property or related bids or bid protests.

84.    On September 27, 2007, WMATA's Board of Directors met in open session to consider WMATA's staff recommendation that WMATA award a contract for the sale of the Bus Garage to Akridge. Again, WMATA represented that its procurement regulations did not apply to the sale of its properties and of this Property in particular: "Just as a clarification, the disposition of surplus property is not governed by procurement regulations. Both FTA regs and our procurement regulations require a delay of five days of an award after a protest has been resolved. That does not apply to the sale of the Southeastern Bus Garage." Exh. E, at p. 46. See also Exh. E, at p. 44 ("The procurement regulations do not apply to sale of our property.").

85.     The WMATA staff reported to the Board of Directors that three developers submitted bids and that MR Ballpark 7's Alternate Bid was not considered in determining the highest bid because of the alternative nature of that bid.  See Exh. E, at page 72 ("So yes, the alternative bid was not considered.").

86.     Paradoxically, WMATA also represented that some mysterious other procedures barred its review and consideration of the Alternative Bid.  E.g., Exh. E, at p. 71 ("However, our procedures in this type of solicitation do not allow for alternative bids.").  Therefore, WMATA was stating that its procedures and regulations do not apply to the disposition of this Property at the same time it represented that some other procedures did apply.

87.     Highlighting WMATA's own state of confusion surrounding which procedures governed the sale, at the hearing, Principal Director and D.C. Councilmember, Jim Graham, stated that "[t]here was a little bit of a mixed message here" as to what procedures did in fact apply.  Exh. E, at p. 48.

88.     Upon information and belief, however, the Monument Alternate Bid was not considered due to certain unstated evaluation criteria applied by staff and WMATA's Contracting Officer, including WMATA's incorrect assertion that Monument was behind schedule with respect to completion of construction activities at the WMATA Navy Yard Metro Station site.  These assertions and unfounded concerns, which WMATA knew to be false given that WMATA had previously received a recovery schedule for timely completion of construction at the Navy Yard Metro Station site from Monument, were publicly addressed by the WMATA Board of Directors at the September 27, 2007 meeting prior to the Board's vote.

89.     Upon information and belief, the staff concluded, without notice to any of the bidders, including MR Ballpark 7, that consideration of the Alternate Bid would have required

WMATA to advise the other two bidders that it had received an alternative bid and an invitation to the other bidders to amend their bid or amend the bid process to another form of bid process as opposed to the one that was initiated.

90.    Upon information and belief, WMATA frequently alters its bidding procedures in procurement situations to obtain better pricing, and there was no prohibition on WMATA doing so in this instance.  Further, upon information and belief, and as precisely had happened with respect to this Property on one prior occasion, WMATA frequently cancels bid solicitations or IFB's and reissues them at a later date.  WMATA could have taken either of these steps in this instance to meet its sole stated bid criteria of maximizing its return, but did not do so, resulting in significant prejudice to Monument in that it was not permitted to acquire the Property.

91.    Had WMATA and/or its contracting officer done so, WMATA would have realized a greater return for the Property, which was the sole criterion set forth in the IFB.  In addition, MR Ballpark 7's bid represented a higher "net return" to WMATA if the leaseback rental specified in the Akridge Bid were taken into account (as WMATA should have done).

92.    Upon information and belief, WMATA's contracting officer and staff therefore elected to evaluate the bids on criteria not disclosed to the bidders, i.e undisclosed evaluation factors, and did not re-issue the IFB expressly to prohibit "relative" or "alternate" bids such as MR Ballpark 7's Alternate Bid, as WMATA should have.  Nor did WMATA seek to maximize its return by cancelling the IFB, accepting MR Ballpark 7's bid, and/or engaging in further negotiations with the bidders, even though such an approach was warranted under the circumstances and the express criterion of the IFB.

93.    Moreover, at the September 27, 2007 open session Board meeting, and in response to questions from Director Graham regarding MR Ballpark 7's Alternate Bid and

whether there were agency rules and regulations that prohibited consideration of that bid, WMATA's General Counsel stated that the Agency's procedures prohibited consideration of such alternate or escalator bids. WMATA's General Manager also represented to the Board of Directors that the PPM did not apply to the disposition of the Property by WMATA and that there were, in fact no applicable rules, regulations, or policies governing this process.

94.     At this same meeting, Emeka C. Moneme, a Principal Director member of WMATA's Board of Directors, stated as follows:

> **And I think it properly would be in the best interest for this board to have some sort of a policy to deal with this, because just like the real estate market this is quite common. We are all aware that people do put in escalation clauses as it relates to property.**

Exh. E, at p. 73.

95.     Director Moneme also stated a very real concern that the Authority did not meet its sole bid criterion, maximizing return for the sale of the Property:

> **[I]t would be unfortunate, in the future, if you left money on the table. And this is a little bit of the feeling that I have about this deal that we may have potentially left some money on the table as it would have benefited the Authority.**

Id.

96.     Based on WMATA's own admissions, WMATA has no internal rules, regulations, policies, or procedures relating to its disposition of this Property and/or that prohibit consideration of alternate or relative bids such as the Alternate Bid submitted by MR Ballpark 7. Alternatively, there are no rules, regulations, policies, or procedures from which bidders at large can discern any rational basis on which WMATA bid decisions are made when they pertain to the disposition of real property by WMATA, or that pertained to the disposition of this Property.

97.    Rather than: (a) notifying MR Ballpark 7 that its Alternate Bid was rejected or would not be considered; (b) modifying the bid process to achieve its stated objective of achieving the highest net return (along with inviting alternate bids from the limited universe of other bidders); or (c) reissuing the IFB to expressly prohibit alternate or relative bids, WMATA arbitrarily, irrationally, and unlawfully elected to simply disregard MR Ballpark's Alternate Bid, which would have provided a higher net return to WMATA and met its stated bid criterion.

98.    In so doing, WMATA relied on undisclosed evaluation criteria, and operated in a vacuum create by the absence of rules, regulations, policies, or procedures, rendering the bid process inherently unfair and illegal.    WMATA also disregarded its unpublished, internal procedures regarding the disposition of this Property.

99.    On September 27, 2007, WMATA's Board of Directors voted to award the contract for the sale of the WMATA Bus Garage to Akridge.

100.    Such action by WMATA is in violation of AWC's comprehensive development plan for the Ballpark District; the Master Development Plan developed by Monument and approved by AWC and the District of Columbia for the Half Street Area; the rights and interests agreed upon between and among AWC, the District of Columbia, WMATA and Monument that Monument would have the exclusive right to acquire and/or negotiate for the acquisition of the WMATA Property; and the agreement among WMATA, AWC, and Monument for the exclusive right to negotiate and acquire the Property – not to mention Monument's part performance, at considerable expense and effort, of its obligations under its agreement with WMATA.

101.    Moreover, such action by WMATA lacks any rational basis, is not supported by any rules or regulations propounded by WMATA or made available to the public, was taken based on undisclosed criteria and unstated evaluation factors, violates the WMATA Compact,

violates the WMATA PPM, violates WMATA's internal rules, and violates the Federal Transit Administration regulations governing the disposition of real property which require that the maximum value for the property be achieved. WMATA's action is arbitrary, capricious, and otherwise unlawful and invalid.

102.  On September 28, 2007, Monument filed another bid protest with WMATA asserting these claims and requesting reconsideration of the Board's action. (That bid protest referenced expressly an August 24, 2007 letter from Jeffrey T. Neal, a principal of Monument Realty, to John B. Catoe, Jr., WMATA's General Manager, sent prior to bid submission and protesting the disposition of the Property through the competitive sealed bid process because of Monument's prior and superior rights in the Property. A copy of the letter is attached as Exhibit K, and the response of WMATA's General Counsel to the letter is attached as Exhibit L.)

103.  On September 28, 2007, WMATA's Contracting Officer, Nat Bottigheimer, denied Monument's first bid protest. The denial stated that "this solicitation was not explicitly covered by WMATA's Procurement Procedures Manual," but nevertheless rejected Monument's concerns.

104.  On October 5, 2007, WMATA's Contracting Officer, Nat Bottigheimer denied Monument's second bid protest. In this denial, however, Mr. Bottigheimer contradicted his previous written statements, at some points stating that the PPM did apply to the disposal of the Property and at other times stating that it did not.

## COUNT ONE
### (Declaratory Judgment)

105.  Plaintiffs reallege and incorporate ¶¶ 1-104, inclusive, as if set forth fully herein.

106.  WMATA is the record owner of the Property.

107.  WMATA holds bare legal title to the Property.

108. Pursuant to agreements between WMATA and Plaintiffs as alleged herein, WMATA is obligated to convey legal title to the Property to Plaintiffs and/or to grant Plaintiffs the options and other rights as alleged in the alternative in this lawsuit.

109. WMATA has no unilateral right to decide to offer the Property for sale to others, to solicit bids from other parties, to contract to convey the Property to other parties, to convey legal title to the Property to other parties, to dispose of the Property in violation of Plaintiffs' rights and interests, or to otherwise disregard, interfere with, or ignore Plaintiffs' rights and interests.

110. WMATA's chosen course of action is otherwise unlawful in that WMATA chose to proceed with a bid process which, as set forth herein, was convened and conducted in violation of the applicable law and procedure; was convened and conducted in an arbitrary and capricious manner; was without a rational basis; was a clear and prejudicial violation of applicable statutes or regulations; and/or was otherwise illegal. WMATA's actions further violate the applicable law, including the Compact by which it was created, its own Procurement Procedures Manual, and Federal Transit Administration Regulations; and its actions are otherwise unauthorized, unlawful, and void.

111. An actionable and justiciable controversy exists between and among Plaintiffs and WMATA concerning the disposition of the Property; the parties' respective rights and interests in and to the Property; the construction, import, and application of various documents, contracts, communications, and agreements between the parties; the course of dealing between the parties; and the other matters described in this Complaint.

112.    This Court is authorized to resolve the underlying controversy and to determine the rights and legal relationships of the parties.  Declaratory relief is necessary to resolve the underlying issues and disputes and preserve the parties' respective rights.

113.    The adjudication of these issues and disputes will serve a useful purpose in clarifying the legal relations between the parties and terminate and afford relief from the uncertainty, insecurity, and controversy concerning the matters described in this Complaint.

WHEREFORE, Plaintiffs Monument and MR Ballpark 7 respectfully request that this Court enter judgment in their favor and against Defendant WMATA and to:

(a)    Determine the respective rights of the parties with respect to the Property;

(b)    Adjudicate and declare that WMATA is required to convey legal title to the Property to Plaintiffs and/or to grant Plaintiffs the options and other rights as alleged in the alternative in this lawsuit;

(c)    Adjudicate and declare that WMATA has no right to unilaterally decide to offer the Property for sale to others, to solicit bids from other parties, to contract to convey the Property to other parties, to convey legal title to the Property to other parties, to dispose of the Property in violation of Plaintiffs' rights and interests, or to otherwise disregard, interfere with, or ignore Plaintiffs' rights and interests;

(d)    Adjudicate and declare that the bid process pursued by WMATA with respect to the Property was convened and conducted in violation of the applicable law and procedure and is ineffective, null, and void; and

(e)    Award such other and further relief as justice may require.

**COUNT TWO**
**(Specific Performance)**

114.    Plaintiffs reallege and incorporate ¶¶ 1-113, inclusive, as if set forth fully herein.

115.    WMATA issued invitations for bid for the Property, solicited bids, and determined to award a purported contract right to purchase the Property to parties other than Plaintiffs.

116.    WMATA is obligated to convey legal title to the Property to Plaintiffs and/or to grant Plaintiffs the options and other rights as alleged in the alternative in this lawsuit.

117.    Plaintiffs' rights and interests in the Property arose and were created and vested in Plaintiffs prior to WMATA's decision to engage in a bid process that did not and could not, as a matter of law, have assumed priority over Plaintiffs' rights.

118.    Plaintiffs will suffer irreparable harm if WMATA continues to pursue a course of conduct to purport to dispose of the Property to other parties, in contravention of Plaintiffs' rights and interests.

119.    The Property is unique and there is no adequate remedy at law available to Plaintiffs with respect to their interests and rights in the Property.

120.    Plaintiffs are entitled to specific performance, to obtain legal title to the Property to Plaintiffs, and/or to obtain the options and other rights as alleged in the alternative in this lawsuit.

121.    Under the circumstances, WMATA is barred by estoppel, waiver, or otherwise from contesting Monument's right to specific performance in this lawsuit.

122.    To the extent that this Court does not find an express agreement as claimed by Monument, then under the circumstances, and as an alternative grounds for the relief sought herein, this Court should find the existence of an enforceable preliminary agreement, implied agreement, oral contract, or other enforceable obligation on the part of WMATA to Monument with respect to the disposition of the Property.

WHEREFORE, Plaintiffs Monument and MR Ballpark 7 respectfully ask this Court enter judgment in their favor and against Defendant Washington Metropolitan Area Transit Authority and to:

(a)    Enter an Order directing specific performance by WMATA of its obligation to convey title to the Property in fee simple absolute to Plaintiffs, and for WMATA to take all necessary and proper actions to effectuate such conveyance, including, but not limited to, execution and delivery of a deed of conveyance, in recordable form;

(b)    In the alternative, enter an Order directing specific performance by WMATA of its obligation to provide Plaintiffs with their options and other rights in the Property;

(c)    Enter an Order directing WMATA to cancel and terminate its bid process, in the entirety; and

(d)    Award such other and further relief as justice may require.

## COUNT THREE
### (Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction)

123.    Plaintiffs reallege and incorporate ¶¶ 1-122, inclusive, as if set forth fully herein.

124.    By virtue of the continuing actions of WMATA as set forth herein, Plaintiffs have suffered and will continue to suffer irreparable harm. In particular, the Property is unique and there is no adequate remedy at law available to Plaintiffs with respect to their interests and rights in the Property.

125.    Such irreparable harm will occur as a result of, among other things, the actions of WMATA in refusing to negotiate exclusively with Plaintiffs, in refusing to convey the Property to Plaintiffs, in attempting to dispose of the Property through an unlawful and illegitimate bid process, and in refusing to honor and recognize Plaintiffs' rights and interests in the Property.

126.    There is a substantial likelihood that the Plaintiffs will prevail on their claims in this lawsuit, the balance of the respective harm to WMATA from injunctive relief favors the Plaintiffs, and the public interest favors injunctive relief.

127.    Plaintiffs have no adequate remedy at law, due to the nature of the real property rights, interests, and claims involved in this case, and since the damages caused by WMATA are difficult or impossible to ascertain fully and, if WMATA continues its actions, further irreparable injury will result to the Plaintiffs.

WHEREFORE, Plaintiffs Monument and MR Ballpark 7 respectfully ask this Court enter judgment in their favor and against Defendant Washington Metropolitan Area Transit Authority and to:

(a)    Enter a temporary restraining order, preliminary injunction, and permanent injunction prohibiting WMATA from any further action to dispose of the Property in any way in contravention of Plaintiffs' rights, interests, and claims;

(b)    Enter a permanent injunction directing WMATA to comply with Plaintiffs' rights and interests;

(c)    Award Plaintiffs their attorneys' fees and costs of this action; and

(d)    Award such other and further relief as justice may require.

## COUNT FOUR
### (Breach of Contract)

128.    Plaintiffs reallege and incorporate ¶¶ 1-127, inclusive, as if set forth fully herein.

129.    Plaintiffs entered into an agreement, either express or implied, with WMATA, whereby WMATA agreed, among other things, that Plaintiffs would be the Master Developer for the Half Street Area of the Ballpark District, which included WMATA's property (including, specifically, the WMATA Bus Garage), that Plaintiffs would have the right to acquire various

adjacent, contiguous, and neighboring properties in the Half Street Area, and that Plaintiffs would acquire, have the right to acquire, and/or have the right to negotiate to acquire, legal title to the Property at a later date.

130.    Plaintiffs agreed to and did expend various efforts, undertake various activities and expenditures, and engage in various development efforts in and around the Ballpark District and Half Street Area in consideration of WMATA's agreements as set forth herein. Plaintiffs further granted additional benefits to WMATA, including easement and other rights and other actions taken for WMATA's direct benefit. In addition, Plaintiffs acquired legal title to various properties. Some of those properties were acquired from WMATA, and in the context of those transactions, WMATA asserted, among other things, that the conveyance of legal title to the Property could not occur immediately and needed to await WMATA's arrangement for an alternative location for the WMATA Bus Garage. Plaintiffs relied on these statements to their detriment.

131.    Plaintiffs performed their obligations, at considerable expense, in accordance with the terms of the parties' agreements, expectancies and understanding, and WMATA's express instructions. Plaintiffs awaited WMATA's and the District of Columbia's arrangement for an alternative location for the Property, following which WMATA has refused to recognize and honor Plaintiffs' rights and interests.

132.    Plaintiffs are entitled to the benefit of their bargain, which includes the right to obtain legal title to the Property and/or to obtain the options and other rights as alleged in the alternative in this lawsuit.

133.    WMATA's continued failure and refusal to convey legal title to the Property to Plaintiffs and/or to grant Plaintiffs the options and other rights as alleged in the alternative in this lawsuit is a material breach of the parties' agreement, and Monument has been damaged thereby.

134.    Plaintiffs have not obtained legal title to the Property or their other options and rights, which has resulted in injury and damages to Plaintiffs as a direct and proximate result of WMATA's breach of its contractual obligations.

135.    WMATA has failed and refused, without justification and despite demand therefore, to perform as it is obligated.

136.    WMATA's actions were calculated and not inadvertent, flagrant, with indifference to the consequences to Plaintiffs, committed as part of a proprietary function, and in disregard of obligations of trust.

137.    Under the circumstances, WMATA is barred by estoppel, waiver, or otherwise from disclaiming the existence of Monument's rights and interests as alleged in this lawsuit.

138.    To the extent that this Court does not find an express agreement as claimed by Monument, then under the circumstances, and as an alternative grounds for the relief sought herein, this Court should find the existence of an enforceable preliminary agreement, implied agreement, oral contract, or other enforceable obligation on the part of WMATA to Monument with respect to the disposition of the Property.  Alternatively, this Court should find that Monument is a third party beneficiary of an agreement between AWC or the District of Columbia and WMATA with respect to the Property or find that Monument has enforceable rights under the doctrine of after acquired title or otherwise.

WHEREFORE, Plaintiff Monument Realty respectfully asks this Court enter judgment in its favor and against Defendant Washington Metropolitan Area Transit Authority and to:

(a)     Award compensatory damages to Plaintiffs, in an amount to be proven at trial, but believed to be in excess of $100,000,000.00;

(b)     Determine the extent to which WMATA's material breach of contract relieves Plaintiffs, in whole or in part, of or from further performance of other obligations for WMATA including rescinding the initial Easement;

(c)     For specific performance; and

(d)     Award such other and further relief as justice may require.

## COUNT FIVE
### (Imposition of Constructive Trust)

139.    Plaintiffs reallege and incorporate ¶¶ 1-138, inclusive, as if set forth fully herein.

140.    WMATA holds bare legal title to the Property for the benefit of and in constructive trust for Plaintiffs.

141.    WMATA does not have the power unilaterally to decide to offer the Property for sale to others, to solicit bids from other parties, to contract to convey the Property to other parties, to convey legal title to the Property to other parties, to dispose of the Property in violation of Plaintiffs' rights, or to otherwise disregard, interfere with, or ignore Plaintiffs' rights and interests.

142.    Under the circumstances, Plaintiffs are entitled to an order directing WMATA to convey legal title to the Property to Plaintiffs, and/or to convey to Plaintiffs the options and other rights as alleged in the alternative in this lawsuit.

WHEREFORE, Plaintiffs Monument and MR Ballpark 7 respectfully ask this Court enter judgment in their favor and against Defendant Washington Metropolitan Area Transit Authority and to:

(a)     Enter an Order directing that WMATA holds legal title and/or any other interests it holds in the Property in constructive trust for the benefit of Plaintiffs;

(b)     Enter an Order providing that Plaintiffs are entitled to an order directing WMATA to convey legal title to the Property to Plaintiffs, and/or to convey to Plaintiffs the options and other rights as alleged in the alternative in this lawsuit; and

(c)     Award such other and further relief as justice may require.

### COUNT SIX
### (Breach of Fiduciary Duty)

143.    Plaintiffs reallege and incorporate ¶¶ 1-142, inclusive, as if set forth fully herein.

144.    WMATA and Plaintiffs established a relationship of trust during their course of dealings.

145.    In furtherance of that relationship of trust, WMATA, at all relevant times, owed a fiduciary duty to the Plaintiffs to, among other things, act in good faith and in the best interests of Plaintiffs, to engage in open and fair dealing with Plaintiffs, and to act with the utmost candor and disclosure, loyalty, and due care.

146.    WMATA's actions, as alleged herein, constitute a breach of fiduciary duty.

147.    WMATA's actions were committed as part of a proprietary function and were willful, in bad faith, resulted in material damage to Plaintiffs, and materially adversely affected and continue to affect the past, present, and future interests of the Plaintiffs.

148.    Plaintiffs have sustained damages as a direct and proximate result of WMATA's breach of fiduciary duty in an amount to be proven at trial, plus the reasonable attorneys' fees and costs incurred by Plaintiffs in this lawsuit.

WHEREFORE, Plaintiffs Monument and MR Ballpark 7 respectfully ask this Court enter judgment in their favor and against Defendant Washington Metropolitan Area Transit Authority and to:

(a)    Award compensatory damages to Plaintiffs, in an amount to be proven at trial, but believed to be in excess of $100,000,000.00; and

(b)    Award such other and further relief as justice may require.

## COUNT SEVEN
### (Fraud)

149.    Plaintiffs reallege and incorporate ¶¶ 1-148, inclusive, as if set forth fully herein.

150.    WMATA actively sought and obtained the services of Plaintiffs, the benefit of Plaintiffs' labors, Plaintiffs' expenditures, and other valuable and significant benefits from Plaintiffs by making various intentional misrepresentations and/or omissions to Plaintiffs.

151.    In doing so, WMATA, by and through its authorized agents acting within the scope of their authority and as part of a WMATA proprietary function, failed, when they had a duty to do so, to advise or otherwise inform Monument that Monument would not be and was not currently entitled to the exclusive right to negotiate with WMATA and/or AWC for acquisition of the Property.  WMATA undertook such a course of conduct knowing that Monument was laboring and expending considerable time, effort, energy, and expense on the understanding and agreements it and all other persons involved in the planning process for the Half Street Area had that it had the sole, exclusive right to negotiate with WMATA and/or AWC for the right to acquire the Property.

152.    For example, on December 12, 2005, AWC issued a press release and held a major news conference with the District of Columbia, announcing the selection of Monument as a Master Developer and indicating that the Monument team had been given the exclusive right to

negotiate for and acquire property within the Half Street Area, including property owned by WMATA. At that time, the Master Development Plan as well as the inclusion within that Plan of the WMATA properties in Square 700 and 701 were discussed. WMATA was aware of AWC's actions in that regard, as well as the fact that AWC's actions included the disposition of, among other things, real estate owned by WMATA. WMATA did not object to the statements made by AWC and participated openly and fully in this process.

153. During the negotiations leading up to the Navy Yard Metro Site acquisition, Monument expressed that it was ready, willing, and able to move forward with an acquisition that would include the WMATA Bus Garage. WMATA personnel, including WMATA Managing Director of Property Development and Management Gary Malasky, indicated to Monument that the WMATA Bus Garage acquisition would have to be delayed because, at the time, WMATA had not yet identified an alternative location for the functions it was performing there.

154. Also, with full knowledge of these understandings and agreements, on December 1, 2006, WMATA signed an Easement Agreement closing alleyways between Van and Half Streets so that it could access its Bus Garage, knowing that Monument believed it had an agreement to acquire and negotiate for the parcel of land directly benefited by that Easement Agreement. WMATA had a duty to speak at the time Monument was encumbering these properties and failed to do so to Monument's detriment.

155. In connection with this Easement Agreement, on January 11, 2007, Monument testified before the District of Columbia Zoning Commission in connection with its efforts to accommodate WMATA's employee parking requirements in Square 700. In Zoning Commission Case Number 06-46, Monument asked for and obtained, at its own expense, a zoning variance with respect to the Capitol Gateway Overlay Zoning Ordinance. WMATA was

aware of and asked Monument to pursue this application. At the hearing, Monument's testified that had an exclusive right to negotiate for the properties owned by WMATA, including for the WMATA Bus Garage. WMATA was aware of this application and testimony, which was made at a public hearing and was a matter of public record. No one from WMATA ever responded or objected in any way, or indicated that the testimony was inaccurate.

156.    In January 2007, WMATA and Monument held a groundbreaking ceremony for the Navy Yard Metro Station improvements, which was attended by many prominent local leaders, including the Mayor and WMATA officials. Jeffrey T. Neal, a principal of Monument Realty, specifically addressed Monument's plans with respect to the reminder of the Half Street Area. WMATA did not object.

157.    Monument undertook substantial efforts to prevent the Bus Garage from being designated a historic building by the Office of Historic Preservation. These efforts inured to WMATA's benefit and would not have been undertaken but for the promises and agreements made to and with Monument for the right to negotiate for and acquire the Property. WMATA had a duty to speak at the time as well and failed to do so.

158.    In addition to and as part of the foregoing, WMATA engaged in material misrepresentations by entering into agreements with Plaintiffs when WMATA had no present intention to perform its obligations with respect to the Property. WMATA did not disclose to Plaintiffs that it had no such intention, and instead indicated to Plaintiffs, by words, actions, or omissions, that it did intend to stand behind and comply with its obligations.

159.    At or about the time of making the foregoing representations, and as a result of these representations, WMATA knowingly obtained and accepted the benefit of services rendered, time and expense incurred, rights conferred, and funds advanced, by the Plaintiffs.

160.   Plaintiffs incurred time and expense, provided services, conferred rights, and advanced funds in reliance upon those representations.

161.   The foregoing representations were false and constituted actionable misrepresentations, and WMATA was acting only to further its own economic interests, profit, and other proprietary functions.

162.   WMATA did not inform Plaintiffs any time prior to at least August 31, 2007 that any of its representations were false, incomplete, and/or misleading.

163.   The foregoing misrepresentations and omissions were made intentionally and knowingly.   The misrepresentations and omissions made by WMATA were done with knowledge of their falsity.   In the alternative, to the extent that the foregoing misrepresentations and omissions were not intentional, WMATA is subject to liability for constructive fraud and/or negligent misrepresentation in making these misrepresentations and omissions.

164.   The foregoing misrepresentations and omissions were material, since, based on those misrepresentations and omissions, Plaintiffs took actions that they would not otherwise have taken, including, but not limited to, providing assistance, rendering services, incurring time and expense, and advancing funds to and for the benefit of WMATA.

165.   The foregoing misrepresentations and omissions were intended by WMATA to induce reliance on the part of the Plaintiffs including, among other things, to induce Plaintiffs to take actions that they would not otherwise have taken, to incur time and expense they would not have incurred, to advance and expend funds they would not have advanced and expended, and to provide services that they would not otherwise have provided.

166.   The foregoing misrepresentations and omissions did induce reliance on the part of Plaintiffs.   Therefore, as a direct result of the foregoing misrepresentations and omissions,

Plaintiffs took actions and provided substantial and valuable services that they would not otherwise have provided.

167.    The reliance on the part of Plaintiffs upon the foregoing misrepresentations and omissions was reasonable and/or justifiable under the circumstances.

168.    Plaintiffs sustained serious damages as a result of their reliance upon the foregoing misrepresentations and omissions, in an amount to be proven at trial, plus the reasonable attorneys' fees and costs incurred by Plaintiffs in this lawsuit.

WHEREFORE, Plaintiffs Monument and MR Ballpark 7 respectfully ask this Court enter judgment in their favor and against Defendant Washington Metropolitan Area Transit Authority and to:

(a)    Award compensatory damages to Plaintiffs, in an amount to be proven at trial, but believed to be in excess of $100,000,000.00; and

(b)    Award such other and further relief as justice may require.

## COUNT EIGHT
### (WMATA Breached its Compact by Failing to Formulate Policies, Procedures, Rules or Regulations Governing the Disposition of its Real Property)

169.    Plaintiffs reallege and incorporate ¶¶ 1-168, inclusive, as if set forth fully herein.

170.    WMATA's Compact requires that it adopt policies and procedures governing contracting and procurement relating to its real property. D.C. Code Ann. § 9-1107.01, sec. 73(g) ("The Board shall adopt policies and procedures to implement this Section"). The PPM at Section 1500.3 states that all agreements pertaining to the purchase, lease, or sale of real property are deemed procurement transactions. Thus, D.C. Code Ann. § 9-1107.01 requires that WMATA have a policy relating thereto.

171.    WMATA has stated publicly, in response to a bid protest filed by MR Ballpark 7 and in open session to the Board of Directors of WMATA that its PPM does not apply to the

disposition of this Property, and that WMATA did not "explicitly" follow the PPM in connection with the solicitation at issue. The absence of such a policy was expressly recognized by WMATA Principal Director Moneme on September 27, 2007. Exh. E, at p. 73.

172.    Therefore, there are no WMATA policies governing the disposition of the Property, and there are no WMATA rules or regulations governing the disposition of the Property.

173.    Therefore, WMATA has breached the provisions of its own Compact that require it to adopt policies and procedures governing the contracting for disposition of its real property.

174.    Moreover, it is fairly implied from the WMATA Compact that the intent of the Compact was to make such policies and procedures generally known and available to the public to ensure fairness in dealing with third parties when WMATA is engaged in contracting and procurement.

175.    By acting in the absence of any policies, procedures, rules and regulations governing the disposition of its Property and in soliciting bids and awarding the contract for the sale of the WMATA Bus Garage to Akridge, WMATA breached its Compact.

176.    By acting in the absence of any policies, procedures, rules and regulations governing the disposition of its Property and in soliciting bids and awarding a contract for the sale of the WMATA Bus Garage to Akridge, WMATA acted irrationally, and arbitrarily and capriciously with respect to other bidders, including MR Ballpark 7.

177.    By failing to make known any policies, procedures, rules or regulations to the public governing the disposition of its Property and in soliciting bids and awarding the contract for the sale of the WMATA Bus Garage to Akridge in the absence of such stated and published

rules, regulations, policies and procedures, WMATA acted irrationally, and arbitrarily and capriciously with respect to other bidders, including MR Ballpark 7.

178.    MR Ballpark 7 and Monument have been damaged by WMATA's actions in this regard in that MR Ballpark was not named the successful bidder on IFB No. 08-1, the valuation of Monument's other Ballpark District properties has been diminished significantly, Monument and its affiliated entities have entered into proffers and agreements with WMATA based on the agreement that Monument would be entitled to acquire and/or negotiate to acquire the WMATA Bus Garage site from WMATA, which has now been denied them; and Monument has been damaged in other ways which shall be proven at trial.

WHEREFORE, Plaintiffs Monument and MR Ballpark 7 respectfully ask this Court enter judgment in their favor and against Defendant Washington Metropolitan Area Transit Authority and to:

(a)    Vacate the award with respect to IFB No. 08-1 made on September 27, 2007;

(b)    Enjoin WMATA from entering into any contract with any party arising out of IFB No. 08-1;

(c)    Remand this matter to WMATA for further disposition in accordance with procedures and policies to be adopted and published by WMATA governing disposition of its real property;

(d)    Require that the Property be the subject of another bidding process initiated and conducted in accordance with said procedures and policies as promulgated and followed by WMATA; and

(e)    Award such other and further relief as justice may require.

## ALTERNATIVE COUNT NINE
**(WMATA'S Decision To Award the Contract for the Purchase of its WMATA Bus Garage
Violated its Own Procurement Procedures Manual or Other Unpublished Internal
Procedures, Was Not Rational, Was Arbitrary And Capricious, An Abuse Of Discretion,
And/Or Not In Accordance With Law)**

179.     Plaintiffs reallege and incorporate ¶¶ 1-178, inclusive, as if set forth fully herein.

180.     In the Alternative, in the event WMATA asserts or this Court determines that the PPM applies to govern the disposition of WMATA's real property, WMATA has violated the plain language and requirements of that PPM, and therefore its own policies and procedures in material ways.

181.     Section 12(d) of the WMATA Compact gives WMATA authority to sell its real property.

182.     Section 73(h) of Compact requires that the Board "shall adopt policies and procedures to implement this section [of the Compact]." The section is entitled " Contracting and Purchasing" and deals specifically with a "procurement of property" (73(a)(1)), and "contracting" (73(f)(1)). See Exh. C.

183.     Chapter 15 of WMATA's Procurement Procedures Manual, entitled "Special Agreements," states that "This Chapter provides regulations and policy required for the effective administration of special agreements including but not limited [to]:  contracts for the purchase, lease or sale of real property . . . between the Authority and other entities that are not covered by other chapters of this Manual." Exh. D, § 1500.1.

184.     The PPM at Section 1500.3 states that "[A]ll special [Agreements] covered by this Chapter shall be treated as procurement transactions." Exh. D, at § 1500.3.

185.    Section 1503 of the PPM is entitled "Real Property Disposal," and cites Article 12(d) of the Compact authorizing WMATA to dispose of its real property.  Exh. D, at § 1503.1.

186.    Therefore, on its face and by its plain language, PPM Chapter 1503 applies to the disposition of the Property.

187.    The PPM at Section 1503.3 states that an action to dispose of any interest in real property "will not be initiated until the real property interest to be disposed of has been certified for disposition in accordance with the existing Authority policy."  Exh. D, at § 1503.3.

188.    Disposal of real property, if it was acquired by federal grant, must comply with 49 CFR Part 18 with respect to its disposition.  Exh. D, at § 1503.4.

189.    An action to dispose of any "fee interest . . . will not be initiated until the real property has been screened throughout the Authority and the jurisdictions and the General Manager determines the property is excess and authorizes disposition in accordance with an approved disposal plan." Exh. D, at § 1503.5.

190.    Disposition of real property requires either Federal Transit Administration approval or notification, depending upon how the property was acquired.  Exh. D, at § 1503.6.

191.    WMATA has asserted that the PPM does not apply to this solicitation and that this solicitation was not "explicitly" covered by WMATA's Procurement Procedures Manual. WMATA's General Manager, John B. Catoe, Jr., represented to the Board of Directors at the September 27, 2007 Board meeting that the PPM did not apply.  See Exh. E.

192.    Therefore, upon information and belief, WMATA did not follow or may not have followed some or all of the PPM procedures outlined above, including but not limited to: (a) adopting a policy with respect to the disposition of this Property; (b) certifying that the disposition of the Property is in accordance with existing Authority policy prior to initiating the

disposition; (c) obtaining, prior to initiating the sale of the Property, a General Manager's certification that the Property is excess and authorizing its disposal pursuant to an approved disposal plan; and (d) obtaining approval of, or notifying, the Federal Transit Administration. The sale of the Property under these circumstances, conducted without following the applicable procedures, violates WMATA's own internal rules and regulations governing how real property assets are to be disposed.

193.    Moreover, the Invitation for Bids section of the PPM (Chapter 5) and other sections of the PPM require that WMATA maximize its return for the property, by selling it to the highest bidder.

194.    WMATA failed to do so.

195.    Section 15 of the PPM requires that WMATA comply with 49 CFR Part 18 promulgated by the Secretary of Transportation to "obtain the highest possible economic return under competitive participation…" Exh. D, at § 1503.4.

196.    WMATA failed to do so in conducting the bid process pursuant to IFB No. 08-1, and this flaw was expressly recognized at the open session September 27, 2007 Board of Directors meeting, when it was discussed that an auction process would have been an appropriate method for achieving the results required by the bid.

197.    Finally, WMATA's Office of Property Development and Management, upon information and belief, promulgated procedures known only to it and WMATA regarding the disposition of its real property. Such procedures were, upon information and belief, not followed by WMATA, and may be in violation of WMATA's Compact, as well as being in violation of Monument's Due Process rights.

198.    WMATA's actions in this regard are arbitrary, capricious, irrational, and without basis in law.

199.    Plaintiffs have been damaged by WMATA's conduct in this regard by not being the awarded a contract for the Property and in other ways.

WHEREFORE, Plaintiff MR Ballpark 7 respectfully asks this Court enter judgment in its favor and against Defendant Washington Metropolitan Area Transit Authority and to:

(a)    Vacate the award with respect to IFB No. 08-1 made on September 27, 2007;

(b)    Enjoin WMATA from entering into any contract with any party arising out of IFB No. 08-1;

(c)    Remand this matter to WMATA for further disposition in accordance with procedures and policies to be adopted and published by WMATA governing its disposition of real property;

(d)    Require that the Property be the subject of another bidding process initiated and conducted in accordance with said procedures and policies as promulgated and followed by WMATA; and

(e)    Award such other and further relief as justice may require.

**COUNT TEN**
**(WMATA Acted Irrationally In Concluding That the Akridge Bid**
**Offered The Highest Possible Economic Return,**
**And the Award to Akridge Is Illegal)**

200.    Plaintiff MR Ballpark 7 realleges and incorporates ¶¶ 1-199, inclusive, as if set forth fully herein.

201.    Pursuant to Section 1503.4 of WMATA's Procurement Procedures Manual, and consistent with the terms of IFB No. 08-1, WMATA is required to "obtain the highest possible economic return" in disposing of the Property.

202.    IFB No. 08-1 asked bidders to offer a purchase price for the Property and a monthly rent to lease the Property back to WMATA for a period of thirty-six months. Therefore, evaluating which bid offered the "highest possible economic return" required WMATA to consider both the purchase price as well as the leaseback costs.

203.    IFB No. 08-1, in the section entitled "General Terms Of Sale And Leaseback," states:  "the Successful Bidder *shall* lease the Property back to WMATA for a period of thirty-six (36) months at the rental rate specified in the Bid Form." (emphasis added).

204.    MR Ballpark 7 submitted a bid that offered to purchase the Property from WMATA for a purchase price of $60,000,000, and to lease the Property back to WMATA at no charge for the entire lease term.  MR Ballpark 7's bid, accordingly, offers WMATA a total economic return after leaseback of $60,000,000.

205.    Akridge submitted a bid that offered to purchase the Property from WMATA for a purchase price of $69,250,000, but also proposed to charge WMATA total leaseback rent of $11,640,000.  Akridge's bid, accordingly, offers WMATA a total economic return after leaseback of $57,610,000.

206.    MR Ballpark 7's bid offered WMATA an overall economic return from the total transaction – sale and 36-month leaseback – that is $2,390,000 higher than the overall economic return offered by Akridge. MR Ballpark 7's bid offers WMATA a substantially higher economic return than the Akridge Bid.

207.    Any conclusion by WMATA that the Akridge Bid is economically more advantageous than MR Ballpark 7's bid is contrary to fact and irrational, and WMATA acted illegally by awarding the contract to Akridge under the circumstances.

WHEREFORE, Plaintiff MR Ballpark 7 respectfully asks this Court enter judgment in its favor and against Defendant Washington Metropolitan Area Transit Authority by:

(a)     vacating WMATA's award to Akridge under IFB No. 08-1;

(b)     declaring the Akridge Bid to be non-responsive and invalid;

(c)     declaring that, among the bids received, the minimum bid of MR Ballpark 7 yields WMATA the highest return considering both the purchase price and the leaseback terms;

(d)     ordering that the Property be awarded to the bidder submitting the highest responsive bid consistent with IFB No. 08-1 and WMATA's published policies and procedures concerning the disposition of real property, namely MR Ballpark 7, pursuant to its minimum bid;

(e)     remanding this matter to WMATA for further proceedings consistent with this Court's decision; and

(f)     awarding such other and further relief as justice may require.

## COUNT ELEVEN
### (WMATA Acted Illegally In Accepting the Akridge Bid Because The Bid Was "Conditionally Submitted")

208.     Plaintiff MR Ballpark 7 realleges and incorporates ¶¶ 1-207, inclusive, as if set forth fully herein.

209.     Akridge submitted a bid to WMATA in response to IFB No. 08-1 that, by its express terms, was "submitted conditionally as set forth" in a separate letter to WMATA.

210.     Under established principles of law applicable to sealed bidding, a bid must transmit an unequivocal and clear offer to perform the exact item or service called for in the IFB.

211.     Under established principles of law applicable to sealed bidding, a bid must be self-contained; a bid that is not complete in itself and without reference to anything else is not a bona fide valid bid.

212.    Under established principles of law applicable to sealed bidding, WMATA was required to reject any bid where the bidder attempts to impose conditions that materially modify the terms and conditions of the IFB.

213.    Akridge's "conditionally" submitted bid: (i) is not an unequivocal and clear offer to perform, (ii) is not a self-contained bid; and/or (iii) attempts to impose conditions that materially modify the terms and conditions of IFB No. 08-1.  For each of these independent reasons, the Akridge Bid is non-responsive and invalid.

214.    In failing to reject and in accepting Akridge's improper "conditionally submitted" bid, and in failing to reject and in accepting Akridge's improper "conditionally submitted" bid when rejecting or not considering MR Ballpark 7's alternate bid WMATA acted arbitrarily, capriciously and illegally and in violation of IFB No. 08-1.

215.    WMATA's illegal and improper actions have injured MR Ballpark 7 by depriving it of a fair bidding process, depriving it of contract award, and in other ways.

WHEREFORE, Plaintiff MR Ballpark 7 respectfully asks this Court enter judgment in its favor and against Defendant Washington Metropolitan Area Transit Authority by:

(a)    vacating WMATA's award to Akridge under IFB No. 08-1;

(b)    declaring the Akridge Bid to be non-responsive and invalid;

(c)    declaring that, among the bids received, the minimum bid of MR Ballpark 7 yields WMATA the highest return considering both the purchase price and the leaseback terms;

(d)    ordering that the Property be awarded to the bidder submitting the highest responsive bid consistent with IFB No. 08-1 and WMATA's published policies and procedures concerning the disposition of real property, namely MR Ballpark 7, pursuant to its Minimum Bid;

(e)      remanding this matter to WMATA for further proceedings consistent with this Court's decision; and

(f)      awarding such other and further relief as justice may require.

## COUNT TWELVE
### (WMATA Acted Illegally In Accepting the Akridge Bid Because The Bid Offered Terms Other Than Those Sought By the IFB)

216.    Plaintiff MR Ballpark 7 realleges and incorporates ¶¶ 1-215, inclusive, as if set forth fully herein.

217.    Akridge submitted a bid to WMATA in response to IFB No. 08-1 that offered to "immediately commence negotiations with WMATA" to provide WMATA with "a temporary site for locating assets presently located on the Property."

218.    IFB No. 08-1 did not invite or ask bidders to propose any such "temporary site" for WMATA assets located on the Property; instead, the IFB asked bidders to offer a purchase price and a rate to lease the Property back to WMATA for 36 months.

219.    By offering to provide such a temporary site in lieu of or in addition to the leaseback specification called out in the IFB, Akridge sought to materially change the terms of the IFB and gain an unfair advantage over other bidders. Akridge's tactic in offering to provide WMATA a "temporary site" that is outside the scope of the IFB and WMATA's advertised needs is fundamentally unfair and contrary to established principles of law applicable to sealed bidding.

220.    By accepting the Akridge Bid, including the "temporary site" provision, and, upon information and belief, conditions outside the IFB, WMATA violated a cardinal rule that the contract awarded to a successful bidder must be the contract offered to all bidders.

221.    In addition, the "temporary site" provision and other conditions interposed by Akridge renders the Akridge Bid fatally ambiguous because it precludes a comparison of the pricing and overall value offered by Akridge with respect to the pricing and overall value offered by other bidders, including MR Ballpark 7.

222.    In failing to reject and in accepting Akridge's bid, including its offer of a "temporary site," and, upon information and belief, other conditions, WMATA acted arbitrarily, capriciously and illegally.

223.    WMATA's illegal and improper actions have injured MR Ballpark 7 by depriving it of a fair bidding process, depriving it of contract award, and in other ways.

WHEREFORE, Plaintiff MR Ballpark 7 respectfully asks this Court enter judgment in its favor and against Defendant Washington Metropolitan Area Transit Authority by:

(a)    vacating WMATA's award to Akridge under IFB No. 08-1;

(b)    declaring the Akridge Bid to be non-responsive and invalid;

(c)    declaring that, among the bids received, the minimum bid of MR Ballpark 7 yields WMATA the highest return considering both the purchase price and the leaseback terms;

(d)    ordering that the Property be awarded to the bidder submitting the highest responsive bid consistent with IFB No. 08-1 and WMATA's published policies and procedures concerning the disposition of real property, namely MR Ballpark 7, pursuant to its Minimum Bid;

(e)    remanding this matter to WMATA for further proceedings consistent with this Court's decision; and

(f)    awarding such other and further relief as justice may require.

Dated:  October 26, 2007                    Respectfully submitted,

                                            NIXON PEABODY, LLP

                                            Louis E. Dolan, Jr. (#442881)
                                            Vernon W. Johnson, III (#423756)
                                            401 9th Street, N.W.
                                            Washington, D.C. 20001
                                            202.585.8000
                                            202.585.8080 (fax)
                                            ldolan@nixonpeabody.com
                                            vjohnson@nixonpeabody.com

                                            Counsel for Plaintiffs

## JURY DEMAND

Plaintiffs respectfully demand a jury trial on all claims so triable herein.

Dated:  October 26, 2007                    Respectfully submitted,

                                            NIXON PEABODY, LLP

                                            Louis E. Dolan, Jr. (#442881)
                                            Vernon W. Johnson, III (#423756)
                                            401 9th Street, N.W.
                                            Washington, D.C. 20001
                                            202.585.8000
                                            202.585.8080 (fax)
                                            ldolan@nixonpeabody.com
                                            vjohnson@nixonpeabody.com

                                            Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on this 26th day of October, 2007, a true and correct copy of the foregoing First Amended Complaint, with appended Exhibits "A" through "L" was served by hand delivery upon the following:

> Harvey A. Levin, Esquire
> Thompson Coburn LLP
> 1909 K Street, Suite 600
> Washington, D.C. 20006-1167

> Counsel for Defendant

Louis E. Dolan, Jr.

# Exhibit "A"



AREA MAP
BALLPARK DISTRICT

# Exhibit "B"





Adapted from map located at: www.jdland.com/dc

# Exhibit "C"



**Search**

**M** Washington Metropolitan Area Transit Authority

**ALERTS:** ☑ **Navy Yard: Trains will share the same tr**          All Advisories

Home
Maps & stations
Schedules & fares
Alerts & advisories
Accessibility
How to travel
About Metro
• Metro at a glance
• News
• Events
• Renewal &
expansion
• Careers
• Public access to
records
• Business
opportunities
• Employer fare
programs
• Metro gifts
• Contact us
Board of Directors
General Manager
Outreach
Metro calendar

About Metro     Metro at a glance

Metro facts
Manageme
Metro Polic
Art in static

# Washington Metropolitan Area Transit Authority Compact



TABLE OF CONTENTS
FOREWORD

TITLE III

ARTICLE I
1. Definitions

ARTICLE II - PURPOSE AND FUNCTIONS
2. Purpose

ARTICLE III - ORGANIZATION AND AREA
3. Washington Metropolitan Area Transit Zone
4. Washington Metropolitan Area Transit Authority
5. Board Membership
6. Compensation of Directors and Alternates
7. Organization and Procedure
8. Quorum and Actions by the Board
9. Officers
10. Conflict of Interest

ARTICLE IV - PLEDGE OF COOPERATION
11. Pledge of Cooperation

ARTICLE V - GENERAL POWERS
12. Enumeration

ARTICLE VI - PLANNING
13. Mass Transit Plan
14. Planning Process
15. Adoption of Mass Transit Plan

ARTICLE VII - FINANCING
16. Policy
17. Plan of Financing
18. Commitments for Financial Participation
19. Administrative Expenses
20. Acquisition of Facilities From Federal or Other Agencies
21. Temporary Borrowing
22. Funding

ARTICLE VIII - BUDGET
23. Capital Budget
24. Current Expense Budget
25. Adoption and Distribution of Budgets

Ads by Google

Washingto
Jobs
Land Your
Today. Sea
Job Listings
www.wizmall.c

Tax Free B
Search for
maturity & o
Hanauer &
bondsearch12:

Elgin bond
Financial pl
investment
Manageme
dexonline.com.

Offer Trans
The benefit
employees
day. Get sta
2435
www.TransitCe

Governme
Learn Abou
Bonds. Exp
Invest Toda
AllBond.org

Advertise o

26. Payments.

**ARTICLE IX - REVENUE BONDS**
27. Borrowing Power
28. Funds and Expenses
29. Credit Excluded; Officers, State, Political Subdivisions and Agencies
30. Funding and Refunding
31. Bonds: Authorization Generally
32. Bonds: Resolutions and Indentures Generally
33. Maximum Maturity
34. Tax Exemption
35. Interest
36. Place of Payment
37. Execution
38. Holding Own Bonds
39. Sale
40. Negotiability
41. Bonds Eligible for Investment and Deposit
42. Validation Proceedings
43. Recording
44. Pledged Revenues
45. Remedies

**ARTICLE X - EQUIPMENT TRUST CERTIFICATES**
46. Power
47. Payments
48. Procedure
49. Agreement and Leases
50. Law Governing

**ARTICLE XI - OPERATION OF FACILITIES**
52. The Operating Contract
53. Compensation for Contractor
54. Selection of Contractor

**ARTICLE XII - COORDINATION OF PRIVATE AND PUBLIC FACILITIES**
55. Declaration of Policy
56. Implementation of Policy
57. Rights of Private Carriers Unaffected
58. Financial Assistance to Private Carriers

**ARTICLE XIII - JURISDICTION: RATES AND SERVICES**
59. Washington Metropolitan Area Transit Commission
60. Public Facilities
61. Standards
62. Hearings
63. Reference of Matters to WMATC

**ARTICLE XIV - LABOR POLICY**
64. Construction
65. Equipment and Supplies
66. Operations

**ARTICLE XV - RELOCATION ASSISTANCE**
67. Relocation Program and Payments

68. Relocation of Public or Public Utility Facilities

**ARTICLE XVI - GENERAL PROVISIONS**
69. Creation and Administration of Funds
70. Annual Independent Audit
71. Reports
72. Insurance
73. Contracting and Purchasing
74. Rights of Way
75. Compliance with Laws, Regulations and Ordinances
76. Police
77. Exemption from Regulation
78. Tax Exemption
79. Reduced Fares
80. Liability for Contracts and Torts
81. Jurisdiction of Courts
82. Condemnation
83. Enlargement and Withdrawal;Duration
84. Amendments and Supplements
85. Construction and Severability
86. Effective Date; Execution

**CONSENT LEGISLATION**

**NOTES**

### FOREWORD

The Washington Metropolitan Area Transit Authority, created effective February 20, 1967, is an interstate compact agency and, by the terms of its enabling legislation, is an agency and instrumentality of the District of Columbia, State of Maryland, and Commonwealth of Virginia. This agency was created by the aforenoted states and the District of Columbia to plan, finance, construct and operate a comprehensive mass transit system for the Washington Metropolitan Area. "Washington Metropolitan Area Transit Authority Compact," Pub. L. No. 89-774, 80 Stat. 1324 (1966); as amended by "National Capital Transportation Act of 1972," Pub. L. No. 92-349, 86 Stat. 464 (1972); "National Capital Area Transit Act of 1972," Pub. L. No. 92-517, 86 Stat. 999 (1972); "Metro Transit Police Act of 1976," Pub. L. No. 94-306, 90 Stat.672 (1976); "Washington Metropolitan Area Transit Regulation Compact Amendments," Pub. L. No. 100-285, 102 Stat. 82 (1988); "Washington Metropolitan Area Transit Regulation Compact," Pub. L. No. 104-322, 110 Stat. 3884 (1996) and Washington Metropolitan Area Transit Regulation Compact Amendment, Pub. L. No. 105-151, 111 Stat. 2686 (1997).

Unless otherwise stated all citations are to the "Washington Metropolitan Area Transit Authority Compact." Amendments thereto are identified. Citations thereto may be found in the notes. The notes also contain the Compact language prior to amendment.

WHEREAS, the Commonwealth of Virginia (Ch. 627, 1958 Acts of Assembly). the State of Maryland (Ch. 613, Acts of General Assembly, 1959), and the Commissioners of the District of Columbia (Resolution of the Board of Commissioners December 22, 1960) have heretofore entered into and executed the Washington Metropolitan Area Transit Regulation Compact on December 22, 1960, as amended March 29, 1963; and

WHEREAS, the Congress of the United States has enacted legislation (Public Law 774,

Metro - Metro Compact

80 Stat. 1324), whereby it has (1) given its consent to the State of Maryland and the Commonwealth of Virginia to effectuate an amendment to said Compact by adding thereto a Title III (known as the Washington Metropolitan Area Transit Authority Compact), and (2) adopted and enacted the said amendment for the District of Columbia; and

WHEREAS, the State of Maryland (Ch. 869, Acts of General Assembly 1965), and the Commonwealth of Virginia (Ch. 2, 1966 Acts of Assembly) and the Commissioners of the District of Columbia (Resolution of the Board of Commissioners adopted on November 15, 1966) have adopted said amendment to the Compact:

NOW, THEREFORE, the District of Columbia and the States of Maryland and Virginia, hereinafter referred to as signatories, do hereby amend the Washington Metropolitan Area Transit Regulation Compact by the following addendum thereto, and do thereby covenant and agree as follows:

# TITLE III

# ARTICLE I

### 1. Definitions.

As used in this Title, the following words and terms, shall have the following meanings, unless the context clearly requires a different meaning:

(a) "Board" means the Board of Directors of the Washington Metropolitan Area Transit Authority;

(b) "Director" means a member of the Board of Directors of the Washington Metropolitan Area Transit Authority;

(c) "Private transit companies" and "private carriers" means corporations, persons, firms or associations rendering transit service within the Zone pursuant to a certificate of public convenience and necessity issued by the Washington Metropolitan Area Transit Commission or by a franchise granted by the United States or any signatory party to this Title;

(d) "Signatory" means the State of Maryland, the Commonwealth of Virginia and the District of Columbia;

(e) "State" includes District of Columbia;

(f) "Transit facilities" means all real and personal property located in the Zone, necessary or useful in rendering transit service between points within the Zone, by means of rail, bus, water or air and any other mode of travel, including without limitation, tracks, rights of way, bridges, tunnels, subways, rolling stock for rail, motor vehicle, marine and air transportation, stations, terminals and ports, areas for parking and all equipment, fixtures, building and structures and services incidental to or required in connection with the performance of transit service;

(g) "Transit services" means the transportation of persons and their packages and baggage by means of transit facilities between points within the Zone including the transportation of newspapers, express and mail between such points, and charter service which originates within the Zone but does not include taxicab service or individual-ticket-sales sightseeing operations;[1]

(h) "Transit zone" or "Zone" means the Washington Metropolitan Area Transit Zone

created by and described in section 3, as well as any additional area that may be added pursuant to section 83(a):[2]

(i) "WMATC" means Washington Metropolitan Area Transit Commission.

# ARTICLE II - PURPOSE AND FUNCTIONS

### 2. Purpose.

The purpose of this Title is to create a regional instrumentality, as a common agency of each signatory party, empowered, in the manner hereinafter set forth, (1) to plan, develop, finance and cause to be operated improved transit facilities, in coordination with transportation and general development planning for the Zone, as part of a balanced regional system of transportation, utilizing to their best advantage the various modes of transportation, (2) to coordinate the operation of the public and privately owned or controlled transit facilities, to the fullest extent practicable, into a unified regional transit system without unnecessary duplicating service, and (3) to serve such other regional purposes and to perform such other regional functions as the signatories may authorize by appropriate legislation.

# ARTICLE III - ORGANIZATION AND AREA

### 3. Washington Metropolitan Area Transit Zone.[3]

There is hereby created the Washington Metropolitan Area Transit Zone which shall embrace the District of Columbia, the cities of Alexandria, Falls Church and Fairfax and the counties of Arlington, Fairfax, and Loudoun and political subdivisions of the Commonwealth of Virginia located within those counties, and the counties of Montgomery and Prince George's in the State of Maryland and political subdivisions of the State of Maryland located in said counties.

### 4. Washington Metropolitan Area Transit Authority.

There is hereby created, as an instrumentality and agency of each of the signatory parties hereto, the Washington Metropolitan Area Transit Authority which shall be a body corporate and politic, and which shall have the powers and duties granted herein and such additional powers as may hereafter be conferred upon it pursuant to law.

### 5. Board Membership.

(a) The Authority shall be governed by a Board of six Directors consisting of two Directors for each signatory. For Virginia, the Directors shall be appointed by the Northern Virginia Transportation Commission; for the District of Columbia, by the Council of the District of Columbia; and for Maryland, by the Washington Suburban Transit Commission. For Virginia and Maryland, the Directors shall be appointed from among the members of the appointing body, except as otherwise provided herein, and shall serve for a term coincident with their term on the appointing body. A Director may be removed or suspended from office only as provided by the law of the signatory from which he was appointed. The appointing authorities shall also appoint an alternate for each Director, who may act only in the absence of the Director for whom he has been appointed an alternate, except that, in the case of the District of Columbia where only one Director and his alternate are present, such alternate may act on behalf of the absent Director. Each alternate shall serve at the pleasure of the appointing authority. In the event of a vacancy in the Office of Director or alternate, it shall be filled in the

same manner as an original appointment.[4]

(b) Before entering upon the duties of his office each Director and alternate director shall take and subscribe to the following oath (or affirmation) of office or any such other oath or affirmation, if any, as the Constitution or laws of the signatory he represents shall provide:

"I, , hereby solemnly swear (or affirm) that I will support and defend the Constitution of the United States and the Constitution and Laws of the state or political jurisdiction from which I was appointed as a director (alternate director) of the Board of Washington Metropolitan Area Transit Authority and will faithfully discharge the duties of the office upon which I am about to enter."

### 6. Compensation of Directors and Alternates.

Members of the Board and alternates shall serve without compensation but may be reimbursed for necessary expenses incurred as an incident to the performance of their duties.

### 7. Organization and Procedure.

The Board shall provide for its own organization and procedure. It shall organize annually by the election of a Chairman and Vice-Chairman from among its members. Meetings of the Board shall be held as frequently as the Board deems that the proper performance of its duties requires and the Board shall keep minutes of its meetings. The Board shall adopt rules and regulations governing its meeting, minutes and transactions.

### 8. Quorum and Actions by the Board.

(a) Four Directors or alternates consisting of at least one Director or alternate appointed from each Signatory, shall constitute a quorum and no action by the Board shall be effective unless a majority of the Board present and voting, which majority shall include at least one Director or alternate from each Signatory, concur therein; provided, however, that a plan of financing may be adopted or a mass transit plan adopted, altered, revised or amended by the unanimous vote of the Directors representing any two Signatories.[5]

(b) The actions of the Board shall be expressed by motion or resolution. Actions dealing solely with internal management of the Authority shall become effective when directed by the Board, but no other action shall become effective prior to the expiration of thirty days following its adoption; provided, however that the Board may provide for the acceleration of any action upon a finding that such acceleration is required for the proper and timely performance of its functions.

### 9. Officers.

(a) The officers of the Authority, none of whom shall be members of the Board, shall consist of a general manager, a secretary, a treasurer, a comptroller and a general counsel and such other officers as the Board may provide. Except for the office of general manager and comptroller, the Board may consolidate any of such other offices in one person. All such officers shall be appointed and may be removed by the Board, shall serve at the pleasure of the Board and shall perform such duties and functions as the Board shall specify. The Board shall fix and determine the compensation to be paid to all officers and, except for the general manager who shall be a full-time employee, all other officers may be hired on a full-time or part-time basis and may be compensated on a salary or fee basis, as the Board may determine. All employees and such officers

as the Board may designate shall be appointed and removed by the general manager under such rules of procedure and standards as the Board may determine.

(b) The general manager shall be the chief administrative officer of the Authority and, subject to policy direction by the Board, shall be responsible for all activities of the Authority.

(c) The treasurer shall be the custodian of the funds of the Authority, shall keep an account of all receipts and disbursements and shall make payments only upon warrants duly and regularly signed by the Chairman or Vice-Chairman of the Board, or other person authorized by the Board to do so, and by the secretary or general manager; provided, however, that the Board may provide that warrants not exceeding such amounts or for such purposes as may from time to time be specified by the Board may be signed by the general manager or by persons designated by him.

(d) An oath of office in the form set out in Section 5 (b) of this Article shall be taken, subscribed and filed with the Board by all appointed officers.

(e) Each Director, officer and employees specified by the Board shall give such bond in such form and amount as the Board may require, the premium for which shall be paid by the Authority.

**10. Conflict of Interest.**

(a) No Director, officer or employee shall:

(1) be financially interested, either directly or indirectly, in any contract, sale, purchase, lease or transfer of real or personal property to which the Board or the Authority is a party;

(2) in connection with services performed within the scope of his official duties, solicit or accept money or any other thing of value in addition to the compensation or expenses paid to him by the Authority;

(3) offer money or any thing of value for or in consideration of obtaining an appointment, promotion or privilege in his employment with the Authority.

(b) Any Director, officer or employee who shall willfully violate any provisions of this section shall, in the discretion of the Board, forfeit his office or employment.

(c) Any contract or agreement made in contravention of this section may be declared void by the Board.

(d) Nothing in this section shall be considered to abrogate or limit the applicability of any federal or state law which may be violated by any action prescribed by this section.

# ARTICLE IV- PLEDGE OF COOPERATION

**11. Pledge of Cooperation.**

Each Signatory pledges to each other faithful cooperation in the achievement of the purposes and objects of this Title.

# ARTICLE V - GENERAL POWERS

**12. Enumeration.**

In addition to the powers and duties elsewhere described in this Title, and except as limited in this Title, the Authority may:

(a) Sue and be sued;

(b) Adopt and use a corporate seal and alter the same at pleasure;

(c) Adopt, amend, and repeal rules and regulations respecting the exercise of the powers conferred by this Title;

(d) Construct, acquire, own, operate, maintain, control, sell and convey real and personal property and any interest therein by contract, purchase, condemnation, lease, license, mortgage or otherwise but all of said property shall be located in the Zone and shall be necessary or useful in rendering transit service or in activities incidental thereto;

(e) Receive and accept such payments, appropriations, grants, gifts, loans, advances and other funds, properties and services as may be transferred or made available to it by any signatory party, any political subdivision or agency thereof, by the United States, or by any agency thereof, or by any other public or private corporation or individual, and enter into agreements to make reimbursement for all or any part thereof;

(f) Enter into and perform contracts, leases and agreements with any person, firm or corporation or with any political subdivision or agency of any signatory party or with the federal government, or any agency thereof, including, but not limited to, contracts or agreements to furnish transit facilities and service;

(g) Create and abolish offices, employments and positions (other than those specifically provided for herein) as it deems necessary for the purposes of the Authority, and fix and provide for the qualification, appointment, removal, term, tenure, compensation, pension and retirement rights of officers and employees without regard to the laws of any of the signatories;

(h) Establish, in its discretion, a personnel system based on merit and fitness and, subject to eligibility, participate in the pension and retirement plans of any signatory, or political subdivision or agency thereof, upon terms and conditions mutually acceptable;

(i) Contract for or employ any professional services;

(j) Control and regulate the use of facilities owned or controlled by the Authority, the service to be rendered and the fares and charges to be made therefor;

(k) Hold public hearings and conduct investigations relating to any matter affecting transportation in the Zone with which the Authority is concerned and, in connection therewith, subpoena witnesses, papers, records and documents; or delegate such authority to any officer. Each director may administer oaths or affirmations in any proceeding or investigation;

(l) Make or participate in studies of all phases and forms of transportation, including transportation vehicle research and development techniques and methods for determining traffic projections, demand motivations, and fiscal research and publicize and make available the results of such studies and other information relating to transportation; and

(m) Exercise, subject to the limitations and restrictions herein imposed, all powers reasonably necessary or essential to the declared objects and purposes of this Title.

Metro - Metro Compact

# ARTICLE VI- PLANNING

**13. Mass Transit Plan.**

(a) The Board shall develop and adopt, and may from time to time review and revise, a mass transit plan for the immediate and long-range needs of the Zone. The mass transit plan shall include one or more plans designating (1) the transit facilities to be provided by the Authority, including the locations of terminals, stations, platforms, parking facilities and the character and nature thereof; (2) the design and location of such facilities; (3) whether such facilities are to be constructed or acquired by lease, purchase, or condemnation; (4) a timetable for the provision of such facilities; (5) the anticipated capital costs; (6) estimated operating expenses and revenues relating thereto; and (7) the various other factors and considerations, which, in the opinion of the Board, justify and require the projects therein proposed. Such plan shall specify the type of equipment to be utilized, the areas to be served, the routes and schedules of service expected to be provided and the probable fares and charges therefor.

(b) In preparing the mass transit plan, and in any review of revision thereof, the Board shall make full utilization of all data, studies, reports and information available from the National Capital Transportation Agency and from any other agencies of the federal government, and from signatories and the political subdivisions thereof.

**14. Planning Process.**

(a) The mass transit plan, and any revisions, alterations or amendments thereof, shall be coordinated, through the procedures set forth, with

(1) other plans and programs affecting transportation in the Zone in order to achieve a balanced system of transportation, utilizing each mode to its best advantage;

(2) the general plan or plans for the development of the Zone; and

(3) the development plans of the various political subdivisions embraced within the Zone.

(b) It shall be the duty and responsibility of each member of the Board to serve as liaison between the Board and the body which appointed him to the Board. To provide a framework for regional participation in the planning process, the Board shall create technical committees concerned with planning and collection and analyses of data relative to decision-making in the transportation planning process and the Mayor and Council of the District of Columbia, the component governments of the Northern Virginia Transportation District and the Washington Suburban Transit District shall appoint representatives to such technical committees and otherwise cooperate with the Board in the formulation of a mass transit plan, or in revisions, alterations or amendments thereof.[6]

(c) The Board, in the preparation, revision, alteration or amendment of a mass transit plan, shall

(1) consider data with respect to current and prospective conditions in the Zone, including, without limitation, land use, population, economic factors affecting development plans, goals or objectives for the development of the Zone and the separate political subdivisions, transit demands to be generated by such development, travel patterns, existing and proposed transportation and transit facilities, impact of transit plans on the dislocation of families and businesses, preservation of the beauty

and dignity of the Nation's Capital, factors affecting environmental amenities and aesthetics and financial resources;

(2) cooperate with and participate in any continuous, comprehensive transportation planning process cooperatively established by the highway agencies of the signatories and the local political subdivisions in the Zone to meet the planning standards now or hereafter prescribed by the Federal-Aid Highway Acts; and

(3) to the extent not inconsistent with or duplicative of the planning process specified in subparagraph (2) of this paragraph (c), cooperate with the National Capital Planning Commission, the National Capital Regional Planning Council, the Washington Metropolitan Council of Governments, the Washington Metropolitan Area Transit Commission, the highway agencies of the Signatories, the Maryland-National Capital Park and Planning Commission, the Northern Virginia Regional Planning and Economic Development Commission, the Maryland State Planning Department and the Commission of Fine Arts. Such cooperation shall include the creation, as necessary, of technical committees composed of personnel, appointed by such agencies, concerned with planning and collection and analysis of data relative to decision-making in the transportation planning process.

**15. Adoption of Mass Transit Plan.**

(a) Before a mass transit plan is adopted, altered, revised or amended, the Board shall transmit such proposed plan, alteration, revision or amendment for comment to the following and to such other agencies as the Board shall determine:

(1) The Mayor and Council of the District of Columbia, the Northern Virginia Transportation Commission and the Washington Suburban Transit Commission;[7]

(2) the governing bodies of the Counties and Cities embraced within the Zone;

(3) the transportation agencies of the signatories;[8]

(4) the Washington Metropolitan Area Transit Commission;

(5) the Washington Metropolitan Council of Governments;

(6) the National Capital Planning Commission;

(7) the National Capital Regional Planning Council;

(8) the Maryland-National Capital Park and Planning Commission;

(9) the Northern Virginia Regional Planning and Economic Development Commission;

(10) the Maryland State Planning Department; and

(11) the private transit companies operating in the Zone and the Labor Unions representing the employees of such companies and employees of contractors providing services under operating contracts.

(b) A copy of the proposed mass transit plan, amendment or revision, shall be kept at the office of the Board and shall be available for public inspection. Information with respect thereto shall be released to the public. After thirty days' notice published once a week for two successive weeks in one or more newspapers of general circulation within the zone, a public hearing shall be held with respect to the proposed plan, alteration, revision or amendment. The thirty days' notice shall begin to run on the first day the notice appears in any such newspaper. The Board shall consider the evidence

submitted and statements and comments made at such meeting and may make any changes in the proposed plan, amendment or revision which it deems appropriate and such changes may be made without further hearing.[9]

# ARTICLE VII - FINANCING

### 16. Policy.

With due regard for the policy of Congress for financing a mass transit plan for the Zone set forth in Section 204(g) of the National Capital Transportation Act of 1960 (74 Stat. 537), it is hereby declared to be the policy of this Title that, as far as possible, the payment of all costs shall be borne by the persons using or benefiting from the Authority's facilities and services and any remaining costs shall be equitably shared among the federal, District of Columbia and participating local governments in the Zone. The allocation among such governments of such remaining costs shall be determined by agreement among them and shall be provided in the manner hereinafter specified.

### 17. Plan of Financing.

(a) The Authority, in conformance with said policy, shall prepare and adopt a plan for financing the construction, acquisition, and operation of facilities specified in a mass transit plan adopted pursuant to Article VI hereof, or in any alteration, revision or amendment thereof. Such plan of financing shall specify the facilities to be constructed or acquired, the cost thereof, the principal amount of revenue bonds, equipment trust certificates, and other evidences of debt proposed to be issued, the principal terms and provisions of all loans and underlying agreements and indentures, estimated operating expenses and revenues, and the proposed allocation among the federal, District of Columbia, and participating local governments of the remaining costs and deficits, if any, and such other information as the Commission may consider appropriate.

(b) Such a plan of financing shall constitute a proposal to the interested governments for financial participation and shall not impose any obligation on any government and such obligations shall be created only as provided in section 18 of this Article VII.

### 18. Commitments for Financial Participation.

(a) Commitments on behalf of the portion of the Zone located in Virginia shall be by contract or agreement by the Authority with the Northern Virginia Transportation District, or its component governments, as authorized in the Transportation District Act of 1964 (Ch. 631, 1964 Acts of Virginia Assembly), to contribute to the capital required for the construction and/or acquisition of facilities specified in a mass transit plan adopted as provided in Article VI, or any alteration, revision or amendment thereof, and for meeting expenses and obligations in the operation of such facilities. No such contract or agreement, however, shall be entered into by the Authority with the Northern Virginia Transportation District unless said District has entered into the contracts or agreements with its member governments, as contemplated by Section 1 (b)(4) of Article 4 of said Act, which contracts or agreements shall inure to the benefit of the Authority and shall be enforceable by the Authority in accordance with the provisions of Section 2, Article 5 of said Act, and such contracts or agreements are acceptable to the Board. The General Assembly of Virginia hereby authorizes and designates the Authority as the agency to plan and provide transit facilities and agency to plan for and provide transit facilities and services for the area of Virginia

encompassed within the Zone within the encompassed within the Zone within the contemplation of Article 1, Section 3(c) of said Act.

(b) Commitments on behalf of the portion of the Zone located in Maryland shall be by contract or agreement by the Authority with the Washington Suburban Transit District, pursuant to which the Authority undertakes to provide transit facilities and service in consideration for the agreement by said District to contribute to the capital required for the construction and/or acquisition of facilities specified in a mass transit plan adopted as provided in Article VI, or in any alteration, revision or amendment thereof, and for meeting expenses and obligations incurred in the operation of such facilities.

(c) With respect to the District of Columbia and the federal government, the commitment or obligation to render financial assistance shall be created by appropriation or in such other manner, or by such other legislation, as the Congress shall determine. If prior to making such commitment by or on behalf of the District of Columbia, legislation is enacted by the Congress granting the governing body of the District of Columbia plenary power to create obligations and levy taxes, the commitment by the District of Columbia shall be by contract or agreement between the governing body of the District of Columbia and the Authority, pursuant to which the Authority undertakes, subject to the provisions of Section 20 hereof, to provide transit facilities and service in consideration for the undertaking by the District of Columbia to contribute to the capital required for the construction and/or acquisition of facilities specified in a mass transit plan adopted as provided in Article VI, or in any alteration, revision or amendment thereof, and for meeting expenses and obligations incurred in the operation of such facilities.

**19. Administrative Expenses.**

Prior to time the Authority has receipts from appropriations and contracts or agreements as provided in Section 18 of this Article VII, the expenses of the Authority for administration and for preparation of a mass transit and financing plan, including all engineering, financial, legal and other services required in connection therewith, shall, to the extent funds for such expenses are not provided through grants by the federal government, be borne by the District of Columbia, by the Washington Suburban Transit District and the component governments of the Northern Virginia Transportation District. Such expenses shall be allocated among such governments on the basis of population as reflected by the latest available population statistics of the Bureau of the Census; provided, however, that upon the request of any Director the Board shall make the allocation upon estimates of population acceptable to the Board. The allocations shall be made by the Board and shall be included in the annual current expense budget prepared by the Board.

**20. Acquisition of Facilities From Federal or Other Agencies.**

(a) The Authority is authorized to acquire by purchase, lease or grant or in any manner other than condemnation, from the federal government, or any agency thereof, from the District of Columbia, Maryland or Virginia, or any political subdivision or agency thereof, any transit and related facilities, including real and personal property and all other assets, located within the Zone, whether in operation or under construction. Such acquisition shall be made upon such terms and conditions as may be agreed upon and subject to such authorization or approval by the Congress and the governing body of the District of Columbia, as may be required; provided, however, that if such acquisition imposes or may impose any further or additional obligation or liability upon the Washington Suburban Transit District, the Northern Virginia Transportation District, or any component government thereof, under any contract with the Authority, the Authority

shall not make such acquisition until any such affected contract has been appropriately amended.

(b) For such purpose, the Authority is authorized to assume all liabilities and contracts relating thereto, to assume responsibility as primary obligor, endorser or guarantor on any outstanding revenue bonds, equipment trust certificates or other form of indebtedness authorized in this Act issued by such predecessor agency or agencies, and in connection therewith, to become a party to, and assume the obligations of, any indenture or loan agreement underlying or issued in connection with any outstanding securities or debts.

### 21. Temporary Borrowing.[10]

The Board may borrow, in anticipation of receipts, from any signatory, the Washington Suburban Transit District, the Northern Virginia Transportation District, or any component government thereof, or from any lending institution for any purposes of this Title, including administrative expenses. Such loans shall be for a term not to exceed two years and such rates of interest as shall be acceptable to the Board. The signatories and any such political subdivision or agency may, in its discretion, make such loans from any available money.

### 22. Funding.

The Board shall not construct or acquire any of the transit facilities specified in a mass transit plan adopted pursuant to the provisions of Article VI of this Title, or in any alteration, revision or amendment thereof, nor make any commitments or incur any obligations with respect thereto until funds are available therefor.

## ARTICLE VIII - BUDGET

### 23. Capital Budget.

The Board shall annually adopt a capital budget, inducing all capital projects it proposes to undertake or continue during the budget period, containing a statement of the estimated cost of each project and the method of financing thereof.

### 24. Current Expense Budget.

The Board shall annually adopt a current expense budget for each fiscal year. Such budget shall include the Board's estimates expenditures for administration, operation, maintenance and repairs, debt service requirements and payments to be made into any funds required to be maintained. The total of such expenses shall be balanced by the Board's estimated revenues and receipts from all sources, excluding funds included in the capital budget or otherwise earmarked for other purposes.

### 25. Adoption and Distribution of Budgets.

(a) Following the adoption by the Board of annual capital and current expense budgets, the general manager shall transmit certified copies of such budget to the principal budget officer of the federal government, the District of Columbia, the Washington Suburban Transit District, and of the component governments of the Northern Virginia Transportation Commission at such time and in such manner as may be required under their respective budgetary procedures.

(b) Each budget shall indicate the amounts, if any, required from the federal

government, the Government of the District of Columbia, the Washington Suburban Transit District and the component governments of the Northern Virginia Transportation District, determined in accordance with the commitments made pursuant to Article VII, Section 18 of this Title, to balance each of said budgets.

### 26. Payments.

Subject to such review and approval as may be required by their budgetary or other applicable processes, the federal government, the Government of the District of Columbia, the Washington Suburban Transit District, and the component governments of the Northern Virginia Transportation District shall include their respective budgets next to be adopted and appropriate or otherwise provide the amounts certified to each of them as set forth in the budgets.

# ARTICLE IX - REVENUE BONDS

### 27. Borrowing Power.

The Authority may borrow money for any of the purposes of this Title, may issue its negotiable bonds and other evidences of indebtedness in respect thereto and may mortgage or pledge its properties, revenues, and contracts as security therefor.

All such bonds and evidences of indebtedness shall be payable solely out of the properties of revenues of the Authority. The bonds and other obligations of the Authority, except as may be otherwise provided in the indenture under which they were issued, shall be direct and general obligations of the Authority and the full faith and credit of the Authority are hereby pledged for the prompt payment of the debt service thereon and for the fulfillment of all other undertakings of the Authority assumed by it to or for the benefit of the holders thereof.

### 28. Funds and Expenses.

The purposes of this Title shall include, without limitation, all costs of any project or facility or any part thereof, including interest during a period of construction and for a period not to exceed two years thereafter and any incidental expenses (legal, engineering, fiscal, financial, consultant and other expenses) connected with issuing and disposing of the bonds; all amounts required for the creation of an operating fund, construction fund, reserve fund, sinking fund, or other special fund; all other expenses connected with administration, the planning, design, acquisition, construction, completion, improvement or reconstruction of any facility or any part thereof; and reimbursement of advances by the Board or by others for such purposes and for working capital.

### 29. Credit Excluded; Officers, State, Political Subdivisions and Agencies.

The Board shall have no power to pledge the credit of any signatory party, political subdivision or agency thereof, or to impose any obligation for payment of the bonds upon any signatory party, political subdivision or agency thereof, but may pledge the contracts of such governments and agencies; provided, however, that the bonds may be underwritten in whole or in part as to principal and interest by the United States, or by any political subdivision or agency of any signatory; provided, further, that any bonds underwritten in whole or in part as to the principal and interest by the United Sates shall not be issued without approval of the Secretary of the Treasury. Neither the Directors nor any person executing the bonds shall be liable personally on the bonds of the

Authority or be subject to any personal liability or accountability by reason of the issuance thereof.

### 30. Funding and Refunding.

Whenever the Board deems it expedient, it may fund and refund the bonds and other obligations of the Authority whether or not such bonds and obligations have matured. It may provide for the issuance, sale or exchange of refunding bonds for the purpose of redeeming or retiring any bonds (including the payment of any premium, duplicate interest or cash adjustment required in connection therewith) issued by the Authority or issued by any other issuing body, the proceeds of the sale of which have been applied to any facility acquired by the Authority or which are payable out of the revenues of any facility acquired by the Authority. Bonds may be issued partly to refund bonds and other obligations then outstanding, and partly for any other purpose of the Authority. All provisions of this Title applicable to the issuance of bonds are applicable to refunding bonds and to the issuance, sale or exchange thereof.

### 31. Bonds; Authorization Generally.

Bonds and other indebtedness of the Authority shall be authorized by resolution of the Board. The validity of the authorization and issuance of any bonds by the Authority shall not be dependent upon nor affected in any way by: (1) the disposition of bond proceeds by the Board or by contract, commitment or action taken with respect to such proceeds; or (ii) the failure to complete any part of the project for which bonds are authorized to be issued. The Authority may issue bonds in one or more series and may provide for one or more consolidated bond issues, in such principal amounts and with such terms and provisions as the Board may deem necessary. The bonds may be secured by a pledge of all or any part of the property, revenues and franchises under its control. Bonds may be issued by the Authority in such amount, with such maturities and in such denominations and form or forms, whether coupon or registered, as to principal alone or as to both principal and interest, as may be determined by the Board. The Board may provide for redemption of bonds prior to maturity on such notice and at such time or times and with such redemption provisions, including premiums, as the Board may determine.

### 32. Bonds; Resolutions and Indentures Generally.

The Board may determine and enter into indentures or adopt resolutions providing for the principal amount, date or dates, maturities, interest rate, or rates, denominations, form, registration, transfer, interchange and other provisions of the bonds and coupons and the terms and conditions upon which the same shall be executed, issued, secured, sold, paid, redeemed, funded and refunded. The resolution of the Board authorizing any bond or any indenture so authorized under which the bonds are issued may include all such covenants and other provisions not inconsistent with the provisions of this Title, other than any restriction on the regulatory powers vested in the Board by this Title, as the Board may deem necessary or desirable for the issue, payment, security, protection, or marketing of the bonds, including without limitation covenants and other provisions as to the rates or amounts of fees, rents, and other charges to be charged or made for the use of the facilities; the use, pledge, custody, securing, application and disposition of such revenues, of the proceeds of the bonds, and of any other moneys or contracts of the Authority; the operation, maintenance, repair and reconstruction of the facilities and the amounts which may be expended therefor; the sale, lease or other disposition of the facilities; the insuring of the facilities and of the revenues derived therefrom; the construction or other acquisition of other facilities; the issuance of additional bonds or other indebtedness; the rights of the bondholders and of any trustee

for the bondholders upon default by the Authority or otherwise; and the modification of the provisions of the indenture and of the bonds. Reference on the face of the bonds to such resolution or indenture by its date of adoption or the apparent date on the face thereof is sufficient to incorporate all of the provisions thereof and of this Title into the body of the bonds and their appurtenant coupons. Each taker and subsequent holder of the bonds or coupons, whether the coupons are attached to or detached from the bonds, has recourse to all of the provisions of the indenture and of this Title and is bound thereby.

### 33. Maximum Maturity.

No bond or its terms shall mature in more than fifty years from its own date and in the event any authorized issue is divided into two or more series or divisions, the maximum maturity date herein authorized shall be calculated from the date on the face of each bond separately, irrespective of the fact that different dates may be prescribed for the bonds of each separate series or division of any authorized issue.

### 34. Tax Exemption.

All bonds and all other evidences of debt issued by the Authority under the provisions of this Title and the interest thereon shall at all times be free and exempt from all taxation by or under authority of any signatory parties, except for transfer, inheritance and estate taxes.

### 35. Interest.

Bonds shall bear interest at such rate or rates as may be determined by the Board, payable annually or semi-annually.

### 36. Place of Payment.

The Board may provide for the payment of the principal and interest of bonds at any place or places within or without the signatory states, and in any specified lawful coin or currency of the United States of America.

### 37. Execution.

The Board may provide for the execution and authentication of bonds by the manual, lithographed or printed facsimile signature of members of the Board, and by additional authentication by a trustee or fiscal agent appointed by the Board; provided, however, that one of such signatures shall be manual. If any of the members whose signatures or countersignatures appear upon the bonds or coupons cease to be members before the delivery of the bonds or coupons, their signatures or countersignatures are nevertheless valid and of the same force and effect as if the members had remained in office until the delivery of bonds and coupons.

### 38. Holding Own Bonds.

The Board shall have power out of any funds available therefor to purchase its bonds and may hold, cancel or resell such bonds.

### 39. Sale.[12]

The Board may fix terms and conditions for the sale or other disposition of any authorized issue of bonds. The Board may sell bonds at less than their par or face value but no issue of bonds may be sold at an aggregate price below the par or face value thereof if such sale would result in a net interest cost to the Authority calculated

upon the entire issue so sold in excess of the applicable rate determined by the Board, payable semiannually, computed with relation to the absolute maturity of the bonds according to standard tables of bond values, deducting the amount of any premiums to be paid on the redemption of any bonds prior to maturity. All bonds issued and sold pursuant to this Title may be sold in such manner, either at public or private sale, as the Board shall determine.

### 40. Negotiability.

All bonds issued under the provision of this Title are negotiable instruments.

### 41. Bonds Eligible for Investment and Deposit.

Bonds issued under the provisions of this Title are hereby made securities in which all public officers and public agencies of the signatories and their political subdivisions and all banks, trust companies, savings and loan associations, investment companies and others carrying on a banking business, all insurance companies and insurance associations and others carrying on an insurance business, all administrators, executors, guardians, trustees and other fiduciaries, and all other persons may legally and properly invest funds, including capital in their control or belonging to them. Such bonds are hereby made securities which may properly and legally be deposited with and received by any officer of any signatory, or of any agency or political subdivision of any signatory for any purpose for which the deposit of bonds or other obligations of such signatory is now or may hereafter be authorized by law.

### 42. Validation Proceedings.

Prior to the issuance of any bonds, the Board may institute a special proceedings to determine the legality of proceedings to issue the bonds and their validity under the laws of any of the signatory parties. Such proceeding shall be instituted and prosecuted in rem and the final judgment rendered therein shall be conclusive against all persons whomsoever and against each of the signatory parties.

### 43. Recording.

No indenture need be recorded or filed in any public office, other than the office of the Board. The pledge of revenues provided in any indenture shall take effect forthwith as provided therein and irrespective of the date of receipt of such revenues by the Board of the indenture trustee. Such pledge shall be effective as provided in the indenture without physical delivery of the revenues to the Board or to the indenture trustee.

### 44. Pledged Revenues.

Bond redemption and interest payments shall, to the extent provided in the resolution or indenture, constitute a first, direct and exclusive charge and lien on all revenues received from the use and operation of the facility, and on any sinking or other funds created therefrom. All such revenues, together with interest thereon, shall constitute a trust fund for the security and payment of such bonds and except as and to the extent provided in the indenture with respect to the payment therefrom of expenses for other purposes including administration, operation, maintenance, improvements or extensions of the facilities or other purposes shall not be used or pledged for any other purpose so long as such bonds, or any of them, are outstanding and unpaid.

### 45. Remedies.

The holder of any bond may for the equal benefit and protection of all holders of bonds similarly situated: (1) by mandamus or other appropriate proceedings require and

compel the performance of any of the duties imposed upon the Board or assumed by it, its officers, agents or employees under the provisions of any indenture, in connection with the acquisition, construction, operation, maintenance, repair, reconstruction or insurance of the facilities, or in connection with the collection, deposit, investment, application and disbursement of the revenues derived from the operation and use of the facilities, or in connection with the deposit, investment and disbursement of the proceeds received from the sale of bonds; or (2) by action or suit in a court of competent jurisdiction of any signatory party require the Authority to account as if it were the trustees of an express trust, or enjoin any acts or things which may be unlawful or in violation of the rights of the holder of the bonds. The enumeration of such rights and remedies does not, however, exclude the exercise or prosecution of any other rights or remedies available to the holders of bonds.

# ARTICLE X - EQUIPMENT TRUST CERTIFICATES

### 46. Power.

The Board shall have power to execute agreements, leases and equipment trust certificates with respect to the purchase of facilities or equipment such as cars, trolley buses and motor buses, or other craft, in the form customarily used in such cases and appropriate to effect such purchase, and may dispose of such equipment trust certificates in such a manner as it may determine to be for the best interests of the Authority. Each vehicle covered by an equipment trust certificate shall have the name of the owner or lessor plainly marked upon both sides thereof, followed by the words "Owner and Lessor".

### 47. Payments.

All monies required to be paid by the Authority under the provisions of such agreements, leases and equipment trust certificates shall be payable solely from the revenue to be derived from the operation of the transit system or from such grants, loans, appropriations or other revenues, as may be available to the Board under the provisions of this Title. Payment for such facilities or equipment, or rental thereof, may be made in installments, and the deferred installments may be evidenced by equipment trust certificates as aforesaid, and title to such facilities or equipment may not vest in the Authority until the equipment trust certificates are paid.

### 48. Procedure.

The agreement to purchase facilities or equipment by the Board may direct the vendor to sell and assign the equipment to a bank or trust company, duly authorized to transact business in any of the signatory States, or to the Housing and Home Finance Administrator, as trustee, lessor or vendor, for the benefit and security of the equipment trust certificates and may direct the trustee to deliver the facilities and equipment to one or more designated officers of the Board and may authorize the trustee simultaneously therewith to execute and deliver a lease of the facilities or equipment to the Board.

### 49. Agreement and Leases.

The agreements and leases shall be duly acknowledged before some person authorized by law to take acknowledgments of deeds and in the form required for acknowledgement of deeds and such agreements, leases, and equipment trust certificates shall be authorized by resolution of the Board and shall contain such

covenants, conditions and provisions as may be deemed necessary or appropriate to insure the payment of the equipment trust certificates from the revenues to be derived from the operation of the transit system and other funds.

The covenants, conditions and provisions of the agreements, leases and equipment trust certificates shall not conflict with any of the provisions of any resolution or trust agreement securing the payment of bonds or other obligations of the Authority then outstanding or conflict with or be in derogation of the rights of the holders of any such bonds or other obligations.

**50. Law Governing.**

The equipment trust certificates issued hereunder shall be governed by Laws of the District of Columbia and for this purpose the chief place of business of the Authority shall be considered to be the District of Columbia. The filing of any documents required or permitted to be filed shall be governed by the Laws of the District of Columbia.

# ARTICLE XI - OPERATION OF FACILITIES

**51. Operation by Contract or Lease.**[13]

Any facilities and properties owned or controlled by the Authority may be operated by the Authority directly or by others pursuant to contract or lease as the Board may determine.

**52. The Operating Contract.**

Without limitation upon the right of the Board to prescribe such additional terms and provisions as it may deem necessary and appropriate, the operating contract shall:

(a) specify the services and functions to be performed by the Contractor;

(b) provide that the Contractor shall hire, supervise and control all personnel required to perform the services and functions assumed by it under the operating contract and that all such personnel shall be employees of the Contractor and not of the Authority;

(c) require the Contractor to assume the obligations of the labor contract or contracts of any transit company which may be acquired by the Authority and assume the pension obligations of any such transit company;

(d) require the Contractor to comply in all respects with the labor policy set forth in Article XIV of this Title;

(e) provide that no transfer of ownership of the capital stock, securities or interests in any Contractor, whose principal business is the operating contract, shall be made without written approval of the Board and the certificates or other instruments representing such stock, securities or interests shall contain a statement of this restriction;

(f) provide that the Board shall have the sole authority to determine the rates or fares to be charged, the routes to be operated and the service to be furnished;

(g) specify the obligations and liabilities which are to be assumed by the Contractor and those which are to be the responsibility of the Authority;

(h) provide for an annual audit of the books and accounts of the Contractor by an

independent certified public accountant to be selected by the Board and for such other audits, examinations and investigations of the books and records, procedures and affairs of the Contractor at such times and in such manner as the Board shall require, the costs of such audits, examinations and investigations to be borne as agreed by the parties in the operating contract; and

(i) provide that no operating contract shall be entered into for a term in excess of five years; provided, that any such contract may be renewed for successive terms, each of which shall not exceed five years. Any such operating contract shall be subject to termination by the Board for cause only.

### 53. Compensation for Contractor.

Compensation to the Contractor under the operating contract may, in the discretion of the Board, be in the form of (1) a fee paid by the Board to the Contractor for services, (2) a payment by the Contractor to the Board for the right to operate the system, or (3) such other arrangements as the Board may prescribe; provided, however, that the compensation shall bear a reasonable relationship to the benefits to the Authority and to the estimated costs the Authority would incur in directly performing the functions and duties delegated under the operating contract; and provided, further, that no such contract shall create any right in the Contractor (1) to make or change any rate or fare or alter or change the service specified in the contract to be provided or (2) to seek judicial relief by any form of original action, review or other proceedings from any rate or fare or service prescribed by the Board. Any assertion, or attempted assertion, by the contractor of the right to make or change any rate or fare or service prescribed by the Board shall constitute cause for termination of the operating contract. The operating contract may provide incentives for efficient and economical management.

### 54. Selection of Contractor.

The Board shall enter into an operating contract only after formal advertisement and negotiations with all interested and qualified parties, including private transit companies rendering transit service within the Zone; provided, however, that, if the Authority acquires transit facilities from any agency of the federal or District of Columbia governments, in accordance with the provisions of Article VII, section 20 of this Title, the Authority shall assume the obligations of any operating contract which the transferor agency may have entered into.

## ARTICLE XII - COORDINATION OF PRIVATE AND PUBLIC FACILITIES

### 55. Declaration of Policy.

It is hereby declared that the interest of the public in efficient and economical transit service and in the financial well-being of the Authority and of the private transit companies requires that the public and private segments of the regional transit system be operated, to the fullest extent possible, as a coordinated system without unnecessary duplicating service.

### 56. Implementation of Policy.

In order to carry out the legislative policy set forth in Section 55 of this Article XII,

(a) The Authority:

Metro - Metro Compact

(1) except as herein provided, shall not, directly or through a Contractor, perform transit service by bus or similar motor vehicles;

(2) shall, in cooperation with the private carriers and WMATC, coordinate to the fullest extent practicable, the schedules for service performed by its facilities with the schedules for service performed by private carriers; and

(3) shall enter into agreements with the private carriers to establish and maintain, subject to approval by WMATC, through routes and joint fares and provide for the division thereof, or, in the absence of such agreements, establish and maintain through routes and joint fares in accordance with orders issued by WMATC directed to the private carriers when the terms and conditions for such through service and joint fares are acceptable to it.

(b) The WMATC, upon application, complaint, or upon its own motion, shall:

(1) direct private carriers to coordinate their schedules for service with the schedules for service performed by facilities owned or controlled by the Authority.

(2) direct private carriers to improve or extend any existing services or provide additional service over additional routes;

(3) authorize a private carrier, pursuant to agreement between said carrier and the Authority, to establish and maintain through routes and joint fares for transportation to be rendered with facilities owned or controlled by the Authority if, after hearing held upon reasonable notice, WMATC finds that such through routes and joint fares are required by the public interest; and

(4) in the absence of such an agreement with the Authority, direct a private carrier to establish and maintain through routes and joint fares with the Authority, if, after hearing held upon reasonable notice, WMATC finds that such through service and joint fares are required by the public interest; provided, however, that no such order, rule or regulation of WMATC shall be construed to require the Authority to establish and maintain any through route and joint fare.

(c) WMATC shall not authorize or require a private carrier to render any service, including the establishment or continuation of a joint fare for a through route service with the Authority which is based on a division thereof between the Authority and private carrier which does not provide a reasonable return to the private carrier, unless the carrier is currently earning a reasonable return on its operation as a whole in performing transportation subject to the jurisdiction of WMATC. In determining the issue of reasonable return, WMATC shall take into account any income attributable to the carrier, or to any corporation, firm or association owned in whole or in part by the carrier, from the Authority whether by way of payment for services or otherwise.

(d) if the WMATC is unable, through the exercise of its regulatory powers over the private carriers granted in paragraph (b) hereof or otherwise, to bring about the requisite coordination of operations and service between the private carriers and the Authority, the Authority may in the situations specified in paragraph (b) hereof, cause such transit service to be rendered by its Contractor by bus or other motor vehicle, as it shall deem necessary to effectuate the policy set forth in Section 55 hereof. In any such situation, the Authority, in order to encourage private carriers to render bus service to the fullest extent practicable, may, pursuant to agreement, make reasonable subsidy payments to any private carrier.

(e) The Authority may acquire the capital stock or the transit facilities of any private transit company and may perform transit service, including service by bus or similar

motor vehicle, with transit facilities so acquired, or with transit facilities acquired pursuant to Article VII, Section 20. Upon acquisition of the capital stock or the transit facilities of any private transit company, the Authority shall undertake the acquisition, as soon as possible, of the capital stock or the transit facilities of each of the other private transit companies within the Zone requesting such acquisition. Lack of such request, however, shall not be construed to preclude the Authority from acquiring the capital stock or the transit facilities of any such company pursuant to Section 82 of Article XVI. (14)

**57. Rights of Private Carriers Unaffected.**

Nothing in this Title shall restrict or limit such rights and remedies, if any, that any private carrier may have against the Authority arising out of acts done or actions taken by the Authority hereunder. In the event any court of competent jurisdiction shall determine that the Authority has unlawfully infringed any rights of any private carrier or otherwise caused or permitted any private carrier to suffer legally cognizable injury, damages or harm and shall award a judgment therefor, such judgment shall constitute a lien against any and all of the assets and properties of the Authority.

**58. Financial Assistance to Private Carriers.**

(a) The Board may accept grants from and enter into loan agreements with the Housing and Home Finance Administrator, pursuant to the provisions of the Urban Mass Transportation Act of 1964 (78 Stat. 302), or with any successor agency or under any law of similar purport, for the purpose of rendering financial assistance to private carriers.

(b) An application by the Board for any such grant or loan shall be based on and supported by a report from WMATC setting forth for each private carrier to be assisted (1) the equipment and facilities to be acquired, constructed, reconstructed, or improved, (2) the service proposed to be rendered by such equipment and facilities, (3) the improvement in service expected from such facilities and equipment, (4) how the use of such facilities and equipment will be coordinated with the transit facilities owned by the Authority, (5) the ability of the affected private carrier to repay any such loans or grants and (6) recommend terms for any such loans or grants.

(c) Any equipment or facilities acquired, constructed, reconstructed or improved with the proceeds of such grants or loans shall be owned by the Authority and may be made available to private carriers only by lease or other agreement which contain provisions acceptable to the Housing and Home Finance Administrator assuring that the Authority will have satisfactory continuing control over the use of such facilities and equipment.

# ARTICLE XIII - JURISDICTION; RATES AND SERVICES

**59. Washington Metropolitan Area Transit Commission.**

Except as provided herein, this Title shall not affect the functions and jurisdiction of WMATC, as granted by Title I and II of this Compact, over the transportation therein specified and the persons engaged therein and the Authority shall have no jurisdiction with respect thereto.

**60. Public Facilities.**

Service performed by transit facilities owned or controlled by the Authority, and the

Metro - Metro Compact

rates and fares to be charged for such service, shall be subject to the sole and exclusive jurisdiction of the Board and, notwithstanding any other provision in this Compact contained, WMATC shall have no authority with respect thereto, or with respect to any contractor in connection with the operation by it of transit facilities owned or controlled by the Authority. The determinations of the Board with respect to such matter shall not be subject to judicial review nor to the processes of any court.

**61. Standards.**

Insofar as practicable, and consistent with the provision of adequate service at reasonable fares, the rates and fares and services shall be fixed by the Board so as to result in revenues which will:

(a) pay the operating expenses and provide for repairs, maintenance and depreciation of the transit systems owned or controlled by the Authority;

(b) provide for payment of all principal and interest on outstanding revenue bonds and other obligations and for payment of all amounts to sinking funds and other funds as may be required by the terms of any indenture or loan agreement;

(c) provide for the purchase, lease or acquisition of rolling stock, including provisions for interest, sinking funds, reserve funds, or other funds required for payment of any obligations incurred by the Authority for the acquisition of rolling stock; and

(d) provide funds for any purpose the Board deems necessary and desirable to carry out the purpose of this Title.

**62. Hearings.**

(a) The Board shall not raise any fare or rate, nor implement a major service reduction except after holding a public hearing with respect thereto.[15]

(b) Any signatory, any political subdivision thereof, any agency of the federal government and any person, firm or association served by or using the transit facilities of the Authority and any private carrier may file a request with the Board for a hearing with respect to any rates or charges made by the Board or any service rendered with the facilities owned or controlled by the Authority. Such request shall be in writing, shall state the matter on which the hearing is requested and shall set forth clearly the matters and things on which the request relies. As promptly as possible after such a request is filed, the Board, or such officers or employees as it may designate, shall confer with the protestant with respect to the matters complained of. After such conference, the Board, if it deems the matter meritorious and of general significance, may call a hearing with respect to such request.

(c) The Board shall give at least fifteen days' notice for all public hearings. The notice shall be given by publication in a newspaper of daily circulation throughout the Transit Zone and such notice shall be published once a week for two successive weeks. The notice shall start with the first day of publication. Notices of public hearings shall be posted in accordance with regulations promulgated by the Board.[17]

(d) Prior to calling a hearing on any matter specified in this section, the Board shall prepare and file at its main office and keep open for public inspection its report relating to the proposed action to be considered at such hearing. Upon receipt by the Board of any report submitted by WMATC, in connection with matter set for hearing, pursuant to the provisions of Section 63 of this Article XIII, the Board shall file such report at its main office and make it available for public inspection. For hearings called by the Board pursuant to paragraph (b), above, the Board also shall cause to be lodged and kept

open for public inspection the written request upon which the hearing is granted and all documents filed in support thereof.

**63. Reference of Matters to WMATC.**

To facilitate the attainment of public policy objective for operation of the publicly and privately owned or controlled transit facilities as stated in Article XII, Section 55, prior to the hearings provided for by Section 62 hereof:

(a) The Board shall refer to WMATC for its consideration and recommendations, any matter which the Board considers may affect the operation of the publicly and privately owned or controlled transit facilities as a coordinated regional transit system and any matter for which the Board has called a hearing, pursuant to Section 62 of this Article XIII, except that temporary or emergency changes in matters affecting service shall not be referred; and

(b) WMATC, upon such reference of any matter to it, shall give the referred matter preference over any other matters pending before it and shall, as expeditiously as practicable, prepare and transmit its report thereon to the Board. The Board may request WMATC to reconsider any part of its report or to make any supplemental reports it deems necessary. All of such reports shall be advisory only.

(c) Any report submitted by WMATC to the Board shall consider, without limitation, the probable effect of the matter or proposal upon the operation of the publicly and privately owned or controlled transit facilities as a coordinated regional system, passenger movements, fare structures, service and the impact on the revenues of both the public and private facilities.

# ARTICLE XIV - LABOR POLICY

**64. Construction.**

The Board shall take such action as may be necessary to insure that all laborers and mechanics employed by contractors or subcontractors in the construction, alteration or repair, including painting and decorating, of projects, buildings and works which are undertaken by the Authority or are financially assisted by it, shall be paid wages at rates not less than those prevailing on similar construction in the locality as determined by the Secretary of Labor in accordance with the Davis-Bacon Act, as amended (40 U.S.C. 276a-276a-5), and every such employee shall receive compensation at a rate not less than one and one-half times his basic rate of pay for all hours worked in any workweek in excess of eight hours in any workday or forty hours in any workweek, as the case may be. A provision stating the minimum wages thus determined and the requirement that overtime be paid as above provided shall be set out in each project advertisement for bids and in each bid proposal form and shall be made a part of the contract covering the project, which contract shall be deemed to be a contract of the character specified in Section 103 of the Contract Work Hours Standards Act (76 Stat. 357), as now or as may hereafter be in effect. The Secretary of Labor shall have, with respect to the administration and enforcement of the labor standards specified in this provision, the supervisory, investigatory and other authority and functions set forth in Reorganization Plan Number 14 of 1950 (15 F.R. 3176, 64 Stat. 1267, 5 U.S.C. 133z-15), and section 2 of the Act of June 13, 1934, as amended (48 Stat. 948, as amended; 40 U.S.C. 276(c)). The requirements of this section shall also be applicable with respect to the employment of laborers and mechanics in the construction, alteration or

repair, including painting and decorating, of the transit facilities owned or controlled by the Authority where such activities are performed by a Contractor pursuant to agreement with the operator of such facilities.

### 65. Equipment and Supplies.

Contracts for the manufacture or furnishing of materials, supplies, articles and equipment shall be subject to the provisions of the Walsh-Healey Public Contracts Act (41 U.S.C. 35 et seq.), as now or as may hereafter be in effect.

### 66. Operations.[18]

(a) The rights, benefits, and other employee protective conditions and remedies of section 13(c) of the Urban Mass Transportation Act of 1964, as amended (49 U.S.C. 1609(c)), as determined by the Secretary of Labor shall apply to the operation by the Washington Metropolitan Area Transit Authority of any mass transit facilities owned or controlled by it and to any contract or other arrangement for the operation of transit facilities. Whenever the Authority shall operate any transit facility or enter into any contractual or other arrangements for the operation of such transit facility the Authority shall extend to employees of affected mass transportation systems first opportunity for transfer and appointment as employees of the Authority in accordance with seniority, in any non-supervisory job in respect to such operations for which they can qualify after a reasonable training period. Such employment shall not result in any worsening of the employee's position in his former employment nor any loss of wages, hours, working conditions, seniority, fringe benefits and rights and privileges pertaining thereto.

(b) The Authority shall deal with and enter into written contracts with employees as defined in section 152 of Title 29, United States Code, through accredited representatives of such employees or representatives of any labor organization authorized to act for such employees concerning wages, salaries, hours, working conditions, and pension or retirement provisions.

(c) In case of any labor dispute involving the Authority and such employees where collective bargaining does not result in agreement, the Authority shall submit such dispute to arbitration by a board composed of three persons, one appointed by the Authority, one appointed by the labor organization representing the employees, and a third member to be agreed upon by the labor organization and the Authority. The member agreed upon by the labor organization and the Authority shall act as chairman of the board. The determination of the majority of the board of arbitration, thus established, shall be final and binding on all matters in dispute. If after a period of ten days from the date of the appointment of the two arbitrators representing the Authority and the labor organization, the third arbitrator has not been selected, then either arbitrators may request the Federal Mediation and Conciliation Service to furnish a list of five persons from which the third arbitrator shall be selected. The arbitrators appointment by the Authority and the labor organization promptly after the receipt of such list shall determine by lot the order of elimination and thereafter each shall in that order alternatively eliminate one name until only one name remains. The remaining person on the list shall be the third arbitrator. The term "labor dispute" shall be broadly construed and shall include any controversy concerning wages, salaries, hours, working conditions, or benefits including health and welfare, sick leave, insurance or pension or retirement provisions but not limited thereto, and including any controversy concerning any differences or questions that may arise between the parties including but not limited to the making or maintaining of collective bargaining agreements, the terms to be included in such agreements, and the interpretation or application of such collective bargaining agreements and any grievance that may arise and questions

concerning representation. Each party shall pay one-half of the expenses of such arbitration.

(d) The Authority is hereby authorized and empowered to establish and maintain a system of pensions and retirement benefits for such officers and employees of the Authority as may be designated or described by resolution of the Authority, to fix the terms of and restrictions on admission to such system and the classifications therein; to provide that persons eligible for admission in such pension system shall not be eligible for admission to, or receive any benefits from, any other pension system (except social security benefits), which is financed or funded, in whole or in part, directly or indirectly by funds paid or appropriated by the Authority to such other pension system, and to provide in connection with such pension system, a system of benefits payable to the beneficiaries and dependents of any participant in such pension system after the death of such participant (whether accidental or otherwise, whether occurring in the actual performance of duty or otherwise or both) subject to such exceptions, conditions, restrictions and classifications as may be provided by resolution of the Authority. Such pension system shall be financed or funded by such means and in such manner as may be determined by the Authority to be economically feasible. Unless the Authority shall otherwise determine, no officer or employee of the Authority and no beneficiary or dependent of any such officer or employee shall be eligible to receive any pension or retirement or other benefits both from or under any such pension system and from or under any pension or retirement system established by an acquired transportation system or established or provided for, by or under the provisions of any collective bargaining agreement between the Authority and the representatives of its employees.

(e) Whenever the Authority acquires existing transit facilities from a public or privately owned utility either in proceeding by eminent domain or otherwise, the Authority shall assume and observe all existing labor contracts and pension obligations. When the Authority acquires an existing transportation system, all employees who are necessary for the operation thereof by the Authority shall be transferred to and appointed as employees of the Authority, subject to all the rights and benefits of this title. These employees shall be given seniority credit and sick leave, vacation, insurance and pension credits in accordance with the records or labor agreements from the acquired transportation system. Members and beneficiaries of any pension or retirement system or other benefits established by the acquired transportation system shall continue to have rights, privileges, benefits, obligation and status with respect to such established system. The Authority shall assume the obligations of any transportation system acquired by it with regard to wages, salaries, hours, working conditions, sick leave, health and welfare and pension or retirement provisions for employees. It shall assume the provisions of any collective bargaining agreement between such acquired transportation system and the representatives of its employees. The Authority and the employees, through their representatives for collective bargaining purposes, shall take whatever action may be necessary to have pension trust funds presently under the joint control of the acquired transportation system and the participating employees through their representative transferred to the trust fund to be established, maintained and administered jointly by the Authority and the participating employees through their representatives. No employee of any acquired transportation system who is transferred to a position with the Authority shall by reason of such transfer be placed in any worse position with respect to workmen's compensation, pension, seniority, wages, sick leave, vacation, health and welfare insurance or any other benefits, than he enjoyed as an employee of such acquired transportation system.

Metro - Metro Compact

# ARTICLE XV - RELOCATION ASSISTANCE

### 67. Relocation Program and Payments.

Section 7 of the Urban Mass Transportation Act of 1964, and as the same may from time to time be amended, and all regulations promulgated thereunder, are hereby made applicable to individuals, families, business concerns and non-profit organizations displaced from real property by actions of the Authority without regard to whether financial assistance is sought by or extended to the Authority under any provision of that Act; provided, however, that in the event real property is acquired for the Authority by an agency of the federal government, or by a State or local agency or instrumentality, the Authority is authorized to reimburse the acquiring agency for relocation payments made by it.

### 68. Relocation of Public or Public Utility Facilities.

Notwithstanding the provisions of Section 67 of this Article XV, any highway or other public facility or any facilities of a public utility company which will be dislocated by reason of a project deemed necessary by the Board to effectuate the authorized purposes of this Title shall be relocated if such facilities are devoted to a public use, and the reasonable cost of relocation if substitute facilities are necessary, shall be paid by the Board from any of its monies.

# ARTICLE XVI - GENERAL PROVISIONS

### 69. Creation and Administration of Funds.[19]

(a) The Board may provide for the creation and administration of such funds as may be required. The funds shall be disbursed in accordance with rules established by the Board and all payments from any fund shall be reported to the Board. Monies in such funds and other monies of the Authority shall be deposited, as directed by the Board, in any branch or subsidiary of any state or national bank which has operations within the Zone, and having a total paid-in capital of at least one million dollars ($1,000,000). The trust department of any state or national bank may be designated as a depositary to receive any securities acquired or owned by the Authority. The restriction with respect to paid-in capital may be waived for any such bank which agrees to pledge federal securities to protect the funds and securities of the Authority in such amounts and pursuant to such arrangements as may be acceptable to the Board.

(b) Any monies of the Authority may, in the discretion of the Board and subject to any agreement or covenant between the Authority and the holders of any of its obligations limiting or restricting classes of investments, be invested in:

(1) Direct obligations of or obligations guaranteed by the United States of America;

(2) Bonds, debentures, notes or other evidences of indebtedness issued by agencies of the United States of America, including but not limited to the following: Bank for Cooperatives; Federal Intermediate Credit Banks; Federal Home Loan Bank System; Export-Import Bank of the United States; Federal Land Banks; Federal National Mortgage Association; Student Loan Marketing Association; Government National Mortgage Association; Tennessee Valley Authority; or United States Postal Service;

(3) Securities that qualify as lawful investments and may be accepted as security for fiduciary, trust and public funds under the control of the United States of any officer or

officers thereof, or securities eligible as collateral for deposits of monies of the United States, including United States Treasury tax and loan accounts;

(4) Domestic and Eurodollar certificates of deposits; and

(5) Bonds, debentures, notes or other evidences of indebtedness issued by a domestic corporation, such as a corporation organized under the laws of one of the States of the United States, provided that such obligations are nonconvertible and at the time of their purchase are rated in the highest rating categories by a nationally recognized bond rating agency.

### 70. Annual Independent Audit.

(a) As soon aa practical after the closing of the fiscal year, an audit shall be made of the financial accounts of the Authority. The audit shall be made by qualified certified public accountants selected by the Board, who shall have no personal interest direct or indirect in the financial affairs of the Authority or any of its officers or employees. The report of audit shall be prepared in accordance with generally accepted auditing principles and shall be filed with the Chairman and other officers as the Board shall direct. Copies of the report shall be distributed to each Director, to the Congress, to the Mayor and Council of the District of Columbia, to the Governors of Virginia and Maryland, to the Washington Suburban Transit Commission, to the Northern Virginia Transportation Commission and to the governing bodies of the political subdivisions located within the Zone which are parties to commitments for participation in the financing of the Authority and shall be made available for public distribution.[20]

(b) The financial transactions of the Board shall be subject to audit by the United States General Accounting Office in accordance with the principles and procedures applicable to commercial corporate transactions and under such rules and regulations as may be prescribed by the Comptroller General of the United States. The audit shall be conducted at the place or places where the accounts of the Board are kept.

(c) Any Director, officer or employee who shall refuse to give all required assistance and information to the accountants selected by the Board or who shall refuse to submit to them for examination such books, documents, records, files, accounts, papers, things or property as may be requested shall, in the discretion of the Board forfeit his office.

### 71. Reports.

The Board shall make and publish an annual report on its programs, operations and finances, which shall be distributed in the same manner provided by Section 70 of this Article XVI for the report of annual audit. It may also prepare, publish and distribute such other public reports and informational materials as it may deem necessary or desirable.

### 72. Insurance.

The Board may self-insure or purchase insurance and pay the premiums therefor against loss or damage to any of its properties; against liability for injury to persons or property; and against loss of revenue from any cause whatsoever. Such insurance coverage shall be in such form and amount as the Board may determine, subject to the requirements of any agreement arising out of issuance of bonds or other obligations by the Authority.

### 73. Contracting and Purchasing.[21]

Metro - Metro Compact

(a) (1) Except as provided in subsections (b), (c), and (f) of this section, and except in the case of procurement procedures otherwise expressly authorized by statute, the Authority in conducting a procurement of property, services, or construction shall:

(A) obtain full and open competition through the use of competitive procedures in accordance with the requirements of this Section; and

(B) use the competitive procedure or combination of competitive procedures that is best suited under the circumstances of the procurement.

(2) In determining the competitive procedure appropriate under the circumstances, the Authority shall:

(A) solicit sealed bids if:

(i) time permits the solicitation, submission, and evaluation of sealed bids;

(ii) the award will be made on the basis of price and other price-related factors;

(iii) it is not necessary to conduct discussions with the responding sources about their bids; and

(iv) there is a reasonable expectation of receiving more than one sealed bid; or

(B) request competitive proposals if sealed bids are not appropriate under clause (A) of this paragraph.

(b) The Authority may provide for the procurement of property, services, or construction covered by this Section using competitive procedures but excluding a particular source in order to establish or maintain an alternative source or sources of supply for that property, service, or construction if the Authority determines that excluding the source would increase or maintain competition and would likely result in reduced overall costs for procurement of property, services, or construction.

(c) The Authority may use procedures other than competitive procedures if:

(1) the property, services, or construction needed by the Authority is available from only one responsible source and no other type of property, services, or construction will satisfy the needs of the Authority; or

(2) the Authority's need for the property, services, or construction is of such an unusual and compelling urgency that the Authority would be seriously injured unless the Authority limits the number of sources from which it solicits bids or proposals; or

(3) the Authority determines that it is necessary in the public interest to use procedures other than competitive procedures in the particular procurement; or

(4) the property or services can be obtained through federal or other governmental sources at reasonable prices.

(d) For the purpose of applying subsection (c)(1) of this section:

(1) in the case of a contract for property, services, or construction to be awarded on the basis of acceptance of an unsolicited proposal, the property, services, or construction shall be deemed to be available from only one responsible source if the source has submitted an unsolicited proposal that demonstrates a concept:

(A) that is unique and innovative or, in the case of a service, for which the source demonstrates a unique capability to provide the service; and

Metro - Metro Compact

(B) the substance of which is not otherwise available to the Authority and does not resemble the substance of a pending competitive procurement.

(2) in the case of a follow-on contract for the continued development or production of a major system or highly specialized equipment or the continued provision of highly specialized services, the property, services, or construction may be deemed to be available from only the original source and may be procured through procedures other than competitive procedures if it is likely that award to a source other than the original source would result in:

(A) substantial duplication of cost to the Authority that is not expected to be recovered through competition; or

(B) unacceptable delays in fulfilling the Authority's needs.

(e) If the Authority uses procedures other than competitive procedures to procure property, services, or construction under subsection (c)(2) of this section, the Authority shall request offers from as many potential sources as is practicable under the circumstances.

(f) (1) To promote efficiency and economy in contracting, the Authority may use simplified acquisition procedures for purchases of property, services and construction.

(2) For the purposes of this subsection, simplified acquisition procedures may be used for purchases for an amount that does not exceed the simplified acquisition threshold adopted by the Federal Government.

(3) A proposed purchase or contract for an amount above the simplified acquisition threshold may not be divided into several purchases or contracts for lesser amounts in order to use the procedures under paragraph (1) of this subsection.

(4) In using simplified acquisition procedures, the Authority shall promote competition to the maximum extent practicable.

(g) The Board shall adopt policies and procedures to implement this Section. The policies and procedures shall provide for publication of notice of procurements and other actions designed to secure competition where competitive procedures are used.

(h) The Authority in its discretion may reject any and all bids or proposals received in response to a solicitation.

## 74. Rights of Way.

The Board is authorized to locate, construct and maintain any of its transit and related facilities in, upon, over, under or across any streets, highways, freeways, bridges and any other vehicular facilities, subject to the applicable laws governing such use of such facilities by public agencies. In the absence of such laws, such use of such facilities by the Board shall be subject to such reasonable conditions as the highway department or other affected agency of a signatory party may require; provided, however, that the Board shall not construct or operate transit or related facilities upon, over, or across any parkways or park lands without the consent of, and except upon the terms and conditions required by, the agency having jurisdiction with respect to such parkways and park lands, but may construct or operate such facilities in a subway under such parkways or park lands upon such reasonable terms and conditions as may be specified by the agency having jurisdiction with respect thereto.

## 75. Compliance with Laws, Regulations and Ordinances.

The Board shall comply with all laws, ordinances and regulations of the signatories and political subdivisions and agencies thereof with respect to use of streets, highways, and all other vehicular facilities, traffic control and regulation, zoning, signs and buildings.

### 76. Police.[22]

(a) The Authority is authorized to establish and maintain a regular police force, to be known as the Metro Transit Police, to provide protection for its patrons, personnel, and transit facilities. The Metro Transit Police shall have the powers and duties and shall be subject to the limitations set forth in this section. It shall be composed of both uniformed and plainclothes personnel and shall be charged with the duty of enforcing the laws of the signatories, and the laws, ordinances and regulations of the political subdivisions thereof in the Transit Zone, and the rules and regulations of the Authority. The jurisdiction of the Metro Transit Police shall be limited to all the transit facilities (including bus stops) owned, controlled or operated by the Authority, but this restriction shall not limit the power of the Metro Transit Police to make arrests in the Transit Zone for violations committed upon, to or against such transit facilities committed from within or outside such transit facilities, while in hot or close pursuit or to execute traffic citations and criminal process in accordance with subsection (c) below. The members of the Metro Transit Police shall have concurrent jurisdiction in the performance of their duties with the duly constituted law enforcement agencies of the signatories and of the political subdivisions thereof in which any transit facility of the Authority is located or in which the Authority operates any transit service. Nothing contained in this section shall either relieve any signatory or political subdivision or agency thereof from its duty to provide police, fire and other public safety service and protection, or limit, restrict or interfere with the jurisdiction of or the performance of duties by the existing police, fire and other public safety agencies. For purposes of this section, 'bus stop' means that area within 150 feet of a metrobus bus stop sign, excluding the interior of any building not owned, controlled, or operated by the Washington Metropolitan Area Transit Authority.[23]

(b) A member of the Metro Transit Police shall have the same powers, including the power of arrest, and shall be subject to the same limitations, including regulatory limitations, in the performance of his duties as a member of the duly constituted police force of the political subdivision in which the Metro Transit Police member is engaged in the performance of his duties. A member of the Metro Transit Police is authorized to carry and use only such weapons, including handguns, as are issued by the Authority. A member of the Metro Transit Police is subject to such additional limitations in the use of weapons as are imposed on the duly constituted police force for the political subdivision in which he is engaged in the performance of his duties.[24]

(c) Members of the Metro Transit Police shall have power to execute on the transit facilities owned, controlled, or operated by the Authority any traffic citation or any criminal process issued by any court of any signatory or of any political subdivision of a signatory, for any felony, misdemeanor, or other offense against the laws, ordinances, rules, or regulations specified in subsection (a). However, with respect to offenses committed upon, to, or against the transit facilities owned, controlled, or operated by the Authority, the Metro Transit Police shall have power to execute criminal process within the Transit Zone.[25]

(d) Upon the apprehension or arrest of any person by a member of the Metro Transit Police pursuant to the provisions of subsection (b), the officer, as required by law of the place of apprehension or arrest, shall either issue a summons or a citation against the person, book the person, or deliver the person to the duly constituted police or judicial

Metro - Metro Compact

officer of the signatory or political subdivision where the apprehension or arrest is made, for disposition as required by law.

(e) The Authority shall have the power to adopt rules and regulations for the safe, convenient, and orderly use of the transit facilities owned, controlled, or operated by the Authority, including the payment and the manner of the payment of fares or charges therefor, the protection of the transit facilities, the control of traffic and parking upon the transit facilities and the safety and protection of the riding public. In the event that any such rules and regulations contravene the laws, ordinances, rules or regulations of a signatory or any political subdivision thereof which are existing or subsequently enacted, these laws, ordinances, rules, or regulations of the signatory or the political subdivision shall apply and the conflicting rule or regulation, or portion thereof, of the Authority shall be void within the jurisdiction of that signatory or political subdivision. In all other respects, the rules and regulations of the Authority shall be uniform throughout the Transit Zone. The rules and regulations established under this subsection shall be adopted by the Board following public hearings held in accordance with section 62(c) and (d) of this Compact. The final regulation shall be published in a newspaper of general cirulation within the Zone at least 15 days before its effective date. Any person violating any rule or regulation of the Authority shall be subject to arrest and upon conviction by a court of competent jurisdiction, shall pay a fine of not more than two hundred fifty dollars ($250) and costs. Criminal violations of any rule or regulation of the Authority shall be prosecuted by the signatory or political subdivision in which the violation occurred, in the same manner by which violations of law, ordinances, rules, and regulations of the signatory or political subdivisions are prosecuted.[26]

(f) With respect to members of the Metro Transit Police, the Authority shall:

(1) establish classifications based on the nature and scope of duties, and fix and provide for their qualifications, appointment, removal, tenure, term, compensation, pension and retirement benefits;

(2) provide for their training and for this purpose, the Authority may enter into contracts or agreements with any public or private organization engaged in police training, and this training and the qualifications of the uniformed and plainclothes personnel shall at least equal the requirements of each signatory and of the political subdivisions therein in the Transit Zone for their personnel performing comparable duties; and

(3) prescribe distinctive uniforms to be worn.

(g) The Authority shall have the power to enter into agreements with the signatories, the political subdivisions thereof in the Transit Zone, and public safety agencies located therein, including those of the Federal Government, for the delineation of the functions and responsibilities of the Metro Transit Police and the duly constituted police, fire and other public safety agencies, and for mutual assistance.

(h) Before entering upon the duties of office, each member of the Metro Transit Police shall take or subscribe to an oath or affirmation, before a person authorized to administer oaths, faithfully to perform the duties of that office.

### 77. Exemption from Regulation.

Except as otherwise provided in this Title, any transit service rendered by transit facilities owned or controlled by the Authority and the Authority or any corporation, firm or association performing such transit service pursuant to an operating contract with the Authority, shall, in connection with the performance of such service, be exempt from all laws, rules, regulations and orders of the signatories and of the United States otherwise

applicable to such transit service and persons, except that laws, rules, regulations and orders relating to inspection of equipment and facilities, safety and testing shall remain in force and effect; provided, however, that the Board may promulgate regulations for the safety of the public and employees not inconsistent with the applicable laws, rules, regulations or orders of the signatories and of the United States.

**78. Tax Exemption.**

It is hereby declared that the creation of the Authority and the carrying out of the corporate purposes of the Authority is in all respects for the benefit of the people of the signatory states and is for a public purpose and that the Authority and the Board will be performing an essential government function, including, without limitation, proprietary, governmental and other functions, in the exercise of the powers conferred by this Title. Accordingly, the Authority and the Board shall not be required to pay taxes or assessments upon any of the property acquired by it or under its jurisdiction, control, possession or supervision or upon its activities in the operation and maintenance of any transit facilities or upon any revenues therefrom and the property and income derived therefrom shall be exempt from all federal, State, District of Columbia, municipal and local taxation. This exemption shall include, without limitation, all motor vehicle license fees, sales taxes and motor fuel taxes.

**79. Reduced Fares.** [27]

The District of Columbia, the Northern Virginia Transportation District, the Washington Suburban Transit District and the component governments thereof, may enter into contracts or agreements with the Authority to make equitable payments for fares lower than those established by the Authority pursuant to the provisions of Article XIII hereof for any specified class or category of riders.

**80. Liability for Contracts and Torts.**

The Authority shall be liable for its contracts and for its torts and those of its Directors, officers, employees and agents committed in the conduct of any proprietary function, in accordance with the law of the applicable signatory (including rules on conflict of laws), but shall not be liable for any torts occurring in the performance of a governmental function. The exclusive remedy for such breach of contracts and torts for which the Authority shall be liable, as herein provided, shall be by suit against the Authority. Nothing contained in this Title shall be construed as a waiver by the District of Columbia, Maryland, Virginia and the counties and cities within the Zone of any immunity from suit.

**81. Jurisdiction of Courts.** [28]

The United States District Courts shall have original jurisdiction, concurrent with the Courts of Maryland, Virginia and the District of Columbia, of all actions brought by or against the Authority and to enforce subpoenas issued under this Title. Any such action initiated in a State or District of Columbia Court shall be removable to the appropriate United States District Court in the manner provided by Act of June 25, 1948, as amended (28 U.S.C. 1446).

**82. Condemnation.**

(a) The Authority shall have the power to acquire by condemnation, whenever in its opinion it is necessary or advantageous to the Authority to do so, any real or personal property, or any interest therein, necessary or useful for the transit system authorized herein, except property owned by the United States, by a signatory, or any political

subdivision thereof, whenever such property cannot be acquired by negotiated purchase at a price satisfactory to the Authority.[29]

(b) Proceedings for the condemnation of property in the District of Columbia shall be instituted and maintained under the Act of December 23, 1963 (77 Stat. 577-581, D.C. Code 1961, Supp. IV, Sections 1351-1368). Proceedings for the condemnation of property located elsewhere within the Zone shall be instituted and maintained, if applicable, pursuant to the provisions of the Act of August 1, 1888, as amended (25 Stat. 357, 40 U.S.C. 257) and the Act of June 25, 1948 (62 Stat. 935 and 937, 28 U.S.C. 1358 and 1403) or any other applicable Act; provided, however, that if there is no applicable Federal Law, condemnation proceedings shall be in accordance with the provisions of the State law of the signatory in which the property is located governing condemnation by the highway agency of such state. Whenever the words 'real property,' 'realty,' 'land,' 'easement,' 'right-of-way,' or words of similar meaning are used in any applicable federal or state law relating to procedure, jurisdiction and venue, they shall be deemed, for the purpose of this Title, to include any personal property authorized to be acquired hereunder.

(c) Any award or compensation for the taking of property pursuant to this Title shall be paid by the Authority, and none of the signatory parties nor any other agency, instrumentality or political subdivision thereof shall be liable for such award or compensation.

### 83. Enlargement and Withdrawal; Duration.

(a) When advised in writing by the Northern Virginia Transportation Commission or the Washington Suburban Transit Commission that the geographical area embraced therein has been enlarged, the Board, upon such terms and conditions as it may deem appropriate, shall by resolution enlarge the Zone to embrace the additional area.

(b) The duration of this Title shall be perpetual but any signatory thereto may withdraw therefrom upon two years' written notice to the Board.

(c) The withdrawal of any signatory shall not relieve such signatory, any transportation district, county or city or other political subdivision thereof from any obligation to the Authority, or inuring to the benefit of the Authority, created by contract or otherwise.

### 84. Amendments and Supplements.[30]

Amendments and supplements to this Title to implement the purposes thereof may be adopted by legislative action of any of the signatory parties concurred in by all of the others. When one signatory adopts an amendment or supplement to an existing section of the Compact, that amendment shall not be immediately effective, and the previously enacted provision(s) shall remain in effect in each jurisdiction until the amendment or supplement is approved by the other signatories and is consented to by Congress.

### 85. Construction and Severability.

The provisions of this Title and of the agreements thereunder shall be severable and if any phase, clause, sentence or provision of this Title or any such agreement is declared to be unconstitutional or the applicability thereof to any signatory party, political subdivision or agency thereof is held invalid, the constitutionality of the remainder of this Title or any such agreement and the applicability thereof to any other signatory party, political subdivision or agency thereof or circumstance shall not be affected thereby. It is the legislative intent that the provisions of this Title be reasonably and liberally construed.

**86. Effective Date; Execution.**

This Title shall be adopted by the signatories in the manner provided by law therefor and shall be signed and sealed in four duplicate original copies. One such copy shall be filed with the Secretary of State of each of the signatory parties or in accordance with laws of the State in which the filing is made. and one copy shall be filed and retained in the archives of the Authority upon its organization. This Title shall become effective ninety days after the enactment of concurring legislation by or on behalf of the District of Columbia, Maryland and Virginia and consent thereto by the Congress and all other acts or actions have been taken, including the signing and execution of the Title by the Governors of Maryland and Virginia and the Commissioners of the District of Columbia.

NOW THEREFORE, we, Walter N. Tobriner, John B. Duncan and Charles M. Duke, members of the Board of Commissioners of the District of Columbia, J. Millard Tawes, Governor of the State of Maryland. and Mills E. Godwin, Jr., Governor of the Commonwealth of Virginia. do hereby execute the foregoing addendum of the Washington Metropolitan Area Transit Regulation Compact.

## CONSENT LEGISLATION

Section 2.

The Commissioners of the District of Columbia are authorized and directed to enter into and execute an amendment to the Compact substantially as set forth above with the States of Virginia and Maryland and are further authorized and directed to carry out and effectuate the terms and provisions of said Title III, and there are hereby authorized to be appropriated out of District of Columbia funds such amounts as are necessary to carry out the obligations of the District of Columbia in accordance with the terms of the said Title III.

Section 3.

(a) To assure uninterrupted progress in the development of the facilities authorized by the National Capital Transportation Act of 1965. the transfer of the functions and duties of the National Capital Transportation Agency (herein referred to as the Agency) to the Washington Metropolitan Area Transit Authority (herein referred to as the Authority) as required by Section 301 (b) of the National Capital Transportation Act of 1960 shall take place on September 30, 1967.

(b) Upon the effective date of the transfer of functions and duties and authorized by subsection (a) of this section, the President is authorized to transfer to the Authority such real and personal property, studies, reports, records, and other assents and liabilities as are appropriate in order that the Authority may assume the functions and duties of the Agency and, further, the President shall make provisions for the transfer to the Authority of the unexpended balance of the appropriations, and of other funds, of the Agency for use by the Authority but such unexpended balances so transferred shall be used only for the purpose for which such appropriations were originally made. Subsequent to said effective date, there is authorized to be appropriated to the Department of Housing and Urban Development, for payment to the Authority any unappropriated portion of the authorization specified in Section 5(a)(1) of the National Capital Transportation Act of 1965. There is also authorized to be appropriated to the

Metro - Metro Compact

District of Columbia out of the general fund of the District of Columbia, for payment to the Authority, any unappropriated portion of the authorization specified in Section 5(a)(2) of such Act. Any such appropriations shall be used only for the purposes for which such authorizations were originally made.

(c) Pending the assumption by the Authority of the functions and duties of the Agency, the Agency is authorized and directed, in the manner herein set forth, fully to cooperate with and assist the Authority, the Northern Virginia Transportation Commission and the Washington Suburban Transit Commission in the development of plans for the extensions, new lines and related facilities required to expand the basic system authorized by the National Capital Transportation Act of 1965 into a regional system, but, pending such transfer of functions and duties, nothing in this Act shall be construed to impair the performance by the Agency of the functions and duties imposed by the National Capital Transportation Act of 1965.

(d) In order to provide the cooperation and assistance specified in subsection (c) of this section, the Agency is authorized to perform, on a reimbursable basis, planning, engineering and such other services for the Authority, as the Authority may request, or to obtain such services by contract, but all such assistance and services shall be rendered in accordance with policy determinations made by the Authority and shall be advisory only.

(e) Amounts received by the Agency from the Authority as provided in subsection (d) of this section shall be available for expenditure by the Agency in performing services for the Authority.

Section 4.

The United States District Courts shall have original jurisdiction, concurrent with the Courts of Maryland and Virginia, of all actions brought by or against the Authority to enforce subpoenas issued pursuant to the provisions of Title III. Any such action initiated in a State court shall be removable to the appropriate United States District Court in the manner provided by the Act of June 25, 1948, as amended (28 U.S.C. 1446).

Section 5.

(a) All laws or parts of laws of the United States and of the District of Columbia inconsistent with the provisions of Title III of this Act are hereby amended for the purpose of this Act to the extent necessary to eliminate such inconsistencies and to carry out the provisions of this Act and Title III and all laws or parts of laws and all reorganization plans of the United States are hereby amended and made applicable for the purpose of this Act to the extent necessary to carry out the provisions of this Act and Title III.

(b) Section 202 of the National Capital Transportation Act of 1960 (Public Law 86-669, 74 Stat. 537), as amended by Section 7 of the National Capital Transportation Act of 1965 (Public Law 89-173, 79 Stat. 666) is hereby repealed.

Section 6.

(a) The right to alter, amend or repeal this Act is hereby expressly reserved.

(b) The Authority shall submit to Congress and the President copies of all annual and special reports made to the Governors, the Commissioners of the District of Columbia and/or the legislatures of the compacting States.

(c) The President and the Congress or any committee thereof shall have the right to require the disclosure and furnishing of such information by the Authority as they may deem appropriate. Further, the President and Congress or any of its committees shall have access to all books, records and papers of the Authority as well as the right of inspection of any facility used, owned, leased, regulated or under the control of said Authority

(d) In carrying out the audits provided for in section 70 (b) of the Compact the representatives of the General Accounting Office shall have access to all books, accounts, financial records, reports, files, and all other papers, things, or property belonging to or in use by the Board and necessary to facilitate the audit, and they shall be afforded full facilities for verifying transactions with the balances or securities held by depositories, agents, and custodians.

## NOTES

1. Original text read: 1. (g) "Transit services" means the transportation of persons and their packages and baggage by means of transit facilities between points within the Zone and includes the transportation of newspapers, express and mail between such points but does not include taxicab, sightseeing or charter service.

For amendment to Title III, Article I, Sec. 1 (g). See National Capital Transportation Act of 1972, Pub. L. No. 92-349 (1972); Maryland House Bill No. 265. Ch. 776, Sec. 317-1 (g) (1971); 1972 Virginia Acts of Assembly, H. 597, Ch. 1591.

2. For amendment to Title III, Article I, Sec. 1 (h), See Metro Transit Police Act of 1976, Pub. L. No. 94-306 (1976); Maryland Senate Bill No. 733, Ch. 586, Sec. 317-1(H) (1974); D.C. Law 1-67, 23 DCR 501 (1972); 1977 Virginia Acts of Assembly, S617, Ch. 627, Sec. (H).

3. Original text read: 3. There is hereby created in the Washington Metropolitan Area Transit Zone which shall embrace the District of Columbia, the cities of Alexandria, Falls Church and Fairfax and the counties of Arlington and Fairfax and political subdivisions of the Commonwealth of Virginia located within those counties, and the counties of Montgomery and Prince George's in the State of Maryland and political subdivisions of the State of Maryland located in said counties.

For amendment to Title III, Article III, Sec. 3. See Washington Metropolitan Area Transit Regulation Compact, Pub. L. No. 104-322, 110 Stat. 3884 (1996); 1996 Laws of Maryland, Ch. 489; 1995 Acts of Assembly of Virginia, Ch. 150; D.C. Law 11-138 (1996).

4. Previously amended text read: 5. (a) The Authority shall be governed by a Board of six Directors consisting of two Directors for each signatory. For Virginia, the Directors shall be appointed by the Northern Virginia Transportation Commission; for the District of Columbia by the City Council of the District of Columbia from among its members, the Commissioner and the Assistant to the Commissioner of the District of Columbia; and for Maryland, by the Washington Suburban Transit Commission. In each instance the Director shall be appointed from among the members of the appointing body, except as otherwise provided herein, and shall serve for a term coincident with his term

on the body by which he was appointed. A Director may be removed or suspended from office only as provided by the law of the signatory from which he was appointed. The appointing authorities shall also appoint an alternate for each Director, who may act only in the absence of the Director for whom he has been appointed an alternate, except that, in the case of the District of Columbia where only one Director and his alternate are present, such alternate may act on behalf of the absent Director. Each alternate shall serve at the pleasure of the appointing authority. In the event of a vacancy in the Office of Director or alternate, it shall be filled in the same manner as an original appointment.

For amendment to Title III, Article III, Sec. 5 (a), See Washington Metropolitan Area Transit Regulation Compact, Pub. L. No. 104-322, 110 Stat. 3884 (1996); 1996 Laws of Maryland, Ch. 489; 1995 Acts of Assembly of Virginia, Ch. 150; D.C. Law 11-138 (1996).

Original text read: 5. (a) The Authority shall be governed by a Board of six Directors consisting of two Directors for each signatory. For Virginia, the Directors shall be appointed by the Northern Virginia Transportation Commission; for the District of Columbia; by the Commissioners of the District of Columbia; and for Maryland, by the Washington Suburban Transit Commission. In each instance the Director shall be appointed from among the members of the appointing body, and shall serve for a term coincident with his term on the body by which he was appointed. A Director may be removed or suspended from office only as provided by the law of the signatory from which he was appointed. The appointed authorities shall also appoint an alternate for each Director, who may act only in the absence of the Director for whom he has been appointed an alternate, and each alternate shall serve at the pleasure of the appointing authority. In the event of a vacancy in the Office of Director or alternate, it shall be filled in the same manner as an original appointment.

For amendment to Title III, Article III, Sec. 5 (a), See National Capital Transportation Act of 1972, Pub. L. No. 92-349 (1972); Maryland House Bill No. 265, Ch. 776 Sec. 317-5 (1971); 1972 Virginia Acts of Assembly, H 597, Ch. 571.

5. Original text read: 8. (a) Four Directors or alternates consisting of at least one Director or alternate appointed from each Signatory, shall constitute a quorum and no action by the Board shall be effective unless a majority of the Board, which majority shall include at least one Director or alternate from each Signatory, concur therein, provided, however, that a plan of financing may be adopted or a mass transit plan adopted, altered, revised or amended by the unanimous vote of the Directors representing any two Signatories.

For amendment to Title III, Article III, Sec. 8, See Washington Metropolitan Area Transit Regulation Compact, Pub. L. No. 104-322, 110 Stat. 3884 (1996); 1996 Laws of Maryland, Ch. 489; 1995 Acts of Assembly of Virginia, Ch. 150; D.C. Law 11-138 (1996).

6. Original text read: 14. (b) It shall be the duty and responsibility of each member of the Board to serve as liaison between the Board and the body which appointed him to the Board. To provide a framework for regional participation in the planning process, the Board shall create technical committees concerned with planning and collection and analyses of data relative to decision-making in the transportation planning process and the Commissioners of the District of Columbia, the component governments of the Northern Virginia Transportation District and the Washington Suburban Transit District shall appoint representatives to such technical committees and otherwise cooperate with the Board in the formulation of a mass transit plan, or in revisions, alterations or

amendments thereof.

For amendment to Title III, Article VI, Sec. 14, See Washington Metropolitan Area Transit Regulation Compact, Pub. L. No. 104-322, 110 Stat. 3884 (1996); 1996 Laws of Maryland, Ch. 489; 1995 Acts of Assembly of Virginia, Ch. 150; D.C. Law 11-138 (1996).

7. Original text read: 15. (a) (1) the Commissioners of the District of Columbia, the Northern Virginia Transportation Commission and the Washington Suburban Transit Commission:

For amendment to Title III, Article VI, Sec. 15(a), See Washington Metropolitan Area Transit Regulation Compact, Pub. L. No. 104-322, 110 Stat. 3884 (1996); 1996 Laws of Maryland, Ch. 489; 1995 Acts of Assembly of Virginia, Ch. 150; D.C. Law 11-138 (1996).

8. Original text read: 15. (a) (3) the highway agencies of the Signatories;

For amendment to Title III, Article VI, Sec. 15 (a) (3), See Washington Metropolitan Area Transit Regulation Compact, Pub. L. No. 104-322, 110 Stat. 3884 (1996); 1996 Laws of Maryland, Ch. 489; 1995 Acts of Assembly of Virginia, Ch. 150; D.C. Law 11-138 (1996).

9. Original text read: 15. (b) Information with respect thereto shall be released to the public. A copy of the proposed mass transit plan, amendment or revision shall be kept at the office of the Board and shall be available for public inspection. After thirty days' notice published once a week for two successive weeks in one or more newspapers of general circulation within the Zone, a public hearing shall be held with respect to the proposed plan, alteration, revision or amendment. The thirty days notice shall begin to run on the first day the notice appears in any such newspaper. The Board shall consider the evidence submitted and statements and comments made at such hearing and may make any changes in the proposed plan, amendment or revision which it deems appropriate and such changes may be made without further hearing.

For amendment to Title III, Article VI, Sec. 15 (b), See Washington Metropolitan Area Transit Regulation Compact, Pub. L. No. 104-322, 110 Stat. 3884 (1996); 1996 Laws of Maryland, Ch. 489; 1995 Acts of Assembly of Virginia, Ch. 150; D.C. Law 11-138 (1996).

10. Original text read: 21. The Board may borrow, in anticipation of receipts from any signatory, the Washington Suburban Transit District, the Northern Virginia Transportation District, or any component government thereof, or from any lending institution for any purposes of this Title, including administrative expenses. Such loans shall be for a term not to exceed two years and at a rate of interest not to exceed six percent per annum. The signatories and any such political subdivision or agency may, in its discretion, make such loans from any available money.

For amendment to Title III, Article VII, Sec. 21. See National Capital Transportation Act of 1972, Pub. L. No. 92-349 (1972); Maryland House Bill No. 265, Ch. 776, Sec. 317-21 (1971); 1972 Virginia Acts of Assembly, H. 597, Ch. 571.

11. Original text read: 35. Bonds shall bear interest at a rate of not to exceed six percent per annum payable annually or semi-annually.

For amendment to Title III, Article IX, Sec. 35, See National Capital Transportation Act of 1972, Pub. L. No. 92-349 (1972); Maryland House Bill No. 265, Ch. 776, Sec. 317-35 (1971); 1972 Virginia Acts of Assembly, H. 597, Ch. 571.

12. Original text read: 39. The Board may fix terms and conditions for the sale or other disposition of any authorized issue of bonds. The Board may sell bonds at less than their par or face value but no issue of bonds may be sold at an aggregate price below the par or face value thereof if such sale would result in a net interest cost to the Authority calculated upon the entire issue so sold of more than six percent per annum payable semiannually, according to standard tables of bond values. All bonds issued and sold pursuant to this Title may be sold in such manner, either at public or private sale as the Board shall determine.

For amendment to Title III, Article IX, Sec. 39, See National Capital Transportation Act of 1972, Pub. L. No. 92-349 (1972); Maryland House Bill No. 265, Ch. 776, Sec. 317-39 (1971); 1972 Virginia Acts of Assembly, H. 597, Ch. 571.

13. Original text read: 51. The Authority shall not perform transit service, nor any of the functions, such as maintenance of equipment and right of way normally associated with the providing of such service, with any transit companies, private railroads, or other persons. Any facilities and properties owned or controlled by the Authority, other than those utilized in performing transit service, may be operated by the Authority or by others pursuant to contract or lease as the Board may determine. All operations of such facilities and properties by the Authority and by its Contractor and lessees shall be within the Zone.

For amendment to Title III, Article XI, Sec. 51, See National Capital Transportation Act of 1972, Pub. L. No. 92-349 (1972); Maryland House Bill No. 265, Ch. 776, Sec. 317-21 (1971); 1972 Virginia Acts of Assembly, H. 597, Ch. 571.

14. For amendment to Title III, Article XII, Sec. 56 (e), See National Capital Transportation Act of 1972, Pub. L. No. 92-517 (1972); Maryland House Bill No. 265, Ch. 776, Sec. 317-56e (1971); 1972 Virginia Acts of Assembly, H. 597, Ch. 571.

15. Previously amended text read: 62(a)The Board shall not make or change any fare or rate, nor establish or abandon any service except after holding a public hearing with respect thereto, except for service changes required by an emergency; minor service changes as defined by regulations promulgated by the Board; experimental service established to test the effect of such service, and in effect for not more than six months; and fare and service changes established for special events.[16]

16. Original text read: 62. (a) The Board shall not make or change any fare or rate, nor establish or abandon any service except after holding a public hearing with respect thereto.

For amendment to Title III, Article XIII, Sec. 62, See Washington Metropolitan Area Transit Regulation Compact Amendments, Pub. L. No. 100-285, 102 Stat. 82 (1988); 1984 Md. Laws, Chs. 674, 675; 1984 Va. Acts, Ch. 610; 1987 Va. Acts, Ch. 112; D.C. Law 5-122 (1984).

- - - -

17. Original text read: (c) The Board shall give at least thirty days' notice for all hearings. The notice shall be given by publication in a newspaper of daily circulation throughout the Zone and such notice shall be published once a week for two successive weeks. The notice shall start with the day of first publication. In addition, the Board shall post notices of the hearing in its offices, all stations and terminals, and in all of its vehicles and rolling stock in revenue service.

For amendment to Title III, Article XIII, Sec. 62, see Washington Metropolitan Area Transit Regulation Compact Amendment, Pub. L. No. 105-151, 111 Stat. 2686 (1997);

1996 Laws of Maryland, Ch. 686 and 1997 Laws of Maryland, Ch. 91; 1995 Acts of Assembly of Virginia, Ch. 150; D.C. Law 11-138 (1996).

18. Original text read: 66. It shall be a condition of the operation of the transit facilities owned or controlled by the Authority that the provisions of section 10(c) of the Urban Mass Transportation Act of 1964 (49 U.S.C. 1609(c)) shall be applicable to any contract or other arrangement for the operation of such facilities.

For amendment to Title III, Article XIV, Sec. 66 (a)-(e), See National Capital Transportation Act of 1972, Pub. L. No. 92-349 (1972); Maryland House Bill No. 265, Ch. 776, Sec. 317-66-e (1971); 1972 Virginia Acts of Assembly, H. 597, Ch. 571.

19. Original text read: 69. (a) The Board may provide for the creation and administration of such funds as may be required. The funds shall be disbursed in accordance with rules established by the Board and all payments from any funds shall be reported to the Board. Monies in such funds and other monies of the Authority shall be deposited, as directed by the Board, in any state or national bank located in the Zone having a total paid-in capital of at least one million dollars ($1,000,000). The trust department of any such state or national bank may be designated as a depositary to receive any securities acquired or owned by the Authority. The restriction with respect to paid-in capital may be waived for any such bank which agrees to pledge federal securities to protect the funds and securities of the Authority in such amounts and pursuant to such arrangements as may be acceptable to the Board.

(b) Any monies of the Authority may, in the discretion of the Board and subject to any agreement or covenant between the Authority and the holders of any of its obligations limiting or restricting classes of investments, be invested in bonds or other obligations of, or guaranteed as to interest and principal by, the United States, Maryland, Virginia or the political subdivisions or agencies thereof.

For amendment to Title III, Article XVI, Sec. 69, See Washington Metropolitan Area Transit Regulation Compact Amendments, Pub. L. No. 100-285, 102 Stat. 82 (1988); 1984 Md. Laws, Chs. 674, 675; 1984 Va. Acts, Ch. 610; 1987 Va. Acts, Ch. 112; D.C. Law 5-122 (1984).

20. Original text read: 70. (a) As soon as practical after the closing of the fiscal year, an audit shall be made of the financial accounts of the Authority. The audit shall be made by qualified certified public accountants selected by the Board, who shall have no personal interest direct or indirect in the financial affairs of the Authority or any of its officers or employees. The report of audit shall be prepared in accordance with generally accepted auditing principles and shall be filed with the Chairman and other officers as the Board shall direct. Copies of the report shall be distributed to each Director, to the Congress, to the Board of Commissioners of the District of Columbia, to the Governors of Virginia and Maryland, to the Washington Suburban Transit Commission, to the Northern Virginia Transportation Commission and to the governing bodies of the political subdivisions located within the Zone which are parties to commitments for participation in the financing of the Authority and shall be made available for public distribution.

For amendment to Title III, Article XVI, Sec. 70 (a), See Washington Metropolitan Area Transit Regulation Compact, Pub. L. No. 104-322, 110 Stat. 3884 (1996); 1996 Laws of Maryland, Ch. 489; 1995 Acts of Assembly of Virginia, Ch. 150; D.C. Law 11-138 (1996).

21. Previously amended text read: 73. Contracts for the construction, reconstruction or improvement of any facility when the expenditure required exceeds twenty-five

thousand dollars ($25,000) and contracts for the purchase of supplies, equipment and materials when the expenditure required exceeds ten thousand dollars ($10,000) shall be advertised and let upon sealed bids to the lowest responsible bidder. Notice requesting such bids shall be published in a manner reasonable likely to attract prospective bidders, which publication shall be made at least ten days before bids are received and in at least two newspapers of general circulation in the Zone. The Board may reject any and all bids and readvertise in its discretion. If after rejecting bids the Board determines and resolves that, in its opinion, the supplies, equipment and materials may be purchased at a lower price in the open market, the Board may give each responsible bidder an opportunity to negotiate a price and may proceed to purchase the supplies, equipment and materials in the open market at a negotiated price which is lower than the lowest rejected bid of a responsible bidder, without further observance of the provisions requiring bids or notice. The Board shall adopt rules and regulations to provide for purchasing from the lowest responsible bidder when sealed bids, notice and publication are not required by this section. The Board may suspend and waive the provisions of this section requiring competitive bids whenever:

(a) the purchase is to be made from or the contract is to be made with the Federal or any State government or any agency or political subdivision thereof or pursuant to any open-end bulk-purchase contract of any of them;

(b) the public exigency requires the immediate delivery of the articles;

(c) only one source of supply is available; or

(d) the equipment to be purchased is of a technical nature and the procurement thereof without advertising is necessary in order to assure standardization of equipment and interchangeability of parts in the public interest.

For amendment to Title III, Article 73, See Washington Metropolitan Area Transit Regulation Compact, Pub. L. No. 104-322, 110 Stat. 3884 (1996); 1995 Acts of the Maryland General Assembly, Ch. 252; 1995 Acts of Assembly of Virginia, Ch. 150; D.C. Law 11-138 (1996).

Original text read: 73. Contracts for the construction, reconstruction or improvement of any facility when the expenditure required exceeds ten thousand dollars ($10,000) and contracts for the purchase of supplies, equipment and materials when the expenditure required exceeds two thousand five hundred ($2,500) shall be advertised and let upon sealed bids to the lowest responsible bidder. Notice requesting such bids shall be published in a manner reasonably likely to attract prospective bidders, which publication shall be made at least ten days before bids are received and in at least two newspapers of general circulation in the Zone. The Board may reject any and all bids and readvertise in its discretion. If

after rejecting bids the Board determines and resolves that, in its opinion, the supplies, equipment and materials may be purchased at a lower price in the open market, the Board may give each responsible bidder an opportunity to negotiate a price and may proceed to purchase the supplies, equipment and materials in the open market at a negotiated price which is lower than the lowest rejected bid of a responsible bidder, without further observance of the provisions requiring bids or notice. The Board shall adopt rules and regulations to provide for purchasing from the lowest responsible bidder when sealed bids, notice and publication are not required by this section. The Board may suspend and waive the provisions of this section requiring competitive bids whenever:

(a) the purchase is to be made from or the contract is to be made with the federal or

any State government or any agency or political subdivision thereof or pursuant to any open end bulk purchase contract of any of them;

(b) the public exigency requires the immediate delivery of the articles;

(c) only one source of supply is available; or

(d) the equipment to be purchased is of a technical nature and the procurement thereof without advertising is necessary in order to assure standardization of equipment and interchangeability of parts in the public interest.

For amendment to Title III, Article XVI, Sec. 73. See Washington Metropolitan Area Transit Regulation Compact Amendments, Pub. L. No. 100-265, 102 Stat. 82 (1988); 1984 Md. Laws, Chs. 674, 675; 1984 Va. Acts, Ch. 610; 1987 Va. Acts, Ch. 112, D.C. Law 5-122 (1984).

22. For amendment to Title III, Article XVI, Sec. 76 (a)-(h), See Metro Transit Police Act of 1976, Pub. L. No. 94-306 (1976); Maryland House Bill No. 733, Ch. 586, Sec. 317-76 (a)-(h) (1974); D.C. Law 1-67, 2, 3, 23 DCR 501 (1976); 1977 Virginia Acts of Assembly, Ch. 627, Sec. 76 (a)-(h); Washington Metropolitan Area Transit Regulation Compact Amendments, Pub. L. No. 100-285, 102 Stat. 82 (1988); 1984 Md. Laws, Chs. 674, 675; 1984 Va. Acts, Ch. 610, 1987 Va. Acts, Ch. 112, D.C. Law 5-122 (1984); Washington Metropolitan Area Transit Regulation Compact Amendment, Pub. L. No. 105-151, 111 Stat. 2686 (1997); 1997 Laws of Maryland, Ch. 699; 1995 Acts of Assembly of Virginia, Ch. 150; D.C. Law 11-138 (1996).

23. Previously amended text read: 76. (a) The Authority is authorized to establish and maintain a regular police force, to be known as the Metro Transit Police, to provide protection for its patrons, personnel, and transit facilities. The Metro Transit Police shall have the powers and duties and shall be subject to the limitations set forth in this section. It shall be composed of both uniformed and plainclothes personnel and shall be charged with the duty of enforcing the laws of the signatories, the laws, ordinances, and regulations of the political subdivisions thereof in the Transit Zone, and the rules and regulations of the Authority. The jurisdiction of the Metro Transit Police shall be limited to all the transit facilities owned, controlled, or operated by the Authority, but this shall not limit the power of the Metro Transit Police to make arrests in the Transit Zone for violations committed upon, to, or against such transit facilities committed from within or outside such transit facilities while in hot or close pursuit, or to execute traffic citations and criminal process in accordance with subsection (c). The members of the Metro Transit Police shall have concurrent jurisdiction in the performance of their duties with the duly constituted law enforcement agencies of the signatories and of the political subdivisions thereof in which any transit facilities of the Authority is located or in which the Authority operates any transit service. Nothing contained in this section shall either relieve any signatory or political subdivision or agency thereof from its duty to provide police, fire, and other public safety service and protection, or limit, restrict, or interfere with the jurisdiction of or the performance of duties by the existing police, fire, and other public safety agencies.

24. Original text read: 76(b)Except as otherwise provided in this section, a member of the Metro Transit Police shall have the same powers, including the power of arrest, and shall be subject to the same limitations, including regulatory limitations, in the performance of his duties as a member of the duly constituted police force of the political subdivision in which the Metro Transit Police member is engaged in the performance of his duties. However, a member of the Metro Transit Police is authorized to carry and use only such weapons, including handguns, as are issued by the

Authority, and only in the performance of his duties or while on the transit facilities owned, controlled, or operated by the Authority in direct transit to and from a duty assignment. A member of the Metro Transit Police is authorized to carry such weapons only while in direct transit to and from a duty assignment and is subject to such additional limitations in the use of weapons as are imposed on the duly constituted police force for the political subdivision in which he is engaged in the performance of his duties.

25. Previously amended text read: 76. (c) Members of the Metro Transit Police shall have power to execute on the transit facilities owned, controlled, or operated by the Authority any traffic citation or any criminal process issued by any court of any signatory or of any political subdivision of a signatory, for any felony, misdemeanor, or other offense against the laws, ordinances, rules, or regulations specified in subsection (a). However, with respect to offenses committed upon, to, or against the transit facilities owned, controlled, or operated by the Authority, the Metro Transit Police shall have power, except in the State of Maryland, to execute criminal process within the Transit Zone.

26. Original test read: (e) The Authority shall have the power to adopt rules and regulations for the safe, convenient, and orderly use of the transit facilities owned, controlled, or operated by the Authority, including the payment and the manner of the payment of fares or charges therefor, the protection of the transit facilities, the control of traffic and parking upon the transit facilities and the safety and protection of the riding public. In the event that any such rules and regulations contravene the laws, ordinances, rules or regulations of a signatory or any political subdivision thereof which are existing or subsequently enacted, these laws, ordinances, rules, or regulations of the signatory or the political subdivision shall apply and the conflicting rule or regulation, or portion thereof, of the Authority shall be void within the jurisdiction of that signatory or political subdivision. In all other respects the rules and regulations of the Authority shall be uniform throughout the Transit Zone. The rules and regulations established under this subsection shall be adopted and published in accordance with all standards of due process, including, but not limited to, the publishing or otherwise circulating of a notice of the intended action of the Authority and the affording to interested persons the opportunity to submit data or views orally or in writing, and the holding of a public hearing. Any person violating any rule or regulation of the Authority shall, upon conviction by a court of competent jurisdiction, pay a fine of not more than $250 and costs.

27. Original text read: 79. All laws of the signatories with respect to free transportation and school fares shall be applicable to transit service rendered by facilities owned or controlled by the Authority.

For amendment to Title III, Article XVI, Sec. 79, See National Capital Transportation Act of 1972, Pub. L. No. 92-349 (1972); Maryland House Bill No. 265, Ch. 776, Sec. 317-79 (1971); 1972 Virginia Acts of Assembly, H. 597, Ch. 571.

28. Original text read: 81. The United States District Courts shall have original jurisdiction, concurrent with the Courts of Maryland and Virginia, of all actions brought by or against the Authority and to enforce subpoenas issued under this Title. Any such action initiated in a State Court shall be removable to the appropriate United States District Court in the manner provided by Act of June 25, 1948, as amended (28 U.S.C. 1446).

For amendment to Title III, Article XVI. Sec. 81, See Washington Metropolitan Area Transit Regulation Compact, Pub. L. No. 104-322, 110 Stat. 3884 (1996); 1996 Laws of

Maryland, Ch. 489; 1995 Acts of Assembly of Virginia, Ch. 150; D.C. Law 11-138 (1996).

29. Original text read: 82. (a) The Authority shall have the power to acquire by condemnation, whenever in its opinion it is necessary or advantageous to the Authority to do so, any real or personal property, or any interest therein, necessary or useful for the transit system authorized herein, except property owned by the United States, by a signatory, or any political subdivision thereof, or by a private transit company.

For amendment to Title III, Article XVI, Sec. 82 (a), See National Capital Transportation Act of 1972, Pub. L. No. 92-517 (1972); Maryland House Bill No. 265, Ch. 776, Sec. 317-82a (1971); 1972 Virginia Acts of Assembly, H. 597, Ch. 571.

30. Original text read: 84. Amendments and supplements to this Title to implement the purposes thereof may be adopted by legislative action of any of the signatory parties concurred in by all of the others.

For amendment to Title III, Article XVI, Sec. 84, See Washington Metropolitan Area Transit Regulation Compact, Pub. L. No. 104-322, 110 Stat. 3884 (1996); 1996 Laws of Maryland, Ch. 489; 1995 Acts of Assembly of Virginia, Ch. 150; D.C. Law 11-138 (1996).

Home | Trip Planner | Alerts | Contact Us | Careers | Privacy Policy | Environmental Policy | Printer-fr

© 1998-2007 Washington Metropolitan Area Transit Authority

**Translate:** 

Help

# Exhibit "D"

# PROCUREMENT PROCEDURES MANUAL
## TENTH EDITION (2004)





**WMATA PROCUREMENT PROCEDURES MANUAL**
**TABLE OF CONTENTS**

**TABLE OF CONTENTS**
**AND GENERAL STRUCTURE**

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

**W.M.A.T.A. PROCUREMENT PROCEDURES MANUAL (PPM)** . . . . . . . . . . . . . . . . . . . . xiii
    PURPOSE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xiii
    AUTHORITY AND APPLICABILITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xiii
    HOW TO USE AND TO RECOMMEND CHANGES TO THE MANUAL . . . . . . xiii
    REVISIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xiv
    DISCLAIMER  (Rev. 10) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xv

**CHAPTER 1 - PROCUREMENT POLICY STATEMENT** . . . . . . . . . . . . . . . . . . . . Ch. 1  Pg. 3
    I.    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 1  Pg. 3
    II.    Procurement Regulations Background . . . . . . . . . . . . . . . . . . . . . Ch. 1  Pg. 3
    III.    General Policy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 1  Pg. 3
    IV.    Procurement Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 1  Pg. 6
    V.    Competition Requirements and Methods of Procurement . . . . . . . . Ch. 1  Pg. 8
    VI.    Contracting  with Disadvantaged Business Enterprise (DBE) . . . . Ch. 1  Pg. 10
    VII.    Cost and Price Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 1  Pg. 11
    VIII.    Bonding Requirements  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 1  Pg. 11
    IX.    Options . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 1  Pg. 11
    X.    Advance Payments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 1  Pg. 11
    XI.    Progress Payments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 1  Pg. 11
    XII.    Liquidated Damages Provisions . . . . . . . . . . . . . . . . . . . . . . . . Ch. 1  Pg. 12
    XIII.    Statutory and Regulatory Requirements . . . . . . . . . . . . . . . . . . . Ch. 1  Pg. 12
    XIV.    Contracting Officer Authority . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 1  Pg. 12
    XV.    Contract Approval Requirements . . . . . . . . . . . . . . . . . . . . . . . . Ch. 1  Pg. 12
    XVI.    Reports . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 1  Pg. 14
    XVII.    Special Agreements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 1  Pg. 14
    XVIII.    Implementation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 1  Pg. 14
    XIX.    Deviation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 1  Pg. 14

**CHAPTER 2 - PROCUREMENT INTEGRITY AND CONTROL** . . . . . . . . . . . . . . Ch. 2  Pg. 1
    200    PURPOSE AND SCOPE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 2  Pg. 1
    201    BACKGROUND AND AUTHORITY . . . . . . . . . . . . . . . . . . . . . . . . Ch. 2  Pg. 1
    202    FEDERAL CONTROLS AND LIMITATIONS . . . . . . . . . . . . . . . . . . Ch. 2  Pg. 1
    203    AUTHORITY CONTROLS AND LIMITATIONS . . . . . . . . . . . . . . . . Ch. 2  Pg. 2
    204    AMENDMENTS AND DEVIATIONS . . . . . . . . . . . . . . . . . . . . . . . Ch. 2  Pg. 2
    205    PROCUREMENT PROCEDURES MANUAL . . . . . . . . . . . . . . . . . . Ch. 2  Pg. 2
    206    CONTRACTING OFFICER AUTHORITY . . . . . . . . . . . . . . . . . . . . Ch. 2  Pg. 3
    207    AUTHORITY AND RESPONSIBILITIES OF CONTRACTING OFFICERS
        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 2  Pg. 3
    208    SYSTEM FOR CONTRACTING OFFICER DELEGATIONS . . . . . . Ch. 2  Pg. 4

i

WMATA PROCUREMENT PROCEDURES MANUAL
TABLE OF CONTENTS

209    UNAUTHORIZED PROCUREMENTS ....................... Ch. 2  Pg. 5
210    STANDARDS OF CONDUCT  (Rev. 2) ..................... Ch. 2  Pg. 6
211    REPORTING OF SUSPECTED IMPROPER OR UNLAWFUL CONDUCT
       ...................................................... Ch. 2  Pg. 8
212    PROHIBITION AGAINST CONTINGENT FEES ................ Ch. 2  Pg. 9
213    ADDITIONAL STANDARDS OF CONDUCT .................. Ch. 2  Pg. 9

**CHAPTER 3 - DISADVANTAGED BUSINESS ENTERPRISE REQUIREMENTS  (Rev. 8)**
       ...................................................... Ch. 3  Pg. 1
300    PURPOSE AND SCOPE  (Rev. 8) ......................... Ch. 3  Pg. 1
301    DEFINITIONS  (Rev. 8) ................................ Ch. 3  Pg. 1
302    DBE POLICIES  (Rev. 8) ............................... Ch. 3  Pg. 2
303    DBE GOAL-SETTING PROCEDURES  (Rev. 8) ............. Ch. 3  Pg. 3
304    RACE-CONSCIOUS AND RACE-NEUTRAL EFFORTS  (Rev. 8) . Ch. 3  Pg. 4
305    SOLICITATION REQUIREMENTS  (Rev. 8) ................ Ch. 3  Pg. 4
306    BID AND PROPOSAL REQUIREMENTS  (Rev. 8) ........... Ch. 3  Pg. 5
307    CONTRACT ADMINISTRATION REQUIREMENTS  (Rev. 8) ..... Ch. 3  Pg. 6
308    PROCEDURAL STEPS BY DEPARTMENT  (Rev. 8) .......... Ch. 3  Pg. 7
309    CONTRACT FILES  (Rev. 8) ............................. Ch. 3  Pg. 8

**CHAPTER 4 - PROCUREMENT PLANNING AND METHODS** .............. Ch. 4  Pg. 1
400    PURPOSE AND SCOPE ................................. Ch. 4  Pg. 1
401    RESPONSIBILITIES ................................... Ch. 4  Pg. 1
402    CONTACTS WITH PROSPECTIVE CONTRACTORS  (Rev. 2) ... Ch. 4  Pg. 1
403    PUBLICIZING CONTRACT ACTIONS  (Rev. 10) ............ Ch. 4  Pg. 2
404    INITIATION AND APPROVAL OF PROCUREMENT ACTIONS  (Rev. 4, 5 and 10)
       ...................................................... Ch. 4  Pg. 3
405    SPECIFICATIONS AND PURCHASE DESCRIPTIONS  (Rev. 4 and 10)
       ...................................................... Ch. 4  Pg. 4
406    AUTHORIZED METHODS OR PROCUREMENT  (Rev. 5) ....... Ch. 4  Pg. 6
407    MULTI-YEAR CONTRACTS  (Rev. 5 and 10) ................ Ch. 4  Pg. 7
408    INDEFINITE DELIVERY CONTRACTS ...................... Ch. 4  Pg. 9
409    USE OF OPTIONS  (Rev. 5) ............................ Ch. 4  Pg. 10
410    SOLICITATION OF CONTRACTS WITH OPTIONS  (Rev. 3 and 5)
       ...................................................... Ch. 4  Pg. 12
411    EXERCISE OF OPTIONS  (Rev. 4 and 5) .................. Ch. 4  Pg. 13
412    ADVANCE PROCUREMENT PLANNING  (Rev. 2) ............ Ch. 4  Pg. 14
413    STOCK REPLENISHMENT PROCUREMENT GUIDELINES  (Rev. 5)
       ...................................................... Ch. 4  Pg. 15
414    COMPETITION  (Rev. 5) ............................... Ch. 4  Pg. 16
415    PRE-QUALIFICATION CRITERIA  (Rev. 5) ................ Ch. 4  Pg. 17
416    ORDERING FROM FEDERAL SUPPLY SCHEDULES  (Rev. 9) . Ch. 4  Pg. 17
417    ORDERING FROM COUNCIL OF GOVERNMENTS CONTRACTS  (Rev. 9)
       ...................................................... Ch. 4  Pg. 20
418    ORGANIZATIONAL CONFLICTS OF INTEREST  (New Rev. 10)
       ...................................................... Ch. 4  Pg. 20

ii

**WMATA PROCUREMENT PROCEDURES MANUAL**
**TABLE OF CONTENTS**

419    REVENUE CONTRACTS   (New Rev. 10) . . . . . . . . . . . . . . . . . . .   Ch. 4 Pg. 21

**CHAPTER 5 - PROCUREMENT BY COMPETITIVE SEALED BIDDING** . . . . . . .   Ch. 5 Pg. 1
500    PURPOSE AND SCOPE   (Rev. 5) . . . . . . . . . . . . . . . . . . . . . . . . .   Ch. 5 Pg. 1
501    INVITATION FOR BIDS   (Rev. 5) . . . . . . . . . . . . . . . . . . . . . . . .   Ch. 5 Pg. 1
502    PREPARATION OF THE INVITATION FOR BIDS . . . . . . . . . . . . . .   Ch. 5 Pg. 2
503    BID REQUIREMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   Ch. 5 Pg. 3
504    TIME FOR SUBMISSION OF BIDS . . . . . . . . . . . . . . . . . . . . . . .   Ch. 5 Pg. 4
505    TELEGRAPHIC BIDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   Ch. 5 Pg. 4
506    BID SAMPLES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   Ch. 5 Pg. 4
507    DESCRIPTIVE LITERATURE . . . . . . . . . . . . . . . . . . . . . . . . . . . .   Ch. 5 Pg. 5
508    FACSIMILE BIDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   Ch. 5 Pg. 6
509    NOTICES OF INVITATIONS FOR BIDS . . . . . . . . . . . . . . . . . . . .   Ch. 5 Pg. 6
510    RECORDS OF INVITATIONS FOR BIDS AND BIDS . . . . . . . . . . .   Ch. 5 Pg. 7
5l1    SOLICITATION  MAILING LISTS . . . . . . . . . . . . . . . . . . . . . . . . . .   Ch. 5 Pg. 7
512    EXCESSIVELY LONG MAILING LISTS . . . . . . . . . . . . . . . . . . . . .   Ch. 5 Pg. 7
513    PRE-BID CONFERENCES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   Ch. 5 Pg. 7
514    AMENDMENT OF INVITATIONS FOR BIDS   . . . . . . . . . . . . . . . .   Ch. 5 Pg. 8
515    CANCELLATION OF INVITATIONS FOR BIDS BEFORE OPENING
       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   Ch. 5 Pg. 8
516    SUBMISSION OF BIDS:  GENERAL PROVISIONS . . . . . . . . . . . .   Ch. 5 Pg. 9
517    MODIFICATION OF WITHDRAWAL OF BIDS . . . . . . . . . . . . . . . .   Ch. 5 Pg. 9
518    LATE BIDS, LATE MODIFICATIONS, AND LATE WITHDRAWALS
       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   Ch. 5 Pg. 10
519    NOTICE TO BIDDERS OF LATE ACTIONS . . . . . . . . . . . . . . . . .   Ch. 5 Pg. 11
520    RECEIPT AND SAFEGUARDING OF BIDS . . . . . . . . . . . . . . . . . .   Ch. 5 Pg. 12
521    OPENING OF BIDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   Ch. 5 Pg. 12
522    POSTPONEMENT OF BID OPENING . . . . . . . . . . . . . . . . . . . . . .   Ch. 5 Pg. 13
523    RECORDING OF BIDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   Ch. 5 Pg. 13
524    CANCELLATION OF AN INVITATION FOR BIDS AFTER OPENING   (Rev. 5)
       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   Ch. 5 Pg. 14
525    REJECTION OF INDIVIDUAL BIDS   (Rev. 5) . . . . . . . . . . . . . . . .   Ch. 5 Pg. 15
526    ALL OR NONE QUALIFICATIONS . . . . . . . . . . . . . . . . . . . . . . . . .   Ch. 5 Pg. 16
527    MINOR INFORMALITIES OR IRREGULARITIES IN BIDS . . . . . .   Ch. 5 Pg. 16
528    MISTAKES IN BIDS BEFORE AWARD   (Rev. 6) . . . . . . . . . . . .   Ch. 5 Pg. 17
529    MISTAKES IN BIDS AFTER AWARD . . . . . . . . . . . . . . . . . . . . . . .   Ch. 5 Pg. 18
530    BID EVALUATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   Ch. 5 Pg. 19
531    CONTRACT AWARDS   (Rev. 2) . . . . . . . . . . . . . . . . . . . . . . . . . .   Ch. 5 Pg. 19
532    ECONOMIC PRICE ADJUSTMENT . . . . . . . . . . . . . . . . . . . . . . . .   Ch. 5 Pg. 20
533    RESOLVING TIE BIDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   Ch. 5 Pg. 20
534    INFORMATION TO BIDDERS . . . . . . . . . . . . . . . . . . . . . . . . . . . .   Ch. 5 Pg. 21
535    TWO-STEP SEALED BIDDING . . . . . . . . . . . . . . . . . . . . . . . . . . .   Ch. 5 Pg. 21
536    CONDITIONS FOR USE OF TWO-STEP SEALED BIDDING . . . .   Ch. 5 Pg. 21
537    SOLICITATION-STEP ONE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   Ch. 5 Pg. 22
538    RECEIPT AND EVALUATION OF STEP ONE PROPOSALS . . . .   Ch. 5 Pg. 23
539    STEP-TWO PROCEDURES . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   Ch. 5 Pg. 24

iii

**WMATA PROCUREMENT PROCEDURES MANUAL**
**TABLE OF CONTENTS**

540   UNBALANCED BIDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 5 Pg. 24

**CHAPTER 6 - PROCUREMENT BY COMPETITIVE NEGOTIATIONS** . . . . . . . . . Ch. 6 Pg. 1
600   SCOPE AND PURPOSE . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 6 Pg. 1
601   AUTHORITY TO NEGOTIATE  (Rev. 5) . . . . . . . . . . . . . . . . . . . Ch. 6 Pg. 1
602   CANCELLATION OF A REQUEST FOR PROPOSAL  (Rev. 5) . . . Ch. 6 Pg. 1
603   SOLICITATION OF PROPOSALS . . . . . . . . . . . . . . . . . . . . . . Ch. 6 Pg. 2
604   PRESOLICITATION NOTICES AND CONFERENCES . . . . . . . . . . Ch. 6 Pg. 2
605   PRE-PROPOSAL CONFERENCES . . . . . . . . . . . . . . . . . . . . . . Ch. 6 Pg. 3
606   AMENDMENT OF SOLICITATIONS BEFORE CLOSING DATE . . . Ch. 6 Pg. 4
607   RECEIPT OF PROPOSALS . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 6 Pg. 4
608   LATE PROPOSALS, LATE MODIFICATIONS, AND LATE WITHDRAWALS
      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 6 Pg. 5
609   DISCLOSURE AND USE OF INFORMATION BEFORE AWARD . . Ch. 6 Pg. 5
610   UNSOLICITED PROPOSALS . . . . . . . . . . . . . . . . . . . . . . . . Ch. 6 Pg. 6
611   EVALUATION OF UNSOLICITED PROPOSALS . . . . . . . . . . . . . Ch. 6 Pg. 7
612   SOURCE SELECTION  (Rev. 5) . . . . . . . . . . . . . . . . . . . . . . . Ch. 6 Pg. 8
613   RESPONSIBILITIES  (Rev. 5) . . . . . . . . . . . . . . . . . . . . . . . . Ch. 6 Pg. 9
614   EVALUATION FACTORS . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 6 Pg. 10
615   CHANGES IN AUTHORITY REQUIREMENTS . . . . . . . . . . . . . . Ch. 6 Pg. 11
616   DISCLOSURE OF MISTAKES BEFORE AWARD . . . . . . . . . . . Ch. 6 Pg. 12
617   PROPOSAL EVALUATION  (Rev. 4 and 5) . . . . . . . . . . . . . . . . Ch. 6 Pg. 12
618   COMPETITIVE RANGE . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 6 Pg. 13
619   DISCUSSIONS WITH OFFERORS . . . . . . . . . . . . . . . . . . . . Ch. 6 Pg. 14
620   BEST AND FINAL OFFERS . . . . . . . . . . . . . . . . . . . . . . . Ch. 6 Pg. 15
621   PRICE NEGOTIATION . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 6 Pg. 16
622   PRE-NEGOTIATION OBJECTIVES . . . . . . . . . . . . . . . . . . . . Ch. 6 Pg. 17
623   SUMMARY NEGOTIATION MEMORANDUM . . . . . . . . . . . . . . Ch. 6 Pg. 17
624   PROFIT OR FEES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 6 Pg. 18
625   PROFIT ANALYSIS FACTORS . . . . . . . . . . . . . . . . . . . . . . Ch. 6 Pg. 18
626   NOTIFICATIONS AND DEBRIEFING . . . . . . . . . . . . . . . . . . . Ch. 6 Pg. 20
627   DESIGN-BUILD SELECTION PROCEDURES  (Rev. 7) . . . . . . . . Ch. 6 Pg. 21

**CHAPTER 7 - SOLE SOURCE, EMERGENCY AND OTHER NON-COMPETITIVE PROCUREMENTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 7 Pg. 1
700   PURPOSE AND SCOPE  (Rev. 10) . . . . . . . . . . . . . . . . . . . . . Ch. 7 Pg. 1
701   GENERAL PROVISIONS  (Rev. 5 and 10) . . . . . . . . . . . . . . . . Ch. 7 Pg. 1
702   SOLE SOURCE PROCUREMENT  (Rev. 5 and 10) . . . . . . . . . . Ch. 7 Pg. 3
703   SINGLE AVAILABLE SOURCE  (Rev. 5 and 10) . . . . . . . . . . . . Ch. 7 Pg. 4
704   NEGOTIATED SOLE SOURCE DETERMINATION AND FINDINGS  (Rev. 4 and 10) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 7 Pg. 5
705   SOLE SOURCE PROCUREMENT PROCEDURES  (Rev. 10) . . . . Ch. 7 Pg. 5
706   EMERGENCY PROCUREMENTS . . . . . . . . . . . . . . . . . . . . . Ch. 7 Pg. 6
707   EMERGENCY PROCUREMENT DETERMINATIONS AND FINDINGS  (Rev. 4)
      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 7 Pg. 7
708   EMERGENCY PROCUREMENT PROCEDURES . . . . . . . . . . . . Ch. 7 Pg. 8

iv

**WMATA PROCUREMENT PROCEDURES MANUAL
TABLE OF CONTENTS**

**CHAPTER 8 - ARCHITECT-ENGINEER AND RELATED SERVICES** . . . . . . . . . Ch. 8 Pg. 1
  800   PURPOSE AND SCOPE  (Rev. 5) . . . . . . . . . . . . . . . . . . . . . . Ch. 8 Pg. 1
  801   ARCHITECT ENGINEER POLICY  (Rev. 5) . . . . . . . . . . . . . . . . . Ch. 8 Pg. 1
  802   SELECTION OF FIRMS FOR ARCHITECT-ENGINEER CONTRACTS
       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 8 Pg. 2
  803   EVALUATION BOARDS  (Rev. 5) . . . . . . . . . . . . . . . . . . . . . . Ch. 8 Pg. 2
  804   NEGOTIATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 8 Pg. 4
  805   RELEASE OF INFORMATION ON FIRM SELECTION . . . . . . . . . . Ch. 8 Pg. 5
  806   SIMPLIFIED PROCEDURES  (Rev. 5) . . . . . . . . . . . . . . . . . . . . Ch. 8 Pg. 5
  807   EVALUATION OF CONTRACTORS . . . . . . . . . . . . . . . . . . . . . . . Ch. 8 Pg. 5
  808   RETENTION OF RECORDS  . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 8 Pg. 6
  809   AUTHORITY COST ESTIMATE . . . . . . . . . . . . . . . . . . . . . . . . Ch. 8 Pg. 6
  810   ARCHITECT-ENGINEER LIABILITY  . . . . . . . . . . . . . . . . . . . . . Ch. 8 Pg. 7
  811   ADDITIONAL A-E CONTRACT GUIDELINES  . . . . . . . . . . . . . . . Ch. 8 Pg. 7

**CHAPTER 9 - CONSTRUCTION CONTRACTS** . . . . . . . . . . . . . . . . . . . . . . . Ch. 9 Pg. 1
  900   PURPOSE AND SCOPE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 9 Pg. 1
  901   CONSTRUCTION CONTRACTS  (Rev. 5) . . . . . . . . . . . . . . . . . Ch. 9 Pg. 1
  902   CONSTRUCTION LABOR STANDARDS . . . . . . . . . . . . . . . . . . . Ch. 9 Pg. 3
  903   VALUE ENGINEERING  (Rev. 2 and 5) . . . . . . . . . . . . . . . . . . Ch. 9 Pg. 5

**CHAPTER 10 - CONTRACT MANAGEMENT AND ADMINISTRATION** . . . . . . . Ch. 10 Pg. 1
  1000  PURPOSE AND SCOPE  . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 10 Pg. 1
  1001  AUTHORITY AND RESPONSIBILITY  . . . . . . . . . . . . . . . . . . . Ch. 10 Pg. 1
  1002  APPROVAL OF AWARD ACTIONS  (Rev. 3) . . . . . . . . . . . . . . Ch. 10 Pg. 1
  1003  PRE-AWARD ORIENTATION . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 10 Pg. 2
  1004  POST-AWARD CONFERENCE . . . . . . . . . . . . . . . . . . . . . . . . Ch. 10 Pg. 3
  1005  POST-AWARD CONFERENCE WITH SUBCONTRACTORS . . . . Ch. 10 Pg. 4
  1006  CONTRACT EXECUTION BY THE AUTHORITY  . . . . . . . . . . . Ch. 10 Pg. 4
  1007  CONTRACT EXECUTION BY CONTRACTORS . . . . . . . . . . . . . Ch. 10 Pg. 5
  1008  CONTRACT DISTRIBUTION . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 10 Pg. 5
  1009  CONTRACT FILES  (Rev. 2) . . . . . . . . . . . . . . . . . . . . . . . . Ch. 10 Pg. 5
  1010  CONTRACT MODIFICATIONS  (Rev. 2) . . . . . . . . . . . . . . . . . Ch. 10 Pg. 7
  1011  CHANGE ORDERS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 10 Pg. 8
  1012  SUSPENSION OF WORK/STOP ORDER . . . . . . . . . . . . . . . . Ch. 10 Pg. 10
  1013  TERMINATION  (Rev. 5) . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 10 Pg. 11
  1014  DELIVERY AND PERFORMANCE . . . . . . . . . . . . . . . . . . . . . Ch. 10 Pg. 12
  1015  ADDITIONAL CONTRACT COMPLIANCE . . . . . . . . . . . . . . . . Ch. 10 Pg. 14
  1016  LIQUIDATED DAMAGES  (Rev. 10) . . . . . . . . . . . . . . . . . . . Ch. 10 Pg. 15
  1017  SUBCONTRACTS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 10 Pg. 16
  1018  CLOSEOUT OF CONTRACTS  (Rev. 2) . . . . . . . . . . . . . . . . . Ch. 10 Pg. 19
  1019  AUTHORITY PROPERTY . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 10 Pg. 20
  1020  DELEGATION OF AUTHORITY TO COTR/COR  (Rev. 5) . . . . Ch. 10 Pg. 20
  1021  LOCATION OF NEGOTIATION MEETINGS  (Rev. 5) . . . . . . . Ch. 10 Pg. 22

v

WMATA PROCUREMENT PROCEDURES MANUAL
TABLE OF CONTENTS

CHAPTER 11 - SIMPLIFIED ACQUISITION PROCEDURES . . . . . . . . . . . . . . . Ch. 11 Pg. 1
1100    PURPOSE AND SCOPE  (Rev. 5) . . . . . . . . . . . . . . . . . . . . . . . . Ch. 11 Pg. 1
1101    USE OF SIMPLIFIED ACQUISITION PROCEDURES  (Rev. 5) . . Ch. 11 Pg. 1
1102    SIMPLIFIED ACQUISITION PROCEDURES AUTHORITY . . . . . . Ch. 11 Pg. 1
1103    NON-COMPETITIVE SIMPLIFIED ACQUISITION PROCEDURES (Rev. 5)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 11 Pg. 1
1104    COMPETITIVE SIMPLIFIED ACQUISITIONS  (Rev. 5) . . . . . . . . Ch. 11 Pg. 2
1105    DETERMINATION OF REASONABLE PRICE AND AWARD . . . . Ch. 11 Pg. 3
1106    BLANKET PURCHASE AGREEMENTS . . . . . . . . . . . . . . . . . . . . Ch. 11 Pg. 4
1107    BLANKET PURCHASE PROCEDURES . . . . . . . . . . . . . . . . . . . Ch. 11 Pg. 5
1108    IMPREST FUNDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 11 Pg. 7
1109    PURCHASE ORDERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 11 Pg. 7
1110    UNPRICED PURCHASE ORDERS . . . . . . . . . . . . . . . . . . . . . . . Ch. 11 Pg. 8
1111    MODIFICATION OF PURCHASE ORDERS . . . . . . . . . . . . . . . . . Ch. 11 Pg. 8
1112    TERMINATION AND CANCELLATION OF PURCHASE ORDERS
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 11 Pg. 8
1113    HANDBOOK FOR SIMPLIFIED ACQUISITIONS . . . . . . . . . . . . . Ch. 11 Pg. 9

CHAPTER 12 - TYPES OF CONTRACTS . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 12 Pg. 1
1200    PURPOSE AND SCOPE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 12 Pg. 1
1201    GENERAL PROVISIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 12 Pg. 1
1202    SELECTING CONTRACT TYPES . . . . . . . . . . . . . . . . . . . . . . . Ch. 12 Pg. 1
1203    FIXED-PRICE CONTRACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 12 Pg. 2
1204    FIXED-PRICE CONTRACTS WITH ECONOMIC PRICE ADJUSTMENTS
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 12 Pg. 3
1205    FIXED-PRICE CONTRACTS WITH PROSPECTIVE PRICE REDETERMINATION
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 12 Pg. 4
1206    COST-REIMBURSEMENT CONTRACTS . . . . . . . . . . . . . . . . . . Ch. 12 Pg. 5
1207    INCENTIVE CONTRACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 12 Pg. 6
1208    TYPES OF INCENTIVES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 12 Pg. 7
1209    FIXED-PRICE INCENTIVE CONTRACTS . . . . . . . . . . . . . . . . . . Ch. 12 Pg. 7
1210    COST-PLUS-AWARD-FEE CONTRACTS . . . . . . . . . . . . . . . . . . Ch. 12 Pg. 8
1211    DEFINITE-QUANTITY CONTRACTS . . . . . . . . . . . . . . . . . . . . . Ch. 12 Pg. 9
1212    TIME-AND—MATERIALS CONTRACT . . . . . . . . . . . . . . . . . . . . Ch. 12 Pg. 9
1213    LABOR-HOUR CONTRACTS . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 12 Pg. 10
1214    LETTER CONTRACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 12 Pg. 10
1215    INDEFINITE DELIVERY CONTRACTS  (Rev. 5) . . . . . . . . . . . . Ch. 12 Pg. 11

CHAPTER 13 - COST PRINCIPLES AND PROPOSAL ANALYSIS . . . . . . . . . Ch. 13 Pg. 1
1300    PURPOSE AND SCOPE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 13 Pg. 1
1301    ADVANCE COST AGREEMENTS . . . . . . . . . . . . . . . . . . . . . . . Ch. 13 Pg. 2
1302    DEVIATION FROM COST PRINCIPLES . . . . . . . . . . . . . . . . . . . Ch. 13 Pg. 2
1303    TOTAL COSTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 13 Pg. 3
1304    DETERMINING ALLOWABILITY . . . . . . . . . . . . . . . . . . . . . . . . Ch. 13 Pg. 3
1305    DETERMINING REASONABLENESS . . . . . . . . . . . . . . . . . . . . Ch. 13 Pg. 3
1306    DETERMINING ALLOCABILITY . . . . . . . . . . . . . . . . . . . . . . . . Ch. 13 Pg. 4

vi

WMATA PROCUREMENT PROCEDURES MANUAL
TABLE OF CONTENTS

1307   CREDITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   Ch. 13  Pg. 4
1308   ACCOUNTING FOR UNALLOWABLE COSTS  . . . . . . . . . . . . . .   Ch. 13  Pg. 4
1309   DIRECT COSTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   Ch. 13  Pg. 5
1310   INDIRECT COSTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   Ch. 13  Pg. 5
1311   SELECTED COSTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   Ch. 13  Pg. 6
1312   PROPOSAL ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . .   Ch. 13  Pg. 6
1313   COST OR PRICING DATA . . . . . . . . . . . . . . . . . . . . . . . . . . .   Ch. 13  Pg. 7
1314   CERTIFIED COST OR PRICING DATA . . . . . . . . . . . . . . . . . . .   Ch. 13  Pg. 7
1315   PRICE ANALYSIS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   Ch. 13  Pg. 11
1316   COST ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   Ch. 13  Pg. 11
1317   DETERMINATION AND FINDINGS APPROVAL  (Rev. 4) . . . . .   Ch. 13  Pg. 13
1318   PREPARING THE COST ANALYSIS . . . . . . . . . . . . . . . . . . . .   Ch. 13  Pg. 14
1319   TECHNICAL ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . .   Ch. 13  Pg. 14
1320   CONTRACT AUDIT AS A PRICING AID  (Rev. 2) . . . . . . . . . .   Ch. 13  Pg. 14
1321   ADDITIONAL COST AND PRICE ANALYSIS GUIDELINES  (Rev. 2)
       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   Ch. 13  Pg. 15


**CHAPTER 14 - CONTRACTOR RESPONSIBILITY AND DEBARMENT** . . . . . . .   Ch. 14  Pg. 1
1400   PURPOSE AND SCOPE  . . . . . . . . . . . . . . . . . . . . . . . . . . . .   Ch. 14  Pg. 1
1401   RESPONSIBLE PROSPECTIVE CONTRACTORS . . . . . . . . . . .   Ch. 14  Pg. 1
1402   SPECIAL STANDARD OF RESPONSIBILITY . . . . . . . . . . . . . .   Ch. 14  Pg. 2
1403   APPLICATION OF WALSH-HEALEY ACT . . . . . . . . . . . . . . . .   Ch. 14  Pg. 2
1404   APPLICATION OF OTHER REQUIREMENTS . . . . . . . . . . . . . .   Ch. 14  Pg. 3
1405   SUBCONTRACTOR RESPONSIBILITY . . . . . . . . . . . . . . . . . .   Ch. 14  Pg. 4
1406   OBTAINING INFORMATION FOR DETERMINATION OF RESPONSIBILITY
       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   Ch. 14  Pg. 4
1407   DETERMINATIONS AND DOCUMENTATION . . . . . . . . . . . . . .   Ch. 14  Pg. 5
1408   PRE-AWARD SURVEYS  (Rev. 4) . . . . . . . . . . . . . . . . . . . . .   Ch. 14  Pg. 6
1409   LIST OF EXCLUDED PARTIES . . . . . . . . . . . . . . . . . . . . . . .   Ch. 14  Pg. 6
1410   DEBARMENT AND SUSPENSION  (Rev. 1) . . . . . . . . . . . . . .   Ch. 14  Pg. 7
1411   DEFINITIONS  (Rev. 1) . . . . . . . . . . . . . . . . . . . . . . . . . . . .   Ch. 14  Pg. 7
1412   EFFECT OF LISTING  (Rev. 1) . . . . . . . . . . . . . . . . . . . . . . .   Ch. 14  Pg. 8
1413   CONTINUATION OF CURRENT CONTRACTS  (Rev. 1) . . . . . . .   Ch. 14  Pg. 9
1414   RESTRICTIONS ON SUBCONTRACTING  (Rev. 1) . . . . . . . . .   Ch. 14  Pg. 9
1415   DEBARMENT  (Rev. 1) . . . . . . . . . . . . . . . . . . . . . . . . . . . .   Ch. 14  Pg. 10
1416   DEBARMENT PROCEDURES  (Rev. 1) . . . . . . . . . . . . . . . . . .   Ch. 14  Pg. 11
1417   PERIOD OF DEBARMENT  (Rev. 1) . . . . . . . . . . . . . . . . . . . .   Ch. 14  Pg. 12
1418   SCOPE OF DEBARMENT  (Rev. 1) . . . . . . . . . . . . . . . . . . . .   Ch. 14  Pg. 13
1419   SUSPENSION  (Rev. 1) . . . . . . . . . . . . . . . . . . . . . . . . . . . .   Ch. 14  Pg. 13
1420   SUSPENSION PROCEDURES  (Rev. 1) . . . . . . . . . . . . . . . . .   Ch. 14  Pg. 14
1421   PERIOD OF SUSPENSION  (Rev. 1) . . . . . . . . . . . . . . . . . . .   Ch. 14  Pg. 16
1422   SCOPE OF SUSPENSION  (Rev. 1) . . . . . . . . . . . . . . . . . . .   Ch. 14  Pg. 16
1423   CERTIFICATION REGARDING DEBARMENT OR INELIGIBILITY  (Rev. 2)
       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   Ch. 14  Pg. 16


**CHAPTER 15 - SPECIAL AGREEMENTS** . . . . . . . . . . . . . . . . . . . . . . . . . . .   Ch. 15  Pg. 1

vii

WMATA PROCUREMENT PROCEDURES MANUAL
TABLE OF CONTENTS

1500  PURPOSE AND SCOPE ............................... Ch. 15 Pg. 1
1501  MASTER AGREEMENTS ................................ Ch. 15 Pg. 1
1502  REAL PROPERTY ACQUISITIONS ......................... Ch. 15 Pg. 3
1503  REAL PROPERTY DISPOSAL ............................ Ch. 15 Pg. 4
1504  PERMITS AND EASEMENTS ............................ Ch. 15 Pg. 5
1505  BUS CHARTER SERVICE AGREEMENTS .................. Ch. 15 Pg. 5
1506  OTHER CONTRACTS AND AGREEMENTS ................. Ch. 15 Pg. 5
1507  ASSURANCE FOR USE OF REAL PROPERTY ............. Ch. 15 Pg. 6
1508  JOINT DEVELOPMENT PROCUREMENT REGULATIONS  (Rev. 5)
      ....................................................... Ch. 15 Pg. 6

CHAPTER 16 - BOND, OTHER SECURITY, AND INSURANCE ............. Ch. 16 Pg. 1
1600  PURPOSE AND SCOPE .............................. Ch. 16 Pg. 1
1601  GENERAL PROVISIONS ............................. Ch. 16 Pg. 1
1602  BID BONDS AND OTHER SECURITY ..................... Ch. 16 Pg. 2
1603  NONCOMPLIANCE WITH BID SECURITY REQUIREMENTS ... Ch. 16 Pg. 3
1604  PERFORMANCE AND PAYMENT SECURITY  (Rev. 10) ...... Ch. 16 Pg. 3
1605  SURETY BONDS AND OTHER SECURITY ................. Ch. 16 Pg. 5
1606  SURETIES ........................................ Ch. 16 Pg. 6
1607  INSURANCE REQUIREMENTS  (Rev. 4) .................. Ch. 16 Pg. 6

CHAPTER 17 - QUALITY ASSURANCE AND WARRANTIES ............. Ch. 17 Pg. 1
1700  PURPOSE AND SCOPE .............................. Ch. 17 Pg. 1
1701  AUTHORITY RESPONSIBILITIES ...................... Ch. 17 Pg. 1
1702  CONTRACTOR RESPONSIBILITIES ..................... Ch. 17 Pg. 2
1703  CONTRACT QUALITY REQUIREMENTS .................. Ch. 17 Pg. 3
1704  WMATA QUALITY ASSURANCE ........................ Ch. 17 Pg. 4
1705  CONTRACT QUALITY ASSURANCE AT SOURCE ........... Ch. 17 Pg. 5
1706  CONTRACT QUALITY ASSURANCE AT DESTINATION ....... Ch. 17 Pg. 5
1707  CONTRACT QUALITY ASSURANCE FOR SMALL PURCHASES
      ....................................................... Ch. 17 Pg. 6
1708  CONTRACT QUALITY ASSURANCE OF SUBCONTRACTS .... Ch. 17 Pg. 6
1709  NONCONFORMING SUPPLIES, SERVICES, OR CONSTRUCTION
      ....................................................... Ch. 17 Pg. 7
1710  ACCEPTANCE ..................................... Ch. 17 Pg. 8
1711  RESPONSIBILITY FOR ACCEPTANCE ................... Ch. 17 Pg. 8
1712  PLACE OF ACCEPTANCE ............................ Ch. 17 Pg. 9
1713  CERTIFICATION OF CONFORMANCE ................... Ch. 17 Pg. 9
1714  TRANSFER OF TITLE AND RISK OR LOSS ............... Ch. 17 Pg. 9
1715  WARRANTIES ..................................... Ch. 17 Pg. 10

CHAPTER 18 - PATENTS, COPYRIGHTS, AND PROPRIETARY INFORMATION
      ....................................................... Ch. 18 Pg. 1
1800  PURPOSE AND SCOPE .............................. Ch. 18 Pg. 1
1801  GENERAL PROVISIONS ............................. Ch. 18 Pg. 1
1802  NOTICE AND ASSISTANCE .......................... Ch. 18 Pg. 1

**WMATA PROCUREMENT PROCEDURES MANUAL**
**TABLE OF CONTENTS**

1803    INDEMNIFICATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 18 Pg. 2
1804    LICENSING AND ROYALTY INFORMATION . . . . . . . . . . . . . . . Ch. 18 Pg. 2
1805    PATENT RIGHTS UNDER CONTRACTS . . . . . . . . . . . . . . . . . . Ch. 18 Pg. 4
1806    PATENT RIGHTS PROCEDURES . . . . . . . . . . . . . . . . . . . . . . . Ch. 18 Pg. 5
1807    RIGHTS TO COPYRIGHTED MATERIAL AND PROPRIETARY INFORMATION
         . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 18 Pg. 7
1808    PROPRIETARY OR CONFIDENTIAL INFORMATION IN BIDS AND PROPOSALS
         . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 18 Pg. 7
1809    SOLICITATION AND CONTRACT PROVISION . . . . . . . . . . . . . . Ch. 18 Pg. 9

**CHAPTER 19 - CONTRACT FINANCING, FUNDING, AND PAYMENT** . . . . . . . Ch. 19 Pg. 1
1900    PURPOSE AND SCOPE . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 19 Pg. 1
1901    PROVIDING CONTRACT FINANCING . . . . . . . . . . . . . . . . . . . Ch. 19 Pg. 1
1902    USES OF CONTRACTING FINANCING . . . . . . . . . . . . . . . . . . Ch. 19 Pg. 1
1903    DESCRIPTION OF CONTRACT FINANCING METHODS . . . . . . . Ch. 19 Pg. 2
1904    ADVANCE PAYMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 19 Pg. 2
1905    PROGRESS PAYMENTS BASED ON COSTS   (Rev. 10) . . . . . . Ch. 19 Pg. 2
1906    PROGRESS PAYMENTS BASED ON A PERCENTAGE OR STAGE OF
         COMPLETION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 19 Pg. 4
1907    CONSIDERATION FOR PROGRESS PAYMENTS . . . . . . . . . . . Ch. 19 Pg. 4
1908    SUPERVISION OF PROGRESS PAYMENTS . . . . . . . . . . . . . . Ch. 19 Pg. 5
1909    REVIEW OR AUDIT OF PROGRESS PAYMENTS . . . . . . . . . . . Ch. 19 Pg. 6
1910    SUSPENSION OR REDUCTION OF PROGRESS PAYMENTS . . Ch. 19 Pg. 6
1911    LIQUIDATION RATES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 19 Pg. 7
1912    PROTECTION OF AUTHORITY TITLE . . . . . . . . . . . . . . . . . . Ch. 19 Pg. 8
1913    RISK OF LOSS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 19 Pg. 8
1914    PROGRESS PAYMENTS TO SUBCONTRACTORS . . . . . . . . . . Ch. 19 Pg. 8
1915    CONTRACT DEBT DETERMINATION AND COLLECTION . . . . . Ch. 19 Pg. 9
1916    DEMAND FOR PAYMENT OF CONTRACT DEBT . . . . . . . . . . . Ch. 19 Pg. 9
1917    NEGOTIATION OF REFUND TO RESOLVE CONTRACT . . . . . . Ch. 19 Pg. 10
1918    SETOFF AND WITHHOLDING OF PAYMENTS . . . . . . . . . . . . . Ch. 19 Pg. 10
1919    DEFERRED PAYMENT AGREEMENTS . . . . . . . . . . . . . . . . . . Ch. 19 Pg. 10
1920    CONTRACT DEBT INTEREST CHARGES AND CREDITS . . . . . Ch. 19 Pg. 11
1921    CONTRACT FUNDING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 19 Pg. 12
1922    LIMITATION OF COST OR FUNDS . . . . . . . . . . . . . . . . . . . . Ch. 19 Pg. 13
1923    ASSIGNMENT OF CONTRACT PAYMENTS BY CONTRACTORS
         . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 19 Pg. 14
1924    PROCEDURES FOR ASSIGNMENT OF CONTRACT PAYMENTS
         . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 19 Pg. 15
1925    AUTHORITY PAYMENT PROCESS   (Rev. 2) . . . . . . . . . . . . . . Ch. 19 Pg. 16

**CHAPTER 20 - PROTESTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 20 Pg. 1
2000    PURPOSE AND SCOPE . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 20 Pg. 1
2001    WRITTEN SUBMISSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 20 Pg. 1
2002    TIME FOR FILING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ch. 20 Pg. 2
2003    PRE-AWARD/POST-AWARD PROTESTS   (Rev. 10) . . . . . . . . . Ch. 20 Pg. 2

ix

WMATA PROCUREMENT PROCEDURES MANUAL
TABLE OF CONTENTS

2004    CLOSING THE RECORD-DECISION . . . . . . . . . . . . . . . . . . . . . . .    Ch. 20 Pg. 3
2005    ACTION PENDING PROTEST DECISION . . . . . . . . . . . . . . . . . .    Ch. 20 Pg. 4
2006    REMEDY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    Ch. 20 Pg. 4
2007    PROTESTS FILED WITH FTA  (Rev. 10) . . . . . . . . . . . . . . . . .    Ch. 20 Pg. 5
2008    AUTHORITY ADMINISTRATION OF PROTESTS . . . . . . . . . .    Ch. 20 Pg. 5
2009    NOTICE OF PROTEST POLICY REQUIREMENT   (Rev. 4 and 10)
        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    Ch. 20 Pg. 5

CHAPTER 21 - CLAIMS AND LITIGATION ACTIONS . . . . . . . . . . . . . . . .    Ch. 21 Pg. 1
2100    PURPOSE AND SCOPE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    Ch. 21 Pg. 1
2101    FTA AND AUTHORITY REQUIREMENTS  (Rev. 3) . . . . . . . . . .    Ch. 21 Pg. 1
2102    CONTRACT DISPUTES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    Ch. 21 Pg. 2
2103    APPEALS TO THE BCA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    Ch. 21 Pg. 3
2104    AUTHORITY CLAIMS AGAINST THE CONTRACTOR . . . . . . . .    Ch. 21 Pg. 3
2105    LITIGATION ACTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    Ch. 21 Pg. 4
2106    COST OR PRICE ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . .    Ch. 21 Pg. 4

CHAPTER 22 - SPECIAL FEDERAL GRANTEE REQUIREMENTS . . . . . . . . .    Ch. 22 Pg. 1
2200    PURPOSE AND SCOPE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    Ch. 22 Pg. 1
2201    CONTRACTOR LABOR REQUIREMENTS . . . . . . . . . . . . . . . . .    Ch. 22 Pg. 1
2202    LABOR SURPLUS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    Ch. 22 Pg. 3
2203    FEDERAL POLICIES FOR ELDERLY AND HANDICAPPED   (Rev. 2)
        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    Ch. 22 Pg. 3
2204    FEDERAL FOREIGN TRADE REQUIREMENTS . . . . . . . . . . . . .    Ch. 22 Pg. 3
2205    ENVIRONMENTAL AND CONSERVATION REQUIREMENTS . . .    Ch. 22 Pg. 4
2206    RESTRICTION ON LOBBYING . . . . . . . . . . . . . . . . . . . . . . . . .    Ch. 22 Pg. 4
2207    ENERGY EFFICIENCY STANDARDS . . . . . . . . . . . . . . . . . . . .    Ch. 22 Pg. 5
2208    USE OF FLY ASH . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    Ch. 22 Pg. 5
2209    AUDITS OF ROLLING STOCK PURCHASES . . . . . . . . . . . . . .    Ch. 22 Pg. 5
2210    PRIVACY ACT REGARDING FEDERAL RECORDS  (Rev. 2) . . .    Ch. 22 Pg. 5
2211    ADDITIONAL FEDERAL INTEGRITY PROVISIONS  (Rev. 2) . . .    Ch. 22 Pg. 5
2212    DRUG AND ALCOHOL TESTING  (Rev. 4) . . . . . . . . . . . . . . .    Ch. 22 Pg. 6

CHAPTER 23 - RESERVED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    Ch. 23 Pg. 1

CHAPTER 24 - RESERVED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    Ch. 24 Pg. 1

CHAPTER 25 - PROCUREMENT FORMS AND PROVISIONS . . . . . . . . . . . .    Ch. 25 Pg. 1
2500    PURPOSE AND SCOPE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    Ch. 25 Pg. 1
2501    LIMITATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    Ch. 25 Pg. 1
2502    CONTRACT PROVISIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    Ch. 25 Pg. 1
2503    ADDITIONAL CONTRACT FORMS . . . . . . . . . . . . . . . . . . . . . .    Ch. 25 Pg. 1
2504    INTERNAL AUTHORITY FORMS . . . . . . . . . . . . . . . . . . . . . . .    Ch. 25 Pg. 2
2505    DISTRIBUTION OF FORMS AND PROVISIONS . . . . . . . . . . . . .    Ch. 25 Pg. 2

CHAPTER 26 - DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    Ch. 26 Pg. 1

x

**WMATA PROCUREMENT PROCEDURES MANUAL**
**TABLE OF CONTENTS**

2600   PURPOSE AND SCOPE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  Ch. 26  Pg. 1
2601   DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  Ch. 26  Pg. 1

\* \* \*

# W.M.A.T.A. PROCUREMENT PROCEDURES MANUAL (PPM)

**(Third Edition)**

## PURPOSE

This is the Procurement Procedures Manual (PPM) which consolidates all Authority procurement policies and procedures into a comprehensive reference book for Authority personnel and outside parties having interest in the Authority's procurement process. This PPM includes a Procurement Policy Statement (Chapter One) adopted by the Board of Directors on July 24, 1997, and implementing procedures (Chapter 2-26) issued by the Director, Department of Procurement. <u>Copies of this Manual may be made available for a reasonable handling fee to outside parties.</u> This PPM is intended as a guide to good procurement practices and is to be used as a supplement to sound business judgment in procurement and contracting. Other good sources for procurement information and guidance are the Federal Acquisition Regulations (FAR) and FTA procurement circulars.

## AUTHORITY AND APPLICABILITY

The PPM is issued in accordance with Policy/Instruction 8.4/5 which authorizes a Procurement Manual and Policy/Instruction 1.1/0 which authorizes Departmental manuals to deal with matters affecting the entire Authority, but in areas of responsibility clearly within the authority of an Assistant General Manager or GMGR Staff Office Director.

## HOW TO USE AND TO RECOMMEND CHANGES TO THE MANUAL

As shown in the GENERAL STRUCTURE, the PPM is divided into chapters with Chapter One as the Board Procurement Policy Statement and the remaining chapters based upon selected subject areas. Each chapter has its own page numbers. Some chapters have been reserved for subjects to be added later as the need arises.

As indicated in Chapter One, only the Board of Directors may make changes to the Procurement Policy Statement. Proposed changes, corrections or additions to the PPM should be sent to the Director of Procurement who is responsible for maintaining the PPM and will assign or coordinate as necessary the proposed changes or additions with the appropriate offices.

**CHAPTER 15**
**SPECIAL AGREEMENTS**

<u>**CHAPTER 15 - SPECIAL AGREEMENTS**</u>

**1500    PURPOSE AND SCOPE**

1500.1    This Chapter provides regulations and policy required for the effective administration of special agreements including but not limited: utility contracts, marketing agreements, bus charter service agreements, employee benefits contracts, or contracts for the purchase, lease or sale of real property, insurance contracts, and other agreements between the Authority and other entities that are not covered by other chapters of this Manual.

1500.2    Contracting Officers will be delegated responsibility for the sufficiency of the special agreements and shall secure necessary legal, engineering, technical or other appropriate advice within legal, engineering, technical or other appropriate advice within WMATA in fulfilling this responsibility.    They are also responsible for administering special agreements including the assuring of performance on the part of the second parties of these agreements.

1500.3    In accordance with P/I 8.7, "Management Approval Process for Procurement Actions", all special covered by this Chapter shall be treated as procurement transactions and will require clearance and approval as indicated in the P/I 8.7.

**1501    MASTER AGREEMENTS**

1501.1    Master Agreements include service agreements with members of the COMPACT and agreements with the various utility companies, with the railroads, and with other agencies in the COMPACT jurisdictions or the Federal government.

1501.2    The Office of Procurement (PROC) shall maintain a Central Register for recording filing all master utility, bond service and other agreements entered into by the Authority.    The large majority of master agreements will involve utility work during construction.    Master agreements and other similar non-expenditure agreements are to be numbered within the Central Register.    Agreement numbers will be assigned by PROC.

1501.3    Originals of all master agreements processed in accordance with Section 1501 shall be maintained by PROC.

1501.4    Master agreements shall be executed on behalf of the Authority by a Contracting Officer within PROC. The Contracting Officer may appoint a representative from other Authority offices to monitor and direct technical performance and to coordinate the work in accordance with <u>Section 1020</u> of this Manual.

1501.5    The Department of Transit System Development (TSDV) has responsibility for initiating utility master agreements, work authorizations, and payment authorizations under work authorizations which recommend, where appropriate, payment of utility invoices.

# CHAPTER 15
## SPECIAL AGREEMENTS

1501.6  Master agreements will contain standard Authority contract clauses unless their use is prevented by conflicting utility regulatory requirements.

1501.7  Where the situation indicates that only a single project will be performed by a utility, a specific agreement, as opposed to a master agreement, may be appropriate.

1501.8  Where there is insufficient time for a master agreement, a letter contract executed by Contracting Officer, may be used when the project is deemed urgent.

1501.9  For procedural purposes, a work authorization is regarded as a modification of its master agreement, rather than new procurement.

1501.10 Each work authorization shall be based on an estimate of the cost to perform the work, either supplied by the utility and determined by TSDV to be reasonable, or supplied by TSDV. TSDV must include in each request for a work authorization determination whether it includes utility betterments.

1501.11 TSDV will prepare modifications to work authorizations where original work authorizations prove insufficient to fund required utility projects.

1501.12 A non-final utility invoice will be paid only if it is part of a sequential series of invoices numbered as such, identifies the work authorization number, the reasons for the charges (including the work performed), and the time period of the service.

A final invoice must be clearly marked "FINAL" and must cite the amount of the contract, the amount previously paid, and the balance due; it need not have a time period of the services identified.

A recapitulation invoice submitted by a utility prior to Authority audit which asks for a small additional Authority payment as a net amount due after the utility has comprehensively reviewed its charges, may be paid without a specific identification by the utility of the reasons for each adjustment. A large (as a percentage of project cost) recapitulation adjustment will not be paid prior to Authority audit without specific utility justification of each adjustment.

1501.13 TSDV is responsible for certifying on payment authorizations that the invoiced services have been performed, and materials and equipment supplied, and to that end will monitor the presence of utility personnel, material, and equipment on work sites or obtain records of manhour charges by the utility. TSDV will examine each invoice for possible backcharge to the Authority's construction contractor on the site of the utility work. In situations where a utility seeks a payment before work can be performed, as for example for a permit, the Project Manager will certify that payment is necessary for required utility work to proceed.

1501.14 Final payment will not be made on any work authorization, and closeout will not be completed, until audit requirements have been met. For master agreements with work

## CHAPTER 15
## SPECIAL AGREEMENTS

authorizations totaling $100,000 or less, the Contracting Officer may elect to proceed with closeout audit after consultation with the Auditor General and obtaining his consent. Audit is required when the value of the total number of work authorizations issued under a master agreement exceeds $100,000.

1501.15 Orders for services may be placed under master agreements by the Contracting Officer. Orders for services or work authorizations under master agreements for relocation of utility facilities will be processed and administered in accordance with procedures issued by the Assistant General Manager for Transit System Development and approved by the Director of Procurement.

**1502    REAL PROPERTY ACQUISITIONS**

1502.1   Section 12(d) of the Authority's COMPACT, as amended, gives WMATA authority to acquire real property generally by the methods enumerated in this Section, including condemnation.

1502.2   Action to acquire any interest in real property will not be initiated until the real property to be acquired has been certified in accordance with the requirements of Policy Instruction No. 4.9/0.

1502.3   Real property certified pursuant to Section 1502.2 above, shall be acquired in accordance with the policies and procedures set forth in Part 24 – Uniform Relocation Assistance and Real Property Acquisition for Federal and Federally Assisted Programs (49 CFR Part 24). The cited regulations implement the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, as amended, and were promulgated by the Secretary of Transportation through delegation to the Federal Highway Administration. Real Property to be acquired with internally generated funds shall follow the guidance of the Regulations in Part 24, as applicable. The Office of LAND will insure that the Contracting Officer is supplied with current versions of the above referenced statutes and regulations and all other statutes and regulations necessary to evaluate its submittals for Contracting Officer action.

1502.4   The Contracting Officer will prescribe the form to be used (and the required supporting documentation) in requesting approval to initiate the real property acquisition process and for approving other actions related to real property. Each request for Contracting Officer action on real property acquisitions will include explicit identification of the land being acquired with that certified in accordance with the requirements of Policy Instruction No. 4.9/1. Real property acquisitions require concurrence as follows: by the Director of the Office of LAND, the Assistant General Manager, TSDV, the Comptroller for fund availability, and by COUN for legal sufficiency.

1502.5   Acquisition of real property where the fair market value of the property exceeds one million dollars requires approval by FTA. Acquisition of real property where the purchase price exceeds the Authority offer by fifty thousand dollars or more requires approval by FTA.

# CHAPTER 15
## SPECIAL AGREEMENTS

1502.6    The Office of LAND will keep the Contracting Officer informed on pending acquisitions of real property so that he may appoint for each such pending action a Representative, with such authority and duties that the Contracting Officer may set forth in writing.   The Contracting Officer's Technical Representative will report to the Contracting Officer no less often than monthly the status of each  such pending action, and will report to the Contracting Officer when each pending action is completed so as to require no further action or attention by the Contracting Officer.

1502.7    Whenever possible acquisitions will be by master forms approved by COUN and by the Contracting Officer.

**1503**    **REAL PROPERTY DISPOSAL**

1503.1    Section 12(d) of the Authority's COMPACT, as amended, gives WMATA authority to dispose of real property by sale, exchange, lease, easement, license (or permit).

1503.2    Section 1503 and the following subparagraphs thereof do not apply to the disposal of real property within a Joint Development area.

1503.3    Action to dispose of any interest in real property whether on a permanent or temporary basis (by sale, exchange, lease, easement, license or lesser interests) will not be initiated until the real property interest to be disposed of has been certified for disposition in accordance with the existing Authority policy.

1503.4    Action to dispose of real property acquired under a federal grant or subgrant shall be accomplished in accordance with Section 18.31, Real Property, subpart C - Post-Award Requirements, Part 18 - Uniform Administrative Requirements for Grants and Cooperative Agreements to State and Local Governments (49 CFR Part 18), promulgated by the Secretary of Transportation.  Similarly, the Disposal of real property acquired by use of WMATA internally generated funds shall also follow procedures that implement the policy of Section 18.31 to obtain the highest possible economic return under competitive participation to the extent practicable.

1503.5    Action to dispose of any fee interest or any permanent interest in Real property which is tantamount to a fee will not be initiated until the real property has been screened throughout the Authority and the jurisdictions and the General Manager determines that the property is excess and authorizes disposition in accordance with an approved disposal plan.

1503.6    Disposition of real property by sale or by other authorized methods of disposal requires either FTA approval or notification.  (Approval is required if property was acquired with grant funds and notification is given if property was acquired with 2/3 - 1/3 appropriated funds).

# CHAPTER 15
## SPECIAL AGREEMENTS

**1504     PERMITS AND EASEMENTS**

1504.1     Permits, easements, revenue producing instruments, and other rights as described in P/I 4.7, "Permits or Easements in WMATA Property" are to be executed by a Contracting Officer in accordance with paragraph 5.2 of P/I 4.7.

**1505     BUS CHARTER SERVICE AGREEMENTS**

1505.1     FTA Regulation, 49 CFR, Part 604, permits the Authority to operate as a subcontractor for bus charter service. The Department of Bus Service shall coordinate and develop policies and procedures for providing bus charter service.

1505.2     The Authority shall enter into written agreements with charter service customers in a standard format with terms and conditions acceptable to the Director of Procurement and the General Counsel. Each agreement shall be prepared by the Department of Bus Service and signed for the Authority by a designated Contracting Officer in the Department of Procurement.

1505.3     Charter Service Orders completed in accordance with the Charter Service Agreements shall be processed and administered by the Department of Bus Service (Bus Subcontract Section).

**1506     OTHER CONTRACTS AND AGREEMENTS**

1506.1     This Section applies to all other contracts and special agreements (including marketing and insurance) prepared for signature by the Contracting Officer under authority delegated by the General Manager. This Section does not apply to marketing documents which do not require a Contracting Officer's signature, such as Fare Media Order Forms, Metrorail One Day Pass Order Forms, Bonus Fares Farecard Request and orders issued under indefinite delivery-indefinite quantity and requirements-type contracts.

1506.2     Prior to entering into any type of contract or special agreement not previously authorized by other provisions of this Regulation, the requesting office will provide the Contracting Officer with an acquisition plan and will comply with existing Authority policies and procedures pertaining to General Manager or Board approval. The requirement for an acquisition plan does not apply to routine marketing agreements, such as Metrochek Voucher Program agreements, blanket purchase agreements with government agencies, WMATA advertising contracts, both A and B versions, Metrochek Voucher Program Farecard Reader Equipment Agreements, Metropool Sales Consignment Agreements, and Retail (off-site) Sale Consignment Agreements. Notwithstanding the waiver of the acquisition plan requirement for these documents, it is required that they be executed by a Contracting Officer.

1506.3     The designated Contracting Officer or his designated representative must be party to all discussions/negotiations with the individual, organization or contractor intended to be a party to the Authority agreement.

CHAPTER 15
SPECIAL AGREEMENTS

1506.4   All contracts and special agreements entered into pursuant to this Section shall:

(a)   Comply with appropriate Authority regulations and laws applicable to the Authority;

(b)   Be coordinated with the Office of General Counsel prior to requesting Contracting Officer signature;

(c)   Be properly coordinated with the Department of Finance if the agreement constitutes a financial commitment on the part of the Authority or revenue to the Authority.

(d)   Be properly documented as to the need for the agreement and the reasons for selecting the source if services or products available from a competitive marketplace are being obtained; and

(e)   Be executed by an authorized Contracting Officer from the Office of Procurement.

**1507    ASSURANCE FOR USE OF REAL PROPERTY**

1507.1   The use of Authority real property by others is to be permitted only upon adequate assurance by the user against loss by WMATA arising out of such use. Additionally, WMATA may not provide assurances against loss arising out of WMATA use of property owned by others without Board approval. Refer to Board Resolution #93-23, adopted May 13, 1993, for further guidance.

**1508    JOINT DEVELOPMENT PROCUREMENT REGULATIONS   (Rev. 5)**

1508.1   The Washington Metropolitan Area Transit Authority (WMATA) defines joint development as a public/private land development program designed to blend WMATA's transit facilities with office, retail and residential development. WMATA's joint development opportunities consist of property interests owned or controlled by WMATA and approved by inclusion in the Joint Development Work Program by the WMATA Board of Directors.

1508. 2   Joint Development is a unique form of procurement and, except as provided in this Chapter or in other, separately published, WMATA regulations which may be issued from time to time, the other provisions of this Manual do not apply.

1508.3   In order to promote the objectives of the Joint Development Program and to provide fair and equitable consideration of all proposals for each joint development opportunity, the guidelines set forth will be followed:

(a)   WMATA will periodically publicize its joint development opportunities in the local and national media and, as necessary, through formal solicitation documents.

(b)   WMATA will entertain proposals for long-term lease, sale, combination lease/sale, or other arrangements. (WMATA prefers transactions other than the sale of its property, but will consider a sale, if it is determined to be in WMATA's best interest.)

## CHAPTER 15
## SPECIAL AGREEMENTS

(c)  WMATA will have a contractor selection process that focuses on achieving a designated developer based on the objectives using good business practices.

(d)  The Disadvantaged Business Enterprise provisions of <u>Chapter 3</u> will apply to joint development projects.

(e)  WMATA will negotiate final terms with the selected developer within applicable guidelines and conditions of initial selection.

(f)  In evaluating proposals the criteria used by WMATA will generally include the following:

- •• Enhanced Metrorail and Metrobus ridership;
- •• Financial benefits accruing to WMATA and the local jurisdiction;
- •• Market/financial viability of the joint development project;
- •• Development team experience and prior performance;
- •• Innovation and creativity;
- •• Joint development project completion time-line; and
- •• Compatibility of development with local requirements and transit area.

1508.4   Proposals will be processed as follows:

(a)  The Contracting Officer reviews the proposals, identifies those proposals reasonably susceptible of being selected of being selected for award and informs the Rail Capital Program Committee of receipt of the proposals.

(b)  The Contracting Officer or a designated Evaluation Team conducts a preliminary analysis and evaluation of each proposal.

(c)  The Evaluation Team meets with each developer to receive a developer presentation and conduct specific discussions about the proposal. The discussions will include identifying areas of the proposal that require clarification, improvement, or do not comply with the solicitation document. The developers may be requested to submit revised proposals based on the discussions. (Local jurisdiction representatives may be participate in evaluating a proposer's development concept and provide questions/comments to WMATA staff.)

(d)  A final analysis and evaluation of proposals will be conducted and a report and recommendation of selection of a developer will be submitted to the Rail Capital Program Committee and Board.

(e)  Upon approval of a selected developer, the final terms of an agreement will be negotiated and submitted to the Rail Capital Program Committee and Board for approval.

1508.5   Proposals received which were not in response to a specific solicitation (unsolicited

**CHAPTER 15**
**SPECIAL AGREEMENTS**

Proposals) will be processed as follows:

(a)  If the site was advertised within the previous year, WMATA may entertain the proposal and proceed solely with that developer provided the initial advertisement gave notice to that effect.

(b)  If the site was never advertised or not advertised within; the previous year, WMATA must advertise the site for at least four weeks and invite additional proposals before it can proceed with the developer who submitted the unsolicited proposal.

(c)  If after advertising the site, WMATA receives no additional proposals, WMATA may entertain the proposal initially submitted and proceed solely with that developer.

1508.6  WMATA may negotiate a joint development contract with an adjacent property owner without competition and without advertising the availability of WMATA site provided that there is only one adjacent property owner or only one interested adjacent property owner.

1508.7  WMATA hold the contents of all proposals in confidence until developer selection. The execution of any agreement negotiated between WMATA and the selected developer is contingent upon the approval of WMATA's Board of Directors and the Federal Transit Administration of the U.S. Department of Transportation (FTA).

* * *

# Exhibit "E"

Washington Metropolitan Area Transit Authority

Board of Directors Meeting

September 27, 2007

11:00 AM

Page 2

1                 P R O C E E D I N G S

2        MS. HEWLETT:  Good afternoon everyone.

3        MALE VOICE:  Good afternoon.

4        MS. HEWLETT:       I think this is the first time

5   I came in and said good afternoon instead of good

6   morning.  But it's been that kind of day.  The 1,322

7   meeting of the Washington Metropolitan Area Transit

8   Authority Board of Directors will now come to order.

9                 First my apologizes for those of you

10  who may have been waiting.  We had a special committee

11  meeting that took a little longer, but was very

12  productive in the end.  We're getting there.  So please

13  accept our apologizes for that.

14  First order of business is approval of the agenda.

15        MR. ZIMMERMAN:  Move approval.

16        MS. HEWLETT:  The second?

17        MALE VOICE:  Second.

18        MS. HEWLETT:  Is there any discussion?  All in

19  favor?

20        GROUP:  Aye.

21        MS. HEWLETT:  Opposed?  The ayes have it.  We have

22  before us the minutes of the July 26, 2007 Board

Page 3

1 Meeting.

2      MR. ZIMMERMAN:  Move approval as presented.

3      MS. HEWLETT:  Second?  Any discussion?

4      MR. ZIMMERMAN:  One comment.

5      MS. HEWLETT:  Oh, comment?  I'm sorry.

6      MR. ZIMMERMAN:  That's okay.  Madam Chairman, I

7 note that on page three of the minutes of the July

8 meeting it is noted that I had asked the general manager

9 about a response to the RAC's recommendation regarding

10 recycling.  And the general manager had replied that it

11 could be provided at the next meeting, which I think we

12 are at.  I'm not going to ask for that now, but I'm

13 noting this ahead of time, since the general manager has

14 a report and he will want to address that.  Thank you,

15 Madam Chairman.

16      MS. HEWLETT:      Thank you.  Is there any

17 additional comment or discussion?  All in favor?

18      GROUP:  Aye.

19      MS. HEWLETT:      Opposed?  The ayes have it.

20 Mr. Snyder, we have the report of the Riders' Advisory

21 Council.

22      MR. SNYDER:  Good afternoon.  I'll try to be brief

Page 4

1 as we're running way behind.  In both my rate and report

2 and my oral report that you have with you, you should

3 see a discussion of railcar configuration, the language

4 assistance plan, the Thirty's Metro Bus Line study.  And

5 I'll go on to some of the other ones.

6 While at the Greenbelt Station, I spoke with a

7 station manager who asked about the benefits for

8 expanding credit card program to parking at all

9 stations.  They have a significant number of visitors to

10 this region and so they'd like to know when that pilot

11 program is going to be expanded to other stations.

12 The emergency communications, Mr. Gerald Francis,

13 presented a detailed account of the 20 plus events that

14 occurred in the rail system on August 26th and 27th.

15 RAC members also participated in an emergency

16 communication subcommittee meeting where we recommended

17 more timely dissemination of information to customers

18 and station managers, greater deployment of Metro

19 employees throughout the system, using existing staff,

20 posting of station specific emergency plans and services

21 systems wide and immediate implementation of service

22 improvements through training and empowerment of

Page 5

1 frontline workers.

2 In the matter of the 2009 budget, I'm very concerned

3 that the RAC was excluded from receiving information to

4 advise the Board when this current round of fare policy

5 discussion, by direction of canceling the Metro budget

6 briefing to the RAC.  I have asked Mr. Harkum (phonetic)

7 to meet with the RAC at our October meeting and discuss

8 the current recommendations.  And with your approval I

9 hope he'll be able to come.

10 In our letter to Mr. Graham this morning, I included

11 a number of questions.  First of all, why is the Metro

12 forecast for passenger revenue growing at only one

13 percent when 12 percent is what the average has been

14 over the last five years? When we've seen a five percent

15 growth in reported ridership over the last six months?

16 When we've had five of the top ten ridership days in

17 Metro's history occurring in the last six months?  When

18 a record 19.2 million riders used Metro in July? So is

19 the forecast of one percent really represent only $5

20 million, when actually there's a $6.5 million, because

21 we have $650 million, one percent of that should be 6.5

22 million.  So I don't know where the 5 million figure

Page 6

1 comes from.

2 And then in another place you mentioned that it

3 would be 8 million.  It would be nice if they could

4 clarify that.

5 But what I really think is that the ridership is

6 probably growing at a more significant rate than one

7 percent. There were other ways to balance this budget

8 besides just making cuts in service or cuts in

9 expenditures.  You can also grow this system.  Why can't

10 Metro market public transit in the second worst transit

11 region in the country?  We should be seeing significant

12 growth.

13 We have -- we're moving from six car trains to eight

14 car trains.  That's a 33 percent improvement in

15 capacity.  We should be able to fill those trains.  So

16 why are we rushing to a fare increase (inaudible) or at

17 all for 2008 without exploring all these other options?

18 Finally, I'd like to quote from the letter that I

19 sent to Mr. Graham for the budget meeting this morning.

20 "More money does not and will not cure all that ails

21 Metro.  As a board you must identify measured business

22 targets and goals with how Metro should be operated.

Page 7

1 You need to establish a policy on sustained ridership

2 growth, increased off-peak ridership, improved customer

3 service, expanded service offerings and competitive

4 transit value.  The Washington, DC region was just

5 ranked as having the second worst traffic in the

6 country.  In this region, at a time of environmental

7 consciousness, a service-oriented public transit entity

8 should be able to produce tangible results through

9 efficient operations and effective marketing of transit

10 options.

11 In conclusion, as a board advisory committee, the

12 RAC would appreciate timely opportunities to offer

13 feedback on operating and budgetary initiatives so that

14 we may achieve a higher level of rider satisfaction and

15 public confidence in WMATA, as it states in our bylaws.

16 I'd like to thank those Metro staff who included the

17 RAC in preplanning, and ask what would the Metro's

18 customers on the RAC think of an idea.  Thank you.

19      MR. ZIMMERMAN:  Question, (inaudible).

20      MS. HEWLETT:       Thank you.  Mr. Zimmerman.

21      MR. ZIMMERMAN:  Mr. Snyder noted the recent

22 reports, the latest study that shows we've moved from, I

Page 8

1 guess clearly from number three to number two, we kind

2 of bounced around between number two and number three

3 for worst congestion in the country.

4 What should be borne in mind is those studies are

5 basically for

6 people who are literally in traffic.  If you do studies

7 that say commuting time for all people by all means, we

8 improve significantly.  And the reason, of course, is

9 Metro.  So, I mean, let's not forget that.

10      MR. SNYDER:  Do you want to move people off the

11 roads on to the Metro.

12      MR. ZIMMERMAN:  And we are in fact doing that to a

13 considerable degree in this city.  Not enough, but more

14 in this metropolitan area than most other areas of the

15 country.  Mr. Snyder, you in your report refer to -- on

16 the budget section I'm looking at here, that it says,

17 "The Board went as far as to exclude the RAC by

18 directing the cancellation of a budget briefing to the

19 RAC."  I -- when did the Board do that?

20      MR. SNYDER:  At the last budget and finance

21 meeting on the -- not this emergency one, the one two

22 weeks ago.  Mr. Harkum was supposed to come and brief

Page 9

1 the RAC on the current budget process, and Mr. Graham

2 asked that he not go forward with that particular

3 presentation.

4         MR. ZIMMERMAN:  I guess I missed that.  And I

5 don't remember the Board voting.  If there was such a

6 vote Madam Chairman, I don't know that I was part of

7 that.

8         MR. SNYDER:  (inaudible).

9         MS. HEWLETT:  I don't --

10        MR. GRAHAM:  I know what it was.  I know Madam

11 Chair.

12        MS. HEWLETT:      -- that's not exactly what

13 happened.

14        MR. GRAHAM:  Since my name has been mentioned,

15 what happened there was I did not want the RAC to be

16 briefed on a proposal, and that was the first proposal

17 of the general manager, because it was clear to me at

18 that point that that proposal had no support.  And it

19 would seem to have been -- it seemed to me to be, you

20 know, an exercise in just upsetting everybody over

21 something that, you know, there was no real reality

22 attached to it.

Page 10

1 And it was in no way means -- no way meant to be

2 excluding the RAC from participation in this process.  I

3 just wanted to save you some time, because the specifics

4 of that proposal were kind of more or less DOA.  And

5 sure enough it proved to be that.  And so that was my

6 only point.  I hope you understand that.

7      MR. SNYDER:  May I?

8      MS. HEWLETT:     Yes, Mr. Snyder.

9      MR. SNYDER:  The issue was that we didn't get the

10 opportunity to even discuss that proposal, much less the

11 proposal that was offered today, much less talk about

12 the fare policy that you were going to be briefed on,

13 because Mr. Harkum felt that he was given direction to

14 not come and talk to the RAC about the budget issues.

15      MR. GRAHAM:  Well that is a mistake.  And I'm very

16 happy to take to heart what you've said and that -- it

17 was no way my intention was to exclude the RAC from this

18 process.  I just simply didn't want a lot of agitation

19 over something that was not a realistic proposal.  Do

20 you understand that?

21      MS. HEWLETT:     I'm sorry.

22      MR. SNYDER:  I understand it.  But, maybe it

1 wasn't made clear to staff that that's what you

2 intended.

3         MS. HEWLETT:         Okay, hold on.   Mr. Zimmerman

4 --

5         MALE VOICE:   Madam Chairman --

6         MS. HEWLETT:         -- wasn't finished by --

7         MR. GRAHAM:   Oh, I'm sorry.

8         MS. HEWLETT:         -- if you're -- are you

9 finished?

10         MR. GRAHAM:   I guess.

11         MS. HEWLETT:         Okay.   Mr. Zimmerman, followed

12 by Ms. Hudgins, followed by Mr. Kauffman, unless you

13 were done.

14         MR. GRAHAM:   No, I'm done.

15         MR. ZIMMERMAN:   Thank you, Madam Chairman.   I

16 appreciate Mr. Graham's helping to clarify that.   And I

17 trust Mr. Snyder that you'll explain what actually

18 happened, what the Board did and didn't direct and

19 perhaps you can get that corrected on the record in the

20 future.

21 There are two important points here.   One is that I

22 think the Board very definitely wants to hear from the

1 Riders' Advisory Council and it was a point we didn't

2 get to that I had hoped to discuss at the meeting

3 earlier.  But there most certainly needs to be input, as

4 just as we will need to do public hearings before we do

5 anything, from the Riders' Advisory Council.  I found it

6 disquieting, if I may use the term, the resolution that

7 the RAC passed, the RAC on behalf of riders.

8 And I appreciate that, of course, you know, there

9 are other folks who represent riders too, "Find the

10 proposal of mid-fiscal year fare increase disquieting.

11 The RAC does not believe any such (inaudible) should be

12 considered without any full public hearing, including

13 consultation with the RAC."  Now, why -- it's not clear

14 to me why you would be under the impression that any way

15 that a proposal would be considered without a full

16 public hearing, since in fact we, by law, have to go to

17 public hearing.  And what we're debating at this point

18 is when to go to public hearing, whether there should

19 actually be any consideration for a fare proposal.  Is

20 that -- I mean if the RAC really is being kept in the

21 dark in that, then I have to worry about whether we're

22 getting, you know -- maybe we're not getting

Page 13

1 presentations to the Riders' Advisory Council that they

2 should have.

3 I mean how can they be laboring under the impression

4 that somehow we were going to consider increasing fares

5 without going to public hearing?  Did they get no staff

6 presentation, Mr. Catoe on budget matters?

7      MR. CATOE:  You were looking at me and I was

8 wondering if that was the question.  I am not aware of

9 us ever telling the RAC we would not have a public

10 hearing.  You must have a public hearing for fare

11 increases.

12      MR. ZIMMERMAN:  Oh no, my concern is that you

13 weren't telling them anything.  But I'm just asking if

14 that's the case, I don't know.

15      MR. CATOE:  Oh.

16      MR. ZIMMERMAN:  But we -- you know, on the one

17 hand we heard that, you know, they were told that the

18 staff couldn't present to them because we had directed

19 them, which obviously was a mistake.  But, are they

20 getting no, you know, no input about -- because I mean

21 it would be the most basic question.  If there's a fare

22 increase, what happens well we'd have to go to public

Page 14

1 hearing.  So, you know, when I see a resolution passed

2 after presumably some deliberation, it suggests to me

3 that they really haven't been given basic information

4 about how the process works.

5     MR. CATOE:  Oh, I believe what's missing here, it

6 just depends on how you define participation.  Whether

7 we have had a detailed briefing with the RAC on the

8 specifics of every detail of the recommendations and

9 asked for feedback on every detail that did not occur.

10 The broader discussion on fare increases, it's been a

11 topic of discussion back and forth between all riders

12 groups as well as the Board, and that has not been

13 something that we have withheld.

14          I have to agree, we didn't go into the

15 specificities, and we will do that.  But again, how you

16 define participation might be debated.

17     MR. ZIMMERMAN:  Well let me say, Madam Chairman as

18 one board member, my view is that we -- as we go forward

19 with this discussion of the budget and the fare issues,

20 that we very much need the Riders' Advisory Council to

21 be working along with us, being educated as we are, and,

22 you know, on the specific here, working through those

Page 15

1 things, learning about it and giving us feedback.

2 I would hope that they would be getting the same

3 kind of briefings that we've been getting and having the

4 same discussions, and struggling with us over the

5 question of how do we make the numbers work in the end.

6 And they need the opportunity to do that, and I really

7 hope that we're sure that they get the staff support

8 that's necessary for that, that they're encouraged to

9 have that discussion.

10 And at the same time, I would say, Mr. Snyder also

11 to understand that we do all have to make the numbers

12 work here.

13  And so we need constructive input as well.

14      MS. HEWLETT:      Okay.

15      MR. ZIMMERMAN:  Thank you.

16      MS. HEWLETT:      I'm sorry.

17      MALE VOICE:  I just want to add to the comment

18 though that there also seems to be some assumption that

19 they're getting less information than some of us are

20 getting.  And I want to make it sure -- make it clear

21 that that is not necessarily true.  And two, that it

22 doesn't make sense to provide you with information, as

1 Mr. Graham stated, when in fact the information is not

2 going to even be considered.  That would be a waste of

3 your time as well.

4 So I think there's kind of a process of what's

5 needed information, when do you need it, and all those

6 kinds of things are things that have to be considered as

7 well.

8      MS. HEWLETT:       Ms. Hudgins followed by Mr.

9 Kauffman.

10      MS. HUDGINS:  Thank you.  Mr. Snyder, thank you

11 for your comment, because I think it probably goes to a

12 larger concern. I think it's unfortunate that you may

13 feel that you were left out of some critical

14 information.  I just wanted to ask staff a question.

15 When was the last time we had a Town Hall meeting?

16      MR. CATOE:  I'm trying to think of the date.  It

17 was a few months -- a couple of months ago.  I'm kind of

18 lost for dates, to be honest with you.  But it's been

19 with --

20      MR. ZIMMERMAN:  (inaudible) we did one, so the one

21 after that.

22      MR. CATOE:  Yes, and we had some later than that

Page 17

1 in the district.

2      MS. HUDGINS:  The reason I raise it, it was raised

3 to me and the question I would is are we utilizing the

4 tool to our benefit in order to better disseminate

5 information?  And I think that really when you have

6 something as drastic as major policy changes, it's an

7 opportunity to unconstrain us from the public hearing

8 process and be able to disseminate information that

9 allows folks to more freely have a discussion.

10 And I think we should probably think about that as

11 we try and move forward through this process.  I think

12 the Riders' Advisory Council is one aspect of it, but

13 there is a larger public and we did see more people

14 engaged in that process.

15      MS. HEWLETT:  Mr. Kauffman?

16      MR. KAUFFMAN:  Just for --

17      MS. HEWLETT:      Followed by Mr. Linton.

18      MR. KAUFFMAN:      -- for clarification, Mr.

19 Snyder, is October 3rd your next RAC meeting?

20      MR. SNYDER:  The first Wednesday of the month,

21 yes.

22      MR. KAUFFMAN:      Well then Madam Chair, I would

Page 18

1 think, without objection that we would request that the

2 RAC be briefed on fare policy and the fare proposal and

3 so we can have the benefit of their opinion and their

4 comments before our meeting on the 11th.

5      MR. GRAHAM:  To the extent that it's known.

6      MR. KAUFFMAN:  To the extent that it's known.

7      MALE VOICE:  Could you restate your --

8      MR. KAUFFMAN:  Basically at their October 3rd

9 meeting be given a briefing on the fare policy and the

10 fare proposals we discussed today.

11      MS. HEWLETT:  (inaudible).

12      MR. KAUFFMAN:  Because they may not be, you know,

13 this is one of the chicken/egg --

14      MS. HEWLETT:  Bring them up-to-date.

15      MR. KAUFFMAN:  -- discussions and bring them up-

16 to-date and whatever they have, as far along as they

17 are, because the concern being we are trying our best to

18 presage with the public reaction will be, as individual

19 members here.  Here's an opportunity to get it.

20      MS. HEWLETT:  Mr. Linton.

21      MR. LINTON:  I was actually going to follow up

22 with Mrs. Hudgins' remark and suggest that as we have

Page 19

1 some information and discussions about fare policy, that

2 we might want to take that to a Town Hall meeting.  But

3 that's when you talk about all the variables, which we

4 don't have right now. But that's where you will get a

5 chance to really talk with the public about what all the

6 issues are and challenges there are in funding this

7 system long term and what the fare policy considerations

8 would be.  But I wouldn't want to do that until we have

9 it more flushed out, so they have some variables and

10 information that they can absorb.

11 Going to them now without having that you really

12 don't give them the full magnitude of what the

13 possibilities are.

14     MS. HEWLETT:  Well they're not mutually exclusive

15 really. You could go -- someone could go with Mr. Snyder

16 who's been paying attention as well, and say -- just so

17 that RAC gets a flavor of what we've been struggling

18 with here.  And that we don't have the answers yet, but

19 we're working diligently to get the answers and figure

20 out -- and that would sort of, you know, we could talk

21 about some of the issues that we've been grappling with.

22  And then as we get some of these policies, go back then

Page 20

1 you can do it --

2     MR. SNYDER:  Well one of our roles is to provide

3 you all on how we think the riders will feel about a

4 particular initiative.  And this is a good opportunity

5 for staff to be able to run things by us and see if

6 something is necessarily a nonstarter from a rider's

7 perspective, as opposed to the Board's perspective.

8 And that's all we're asking.  We understand that

9 things have not been worked out.  And we want to be a

10 partner in helping you to be able to formulate the

11 direction that Metro goes.

12     MS. HEWLETT:  I think the sentiment here is that

13 we're in agreement --

14     MR. GRAHAM:  Yes.

15     MS. HEWLETT:   -- with that.

16     MR. GRAHAM:  That's right, that's right.

17     MS. HEWLETT:  So --

18     MR. LINTON:  Madam Chair --

19     MS. HEWLETT:  Mr. Linton, followed by Mr. Catoe.

20     MR. LINTON:  -- one other question I had.  I noted

21 that the -- you made reference to this 1 percent, 12

22 percent, 5 percent and you were suggesting that the

1 staff's recommendation of passenger revenue growth was

2 small compared to what it had been.  I was wondering,

3 Mr. Catoe, have you and your staff looked at that and

4 see whether or not there's some validity there, or?

5       MR. CATOE:  Yes, we've looked at past year revenue

6 growth. You know, in '07 it was 1 percent over the prior

7 year, if you

8 go to the two years preceding that it averaged about 12

9 percent -- or 6 percent per year.  And then if you go

10 back several years, many years, it's in the 2 1/2, 3

11 percent range over time.

12 So clearly growth has fallen off from what it was even

13 two to

14 three years ago.

15      MR. LINTON:  I thought that was the case, but

16 these numbers here don't seem to suggest it.

17      MR. CATOE:  Yeah, we would have to look at these

18 numbers. I'm not sure of the source of these.

19      MR. LINTON:  That's why I'm trying to get to see

20 if we can get some consistency of this, because the

21 numbers on this statement from the RAC doesn't seem to

22 be consistent with the numbers that I've seen in reports

Page 22

1 over the last -- particularly the last year where that

2 growth had greatly reduced.  Their numbers here don't

3 seem to reflect that.  So I'm trying to see --

4       MR. CATOE:  And we'll look at that.  The numbers I

5 just said are the numbers from our report.

6       MR. LINTON:       -- reconcile the differences

7 here.

8       MR. CATOE:  Yes, sir.

9       MS. HEWLETT:  Are there any other questions or

10 comments? Mr. Catoe, did you have anything else to add?

11       MR. CATOE:  We're fine, I understand the

12 direction.

13       MS. HEWLETT:  Okay.  Thank you very much, Mr.

14 Snyder.

15       MR. SNYDER:  (inaudible).

16       MS. HEWLETT:  Okay.  Okay, we now have the public

17 comment period.  We have a number of people signed up.

18 I'm going to remind everyone, thank them for coming

19 today, remind everyone that we have a two minute time

20 limit.  So as I call your name take that into

21 consideration as you're coming up to the podium so that

22 you'll know when your comments have to -- to wrap up

Page 23

1 your comments.  Sarah Green?  No?  Gone?

2       MALE VOICE:  I think she's gone, she's coming.

3       MS. HEWLETT:  Okay, coming, okay.  To be followed

4 by Seth Grimes.

5       SARA GREEN:  Good afternoon my name is Sara Green,

6 I'm an advisory neighborhood commissioner for the 01

7 (phonetic) in the District of Columbia.  And the

8 community that elected me to that position is the

9 community that lives all -- very close to your metro

10 station.  The metro station is within my single member

11 district.

12 And you've gotten this in the public hearing record,

13 but this is way more than a 1,000 signatures.  Your

14 riders who are District of Columbia residents, and the

15 community surrounding the Metro station all telling you,

16 "Please do not build the current proposal for 85 --

17 roughly 85 town homes at Takoma Metro Station."

18 Also, during your October 11, 2006 public hearing

19 between the spoken comments and the submitted comments

20 you had about 90 -- over 90 percent of those comments,

21 roughly 200 comments saying no, no, no.  There were very

22 few, if any, yeses to this proposal.  Why do you think

Page 24

1 that is?  Well it's because you're going to be selling

2 about 2/3 of the land at one of the very smallest

3 stations you have and you're going to be doing it to

4 build town homes with private, two car garages.  And in

5 order to build these town homes, which are 150 feet from

6 the fare (inaudible) you're going to have a network of

7 driveways and streets that are very, very land wasteful,

8 all at one of the smallest stations, to get those cars

9 into the private two car garages.

10 And you've been ignoring an alternative development

11 proposal that your staff refuses to look at, that the

12 staff report for that public hearing does not

13 acknowledge.  So, what we've been hearing time and time

14 again, from your staff, from elected officials years

15 ago, is that this is a done deal.  Don't come with any

16 alternatives, don't come opposing this, a public hearing

17 doesn't matter.

18      MALE VOICE:  Ms. Green.

19      SARA GREEN:  It's done deal.

20      MALE VOICE:  Your time is up.

21      SARA GREEN:  Thank you very much.  You have the

22 ability to do the right thing here and we're asking you

Page 25

1 to do that.

2    MS. HEWLETT:  Thank you Miss Green.  Seth Grimes

3 followed by Robert Diedrick (phonetic), did I --

4    SETH GRIMES:  Good afternoon Chairman Hewlett,

5 board members, Mr. Catoe and staff.  I'm Seth Grimes,

6 7300 Willow Avenue, Takoma Park, Maryland.  I'm

7 President of the Old Time Residents Association and a

8 member of an ad hoc group of Takoma Park residents, both

9 from the District of Columbia and Maryland who seek to

10 better our shared neighborhood.  In that respect we are

11 like many communities throughout the Washington, DC

12 area.

13        We are similarly considered with -- you are

14 similarly concerned with regional issues that cross

15 jurisdictional boundaries.  Joint development at the

16 Takoma Metro site is one such issue.  We in the

17 community appreciate the process that allows us to

18 comment at meetings such as this one, to testify at

19 compact hearings and in particular to offer our

20 reactions to a site design that affects the livability

21 and especially the transit usability and accessibility

22 of the Takoma Metro site, adversely affects it.

Page 26

1 We regret that we in the community have been an

2 after thought in the joint development process.  That

3 process has had many flaws and has culminated in a site

4 design that negatively limits transit access and

5 capacity.  We urge very significant design changes that

6 will transform developer EYA's plan even as recently

7 revised into two true transit oriented developments.

8 To this end we in the community have organized an

9 outreach effort to encourage our neighbors to make

10 comments in response to the staff report on the last

11 October's compact hearing.  And I think that you will

12 find those comments are overwhelmingly opposed to EYA

13 developer current plans.  I appreciate that you will

14 take into your consideration the comments that you

15 receive, all of you, without regard to jurisdictional

16 boundaries and the comment interests that we all have.

17 Thank you.

18      MS. HEWLETT:  Thank you very much.  Mr. Diedrick,

19 followed by Richard Holsage (phonetic).

20      MR. DIEDRICK:  -- board members and staff, I have

21 three quick points that I'll make on two interrelated

22 themes, cost efficiency and operational efficiency.

Page 27

1 (inaudible) procurement of the hybrid electrical buses

2 which I understand will be discussed today, it is very

3 important for the both cost efficiency and the

4 operational efficiency of the model, particularly with

5 hybrid buses which are very important to our system.

6 And I hope that this issue isn't being complated with

7 the separate procurement of the 22 articulated

8 compressed natural gas buses, which I also saw in the

9 little link below the item on the agenda.

10 In these times of budgetary issues and proposed fare

11 hikes, I hope the Board will thoroughly consider whether

12 riders will be best served and the cost efficiency of

13 WMATA will be served in the award of these hybrid buses.

14  I understand that there is a company that has extensive

15 experience having delivered early 400 buses to five

16 different transit authorities nationwide and has

17 submitted a proposal that delivers the most value at the

18 lowest cost to Metro riders and WMATA.  I understand

19 that this company is called NABI.  I don't know what

20 decision the Board plans to take today, but I urge the

21 board to table any decision until it carefully considers

22 and investigate why buses are not being purchased in the

Page 28

1 best interest of the riders and the efficiency of WMATA.

2 My second point is a little different track, but

3 it's still focused on efficiency.  The train track

4 between the airport and Braddock Road, the little yellow

5 lines, is running very slowly.  And it hinders the

6 commute both in the morning and at night.  And then

7 returning to both themes together, I know that, you

8 know, the budgetary issues and I know the proposed fare

9 hikes that you all are considering and I imagine that

10 you take your slogan, "Metro Open Doors, " seriously.

11 And I hope you ensure that the cost of walking through

12 those doors is not prohibitive.

13          We can do that by managing our resources and

14 procurements to ensure cost effectiveness and

15 operational --

16     MALE VOICE:  Diedrick, your time is up.

17     MR. DIEDRICK:  Thank you, sir.

18     MR. ZIMMERMAN:  Question for the speaker, Madam

19 Chairman?

20     MS. HEWLETT:  Okay, Mr. Zimmerman, thank you.  Mr.

21 Diedrick, on your first point, the award of the contract

22 or procurement for buses, you're suggesting that it was

Page 29

1 somehow what's recommended to us is not the basis -- has

2 not been on the basis of competitive bid and it's not

3 the lowest cost?  And I was wondering what you were

4 basing that on?

5      MR. DIEDRICK:  My understanding is that there was

6 a competitive bid process.  What I do understand is that

7 it may not be the lowest bid.  And I don't know what the

8 considerations staff took into account when deciding

9 which recommendation to make to you all.  Frankly, I

10 don't think that is a matter of public record, at least

11 at this point.  So I'm kind of operating in the dark

12 here.

13 But I know, or at least I have reason to believe,

14 that it may not be the option that was in the best

15 interest of riders.

16      MR. ZIMMERMAN:  And grant it, it's not necessarily

17 on low bid, 'cause you know, we often use best value

18 procurement in these situations, because of course the

19 lowest price is not necessarily the best product.

20      MR. DIEDRICK:  (inaudible) that works too.

21      MR. ZIMMERMAN:  But what would lead you to

22 question, in this case, whether the recommendation is in

Page 30

1 the best interest of riders?

2    Mr. DIEDRICK:  Well frankly, just what I said,

3 that I understand that there is a provider that has

4 offered to an option that has a lot of experience behind

5 it, the company which I understand is NABI, has a lot of

6 experience --

7    MR. ZIMMERMAN:  Quite a few bus vendors and

8 they're one of them.

9    MR. DIEDRICK:  -- I'm sure.  And they have a lot

10 of experience in providing this type of service and I

11 don't know what the process was and the final decision

12 making, because that's not public.  But I am concerned

13 that there is such a vendor out there that has a lot of

14 experience, that has submitted a low cost bid.  I don't

15 know if it was the lowest or not, because that's not

16 public information, but I don't know if it was

17 considered and I don't know if that decision making

18 process can be made public.

19    MR. ZIMMERMAN:  And we -- when we get to that item

20 you can certainly ask those questions.  I just was

21 trying to understand what basis there might be for you

22 having such a suspicion.  In any case, when there's a

Page 31

1 procurement there are always bidders and there's always

2 people who lose the bid. And my experience, those who

3 lose the bid always say theirs was better, but in the

4 end you have to evaluate it based on price and other

5 factors that are in the best value procurement are laid

6 out beforehand.

7 And so in any case, I mean it's always a fair

8 question to ask about any procurement, why this one and

9 not another one. But usually there's a pretty

10 straightforward answer to that. And I just wondered

11 whether there was something about this one that would

12 lead you to think something else was going on. You

13 know, again, I know the names of the major bus

14 manufacturers and several of them might have been

15 interested and one of them is being recommended. Why

16 should I, as a board member, be concerned that one of

17 the ones that didn't get the bid would be better for us?

18     MR. DIEDRICK: Well other than what I've said I

19 can't point to anything specific in this case that might

20 raise more suspicions than others. But as you said,

21 it's always a fair question, procurements, you know, why

22 this one and not the other one. And when we have a

Page 32

1 company that at least -- I mean and you probably have

2 access to far more information than I do about who

3 submitted bids and who didn't.  I don't have all that

4 information.

5      MR. ZIMMERMAN:  Not necessarily, no.

6      MR. DIEDRICK:  Not necessarily, but maybe the

7 staff does. I'm just aware that there's a company with

8 an extensive amount of experience that my understanding

9 put in a low cost bid and I just don't know was that

10 cost effective?  Was that decision made in the best

11 interest of the riders?  And I think that warrants the

12 Board's consideration.

13      MR. ZIMMERMAN:  Okay.  Thank you.

14      MS. HEWLETT:  Are there any other questions?  Mr.

15 Holsager (phonetic) followed by Faith Wheeler.

16      MR. HOLSAGER:  My name is Richard Holsager, I live

17 on Pine Branch Road in DC, about three blocks from

18 Takoma Metro.  Given where I live it's no surprise that

19 I want to talk about a topic spoken of by two of my

20 predecessors, one of whom happens to be my wife, I

21 should disclose.

22 I want to talk about the response to the report on

Page 33

1  the compact hearing on the planned joint development

2  (inaudible) and I have my response to that hearing here

3  that I plan to turn in and as long as I'm here I thought

4  I would try to emphasize my main point, which is that I

5  think that the report is highly selective, which leads

6  to a foregone conclusion and is basically not really a

7  report but testimony by an advocate of the (inaudible)

8  plan.

9  As far as I can telling, having read through it, I

10 think I saw the whole thing.  It fails to even mention

11 the fact mentioned by my wife already, that the oral and

12 the written testimony was overwhelmingly in opposition

13 to this plan, both from DC and Maryland people, that

14 that opposition has been uniform throughout all the

15 public hearings that have occurred throughout the

16 process.  And also, I think it greatly understates the

17 amount of noncompliance of this plan with the Takoma

18 Central District plan, which forms the basis of the

19 official support for this plan by DC.

20 So in fact, I think in terms of either public or

21 official support, it really is misleading to think that

22 DC supports this plan.  Thank you.

Page 34

1       MS. HEWLETT:  Thank you.  Are there any questions?

2  Okay. Ms. Wheeler followed by -- I may no say this

3  correctly, Joe--Jiocchi (phonetic).  Is that right?

4  Perry?  Thank you. Ms. Wheeler.

5       MS. WHEELER:  Good afternoon ladies and gentlemen,

6  WMATA board members and staff.  My name is Faith

7  Wheeler, an advisor and neighborhood commissioner (tape

8  damage) off peak ridership, we in Takoma want Metro to

9  continue to be the best ride in the nation.  We in

10 Takoma are an original cross jurisdictional, transit-

11 oriented community since it was first established in the

12 1880's, that's the 19th century, around the D&O

13 Metropolitan Branch tracks, which is exactly the same

14 rail bed that the Red Line of WMATA uses today.

15 In the 1960's the Takoma community, DC and Maryland,

16 were instrumental in stopping the North Central Freeway

17 which was to bring some 12,000 cars into the city.  We

18 urged that the federal highway funds be transferred to

19 establish a rail system, a rapid rail system, a Metro,

20 the WMATA Metro.  We are a great supporter of WMATA, we

21 are an initiator in supporting and establishing WMATA,

22 our Metro.

Page 35

1          In the 1970's our Takoma station (inaudible)

2 community and it's taken hundreds of drivers off our

3 streets. Now in 2007 we're looking at a new (inaudible)

4 terminal --

5     MALE VOICE:  Ms. Wheeler, your time is up.  Thank

6 you.

7     MS. HEWLETT:  Thank you Miss Wheeler.  Mr. Perry?

8 If you have comments in writing you can submit them.

9 Followed by Norman --

10    MR. PERRY:  Good afternoon.  My name is Giocat

11 (phonetic) Perry and I'm visiting you here from Atlanta,

12 Georgia.  I'm a member of the Atlanta Jobs for Justice

13 (inaudible) campaign, our transit agency.  I'm here

14 pretty much alluding to the sign on the wall that the

15 previous speaker (tape damage) because that always held

16 Metro system out as a national example.

17 We are visiting this week considering a return to

18 the DC area.  So on Tuesday I got information that there

19 any be a fare increase.  I've done some transit justice

20 work in Atlanta with (inaudible) and we're a coalition

21 in 40 cities, in 12 states across America with over

22 5,000 members.  (tape damage) national office here on

Page 36

1 (tape damage) local office, it's on (tape damage)

2 concerned about this proposed fare increase (tape

3 damage) my efforts and work that I found that a severely

4 transit dependant community (tape damage) burden cost

5 for transit, and that's all across America and it's

6 unjust and it's unfair.

7 You're having (inaudible) transit racism (inaudible)

8 Dr. Robert Bullard's book, Transit:  Highway Robbery,

9 (tape damage).  So for democracy of all these transit

10 (inaudible) that include transportation employees (tape

11 damage).

12        MALE VOICE:  Mr. Perry, your time is up.

13        MR. PERRY:  Thank you, transit justice for all.

14        MS. HEWLETT:  Thank you.  Norman, is it Book?  No?

15  Beeke (phonetic)?  Okay, are there any other speakers

16 who've signed up today, because I might not be

17 pronouncing it correctly.  No? Hearing none, I'll

18 declare that potion of the agenda to be over, the public

19 comment period.

20 Okay, we now have the report by the Chair.  I only

21 have two things to address really, one on a more

22 pleasant note. The 31st Annual Metro Bus Roadeo, R-O-A-

Page 37

1 D-E-O, took place on September 15th. And this event, as

2 you may know, is a great way to encourage our bus

3 operators and maintenance teams to take pride in their

4 work. And we just wanted to congratulate two folks.

5 Well actually a couple of folks here. First, Robert

6 Miles of the Landover Bus Division in Prince Richard's

7 County, for winning the operator competition for the

8 19th time, the 19th time. Miles is a 37 year veteran

9 with Metro Bus. He competed against 69 fellow bus

10 drivers on an obstacle course that included every

11 conceivable maneuver a bus operator would ever encounter

12 on the street. So we congratulate Miles.

13 In the maintenance competition there is a team of

14 Don Rich, David Swearman (phonetic), and Kim Pe Trin

15 (phonetic) from the technical support service branch, in

16 Washington, DC, who took first place. And this was just

17 their second year of competition. So we wanted to

18 congratulate all those winners and wish them the best of

19 luck when they represent WMATA at the American Public

20 Transit Transportation Association International Bus

21 Roadeo in May, 2008 in Austin, Texas. So we want to

22 congratulate them.

Page 38

1 Now the second item I have to take the chair's

2 privilege in addressing something that we have been

3 addressing but I was fairly silent today.  So -- but not

4 right now.  I just want to make it clear that we take

5 the proposed fare increase very, very, very seriously.

6 It's a comment that has been the topic of the day and

7 it's clear -- and it will be the topic of many, many

8 days to come.  But the things that I wanted to point out

9 were that we all feel very, very strongly about this

10 issue. We may not come down the same way, but we all, on

11 this board, feel very, very strongly about this issue.

12 And we recognize, as one of our goals, that one of

13 our primary goals to provide quality, dependable and

14 affordable transportation.  This board understands that

15 Metro's operating costs are rising, that we are

16 grappling with this as are many other transit operations

17 in all the jurisdictions throughout. Like everyone else,

18 we recognize that it's a problem and we're grappling

19 with how do we fix this budget, this eminent budget

20 dilemma without placing the burden unfairly on the backs

21 of our riders.

22 We all care about our riders.  We all recognize how

1 -- the extent to which this could affect our customers,

2 particularly those who ride the rail system, those who

3 ride the bus system and those who use our parking

4 facilities, and particularly those who use all of the

5 above.  It can have enormous impact on them and we care

6 about all of those riders.

7 We want to ensure the public that the board members

8 and I do not take this decision lightly, we are acutely

9 aware of our responsibility and we recognize that

10 ultimately -- and I have faith that ultimately we will

11 all do the right thing, even if that right thing is not

12 the popular thing.  We will all do the right thing, but

13 not before analyzing all the information that comes to

14 us from our staff, from our professionals there, not

15 before analyzing all the information and the testimony

16 that we hear at our public hearings, not before getting

17 all the input that we can from the Riders' Advisory

18 Council, and not before getting all the board questions

19 answered.

20 We are going to take all that stuff, synthesize it,

21 distill it and try to make the best decision that we

22 possibly can after soliciting the rest of the

Page 40

1 information via public hearing process.  So I want to

2 make it clear that right now we are still in that stage

3 of analyzing information that comes to us.  And we're

4 just really at the beginning still.  And we will have

5 public hearings, and no decision has been made.  And I

6 really wanted to take the opportunity to thank Mr. Catoe

7 and staff.  You know, we are all bombarding you with

8 questions, not just at these special sessions, we had a

9 special session, finance committee meeting today, we are

10 going to have a special board meeting.  I mean we are

11 really, really engaged and interested here, because we

12 recognize how serious this is.  So we wanted to thank

13 you for your constant feedback and for all of your

14 efforts.  And the e-mails that have gone back and forth,

15 I mean we all have questions for you.

16 And I'd also like to the citizens who have e-mailed

17 and called and those who've come here today to speak on

18 this subject, because your input is invaluable as well.

19 And I think the Board has been truly engaged and even

20 though we have differences on how we come down, I think

21 we're all concerned about our riders and making sure

22 that our fare policy is just that, fair, F-A-I-R.

Page 41

1 So I did want to mention that.  I think we are on as

2 Mayor Yul (phonetic) said, we are on the right track

3 here, but we've got to keep going.  So thank you so

4 much.  And with that we have the report of the general

5 manager, Mr. Catoe.

6       MR. CATOE:  Thank you Madam Chair, and Madam

7 Chair, members of the board, I'm going to make my report

8 very short given the lateness of the day.  From a safety

9 standpoint I just want to notify you that we have moved

10 into a new phase of our safety improvement program.  And

11 our contractor has completed work on the safety

12 assessment and is now briefing the results to our

13 employees.  And we will keep this board informed of the

14 results of that.

15 In addition, we ended the last day of service for

16 the Nationals at RFK, and we provided services for over

17 246 home games.  And we're very successful in doing

18 that, in moving a lot of commuters.

19 Today there was an article concerning the possible

20 delay in the completion of the Navy Yard Station

21 expansion or the new entry to the Metro rail system.

22 There's two pieces of construction going on at that

1 location, one that's being handled by Metro staff and

2 the internal configuration of the station, and the other

3 that's being handled by the developer putting up a

4 complex there.  That is behind schedule, the developer's

5 work schedule is delayed by, I think, approximately

6 seven weeks. We've been assured, and our observation has

7 been they're putting in extra efforts in order to get

8 that project completed on time.

9 But I wanted to ensure this board as well the Nationals,

10 that

11 we are and have contingency plans to be able to provide

12 those services at the beginning of the baseball season.

13          The other is concerning our services that a

14 gentleman brought up today about the slowness of trains

15 between National and other stations --

16          MALE VOICE:  Braddock.

17          MR. CATOE:  -- and Braddock station.  We have

18 replaced the main transformer at the Pacific Yard's

19 electric substation. That was the transformer that was

20 the major cause of our power problems on August 26th.

21 And we've also reconfigured the substation at National

22 Airport to improve that efficiency.

Page 43

1 In addition, there was a question from the Riders'

2 Advisory Committee at the last meeting, concerning

3 recycle bins for newspapers.  And we do have recycle

4 containers that, I believe, were provided by the

5 Washington Post, that are at our stations.  And we

6 recycle the newspapers.  There are a couple locations

7 where we find that they become an overload because of

8 the number of passengers.  And so we're working to

9 secure additional bins there.  But we do recycle the

10 newspapers.  As I mentioned, we handle those very well.

11 There's a couple of stations where it's slightly going

12 over the capacity of the bins themselves.

13        MR. ZIMMERMAN:  Question on that, Madam Chair?

14        MR. CATOE:  Yes.

15        MS. HEWLETT:  Yes, Mr. Zimmerman?

16        MR. ZIMMERMAN:  Well that report be given to the

17 Riders' Advisory Council since they raised the question

18 in the first place?

19        MR. CATOE:  Yes, we will give a report and a

20 response back to them.  I believe you say you have a

21 meeting on October 3rd, we'll make that presentation to

22 them on October 3rd.

Page 44

1       MR. ZIMMERMAN:  Okay.  Thank you.

2       MR. CATOE:  Also, before I get into recognizing

3 one of our employees, I do have to let the board know

4 there are pending protests on two items before you today

5 for approval.  There are two protests on the bus award,

6 one from Design Line International and North American

7 Bus Industries, or NABI, N-A-B-I, to the award of a bus

8 contract in New Flyer.  Should you authorize the award

9 to New Flyer our procurement regulations require a delay

10 of the actual award for five days following the

11 contracting officer's review and also decisions on the

12 protest. And we will follow our normal procedures should

13 you approve that award.

14 The second protest is brought by NR Ballpark Seven,

15 LLC concerning the sale of the Southeastern bus garage.

16 The procurement regulations do not apply to the sale of

17 our property.  However, should the Board approve the

18 sale today, the award would be made as soon as possible

19 following review of the protest.  Are there any

20 questions on that?

21      MALE VOICE:  -- update?

22      MS. HEWLETT:  Are you just -- if you want to

Page 45

1 answer your question.

2     MALE VOICE:  If you'd like to (inaudible).

3     MR. GRAHAM:  Are we interrupting or doing this

4 now?  Or waiting to the end of the report?

5     MR. CATOE:  I have some more but it is a separate

6 issue. If you are bringing up -- if you have a question

7 I will try my best to answer it.

8     MR. GRAHAM:  Well, I am struck by something he's

9 just said, I mean since you already asked the question.

10     MR. ZIMMERMAN:  Which question?

11     MR. GRAHAM:  I don't know, whatever you asked.

12 But anyway, I'm surprised, well maybe not surprised,

13 I'm struck, that's what I wanted to say.  You said that

14 in the case of the Southeastern bus garage, that even

15 though there was no delay required by our procurement

16 regulations you would delay the decision until -- what

17 did you say about that?

18     MR. CATOE:  No, no.  I said should the board award

19 the garage to the successful bidder, that we would go

20 through the normal review process to ensure that we

21 followed all the procedures, and our procedures for

22 procurement generally is a five day delay of the release

Page 46

1 of the property itself, it would delay it five days,

2 just for the review process.

3     MR. GRAHAM:  But I thought I heard you say that

4 that didn't apply to dispositions.

5     MS. O'KEEFE:  Just as a clarification, the

6 disposition of surplus property is not governed by

7 procurement regulations. Both FTA regs and our

8 procurement regulations require a delay of five days of

9 an award after a protest has been resolved.  That does

10 not apply to the sale of the Southeastern bus garage,

11 but we would, of course, respond to the protest and then

12 move forward with the award should the board approve it

13 today as quickly as possible after the protest has been

14 answered.  The protest was just received late yesterday.

15     MR. GRAHAM:  The question, you know, the question

16 Madam Chair that I was going to ask at the conclusion of

17 your remarks, but I'll ask now, you know, does pertain

18 to these delays, because, you know, I appreciate the

19 comment that you made on the delays at the Navy Yard.

20 But I think we need something more specific to assure us

21 that if the improvements at the Navy Yard Station are

22 not made -- are not to be completed by opening game day,

Page 47

1 I think we need a Plan B in place for how to handle that

2 opening day crowd.

3 And so I would like to ask, if I may, for more

4 detailed consideration of what our options are there

5 because we may end up with delays there.  And I am also

6 concerned about whatever decision this board makes on

7 the disposition of the Southeastern bus garage that we

8 move as expeditiously as possible because again that

9 particular property has great relevance to the opening

10 day, as well, of the baseball season because the owners

11 of the team and the District of Columbia are

12 anticipating that there would be 350 parking spaces in

13 that garage.  And we're also concerned about pedestrian

14 safety which is one of the reasons we are moving the

15 garage.  So that all of these buses moving at the same

16 time as people are arriving for a baseball game is

17 obviously not a situation that we want to have happen.

18        And so on both cases I want to be assured, and I

19 was a little bit taken aback about your comment, that

20 you know, it seemed as though there is going to be an

21 extended process.  I mean we should follow our

22 procedures precisely.  And if they involve a delay we

Page 48

1 should have the delay and if they don't involve a delay

2 we ought not have it.  Do you understand what I am

3 saying?

4      MR. CATOE:  I understand, that's very clear to me.

5      MR. GRAHAM:  There was a little bit of a mixed

6 message here.

7      MR. CATOE:  That's very clear.

8      MR. GRAHAM:  I mean whatever our policies, are I

9 definitely want to abide by them.  But I don't want to

10 create a new consideration that involves delays relating

11 to this property, 'cause we just can't afford it.  Are

12 we on the same page?

13      MR. CATOE:  Yes we are.

14      MR. GRAHAM:  Okay, great.  Thank you.

15      MR. CATOE:  Thank you.  At each board meeting we

16 like to recognize the outstanding work our employees do

17 each and every day.  Today I would like to talk about

18 Cynthia Champion one of our Red Line station managers.

19 And she is here this morning. Better yet I am going to

20 let you hear about what had happened in the words of one

21 of our customers and I will be paraphrasing the letter

22 we received from the customer who was visiting from Ohio

Page 49

1 two months ago.  "On July 19th my ten year old daughter

2 and I were separated after we departed from DuPont

3 Circle.  We arrived at Farragut North and I stepped off

4 the train assuming my daughter was right behind me.  She

5 was not.  I turned and saw the train take off, all the

6 while my daughter's face was glued to the window, as we

7 watched each other vanish, seemingly forever.

8 Can you imagine the panic and horror in our minds.

9 I had no idea what to do at this point.  I ran to the

10 upstairs platform where I approached a woman, a Metro

11 employee, and explained what has happened.  She quickly

12 gathered the facts and called in the troops and managed

13 to stay on top of every aspect of what was transpiring

14 on the Red Line.  She stayed near me and assumed that my

15 daughter would be found no mater what.  She was right.

16 She had already orchestrated many other security

17 teams at various points of the Red Line, particularly

18 Metro Center.  I was impressed that she also had

19 contingency plans in the event that she was not found

20 there.  My daughter was found at Metro Center by your

21 security team, where she was held until I was able to

22 get to her.  I cried twice in the last 20 years.  And

Page 50

1 this is one of those occasions whereby I let loose with

2 tears of joy when this woman conveyed to me that my

3 daughter was found at Metro Center.

4 It is people like this Metro employee that makes the

5 world a safer place.  Her attention to detail and her

6 attention to others concern should be rewarded with the

7 highest praise.  I thank the entire Metro Subway System

8 for their organization and professionalism during such

9 stressful moments."

10 The actions of station manager Cynthia Champion are

11 a reminder of just how seriously our employees take

12 their responsibilities.  I am grateful and proud of Ms.

13 Champion for the example that she has set for all of us.

14  And now I would like to present to Ms. Champion a

15 certificate acknowledging her excellent work and ask

16 that the board also thank her for the outstanding

17 performance she demonstrated on July 19th.

18 (inaudible) Washington Metropolitan Area Transit

19 Authority (inaudible) as a general manager, recognizes

20 the station manager ,Cynthia Champion, for

21 professionalism and outstanding service to our

22 customers.

Page 51

1 Do you have any comments you want -- I know your

2 husband's here also.  (tape damage) Madam Chair, that

3 completes my presentation.

4        MS. HEWLETT:  Thank you.  Ms. Champion, on behalf

5 of the board we thank you so very much for your

6 responsiveness, for being so quick on your feet and

7 deflecting what could have been a really tragic

8 circumstance.  So thank you so very much on behalf of

9 everyone.

10 Okay.  We have item number 8 on the report of

11 Customer Service Operations Safety Committee, Mr.

12 Benjamin.

13        MR. BENJAMIN:  My staff is requesting approval to

14 award a one year base and four one year options for the

15 purchase of 474 buses over a period of five years.  This

16 was brought to us in committee and we requested a

17 detailing of what buses would be bought and the funding

18 associated with them.  The information that we have

19 received shows that 125 buses would be part of the base

20 buy and 100 buses in FY '09 as the first option.  There

21 are no funds available for the remaining 249 buses in

22 this order. So I am therefore moving that we approve

Page 52

1 this request for an award of these buses for the base

2 year and the one year option and the remaining options

3 based on availability of funds.  Are there additional

4 follow-ups, or do you need a second and also --

5      MS. HEWLETT:  Yeah. We need a second

6      MR. BENJAMIN:  -- we need to follow up --

7      MALE VOICE:  I'll second it.

8      MS. HEWLETT:  Second.  And any discussion.

9      MR. BENJAMIN:  And we need a follow up on the

10 issue brought up earlier

11      MS. HEWLETT:  Okay.  Mr. Moneme, oh I thought you

12 had something.

13      MR. MONEME:  Oh, I'm sorry.

14      MS. HEWLETT:  Go ahead.  Mr. Zimmerman.

15      MR. ZIMMERMAN:  Okay.  Mr. Catoe, can you address

16 the question about, well first just tell me generally

17 how this procurement recommendation was made?  How did

18 you come to the award that you are asking us to approve?

19      MR. CATOE:  We went out for requests for best

20 value proposals to various firms to provide buses.  And

21 the various bids came in, we reviewed those via

22 committee, which I was not a part of and I purposely

1 stayed out of that process.  The committee and their

2 best judgment based upon the technical requirements of

3 the specifications as well as what was submitted,

4 recommended that we procured 22 articulated buses from

5 NABI and that the additional vehicles be obtained from

6 New Flyer.  And we have staff here who could go into the

7 actual details of that procurement process if necessary.

8        MR. ZIMMERMAN:  What I want to know is did -- and

9 you said, you didn't yourself participate directly, but

10 you have reviewed it.

11        MR. CATOE:  Yes I did.

12        MR. ZIMMERMAN:  And so first, are you satisfied

13 that the process conformed to our own regulations and

14 those of the Federal Transit Administration?

15        MR. CATOE:  I am completely satisfied that the

16 process conforms to our Metro requirements as well as

17 those requirements of the Federal Transit

18 Administration.

19        MR. ZIMMERMAN:  And the protest that you referred

20 to earlier, is that concerning the entire procurement or

21 one aspect, one component of it?

22        MR. CATOE:  I have not had the chance to look at

Page 54

1 the details of the protest.  The protest though, I

2 believe, is from one provider is the entire award and

3 from the other provider is a portion of the award,

4 because one of the protesters we are procuring buses

5 from them.  It is the second piece that they are

6 protesting, every vehicle -- the non-articulated

7 vehicles.

8       MR. ZIMMERMAN:  They got one award, They didn't

9 get the other.  They are objecting to the part they

10 didn't get?

11      MR. CATOE:  Right.

12      MR. ZIMMERMAN:  And just briefly what is the basis

13 for the protest.

14      MR. CATOE:  I have not had a chance to read the

15 protest, I don't know if you?

16      MS. O'KEEFE:  Well essentially they are saying

17 they provided the lowest price and it should have been

18 awarded on that basis.

19      MR. ZIMMERMAN:  Okay.  And the procurement was on

20 the basis of best value?

21      MR. CATOE:  Yes.

22      MR. ZIMMERMAN:  Because it is not like buying

Page 55

1 number 2 pencils, there are actually different

2 characteristics of the product we're purchasing?  Yes?

3     MR. CATOE:  Yes.

4     MR. ZIMMERMAN:  And how significant a price

5 difference are we talking about?

6     MR. CATOE:  I am going to ask the staff to respond

7 to that.

8     MALE VOICE:  I would have to defer to Mr. Griswall

9 on that one.  Well from what I know initially the

10 pricing came in, I think there was a $2 million

11 discrepancy between one of the protesters and the one

12 the staff recommended.  Subsequent to that, the way the

13 buses were scheduled to be delivered the pricing was

14 adjusted and they're virtually the same.  That has to do

15 with the tie in of the (inaudible) procurements being

16 awarded concurrently.

17     MR. ZIMMERMAN:  Okay.  I'm not sure I follow that.

18  All I wanted to know was are these guys saying there

19 price is five percent lower, 10 percent lower, 50

20 percent lower?

21     MALE VOICE:  They didn't give us any (tape damage)

22 percentage differential between the two proposals.

Page 56

1 Because I am not sure that they are aware of the one

2 that was -- you know, one is aware of what the other has

3 submitted at this point in time.

4        MR. ZIMMERMAN:  But you are.

5        MALE VOICE:  Yes.

6        MR. ZIMMERMAN:  So, Since you know what they were

7 saying that they would sell us X number buses and you

8 divided by, you know how much it is per bus?

9        MALE VOICE:  Yes.

10       MR. ZIMMERMAN:  So you can say, these guys bus --

11 their bus cost five percent more than these.

12       MALE VOICE:  Well initially there was a

13 differential of about that amount, five percent.  But

14 like I was saying, subsequent to that, when the award

15 was -- the proposal was addressed, and the final pricing

16 was provided based on the award information, they both

17 were within, I think, .09 percent they ended up.

18       MR. ZIMMERMAN:  One went up or the other went

19 down?

20       MALE VOICE:  One went down.  One of them went

21 down.

22       MR. ZIMMERMAN:  The one you were awarding --

Page 57

1      MALE VOICE:  Yes, went down.

2      MR. ZIMMERMAN:  -- appeared to be?

3      MALE VOICE:  It came down.

4      MR. ZIMMERMAN:  Now how could that be if it's a

5 bid?

6      MALE VOICE:  Well what happened, the delivery

7 dates of the buses remained the same starting in the

8 fall -- the beginning of fiscal year '08 and being

9 completed in fiscal year '09.  But if you made the award

10 concurrently, economies of scale, even though the

11 expenditure didn't change, the fact is if they were

12 awarded upfront, the price went down instead of --

13      MR. ZIMMERMAN:  You know, it sounds like as if

14 there was a negotiation subsequent to the award being

15 determined --

16      MALE VOICE:  It was --

17      MR. ZIMMERMAN:  -- to change the terms of the

18 offer?  Is that what I'm hearing?

19      MALE VOICE:  -- there was no negotiation.

20      MR. ZIMMERMAN:  Well how does the bid change after

21 -- I mean if you have a sealed bid process --

22      MS. O'KEEFE:  (inaudible) it was a request for

Page 58

1 proposals. So under an RP, you can have a type of

2 negotiation, it's not a direct negotiation, but there

3 can be discussions and the proposers can be given the

4 opportunity to provide a best and final offer after t

5 discussions, all proposers of course are given that

6 option, as I understand it.

7      MR. ZIMMERMAN:  Thank you for that clarification.

8      MS. O'KEEFE:  Yes.

9      MR. ZIMMERMAN:  So under the process, the initial

10 bid is not the best and final offer and there's give and

11 take with the various proposers.  And if, in the course

12 of that discussion they modify it, the cost number can

13 change?

14      MS. O'KEEFE:  Yes.

15      MR. ZIMMERMAN:  Do secondary -- I mean again,

16 suppose you have that back and forth with one bidder of

17 say three, I don't know what there were, but I image

18 there were three.  And you know, you have that back and

19 forth and one bidder's numbers get better then.  Is

20 there any way -- do you then go and try to determine

21 from the other bidders whether theirs would change?

22      MS. O'KEEFE:  I can't speak to this specific

1 process, but generally, in a request for a proposal if

2 there are true discussions that lead to, for example,

3 one proposer improving their bid, then all proposers are

4 allowed to do so.  So you don't just pick out one person

5 or one proposer and treat them differently.

6 But I'm not familiar with the procedures.  I haven't

7 had a chance to review the protest yet.  But I'm talking

8 generally, the difference between a request for proposal

9 and an invitation for bids.

10    MR. ZIMMERMAN:  Couple of questions.  First, Mr.

11 Catoe, are you confident that anyone who wanted to had

12 the same opportunity as the firm that you're

13 recommending be awards the contract?

14    MR. CATOE:  Had the same opportunity if they met

15 the specifications, outlined in the original request,

16 yes.

17    MR. ZIMMERMAN:  (inaudible) what it is you want to

18 see in the product they're going to sell you, and they

19 have to be responsive to that?

20    MR. CATOE:  I'm sorry, I missed that question.

21    MR. ZIMMERMAN:  Specify --

22    MR. CATOE:  Yes.

Page 60

1      MR. ZIMMERMAN:  -- what it is you want to buy and

2 bidders have to be responsive to that.  If they're not

3 --

4      MR. CATOE:  Have to be responsive to that and they

5 have to have a product that meets our needs and the

6 product has to have been certified for use in the United

7 States.

8      MR. ZIMMERMAN:  In this case, the award -- the

9 difference seems not to have been really around price

10 anyway, ultimately.

11     MR. CATOE:  Right.

12     MR. ZIMMERMAN:  So there's a difference between

13 the one you're recommending and the ones you're not

14 recommending, in terms of what kind of characteristics?

15 Are you saying the others were nonresponsive?  Are you

16 saying that this one is superior in some specific

17 features or?

18     MR. CATOE:  There are different degrees of detail

19 and I know some of it, but let me --

20     MR. ZIMMERMAN:  A simple one.

21     MR. CATOE:  -- go into detail.  For an example,

22 one of the providers have not had their vehicle that

Page 61

1 they proposed tested. And Pennsylvania is required by FT

2 -- Altoona testing site -- and there is no vehicles in

3 operation in the United States and there's some

4 questions about the percentage of the Buy America

5 Regulations, whether they met that, that's one example.

6      MR. ZIMMERMAN:  Okay.

7      MR. CATOE:  The example on the second one I'm

8 going to have to --

9      MALE VOICE:  Well the example on the second one,

10 they had no real experience in the Harvard electric

11 propulsion portion of their vehicle as they proposed.

12 They did have the background and technical expertise in

13 the BRT portion.  But they, to date, had only built one

14 bus, that was their test bus.  And there were also some

15 concerns about some structural issues that had occurred.

16  We met with them and discussed them.  They did have

17 some resolutions in place, but we didn't feel

18 comfortable that enough mileage had accrued since the

19 repairs had been made, that the bus would perform well

20 in our duty cycle.

21      MR. ZIMMERMAN:  Thank you.  Madam Chairman, I

22 think this illustrated, in part, the reason why

Page 62

1 procurement becomes complex as you're buying a complex

2 product.  And the fact that, you know, you can't do

3 something as simple as low bid, because the nature of

4 whatever you buy is different from different providers.

5 And I've seen this in the past where you'll have a bid

6 process and somebody will object, and what they're

7 objecting to is they essentially want to sell you

8 something different than you said you wanted to buy.

9 And they say, "Well you really shouldn't be asking

10 me for that.  You should be asking me for this, which

11 (inaudible) what I sell."  I don't know if that's the

12 case here, but I know that's often at the heart of a lot

13 of dissatisfaction by unsuccessful bidders.  I'm

14 satisfied that, you know, the process here is followed

15 here as it is in every such bid and at some point we

16 have to trust the experts who do this for us to evaluate

17 the criteria that's most important.

18 And (inaudible) support the recommendation with the

19 understanding that, as we heard, the usually process

20 will also apply afterwards.  And the general manager and

21 staff will have to review the award once more and

22 determine that in fact all the requirements are

Page 63

1 satisfied, and then it would go forward.  Thank you,

2 Madam Chairman.

3      MS. HEWLETT:  Thank you.  Are there any other

4 questions? Okay, right now we have a --

5      MALE VOICE:  A vote.

6      MS. HEWLETT:  -- a motion and a second.  All in

7 favor of the report?

8      GROUP:  Aye.

9      MS. HEWLETT:  Opposed?

10      GROUP:  The ayes have it.  Okay, Mr. Graham, we

11 had the report of the Finance Administration and --

12      MALE VOICE:  Oh, you're not with the (inaudible).

13      MS. HEWLETT:  Oh, we're on B.  I'm sorry, B.  Mr.

14 Benjamin?

15      MR. BENJAMIN:  There's a staff request for the

16 Board to authorize a public hearing to discontinue

17 service on Route C7 and C9 from Greenbelt to Glenmont.

18 And to reinvest those funds within Montgomery and Prince

19 George's County.  This was before the Board once before,

20 was postponed.  I believe Prince George's and Montgomery

21 County have determined how they wish to move forward and

22 would like us to reconsider this at this time.  So I

Page 64

1 move authorization to conduct a public hearing.

2      MS. HEWLETT:  We have the motion.  Is there a

3 second?

4      MALE VOICE:  If you want to second.

5      MS. HEWLETT:  I'll second.  Okay.  All in favor?

6      GROUP:  Aye.

7      MS. HEWLETT:  Opposed?  The ayes have it.  Now,

8 Mr. Graham, report of the Finance Administration and

9 Oversight Committee.

10      MR. GRAHAM:  Thank you very much, Madam Chair.

11 The following actions, well I should say that the

12 Finance Administration and Oversight Committee met on

13 September the 13th, and the following actions were

14 referred to the Board by the committee.  First, use of

15 the operating reserve and refund of jurisdictional

16 balances on account, staff requested approval to use the

17 authorized contingency reserve totaling 10.4 million to

18 fund a portion of the FY '07 operating budget deficit

19 expected to be 19.9 million.

20 Committee members from all three jurisdictions

21 requested the jurisdictional balances, totaling 8.3

22 million be held on account.  I move approval.

Page 65

1    MALE VOICE:  Second.

2    MS. HEWLETT:  We have a motion and a second.  Is

3 there any discussion?  All in favor?

4    GROUP:  Aye.

5    MS. HEWLETT:  Opposed?  The ayes have it.

6    MR. GRAHAM:  Staff also requested approval to

7 reward a contract for consulting services to develop a

8 comprehensive plan to reduce energy consumption in Metro

9 facilities.  I move approval.

10    MALE VOICE:  Second.

11    MS. HEWLETT:  We have a motion and a second.  Is

12 there any discussion?  All in favor?

13    GROUP:  Aye.

14    MS. HEWLETT:  Opposed?  The ayes have it.

15    MR. GRAHAM:  Staff also requested approval of

16 procurement streamlining initiatives to improve business

17 functions and implement best procurement practices.  The

18 Inspector General has no issues with this proposed

19 procedures, but I do.  And I voted no.  This is the

20 purchase card.  But I was in the distinct minority,

21 since there was no one else voting no.  And I will vote

22 no again today, but I'll move approval.

Page 66

1      MALE VOICE:  Second.

2      MS. HEWLETT:  You very a motion and a second.  Is

3  there any discussion?  All in favor?

4      GROUP:  Aye.

5      MS. HEWLETT:  Opposed?

6      MR. GRAHAM:  No.

7      MS. HEWLETT:  One no.

8      MR. GRAHAM:  Please record me as voting no.

9      MS. HEWLETT:  Any abstentions?  Okay.  Mr. Graham

10 has (inaudible) --

11     MR. GRAHAM:  And I just want to say, that's a

12 result of the purchase card experience that we had in

13 the District of Columbia, which I know everyone doesn't

14 share.

15     MS. HEWLETT:  Okay.

16     MR. GRAHAM:  I'm not going to -- we talked a lot

17 about fares.  Staff did request approval to amend the

18 capital budget by 68 million.  And we'll bring that back

19 to our October 11th meeting.  And there was also

20 discussion of the issuance of Metro debt, but that will

21 also be reappearing at our October the 11th meeting.

22 And we've had updates on the monthly operating financial

Page 67

1 report and the quarterly CIP financial report, all of

2 which is available to members of the board.   Thank you.

3        MS. HEWLETT:   Thank you.   Are there any questions

4 of Mr. Graham?   Okay.   So for the Planning, Development

5 and Real Estate Committee we have --

6        MR. ZIMMERMAN:   Madam Chairman?

7        MS. HEWLETT:   (inaudible) report, okay?

8        MR. ZIMMERMAN:   The Planning, Development and Real

9 Estate Committee met on September 13th, discussed what

10 is one part of really a two part action item, the

11 discussion at that time all around the Southeastern bus

12 garage.   The discussion concerned essentially what to do

13 in the interim and assigning buses. There is the related

14 question of the sale of the property itself,  which

15 wasn't the subject of that meeting, but is the subject

16 of the action item before you today.

17 The result of the discussion on September 13th was

18 that the matter was moved forward to the Board without

19 recommendation.  Since that time, more work has been

20 done.   The manager has a revised recommendation that

21 relates both to the assignment of the buses and the sale

22 of the garage property. And I would like to turn to Mr.

Page 68

1 Catoe to summarize his revised recommendation.

2     MR. CATOE:  Thank you Mr. Zimmerman.  We are

3 asking the board to approve the sale of the Southeastern

4 bus garage company to the John Acridge (phonetic)

5 Development Company.  And that the allocation of the

6 proceeds from the sale of the garage be applied to the

7 capital cost of the replacement garage, lease back

8 rentals and any additional denhead (phonetic) costs and

9 other interim costs contingent upon 1), the acquisition

10 of the replacement bus garage property at DC village

11 from the District of Columbia; and 2) board approval of

12 the Southeastern bus garage replacement project and

13 amendment of the mass transit plan in accordance with

14 the Ramada Compact.

15 So basically in summary we are asking that we

16 approve the sale of the garage to John Acridge

17 Development Company for $69,250,000 and that $9,250,000

18 be set aside to be allocated for the cost of temporary

19 lease back as well as the additional denhead and other

20 interim costs for that facility.

21     MR. ZIMMERMAN:  The recommendations are summed up

22 -- or really I should say, that you've just summed up

Page 69

1 are contained specifically in the proposed resolution

2 that is attached to the report here before us?

3      MR. CATOE:  Yes. That is true.

4      MR. ZIMMERMAN:  Thank you.

5      MS. HEWLETT:  Okay.  Are there any questions of

6 Mr. Zimmerman?

7      MR. GRAHAM:  I have.

8      MS. HEWLETT:  Okay.  Mr. Graham

9      MR. GRAHAM:  I have two questions and then I am

10 prepared to move approval of this.  First, pardon of me?

11      MS. HEWLETT:  (inaudible) there's more questions

12 to look ahead.

13      MALE VOICE:  But he can move it.

14      MR. GRAHAM:  I can move at and then you can --

15      MS. HEWLETT:  Yeah, uh-huh.  Okay.

16      MR. GRAHAM:  -- is that all right?

17      MS. HEWLETT:  Mm-hmm.

18      MR. GRAHAM:  Okay good.  First, Mr. Catoe, is it

19 the position of the staff that it is both fully

20 appropriate and legal that we award the disposition of

21 this particular property to the applicant, I mean to the

22 bidder in this case?

Page 70

1        MR. CATOE:  Yes.

2        MR. GRAHAM:  This matter has been the subject of

3 some controversy in the District of Columbia.  And part

4 of that controversy has related to the fact that one of

5 the bidders had what is known as an escalator clause,

6 And the bid that they introduced for consideration by

7 the authority.  Does our general counsel have legal

8 advice of the efficacy of an escalator clause in this

9 particular form of bidding?  Is it effective?  Is it

10 efficacious or not?

11        MS. O'KEEFE:  Well.  Let me say that the procedure

12 that was used for the sale of the Southeastern bus

13 garage site was not a request for proposal as was just

14 discussed concerning the bus reward.  It was a request

15 for sealed bids that asked for price for purchase of the

16 site and a lease back amount.

17            One of the proposers came forward with an

18 alternative bid.  And the alternative bid was structured

19 that if there were a bid higher, and this bid by the way

20 was the lowest bid of the three that were received, if

21 there were a higher bid, and our procedures allowed it,

22 then that particular proposers bid would be increased to

Page 71

1 $250,000 above the higher bid. It did not, I might

2 point out, in the bid say above the highest bid. So even

3 in the alternative there was a bit of a discrepancy.

4 However, our procedures in this type of solicitation

5 do not allow for alternative bids. And I think if you

6 look at these types of transactions as always requiring

7 fairness to all proposers you can immediately see why

8 there would be a problem in giving one proposer, one

9 bidder two bites at the apple while the others have only

10 one. It wasn't -- this particular solicitation again

11 was not structured to embrace either negotiations, best

12 and final offers, or -- or nor was it structured as an

13 auction.

14 In order to give the facts to the alternative

15 proposer, or alternative bid, the authority would have

16 had to given the other bidders the same opportunity.

17 And that would escalate this, or change, or convert this

18 process mid-stream into an auction. And it was a

19 process that was not structured as an auction. There

20 were other considerations to take into account that

21 didn't lend this process, this sale to an auction type

22 arrangement.

Page 72

1           That was why the alternative proposal, the

2 alternative bid I should say, could not be considered

3 and it would not have been fair or appropriate to do so

4 in the context of this type of sale.  So yes, the

5 alternative bid was not considered.  I might also point

6 out that that bidder, which was MR Ballpark, LLC, stated

7 that if our procedures did not allow alternative bids

8 then their original bid, $60 million was to be

9 reinstated.  And that was what we did, that's the

10 process that was followed.

11      MR. GRAHAM:  Just for the sake of absolute

12 clarity, it is your considered legal opinion that the

13 attempt to have an escalator clause, an escalator bid in

14 this particular competition was not valid?

15      MS. O'KEEFE:  Yes.  That is my opinion.

16      MR. GRAHAM:  And madam chair, I move approval.

17      MALE VOICE:  Second.

18      MS. HEWLETT:  It has been properly motioned and

19 seconded. Mr. Moneme --

20      MALE VOICE:  (inaudible).

21      MS. HEWLETT:  -- and followed by Mr. Benjamin.

22      MR. MONEME:  This is more of a comment then a

Page 73

1 question.  I think that the questions posed by Mr.

2 Graham are fair questions.

3 And I think it properly would be in the best interest

4 for this

5 board to have some sort of a policy to deal with this,

6 because just like the real estate market this is quite

7 common.  We are all aware that people do put in

8 escalation clauses as it relates to property.

9 And in light of the discussion we just had in the

10 next room about budget constraints, it would be

11 unfortunate, in the future, if you left money on the

12 table.  And this is a little bit of the feeling that I

13 have about this deal that we may have potentially left

14 some money on the table as it would have benefit the

15 Authority.  I would suggest that we -- and I know this

16 is a very complex issue and it is not as straight

17 forward as it may seem, but it may be worth while to at

18 least consider something to address a similar situation.

19 And then my final point is as we do other

20 transactions like this near Metro Rail facilities, or

21 anywhere close to a Metro Rail facility, I think it

22 would be wise to consider a joint development.  And I

Page 74

1 think there's an opportunity here for the Authority and

2 the jurisdictions associated with that Metro Rail

3 station to have some input into what happens there, a

4 greater input into what happens there versus just the

5 sale of property.  You would hope that the wishes and

6 dreams of any jurisdictions is considered when you

7 dispose of property near a valuable piece of real 9tape

8 damage) comments for the record.

9        MS. HEWLETT:  Thank you Mr. Benjamin

10       MR. BENJAMIN:  I'd just like to focus on the very

11 last comment that Mr. Catoe made and just make sure that

12 I understand that the provision in here is that we will

13 not go to settlement until such time as we have approved

14 the replacement project and have funding in place for

15 that.  Is that correct?

16       MR. CATOE:  I will read the resolution and that's

17 my understanding of the intent of the resolution, is

18 that true (inaudible)?

19       MS. O'KEEFE:  Yes.

20       MS. HEWLETT:  Is there any other questions?  Okay,

21 it's --

22       MR. GRAHAM:  I just want to say --

Page 75

1      MS. HEWLETT:  -- Mr. Graham.

2      MR. GRAHAM:  -- again, this harkens back to my

3 earlier comments.  I would hope that we would move as --

4 and I know Mr. Moneme is very much involved in this,

5 but I would hope that we move with -- as rapidly as

6 possible regarding the DC Village arrangement and any

7 other matter that is contained, envisioned by the last

8 paragraph of the resolution.  Again, it is of the utmost

9 urgency that this building be ready for parking and for

10 avoiding a pedestrian hazards by the opening day of the

11 new baseball season.  And so I again, would ask you Mr.

12 Catoe to move with as much rapidity as you can muster on

13 this.

14      MR. CATOE:  I can muster it, sir.

15      MS. HEWLETT:  Are there any other questions?  All

16 in favor of the motion?

17      GROUP:  Aye.

18      MS. HEWLETT:  Opposed?  The ayes have it.

19      MR. ZIMMERMAN:  Move (inaudible).

20      MS. HEWLETT:  Thank you.  Okay.  We have 17

21 administrative action items.

22      MR. ZIMMERMAN:  Madam Chairman?

Page 76

1      MS. HEWLETT:  Yes?

2      MR. ZIMMERMAN:  I would move approval on block of

3 administrative actions, numbered 1 through 17 minus item

4 9.

5      MS. HEWLETT:  Okay.

6      MALE VOICE:  (inaudible).

7      MR. ZIMMERMAN:  And so that's items 1 through 8

8 and 10 through 17.

9      MS. HEWLETT:  Okay.  Okay.  We have a motion.  Is

10 there a second?

11     MALE VOICE:  Second.

12     MS. HEWLETT:  Any discussion?  All in favor?

13     GROUP:  Aye.

14     MS. HEWLETT:  Opposed?  The ayes have it.  Item 9.

15     MR. ZIMMERMAN:  (inaudible).

16     MS. HEWLETT:  Item 9, I did, I called item 9.

17     MALE VOICE:  Who's going to comment?

18     MALE VOICE:  I'd like to comment real quick.

19     MR. ZIMMERMAN:  Why don't we say what it is?

20     MS. HEWLETT:  Okay, item 9 is --

21     MR. ZIMMERMAN:  (INAUDIBLE).

22     MS. HEWLETT:  -- the approval to initiate and

Page 77

1 award and contract for parking meters.  Mr. Moneme?

2      MR. MONEME:  I just had a quick question a little

3 bit about what type of meters are we talking about

4 procuring here. We're talking about replacing

5 essentially what proportion of our entire population of

6 meters?

7      MR. REQUA:  All right, we have approximately 3,800

8 parking meters in the system, and we're asking for a

9 replacement of up to 3,500 of those that will provide

10 acceptance of the dollar coin, a larger vault, allow

11 them to be programmable for fare changes.

12      MR. MONEME:  So for the most part, replacement in

13 kind, some modifications to accept new --

14      MR. REQUA:  Yes.

15      MR. MONEME:  -- money, new medium?

16      MR. REQUA:  Yes.

17      MR. MONEME:  I think it might be beneficial for us

18 to consider something that might be more friendly for

19 credit card use, or in addition some sort of multi-

20 space meters, cheaper, you can use solar power, you can

21 use credit cards, you can use your cell phone.  It would

22 seem like it would be very customer friendly and

Page 78

1 customer focused.

2      MR. REQUA:  We certainly can consider that prior

3 to going out for the initiation of the contract.

4      MR. CATOE:  I think that's a good recommendation,

5 similar to the ones that are on certain segments of K

6 Street I've seen in the District and also in Virginia.

7 We will -- if the Board approves it, take that as a

8 modification to this and we will include that to seek

9 other types of meters that are -- will accept credit

10 cards and could handle multiple space.

11      MS. HEWLETT:  Mr. Benjamin?

12      MR. BENJAMIN:  May I suggest that as you do that,

13 proximity cards are being used for many of these meters,

14 and we have one.  Our smart card is a proximity card.

15 We might want to have these work with proximity cards.

16      MR. CATOE:  We could.

17      MS. HEWLETT:  Mr. Zimmerman?

18      MR. ZIMMERMAN:  Is it not assumed that whatever

19 meters we procure would be smart trip compatible?

20      MR. CATOE:  The details of the bid, I have to ask

21 Jack that question.

22      MR. REQUA:  I'm not sure I'll have to go back to

Page 79

1 staff.  I don't believe they were.

2       MR. CATOE:  It's assumed now, sir.

3       MR. ZIMMERMAN:  I mean, you know, there may be

4 reasons you can't do it, but I just would assume that in

5 anything we're looking at doing that we'd be saying,

6 "Yeah, can we use our own card that we've --"

7       MR. REQUA:  We'll take a look at all of those

8 prior to, you know, any action.

9       MR. ZIMMERMAN:  I almost took that for granted.

10 Thank you.

11       MR. REQUA:  It would require at this point a tri-

12 reader.

13       MR. ZIMMERMAN:  Okay.

14       MR. REQUA:  Okay.

15       MR. CATOE:  Thank you.

16       MR. MONEME:  So based -- we can incorporate those

17 amendments to the --

18       MR. CATOE:  They will be incorporated to

19 (inaudible).

20       MR. MONEME:  I move for approval.

21       MS. HEWLETT:  Okay.  We have a motion.

22       MALE VOICE:  Second.

Page 80

1    MS. HEWLETT:  And a second.  Is there any

2 additional discussion?  All in favor?

3    GROUP:  Aye.

4    MS. HEWLETT:  Opposed?  The ayes have it.  Okay.

5 Do we have any jurisdictional reports for the District

6 of Columbia?

7    MR. GRAHAM:  None.

8    MS. HEWLETT:  For Maryland?

9    MALE VOICE:  Nope.

10    MS. HEWLETT:  No.  From Virginia?

11    MALE VOICE:  Nope.

12    MS. HEWLETT:  Nope.  Hearing none I move that the

13 Board recess and convene in executive session to discuss

14 personnel issues and board matters consistent with Board

15 Procedure Roman Numeral 6.3.

16    MALE VOICE:  Second.

17    MS. HEWLETT:  Okay, all in favor?

18    GROUP:  Aye.

19    MS. HEWLETT:  Opposed?  The ayes have it.

20        (Whereupon, the public session was

21 concluded.)

22

**Capital Reporting Company**

CERTIFICATE OF TRANSCRIBER

I, Susan LaPooh, do hereby certify that this transcript was prepared from tape to the best of my ability.

I am neither counsel nor party to this action nor am I interested in the outcome of this action.

Susan LaPooh

# Exhibit "F"

# The
# Anacostia
## Waterfront Corporation

**FOR IMMEDIATE RELEASE:**
**MONDAY, DECEMBER 12, 2005**

**CONTACT: DAVID HOWARD**
(202) 468-0898

## ANACOSTIA WATERFRONT CORPORATION ANNOUNCES DESIGNATED DEVELOPERS FOR BASEBALL DISTRICT DEVELOPMENT

(Washington DC) On Monday, December 12, 2005 the Anacostia Waterfront Corporation (AWC) announced the selection of designated developers for sites in the area surrounding the new Washington Nationals ballpark that will be built on the banks of the Anacostia River in southeast Washington DC. The team of Forest City Washington, Inc., Western Development Corporation, The Jarvis Company, The Jair Lynch Companies and MacFarlane Partners-DC and the team of Monument Realty, LLC, the Cordish Company, and Triden Development Group will both have the opportunity to enter into exclusive negotiations with AWC to develop different mixed-use projects on two publicly owned sites that AWC is presently seeking to acquire near the ballpark.

AWC released a Request for Expressions of Interest (RFEI) for mixed-use development in the area surrounding the new Washington Nationals ballpark on September 16, 2005. The RFEI was issued as an open invitation to qualified developers with experience in large scale mixed use, retail, sports-related and waterfront development. AWC received nine proposals from nationally recognized groups to develop the area into a one-of-a-kind mixed use residential, retail, and office district.

"These are great teams with strong local capacity and extensive retail and mixed-use development credentials," said Adrian Washington, AWC's new President and CEO. "This brings us one step closer to fulfilling AWC's mission of creating new waterfront districts that increase neighborhood amenities and create exciting new destinations at the river" Washington also noted.

The twelve-week selection process represents the first developer solicitation facilitated by the newly formed AWC, an independent instrumentality of the District Government "The ballpark and development program proposed by the development teams is expected to bring millions of people annually to the waterfront, generate new tax revenue, create thousands of permanent jobs and provide a range of affordable and market-rate housing—all helping to fulfill the promise of the Anacostia Waterfront Initiative and accelerate economic benefits for the entire city" said Stephen Goldsmith, AWC Board Chair.

"The development envisioned by the Anacostia Waterfront Corporation and the development teams will result in tens of millions of dollars in tax revenue to the District, said Mayor Anthony A. Williams. "This tax revenue is a direct result of building a ballpark in Southeast, and it will significantly benefit the entire city. I applaud the speed with which AWC designated this 'All Star

Page 2 of 2

Team' of developers who will participate in the waterfront district development. We need to keep up the pace set by the construction of the ballpark to ensure that the area supports new retail and entertainment venues and provides tax revenues that contribute to the Community Benefit Fund."

The two developer teams will work with AWC to create a comprehensive Development Strategy for the area over the next 90 days and negotiate exclusive rights agreements for the development of parcels to be acquired by AWC with the goal of Council approval by July, 2006.

The power point presentation from the today's announcement is available on the Anacostia Waterfront Corporation website at www.anacostiawaterfront.net.

*About the Anacostia Waterfront Corporation: The Anacostia Waterfront Corporation is an instrumentality of the Government of the District of Columbia charged with the development and revitalization of underutilized public lands along the Anacostia River and the advocacy and coordination of environmental and programming initiatives that promote river clean up and public awareness and enjoyment of the river. Further information about the Corporation and the Anacostia Waterfront Initiative framework plan can be found on our website (http://www.anacostiawaterfront.net). AWC is governed by a Board of Directors consisting of nine public citizens, two District of Columbia officials and four non-voting Federal Government ex-officio representatives.*

XXX

# Exhibit "G"

## EASEMENT AGREEMENT

WHEREAS, MR Ballpark 3 LLC ("Grantor") currently owns Lots 33, 802, 868, 864, 841, 850, 865 and 840 in Square 700 in the District of Columbia ("Grantor Property"); and

WHEREAS, the Washington Metropolitan Area Transit Authority ("WMATA") currently owns Lot 857 in Lot 700 in the District of Columbia (the "Bus Garage Property"); and

WHEREAS, there currently exists an alley consisting of approximately 3,917 square feet that runs, and is located, between the Grantor Property and the Bus Garage Property which connects Van Street, S.E. with Half Street, S.E. (the "Alley"); and

WHEREAS, Grantor desires that the Alley be closed and WMATA agrees to cooperate in closing the Alley; and

WHEREAS, WMATA continues to operate the "Southeastern Bus Garage" facility on the Bus Garage Property and, for so long as it does so, requires access over the footprint of the Alley identical to that it currently has.

NOW, THEREFORE, in consideration of the agreements, terms, covenants, and conditions hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, WMATA and Grantor hereby agree as follows:

1)    WMATA shall cooperate with the Grantor's efforts, at Grantor's sole expense, to close the Alley.

2)    In consideration, Grantor, at the time the Alley is closed (but in no event more than thirty (30) days thereafter, during which such thirty (30) day period Grantor shall not object to WMATA's use of the Alley), agrees to convey to WMATA an easement (the "WMATA Alley Easement") over any portion of the Alley then owned by Grantor (the "WMATA Alley Easement Area"). The WMATA Alley Easement shall allow WMATA to use the WMATA Alley Easement Area for ingress and egress of buses and other vehicles to and from the Bus Garage Property to allow WMATA to continue to operate its "Southeastern Bus Garage" facility on the Bus Garage Property. In addition, WMATA, at the time the Alley is closed (but in no event more than thirty (30) days thereafter, during which such thirty (30) day period Grantor shall not object to WMATA's use of the Alley), agrees to convey to Grantor an easement (the "Grantor Alley Easement") over any portion of the Alley then owned by WMATA (the "Grantor Alley Easement Area"). The Grantor Alley Easement shall allow Grantor, if it so desires, to use the Grantor Alley Easement Area for ingress and egress of vehicles to and from the Grantor Property.

3)   Both the WMATA Alley Easement and the Grantor Alley Easement shall exist for so long as WMATA owns the Bus Garage Property, and each shall automatically expire, and be of no further force and effect, at such time.

4)   WMATA will reasonably cooperate with Grantor in the preparation and approval of the WMATA Alley Easement and the Grantor Alley Easement, and take such actions as are reasonably requested by Grantor in connection therewith.  Grantor shall prepare, subject to WMATA's reasonable approval, and timely record the WMATA Alley Easement and the Grantor Alley Easement, at Grantor's expense.

5)   WMATA and Grantor, at such time as WMATA sells the Bus Garage Property, shall jointly execute releases of the WMATA Alley Easement and the Grantor Alley Easement.

**IN WITNESS WHEREOF,** the parties hereto have executed and delivered this Agreement under seal as their free act and deed for the uses and purposes herein contained as of the date first set forth above.

WMATA:

**Washington Metropolitan Area Transit Authority**

By: _____

Name: _Jack Requa_

Title: _Acting General Manager_

Date: _12/1/06_

Developer:

**MR Ballpark 3 LLC, a Delaware limited liability company**

By:  **MR Ballpark 3 Holdings LLC, a Delaware limited liability company**

By:  **MR Ballpark 3 Capital LLC, a Delaware limited liability company**

By: _____

Name: _____

Title: Managing Member

Date: _____

# 4219266_v3

# Exhibit "H"



# FOR SALE
# (WITH LEASEBACK)

**PROPERTY OF**
**THE WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY**
**(WMATA)**
**Office of Property Development and Management**
**600 Fifth Street, NW**
**Washington, DC 20001**

Bid No. 08-1
Invitation For Bids For Sale,
With Leaseback,
of
WMATA Property
Lots 857 and 866, Square 700
District of Columbia

**Bid No. 08-1**
**INVITATION FOR BIDS FOR SALE,**
**WITH LEASEBACK,**
**OF**
**WMATA PROPERTY**
Lots 857 and 866, Square 700
**District of Columbia**

## A.  INVITATION FOR BIDS

1.  **Invitation for Bids.**  The Washington Metropolitan Area Transit Authority ("WMATA") invites interested parties to submit sealed bids in accordance with the terms of this Invitation For Bids For Sale, With Leaseback, of WMATA Property ("Invitation for Bids"). Sealed bids will be received at the Office of Property Development and Management, Washington Metropolitan Area Transit Authority, 600 Fifth Street, NW, Washington, DC 20001 starting **July 30, 2007**, and closing on **August 28, 2007 at 2:00 P.M.** ("Bid Deadline") at which time bids will be opened. The bid opening will not be open to the public. Bids may be mailed or hand-carried, but must be **received** by WMATA prior to the Bid Deadline.

All bids submitted must comply with this Invitation for Bids, including its General Terms of Sale and Leaseback, Special Terms of Sale, Instructions to Bidders and Bid for Purchase of WMATA Property (the "Bid Form"), all of which are attached. WMATA may reject any noncomplying bid.  WMATA will not be responsible for any expenses incurred by bidders.

2.  **Property Description.**    The property comprises two separate parcels consisting of approximately 69,607 square feet (Square 700, Lot 857) and approximately 27,558 square feet (Square 700, Lot 866) (hereinafter "the Property").  Improvements include asphalt paving and a 60,200-square-foot industrial building used as a bus maintenance facility. The bus facility is a one-story brick building constructed in 1936 and renovated in 2002.

3.  **Zoning.** The Property is believed to be zoned CG-CR. The bidder, at its own risk, is required to verify zoning and to make all determinations as to whether the Property can be used for whatever purpose bidder wishes. WMATA makes no warranties or representations regarding zoning or the Property's suitability for any use or purpose.

4.  **Utilities.**  WMATA believes all usual services and utilities are available to the Property. The bidder, at its own risk, is required to verify services and utilities and to make all determinations as to whether such services and utilities can be used by the bidder.

1

5. **Title Documentation and Closing.** WMATA acquired the property from the DC Transit System by Declaration of Taking No. CA-79-73 dated January 12, 1973, recorded in the Land Records of the District of Columbia in Book 4178, Page 920. WMATA will not obtain or provide a title report or title insurance. The bidder is exclusively responsible for investigating title and determining whether the state of title suits bidder's purposes. WMATA will convey the Property by special warranty deed subject to all encumbrances of record.

6. **Inspection.** Bidders are invited and encouraged to inspect the Property prior to submitting a bid. Inspections will be scheduled through WMATA. Walk-through inspections will be permitted without a permit or other formal documentation. Inspection of the Property must be coordinated through the WMATA contact person indicated in Section C, Paragraph 5. Due diligence is the bidder's responsibility, to be done at bidder's sole expense. WMATA will provide bidders the opportunity to review environmental documents and reports in WMATA's possession by appointment, but makes no warranty or representation as to the accuracy or completeness of such documentation.

7. **Effect of Submitting Bid.** By submitting a bid, the bidder is deemed to have agreed to, and accepted, all terms in this Invitation for Bids. Notwithstanding the foregoing, WMATA reserves the right to amend or modify any of the terms and conditions set forth herein. After the bid opening, WMATA will select the Successful Bidder and may also select one or more Alternate Bidders based upon the terms offered. WMATA's obligations hereunder are expressly contingent upon WMATA obtaining the approvals described in Section B, Paragraph 13. You will become the Successful Bidder (with the corresponding obligation and risk of performance hereunder) as soon as WMATA notifies you of your selection.

## B.   GENERAL TERMS OF SALE AND LEASEBACK

1. **Invitation for Bids.** "Invitation for Bids" refers collectively to this Invitation for Bids (including its general and special terms of sale and leaseback and instructions) as well as the accompanying Bid Form, form of Real Estate Permit, form of Lease, and Underground Storage Tank Real Estate Disclosure Form, all as may be modified and supplemented by any addenda thereto.

2. **Descriptions in Invitation for Bids.** Information provided in the Invitation for Bids is based on information available to WMATA and is believed to be correct, but any error or omission, including but not limited to the omission of any information available to WMATA, will not constitute grounds or reason for nonperformance under this Invitation for Bids, or claim by bidder for allowance, refund or deduction from the purchase price. The foregoing disclaimer does not apply to the legal description of the Property as Square 700, Lot 857 and Lot 866 in the District of Columbia.

2

3.  **Condition of Property.**  The Property is being sold **"AS IS, WHERE IS."**  Except for statutory disclosures expressly provided in this Paragraph, WMATA disclaims any warranty or representation, express or implied, as to, or concerning, the following: (a) the condition or state of repair of the Property, including the possible presence of hazardous substances on, under, or in the vicinity of the Property; (b) suitability of the Property for any use; or (c) compliance with any applicable laws, including without limitation, land use, wetland, zoning, or environmental laws.  No claim for any allowance or deduction upon such grounds will be considered after the bid opening.  Notwithstanding the foregoing, pursuant to the Underground Storage Tank Management Act of 1990, WMATA makes the disclosures set forth in the Underground Storage Tank Real Estate Transfer Disclosure Form.  The Successful Bidder agrees to execute and deliver the Underground Storage Tank Real Estate Transfer Disclosure Form (Attachment 3) at settlement. In addition, the characteristics of soil on the Property as described by the Soil Conservation Service of the United States Department of Agriculture in the Soil Survey of the District of Columbia and as shown on the Soil Maps of the District of Columbia is Urban (Ub).  For further information, any bidder may contact a soil-testing laboratory, the District of Columbia Department of Environmental Services or the Soil Conservation Service of the Department of Agriculture.

4.  **Continuing Offers.**  Each bid received will be a continuing irrevocable offer for one hundred twenty (120) calendar days after the date of the bid. WMATA reserves the right to consider, and accept, late modification of the successful bid that makes its terms more favorable to WMATA.

5.  **Possession.**  Title to the Property will pass to the Successful Bidder at settlement upon payment of the purchase price; possession of the Property, after settlement, will be governed by the terms of the Lease.

6.  **Leaseback Provision.**  At settlement, the Successful Bidder shall lease the Property back to WMATA for a period of thirty-six (36) months at the rental rate specified in the Bid Form. The lease of the Property from the Successful Bidder to WMATA shall be pursuant to the form Lease (Attachment 1), attached hereto and made a part hereof.    The Bid Form shall set forth a monthly rent.  You may set a single monthly rent to be paid for each month of the 36 month term.  You may also set forth a different fixed monthly rent for a different portion of the lease term; that is, by way of illustration, the fixed monthly rent for months 25 through 36 may be higher (or lower) than that for months 13 through 24, which, in turn, may be higher (or lower) than that for months 1 through 12.  You must, however, identify a certain fixed rent amount for each month of the lease term; that is, rent cannot be calculated by reference to any index, including a CPI index.  You may propose modification to the form Lease, but you are discouraged from doing so, and bids submitted proposing a landlord-tenant relationship other than that described in the form Lease will be disfavored and may be rejected solely on that ground.

3

7.   **Taxes**. As of the date of settlement, the Successful Bidder will assume responsibility for all general and special, real and personal property taxes and any other impositions on the Property. The lease must remain a gross lease, with WMATA to pay only the fixed monthly rent amount(s) identified in your Bid Form and no portion of real estate taxes.

8.   **Insurance**. WMATA is not imposing any insurance requirements on the Successful Bidder for the time period between bid acceptance and settlement except as required in WMATA's Real Estate Permit, attached hereto as Exhibit B, for due diligence entry upon the Property (either before bidding or by the Successful Bidder pursuant to Paragraph B.11, below).

9.   **Default**. If the Successful Bidder defaults on any of the terms of this Invitation for Bids, including failing to timely proceed to settlement, the Bid Deposit, together with the Security Deposit and any payments subsequently made on account, will be forfeited, as liquidated damages, in which event the Successful Bidder will be relieved from further liability, except for its indemnification obligations under the Real Estate Permit.

10.  **WMATA Liability**. If a bid is accepted by WMATA and: (1) WMATA fails for any reason to perform its obligation as set forth herein; or (2) title does not transfer or vest in the Successful Bidder for any reason although the Successful Bidder is ready, willing, and able to settle, then the Successful Bidder's sole remedy shall be for specific performance and the Successful Bidder shall have no right to monetary damages. Neither party shall be entitled to recover attorneys' fees.

11.  **Due Diligence Period**. The Successful Bidder shall have forty-five (45) days from the date it receives WMATA's notification of designation as Successful Bidder to perform any necessary environmental and title due diligence. Upon expiration of this forty-five (45) day period (the "Due Diligence Period"), the Successful Bidder, by written notice to WMATA, shall either a) withdraw its bid and this Invitation for Bids shall be of no further force and effect and the Security Deposit (but *not* the Bid Deposit, which becomes non-refundable upon designation as Successful Bidder, unless WMATA fails to obtain the Approvals required under Paragraph B.13, below) shall be returned; or b) proceed to settlement in accordance with the terms of this Invitation for Bids. Prior to Successful Bidder's entry on the Property for any testing or work more intrusive or prolonged than a walk-through inspection, the Successful Bidder will execute and deliver to WMATA a Real Estate Permit in the form shown in Attachment 2. The Successful Bidder may elect, in its Bid Form, to waive the Due Diligence Period. WMATA reserves the right to select a bid where the Due Diligence Period is waived over another bid, even where the other bid is otherwise more economically favorable to WMATA. In the event the Successful Bidder waives the Due Diligence Period, then settlement will occur not later than five (5) business days after WMATA satisfies the conditions precedent identified in Paragraph B.13, below.

12.  **Alternate Bidders**. WMATA, in its sole discretion, may select Alternate Bidder(s) in response to this Invitation for Bids. If the initial Successful Bidder defaults or terminates

pursuant to Paragraph B.11, above, WMATA may select an Alternate Bidder as the Subsequent Successful Bidder which shall be treated in all respects as a Successful Bidder, except that the Subsequent Successful Bidder shall be afforded the full 45-day Due Diligence Period set forth in Paragraph B.11, above, commencing on the date the Alternate Bidder receives written notice from WMATA that it has been designated as a Subsequent Successful Bidder.

13. **Approvals**. WMATA's offer of the Property for sale, and its authority to sell the Property, is contingent upon approval by the WMATA Board of Directors and any required approval by the Federal Transit Administration (FTA). During the Due Diligence Period (which will run to the benefit of WMATA under this Paragraph even if waived by the Successful Bidder under Paragraph B.11, above), WMATA will make best efforts to obtain the required approvals. If WMATA fails to timely obtain the required approvals, WMATA, by written notice delivered to the Successful Bidder (and any Alternate Bidder(s)), shall withdraw this bid and the offer of the Property, and return the Security Deposit and the Bid Deposit. WMATA and the Successful Bidder may agree to extend the 45-day Due Diligence Period and/or the approval period described in this Paragraph as well as the settlement date.

14. **Settlement**. The balance of the purchase price (by certified or cashier's check) is due at settlement. Settlement is to be held on November 30, 2007, at a location within ten (10) miles of WMATA's headquarters building. The Successful Bidder shall select the title company. The Successful Bidder will notify WMATA by written notice of the time and place of settlement not less than two (2) weeks in advance. WMATA may extend the settlement date for a reasonable amount of time to obtain approvals or prepare conveyance documents. Title examination, conveyancing, notary and other fees, state and local revenue stamps, transfer and recording taxes and all recording charges, and fees necessary to secure the loan, if any, are to be paid by the Successful Bidder.

15. **Contract of Sale**. This Invitation for Bids, and the bid when accepted, will constitute an enforceable contract between the Successful Bidder and WMATA. No oral statements or representations made by, or on behalf of either party will be a part of such contract; nor will the contract, or any interest therein, be transferred or assigned by the Successful Bidder without the consent of WMATA, and any assignment transaction without such consent will be void, except that the Successful Bidder may assign the contract to a special purpose entity controlled by the Successful Bidder. WMATA will not pay brokerage commissions.

16. **Officials Not to Benefit**. No member of or delegate to Congress, or resident commissioner, will be admitted to any share or part of the sale transaction or to any benefit that may arise therefrom. This provision will not be construed, however, to extend to a corporation if it is entering into this transaction for its general benefit.

17. **FTA Compliance**. WMATA is required to provide the Federal Transit Administration (FTA) with notice of the sale and conveyance of the Property. By submitting a Bid Form, the bidder is certifying to WMATA that it is not debarred under any federal procurement regulation. The special warranty deed will require the Successful Bidder to covenant that it will not exclude any person, or otherwise discriminate against any person, on the grounds of race, color, national origin, sex, or disability in connection with construction upon, or operations on the Property and that any construction upon the Property will comply with the "Americans with Disabilities Act" (ADA), 42 U.S.C. §12101, et seq., as amended, and any regulations promulgated thereunder.

C. **SPECIAL TERMS OF SALE**

1. **Bid Deposits**. A Bid Deposit is required. **Bid Forms not accompanied by a Bid Deposit will be disqualified.** The Bid Deposit must be tendered by a cashier's check or certified check only. No interest will accrue on the Bid Deposit. All checks are to be made payable to "WMATA". The full balance of the purchase price is due and payable at settlement.

**Bid Deposit**

**THREE HUNDRED THOUSAND DOLLARS ($300,000)**

2. **Return of Bid Deposits**. The Bid Deposit of the Successful Bidder and any Alternate Bidders will be held until the Property is sold and the Successful Bidder's deposits are applied to the purchase price. The bid deposits of the Successful Bidder is non-refundable unless WMATA fails to obtain any approval required as a condition of sale in Section B, Paragraph 13, above. The Bid Deposit for all other bidders will be returned, via express carrier, within five (5) business days after the date of settlement.

3. **Security Deposit**. In addition to the Bid Deposit, which is a prerequisite of bidding, the Successful Bidder will also have to post a Security Deposit, which along with the Bid Deposit, will be applied toward the purchase price at settlement. Within five (5) business days after a bidder's designation as the Successful Bidder, the Successful Bidder must deliver the Security Deposit to WMATA in the form of a cashier's check or certified check. No interest will accrue on the Security Deposit.

**Security Deposit**

**THREE MILLION DOLLARS ($3,000,000)**

The Successful Bidder's failure to timely transmit the Security Deposit to WMATA will

result in a default and, in addition to its rights under Section B, Paragraph 9, WMATA may immediately thereupon designate a Subsequent Successful Bidder.

4.  **Minimum Bid Price.**  The minimum bid amount for this Property is:

**SIXTY MILLION DOLLARS ($60,000,000).**

5.  **Bidding in General.**  Bids extending the settlement date will not be accepted.  Bid Forms must be delivered to the WMATA Office of Property Development and Management either in person, by mail, or express delivery and received by WMATA by the Bid Deadline, **August 28, 2007 at 2:00 p.m.** Immediately after the Bid Deadline, WMATA will open bids and select the Successful Bidder and any Alternate Bidders. The bid opening will not be open to the public. All bids are irrevocable for one hundred twenty (120) calendar days from the date of the bid. The bid which represents the best net return to WMATA after leaseback monthly rent for WMATA's anticipated lease term (which may, in WMATA's sole discretion be less than 36 months) is deducted from the Bid Amount. The Successful Bidder and any Alternate Bidders will be notified in writing at the address they provide on the Bid Form.  WMATA reserves the right to reject any and all bids at any time for any reason. Additional Bid Forms are available from WMATA's Office of Property Development and Management.  Bid Forms may be photocopied and used.

If you wish to hand deliver a bid, enter the Jackson Graham Building at 600 Fifth Street, NW, Washington, DC 20001 and request that the receptionist call extension 2392 or 1588 to be directed to the appropriate location to deliver the bid.

Questions about this Invitation for Bids should be submitted to Mr. Bob Burns at rlburns@wmata.com. Questions will be answered publicly; that is, WMATA will post all questions and answers on its website: www.wmata.com (About Metro/Business Opportunities, Metro Real Estate, Southeastern Bus Garage Sale). Mr. Burns may be also reached for general comments at 202-962-2393.

D.  **INSTRUCTIONS TO BIDDERS**

1.  **Bid Form.**

    a. Bids must be submitted only on a fully-completed Bid Form.

    b. Bids must be legible with corrections initialed and the bid manually signed.

c.  In submitting a bid, only return the Bid Form. Retain all other documents, including one copy of the Bid Form, for your records.

2.  **Bid Envelopes.**  Envelopes containing bids must be sealed and addressed to the bid receiving office stated in this Invitation for Bids. The name and address of the bidder must be shown in the upper left corner of the bid envelope, and the invitation number, the date and the phrase **"Bid for Real Property"** must be shown in the lower left corner of the envelope. No responsibility will attach to any officer of WMATA for the premature opening of or failure to open a bid not properly addressed and identified.

3.  **Bid Executed on Behalf of Bidder.**

a.  Attorney or Agent:  A bid may be executed by an attorney or agent on behalf of the bidder if the Bid Form is accompanied by an original, notarized Power of Attorney.

b.  Corporation:  If the bidder is a corporation, the Bid Form must be signed under the corporate seal by a duly authorized officer of the corporation. The bidder must submit evidence of corporate authorization to bid on behalf of the corporation.

c.  Partnership: If the bidder is a partnership, the Bid Form must be signed by an authorized general partner or some other authorized agent.  The bidder must submit evidence of the signatory's authorization.

d.   Limited Liability Company: If the bidder is a limited liability company, the Bid Form must be signed by all Members or the bidder must provide evidence that all Members consented to the execution and delivery of the Bid Form, including but not limited to satisfactory evidence of the authority of a "Manager" or limited number of Members to execute and deliver the Bid Form.

4.  **Bid Deposit.**  Each bid must be accompanied by a Bid Deposit in the form of a certified check or cashier's check only, payable to the order of WMATA. See "Special Terms of Sale, Bid Deposits" (Section C, Paragraph 1) for further clarification.

Failure to provide the Bid Deposit will result in rejection of the bid. Upon acceptance of a bid, the Bid Deposit of the Successful Bidder will be applied toward payment of the Successful Bidder's obligation.

5.  **Additional Information.**  WMATA will, upon request, provide additional copies of this Invitation for Bids and Bid Form. Requests for additional available information and all questions regarding this Invitation for Bids must be submitted via e-mail to Mr. Burns in accordance with Section C, Paragraph 6, above. WMATA will post all questions and answers on its website: www.wmata.com (About Metro/Business Opportunities, Metro Real Estate, Southeastern Bus Garage Sale. Each bid submitted will be deemed to have

been made **with full knowledge of all terms,** conditions and requirements contained in this Invitation for Bids.

6.   **Waiver of Informalities or Irregularities.**   WMATA may, at its election, waive any minor informality or irregularity in bids received.

7.   **Acceptable Bid.**   A bid received from a responsible bidder whose bid, conforming to this Invitation for Bids, will be most advantageous to WMATA, in terms of purchase price and leaseback rental.   If two or more acceptable bids are received that are equal in all respects, the selection will be made by a drawing by lot limited to such equal bids.

8.   **Notice of Acceptance or Rejection.**   Notice by WMATA of acceptance or rejection of a bid will be deemed to have been sufficiently given when hand delivered, sent by overnight courier or mailed, via certified mail, return receipt requested, or mailed, via first-class mail, with a copy sent by facsimile, to the bidder, or his/her duly authorized representative, at the address (and facsimile number) indicated in the bid. WMATA's processing of a bid deposit will not, in itself, constitute acceptance of such bid.  WMATA reserves the right to reject any or all bids or portions thereof.

**BID NO. 08-1**

**WMATA Property**

**Lots 857 and 866, Square 700**

**District of Columbia**


<u>**BID FOR PURCHASE OF WMATA PROPERTY**</u> **(Bid Form)**


TO:    Office of Property Development and Management

Washington Metropolitan Area Transit Authority

600 Fifth Street, NW

Washington, DC  20001


**SUBJECT TO:**  The terms and conditions of the Invitation for Bids; the General Terms of Sale; the Special Terms of Sale and Leaseback; and the Instructions to Bidders, the Right of Entry Permit, Lease Form, and Underground Storage Tank Real Estate Transfer Disclosure Form, all of which are incorporated as part of this bid. The undersigned bidder hereby offers and agrees, if this bid is accepted, to purchase the identified Property at the bid price entered below by November 30, 2007 and to lease the Property back to WMATA at the Leaseback Rental entered below pursuant to the Lease form (or an alternate form submitted with this Bid Form (disfavored)).


The bid must be accompanied by a Bid Deposit in the amount of Three Hundred Thousand Dollars ($300,000).  The Bid Deposit must be in the form of a certified or cashier's check, payable to "WMATA".


Bid Amount: $_____


Bid Spelled-out: _____


Leaseback Rental (Per Month): $ _____


Leaseback Rental (Per Month) Spelled-out:  $ _____


10

If I am selected as the Successful Bidder (or an Alternate Bidder), WMATA may notify me by courier, overnight delivery or certified mail, return receipt requested, at the address listed below.

If this bid is accepted, the deed should name the following as grantee(s) and the lease should identify the following as landlord:

You may designate an alternate grantee/landlord at settlement, provided it is controlled by the person or entity identified above.

Bidder represents that bidder operates as an individual / partnership / corporation / limited liability company / other: _____.    Evidence of authority to sign and submit this Bid Form (for any entity other than an individual) is attached. If signed by a trustee or agent, a copy of the power of attorney or other authorizing document is attached.

If selected, I waive / do not waive the Due Diligence Period set forth in Section B, Paragraph 11 [circle the appropriate choice].

Initial: _____

Signature of bidder: _____    Date_____

Name (Print)_____

Title_____

Address_____City/State/Zip_____

Telephone_____

Facsimile Number _____

Signature of WMATA indicating acceptance of bid:



_____    Date_____
Nat Bottigheimer
Contracting Officer

12

# Exhibit "I"



## ** ALTERNATE BID **

**BID NO. 08-1**

**WMATA Property**

**Lots 857 and 866, Square 700**

**District of Columbia**

### BID FOR PURCHASE OF WMATA PROPERTY (Bid Form)

TO:  Office of Property Development and Management

Washington Metropolitan Area Transit Authority

600 Fifth Street, NW

Washington, DC  20001

**SUBJECT TO:**  The terms and conditions of the Invitation for Bids; the General Terms of Sale; the Special Terms of Sale and Leaseback; and the Instructions to Bidders, the Right of Entry Permit, Lease Form, and Underground Storage Tank Real Estate Transfer Disclosure Form, all of which are incorporated as part of this bid. The undersigned bidder hereby offers and agrees, if this bid is accepted, to purchase the identified Property at the bid price entered below by November 30, 2007 and to lease the Property back to WMATA at the Leaseback Rental entered below pursuant to the Lease form (or an alternate form submitted with this Bid Form (disfavored)).

The bid must be accompanied by a Bid Deposit in the amount of Three Hundred Thousand Dollars ($300,000).  The Bid Deposit must be in the form of a certified or cashier's check, payable to "WMATA".

Bid Amount: $60,000,000.00 * _____

Bid Spelled-out:  Sixty Million Dollars and 00/100 _____

Leaseback Rental (Per Month): $0.00 _____

Leaseback Rental (Per Month) Spelled-out: Zero Dollars and 00/100 _____

If I am selected as the Successful Bidder (or an Alternate Bidder), WMATA may notify me by courier, overnight delivery or certified mail, return receipt requested, at the address listed below.

If this bid is accepted, the deed should name the following as grantee(s) and the lease should identify the following as landlord:

**MR Ballpark 7 LLC**

You may designate an alternate grantee/landlord at settlement, provided it is controlled by the person or entity identified above.

Bidder represents that bidder operates as an individual / partnership / corporation / limited liability company / other: _____limited liability company_____. Evidence of authority to sign and submit this Bid Form (for any entity other than an individual) is attached. If signed by a trustee or agent, a copy of the power of attorney or other authorizing document is attached.

If selected, I waive / do not waive the Due Diligence Period set forth in Section B, Paragraph 11 [circle the appropriate choice].

Initial: ___TH___

\* **Bid Amount Addendum:**

In the event WMATA receives a bid, conforming to the WMATA's invitation to Bids, from a qualified bidder, which is more than Sixty Million Dollars and 00/100 ($60,000,000.00), in terms of purchase price and leaseback rental, then MR Ballpark 7 LLC's Bid Amount shall increase to such bidder's Bid Amount plus Two Hundred Fifty Thousand Dollars and 00/100 ($250,000.00).

For example, if such other bidder offers a bid amount of Sixty Million Five Hundred Thousand Dollars and 00/100 ($60,500,000.00) and a Leaseback Rental rate of zero dollars ($0.00) per month, then MR Ballpark 7 LLC's Bid Amount shall be Sixty Million Seven Hundred Fifty Thousand Dollars and 00/100 ($60,750,000.00) and its Leaseback Rental rate shall remain zero dollars ($0.00) per month.

If WMATA's rules and regulations regarding the acceptance of bids for the sale of real property do not permit WMATA to consider escalation clauses, then this addendum shall be disregarded and MR Ballpark 7 LLC's Bid Amount shall be as shown on the Bid Form above.

11

Signature of bidder:    MR BALLPARK 7 LLC

By: _____    Date: _August 28, 2007_

Jeffrey T. Neal
Managing Member

By: _____    Date: _August 28, 2007_

Michael J. Darby
Managing Member

Address:    c/o Monument Realty
1700 K Street, NW
Suite 600
Washington, DC  20006

Telephone:    (202) 777-2000

Facsimile Number:    (202) 777-2020

Signature of WMATA indicating acceptance of bid:

_____    Date_____

Nat Bottigheimer
Contracting Officer

12



SPXCEIV965

OFFICIAL BANK CHECK

United BANK
FAIRFAX, VA 22030

MOUNTAIN REALTY

PAY

TO THE
ORDER OF:    ***    WMATA

Three Hundred Thousand Dollars and 00 cents

FASS BY KONE FORMAL PAYMENT SYSTEMS INC.
P.O. BOX 9476, MINNEAPOLIS MN 55440
REGIONS BANK, DEPOSIT & TRUST CO
BOSTON, MASSACHUSETTS

200403 8406

DATE    07/19/2007

$    ***$300,000.00

VOID OVER
***$300,000.00

DRAWER: UNITED BANK

AUTHORIZED SIGNATURE

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## MR BALLPARK 7 LLC

This Limited Liability Company Agreement (the "Agreement") of MR Ballpark 7 LLC, is entered into by the persons named as members on Annex A hereto (the "Members") as of the 18th day of July, 2007 (the "Effective Date").

WHEREAS, the LLC was formed as a limited liability company under the Delaware Limited Liability Company Act (6 Del. C. § 18-101, et seq.), as amended from time to time (the "Act") on July 18, 2007 pursuant to a Certificate of Formation filed with the Secretary of State of the State of Delaware;

WHEREAS, the Members now wish to adopt an Agreement to set forth the terms and conditions by which the LLC will be governed.

1.  **Name.**

    (a)     The name of the limited liability company is MR Ballpark 7 LLC (the "LLC"). The business of the LLC may be conducted under any other name deemed necessary or desirable by the Managing Members (as defined below) in order to comply with local law.

    (b)     The parties hereto agree to form the LLC as a limited liability company pursuant to the provisions of the Act and of this Agreement and agree that the rights and liabilities of the Members and the Managing Members shall be as provided in the Act for members and managers, respectively, except as provided herein.

2.  **Purpose.** The LLC is formed for the object and purpose of, and the nature of the business to be conducted and promoted by the LLC is, engaging in any lawful act or activity for which limited liability companies may be formed under the Act and engaging in any and all activities necessary or incidental to the foregoing.

3.  **Registered Office; Registered Agent.** The address of the registered office of the LLC in the State of Delaware is c/o Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, New Castle County, Delaware 19808. The name and address of the registered agent of the LLC for service of process on the LLC in the State of Delaware is Corporation Service Company, 2711 Centerville Road, Wilmington, Delaware 19808.

4.  **Principal Office.** The principal office address of the LLC shall be c/o Monument Realty LLC, 1700 K Street, N.W., Suite 600, Washington, D.C. 20006, or such other place as the Managing Members may determine from time to time.

5.  **Members.** The names, mailing addresses, capital contributions to the LLC and percent of ownership interests in the LLC (the "Percentage Interest(s)") of the Members (the "Schedule of Members") are as set forth in Annex A hereto, as such Annex A may be amended from time to time. Each of the Members is hereby admitted as a member of the LLC and agrees to be bound by the terms of this Agreement.



6.     **Powers.** Except as otherwise provided in this Agreement, the Members shall have the power to do any and all acts necessary or convenient to or for the furtherance of the purposes described herein, including all powers, statutory or otherwise, possessed by members under the laws of the State of Delaware. Charles Welch Tiedemann is hereby designated as an authorized person, within the meaning of the Act, to execute, deliver and file the Certificate of Formation of the LLC (and any amendments and/or restatements thereof) and any other certificates (and any amendments and/or restatements thereof) necessary for the LLC to qualify to do business in any jurisdiction in which the LLC may wish to conduct business as well as such other agreements and instruments in connection with matters and transactions otherwise approved by the LLC with respect to conduct of its business.

7.     **Management.**

(a)     In accordance with Section 18-402 of the Act, management of the LLC shall be vested in one or more members who shall be designated "Managing Members." The Members hereby appoint Jeffrey T. Neal and Michael J. Darby, jointly, as the Managing Member(s) of the LLC for purposes of the Act. To the extent permitted by law, any one Managing Member shall be authorized to act on behalf of and to bind the LLC, including the completion, execution and delivery of any and all agreements, deeds, instruments, receipts, certificates and other documents, and to take all such other action as they may consider necessary or advisable in connection with the management of the LLC.

(b)     The Members agree that all determinations, decisions and actions made or taken by any Managing Member in accordance with this Agreement shall be conclusive and absolutely binding upon the LLC, the Members and their respective successors, assigns and personal representatives.

(c)     The Managing Members may (but need not) adopt procedures relating to meetings of the Managing Members (if more than one) and the taking of actions and may exercise their respective authority hereunder by resolution. A written resolution or consent of the Managing Members shall be conclusive evidence of the act of the Managing Members set forth therein.

(d)     Persons dealing with the LLC are entitled to rely conclusively upon the power and authority of the Managing Members as herein set forth.

8.     **Capital Contributions.** The Members have made or will make initial contributions to the capital of the LLC in the amounts and proportions set forth in <u>Annex A</u> hereto.

9.     **Additional Contributions.**

(a)     Each Member shall make such additional capital contributions to the LLC (which additional capital contributions shall always be made by each Member in proportion to such Member's Percentage Interest set forth on <u>Annex A</u> hereto) as the Managing Members, acting unanimously, may deem necessary or advisable in connection with the business of the LLC.

2

(b)     The provisions of Section 8 and this Section 9 are intended solely to benefit the Members of the LLC and, to the fullest extent permitted by law, shall not be construed as conferring any benefit upon any creditor of the LLC other than the Members (and no such creditor of the LLC other than the Members shall be a third party beneficiary of this Agreement), and no Member of the LLC shall have a duty or obligation to any creditor of the LLC (other than to the Members of the LLC) to make any contribution to the LLC and no Member of the LLC shall have any duty or obligation to any creditor of the LLC (other than to the Members of the LLC) to issue any call for capital pursuant to this Section 9.

10.     **Capital Accounts.** The LLC shall maintain for each Member a separate capital account (the "Capital Account(s)") in accordance with this Section 10, the specific provisions set forth on Annex B hereto and in accordance with the rules of Treasury Regulation Section 1.704-1(b)(2)(iv). Each Member's Capital Account shall have an initial balance equal to the amount of cash constituting such Member's initial contribution to the capital of the LLC. Each Member's Capital Account shall be increased by the sum of (a) the amount of cash constituting additional contributions by such Member to the capital of the LLC, plus (b) the portion of any profits allocated to such Member's Capital Account pursuant to Section 11. Each Member's Capital Account shall be reduced by the sum of (a) the amount of cash and the fair value of any property distributed by the LLC to such Member, plus (b) the portion of any losses allocated to such Member's Capital Account pursuant to Section 11. No Member shall be required to pay to the LLC any deficit in his/her/its Capital Account upon liquidation or otherwise, except to the extent provided in the Act.

11.     **Allocation of Profits and Losses.** The LLC's income, profits, gains, losses, deductions and credits for tax and accounting purposes shall be determined by the LLC in accordance with generally accepted accounting principles and shall be allocated to the Members in accordance with the specific provisions set forth in Annex B hereto.

12.     **Distributions.**

(a)     No Member shall (i) be entitled to interest on his/her/its capital contributions to the LLC, or (ii) have the right to distributions or the return of any contribution to the capital of the LLC except (A) for distributions in accordance with this Section 12 or (B) upon dissolution of the LLC. The entitlement to any such return at such time shall be limited to the value of the Capital Account of the Member. No Member shall be liable for the return of any such amounts.

(b)     Distributions, whether arising from or attributable to current operations, the sale of all or any part of the property or assets of the LLC, the dissolution of the LLC or otherwise, shall be made to the Members at the times and in the aggregate amounts determined by the Managing Members. Such distributions shall be allocated among the Members (i) first, in the same proportion as the Members then Capital Account balances until each Member has received an amount equal to his/her/its total capital contributions to the LLC and (ii) the balance, in proportion to each Member's Percentage Interest set forth on <u>Annex A</u> hereto.

13.     **Fiscal Year; Tax Matters.**

3

(a)    The Fiscal Year of the LLC for accounting and tax purposes shall begin on January 1 and end on December 31 of each year, except for the short taxable years in the years of the LLC's formation and termination and as otherwise required by the Internal Revenue Code of 1986, as amended (the "Code"),

(b)    Proper and complete records and books of account of the business of the LLC, including the Schedule of Members, shall be maintained at the LLC's principal place of business. Each of the Members acknowledges and agrees that the LLC is intended to be classified and treated as a partnership for income tax purposes. The LLC's books of account shall be maintained on a basis consistent with such treatment and on the same basis utilized in preparing the LLC's United States federal income tax return. Each Member and his/her/its duly authorized representatives may, for any reason reasonably related to his/her/its interest as a Member of the LLC, examine the LLC's books of account and make copies and extracts therefrom at his/her/its own expense. The Managing Members shall maintain the records of the LLC for three years following the termination of the LLC.

(c)    Jeffrey T. Neal shall act as the "Tax Matters Partner" as defined in the Code and shall make such elections under the Code and other relevant tax laws as to the treatment of items of the LLC income, gain, loss, deduction and credit, and as to all other relevant matters, as the Tax Matters Partner deems necessary or appropriate.

(d)    The Members hereby agree to take any measures necessary (or, if applicable, refrain from any action) to ensure that the LLC is treated as a partnership for federal income tax purposes.

14.    **Assignments and Transfers of Interests.**  A Member may not assign or transfer all or ay portion of his/her/its interest in the LLC without the unanimous consent of the Managing Members, which consent may be withheld in their sole discretion.

15.    **Admission of Additional Members.**  One (1) or more additional persons may be admitted to the LLC as new Members with the unanimous consent of the Managing Members.

16.    **Liability of Members.**  The Members shall not have any liability for the obligations or liabilities of the LLC except to the extent provided in the Act. Nothing express or implied shall be construed to confer upon or to give any person except the Members or Managing Members, any rights or remedies under or by reason of this Agreement.

17.    **Dissolution.**

(a)    Subject to the occurrence of an event of dissolution pursuant to Section 17(b), the LLC shall have perpetual existence.

(b)    The LLC shall dissolve, and its affairs shall be wound up upon the first to occur of the following: (i) the unanimous written consent of the Managing Members, together with the written consent of Members holding at least 75% of the Percentage Interests, (ii) the death, retirement, resignation, expulsion, bankruptcy or dissolution of a Member or the occurrence of any other event which terminates the continued membership of a Member in the LLC, including the disposition of all or a portion of a Member's interest in the LLC, unless the

4

business of the LLC is continued by the prior written consent of all of the Managing Members and the prior written consent of the other/remaining Members holding at least 75% of the Percentage Interests of all other/remaining Members, within 90 days following the occurrence of any such event, or (iii) the entry of a decree of judicial dissolution under Section 18-802 of the Act.

18.    **Indemnification.**    To the full extent permitted by law, the LLC shall (a) indemnify any person or such person's heirs, distributees, next of kin, successors, appointees, executors, administrators, legal representatives or assigns who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative by reason of the fact that such person is or was a Member, Managing Member, director, officer, employee or agent of the LLC or is or was serving at the request of the LLC or its Members as a member, manager, director, officer, employee or agent of another corporation, limited liability company, partnership, joint venture, trust or other enterprise, domestic or foreign, against expenses, attorneys' fees, court costs, judgments, fines, amounts paid in settlement and other losses actually and reasonably incurred by such person in connection with such action, suit or proceeding and (b) advance expenses incurred by a manager, officer or director in defending such civil or criminal action, suit or proceeding to the full extent authorized or permitted by the laws of the State of Delaware. A Managing Member shall have no personal liability to the LLC or its Members for monetary damages for breach of fiduciary duty as a Managing Member; provided, however, that the foregoing provision shall not eliminate the liability of a Managing Member for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law or for any transaction from which the Managing Member derived an improper personal benefit.

19.    **Amendments.**    Any amendments to this Agreement shall be in writing signed and approved by all of the Managing Members; provided, however, that any such amendment that materially adversely affects any Member shall also be signed and approved by all of such adversely affected Members.

20.    **Governing Law.**    This Agreement shall be governed by, and construed under, the laws of the State of Delaware, all rights and remedies being governed by said laws. The Members intend the provisions of the Act to be controlling as to any matters not set forth in this Agreement.

21.    **Uniform Commercial Code.**    Each membership interest in the Company shall constitute a "security" within the meaning of, and shall be governed by, (i) Article 8 of the Uniform Commercial Code (including Section 8-102(a)(15) thereof) as in effect from time to time in the State of Delaware (6 Del. C. § 8-101, et seq.) and (ii) Article 8 of the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995.

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, have duly executed this Limited Liability Company Agreement as of the Effective Date first above written.

_____
Jeffrey T. Neal

_____
Michael J. Darby

6

ANNEX A

TO THE

LIMITED LIABILITY COMPANY AGREEMENT

OF

MR BALLPARK 7 LLC

Schedule of Members

| Name and Address of Members | Initial Capital Contribution ($) | Percentage Interest (%) |
|---|---|---|
| Jeffrey T. Neal<br>1700 K Street, N.W.<br>Suite 600<br>Washington, D.C. 20006 | $ 500.00 | 50% |
| Michael J. Darby<br>1700 K Street, N.W.<br>Suite 600<br>Washington, D.C. 20006 | $ 500.00 | 50% |
| TOTALS | $1,000.00 | 100% |

# 3076524_v2

# Exhibit "J"

# Akridge

August 28, 2007

*BY COURIER*

Mr. Nat Bottigheimer
Assistant General Manager
Department of Planning, Land and Joint Development
Washington Metropolitan Area Transit Authority
600 Fifth Street, NW
Washington, DC 20001

**Re: Bid No. 08-1; Lots 857 and 866 in Square 700 (the "Second Bid Request")**

Dear Mr. Bottigheimer:

The John Akridge Development Company ("Akridge") hereby submits the enclosed bid in response to the Second Bid Request. This bid is submitted conditionally as set forth in the enclosed letter from our counsel, Williams & Connolly LLP, to Carol B. O'Keeffe, WMATA's general counsel. Please be advised that the bid submitted by Akridge in connection with Bid No. 07-3: Lots 857 and 866 in Square 700 is no longer valid and may no longer be accepted by WMATA.

Sincerely,

Matthew J. Klein
President

cc:    Elizabeth M. Hewlett
       Christopher Zimmerman
       Jim Graham
       Peter Benjamin
       Dana Kauffman
       Emeka C. Moneme
       Marcell Solomon
       William D. Euille
       Marion Barry
       Gordon Linton
       Catherine Hudgins
       Anthony R. Giancola, P.E.
       John B. Catoe
       Helen Law
       Carol O'Keeffe

       John E. Akridge, III
       Matthew J. Klein

**BID NO. 08-1**

**WMATA Property**

**Lots 857 and 866, Square 700**

**District of Columbia**

## BID FOR PURCHASE OF WMATA PROPERTY (Bid Form)

**TO:**   Office of Property Development and Management

Washington Metropolitan Area Transit Authority

600 Fifth Street, NW

Washington, DC  20001

**SUBJECT TO:**  The terms and conditions of the Invitation for Bids; the General Terms of Sale; the Special Terms of Sale and Leaseback; and the Instructions to Bidders, the Right of Entry Permit, Lease Form, and Underground Storage Tank Real Estate Transfer Disclosure Form, all of which are incorporated as part of this bid. The undersigned bidder hereby offers and agrees, if this bid is accepted, to purchase the identified Property at the bid price entered below by November 30, 2007 and to lease the Property back to WMATA at the Leaseback Rental entered below pursuant to the Lease form (or an alternate form submitted with this Bid Form (disfavored)).

The bid must be accompanied by a Bid Deposit in the amount of Three Hundred Thousand Dollars ($300,000).  The Bid Deposit must be in the form of a certified or cashier's check, payable to "WMATA".

Bid Amount: $_____ 69,250,000.00 _____

Bid Spelled-out: Sixty-Nine Million Two Hundred Fifty Thousand and No/100 Dollars

Leaseback Rental (Per Month): $ _____ Months 1 - 12  $110,000.00 _____
                                      Months 13 - 36 $430,000.00

Leaseback Rental (Per Month) Spelled-out: $ Months 1 - 12: One Hundred Ten Thousand and No/100 Dollars
Months 13 - 36: Four Hundred Thirty Thousand and No/100 Dollars

10

W000072



If I am selected as the Successful Bidder (or an Alternate Bidder), WMATA may notify me by courier, overnight delivery or certified mail, return receipt requested, at the address listed below.

If this bid is accepted, the deed should name the following as grantee(s) and the lease should identify the following as landlord:

The John Akridge Development Company, A District of Columbia Corporation

You may designate an alternate grantee/landlord at settlement, provided it is controlled by the person or entity identified above.

Bidder represents that bidder operates as an ~~individual~~ / ~~partnership~~ / corporation / ~~limited liability company~~ / ~~other:~~ _____. Evidence of authority to sign and submit this Bid Form (for any entity other than an individual) is attached. If signed by a trustee or agent, a copy of the power of attorney or other authorizing document is attached.

If selected, I ~~waive~~ / do not waive the Due Diligence Period set forth in Section B, Paragraph 11 [circle the appropriate choice].

Initial: _JWW_

Akridge manages an Affiliate that owns and/or controls substantial portions of Square 664 (the "Akridge Property") and, if this bid is accepted, Akridge would immediately commence negotiations with WMATA to establish an arrangement pursuant to which WMATA would be able to use the Akridge Property as a temporary site for locating assets presently located on the Property during the period WMATA is contemplating relocation of the operations presently conducted at the Property.

Initial: _JWW_

11

W000073



Signature of bidder: _____    Date _____August 28, 2007_____

Name (Print)_____Matthew J. Klein_____

Title_____President_____

Address_____601 Thirteenth Street, NW,    City/State/Zip _Washington, D.C.  20005_
Suite 300 North

Telephone__(202) 638-3000__

Facsimile Number ___(202) 347-8043___

Signature of WMATA indicating acceptance of bid:


_____    Date_____

Nat Bottigheimer
Contracting Officer

12

W000074

# THE JOHN AKRIDGE DEVELOPMENT COMPANY

## WRITTEN CONSENT
## IN LIEU OF
## ANNUAL MEETING
## OF THE
## BOARD OF DIRECTORS

### April 25, 2007

In lieu of the annual meeting of the Board of Directors of The John Akridge Development Company, a District of Columbia corporation (the "Corporation"), all the directors of the Corporation, hereby consent, to the following resolutions, which are to be filed with the minutes of the Board of Directors;

1.  RESOLVED, that the following persons be, and they hereby are, elected to serve in the offices set forth next to their names for the following year and until their respective successors are elected and shall qualify or until their earlier resignations:

| NAME | TITLE |
| --- | --- |
| John E. Akridge, III | Chairman |
| Sarah B. Akridge | Secretary |
| Matthew J. Klein | President |
| Thomas W. Wilbur | Senior VP and Assistant Secretary |
| Joseph G. Svatos | Senior VP and Assistant Secretary |
| Stephanie F. Brown | Senior VP and Assistant Secretary |
| Kathryn L. Barnes | Senior VP and Assistant Secretary |
| P. Brian Connolly | Senior VP and Assistant Secretary |
| Brian A. Cass | Senior VP, Treasurer, and Assistant Secretary |
| Robert L. Blair | VP, Asst. Secretary & Asst. Treasurer |
| Michele L. Slaney | Asst. Treasurer and Asst. Secretary |
| Christina S. M. Chan-Walker | Asst. Treasurer and Asst. Secretary |
| Gregory P. Tomasso | Vice President |
| Robert E. Schofield, Jr. | Vice President |
| Andrew Pace | Vice President |
| Joseph G. Ersek | Vice President |
| Wilbur E. Pace | Vice President |
| Eugene J. Kenney | Vice President |
| Mary L. Lynch | Vice President |
| Bryan H. Dold | Vice President |

FURTHER RESOLVED, that the officers shall hereby enter upon the discharge of their duties.

APPROVED:

_____
John E. Akridge, III, Director

_____
Sarah B. Akridge, Director

W000075

# Exhibit "K"

Monument Realty

August 24, 2007

**VIA HAND DELIVERY**

**John B. Catoe**
General Manager
Washington Metropolitan Area Transit Authority
600 Fifth Street, NW
Washington, DC 20001

Re:    **Square 700 and Square 701**

Dear Mr. Catoe:

On behalf of Monument Realty and our affiliated companies, I write to inform you of the improper and, frankly, disrespectful treatment we are receiving from WMATA regarding the disposition of the property located at 17 M Street, S.E. – e.g., Lots 857 and 866 in Square 700. Because we are fast approaching some important deadlines for the entire Baseball-related development cycle, including deadlines involving the Navy Yard station, I am asking that WMATA review and reconsider where we are heading.

It is our view that WMATA endorsed a competitive, public process put in place by the District of Columbia through the auspices of the Anacostia Waterfront Corporation (AWC) that awarded Monument the exclusive right to buy the Square 700 property, and further, that WMATA must now recognize this right by providing Monument exclusive negotiating rights to purchase the Square 700 property from WMATA. Furthermore, WMATA has greatly benefited in a variety of ways from this process, only to turn around and disregard the physical, historical and political context surrounding the Square 700 property. It was within this broader context in which the District of Columbia, through AWC, identified developers for the Ballpark District, and in which we entered into the Sale and Development Agreement with WMATA and related agreements for the purchase of WMATA's property in Square 701, which property includes the Navy Yard Metro station. WMATA's current plan to dispose of the Square 700 property through a bidding process throws into doubt all of the careful planning that has been done so far. It exposes us, WMATA and the District to uncertainty, risk, and expense that far outweighs any possible benefits WMATA could realize from its current course.

\*       \*       \*       \*       \*

Mr. John Catoe
August 24, 2007
Page 2

Let me review briefly where we have been.

In 2004, Monument began acquiring sites in what would later be labeled the "Ballpark District" in Southeast. In March 2005, WMATA issued a Joint Development Solicitation for the three parcels it owned in Squares 700 and 701. By May 2005, when the responses to the JDS were due, Monument owned or controlled by contract most of the land surrounding the WMATA properties. Monument registered to respond to the JDS and prepared the response, only to have WMATA advise on the day before offers were due, that the JDS was being withdrawn. The withdrawal was done at the request of the Williams Administration so that planning for the district could be coordinated through AWC. Following application, interviews, and a competitive process, AWC selected the Monument team as the master developer for the area north of N Street, including Squares 700 and 701. With that selection came the exclusive right to negotiate for the WMATA parcels. The Monument team was chosen based on our comprehensive plan, combined with our proven interest in this area, an interest which we had already backed up with a significant investment of more than $50,000,000 that has since grown to over $160,000,000.

In the summer of 2006, Monument approached WMATA directly to purchase the WMATA sites in Squares 700 and 701, including the Navy Yard Metro station site in Square 701. Because of certain timing needs and desires of WMATA, particularly the desire to complete the expansion of the Navy Yard station by the opening of the new Nationals Ballpark and the uncertainty regarding the future of WMATA's Southeastern Bus Garage facility (Bus Facility) located in Square 700, WMATA requested that the parties focus on Square 701 first. With the clear expectation by all parties that Square 701 was the first phase of a two-phase acquisition, Monument and WMATA negotiated a deal which involved commitments from Monument that were consistent with this expectation. Without Monument's involvement, a below-grade expansion for the Navy Yard Metro station entrance in Square 701 would not have been possible given both site and scheduling constraints. Indeed, in lieu of Monument's purchase and redevelopment of Square 701, WMATA's next best alternative was to forgo the sale of WMATA's holdings in Square 701 and any associated land profit and instead go forward with the construction at grade of an expanded, stand-alone Metro entrance. Furthermore, by no means did Monument get a "bargain" for the Square 701 property. On the contrary, we paid fair market value as supported by WMATA's own appraisal and moreover agreed to complete the construction of the Navy Yard Metro station improvements on time and on budget, even if it meant accelerating the schedule of our own project to satisfy WMATA's timeline. Additionally, we (a) accommodated WMATA's employee parking requirements by relocating WMATA's parking spaces previously located on



Mr. John Catoe
August 24, 2007
Page 3

WMATA's property in Square 701 to other property we owned in Square 700 at no cost to WMATA, (b) closed alleys in both Square 700 and 701 for the benefit, in part, of WMATA again at no cost to WMATA, (c) agreed to meet certain LSDBE and First Source employment goals on the Navy Yard station property and adjacent, unrelated development sites in Square 701, and (d) agreed to an eight percent (8%) affordable housing requirement without any offsetting bonus density, not on the Navy Yard station property, but again on the adjacent, but otherwise unrelated property in Square 701 previously purchased from private-sector owners on the open market. In short, WMATA took full advantage of the benefits offered by Monument's master development, only to ignore these and other important facts when it came time to sell the Square 700 property.

Keep in mind that all of this was done to advance the common goals of the District, WMATA, and Monument. We were proud to stand with WMATA and the Mayor at the groundbreaking ceremony for the Metro station improvements in January 2007. We believed we were partnering with you and with the District in this neighborhood development. And when it seemed to us that the timing for the second phase of the acquisition was slow, we received assurances from District officials and staff that that the AWC and the District were still behind the concept of a coordinated master development for Half Street. Our collective understanding was that WMATA first needed to identify a site for the relocation of the Bus Facility and its operations, and that negotiations for the sale of the Square 700 property would follow in due course.

In April 2007, when it became publicly known that WMATA and the District were in agreement regarding the relocation of the Bus Facility operations to DC Village, Monument submitted an offer to WMATA for the Square 700 property to begin the negotiation process. We offered the same price that we had paid to WMATA only four months earlier for its property in Square 701, a price which we believe is market price considering the uncertainty surrounding WMATA's schedule to relocate the Bus Facility. Instead of responding to our offer, WMATA started down the path of disposing of the property by public sale without any advance notice to Monument or the District.

Needless to say, this has caused us a great deal of concern. WMATA appears willing to negate the extensive coordination and planning efforts made to date by the District and AWC for the Ballpark District by inviting into the mix a new owner for Square 700 – a new owner that has none of the history or investment in the Ballpark District as Monument, or any connection to the development of the Half Street corridor as does Monument. By way of example, Monument is currently planning a unique design for Half Street with the District Department of Transportation, a project that was meant to be



Mr. John Catoe
August 24, 2007
Page 4

undertaken at Monument's sole cost. The District does not have funds for the necessary streetscape improvements to Half Street, which would ensure a pleasant and safe pedestrian passage from the Navy Yard station entrance to the Nationals Ballpark.

WMATA must appreciate that Square 700 and Square 701 was and is a master planned project. Separate transactions for the sale and purchase of these sites were proposed only for timing purposes, and were endorsed by the District and WMATA's District Board Members, to (a) ensure that the Navy Yard Metro station improvements were fast-tracked and (b) assign the responsibility and risk of timely completion of the station improvements to a third party. Monument agreed to separate the transactions and accelerate our improvements in Square 701 to benefit WMATA, but we would have never agreed to be responsible for the obligations, and the implicit risks, we agreed to in Square 701 for the benefit of WMATA without the understanding that Square 700 would eventually be part of the package. Why would we have paid the cost for the alley closings that benefit Square 700 if WMATA planned to sell the Square 700 properties to a competitor? Why would Monument bear the costs to accelerate the design and construction of the office building in Square 701 to accommodate the schedule for the station expansion, or agree to encumber unrelated property in Square 701 with public benefit commitments if WMATA did not intend to honor the plans, process and agreements made for Squares 700 and 701 collectively?

In short, does WMATA believe that if it had been forthright with Monument and the District in 2006 regarding the now-apparent intention to sell Square 700 in a public auction that Monument would have agreed to the obligations in the Square 701 contract? Of course not. No rational developer would have.

Not only is WMATA's current course of action inconsistent with the history of this project and the parties' agreements, but it also jeopardizes current construction activities in Square 701. Monument cannot agree to spend more and more money to advance WMATA's and the District's own goals at the expense of our fiduciary responsibilities to our partners and lenders. We have accelerated construction on the eastern side of Half Street, a decision that makes little sense if WMATA intends to jeopardize the planned two million square foot mixed-use master project by offering the Square 700 properties to outside parties. We have been committed to a schedule that will ensure that the Navy Yard Metro station entrance is ready for Opening Day. The importance of that schedule, and the acceleration effort underway, are of little consequence to us if we are forced to reconsider the future of our holdings in, and the planned development of, Squares 700 and 701. Sale of the WMATA holdings in Square 700 to another party will immediately slow



Mr. John Catoe
August 24, 2007
Page 5

the development of Half Street – the main pedestrian corridor for entrance to
the new stadium – affecting both retail and parking opportunities for baseball
patrons as well as the anticipated tax revenues resulting therefrom for the
Community Benefit Fund.

We are at a crossroads for this project. One road leads to continued
joint efforts, more groundbreakings, and a successful outcome for all parties.
The other road leads to dispute, expense, frustration, and, most likely,
litigation. In candor, I must advise you that we have consulted separate
litigation counsel so that we are prepared for that eventuality. However, we
would prefer to continue down the first road with a coordinated effort in the
spirit of the publicly planned efforts for development of the Ballpark District.
The first step on that road is for WMATA to pull back from the ill-advised
effort to dispose of Square 700 through public auction. Monument was
awarded, through a competitive public process with WMATA's consent, the
preemptive right to negotiate for Square 700 properties in question. We now
want WMATA to honor that right.

I look forward to discussing this with you further but must insist that
WMATA address this situation immediately.

Sincerely,

Jeffrey T. Neal
Principal
Monument Realty LLC

cc:    Mr. Neil Albert
       Mr. Emeka Moneme
       Hon. Jim Graham
       Hon. Marion Barry, Jr.
       Hon. Tommy Wells



# Exhibit "L"



August 31, 2007


Jeffrey T. Neal
Principal
Monument Realty, LLC
1700 K Street, NW, Suite 600
Washington, DC 20006

Re:    Square 700 and Square 701

Dear Mr. Neal:

This is in response to your letter to Mr. John Catoe, Jr. dated August 24 in which you threaten litigation regarding WMATA's competitive sale of Square 700 and suggest that progress on the construction of the Navy Yard Metrorail Station improvements will be adversely affected if the Southeastern Bus garage site (Square 700) is not sold to Monument Realty LLC (Monument).

You claim that WMATA "endorsed" the process through which the Anacostia Waterfront Corporation (AWC) awarded Monument "the exclusive right to buy the Square 700 property."  You also make a number of other assertions concerning Monument's expectations based on the fact that AWC included property owned by WMATA in a solicitation and understandings that were supposedly shared by "all parties" concerning the sale of the Southeastern Bus Garage site.

You are simply wrong on all counts.  The WMATA Board of Directors (WMATA Board) is the sole body with the legal ability to approve the sale of the Property or to "endorse" the inclusion of WMATA property in a solicitation.  No such endorsement has occurred.  AWC was informed before it issued the solicitation for a preferred developer for the Anacostia Waterfront area that AWC's actions did not bind the WMATA Board which is an interstate compact entity composed of jurisdictions in Maryland and Virginia, as well as the District of Columbia.  The actions of one WMATA jurisdiction simply cannot bind the other WMATA jurisdictions without their consent, or otherwise vitiate WMATA's Compact and FTA regulations concerning WMATA's obligations to dispose of property through competition to maximize the return.

**Washington
Metropolitan Area
Transit Authority**

600 Fifth Street, NW
Washington, DC 20001
202/962-1234

By Metrorail:
Judiciary Square—Red Line
Gallery Place-Chinatown—
Red, Green and
Yellow Lines
By Metrobus:
Routes D1, D3, D6, P6,
70, 71, 80, X2

*A District of Columbia,
Maryland and Virginia
Transit Partnership*

Jeffrey T. Neal
August 31, 2007
Page 2

With the opening of the new stadium fast approaching, WMATA's sole goal is to maximize the revenue that will be available to construct a new garage. Continued operation of the bus garage after the new stadium opens presents significant operational challenges. It has been our experience that competition is the best way to maximize revenues; to that end, bids for the purchase of the Southeastern Bus Garage were opened August 28.   As stated in the solicitation, the award will be made by the WMATA Board based on an evaluation of which bid,

> Represents the base net return to WMATA after leasehold monthly rent for WMATA's anticipated lease term (which may, in WMATA's sole discretion be less than 36 months) is deducted from the Bid Amount.

Of course, WMATA fully supports the District's exciting initiatives in the Anacostia Waterfront area and is confident that the District can ensure that its vision for the area and for the South East Bus Garage site are implemented regardless of the developer chosen for Square 700.

I cannot respond to your many statements concerning Monument's motivation in entering into the agreement for air rights at the Navy Yard Metrorail station, and the linkage in your mind to the bus garage site, except to say that it has been our experience that many businesses have found air rights over Metrorail stations to be extremely valuable; we assumed that was also the case for Monument.

Sincerely,

*Carol B. O'Keeffe*

Carol B. O'Keeffe
General Counsel

cc:    Mr. John B. Catoe
       Mr. Neil Albert
       Mr. Emeka Moneme
       Hon. Jim Graham
       Hon. Marion Barry, Jr.
       Hon. Tommy Wells