IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MONUMENT REALTY LLC, *et al.*, | ) ) ) |
| *Plaintiffs* | ) ) ) |
| v. | ) ) ) |
| WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, | ) ) ) |
| *Defendant* | ) ) ) |

Civil Action No. 1:07-CV-01821 (EGS)

## WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY'S MOTION TO DISMISS FIRST AMENDED COMPLAINT

Pursuant to Fed. R. Civ. P. 12(b)(6), 12(b)(1) 9(b) and Local Rule 7, Defendant Washington Metropolitan Area Transit Authority ("WMATA"), by undersigned counsel, respectfully moves to dismiss the Complaint on the grounds that the Complaint fails to state a claim upon which relief can be granted and, as to certain counts, the Court has no subject matter jurisdiction due to WMATA's sovereign immunity.

A memorandum of points and authorities setting out the grounds more fully accompanies this motion. For the reasons set forth in the memorandum, WMATA respectfully prays that the Court dismiss the Complaint in its entirety, without leave to amend, award WMATA its costs and expenses including legal fees and grant WMATA such other and further relief as is proper.

Pursuant to Local Rule 7(m), undersigned counsel conferred with Plaintiffs' counsel in connection with the previous motion to dismiss, and based on that consultation and Plaintiffs' opposition to the previous motion to dismiss, WMATA believes that Plaintiffs intend to oppose this motion.

4618670

Dated this 9th day of November 2007.

Respectfully submitted,

_____ /s/ Harvey A. Levin
Harvey A. Levin (D.C. Bar No. 203869)
THOMPSON COBURN LLP
1909 K Street, N.W. Ste. 600
Washington, D.C.  20006-1167
T: (202) 585-6942 (direct)
F: (202) 508-6969 (direct)
email: hlevin@thompsoncoburn.com

_____ /s/ Donald A. Laffert
Carol B. O'Keeffe
General Counsel
Donald A. Laffert
Bruce P. Heppen
Associate General Counsel
Washington Metropolitan Area Transit Authority
600 Fifth Street, N.W.
Washington, DC 20001
T: (202) 962-1499
F: (202) 962-2550
email: dlaffert@wmata.com
email: bheppen@wmata.com

Counsel for Defendant Washington Metropolitan
Area Transit Authority

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of November, 2007, true and correct copies of the foregoing Motion and accompanying Memorandum of Points and Authorities and Order were served by ECF and by electronic mail on:

> Louis E. Dolan, Jr., Esquire
> Vernon W. Johnson, III, Esquire
> NIXON PEABODY, LLP
> 401 Ninth Street, N.W.
> Washington, D.C.  20001

_/s/ Harvey A. Levin_

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| MONUMENT REALTY LLC, *et al.*, | ) | |
| *Plaintiffs* | ) ) ) | |
| v. | ) ) | Civil Action No. 1:07-CV-01821 (EGS) |
| WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, | ) ) ) | |
| *Defendant* | ) ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY'S
MOTION TO DISMISS FIRST AMENDED COMPLAINT**

Pursuant to Fed. R. Civ. P. 12(b)(6), 12(b)(1) and 9(b) and Local Rule 7, Defendant Washington Metropolitan Area Transit Authority ("WMATA"), by undersigned counsel, respectfully moves to dismiss the First Amended Complaint (the "Complaint") on the grounds that (i) the Complaint fails to state a claim upon which relief can be granted; (ii) as to certain counts, the Court has no subject matter jurisdiction due to WMATA's sovereign immunity; and (iii) the Complaint fails to plead fraud with particularity.

### INTRODUCTION

WMATA owns and operates a bus garage on property in Southeast Washington adjacent to the site of the new Washington Nationals baseball stadium (the "Bus Garage Property"). Plaintiffs contend that they and WMATA had agreed that Plaintiffs had the exclusive right to negotiate for the acquisition of the Bus Garage Property.   In August of this year, WMATA issued an Invitation for Bids for the sale of the Bus Garage Property.  After receiving three bids, in late September the WMATA Board authorized the sale to John Akridge Development Company ("Akridge"), a prominent District of Columbia developer, as the highest bidder.

4619270

Plaintiffs contend that (i) the Invitation for Bids and the award to Akridge breached this alleged -- but nonexistent -- agreement under which Plaintiffs claim to have had the exclusive right to negotiate to acquire the Bus Garage Property, (ii) WMATA wrongfully rejected an "alternate bid" with a contingent escalation clause from Plaintiff MR Ballpark 7 LLC, which Plaintiffs claim was higher than the Akridge bid, and (iii) WMATA wrongfully selected Akridge as the high bidder.

Plaintiffs' Complaint must be dismissed because, based on the application of prevailing law to the allegations and inferences in the Complaint, (i) as a matter of law, neither Monument Realty LLC nor MR Ball Park 7 LLC  had an agreement with WMATA regarding the Bus Garage Property but even if there were an agreement as Plaintiffs allege, (a) such an agreement to negotiate is unenforceable as a matter of law, (b) the agreement would be unenforceable under the Statute of Frauds and (c) Plaintiff MR Ballpark 7 LLC, the only bidder of the two Plaintiffs, had no agreement and had no rights or interest in or under such agreement; (ii) Plaintiff Monument Realty LLC did not bid, did not protest the award to Akridge and has no standing to challenge that award; (iii) WMATA correctly declined to consider MR Ballpark 7 LLC's "alternate bid" as not responsive, unfair and anti-competitive; (iv) WMATA legally, correctly and properly accepted the Akridge bid as the highest, self-contained and unambiguous bid; and (v) WMATA is immune from this action in all remaining respects based on WMATA's sovereign immunity.

## THE COMPLAINT

### 1. The Plaintiffs

There are two discrete plaintiffs: Monument Realty LLC ("Monument Realty") and MR Ballpark 7 LLC ("MRB 7").  Monument Realty is a Delaware LLC of uncertain and unalleged duration.  Monument Realty was not a bidder in response to WMATA's Invitations for Bids

(collectively, "IFBs" and individually, an "IFB") for the Bus Garage Property. MRB 7 also is a Delaware LLC, in existence only since July 18, 2007. *See* Compl. ¶ 2 & Ex. I.[1] MRB 7 has two members, both individuals, and has only $1,000 in capital. MRB 7's Operating Agreement provides also that the members and their capital contributions are not liable to third-party creditors (which WMATA would have been had MRB 7 been the high and successful bidder) and that third-party creditors cannot compel any additional capital contributions above the initial aggregate $1,000. *See* Compl. Ex. I, § 9(b).

Unlike Monument Realty, MRB 7 did submit a bid, in fact two bids. The first bid was a low-ball bid, offering only the IFB-mandated Minimum Bid Price of $60 million. The second or "alternate" bid was not a self-contained, ascertained amount. Rather, it was a contingent, escalator bid requiring WMATA to integrate another unspecified bid from an unidentified bidder and purporting to exceed that one unspecified higher bid by $250,000. The escalator applied "In the event WMATA receives *a* bid, conforming to WMATA's Invitation to Bids, from *a* qualified bidder, which is more than Sixty Million Dollars and 00/100" (emphasis added).

MRB 7 further qualified its alternate bid as follows, so that even its submission was an uncertainty:

> If WMATA's rules and regulations regarding the acceptance of bids for the sale of real property do not permit WMATA to consider escalation clauses, then this addendum shall be disregarded and MR Ballpark 7 LLC's Bid Amount shall be as shown on the Bid Form above [*i.e.*, the Minimum Bid Price of $60 million].

*See* Compl. ¶¶ 70-72 & Ex. I at 11. It is this alternate, contingent bid that gives rise to this action.

---

[1] Notwithstanding the separate existences of Monument Realty and MRB 7, the Complaint identifies both singularly as "Monument." Plaintiffs' melding of the two wrongly and deceptively attributes the actions of one to the other, the existence of one to the other, the roles of one to the other and the standing of one to the other.

### 2. Monument's Early and Aggressive Acquisitions

The Complaint begins with the District's 2004 announcement of plans to build the new baseball stadium and formation of the Anacostia Waterfront Corporation ("AWC") as the District's "economic development entity for the entire Ballpark District." Anticipating economic development, in October 2004 Monument began acquiring land in the Ballpark District. Monument's efforts "paved the way for the master planning process," and in particular a Master Development Plan for which Plaintiffs immodestly claim credit: "The Master Development Plan ultimately agreed upon for the Half Street Area would never have happened but for Monument's efforts and undertakings." By May 2005, Monument owned or had under control most of the privately held property surrounding the WMATA Bus Garage and the Navy Yard Metro Station sites. *See* Compl. ¶¶ 10-12, 19.

### 3. The Origins of Plaintiffs' Alleged Exclusivity Agreement With AWC

In December 2005, the Complaint alleges, the District selected Monument as Master Developer for the Half Street Area, which includes WMATA's Bus Garage Property, and announced the selection in a press release. *See* Compl. ¶ 23 and Ex. F.[2] Repeatedly thereafter, Plaintiffs allege that *Monument* was the Master Developer and that *as Master Developer* Monument had rights, prerogatives and expectations, including the exclusive right to negotiate

---

[2] Because the Complaint cites, portrays and relies on the full press release, WMATA includes the full press release as Exhibit 1. WMATA's inclusion of the full press release and the Court's consideration of the full press release, as well as WMATA's inclusion and the Court's consideration of other documents that the Complaint cites and on which it relies, are permissible in a Rule 12(b)(6) context without converting this motion to a motion for summary judgment. *See Osseiran v. Int'l. Finance Corp.*, 498 F. Supp. 2d 139, 146 (D.D.C. 2007) (citation omitted) ("While the court must generally limit its review to the facts alleged in the complaint, it may consider documents that "are both referenced in the complaint and central to the plaintiff's claims.")

To the extent that consideration of any Exhibit would cause this Rule 12(b)(6) motion to become a summary judgment motion, WMATA requests that the Court not consider that Exhibit so that this motion remains a motion to dismiss.

for the Bus Garage Property. Monument also alleges that it agreed to purchase the Navy Yard

Metro Station site first "only because it had exclusive rights as Master Developer and

otherwise." *See* Compl. ¶¶ 25-35. The allegation that Monument was the Master Developer

is not true. The full press release shows that AWC designated another limited liability

company, MR Cordish LLC, as Master Developer.[3] Therefore, the Court should disregard the

allegations regarding the selection of Monument as Master Developer and all allegations

regarding rights, interests and expectations that Plaintiffs claim they had as Master Developer,

*including the allegations that Monument had the exclusive right to negotiate for the Bus Garage*

*Property.*[4]

### 4. Sale of the Navy Yard Metro Station Property

At some point in 2006, according to the Complaint, Monument submitted an

unsolicited bid to WMATA for the Navy Yard Metro Station property. Upon receipt of

Monument's bid, WMATA advertised this property for sale to the public but received no bids

other than Monument's. Following this unsuccessful public advertising, according to the

Complaint, WMATA sold the Navy Yard Metro Station property to Monument "through a

sole-source negotiation." Further according to the Complaint, "During completion of this

---

[3] Monument Realty appears to have been only one member of MR Cordish LLC. MRB 7 was not and could not have been a member; MRB 7 did not exist at the time. Other members of the LLC evidently included The Cordish Company, Urban Asset Management, Inc., EastBanc, Inc. and Triden Development, LLC. *See* Exhibit 1 at p.4 (unnumbered).

[4] *See Franklin Asaph, L.P. v. FDIC*, 794 F. Supp. 402, 404 (D.D.C. 1992) (The Court should not accept as true allegations that the Complaint, including the documents that "are both referenced in the complaint and central to the plaintiff's claims," shows to be false); *see generally* 5A Wright & Miller, *Federal Practice and Procedure*: Civil 3d § 1357 n. 31 (2004).

transaction, WMATA ... understood that Monument would continue to have the exclusive right to negotiate for and acquire ... the WMATA Bus Garage." *See* Compl. ¶¶ 34-39.[5]

The Complaint, however, does *not* allege, as it cannot allege in good faith, that the terms and conditions of the purchase-and-sale agreement for the Navy Yard Metro Station property (the "Metro Station Agreement") contained any condition or term relating to Monument's alleged exclusive right to negotiate to acquire the Bus Garage Property. In fact, the Metro Station Agreement did not.[6]

### 5. The Bus Garage Property Bid Process

On April 6, 2007, Monument sent WMATA an unsolicited offer to buy the Bus Garage Property. As WMATA had done with respect to the Navy Yard Metro Station property, WMATA advertised the Bus Garage Property for sale and issued IFB No. 07-3. The District and AWC then advised WMATA that the District wanted to buy the Bus Garage Property, but the District and the AWC later withdrew their offer, and WMATA re-issued an IFB for the Bus Garage Property, IFB 08-1. *See* Compl. ¶¶ 56-63.

Akridge and JBG, who had responded to IFB 07-3, also responded to IFB 08-1. Monument Realty did not bid in response to IFB 08-1. Newly formed MRB 7, however, submitted two bids. MRB 7 submitted a firm bid for the Minimum Bid Price of $60 million and an "Alternate Bid" that had a base of $60 million with the following contingent escalator:

> In the event WMATA receives a bid, conforming to WMATA's Invitation to Bids, from a qualified bidder, which is more than Sixty Million Dollars and

---

[5] All the allegations in the first 41 paragraphs about promises, commitments, understandings, exclusivity, etc. relate to the District and AWC, *not to WMATA*. It is not until paragraph 42 that the Complaint makes its first reference linking WMATA to any alleged promise. These alleged WMATA "promises" simply appear *mirabile dictu* in paragraph 42 without any preceding factual basis alleged.

[6] Because the Complaint portrays and relies on the terms and conditions of the Metro Station Agreement, under *Osseiran v. Int'l. Finance Corp.*, *supra*, WMATA includes the full Agreement as Exhibit 2.

00/100 ($60,000,000), in terms of purchase price and leaseback rental, then MR Ballpark 7 LLC's Bid Amount shall increase to such bidder's Bid Amount plus Two Hundred Fifty Thousand and 00/000 ($250,000).

*See* Compl. ¶¶ 65-72 & Ex. I.  WMATA declined to consider MRB 7's alternate bid because it was not self-contained but instead required integrating the bid of another, unidentified and uncertain bidder in order to ascertain the bid amount.

WMATA accepted a competing bid for the highest sum certain of $69.25 million (the "Akridge bid").  Plaintiffs allege that the Akridge bid was conditional.  Plaintiffs allege also that the Akridge bid was not as high as the MRB 7 bid on a net basis because the Akridge bid contained monthly rental for the 36-month leaseback that had to be subtracted from the gross bid amount, and when netting out the full 36 months of rental payments, the MRB 7 bid was higher (MRB 7's had no rental charge).  *See* Compl. ¶¶ 76-79.[7]

Plaintiffs also allege that WMATA declined to consider MRB 7's bid because of an incorrect belief that Monument was behind schedule on construction at the Metro Station, which Plaintiffs deny.  *See* Compl. ¶¶ 88.[8]

---

[7] Complaint Ex. H is only a part of IFB 08-1 and omits crucial parts especially relating to the leaseback provision.  WMATA includes the full IFB 08-1 as Exhibit 3, under *Osseiran v. Int'l. Finance Corp.*, *supra*.

In paragraph 66, Plaintiffs quote and rely on a portion of IFB 08-1, Compl. Ex. H, that reads as follows (emphasis added):

> The bid which represents the best net return to WMATA after leaseback monthly rental for WMATA's anticipated lease term (*which may, in WMATA's sole discretion be less than 36 months*) is deducted from the Bid Amount. ....

Plaintiffs overlook entirely the italicized limitation that gave WMATA explicit discretion and foretold a term of less than 36 months.  In addition, IFB 01-8 § B. 6., entitled Leaseback Provision, referred bidders to the form Lease that was Attachment 1 in the IFB.  That form Lease defined the "Term" as including WMATA's right to cancel the lease on 90-days' notice.

[8] Again, however, the allegation contains its own refutation.  Paragraph 88 also alleges that WMATA had "received a recovery schedule for timely completion of construction at the Navy Yard Metro Station site."  There is no other meaning or connotation of, or reason for,

The Complaint has twelve counts. Eight plead claims and four merely plead remedies. Counts Four (breach of contract), Six (breach of fiduciary duty), Seven (fraud), Eight (breach of the Compact), Nine (arbitrary and capricious decision), Ten (irrational decision in approving the Akridge bid), Eleven (illegal action in approving the Akridge bid) and Twelve (illegal action in accepting the Akridge bid) purport to plead claims for relief. Counts One (declaratory judgment), Two (specific performance), Three (injunction) and Five (constructive trust) plead only remedies.

**ARGUMENT**

All Counts should be dismissed for failure to state a claim upon which relief can be granted. Additionally, Counts Five, Six, Seven and Eight should be dismissed on the ground of WMATA's sovereign immunity.

### I. The Complaint Fails To State A Claim Against WMATA Upon Which Relief Can Be Granted

### 1. Standard of Review Under Rule 12(b)(6)

Presuming the truth of all well pleaded facts, and giving Plaintiffs the benefit of reasonable inferences grounded in and flowing from the well pleaded facts, the Court should grant this motion to dismiss if the Complaint fails to state a legally sufficient claim for relief. The Court may not sustain the Complaint based on conclusory allegations, speculation or strategic pleading decisions. Additionally, the Complaint must also meet the requirement of plausibility, now a criterion advanced from the summary judgment stage to the pleading stage. *See Bell Atlantic Corp. v. Twombley*, 127 S. Ct. 1955, 1969 (2007); *Tnaib v. Document Technologies, LLC*, 450 F. Supp. 2d 87, 90-91 (D.D.C. 2006).

---

Monument's providing a "recovery schedule" unless it *was* behind schedule in the construction.

**2. The Complaint Fails to State a Claim For Breach of Contract or Agreement Against WMATA**

    **A. The Alleged Agreement Is An Unenforceable Agreement to Negotiate or Agreement to Agree**

The Complaint pleads that Monument had an exclusive right to negotiate for the acquisition of the Bus Garage Property.[9] Assuming, *arguendo*, that Monument had such an agreement with WMATA (though Monument did not), this alleged agreement is unenforceable. *See Natural Resources Defense Council v. Environmental Protection Agency*, 464 F.3d 1, 9-10 (D.C. Cir. 2006) (holding, "'Agreements to agree' are usually not enforceable in contract."); *Novecon Ltd. v. Bulgarian-American Enterprise Fund*, 190 F.3d 556, 564-65 (D.C. Cir. 1999) (holding, under District of Columbia law agreements and offers to negotiate are not enforceable).

Furthermore, even were there an agreement to negotiate to acquire the Bus Garage Property, there is no promise of, guarantee of or agreement on terms, and there is no promise, guarantee or agreement of a successful outcome. "Under District of Columbia law, a valid and enforceable contract requires both: (i) intention of the parties to be bound; and (ii) agreement as to all material terms." *Steven R. Perles, P.C. v. Kagy*, 473 F.3d 1244, 1249 (D.C. Cir. 2007); *id.* at 1251-52 (holding, to be final the negotiations and the contract must include all terms the

---

[9] *See* Compl. ¶ 25 (citing to the AWC press release indicating that the Monument team had been given the right to enter into exclusive negotiation to acquire properties in the Half Street area that AWC was seeking to acquire from WMATA); ¶ 33 (alleging that Monument agreed to structure purchases in phases because it had exclusive rights to negotiate for the acquisition of the Bus Garage Property); ¶¶ 37 & 38 (alleging an understanding that Monument had the exclusive right to negotiate for the Bus Garage property); ¶ 40 (alleging, Monument had a "right to negotiate exclusively for the WMATA Bus Garage"); ¶ 43 (alleging, Monument agreed to and undertook actions "in reliance on its right to negotiate exclusively for the WMATA Bus Garage"); ¶ 56 (alleging "WMATA's commitment to negotiate exclusively with Monument for the acquisition of the Property"); and ¶ 68 (referring to Monument's August 24, 2007 letter, Exhibit K to the Complaint, stating, "Monument was awarded, through a competitive public process with WMATA's consent, the preemptive right to negotiate for Square 700 properties in question."

parties intended to resolve and cannot leave material terms to future settlement). The Complaint does not allege that Plaintiffs and WMATA agreed on the material terms of Plaintiffs' acquisition of the Bus Garage Property, as the parties did not so agree. For Plaintiffs to state a claim upon which relief can be granted, the Court will have to create the purchase-and-sale agreement out of whole cloth. That, the Court may not do. *See Mantech Telecomm. and Info. Systems Corp. v. U.S.*, 49 Fed. Cl. 57, 80 (2001) (emphasis added; citations omitted) ("It is indisputable that the ultimate grant of a contract must be left to the discretion of a government agency; *the courts will not make contracts for the parties*.").

### B. The Alleged Agreement Is Unenforceable Under the Statute of Frauds

The alleged agreement also is unenforceable under the District's Statute of Frauds. To be enforceable, the alleged agreement for the sale of real property must be "in writing ... signed by the party to be charged therewith or a person authorized by him." D.C. Code Ann. § 28-3502; *see Scoville St. Corp. v. District TLC Trust, 1996*, 857 A.2d 1071, 1077-78 (D.C. App. 2004); *Clay v. Hanson*, 536 A.2d 1097, 1100-01 (D.C. App. 1988). The Complaint does not allege the existence of  an  agreement in writing signed by any authorized WMATA official (there is none). Accordingly, the Court should dismiss all claims to enforce, or otherwise emanating from, the alleged unwritten exclusivity agreement for the sale of the Bus Garage Property to Plaintiffs.

### C. The Complaint Fails to Allege An Agreement Entered Into By WMATA

Plaintiffs fill the Complaint with allegations of silence, understanding and acquiescence of unnamed WMATA personnel to allege that WMATA entered into an agreement with Plaintiffs according them the exclusive right to negotiate to acquire the Bus Garage Property. Plaintiffs cannot state any claim arising in contract because as a matter of law, there was no agreement.

4619270

### i. WMATA Acts Through Its Board And There Is No Allegation Of Any Board Action Agreeing To, Approving Or Authorizing The Alleged Exclusivity

WMATA is a *sui generis* statutory "body corporate and politic" established under the Compact among the District of Columbia, Maryland and Virginia and approved by Congress under Art. I, § 10, cl. 3 of the Constitution. WMATA's existence, authority, mission and rights are independent of and separate from the existence, authority and rights of the District of Columbia, Maryland and Virginia, and these Compact signatories are not agents of, and cannot bind, WMATA. "Furthermore, pursuant to the WMATA Compact, one signatory may not impose its legislative enactment upon the entity created by it without the express consent of the other signatories and of the Congress of the United States." *Lucero-Nelson v. WMATA*, 1 F. Supp. 2d 1, 7 (D.D.C. 1998). The Compact, moreover, deems WMATA a sovereign in conferring on WMATA sovereign immunity equal to that of the signatories. *See* Compl. ¶¶ 3-4 11 & Ex. C; *Abdulwali v. WMATA*, 315 F.3d 302, 304 (D.C. Cir. 2003); *KiSKA Constr. Co. v. WMATA*, 321 F.3d 1151, 1158 (D.C. Cir. 2002), *cert. denied*, 540 U.S. 939 (2003).

WMATA's independence and sole authority extend to the capability and authority to enter into agreements. When exercising that authority, and when entering into agreements, WMATA acts by and through its Board, and *only* its Board can authorize and/or enter into agreements such as the one sought by Monument. *See* the Compact, Art. III, §§ 4, 5, 8(b) & 12(d), (e) & (f). But the Complaint does not allege, as it could not allege in good faith, that the WMATA Board entered into or even authorized any agreement promising Plaintiffs the exclusive right to negotiate to acquire the Bus Garage Property. Accordingly, the Complaint's allegations of approval of and/or acquiescence in statements and actions of the District, AWC or Monument fail to state a claim on which relief can be granted.

### ii. There Are No Allegations Or Reasonable Inferences That Anyone Had Authority To Bind WMATA, Or That Anyone With Authority Did Bind WMATA, To The Alleged Promises And Commitments

The Complaint cannot withstand a motion to dismiss on the basis that someone other than the WMATA Board bound WMATA because the Complaint has no allegations to support that argument. For example, there is no allegation, as in good faith there could be no allegation, that (i) WMATA's General Manager made any promise or commitment or entered into any agreement granting Plaintiffs the exclusive right to negotiate for the Bus Garage Property; or (ii) WMATA had delegated authority to a particular person or persons authorized to bind WMATA in the disposition of the Bus Garage Property and/or that such lawful delegee(s) of WMATA's authority made any promise or commitment or entered into any agreement granting Plaintiffs the exclusive right to negotiate for the Bus Garage Property.[10]

Even were there to be such allegations, they would be in vain absent allegations, which Plaintiffs do not and in good faith cannot make, of actual authority. Anything less than explicit, actual authority does not state a claim on which relief can be granted against WMATA. *See Littlejohn v. WMATA*, No. 90-1724 (RCL), 1992 WL 122755 at *2 (D.D.C. May 28, 1992) (footnotes and citations omitted):

> [T]the court finds that WMATA is not bound by Morrison's representations to plaintiff because the doctrine of apparent authority does not apply to dealings with the government. ... The United States Supreme Court has held that:
>
> > [w]hatever the form in which the Government functions, anyone entering into an arrangement with the Government takes the risk

---

[10] There is *nothing* in the 223 paragraphs of the Amended Complaint (consuming 56 pages) and in the 12 Exhibits that reflects the alleged agreement. In this morass of allegations and documents, Plaintiffs fail to pinpoint who at WMATA allegedly made promises and entered into the exclusivity agreement, where or when that person or persons allegedly did so and how they did so (*e.g.*, in what form and what forum). If Plaintiffs can allege the who, what, when, where and how of WMATA's alleged agreement, they must do so -- or be made to do so -- *forthwith*. This matter is too important, too urgent and too injurious to the public interest to let Plaintiffs remain coy on these crucial facts.

of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority.... And this is so even though ... the agent himself may have been unaware of the limitations on his authority.

... WMATA is a government agency. It is an agency and instrumentality of the District of Columbia, Maryland and Virginia that was created by a compact that was consented to and enacted by Congress. ... Consequently, the doctrine of apparent authority does not apply to WMATA and defendant is not bound by the settlement agreement that was entered into by Morrison and plaintiff.

### iii. The Alleged Promises And Commitments Were Promises And Commitments Of The District And AWC, Not WMATA

The Complaint fails to state a claim against WMATA also because the District and AWC, not WMATA, made the alleged promises and agreement. The Complaint does not allege that WMATA made any promise until paragraph 42, and the reference is to the previously pled promises and agreements of the District and AWC. Then what follows are mere repetitions of the same conclusory allegations of promises and commitments. *Nowhere does the Complaint allege that any person with authority to bind WMATA, at any place, at any time or in any manner, made a promise, commitment or representation to Plaintiffs that they had the exclusive right to negotiate for the sale of the Bus Garage Property.*

Whatever AWC and the District might have said or done does not and cannot bind WMATA. WMATA is a discrete statutory, juridical body legally separate from and not controlled by its any one of the Compact signatories. *See* Compl. ¶ 3; *Md. Code Ann., Transp. Art.*, § 10-204 *et seq.* (2004); *Va. Code Ann.* § 56-529 *et seq.* (2004); *D.C. Code Ann.* § 9-11107.01 *et seq.* Maryland and Virginia are sovereign states in their own right, unbound by anything that the District and its instrumentality AWC might do or say. Maryland and Virginia did not surrender their sovereignty (or their sovereign immunity) to the District, whether in the Compact or otherwise. *See* Compact § 80 ("Nothing contained in this Title

shall be construed as a waiver by the District of Columbia, Maryland and Virginia and the counties within the Zone of any immunity from suit.").

Furthermore, there is no basis in law, or in fact, for Plaintiffs to argue that WMATA's alleged failures to respond to or dissent from public statements and actions of the District and AWC created an agency relationship between WMATA, as principal, and the District and AWC, as agents.  *See id.; Littlejohn, supra*, 1992 WL 122755 at *2; *First Fed. Lincoln Bank v. U.S.*, 54 Fed. Cl. 446, 452 (2002) (citations omitted):

> "Government employees hold express actual authority to bind the government in contract only when the Constitution, a statute, or a regulation grants them such authority in unambiguous terms."

*See also Davis v. OPM*, 168 F.3d 1316, 1998 WL 513605 at *2 (Fed. Cir. 1998) ("Although actions can sometimes create an agency relationship between private parties, ordinarily they cannot do so in the case of government agencies, and certainly not in direct contravention of explicit statutory requirements.") (internal citations omitted); *Petersen v. OPM*, 16 F.3d 442, 1993 WL 528058 at *2 (Fed. Cir. 1993) (same).

If Monument erroneously believed otherwise, it did so at its peril.  *See Gary v. U.S.*, 67 Fed. Cl. 202, 212 (2005) (citations omitted):

> "It is well established that the government is not bound by the acts of its agents beyond the scope of their actual authority." ... Anyone asserting the existence of a contractual relationship with the United States has the burden of discovering whether the government agent has contracting authority. ... Moreover, "anyone entering into an agreement with the Government takes the risk of accurately ascertaining the authority of the agents who purport to act for the Government, and this risk remains with the contractor even when the government agents themselves may have been unaware of the limitations on their authority."

Thus, all the allegations about WMATA's implicit acquiescence in and/or agreement with statements and actions by the District or AWC, and all the allegations about WMATA's

silence in the face of statements and actions by the District or AWC, fail to state a claim upon which relief can be granted.[11]

> **D. The Complaint Fails To State A Claim For Breach of Contract, Fraud And Breach Of Fiduciary Duty Because Neither Monument Realty Nor MRB 7 Was The Master Developer And Neither Had Any Rights, Interests Or Expectations As, Or Emanating From The Designation As, Master Developer**

Though the Complaint alleges repeatedly that AWC designated Monument as Master Developer, the press release on which the Complaint relies shows that the allegation is not true. The Court must disregard it in considering this motion to dismiss. Since neither Monument Realty nor MRB 7 was the Master Developer, neither had the rights, prerogatives or interests, if any, as, or emanating from the designation, of Master Developer, including to negotiate for or acquire the Bus Garage Property.[12]

> **E. The Complaint Fails To State A Claim For Breach of Contract, Fraud And Breach Of Fiduciary Duty Because The Metro Station Agreement's Integration/Merger Provision Bars the Existence of the Alleged Agreement**

---

[11] Paragraph 156 of the Complaint illustrates the extreme nature of Plaintiffs' claim. There, Plaintiffs allege that in January 2007, WMATA and Monument held a groundbreaking ceremony for the Navy Yard Metro Station property. Plaintiffs fault unnamed WMATA personnel for not standing up in the middle of this public relations event to challenge Monument, alleging: "Jeffrey T. Neal, a principal of Monument Realty, specifically addressed Monument's plans with respect to the remainder of the Half Street Area. WMATA did not object."

[12] Monument Realty's being a member of MR Cordish LLC gives it no personal stake in the LLC's property. It is the general law -- indeed the very purpose -- of limited liability companies that the entity is distinct from the members and that the members do not own or have any personal interest in the assets and rights of the entity. *See, e.g.,* (i) Del. Code Ann., Title 6, Commerce and Trade § 18-701, Nature of limited liability company interest: "A limited liability company interest is personal property. A member has no interest in specific limited liability company property."; (ii) D.C. Code Ann. § 29-1001(20) (defining "Membership interest" or "interest" to mean "a member's share of the profits and losses of the limited liability company and a member's right to receive distributions of the limited liability company's assets"); § 29-1016 ("Any estate or interest in property may be acquired in the name of the limited liability company, and title to any estate or interest so acquired vests in the limited liability company") & § 29-1033 ("A membership interest in a limited liability company is personal property").

The Complaint alleges that in connection with, and as an inducement to, Plaintiffs' purchase of the Navy Yard Metro Station site, WMATA understood, acquiesced in and agreed to promises, representations and commitments regarding Plaintiffs' alleged exclusive right to negotiate for the acquisition of the Bus Garage Property. *See, e.g.,* Compl. ¶¶ 35-43. The terms and conditions of the purchase of the Navy Yard Metro Station site to which the Complaint refers are in the Metro Station Agreement, Exhibit 3 to this Memorandum. That Agreement has *nothing* in it supporting the Complaint's allegations. The Metro Station Agreement contains no commitments, promises, representations or grants of exclusivity to negotiate for the sale of, or for any other right or interest in, the Bus Garage Property.

The Metro Station Agreement does, however, contain commitments, promises and representations regarding *other* properties. Section 2.2, entitled Ballpark District Area, commits WMATA to "cooperate with Developer's pre-development activities for the Developer's Property, the Adjacent Property and the Property." The "Developer's Property," the "Adjacent Property" and the "Property" do not include the Bus Garage Property. *See* Article I, Defined Terms. Similarly, in § 5.10, Business Improvement District ("BID"), the parties created a business improvement district that, again, did not include the Bus Garage Property. In § 7.5, Preparation, Submission and Approval of Development Plan, there is no linkage between the planning and development of the Navy Yard Metro Station Property and the Bus Garage Property.

The absence of any reference to commitments, promises and representations regarding the Bus Garage Property means, as a matter of law, that there were none and are none. The Metro Station Agreement  contained the following integration/merger provision:

18.7    **Entirety And Amendments**.    This Agreement embodies the entire Agreement between the parties and supersedes all prior agreements and understandings, if any, relating to the Property.    This Agreement may be

amended only by writing executed by the party against whom enforcement is sought.

Pursuant to this Section 18.7, all alleged preceding commitments, promises, representations and agreements regarding the Bus Garage Property in any way inducing or connected to the acquisition of the Navy Yard Metro Station, if any, perished upon execution of the Agreement. *See One-O-One Enterprises v. Caruso*, 848 F.2d 1283, 1287 (D.C. Cir. 1988) (citations omitted):

> Were we to permit plaintiffs' use of the defendants' prior representations (and defendants' nondisclosure of negotiations inconsistent with those representations) to defeat the clear words and purpose of the Final Agreement's integration clause, "contracts would not be worth the paper on which they are written." ... On a matter of such large significance to the parties' bargain, silence in a final agreement containing an integration clause - in the face of prior explicit representations - must be deemed an abandonment or excision of those earlier representations.

*See also ARB, Inc. v. E-Systems, Inc.*, 663 F.2d 189, 198 (D.C. Cir. 1980) (footnote and citations omitted); *L & L Constr. Assocs., Inc. v. Slattery Skanska, Inc.*, No. 05-1289 (RCL), 2006 WL 1102814 at *4 (D.D.C. 2006).

Accordingly, the Court should dismiss Counts One, Two, Three, Four, Five, Six and Seven as to both Plaintiffs.

### 3. The Complaint Fails to State a Claim on Behalf of MRB 7 For Breach of Any Agreement, Understanding, Promise or Commitment With Respect to the Bus Garage Property

MRB 7 did not come into existence until July 18, 2007. All the alleged agreements binding WMATA to exclusivity in negotiating the sale of the Bus Garage Property occurred before July 18, 2007 and thus predated MRB 7's existence. *See* Compl. ¶¶ 17, 25, 28-30, 32-37, 40-42, 44-45. MRB 7 could not have been and was not a party or beneficiary to the alleged agreements upon which Plaintiffs base their claims. Accordingly, the Complaint fails to state a claim on behalf of MRB 7 for the existence of or breach of any agreement, promise,

commitment or understanding, and the Court should dismiss Counts One through Seven with respect to MRB 7.

### 4. The Complaint Fails to State a Claim on Behalf of Monument Realty With Respect to WMATA's Bid Procedures and WMATA's Acceptance of the Winning Bid For the Bus Garage Property Because Monument Realty Did Not Bid and Does Not Have Standing

As the Complaint correctly pleads and shows in Ex. I, Monument Realty did not submit a bid to purchase the Bus Garage Property, and Monument Realty could not have received the award of the right to purchase the Bus Garage Property as a result of the bid process. Accordingly, Monument Realty has no standing to challenge the IFB, the bid process, the Akridge bid or the award to Akridge. *See Info Tech. & Applications Corp. v. U.S.*, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (citation omitted):

> In order to establish standing, ITAC must show that it is an "actual or prospective bidder[ ] or offeror[ ] whose direct economic interest would be affected by the award of the contract or by failure to award the contract," *i.e.*, that ITAC was an interested party, prejudiced by the award to RSIS.

*See also Myers Investigative and Sec. Servs., Inc. v. U.S.*, 275 F.3d 1366, 1370 (Fed. Cir. 2002).[13]

Because Monument Realty does not have standing to contest or to seek relief as a result of the bid process and award, the Complaint fails to state a claim for Monument Realty upon which relief can be granted. Accordingly, as to Monument Realty the Court should dismiss

---

[13] The Complaint does allege, however, that MRB 7 was "Monument Realty's affiliate." Compl. ¶ 70. As the cases cited above show, the allegation of affiliation does not make Monument Realty an "interested party" with standing to pursue this bid protest. "[T]he standing doctrine embraces the general prohibition against a litigant's raising another entity's legal rights." *Eagle Design & Mgmt., Inc. v. U.S.*, 62 Fed.Cl. 106, 109 (2004). *See Gravely & Rodriguez*, B-256506, March 28, 1994, 94-1 CPD ¶ 234 (protest dismissed because protester, a partnership, was a different legal entity from the named bidder, a sole proprietorship and subsequent partner in the protester, and therefore did not qualify as an interested party).

Counts One, Two, Three, Four, Five, Six and Seven to the extent that they depend on or include the bid process and Counts Eight, Nine, Ten, Eleven and Twelve in their entirety.

