**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

MONUMENT REALTY LLC, et al.,    )
    )
        Plaintiffs,    )
    )
    v.    )
    )    **Civil Action No. 1:07-cv-01821 (EGS)**
    )    **Judge Emmet G. Sullivan**
WASHINGTON METROPOLITAN    )
AREA TRANSIT AUTHORITY,    )
    )
        Defendant.    )
_____)

## OPPOSITION TO MOTION TO DISMISS FIRST AMENDED COMPLAINT

Louis E. Dolan, Jr. (#442881)
Vernon W. Johnson, III (#423756)
401 9th Street, N.W.
Washington, D.C. 20001
202.585.8000
202.585.8080 (fax)
ldolan@nixonpeabody.com
vjohnson@nixonpeabody.com

Counsel for Plaintiffs

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................... 1

ARGUMENT ............................................................................................................ 4

I.  THE STANDARDS GOVERNING THIS MOTION ........................................ 4

II.  PLAINTIFFS STATE VIABLE CLAIMS FOR BREACH OF
CONTRACT .................................................................................................... 5

A.  The Agreement Alleged By Plaintiffs Is Not "An Unenforceable
Agreement To Negotiate Or Agreement To Agree" ................................. 8

B.  The Statute Of Frauds Is No Defense To The Claims Asserted ............... 10

C.  The First Amended Complaint Properly Alleges An Agreement By
WMATA .............................................................................................. 11

1.  The Alleged Lack Of Board Approval Is Not Fatal To The
Claims ...................................................................................... 11

2.  The Asserted Lack Of Authority Is Not Fatal To The
Claims ...................................................................................... 13

3.  Plaintiffs Are Not Suing On "Promises And Commitments
Of The District And AWC, Not WMATA" ................................. 15

D.  Monument Realty Has Alleged Contractual And Real Property
Rights .................................................................................................. 18

E.  The Alleged "Integration/Merger Clause" Is Not Fatal To The
Claims .................................................................................................. 18

F.  The Asserted Lack Of A Contractual Right On The Part Of MR
Baseball 7 Is Not Fatal To The Claims ................................................... 20

III.  MONUMENT REALTY HAS STANDING TO ASSERT ALL
CLAIMS IN THE COMPLAINT EXCEPT COUNTS NINE
THROUGH TWELVE; MR BALLPARK 7, HOWEVER, HAS
STANDING TO ASSERT THE CLAIMS IN THOSE COUNTS ................. 21

A.  Count Eight ........................................................................................ 23

B.  Count Nine ......................................................................................... 25

IV.  PLAINTIFFS ARE ENTITLED TO PURSUE THEIR CLAIM THAT
WMATA'S ACTIONS WERE ARBITRARY, CAPRICIOUS, AND
OTHERWISE UNLAWFUL AND INVALID AS SET FORTH IN
COUNTS TEN THROUGH TWELVE .......................................................... 27

V.  SOVEREIGN IMMUNITY DOES NOT PROTECT WMATA FROM
EITHER MONUMENT'S CONTRACT OR NON-CONTRACT
CLAIMS ....................................................................................................... 31

A.  The Umbrella Of Sovereign Immunity Does Not Protect WMATA
From Plaintiff's Contract Claims, Including Counts Eight And
Nine .................................................................................................... 33

i

1.   WMATA's Conduct Implicated by Counts Eight And Nine Does Not Sound In Tort And Is, Therefore, Not Shielded by Sovereign Immunity ................................................... 33

2.   Even If The Challenged Activities That Give Rise To Counts Eight And Nine Sound In Tort, The Challenged Activities Are Proprietary, Not Quintessentially Governmental. .................................................................... 33

3.   Where A Statute, Regulation, Or Policy Specifically Prescribes A Course Of Action For WMATA To Follow, WMATA Has No Choice But To Adhere To These Binding Directives. ................................................................. 34

4.   Even If WMATA Has Discretion, That Discretion Is Not Grounded In Social, Economic, Or Political Goals. ............... 35

B.   The Umbrella Of Sovereign Immunity Does Not Protect WMATA From Plaintiff's Only Non-Contract Claims: Counts Six And Seven ........................................................................... 36

1.   The Challenged Activities Are Not "Quintessentially Governmental." ............................................................ 37

2.   A Statute, Regulation, Or Policy Specifically Prescribes A Course Of Action For WMATA To Follow; WMATA Has No Choice But To Adhere To These Binding Directives. ............ 38

3.   Even If WMATA Has Discretion, That Discretion Is Not Grounded In Social, Economic, Or Political Goals. .................... 39

VI.   **PLAINTIFFS STATE A VIABLE CLAIM FOR FRAUD** ............................ 39

VII.   **PLAINTIFFS STATE A VIABLE CLAIM FOR BREACH OF FIDUCIARY DUTY** ................................................................. 43

**CONCLUSION** ................................................................................. 45

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

MONUMENT REALTY LLC, et al.,     )
     )
     Plaintiffs,     )
     )
     v.     )
     )     **Civil Action No. 1:07-cv-01821 (EGS)**
     )     **Judge Emmet G. Sullivan**
WASHINGTON METROPOLITAN     )
AREA TRANSIT AUTHORITY,     )
     )
     Defendant.     )
_____)

## OPPOSITION TO MOTION TO DISMISS FIRST AMENDED COMPLAINT

### INTRODUCTION

Over a several year period, Plaintiff Monument Realty LLC ("Monument Realty") has invested tens of millions of dollars in the acquisition and development of a number of properties in and around the Ballpark District, advancing the express public policy interests of the District of Columbia Government in creating a vibrant mixed-used neighborhood surrounding the new baseball stadium, spearheading a coordinated and unified development program as "Master Developer" of the Half Street Area, and promoting economic development and prosperity in a once blighted area of the City. Although the Washington Metropolitan Area Transit Authority ("WMATA") goes to great lengths to disassociate itself from the District, the Anacostia Waterfront Corporation ("AWC"), Monument Realty, and the development of the Baseball District, WMATA has been a direct participant in, and beneficiary of, these efforts.

On its part, Monument Realty would never have made such a vast investment in these development efforts had it not enjoyed the exclusive rights to negotiate for and acquire the Bus Garage Property at issue in this case. As WMATA well knows, none of the parties ever agreed or intended that Monument Realty would not have the opportunity to negotiate with WMATA to

acquire all of the adjacent properties marked on Exhibit B to the First Amended Complaint ("Amd. Compl.") to complete the comprehensive plan for the Half Street Area, endorsed by all parties. Now, however, after years of working with Monument Realty, accepting the benefits conferred on it including those directly affecting the Property, and executing and closing on contracts with respect to other phases of the development, WMATA has taken the maverick step of attempting to sell the Property – which is located squarely in the center of Monument Realty's holdings in the Half Street Area – to another party, thereby leaving Monument Realty with a disconnected set of attenuated real estate and thwarting the plan for coordinated development.  Whatever the reason for WMATA's recent decision to disavow Monument Realty's rights, Monument Realty can and does advance viable contract and real property rights that have long been recognized under District of Columbia law.  *See, e.g., Brewood v. Cook,* 207 F.2d 439 (D.C. Cir. 1953) (affirming award of specific performance in case where parties had a previous and fully performed written contract for eight of ten lots of real estate, and this Court had enforced a collateral oral contract providing that the remaining two lots would be conveyed later).

In addition, in WMATA's haste to trample the rights of Monument Realty and its affiliate, MR Ballpark 7 LLC ("MR Ballpark 7"; both entities are sometimes referred to collectively herein as "Monument"), it has followed a bid process that breaches its Compact, procurement procedures, and is otherwise arbitrary, capricious, without a rational basis, and in violation of the law. Ironically, the end result of the illegal process followed by WMATA would cause not only irreparable harm to the Plaintiffs, but would result in less than the "best net return to WMATA after leaseback monthly rent," even though this was the sole criterion in the Invitation for Bids.  This is because subtracting the vigorous monthly rent stated in the purported winning bid submitted by the John Akridge Development Company (the entity is referred to herein as "Akridge," and its bid is referred to as the "Akridge Bid") over the full thirty-six month leaseback term renders the "net

return" indisputably below that of even Monument's minimum bid. Likewise, the Akridge Bid suffers from significant infirmities—including being a "conditional bid" and a bid that offered WMATA additional consideration not permitted under the terms of the IFB. How WMATA can accept that bid while at the same time declaring that Monument's Alternate Bid—which, according to WMATA suffered from some of the same infirmities—would not be considered is the essence of arbitrary and illegal action by WMATA. WMATA's flawed process itself cannot stand, even if Monument had no contract and real property rights in the Property.

In seeking dismissal of the First Amended Complaint, WMATA essentially asks the Court to disregard and disbelieve Plaintiffs' allegations, and to deprive Plaintiffs of the benefit of all inferences that can be drawn from those allegations, notwithstanding the applicable standards. WMATA also impermissibly attempts to inject into the analysis arguments, documents, and factual assertions not part of the First Amended Complaint and not proven by competent admissible evidence. (WMATA underscores the impropriety of these arguments by urging that its motion not be converted to one for summary judgment.) At this stage of the case, such arguments by WMATA are unavailing.

WMATA also advances its standard technical objections on the basis of sovereign immunity and lack of standing even though the First Amended Complaint plainly involves matters of contract, as well as other claims not subject to any defense of sovereign immunity, and demonstrates the required injury in fact and other grounds for standing on the part of the Plaintiffs. WMATA's position on these issues is without merit. At this stage of the case, Plaintiffs' factual allegations must be taken as true, and Plaintiffs must be given the benefit of all inferences that can be drawn from those facts. Applying those standards, Plaintiffs have more than met the threshold test of stating claims that are viable and plausible on their face. The motion should be denied.

**ARGUMENT**

## I.    THE STANDARDS GOVERNING THIS MOTION

WMATA brings this motion under Fed. R. Civ. P. 12(b)(6) and 12(b)(1), and Local Rule 7.

In asserting Rule 12(b)(6), WMATA contests the legal sufficiency of the First Amended Complaint

based on the applicable pleading standards. *See, e.g., Browning v. Clinton,* 292 F.3d 235, 242 (D.C.

Cir. 2002).   The Supreme Court has indicated that the pleading standards require assertion of

"enough facts to state a claim to relief that is plausible on its face," and "above the speculative

level." *See Bell Atlantic Corp. v. Twombly,* 127 S. Ct. 1955, 1965 (2007).   In applying the Rule

12(b)(6) standards, this Court must accept as true all of the Plaintiffs' factual allegations, and afford

Plaintiffs the benefit of all inferences that can be drawn from the facts alleged.  *See id.* at 1974.

The Rule 12(b)(1) standards applicable to WMATA's claim of lack of subject matter

jurisdiction are slightly different.  Although the Plaintiffs have the burden to establish subject matter

jurisdiction when it is challenged under Rule 12(b)(1), the burden is not a heavy one and can be

carried by a preponderance of the evidence. *APWU v. Potter,* 343 F.3d 619, 623 (2d Cir. 2003)

("Plaintiffs bear the burden of showing by a preponderance of the evidence that subject matter

jurisdiction exists.") (citation omitted); *see also Doe v. Metro. Police Dep't,* 445 F.3d 460,

467 (D.C. Cir. 2005) (dismissal is appropriate under 12(b)(1) only if claim is "wholly insubstantial

or frivolous"); *Garcia v. Copenhaver, Bell & Assocs.,* 104 F.3d 1256, 1260-61 (11th Cir. 1997)

(stating that it is "extremely difficult" to dismiss a claim for lack of subject matter jurisdiction);

*Best v. Kelly,* 39 F.3d 328, 330 (D.C. Cir. 1994) ("jurisdiction is lacking [under Rule 12(b)(1)] when

the complaint is patently insubstantial" and "that the claims [must] be flimsier than 'doubtful or

questionable' – they must be essentially fictitious").

WMATA's inclusion of materials and facts not found in the First Amended Complaint is

also entirely inappropriate.   Throughout the motion, WMATA cites *Osseiran v. International*

*Finance Corp.,* 498 F.Supp. 2d. 139 (D.D.C. 2007) as license to include such additional facts and materials. (*See* Mem. 4 n.3, 6 n.6, 7 n.7, 32 n.20.) (References to WMATA's Memorandum of Points and Authorities are abbreviated herein as "Mem. ___.")