> **5. The Complaint Fails to State a Claim on Behalf of Monument Realty and MRB 7 With Respect to MRB 7's Alternate Bid Because the Alternate Bid Was Not Responsive or Acceptable, and Under Long Established Law WMATA Acted Rationally and Did Not Act Arbitrarily or Capriciously In Declining To Consider the Alternate Bid**

The Court may disturb WMATA's decision not to consider MRB 7's alternate bid only if WMATA acted arbitrarily and capriciously and without any rational basis. *See Elcon Enters., Inc. v WMATA*, 977 F.2d 1472 (D.C. Cir. 1992) (holding, (i) the district court cannot award any relief short of irrationality or clear and prejudicial violation of applicable law; (ii) there is a strong presumption that government officials act correctly, honestly and in good faith when considering bids; and (iii) the standard of review is highly deferential and assumes validity of agency action).

In evaluating the bids in general and MRB 7's alternate bid in particular, as these cases show, WMATA enjoyed a great deal of discretion. *See Tutor-Saliba Corp. v. U.S. Army Corps of Engineers*, No. 94-0908, 1995 WL 520765 at *6 (D.D.C. Aug. 23, 1995) (citations omitted):

> This standard is highly deferential to the contracting agency's final determination ... The D.C. Circuit stated that "[i]t is undisputable that the ultimate grant of a contract must be left to the discretion of a government agency; the courts will not make contracts for the parties."
>
> Courts place such great weight on the discretion typically accorded to procurement officials because "[j]udges are 'ill-equipped to settle the delicate questions involved in procurement decisions.'"

*See also Banknote Corp. of Am., Inc. v. U.S.*, 365 F.3d 1345 (Fed. Cir. 2004) (citation omitted) ("It is well-established that contracting officers have a great deal of discretion in making contract award decisions, particularly when, as here, the contract is to be awarded to the bidder or bidders that will provide the agency with the best value."); *ABF Freight System, Inc. v. U.S.*, 55 Fed. Cl. 392, 409 n.13 (2003).

In both law and in fact, it is clear on the face of the Complaint and the accompanying alternate bid that WMATA had a rational basis for declining to consider the alternate bid and did not act arbitrarily and capriciously.

### A. Rational Basis In Law

The law of this District is that MRB 7's alternate bid was nonresponsive. *See Trump v. Mason*, 190 F. Supp. 887 (D.D.C. 1961) (holding, bid to acquire real property at stated amount of $20,000 more than any other bid was not a firm bid and agency could reject it as nonresponsive) (citation omitted):

> The Court is of the opinion that to accept a bid such as plaintiff's 'would destroy the integrity of the bidding system by establishing a precedent which would invite a repetition of this type of bidding in the future so as to completely defeat the sealed bid procedure' (as argued by defendant). ... The plaintiff's bid not being firm or one which could 'independently' (and by 'independently' the Court means one not subject to or reliant on the bids of others) guarantee, within its four corners, a sum-certain offer which could be accepted and so ripen into a contract, the defendant acted within the bounds of his sound discretion in refusing to accept the bid as responsive to the invitation to bid.

*Id.* at 889. *See also Holliday v. Higbee*, 172 F.2d 316, 318 (10th Cir. 1949) (footnotes omitted):

> As pointed out, pursuant to the published invitation for sealed bids, he submitted Bid Number two set out in footnote one, on which he predicated his cause of action. This bid was not a direct bid in any specified amount. Merely bidding $10 more than any other bid is not a bona fide valid bid. It was not a fair bid and the Government was not required to give it consideration, especially under a bidding invitation in which the right was reserved to accept or reject any or all bids.[14]
>
> The Government was under no legal duty to accept appellant's bid. It follows that his complaint failed to state a cause of action and the judgment of the trial court is, therefore, affirmed.

A Comptroller General decision coming after *Trump* and *Holliday* explains the reasoning – *i.e.*, the rationality – behind declining to consider MRB 7's alternate bid:

---

[14] Like the IFB in *Holliday*, WMATA's solicitation, at ¶¶ C.5 and D.8, expressly reserved the right to reject any and all bids, or portions thereof, at any time and for any reason.

[T]he courts have uniformly held that bids not complete in themselves are not *bona fide* valid bids. In *Casey* v. *Independence County*, 159 S.W. 24 (1913), a bank proposed to pay the county interest at a rate "one-quarter of 1 percent" higher than any other bid. The court, citing the case of *Webster, et al.* v. *French, et al.*, 11 Ill. 254, stated that:

> * * * a proposal to be recognized as a bid must contain a distinct proposition, which can be acted upon taken alone and without reference to anything out of itself. * * * if this form of bidding is allowed, one man, by offering a nominal sum above all others, might appropriate to his own advantage the judgment of others who might have gone to great trouble and expense to form a correct opinion, when the intention was to give each bidder the benefit only of his own judgment. The court further said that the effect of it would be to drive away all prudent and reasonable men and destroy all fair competition in the bidding * * * .

****

For the defect lies in the introduction of such elements of chance and wagering which we believe have no place in the competitive bidding system.

Certainly chance also plays a part under sealed bidding procedures. There each bidder is faced with the problem of "guessing" what other bidders will offer. However, each bidder determines for himself the prices at which he is willing to contract. And he states in submitting his bid that the price offered is the price for which he is bargaining. The only chance involved is whether the bidder is over or underestimating his competition. In one event he will be paying a price greater than was necessary to obtain his contract; in the other event he, of course, will not obtain a contract. But it is this very element which the sealed bid procedure relies upon to assure real and fair competition.

The procedure we are asked to consider goes considerably beyond what may be reasonably considered to be fair risks.

*Comptroller General to Sec'y of Agriculture*, 44 Comp. Gen. 292 (Nov. 19, 1964).

MRB 7's alternate bid, in and of itself, did not contain a sum certain. Rather, MRB 7's alternate bid depended on amount(s) bid by one or more other bidder(s). WMATA could not ascertain the amount of the alternate bid without consulting and integrating materials outside the bid itself. Under *Trump, Holliday*, the Comptroller General's decision and other well

established law,[15] WMATA properly did not consider the alternate bid.  Plaintiffs agree.  *See*

Compl. ¶ 211:

> Under established principles of law applicable to sealed bidding, a bid must be self-contained; a bid that is not complete in itself and without reference to anything else is not a bona fide valid bid.[16]

### B. Rational Basis In Fact

There are many reasons grounded in fact, on the face of the Complaint and the

accompanying alternate bid, why WMATA's decision not to accept MRB 7's alternate bid was

rational.  First, MRB 7's alternate bid was an attempt to get "two bites at the apple," a

construct that reviewing decisions reject out-of-hand as not fair and not competitive.  In

addition to the cases cited above in Point I. 5. A., Rational Basis in Law, *see generally Matter of*

*RO Contracting Co.*, B-235496, Aug. 31, 1989, 89-2 CPD ¶ 200; *Matter of Waste Conversion,*

*Inc.*, B-224425, Nov. 7, 1986, 86-2 CPD ¶ 534.

Second, if MRB 7 is right and can make this alternate bid, then IFB 08-1 is unfair and

anti-competitive.  The right to make an alternate bid would guarantee MRB 7 that it would be

the successful bidder.  MRB 7's guarantee would come, moreover, without the necessity of

having to make a fair evaluation and bid and without any of the risks of the competitive

---

[15] *See also Fire-Trol Holdings, LLC v. U.S.*, 68 Fed. Cl. 281, 286 (2005) (upholding the rejection of plaintiff's alternate bid because it did not provide a firm fixed-price); *National Ambulance And Escort Service, Inc.*, B-196511, Nov. 8, 1979, 79-2 CPD ¶ 342 (denying protest on ground, *inter alia*, that bid providing for a change in price of services to be furnished if certain circumstances occur did not offer a firm fixed-price and was non-responsive).

[16] MRB 7 recognized that there was a significant issue of the legality of its alternate bid, stating:

> If WMATA's rules and regulations regarding the acceptance of bids for the sale of real property do not permit WMATA to consider escalation clauses, then this addendum shall be disregarded and MR Ballpark 7 LLC's Bid Amount shall be as shown on the Bid Form above [*i.e.*, the Minimum Bid Price of $60 million].

WMATA simply took MRB 7 at its word.

bidding process. It would allow MRB 7 to do exactly what it did, or at least tried to do: manipulate the process by bidding the lowest possible amount to enter the process and guarantee success by tacking on a minimal, almost insignificant escalator. MRB 7 was gaming the bid process, and WMATA was *right* – not just rational, not merely non-arbitrary and non-capricious – in maintaining the integrity of the process and in not capitulating to MRB 7's abuse of the process.

Third, allowing alternate bids with contingent escalation clauses negates the bid process altogether. If more than one bidder were to submit alternate bids, with each purporting to top the highest bid by some increment, the bidding process would be a never ending, linear arithmetic progression to infinity, as each alternate bid topped each initial bid and each preceding alternate bid. No bid ever would be the highest, and no bidder ever could prevail.

Fourth, the alternate bid does not conform to the IFB Bid Form. The Bid Form has this one line for the bid: "Bid Amount $_____." That clearly calls for a fixed number. Common sense and common experience alone make clear that numbers (numerical or spelled out) follow dollar signs. There is not, and there cannot be, any plausible ambiguity in this request for a bid amount.

Fifth, though MRB 7 was concerned with the propriety of the alternate bid so much so that MRB 7 instructed WMATA that the alternate bid "shall be disregarded" if not permitted, MRB 7 eschewed the open invitation to ask WMATA about the propriety of the alternate bid.[17]

---

[17] See IFB § D. 5. at 8:

> Additional Information: "Requests for additional available information and all questions regarding this Invitation for Bids must be submitted via e-mail to Mr. Burns in accordance with Section C, paragraph 6, above. WMATA will post all questions and answers on its website …."

Sixth, allowing the alternate bid because, as the Complaint alleges, the IFB did not explicitly prohibit alternate bids leads to dangerous and unacceptable consequences. The IFB also did not explicitly prohibit innumerable other variances such as bids in currencies other than United States dollars or, in fact, bids using some form of consideration other than currency. The consequences of "what is not expressly prohibited is allowed" are too varied and too numerous to summarize, but this much is clear: Introduction of "what is not expressly prohibited is allowed" as a principle of government contracting is untenable. Inserting this latitude into bids would vitiate agencies' discretion and would replace reason with anarchy.

Seventh, the alternate bid itself contained many ambiguities. For example, the alternate bid stated that should WMATA receive "a bid" greater than $60 million, MRB 7 would offer $250,000 more than that bid. But the alternate bid did not address WMATA's receiving more than one bid greater than $60 million, as happened. As a result, the alternate bid offered (and could have offered more than) two prices, $250,000 over the next highest bidder and $250,000 over the highest bidder. Which was MRB 7's bid, the former or the latter? Also, the alternate bid was ambiguous in failing to explain how to calculate MRB 7's bid if another bidder offered more than $60 million net but with a leaseback rent of greater than $0, as in fact was the case. The manifold ambiguities inherent in this alternate bid justified – in fact required – WMATA to decline it. *See, e.g., Don's Wheelchair & Ambulance Svc., Inc.,* B-216790, Jan. 22, 1985, 85-1 CPD ¶ 82; *B&P Printing, Inc.,* B-188511, June 2, 1977, 77-1 CPD ¶ 387.

Eighth, MRB 7's alternate bid was fraught with litigation risks, and in fact was a virtual invitation to litigation. The alternate bid would apply "In the event WMATA receives a bid, conforming to WMATA's Invitation to Bids, from a qualified bidder, which is more than Sixty Million Dollars and 00/100." Especially viewed in light of Plaintiffs' present actions, if Plaintiffs were dissatisfied for any reason or in any respect, could there be any doubt but that

WMATA would have faced Plaintiffs' suit over whether a bid was "conforming to WMATA's Invitation for Bids"? Could there be any doubt but that Plaintiffs would contest whether a bidder was "a qualified bidder," precisely what Plaintiffs contest in this case with respect to Akridge? Monument Realty in fact left no room for doubt, threatening litigation before WMATA even opened the bids. *See* Plaintiffs' August 24, 2007 letter to WMATA's General Manager, Exhibit K to the Complaint (emphasis added):

> We are at a crossroads for the project. One road leads to continued joint efforts, more groundbreakings, and a successful outcome for all parties. *The other road leads to dispute, expense, frustration, and most likely, litigation. In candor, I must advise you that we have consulted separate litigation counsel so that we are prepared for that eventuality.*

The wording of this alternate bid was uncertain, foreboding and, likely, crafted to assure Plaintiffs the litigation option.

In sum, on the face of the Complaint WMATA acted well within the law and its discretion in excluding the alternate bid, as matters of both law and fact. Accordingly, the Court should dismiss Counts One, Two, Three, Four, Five, Six and Seven to the extent that they depend on or include the bid process and Counts Eight, Nine, Ten, Eleven and Twelve in their entirety.

### II. Counts Eight And Nine Must Be Dismissed For Failure To State A Claim Upon Which Relief Can Be Granted Because The Compact Does Not Require WMATA To Issue Policies And Procedures For This Sale

In Counts Eight and Nine, Plaintiffs seek relief on the ground that WMATA failed to adopt policies and procedures under Section 73(g) of the Compact and failed to follow adopted policies and procedures. These Counts fail to state claims, however, because Section 73(g) does not require policies and procedures for the sale of WMATA's surplus property, and in any event, the sealed bid procedure that WMATA employed satisfies Section 73 and general principles of sales of property by government agencies.

**1. There Is No Requirement That WMATA Issue Policies And Procedures When Selling Surplus Property**

Section 73 provides in pertinent part as follows (emphasis added):

(a)(1) except as provided in subsections (b), (c), and (f) of this section, and except in the case of procurement procedures otherwise expressly authorized by statute, the Authority *in conducting a procurement of property, services, or construction* shall:

(A) obtain full and open competition through the use of competitive procedures in accordance with the requirements of this section; and

(B) use the competitive procedures or combination of competitive procedures that is best suited under the circumstances *of the procurement.*

Section 73 is clear in its application: it applies to "a procurement of property, services, or construction." The Compact does not define "procurement." Following federal procurement cases,[18] this Court limits the word "procurement" to its "natural meaning," which does not include a sale. *See Corel Corp. v. U.S.*, 165 F. Supp. 2d 12, 24 (D.D.C. 2001) (holding that procurement necessarily involves an agency purchase of goods) (citations omitted):

[C]ourts within this Circuit and elsewhere have accorded the term its natural meaning - "the process by which the government pays money or confers other benefits in order to obtain goods and services from the private sector."

*See also Black's Law Dictionary* (8th ed. 2004) (procurement is "the act of getting or obtaining something").

The only section of the Compact that speaks to WMATA's selling property is Section 12(d). That section empowers WMATA to:

(d) Construct, acquire, own, operate, maintain, control, sell and convey real and personal property and any interest therein by contract, purchase, condemnation, lease, license, mortgage or otherwise but all of said property shall be located in the Zone and shall be necessary or useful in rendering transit service or in activities incidental thereto.

---

[18] This Court generally applies federal procurement law to WMATA. *See, e.g., China Trade Center, L.L.C. v. WMATA*, 34 F. Supp. 2d 67, 70 (D.D.C. 1999); *Birnberg v. WMATA*, 389 F. Supp. 340, 343 (D.D.C. 1975).

In contrast to procurement situations, the Compact does not make any reference to policies and procedures, necessary or advisable, for WMATA's sale of property.

Because this is a sale of the Bus Garage Property – because WMATA is not paying any money to obtain goods and services but rather is selling and receiving money – this transaction falls outside the literal reach and mandate of Section 73(g). Accordingly, Plaintiffs' claims that WMATA's alleged failure to adopt and to follow policies and procedures under Section 73 fail to state a claim upon which relief can be granted.

Other reasons grounded in agency law support WMATA.  First, as a general proposition of law, "Administrative rule making does not ordinarily comprehend any rights in private parties to compel an agency to institute such proceedings or promulgate rules." *Rhode Island Television Corp. v. Fed. Comm. Comm'n.*, 320 F.2d 762, 766 (D.C. Cir. 1963). Second, even if a statute contemplates rulemaking, rulemaking is not always a necessity. The circumstances dictate necessity, and even there the agencies enjoy discretion. *See SEC v. Chenery Corp.*, 332 U.S. 194, 203 (1947) (citations omitted). Third, even where, after surmounting these first two hurdles, an agency is required to promulgate rules or regulations, the agency will enjoy great deference in crafting a reasonable level of regulation when the statute does not make clear what the necessary level of specificity is. *See American Trucking Ass'n. v. Dep't. of Transp.*, 166 F.3d 374, 379-380 (D.C. Cir. 1999); *New Mexico v. EPA*, 114 F.3d 290, 294 (D.C. Cir. 1997). IFB 08-1 and the sealed bid approach contained ample specificity about the procedure.  No bidder raised any question or made any inquiry under § D. 5. that invited requests for additional information.  Also, IFB 08-1 and use of sealed bids were consistent with, and effected, the notice and competition requirements found in the WMATA Compact and well established general principles of competition in government contracting.  It is difficult to fathom what further specificity MRB 7 needed or may contend was necessary, except to

contradict the long-standing law against the escalator bid and against bids that are not self-contained.

### 2. The Sealed Bid Procedure Used By WMATA Satisfies The Compact's Requirement That WMATA Use Competitive Procedures

As the Complaint sets out in paragraphs 65-80 and its Exhibit H, part of IFB 08-1, WMATA employed a straight-forward, competitive, sealed bid process to select the high bidder as the purchaser. WMATA's process met the principles and dictates of competition in Section 73(a) of the Compact, providing as follows:

(a)(1) Except as provided in subsections (b), (c), and (f) of this section and except in the case of procurement procedures otherwise expressly authorized by statute, the Authority in conducting a procurement of property, services or construction shall:

(A) obtain full and open competition through the use of competitive procedures in accordance with the requirements of this Section; and

(B) use the competitive procedure or combination of competitive procedures that is best suited under the circumstances of the procurement.

****

(2) In determining the competitive procedure or combination of competitive procedures that is best suited under the circumstances, the Authority shall:

(A) solicit sealed bids ...

****

(e) If the Authority uses procedures other than competitive procedures to procure property, services, or construction under subsection (c)(2) of this section, the Authority shall request offers from as many potential sources as is practicable under the circumstances.

Furthermore, Plaintiffs are shedding crocodile tears. Plaintiffs claim that (i) WMATA lacked policies and procedures, (ii) Plaintiffs did not know what to do and (iii) evidently Plaintiffs are shocked and dismayed by a procedure that (a) advertises for sealed bids and (b) awards the sale to the highest bidder. But MRB 7 participated freely, neither Plaintiff availed

itself of the IFB's invitation to make inquiries if they had any uncertainty and neither Plaintiff

timely protested the content of IFB 08-1. *See Blue & Gold Fleet, L.P. v. U.S.*, 492 F.3d 1308,

1313-14 (Fed. Cir. 2007) (holding, the waiver rule requires that a party object to solicitation

terms during the bidding process).

### III. Count Nine Must Be Dismissed For The Additional Reasons That Plaintiffs Lack Standing To Sue For Alleged Nonconformity With WMATA's Procurement Procedures Manual And That The Sections On Which Plaintiffs Rely Do Not Apply

### 1. Plaintiffs Lack Standing To Sue For Alleged Nonconformity With WMATA's Procurement Procedures Manual

Plaintiffs lack standing to sue on the Procurement Procedures Manual ("PPM") for the

following reasons.

**First**. The PPM is an internal procedures manual that WMATA created under the

authority of Section 73 of the Compact. The PPM is *not* a statute. Prudential standing

requires that Plaintiffs' Complaint be within the zone of interests to be protected or regulated

by *statute. See Courtney v. Smith*, 297 F.3d 455, 462-463 (6th Cir. 2002); *Amer. Fed. of Gov't*

*Employees v. Babbitt*, 46 Fed. Appx. 254, 257, 2002 WL 2027228 at *2 (6th Cir. 2002).

**Second**. For the same reasons as set forth in Argument Point I.4. above, Monument

Realty has no standing to disturb the award to Akridge or to seek damages based on WMATA's

alleged noncompliance with the PPM. Monument Realty was not an actual or frustrated

prospective bidder and nothing in the bid process procedures injured Monument Realty.

**Third**. MRB 7 likewise lacks standing. While MRB 7 was a bidder, the Complaint does

not allege that anything that WMATA allegedly did or did not do with respect to the PPM

caused MRB 7 any injury, and in fact MRB 7 suffered no injury arising out of the alleged

noncompliance with the PPM. Whether or not WMATA certified the Bus Garage Property for

disposition, whether or not WMATA's General Manager determined the Bus Garage Property

to be "excess" and whether or not WMATA's General Manager authorized disposition of the Bus Garage Property did not adversely affect MRB 7.

**Fourth**. MRB 7's alternate bid failed to meet the requirements of the solicitation. The escalator clause converted the bid into a "soft" bid, when the IFB mandated a firm bid, thereby breaking any chain of causation and depriving MRB 7 of standing. *See GBA Associates v. General Services Admin.*, 32 F.3d 898, 901 (4th Cir. 1994).

### 2. The Sections On Which Plaintiffs Rely Do Not Apply

In paragraphs 16-18, Plaintiffs set out allegations regarding the Joint Development Solicitation ("JDS") and WMATA's including the Bus Garage Property in the JDS. These paragraphs conclude, "Upon information and belief, WMATA also never formally removed the Property from Joint Development program." Compl. ¶ 18. Continued inclusion of the Bus Garage Property as Joint Development property removed it from the sections of the PPM on which Count Nine relies (and in part on which Count Ten relies). *See* PPM § 1503.2: "Section 1503 and the following subparagraphs thereof do not apply to the disposal of real property within a Joint Development area."

Accordingly, Plaintiffs have no standing to assert the claim in Count Nine, Count Nine fails to state a claim upon which relief can be granted, and the Court should dismiss Count Nine.

### IV. Counts Ten, Eleven And Twelve Must Be Dismissed For Failure To State A Claim Upon Which Relief Can Be Granted

Counts Ten, Eleven and Twelve seek to have the Court set aside WMATA's acceptance of the Akridge bid on three grounds: WMATA acted irrationally in concluding that the Akridge bid offered the highest return (Count Ten), WMATA acted illegally in accepting the Akridge bid because it was "conditionally submitted" (Count Eleven) and WMATA acted illegally in

accepting the Akridge bid because it offered terms other than as contained in IFB 08-1 (Count Twelve). None of these counts states a claim upon which relief can be granted.

**1. Count Ten Fails To State A Claim That WMATA's Selection Of The Akridge Bid Was Arbitrary, Capricious Or Unlawful Because, Allegedly, It Did Not Yield WMATA The Highest Return**

Plaintiffs' claim that WMATA's selection of the Akridge bid was arbitrary and capricious, based on the allegedly required application of the full 36-month leaseback, fails because the IFB provided that the "anticipated lease term … may, in WMATA's sole discretion be less than 36 months," and the attached form of Agreement of Lease defined the Term as terminable by WMATA at any time on 90-days' notice. Thus, the IFB by its plain, categorical terms gave WMATA the "sole discretion" to apply a leaseback period of less than 36 months and clearly informed all bidders that the leaseback period might be less than 36 months. Whatever leaseback period WMATA employed in evaluating the bids, so long as that period was 36 months or less and so long as WMATA applied that leaseback period uniformly to all bidders (Plaintiffs do not allege, as they cannot in good faith allege, that WMATA used a leaseback period greater than 36 months or that WMATA did not apply the period uniformly), WMATA acted well within the terms of the IFB and well within its discretion in determining that the Akridge bid offered the best and highest yield for WMATA. *See Tutor-Saliba Corp. supra,* 1995 WL 520765 at *6, quoted at 19 above. Accordingly, Count Ten fails to state a claim upon which relief can be granted.[19]

Additionally, this is not a case within the Administrative Procedure Act ("APA"), and Plaintiffs have no APA or APA-type standing to challenge WMATA's selection as arbitrary and

---

[19] If Plaintiffs are objecting to IFB 08-1's inclusion of WMATA's discretion to lessen and right to cancel the 36-month leaseback period, Plaintiffs are untimely and waived their right to sue over that inclusion. *See Blue & Gold Fleet, L.P., supra,* 492 F.3d at 1313-14 (holding, the waiver rule requires that a party object to solicitation terms during the bidding process).

capricious.  *See Tutor-Saliba Corp., Banknote Corp. of Am., Inc.* and *ABF Freight System, Inc.*,

all cited above, and scores of other decisions, pursuant to which WMATA had the sole and

expansive discretion to assess the bids and select the best one.

### 2. Count Eleven Fails To State A Claim That The Akridge Bid Allegedly Was Conditional

Based on a cover letter accompanying the Akridge bid from Akridge counsel Williams &

Connolly,[20] the Complaint alleges that the Akridge bid was a conditional bid that WMATA

could not consider.  A true reading of that letter, however, shows that the bid in fact was not

conditioned or conditional.  The letter stated only that the bid was "submitted" conditionally,

not that the terms of the bid itself were conditional.  The letter does not contain any term or

condition departing from or disputing the IFB terms and requirements.  The letter did not

purport to limit or in any way affect Akridge's bid price and did not purport to limit, reduce or

modify Akridge's obligation to perform in accordance with the IFB.  The Williams & Connolly

letter did not render the clear, firm, fixed-price bid nonresponsive.  *See Tutor-Saliba Corp,*

*supra,* 1995 WL 520765 at *8 (citations omitted):

> The practical test of responsiveness is whether the bid promises exactly what the
> government seeks to acquire as defined by the Solicitation.  More specifically,
> the test for evaluating the responsiveness of a bid is:
>
> > "[w]hether a bid as submitted represents an unequivocal offer to
> > provide the requested supplies or services at a firm, fixed price.
> > Unless something on the face of the bid either limits, reduces or
> > modifies the obligation of the prospective contractor to perform in
> > accordance with the terms of the invitation, the bid is
> > responsive."

Rather, the Williams & Connolly letter delivered two messages, each of virtually no

meaning or consequence, that (i) WMATA acted improperly in canceling the prior IFB 07-3 and

---

[20] The Complaint references the Williams & Connolly letter in Compl. ¶¶ 76, 209 & 213 and in Exh. J.  Pursuant to *Osseiran v. Int'l. Finance Corp., supra,* the letter is Exhibit 4 to this Memorandum.

returning the bids unopened, and (ii) WMATA could not consider the Akridge bid submitted in response to IFB 07-3 as an offer in response to IFB 08-1. Both items concerned the superseded and inconsequential IFB 07-3. Neither addressed IFB 08-1. These two items do not even amount to "conditions" (an unfortunate and, in government contract law, artless reference). In sum, nothing in either of these references impacted IFB 08-1, the IFB 08-1 process, the Akridge bid or WMATA's consideration of that bid. Count Eleven fails to state a claim and should be dismissed.

### 3. Count Twelve Fails To State A Claim That The Akridge Offer To Negotiate For A Temporary Site Allegedly Affected The Bid Or The Award

The Complaint also raises Akridge's offer to commence negotiations to provide WMATA a temporary site for locating assets presently at the Bus Garage Property as rendering WMATA's acceptance of that bid illegal. That is incorrect. That offer was an extraneous, irrelevant inclusion that (i) did not limit, reduce or modify any requirements of the IFB, (ii) had no effect on price, quantity, quality or delivery, (iii) did not impose any conditions on WMATA's evaluation or acceptance of Akridge's bid and (iv) did not limit Akridge's liability in the event of acceptance of the bid. In short, it did not modify or condition the IFB's material requirements, and WMATA was well within the law and its discretion in disregarding it. *See Tutor-Saliba Corp., supra,* 1995 WL 520765 at *6; *Interstate Construction, Inc.,* B-281465, Feb. 10, 1999, 99-1 CPD ¶ 31 ("If in its bid a bidder attempts to impose conditions that would modify material requirements of the invitation, limit its liability to the government, or limit rights of the government under any contract clause, then the bid must be rejected."); *Tel-Instrument Electronic Corp. v. U.S.,* 56 Fed. Cl. 174, 176 (2003) (defining material requirements as "those affecting price, quantity, quality, or delivery of the solicited products.").

Furthermore, the Complaint does not allege, as it could not allege in good faith, that WMATA considered this gratuitous offer or that the offer in any way affected WMATA's

ascertaining which of the three bids offered the highest price.  To the contrary, the Complaint alleges inferentially, and correctly, that WMATA did not consider Akridge's offer in the evaluation of its bid and determination of highest net return – which, after all, the Akridge bid did offer.  *See Tutor-Saliba Corp., supra,* 1995 WL 520765 at *6; *Toyo Menka Kaisha, Ltd. v. U.S.,* 597 F.2d 1371, 1375 (Ct. Cl. 1979) (citations omitted):

> Where a government contract is awarded under competitive bidding, 'deviations (from advertised specifications) may be waived by the contracting officer provided they do not go to the substance of the bid or work an injustice to other bidders.  A substantial deviation is defined as one which affects either the price, quantity, or quality of the article offered.'

More fundamentally, Count Twelve does not articulate a legal basis for the Count, and none -- no statute and no rule -- is readily discernible.  Merely labeling WMATA's conduct in conclusory fashion as "illegal and improper" does not satisfy Fed. R. Civ. P. 8(a) and certainly does not meet the Supreme Court's pleading threshold established in *Bell Atlantic Corp. v. Twombly, supra.*  For this reason also, the Court must dismiss Count Twelve.

### V. The Noncontract Claims Must Be Dismissed By Reason of WMATA's Sovereign Immunity

#### 1. Standard of Review Under Rule 12(b)(1)

On this Rule 12(b)(1) motion, Plaintiffs have the burden of persuasion.  *See Smith v. WMATA,* 290 F.3d 201, 205 (4th Cir. 2002) (citation omitted).

#### 2. WMATA's Sovereign Immunity

WMATA possesses sovereign immunity from suit for torts occurring in the performance of a governmental function.  *See Abdulwali, supra,* 315 F.3d at 304; D.C. Code Ann. § 9-1107.01(80).  WMATA's tort immunity initially turns on whether the challenged activity is "quintessentially governmental."  If so, the activity falls within WMATA's immunity. *Abdulwali, supra,* 315 F.3d at 304.

If the activity is not quintessentially governmental, the inquiry then becomes whether WMATA's actions were "discretionary," as opposed to ministerial. *Id.*; *see KiSKA Constr. Co.*, *supra*, 321 F.3d at 1158-59. To determine whether a WMATA action is discretionary, the Court must look to (i) whether a statute, regulation or policy specifically prescribes a course of action for the employee to follow and (ii) in the absence of a prescribed course of action, or if governing statutes or regulations leave room for the exercise of discretion, whether the exercise of discretion is grounded in social, economic or political goals. *See Abdulwali*, *supra*, 315 F.3d at 304; *KiSKA Constr. Co.*, *supra*, 321 F.3d at 1158-59. The "room for the exercise of discretion" is wide and includes:

> more than the initiation of programs and activities. It also includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations. Where there is room for policy judgment and decision there is discretion. . . . The core of the *Dalehite* idea is that WMATA should be immune . . . from judicial 'second guessing' via tort suits 'of legislative and administrative decisions grounded in social, economic and political policy.'

*Sanders v. WMATA*, 819 F.2d 1151, 1153-54 (D.C. Cir. 1987) (citation omitted). In *Souders v. WMATA*, 48 F.3d 546, 549 (D.C. Cir. 1995), this Circuit again cautioned against cabining WMATA's immunity:

> By insulating from liability, decisions involving the balancing of 'social, political, and economic factors' – whether under the WMATA Compact, the FTCA, or elsewhere – Congress presumably *did* intend to allow government to 'create' immunity by carefully considering a question in policy terms. It is true, as appellants argue, that such immunity could have substantial and even on occasion undesirable impact if those policies are ill-considered. But the hard fact remains that insulating policy determinations, good and bad, is the *raison d'etre* of the discretionary function exception.

> Plaintiffs' tort claims are barred as based on quintessentially governmental action, or if not quintessentially governmental, then barred as based on discretionary action.

**3. This Court Does Not Have Subject Matter Jurisdiction Over Claims Relating to the Creation and Content of the IFB and the Compact By Reason of WMATA's Sovereign Immunity**

Plaintiffs seek relief, articulated particularly in Counts Eight and Nine but woven throughout other counts as well, based on (i) WMATA's alleged breach of the Compact by failing to formulate policies, procedures, rules and regulations governing the disposition of real property[21] and (ii) ambiguity in the IFB over the propriety and acceptance of alternate bids (as to the latter, *see* Point I. 6. above).   These claims, however, come within WMATA's sovereign immunity and are outside this Court's subject matter jurisdiction.

These Counts challenge a sovereign's determination of if, how and when to issue policies and procedures.   Only governments and government bodies issue the kind of policies, procedures and regulations that are the subject of Counts Eight and Nine, and when governments do so, they act pursuant to statutory allowances, not pursuant to rules of the proprietary marketplace.

Even if not quintessentially governmental, however, WMATA's actions with respect to if, how and when to issue policies and procedures are discretionary and within WMATA's immunity, thus barring Counts Eight and Nine.   *See KiSKA Constr. Co., supra*, 321 F.3d at 1159-1162 (holding, the contents of WMATA's bid packages and the decisions in a procurement as to what is desired as matters of social, economic or political policies are discretionary determinations protected by the sovereign immunity).   Accordingly, the Court must dismiss for lack of subject matter jurisdiction all claims emanating from or premised on acts and omissions of WMATA with respect to the IFBs and the Compact and the social, economic and political choices within and pursuant to the IFBs and the Compact.

---

[21] WMATA assumes for purposes of this argument only, but does not concede, that Plaintiffs would have standing to assert such a claim.   WMATA believes that its sovereign immunity disposes of the claim.

**4. This Court Does Not Have Subject Matter Jurisdiction Over Any Fraud, Breach of Fiduciary Duty Or Other Tort Claims By Reason of WMATA's Sovereign Immunity**

Under *Abdulwali, supra*, 315 F.3d at 304 and *KiSKA Constr. Co., supra*, 321 F.3d at 1158-59, the conduct of which Plaintiffs complain is "quintessentially governmental" and therefore protected from suit by WMATA's sovereign immunity. One need look no further than the Complaint to establish this.

### A. The Decisions At Issue Here Are Quintessentially Governmental

The Complaint's entire context is governmental, not proprietary. Congress approved the Compact "to deal with growing traffic problems in the Washington area" and made WMATA "[r]esponsible for creating a coordinated transportation system for the region." *Beebe v. WMATA*, 129 F.3d 1283, 1285 (D.C. Cir. 1997). Like police and firefighters, public transportation serves essential governmental interests, here providing the necessary mobility for all the area's citizenry and dealing with major "problems in the Washington area" impacting, in one way or another, the lives of virtually every resident, business and government agency. In fact, leaving the police and firefighters aside, the "coordinated transportation system for the region" is as comprehensive, integral and necessary a governmental service as any.

At issue here is an important element of this public transportation service, the consummation of WMATA's longstanding goal of relocating a bus garage from a cramped, outdated facility off South Capitol street to a state of the art facility in a less congested part of the District of Columbia. WMATA determined that it would be able to achieve this goal once the District of Columbia identified another property where WMATA could locate the new, expanded garage. An essential element of this plan was the decision to sell the existing property and to use the proceeds from the sale to fund the construction of the new facility.

WMATA's basic mandate, as the Compact explicitly spells out, is "to plan, develop, finance and cause to be operated improved transit facilities." Compact, Section 2. Carrying

out this mandate is the essence of a governmental function. The decision to relocate, and all of the subsidiary decisions involved in achieving that goal, including the decisions regarding publication of the offering and use of sealed bid procedures in connection with the sale, are all barred from review because of the governmental nature of the activity at issue. Thus, for example, this Court is foreclosed from reviewing the decision to solicit bids under a sealed bid process because such review would undermine WMATA's ability to carry out its basic mission under the Compact of constructing improved transit facilities. Creating improved transit facilities to benefit large segments of the population of this region is the *raison d'etre* of WMATA. The Compact granted WMATA sovereign immunity to assure its ability to achieve this mandate.

### B. In the Alternative, WMATA Is Immune Because the Decisions At Issue Here Involve Discretionary Matters

The touchstone of the discretionary function exception is the existence of policy decisions that may be analyzed in terms of social, economic, or political considerations. It is the nature of the conduct, rather than the status of the actor, that governs whether the exception applies. *See United States v. Gaubert*, 499 U.S. 315, 322 (1991). A discretionary function is one that involves choice or judgment; it is not necessary that it involve planning or policy-making functions. *Id.* at 325. In assessing the "discretionary" nature of the decision, the analysis does not focus on what the decision-maker in a particular case was thinking, but rather on "whether the *type* of decision being challenged" implicates policy judgments. *See Cope v. Scott*, 45 F.3d 445, 449 (D.C. Cir. 1995).

The cases are legion in which the federal courts have applied the discretionary function doctrine to hold WMATA immune from common law claims. Most recently, in *Beebe, supra*, this Circuit applied WMATA's sovereign immunity bar to tort claims, including misrepresentation and fraud, for decisions involving the reorganization of WMATA's

procurement office. In *Souders, supra,* WMATA's immunity barred nuisance claims involving vibrations and noise from passing Metrorail trains. In *Dant v. District of Columbia,* 829 F.2d 69 (D.C. Cir. 1987), claims involving negligent design of the fare card system were barred. In *Sanders, supra,* WMATA's immunity barred constitutional claims involving drug testing of employees. In *Smith, supra,* the Fourth Circuit relied heavily on D.C. Circuit law and remanded a partial denial of immunity in regard to claims arising out of the death of a patron who climbed the stairs at the Bethesda station. The court held that WMATA's decision not to reassemble, for rush-hour use, an escalator that was out of service, was an immunized governmental decision. 290 F.3d at 209.

The actions and decisions at issue here fall well within the definition of discretionary. The determinations of where, when and how to relocate the bus garage and what to do with the old garage are economic for sure, requiring consideration of, for example, the cost of acquiring a new site, the costs of relocation, the costs of changes in the transportation system to accommodate the move and maximizing the return on the old property.