The law does not permit WMATA's attempted end run around the applicable standards on such a motion, and neither *Osseiran,* nor, more importantly, any other binding law of this Circuit, grants the wide latitude WMATA seeks on this motion. In addition to the First Amended Complaint's allegations and exhibits, the only other materials appropriate to consider consist of documents in the record in this case or matters for which the Court could take judicial notice. *See Phillips v. Bureau of Prisons,* 591 F.2d 966, 969 (D.C. Cir. 1979). It appears that WMATA recognizes the precariousness of its position in asking the Court to consider materials not suitably part of the analysis, as WMATA "requests that the Court not consider" such materials to the extent that they would convert this to a summary judgment motion under Fed. R. Civ. P. 12(b) (in which event "all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56"). (*See* Mem. 4 n.2.)

Review of the issues posed by this motion must be confined to the First Amended Complaint and its exhibits. There is nothing else that can properly be considered at this stage of the litigation. Where, as here, the factual allegations, taken as true, and the inferences that can be drawn demonstrate claims that are plausible on their face, the Rule 12(b)(6) challenge must be denied. Where, as here, the Plaintiffs' submissions demonstrate that this Court has subject matter jurisdiction, the request for dismissal based on sovereign immunity must also be denied.

## II.    PLAINTIFFS STATE VIABLE CLAIMS FOR BREACH OF CONTRACT

Plaintiffs have alleged a form of agreement that is recognized and valid under District of Columbia law. They have plead a number of ways by which Monument Realty acquired contractual rights in the Property, by entering into an agreement with WMATA to ensure

Monument Realty the exclusive right to negotiate for and to acquire the Property as part of the overall AWC process. Although WMATA has obviously chosen to contest those factual allegations (*see* Mem. 9-18), at the motion to dismiss stage there is no mechanism for accepting WMATA's protestations that there was no such agreement. Plaintiffs have plainly set forth all requisite elements establishing an enforceable agreement and for breach of that agreement: "In general, against a motion to dismiss, once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint, construing the complaint liberally in the plaintiff's favor with the benefit of all reasonable inferences derived from the facts alleged." *In re Sealed Case,* 494 F.3d 139, 145 (D.C. Cir. 2007) (citations omitted).

Indeed, it is not only plausible, but eminently logical, that Monument had such an agreement with WMATA, either to negotiate exclusively with WMATA for the Property, or to acquire the Property, or both, given that Monument had been designated as Master Developer for the Half Street Area, had already negotiated exclusively with WMATA (and consummated a transaction with WMATA) for a portion of the development (*i.e.,* the Navy Yard Metro Station), and had received promises and assurances that completion of the AWC process, specifically including Monument's rights to negotiate for and acquire the Southeast Bus Garage, would be honored. These allegations are central to Plaintiffs' claims. (Amd. Compl. ¶¶ 17, 25-26, 28, 39, 43.)

Monument conferred substantial consideration upon WMATA that it would not have provided but for the rights granted to Monument as Master Developer and WMATA's acquiescence in those rights. (*Id.* ¶¶ 41-45.) This consideration related directly to, and benefited, the Property in which Monument holds its interests. (*Id.* ¶ 42.) The benefits afforded by Monument included obtaining a zoning variance for WMATA's benefit so that WMATA employees could park on an adjacent surface parking lot owed by Monument through the cessation of WMATA operations at the Bus Garage (thereby tying up Monument's real estate for WMATA's benefit in the interim),

6

efforts to prevent the Property from being designated as an historic site (thereby enhancing its value to WMATA), closure of an alleyway (generating additional development rights and thereby enhancing the value of WMATA's real estate) and providing an alleyway easement benefiting the Property through the end of WMATA's operations there, and other considerations.  (*Id.* ¶¶ 41-43.)

District of Columbia law recognizes precisely such an arrangement, and confirms that Plaintiffs have a viable interest in the Property.  In a case on point, the D.C. Circuit affirmed this Court's grant of specific performance where the parties entered into both a written and an oral agreement for the sale of a tract of land containing ten separate lots.  *See Brewood,* 207 F.2d at 440. Eight of the lots were sold under the written contract, and this Court ordered specific performance and conveyance of the two remaining lots under "a further agreement that the remaining two lots would also be conveyed to [appellees], at a price and on terms respecting taxes agreed upon, at such time as appellant's wife became reconciled to parting with all of the land."  *See id.*

This Court found, and the D.C. Circuit affirmed, that the buyer would not have purchased the original eight lots, and invested in their development, without the right to acquire the other two. *See id.* at 440-42.  The acquisition of the first eight lots was a partial performance of the obligations concerning the sale of the entire tract, and the buyer would not have incurred the initial expense without the oral agreement conferring the rights in the entire tract.  *Id.* at 441-42.  Monument is entitled to pursue claims in this case that it never would have made its multimillion dollar acquisition and development efforts in the Half Street Area, without the agreement concerning the Property.  The D.C. Circuit confirmed in *Brewood* that these principles are well-recognized under District of Columbia law:

> That this resulted directly from the contract and is directly and immediately traceable to it, there can be no particle of doubt. Nothing is shown to account for it otherwise. It is just as obvious as the placing of a building on land by one who has a contract to purchase. Not only was this a part performance of the contract, but its circumstances lead inevitably to the contract as the reason.

*Id.* at 442 n.5 (citations omitted).

This is precisely what is alleged, and what Monument Realty is entitled to prove, in this lawsuit.  The D.C. Circuit recognized, under the similar circumstances in *Brewood,* that, "[t]he situation created by appellant's failure to convey could not be rectified by rescission or by an action for damages for breach of contract."  *Id.* at 442.  As in *Brewood*, Monument Realty has an identifiable property interest that it is entitled to protect with the remedies it seeks in this case.

It should also be noted that Monument has alleged specifically not only WMATA's assent to the terms of the agreement, but, further, that WMATA decided at some point arbitrarily to ignore and violate Monument Realty's rights based on the erroneous belief that Monument Realty is behind schedule in the development of the Navy Yard Metro Station.  (Amd. Compl. ¶¶ 61-64, 88.)  This erroneous belief was expressly stated immediately prior to the Board of Directors awarding a contract for the purchase to Akridge, and in the face of acknowledgement by WMATA staff that WMATA had accepted a recovery schedule from Monument.  (*See* Amd. Compl., Exhibit E.)  Thus, Monument Realty has stated viable and plausible claims for breach of contract.

### A.    The Agreement Alleged By Plaintiffs Is Not "An Unenforceable Agreement To Negotiate Or Agreement To Agree"

Disregarding the substance of Plaintiffs' allegations, WMATA claims that the facts in the First Amended Complaint establish, at best, "an unenforceable agreement to negotiate or agreement to agree."  (*See* Mem. 9-10.)  Plaintiffs' allegations cannot be pigeonholed as WMATA suggests.

Plaintiffs have alleged an agreement to grant Monument Realty exclusive rights to negotiate for and to acquire the Property, under circumstances which have been recognized as appropriate for enforcement of contractual and real property rights under District of Columbia law.  *See, e.g., Brewood, supra.*  A party is free to contract in a way that grants preemptive or similar rights to another party, in specific transactions that may include the conveyance of real estate.

In *BMX Electronics, Inc. v. Control Data Corp.,* 929 F.2d 707, 708 (D.C. Cir 1991), for instance, part of the claim involved an action for breach of contract involving "an exclusive option to negotiate for the purchase of a business and a building." This Court found, and the D.C. Circuit affirmed, that there had been no breach of the contract, but at the same time it was clear that the underlying obligation was both valid and enforceable:

> The foregoing provisions, read together, permit only one interpretation, Upon signing the LOI, the parties were to attempt to negotiate a binding agreement on the sale of the Capital business by September 30, 1986, and were also to begin negotiations concerning sale of the Capital building. During this period, CDC could not negotiate with any other party concerning sale of either property. If the parties succeeded in arranging the sale of the business, they would continue negotiations regarding sale of the Capital building. If, however, the parties could not reach agreement on the sale of the business by September 30, 1986, the LOI would expire, and with it, CDC's exclusive negotiating obligations with regard to both the Capital business *and* the Capital building.

*Id.,* 929 F.2d at 711.

At the very least, this was WMATA's obligation with respect to the Property: to negotiate with Monument Realty, and not to negotiate with any other party outside of the AWC process concerning sale of the Property. Monument Realty had the exclusive right to negotiate with WMATA concerning the Property as part and parcel of the AWC process, and was entitled to hold WMATA to the implied covenant of good faith and fair dealing recognized under District of Columbia law. *See Allworth v. Howard Univ.,* 890 A.2d 194, 201 (D.C. 2006). Indeed, WMATA acknowledged that right on at least two occasions, once when it suspended the Joint Development Solicitation in deference to the AWC process and later, when it suspended the first bid solicitation in deference to the AWC process. (Amd. Compl. ¶¶ 17, 62.) Here, WMATA clearly evaded the spirit and substance of its obligations, willfully deciding to ignore Monument Realty's rights while moving obstinately forward with a series of efforts to *not* negotiate with or convey the Property to Monument Realty. This conduct is actionable. *Allworth*, 890 A.2d at 201. Failure to honor "an

agreed common purpose," and disregard for "the justified expectations" of the other party are actionable; the improper action can be overt or "may consist of inaction." *See id.*

WMATA is incorrect in suggesting that "the Court will have to create the purchase-and-sale agreement out of whole cloth." (*See* Mem. 10.) WMATA's obligation was to deal with Monument Realty before dealing with any other party outside of the AWC process, and WMATA violated that obligation as set forth in the First Amended Complaint. Indeed, Monument Realty, as AWC's designee and otherwise, was entitled to an exclusive period within which to negotiate with WMATA. Those rights, recognized in part through WMATA's obligation to offer the property to the District of Columbia, AWC, and Monument at fair market value, were never honored by WMATA. Under District of Columbia law, the allegations in the First Amended Complaint are sufficient to state the parties' contract, to identify a contract with terms fairly evident to WMATA, and to permit the trier of fact to decide if the contract was breached and the appropriate remedy. *See Affordable Elegance Travel, Inc. v. Worldspan, L.P.,* 774 A.2d 320, 327-328 (D.C. 2001). Moreover, if necessary, any absent material or other terms can be supplied by this Court in granting specific performance. *See Ammerman v. City Stores Co.*, 394 F.2d 950 (D.C. Cir. 1968).

**B.    The Statute Of Frauds Is No Defense To The Claims Asserted**

The Statute of Frauds is no panacea for WMATA, despite its arguments that it is a complete bar to the contract-related claims in this case. (*See* Mem. 10.) As evinced in *Brewood, supra*, the disposition of the Property was but one part of an entire transaction, and there was part performance, directly traceable to the other actions taken, money spent, and work done by Monument Realty as a result of the overall understanding that Monument Realty would have exclusive rights to negotiate for and to acquire the Property. As expressly stated in *Brewood*, partial performance, as pled here through Monument Realty's issuance of an unsolicited offer, (Am. Compl. ¶ 56), completion of the acquisition of the first phase of the development in the Navy Yard

Metro site (Am. Compl. ¶ 35), and otherwise, clearly takes this case out of the statute of frauds. *See also District of Columbia Hous. Fin. Agency v. Harper,* 707 A.2d 53, 55 (D.C. 1998) (part performance meets exception to Statute of Frauds).  Moreover, given WMATA's acquiescence in the existence of the contract (*see* Amd. Compl. ¶¶ 25-26, 28-32), WMATA waived its right to assert the Statute of Frauds defense – or at the very least, this is an issue for trial.  Finally, the Statute of Frauds does not bar the imposition of a constructive trust as Plaintiffs have alleged in Count Five. *In re Reilly,* No. 06-RR-320, 2007 D.C. App. LEXIS 589, *20-24 (D.C. Oct. 11, 2007), *citing Tauber v. District of Columbia,* 511 A.2d 23, 27 n.11 (D.C. 1986).