The determinations of where, when and how to relocate and what to do with the existing garage are also deeply discretionary decisions based on social and political considerations, for example: (i) assessing and reaching decisions on the interests and concerns of the residents and businesses in the areas under consideration for the new location; (ii) assessing and reaching decisions on the political consequences both within and among the three jurisdictions comprising WMATA; (iii) assessing and reaching decisions on the best and the preferred method for WMATA to go about disposing of the old garage site; (iv) assessing and reaching decisions on the best form of the disposition transaction; (v) assessing and reaching decisions on WMATA's needs in anticipation of and during the move; and (vi) assessing and reaching decisions on the terms and conditions of any disposition of the old site.

In sum, a decision such as this one, involving the integrated disposition and relocation of a major transportation system facility, with all necessary planning, coordination and design of the transportation system, and with all the ramifications on the communities, the transportation schedules, and the costs and the requirements of maintaining a smoothly operating public transportation system, invokes prototypical social, economic and political policies and considerations. The decision enjoys the protection of WMATA's sovereign immunity. *See McKethean v. WMATA*, 588 A.2d 708, 713-14 (D.C. 1991) (footnote and citations omitted):

> [W]e hold that the design and planning of a transportation system are governmental activities because they involve quasi-legislative policy decisions which are discretionary in nature ... A decision to relocate or not to relocate the bus stop after 1967 would involve safety planning, not implementation or operation of a safety plan.

*See also Warren v. WMATA*, 880 F. Supp. 14, 16-17 (D.D.C. 1995); *Nathan v. WMATA*, 653 F. Supp. 247, 249 (D.D.C. 1986); *Urow v. District of Columbia*, 316 F.2d 351, 352 (D.C. Cir. 1963); *Pavelka v. Carter*, 996 F.2d 645, 648 (4th Cir. 1993) (taking judicial notice "that public transportation in general, and thus the Ride-On bus service in particular, benefits the public health and welfare in a variety of well established ways ... there is no doubt that municipal bus service qualifies for [governmental immunity]").

Furthermore, as a practical matter these considerations and decisions are best left to WMATA. WMATA alone has the political base to make these difficult determinations. Private parties should not be given the prerogative to dictate, direct or preempt WMATA's statutory mandate to make these determinations or to sue if the private parties feel slighted by the result. That is the clear message of the cases. Accordingly, the Court must dismiss Counts Six and Seven in their entirety and dismiss all Counts to the extent they sound in tort.

**VI. The Complaint Fails To State And To Plead A Claim For Fraud Upon Which Relief Can Be Granted**

**1. The Complaint Fails To Plead All The Elements Of A Fraud Claim**

To survive a motion to dismiss, a fraud claim

> requires a showing that (1) the defendant made a false representation, (2) the representation was in reference to a material fact, (3) the defendant had knowledge of its falsity, (4) the defendant intended to deceive, (5) the plaintiffs acted in reliance on the misrepresentation, and (6) the reliance was reasonable.

*Meehan v. U.S. Office Products Co.*, 251 F. Supp. 2d 77, 100 (D.D.C. 2003) (footnote and citation omitted).  The Complaint lacks these necessary elements of a fraud claim.

Except for the bare legal conclusions that do not suffice, the Complaint fails to allege that WMATA made any false representation – indeed made any representation at all.  The Complaint fails to allege that the false representation, even were there one, was of a material fact.  The Complaint fails to allege that WMATA made any false representation of material fact with an intent to deceive either Plaintiff (that would be an impossible allegation with respect to MRB 7, with which WMATA had no dealings until the sealed bid process).  The Complaint arguably does allege that Monument Realty (only) acted in reliance, but in reliance on representations of the District and AWC, not in reliance on representations of WMATA.  Finally, the Complaint fails to allege that any such reliance by Monument Realty was reasonable.  Plaintiffs could not allege factually, as opposed to in bare conclusory terms, that any alleged reliance was reasonable because Monument Realty never dealt with the WMATA Board or even the WMATA General Manager, and Plaintiffs could not rely, as a matter of law, on the alleged silence and implicit acquiescence of WMATA employees.  *See* Argument Point I.2.B. above.

**2. The Complaint Fails To Plead Fraud With Particularity**

Fed. R. Civ. P. 9(b) requires Plaintiffs to plead the circumstances of fraud with

particularity:

> The "circumstances" that must be pleaded include the "time, place and content
> of the false misrepresentations, the fact misrepresented and what was retained
> or given up as a consequence of the fraud." ... "With respect to omissions, the
> plaintiff must plead the type of facts omitted, the type of document in which
> they should have appeared and the way in which their omission made the
> documents misleading."

*Hite v. Leeds Weld Equity Partners, IV, LP*, 429 F. Supp. 2d 110, 115 (D.D.C. 2006) (citations

omitted).  As briefed above, the Complaint does not identify the maker(s), if any, of any alleged

fraudulent statement, the time when or place where the unidentified person(s) made the

unspecified fraudulent statement, the form that the alleged fraudulent statement took or any

other circumstances particularizing the alleged fraud.  For this reason also, in addition to failing

to state a claim, the Court should dismiss Count Seven.

**VII. The Complaint Fails To State A Claim For Breach of Fiduciary Duty
Upon Which Relief Can Be Granted**

The requirements for stating a breach of fiduciary duty claim are as follows:

> [Plaintiffs] must allege that [WMATA] had a fiduciary duty to them and violated
> that duty. ... [Plaintiffs] also must allege facts from which proximate cause and
> injury may be inferred if they seek compensatory damages.

However, in assaying the sufficiency of a breach of fiduciary of duty claim against a

motion to dismiss for failure to state a claim upon which relief can be granted,

> Although the Court must treat [Plaintiffs'] factual assertions as true and draw all
> reasonable inferences therefrom in [Plaintiffs'] favor, "the court need not accept
> inferences drawn by [Plaintiffs'] if such inferences are unsupported by the facts
> set out in the complaint. Nor must the Court accept legal conclusions cast in
> the form of factual allegations."

*Shapiro, Lifschitz & Schram, P.C. v. Hazard*, 24 F. Supp. 2d 66, 75, 77-78 (D.D.C. 1998)

(footnote and citations omitted).

This Complaint fails to plead a claim for breach of fiduciary duty for several reasons. First, the Complaint does not plead the existence of any traditional fiduciary relationship, such as a trustee relationship, and none exists. Second, the Complaint does not plead any statutorily created fiduciary relationship, such as may exist under the federal securities laws, and none exists. Third, the Complaint does not plead factually – as opposed to bare legal conclusions – the existence of any other form of fiduciary relationship. Rather, the Complaint pleads an ordinary contractual relationship, an ordinary real property seller-buyer relationship and an ordinary property owner-developer relationship. These allegations do not suffice.

Furthermore, Plaintiffs cannot allege that WMATA had a fiduciary relationship with Plaintiffs as a matter of law. A fiduciary relationship is one in which the fiduciary "owes to his principal the duty to discharge with loyalty and good faith the trust imposed in him, to obey the instructions given to him by insured, and to exercise reasonable skill, care, and diligence in effecting the [instructions]." *Chao v. Day*, 436 F.3d 234, 238 (D.C. Cir. 2006). The fiduciary must "exclude from consideration his own advantages and the welfare of third parties." Bogert, *The Law of Trusts* § 95 (West 5th ed.). In order for there to be a fiduciary relationship here, WMATA must be held to contravene the Compact, to abandon the public interest and its public responsibilities and to act only in Plaintiffs' interests to the exclusion of all others. The notion that WMATA can and must do this is legally untenable.

## CONCLUSION

This matter is of extreme urgency and importance for WMATA and the public. Its resolution greatly impacts the public transportation system, WMATA's funding for the necessary relocation of the bus garage and access to the new stadium for Opening Day in April 2008. For the foregoing reasons, all Counts should be dismissed for failure to state a claim

upon which relief can be granted, and Counts Five, Six, Seven and Eight should be dismissed also on the ground of WMATA's sovereign immunity.

Accordingly, WMATA respectfully prays that the Court dismiss the Complaint in its entirety, without leave to amend, award WMATA its costs and expenses including legal fees and grant WMATA such other and further relief as is proper.

Respectfully submitted,

/s/ Donald A. Laffert
Carol B. O'Keeffe
General Counsel
Donald A. Laffert
Bruce P. Heppen
Associate General Counsel
Washington Metropolitan Area
Transit Authority
600 Fifth Street, N.W.
Washington, DC 20001
T: (202) 962-1499
F: (202) 962-2550
email: dlaffert@wmata.com
email: bheppen@wmata.com

     /s/ Harvey A. Levin
Harvey A. Levin (D.C. Bar No. 203869)
THOMPSON COBURN LLP
1909 K Street, N.W. Ste. 600
Washington, D.C.  20006-1167
T: (202) 585-6942 (direct)
F: (202) 508-1013 (direct)
email: hlevin@thompsoncoburn.com


Counsel for Washington Metropolitan Area
Transit Authority

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MONUMENT REALTY LLC, *et al.*,       )
                                     )
            *Plaintiffs*             )
                                     )
v.                                   )       Civil Action No. 1:07-CV-01821 (EGS)
                                     )
WASHINGTON METROPOLITAN AREA         )
TRANSIT AUTHORITY,                   )
                                     )
            *Defendant*              )
                                     )

**EXHIBIT 1**

**MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY'S
MOTION TO DISMISS FIRST AMENDED COMPLAINT**

# The Anacostia
## Waterfront Corporation

**FOR IMMEDIATE RELEASE:**
**MONDAY, DECEMBER 12, 2005**

**CONTACT:  DAVID HOWARD**
**(202) 468-0898**

### ANACOSTIA WATERFRONT CORPORATION ANNOUNCES DESIGNATED
### DEVELOPERS FOR BASEBALL DISTRICT DEVELOPMENT

(Washington DC) On Monday, December 12, 2005 the Anacostia Waterfront Corporation (AWC) announced the selection of designated developers for sites in the area surrounding the new Washington Nationals ballpark that will be built on the banks of the Anacostia River in southeast Washington DC. The team of Forest City Washington, Inc., Western Development Corporation, The Jarvis Company, The Jair Lynch Companies and MacFarlane Partners-DC and the team of Monument Realty, LLC, the Cordish Company, and Triden Development Group will both have the opportunity to enter into exclusive negotiations with AWC to develop different mixed-use projects on two publicly owned sites that AWC is presently seeking to acquire near the ballpark.

AWC released a Request for Expressions of Interest (RFEI) for mixed-use development in the area surrounding the new Washington Nationals ballpark on September 16, 2005. The RFEI was issued as an open invitation to qualified developers with experience in large scale mixed use, retail, sports-related and waterfront development. AWC received nine proposals from nationally recognized groups to develop the area into a one-of-a-kind mixed use residential, retail, and office district.

"These are great teams with strong local capacity and extensive retail and mixed-use development credentials," said Adrian Washington, AWC's new President and CEO. "This brings us one step closer to fulfilling AWC's mission of creating new waterfront districts that increase neighborhood amenities and create exciting new destinations at the river" Washington also noted.

The twelve-week selection process represents the first developer solicitation facilitated by the newly formed AWC, an independent instrumentality of the District Government "The ballpark and development program proposed by the development teams is expected to bring millions of people annually to the waterfront, generate new tax revenue, create thousands of permanent jobs and provide a range of affordable and market-rate housing—all helping to fulfill the promise of the Anacostia Waterfront Initiative and accelerate economic benefits for the entire city" said Stephen Goldsmith, AWC Board Chair.

"The development envisioned by the Anacostia Waterfront Corporation and the development teams will result in tens of millions of dollars in tax revenue to the District, said Mayor Anthony A. Williams. "This tax revenue is a direct result of building a ballpark in Southeast, and it will significantly benefit the entire city. I applaud the speed with which AWC designated this 'All Star

Page 2 of 2

Team' of developers who will participate in the waterfront district development. We need to keep up the pace set by the construction of the ballpark to ensure that the area supports new retail and entertainment venues and provides tax revenues that contribute to the Community Benefit Fund."

The two developer teams will work with AWC to create a comprehensive Development Strategy for the area over the next 90 days and negotiate exclusive rights agreements for the development of parcels to be acquired by AWC with the goal of Council approval by July, 2006.

*About the Anacostia Waterfront Corporation: The Anacostia Waterfront Corporation is an instrumentality of the Government of the District of Columbia charged with the development and revitalization of underutilized public lands along the Anacostia River and the advocacy and coordination of environmental and programming initiatives that promote river clean up and public awareness and enjoyment of the river. Further information about the Corporation and the Anacostia Waterfront Initiative framework plan can be found on our website (http://www.anacostiawaterfront.net). AWC is governed by a Board of Directors consisting of nine public citizens, two District of Columbia officials and four non-voting Federal Government ex-officio representatives.*

**XXX**



The
# Anacostia
Waterfront Corporation

## ANNOUNCEMENT OF DESIGNATED DEVELOPER
## FOR BASEBALL DISTRICT DEVELOPMENT

**December 12, 2005**
**1:00 p.m.**

**Earth Conservation Corps Pump House**
**1st and Potomac Avenue, S.E., Washington, D.C.**

### PRESS PACKET

- **Anacostia Waterfront Corporation Press Release – 12/12/2005**
- **Announcement Agenda**
- **Developer Team Members**
- **Frequently Asked Questions**
- **Ballpark District Urban Development Strategy – Draft Summary 9/23/2005**



# The Anacostia Waterfront Corporation

South Capitol Street Waterfront District
## ANNOUCNCEMENT OF DESIGNATED DEVELOPERS

December 12, 2005

## MR Cordish LLC

**Monument Realty LLC**
Michael J. Darby, Principal
Jeffery T. Neal, Principal
F. Russell Hines, Executive Vice President

**The Cordish Company**
David S. Cordish, Chairman
Jonathan Cordish, Vice president
Joseph Weinberg, Vice President

**Urban Asset Management, Inc.**
Zed Smith, Chief Executive Officer

**EastBanc, Inc.**
Anthony M. Lanier

**Triden Development, LLC**
Freddie Lewis Archer, President
Curtis Williams, Partner
Michael Jones, Partner
Cheryl Williams, Partner



# The Anacostia Waterfront Corporation

## South Capitol Street Waterfront District
## ANNOUCNCEMENT OF DESIGNATED DEVELOPERS

December 12, 2005

### Forest City Washington & Western Development Corporation

**Forest City Washington**
Deborah Ratner Salzburg, President
Thomas Henneberry, Chief Operating Officer

**Western Development Corporation**
Herbert S. Miller, Chairman
Bradford H. Dockser, Executive Vice President and Chief Operating Officer

**The Jair Lynch Companies**
Jair K. Lynch, President
Kevin A. Anderson, Chief Financial Officer

**The Jarvis Company**
N. William Jarvis, Chief Executive Officer
Ernest D. Jarvis, Chief Operating Officer

**KUD International LLC**
Thomas D. Winter, Senior Vice President

**MacFarlane Partners-DC**
Victor MacFarlane, Chief Executive Officer

The Anacostia Waterfront Corporation
1100 New Jersey Avenue S.E., Suite 700, Washington, D.C. 20003
202.724.3780 tel   202.724.4481 fax
www.anacostiawaterfront.net

# The Anacostia
### Waterfront Corporation

**South Capitol Street Waterfront District**
**PRESS ANNOUNCEMENT QUESTION AND ANSWER SHEET**
December 12, 2005

## GENERAL OVERVIEW

### 1. What is the vision for the South Capitol Street Waterfront District?

The Development Strategy leverages public lands and public investment with private resources to create a vibrant, mixed-use destination on the Anacostia River. Specific development objectives:

- Create an exciting urban destination on the Anacostia River;
- Create jobs;
- Help local, small and minority companies participate in commercial opportunities ancillary to baseball uses;
- Produce tax resources to fund community and neighborhood needs;
- Provide a unique and exceptional experience for visitors to the area;
- Create an accessible public realm along the river's edge;
- Promote public benefit, economic development and economic inclusion; and
- Achieve excellence in execution by aligning public and private stakeholders to support a common vision.
- Increase attendance to Washington Nationals games

### 2. What types of uses are envisioned?

The Washington Nationals ballpark will be an exciting new civic destination in the city, but should not be the only focus of this new waterfront district. The new South Capitol Street Waterfront district will include a mix of uses that create distinct precincts around the area of the ballpark to serve residents, workers and visitors. Half Street leading to the front door of the ballpark and First Street SE leading to the Anacostia River should serve as the primary entertainment and retail streets in the district. An animated waterfront should be the primary focus with the intersection at First and Potomac Streets generating a dynamic commercial and civic node at the river's edge.

3.  **What are the boundaries of the district?**

The district is defined for the purposes of the RFEI as the area generally bounded by **M street, South Capitol Street, the Anacostia River, and New Jersey Avenue.** These land parcels include the Florida Rock site; the Washington Water & Sewer Authority Campus; a portion of the Southeast Federal Center site; Washington Metro Area Transit Authority parcels; and several smaller privately held parcels.

4.  **What are the benefits of this development around the ballpark at South Capitol Street?**

Economic benefits:
  - $450 million in community benefits are being generated to build our libraries, parks and other District priorities.
  - The designated teams have estimated economic impact of **approximately $100 million in direct annual DC tax revenue** associated with the proposed development program.
  - The teams have also estimated up to **20,000 permanent District jobs** associated with development in the District, a substantial portion of which will be held by District residents.
  - The teams estimate **2,100-2,700 construction jobs** associated with the project.
  - The teams also project over **4,000 new DC residents** in the District.

Activation of the waterfront:
  - The ballpark and related development will bring millions of people annually to the waterfront—helping to fulfill the promise of the Anacostia Waterfront Initiative.
  - AWC received nine proposals from nationally recognized groups to develop the area around the ballpark into a one-of-a-kind mixed use residential, retail, and office district.

5.  **How was this vision developed?**

The AWC, in collaboration with OP, DDOT, WMATA, WASA, the DC Sports & Entertainment Commission ("DCSEC") and the Deputy Mayor for Planning & Economic Development ("DMPED") initiated a master planning effort for South Capitol Street and the new Ballpark Project site in March 2005. Recommendations have focused on the land use, regulatory, urban design and open space and vision and opportunities creating by the siting of the ballpark along South Capitol Street. The plan envisions a vibrant waterfront District, attracting residents and visitors throughout the year with a mix of retail, entertainment, residential and other commercial uses.

6.  **Does this vision contradict plans put forward by NCPC?**

AWC staff has participated on the NCPC South Capitol Street Task Force and over the last year has coordinated on all transportation and land-use recommendations.

7. **How has the community been involved in this process?**
Beginning in Spring 2005, AWC together with the Office of Planning and other DC agencies initiated a planning process for the creation of the South Capitol Street Waterfront District plan which included the following community planning sessions:

   - Community Information Open House, March 8
   - Community Planning Workshop, April 23
   - Community Planning Meeting, May 24

# RFEI PROCESS OVERVIEW

1. **What was the purpose of the RFEI?**

   The RFEI invited highly qualified developers with experience in large scale mixed use, retail, sports-related and waterfront development to submit for consideration for mixed-use development in the area surrounding the new Washington Nationals ballpark. The objective of the RFEI process is for AWC to identify one or more developers with whom to enter into exclusive negotiations to develop mixed-use projects within the District, on one or more sites that AWC is presently seeking to acquire.

2. **When was the RFEI issued?**

   The RFEI was published on the Anacostia Waterfront Corporation website September 16th. The RFEI was also noticed in the Washington Post, Washington Business Journal; DC Chamber of Commerce; DCBIA, African American Real Estate Professionals and Real Estate Executive Council websites. Responses were due October 21st. An addendum to the RFEI was issued November 4 to clarify LSDBE requirements.

3. **How many teams responded?**

   Nine teams responded to the RFEI including:
   - Akridge
   - The Cordish Company
   - DSG Capital Group
   - Forest City / Western Development
   - Franklin D. Haney
   - LNR Property Corporation
   - Monument Realty LLC
   - Trammell Crow Residential
   - Triden Development Group, LLC

4.  **What were the teams asked to address in their responses?**

Responses to this RFEI are required to describe the following:
- proposed land use(s), the proposed development team
- the team's experience in meeting similar development challenges
- response to the vision articulated in the Draft District Development Strategy Summary
- a financial framework for execution
- the team's commitment to LSDBE participation in contracting and development.

5.  **How were the proposals evaluated?  What criteria were used?**

Proposals were evaluated according to the following five criteria identified in the RFEI:

- Experience and Capability of the Development Team
- Financial Framework
- Commitment to LSDBE Participation
- Implementation Strategy, including willingness to commence pre-development activities
- Vision for the District

6.  **Who participated in the evaluation process?**

A five member Evaluation Panel was named by the Board  Chair and including the following personnel:

- Toni L. Griffin, Vice President, Anacostia Waterfront Corporation
- Uwe Brandes, Vice President, Anacostia Waterfront Corporation
- Claude Bailey, General Counsel, DC Sports & Entertainment Commission
- Konrad Schlater, Special Assistant to the Deputy Mayor for Planning & Economic Development
- Jerry Keyser, Chairman of the Board, Keyser Marston Associates, Life Council member, Urban Land Institute

7.  **What are developer teams being offered?**

The developer teams are being offered exclusive rights to negotiate with AWC for the disposition of public land that AWC will acquire within the District.   The teams are also being offered the opportunity to participate in the planning of a Development Strategy for the District, and to work with AWC to create the pedestrian-oriented retail plan that will link each area of the District together.

8. **What land does AWC have control over within the District?**

AWC currently has no control over lands within the District. The Mayor has assigned AWC with the task of acquiring the WMATA Navy Yard parcels (approximately 3 acres) and the excess land at the WASA O Street Pump Station Campus (approximately 6 acres). The teams selected will also provide services to AWC in discharging its responsibility to coordinate development in the area.

9. **Will action has/will the AWC board take?**

The AWC Board Chair established a subcommittee for the purposes of reviewing the recommendations of the Evaluation Panel. The subcommittee unanimously endorsed the final recommendation of the Panel. Each specific land disposition and/or exclusive rights agreement necessary to execute the disposition of lands for development will be brought to the Board at subsequent public board meetings for approval through Board resolution.

10. **What is the role of the Council of the District of Columbia in this process?**

AWC will submit an Exclusive Rights Agreement (ERA) to the Council of the District of Columbia for its approval. AWC will negotiate ERAs over the ensuing months with the designated developers.

# DESIGNATION DETAILS

1. **Who are the designated developers:**

AWC has designated two outstanding development teams to execute development of the South Capitol Street Waterfront District.
- **Forest City Washington Inc.** and **Western Development Corporation (Forest City/Western) team**
- **Monument Realty LLC** and **The Cordish Company (MR Cordish LLC) team**
This designation structure blends strong local leadership with substantial national experience in urban, mixed use development, often in conjunction with baseball stadiums.

2. **Who are their LSDBE and Minority developer partners?**

- **The Jarvis Company LLC, The Jair Lynch Companies,** and **MacFarlane Partners-DC** are the named LSDBE Partners for the Forest City/Western team.
- **Triden Development Group LLC** is the named LSDBE Partner for MR Cordish LLC.

3. **Why were the teams selected?**

The teams were selected based on existing qualifications and experience and on their proposals to AWC for development within the District. The teams that were selected demonstrated the greatest commitment to an appropriate vision for the District. The teams also demonstrated substantial capacity for implementation and willingness to conduct and fund predevelopment activities.

Both teams are committed to development of pedestrian retail as a unifying element of the District, and demonstrated a strong willingness to partner with AWC to achieve that goal. The teams that were selected are committed to LSDBE participation in equity, development, and hiring throughout the development process. Specifically, the Forest City/Western team and the MR Cordish LLC team possess the following key attributes:

- Substantial local and national public-private development experience
- Passionate commitment to AWC's vision for creation of dynamic waterfront and Baseball District
- Experience in DC speculative development
- Proven willingness to move quickly and aggressively
- Commitment to realizing visions
- Extensive track record of success in public private developments
- Principals have significant experience in development of professional sports venues and in mixed-use projects built in conjunction with Major League Baseball teams
- Extensive land holdings and experience in the District that will ensure timely development
- Unique ability to create a continuous waterfront experience

**4. What is the nature of the designation?**

AWC has designated two teams for development of the District. The teams will each take part in the process of formulating a Development Strategy, which will be led by AWC and coordinated by Forest City/Western. AWC will retain approval rights for each element of the Development Strategy. The teams' acceptance of the final Development Strategy will constitute an agreement to adhere to the Strategy on an ongoing basis for all development under their control within the District.

**5. Are specific parcels of land being awarded?**

The **Forest City/Western** team will be the party with whom the Corporation exclusively negotiates for the development rights for land that the Corporation will acquire from WASA.

The **MR Cordish LLC** team will be the party with whom the Corporation exclusively negotiates for the disposition of land that the Corporation will acquire from WMATA.

**6. What commitments have the developer teams made?**

The developer teams have each signed a Letter of Intent that includes the following commitments:

**Development Strategy**: Under AWC's direction, Forest City/Western will coordinate the creation of a Development Strategy for the District with the active participation of MR Cordish LLC.   Forest City/Western and The Cordish Company will be responsible for the retail portion of the Development Strategy under the direction of AWC.

**LSDBE Commitment:**   Both teams have committed to LSDBE participation in four specific areas: LSDBE equity participation of at least 20%; LSDBE contracting of at least 35% in all phases; Entrepreneurial opportunity goals of 35 %; First Source hiring of at least 51% and development of a local apprenticeship program.

**Financial Commitment:**  Both teams have committed to provide payment to the Corporation through a combination of up-front payment, annual base rent under long-term leases, and participation in development profits.

7.  **What timelines have been established?**

- ▪ The teams have committed to the completion of a Draft Development Strategy by March 15, 2005 and a final Development Strategy by April 15, 2005.

- ▪ The teams have committed to the negotiation of an ERA/LDA with the objective of completing such negotiations no later than April 15, 2006.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MONUMENT REALTY LLC, *et al.*,   )
                           )
      *Plaintiffs*        )
                           )
v.                         )      Civil Action No. 1:07-CV-01821 (EGS)
                           )
WASHINGTON METROPOLITAN AREA  )
TRANSIT AUTHORITY,         )
                           )
      *Defendant*       )
                           )

**EXHIBIT 2**

**MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY'S
MOTION TO DISMISS FIRST AMENDED COMPLAINT**

# SALE AND DEVELOPMENT AGREEMENT

### *BETWEEN*

# WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY

### *AS SELLER*

### *AND*

# MR BALLPARK 5 LLC

### *AS DEVELOPER AND PURCHASER*

# TABLE OF CONTENTS

Page

ARTICLE 1 DEFINED TERMS ................................................................................................. 1

ARTICLE 2 CONVEYANCE OF PROPERTY ...................................................................... 15
    2.1     Agreement to Sell. ...........................................................................................15
    2.2     Ballpark District Area. ....................................................................................15
    2.3     Station Upgrades. ...........................................................................................16

ARTICLE 3 PURCHASE PRICE AND DEPOSIT ................................................................. 19
    3.1     Purchase Price. ...............................................................................................19
    3.2     Deposit. ...........................................................................................................21

ARTICLE 4 RIGHT OF ENTRY AGREEMENT; TERMINATION RIGHT AND ENTRY
CONDITIONS AND LIMITATIONS ...................................................................................... 21
    4.1     Right of Entry. ................................................................................................21

ARTICLE 5 TITLE .................................................................................................................... 22
    5.1     Title Commitment. ..........................................................................................22
    5.2     Survey ..............................................................................................................22
    5.3     Intentionally Omitted. .....................................................................................22
    5.4     Intentionally Omitted. .....................................................................................22
    5.5     Condition of Title. ...........................................................................................22
    5.6     Notice and Cure. .............................................................................................23
    5.7     Developer's Termination Right. ......................................................................23
    5.8     Waiver. ............................................................................................................23
    5.9     Encumbrances Following Effective Date. ......................................................23
    5.10   Business Improvement District ("BID"). ......................................................23

ARTICLE 6 INTENTIONALLY DELETED ........................................................................... 24

ARTICLE 7 APPROVAL PERIOD .......................................................................................... 24
    7.1     Developer's Rights and Obligations to Pursue Approvals, Station Upgrade
            Approvals and Construction Approvals. .........................................................24
    7.2     Approvals, Station Upgrade Approvals and Construction Approvals Notice
            Requirements. . ................................................................................................24
    7.3     Inquiries and Applications. .............................................................................24
    7.4     As Built Drawings. .........................................................................................24
    7.5     Preparation, Submission and Approval of Development Plan. .......................25
    7.6     Approvals. .......................................................................................................27
    7.7     Developer's Obligations Applicable to Entire Property. ................................27
    7.8     Submission of Proposed Applications for Approvals, Station Approvals and
            Infrastructure Development ............................................................................27

ARTICLE 8 CLOSING ............................................................................................................. 28

8.1     Dates, Places Of Closing and Prorations .................................................28
8.2     Items to Be Delivered Prior to or at Closing. ......................................29
8.3     Financing. ...............................................................................................30

ARTICLE 9 REPRESENTATIONS, WARRANTIES AND COVENANTS OF WMATA
AND DEVELOPER; WMATA OBLIGATIONS PRIOR TO CLOSING............................ 32
9.1     Representations And Warranties of WMATA..........................................32
9.2     As Is, Where Is Terms. ..........................................................................33
9.3     WMATA Information. .............................................................................33
9.4     Title Information......................................................................................33
9.5     Information Concerning Zoning and Code Requirements. ....................33
9.6     Representations And Warranties Of Developer. ...................................34
9.7     Survival Period. .....................................................................................35
9.8     Intentionally Deleted...............................................................................35

ARTICLE 10 CONDITIONS PRECEDENT TO CLOSING.................................. 35
10.1    Developer's Conditions. .........................................................................35
10.2    WMATA's Conditions. ...........................................................................36
10.3    Failed Conditions. .................................................................................37

ARTICLE 11 INTENTIONALLY OMITTED ..................................................... 37

ARTICLE 12 TRANSIT ORIENTED DEVELOPMENT; FTA APPROVAL ..................... 37
12.1    Transit-Oriented Development. ..............................................................37
12.2    FTA Approval. ........................................................................................37

ARTICLE 13 ASSIGNMENT OF AGREEMENT.............................................. 38
13.1    Personal Services Contract. ..................................................................38
13.2    Assignment..............................................................................................38
13.3    Change of Control. .................................................................................38
13.4    Developer Affiliates. ..............................................................................38
13.5    Institutional Lender. ...............................................................................38

ARTICLE 14 BROKERAGE ........................................................................... 39

ARTICLE 15 DEFAULTS AND REMEDIES ..................................................... 39
15.1    WMATA's Default. .................................................................................39
15.2    Developer's Remedies. ..........................................................................40
15.3    Developer's Default. ..............................................................................40
15.4    WMATA's Remedies. .............................................................................40
15.5    Refund of Deposit...................................................................................41

ARTICLE 16 INTENTIONALLY DELETED ..................................................... 42

ARTICLE 17 INTENTIONALLY DELETED ..................................................... 42

ARTICLE 18 MISCELLANEOUS .................................................................... 42
18.1    Exhibits And Schedules. .......................................................................42

2

18.2    Binding Effect. ..........................................................................................42
18.3    Captions. ...................................................................................................42
18.4    Number And Gender Of Words. ...............................................................42
18.5    Notices. .....................................................................................................42
18.6    Governing Law And Venue. .....................................................................42
18.7    Entirety And Amendments. ......................................................................43
18.8    Severability. ..............................................................................................43
18.9    Multiple Counterparts. .............................................................................43
18.10   Further Acts. .............................................................................................43
18.11   Intentionally Deleted. ...............................................................................44
18.12   Intentionally Deleted. ...............................................................................44
18.13   Intentionally Deleted. ...............................................................................44
18.14   Sovereign Immunity; Anti-Deficiency Clause. .......................................44
18.15   Construction. ............................................................................................44
18.16   Time Of The Essence. ..............................................................................44
18.17   Cumulative Remedies And Waiver. .........................................................44
18.18   Disclaimer. ...............................................................................................44
18.19   Intentionally Omitted. ..............................................................................44
18.20   Use of WMATA Compact. .......................................................................44
18.21   Hazardous Materials. ...............................................................................44
18.22   Noise and Vibrations. ..............................................................................45
18.23   No Interference. ........................................................................................45
18.24   Acknowledgment of Tax Exempt Status. .................................................45
18.25   Officials Not To Benefit. ..........................................................................45
18.26   Gratuities. .................................................................................................45
18.27   Litigation Expenses. .................................................................................45
18.28   Time Periods. ............................................................................................46
18.29   Third Parties. ............................................................................................46
18.30   Ratification by WMATA's Board of Directors. ......................................46
18.31   Limitation of Liability. ............................................................................46
18.32   Survival. ...................................................................................................46
18.33   Soil Disclosure. ........................................................................................46
18.34   UST Disclosure. .......................................................................................47
18.35   General Interpretive Principles. ..............................................................47

**EXHIBITS**

Exhibit A    Project Schedule

# SALE AND DEVELOPMENT AGREEMENT

***THIS SALE AND DEVELOPMENT AGREEMENT*** (this "**Agreement**") is entered into as of December 1, 2006 (the "**Effective Date**") by and between **Washington Metropolitan Area Transit Authority**, a regional body, corporate and politic, organized pursuant to Public Law 89-774, 80 Stat. 1324; Maryland Acts of General Assembly, Chapter 869-1965; Virginia Acts of Assembly, Chapter 2-1966; and Resolution of D.C. Board of Commissioners adopted November 15, 1966, having a principal business address at 600 Fifth Street, NW, Washington, DC 20001 ("**WMATA**"), and **MR Ballpark 5 LLC**, a Delaware limited liability company having a principal office at c/o Monument Realty LLC, 1155 Connecticut Avenue, N.W., Washington, DC 20036 ("**Developer**"). Capitalized terms used herein shall have the meanings set forth in Article 1, unless otherwise specifically set forth herein.

## RECITALS

R-1. WMATA owns the Property.

R-2. Developer owns the Developer's Property, which Developer's Property is located adjacent to the Property.

R-3. WMATA and Developer, intending to be bound by this Agreement, desire to set forth herein the terms, conditions and agreements under and by which WMATA shall sell to Developer, and Developer shall purchase from WMATA, the Property.

R-4. In the event Developer successfully acquires the Property pursuant to this Agreement, Developer intends to combine the Property with the Developer's Property; to cause the construction on the Property and a portion of the Developer's Property of a mixed-use development containing retail space, office space and parking facilities (the "**Project**"); to coordinate construction of the Project with the construction of the Station Upgrades; and to cause the Adjacent Property to be encumbered by the Affordable Housing Covenant. The Project and Station Upgrades, and the design and construction costs related thereto, and the Affordable Housing Covenant shall be further described and defined below.

R-5. In consideration, in part, of WMATA's sale of the Property to Developer, Developer has agreed to (i) cause to construct and provide the Interim Parking Lot for use by WMATA, and (ii) coordinate the construction of the Station Upgrades on a portion of the Property, all upon terms and conditions set forth in this Agreement.

**NOW, THEREFORE**, in consideration of the agreements, terms, covenants, and conditions hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, WMATA and Developer hereby agree as follows:

## ARTICLE 1
## DEFINED TERMS

"**Accommodation Fee**" is defined in Section 2.3.3.

1

"**Actual Knowledge**" means the actual (and not the constructive) knowledge of a party's Designated Representative.

"**Additional Improvements**" is defined in Section 2.2.

"**Adjacent Construction Manual**" means WMATA's Adjacent Construction Design Manual (Rev. 1) (1989), or such other revision thereof as shall be in effect at the time that Developer or its Affiliates engage in work on the Project.

"**Adjacent Project**" means that certain mixed-use development to be constructed and operated upon the Adjacent Property and a portion of the Developer's Property, which mixed-use development shall contain retail space, hotel space, residential space and parking facilities.

"**Adjacent Property**" means those tracts or parcels of land owned or controlled by an Affiliate of Developer located in the southeast quadrant of the District of Columbia, specifically Lots 3, 98 through 105 inclusive, 144, 145, 167 and 815, all in Square 701.

"**Affiliate**" means any Person (hereinafter defined) in Control of or under common Control with any other Person.

"**Affordable Housing Covenant**" means an agreement requiring the Developer and any Affiliate of Developer owning the Adjacent Property to provide affordable housing as part of the improvements to be built on the Adjacent Property, in form and substance reasonably acceptable to Developer and WMATA.

"**Agreement**" means this certain Sale and Development Agreement by and between WMATA and Developer.

"**ALTA**" means the American Land Title Association.

"**Alley Easement Agreement**" means that certain Easement Agreement to be executed by WMATA and MR Ballpark 3 LLC, an Affiliate of Developer, in form and substance reasonably acceptable to Developer and WMATA.

"**Approvals**" means all variances, special exceptions, alley closings, special use permits, platting or replatting approvals, and subdivision and/or consolidation approvals necessary for the development of the Project on the Property and, to the extent applicable, the Developer's Property in conformity with the terms of the Approved Development Plan, including any approvals related to any below-grade improvements on the Adjacent Property necessary to construct the Project on the Project Site, but excluding the Station Upgrade Approvals.

"**Approvals Achievement Date**" means the date on which all Approvals and Station Upgrade Approvals required for the development of the Project and the Station Upgrades on the Property and, to the extent applicable, the Developer's Property and Adjacent Property have been obtained. Approvals and Station Upgrade Approvals shall be deemed to have been obtained for the Project and the Station Upgrades at such time as: (i) a record plat has been approved by all governmental and/or quasi-governmental authorities whose approval is legally required; and (ii) all appeal periods have elapsed or been waived.

**"Approved Design and Construction Documents"** means those certain Design and Construction Documents, as finally approved, in part, by WMATA.

**"Approved Development Plan"** means that certain Proposed Development Plan, requiring approval, in part, by WMATA, as more particularly described in Section 7.5, below.