### C.    The First Amended Complaint Properly Alleges An Agreement By WMATA

WMATA also suggests that it could not have become bound as alleged in the First Amended Complaint, advancing three separate arguments in that regard.  (*See* Mem. 11-15.)  First, WMATA says that there is no allegation of Board of Directors approval which, it says, is an absolute prerequisite to the approval of the rights Plaintiffs claim.  (*See id.* 11.)  Second, WMATA claims that there are no other allegations that any authorized agent of WMATA bound it to the rights Plaintiffs claim.  (*See id.* 12-13.)  Third, WMATA argues that the promises made were AWC's or the District's (but not WMATA's).  (*Id.* 13-14.)  WMATA's arguments are unavailing.

#### 1.    The Alleged Lack Of Board Approval Is Not Fatal To The Claims

WMATA bases its claim of lack of Board approval principally on the Compact (*see id.* 11), referring the Court to several sections of the Compact which, WMATA suggests, support its legal conclusion that only its Board may bind it to agreements like the ones alleged in this case.  (*See id.* 11.)  The principles stated by WMATA, however, are not found in the Compact.  The provisions cited by WMATA state only the following: (1) WMATA was created as an instrumentality and agency of each of its constituent jurisdictions (Art. III, sec. 4); (2) WMATA shall be governed by a Board of Six Directors who shall take an oath of office (Art. III, sec. 5); (3) WMATA's Board may

act by motion or by resolution (Art. III, sec. 8(b)); (4) WMATA "may" own and sell real and personal property by contract (Art. III, sec. 12(d)); (5) WMATA "may" receive payments, funds, properties and services (Art. III, sec. 12(e)); and (6) WMATA "may" enter into and perform contracts, leases, and agreements (Art. III, sec. 12(f)). *See also D.C. Code Ann.* § 9-1107.01, *et seq.* (2007). These sections of the Compact do not state that only the Board can authorize an agreement to negotiate exclusively for, or authorize the sale of, real estate.

Moreover, there is ample contrary authority stating that WMATA's General Manager and others had the authority to bind WMATA to the agreements with Monument. First, the Compact itself states that WMATA's General Manager shall be responsible for "all [of WMATA's] activities." *D.C. Code Ann.* § 9-1107.01, sec. 9(b). Second, WMATA's own Procurement Procedures Manual ("PPM") contains a Chapter dealing expressly with WMATA's sale of its real property. It provides that the General Manager, after screening the property among the constituent jurisdictions, must authorize the disposition of the Property. PPM, at sec. 1503.5 (attached at Amd. Compl., Exhibit D.) Third, the PPM, at Chapter 1, part XIV, states that the authority and responsibility to enter into contracts for the Authority is vested in the General Manager, and that the General Manager may delegate Contracting Officer authority to qualified employees. *See also* Federal Acquisition Regulations ("FAR"), at sec. 1.601 (stating that certain high level officials can be "designated contracting officers solely by virtue of their positions"); FAR, at sec. 2.101 (stating that contracting officers include "certain representatives of the contracting officer."). Hence, there is ample authority to suggest that the WMATA Board can, and has, delegated authority to others within WMATA to discuss, negotiate, and contract for the disposition of real property. While the WMATA Board may ultimately have responsibility for approving a negotiated disposition, that is a far cry from claiming that only the Board may negotiate for a disposition or authorize a WMATA employee to negotiate for the disposition. Any necessary authorization existed.

2.     The Asserted Lack Of Authority Is Not Fatal To The Claims

Obviously, WMATA's Board did not hold the sole power to grant Plaintiffs the rights claimed in the lawsuit. The other individuals with whom Plaintiffs dealt, such as for example, Nat Bottigheimer, the Contracting Officer to whom MR Ballpark 7 submitted bids (Am. Compl. ¶ 103), had the requisite authority. Additionally, this type of argument depends on the facts and circumstances of the case, and is proper for resolution on the merits by the trier of fact based on the contested evidence in this lawsuit – not at the motion to dismiss stage. *See DBI Architects, P.C. v. Am. Express Travel-Related Servs. Co., Inc.,* 388 F.3d 886, 889-91 (D.C. Cir. 2004) ("The existence of apparent authority is a question of fact that should normally be left to the jury.") (citation omitted); *Lewis v. WMATA,* 466 A.2d 666, 673 (D.C. 1983) ("the existence of agency, and its nature and extent, are questions of fact").

Further, even if the WMATA personnel with whom Monument dealt did not possess actual express authority, this does not mean that these individuals did not have authority to bind WMATA. First, WMATA personnel can bind WMATA if they possess implied actual authority. *See, e.g., SGS-92-X003 v. United States*, 74 Fed. Cl. 637, 652 (2006) ("A government official with implied actual authority can bind the government when such authority is considered to be an integral part of the duties assigned to a government employee."). Second, WMATA officials can ratify an unauthorized act and give it effect as if it had been authorized. *See, e.g., Silverman v. United States*, 230 Ct. Cl. 701, 710 (1982) ("Although the senior FTC official was not a contracting officer for the FTC, with expressly delegated authority to make contracts for the Government, the FTC retained and utilized the transcripts which the plaintiff released to the FTC on the basis of the official's promise. By accepting the benefits flowing from the senior FTC official's promise of payment, the FTC ratified such promise and was bound by it."). Finally, the actual authority requirement is premised largely on the notion that "restrictions on government agents are accomplished in the

open, through laws and regulations." *Brunner v. United States*, 70 Fed. Cl. 623, 629 (2006).

WMATA's alleged restrictions on its agents' authority, however, are not similarly open, through

laws and regulations, since WMATA is a quasi-governmental Compact-entity – an entity that can

more easily conceal restrictions on the scope of an agent's authority, particularly in light of the fact

that WMATA's own Compact does not expressly state the limitation on its agents' authority that it

now suggests.  Moreover, WMATA has taken directly contrary positions as to which, if any, of its

internal regulations or procedures apply.

In this regard, Plaintiffs have alleged that the property disposition involved in this case was

handled by WMATA's Office of Property Development and Management (apparently commonly

referred to within WMATA as "LAND").  Plaintiffs have alleged that the now-former Director of

LAND, Gary Malasky, and others, were acting within the scope of their authority during the

negotiations with Monument and throughout this development process. (Amd. Compl. ¶¶ 151, 153.)

Moreover, Plaintiffs have alleged that the properties owned by WMATA in the Ballpark District

were all authorized by the Board for disposition as a part of the Joint Development Solicitation

("JDS") issued by WMATA in March 2005 (*Id.* ¶ 16), and that negotiations surrounding the

property disposition were conducted by the Office of Property Development and Management. (*Id.*

¶¶ 58, 197.)  The PPM plainly gives personnel other than the Board the authority to negotiate Joint

Development Solicitations.  *See, e.g.,* PPM, at sec. 1508.4 (dealing with Contracting Officer and

Evaluation Team authority to negotiate JDS agreements).  Moreover, Monument Realty alleges

specifically that the Property was never formally removed from the JDS.  (*Id.* ¶ 18.)

Because WMATA never formally removed the Property from the JDS, WMATA remained

empowered to act under the JDS guidelines and the PPM provisions dealing with Joint

Development Solicitation, which include specifically the right to negotiate with neighboring

landowners such as Monument Realty.  (*Id.* ¶ 18; PPM, at sec. 1508.6.)  It is a reasonable inference

from these factual allegations, taken as true, that that the Board did, in fact, authorize disposition of these properties in precisely the manner in which Plaintiffs allege – to one Master Developer who would acquire the properties and then develop the properties under a comprehensive development plan, just as Monument agreed to do.  It is a further reasonable inference, and it is pled in the Complaint, that, as a result of such Board activity, WMATA personnel had the requisite authority to agree to and enter into exclusive negotiations with Monument.  Indeed, WMATA at all times after the AWC award, continued to cooperate and work in concert with Monument as Master Developer with rights in the Property.  WMATA accepted all benefits conferred on it by Monument in this relationship, but now refuses to recognize Monument's rights.  (*Id.* ¶¶ 44-45.)

Further, Plaintiffs allege that WMATA in fact entered into sole-source negotiations with Monument with respect to one phase of the development property, the Navy Yard Metro Station site, and that a contract was completed for the acquisition of that site.  (Amd. Compl. ¶ 35.) WMATA officials plainly had the requisite authority to carry out the conveyances involved in the Navy Yard Metro Station portion of the development, and WMATA does not assert to the contrary. Those negotiations were conducted on a "sole-source" basis, just as Plaintiffs allege was required to happen here.  Plaintiffs allege that the Navy Yard Metro Station transaction was part of a larger whole (*Id.* ¶¶ 23-34), that the Navy Yard Metro Station portion of the transaction moved forward separately at an earlier date for several reasons, including the need to complete construction of the Metro station in time for the start of the 2008 baseball season (*Id.* ¶¶ 35-50), and that the portion of the transaction involving the Bus Garage was deferred until later, at WMATA's request, based on several grounds, including the need to finalize WMATA's relocation plans.  (*Id.* ¶ 30.)

### 3. Plaintiffs Are Not Suing On "Promises And Commitments Of The District And AWC, Not WMATA"

WMATA's suggestion that this suit is based on a contract entered into either by the District or AWC, but not by WMATA, simply asks the Court again to disregard the factual allegations in

the First Amended Complaint and the inferences that may be drawn therefrom.  Plaintiffs are not

suing the District or AWC, and are not suing WMATA on obligations of the District or AWC.  The

obligations giving rise to the suit are those of WMATA.  (*See id.* ¶¶ 16-18, 25-26, 28-30, 32-51, 55-

58, 62-63.)  Certainly, both the District and AWC were involved in the underlying events and no

doubt witnessed and participated in many of the factual circumstances underpinning this case.

Certain aspects of the development of the Half Street Area, for instance, were influenced and

fashioned by the District and AWC.  The essence of Plaintiffs' claims, however, is WMATA's

involvement and acquiescence in that development plan, which included Monument Realty's rights

in the Property.  (*See id.*)  Although WMATA might wish to blame the District or AWC for the

predicament in which it now finds itself – attempting to sell the Property out from under Monument

Realty's rights – it cannot, particularly on this motion, foist responsibility onto other parties.

Moreover, it is not an impossibility, as WMATA suggests, for the actions of the District or

AWC to have affected WMATA's obligations.  Agencies such as AWC can, in fact, possess

apparent authority to act on behalf of other agencies.  *See, e.g., Williams v. WMATA,* 721 F.2d

1412, 1416-18  (D.C. Cir. 1983) (remanding case to this Court for failing to consider issue of

whether the District of Columbia Office of Human Rights possessed the apparent authority to act on

behalf of the Equal Employment Opportunity Commission, noting that "the apparent authority of

OHR . . . may have sprung from the negligence of EEOC in failing to correct representations made

by the local agency").  Plaintiffs' allegations in this case implicate precisely the sort of issues

referenced in *Williams* and involve allegations that cannot be dismissed at the pleading stage.

(Amd. Compl. ¶¶ 11, 13-14, 16-18, 20-26, 28-34, 37-47, 49-50, 53-54, 55-56, 151-158.)  Monument

also alleges that the District and WMATA reached an agreement for Monument's benefit. (Amd.

Compl. ¶¶ 44, 57, 62, 63, 138).  Such an agreement certainly could bind WMATA and Monument

would have rights as a third party beneficiary of that agreement. *See, e.g., Christiansen v. Nat'l*

*Sav. & Trust,* 683 F.2d 520, 530 (D.C. Cir. 1982) ("If property is transferred from one person to another who agrees to assume a personal liability to a third person, the resulting relationship is that of a third party beneficiary contract . . . ."). This is the case here. The District could have acquired equitable title and the right to acquire the Property from WMATA (indeed Monument alleges that there was such an agreement (Amd. Compl. ¶ 61-63); WMATA could have subsequently decided not to fulfill its obligations, without any legitimate basis for doing so. In fact, Plaintiffs have alleged that WMATA's actions in failing to honor its obligations and commitments were based on improper motives, including its mistaken belief that Monument was behind schedule on the Navy Yard construction, and its lack of a policy to capture the economic windfall that the District might earn by "flipping" the Property to Monument. (*See* Amd. Compl. ¶ 63.) Monument is entitled to enforce WMATA's agreement with and obligations to the District as a third party beneficiary. Indeed, those obligations included WMATA's obligation to offer the subject property to the District at fair market value. (Amd. Compl. ¶ 62.) However, WMATA never did this, instead attempting to retain for itself the benefit of any increase in value of the Property for as much as one year after the disposition of the Property by AWC or the District. Obviously, such conduct was inconsistent with WMATA's obligation to offer the Property to the District or its designee at fair market value.