**"Ballpark"** means that certain baseball stadium being constructed as of the Effective Date hereof for the Washington Nationals Major League Baseball Team.

**"Ballpark District"** has the meaning set forth in Section 2.2, below.

**"Ballpark District Guidelines"** has the meaning set forth in Section 2.2, below.

**"Business Day"** means any day other than a Saturday, Sunday or Legal Holiday.

**"Business Improvement District" "BID"** has the meaning set forth in Section 5.10, below.

**"Calculation"** is defined in Section 3.1.

**"Change of Control"** means any and all of the following, whether effected in a single transaction or a series of related transactions:

    (a)    The direct or indirect sale or transfer of a majority of or controlling interest in the membership, partnership or other ownership interests in a Person (individually or in the aggregate); or

    (b)    Any other event that results in a transfer of Control of a Person;

**"Closing"** means the consummation of the purchase and sale of the Property contemplated by this Agreement evidenced by delivery of the Deed, in accordance with the terms and provisions of this Agreement.

**"Closing Date"** has the meaning set forth in Section 8.1.1, below.

**"Commercially Reasonable Best Efforts"** means the diligent and timely satisfaction of the following: (i) undertaking all actions (including payment and performance obligations) that would usually and customarily be undertaken or performed by a diligent and experienced real estate owner, developer and construction manager in performance of the Transaction Documents; (ii) undertaking such additional commercially reasonable actions as are appropriate in the context of unanticipated or unusual events, circumstances or obstacles to lawfully achieve the Developer Responsibilities; (iii) as necessary to meet the Project Schedule and, where possible, applying for and obtaining Approvals necessary for the Station Upgrades, Station Upgrade Approvals and Construction Approvals required for the Station Upgrades before those for the remainder of the Project.

**"Condemnation Proceeds"** is defined in Section 17.3.

3

"**Construction Agreement**" means the Design/Build and Construction Coordination Agreement in form and substance reasonably acceptable to WMATA, Developer and General Contractor to be entered into between Developer, WMATA and General Contractor with respect to the construction of the Station Upgrades; pursuant to which Developer shall coordinate the work of the General Contractor in the design and construction of the Station Upgrades with the design and construction of the Project.

"**Construction Approvals**" means any and all governmental and quasi-governmental approvals and permits (excluding the Approvals and the Station Upgrade Approvals) required to start and finish construction of the Project and the Station Upgrades, including any engineering permits and/or building permits related to the Project and/or the Station Upgrades and any approvals and/or permits related to any below-grade improvements on the Property, the Developer Property and/or the Adjacent Property necessary to construct the Project.

"**Consultants**" means all agents, consultants, contractors, engineers, surveyors, attorneys and employees retained by Developer for, or in connection with, this Agreement.

"**Contractor Delay**" means any delay by the General Contractor of its obligations under the Construction Agreement, not otherwise excused by Force Majeure, WMATA Delay or Municipal Delay, arising from unforeseeable causes beyond the control and without the fault or negligence of the Developer and/or General Contractor and not related to Developer's and/or General Contractor's financial incapacity. There shall not be a Contractor Delay if the General Contractor's performance under the Construction Agreement is delayed by Developer, including Developer's responsibilities with respect to Precursor Activities (as defined in the Construction Agreement). Notwithstanding the foregoing, any of the aforementioned occurrences shall not be construed to be a Contractor Delay unless such occurrences (i) actually and demonstrably affect the critical path identified in the Project Schedule, and (ii) Developer and/or General Contractor delivers written notice of such occurrence to WMATA within five (5) Business Days of the date of Developer's and/or General Contractor's Actual Knowledge of the commencement of such occurrence stating the nature of the occurrence and its anticipated effect on the critical path. In the event of a Contractor Delay, the Person affected thereby shall be entitled to an increase in the time for performance equal to the number of days, or portions thereof, that completion of the activity beyond the dates established in this Agreement is actually delayed by such Contractor Delay.

"**Control**" means the power of a Person, directly or indirectly, to direct or cause the direction of the disposition of property, management and policies of another Person, whether through ownership of voting securities, by contract or otherwise.

"**CCR**" means those written covenants, conditions and restrictions to be recorded in the Land Records of the District (the "**Land Records**") at Closing which shall (i) protect WMATA's interests in, and operations at, the Property, including use of, and access to, WMATA's Reserved Areas and the Metro Station; (ii) protect Developer's interests in, and operations at, the Property; (iii) provide for mutually-agreeable access rights for both Developer and WMATA over Developer's Property and the Property, as applicable; (iv) define the obligations, including any cost and maintenance obligations, of Developer and WMATA to maintain the Project, the Metro Station and the Station Upgrades, including any structural components of the Project and the

4

Station Upgrades; (v) incorporate any requirements imposed by the District; and (vi) provide such other rights and duties as the parties shall deem reasonable and necessary.

"**Deed**" means that certain special warranty deed conveying title to the Property from WMATA to Developer, the form of which shall be mutually agreed to by the parties hereto.

"**Default**" means either party's failure to perform any material agreement or covenant of this Agreement, as more particularly described in Article 15, below.

"**Deposit**" means that certain $250,000 cash deposit required to be posted by Developer pursuant to Section 3.2, below.

"**Design and Construction Documents**" means, in connection with the Project, the following: (i) any and all design documents included in the "schematic design phase," (ii) any and all design documents required to be completed in connection with the issuance of any Approvals and Station Upgrade Approvals, (iii) any and all design documents included in the "design development phase," and (iv) any and all design documents included in the "construction documents phase" in order to obtain the Construction Approvals.

"**Designated Representative**" means, with respect to WMATA, its Managing Director of Property Development and Management and Mr. John Thomas and, with respect to Developer, means Mr. Bill Krokowski, Ms. Amy Phillips and the Development Manager or such other representative(s) as may be designated by either party in writing to all other parties.

"**Developer**" means the Developer identified in the first paragraph of this Agreement.

"**Developer Affiliate**" is defined in Section 13.4.

"**Developer Responsibilities**" means any and all obligations and requirements required or reasonably contemplated to be performed by Developer under this Agreement, including the Construction Agreement, the CCR and the Affordable Housing Covenant.

"**Developer's Property**" means those tracts or parcels of land owned or controlled by Developer located in the southeast quadrant of the District of Columbia, specifically Lots 106, 146, 147, 161 and 824, all in Square 701.

"**Development Manager**" means that individual either employed by Developer acting as, or contracted by Developer as Developer's authorized agent to act as, the "Development Manager" of the Project, including coordination of the construction of the Project with the construction of the Station Upgrades, as shall be designated by Developer in writing to WMATA on or before the Excavation Commencement Date.

"**Development Plan**" means that certain detailed plan for the development and construction of the Project, including the Station Upgrades, prepared by Developer.

"**Development Plan Approval Date**" means the date, if any, on which WMATA gives Developer Notice that it has approved the Development Plan.

5

"**District**" means the District of Columbia.

"**Effective Date**" means December 1, 2006, provided that this Agreement is executed by both parties as of such date.

"**EPI Deposit**" is defined in Section 3.1.

"**Equity Investor**" is defined in Section 13.4.

"**Excavation Commencement Date**" means the date upon which all necessary permits for excavation, sheeting and shoring activities at the Project Site and the Adjacent Property in connection with the construction of the Project and the Station Upgrades have been obtained, and such excavation, sheeting and shoring activities at the Project Site and the Adjacent Property has commenced.

"**Existing Improvements**" means all WMATA Facilities existing on the Property as of the Effective Date.

"**Extraordinary Project Items**" is defined in Section 3.1.

"**Final Completion Date**" means the date established in the Project Schedule for Final Completion of the Project.

"**First Calculation**" is defined in Section 3.1.

"**Force Majeure**" means a delay to the performance of any construction obligation hereunder, excluding any Contractor Delay, Municipal Delay, WMATA Delay or any Default by WMATA, arising from unforeseeable causes beyond the control and without the fault or negligence of either party, their respective contractors or subcontractors and not related to financial incapacity, including acts of God, acts of the public enemy, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, and unusually severe weather, which occurrences delay or prevent performance. Notwithstanding the foregoing, any of the aforementioned occurrences shall not be construed to be a Force Majeure unless such occurrences (i) actually and demonstrably affect the critical path identified in the Project Schedule, and (ii) Developer delivers written notice of such occurrence to WMATA within five (5) Business Days of the date which is the earlier to occur of (a) the date of Developer's Actual Knowledge of the commencement of such occurrence or (b) the date of Developer's receipt from the General Contractor of notice of such occurrence where such notice is made in accordance with the terms and conditions of the Construction Agreement, stating the nature of the occurrence and its anticipated effect on the critical path. In the event of a Force Majeure, the Person affected thereby shall be entitled to an increase in the time for performance equal to the number of days, or portions thereof, that completion of the activity beyond the dates established in this Agreement is actually delayed by such Force Majeure.

"**Functional Completion**" is defined in Section 2.3.1.

"**FTA**" means the Federal Transit Administration of the United States Department of Transportation.

6

"**General Contractor**" means Clark Design/Build LLC or another design-builder reasonably acceptable to WMATA and Developer.  As used in this Agreement, the term "General Contractor" has the same meaning as the term "Design Builder" in the Construction Agreement.

"**Hazardous Materials**" means any and all substances, materials or wastes that are or become regulated by any federal, state or local governmental authority or otherwise pose a material threat to human health, safety or the environment.  Without limiting the generality of the foregoing, the term "Hazardous Materials" includes any and all materials, substances and wastes that are:  (a) defined as a "hazardous waste", "hazardous material", "hazardous substance", "extremely hazardous waste" or "restricted hazardous waste" under any provision of local, state or federal law, or (b) petroleum, or (c) asbestos, or (d) polychlorinated biphenyls, or (e) radioactive materials, or (f) designated as a "hazardous substance" pursuant to Section 311 of the Clean Water Act (33 U.S.C. § 1321) or listed pursuant to Section 307 of the Clean Water Act (33 U.S.C. § 1317), or (g) defined as a "hazardous waste" pursuant to Section 1004 of the Resource Conservation and Recovery Act, (42 U.S.C. § 6903), or (h) defined as a "hazardous substance" pursuant to Section 101 of the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. § 9601).

"**Institutional Lender**" means any of the following Persons, that is not an Affiliate of Developer, provided, that such entity has assets equal to at least $500,000,000:  (i) any bank, savings institution, trust company or national banking association, or any wholly-owned subsidiary of any thereof, acting for its own account or in a fiduciary capacity, (ii) any charitable foundation, (iii) any insurance company, (iv) any pension, retirement or profit sharing trust or fund for which any bank, trust company, national banking association or investment adviser registered under the Investment Advisers Act of 1940, as amended, is acting as trustee or agent, (v) any investment company, as defined in the Investment Company Act of 1940, as amended, (vi) any college or university, (vii) any government, any public employees, pension or retirement system any other governmental agency supervising the investment of public funds, (viii) any Real Estate Investment Trust ("REIT"), or (ix) Lehman Brothers Holdings Inc.

"**Interim Parking Lot**" means that certain fenced surface parking lot caused to be designed and constructed by Developer, at Developer's sole cost and expense, on Lot 46 in Square 700 in the southeast quadrant of Washington, DC, which Interim Parking Lot shall (a) have twenty-four (24) hour, three hundred sixty-five (365) day access per year, (b) contain at least forty-six (46) full-size parking spaces, which forty-six (46) full-size parking spaces may be tandem parking spaces, and be of similar or better quality, including lighting, of that certain WMATA-employee parking lot existing as of the Effective Date hereof (the "**Existing Parking Lot**") presently located on a portion of the Property, specifically Lots 107 through 118, inclusive, in Square 701, (c) be used solely by employees of WMATA working in the "Southeastern Bus Garage" facility located in Square 700 for parking only, (d) be provided to WMATA and its employees, at no cost to WMATA or its employees, for a term (the "**Parking Lot Initial Term**") commencing on the delivery to and acceptance by WMATA of the Initial Parking Lot (WMATA's acceptance thereof not to be unreasonably withheld, conditioned or delayed), unless this Agreement is terminated prior to such date in accordance with the terms and provisions contained herein, and ending on December 31, 2009 (the "**Interim Parking Lot Early Expiration Date**"), and (e) be upon such other terms and conditions as more particularly set forth herein; provided, however, in the event, upon expiration of such Parking Lot Initial Term, the Interim Parking Lot or, if

7

applicable, the Alternate Interim Parking Lot (hereinafter defined), in Developer's sole and absolute discretion, has not been selected for redevelopment and continues to operate as a surface parking lot facility, WMATA and its employees shall have the right to use the Interim Parking Lot or, if applicable, the Alternate Interim Parking Lot, at no cost to WMATA or its employees, until thirty (30) days following written notice from Developer to WMATA stating unconditionally that such parking facility has been selected for redevelopment in Developer's sole and absolute discretion; provided that, after such thirty (30) day notice, Developer shall provide to WMATA an Alternate Interim Parking Lot in accordance with the terms and provisions provided below. Notwithstanding the forgoing, the Interim Parking Lot Early Expiration Date shall be extended day-for-day for each calendar day after January 2, 2007 that the Initial Parking Lot is delivered to and accepted by WMATA. Notwithstanding any contrary provision in this Agreement, (A) Developer, upon thirty (30) days' prior written notice to WMATA, shall have the right to change the location of Interim Parking Lot (the "**Alternate Interim Parking Lot**") at any time, but in no event more than five (5) times in the aggregate, to any location within Square 700 or 701, which Alternate Interim Parking Lot shall contain at least forty-six (46) full-size parking spaces, which forty-six (46) full-size parking spaces may be tandem parking spaces, have twenty-four (24) hour, three hundred sixty-five (365) day access per year, and be of a similar or better quality, including lighting, as the Existing Parking Lot, and (B) in the event any parking spaces utilized after the Interim Parking Lot Early Expiration Date are located in a covered parking garage facility (as compared to a surface parking lot facility), then WMATA shall pay, or cause to pay, One Hundred Dollars ($100) per month for each such covered parking space for the period commencing on the date immediately following the Interim Parking Lot Early Expiration Date through the date that is twenty-four (24) calendar months after the Interim Parking Lot Early Expiration Date, it being agreed that, thereafter, any covered parking spaces utilized by WMATA or its employees thereafter shall be at market rate. If, after the date that is twenty-four (24) calendar months after the Interim Parking Lot Early Expiration Date, WMATA is still operating the Southeastern Bus Garage and WMATA desires any parking spaces, but no more than forty-six (46) full-size parking spaces, which forty-six (46) full-size parking spaces may be tandem parking spaces, for use by WMATA and/or its employees working in the Southeastern Bus Garage after the date that is twenty-four (24) calendar months after the Interim Parking Lot Early Expiration Date, then, for so long as Developer owns and/or controls the Project and for one (1) year thereafter, WMATA shall have the option to rent from Developer, and its successors and assigns, such desired number of parking spaces, but no more than forty-six (46) full-size parking spaces, which forty-six (46) full-size parking spaces may be tandem parking spaces, in the Project, on a monthly basis at the then-market monthly rate for such available parking spaces, provided that Developer shall have no obligation whatsoever to provide any parking spaces after December 31, 2016. Notwithstanding any contrary provisions contained in this Agreement, (i) any and all rights held by WMATA to use, license and/or rent any parking spaces within Square 700 and Square 701 pursuant to the terms and provisions of this paragraph shall immediately cease and be of no further force and effect upon the date of WMATA's closure of, and cessation of operations in, the "Southeastern Bus Garage" facility, and (ii) WMATA shall have the right to terminate, in its sole and absolute discretion, its use and payment for any such parking spaces described in this paragraph by providing at least thirty (30) days prior written notice of same to Developer. Developer shall use commercially reasonable efforts to obtain from any future mortgagee holding a mortgage or deed of trust encumbering the real property on which is located the Interim Parking Lot or, if applicable, any Alternate Interim

Parking Lot, a subordination non-disturbance and attornment agreement ("SNDA") for WMATA's benefit in form and substance reasonably acceptable to WMATA. The SNDA shall provide, *inter alia*, that, in the event of a foreclosure under such mortgagee's mortgage or deed of trust (or transfer by way of deed-in-lieu thereof), so long as WMATA is not in default beyond any applicable notice and cure period under the Parking License Agreement, WMATA's right to possess the real property on which is located the Interim Parking Lot or, if applicable, any Alternate Interim Parking Lot, will not be disturbed as a result of such foreclosure or other transfer and the Parking License Agreement shall continue in full force and effect, subject to certain limitations with respect to the obligations of the successor licensor as may be set forth in such SNDA.

**"Job Report"** is defined in Section 18.12.

**"Laws"** means any federal, state or local constitutions, statutes, codes, ordinances, regulations, judicial or administrative requirements, rules, orders, judgments, decrees, injunctions, decisions or other rules of law.

**"Legal Holiday"** means any local or federal holiday on which post offices are closed in the District of Columbia.

**"Metro Station"** means WMATA's Navy Yard Metrorail station, including all WMATA Facilities in connection therewith.

**"Municipal Delay"** means any improper action, omission, or failure to act by any municipal authority, including the District and/or any utility provider, excluding any Force Majeure, Contractor Delay or WMATA Delay, in its timely performance of its duties in connection with the Developer's performance to (1) coordinate the design and construction of the Station Upgrades with the design and construction of the Project and/or (2) design and construct those portions of the Project that must be completed as a condition precedent to the construction of any parts of the Station Upgrades, including the rendering of permit reviews, site inspections, issuance of approvals, certificates and/or licenses as listed in the Project Schedule or as otherwise necessary for the scheduled performance of the Developer Responsibilities, to the extent same does not arise out of a Default by Developer and/or General Contractor, arises from unforeseeable causes beyond the control and without the fault or negligence of Developer and/or General Contractor, and are not related to financial incapacity of Developer and/or General Contractor. For purposes of determining "timely" performance by the District (but not by any utility or party other than the District), "timely" shall mean an expedited performance, but one that is nonetheless done in a thorough and professional manner with full consideration to be given by the District to the legal, regulatory, practical and engineering considerations inherent in any particular performance of the District's duties, and one that is provided on the assumption that all submissions by Developer (or others that relate to Developer's performance) are complete and accurate and submitted in accordance with applicable Laws. Notwithstanding the foregoing, any of the aforementioned acts, omissions or failure to act shall not be construed to be a Municipal Delay unless such acts, omissions or failures to act (i) actually and demonstrably affect the critical path identified in the Project Schedule, and (ii) Developer delivers written notice of such act, omission or failure to act to WMATA within five (5) Business Days of the date which is the earlier to occur of (a) the date of Developer's Actual Knowledge of the

9

commencement of such act, omission, or failure to act or (b) the date of Developer's receipt from the General Contractor of notice of such act, omission, or failure to act where such notice is made in accordance with the terms and conditions of the Construction Agreement, stating the nature of the act, omission, or failure to act and its anticipated effect on the critical path. In the case of a continuing Municipal Delay, only one (1) such written notice from the Developer to WMATA shall be sufficient. In the case of such Municipal Delay, the Developer shall be entitled to an increase in the time for performance equal to the number of days, or portions thereof, that completion of the activity beyond the dates established in this Agreement is actually delayed by such Municipal Delay. Notwithstanding the foregoing, the parties hereto specifically acknowledge and agree that Developer's timely performance of Developer's Responsibilities hereunder, specifically, to (1) coordinate the design and construction of the Station Upgrades with the design and construction of the Project and/or (2) design and construct those portions of the Project that must be completed as a condition precedent to the construction of any parts of the Station Upgrades, shall not be excused or equitably extended as a result, in whole or in part, of any delays in securing any permit reviews, any site inspections, and/or the issuance of any Approvals, Station Upgrade Approvals, Construction Approvals or other certificates and/or licenses necessary for the scheduled performance of the construction of the Station Upgrades, to the extent any such delay arises out of the inclusion of the Developer Property and/or the Adjacent Property in any Submittal therefor other than the Precursor Activities, as defined in the Construction Agreement.

"**Notice**" means a written notice sent in accordance with Section 18.5, below.

"**Parking License Agreement**" means that certain Parking License Agreement to be executed by WMATA and MR Ballpark 2 LLC, an Affiliate of Developer, in form and substance reasonably acceptable to Developer and WMATA.

"**Permitted Exceptions**" means those exceptions or conditions permitted to encumber the title to the Property in accordance with the provisions of Article 5, below.

"**Person**" means any individual, corporation, limited liability company, partnership, joint venture, estate, trust, unincorporated association or any other legal entity, or any government, and any fiduciary acting in such capacity on behalf of any of the foregoing.

"**Project**" means that certain mixed-use development containing retail space, office space and parking facilities to be constructed on the Property and a portion of the Developer's Property by Developer at Developer's sole cost and expense, excluding the Station Upgrades work to be designed and constructed by the General Contractor on behalf of WMATA.

"**Project Completion Date**" means the date established in the Project Schedule for Project Final Completion of the Project.

"**Project Manager**" means MR Ballpark 5 LLC or any Developer Affiliate as may be designated by Developer in writing to all other parties. Project Manager has the same meaning as "Construction Coordinator" under the Construction Agreement.

**"Project Final Completion"** means the proper and full completion of the Project and the Station Upgrades, including satisfactory operation of all equipment and systems related thereto; completion or correction of all punch list items; issuance of all required approvals and certificates by any authorities with jurisdiction over the Project (including any required certificates of occupancy related thereto); removal of all rubbish, tools, scaffolding and surplus materials from the Project Site; and correction of all property damage by Developer, General Contractor and/or WMATA, as applicable, that is the responsibility of such party to cure.

**"Project Schedule"** means that certain schedule for development of the Project and the Station Upgrades including submissions of municipal, utility and other third party approvals, approved by Developer and WMATA as of the Effective Date, attached hereto as **Exhibit A**, and made a part hereof, which Project Schedule shall, if at all, be amended in accordance with the terms and provisions set forth herein.   All critical path items for municipal, utility and other third party approvals are provided in the Project Schedule.  Because of the expedited nature of this Project brought about by the parties' desire to Functionally Complete the Station Upgrades by the Station Upgrades Outside Functional Completion Date and to finally complete the Station Upgrades by the Station Upgrades Final Completion Date, the Project Schedule is considered to be achievable, but is nevertheless considered to be an aggressive one, with no time contingencies built into it.   The critical path milestones in the Project Schedule do not constitute a representation or warranty by any party that performance beyond any milestone constitutes, per se, a Municipal Delay.

**"Project Site"** means the Property and the Developer's Property.

**"Property"** means that certain real property comprising approximately 25,619 square feet located in the southeast quadrant of the District of Columbia, more particularly described as Lots 107 through 118, inclusive, and Lot 162, all in Square 701 (the **"Land"**), including any right, title and interest of WMATA, if any, in and to (i) any strips and gores adjacent to such Land and any Land lying in the bed of any street, road, alley or avenue opened or proposed, in front of or adjoining the Land (the **"Abutting Roads"**), and (ii) all of the easements, hereditaments, rights, privileges, and appurtenances belonging or in any way appertaining to the Land (collectively, the **"Easements"**), but excluding any underground easements or other below-grade interests of WMATA directly beneath the surface of M Street, S.E., Washington, DC (hereinafter **"Tunnel Easements"**) for the operation, maintenance and repair of existing Metrorail tunnel and Metro Station located thereunder.

**"Right of Entry Permit"** is defined in Section 4.1.

**"Second Calculation"** is defined in Section 3.1.

**"Start of Construction"** means the date upon which all necessary permits to begin, or cause to begin, the excavation of the Project Site for construction of the Project, including the Station Upgrades, have been obtained.

**"Station Upgrades"** means those certain upgrades and improvements on, under and to the Property in connection with the "Half Street" exit/entrance to the Metro Station intended to increase its capacity to meet anticipated increased use of the Metro Station resulting from the

construction of nearby new federal facilities and the Ballpark, as preliminarily described, and as approved by WMATA and Developer, in the Station Upgrades Plans.

"**Station Upgrade Approvals**" means all alley closings, platting or replatting approvals, and subdivision/consolidation approvals necessary for the development of the Station Upgrades on the Property in conformity with the terms of the Approved Development Plan.

"**Station Upgrades Final Completion**" means the proper and full completion of the Station Upgrades and that portion of the Project to allow the "Half Street" entrance/exit to the Metro Station to function as a stand-alone operation with minimal disruption to same by General Contractor and Developer arising or resulting from the construction of the remainder of the Project (it being agreed by the parties hereto that, if necessary, protective scaffolding and/or other industry-standard safety measures designed to protect the general public from injury and/or harm resulting from the construction of the Project and which do not affect the regular daily operations at the "Half Street" entrance/exit to the Metro Station would not be deemed a disruption to WMATA's operations), including satisfactory operation of all equipment and systems related thereto; completion or correction of all punch list items; issuance of all required approvals and certificates by any authorities with jurisdiction over the Station Upgrades; delivery of as-built plans and specifications relating to the Station Upgrades; removal of all rubbish, tools, scaffolding and surplus materials from that portion of the Project Site identified for general public use in connection with WMATA's operations at the Metro Station; and correction of all property damage by, or on behalf of, Developer, General Contractor and/or WMATA, as applicable, that is the responsibility of such party to cure.

"**Station Upgrades Final Completion Date**" means the date established in the Project Schedule for Station Upgrades Final Completion of the Station Upgrades.

"**Station Upgrades Outside Functional Completion Date**" means the date on which occurs the first (1st) regular season home game at the Ballpark for the Washington Nationals, but in no event earlier than the first (1st) regular season home game at the Ballpark for the Washington Nationals in calendar year 2008.

"**Station Upgrades Plans**" means those certain plans, approved by WMATA as of the Effective Date, depicting the Station Upgrades to be constructed in accordance with this Agreement and the Construction Agreement. The Station Upgrades Plans are attached to the Construction Agreement as an exhibit thereto.

"**Station Upgrades Substantial Completion Date**" is defined in Section 2.3.5.

"**Study**" or "**Studies**" means those studies, tests, examinations, analyses and inspections, or investigations of or concerning the Property made by Developer in accordance with Article 4, below.

"**Submission**" means any application of any kind made by, or on behalf of, Developer as part of its application for any Approvals, Station Upgrade Approvals and Construction Approvals.

"**Substantial Completion**" means the last to occur of (i) the date on which General Contractor procures all certificates, permits, approvals and consents with respect to the Station Upgrades,

required under applicable Laws for the occupancy and use of the Station Upgrades, and (ii) the date when the Station Upgrades are sufficiently complete in accordance with the Approved Design and Construction Documents to allow complete occupancy and utilization of the Station Upgrades for their intended purpose; provided, however, that protective scaffolding and/or other industry-standard safety measures, if necessary, designed to protect the general public from injury and/or harm from the construction of the Project and which, in WMATA's reasonable opinion, do not materially adversely affect the regular daily operations at the "Half Street" entrance/exit to the Metro Station shall be permitted until the date of Project Final Completion. Developer, with the assistance of the General Contractor shall deliver, or cause to deliver, to WMATA copies of all certificates, permits, approvals and consents related to the Station Upgrades promptly after the issuance of the same.

**"Survey"** is defined in Section 5.2.

**"Temporary Measures"** is defined in Section 2.3.1.

**"Title Commitment"** is defined in Section 5.1.

**"Title Insurer"** means New York Land Services, a division of LandAmerica Commonwealth Title Insurance Company, or such other title insurer as may be designated by Developer in writing to all other parties.

**"Transaction Documents"** means this Agreement; the Right of Entry Permit; the CCR; the Construction Agreement; the Deed; the Affordable Housing Covenant; and any other documents reasonably required and mutually agreed to by the parties hereunder.

**"Transit-Oriented Development"** means, as applicable to the design and the construction of the Project and as to its subsequent maintenance and operation, (a) providing convenient pedestrian and vehicular access to a transit station; (b) incorporating private investment and office, commercial or residential development; (c) enhancing the effectiveness of a mass transit project and developing a project that is physically or functionally related to the mass transit project; and (d) creating non-vehicular capital improvements designed to increased transit ridership.

**"Underlying Documents"** is defined in Section 5.1.

**"Washington Nationals"** means the Washington Nationals Major League Baseball Team.

**"WMATA"** means the Washington Metropolitan Area Transit Authority, a regional body, corporate and politic, organized pursuant to Public Law 89-774, 80 Stat. 1324; Maryland Acts of General Assembly, Chapter 869-1965; Virginia Acts of Assembly, Chapter 2-1966; and Resolution of D.C. Board of Commissioners adopted November 15, 1966, having a principal business address at 600 Fifth Street, NW, Washington, DC 20001. In connection with provisions requiring indemnification of WMATA or providing for the exculpation of WMATA, such term shall also include WMATA's officers, directors, employees, contractors, attorneys, consultants, representatives, agents, successors, assigns, predecessors-in-interest and successors-in-interest.

**"WMATA Compact"** is defined in Section 18.20.

13

**"WMATA Delay"** means any act, omission, or failure to act by WMATA, excluding any Force Majeure, Contractor Delay or Municipal Delay, in WMATA's timely performance of its express contractual duties hereunder in connection with the Developer's performance to (1) coordinate the design and construction of the Station Upgrades with the design and construction of the Project and/or (2) design and construct those portions of the Project that must be completed as a condition precedent to the construction of the Station Upgrades, including any delay resulting from a Default by WMATA and/or any delay by WMATA in providing a review or approval within any of the time frames expressly set forth in this Agreement necessary for the scheduled performance of the Developer's and/or General Contractor's obligations hereunder or under the Construction Agreement, to the extent same does not arise out of a Default by Developer and/or General Contractor, and are not related to financial incapacity of Developer and/or General Contractor. Notwithstanding the foregoing, any of the aforementioned acts, omissions or failures to act shall not be construed to be a WMATA Delay unless such acts, omissions or failures to act (i) actually and demonstrably affect the critical path identified in the Project Schedule, and (ii) Developer delivers written notice of such act, omission or failure to act to WMATA within five (5) Business Days of the date which is the earlier to occur of (a) the date of Developer's Actual Knowledge of the commencement of such act, omission, or failure to act or (b) the date of Developer's receipt from the General Contractor of notice of such act, omission, or failure to act where such notice is made in accordance with the terms and conditions of the Construction Agreement, stating the nature of the act, omission, or failure to act and its anticipated effect on the critical path. In the case of a continuing WMATA Delay, only one such written notice from the Developer to WMATA shall be sufficient. In the case of such WMATA Delay, the Developer shall be entitled to an increase in the time for performance equal to the number of days, or portions thereof, that completion of the activity beyond the dates established in this Agreement is actually delayed by such WMATA Delay.

**"WMATA Facilities"** means all improvements, structures, infrastructure components, tangible property and areas used by WMATA in, on, under, above or about the Property for the operation, access, maintenance, repair, servicing, replacement or removal of any and all structures and supports; station access; parking; operation and service facilities; the Metro Station; tunnels; rails; tracks; bus supervisor kiosks; employee bathrooms; electric substations; conduits and lines; pedestrian traffic; waiting and shelter areas; facilities serving persons with disabilities; cooling towers; chiller plants; vent and fan shafts; and all other associated facilities.

**"WMATA Information"** shall have the meaning set forth in Section 9.3, below.

**"WMATA's Reserved Areas"** means areas and improvements within the Property required by WMATA for the use, operation, access, maintenance, repair, servicing, replacement or removal of any WMATA Facilities and the Station Upgrades, including the land and air space for which areas WMATA is to be given, use and access rights pursuant to the CCR. As of the Effective Date, the parties agree that the **"Maximum WMATA's Reserved Areas"** shall include, and be limited to, all existing WMATA Facilities (other than the Existing Parking Lot) on, above or under the Property and that certain above and below grade area as generally identified in an Exhibit attached to the CCR and which Maximum WMATA's Reserved Areas shall be further refined in good faith by mutual agreement of the parties if necessary, by amending the CCR upon Project Final Completion, consistent in all material respects with the definition of WMATA's Reserved Areas in the preceding sentence and with the Approved Design and

Construction Documents. The parties further acknowledge that the construction of the Project will require Developer's and/or General Contractor's entry into the WMATA's Reserved Area and, in some cases, including the construction of the Extraordinary Project Items described in Section 3.1, the installation of components of the Project Improvements within the bounds of WMATA's Reserved Areas. Such entry will be done pursuant to the Construction Agreement or by separate right of entry permit and, in all events, shall not materially adversely affect the WMATA Facilities (except for the temporary closing of the "Half Street" entrance/exit to the Metro Station and the relocation of the Existing Parking Lot which temporary closing and relocation, respectively, are contemplated by and provided for in this Agreement).

"**WMATA Temporary Measures Advance**" shall have the meaning set forth in Section 2.3.3, below.

"**WMATA's Unconditional Approval Matters**" means any and all matters that in the sole and unreviewable judgment of WMATA (such standard to apply in all circumstances without expressly so stating in an applicable context) would have an adverse impact on any or all of the following: (i) the functionality, efficiency, safety, operation, maintenance, legal compliance, cost or profitability of WMATA's business, operations or activities, including bus operations at the Southeastern Bus Garage (ii) WMATA's transit customers, (iii) any of the Existing Improvements contemplated to remain and not to be demolished, rebuilt or relocated by this Agreement, (iv) the Metro Station, (v) the other WMATA Facilities, (vi) WMATA's Reserved Areas, (vii) the design of the Station Upgrades and/or means and methods employed in the construction of the Station Upgrades, and (viii) ingress or egress relating to any of the foregoing, unless otherwise expressly set forth herein.

## ARTICLE 2
## CONVEYANCE OF PROPERTY

2.1    **Agreement to Sell.**  WMATA agrees to convey for the Purchase Price, and Developer agrees to accept in return for the Purchase Price, on the Closing Date good, marketable, indefeasible fee simple title to the Property by way of the Deed, to be executed and delivered by WMATA at Closing, and which shall be subject only to the Permitted Exceptions and the CCR and any surviving obligations under this Agreement.

2.2    **Ballpark District Area.**  The Property is located approximately one (1) block north of the site of the Ballpark, which facility is currently under construction. The Property is located in the area designated as the "**Ballpark District**" by the laws of the District. WMATA shall cooperate with Developer's pre-development activities for the Developer's Property, the Adjacent Property and the Property. Prior to and after Closing, WMATA shall publicly support, and cooperate with Developer in good faith in, the closing of any and all public alleyways located in Square 701, and, provided Closing occurs under this Agreement, the consolidation of the Property with the Developer's Property and the Adjacent Property, in whole or in part, and the issuance of all zoning and land use entitlements reasonably necessary for Developer to cause to commence and complete construction of the Project, including the Station Upgrades. Except for those costs and expenses incurred by WMATA in connection with the Station Upgrades, WMATA's duty to cooperate pursuant to this Section 2.2 shall not require WMATA to

incur any third party out-of-pocket costs or expenses. The CCR will provide for the preparation, submission and recordation of all necessary easements and covenants for the development of the Project on the Property and Developer's Property. The improvements to be constructed as part of the Project (collectively, the "**Project Improvements**") and all other improvements to be developed by Developer and/or its Affiliates in any other portions of the Ballpark District (collectively, the "**Additional Improvements**") shall be designed, constructed and operated in reasonable accordance with the requirements set forth in the "**Ballpark District Guidelines**" attached to the CCR as an exhibit thereto), and, in recognition of same, Developer shall execute and record at Closing among the Land Records the CCR, which CCR shall, in part, give notice of the Ballpark District Guidelines and that the CCR, including therein the Ballpark District Guidelines, shall be senior to any financing liens or other encumbrances affecting the Property and the Developer's Property. Notwithstanding any contrary provision contained in this Agreement, the requirements of the Ballpark District Guidelines shall not apply to (a) construction of the Station Upgrades to the extent that any such Ballpark District Guidelines conflict with any rules, regulations or requirements of WMATA, FTA or any federal agency applicable to the construction of the Station Upgrades, or (b) WMATA's operations or WMATA's use of WMATA's Reserved Areas and/or the WMATA Facilities.

2.3    **Station Upgrades.**   Developer is obligated, in accordance with the terms and conditions of this Agreement and the Construction Agreement to (i) cause the construction of the Project around and above the Station Upgrades in such a manner so as to allow the timely construction of the Station Upgrades, and (ii) coordinate the construction activities of the General Contractor in the construction of the Station Upgrades with those of the Project so as to cause to allow the Functional Completion (hereinafter defined) of the Station Upgrades by General Contractor no later than the Station Upgrades Outside Functional Completion Date.

2.3.1    *Definition of "Functional Completion" and "Temporary Measures".*  As used in this Agreement and the Construction Agreement, the term **"Functional Completion" or "Functionally Complete"** means that level of completion of the Station Upgrades that is less than Substantially Complete, but that nevertheless would allow the general public (at a minimum rate of 15,000 riders per hour) to use the "Half Street" entrance/exit to the Metro Station on those days and/or nights on which occurs a Washington Nationals' regular season home game for a period starting three (3) hours before scheduled game time and ending two (2) hours after completion of the game. The term "Functional Completion" or "Functionally Complete" shall expressly include WMATA's ability to electronically collect fares by means of its currently established system of Farecard gates. Functional Completion of the Station Upgrades may incorporate, if necessary, **"Temporary Measures"** to accommodate the opening of such entrance/exit and such rider volume, including temporary lighting and temporary floor, ceiling and/or wall coverings and/or partitions, additional security measures, fire watches, and shuttle buses for disabled patrons to the east entrance/exit to the Metro Station.

16

2.3.2    *Minimum Requirements for Temporary Measures.*  Temporary Measures must be (i) approved in writing, in advance, by WMATA, acting in good faith, and (ii) approved by any applicable municipal authorities, including, if necessary, the District Fire Marshal.