In addition, given the preexisting obligation of AWC to recognize Monument Realty as Master Developer of the Half Street Area and to convey title to Monument Realty, Monument Realty is also entitled to enforce those rights under the doctrine of after acquired title. *Id.*; *see also Miller-Long v. John Hanson Sav. & Loan, Inc.,* 676 F. Supp. 298, 299 (D.D.C. 1987) (recognizing that the doctrine of after acquired title has long been recognized in the District of Columbia); *Douglas v. Lyles,* 841 A.2d 1, 5 (D.C. 2004) ("Further guidance on the general principle that one can validly contract to sell that which he does not yet own comes from the doctrine of after-acquired title, which holds that 'if a grantor purports to transfer ownership of real property to which he lacks

17

legal title at the time of transfer, but subsequently acquires legal title to the property, the after-acquired title inures, by operation of law, to the benefit of the grantee.'") (citations omitted).  These rights include the rights that AWC had as a result of WMATA's obligation to offer the Property to the District or AWC at fair market value – an obligation WMATA never honored.

**D.    Monument Realty Has Alleged Contractual And Real Property Rights**

In a similar vein, WMATA asks the Court to accept its arguments that neither Monument Realty nor MR Ballpark 7 has or could have any viable rights in the Property because they were not the Master Developer.  (*See* Mem. 15.)  Again, this would require the complete disregard of the First Amended Complaint's allegations, and this is not a proper exercise on a motion to dismiss.  In addition, the December 2005 Press Release announcing the Master Developer designations references "Monument Realty, LLC" specifically, and, in any event, the contents of a press release do not trump Plaintiffs' allegations.  (*See* Amd. Compl., Exhibit F.)

**E.    The Alleged "Integration/Merger Clause" Is Not Fatal To The Claims**

WMATA again ventures outside of the First Amended Complaint to make a claim that a so-called "merger/integration" clause in one of the documents executed as part of the transaction in which Monument acquired the Navy Yard Metro Station site bars the claims in this case.  (*See* Mem. 15-17.)  Neither this argument, nor WMATA's Exhibit 3, can properly be considered on a motion to dismiss.  Even if it were proper to consider these arguments or these materials, they are not fatal to Plaintiffs' claims.  Even if there were such a clause, Plaintiffs alleged that this transaction was part of a larger whole and that the Bus Garage acquisition was left out, at the time, at WMATA's request.  (*See* Amd. Compl. ¶¶ 28, 32-38.)

The inclusion of a so-called integration clause or merger clause in a contract is not conclusive as to whether there are additional terms as part of the agreement, or a collateral contract, or other obligations and agreements in addition to those set forth in the purported fully-integrated

writing. *See Bowden v. United States*, 106 F.3d 433, 439-40 (D.C. Cir. 1997) ("While the presence of an integration clause suggests that the agreement is fully integrated, it does not by itself dictate that conclusion.") (citation omitted); *Howard Univ. v. Good Food Servs., Inc.,* 608 A.2d 116, 127 (D.C. 1992) ("Evidence in addition to the written agreement admissible for determining whether the parties' contract is completely, or only partially, integrated includes agreements or negotiations prior to or contemporaneous with the adoption of a writing. The presence or absence of a merger clause indicating complete integration may be a significant, though not conclusive, factor in ascertaining the parties intent.") (citation omitted). WMATA's bare assertion of an integration or merger clause in a document not included within the lawsuit cannot be a proper basis for dismissal because it would require this court to weigh the parties' intent. *Stamenich v. Markovic*, 462 A.2d 452, 456 (D.C. 1983) ("Whether the written contract in this case represented a complete integration of the understanding between the parties depends on their intent at the time of the execution of the contract.") (citation omitted). The provisions do not negate the course of dealing and Plaintiffs' other allegations. *See Good Food,* 608 A.2d at 126 (reversing and remanding trial court's finding of a completely integrated agreement on the grounds that, *inter alia*, the parties' prior conduct was relevant and had to be considered in construing their intent in entering into an agreement).

The cases cited by WMATA do not suggest a contrary result. *See One-O-One Enter. v. Caruso,* 848 F.2d 1283 (D.C. Cir. 1988) (dismissing claim for *fraud in the inducement* based on integration clause); *ARB, Inc. v. E-Sys., Inc.,* 663 F.2d 189 (D.C. Cir. 1980) (applying Maryland law; conceding that integration clauses are not "absolutely conclusive" as to parties' intent); *L&L Constr. Assocs., Inc. v. Slattery Skanska, Inc.,* No. 05-1289**,** 2006 WL 1102814 (D.D.C. Mar. 31, 2006) (finding that forum selection clause was intended to be exclusive provision governing all disputes between parties, in part based on merger clause of Subcontract).

F.    **The Asserted Lack Of A Contractual Right On The Part Of MR Baseball 7 Is Not Fatal To The Claims**

WMATA also claims that MR Ballpark 7 is not a proper party to certain counts of the lawsuit, because it had no agreement with WMATA. (*See* Mem. 17-18.) MR Ballpark 7 cannot allege that it was a party to the exclusivity negotiations that were required to take place with WMATA. Therefore, MR Ballpark 7 is not a proper party with respect to Count Four (Breach of Contract) as it is currently pled. However, MR Ballpark 7 is a proper party with respect to Count One, which seeks a declaratory judgment with respect to the rights of the parties. MR Ballpark 7's rights, along with those of Monument Realty, have been harmed by WMATA in connection with the bidding process and breach of WMATA's Compact (Counts Eight and Nine). There are actual controversies between MR Ballpark 7 and WMATA, including those relating to the flawed bid process WMATA has pursued (Amd. Compl. ¶ 110), making it appropriate for MR Ballpark 7 to join in the request for a declaratory judgment in this case.

MR Ballpark 7 is also a proper party to assert that it is entitled to specific performance (Count Two) in accordance with its bid, which for a variety of reasons, would have yielded the best net return to WMATA and therefore met WMATA's sole stated bid criterion. Likewise, MR Ballpark 7 is plainly entitled to seek injunctive relief to protect its interests in the Property that arose as a result of it submitting the superior bid to WMATA (Count Three) and is also entitled to assert a claim for constructive trust over the Property for the same reasons (Count Five). Finally, even WMATA cannot dispute that MR Ballpark 7 is a proper party with standing to assert the claims set forth in Counts Eight and Nine (violation of WMATA's Compact and PPM) as a result of improprieties in the bidding process. Counts Ten through Twelve of the Amended Complaint are similar, and there can be no dispute that MR Ballpark 7 can properly seek relief under those claims.

Moreover, although MR Ballpark 7 was not formed until July, 2007, Monument Realty was in existence at all relevant times and had the exclusivity dealings and agreements alleged with

WMATA.   Therefore, Monument Realty is also a proper party with respect to all counts of the Complaint except Nine through Twelve, and did, in fact, complain to WMATA about the flawed bid process that it has been pursuing.  (Amd. Compl., Exhibit K.)   At best, WMATA's argument amounts only to an assertion as to *which* of the two Plaintiffs are entitled to assert certain claims; not that the claims should be dismissed altogether. Therefore, no counts should be dismissed.

### III.   MONUMENT REALTY HAS STANDING TO ASSERT ALL CLAIMS IN THE COMPLAINT EXCEPT COUNTS NINE THROUGH TWELVE; MR BALLPARK 7, HOWEVER, HAS STANDING TO ASSERT THE CLAIMS IN THOSE COUNTS

WMATA also asserts that since Monument did not submit a bid, it has no standing to "challenge the IFB, the bid process, the Akridge Bid, or the award to Akridge."  (*See* Mem. 18-19.) Therefore, WMATA somehow concludes that Counts One through Seven should be dismissed "to the extent they depend on the bid process" (see *id.*) and that Counts Eight, Nine, Ten, Eleven, and Twelve should be dismissed in their entirety.  (*Id.*)

As an initial matter, to the extent that Counts One through Seven pertain to the bid process followed by WMATA, MR Ballpark 7 has standing to assert those Counts, as discussed above.  To the extent that those counts pertain to activities that preceded the bid process, such as the exclusivity negotiations, Monument Realty has standing to assert the claims set forth in those counts; therefore, there is no basis, and none has been asserted, for WMATA's erroneous conclusion that these counts should be dismissed on "standing" grounds.   Indeed, Counts One through Seven pertain largely to events leading up to the bid process, all of which Monument Realty was centrally engaged in to its detriment and injury.   Therefore, Monument Realty has standing to assert these claims.   It is axiomatic that a party who suffers injury has standing to sue for that injury.  *See Mountain States Legal Found. v. Glickman,* 92 F.3d 1228, 1234-35 (D.C. Cir. 1996) ("[E]ven a small probability of injury is sufficient to create a case or controversy – to take a suit out of the category of the hypothetical – provided of course that the relief sought would, if granted, reduce the probability.").

But, in addition, WMATA is incorrect that Monument Realty lacks standing to challenge WMATA's bid procedures. It may be true that standing is limited to actual or prospective bidders in certain bid protest forums in certain contexts. *See Scott v. United States*, 78 Fed. Cl. 151, 154 (2007) ("The governing precedent thus requires plaintiff to establish that he is an interested party by demonstrating that he is an actual or prospective bidder with a direct economic interest in the procurement.") (citation omitted). This Court should not, however, apply this standard in assessing Monument Realty's standing to assert its claims against WMATA. *See Bootery Inc. v. WMATA*, 326 F. Supp. 794, 797 (D.D.C. 1971). Rather, general standing criteria applies, and Monument Realty meets those standards handily, for all of the Counts challenged by WMATA. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *see also Shays v. FEC*, 414 F.3d 76, 91 (D.C. Cir. 2007) (noting that "so long as the procedures in question are designed to protect some threatened concrete interest of [the plaintiff's] that is the ultimate basis of his standing, the party invoking jurisdiction may establish injury in fact by showing that the government act performed without the procedure in question will cause a distinct risk to a particularized interest of [that party].") (citations omitted). Whether parties have standing to sue under WMATA's Compact turns on the extent to which the provisions of the Compact and its rules affect the interests of the parties. *Borough of Morrisville v. Del. River Basin Comm'n*, 399 F. Supp. 469, 479 n.3 (E.D. Pa. 1975) ("To hold that the Compact is an agreement between the political signatories imputing only to those signatories standing to challenge actions pursuant to it would be unduly narrow in view of the direct impact on plaintiffs and other taxpayers.").

In *Bootery Inc. v. Washington Area Metropolitan Transit Authority,* for example, two taxpayers sued WMATA alleging that WMATA failed "to fulfill properly its statutory obligations regarding public hearings concerned with the location and design of subway stations and regarding a plan for financing the proposed subway system." 326 F. Supp. at 797. WMATA moved to

dismiss challenging Plaintiffs' standing to challenge WMATA's compliance with its Compact. *Id.* This Court found that "[i]n view of the federal interest in the Compact, there appears no reason why the general criteria for standing to challenge action under a federal statute should not be employed." *Id.* at 799. This Court found that the plaintiffs had standing to sue because "[t]he actions of the Authority in condemning their leaseholds would cause them injury in fact; the plaintiffs have alleged that the Authority acted arbitrarily and contrary to its statutory authority; there is no clear and convincing indication of a legislative intent to withhold judicial review and the interest of the plaintiffs is arguably within the zone of interests to be protected or regulated by the statute." *Id.* at 798 (citation omitted).