2.3.3    *Procedure for Calculation and Pre-Payment of Accommodation Fee.*  If Temporary Measures are required, Developer agrees to pay to WMATA an "**Accommodation Fee**" equal to the actual costs incurred by WMATA in cooperating with Developer's implementation of any and all Temporary Measures (which cooperation shall include WMATA's Commercially Reasonable Best Efforts to provide services, supplies or manpower or payment of additional charges by WMATA to the General Contractor or others for Temporary Measures, as applicable), unless Developer's failure to achieve Functional Completion of the Station Upgrades by the Station Upgrades Outside Functional Completion Date has occurred by occurrence of Force Majeure, Municipal Delay, WMATA Delay and/or Contractor Delay.  Not later than sixty (60) days before the Station Upgrades Outside Functional Completion Date, the parties and General Contractor shall meet to discuss the status of the Project, including the Station Upgrades, and, to identify all Temporary Measures then anticipated to be implemented on and after the Functional Completion Date.  Not later than forty-five (45) days before the Station Upgrades Outside Functional Completion Date, WMATA shall prepare and deliver to Developer a written good faith estimate of the anticipated actual costs expected to be incurred by WMATA in cooperating with Developer's implementation of those identified Temporary Measures.    Not later than thirty (30) days before the Station Upgrades Outside Functional Completion Date, Developer shall deliver to WMATA cash in the amount identified in WMATA's good faith estimate (the "**WMATA Temporary Measures Advance**").  The payment of the WMATA Temporary Measures Advance by Developer to WMATA, and the preparation by WMATA of the good faith estimate, are both without prejudice to WMATA's claim for recovery of all of its actual costs in cooperating with Developer's implementation of the Temporary Measures.  Not later than sixty (60) days after Substantial Completion of the Station Upgrades, the parties will reconcile the WMATA Temporary Measures Advance against the total Accommodation Fee and make adjustments accordingly.  If the total Accommodation Fee exceeds the WMATA Temporary Measures Advance, then Developer shall promptly pay WMATA the difference.    If the WMATA Temporary Measures Advance exceeds the total Accommodation Fee, then WMATA shall promptly refund Developer the difference.

2.3.4    *Developer's Obligation to Provide Bus Bridge.*  In addition to any other requirements of this Agreement, if the Station Upgrades, taking into account the Temporary Measures, are not Functionally Complete by the Station Upgrades Outside Functional Completion Date, then Developer shall provide temporary bus shuttle services with the greatest practical capacity in light of bus availability and capacity, available staging area(s), traffic and safety considerations, for up to 15,000 riders per hour between the Ballpark and the L'Enfant Plaza Metro Station (for three (3) hours prior to scheduled game time and two (2) hours after the completion of such game) for each day and/or night on which occurs a Washington Nationals' regular season home

17

game in the Ballpark until Functional Completion of the Station Upgrades is achieved. If Developer elects to use WMATA equipment and manpower to provide such shuttle service, in whole or in part, then Developer shall pay WMATA, in advance, for WMATA's overhead, equipment and manpower for any such WMATA-provided bus shuttle service; provided, however, the parties hereto acknowledge that there is no guarantee that WMATA will have available equipment and manpower, in particular during normal rush hour periods, to provide such bus shuttle service. If WMATA elects not to, or is unable to, provide the bus shuttle service, in whole or in part, with WMATA's own manpower and equipment, then Developer, at Developer's sole cost and expense, shall contract with third parties to provide for such bus shuttle service, subject to WMATA's approval, which approval shall not be unreasonably withheld, conditioned or delayed. Notwithstanding any contrary provision contained in this Agreement, including this Section 2.3.4, Developer and WMATA agree that, after Closing hereunder, the Deposit shall be held by WMATA and disbursed towards payment of the actual costs incurred by WMATA of providing the temporary bus shuttle services set forth in this Section 2.3.4. WMATA's remedies described in this Section 2.3 shall not apply for such period of time, if any, that the Station Upgrades Outside Functional Completion Date has been equitably extended by the terms hereof in recognition of Force Majeure, Municipal Delay, WMATA Delay and/or Contractor Delay.

2.3.5    *Developer's Duty to Facilitate.* Developer shall use Commercially Reasonable Best Efforts in performing its obligations hereunder to obtain Approvals and otherwise facilitate the Substantial Completion of the design and construction of the Station Upgrades by the General Contractor on or before the date identified in the Project Schedule as the "**Station Upgrades Substantial Completion Date**".

*Security for Stand-Alone Operations.* If the Project Final Completion of the Project is not achieved on or before the "**Project Completion Date**", as such date is set forth in the Project Schedule (as it may be equitably amended by Force Majeure, Municipal Delay, WMATA Delay and/or Contractor Delay), then Developer shall provide, or cause to provide, at a minimum and at Developer's sole cost and expense, such completed improvements immediately adjacent to, and immediately below and/or above, the "Half Street" entrance/exit to the Metro Station as reasonably determined by WMATA to allow the "Half Street" exit/entrance to the Metro Station to function as a stand-alone operation, including the completion of all columns, walls and ceilings directly adjacent to the Station Upgrades with the balance of the Project Site being made safe and sightly in all respects. The balance of the EPI Deposit after the initial disbursements under Section 3.1, shall remain in escrow as security in the event of a Developer Default, to complete that portion of the Project Improvements immediately adjacent to, and immediately below and/or above, the "Half Street" entrance/exit to the Metro Station as reasonably determined by WMATA to allow the "Half Street" exit/entrance to the Metro Station to function as a stand-alone operation, including the completion of all columns, walls and ceilings directly adjacent to the Station Upgrades with the balance of the Project Site being made safe and sightly in all respects. In the event of such Developer Default, WMATA may draw upon the balance of the EPI Deposit to the extent of actual costs and damages incurred by

WMATA to complete the Project Improvements as set forth in this Section 2.3.6. Such balance of the EPI Deposit shall be disbursed within thirty (30) days of the substantial completion of the following activities identified in the Project Schedule attached to the Construction Agreement:

(1) BB0060 – Parking Level P-3 – Base Building: $200,000.00

(2) BB0120 – Parking Level P-2 – Base Building: $200,000.00

(3) BB0160 – Parking Level P-1 – Base Building: $200,000.00

(4) BB0200 – Base Building 1st Floor – Base Building: $200,000.00

(5) BB0220 – Base Building 2nd Floor – Base Building:  $200,000.00

(6) BB0250 – Base Building 3rd Floor – Base Building:  $200,000.00.

2.3.6    In the event of a Developer Default, WMATA may draw upon the balance of the EPI Deposit to the extent of actual costs and damages incurred by WMATA to complete the Project Improvements as set forth in this Section 2.3.6. Any portion of the EPI Deposit remaining in escrow three (3) years after a Developer Default under this Section shall be released to Developer.

### ARTICLE 3
### PURCHASE PRICE AND DEPOSIT

3.1    **Purchase Price.** The purchase price for the Property is Fifteen Million Two Hundred Seventy-Six Thousand One Hundred Twenty and NO/100 Dollars ($15,276,120.00) (the **"Purchase Price"**), which Purchase Price has been calculated based on the difference of (A) Fifteen Million Nine Hundred Forty Thousand One Hundred Twenty and NO/100 Dollars ($15,940,120.00) (which is the product of (i) the estimated square footage of the Property (28,464.5 square feet), (ii) seven (7) FAR or floor area ratio which represents the currently permitted "matter of right" density for the Project Site, and (iii) Eighty Dollars ($80.00) (which represents the mutually agreed to price per developable square foot for the Project Site)), and (B) Six Hundred Sixty Four Thousand and NO/100 Dollars ($664,000) (which is equal to the product of (i) 8,300 square feet (which represents the estimated and mutually agreed-to square footage of that portion of the Project which shall be employed by WMATA) and (ii) Eighty Dollars ($80.00) (which represents the mutually agreed to price per developable square foot for the Project Site); provided, however, that in the event the square footage of the Project Site, upon receipt of the Survey, is not 28,464.5 square feet including WMATA's interest in the alleys to be closed as contemplated by this Agreement, then the Purchase Price shall be adjusted accordingly at Closing. The Purchase Price shall be paid by Developer to WMATA at Closing; provided, however, that Two Million Dollars ($2,000,000) of the Purchase Price paid by Developer at Closing shall be deposited by WMATA promptly thereafter into escrow with the Title Company (the "EPI Deposit"). The form of the escrow agreement shall be

a form that is mutually acceptable to WMATA, Developer and Title Company, and shall provide that the EPI Deposit shall be held by the Title Company until WMATA and Developer reach agreement upon the incremental hard costs incurred by Developer due solely to the Extraordinary Project Items. As used herein, the term **"Extraordinary Project Items"** means those certain necessary improvements, as mutually agreed to by the parties in good faith, resulting from the design and construction of a portion of the Project under, above, through and around WMATA's Reserved Areas, specifically limited to, (a) the installation and construction of three (3) caisson columns along the "M Street" frontage of the Property in lieu of bearing piles, and (b) the installation and construction of a steel truss system designed to spread the weight loads of that portion of the Project to be constructed above the "Half Street" entrance/exit to the Metro Station. At such time after Closing that (A) Developer has entered into a construction contract for the Project and (B) the costs therein for the Project are based on not less than eighty percent (80%) completion of the construction document plans and specifications for the Project, Developer shall cause the preparation of two (2) cost calculations based thereon with respect to construction of the Project. The first calculation (**"First Calculation"**) shall itemize the hard costs projected to construct the Project, including the Extraordinary Project Items. The second calculation (the **"Second Calculation"**, and, together with the First Calculation, each, a **"Calculation"**) shall itemize the hard costs projected to build the Project, but assuming (i) there were no Extraordinary Project Items and (ii) that construction costs and site conditions on the north side of the Property (where the Extraordinary Project Items are to be located) are to be calculated assuming the same design and site conditions, manner of construction and function as those on the south side of the Property (where ordinary construction techniques are to be employed); it being agreed that costs shall be established on the same per unit basis, where applicable, or, if necessary, by direct extrapolation. In preparing each Calculation for WMATA's review and approval, Developer shall submit to WMATA detailed cost estimates for the Project, including quantities of labor and material for each Calculation. No so-called "soft costs", including design fees, contractor's general conditions, profit and overhead shall be included in either of the Calculations. If WMATA and Developer reach agreement on the reasonableness of the Calculations, the Title Company, upon written confirmation of same from WMATA and Developer, shall release (a) to WMATA that portion of the EPI Deposit, if any, in excess of the difference between the First Calculation and the Second Calculation, (b) to Developer the remainder of the EPI Deposit in excess of One Million Two Hundred Thousand Dollars ($1,200,000.00) and (c) the balance of the EPI Deposit shall be disbursed in accordance with Section 2.3.6. If Developer and WMATA do not agree, for any reason, upon the reasonableness of the Calculations or the incremental hard costs of the Extraordinary Project Items on or before the date of Project Final Completion, then the dispute shall be resolved by arbitration in accordance with the Construction Industry Rules of the American Arbitration Association. Upon final determination by the arbitrator[s], the EPI Deposit shall be released by Title Company in accordance with same. The EPI Deposit shall be held in an interest bearing account, and interest earned thereon pending final disbursement of the EPI Deposit in accordance with the provisions of this Agreement shall be applied in the same ratio and same manner as the EPI Deposit is disbursed to Developer and WMATA, respectively.

20

3.2    **Deposit.**  Within two (2) Business Days after the Effective Date, but not later than the Closing Date, Developer shall deliver to WMATA a cash deposit (the "**Deposit**") in the total sum of Two Hundred Fifty Thousand Dollars and NO/100 Dollars ($250,000.00) in immediately available funds.

3.2.1    The Deposit shall not be applied to the Purchase Price at Closing, it being agreed that (i) prior to Closing, the Deposit shall be forfeited by Developer as liquidated damages pursuant to Section 15.4.1.1 if Developer fails to timely proceed to Closing in accordance with the terms and provisions of this Agreement, and (ii) after Closing, the Deposit shall be held as security for payment of the actual costs to provide temporary bus shuttle services pursuant to the terms of Section 2.3.4, above, whether such temporary bus shuttle services are provided by WMATA or Developer.

3.2.2    Upon receipt, WMATA shall promptly place the Deposit in an interest-bearing account (and such deposit will be recorded as a special line item in WMATA's accounts receivable and will be included in WMATA's general ledger) as WMATA, in its reasonable discretion, deems suitable, and all interest and income thereon shall become part of the Deposit and shall be remitted to the party entitled to the Deposit, as set forth below.

3.2.3    Notwithstanding any provision in this Agreement requiring a refund of the Deposit to Developer, (i) WMATA shall be entitled to retain and apply all or any portion of the Deposit to satisfy any accrued indemnification liabilities under the Right of Entry Agreement, but such application shall not be deemed a cure or waiver of any Default by Developer or an election of remedies, and (ii) WMATA shall not be required to refund the Deposit until Developer's obligations under this Agreement have been fully and finally satisfied.  In addition, for purposes of determining and applying the damages provisions of this Agreement, if WMATA retains or applies all or any portion of the Deposit to satisfy any accrued liabilities under this Agreement or the Right of Entry Permit, payment to WMATA of the remaining balance of the Deposit shall not be deemed to satisfy the damages provisions of this Agreement and Developer shall be required to satisfy and pay over the full amount of damages to WMATA.

### ARTICLE 4
### RIGHT OF ENTRY AGREEMENT; TERMINATION RIGHT AND
### ENTRY CONDITIONS AND LIMITATIONS

4.1    **Right of Entry.**  WMATA and Developer have previously entered into that certain Real Estate Right of Entry Permit (the "**Right of Entry Permit**"), to permit site investigation work which Right of Entry Permit grants Developer, and its Consultants, a license to enter onto the Property at their sole cost, risk, and expense to conduct and make any and all studies, tests, examinations, analyses and inspections, or investigations of or concerning the Property (including without limitation, environmental, engineering and feasibility studies, evaluation of drainage and flood plain, soil tests for bearing capacity and percolation, surveys, including topographical surveys, laboratory or other off-site tests) (each a "**Study**" and collectively, the "**Studies**") that Developer, in its sole

21

discretion may chose, subject to WMATA's approval rights, insurance and indemnification requirements and all other terms of the Right of Entry Permit.

**ARTICLE 5**
**TITLE**

5.1    **Title Commitment.** Developer has received a commitment for title insurance for the Property dated November 22, 2006 in an amount equal to the Purchase Price ("**Title Commitment**"), issued by Title Insurer for an owner's title insurance policy on the Property on the most recent standard ALTA policy form, together with legible copies of all instruments identified as exceptions therein ("**Underlying Documents**"), copies of which have been previously delivered to WMATA. Developer shall pay all costs in procuring the Title Commitment and all owner's and lender's title insurance policies.

5.2    **Survey.** Developer, at its sole expense, has obtained an updated survey for the Property (the "**Survey**"). Developer shall promptly cause a copy of the Survey to be delivered to WMATA. The Survey (i) shall be prepared in accordance with ALTA requirements; (ii) shall be in a form, and shall be certified as of a date satisfactory to Title Insurer, to enable Title Insurer to delete standard survey exceptions from the title insurance policy, except for Permitted Exceptions; (iii) shall show all improvements, all recorded easements to the extent locatable, set-back lines, and all matters shown as exceptions by the Title Commitment; (iv) shall specifically show the right of way for all adjacent public streets; (v) shall disclose whether (and, if so, what part of) the Property is in an area designated as requiring flood insurance under applicable Laws; (vi) shall contain a perimeter legal description (showing perimeter boundaries and providing metes and bounds descriptions of the Property; (vii) shall be certified to Developer, WMATA and any other parties reasonably requested by Developer and/or WMATA as being true and correct; and (viii) shall certify that the legal descriptions set forth therein describes the Property, including WMATA's interest in any alleys to be closed, and comprises all of the real estate comprising the Property to be purchased by Developer pursuant to this Agreement. The survey shall also describe WMATA's Reserved Areas.

5.3    **Intentionally Omitted.**

5.4    **Intentionally Omitted.**

5.5    **Condition of Title.** Developer agrees to accept title and the deed to the Property by Deed, so long as the same is in the condition shown on the Title Commitment, expressly subject to the following matters which shall be deemed to constitute "**Permitted Exceptions**":

5.5.1    All notes, conditions and restrictions, if any, affecting the Property contained in the Land Records of the District or shown in the Title Commitment as an exception other than (i) any deeds of trust, mortgages or other instruments (excepting mechanics' liens) recorded against the Property which can be satisfied by monetary payment by WMATA at or prior to Closing, (ii) mechanics' liens (provided that Developer shall be responsible for all liens arising from Developer's entry onto, investigation of, or

construction on, under or about the Property), and (iii) taxes due and payable by WMATA in respect of the period up to and preceding Closing (but in all respects subject to Section 18.24, below);

5.5.2    All city, county, state and school district ad valorem property taxes and other assessments if any, for the year in which the conveyance occurs and all subsequent years and real estate and property taxes to the extent not due and payable (but in all respects subject to Section 18.24, below).

5.5.3    Zoning and building restrictions, regulations and ordinances, easements and rights-of-way of whatsoever nature and kind reserved and recorded in the jurisdiction in which the Property is located; and

5.5.4    The CCR.

5.6    **Notice and Cure.** If, on the Closing Date, the state of title is other than as required by this Agreement, Developer shall provide WMATA with Notice thereof at such time. If Developer does not give such Notice on or before the Closing Date, Developer shall be deemed to have waived any such objection to the state of title or unfulfilled condition and shall be required to consummate the Closing on the Closing Date. If Developer timely gives WMATA such Notice, WMATA shall cure such objection to the extent required under this Article 5 within a period not to exceed twenty-one (21) days from the date of such Developer's Notice, it being agreed that such additional period shall be deemed a WMATA Delay for purposes of this Agreement.

5.7    **Developer's Termination Right.** If, during the twenty-one (21) day period provided in Section 5.6, above, WMATA is unable to satisfy such title objection to Developer's satisfaction, WMATA shall give Developer Notice thereof. Within seven (7) days following WMATA's Notice, Developer may elect to terminate this Agreement in its entirety by giving Notice to WMATA of Developer's election to terminate this Agreement, WMATA shall refund the full amount of the Deposit to Developer, and the parties thereafter shall have no further obligations or liabilities hereunder, except those which expressly survive termination.

5.8    **Waiver.** If Developer fails to give timely Notice of Termination in accordance with Section 5.7, above, all title and survey objections shall be deemed waived by Developer and Developer shall thereafter promptly proceed to Closing.

5.9    **Encumbrances Following Effective Date.** Except as otherwise provided in this Agreement, following the Effective Date and until Closing or termination of this Agreement, WMATA shall not voluntarily encumber the Property without Developer's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed, or in a way that would materially impair development of the Project, without Developer's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed.

5.10    **Business Improvement District ("BID").** Notwithstanding anything contained in this Agreement to the contrary, Developer shall support the creation of business improvement

23

district ("BID") that includes the Property and the Developer's Property and shall pay its equitable share of any amounts due and payable to such BID.

## ARTICLE 6
## INTENTIONALLY DELETED

## ARTICLE 7
## APPROVAL PERIOD

7.1 **Developer's Rights and Obligations to Pursue Approvals, Station Upgrade Approvals and Construction Approvals.** WMATA hereby authorizes Developer to seek and secure, or cause General Contractor or other third party to seek and secure, the Approvals, Station Upgrade Approvals and Construction Approvals in accordance with this Agreement and the Approved Development Plan. Developer agrees to diligently, or cause General Contractor or other third party to diligently, seek and secure the Approvals, Station Upgrade Approvals and Construction Approvals for the Station Upgrades before and after Closing using Commercially Reasonable Best Efforts, at Developer's sole cost and risk, it being acknowledged and agreed by the parties hereto that formal issuance of the Approvals, Station Upgrade Approvals and Construction Approvals can not occur until after Closing.

7.2 **Approvals, Station Upgrade Approvals and Construction Approvals Notice Requirements.** Within thirty (30) days following the Effective Date and every thirty (30) days thereafter, Developer shall submit, or cause General Contractor to submit, to WMATA a written report containing a listing of anticipated required Approvals, Station Upgrade Approvals and Construction Approvals for the Station Upgrades, a schedule for obtaining such Approvals, Station Upgrade Approvals and Construction Approvals for the Station Upgrades, a statement in Developer's reasonable business judgment of the anticipated period required to obtain such Approvals, Station Upgrade Approvals and Construction Approvals for the Station Upgrades under the standards of diligence, timing and efforts required by this Agreement and the basis for the Developer's judgment that the Approvals, Station Upgrade Approvals and Construction Approvals for the Station Upgrades can be secured within such periods, and the steps taken to such date and required in the future to obtain such approvals.

7.3 **Inquiries and Applications.** WMATA authorizes Developer to make, or cause General Contractor or other third party to make, all inquiries of and applications to the appropriate governmental authorities for or in connection with the approval of the design and construction of the Project, including the Station Upgrades, as Developer reasonably deems necessary, subject to the terms and conditions set forth in this Agreement. WMATA agrees to promptly execute such applications for any Approvals, Station Upgrade Approvals and/or Construction Approvals as are reasonably requested by Developer and/or General Contractor, provided that WMATA shall not be required to incur any liability or expense in connection therewith.

7.4 **As Built Drawings.**  WMATA, to the extent existing, has delivered to Developer as-built drawings for the Existing Improvements (hard copy and, if existing and available, in

24

digital format (auto cad)). Such drawings, if any, have been provided for informational purposes only and without any representation or warranty whatsoever, including without limitation, regarding accuracy, completeness, compliance with Laws or suitability for Developer's use and shall be subject to the disclaimers regarding WMATA Information.

7.5    **Preparation, Submission and Approval of Development Plan.**

7.5.1    **Planning.** All of WMATA's requirements with respect to the Station Upgrades only shall be incorporated into the Development Plan, including, without limitation, WMATA's requirements as to (i) physical components, (ii) design features, (iii) traffic circulation, and (iv) access, including ADA-compliant access. The Development Plan with respect to the Station Upgrades only, and any changes thereto, shall be subject to the review and approval of WMATA in its reasonable discretion, except as to those aspects that affect WMATA's Unconditional Approval Matters, which shall be subject to the review and approval of WMATA, in its sole and absolute discretion. Construction of the rest of the Project shall be in accordance with WMATA's Adjacent Construction Manual, as applicable, and shall be undertaken so as not to materially adversely interfere with WMATA's transit operations, except as provided for herein (i.e., the station entrance closure; the relocation of the Existing Parking Lot, temporary scaffolding and other similar safety measures).

7.5.2    **Proposed Development Plan.** As soon as reasonably possible after the Effective Date, Developer shall prepare, or cause General Contractor or other third party to prepare, in consultation with WMATA, and submit, or cause General Contractor or other third party to submit, to WMATA for its review and approval the Development Plan. WMATA's review and approval of the Development Plan shall be limited to the Station Upgrades and matters on the Project Site adjacent to the Station Upgrades and WMATA Facilities regulated by the Adjacent Construction Manual. The Development Plan shall comply with the provisions of this Section 7.5.2, shall show in reasonable detail the development of and construction of the Project, including the Station Upgrades, the proposed locations and configurations of the improvements that will comprise the Project, the applicable uses for such improvements and the number of square feet for each such improvement(s), as well as any other requirements required for submittal of the Approvals, Station Upgrade Approvals and Construction Approvals for the Station Upgrades. The Development Plan shall be consistent with and conform to the Station Upgrades Plans, subject only to Station Upgrades changes approved by WMATA. Within twenty-one (21) days upon receipt of same, WMATA shall reasonably approve or reject the Development Plan or notify Developer that its submission is not complete (and is therefore disapproved), it being agreed that, provided that the Project shall be in substantial conformance with the FTA Approval Letter dated November 6, 2006, the Development Plan shall be reasonably approved to the extent it is consistent in all material respects with the Station Upgrades Plans; it being further agreed that, in such event, WMATA's review shall be limited to the Station Upgrades only and matters on the Project Site adjacent to the Station Upgrades and other WMATA Facilities regulated by, or within the scope of, the Adjacent Construction Manual, and WMATA may grant or withhold its approval of the Development Plan in its sole and absolute discretion only as to any of WMATA's

25

Unconditional Approval Matters.    In the event WMATA rejects the Development Plan, WMATA shall include in such rejection the nature of WMATA's objections or qualifications, as the case may be, and WMATA and Developer, General Contractor and any other necessary third parties shall meet in person no later than three (3) Business Days after such rejection to address in good faith WMATA's objections or qualification.

7.5.2.1    The Development Plan shall be (a) substantially in accordance with applicable existing zoning ordinances (and applicable waivers thereto or variances therefrom), (b) consistent with the Station Upgrades Plans and this Agreement, (c) consistent with the requirements and objectives of any applicable master plan, and (d) consistent with the Ballpark District Guidelines. The location of all Station Upgrades shall be reflected on the Development Plan and all Station Upgrades shall be on the Property (within WMATA's Reserved Areas).

7.5.2.2    As part of the Development Plan, Developer shall provide, or cause to provide, reasonable details of the proposed infrastructure construction as the same pertain to (a) the Property as a whole, (b) development of the Project, and (c) the scope, design and timing of all of the foregoing, including the Interim Parking Lot, the Station Upgrades, and proposed construction staging, storage and parking.    Excepting the Station Upgrades which shall be constructed by General Contractor on behalf of WMATA and which shall be paid for, or shall be caused to be paid for by WMATA, Developer, at its sole cost and expense, shall construct the Project as set forth in the Approved Development Plan and in accordance with any applicable Laws. Developer, not WMATA, shall maintain, operate, repair and replace, or cause to maintain, operate, repair and replace, any and all infrastructure constructed on the Property by Developer or on behalf of Developer, except infrastructure constituting part of WMATA's Reserved Areas.

7.5.2.3    The Development Plan shall show the Station Upgrades and shall indicate any other portions of the Project which are to be on the Property.

7.5.3    **Approved Development Plan.**    The Development Plan as finally approved by WMATA shall be initialed by WMATA, Developer and the General Contractor and shall be considered a part of this Agreement and is referred to herein as the **"Approved Development Plan."**

7.5.4    **No Assumption of Liability or Waiver of Rights.**    Except with respect to the Station Upgrades, WMATA shall have no liability and waives none of its rights by reason of its approval of the Development Plan.

7.5.5 **Changes to Approved Development Plan.** After WMATA's approval of the Development Plan and the designation by WMATA of such Development Plan as the Approved Development Plan, Developer may not change the Approved Development Plan with respect to the Station Upgrades without WMATA's prior written approval, which approval shall not be unreasonably withheld, except as to WMATA's Unconditional Approval Matters in which case approval may be withheld in WMATA's sole and absolute discretion. After the approval by WMATA of the Approved Development Plan, WMATA shall have no right to make or require changes to the Approved Development Plan.

7.6 **Approvals.** Developer, at its option but subject to this Agreement, may commence, or cause General Contractor or other third party to commence, the effort to obtain the Approvals, Station Upgrade Approvals and Construction Approvals for the Station Upgrades, at any time, provided, however, that Developer shall not make, or cause General Contractor or other third party to make, any Submission for any Station Upgrade Approvals or Approvals or Construction Approvals with respect to any Station Upgrades without the prior written consent of WMATA, as more particularly set forth in Section 7.8.1, below. In connection with Developer's efforts to obtain the Approvals, Station Upgrade Approvals and Construction Approvals for the Station Upgrades, with respect to the Property, WMATA shall lend reasonable cooperation and assistance to Developer, provided that WMATA shall not be required to incur any liability or expense in connection therewith.

7.7 **Developer's Obligations Applicable to Entire Property.** Developer shall use Commercially Reasonable Best Efforts to seek and secure, or cause General Contractor or other third party to seek and secure, the Approvals, Station Upgrade Approvals and Construction Approvals. Notwithstanding anything to the contrary, Developer shall not be authorized and WMATA shall not be required to approve or agree to variances, predications or other governmental requirements to the extent the same adversely impact WMATA's Unconditional Approval Matters.

7.8 **Submission of Proposed Applications for Approvals, Station Approvals and Infrastructure Development**

7.8.1 **Timing of Application for Approvals and Station Approvals.** Developer shall provide, or cause General Contractor or other third party to provide, to WMATA the proposed Submission applications for any Approvals and Station Upgrade Approvals to be submitted to the District or other governmental or quasi-governmental authority. Any such Submission application for Approvals and Station Upgrade Approvals that relates to, or that could affect the Station Upgrades (including the schedule of completion of the Station Upgrades) must first be submitted for WMATA's review and approval in conformity with the timing procedure set forth in Section 7.5.2, above. Within five (5) days after WMATA has approved such proposed Submission application(s) in accordance with Section 7.5.2, above, Developer shall make, or cause General Contractor or other third party to make, formal application of such Submission(s) under applicable laws for all Station Upgrade Approvals and, if necessary, Approvals that reasonably are susceptible to submission at such time and,

27

thereafter, at the earliest possible time. Requests for Approvals that do not relate to, or affect, the Station Upgrades shall be submitted to WMATA at, or before, the date they are submitted to the District or other governmental or quasi-governmental authority, and Developer shall use Commercially Reasonable Best Efforts to provide, or cause General Contractor or other third party to provide, WMATA with such Submission applications as soon as possible. If WMATA does not approve it prior to Submission, then WMATA reserves the right to object, to the District or appropriate authority, to any request for Approval and/or Station Upgrade Approval if it is in any way inconsistent with the terms of this Agreement or would impair WMATA's transit operations.

7.8.2    **Compliance of Developer's Submissions with Approved Development Plan.** Unless expressly approved by WMATA in its discretion in writing, each Submission for the Approvals and Station Upgrade Approvals:

    7.8.2.1    Shall comply with this Agreement and shall be consistent with the Approved Development Plan in all respects; and

    7.8.2.2    Shall not contain, propose or constitute an acceptance of features that relate to or could impact on WMATA's Unconditional Approval Matters, except only as expressly set forth in the Approved Development Plan.

7.8.3    Intentionally Deleted.

7.8.4    **Coordination for Obtaining Approvals and Station Upgrade Approvals.** Each party shall deliver to the other Notice of any change in the identity of its Designated Representative. The WMATA Designated Representative and the Developer Designated Representative shall keep each other fully informed of all pending meetings, hearings and conferences with governmental agencies occurring in connection with all applications, Submissions, Approvals and Station Upgrade Approvals, and each of the WMATA Designated Representative and the Developer Designated Representative shall have the right to attend any and all of the meetings pertaining to the same. Copies of all material communications delivered to or received by Developer or WMATA in connection with applications, Submissions, Approvals and Station Upgrade Approvals shall be promptly delivered to the WMATA Designated Representative or the Developer Designated Representative, respectively. Nothing contained in this Section 7.8.5 shall be deemed to modify any obligation of the parties with respect to delivery of Notices.

7.8.5    **Construction Approvals.** The procedures for WMATA's review and approval of Submissions for Construction Approvals for the Station Upgrades shall be included in the Construction Agreement.

**ARTICLE 8**
**CLOSING**

8.1    **Dates, Places Of Closing and Prorations**

8.1.1    Closing shall be on December 1, 2006 (the "**Closing Date**").

8.1.2    Closing shall take place at a location determined by Developer in the Washington, D.C. metropolitan area.

8.1.3    Except as otherwise expressly provided in this Agreement and subject to Section 18.24, below:

    8.1.3.1    Closing costs shall be allocated between WMATA and Developer, as follows:

        Developer shall be responsible for (i) all applicable recordation, transfer and mortgage taxes assessed by the District's Recorder of Deeds, (ii) title insurance and escrow costs, (iii) all costs associated with Developer's due diligence including any appraisals, environmental assessments, architectural and/or engineering assessments, insurance and any and all consultants, inspections, or reports of any kind, deemed necessary by Developer or Developer's lender, and (iv) Developer's own legal expenses.

        WMATA shall be responsible for (i) preparation of the Deed, and (ii) WMATA's own legal expenses.

        Developer shall pay for any and all other closing costs not covered above, or in Section 8.1.3.2, below.

    8.1.3.2    All normal and customarily pro-ratable items, including, without limitation, personal property taxes, utilities, other operating expenses and fees, shall be prorated as of the Closing Date.

**8.2**    **Items to Be Delivered Prior to or at Closing.**

8.2.1    **WMATA.** At Closing, WMATA shall deliver to Developer each of the following items, as applicable:

    8.2.1.1    The Deed.

    8.2.1.2    The CCR.

    8.2.1.3    The Construction Agreement.

    8.2.1.4    The Affordable Housing Covenant.

    8.2.1.5    The Alley Easement Agreement.

    8.2.1.6    The Parking License Agreement.

29

8.2.1.7    A closing statement executed by WMATA.

8.2.1.8    An owner's affidavit in form reasonably required by the Title Company.

8.2.1.9    Prior to Closing, WMATA shall have delivered to Developer and Title Company satisfactory evidence (as determined by Developer and Title Company in their reasonable discretion) of WMATA's authority to convey the Property to the Developer.

8.2.1.10    Such other documents and instruments by WMATA as may be reasonably required by Developer and/or Title Company in order to consummate the transaction contemplated by this Agreement.

8.2.2    **Developer.**  At Closing, Developer shall deliver, or cause to deliver, to WMATA each of the following items:

8.2.2.1    A closing statement executed by Developer.

8.2.2.2    The CCR executed by both Developer and any Affiliate of Developer that owns the Adjacent Property.

8.2.2.3    The Construction Agreement.

8.2.2.4    The Affordable Housing Covenant executed by Developer and any Affiliate of Developer that owns the Adjacent Property.

8.2.2.5    The Alley Easement Agreement.

8.2.2.6    The Parking License Agreement.

8.2.2.7    The Project Schedule.

8.2.2.8    Intentionally Omitted.

8.2.2.9    Prior to Closing, Developer shall have delivered to WMATA and Title Company satisfactory evidence (as determined by WMATA and Title Company in their reasonable discretion) of Developer's ownership or control of Developer's Property and authority to purchase the Property.

8.2.2.10    Such other instruments, documents or certificates by Developer as are reasonably required by WMATA and/or Title Company in order to consummate the transaction contemplated by this Agreement.

8.3    **Financing for Purchase Price/Parking Escrow.**

8.3.1    Notwithstanding any contrary provision contained in this Agreement, Developer and WMATA acknowledge and agree that (a) Developer, as of the Closing Date, has not obtained funds for the Purchase Price, as may be adjusted or prorated pursuant to this Agreement and (b) as an accommodation to Developer, WMATA hereby agrees to defer Developer's payment of the Purchase Price, as may be adjusted or prorated, until on or before 5:00 p.m., Washington, DC time, on December 20, 2006 (the "**Payment Date**"). Accordingly, on the Closing Date, Developer shall deliver to WMATA an amount, in cash equal to Seven Hundred Fifty Thousand and NO/100 Dollars ($750,000.00) (the "**Financing Contingency Amount**"). Upon receipt, WMATA shall promptly place the Financing Contingency Amount in a non-interest bearing account (and such amount will be recorded as a special line item in WMATA's accounts receivable and will be included in WMATA's general ledger) as WMATA, in its reasonable discretion, deems suitable. In the event Developer fails to timely deliver the Purchase Price, as may be adjusted or prorated pursuant to this Agreement, to WMATA, the Financing Contingency Amount and the Deposit shall be forfeited by Developer as liquidated damages, all Closing deliverables made hereunder shall be returned to each respective party, and this Agreement shall automatically terminate and be of no further force and effect except as to those provisions which expressly survive termination. In the event the Developer timely delivers the Purchase Price, as may be adjusted or prorated pursuant to this Agreement, by the Payment Date, the Title Company, pursuant to each party's written closing instructions previously delivered to the Title Company, shall be authorized to record in the Land Records of the District, in the following order, the Deed, the CCR and the Affordable Housing Covenant.

8.3.2    If the Developer timely delivers the Purchase Price, as may be adjusted or prorated pursuant to this Agreement, then Five Hundred Thousand Dollars ($500,000.00) of the Financing Contingency Amount shall be promptly returned to Developer. The remainder of the Financing Contingency Amount, in the amount of Two Hundred Fifty Thousand Dollars ($250,000.00) (the "**Parking Escrow Amount**"), shall continue to be held in escrow by WMATA. The Parking Escrow Amount shall be forfeited to WMATA as liquidated damages if WMATA's use and possession of the Interim Parking Lot or, if applicable, any Alternate Interim Parking Lot is interrupted as a result of the foreclosure of any mortgage or deed of trust (or transfer by way of deed-in-lieu thereof) encumbering the real property on which such parking is located. The Parking Escrow Amount shall be returned promptly to Developer if Developer (a) obtains the SNDA or (b) refinances the existing mortgage(s) or deed(s) of trust encumbering the property on which the Interim Parking Lot or, if applicable, any Alternate Interim Parking Lot is located such that WMATA's right to use such parking is senior to any existing mortgage or deed of trust. If not previously released to WMATA, the Parking Escrow Amount shall be returned promptly to Developer at such time as WMATA is no longer entitled to use and occupy the Interim Parking Lot or, if applicable, the Alternate Interim Parking Lot under the Parking License Agreement.

8.3.3    The parties expressly acknowledge that it would be impracticable and extremely difficult to ascertain the actual damages suffered by WMATA as a result of

31

Developer's default under either Section 8.3.1 or Section 8.3.2 and that, under the circumstances existing as of the Effective Date, the liquidated damages set forth therein represent a reasonable estimate of the damages that WMATA would incur as a result of a default by Developer thereunder. The parties acknowledge and stipulate that payment of such liquidated damages under Section 8.3.1 or Section 8.3.2 is not intended as a forfeiture or penalty. The parties hereby waive any and all rights to contest the validity of the liquidated damages provisions under Section 8.3.1 or Section 8.3.2, including the defense that there is or may be an adequate remedy at law.