### A.    Count Eight

Despite WMATA's assertions to the contrary, (Mem. 25-28), WMATA had an obligation to adopt policies and procedures governing the sale of its surplus or excess property. Count Eight asserts that WMATA breached Section 73(g) of its Compact, by failing to adopt those policies and procedures. (Amd. Compl. ¶¶ 169-178.) The injury to Monument Realty that is fairly traceable to the absence of the required policy is painfully evident in this case. First, WMATA issued a JDS for the joint development of this Property. (*See id.* ¶¶ 16-18.) The JDS expressly included the Navy Yard Metro Station and the Bus Garage and solicited *one* developer to jointly develop all of these properties. (*See id.* ¶ 16.) The JDS was then apparently withdrawn, or simply not completed, in deference to the AWC process. (*Id.* ¶ 17.) Second, WMATA entered into sole-source negotiations with Monument with respect to the first phase of the development property, the Navy Yard Metro Station site, and all parties understood that WMATA would subsequently negotiate exclusively with Monument for the remainder of the Property after it secured a relocation site. (*Id.* ¶ 30.) Those sole source negotiations resulted in a contract between Monument and WMATA. (*Id.* ¶ 35.) Third, the Property was included in an IFB process (No. 07-3) that was subsequently pulled or withdrawn or

suspended by WMATA in deference to the AWC process.  (*Id.* ¶¶ 59-60.)  Fourth, Monument was informed that an agreement had been reached between the District of Columbia and WMATA for disposition of the Property to the District for Monument's benefit, apparently in accordance with a secret one-page disposition procedures sheet promulgated by LAND that no one outside WMATA was aware of that *required* disposition to the local jurisdiction at fair market value.  (*Id.* ¶ 62.) Fifth, and finally, the Property again became the subject of an IFB – this time No. 08-1.  (*Id.* ¶¶ 65-68.)

The absence of a Policy in this regard – as required by the Compact – was acknowledged by Principal Director Moneme at the September 27, 2007 Board Meeting (*id.* ¶ 94, Exhibit E) and formed the basis, in part, of MR Ballpark 7's second bid protest.  The sealed bid procedure utilized by WMATA does not take the place of such a policy, as WMATA asserts (Mem. 28-29).  Indeed, that procedure came under substantial criticism and it was expressly stated by Director Moneme that the Board needed to adopt a policy to deal with this circumstance.  (Am. Compl. ¶ 94.)  This discussion took place in the context of discussing the results of the sealed bid process; therefore, there is no question that WMATA's own Board did not consider the sealed bid process as replacing the required policy. Instead of presenting a constantly moving target, WMATA had a statutory obligation to establish a policy in this regard.  Armed with knowledge, Monument could have acted to protect its interests instead of being left to the vagaries and whims of arbitrary decision making by WMATA.  The absence of any such policy manifestly harmed Monument, which had exclusive rights in the Property.  Monument plainly has standing to assert a breach of the Compact.

WMATA's violations in this regard are clear and undeniable.  WMATA's authority to sell its real estate derives from Article 12(d) of its Compact.  *D.C. Code Ann.* § 9-1107.01, sec. 12(d) (2007).  Article 73(g) of the Compact requires that WMATA's Board "shall adopt policies and procedures to implement this section [of the Compact]."  *D.C. Code Ann.* § 9-1107.01, sec. 73.

This section of the Compact is entitled "Contracting and Purchasing" and deals specifically with "procurement of property" (73(a)(1)), and "contracting" (73(f)(1)). *Id.* Presumably then, in compliance with this requirement, WMATA adopted its PPM, which explicitly outlines the requirements for <u>disposal</u> of real property in Chapter 15. Chapter 15 of the PPM expressly states that it applies to agreements to <u>sell</u> real property and states that such agreements shall be considered "procurement transactions." *See* PPM, at sec. 1500.3. Procurement transactions include the disposition of real property. *Catholic Univ. of Am. v. United States*, 49 Fed. Cl. 795, 799-800 (2001) (holding that "procurement" encompasses the sale of real property). WMATA's rejection of MR Ballpark 7's second bid protest disavows the express language of the PPM that states that agreements for the sale of property shall be "procurement transactions," preferring instead to rely on a *Black's Law Dictionary* definition of procurement. Hence, despite being required by statute to have a policy for the disposition of its real property, WMATA has none.

### B.    Count Nine

WMATA admittedly did not apply the PPM, but instead may have applied – or attempted to apply – secret procedures known only to its own staff, in violation of the Compact, set forth in a single page excess property disposition sheet. Failure to properly adhere to either the PPM or the disposition sheet has harmed Monument and MR Ballpark 7 despite WMATA's protestations otherwise (Mem. 29-30). This is alleged in Count Nine. (Am. Compl. ¶¶ 179-99.)

WMATA has stated publicly that the PPM does not apply to the sale of property or this Property.[1] (*Id.* ¶¶ 83, 84.) In fact, at the September 27, 2007 hearing of the WMATA Board of Directors, the General Manager of WMATA, John B. Catoe, Jr., stated that the PPM did not apply

---

[1]    WMATA asserts that if the Property was not removed from the Joint Development Solicitation process, as Plaintiffs allege, then the PPM does not apply (Mem. 30). There are two problems with WMATA's analysis: First, the PPM expressly includes JDS procurement regulations (sec. 1508) and therefore by its own terms applies; and second, if the Property was not, in fact, removed from the JDS process, then WMATA had no authority to sell it to Akridge.

and then stated that some other procedures did not apply. This prompted one Principal Director and D.C. Councilmember, Jim Graham, to state that "[t]here's a little bit of a mixed message here" as to what procedures did in fact apply. That exchange highlighted WMATA's own state of confusion surrounding which procedures, if any, govern the sale. (*See id.* ¶¶ 84, 86, 87.) In other words, WMATA has no policy about whether such disposition must be conducted in the form of an auction, through a Joint Development Solicitation, through a sealed bid, through a sole-source negotiation, or through some or all of the foregoing.

Thus, WMATA has violated the Compact, either by not formulating, adopting, and publishing a policy, or by simply not following its established policy, as detailed in its PPM, or in its excess property disposition procedures sheet. Monument has standing to challenge such a flawed process. *See Elcon Enters. Inc. v. WMATA*, 977 F.2d 1472, 1478 (D.C. Cir. 1992) (WMATA's decisions may be challenged in court for clear and prejudicial violation of applicable statutes and regulations). Courts have also recognized a private right of action to hold WMATA to its Compact. *See id.*, at 1479 n.2, *citing Seal & Co. v. WMATA*, 768 F. Supp. 1150 (E.D. Va. 1991).

In *Seal v. Washington Area Metropolitan Transit Authority*, the court explained why such a private right of action must exist in order for the Compact to function as intended. 768 F. Supp. at 1153-57. Such a cause of action is implicit in the Compact, and provides a necessary means of holding WMATA to the Compact's requirements. *See Seal*, 768 F. Supp. at 1156 ("Moreover, the existence of a cause of action for disappointed bidders is arguably implicit in Section 73 and in the scheme of the Compact, for if private bidders on WMATA's contracts lacked standing to challenge WMATA's awards, it is hard to see how Section 73's mandate . . . would be monitored and enforced."). On this independent basis, WMATA's actions in soliciting bids for the Property and purporting to approve an award are invalid.

Similarly, Monument Realty and MR Ballpark 7 have standing to sue for breach of the PPM (Mem. 29). WMATA's protestations that the PPM is for "internal" purposes only (*id.*) is belied by the PPM itself which requires that it be made available to the public. PPM, at sec. 200.5. WMATA's argument that a 200+ page procurement manual required to be held out to the bidding public cannot be relied upon and used as the basis for a complaint against the agency when it fails to follow it is not serious. Indeed, WMATA never raised this contention when it responded to MR Ballpark 7's first two bid protests, instead addressing MR Ballpark's contentions regarding the PPM. WMATA cannot now assert that MR Ballpark 7 does not have standing to complain under WMATA's procurement guidelines. *See Elcon Enters., Inc. v. WMATA*, 977 F.2d 1472, 1479 (D.C. Cir. 1992) (plaintiff has standing to sue for WMATA's alleged breach of procurement regulations).

## IV.  PLAINTIFFS ARE ENTITLED TO PURSUE THEIR CLAIM THAT WMATA'S ACTIONS WERE ARBITRARY, CAPRICIOUS, AND OTHERWISE UNLAWFUL AND INVALID AS SET FORTH IN COUNTS TEN THROUGH TWELVE

In counts Ten through Twelve, Monument and MR Ballpark 7 have alleged that WMATA's actions in pursuing its flawed bid process and awarding a contract to a competing bidder were arbitrary, capricious, and otherwise unlawful and invalid. (Amd. Compl. ¶¶ 79, 101, 110, 176, 177, 198, 214, 222.) WMATA asks the Court to ignore those allegations and to find that WMATA acted within its lawful discretion and with a rational basis, as a matter of law. (*See* Mem. 19-25.)

With respect to Count Ten, WMATA states that its decision to "reject" MR Ballpark 7's Alternate Bid has both a rational basis in law and a rational basis in fact. (*See id.* 20-25.) WMATA, however, never "rejected" MR Ballpark 7's Alternate Bid. It simply chose not to consider it. (Amd. Compl. ¶ 85.) Nowhere in WMATA's bid procedures and processes, let alone in WMATA's IFB, is there any indication that WMATA would not consider such a bid. Indeed, the fact that "escalator bids" or alternate bids are common prompted Director Moneme to remark at the September 27, 2007 Board meeting that receipt of such bids by WMATA is commonplace and an

accepted practice in the real estate industry and that the Board had no policy in place to deal with such a situation. (*Id.* ¶ 94.) Under these circumstances, MR Ballpark 7 submits that if WMATA had followed its statutory mandate to adopt a policy, Plaintiffs would not have been damaged.

In defending its actions, WMATA employs a cacophony of attacks on MR Ballpark 7's Alternate Bid: it "did not contain a sum certain" (*see* Mem. 21); it "depended on amount(s) bid by one or more other bidder(s)" (*id.*); WMATA "could not ascertain the amount of the alternate bid without consulting and integrating materials outside the bid itself" (*id.*); it was "an attempt to get 'two bites at the apple,'" (*id.* 22); and it was otherwise unfair, anti-competitive, nonconforming, ambiguous, "a virtual invitation to litigation," and uncertain. (*Id.* 22-25.) Plaintiffs have made a series of allegations to demonstrate WMATA's improper actions, and those assertions must be taken as true at this stage of the case. (Amd. Compl. ¶¶ 79, 101, 110, 176, 177, 198, 214, 222.) These are factual disputes that will require trial to resolve. This conclusion is further compelled when one examines the Akridge Bid that WMATA determined to accept.

As Plaintiffs learned only recently, and have more fully pled in Counts Eleven and Twelve, the Akridge Bid stated a Bid Amount of $69,250,000.00, but had several very interesting characteristics: (1) it was "submitted conditionally" on terms set forth in a separate letter from Akridge's counsel to WMATA, (2) it provided for an exorbitant leaseback rental to WMATA, amounting to $11,640,000 over the 36 month leaseback period mandated in the IFB which put the total amount of the bid at less than the minimum required amount; and (3) it included an offer to "immediately commence negotiations with WMATA to establish an arrangement pursuant to which WMATA would be able to use [nearby real estate owned by Akridge] as a temporary site for locating assets presently located on the Property during the period WMATA is contemplating relocation of the operations presently conducted at the Property." (*Id.* ¶¶ 76-77.)

WMATA makes much hay of the fact that its Bid Form "clearly calls for a fixed number." (Mem. 23.) WMATA cites to "[c]ommon sense and common experience alone" and states that it was absolutely clear that the only thing called for by the IFB was "numbers (numerical or spelled out)." (*See id.*) Yet, the Akridge Bid contained several narrative provisions, including its conditional submission that referred WMATA to conditions outside the four corners of the bid form, and the concession involving nearby real estate owned by Akridge. (Amd. Compl. ¶¶ 76-77.) WMATA says that the "one line for the bid" asks only for a dollar figure. (*See* Mem. 23.) On this basis, it asks the Court to rubber stamp its actions as a matter of law. WMATA, however, cannot legitimately explain how it could decide to "reject" MR Ballpark 7's submission while finding the Akridge Bid conforming and responsive in all respects.