## ARTICLE 9
## REPRESENTATIONS, WARRANTIES AND COVENANTS OF WMATA AND DEVELOPER; WMATA OBLIGATIONS PRIOR TO CLOSING

**9.1    Representations And Warranties of WMATA**

9.1.1    For the purpose of inducing Developer to enter into this Agreement to cause the construction of the Station Upgrades and to consummate the sale and purchase of the Property in accordance herewith, WMATA represents and warrants to Developer the following as of the Effective Date and as of Closing:

9.1.1.1    WMATA is a regional body, corporate and politic, organized pursuant to Public Law 89-774, 80 Stat. 1324; Maryland Acts of General Assembly, Chapter 869-1965; Virginia Acts of Assembly, Chapter 2-1966; and Resolution of D.C. Board of Commissioners adopted November 15, 1966.

9.1.1.2    WMATA has full corporate power and authority to sell and convey the Property and to execute this Agreement and the Deed and prior to Closing will have taken, as applicable, all corporate, or equivalent entity actions required for the consummation of the transactions contemplated by this Agreement. The parties executing this Agreement on behalf of WMATA have full power and authority to bind WMATA to the obligations of WMATA set forth herein;

9.1.1.3    WMATA owns fee title to the Property, subject to encumbrances and other matters of record and existing site conditions;

9.1.1.4    There are no adverse or other parties in possession of the Property;

9.1.1.5    The joinder of no person or entity other than WMATA is necessary to convey the Property to Developer at Closing in accordance with the terms and conditions of this Agreement or for WMATA to fulfill WMATA's other obligations subject to and in conformity with the terms and conditions of this Agreement;

32

9.1.1.6    To WMATA's Actual Knowledge, there are no actions, proceedings, litigation, governmental investigations or condemnation actions either pending or threatened against the Property;

9.2    **As Is, Where Is Terms.** Except for the representations and warranties expressly set forth above in Section 9.1 or elsewhere in this Agreement, this Agreement is being executed and the Property is expressly to be purchased and sold **"AS IS," "WHERE IS,"** and **"WITH ALL FAULTS."** The Purchase Price and the terms and conditions set forth herein, are the result of arm's-length bargaining, and reflect the fact that, other than any special warranty of title contained in the Deed and those set forth above in Section 9.1 or elsewhere in this Agreement, Developer is relying on no statements, representations or warranties, express or implied, made by or enforceable, directly or indirectly, against WMATA. Upon Closing, Developer assumes all risks associated therewith, except only for those matters that are within the express scope of WMATA's representations and warranties and then only for such period as to which claims in respect thereto may be asserted by Developer under this Agreement.

9.3    **WMATA Information.** Developer is buying the Property based solely on its inspection and investigation of the Property. In order to induce WMATA to enter into this Agreement, Developer represents and warrants that it has undertaken all due diligence and has reviewed and conducted such independent analyses, studies, reports, investigations and inspections as it deems appropriate in connection with the Property and the Project that Developer in its judgment has determined to its satisfaction to be required or desirable. To the extent that WMATA has provided or provides any information, data, reports, studies or the like (**"WMATA Information"**), WMATA has made and makes no representations or warranties whatsoever regarding the accuracy, completeness or reliability of all or any part thereof. Developer has been, and under this Agreement is being, provided with ample opportunity to confirm the suitability, feasibility and all other characteristics of the Property to its satisfaction, and that it shall rely only on its own due diligence and not on any WMATA Information in making a determination as to whether it should continue with the Project. If Developer relies on any such WMATA Information, such reliance shall be at Developer's sole risk and peril and all claims against WMATA.

9.4    **Title Information.** Developer shall rely only on any title insurance obtained by Developer with respect to title to the Property and to any matter as to which a title policy endorsement is available in the jurisdiction where the Property is located.

9.5    **Information Concerning Zoning and Code Requirements.** No representation has been made and no responsibility is assumed by WMATA with respect to current and future applicable zoning or building code requirements; the Property's compliance with Laws; or the Property's financial earning capacity or expense history.

33

9.6    **Representations And Warranties Of Developer.**

9.6.1    For the purpose of (i) inducing WMATA to enter into this Agreement, (ii) using Developer as Project Manager to cause the construction of the Station Upgrades and (iii) consummating the sale and purchase of the Property in accordance herewith, Developer represents and warrants to WMATA the following as of the Effective Date and as of Closing:

9.6.2    With respect to Developer and its business, Developer represents and warrants, in particular, that:

        9.6.2.1    Developer is a limited liability company duly formed, validly existing and in good standing under the Laws of the State of Delaware, and is authorized and qualified to do business in the District.

        9.6.2.2    Developer, acting through any of its or their duly empowered and authorized officers, partners or members, has all necessary power and authority to own and use its properties and to transact the business in which it is engaged, and has full power and authority to enter into this Agreement, to execute and deliver the documents and instruments required of Developer herein, and to perform its obligations hereunder; and no consent of any of Developer's officers, partners or members is required to so empower or authorize Developer.

        9.6.2.3    No pending or, to the Actual Knowledge of Developer, threatened litigation exists that, if determined adversely, would restrain the consummation of the transactions contemplated by this Agreement or would declare illegal, invalid or non-binding any of Developer's obligations or covenants to WMATA.

        9.6.2.4    Developer, acting through its duly empowered and authorized member is duly authorized to execute, deliver and perform this Agreement and all documents and instruments and transactions contemplated hereby or incidental hereto, and such execution, delivery and performance by Developer does not (i) violate any of the provisions of its organizational documents, operating agreements or similar organic documents, (ii) violate any provision of any Laws currently in effect, (iii) violate any judgment, decree, writ, injunction, award, determination or order currently in effect that names or is specifically directed at Developer or its property, or (iv) require the consent, approval, order or authorization of, or any filing with or notice to, any court or other governmental authority.

9.6.2.5    Developer or a Developer Affiliate owns or controls, or at the time of Closing, will own or control, the Developer's Property and the Adjacent Property.

9.7    **Survival Period.** WMATA and Developer agree that those representations contained in Sections 9.1 and 9.6 shall survive Closing for a period of one (1) year (that is, any proceeding based on the breach of a representation contained in Section 9.1 or 9.6 that survives Closing must be commenced within one (1) year subsequent to the Closing Date). If WMATA breaches any representation contained in Section 9.1 and Developer had Actual Knowledge of such breach prior to the Closing Date, Developer shall be deemed to have waived any right of recovery and WMATA shall not have any liability in connection therewith. If Developer breaches any representation contained in Section 9.6 and WMATA had Actual Knowledge of such breach prior to the Closing Date, WMATA shall be deemed to have waived any right of recovery and Developer shall not have any liability in connection therewith. In no event shall WMATA's collectively liability or Developer's collective liability after Closing in connection with any breach by same of a representation or warranty contained in Sections 9.1 and 9.6 (exclusive of Section 9.6.2.5), respectively, exceed Five Hundred Thousand Dollars ($500,000.00), and no action may be taken with respect to any greater amounts or other assets of WMATA or Developer, as applicable.

9.8    **Intentionally Deleted.**

## ARTICLE 10
## CONDITIONS PRECEDENT TO CLOSING

10.1    **Developer's Conditions.** Developer's obligation to close under this Agreement shall be subject to and conditioned upon the fulfillment (or written waiver by Developer) of each and all of the following conditions precedent:

10.1.1    All the documents required to be delivered by WMATA to Developer at or before Closing shall have been delivered;

10.1.2    Each of the representations and warranties of WMATA made as of the Effective Date herein shall be true in all material respects with the same effect as if made at and as of Closing;

10.1.3    Neither party shall have previously exercised any right to terminate this Agreement;

10.1.4    There shall not exist any Default under this Agreement by WMATA or circumstances, which with notice or the lapse of time would constitute a Default by WMATA under this Agreement;

10.1.5    Intentionally Omitted;

10.1.6    Title to the Property shall be in the condition specified in Article 5 hereof;

10.1.7    The execution and delivery of the CCR by WMATA, Developer and the Affiliate of Developer that owns the Adjacent Property;

10.1.8    The execution and delivery of the Affordable Housing Covenant by WMATA, Developer and the Affiliate of Developer that owns the Adjacent Property;

10.1.9    The execution and delivery of the Construction Agreement by WMATA, Developer and General Contractor;

10.1.10   The execution and delivery of the Alley Easement Agreement by WMATA and MR Ballpark 3 LLC;

10.1.11   The execution and delivery of the Parking License Agreement by WMATA and MR Ballpark 2 LLC; and

10.1.12   WMATA shall have performed in all material respects each and every obligation of WMATA to be performed hereunder except to the extent waived by Developer in writing.

10.2    **WMATA's Conditions.**  Without limiting any of WMATA's rights elsewhere provided for in this Agreement, WMATA's obligation to consummate the transactions contemplated hereunder, including authorization to record the Deed in the Land Records, shall be subject to and conditioned upon the fulfillment of each and all of the following conditions precedent:

10.2.1    All documents required to be delivered by Developer to WMATA at or before Closing shall have been delivered;

10.2.2    Each of the representations and warranties of Developer made as of the Effective Date herein shall be true in all material respects with the same effect as if made at, and as of, such Closing;

10.2.3    Developer shall have paid the Deposit and all other payments required to be made by Developer at Closing prior to, or on, the Closing Date;

10.2.4    Developer shall have paid the Purchase Price prior to, or on, the Payment Date;

10.2.5    Neither party shall have previously exercised any right to terminate this Agreement;

10.2.6    Intentionally Deleted

10.2.7    There shall have occurred no Change of Control of Developer, other than (a) with the prior written approval of WMATA or (b) as permitted in accordance with the terms and provisions of Section 13.4, below;

10.2.8    All required payment and performance bonds and any other security, including any letters of credit required hereunder, for the benefit of WMATA shall have been posted or delivered, as applicable, prior to, or on the Payment Date;

36

10.2.9      There shall not exist any Default under this Agreement by Developer or circumstances, which with notice or the lapse of time could constitute a Default by Developer;

10.2.10      The execution and delivery of the CCR by WMATA, Developer and the Affiliate of Developer that owns the Adjacent Property.

10.2.11      The execution and delivery of the Affordable Housing Covenant by WMATA, Developer and the Affiliate of Developer that owns the Adjacent Property;

10.2.12      The execution and delivery of the Construction Agreement by WMATA, Developer and General Contractor;

10.2.13      The execution and delivery of the Alley Easement Agreement by WMATA and MR Ballpark 3 LLC;

10.2.14      The execution and delivery of the Parking License Agreement by WMATA and MR Ballpark 2 LLC; and

10.2.15      Developer shall have performed in all material respects each and every obligation of Developer to be performed hereunder except to the extent waived by WMATA in writing.

10.3      **Failed Conditions.** In the event of any failure of the above conditions precedent set forth in this Agreement as of the Closing Date that are not the result of a Default by the party asserting such failure, then Developer, with respect to the conditions precedent set forth in Section 10.1, or WMATA with respect to the conditions precedent set forth in Section 10.2, shall have the option, in its sole discretion, exercised by written notice to the other party hereto, to either (i) waive such conditions and proceed to Closing in accordance with this Agreement on the applicable Closing, or (ii) terminate this Agreement, whereupon, the full amount of the Deposit shall be promptly refunded to Developer by WMATA, and the parties shall have no further obligations or liabilities hereunder, except for liabilities that expressly survive termination.

**ARTICLE 11**
**INTENTIONALLY OMITTED**

**ARTICLE 12**
**TRANSIT ORIENTED DEVELOPMENT; FTA APPROVAL**

12.1      **Transit-Oriented Development.** Developer warrants and covenants that the Project shall, at all times, be and remain a Transit-Oriented Development. This covenant shall run with the Property and be included in the CCR.

12.2      **FTA Approval.** The Project is subject to FTA approval. As of the Effective Date, WMATA has received FTA approval of the Station Upgrades and the Project.

12.3    **FTA Requirements.** In accordance with FTA Circular 5010.C—Appendix, Section 9(a), Developer shall, in the CCR, covenant not to discriminate based on race, color, national origin, sex or disability. In addition, the Construction Agreement shall require that all improvements to be constructed on the Property shall comply with Titles II and III of the "Americans with Disabilities Act," 42 USC § 12101, *et seq.*, as amended, and any regulations promulgated thereunder (**"ADA"**) as appropriately applied to Developer owned (Title III) and WMATA owned (Title II) improvements.

### ARTICLE 13
### ASSIGNMENT OF AGREEMENT

13.1    **Personal Services Contract.** WMATA has entered into this Agreement on the basis of its trust and special confidence in Developer. Except for any permissible "Change of Control" or other permissible assignment, sale or transfer of any interests in Developer as set forth herein, Developer shall continue to remain in control of the management and construction of the Project through Station Upgrades Final Completion.

13.2    **Assignment**

13.2.1    Neither this Agreement nor any rights or interests conferred hereunder shall be assigned or assignable, delegated or transferred in any manner by Developer without WMATA's prior written approval in WMATA's sole discretion and any purported assignment, delegation or transfer in violation of this provision shall be null and void. No assignment shall relieve or release Developer from its obligations under this Agreement.

13.2.2    All assignments shall be made expressly subject to this Agreement and shall require among other things:

    13.2.2.1    That the assignment shall not be binding on WMATA until a duly executed copy of the assignment is delivered to WMATA. The assignment shall designate the name of the assignee and the address to which all Notices required by this Agreement shall be sent; and

    13.2.2.2    That the assignee shall expressly assume all rights and obligations of Developer under this Agreement and the other Transaction Documents, as if such assignee were an original party to this Agreement and the other Transaction Documents.

13.3    **Change of Control.** Prior to Station Upgrades Final Completion, each and every Change of Control of the Developer shall require the prior written approval of WMATA in WMATA's sole discretion. Contemporaneously herewith, Developer has delivered to WMATA a true, accurate and complete organizational structure chart of Developer.

13.4    **Developer Affiliates.** Notwithstanding any contrary provision contained herein, WMATA's prior written approval shall not be required for any direct or indirect sale or transfer by Developer of all of, a majority of, a fifty percent interest in, or a controlling

38

interest in Developer to (A) any Developer Affiliate (hereinafter defined), provided Developer provides (i) WMATA at least fifteen (15) Business Days prior written notice of such sale or transfer to such Developer Affiliate, and (ii) evidence reasonably acceptable to WMATA in the form of organizational agreements or other documentary evidence demonstrating that such sale or transfer is to a Developer Affiliate entity, or (B) any equity partner identified by Developer ("**Equity Investor**"), provided, in the case of subsection (A) and/or (B) above, that (i) Developer provides WMATA at least fifteen (15) Business Days prior written notice of any such sale or transfer, and (ii) evidence reasonably acceptable to WMATA in the form of organizational agreements or other documentary evidence demonstrating that, after any such sale or transfer, Developer or a Developer Affiliate shall remain in control of the management and construction of the Project through Station Upgrades Final Completion.    As used herein, the term **"Developer Affiliate"** means any entity owned or controlled directly or indirectly by Developer or the principals of Monument Realty LLC.

13.5  **Institutional Lender.**  Notwithstanding any contrary provision contained herein, this Agreement and the rights conferred herein, and the Transaction Documents or any other agreements contemplated hereunder and the rights conferred therein, may be assigned to any Institutional Lender providing financing for the Property and/or the Project, as applicable, with prior or simultaneous written notice to WMATA but without the consent of WMATA, provided that enforcement of such right of assignment is conditioned, first, on the occurrence of an event of a default under any loan documents for financing for the Property and/or the Project with such Institutional Lender (with, for purposes of this assignment clause only, the determination of whether such a default has occurred to be made solely by the Institutional Lender) and, second, as a condition to the Institutional Lender's right to enforcement of assignment, the assignee under any such assignment (or the assignee under any re-assignment thereof at the time of the Institutional Lender's enforcement of its rights and remedies) shall in writing assume all rights and obligations of Developer under this Agreement and the other Transaction Documents, as if such assignee were an original party to this Agreement and the other Transaction Documents and such assumption agreement will be sent to WMATA immediately upon execution thereof.

## ARTICLE 14
## BROKERAGE

WMATA and Developer each represents and warrants to the other that it has not dealt with or utilized the services of any real estate broker, sales person or finder in connection with this Agreement.

## ARTICLE 15
## DEFAULTS AND REMEDIES

15.1  **WMATA's Default.**  WMATA shall be in "Default" if it fails to perform any material agreement or covenant required to be performed by WMATA under this Agreement and any such failure is not cured within fifteen (15) days after receipt of Notice (or, if cure is not practical within fifteen (15) days, a reasonable additional period of time, so long as

39

WMATA commences such cure within fifteen (15) days and thereafter diligently prosecutes such cure to completion). WMATA shall not be in default for any failure or non-satisfaction of a condition precedent to Developer's obligation to consummate Closing.

15.2    **Developer's Remedies.**  If WMATA is in Default, and, if Developer is not otherwise in Default hereunder, Developer, in addition to any other rights and remedies available to it at law or in equity (including, without limitation, the right to require specific performance) shall be entitled to terminate this Agreement and to receive a refund of the Deposit, which shall be promptly refunded to Developer by WMATA (except to the extent of WMATA's entitlement to retain same under the Right of Entry Permit or other terms of this Agreement); provided that in no event shall Developer be entitled to any consequential damages in connection with any Default by WMATA.

15.3    **Developer's Default.**    Developer shall be in "Default" under this Agreement if Developer breaches any covenant of Developer contained in this Agreement or fails to perform any Developer Responsibility, in any material respect, and such failure is not cured within five (5) Business Days of receipt of Notice (for defaults with respect to Developer's obligation to make monetary payments to WMATA) or fifteen (15) days after receipt of Notice (for non-monetary defaults) (or, if cure for non-monetary default is not practical within fifteen (15) days, a reasonable additional period of time, so long as Developer commences such cure within fifteen (15) days and thereafter diligently prosecutes such cure to completion).

15.4    **WMATA's Remedies.**

15.4.1    WMATA shall be entitled to exercise the following remedies in connection with a Developer's Default:

15.4.1.1    If Developer shall be in Default prior to the Payment Date, WMATA shall have the right to terminate this Agreement, in its entirety, by Notice to Developer and the full amount of the Deposit and Financing Contingency Amount paid, or required to be paid by Developer, to WMATA pursuant to this Agreement shall be paid by Developer and/or retained by WMATA as liquidated damages as WMATA's exclusive remedy hereunder, except as otherwise provided in the Right of Entry Permit. Notwithstanding the foregoing, WMATA shall retain its rights and remedies available pursuant to this Agreement that expressly survive any termination of this Agreement.

15.4.1.2    If Developer shall be in Default under this Agreement after the Payment Date, then WMATA shall have all rights and remedies available to it at law or in equity as to such Default, including, without limitation, receipt of the full amount of the Deposit then held by WMATA pursuant to this Agreement, the right to require specific performance, and the right to recover its actual damages

40

which actual damages shall be specifically limited to Developer's interest and ownership in the Project; and provided that in no event shall WMATA be entitled to any consequential damages in connection with such Default. Notwithstanding the foregoing, WMATA shall retain its rights and remedies available pursuant to this Agreement that expressly survive any termination of this Agreement.

15.4.2    It would be impracticable and extremely difficult to ascertain the actual damages suffered by WMATA as a result of Developer's pre-Payment Date default hereunder, and that, under the circumstances existing as of the Effective Date, the liquidated damages to the extent provided for in Section 15.4.1 represent a reasonable estimate of the damages that WMATA would incur as a result of such Default by Developer. The parties acknowledge and stipulate that payment of such liquidated damages under Section 15.4.1 is not intended as a forfeiture or penalty. The parties hereby waive any and all rights to contest the validity of the liquidated damages provisions under Section 15.4.1 and this Section 15.4.2, including the defense that there is or may be an adequate remedy at law.

15.4.3    Subject to the limitations set forth in Section 15.4.1, above, the payment of liquidated damages as provided in Section 15.4.1 shall not extinguish or otherwise affect any other of Developer's liabilities with respect to the Station Upgrades or post-closing liabilities or WMATA's remedies in respect thereof specified in this Agreement.

15.4.4    All remedies of WMATA under this Agreement and under Laws shall be cumulative, unless otherwise expressly provided to the contrary in this Agreement.

**15.5    Refund of Deposit.**

15.5.1    Developer shall be entitled to a refund of the Deposit only in accordance with the terms and provisions of this Agreement, and to the extent provided in Section 15.5.2, below:

15.5.2    Notwithstanding anything to the contrary, WMATA's obligation to refund the Deposit to Developer shall be subject to offset by WMATA to the extent of WMATA's entitlement to retain all or any portion of the Deposit under this Agreement for obligations of Developer that have accrued prior to the date on which WMATA's obligation to make such refund arises.

41

## ARTICLE 16
## INTENTIONALLY DELETED

## ARTICLE 17
## INTENTIONALLY DELETED

## ARTICLE 18
## MISCELLANEOUS

18.1  **Exhibits And Schedules.**  Exhibits and Schedules annexed hereto are incorporated herein and part of this Agreement.

18.2  **Binding Effect.**  This Agreement is binding upon WMATA and Developer, and their respective successors, heirs and permitted assigns.

18.3  **Captions.**  Captions, headings and arrangements used in this Agreement are for convenience only and do not in any way affect, limit, amplify, or modify the terms and provisions hereof.

18.4  **Number And Gender Of Words.**  Whenever the singular number is used, it shall include the plural where appropriate; words of any gender shall include the other gender where appropriate.

18.5  **Notices.**  All notices, demands, requests and other communications required pursuant to or in connection with the provisions of this Agreement ("Notice") shall be in writing and shall be deemed to have been properly given or served for all purposes (i) if sent by any nationally recognized overnight carrier for next business day delivery, on the actual date of delivery by such carrier, or (ii) if personally delivered, on the actual date of delivery or (iii) if sent by certified mail, return receipt requested postage prepaid, on the fifth (5th) Business Day following the date of mailing addressed as follows:

If to Developer:

> MR Ballpark 5 LLC
> c/o Monument Realty LLC
> 1155 Connecticut Avenue, N.W.
> 7th Floor
> Washington, DC 20036
> Attn:  Jeffrey T. Neal
> Phone:  (202) 777-2001
> Fax:  (202) 777-2020

And with a copy to:

> Holland & Knight LLP
> 2099 Pennsylvania Avenue, N.W.
> Suite 100
> Washington, DC 20006-6801
> Attn:  Charles Welch Tiedemann, Esq.
> Phone:  (202) 955-3000

42

Fax: (202) 955-5564

If to WMATA:

Washington Metropolitan Area Transit
Authority
600 Fifth Street, NW
Washington, D.C. 20001
Attn: Director, Office of Property
Development and Management
Phone: (202) 962-1504
Fax: (202) 962-2396

And with a copy to:

Washington Metropolitan Area Transit
Authority
600 Fifth Street, NW
Washington, D.C. 20001
Attn: General Counsel
Phone: (202) 962-1275
Fax: (202) 962-2550

Any party may change its address by written Notice to the other.

18.6 **Governing Law And Venue.** District law (except for its conflict of laws provisions) exclusively governs the validity, construction, enforcement and interpretation of this Agreement. Except as expressly permitted in Section 3.1, all claims, disputes and other matters arising out of or relating to this Agreement, or the breach thereof, shall be decided by proceedings instituted and litigated in the United States District Court of the District, and the parties hereto expressly consent to venue and jurisdiction in such court.

18.7 **Entirety And Amendments.** This Agreement embodies the entire Agreement between the parties and supersedes all prior Agreements and understandings, if any, relating to the Property. This Agreement may be amended only by writing executed by the party against whom enforcement is sought.

18.8 **Severability.** If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future laws, such provision shall be fully severable. The Agreement shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Agreement and the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance from this Agreement.

18.9 **Multiple Counterparts.** This Agreement may be executed in a number of identical counterparts. If so executed, each of such counterparts is deemed an original for all purposes and all such counterparts shall, collectively, constitute one Agreement. In

making proof of this Agreement, it shall not be necessary to produce or account for more than one such counterpart.

18.10  **Further Acts.**  WMATA and Developer agree to perform, execute or deliver or cause to be performed, executed or delivered any and all such further acts, deeds and assurances as may be reasonably necessary or appropriate to consummate the transactions contemplated in this Agreement.

18.11  **Intentionally Deleted.**

18.12  **Intentionally Deleted.**

18.13  **Intentionally Deleted.**

18.14  **Sovereign Immunity; Anti-Deficiency Clause.**  WMATA is liable for contractual obligations in accordance with the WMATA Compact.  Nothing in this Agreement shall otherwise be deemed or construed to waive any immunity of WMATA.  All obligations of WMATA hereunder that directly or indirectly require, or may require, WMATA's expenditure of funds are, and shall be, subject to the appropriation and availability of funding through WMATA's normal and customary budgetary procedures.

18.15  **Construction.**  No provision of this Agreement shall be construed in favor of, or against, any particular party by reason of any presumption with respect to the drafting of this Agreement; both parties, being represented by counsel, having fully participated in the negotiation of this Agreement.

18.16  **Time Of The Essence.**  Time is of the essence under this Agreement.

18.17  **Cumulative Remedies And Waiver.**  Except as otherwise provided in this Agreement, no remedy herein conferred or reserved is intended to be exclusive of any other available remedy or remedies, but each and every such remedy shall be cumulative and shall be in addition to every other remedy given under this Agreement or now or hereafter existing at law or in equity.  No delay or omission to exercise any right or power accruing upon any default, omission or failure of performance hereunder shall impair any right or power or be construed as a waiver thereof, but any such right and power may be exercised from time to time and as often as deemed expedient.  No waiver, amendment, release or modification of this Agreement shall be established by conduct, custom or course of dealing.

18.18  **Disclaimer.**  WMATA shall have no obligation to make any change, demolition or improvement of, or to, the Property, except as expressly set forth in this Agreement, and Developer shall have no right to make any such changes, demolitions or improvements without the prior written consent of WMATA.

18.19  **Intentionally Omitted.**

18.20  **Use of WMATA Compact.**  In no event shall Developer assert for its own benefit, or attempt to claim or assert, an exemption or immunity available to WMATA under the

Washington Metropolitan Area Transit Authority Compact, Public Law 89-774, 80 Stat. 1324, as same may be amended (the "**WMATA Compact**").

18.21 **Hazardous Materials.** Developer and any Persons now or hereafter occupying any part of the Project shall not cause or permit any Hazardous Materials to be used, generated, stored or disposed of, on or about, from or adjacent to the Property.

18.22 **Noise and Vibrations.** Developer and any Persons now or hereafter occupying any part of the Project shall make no claim against WMATA arising from noise or vibration caused from WMATA's operation of the Metro Station or any WMATA Facilities. A provision to this effect shall be included in the CCR.

18.23 **No Interference.** Except as otherwise set forth herein and in the Construction Agreement, following Final Completion of the Station Upgrades, Developer shall not interfere or permit any interference with any of WMATA's operations or the free flow of pedestrian traffic to and from the Metro Station, WMATA Facilities, the Station Upgrades or WMATA's Reserved Areas. Developer shall not conduct or permit any activities to be conducted that would interfere with or diminish WMATA's ability to realize transit revenues in, on or about the Property.

18.24 **Acknowledgment of Tax Exempt Status.** WMATA is a tax exempt entity and shall not pay any taxes or impositions relating to this Agreement or the transactions contemplated by this Agreement or the other Transaction Documents. Any and all taxes and other impositions shall be paid by Developer. From and after the Effective Date, other than such impositions as WMATA has routinely paid and is legally required to pay with respect to the Property on and before the Effective Date, Developer (and not WMATA) shall pay all taxes and impositions, including, without limitation, real estate taxes, relating to the Property.

18.25 **Officials Not To Benefit.**

18.25.1 No member of, or delegate to, Congress, or any similar official, or any member of such person's family, shall be admitted to any share or part of this Agreement, or to any benefit that may arise therefrom. Developer warrants, represents, and agrees that as of the date of this Agreement, no person described in this Subparagraph, nor any entity with which such person is affiliated, has any such interest in Developer or any Consultant. Developer shall forthwith deliver, and cause its Consultants to deliver, written notice to WMATA of any breach of the foregoing warranty, representation, and agreement, and shall make reasonable inquiries from time to time to determine whether any such breach has occurred.

18.25.2 No member, officer, or employee of WMATA or of a local public body during his/her tenure or one year thereafter shall have any interest, direct or indirect, in this Agreement.

18.26 **Gratuities.** In connection with this Agreement, or any amendments or modifications thereto, the giving of, or offering to give, gratuities (in the form of entertainment, gifts or otherwise) by the Developer or any Consultant, or any agent, representative, or other

person deemed to be acting on behalf of the Developer or any Consultant, or any contractor, subcontractor or supplier furnishing material to or performing work under this Agreement, or any agent, representative or other person deemed to be acting on behalf of such supplier or subcontractor, to any director, officer or employee of WMATA, or to any director, officer, employee or agent of any of WMATA's agents, consultants or representatives, with a view toward securing an agreement or securing favorable treatment with respect to the awarding or amending, or the making of any determinations with respect to performance under this Agreement or any agreement that will be negotiated, is expressly forbidden. The terms of this Section shall be strictly construed and enforced in the event of violation hereto.

18.27 **Litigation Expenses.** If either party commences litigation or arbitration against the other to enforce its rights hereunder, the prevailing party in such litigation shall be entitled to recover from the other party its reasonable attorneys' fees and litigation or arbitration expenses.

18.28 **Time Periods.** Should the last day of a time period fall on a Saturday, Sunday, federal or District legal holiday, the next Business Day thereafter shall be considered the end of the time period.

18.29 **Third Parties.** There are no third party beneficiaries of this Agreement.

18.30 **Ratification by WMATA's Board of Directors.** WMATA's Board of Directors approved this Agreement on November 17, 2006.

18.31 **Limitation of Liability.** Notwithstanding any contrary provision contained in this Agreement, WMATA and Developer expressly acknowledge and agree that: (a) subject to the terms of Section 15.4.1.2, above, Developer's liabilities and obligations under this Agreement and any document referenced herein shall be limited to the named "Developer" hereunder, its successors and/or assigns; (b) Developer's obligations and liabilities under this Agreement and any document referenced herein shall not constitute personal obligations of the officers, directors, employees, agents, attorneys, shareholders, principals, members, managers or representatives of Developer, any Developer Affiliates, Development Manager or Project Manager; and (c) WMATA's obligations and liabilities under this Agreement and any document referenced herein shall not constitute personal obligations of the officers, directors, employees, agents, attorneys, shareholders, principals, members, managers or representatives of WMATA. The limitations of liability contained in this Section 18.31 shall apply equally to, and inure to the benefit of present and future officers, directors, agents, employees, attorneys, shareholders, members, managers or other principals and representatives and their respective heirs, successors and assigns for each party set forth above in this Section 18.31.

18.32 **Survival.** Except as otherwise specifically set forth in Section 9.7, above, all representations, warranties, covenants and provisions of this Agreement shall survive recordation of the Deed and Closing hereunder, and shall not be merged into the Deed.

18.33  **Soil Disclosure.**  The characteristics of soil on the Property as described by the Soil Conservation Service of the United States Department of Agriculture in the Soil Survey of the District of Columbia and as shown on the Soil Maps of the District of Columbia is Urban Land.  For further information, Developer may contact a soil-testing laboratory, the District of Columbia Department of Environmental Services or the Soil Conservation Service of the Department of Agriculture.

18.34  **UST Disclosure.**  Concurrently with its execution of this Agreement, WMATA has executed and delivered to Developer, pursuant to the Underground Storage Tank Management Act of 1990, an Underground Storage Tank Real Estate Transfer Disclosure Form.

18.35  **General Interpretive Principles.**  For purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires, (i) the terms defined in this Agreement have the meanings assigned to them in this Agreement and include the plural as well as the singular, and the use of any gender herein shall be deemed to include the other gender; (ii) accounting terms not otherwise defined herein have the meanings assigned to them in accordance with generally accepted accounting principles; (iii) references herein to sections, subsections, paragraphs and other subdivisions without reference to a document are to designated sections, subsections, paragraphs and other subdivisions of this Agreement; (iv) the words "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular provision; (v) the word "including" means "including, but not limited to"; and (vi) a reference herein to an Exhibit without a reference to a document is to be designated Exhibit attached to this Agreement and incorporated herein by reference.

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement under seal as their free act and deed for the uses and purposes herein contained as of the date first set forth above.

WMATA:

**Washington Metropolitan Area Transit Authority**

By: _Jack Requa_ (signature)

Name: Jack D Requa

Title: Acting General Manager

Developer:

**MR Ballpark 5 LLC, a Delaware limited liability company**

By:  **MR Ballpark 5 Holdings LLC, a Delaware limited liability company**

    By:  **MR Ballpark 5 Capital LLC, a Delaware limited liability company**

        By: _(signature)_

        Name: _____

        Title: Managing Member

        Date: _____

# EXHIBIT A

## PROJECT SCHEDULE

# 4219285_v4

**Navy Yard Station Modifications**
**Station Upgrades**

| Activity ID | Description | Item Dur | Early Start | Early Finish |
|---|---|---|---|---|
| D90010 | **DEVELOPMENT SCHEDULE** | | | |
| D90010 | Alley Closings - Development Schedule | 11* | 07/17/08 | 12/19/08 |
| D90020-PA | Documents and Drawings | 0 | 07/17/08 | |
| D50000-PA | Introduction to Council by Arborists | 0 | 09/05/08 | 09/05/08 |
| D50010-PA | Presentation to ANC 6D | 0 | 10/10/08 | 10/10/08 |
| D50002-PA | Presentation to the COW | 0 | 10/31/08 | 10/31/08 |
| D50003A-PA | First Hearing of the COW | 0 | 11/20/08 | 11/20/08 |
| D50005B-PA | Second Hearing of the COW | 1 | 12/19/08 | 12/19/08 |
| D50006-PA | Emergency Legislation Approval by Council | 1 | 12/19/08 | 12/19/08 |
| D90060 | Lot Consolidation | 9 | 12/20/08 | 01/02/07 |
| D90070 | Zoning Approvals - Development Schedule | 88* | 06/01/06 | 04/11/07 |
| D50008-PA | Record/Administration/Drawings | 0 | 06/01/06 | 04/03/07 |
| D50010-PA | Filing | 0 | 11/16/06 | 11/16/06 |
| D50010A-PA | Presentation to ANC 6D | 0 | 12/19/06 | 12/19/06 |
| D50130 | Hearing | 0 | 01/11/07 | 01/11/07 |
| D50130 | Design Documents - Precursor Activities | 187* | 06/19/06 | 06/20/07 |
| D50140-PA | Schematic Develop | 67 | 06/01/06 | 11/28/06 |
| D50140A-PA | Design Development | 38 | 11/30/06 | 01/24/07 |
| D50150-PA | Sign-off on Schematic Drawings | 39 | 11/25/06 | 02/21/07 |
| D50160-PA | Provide Site Drawings/Foundation to Grade | 0 | 02/28/07 | 02/28/07 |
| D50200-PA | Shoring and Excavation Design | 145 | 10/24/06 | 04/12/06 |
| D50210-PA | Construction Drawings: Above Grade | 23 | 09/01/07 | 05/13/06 |
| D50180 | **Permits - Submittal/Approvals - Development** | 277* | 09/11/06 | 10/03/07 |
| D50210A-PA | Abatement/Demolition Permit for MR Properties | 61 | 09/11/06 | 12/05/06 |
| D50215-PA | Demo Existing Structures | 17 | 12/06/06 | 12/28/06 |
| D50220-PA | Sheeting, Shoring and Excavation Permit App | 81 | 11/25/06 | 01/02/07 |
| D50230 | Issue Sheeting and Excavation Permit | 0 | 01/02/07 | 01/02/07 |
| D50240 | Above Grade Improvements Permit + WMATA/Tru | 29 | 02/28/07 | 09/25/07 |
| MA0000 | Above Grade Improvements Permit | 0 | 09/03/07 | 09/03/07 |
| MA0000 | **MUNICIPAL ACTIVITIES** | 146* | 10/06/06 | 04/30/07 |
| MA0010 | Issue Public Space Permit | 89 | 10/06/06 | 04/30/07 |
| MA0020 | Issue Dewatering/Sediment and Erosion Control Pa | 61 | 10/06/06 | 01/02/07 |
| MA0030 | Issue Raze Permit | 50 | 10/06/06 | 12/18/06 |
| MA0035 | Issue Frame Permit | 80 | 11/14/06 | 12/28/06 |
| MA0040 | Issue Curb & Lane Permit | 145 | 10/06/06 | 10/03/07 |
| MA0050 | **WMATA ACTIVITIES** | 397* | 10/04/06 | 04/01/07 |
| WA0000 | Adjacent Construction Approval | 15 | 03/22/07 | 04/12/07 |
| WA0010 | Support of Excavation Preliminary Approval | 0 | 10/04/06 | 12/15/06 |
| WA0020 | Support of Excavation Final Approval | 20 | 11/17/06 | 12/15/06 |
| WA0028 | Status Upgrades - 60% Design Submittal/Approval | 15 | 12/14/06 | 01/02/07 |
| WA0030 | Status Upgrades - 90% Design Submittal/Approval | 15 | 01/25/07 | 02/23/07 |
| WA0040 | Status Upgrades - 100% Design Submittal/Approval | 15 | 04/02/07 | 04/23/07 |
| WA0050 | Closing of West Entrance | 0 | 01/02/07 | |
| WA0060 | Furnish & Install Kiosk/AFC Fare Machines | 55 | 01/16/08 | |
| WA0070 | **INTERIM PARKING LOT** | | | |
| IPL0000 | Issue Interim Parking Lot | 25* | 09/20/06 | 10/26/06 |
| IPL0010 | Storm Water Management Design | 25 | 09/20/06 | 10/26/06 |
| IPL0020 | Asphalt at Layout/Design | 25 | 09/20/06 | 10/26/06 |
| IPL0020-PA | **Permits - Interim Parking Lot** | 37* | 09/20/06 | 11/17/06 |
| IPL0040 | Zoning Commission Approval "Temp Parking Lot" | 0 | 11/17/06 | 11/17/06 |
| IPL0041-PA | Demo/Asbestos Permit (MR 6) | 25 | 10/25/06 | 11/28/06 |
| IPL0045-PA | Grading Permit (Sign off MR 5) | 32 | 10/25/06 | 12/06/06 |
| IPL0050-PA | Grading Permit (MR 6) | 5 | 12/06/06 | 12/15/06 |
| IPL0060-PA | Electric Permit (CSB) | 25 | 11/15/06 | 12/15/06 |
| IPL0090 | Construction - Interim Parking Lot | 45* | 10/26/06 | 01/01/07 |

Start date 06/02/06 12:00PM
Finish date 04/01/08 11:55AM
Data date 06/16/06 12:00PM
Run date 11/28/06 1:00PM
Page number 1A

© Primavera Systems, Inc.