These allegations form the core of Plaintiffs' Counts Eleven and Twelve. If the IFB "clearly calls for a fixed number," then the Akridge Bid was nonresponsive by WMATA's own admission. The Akridge Bid was not a "number" or a "firm bid." (Amd. Compl., Exhibit J.) By WMATA's reasoning, it had no choice but to reject the Akridge Bid as "nonresponsive." For example, fundamental procurement principles hold that a bid is non-responsive where it includes variations from the IFB, or renders price uncertain, or otherwise fails to fix a firm price. *See Nat'l Oil & Supply Co.*, B-198321, 80-1 CPD ¶437, 1980 U.S. Comp. Gen. LEXIS 2940 (June 20, 1980) (holding that a bid is nonresponsive where it includes additions or variations from the IFB because it is then not clear how the procuring agency should interpret the addition); *United States Coast Guard—Advance Decision*, B-252396, 93-1 CPD ¶286, 1993 U.S. Comp. Gen. LEXIS 348 (Mar. 31, 1993) (holding that a bid is nonresponsive if the intended price is uncertain and cannot be determined from the submitted bid documents); *In re S. Atl. Servs., Inc.*, B-252419, 93-1 CPD ¶418, 1993 U.S. Comp. Gen. LEXIS 537, at *4 (June 2, 1993) ("Bid responsiveness requires an unequivocal offer to provide without exception exactly what is required at a firm, fixed-price.").

The Akridge Bid violates these fundamental principles by introducing a concession involving nearby real estate and thereby failed to fix a firm price for the Property. Not only was the Akridge Bid nonresponsive, but it allowed Akridge "two bites at the apple" by permitting it the "singular right" to include benefits to WMATA that could not have been known to any of the other bidders. WMATA unilaterally rejecting one bid that it alleges suffers from these flaws, but accepting another, more egregious bid, is the essence of arbitrariness and capriciousness.

Similarly, WMATA cannot aver that it could ascertain the amount of the Akridge Bid without consulting and integrating materials outside the bid itself. The Akridge Bid itself was submitted only "conditionally," and subject to terms of a side letter. (WMATA's effort to say that the Akridge Bid was "'submitted' conditionally" but "was not conditioned or conditional" (Mem. 32), is a masterful feat of verbal prestidigitation made while again injecting improper arguments and materials on a motion to dismiss.) Consideration of conditional bids is not permitted. *See Antennas for Comm.*, B-253950, 93-2 CPD ¶48, 1993 U.S. Comp. Gen. LEXIS 660 (July 23, 1993) (holding that a bid is nonresponsive where it imposes a condition that would modify the material requirements of the solicitation); *B&C Indus., Inc.*, B-244471.4, 91-2 CPD ¶ 314, 1991 U.S. Comp. Gen. LEXIS 1216 (Oct. 7, 1991) (holding that a bid is nonresponsive where it is ambiguous as to whether it is an unconditional offer to comply with the IFB); *In re Walashek Indus. & Marine*, B-281577, 99-1 CPD ¶30, 1999 U.S. Comp. Gen. LEXIS 13, at *3 (Jan. 29, 1999) ("If, in its bid, a bidder attempts to impose conditions that would modify the material requirements of the IFB, limit the bidder's liability to the government, or limit the rights of the government under any contract clause, then the bid must be rejected."). Because Akridge introduced conditions that modified the IFB, or rendered the bid ambiguous as to whether it is an unconditional offer to comply with the IFB, the Akridge bid should have been rejected outright. (Amd. Compl. ¶ 208-15.)

WMATA cannot even claim credibly that the Akridge Bid resulted in the "best net return" to WMATA or was the best offer it received.  Subtracting the leaseback rental results in a net return to WMATA of no more than $57,610,000, far less than even MR Ballpark 7's minimum bid (notwithstanding WMATA's denigration of it as a "low-ball bid" (*see* Mem. 3)).  Accepting MR Ballpark 7's minimum bid of $60 million would have resulted in a net return to WMATA of several million dollars more than the Akridge Bid.  Likewise, WMATA failed to consider that MR Ballpark 7 waived the 45 day Due Diligence Period, a fact that the contracting officer was entitled to give great weight, but clearly did not, since no other bidder, including Akridge, waived it.

## V.    SOVEREIGN IMMUNITY DOES NOT PROTECT WMATA FROM EITHER MONUMENT'S CONTRACT OR NON-CONTRACT CLAIMS

Under the Rule 12(b)(1) portion of its Motion, WMATA seeks to shield itself in a broad cloak of sovereign immunity, asserting that Monument's "non-contract" claims are subject to an absolute defense of sovereign immunity.  (*See* Mem. 34-40.)   WMATA pushes the sovereign immunity envelope, however, by further asserting that claims involving its bid procedures are protected by sovereign immunity, that it enjoys sovereign immunity against claims that it did not comply with its own Compact, and against claims that it did not follow its own published procurement procedures.  (*See* Mem. 36.)   With respect to contract claims, WMATA has no sovereign immunity.  *D.C. Code Ann.* § 9-1107.01, sec. 80 (2007).  For tort claims, sovereign immunity does not apply, either because the activities alleged are not discretionary (in that they involve ministerial acts directed by applicable statute or regulations), or because they are not fraught with public policy considerations.

WMATA's immunity is not absolute.  *Chester v. WMATA*, 335 F. Supp. 2d 57, 61 (D.D.C. 2004).  Section 80 of the Compact preserves WMATA's immunity only for "any torts occurring in the performance of a governmental function."  *Id., citing D.C. Code Ann.* § 9-1107.01, sec. 80 (2007).  Unless there is some "good reason to believe" that immunity was intended for WMATA, it

is generally not accorded governmental immunity. *Morris v. WMATA*, 781 F.2d 218, 224 (D.C. Cir. 1986) (*quoting Lake Country Estates v. Tahoe Reg'l Planning Agency*, 440 U.S. 391, 401 (1979)).

To identify "governmental" functions under the Compact, the Court must engage a two-step analysis developed by the D.C. Circuit to analyze the discretionary/ministerial dichotomy employed by the Federal Tort Claims Act. *Burkhart v. WMATA*, 112 F.3d 1207, 1216 (D.C. Cir. 1997). First, the Court inquires whether WMATA is engaged in "quintessential governmental functions" – activities that fall within the scope of WMATA's immunity. *Id.* Second, if WMATA is not engaged in a quintessential governmental function, the Court must determine whether the activity is discretionary or ministerial. *Chester*, 335 F. Supp. 2d at 61. If the challenged activity is discretionary in nature, then it falls within section 80's retention of sovereign immunity. *Id.*

In *Beebe v. Washington Metropolitan Area Transit Authority*, the D.C. Circuit held that:

> To determine whether a function is discretionary, and thus shielded by sovereign immunity, we ask whether any statute, regulation, or policy specifically prescribes a course of action for an employee to follow. If no course of action is prescribed, we then determine whether the exercise of discretion is grounded in social, economic, or political goals. If so grounded, the activity is governmental, thus falling within section 80s retention of sovereign immunity.

129 F.3d 1283, 1287 (D.C. Cir. 1995). This test reflects that "conduct cannot be discretionary unless it involves an element of judgment or choice." *Berkovitz v. United States*, 486 U.S. 531, 536 (1988). "If such a binding directive exists, then the employee has no rightful option but to adhere to the directive." *Loughlin v. United States*, 393 F.3d 155, 163 (D.C. Cir. 2004) (citation omitted).

Yet, even if the activity involves an element of judgment, the Court must make a secondary determination that the "judgment is of the kind that the discretionary function exception was designed to shield." *Berkovitz*, 486 U.S. at 537. For example, there is no governmental immunity in the negligent operation of motor vehicles. *United States v. Gaubert*, 499 U.S. 315, 325 n.7 (1991) ("Although driving requires the constant exercise of discretion, the official's decisions in exercising that discretion can hardly be said to be grounded in regulatory policy."). Both discretion

and a policy judgment must be present for immunity to attach: "[w]here there is room for policy judgment and decision there is discretion." *Dalehite v. United States*, 346 U.S. 15, 28 (1953).

**A.    The Umbrella Of Sovereign Immunity Does Not Protect WMATA From Plaintiff's Contract Claims, Including Counts Eight And Nine**

    1.    <u>WMATA's Conduct Implicated by Counts Eight And Nine Does Not Sound In Tort And Is, Therefore, Not Shielded by Sovereign Immunity</u>

The challenged activities giving rise to Counts Eight and Nine include, respectively, WMATA's failure to comply with the Compact's requirement to formulate policies, procedures, rules or regulations governing the disposition of its real property, and WMATA's arbitrary decision not to follow its own procurement procedures manual or other unpublished internal procedures. (*See* Amd. Compl. ¶¶ 169-78, 179-99.)  These activities do not sound in tort.  And the Compact only preserves WMATA's immunity for "torts occurring in the performance of a governmental function." *D.C. Code Ann.* § 9-1107.01, sec. 80 (2007); *Chester*, 335 F. Supp. 2d at 61.  In *Seal v. Washington Metropolitan Area Transit Authority*, for example, WMATA never took the position that a challenge to a bid procedure is subject to a sovereign immunity defense, demonstrating that even WMATA does not seriously contend that sovereign immunity attaches to issues surrounding whether it has followed proper bid procedures or its own Compact.  768 F. Supp. at 1155. WMATA's motion ignores this critical issue.

    2.    <u>Even If The Challenged Activities That Give Rise To Counts Eight And Nine Sound In Tort, The Challenged Activities Are Proprietary, Not Quintessentially Governmental.</u>

Even assuming, *arguendo*, that the challenged activities that give rise to Counts Eight and Nine sound in tort, which they do not, they are not "quintessential governmental activities."  (Amd. Compl. ¶¶ 169-178, 179-199.)  Certain functions that WMATA undertakes are, by definition, quintessential governmental functions.  The primary example is the operation of WMATA's police force.  *See, e.g.*, *Morris*, 781 F.2d at 220 ("The principle is well-established that operation of a

police force is a governmental rather than a proprietary function."). WMATA's conduct surrounding its disposition of the Property is not a quintessential governmental function. *See, e.g.*, *E. 56th St. Corp. v. Mobil Oil Corp.*, 906 F. Supp. 669 (D.D.C. 1995) (holding that WMATA is not immune from claims arising out of the operation and maintenance of property it owns, since such activity is proprietary; making this determination without even considering whether WMATA's activities are "quintessentially governmental").

Yet, without citing any authority, WMATA submits that counts Eight and Nine arose out of quintessentially governmental activities. (*See* Mem. 36.) While it is obviously true that only WMATA can issue its own procedures, that fact alone does not make the activities that gave rise to Counts Eight and Nine "quintessentially governmental." Private companies and corporations, for example, can also issue procedures to govern disposal of property they own. Private companies and corporations cannot, however, operate a police force. *See Leshko v. Servs.*, 423 F.3d 337, 347 (3d Cir. 2005) (stating that "[t]he power that a state exercises over a person whose liberty is restricted as a result of a criminal conviction or involuntary civil commitment is a quintessentially governmental function).

### 3.    Where A Statute, Regulation, Or Policy Specifically Prescribes A Course Of Action For WMATA To Follow, WMATA Has No Choice But To Adhere To These Binding Directives.

It is well-settled that immunity does not attach where there are binding statutory and/or regulatory directives that prescribe a course of conduct for the governmental actor. In *Warren v. WMATA*, 880 F. Supp. 14, 15 (D.D.C. 1995) for example, a passenger injured by shattered glass on a WMATA bus filed a personal injury suit alleging that the glass did not meet safety regulations applicable to WMATA vehicles. After recognizing that WMATA's providing mass transit is generally considered a proprietary function, this Court held that "if a statute or regulation prescribes a particular course of action, then WMATA has no discretion and the sole question is whether

WMATA did or did not follow the directive." *Id*. at 17; *see also Berkovitz*, 486 U.S. at 531 (no immunity when suit charges agency with failing to act in accord with specific binding directives).