Navy Yard Station Modifications
Station Upgrades

| Activity ID | Description | Rem Dur | Early Start | Early Finish |
|---|---|---|---|---|
| NY0058 | Street Traction Elevator Rails + Brackets | 30 | 11/12/2007 | 12/24/07 |
| NY0031 | Street Traction Elevator Set Machines | 5 | 1/22/407 | 12/31/07 |
| NY0033 | Street Traction Elevator Ropes, Platform + Cab | 38 | 12/31/07 | 02/19/08 |
| NY0078 | Street Traction Elevator Finishes | 25 | 02/19/08 | 03/24/08 |
| NY0080 | Street Traction Elevator Testing + Inspections | 4 | 03/24/08 | 03/31/08 |
| NY0032 | Kiosk + Station Elevator Finishes | 178 | 04/03/07 | 12/03/07 |
| NY0033 | Remove of Existing Kiosk | 10 | 04/03/07 | 04/16/07 |
| NY0034 | Demo at Existing Mezzanine for New Fare Card Arr | 60 | 04/16/07 | 09/24/07 |
| NY0035 | Revenue Collection Rough-In | 115 | 06/25/07 | 12/03/07 |
| B80090 | BASE BUILDING - Column Lines 2 - 6 | | | |
| B80100 | Parking Level P-3 - Base Building | 15* | 07/23/07 | 08/10/07 |
| B80060-PA | Place P-3 Support Slab | 5 | 07/23/07 | 07/27/07 |
| B80070-PA | Place P-3 Mud Mat | 4 | 07/23/07 | 07/27/07 |
| B80140-PA | P-3 Walls | 8 | 07/27/07 | 08/07/07 |
| B80090-PA | P-3 Columns | 10 | 07/30/07 | 08/13/07 |
| B80100-PA | P-3 Columns | 5 | 08/07/07 | 08/08/07 |
| B80120 | Parking Level P-2 - Base Building | 15* | 09/03/07 | 09/24/07 |
| B80130-PA | Place P-2 Support Slab | 5 | 09/03/07 | 07/00/07 |
| B80150-PA | P-2 Walls | 10 | 09/10/07 | 09/24/07 |
| B80160-PA | P-2 Columns | 10 | 09/03/07 | 09/13/07 |
| B80160-PA | P-2 Columns | 5 | 09/20/07 | 09/27/07 |
| B80160 | Parking Level P-1 - Base Building | 15* | 09/03/07 | 09/24/07 |
| B80170-PA | Place P-1 Support Slab | 5 | 09/03/07 | 09/10/07 |
| B80180-PA | P-1 Walls | 10 | 09/10/07 | 09/24/07 |
| B80180-PA | P-1 Columns | 6 | 09/03/07 | 09/24/07 |
| B80200 | Base Building 1st Floor - Base Building | 6 | 09/11/07 | 09/24/07 |
| B80210-PA | Place 1st Floor Support Slab | 6 | 09/24/07 | 10/02/07 |
| B80220 | Base Building 2nd Floor - Base Building | 8 | 10/02/07 | 10/12/07 |
| B80230-PA | Place 2nd Floor Support Slab | 8 | 10/02/07 | 10/12/07 |
| B80060 | Base Building 3rd Floor - Base Building | 8 | 10/15/07 | 11/12/07 |
| B80050-PA | Place 3rd Floor Support Slab | 8 | 10/23/07 | 11/12/07 |

Navy Yard Station Modifications
Station Upgrades

| | |
|---|---|
| Start date | 06/02/06 12:00PM |
| Finish date | 04/01/08 11:58AM |
| Data date | 09/11/06 12:00PM |
| Run date | 11/28/06 1:00PM |
| Page number | 3A |

© Primavera Systems, Inc.

Early bar
Progress bar
Critical bar
Summary bar
Progress point
Critical point
Summary point
Start milestone point
Finish milestone point

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MONUMENT REALTY LLC, *et al.*, ) | |
| ) | |
| *Plaintiffs* ) | |
| ) | |
| v. ) | Civil Action No. 1:07-CV-01821 (EGS) |
| ) | |
| WASHINGTON METROPOLITAN AREA ) | |
| TRANSIT AUTHORITY, ) | |
| ) | |
| *Defendant* ) | |
| ) | |

EXHIBIT 3

**MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY'S
MOTION TO DISMISS FIRST AMENDED COMPLAINT**



# FOR SALE
# (WITH LEASEBACK)

**PROPERTY OF**
**THE WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY**
**(WMATA)**
**Office of Property Development and Management**
**600 Fifth Street, NW**
**Washington, DC 20001**

Bid No. 08-1
Invitation For Bids For Sale,
With Leaseback,
of
WMATA Property
Lots 857 and 866, Square 700
District of Columbia

W000080

**Bid No. 08-1**
**INVITATION FOR BIDS FOR SALE,**
**WITH LEASEBACK,**
**OF**
**WMATA PROPERTY**
**Lots 857 and 866, Square 700**
**District of Columbia**

A.    **INVITATION FOR BIDS**

1.    **Invitation for Bids.**    The Washington Metropolitan Area Transit Authority ("WMATA") invites interested parties to submit sealed bids in accordance with the terms of this Invitation For Bids For Sale, With Leaseback, of WMATA Property ("Invitation for Bids"). Sealed bids will be received at the Office of Property Development and Management, Washington Metropolitan Area Transit Authority, 600 Fifth Street, NW, Washington, DC 20001 starting **July 30, 2007**, and closing on **August 28, 2007** at **2:00 P.M.** ("Bid Deadline") at which time bids will be opened. The bid opening will not be open to the public. Bids may be mailed or hand-carried, but must be **received** by WMATA prior to the Bid Deadline.

All bids submitted must comply with this Invitation for Bids, including its General Terms of Sale and Leaseback, Special Terms of Sale, Instructions to Bidders and Bid for Purchase of WMATA Property (the "Bid Form"), all of which are attached. WMATA may reject any noncomplying bid.   WMATA will not be responsible for any expenses incurred by bidders.

2.    **Property Description.**    The property comprises two separate parcels consisting of approximately 69,607 square feet (Square 700, Lot 857) and approximately 27,558 square feet (Square 700, Lot 866) (hereinafter "the Property").   Improvements include asphalt paving and a 60,200-square-foot industrial building used as a bus maintenance facility. The bus facility is a one-story brick building constructed in 1936 and renovated in 2002.

3.    **Zoning.** The Property is believed to be zoned CG-CR. The bidder, at its own risk, is required to verify zoning and to make all determinations as to whether the Property can be used for whatever purpose bidder wishes. WMATA makes no warranties or representations regarding zoning or the Property's suitability for any use or purpose.

4.    **Utilities.**  WMATA believes all usual services and utilities are available to the Property. The bidder, at its own risk, is required to verify services and utilities and to make all determinations as to whether such services and utilities can be used by the bidder.

1

5. <u>**Title Documentation and Closing**</u>. WMATA acquired the property from the DC Transit System by Declaration of Taking No. CA-79-73 dated January 12, 1973, recorded in the Land Records of the District of Columbia in Book 4178, Page 920. WMATA will not obtain or provide a title report or title insurance. The bidder is exclusively responsible for investigating title and determining whether the state of title suits bidder's purposes. WMATA will convey the Property by special warranty deed subject to all encumbrances of record.

6. <u>**Inspection**</u>. Bidders are invited and encouraged to inspect the Property prior to submitting a bid. Inspections will be scheduled through WMATA. Walk-through inspections will be permitted without a permit or other formal documentation. Inspection of the Property must be coordinated through the WMATA contact person indicated in Section C, Paragraph 5. Due diligence is the bidder's responsibility, to be done at bidder's sole expense. WMATA will provide bidders the opportunity to review environmental documents and reports in WMATA's possession by appointment, but makes no warranty or representation as to the accuracy or completeness of such documentation.

7. <u>**Effect of Submitting Bid**</u>. By submitting a bid, the bidder is deemed to have agreed to, and accepted, all terms in this Invitation for Bids. Notwithstanding the foregoing, WMATA reserves the right to amend or modify any of the terms and conditions set forth herein. After the bid opening, WMATA will select the Successful Bidder and may also select one or more Alternate Bidders based upon the terms offered. WMATA's obligations hereunder are expressly contingent upon WMATA obtaining the approvals described in Section B, Paragraph 13. You will become the Successful Bidder (with the corresponding obligation and risk of performance hereunder) as soon as WMATA notifies you of your selection.

B.   **GENERAL TERMS OF SALE AND LEASEBACK**

1. <u>**Invitation for Bids**</u>. "Invitation for Bids" refers collectively to this Invitation for Bids (including its general and special terms of sale and leaseback and instructions) as well as the accompanying Bid Form, form of Real Estate Permit, form of Lease, and Underground Storage Tank Real Estate Disclosure Form, all as may be modified and supplemented by any addenda thereto.

2. <u>**Descriptions in Invitation for Bids**</u>. Information provided in the Invitation for Bids is based on information available to WMATA and is believed to be correct, but any error or omission, including but not limited to the omission of any information available to WMATA, will not constitute grounds or reason for nonperformance under this Invitation for Bids, or claim by bidder for allowance, refund or deduction from the purchase price. The foregoing disclaimer does not apply to the legal description of the Property as Square 700, Lot 857 and Lot 866 in the District of Columbia.

W000082

3.   **Condition of Property**.   The Property is being sold **"AS IS, WHERE IS."**   Except for statutory disclosures expressly provided in this Paragraph, WMATA disclaims any warranty or representation, express or implied, as to, or concerning, the following: (a) the condition or state of repair of the Property, including the possible presence of hazardous substances on, under, or in the vicinity of the Property; (b) suitability of the Property for any use; or (c) compliance with any applicable laws, including without limitation, land use, wetland, zoning, or environmental laws.   No claim for any allowance or deduction upon such grounds will be considered after the bid opening.   Notwithstanding the foregoing, pursuant to the Underground Storage Tank Management Act of 1990, WMATA makes the disclosures set forth in the Underground Storage Tank Real Estate Transfer Disclosure Form.   The Successful Bidder agrees to execute and deliver the Underground Storage Tank Real Estate Transfer Disclosure Form (Attachment 3) at settlement. In addition, the characteristics of soil on the Property as described by the Soil Conservation Service of the United States Department of Agriculture in the Soil Survey of the District of Columbia and as shown on the Soil Maps of the District of Columbia is Urban (Ub).   For further information, any bidder may contact a soil-testing laboratory, the District of Columbia Department of Environmental Services or the Soil Conservation Service of the Department of Agriculture.

4.   **Continuing Offers**.   Each bid received will be a continuing irrevocable offer for one hundred twenty (120) calendar days after the date of the bid. WMATA reserves the right to consider, and accept, late modification of the successful bid that makes its terms more favorable to WMATA.

5.   **Possession**.   Title to the Property will pass to the Successful Bidder at settlement upon payment of the purchase price; possession of the Property, after settlement, will be governed by the terms of the Lease.

6.   **Leaseback Provision**.   At settlement, the Successful Bidder shall lease the Property back to WMATA for a period of thirty-six (36) months at the rental rate specified in the Bid Form.   The lease of the Property from the Successful Bidder to WMATA shall be pursuant to the form Lease (Attachment 1), attached hereto and made a part hereof.   The Bid Form shall set forth a monthly rent.   You may set a single monthly rent to be paid for each month of the 36 month term.   You may also set forth a different fixed monthly rent for a different portion of the lease term; that is, by way of illustration, the fixed monthly rent for months 25 through 36 may be higher (or lower) than that for months 13 through 24, which, in turn, may be higher (or lower) than that for months 1 through 12.   You must, however, identify a certain fixed rent amount for each month of the lease term; that is, rent cannot be calculated by reference to any index, including a CPI index.   You may propose modification to the form Lease, but you are discouraged from doing so, and bids submitted proposing a landlord-tenant relationship other than that described in the form Lease will be disfavored and may be rejected solely on that ground.

3

7. **Taxes**. As of the date of settlement, the Successful Bidder will assume responsibility for all general and special, real and personal property taxes and any other impositions on the Property. The lease must remain a gross lease, with WMATA to pay only the fixed monthly rent amount(s) identified in your Bid Form and no portion of real estate taxes.

8. **Insurance**. WMATA is not imposing any insurance requirements on the Successful Bidder for the time period between bid acceptance and settlement except as required in WMATA's Real Estate Permit, attached hereto as Exhibit B, for due diligence entry upon the Property (either before bidding or by the Successful Bidder pursuant to Paragraph B.11, below).

9. **Default**. If the Successful Bidder defaults on any of the terms of this Invitation for Bids, including failing to timely proceed to settlement, the Bid Deposit, together with the Security Deposit and any payments subsequently made on account, will be forfeited, as liquidated damages, in which event the Successful Bidder will be relieved from further liability, except for its indemnification obligations under the Real Estate Permit.

10. **WMATA Liability**. If a bid is accepted by WMATA and: (1) WMATA fails for any reason to perform its obligation as set forth herein; or (2) title does not transfer or vest in the Successful Bidder for any reason although the Successful Bidder is ready, willing, and able to settle, then the Successful Bidder's sole remedy shall be for specific performance and the Successful Bidder shall have no right to monetary damages. Neither party shall be entitled to recover attorneys' fees.

11. **Due Diligence Period**. The Successful Bidder shall have forty-five (45) days from the date it receives WMATA's notification of designation as Successful Bidder to perform any necessary environmental and title due diligence. Upon expiration of this forty-five (45) day period (the "Due Diligence Period"), the Successful Bidder, by written notice to WMATA, shall either a) withdraw its bid and this Invitation for Bids shall be of no further force and effect and the Security Deposit (but *not* the Bid Deposit, which becomes non-refundable upon designation as Successful Bidder, unless WMATA fails to obtain the Approvals required under Paragraph B.13, below) shall be returned; or b) proceed to settlement in accordance with the terms of this Invitation for Bids. Prior to Successful Bidder's entry on the Property for any testing or work more intrusive or prolonged than a walk-through inspection, the Successful Bidder will execute and deliver to WMATA a Real Estate Permit in the form shown in Attachment 2. The Successful Bidder may elect, in its Bid Form, to waive the Due Diligence Period. WMATA reserves the right to select a bid where the Due Diligence Period is waived over another bid, even where the other bid is otherwise more economically favorable to WMATA. In the event the Successful Bidder waives the Due Diligence Period, then settlement will occur not later than five (5) business days after WMATA satisfies the conditions precedent identified in Paragraph B.13, below.

12. **Alternate Bidders**. WMATA, in its sole discretion, may select Alternate Bidder(s) in response to this Invitation for Bids. If the initial Successful Bidder defaults or terminates

W000084

pursuant to Paragraph B.11, above, WMATA may select an Alternate Bidder as the Subsequent Successful Bidder which shall be treated in all respects as a Successful Bidder, except that the Subsequent Successful Bidder shall be afforded the full 45-day Due Diligence Period set forth in Paragraph B.11, above, commencing on the date the Alternate Bidder receives written notice from WMATA that it has been designated as a Subsequent Successful Bidder.

13. **Approvals**. WMATA's offer of the Property for sale, and its authority to sell the Property, is contingent upon approval by the WMATA Board of Directors and any required approval by the Federal Transit Administration (FTA). During the Due Diligence Period (which will run to the benefit of WMATA under this Paragraph even if waived by the Successful Bidder under Paragraph B.11, above), WMATA will make best efforts to obtain the required approvals. If WMATA fails to timely obtain the required approvals, WMATA, by written notice delivered to the Successful Bidder (and any Alternate Bidder(s)), shall withdraw this bid and the offer of the Property, and return the Security Deposit and the Bid Deposit. WMATA and the Successful Bidder may agree to extend the 45-day Due Diligence Period and/or the approval period described in this Paragraph as well as the settlement date.

14. **Settlement**. The balance of the purchase price (by certified or cashier's check) is due at settlement. Settlement is to be held on November 30, 2007, at a location within ten (10) miles of WMATA's headquarters building. The Successful Bidder shall select the title company. The Successful Bidder will notify WMATA by written notice of the time and place of settlement not less than two (2) weeks in advance. WMATA may extend the settlement date for a reasonable amount of time to obtain approvals or prepare conveyance documents. Title examination, conveyancing, notary and other fees, state and local revenue stamps, transfer and recording taxes and all recording charges, and fees necessary to secure the loan, if any, are to be paid by the Successful Bidder.

15. **Contract of Sale**. This Invitation for Bids, and the bid when accepted, will constitute an enforceable contract between the Successful Bidder and WMATA. No oral statements or representations made by, or on behalf of either party will be a part of such contract; nor will the contract, or any interest therein, be transferred or assigned by the Successful Bidder without the consent of WMATA, and any assignment transaction without such consent will be void, except that the Successful Bidder may assign the contract to a special purpose entity controlled by the Successful Bidder. WMATA will not pay brokerage commissions.

16. **Officials Not to Benefit**. No member of or delegate to Congress, or resident commissioner, will be admitted to any share or part of the sale transaction or to any benefit that may arise therefrom. This provision will not be construed, however, to extend to a corporation if it is entering into this transaction for its general benefit.

W000085

17. **FTA Compliance**.  WMATA is required to provide the Federal Transit Administration (FTA) with notice of the sale and conveyance of the Property. By submitting a Bid Form, the bidder is certifying to WMATA that it is not debarred under any federal procurement regulation. The special warranty deed will require the Successful Bidder to covenant that it will not exclude any person, or otherwise discriminate against any person, on the grounds of race, color, national origin, sex, or disability in connection with construction upon, or operations on the Property and that any construction upon the Property will comply with the "Americans with Disabilities Act" (ADA), 42 U.S.C. §12101, et seq., as amended, and any regulations promulgated thereunder.

## C.    SPECIAL TERMS OF SALE

1. **Bid Deposits**.  A Bid Deposit is required. **Bid Forms not accompanied by a Bid Deposit will be disqualified.**  The Bid Deposit must be tendered by a cashier's check or certified check only. No interest will accrue on the Bid Deposit. All checks are to be made payable to "WMATA". The full balance of the purchase price is due and payable at settlement.

**Bid Deposit**

**THREE HUNDRED THOUSAND DOLLARS ($300,000)**

2. **Return of Bid Deposits**.  The Bid Deposit of the Successful Bidder and any Alternate Bidders will be held until the Property is sold and the Successful Bidder's deposits are applied to the purchase price. The bid deposits of the Successful Bidder is non-refundable unless WMATA fails to obtain any approval required as a condition of sale in Section B, Paragraph 13, above.  The Bid Deposit for all other bidders will be returned, via express carrier, within five (5) business days after the date of settlement.

3. **Security Deposit**.  In addition to the Bid Deposit, which is a prerequisite of bidding, the Successful Bidder will also have to post a Security Deposit, which along with the Bid Deposit, will be applied toward the purchase price at settlement.  Within five (5) business days after a bidder's designation as the Successful Bidder, the Successful Bidder must deliver the Security Deposit to WMATA in the form of a cashier's check or certified check. No interest will accrue on the Security Deposit.

**Security Deposit**

**THREE MILLION DOLLARS ($3,000,000)**

The Successful Bidder's failure to timely transmit the Security Deposit to WMATA will

W000086

result in a default and, in addition to its rights under Section B, Paragraph 9, WMATA may immediately thereupon designate a Subsequent Successful Bidder.

4.    **Minimum Bid Price**.  The minimum bid amount for this Property is:

**SIXTY MILLION DOLLARS ($60,000,000)**.

5.    **Bidding in General**.  Bids extending the settlement date will not be accepted.  Bid Forms must be delivered to the WMATA Office of Property Development and Management either in person, by mail, or express delivery and received by WMATA by the Bid Deadline, **August 28, 2007** at **2:00 p.m.** Immediately after the Bid Deadline, WMATA will open bids and select the Successful Bidder and any Alternate Bidders. The bid opening will not be open to the public. All bids are irrevocable for one hundred twenty (120) calendar days from the date of the bid. The bid which represents the best net return to WMATA after leaseback monthly rent for WMATA's anticipated lease term (which may, in WMATA's sole discretion be less than 36 months) is deducted from the Bid Amount. The Successful Bidder and any Alternate Bidders will be notified in writing at the address they provide on the Bid Form.  WMATA reserves the right to reject any and all bids at any time for any reason. Additional Bid Forms are available from WMATA's Office of Property Development and Management.  Bid Forms may be photocopied and used.

If you wish to hand deliver a bid, enter the Jackson Graham Building at 600 Fifth Street, NW, Washington, DC 20001 and request that the receptionist call extension 2392 or 1588 to be directed to the appropriate location to deliver the bid.

Questions about this Invitation for Bids should be submitted to Mr. Bob Burns at rlburns@wmata.com. Questions will be answered publicly; that is, WMATA will post all questions and answers on its website: www.wmata.com (About Metro/Business Opportunities, Metro Real Estate, Southeastern Bus Garage Sale). Mr. Burns may be also reached for general comments at 202-962-2393.

D.    **INSTRUCTIONS TO BIDDERS**

1.    **Bid Form**.

   a. Bids must be submitted only on a fully-completed Bid Form.

   b. Bids must be legible with corrections initialed and the bid manually signed.

7

W000087

c. In submitting a bid, only return the Bid Form. Retain all other documents, including one copy of the Bid Form, for your records.

2. **Bid Envelopes**. Envelopes containing bids must be sealed and addressed to the bid receiving office stated in this Invitation for Bids. The name and address of the bidder must be shown in the upper left corner of the bid envelope, and the invitation number, the date and the phrase **"Bid for Real Property"** must be shown in the lower left corner of the envelope. No responsibility will attach to any officer of WMATA for the premature opening of or failure to open a bid not properly addressed and identified.

3. **Bid Executed on Behalf of Bidder**.

a. Attorney or Agent: A bid may be executed by an attorney or agent on behalf of the bidder if the Bid Form is accompanied by an original, notarized Power of Attorney.

b. Corporation: If the bidder is a corporation, the Bid Form must be signed under the corporate seal by a duly authorized officer of the corporation. The bidder must submit evidence of corporate authorization to bid on behalf of the corporation.

c. Partnership: If the bidder is a partnership, the Bid Form must be signed by an authorized general partner or some other authorized agent. The bidder must submit evidence of the signatory's authorization.

d. Limited Liability Company: If the bidder is a limited liability company, the Bid Form must be signed by all Members or the bidder must provide evidence that all Members consented to the execution and delivery of the Bid Form, including but not limited to satisfactory evidence of the authority of a "Manager" or limited number of Members to execute and deliver the Bid Form.

4. **Bid Deposit**. Each bid must be accompanied by a Bid Deposit in the form of a certified check or cashier's check only, payable to the order of WMATA. See "Special Terms of Sale, Bid Deposits" (Section C, Paragraph 1) for further clarification.

Failure to provide the Bid Deposit will result in rejection of the bid. Upon acceptance of a bid, the Bid Deposit of the Successful Bidder will be applied toward payment of the Successful Bidder's obligation.

5. **Additional Information**. WMATA will, upon request, provide additional copies of this Invitation for Bids and Bid Form. Requests for additional available information and all questions regarding this Invitation for Bids must be submitted via e-mail to Mr. Burns in accordance with Section C, Paragraph 6, above. WMATA will post all questions and answers on its website: www.wmata.com (About Metro/Business Opportunities, Metro Real Estate, Southeastern Bus Garage Sale. Each bid submitted will be deemed to have

W000088

been made **with full knowledge of all terms,** conditions and requirements contained in this Invitation for Bids.

6.    **Waiver of Informalities or Irregularities**.   WMATA may, at its election, waive any minor informality or irregularity in bids received.

7.    **Acceptable Bid**.   A bid received from a responsible bidder whose bid, conforming to this Invitation for Bids, will be most advantageous to WMATA, in terms of purchase price and leaseback rental.   If two or more acceptable bids are received that are equal in all respects, the selection will be made by a drawing by lot limited to such equal bids.

8.    **Notice of Acceptance or Rejection**.   Notice by WMATA of acceptance or rejection of a bid will be deemed to have been sufficiently given when hand delivered, sent by overnight courier or mailed, via certified mail, return receipt requested, or mailed, via first-class mail, with a copy sent by facsimile, to the bidder, or his/her duly authorized representative, at the address (and facsimile number) indicated in the bid. WMATA's processing of a bid deposit will not, in itself, constitute acceptance of such bid.  WMATA reserves the right to reject any or all bids or portions thereof.

W000089

**BID NO. 08-1**

**WMATA Property**

**Lots 857 and 866, Square 700**

**District of Columbia**

## BID FOR PURCHASE OF WMATA PROPERTY (Bid Form)

TO:    Office of Property Development and Management

       Washington Metropolitan Area Transit Authority

       600 Fifth Street, NW

       Washington, DC  20001

**SUBJECT TO:**  The terms and conditions of the Invitation for Bids; the General Terms of Sale; the Special Terms of Sale and Leaseback; and the Instructions to Bidders, the Right of Entry Permit, Lease Form, and Underground Storage Tank Real Estate Transfer Disclosure Form, all of which are incorporated as part of this bid. The undersigned bidder hereby offers and agrees, if this bid is accepted, to purchase the identified Property at the bid price entered below by November 30, 2007 and to lease the Property back to WMATA at the Leaseback Rental entered below pursuant to the Lease form (or an alternate form submitted with this Bid Form (disfavored)).

The bid must be accompanied by a Bid Deposit in the amount of Three Hundred Thousand Dollars ($300,000).  The Bid Deposit must be in the form of a certified or cashier's check, payable to "WMATA".

Bid Amount: $_____

Bid Spelled-out: _____

Leaseback Rental (Per Month): $ _____

Leaseback Rental (Per Month) Spelled-out: $ _____

W000090

If I am selected as the Successful Bidder (or an Alternate Bidder), WMATA may notify me by courier, overnight delivery or certified mail, return receipt requested, at the address listed below.

If this bid is accepted, the deed should name the following as grantee(s) and the lease should identify the following as landlord:



You may designate an alternate grantee/landlord at settlement, provided it is controlled by the person or entity identified above.


Bidder represents that bidder operates as an individual / partnership / corporation / limited liability company / other: _____.    Evidence of authority to sign and submit this Bid Form (for any entity other than an individual) is attached.  If signed by a trustee or agent, a copy of the power of attorney or other authorizing document is attached.


If selected, I waive / do not waive the Due Diligence Period set forth in Section B, Paragraph 11 [circle the appropriate choice].


Initial: _____

11

W000091

Signature of bidder: _____    Date_____

Name (Print)_____

Title_____

Address_____City/State/Zip_____

Telephone_____

Facsimile Number _____

Signature of WMATA indicating acceptance of bid:


_____    Date_____
Nat Bottigheimer
Contracting Officer

12

W000092

**ATTACHMENT 1**
**AGREEMENT OF LEASE**

W000093

# AGREEMENT OF LEASE

**THIS AGREEMENT OF LEASE** ("**Lease**") is made this _____ day of _____, 2007 ("Effective Date"), by and between _____, a _____ with a principal office at _____ ("**Landlord**"), and the **WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY**, an interstate compact agency with a principal office at 600 Fifth Street, NW, Washington, DC 20001 ("**WMATA**"). Landlord and WMATA are sometimes referred to herein jointly as the "**Parties**" or individually as a "**Party**."

**WITNESSETH:**

**WHEREAS**, WMATA sold its property known as Lots 857 and 866 in Square 700 in the District of Columbia (and the improvements thereon) to Landlord ("**Property**"); and

**WHEREAS**, the Property has been used for decades as WMATA's Southeastern Bus Garage and adjacent parking lot ("**Southeastern Bus Garage Facility**"); and

**WHEREAS**, the leaseback of the Southeastern Bus Garage Facility to WMATA was a condition of the sale of the Property; and

**WHEREAS**, WMATA will continue to operate its Southeastern Bus Garage Facility in accordance with the terms and conditions set forth in this Lease.

**NOW THEREFORE**, in consideration of the foregoing, of the mutual promises hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

## 1.    INCORPORATION OF RECITALS

The recitals set forth above are incorporated herein and made a part of this Lease to the same extent as if set forth herein in full.

## 2.    AGREEMENT

Landlord leases the Property to WMATA, and WMATA leases the Property from Landlord, according to this Lease.

## 3.    PROPERTY

As stated above, the Property consists of Lots 857 and 866 in Square 700 in the District of Columbia and the building referred to as the Southeastern Bus Garage Facility, which includes the bus garage building, the bus parking lot and all existing heating,

W000094

electrical and plumbing systems.

## 4.   TERM

### 4.1.   Term

The term of this Lease shall be thirty-six (36) months, commencing on the Effective Date and ending on [DATE], unless earlier terminated pursuant to **Section 4.2** ("**Term**").

### 4.2.   Termination

WMATA has the right to terminate this Lease at any time during the Term by giving Landlord ninety (90) days Notice in accordance with **Section 14**.  Termination will be effective on the 90th day after Landlord's receipt of the Notice.

## 5.____USE

WMATA shall use the Property for continued operation of the Southeastern Bus Garage Facility and for any ancillary transit-related purposes.  WMATA shall comply with all applicable laws, rules and regulations, including those related to the use, storage and disposal of hazardous materials.  WMATA will not use or permit the Property to be used for any disorderly or unlawful purpose.

## 6.   RENT

### 6.1   Rent Amount

Tenant shall pay Landlord monthly rent in the amount of _____ _____ [to be obtained from successful bid] ("**Rent**").

### 6.2   Rent Payment

WMATA shall pay the Rent to Landlord by the fifth day of each calendar month without notice or demand.  Payments shall be sent to:

[to be obtained from successful bid]

## 7.   SECURITY DEPOSIT

There shall be no security deposit.

## 8.   TAXES

-3-

Landlord shall pay all taxes and other impositions related to the Property including without limitation, real estate taxes. Landlord acknowledges that pursuant to Section 78 of the WMATA Compact, WMATA is a tax-exempt entity and agrees that WMATA shall not be responsible for the payment of any taxes or impositions relating to this Lease or the Property.

## 9.    UTILITIES

WMATA shall be responsible for the payment of all utilities required to continue operating the Southeastern Bus Garage Facility during the Term.

## 10.    MAINTENANCE AND REPAIRS

WMATA shall maintain and repair the Property including the removal of snow and ice from the sidewalk. Because the Parties agree that all improvements will be demolished after WMATA vacates the Property, WMATA shall have no responsibility to perform any maintenance or repairs not required for WMATA operations, required by applicable law or required to maintain safe conditions.

## 11.    INSURANCE

WMATA is a self-insured governmental entity. Additionally, WMATA meets the financial responsibilities requirement set by the U.S. Environmental Protection Agency. At all times while this Lease is in effect, if requested by Landlord, WMATA shall provide Landlord with satisfactory evidence of its self-insurance. If Landlord seeks access to the Property other than to inspect it (e.g. to perform testing related to Landlord's anticipated development of the Property), then WMATA may require the Landlord provide reasonable insurance and indemnification.

## 12.    INDEMNIFICATION

To the extent permitted by law, WMATA shall protect, indemnify and hold harmless Landlord from and against any and all claims and costs of whatsoever kind or nature including reasonable attorney's fees, arising or alleged to arise for injury to any person or persons including death and/or loss or damage to any property occurring in connection with or arising out of WMATA's possession, use and occupancy of the Property during the Term.

## 13.    LANDLORD ACCESS

Landlord acknowledges that the Property is used as an operating bus facility and that for reasons of security and safety, Landlord and its agents may only enter the Property when escorted by a WMATA employee. To schedule entry onto the Property and an escort, Landlord and its agents shall contact WMATA's Office of Property Development

-4-

W000096

and Management at (202) 962-2392 or (202) 962-1588.  Under no circumstance shall Landlord interfere with WMATA's transit operations.

**14.    NOTICES**

All notices required or desired to be given hereunder by either Party to the other shall be given in writing by hand, overnight commercial courier, or by registered or certified mail, return receipt requested ("**Notice**").  Notices shall be deemed to have been given on the earlier of actual receipt or, in the case of mailing by United States mail, the fourth business day after the date so mailed, or in the case of overnight courier, on the first business day after delivery to such courier, to any Party as follows:

**14.1.  If to Landlord:**

_____

And with a copy to:

_____

**14.2.  If to WMATA:**

_____Manager, Asset Management
Office of Property Development and Management
Washington Metropolitan Area Transit Authority
600 Fifth Street, NW
Washington, DC 20001

And with a copy to:

General Counsel
Washington Metropolitan Area Transit Authority
600 Fifth Street, NW
Washington, DC 20001

**14.3.  Notice Recipient Changes**

Any Party may designate a change of name or address by sending a Notice to the other Party.

**15.    COVENANT OF QUIET ENJOYMENT**

So long as WMATA performs all of its duties and obligations under this Lease, WMATA's possession of the Property will not be disturbed by Landlord, or by the holders of any mortgage, deed of trust or similar instrument.

-5-

W000097

## 16. REMEDIES FOR FAILURE OF PERFORMANCE

If either Party to this Lease fails to perform any of its duties or obligations provided under this Lease ("**Defaulting Party**"), the other Party ("**Non-Defaulting Party**"), may, at any time, give  Notice pursuant to **Section 14**, to the Defaulting Party setting  forth the specific failures to comply with this Lease. If those failures are not corrected within ten (10) days for monetary defaults or thirty (30) days for non-monetary defaults (or in the case of a non-monetary default not correctable within thirty (30) days, such longer period of time as may be reasonably necessary to effect such cure provided the Defaulting Party commences to cure within the initial thirty (30) days and thereafter continuously and diligently prosecutes cure), then, upon the expiration of such cure period, the Non-Defaulting Party shall have the right to seek legal or equitable remedies against the Defaulting Party, including the Landlord's right to seek (by judicial proceedings only and not by self-help) possession of the Property.  All legal proceedings and actions shall be subject to Sections 80 and 81 of the WMATA Compact.  WMATA waives its right to any statutory notice to quit.

## 17. EXPIRATION/TERMINATION

This Lease shall terminate at the end of the Term unless WMATA exercises its right to terminate the Lease early as set forth in **Section 4.2**, above.

## 18. SURRENDER OF PROPERTY

Upon the expiration or earlier termination of this Lease, WMATA shall surrender the Property to Landlord in its existing condition.  Since the Parties agree that all improvements on the Property will be demolished, WMATA shall have no obligation to remove any fixtures, equipment  or personal property it no longer needs.  WMATA shall pay all outstanding utility bills immediately upon vacating the Property. Additionally, unless requested otherwise by Landlord in writing, WMATA shall have all utilities turned off, and transfer all utility accounts, if possible, to Landlord's name.

## 19. AUTHORITY OF PARTIES

### 19.1. Landlord

Landlord represents and warrants to WMATA that it has the power and authority to enter into and perform its obligations under this Lease.

### 19.2. WMATA

WMATA represents and warrants that it has the power and authority to enter into and perform its obligations under this Lease.

-6-

W000098

**20.    GOVERNING LAW**

The Parties acknowledge that WMATA is bound by the WMATA Compact.  The Parties agree that all matters of construction and interpretation with regard to this Lease shall be governed by the laws of the District of Columbia (without reference to choice of law principles), and all disputes arising under or related to this Lease shall be resolved in the United States District Court for the District of Columbia.  It is understood that no provision of this Lease shall constitute a waiver of WMATA's immunity under the WMATA Compact, or a consent to the jurisdiction of any tribunal, except as provided in Section 81 of the WMATA Compact.

**21.    BINDING NATURE OF LEASE/ASSIGNMENT**

The obligations and benefits of this Lease shall be binding upon and inure to the benefit of the Parties hereto and their respective heirs, legal representatives, successors and assigns.  This Lease may only be assigned or transferred by WMATA with the prior written approval of Landlord, which approval shall not be unreasonably withheld, delayed or conditioned. Landlord may assign this Lease.

**22.    NO BENEFIT TO GOVERNMENTAL OFFICIALS**

No Member of or Delegate to Congress shall be admitted to any share or part of this Lease or to any benefit to arise therefrom.

**23.    GRATUITIES**

Pursuant to this Lease, the giving of, or offering to give, gratuities in the form of entertainment, gifts or otherwise to any director, officer or employee of WMATA with a view toward securing an agreement or favorable treatment with respect to the awarding or amending, or the making of any determinations with respect to performance under this Lease, or any agreement that will be negotiated, is expressly forbidden.  The terms of this Section shall be strictly construed and enforced in the event of a violation.

**24.    AMENDMENTS**

This Lease may be amended or modified, in whole or in part, at any time or from time to time only by a written instrument executed by the Parties.

**25.    SEVERABILITY**

If any provision of this Lease shall, to any extent, be invalid or unenforceable, the remainder of this Lease (or the application of such provision to persons or circumstances other than those in respect of which it is invalid or unenforceable) shall not be affected thereby, and each provision of this Lease shall be valid and enforceable to the fullest

-7-

W000099

extent permitted by law.

## 26.    COUNTERPARTS

This Lease may be executed in one or more identical counterparts each of which shall be deemed to be an original thereof and shall be enforceable against each of the Parties hereto.

## 27.    ENTIRE AGREEMENT

All terms and conditions with respect to this Lease are expressly contained herein. The Parties agree that no representative or agent of any Party has made any representation of promise with respect to this Lease not expressly contained herein.