WMATA's Compact requires WMATA to establish policies and procedures relating to its contracting and procurement practices, which includes the disposition of WMATA's real property. (Amd. Compl. ¶¶ 4, 5, 169-178.)  In addition, WMATA's PPM prescribes a course of conduct for WMATA to follow when disposing of its real property, which WMATA did not follow.  (*Id*. ¶¶ 179-199.)

The challenged activities that give rise to Counts Eight and Nine, therefore, flow from a binding statute and regulation.  Whatever discretion WMATA might enjoy to decide if, how, and when to issue policies and procedures, such discretion vanishes in the face of a specifically prescribed course of conduct.  WMATA can sometimes decide what policy to adopt; but it cannot elect not to adopt a policy where its Compact requires it to do so.  WMATA cannot and does not seriously challenge these assertions.

4.    Even If WMATA Has Discretion, That Discretion Is Not Grounded In Social, Economic, Or Political Goals.

Even if this Court were to decide that WMATA has discretion regarding whether to adopt policy under Compact Section 73(g), or regarding whether to follow the disposition of real property procedures in the PPM – a conclusion that the Court should not and cannot reach based on the plain language of the statute and PPM – that discretion is not protected by the doctrine of sovereign immunity.  *See, e.g., United States v. Gaubert*, 499 U.S. 315, 325 n.7 (1991) ("Although driving requires the constant exercise of discretion, the official's decisions in exercising that discretion can hardly be said to be grounded in regulatory policy.").

The discretionary function exception "protects only governmental actions and decisions based on considerations of public policy." *Berkovitz*, 486 U.S. at 537; *accord Cope*, 45 F.3d at 446 ("The mere association of a decision with regulatory concerns is not enough; exempt decisions are

those 'fraught with . . . public policy considerations."); *Shansky v. United States*, 164 F.3d 688, 694 (1st Cir. 1999) (identifying a line of cases where there is no immunity for "judgments that embody a professional assessment undertaken pursuant to a policy of settled priorities.").

Monument submits that any discretion to implement policies under Compact Section 73(g) or the discretion to follow the disposition of real property procedures in the PPM – assuming, *arguendo*, that such discretion exists – is not the type of discretion "fraught with public policy considerations." *Cope v. Scott*, 45 F.3d 445, 446 (D.C. Cir. 1995).

**B.** **The Umbrella Of Sovereign Immunity Does Not Protect WMATA From Plaintiff's Only Non-Contract Claims: Counts Six And Seven**

WMATA is not immune to Monument's claims of fraud and breach of fiduciary duty, because the challenged activities that give rise to these claims are based on WMATA's breach of its agreements with Monument and are also proprietary functions. The conduct that gives rise to these claims encompasses a number of WMATA's activities. It includes, but is not limited to, the following: (1) the formation of agreements and promises for Monument's direct benefit; (2) the creation and breach of a fiduciary duty to, among other things, act in good faith and fair dealing, and to engage in open and fair dealing with the Plaintiffs – a condition at least implicit in the agreements between Monument Realty and WMATA, and which includes the obligation to act with the utmost candor and disclosure, loyalty, and due care (Amd. Compl. ¶¶ 143-48); (3) the failure of WMATA to advise or otherwise inform Monument that WMATA was going to affect the position that Monument would not be and was not entitled to the exclusive right to negotiate with WMATA and/or AWC for acquisition of the Property (*id.* ¶¶ 149-168); (4) aspects of the manner in which WMATA attempted to dispose of the Property (*id.* ¶¶ 1-104); (5) WMATA's failure to implement its Compact (*id.* ¶¶ 169-78); (6) WMATA's arbitrary decision not to follow its own binding PPM or other unpublished internal procedures (*id.* ¶¶ 179-199); and (7) the activities that give rise to Monument's breach of contract claim (*id.* ¶¶ 128-138).

36

1.    The Challenged Activities Are Not "Quintessentially Governmental."

The conduct that gives rise to Counts Six and Seven is not quintessentially governmental. First, the conduct clearly does not involve the operation of WMATA's police force or similar governmental function.   But, more fundamentally, if WMATA is correct that carrying out the Compact mandate to "plan, develop, finance and cause to be operated improved transit facilities" (Mem. 37) constitutes a quintessential governmental activity, then it is difficult to imagine a single instance in which WMATA's activities would not be considered quintessentially governmental. WMATA's reading guts Section 80's limited sovereign immunity waiver of any meaning because there would exist no set of circumstances that would expose WMATA to tort liability.   Indeed, WMATA's current position is impossible to reconcile with the host of cases where courts have held that WMATA is exposed to tort liability.   *See, e.g., Heffez v. WMATA*, 569 F. Supp. 1551 (D.D.C. 1983) (WMATA is not protected for the allegedly tortious acts of station attendant).   WMATA's position would require this Court to "import immunity back into a statute designed to limit it." *Indian Towing Co. v. United States*, 350 U.S. 61, 69 (1955).

And finally, in case there is any lingering doubt, WMATA misstates the law when it characterizes, without citation, WMATA's basic mandate "to plan, develop, finance and cause to be operated improved transit facilities" as a quintessential governmental activity.  (*See* Mem. 37.)  In *Warren*, for example, this Court expressly stated that "WMATA's provision of mass transit is generally considered a proprietary function that would not be protected by sovereign immunity." 880 F. Supp. at 16; *see also Qasim v. WMATA*, 455 A.2d 904, 906 (D.C. 1983) ("Section 80 of the Compact waives each signatory's immunity from suit in its own courts for any proprietary functions, in accordance with the laws of the applicable signatory. Provision of mass transportation under the auspices of three governmental bodies is such a function.") (citation omitted).

2.    A Statute, Regulation, Or Policy Specifically Prescribes A Course Of Action For WMATA To Follow; WMATA Has No Choice But To Adhere To These Binding Directives.

As indicated above, the conduct that has given rise to Monument's breach of fiduciary duty claim and fraud claim touch on a number of areas including the activities that give rise to Counts Eight and Nine.  Thus, to the extent this Court finds that WMATA had no choice but to adhere to the binding directives set forth in the Compact and/or the PPM, this Court should find similarly that statutes, regulations or policies prescribe a course of action for WMATA to follow with respect to the activities that underpin Counts Eight and Nine.

The challenged activities that gave rise to Counts Six and Seven also include WMATA's breach of an express or implied agreement.  Performance under a contract does not leave any room for discretion.  *See, e.g., Casco Marina Dev. v. District of Columbia Redevelop. Land Agency*, 834 A.2d 77, 81-82 (D.C. 2003) ("While [an agency] is free to exercise discretion in initially entering a contract, or in deciding to seek to alter the terms of a contract, it is ministerially bound as a contracting party by the terms of a valid, existing contract unless and until both parties to the contract agree to amend it.").  Accordingly, WMATA's conduct is not discretionary but prescribed.

Finally, WMATA's tactic in re-casting the challenged activity is misleading.  (Mem. 39-40). WMATA attempts to re-cast the challenged activity as involving merely the decision to relocate a bus garage.  (Mem. 39).  But, as noted above, the challenged conduct encompasses a number of WMATA's activities that are not akin to a "decision to relocate or not to relocate [a] bus stop," *McKethean v. WMATA*, 588 A.2d 708, 714 (D.C. 1991), or design and planning decisions, but that are more properly characterized as proprietary or ministerial activities.  *See id.* at 713-14 (noting that "operation and maintenance" and the "provision of mass transportation by WMATA" are proprietary activities, while distinguishing design and planning of a transportation system as

governmental); *see also Gillot v. WMATA*, 507 F. Supp. 454, 457 (D.D.C. 1981) (holding that WMATA is not immune when it failed to make its parking lots safe).

      3.    <u>Even If WMATA Has Discretion, That Discretion Is Not Grounded In Social, Economic, Or Political Goals.</u>

As discussed above, even if the challenged activity involves an element of judgment, this Court must make a secondary determination that the "judgment is of the kind that the discretionary function exception was designed to shield." The element of judgment involved in the challenged activities that give rise to Counts Six and Seven is not discretion that is "fraught with public policy considerations" so as to support the defense of sovereign immunity. *Cope*, 45 F.3d at 446.

## VI.    PLAINTIFFS STATE A VIABLE CLAIM FOR FRAUD

WMATA argues that the claim for fraud in Count Seven is insufficient and fails to meet the pleading requirements of Rule 9(b). (*See* Mem. 41-42). Rule 9(b), however, must be harmonized with Rule 8's general directives that the pleadings contain a short and plain statement of the claim and that each averment be simple, concise, and direct. Fed. R. Civ. P. 8; *Joseph v. Cannon,* 642 F.2d 1373, 1386 (D.C. Cir. 1981).

In light of the tension between Rule 8 and Rule 9(b), the allegations of fraud in this case more than meet the applicable pleading requirements. Under District of Columbia law, there are five specific elements to a viable fraud claim: (1) a false representation; (2) in reference to a material fact; (3) made with knowledge of its falsity; (4) with the intent to deceive; and (5) action taken in reliance upon the misrepresentation. *See, e.g., Jankins v. TDC Mgmt. Corp.*, 21 F.3d 436, 439 (D.C. Cir. 1994), *citing Higgs v. Higgs*, 472 A.2d 875, 876 (D.C. 1984) (setting forth elements); *Bennett v. Kiggins*, 377 A.2d 57, 59 (D.C. 1977), *cert. denied*, 434 U.S. 1034 (1978).

Nondisclosure of material information may constitute fraud, *Bennett*, 377 A.2d at 59, especially where there is a duty to disclose. *Rothenberg v. Aero Mayflower Transit Co.*, 495 F. Supp. 399, 406 (D.D.C. 1980). *See also Loughlin v. United States*, 209 F. Supp. 2d 165, 173

(D.D.C. 2002) ("Fraud can arise from nondisclosure"); *Pyne v. Jamaica Nutrition Holdings, Ltd.*, 497 A.2d 118, 131 (D.C. 1985) ("Nondisclosure of material information may constitute fraud . . . ."). The "ultimate Rule 9(b) inquiry" is whether plaintiffs have provided defendants with "adequate notice of the fraud claim against them so that they may provide a meaningful response." *Cadet v. Draper & Goldberg, PLLC*, No. 05-2105, 2007 U.S. Dist. LEXIS 72504, at \*17 (D.D.C. Sept. 28, 2007); *United States v. Network Software Assoc.*, 227 F.R.D. 4, 9 (D.D.C. 2005).

WMATA argues that the Plaintiffs fail to allege that WMATA made any false representations and fail to allege that there was any reliance on those representations. That is incorrect. Every requirement is alleged. There are allegations that WMATA made various false representations and fraudulent omissions (Amd. Compl. ¶¶ 149-157, 158-62); that the false representations were in reference to material facts (*Id.* ¶ 164); that WMATA made the misrepresentations with knowledge of their falsity (*Id.* ¶ 163); that WMATA intended to deceive the Plaintiffs, (*Id.* ¶ 165); and that the Plaintiffs took action in reliance upon the representations of WMATA, (*Id.* ¶ 166). Further, WMATA's analysis does not even address the argument that nondisclosure or silence can constitute fraud, or seriously challenge that the elements of fraud are satisfied with respect to WMATA's willful omissions. A duty to disclose can arise either by operation of law in fiduciary relations or otherwise where the circumstances so warrant. *See, e.g., Loughlin*, 209 F. Supp. 2d at 173 (finding that landowner owed implied duty to disclose to neighbors hazardous condition of property even in the absence of a fiduciary relationship); *Andolsun v. Berlitz Schs. of Languages of Am., Inc.*, 196 A.2d 926, 927 (D.C. 1964) (finding a duty to speak based on a party's foreseeable reliance). Moreover, courts here have long held that:

> Though one may be under no duty to speak as to a matter, if he undertakes to do so, either voluntarily or in response to inquiries, he is bound not only to state truly what he tells, but also not to suppress or conceal any facts within his knowledge which materially qualify those stated. If he speaks at all, he must make a full and fair disclosure.