**IN WITNESS WHEREOF**, the Parties hereto have signed and sealed this Lease all as of the day and year first herein above written.


**WITNESS OR ATTEST:**                    **LANDLORD**

_____          By: _____
                                         Name: _____
                                         Title: _____


**WITNESS OR ATTEST:**                    **WASHINGTON METROPOLITAN AREA
                                         TRANSIT AUTHORITY**

_____          By: _____
                                         Name: _____
                                         Title: _____


T:\Dispositions\SE Bus Garage\SE Bus Bid Pkg\SE Bus  Attach1.wpd

W000100

**ATTACHMENT 2**
**WMATA REAL ESTATE PERMIT**

W000101

**WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY
REAL ESTATE PERMIT**

      **THIS REAL ESTATE PERMIT** ("Permit") is made and entered into this_____ day of _____, 2007, by and between the **WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY,** a body corporate and politic (herein- after "WMATA") and _____, with principal offices at _____, (hereinafter "Permittee").

**WITNESSETH:**

      **WHEREAS**, Permittee has requested from WMATA permission to enter the Southeastern Bus Garage facility at 17 M Street, SE in Washington, DC (hereinafter "Permitted Premises") for property inspection and environmental testing  (hereinafter "the Work"); and

      **WHEREAS**, WMATA has agreed to allow Permittee and its contractor(s), subcontractor(s) and consultants (hereinafter "Contractor" and collectively with the Permittee "Permitted Parties") the right and privilege to enter upon and use the Permitted Premises to perform the above-referenced Work upon the terms and conditions specifically set forth in this Permit.

      **NOW, THEREFORE**, in consideration of the sum of TEN DOLLARS ($10.00), and for the mutual covenants included herein, the parties hereto agree as follows:

1.    **Incorporation of Recitals.**  The recitals set forth above are incorporated herein by this reference to the same extent and with the same force and effect as if fully hereinafter set forth.

2.    **Description of Permitted Premises**. The Permitted Premises which is the subject of this Permit is described as Lots 857 and 866, Square 700 in the District of Columbia.

3.    **Term of Permit**. The term of this Permit shall commence as of the date of this Permit and expire on October 26, 2007.

4.    **Submission of Site Investigation Plans and Notification.**

      a.    Prior to entering onto the Permitted Premises to conduct any environmental testing, Permittee shall submit its site investigation plans (with soil boring locations noted) to the WMATA office given below for

2

review and written approval:

> Ms. Joan LeLacheur
> Manager, Environmental Services
> WMATA/CENF
> 3500 Pennsy Drive
> Hyattsville, MD 20785

Once locations have been approved by WMATA, Permittee may only make minor changes in the locations with the prior approval of Ms. Joan LeLacheur.

b.    After receipt of WMATA's written approval of the site investigation plans, and at least five (5) business days in advance of any entry on the Permitted Premises, Permittee shall notify Mr. Jack Desai at (301) 618-1016 and Ms. Joan LeLacheur at (202) 302-4024 or (301) 618-7522 and Mr. Bob Burns at (202) 962-2392 as to the date work will commence.

5.    **Use of Permitted Premises**.  Upon Permittee's receipt of WMATA's written approval of Permittee's site investigation plans, WMATA grants unto Permittee, its officers and employees (earlier identified as "Permittee") and its contractor(s), subcontractor(s) and agents, (hereinafter referred to as "Contractor"), the right to enter upon and use the Permitted Premises to:_____

_____

_____ [INSERT ALLOWED USE].
It is understood by the parties that Permittee will conduct all testing at its sole cost and expense during the term of this Permit.  This Permit grants only a non-exclusive use to Permittee and its Contractor, and all reasonable measures shall be taken by Permittee and its Contractor to ensure the safety and convenience of pedestrians and WMATA personnel who may enter the Permitted Premises at any time.  Permittee shall arrange all work schedules with Mr. Bob Burns at (202) 962-2392 to ensure that day-to-day bus operations are not disrupted.

WMATA accepts no liability and waives none of its rights under this Permit solely by reason of its acceptance or approval of any of the proposed work or soil boring locations.

6.    **Reports**.  Upon completion of the approved site investigation studies, Permittee shall provide Ms. Joan LeLacheur, Manager, Environmental Services, WMATA/CENF, 3500 Pennsy Drive, Hyattsville, MD 20785, with three (3)

3

copies of all environmental test information including final soil boring locations, soil sampling results, soil disposal manifests, chain-of custody documents, the draft and final reports and any other material dealing with any work on the Permitted Premises.

7.    **Conditions on Use**.

a.    No use shall be made of the Permitted Premises other than for performance of the WMATA approved site investigation studies.

b.    If, in WMATA's reasonable judgment, any of Permittee's proposed activities within the Permitted Premises may adversely affect the operation of the Southeastern Bus Garage, WMATA may require such activities to be performed at a designated time. All work must be scheduled to accommodate the bus garage operations.

c.    During and as a result of its Contractor's site investigation activities, Permittee shall protect all WMATA property and property immediately adjacent to the Permitted Premises from any objects falling on WMATA property and employees.

d.    Operation of any heavy equipment required for the performance of the work shall be in accordance with the guidelines of the WMATA "Adjacent Construction Design Manual, Revision 1," which Permittee acknowledges having received.

e.    All costs in connection with the performance of work on the Permitted Premises by Permittee pursuant to this Permit are to be borne by Permittee.

8.    **Payment by Permittee**.  In consideration of the permission granted by WMATA to Permittee hereunder, Permittee hereby covenants and agrees to pay to WMATA the sum of TEN DOLLARS ($10.00) simultaneously with the execution of this Permit.

9.    **Assignment**.  This Permit is not assignable or transferable by Permittee in any way. The rights, privileges, duties and obligations extended to or assumed by Permittee are personal to Permittee, its officers, employees, agents and contractor only.

4

10. **Compliance with Orders and Directions of WMATA.** With respect to the use of the Permitted Premises, Permittee shall at all times conform with and abide by the reasonable orders and directions of WMATA officials or their duly authorized representatives, regardless of whether such orders and directions are oral or written.

11. **Non-Interference with WMATA Activities.** Pursuant to the terms of this Permit, Permittee may only use the Permitted Premises in such manner and at such times as herein described and shall not interfere with the use, construction, maintenance, repair and operations of WMATA.

12. **Damage to WMATA Property.** Permittee shall be responsible for, and must make good at its own expense, all damage to WMATA property caused by its acts or those of the Permitted Users and others acting on behalf of Permittee. Permittee shall carry out such repair or replacement within fifteen (15) business days of Permittee's receipt of notice from WMATA except in the case of any emergency as determined by WMATA in its sole discretion, in which event Permittee's obligation of repair or replacement shall be immediate upon receipt of notice from WMATA.

13. **Restoration.** Upon completion of all activities, Permittee shall remove all its equipment and improvements and restore the Permitted Premises as close as reasonably possible to the condition immediately prior to Permittee's, and/or its Contractor's, entry and to WMATA's reasonable satisfaction.

14. **Responsibility for Licenses and Permits.** Permittee and its Contractor shall be responsible for obtaining any necessary licenses and permits for the work permitted under this Permit including transportation and disposal of materials, pursuant to this Permit.

15. **Available Information.** WMATA shall make available to Permittee and its Contractor for their examination and use surveys, studies, test results and reports with respect to the Permitted Premises that WMATA has readily accessible. WMATA disclaims all responsibility for the accuracy of the information provided; however, WMATA will use its best efforts to promptly advise Permittee if WMATA now has or hereafter acquires actual knowledge of any such inaccuracy. If Permittee and its Contractor identify any information that WMATA does not have readily accessible, WMATA shall use reasonable efforts to obtain such information or to assist Permittee and its Contractor in obtaining such information at the earliest reasonable date.

5

16.  **Indemnification**.

   a.   Permittee shall indemnify and save harmless WMATA, its directors, officers, employees and agents from all liabilities, obligations, damages, penalties, claims, costs, charges and expenses (including reasonable attorney's fees), of whatsoever kind and nature for injury, including personal injury or death of any person or persons, including employees of Permittee or its Contractors, and for loss or damage to any property, occurring in connection with, or in any way arising out of the use, occupancy and performance of the work permitted by this Permit and/or any acts in connection with activities to be performed under this Permit resulting in whole or in part from the acts, errors or omissions of Permittee or its Contractor, or any employee, agent or representative of Permittee or its Contractor.  Nothing in the preceding sentence shall be deemed to relieve Permittee from ultimate liability for any obligation of Permittee under this Permit.

   b.   Permittee shall indemnify, defend and hold harmless WMATA its directors, officers, employees and agents against any and all claims, liabilities, losses, demands, damages, penalties, costs, charges, remedial costs, environmental claims, fees or other expenses including attorneys fees, related to, arising from or attributable to any effluent or other hazardous waste, residue, contaminated soil or other similar material discharged from, removed from, or introduced on, about or under the Permitted Premises by Permittee.

   c.   If any action or proceeding relating to the indemnification required by this Paragraph is brought against WMATA, then upon written notice from WMATA to the indemnitor, indemnitor shall, at indemnitor's expense, resist or defend such action or proceeding by counsel approved by WMATA in writing, such approval not to be unreasonably withheld, but no approval of counsel shall be required where the cause of action is resisted or defended by counsel of any insurance carrier obligated to resist or defend the same.

   d.   Permittee understands and agrees that it is Permittee's responsibility to provide indemnification to WMATA pursuant to this Paragraph. The provision of insurance, while anticipated to provide a funding source for this indemnification, is in addition to any indemnification requirements and the failure of Permittee's insurance to fully fund any indemnification shall not relieve Permittee of any obligation assumed under this indemnification.

6

W000106

17. <u>Insurance</u>.

    a.    It is Permittee's responsibility to ensure adequate and complete coverage as contemplated in this Permit. This responsibility is not waived, nor is any requirement to indemnify waived by WMATA's review and approval of any Policy.

    b.    WMATA is acknowledged and understood to be a third party beneficiary of any insurance policy carried by any Permitted Party.

    c.    As may be required in any insurance policy carried by any Permitted Party, this Permit is understood and agreed to be a written contract or an Insured Contract between that Permitted Party and WMATA.

    d.    Permittee understands and agrees that provision of a complete copy of the Policy or Policies which provide the below required insurance (as indicated by an "x" before said type of insurance), including a copy of any endorsement or exclusion thereto, for review and approval by WMATA is a prerequisite for entry onto WMATA property.

    e.    Permittee understands and agrees that WMATA is a self-insured governmental entity and that the insurance and indemnification provided by any Permitted Party under the terms of this Permit shall be Primary. Permittee agrees that to the extent any endorsement contemplates issuance of a permit by a state or political subdivision, WMATA shall be considered a state or political subdivision issuing a permit for the purposes of those policies and endorsements.

    f.    <u>Insurance Companies</u>. Insurance companies providing the required coverages must be rated by A.M. Best or a comparable rating company and carry at least an "A" rating. All insurance shall be procured from insurance or indemnity companies acceptable to WMATA and licensed and authorized to conduct business in the jurisdiction where the work is to be performed. WMATA's approval or failure to disapprove the insurance shall not release the Permitted Parties of full responsibility for liability for damage and accidents.

    g.    <u>Changes in Insurance Coverage</u>. The requisite insurance policies shall not be canceled, terminated or modified (except to increase the amount of coverage) without thirty (30) calendar days prior written notice from Permittee to WMATA's Office of Insurance, Room, 8D01, and Office of Property Development and Management, Room 5B, 600 Fifth Street,

7

W000107

NW, Washington, DC 20001. If any required insurance policies should be canceled, terminated or modified so that the insurance is not in full force and effect, then WMATA can hold Permittee in default of this Permit. Under such circumstances, WMATA shall give Permittee a notice of default and, after the expiration of any cure period, WMATA may terminate this Permit for an event of default or obtain insurance coverage equal to that required herein, the full cost of which shall be paid by Permittee to WMATA on demand.

h.    <u>Evidence of Insurance Coverage</u>.  Evidence of the requisite insurance policies in the form of the complete insurance policy including any endorsements and certificates of insurance stating work to be performed and shall be submitted to WMATA at least ten (10) business days prior to commencement of operations and from time to time at WMATA's request. Permitted Parties shall not be allowed to enter the Permitted Premises until the evidence of insurance has been received and approved in writing by WMATA. All evidence of insurance shall be sent to:

Office of Property Development and Management
Washington Metropolitan Area Transit Authority
600 Fifth Street, NW
Washington, DC 20001

With a Copy to:

Office of Insurance
Washington Metropolitan Area Transit Authority
600 Fifth Street, NW
Room 8D01
Washington, DC 20001

i.    Permittee shall require each Contractor, at all tiers, to provide evidence of insurance coverage specified herein (as indicated by an "**x**" before said type of insurance) and such evidence of coverage shall be provided to WMATA.

j.    Any contract of insurance or indemnification naming WMATA, the United States of America, or any of the departments, agencies, administrators or authorities as an additional insured shall be endorsed to provide that the insurer will not contend in the event of any occurrence, accident, or claim that WMATA or the United States of America, et al, are not liable in tort by virtue of the fact of being governmental instrumentalities or

8

public or quasi-public bodies.

k.    <u>Limits and Modification of Coverage</u>. The limits of liability included herein are minimum limits. WMATA reserves the right to review or change these limits if the terms of the Permit or standards in the industry change. If requested by WMATA, Permittee shall make or require its Contractors to make any necessary adjustments in such limits or in the type of coverage to reflect then currently acceptable, commercially reasonable policy limits and types of coverage for similar uses and operations. During the term of this Permit and any extensions, except for such longer terms as may be required herein, Permittee shall provide or cause to be provided at least the types and amounts of insurance indicated below:

   **X**    <u>Worker's Compensation</u>. An insurance policy complying with the requirements of the statutes of the jurisdiction(s) in which the work will be performed, and if there is any exposure to personnel of any Permitted Party with the U. S. Longshoremen's and Harbor Workers' Act, Jones Act, Admiralty Laws or the Federal Employers' Liability Act, Permittee will provide coverage for these exposures on an "if any basis" with limits not less than:

| | |
|---|---|
| Worker's Compensation: | Statutory |
| Employers' Liability: | |
|    Each Accident | $1,000,000 |
|    Disease - Policy Limit | $1,000,000 |
|    Disease - Each Employee | $1,000,000 |

   **X**    <u>Commercial General Liability Insurance</u>. A Commercial General Liability Insurance policy issued to and covering the liability for all work and operations under or in connection with this Permit and all obligations assumed by Permittee under this Permit. Coverage shall include Products Liability, Completed Operations and Contractual Liability Insurance in addition to coverage for explosion, collapse, and underground hazards, wherever required. The coverage under such an insurance policy or policies shall be maintained for three (3) years after the termination of this Permit and shall have at least the following limits:

Bodily Injury and Property Damage Liability
$1,000,000 Each Occurrence; $2,000,000 Aggregate

W000109

| Premises Medical Payments | $5,000 |
| Fire Legal Liability (if applicable) | $1,000,000 |
| Personal Injury/Advertising | $1,000,000 or Combined Single Limit not less than $2,000,000 |

WMATA shall be included as an additional insured under the coverage for Commercial General Liability Insurance on a manuscript endorsement which shall read: "Section II – Who is An Insured is amended to include as an additional insured the person(s) or organizations(s) shown in the Schedule with respect to liability for "personal injury", "bodily injury" or "property damage" caused , in whole or in part, by your acts or omissions or the acts or omissions of those acting on your behalf:

A.  In the performance of your ongoing operations; or
B.  Included in the "products-completed operations hazard"; or
C.  In connection with your premises owned by or rented to you."

If construction or demolition work is being performed within 50 feet of the center line of WMATA's railroad tracks, then an endorsement that removes the railroad exclusion from the definition of an "Insured Contract" shall be included.

X   <u>Automobile Liability Insurance</u>. A commercial auto insurance policy covering the use of all owned, non-owned, hired, rented or leased vehicles bearing valid license plates appropriate for the circumstances for which the vehicles are being used. These vehicles should bear license plates applicable to the state laws for which the vehicle(s) are registered. Liability for contractor's mobile equipment is not subject to this coverage and therefore the aforementioned general liability insurance is required. Contract employees are not permitted to operate any vehicle owned by WMATA whether in commission of the contract or outside the same.

The coverage under such an insurance policy or policies shall include mandatory Uninsured Motorist Coverage where applicable. Form MCS-90 as required by the Motor Carrier Act of 1980 shall also be included where applicable.

10

The coverage under such an insurance policy or policies shall have limits not less than: BODILY INJURY AND PROPERTY DAMAGE LIABILITY $2,000,000 Combined Single Limit and Uninsured Motorist Coverage Minimum Limit $50,000

WMATA must be included as an additional insured under the auto liability insurance coverage with respect to activities related to this Permit.

Railroad Protective Liability Insurance. (May be included if work is planned within 50 feet in any direction of the center-line of WMATA's operating railroad tracks) An insurance policy issued to WMATA as the named insured and covering the liability of all Permitted Parties  for the work to be performed on, above, adjacent to or underneath WMATA's operating railroad property for any personal injuries or deaths or any damage to the property, equipment and facilities caused by the activities of any Permitted Party resulting from performance of this project work.   The coverage under     such an insurance policy shall have a limit of liability not less than:

BODILY INJURY AND PROPERTY DAMAGE LIABILITY
$5,000,000 per occurrence/$10,000,000 aggregate

__X____ Contractor's Pollution Legal Liability Insurance. (Environmental Impairment Liability)  Permittee shall require its Contractor to provide an insurance policy covering the liability of the Permitted Parties during the process of removal, storage, transport and disposal of hazardous waste and contaminated soil and or asbestos abatement. The policy should also include coverage for bodily injury and loss of, damage to, or loss of use of property, directly or indirectly arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids, or gas, waste materials or other irritants, contaminants or pollutants into or upon the land, the atmosphere or any water course or body of water, whether it be gradual or sudden and accidental.

11

W000111

Limits shall not be less than $3,000,000 Per Occurrence

The policy form shall include an extended reporting period of at least three (3) years. WMATA shall be included as an additional insured.

Professional Errors and Omissions Liability Insurance. A separate insurance policy to pay on behalf of Permittee all costs Permittee shall become legally obligated to pay as damages due to any claim caused by any negligent act, error or omission of any Permitted Party out of their acts or omissions in performance of their work under this Permit.

Such insurance shall be maintained for five (5) years after the final acceptance of the work by either continuation of the policy every year or if coverage is moved to another carrier, the same prior acts retro date should be continued. If coverage is not renewed, an extended reporting period of five (5) years should be purchased and such coverage should be evidenced on the certificate of insurance. In addition, Contractor should purchase unintentional errors and omissions and cross liability coverage by endorsement if not already provided.

For contracts with a value Over $500,000 the coverage under such an insurance policy shall have a limit of liability not less than:

BODILY INJURY AND PROPERTY DAMAGE LIABILITY
$3,000,000 per occurrence / $3,000,000 aggregate

For contracts with a value Under $500,000 the coverage under such an insurance policy shall have a limit of liability not less than:
BODILY INJURY AND PROPERTY DAMAGE LIABILITY
$1,000,000 per occurrence / $1,000,000 aggregate

12

<u>      </u> <u>Builder's Risk Insurance</u>. (May be required if Permittee is constructing a building adjacent to WMATA property) An insurance policy covering all risk of physical damage to property under construction shall be procured. Coverage for damage to building materials to be installed may be written separately or by endorsement to this policy; damage to Permittee's owned, leased or rented equipment may be written separately or by endorsement to this policy. Insurance shall be on an all-risk policy form including the perils of fire, extended coverage, theft, vandalism, certified acts of terrorism, malicious mischief, collapse and earthquake. Coverage limits shall be equal to the initial contract construction amount and any amendments to the contract which affect the project cost on a replacement cost basis.

18.    <u>**Non-Liability of WMATA**</u>. WMATA shall have no liability for the actions or negligence of Permittee or the Permitted Users. Neither the grant of this right of entry, nor any provision thereof, shall impose upon WMATA any new or additional duty or liability or enlarge any existing duty or liability of WMATA. Nothing in this Permit shall be deemed to waive WMATA's immunity as a sovereign entity.

19.    <u>**No Impairment of WMATA's Title**</u>. This Permit constitutes a mere license, and nothing in this Permit and no action or inaction by WMATA shall be construed to mean that WMATA has granted Permittee or any other person or entity any legal or equitable estate in the Permitted Premises, or any right, power, or permission to do any act or make any agreement which may create, give rise to, or be the foundation for any right, title, interest, lien, charge, or other encumbrance upon the interests of WMATA in the Permitted Premises. In amplification and not in limitation of the foregoing, Permittee shall not allow any portion of the Permitted Premises to be used by any persons or entities, in such manner as would likely impair WMATA's title or interest in the Permitted Premises or would result in a claim of adverse use, adverse possession, prescription, dedication or other similar claims with respect to the Permitted Premises or any part thereof.

20.    <u>**Gratuities**</u>. In connection with this Permit, or any amendments or modifications thereto, the giving of, or offering to give, gratuities (in the form of entertainment, gifts or otherwise) by Permittee or any agent, representative, or other person deemed to be acting on behalf of Permittee or its Permitted Users under this Permit, to any director, officer or employee of WMATA, or to any director, officer, employee of any of WMATA's agents, consultants or representatives, with an intent to secure an agreement or favorable treatment

W000113

or the making of any determinations with respect to performance under this Permit is expressly forbidden.  The terms of this Paragraph shall be strictly construed and enforced in the event of violation hereto.

21.    **Governing Law**.  This Permit shall be governed by the laws of the  District of Columbia, except to the extent that  District of Columbia  law conflicts with the WMATA Compact, WMATA shall be governed by the WMATA Compact.

22.    **Officials Not To Benefit**.

   a.    No member of or delegate to Congress, or resident commissioner, shall be admitted to any share or part of this Permit, or to any benefit that may arise therefrom, but this provision shall not be construed to extend to this Permit if made with a corporation for its general benefit.

   b.    No member, officer, or employee of WMATA or of a local public body during his/her tenure or one year thereafter shall have any interest, direct or indirect, in this Permit.

23.    **Disposal of Drilling Well Spoils.**  The spoil (soil and water) produced by Permittee or Contractor activities on the Permitted Premises must be stored in closed steel drum containers until the tests on the samples have been completed. The containers shall be fully labeled as to their contents, source and date generated. Permittee or its Contractor shall provide whatever signs and/or barricades may be appropriate to identify and protect the storage site, including without limitation, to prevent injury to any person, the Permitted Premises or any surrounding property. After the samples have been tested by Permittee or its Contractor, a determination shall be made of the type of disposal required.  If the tests determine that the spoil is not considered to be hazardous material, or otherwise requires special handling, Permittee or its Contractor shall dispose of the spoil within sixty days (60) days in accordance with the appropriate District of Columbia regulations and guidance, and/or U.S. Environmental Protection Agency regulations, policies and guidance. If the tests determine that the spoil is considered to be a hazardous material or waste, or to otherwise require special handling, Permittee or its Contractor shall dispose of the spoil within sixty (60) days in accordance with the provisions and regulations of the Resource Conservation Recovery Act (RCRA), the Toxic Substances Control Act (TSCA), other applicable federal environmental legislation, or state statute(s), local laws, regulations, and procedures including but not limited to, if required, preparation, execution and filing of any travel manifest documents showing the quantity and origin of any contaminated materials, and shall provide WMATA with copies of all such travel manifest documents. In the instance of bioremedial or thermal

14

W000114

destruction of any contaminated sampling and testing residues, Permittee shall obtain a certificate of treatment or of destruction, and a certified copy thereof shall be provided to WMATA. In the instance of disposal at a landfill, a certified copy of the manifest indicating receipt of such material by the landfill shall be provided to WMATA in accordance with the Notice requirements set forth in this Permit. Permittee shall provide WMATA with all documents required by this Paragraph within thirty (30) days of disposal or treatment of the sampling and testing residues.

24. **Notices.** Notices given in connection with this Permit shall be in writing and shall be sent to the parties at the following respective address(es) by: (a) registered or certified mail, return receipt requested; (b) hand delivery; or (c) a nationally recognized overnight courier service. Notices and other communications shall be deemed to have been given on the earlier of actual receipt or, in the case of mailing by United States mail, the fourth business day after the date so mailed or, in the case of overnight courier, on the first business day after delivery to such courier.

If to WMATA:    Contracting Officer
Office of Property Development and Management
Washington Metropolitan Area Transit Authority
600 5th Street, NW
Washington, DC 20001

If to Permittee:    _____

25. **Default/Termination.** Permittee shall be deemed to be in default of this Permit if any Permitted Party shall fail to observe or perform any of the provisions, covenants, conditions, or agreements contained herein and such failure shall continue for a period of ten (10) calendar days after written notice is received from WMATA. If an event of default shall have occurred and be continuing, WMATA at its option, may at once, or at any time thereafter, terminate this Permit by written notice to Permittee, whereupon this Permit shall end and all rights of the Permitted Parties hereunder (but not their liabilities) shall expire and terminate. Upon such termination by WMATA, and without in any way limiting the remedies available to WMATA at law, in equity or under the terms of this Permit, Permittee shall at once remove all Permitted Parties, their persons, and equipment from the Permitted Premises, and restore the Permitted Premises in accordance with **Paragraph 13.** WMATA may enter into or repossess the Permitted Premises either by force, by summary proceeding or otherwise. WMATA shall have no liability by reason of any such reentry, repossession or

15

removal.

26. **Amendments**.  This Permit shall not be amended or modified in any manner except by an instrument in writing executed by the parties as an amendment to this Permit.

27. **Entire Agreement**.  This Permit constitutes the entire agreement between the parties. The parties acknowledge that no representations or warranties have been made except as set forth herein.

**IN WITNESS WHEREOF**, the parties have caused this Permit to be executed in two counterparts as of the date and year first written above.

**WITNESS OR ATTEST:**                          **WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY**


_____            _____
                                   Nat Bottigheimer
                                   Contracting Officer


**WITNESS OR ATTEST:**                          **PERMITTEE NAME**


_____            _____
                                   Name: _____
                                   Title: _____


16

**ATTACHMENT 3**
**UNDERGROUND STORAGE TANK**
**REAL ESTATE TRANSFER DISCLOSURE FORM**

W000117

**D.C. DEPARTMENT OH HEALTH**
**ENVIRONMENTAL HEALTH ADMINISTRATION**

**UNDERGROUND STORAGE TANK REAL ESTATE TRANSFER**
**DISCLOSURE FORM**
(FOR USE WITH ALL PROPERTIES OTHER THAN SINGLE FAMILY HOMES)

The Underground Storage Tank (UST) Management Act of 1990, as amended, and implementing regulations, require that sellers of real property in the District of Columbia inform prospective purchasers in writing, prior to entering into a contract for sale, of the existence or removal of any USTs of which the seller has knowledge. If the sale is of commercial property, seller is also required to inform prospective purchasers of any prior use of the property of which seller has actual knowledge which suggests the existence of tanks on the property. (For example, if seller knows there was formerly a gas station at the site, he is required to disclose this fact.) Sellers of individual condominium or cooperative units are not subject to the disclosure requirements. Sellers of single family homes should use the appropriate form or provide disclosure in the sales contract.

Seller's Name: Washington Metropolitan Area Transit Authority (WMATA)
Address of property to be sold: Lots 857 and 866 in Square 700

1) To the best of your knowledge, are there any underground storage tanks (USTs) located on or under the above-referenced real property? Yes X No____

2) If yes, how many USTs are located on the property? 4
a) What is the capacity of the tanks? 2 @ 12,000 gal diesel; 1 @ 12,000 gal heating oil; and
b) Are they presently in service X or abandoned____? 1 @ 6,000 gal gasoline
c) If in service, for what purpose are they used? Gasoline and diesel tanks used to fuel vehicles.
d) If abandoned, have you complied with all requirements of the D.C. UST Regulations Heating oil tank used pertaining to closure of USTs? Yes____ Don't know____ as back-up fuel for building Heat.

3) Have you removed any USTs during the period of time you have owned the above-referenced property? Yes X No_____

4) If Yes, how many USTs did you remove? 6 When? 6/1993 and 9/1998
a) What were their capacities? 4 @ 4,000 gal diesel removed 6/1993; 1 @ 15,000 gal heating
b) Have you complied with all requirements of the DC UST Regulations pertaining to closure of oil removed 9/1998; and
USTs? Yes X No____ Don't know____ 1 @ 4,000 gal used oil removed 9/1998

5) Do you know of any prior uses of the property which suggest that USTs may be or have been used on the property? Yes____ No X
If yes, please describe the former use _____

Seller:_____ Date:_____

PURCHASER ACKNOWLEDGES THAT PURCHASER HAS RECEIVED THE ABOVE DISCLOSURES PRIOR TO SIGNING A CONTRACT FOR PURCHASE.

Purchaser:_____ Date:_____

Information pertaining to USTs and UST removals of which the D.C. Government has received notification, is on file with the D.C. Department of Health, Environmental Health Administration, Underground Storage Tank Division, 2100 MLK, Jr. Avenue, S.E., Wash., D.C., Phone (202) 645-6080.



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MONUMENT REALTY LLC, *et al.*, | ) |
| | ) |
| *Plaintiffs* | ) |
| | ) |
| v. | )    Civil Action No. 1:07-CV-01821 (EGS) |
| | ) |
| WASHINGTON METROPOLITAN AREA | ) |
| TRANSIT AUTHORITY, | ) |
| | ) |
| *Defendant* | ) |

**EXHIBIT 4**

**MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY'S
MOTION TO DISMISS FIRST AMENDED COMPLAINT**

JOHN W. VARDAMAN
PAUL MARTIN WOLFF
J. ALAN GALBRAITH
JOHN G. KESTER
WILLIAM E. McDANIELS
BRENDAN V. SULLIVAN, JR.
RICHARD M. COOPER
GERALD A. FEFFER
JERRY L. SHULMAN
ROBERT B. BARNETT
DAVID E. KENDALL
GREGORY B. CRAIG
JOHN J. BUCKLEY, JR.
TERRENCE O'DONNELL
DOUGLAS R. MARVIN
JOHN K. VILLA
BARRY S. SIMON
KEVIN T. BAINE
STEPHEN L. URBANCZYK
PHILIP J. WARD
F. WHITTEN PETERS
JAMES A. BRUTON, III
PETER J. KAHN
LON S. BABBY

MICHAEL S. SUNDERMEYER
JAMES T. FULLER, III
BRUCE R. GENDERSON
CAROLYN H. WILLIAMS
F. LANE HEARD III
STEVEN R. KUNEY
GERSON A. ZWEIFACH
PAUL MOGIN
HOWARD W. GUTMAN
STEVEN A. STEINBACH
MARK S. LEVINSTEIN
VICTORIA RADD ROLLINS
DANIEL F. KATZ
WILLIAM R. MURRAY, JR.
EVA PETKO ESBER
STEPHEN D. RABER
DAVID C. KIERNAN
LON E. MUSSLEWHITE
ROBIN E. JACOBSOHN
HEIDI K. HUBBARD
GLENN J. PFADENHAUER
GEORGE A. BORDEN
ROBERT J. SHAUGHNESSY
DAVID S. BLATT

ARI S. ZYMELMAN
DANE H. BUTSWINKAS
LAURIE S. FULTON
DENNIS M. BLACK
PHILIP A. SECHLER
LYNDA SCHULER
PAUL K. DUEFFERT
R. HACKNEY WIEGMANN
ROBERT M. CARY
KEVIN M. HODGES
DAVID M. ZINN
JOSEPH G. PETROSINELLI
STEVEN M. FARINA
KEVIN M. DOWNEY
THOMAS G. HENTOFF
PAUL B. GAFFNEY
ROBERT A. VAN KIRK
MARCIE R. ZIEGLER
KENNETH C. SMURZYNSKI
JOHN E. SCHMIDTLEIN
CRAIG D. SINGER
JAMES L. TANNER, JR.
J. ANDREW KEYES
GILBERT O. GREENMAN

M. ELAINE HORN
ENU MAINIGI
MICHAEL F. O'CONNOR
PAUL T. HOURIHAN
WILLIAM J. BACHMAN
MARGARET A. KEELEY
MEGAN E. HILLS
EDWARD J. BENNETT
TOBIN J. ROMERO
BETH A. LEVENE
THOMAS G. WARD
WILLIAM T. BURKE
LISA M. DUGGAN
JOHN E. JOINER
NICHOLAS J. BOYLE
ADAM L. PERLMAN
ANDREW W. RUDGE
DENEEN C. HOWELL
ALEX C. ROMAIN
DAVID A. FORKNER
JONATHAN M. LANDY
CHRISTOPHER N. MANNING
RYAN T. SCARBOROUGH
JENNIFER G. WICHT
STEPHEN D. ANDREWS

OF COUNSEL
RAYMOND W. BERGAN
JEREMIAH C. COLLINS
DAVID POVICH
ROBERT P. WATKINS
MARY G. CLARK
JACQUELINE E. MAITLAND DAVIES

LAW OFFICES

# WILLIAMS & CONNOLLY LLP

725 TWELFTH STREET, N.W.

WASHINGTON, D. C. 20005-5901

(202) 434-5000

FAX (202) 434-5029

www.wc.com

EDWARD BENNETT WILLIAMS (1920-1988)
PAUL R. CONNOLLY (1922-1978)

August 28, 2007

BY COURIER

Carol B. O'Keeffe, Esq.
General Counsel
Washington Metropolitan Area Transit Authority
600 Fifth Street, NW
Washington, DC 20001

**Re: Bid No. 08-1; Lots 857 and 866 in Square 700**

Dear Ms. O'Keeffe:

My client, the John Akridge Development Company ("Akridge"), is today submitting its bid in response to the Washington Metropolitan Area Transit Authority's Bid No. 08-1; Lots 857 and 866 in Square 700 (the "Second Bid Request") to Mr. Nat Bottigheimer, Assistant General Manager. By this letter I am alerting you that this bid is made without prejudice to Akridge's contention outlined in my letter to you of August 17, 2007, that the process by which Bid No. 07-3; Lots 857 and 866 in Square 700 (the "Initial Bid Request") was cancelled was improper and a violation of WMATA's procurement regulations and the terms of the RFP for the Initial Bid Request.

Let me say initially that you are incorrect when you write that my letters suggest that the District of Columbia Government's intervening announcement of an intent to purchase was inconsequential. The facts as they are and as I presented them are that WMATA on its website acknowledged the District's announcement but stated that nonetheless "the Invitation for Bids process will proceed as scheduled . . ." In effect WMATA told potential bidders that <u>WMATA would treat the District's announcement as inconsequential</u> and asked bidders to do likewise and submit bids before the deadline—which Akridge dutifully did.

As you acknowledged in your letter to me of August 24, the Second Bid Request process "provides an opportunity to one who 'stood on the sidelines'..." during the Initial Bid Request process. It also gives the back of the hand to those parties who cooperated fully with WMATA and submitted bids in response to the Initial Bid Request in the face of the indication of interest by the District of Columbia Government <u>as WMATA requested that they do.</u> I would think WMATA would want to avoid appearing to confer a benefit on those

WILLIAMS & CONNOLLY LLP

Ms. O'Keeffe
August 28. 2007
Page 2 of 2

parties who chose to hedge their bets while giving no credit to those parties who followed WMATA's instructions to the letter.

The fact that WMATA returned the bids submitted in response to the Initial Bid Request and so cannot make an award based on the bids submitted by July 23 does not, as you suggest in your letter, prevent WMATA from adopting a fair process going forward. There is an alternative available to WMATA and is outlined in my July 30, 2007 letter to Mr. Bottigheimer: limit the bids considered in the Second Bid Request to those submitted by the parties who followed WMATA's instructions and submitted timely bids in accordance with the Initial Bid Request.

To mitigate the damages it has suffered as a result of WMATA's irresolute and vacillating actions, Akridge has no other choice than to submit a bid to the Second Bid Request. At the same time, however, Akridge urges WMATA to do the right thing and make its award to one of the three parties who submitted bids in response to the Initial Bid Request.

In the interests of clarity, Akridge hereby advises WMATA that the conditional bid it is providing in response to the Second Bid Request shall constitute its only bid in response to the Second Bid Request and WMATA may not consider the bid Akridge made pursuant to the First Bid Request as an offer in response to the Second Bid Request.

Sincerely,

Paul Martin Wolff

Paul Martin Wolff

cc:    John E. Akridge, III
       Matthew J. Klein

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MONUMENT REALTY LLC, *et al.*,                    )
                                                  )
       *Plaintiffs*                               )
                                                  )
v.                                                )          Civil Action No. 1:07-CV-01821 (EGS)
                                                  )
WASHINGTON METROPOLITAN AREA                      )
TRANSIT AUTHORITY,                                )
                                                  )
       *Defendant*                                )
                                                  )

## ORDER GRANTING
## MOTION TO DISMISS OF
## WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY

On motion of Defendant Washington Metropolitan Area Transit Authority ("WMATA"), pursuant to Fed. R. Civ. P. 12(b)(6), 12(b)(1) and 9(b) and Local Rule 7, to dismiss the Complaint on the grounds that the Complaint fails to state a claim upon which relief can be granted and, as to certain counts, the Court has no subject matter jurisdiction due to WMATA's sovereign immunity, it is this _____ day of _____ 2007 ORDERED that:

    1. WMATA's motion be, and hereby is granted.

    2. All Counts are dismissed for failure to state a claim upon which relief can be granted.

    3. Counts Five, Six, Seven and Eight are dismissed also on the ground of WMATA's sovereign immunity.

    4. The Court finds that Plaintiffs have amended once already and that further amendment would be futile, and therefore the foregoing dismissals are without leave to amend.

_____
Emmet G. Sullivan
United States District Judge

Copies to:

Harvey A. Levin
Donald A. Laffert
Louis E. Dolan, Jr.
Vernon W. Johnson, III