*Borzillo v. Thompson*, 57 A.2d 195, 198 (D.C. Mun. App. 1948); *Ehrlich v. Real Estate Comm'n*, 118 A.2d 801, 802 (D.C. 1955) (same). WMATA's duty to speak does not just flow from its fiduciary relationship with Plaintiffs. (Amd. Compl. ¶¶ 143-48.) Once WMATA, *inter alia*, began making affirmative statements that the Bus Garage acquisition would have to be delayed (*Id.* ¶ 153), signed the Easement Agreement (*Id.* ¶ 155), attended the groundbreaking ceremony for the Navy Yard Metro Station improvements (*Id.* ¶ 156), and entered into agreements with Plaintiffs (*Id.* ¶ 158-62), Monument was entitled to a full and fair disclosure of all materially qualifying facts. WMATA never made such a disclosure.

WMATA also argues that Plaintiff's fail to allege materiality and reasonable reliance. (*See* Mem. 41.) That is also incorrect. (Amd. Compl. ¶¶ 164, 167.) That Plaintiffs were induced into taking actions that they would not otherwise have taken renders the misrepresentations and omissions material. *See Railan v. Katyal*, 766 A.2d 998, 1010 (D.C. 2001); *C&E Servs., Inc. v. Biggs*, 498 F. Supp. 2d 242, 258 (D.D.C. 2007). And the reasonableness of Plaintiffs' reliance on WMATA's misrepresentations and omissions is "a question of fact." *Biggs*, 498 F. Supp. 2d at 260. Although WMATA suggests that the misrepresentations and omissions are either not material or that Plaintiffs did not reasonably rely on them, those determinations will be for the trier of fact at trial. *See id.* For present purposes, the allegations are sufficient to place WMATA on fair notice of the nature and substance of the fraud claim against it. And this factual detail is more than sufficient to meet the minimum pleading requirements. In fact, Rule 9(b) contemplates specifically that fraud allegations concerning "intent, knowledge, and other condition of mind of a person may be averred generally." The third and fourth elements of the fraud claim, which involve the knowledge and intent of WMATA, are therefore amply satisfied by the allegations in Paragraphs 163 and 165.

In addition, this Court has provided relevant guidance: fraud claims with much less factual detail than those at bar have passed Rule 9(b) scrutiny. In *Cadet v. Draper & Goldberg, PLLC*, this

Court found specifically that the level of factual detail was sufficient to satisfy Rule 9(b)'s particularity requirement.  2007 U.S. Dist. LEXIS at *13-17.  Plaintiffs' "all-encompassing claim" was the assertion that that "defendants either individually or in concert acted deceptively and fraudulently in that they intentionally misrepresented, concealed and withheld material facts." *Id.* at *14.  In reviewing the sufficiency of these allegations, this Court applied the standard that the fraud claim need only specify generally the time, place, and content of the false representations, the fact misrepresented, and what was retained or given up as a consequence of the fraud. *Id.*

In doing so, this Court clarified that exact precision as to each of those allegations is not required.  For example, the plaintiffs did not explicitly state "when" the defendants should have disclosed the alleged material facts. *Id.* at *15-16.  Indeed, this Court looked at the context of the case and presumed that the plaintiffs wanted the information prior to a certain date. *See id.* Moreover, the plaintiffs did not allege how the disclosures should have been made. *Id.* at *16.  The plaintiffs also did not expressly state what was "given up" as a consequence, which led this Court to again presume what was "given up" based on the context of the case. *Id.*  Finally, plaintiffs sued various defendants but did not allege the specific defendant that should be held responsible for each supposedly fraudulent omission. *Id.* at *18.  Although, admittedly, it was a "close question," the plaintiffs' allegations met the required Rule 9(b) threshold. *Id.*

In the First Amended Complaint, the time period is focused upon the time in which WMATA was participating in the process for the development of the Ballpark District while neglecting to inform Plaintiffs that any of its representations were false, incomplete, and/or misleading—a time period which ended by at least August 31, 2007.  (Amd. Compl. ¶ 162).  The context is provided clearly by the factual allegations, and the Plaintiffs meet the standard of providing sufficient, but concise and plain, information generally as to the time, place, and content

of the false representations, the facts misrepresented, and what was retained or given up as a consequence of the fraud.  This is all that that is required at this stage.

## VII.    PLAINTIFFS STATE A VIABLE CLAIM FOR BREACH OF FIDUCIARY DUTY

WMATA's first defense to Plaintiff's fiduciary duty count is to argue that none exists. WMATA suggests that Plaintiffs fail to plead the existence of any traditional fiduciary relationship, statutorily created relationship, or the existence of any other form of fiduciary relationship.  (*See* Mem. 43.)  Under District of Columbia law, a relationship of trust and confidence gives rise to fiduciary duties, the breach of which give rise to claims for damages.  *See Vassiliades v. Garfinckel's*, 492 A.2d 580, 591-592 (D.C. 1985).  As the D.C. Court of Appeals explained in *Vassiliades*, the law in the District is that "persons who occupy a fiduciary relationship must scrupulously honor the trust and confidence reposed in them because of that special relationship, and that the breach of a fiduciary duty warrants the imposition of damages." *See id.*, *citing Wagman v. Lee*, 457 A.2d 401, 405 (D.C. 1983), *cert. denied*, 464 U.S. 849 (1983).   The D.C. Court of Appeals also explained that "the relationship of joint adventurers gives rise to certain well-defined fiduciary duties and obligations . . . [that include] good faith, fair and open dealing, and the utmost of candor and disclosure."  *Sind v. Pollin*, 356 A.2d 653, 655 (D.C. 1976).  Plaintiffs have alleged such a fiduciary relationship.  (*See* Amd. Compl. ¶¶ 144-146.).

What constitutes a fiduciary relationship is a flexible legal concept.  *See Libby v. L.J. Corp.*, 247 F.2d 78, 81 (D.C. Cir. 1957) ("Two or more persons who join in a particular business enterprise for profit … create a joint adventure or venture. . . . [t]he relationship may be inferred from conduct of the parties without express agreement."); *Church of Scientology Int'l v. Eli Lilly & Co.*, 848 F. Supp. 1018, 1028 (D.D.C. 1994) ("[T]he existence of a fiduciary relationship would depend on whether the parties, through the past history of the relationship and their conduct, had extended the relationship beyond the limits of the contractual obligations.").   And Plaintiffs have alleged

numerous facts supporting a legal finding of a fiduciary relationship with WMATA. *See Vassiliades*, 492 A.2d at 591-92. For example, AWC designated Monument as the Master Developer of the Half Street Area (Amd. Compl. ¶ 12), WMATA expressly or impliedly acquiesced in the master planning process established for the Ballpark District and Half Street Area (*Id.* ¶ 17), Monument signed a Letter of Intent (*Id.* ¶ 24), WMATA was aware of AWC's designation of the Monument team's exclusive right (*Id.* ¶ 25), WMATA offered no objection to the Master Development Plan (*Id.* ¶ 28), WMATA participated actively in discussions regarding the development of Ballpark District by Monument (*Id.* ¶ 30), Monument agreed to cooperate with WMATA regarding the WMATA's requested phasing regarding the disposition of its property (*Id.* ¶ 32), WMATA participated in numerous meetings regarding Monument's exclusive right to negotiate for the Property (*Id.* ¶¶ 37-39), and Monument provided consideration to WMATA in return for the commitment to allow Monument to negotiate exclusively for, and acquire, the Property (*Id.* ¶¶ 40-45, 50-54). The parties established a fiduciary relationship. (*Id.* ¶¶ 143-45).

WMATA also asserts that the existence of such a relationship means that it would have to act only in the Plaintiffs' interests to the exclusion of all others. (Mem. 44.) WMATA's argument would mean that government entities and agencies could never serve in a fiduciary capacity. That is incorrect. *See*, e.g., *Cobell v. Kempthorne*, 455 F.3d 301, 305 (D.C. Cir. 2006) (noting that courts may impose on trustees—including federal agencies—traditional fiduciary duties); *see also Trandes Corp. v. Atkinson Co.*, 996 F.2d 655, 657 (4th Cir. 1993) (noting that the district court submitted to the jury the issue of whether WMATA breached its fiduciary duty owed to a private corporation by disclosing to a third party a certain software program).

Whether a fiduciary duty exists, given the trust and confidence involved in the relationship, involves questions of fact. *See, e.g., Hopper v. Fin. Mgmt. Sys., Inc.,* No. 96-456, 1997 U.S. Dist. LEXIS 19956 (D.D.C. Jan. 23, 1997) (applying Virginia law). Issues of whether a relationship of

trust and confidence was breached involve questions of fact for trial. *See Noble v. Sombrotto,* 260 F.Supp. 2d. 132, 138 (D.D.C. 2003) (denying summary judgment motion on breach of fiduciary duty claims, stating that "[a]s a general rule, such determinations have been made following a bench trial, at which testimony was offered and evaluated regarding facts relevant to the factors which should guide the courts' application of the relevant standards."). WMATA may ultimately dispute the underlying facts, but not at this stage. Plaintiffs' burden is satisfied. *See Thompson, Cobb, Bazilio & Assocs. v. Grant Thornton LLP*, No. 99-8, 2002 U.S. Dist. LEXIS 4976, at *17 (D.D.C. Mar. 25, 2002) ("[T]he existence of a fiduciary relationship is, by its very nature, a fact-bound inquiry bearing on the relationship between the parties and the specific facts and representations that are claimed to be the basis of that relationship. . . [i]f . . . the existence of a relationship can raise a genuine issue of fact despite the protestation that it did not exist, then, *a fortiorari*, the assertion that it exists is sufficient to at least engender discovery and fact finding.").

## CONCLUSION

For the foregoing reasons, the motion to dismiss should be denied in its entirety. In the alternative, to the extent that this Court is inclined to grant the motion, in whole or in part, Plaintiffs request that any that dismissal be without prejudice, with leave for Plaintiffs to amend.

Dated:  November 16, 2007

Respectfully submitted,

NIXON PEABODY, LLP

/s/ ***Vernon W. Johnson, III***
_____
Louis E. Dolan, Jr. (#442881)
Vernon W. Johnson, III (#423756)
401 9th Street, N.W.
Washington, D.C. 20001
202.585.8000
ldolan@nixonpeabody.com
vjohnson@nixonpeabody.com

Counsel for Plaintiffs

## <u>REQUEST FOR ORAL ARGUMENT</u>

Pursuant to LCvR 78.1, Plaintiffs respectfully request oral argument on this motion.

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of November, 2007, a true and correct copy of the foregoing Opposition to Motion to Dismiss First Amended Complaint, with appended Request for Oral Argument and Proposed Form of Order was served by ECF upon:

> Harvey A. Levin, Esquire
> Thompson Coburn LLP
> 1909 K Street, Suite 600
> Washington, D.C. 20006-1167
>
> Counsel for Defendant

/s/ ***Vernon W. Johnson, III***
_____
Vernon W. Johnson, III

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

MONUMENT REALTY LLC, et al.,     )
                                    )
        Plaintiffs,        )
                                    )
        v.                )      
                                    )     **Civil Action No. 1:07-cv-01821 (EGS)**
                                    )     **Judge Emmet G. Sullivan**
WASHINGTON METROPOLITAN   )
AREA TRANSIT AUTHORITY,     )
                                    )
        Defendant.       )
_____)

**ORDER DENYING DEFENDANT'S MOTION
TO DISMISS FIRST AMENDED COMPLAINT**

        Upon consideration of Defendant's motion to dismiss the First Amended Complaint, the

memoranda of points and authorities in support of and in opposition to the motion, and the entire

record herein, and this Court having considered the argument of counsel thereon, it is, this ___ day

of _____, 2007, hereby

        ORDERED, that the motion be, and it hereby is, denied in its entirety.


                       _____
                                  Emmet G. Sullivan
                             United States District Judge

COPIES TO:

Louis E. Dolan, Jr.
Vernon W. Johnson, III
Nixon Peabody LLP
401 9th Street, N.W.
Washington, D.C. 20001

Harvey A. Levin
Thompson Coburn LLP
1909 K Street, Suite 600
Washington, D.C. 20006-1167