IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MONUMENT REALTY LLC, *et al.*, | ) | |
| | ) | |
| *Plaintiffs* | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:07-CV-01821 (EGS) |
| | ) | |
| WASHINGTON METROPOLITAN AREA | ) | |
| TRANSIT AUTHORITY, | ) | |
| | ) | |
| *Defendant* | ) | |

**REPLY OF WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY
IN SUPPORT OF MOTION TO DISMISS FIRST AMENDED COMPLAINT**

Pursuant to Local Rule 7, Defendant Washington Metropolitan Area Transit Authority

("WMATA"), by undersigned counsel, respectfully replies to Plaintiffs' Opposition to Motion to

Dismiss First Amended Complaint ("Plaintiffs' Opp.").

**I. The Complaint Fails To State A Claim Based On The Alleged Agreement To
Negotiate Exclusively With Monument**

Plaintiffs' Opposition fails to overcome the Complaint's insufficiency regarding the

alleged agreement to negotiate, for the following reasons.

**1. Merely Invoking The Word "Agreement," No Matter How Many Times,
Does Not State A Claim Upon Which Relief Can Be Granted**

The Complaint bases its claim that an agreement existed with WMATA on repeatedly

reciting the words "agreement" or "promise" to negotiate and then expecting that repeated

recitation to carry Plaintiffs past Rule 12(b)(6).[1]  But Plaintiffs cannot coast through Rule

12(b)(6) in this manner, especially here where (i) the alleged agreement is premised on a

---

[1] *See, e.g.*, Plaintiffs' Opp. at 8: "It should also be noted that Monument has alleged specifically
not only WMATA's assent to the terms of the agreement, but, further, that WMATA decided
at some point arbitrarily to ignore and violate Monument's rights ...."  This statement, like all
similar statements, begs the essential questions of who, what "terms," when, where and how,
none of which Monument supplied in the Complaint or the Opposition.

gossamer web of alleged silent, implicit assents; (ii) there is no allegation that any person at WMATA, at any time, at any place or through any medium, promised or agreed that Monument would have the exclusive right to negotiate for the Bus Garage Property; (iii) there is no writing constituting or evidencing the alleged agreement; and (iv) the writings that do exist and on which Plaintiffs premise key parts of the Complaint (*e.g.*, the AWC press release, the Metro Station Agreement and IFB 08-1, Exhibits 1, 2 and 3 to the Memorandum of Points and Authorities in Support of Washington Metropolitan Area Transit Authority's Motion to Dismiss First Amended Complaint (Nov. 9, 2007; the "WMATA Memo")) fatally undermine the existence of an agreement. In their Opposition, Plaintiffs add 45 pages of explanation and argument in defense of the 55 pages of allegations in the Complaint, yet in these 100 pages Plaintiffs still do not -- because they cannot -- overcome these deficiencies. Plaintiffs do not identify any WMATA employee, at any time, at any place or in any medium, who agreed, promised or committed to negotiate exclusively with Monument. Plaintiffs do not cite any document in which WMATA allegedly agreed to give Monument the exclusive right to negotiate for the Bus Garage Property. And Plaintiffs do not dispute that the documents on which they rely in their Complaint refute the allegations of such an agreement.

For this reason, the Complaint fails under Rule 12(b)(6). *See Bell Atlantic Corp. v. Twombley,* 127 S. Ct. 1955, 1964 (2007) (A complaint must include "more than just labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."); *See also Tilahun v. Philip Morris Tobacco Co.,* No. C2 04 1078, 2005 WL 2850098, at *3 (S.D. Ohio Oct. 28, 2005) (granting motion dismiss for failure to state a claim and holding, "A complaint must contain either direct or inferential allegations with respect to all the material elements necessary to sustain a recovery under some viable legal theory. ... [A]bsent proof that a contract exists, a plaintiff's breach of contract suit cannot survive a Rule 12(b)(6) motion to dismiss."); *Huang v. Chiron Corp.,* No. C-04-5281, 2005 WL 756575, at *1 (N.D. Cal. Mar.

31, 2005) (granting motion to dismiss breach of contract claim for plaintiff's failure to plead specific facts regarding allegation of existence of oral contract).[2]

Furthermore, Plaintiffs cannot overcome the insurmountable hurdle that no one is alleged to have had authority, and in fact no one did have authority, to commit WMATA to negotiate exclusively with Monument for the Bus Garage Property. Even assuming that WMATA employees engaged in discussions and attended meetings with Monument and implicitly assented, acquiesced, raised no objections, etc.,

> [Monument] cannot escape the fact that the final decisionmaker in this procurement was the Board. There is simply no support for the proposition that superior decisionmakers are duty-bound to follow the recommendations of staff.

*Elcon Enters., Inc. v. WMATA*, 977 F.2d 1472, 1480 (D.C. Cir. 1992). However, despite the newly raised speculation regarding theoretical delegations of authority (*see* Plaintiffs' Opp. at 12-14), Plaintiffs cannot overcome this same hurdle -- the Complaint's lack of allegations of authority and the factual lack of actual authority -- with respect to any WMATA employees who may have heard but did not respond to Monument statements or with whom Monument may have dealt. *See* WMATA Memo at 13-14; *Gary v. U.S.*, 67 Fed. Cl. 202, 212 (2005).

As the Complaint alleges no WMATA person (let alone a person with authority to bind WMATA), at any time, at any place or in any document, agreed to or promised Monument the exclusive right to negotiate for the Bus Garage Property, as the Complaint alleges no document reflecting or evidencing the alleged agreement and as the Complaint contradicts its own

---

[2]  Plaintiffs themselves are uncertain about even the nature of the alleged agreement. *See* Plaintiffs' Opp. at 6: "Indeed it is not only plausible, but eminently logical, that Monument had such an agreement with WMATA either to negotiate exclusively with WMATA for the Property, or to acquire the Property, or both ...." WMATA can clear up this uncertainty: There is nothing whatsoever in the Complaint to support the claim that WMATA and Monument had a deal -- price, timing, conditions to closing, etc. -- for Monument to acquire the Bus Garage Property. Additionally, if the parties agreed "to negotiate" the terms of the sale, clearly they had no existing agreement on the terms and therefore no agreement for Monument to acquire the Bus Garage Property.

material allegations, the Complaint resembles a fairy tale more than a cognizable complaint, and a particular fairy tale at that: *This Emperor is wearing no clothes.* See Hans Christian Anderson, *The Emperor's New Suit* (1837) (available at http://hca.gilead.org.il/emperor.html). This Complaint simply falls short, as it must fall short, of stating a claim for breach of contract. There was no such agreement.

### 2. The Complaint Contains Its Own, Internal Contradictions That Negate Allegations Of A WMATA Agreement

Relying on accepted Rule 12(b)(6) procedure, WMATA included in its Memorandum four documents on which Plaintiffs relied in their Complaint.[3] With respect to one document, the AWC press release, Plaintiffs' Opposition places Plaintiffs in a dicey dilemma. The Complaint cites the press release as the only documentary source of AWC's alleged designation (not WMATA's designation) of Monument as Master Developer, from which designation Monument alleges that it had certain rights and interests. Contradicting the allegations, the AWC press release designated MR Cordish LLC, an LLC in which Monument at most is only one member, not Monument, as Master Developer. The press release on which Plaintiffs rely shows that Plaintiffs' allegations of Monument as Master Developer and Plaintiffs' allegations that Monument had rights and interests as Master Developer are wrong and cannot be considered as true under Rule 12(b)(6).

---

[3] With respect to the AWC press release, WMATA Memo Ex. 1, and IFB 08-1, WMATA Memo Ex. 3, Plaintiffs attached only part of the documents, and WMATA included the documents in their entirety. The Metro Station Agreement, WMATA Memo Ex. 2, is the document containing the terms of the purchase-and-sale of the Navy Yard Metro Rail Station property. The Complaint refers to and relies on certain terms of that transaction, and WMATA included the Agreement that embodied all the terms and conditions of that transaction. In the case of the cover letter accompanying the Akridge bid, WMATA Memo Ex. 4, the Complaint again cited and relied on it with some frequency so WMATA included the letter.

As Plaintiffs correctly point out, WMATA included these documents subject to the request that the Court not consider these or any other Exhibits that would cause WMATA's motion to become a motion for summary judgment.

In their Opposition, Plaintiffs do not dispute the correctness of the press release in its entirety and do not dispute the correctness of the press release's announcement of MR Cordish LLC, not Monument, as AWC's designated Master Developer. Rather, Plaintiffs ask the Court to disregard the truth as contained in the press release and instead to accept the contradicted allegations of the Complaint as true. *See* Plaintiffs' Opp. at 18. That is the wrong course to follow.

Plaintiffs' Opposition relies on other self-contradicted allegations also. As they did in the Complaint, Plaintiffs refer to and rely on the March 2005 Joint Development Solicitation (the "JDS"). *See* Plaintiffs' Opp. at 22-23; Compl. ¶¶ 16-18. Again, the cited document contradicts Plaintiffs' assertions. Plaintiffs argue that the JDS "solicited *one* developer to jointly develop all of these properties." Plaintiffs' Opp. at 22-23 (emphasis in original). This assertion is wrong. The JDS referred to "the development team" and stated expressly, "WMATA will consider separate Proposals" for the separate properties. *See* the JDS at 5.[4]

The JDS provided also that WMATA's first preference was a long-term lease of the Bus Garage Property, not a sale, and that anyone proposing a sale also had to provide for the relocation of the bus garage, including an alternative site.[5] But as the Complaint alleges, and as inferences raised from the allegations and absence of allegations confirm, Plaintiffs submitted an unsolicited offer to purchase the Bus Garage Property but did *not* offer to lease the Bus

---

[4] The JDS, a copy of which is Exhibit 5 to this Reply, is included under the authority of *Osseiran v. Int'l. Finance Corp.*, 498 F. Supp. 2d 139, 146 (D.D.C. 2007), and is subject to the Court's disregarding it in order to maintain Rule 12(b)(6) consideration.

[5] Anyone proposing a sale "must clearly demonstrate that it is more advantageous to WMATA than a long term lease." The JDS also required that "any Proposal for a parcel or parcels south of M Street must address and provide for, or help provide for, the relocation of the Southeastern Bus Garage. Proposals must include an alternate site, under the control of the Developer, for the relocation of this operating bus facility. Offers should also indicate the Developer's ability to construct a replacement bus garage on the alternative location." *See* the JDS at 5 & 11.

Garage Property or to provide an alternate site and plans to construct a replacement garage.[6] Furthermore, what Monument seeks here is *not* a "joint development" with WMATA but rather Monument's ownership and development free of any joint interest of or with WMATA. These *facts* negate the Complaint's contradictory and fallacious reliance on the JDS.

### 3. The Complaint Fails To Allege Sufficient Facts To Show The Existence Of Or Part Performance Of An Alleged Agreement For Exclusive Negotiations

There is no allegation that WMATA did anything with respect to the *Bus Garage Property* that could support formation or existence of a contract with respect to that Property. *See* WMATA Memo at 15-17. Plaintiffs argue nevertheless that they partly performed the alleged agreement and that their part performance evidences the agreement and exempts it from the Statute of Frauds, relying on *DCFHA v. Harper*, 707 A.2d 53 (D.C. App. 1998). But that case is unhelpful for several reasons. First and foremost, in *Harper* it was actions of the party to be charged, with respect to the very property at issue, that comprised the part performance. *Harper* concerned a 10-year unwritten lease where, *inter alia*, (i) DCFHA had occupied the premises and paid rent for the first three years of the lease term; (ii) the landlord had made renovations per DCHFA's specifications; and (iii) DCHFA had reimbursed the landlord for part of the renovations. Here, in contrast, Plaintiffs do not allege, as they cannot allege, that WMATA did anything with respect to the Bus Garage Property that could constitute part performance or even that could evidence WMATA's alleged agreement. The only reasonable inference, indeed the only possible inference, from the allegations and the absence of allegations is, as is true, that WMATA did *nothing* evidencing or reflecting the

---

[6] Plaintiffs' unsolicited offer to purchase the Bus Garage Property on which both the Complaint and Opposition rely, *see* Compl. ¶ 56 & Plaintiffs' Opp. at 10, was titled "Letter of Intent for a Purchase and Sale Agreement." It made no reference to a long-term lease arrangement or to an alternative site for the bus garage. *See* Exhibit 6 to this Reply, a true and correct copy of the unsolicited offer, included per *Osseiran, supra*.

alleged agreement. Furthermore, Plaintiffs themselves did nothing with respect to the Bus Garage Property that evidenced or reflected the alleged agreement.

In sum, Plaintiffs do not allege that either party to the alleged agreement did anything with respect to the subject matter of the alleged contract.[7] Thus, there is nothing in the Complaint remotely supporting the application of part performance, nothing to buttress the existence of an agreement or to lift the Complaint out of the Statute of Frauds.

Plaintiffs' effort must fail for another reason. *Harper* requires that the alleged part performance be "consistent with the contract set up, but inconsistent with any other." *Id*. at 56 (citation omitted). In the context of Plaintiffs' myriad acquisitions, other expenditures and plans in and for the Ballpark District, including many preceding the JDS (*see* Compl. ¶¶ 12-16), Plaintiffs' allegations cannot meet this requirement.

### 4. The Complaint Pleads An Unenforceable Agreement To Negotiate

Plaintiffs rely on *BMX Electronics, Inc. v. Control Data Corp.*, 929 F.2d 707 (D.C. Cir. 1991), to counter their own oft-repeated allegations that the alleged agreement was one "to negotiate" for the acquisition of the Bus Garage. But *BMX Electronics* does not help Plaintiffs. In that case, CDC solicited bids from several prospective buyers. After reviewing the responses, CDC initiated discussions with two bidders. Later, "CDC *elected to negotiate exclusively*" (emphasis added) with ATC, BMX's predecessor in interest, and "BWX and CDC entered into a Letter of Intent ("LOI"). Under the terms of the LOI, CDC agreed to negotiate exclusively." *Id*. at 708. In contrast here, the Complaint does not allege that WMATA elected to negotiate exclusively, and does not allege that WMATA did negotiate -- exclusively or otherwise -- with Monument. Here also, WMATA and Monument did not enter into a written agreement committing WMATA to negotiate exclusively with Monument. Again, the fact is,

---

[7] Conversely in the affirmative, Plaintiffs allege that neither party to the alleged agreement did anything with respect to the subject matter of that alleged agreement.

as the Complaint and Plaintiffs' Opposition acknowledge, *there is no written agreement*, indeed *no document whatsoever* that Plaintiffs cite or of which WMATA is aware, that reflects such an agreement. Moreover, all the written documents on which Plaintiffs rely, the AWC press release, IFB 08-1, the Metro Station Agreement and the unsolicited offer to purchase the Bus Garage Property, are irreconcilable with an exclusivity agreement between Monument and WMATA.[8] *BMX Electronics* thus shows that Plaintiffs fail to allege an enforceable agreement and that the agreement they do allege is unenforceable.

### 5. The Complaint Fails To State Claims Based On After-Acquired Property And Implied-In-Fact Contract

Plaintiffs make wild stabs at stating claims under theories of after-acquired property, relying on *Miller-Long v. John Hanson Savings & Loan, Inc.*, 676 F. Supp. 298 (D.D.C. 1987), and implied-in-fact contract, relying on *SGS-92-X003 v. U.S.*, 74 Fed. Cl. 637 (2006), and *Silverman v. U.S.*, 679 F.2d 865 (Ct. Cl. 1982). Both theories fail on the cases that Plaintiffs cite as support.

Under the doctrine of after-acquired title, if a grantor purports to transfer ownership of real property to which he lacks legal title at time of transfer, but subsequently acquires legal title to the property, after-acquired title inures, by operation of law, to the benefit of the grantee. *Miller-Long*, 676 F. Supp. at 299-300. Here, WMATA did not purport to transfer ownership of the Bus Garage Property to anyone, no transferee from WMATA (there was and is none) subsequently acquired title to the Bus Garage Property and the proposed acquiror, Akridge, has no obligation to Monument in any event. The after-acquired property doctrine does not apply.

---

[8] Plaintiffs' unsolicited offer, Exhibit 6, contained no reference to any alleged exclusivity agreement, to any prior right to negotiate for the Bus Garage Property or to anything otherwise committing WMATA to negotiate with or to sell to Monument.

For an implied-in-fact contract, Plaintiffs must demonstrate: (1) mutuality of intent; (2) consideration; (3) lack of ambiguity in the offer and acceptance; and (4) actual authority to bind the government in contract on the part of the government representative whose conduct is relied upon. *SGS-92-X003*, 74 Fed. Cl. at 650. Here, (1) there is no mutuality of intent – to the contrary, there is a distinct antagonism; (2) there is no consideration traceable to the alleged agreement to negotiate for the Bus Garage Property; (3) there is total ambiguity – not a single term of any alleged agreement with respect to the Bus Garage Property exists, let alone possesses any certainty; and (4) no one with (or without) authority engaged in any conduct or made any representations giving rise to an implied-in-fact contract. *Compare Silverman*, 679 F.2d at 868, where an FTC official with actual authority to approve vouchers for payment promised Plaintiff payment, and *SGS-92-X003*, 74 Fed. Cl. at 650-51, where the Court framed the issues as "whether ASAC Salvemini possessed the requisite authority to bind the Government and whether ASAC Salvemini's promise was ratified."[9]

---

[9] Even though there were no terms of any possible acquisition, Plaintiffs also attempt to support a claim of a contract and for specific performance of that contract by relying on *Brewood v. Cook*, 207 F.2d 439 (D.C. Cir. 1953). But that case does not aid Plaintiffs. The differences between *Brewood* and this case are many and decisive. *Brewood* concerned ten lots comprising a single tract. Here, the parties are dealing with two different and deliberately separate parcels, the Navy Yard Metro Rail Station and the Bus Garage Property. The ten lots were together and had a single purpose, residential development. Here, the two properties are distinctly different. One is a Metro Rail station and one is a bus garage. In *Brewood*, the parties had agreed on the specific, fixed price and on other terms for the two yet-to-be-conveyed lots. Here, the parties had not agreed on any terms. In *Brewood*, the complaining purchasers had entered into possession of the two lots under the belief that they had a binding contract for their purchase. Here, Plaintiffs have taken no such action or any other action indicating dominion over or right to the Bus Garage Property. In *Brewood*, the complaining purchasers had made "permanent improvements of substantial value," not the case here. In *Brewood*, the sellers had induced the purchasers to buy eight lots and to enter into possession of and make material permanent improvements to the remaining two lots based on the agreement to sell the remaining two lots at fixed, agreed-on prices and other terms. Here, Monument determined to buy and bought tens of millions of dollars of property in the Ballpark District well before any alleged promise of exclusive negotiations for the Bus Garage Property and having nothing to do with any right to acquire the Bus Garage Property, and the fully integrated Metro Station Agreement is clear that the prospect of purchasing the Bus Garage Property was

**II. Plaintiffs Do Not Discuss, Let Alone Dispute, The Fixed, Uniform Case Law Rejecting MRB 7's Alternative Bid As Nonresponsive As A Matter Of Law**

As WMATA briefed in support of its motion to dismiss, under the clear, categorical case law in this District and case law applicable generally, MRB 7's alternate, escalator bid was nonresponsive as a matter of law, and WMATA's declining to consider that alternate bid was rational, indeed required. *See WMATA Memo at 20-22, citing Trump v. Mason*, 190 F. Supp. 887 (D.D.C. 1961), *Holliday v. Higbee*, 172 F.2d 316 (10th Cir. 1949), and *Comptroller General to Sec'y of Agriculture*, 44 Comp. Gen. 292 (Nov. 19, 1964). In their opposition, Plaintiffs do not address, let alone dispute, the certainty and applicability of this case law and do not dispute that WMATA's declining to consider that alternate bid conformed to this case law and was rational as a matter of law.

Furthermore, Plaintiffs do not dispute that WMATA enjoyed wide discretion in reviewing the alternate bid and in determining not to consider it. Based on the applicable law (and additionally on the rational basis in fact apparent on the face of the alternate bid, *see* WMATA Memo at 22-25), this Court may not disturb WMATA's exercise of discretion in that determination. *See Tutor-Saliba Corp. v. U.S. Army Corps of Engineers*, No. 94-0908, 1995 WL 520765, at *6 (D.D.C. Aug. 23, 1995) (citations omitted):

> This standard is highly deferential to the contracting agency's final determination ... The D.C. Circuit stated that "[i]t is undisputable that the ultimate grant of a contract must be left to the discretion of a government agency; the courts will not make contracts for the parties."
>
> Courts place such great weight on the discretion typically accorded to procurement officials because "[j]udges are 'ill-equipped to settle the delicate questions involved in procurement decisions.'"

---

not an inducement to or other element of Monument's purchase of the Navy Yard Metro Rail Station property.

Finally, and perhaps most importantly, *Brewood* stated, "the case must stand on its special facts," assuring that the manifest differences between that case and this case make *Brewood* inapplicable here.

*See also Elcon, supra,* 977 F.2d 1472 (D.C. Cir. 1992); *Banknote Corp. of Am., Inc. v. U.S.,* 365 F.3d 1345 (Fed. Cir. 2004); *Mantech Telecomm. & Info. Systems Corp. v. U.S.,* 49 Fed. Cl. 57, 80 (2001).

**III. The Court Should Dismiss Counts Eight and Nine Because: (1) They Are Barred By WMATA's Sovereign Immunity; (2) Plaintiffs Have No Standing To Pursue Counts Eight and Nine; And (3) Plaintiffs Have No Cause Of Action Under Counts Eight And Nine**

**1. WMATA's Sovereign Immunity Bars Counts Eight And Nine**

Plaintiffs argue that "governmental" functions or activities are limited to functions or activities not found in the private sector. *See* Plaintiffs' Opp. at 34. The case law does not support this narrow construction. For example, nongovernmental entities and individuals routinely hire, train and supervise their employees, but "hiring, training and supervising" WMATA employees are governmental functions, and immune from judicial review, due to the discretionary nature of the activity. *See Hopps v. WMATA,* 480 F. Supp. 2d 243, 255 (D.D.C. 2007) (citations omitted):

> [WMATA's] choices in hiring, training and supervising its employees "require consideration of numerous factors, including budgetary constraints, public perception, economic conditions, 'individual backgrounds, office diversity, experience and employer intuition.'" ... Similarly, employee supervision involves "a complex balancing of budgetary considerations, employee privacy rights, and the need to ensure public safety." ... "The hiring, training and supervising of WMATA employees are governmental functions," and thus are immune from judicial review.

*See also Jones v. WMATA,* 205 F.3d 428, 432 (D.C. Cir. 2000).

WMATA's immunity from Counts Eight and Nine similarly survives Plaintiffs' faulty, *ad hoc* distinction. Although development of policies and procedures generically may not be an activity unique to governmental agencies -- many nongovernmental organizations issue policies and procedures -- it certainly is uniquely governmental when legislative bodies empower agencies to adopt policies and procedures. In this undeniably governmental context,

promulgation of regulations, policies and procedures is a discretionary function.   *See Loge v. U.S.*, 662 F.2d 1268, 1271 (8th Cir. 1981).

Additionally, WMATA's decision to develop policies and procedures to control the disposition of surplus property, and the particular method or methods WMATA chooses to accomplish such development, involve a complex balancing of factors requiring that WMATA exercise its discretion.   These factors include WMATA's immediate and long-term goals and needs with respect to the particular disposition, the need to ensure fair and competitive bidding, budgetary constraints, economic efficiency, transportation scheduling, employment and other planning and political and societal considerations of how, when and where to dispose of one garage and how, when and where to move the garage operations elsewhere.

Because the promulgation of policies and procedures is a discretionary function, sovereign immunity bars causes of action based on the promulgation or failure to promulgate policies or procedures.   *See Loge, supra,* 662 F.2d at 1271 ("Insofar as the Loges' amended complaint alleged that the government was negligent in promulgating or failing to promulgate regulations that would ensure the safety of live, oral poliovirus vaccines and properly protect susceptible persons such as Mrs. Loge, the district court correctly found that such actions by the government were discretionary functions and therefore immune from suit under FTCA.").   As WMATA's sovereign immunity bars Counts Eight and Nine, the Court should dismiss them.

### 2. Counts Eight and Nine Sound in Tort, Not Contract

Plaintiffs try to skirt sovereign immunity by postulating, without supporting authority, that Counts Eight and Nine sound in contract, not in tort.   Plaintiffs are wrong.   Counts Eight and Nine seek recovery for WMATA's alleged failure to adopt policies and procedures, on the one hand, or WMATA's alleged failure to follow its policies and procedures, on the other, allegedly harming Plaintiffs by interfering with their ability to acquire the Bus Garage Property.

In other words, WMATA's alleged actions (or inactions) interfered with Plaintiffs' ability to contract with WMATA. Thus, Counts Eight and Nine sound in tort. *See Williamson v. U.S.*, 1964 WL 8535, at *3 (Ct. Cl. 1964) (claim "based upon unlawful acts of the defendant's officer said to have interfered with plaintiff's contract of employment" sounded "in tort").[10]

Alternatively, Plaintiffs' claims may be characterized as actions based on WMATA's perceived breach of a duty that the Compact imposed. That also sounds in tort. *See A & S Council Oil Co., Inc. v. Saiki*, 799 F. Supp. 1221, 1230 n.9 (D.D.C. 1992) (citations omitted) ("Breach of a statutory duty or one imposed by case law, and not by a contract, is a tort."), *rev'd on other grounds*, 56 F.3d 234 (D.C. Cir. 1995); *Overby v. Johnson*, 418 F. Supp. 471, 472-473 (E.D. Mich. 1976) ("A 'tort' in the broad sense is the breach of a noncontractual legal duty owed to the plaintiff. The source of this legal duty may be a statute as well as the common law."). Thus, assuming *arguendo* that WMATA has a statutory duty to develop policies and procedures for disposition of surplus property, an action premised on WMATA's failure to develop such policies and procedures would "sound in tort" and is barred by WMATA's sovereign immunity. *See Loge, supra*, 662 F.2d at 1271.

### 3. Plaintiffs Have No Standing To Pursue Counts Eight And Nine

Plaintiffs have no standing to proceed under Counts Eight and Nine against WMATA's alleged violation of the Compact in failing to adopt policies and procedures under Section 73(g) to implement Section 73(a). In both the Complaint and their Opposition, Plaintiffs repeatedly rail against the absence of such policies and procedures. *See, e.g.*, Plaintiffs' Opp. at 26:

> In other words, WMATA has no policy about whether such disposition must be conducted in the form of an auction, through a Joint Development Solicitation,

---

[10] It is of no importance that Plaintiffs do not use the word "tort" to describe the claims in Counts Eight and Nine. The Court is not bound by Plaintiffs' characterization of their claims. *See Kelton v. District of Columbia*, 413 A.2d 919, 922 (D.C. App. 1980), *citing Morfessis v. Baum*, 281 F.2d 938 (D.C. Cir. 1960).

through a sealed bid, through a sole-source negotiation, or through some or all of the foregoing.

But the litany of allegations of no policies fails to establish standing for two crucial reasons.

First, Plaintiffs do not and cannot establish that the District, Maryland and Virginia agreed to protect, and enacted the Compact intending to protect, Plaintiffs' interests.[11]

Second, Plaintiffs do not and cannot establish that the alleged failure to adopt policies and procedures under Section 73(g) injured Plaintiffs or that any conceivable injury is "fairly traceable" to the alleged absence of policies and procedures. *See Shays v. FEC*, 414 F.3d 76, 91 (D.C. Cir. 2007) (on which Plaintiffs rely, Plaintiffs' Opp. at 22):

> "[S]o long as the procedures in question are designed to protect some threatened concrete interest of [the plaintiff's [sic]] that is the ultimate basis of his standing, the party invoking jurisdiction may establish injury in fact by showing that the government act performed without the procedure in question will cause a distinct risk to a particularized interest of [that party]." (citations omitted).

*See also id.* at 83 (citations omitted):

> Article III standing requires plaintiffs to establish, as an "irreducible constitutional minimum," that they face "injury in fact" caused by the challenged conduct and redressable through relief sought from the court. ... The first element, "injury in fact," requires "an invasion of a concrete and particularized legally protected interest." ... The second element, causation, demands a "causal connection between the injury and the conduct complained of – the injury has to be fairly traceable to the challenged action of the defendant, and not the result of independent action of some third party not before the court."

Under *Shays*, neither Monument Realty nor MRB 7 has standing to pursue Counts Eight and Nine. Monument Realty claims that it had a preemptive agreement committing

---

[11] The absence of any consideration of the sovereignty of the signatories and the absence of consideration of the presence of the Compact in the state codes are flaws in *Seal & Co. v. WMATA*, 768 F. Supp. 1150 (E.D. Va. 1991), and in Plaintiffs' reliance on *Seal*. WMATA has sovereign immunity because the signatory sovereign states have immunity, carry that immunity into the Compact and imbue the Compact with their immunity. Later case law in the Fourth Circuit (and in the District of Columbia Circuit) showed the importance of this omission in *Seal* and diminished *Seal*'s vitality for this reason. *See Smith v. WMATA*, 290 F.3d 201, 205-06 & n.6 (4th Cir. 2001) ("The Compact, however, evinces the clear intent of its signatories to effect such conferral [of governmental immunity]"); *see also* note 12 below.

WMATA to negotiate exclusively for the acquisition of the Bus Garage Property. Monument Realty's claim of a preexisting and preeminent agreement, however, overrides the allegedly lacking or flawed policies and procedures. Monument Realty's claim is not dependent, to any extent, on the presence, absence, sufficiency, legality, illegality or other characteristic of any policies or procedures. In fact, whether or not WMATA had policies and procedures for the public sale of WMATA's surplus property, and whether or not WMATA adhered to policies and procedures for the public sale of surplus property, are entirely irrelevant to Monument Realty's claim of a preexisting and preemptive agreement to be WMATA's exclusive negotiating partner for the Bus Garage Property. Hence, the "procedures in question" are *not* "designed to protect some threatened concrete interest of" Monument Realty in this case. Likewise, Monument Realty's alleged injury (itself uncertain) from WMATA's breach of the elusive agreement to negotiate is not traceable -- fairly or otherwise -- "to the challenged action of" WMATA in allegedly violating the Compact by not having policies or procedures for this sealed bid process. The alleged injury from WMATA's breach of the exclusivity agreement would arise with or without policies and procedures and in fact with or without the Compact altogether.[12]

---

[12] In addition to the grounds set forth in note 11 above, for Monument Realty at least, reliance on *Seal & Co. v. WMATA, supra*, as the legal basis for standing is unavailing. "The question here is whether Congress intended, in enacting the Compact and Section 73, for bidders to bring private causes of action to enforce the compact's procurement provisions." *Id.* at 1155. Monument Realty was not a bidder.

Moreover, this Circuit expressly left open the issue of standing to sue for enforcement of the Compact and in doing so declined to endorse *Seal*. *See Elcon, supra*, 977 F.2d at 1479 n.2:

> WMATA apparently has overlooked the fact that if the APA does not apply, there is a serious question whether Elcon has a federal cause of action for judicial review of WMATA's procurement decisions. While the District Court in *Seal & Co.* concluded that disappointed bidders or proposers have an implied cause of action under the WMATA compact, the parties have not raised that issue.

Nor does MRB 7 have standing. MRB 7 claims that WMATA should have declared MRB 7 the high and winning bidder under the very policies and procedures that MRB 7 alleges were lacking, flawed and/or illegal. Additionally, whether or not WMATA had policies and procedures for the public sale of WMATA's surplus property, and whether or not WMATA adhered to policies and procedures for the public sale of surplus property, are irrelevant to MRB 7's claim that it submitted the highest responsive bid and that WMATA should have awarded the Bus Garage Property purchase to MRB 7. If MRB 7's bid were the highest responsive bid, then MRB 7 should prevail regardless of the presence or absence of policies and procedures. If MRB 7's bid were not the highest and/or not responsive, then MRB 7 loses, again regardless of the presence or absence of policies and procedures implementing Section 73(a). *See Jackson v. Romney*, 355 F. Supp. 737, 741 (D.D.C. 1973) (dismissing plaintiffs' claim for lack of standing where claim was based on "the alleged current failure of HUD to promulgate proper regulations in compliance with the mandate of § 221(d)(2)" and such failure could "inflict no harm upon them").

### 4. WMATA's Alleged Failure To Adopt Policies And Procedures Under Section 73(g) Of The Compact By Itself Does Not Give Rise To A Claim For Relief

Plaintiffs' contention that WMATA's Compact contains binding directives regarding the establishment of policies and procedures for procurement activities and constrains WMATA's inherent discretion in its contracting and procurement functions is incorrect. The Compact would constrain WMATA's discretion only if the Compact "specifically prescribes a course of

---

As set forth in note 11 above, *Seal* has dubious life left. Additionally, the Fourth Circuit now looks to this Circuit in construing the Compact. *See Smith, supra*, 290 F.3d at 207 & n. 9 ("We recently recognized that a proper consideration in construing the Compact is the maintenance of consistency between the legal interpretations of the 'two federal circuits most likely to hear cases in which [METRO] is a party,' i.e., this Court and the Court of Appeals for the District of Columbia," thereafter relying on the analyses developed by "[o]ur sister circuit in the seat of government").

action for [WMATA] to follow such that [WMATA] has no rightful option but to adhere to the directive." *KiSKA Const. Corp. v. WMATA*, 321 F.3d 1151, 1160 (D.C. Cir. 2003) (internal quotations and citations omitted). In *KiSKA*, the court found that an FTA circular obligating WMATA to "[i]ncorporate a clear and accurate description of the technical requirements for the material, product, or service to be procured" did not "'specifically prescribe' a course of action for WMATA to follow in specifying the contents of a bid package." *Id.*

Assuming *arguendo* that Section 73(g) of the Compact does apply to dispositions of surplus property, Section 73(g) does not "specifically prescribe a course of action" for WMATA. Section 73(g) does not mandate that WMATA develop specific policies or procedures and does not prescribe the content or form of these policies and procedures. Hence, WMATA retains discretion to decide if, when, and how such policies and procedures will be developed and implemented.

### 5. Counts Eight and Nine Fail To State A Plausible Claim Of Harm Or Need For Relief

Plaintiffs' claims based on the absence of, and implied necessity for, policies and procedures for WMATA's sale of surplus property fail to state a plausible claim of harm and therefore fail to state a claim under *Bell Atlantic Corp. v. Twombley*. Plaintiffs had all the relevant and material information they needed, with or without additional policies and procedures. One need look only to IFB 08-1 itself, the terms of which Plaintiffs' Complaint largely ignores. IFB 08-1 provided more than adequate notice, guidance and direction, and IFB 08-1 did so in the manner best suited to deliver the information directly to the persons interested and affected. IFB 08-1 informed all interested persons that WMATA was seeking the highest bid from a responsible bidder and explained the sealed process in great detail, so much so that neither Plaintiff, and neither of the two non-plaintiff bidders (Akridge and JBG), invoked § D. 5. of the IFB inviting inquiries if the bidders had any uncertainties, questions or

need for additional information.  No other pronouncement could do better.[13]  *See also* the

WMATA Memo at 28, citing (and quoting in part) Section 73(a) of the Compact.

Without any realistic, believable claim that Plaintiffs were denied material, necessary

information relevant to WMATA's bid procedure because of the alleged lack of policies and

procedures for disposition of surplus property, Plaintiffs' claims for relief based on WMATA's

alleged failure to develop such policies and procedures fail to state a plausible claim of harm

and should be dismissed.  *See Grigsby Brandford & Co. v. U.S.*, 869 F. Supp. 984, 997

n.18 (D.D.C. 1994):

> Plaintiffs also allege a violation of the APA because "[t]he Secretary failed to
> publish its notice for the RFP in the Federal Register as is required by the
> enabling statute." Complaint, p. 15. Plaintiffs however can allege no harm or
> prejudice as a result of this failure. The administrative record shows, and
> Plaintiffs must concede, that the publication of the RFP in the trade publication
> *Bond Buyer* elicited an extensive response and a large number of submissions,
> including that of Plaintiffs themselves.

*See also Laguna Greenbelt, Inc. v. U.S. Dept. of Transp.*, 42 F.3d 517, 527 (9th Cir. 1994) (no

reversible error for violation of NEPA where violation did not "frustrate NEPA's goal of

ensuring that relevant information is available to the wider audience participating in agency

decision-making"); *Jackson v. Romney, supra*, 355 F. Supp. at 741 (dismissing plaintiffs' claim

where claim was based on "the alleged current failure of HUD to promulgate proper regulations

in compliance with the mandate of § 221(d)(2)" and such failure could "inflict no harm upon

them"); *Morris v. Trans Union LLC*, 420 F. Supp. 2d 733, 738 (S.D. Tex. 2006) (finding, "[T]he

information contained within Morris's credit report after his complaint was the same as it

---

[13] This is so particularly when IFB 08-1 is read, as it must be read, in the context of directly
applicable law rejecting escalator bids such as MRB 7's and requiring bids to be unambiguous,
complete within themselves and not dependent on integrating one or more bids of others, or
any other extraneous material, to determine the bid price. *See Trump v. Mason*, 190 F. Supp.
887 (D.D.C. 1961), *Holliday v. Higbee*, 172 F.2d 316 (10th Cir. 1949), and *Comptroller
General to Sec'y of Agriculture*, 44 Comp. Gen. 292 (Nov. 19, 1964), cited in the WMATA
Memo at 20-21.

would have been had Trans Union initially given RNB-Target notice of Morris's dispute within the five-day statutory period."); *AARP v. E.E.O.C.*, 390 F. Supp. 2d 437, 461 (E.D. Pa. 2005); *Dodgens v. Kent Mfg. Co.*, 955 F. Supp. 560, 564-565 (D.S.C. 1997); *Smith v. Eastman Kodak Co.*, 1999 WL 33327051, at *6 (D.N.J. Oct. 7, 1999).

Finally, as WMATA briefed in its initial motion, WMATA Memo at 25-30, WMATA possesses a great deal of discretion in the means and specificity that WMATA employs to inform interested persons of the route they must follow in submitting bids and the route WMATA follows in soliciting and considering bids. *See KiSKA, supra*, 321 F.3d at 1160 ("we conclude that WMATA had broad discretion to determine the contents of the tunnel project's bid package"); *Elcon, supra*, 977 F.2d 1472 ("Elcon claims that because no procurement regulation expressly authorized the Board to appoint the Ad Hoc Panel, the Board's decision to do so violated the procurement regulations. This contention strikes us as frivolous."). Under well established law applicable to WMATA contracting, and under well established general administrative law, WMATA was within its permissible discretion and no other, duplicative notice was necessary.

### 6. Counts Eight And Nine Ask The Court To Compel And To Enforce A Redundancy And To Elevate Form over Substance

As the IFB (augmented by Section 73(a) of the Compact) gave Plaintiffs all the information and direction they needed about submission of bids and the criteria for the award, to allow this action to proceed on the grounds that WMATA did not inform Plaintiffs and all other interested persons of the "policies" (sealed bids with the award going to the highest bid under the terms of the IFB) and "procedures" (terms of the IFB, bid form, minimum bid price, time for submitting bid, award to the highest bidder, etc.), merely because WMATA did not "adopt" such policies and procedures formally, outside of the IFB, is a pure elevation of form over substance in which this Court should not indulge. *See Leonard v. McKenzie*, 869 F.2d

1558, 1562 (D.C. Cir. 1989) (holding that parents' claim "unduly exalts form over substance" where substitute courses at different school for their child "would serve the same underlying objectives").

### IV. Plaintiffs' Attack On The Akridge Bid Is Groundless; Counts Ten, Eleven And Twelve Must Be Dismissed For Failure To State A Claim Upon Which Relief Can Be Granted

Plaintiffs acknowledge the applicable law defining conditional bids, namely that conditional bids are bids that "impose conditions that would modify the material requirements of the IFB, limit the bidder's liability to the government, or limit the rights of the government under any contract clause." Plaintiffs' Opp. at 30 (citation omitted). But then Plaintiffs abandon this law in attempting to portray an unconditional bid as conditional.[14]

This law applied to the facts of this case defeats a claim under Counts Ten, Eleven and Twelve. Plaintiffs cite nothing in the Akridge bid affecting certainty of price, varying the material terms of the IFB, limiting Akridge's liability to WMATA or limiting WMATA's rights against Akridge. The alleged "conditions" had nothing to do with IFB 08-1, and in fact there was no "condition" in nature or effect. This was just a poor word choice. *See WMATA Memo*

---

[14] The cases on which Plaintiffs rely (Plaintiffs' Opp. at 29-30) show just how much Plaintiffs are trying to drive a square peg (the Akridge bid) into a round hole (the definition of a conditional bid). *See Nat'l Oil & Supply Co.* (bid nonresponsive because conditioned on right to receive transportation rate increases); *U.S. Coast Guard-Advance Decision* (bid nonresponsive because bidder requested additional charge of $1,000 per hour and did not provide firm, fixed price); *In re S. Atl. Servs., Inc.* (bidder submitted two different schedules with different prices; one schedule omitted one item and other schedule was ambiguous and low only under one interpretation); *Antennas for Comm.* (bid nonresponsive because included installation delay charges of $1,000 per day and varied from provision requiring reimbursement for actual delay costs); *B & C Indus. Inc.* (bid not in compliance with IFB; bid contained fiberboard container instead of required wood container); *In re Walashek Indus. & Marine* (bid nonresponsive because would require support services and utilities from ship and imposed conditions that modified material terms of the IFB).

None of these cases applies to the Akridge bid, which did not alter the material terms of IFB 08-1, did not limit Akridge's liability or compliance with the IFB and did not seek to impose additional terms and conditions of performance. Each, moreover, supports -- indeed mandates -- WMATA's not considering MRB 7's alternate bid.

at 32-34.[15]    Based on the law that Plaintiffs recite correctly, the Akridge bid was not

nonresponsive.    *See Tutor-Saliba, supra*, 1995 WL 520765, at *8: "The practical test of

responsiveness is whether the bid promises exactly what the government seeks to acquire as

defined by the Solicitation."    The Akridge bid promised exactly what WMATA sought, a firm,

fixed price for the Bus Garage Property.[16]

### V. Plaintiffs Fail To State Claims For Fraud And For Breach Of Fiduciary Duty

#### 1. Plaintiffs Fail To State A Claim For Fraud

What matters in considering whether Plaintiffs plead a claim for fraud, and whether

they plead that claim with the requisite particularity, is the Complaint.    Of the Complaint, this

may be said without legitimate dispute: *Plaintiffs do not allege a single particularized*

*misrepresentation or a single particularized material omission*.    The only statement alleged

(Compl. ¶ 153) is the true statement of Gary Malasky that WMATA had to delay sale of the

Bus Garage Property because WMATA did not have a replacement site.    But that allegation is

not a misrepresentation and in any case lacks the required particularities of time and place.

#### 2. Plaintiffs Fail To State A Claim For Breach Of Fiduciary Duty

Plaintiffs' justification of their breach of fiduciary claim relies on two points, one factual

and one legal.    The factual reliance belies a legitimate claim.    Every purported underpinning

that Plaintiffs cite is merely an allegation of WMATA's implicit -- Plaintiffs allege nothing

explicit -- acquiescence in or assent to statements, discussions and meetings.    *See* Plaintiffs'

Opp. at 44.    There is no factual allegation of any conduct or obligation creating a relationship

---

[15] Contrary to Plaintiffs' argument, the cover letter was not "outside the bid itself," Plaintiffs' Opp. at 30.    *See Tel-Instrument Electronics Corp. v. U.S.*, 56 Fed.Cl. 174, 177 (2003); *New Dimension Masonry, Inc.*, B-258876, Feb. 21, 1995, 1995 WL 73759.

[16] While the Complaint does not allege that WMATA paid any regard to anything but the price in the Akridge bid (as was the case), nevertheless "a bid that offers to supply more than that which is required by the government under an IFB properly may be accepted as responsive." *Emmett R. Woody*, B-213201, Jan. 26, 1984, 84-1 CPD 123, 1984 WL 43483.

of trust or confidence. All that Plaintiffs allege is that Monument talked and WMATA listened and at times participated in the discussions. If Plaintiffs' allegations suffice to establish a fiduciary relationship, then every ordinary commercial situation where people talk is a fiduciary relationship. That, of course, is not the law. There must be some special legal relationship of trust and confidence. *Compare, e.g.*, *Nevius v. Africa Inland Mission Intl.*, 511 F. Supp. 2d 114, 121 (D.D.C. 2007) (citing principle that trustees of charitable organizations are fiduciaries); *McCracken v. Walls-Kaufman*, 717 A.2d 346, 352 (D.C. App. 1998) (holding, medical professional in superior position who offers counseling on personal matters to patient enters into a relationship of trust and confidence); *Vicki Bagley Realty, Inc. v. Laufer*, 482 A.2d 359, 363 (D.C. App. 1984) (citing principle that real estate broker, "like any other agent, owes a fiduciary duty to his principal").

Additionally, WMATA is a public body that acts in and for the public interest and not for the particular interest of any private entity or person. WMATA's status and mission negate the prospect of a fiduciary duty running to Monument.

Furthermore, Plaintiffs cannot escape the fact that the WMATA Board, in which the alleged duty would lie were there one, never made representations or commitments or otherwise engaged in any conduct that conceivably could give rise to a fiduciary obligation. *See Elcon*, 977 F.2d at 1480 ("Third, and more fundamentally, Elcon cannot escape the fact that the final decisionmaker in this procurement was the Board.").

Plaintiffs' legal premise also is faulty. Plaintiffs cite *Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 955, 960 (4th Cir. 1993). Plaintiffs' Opp. at 43. *Trandes* presents the very kind of statutory breach of fiduciary claim that this case lacks:

> We agree with the Second Circuit that the breach of a duty of trust or confidentiality comprises the core of actions for trade secret misappropriation, ... Because Trandes's claim for trade secret misappropriation requires proof of a breach of trust or confidence, § 301 does not preempt the claim.

Plaintiffs do not have that statutory fiduciary duty here.  *See* WMATA Memo at 43; Plaintiffs'

Opp. at 43.

### 3. WMATA Possesses Sovereign Immunity Against The Fraud, Breach Of Fiduciary Duty And All Noncontract Claims

In addition to what WMATA sets forth in Points V. 1. and 2. above, showing that the

purported fraud and breach of fiduciary duty counts are nothing more than standard tort claims

arising out of WMATA's discretionary acts, and in addition to what WMATA sets forth in

Point III. 1. above, WMATA possesses immunity because WMATA was effecting its sovereign

function to "plan, develop, finance and cause to be operated improved transit facilities."

Compact, Compl. Ex. C, § 2.  *See* WMATA Memo at 37-38.

Plaintiffs recite but do not read the words "plan, develop, finance and cause to be

operated improved transit facilities" carefully.   The case law differentiates instances of

planning, developing, financing and causing to be operated transit facilities, on the one hand,

from actual operation, *i.e.*, instances in the course of providing transit services, on the other

hand.  WMATA retains immunity in the former instances and does not in the latter instances.

This case falls in the immune category.  Planning and implementing the disposition

and relocation of the bus garage are at least discretionary, if not governmental, acts.  *See*

WMATA Memo at 37-40 and Point III. 1. above.  Planning and implementing the disposition

and relocation of the bus garage are not acts of providing bus or subway service, do not arise

out of a bus accident, a station attendant's acts or other conduct in providing transit services,

and therefore do not fall within Plaintiffs' cited cases denying immunity.   *See Warren v.*

*WMATA*, 880 F. Supp. 14, 16-17 (D.D.C. 1995), and cases cited therein (holding, design of

bus, including design of replacement glass, is protected by sovereign immunity; considerations

of current and projected budgets, demands for services, impact of costs, revenue needs, etc., the

consideration of which the sale and relocation of the bus garage necessitate, "involve political,

economic and social determinations that are cloaked by the protective mantle of sovereign immunity.").

## CONCLUSION

This case presents an urgent and important matter for WMATA and for the public. Its resolution greatly impacts the public transportation system, WMATA's funding for the necessary relocation of the bus garage and access to the new stadium for Opening Day in April 2008. For the foregoing reasons and the reasons set forth in the WMATA Memo, the Court should dismiss all Counts of this implausible Complaint for failure to state a claim upon which relief can be granted and dismiss Counts Five, Six, Seven and Eight also on the ground of WMATA's sovereign immunity.

Accordingly, WMATA respectfully prays that the Court dismiss the Complaint in its entirety, without leave to amend, award WMATA its costs and expenses including legal fees and grant WMATA such other and further relief as is proper.

Respectfully submitted,

/s/ Donald A. Laffert
Carol B. O'Keeffe
General Counsel
Bruce P. Heppen
Donald A. Laffert
Associate General Counsel
Washington Metropolitan Area
Transit Authority
600 Fifth Street, N.W.
Washington, DC 20001
T: (202) 962-2569
F: (202) 962-2550
email: bheppen@wmata.com
email: dlaffert@wmata.com

   /s/ Harvey A. Levin
Harvey A. Levin (D.C. Bar No. 203869)
THOMPSON COBURN LLP
1909 K Street, N.W. Ste. 600
Washington, D.C. 20006-1167
T: (202) 585-6942 (direct)
F: (202) 508-1013 (direct)
email: hlevin@thompsoncoburn.com

Counsel for Washington Metropolitan Area
Transit Authority

4627588

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of November, 2007, a true and correct copy of the foregoing Reply was served by ECF and by electronic mail on:

> Louis E. Dolan, Jr., Esquire
> Vernon W. Johnson, III, Esquire
> NIXON PEABODY, LLP
> 401 Ninth Street, N.W.
> Washington, D.C.  20001

_____ /s/ Harvey A. Levin

4627588

- 25 -

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MONUMENT REALTY LLC, *et al.*, ) | |
| ) | |
| *Plaintiffs* ) | |
| ) | |
| v. ) | Civil Action No. 1:07-CV-01821 (EGS) |
| ) | |
| WASHINGTON METROPOLITAN AREA ) | |
| TRANSIT AUTHORITY, ) | |
| ) | |
| *Defendant* ) | |

**EXHIBIT 5**

**TO**

**REPLY OF WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY
IN SUPPORT OF MOTION TO DISMISS FIRST AMENDED COMPLAINT**




Washington Metropolitan Area Transit Authority

# Joint Development
# Solicitation


**M** metro®



**March 2005**

# Washington Metropolitan Area Transit Authority
# Joint Development Solicitation



Topping off Langston Lofts at 14th and V Streets NW, near U St/African-American
Civil War Memorial/Cardozo Metro station. Completion in 2005.

## ISSUE DATE: MARCH 2005

# TABLE OF CONTENTS

LETTER FROM THE MANAGING DIRECTOR                                          5


PART ONE.  JOINT DEVELOPMENT SITES                                        7

Navy Yard Metro Station ................................................................. 9

Royal Street Bus Garage ................................................................ 13


PART TWO.  PROPOSAL SUBMISSION REQUIREMENTS                               17

Section 1:      Administrative and Contractual Information ................. 19

Section 2:      Proposal Preparation/Format/Content/Submission ......... 21

Section 3:      Proposal Review, Evaluation, Developer Selection and Post
                Developer Selection Process ....................................... 27

Section 4:      WMATA's Non-Negotiable Requirements and Conditions ......... 29

Section 5:      Additional Joint Development Requirements and Procedures ... 33

Section 6:      Definitions ................................................................ 36


PART THREE. ATTACHMENTS                                                    41

Attachment A.  Proposal Form ....................................................... 43

Attachment B.  Proposal Bond ...................................................... 49

Attachment C.  Irrevocable Standby Letter of Credit ......................... 55

Attachment D.  Summary Requirements, Washington Metrobus
                Maintenance and Storage Facilities .............................. 61

March 15, 2005



Dear Developer:

The Washington Metropolitan Area Transit Authority (WMATA) is pleased to release its Joint Development Solicitation (JDS) for two prime locations, the approximately 3.2-acre Navy Yard Metro station site in Southeast Washington, D.C. and the approximately 2.1-acre Royal Street Bus Garage site in Alexandria, Virginia. Each site is in a highly desirable development area.

The Navy Yard site consisting of multiple parcels is close to Washington's proposed major league baseball stadium in a part of the city already experiencing the beginning of a development boom. The Royal Street site is located in historic Old Town, one of the most sought-after residential locales in metropolitan Washington. In each case, the development team must identify a site and relocate the existing, on-site bus mainte-nance garage and bus and employee parking areas. The team must identify the costs of the relocation, fund them to the extent feasible and specify, if needed, what other sources of funds are proposed for use.

WMATA is looking for innovative plans at these sites that will yield quality develop-ments for the local jurisdictions, increase transit ridership, enhance the local tax base and provide a stream of revenue to WMATA for capital needs. Proposals should adhere to principles of Transit-Oriented Development, providing safe, walkable, mixed-use communities that emphasize transit connections and reduce auto dependency.

Note that WMATA is offering its sites for long term lease, which it strongly prefers over a sale. If you propose a sale, you must clearly demonstrate that it is more advantageous to WMATA than a long term lease.

You are encouraged to review the JDS and to attend WMATA's Pre-Proposal Confer-ence which will be held on March 29, 2005 at 2 p.m. in the lobby level meeting room at WMATA headquarters, 600 Fifth Street, NW, Washington, D.C. The Pre-Proposal Confer-ence will give interested Developers the opportunity to ask questions about the JDS. Though attendance is not mandatory, it is strongly recommended.

This JDS is issued in accordance with WMATA's Joint Development Policies and Proce-dures.  The closing date for submitting Proposals is May 13, 2005.

If you have any general questions regarding this JDS, please contact Elisa Hill by e-mail at ehill@wmata.com or by phone at 202-962-1593.

Thank you for your interest in WMATA's Joint Development Program.

Sincerely,

Washington
Metropolitan Area
Transit Authority

600 Fifth Street NW
Washington D.C.
20001
202-962-1234

*K-P Heinemeyer*

K-P. Heinemeyer
Acting Managing Director
Office of Property Development and Management

# PART ONE. JOINT DEVELOPMENT SITES



Park Place, at Georgia Ave-Petworth Metro station. Completion in 2007.

## NAVY YARD METRO STATION

### JDS 05-1

### Site profile

Comprising about 3.2 acres in all, the Navy Yard Metro station parcels are located on or close to M Street in Southeast Washington, D.C. An approximately 4,400 square foot parcel containing WMATA's eastern Navy Yard Metro station entrance is at New Jersey Avenue on the north side of M Street. An approximately 14,100 square foot parcel containing a WMATA chiller plant that serves the Navy Yard station is located at the south-west corner of Half and L streets. The remaining parcels are on the south side of M Street and include the Navy Yard Metro station's western entrance, WMATA's Southeastern Bus Garage, which is a bus maintenance facility, and parking lots for WMATA buses and employees. These parcels stretch from South Capitol Street on the west to Cushing Street on the east and are separated by Van Street and Half Street.

The site is connected via South Capitol Street to the metropolitan area's major Interstates: 295, 395, 495 and 95. The Navy Yard Metro station is on WMATA's Green Line, which terminates at Branch Avenue in Maryland to the south and Greenbelt in Maryland to the north.

Existing improvements include the two station entrances, each of which contains escalators. The eastern entrance has a station elevator. The Southeastern Bus Garage, located on the portion of the site between Half and Van streets, currently services and parks 108 buses.

All utilities are available.

### Area and amenities

Located about ten blocks from the U.S. Capitol to the north and a few blocks from the Anacostia River to the south, the Navy Yard Metro station environs are characterized by light industrial use with some small scale residential and retail activity and recent new office construction. However, the surrounding area is poised for dramatic redevelopment, and the Navy Yard parcels are well positioned to benefit from the substantial



SITE LOCATION MAP

9



public investment and planning that is leading the revitalization of near Southeast Washington. The renaissance of this area was begun by the recent transfer of some 5,000 federal jobs into the Washington Navy Yard located at Eighth and M streets and the U.S. General Service Administration's mixed use plan for the 44-acre Southeast Federal Center, along the Anacostia River several blocks east of the Navy Yard site, being undertaken by private development firms. The latter site will include the federal Department of Transportation headquarters, now under construction, and residential, retail and office development. The area will also benefit from a Hope VI project underway that will rebuild the Arthur Capper/ Carrollsburg Dwellings public housing project, north of M Street between Third and Fifth streets, as a mixed- income housing community. The Council of the District of Columbia recently passed legislation enabling financing and construction of a new major league baseball stadium scheduled to open in April 2008. The approximately 40,000-person stadium will be located immediately south of the Southeastern Bus Garage in an area bounded by N, First, South Capitol and N streets. Private sector focus on the area since the beginning of this decade has spurred actual or announced construction of a number of office buildings and a hotel/residential complex. The Council of the District of Columbia has also passed legislation allowing the creation of the Anacostia Waterfront Corporation, an organization that will be responsible for the planning and redevelopment, through public-private partnerships, of much of the proposed development for the area.

### Location advantages

On-site Green Line Metrorail service allows patrons to reach downtown Washington in approximately 15 minutes. Weekday Metrorail ridership at this station averaged 3,132 week-

day passenger boardings in May 2004. The site is also served by bus routes A42, A46, A48, P1, P2, N22, V7, V8 and V9, which connect the site to downtown Washington and neighborhoods east of the Anacostia River.

WMATA and the District of Columbia Department of Transportation (DDOT) are currently in the early stages of examining options to create a surface transit line on the M Street corridor for light rail or bus rapid transit providing local service and running generally from the vicinity of the Potomac Avenue Metro station at Eighth Street and Pennsylvania Avenue, SE to the L'Enfant Plaza/Banneker Overlook with connections to downtown north of the Mall.

The site is next to South Capitol Street which provides connections to Interstates 95, 295, 395 and 495 providing access to points throughout the Washington D.C. region, as well as up and down the Atlantic seaboard. South Capitol Street and New Jersey Avenue also provide quick connections to downtown Washington and Capitol Hill only a few minutes away.

## Zoning

The chiller plant parcel is zoned C-3-C. The Navy Yard Metro station's eastern entrance is zoned CG/C-3-C and the rest of the site is zoned CG/CR. CG stands for the Capitol Gateway overlay zone, recently created in a December 2004 order by the District of Columbia Zoning Commission. Within the CG zone along M Street, SE the Zoning Commission has mandatory development review for mix of uses, architectural design and the quality of the landscaping and sidewalk treatment.  The underlying C-3-C zone allows mixed use development, with a Floor Area Ratio (FAR) of 6.5 for commercial and residential use, up to

100% lot occupancy and a maximum matter-of-right height of 90 feet. The underlying CR zone permits matter-of-right residential, commercial and certain light industrial development to a maximum lot occupancy of 75% for residential use, a maximum FAR of 6.0 for residential and 3.0 for other permitted uses and a maximum height of 90 feet. Residential recreation space is required. More information about the zoning districts and Zoning Commission Order No. 971, which created the CG overlay and rezoned the WMATA parcels south of M Street to CR, may be found at www.dcoz.dc.gov.

## Special considerations

WMATA will consider separate Proposals for its parcel at New Jersey Avenue, north of M Street (eastern entrance to the Navy Yard Metro station) and for its parcel at Half and L streets (chiller plant site). The chiller plant must remain in service (April-October) during construction and must be replaced on-site. A Proposal solely for the parcels north of M Street does not need to address relocation of the Southeastern Bus Garage. WMATA encourages but does not mandate a Proposal for the combined parcels south of M Street. However, any Proposal for a parcel or parcels south of M Street must address and provide for, or help provide for, the relocation of the Southeastern Bus Garage.

Proposals must include an alternative site, under the control of the Developer, for the relocation of this operating bus facility. Offers should also indicate the Developer's ability to construct a replacement bus garage on the alternative location. The property must be approximately five to seven acres and in a configuration that accommodates the servicing and storage of 102 to 150 buses. Summary requirements are included as

Attachment D to this JDS. The location of the new site must be reasonably convenient to the Southeastern Bus Garage's service area, which will be determined by WMATA in its sole discretion.

Proposals should contain an estimate of costs to carry out the relocation, identify the amount of Developer funding for the relocated garage and, if necessary, specify other sources of funds to be used for the replacement facilities.

In January of 2005, WMATA and the District of Columbia drafted a report, "Technical Memorandum II: Screening of Facilities Sites and Sketch Facilities Layouts" examining possible relocation sites. Following final approval of the memorandum, WMATA can make this document or any update available to Developers upon request.

The District of Columbia intends to finance expansion of WMATA's station entrance at M and Half streets in order to accommodate the passenger volumes expected for baseball games. Developers will need to coordinate with WMATA's Office of Construction to evaluate the feasibility of building plans. Developers also should pay special attention to enhancing pedestrian connections from nearby development to the station entrances.

WMATA operates a ground water remediation system on the Southeastern Bus Garage site to clean up petroleum contamination. It is expected that the remediation will continue for several more years in order to meet District of Columbia Corrective Action Plan requirements. Groundwater remediation will be required during any construction on the site. The site also contains contaminated soil. Information on groundwater and soil conditions may be examined upon request to WMATA's Office of Chief Engineer.

### Financial incentives and opportunities

The District of Columbia Office of Planning and Anacostia Waterfront Corporation are currently preparing a detailed plan for the area surrounding the proposed baseball stadium. Preliminary results are expected in the spring of 2005, and Developers will need to consult with the Office of Planning in preparing a response to this JDS.

The Office of Planning may be contacted at 202-442-7600 and can also provide access to the Anacostia Waterfront Corporation, which is currently being formed.

To learn about economic development programs which may be applicable to this area, contact the Deputy Mayor for Planning and Economic Development at 202-727-6365.

# ROYAL STREET BUS GARAGE

## JDS 05-2

### Site profile

WMATA's Royal Street Bus Garage is located in Old Town Alexandria, Virginia, and is bounded by Wythe Street to the north, Pendleton Street to the south, North Pitt Street to the west and North Royal Street to the east. The property, which is approximately 2.08 acres, currently contains a two-story brick bus maintenance garage with a footprint of about 45,000 square feet, as well as a one-story building about 2,300 square feet in size. At this time, the garage services 82 buses. The immediate vicinity includes townhomes, multifamily dwellings, office buildings and retail establishments.

### Area and amenities

The Royal Street Bus Garage site is a prime development location, adjacent to two new residential developments which provide luxury dwellings in the heart of historic Old Town. A short walk from elegant shopping and dining in the midst of one of Northern Virginia's most well-established commercial areas, this neighborhood presents its residents with a unique combination of colonial history and gracious living. The site provides an excellent opportunity for high-end townhome development. Additionally, the property offers recreational opportunities at nearby parks and boat clubs, as it is only two blocks from the Potomac River.

### Location advantages

The site is only blocks away from Interstates 95 and 495 and from US Route 1, which give quick access to points throughout the Washington DC region, as well as up and down the Atlantic seaboard. The George Washington Memorial Parkway, which runs through the heart of Old Town Alexandria, connects this location to Interstates 395, 495 and 66, which give direct access to points west of Washington. The site is served by Metrobus routes 29K and 29N, which terminate at the bus garage and connect the site with George Mason University and Fairfax Circle. It is also reached by east-west and north-south routes provided by DASH, the local area bus service, including routes A2, A4,



SITE LOCATION MAP

13



A5 and A8. Metro has four stations in Alexandria, two of which are in Old Town. Amtrak trains also stop in Old Town.

## Zoning

The site is zoned RM, which allows townhome development up to 30 dwelling units per acre. Additional information regarding this zoning category can be found on-line at www.municode.com.

## Special considerations

Responses to this solicitation for the redevelopment of this site must include an alternative site, under the control of the Developer, for the relocation of the operating bus facility. Offers should also indicate the Developer's ability to construct a replacement bus garage on the alternative location. The property must be a minimum of five acres in size, and in a configuration that accommodates the servicing of between 82 and 125 buses. Other standards for the design of bus garages are given in Attachment D of this JDS. The location of the new site must be reasonably convenient to the Royal Street Bus Garage's service area, which will be determined by WMATA in its sole discretion. Proposals should contain an estimate of costs to carry out the relocation, identify the amount of Developer funding for the relocated garage, and, if necessary, specify other sources of funds to be used for the replacement facilities.

During underground storage tank replacements in 1997 and 1998, WMATA found petroleum contamination in the soils and groundwater. Under a Corrective Action Plan

approved by the Virginia Department of Environmental Quality (VADEQ), the groundwater was treated to an acceptable level and the case was closed by VADEQ. Reports are available for review. If soils are excavated, special disposal requirements may result from residual petroleum contamination. Similarly, groundwater dewatering may require pretreatment before discharge to sanitary or storm water sewers.

**Financial Incentives and Opportunities**

For specific information about plans for the area, contact the Alexandria Department of Planning at 703-838-4666. For possible financial assistance with the replacement of the bus garage, contact Alexandria Assistant City Manager for Fiscal and Financial Affairs at 703-838-4300. Additional information about economic development programs may be obtained from the Alexandria Economic Development Partnership at 703-739-2830.

# PART TWO. PROPOSAL SUBMISSION REQUIREMENTS



Strathmore Park Condominiums at Grosvenor-Strathmore
Metro station. Completed in 2003.

# SECTION 1: ADMINISTRATIVE AND CONTRACTUAL INFORMATION

## 1.1.  Issuing Information
This JDS is issued in accordance with WMATA's Joint Development Policies and Guidelines, Revised February 21, 2002, and as further amended, which are available at MetroOpensDoors.com/About us/Business opportunities/Joint development opportunities. The sites in this solicitation are available under a long term lease, as WMATA's preference is to lease, rather than sell its property. If a sale is proposed, the Proposal must clearly demonstrate that a sale is more advantageous to WMATA than a long term lease.

## 1.2.  Purpose and Scope
This JDS is intended to provide interested Developers with sufficient summary information about WMATA's requirements to facilitate Proposal preparation. It contains instructions on Proposal content and format, but does not attempt to define all of WMATA's Joint Development contract requirements in detail. Certain contract requirements are not negotiable.

## 1.3.  Amendments and Supplements to JDS
WMATA reserves the right to issue Amendments and/or Supplements to this JDS. If after the Closing Date for submission of Proposals, WMATA determines that an Amendment and/or Supplement is necessary, it will only be sent to those Developers who submitted responsive Proposals for the specific Joint Development Site for which the Amendment and/or Supplement is being issued. Developers will be required to acknowledge in writing the receipt of an Amendment and/or Supplement.

## 1.4.  Acceptance/Rejection of Proposals
This JDS does not commit WMATA to designate a Selected Developer or to enter into a Development Agreement. WMATA reserves the right to accept or reject any or all Proposals.

## 1.5.  Acceptance of Terms and Conditions
By submitting a Proposal, a Developer is deemed to have agreed to and accepted all terms and conditions set forth in this JDS. Notwithstanding the foregoing, WMATA reserves the right to amend or modify any of the terms and conditions.

## 1.6.  Selected Developer Status
A designation as Selected Developer for a Joint Development Site does not mean WMATA accepts the Proposal without further negotiation. Rather, the Selected Developer's Proposal is the foundation for further negotiation and WMATA reserves the right to negotiate a Development Agreement with a Selected Developer containing benefits to WMATA that exceed those set forth in the Proposal.

## 1.7.  Binding Agreement
An executed Development Agreement is the only binding commitment of and by WMATA with respect to a Joint Development Site. Designation of a Selected Developer, WMATA's agreement to a Term Sheet or any conduct or oral representations by WMATA shall not in any way constitute a binding obligation or commitment by WMATA. In submitting a Proposal, the Developer acknowledges it will have no legal or equitable right to, or interest in, any Joint Development Site except as set forth in an executed Development Agreement.

## 1.8.  Schedule of Activities

| Item | Date |
| --- | --- |
| JDS Issue Date | MAR 15, 2005 |
| Pre-Proposal Conference | MAR 29, 2005 |
| Closing Date for Receipt of Written Inquiries | APR 15, 2005 |
| Closing Date for Proposal Submission | MAY 13, 2005 |
| Meetings with Developers (if required) | JUN 2005 |
| Final Proposals Due (if required) | JUL 2005 |

WMATA shall not be liable for any costs incurred by a Developer and/or Development Team responding to this JDS or any costs incurred with respect to the negotiation of the Development Agreement and related final documentation.

## 1.10.  Approvals

The designation of Selected Developer and the terms of a Development Agreement negotiated pursuant to this JDS are subject to the approval of the WMATA Board of Directors and the Federal Transit Administration of the U.S. Department of Transportation (FTA).

## 1.11.  Pre-Proposal Conference

A Pre-Proposal Conference will be held on Tuesday, March 29, 2005 at 2 p.m. at WMATA Headquarters, 600 Fifth Street NW, Washington, D.C. in the lobby level meeting room. The Pre-Proposal Conference is intended to give Developers the opportunity to ask questions about the JDS and to request clarifications. Interested Developers are encouraged to attend the Pre-Proposal Conference, but attendance is not mandatory.

## 1.12.  Inspections

Inspections of Joint Development Sites may be arranged by contacting Ms. Jo Ann Harrison at 202-962-2395.

## 1.13.  Inquiries

Inquiries concerning this JDS are to be submitted in writing to:

Contracting Officer
Office of Property Development
and Management
Washington Metropolitan Area
Transit Authority
600 Fifth Street NW
Washington, D.C. 20001

The closing date for receipt of written inquiries is 3 p.m. on Friday, April 15, 2005.

Any interpretation made by WMATA's Contracting Officer will be in the form of an Amendment to this JDS. Oral explanations or interpretations are not binding.

## 1.14.  Closing Date for Proposal Submission

One original and 15 copies of the Proposal must be received in a sealed package not later than 3 p.m. on Friday, May 13, 2005 (Closing Date) addressed as provided in Section 2.7.

## 1.15.  Late Proposals

Any Proposal received by WMATA after the Closing Date shall be considered a Late Proposal. A Late Proposal may be accepted and evaluated by WMATA at the sole discretion of WMATA's Contracting Officer.

## 1.16.  Jurisdictional and Community Participation Requirements

Prior to submitting a Proposal, Developers are required to meet with jurisdictional representatives and interested community organization(s) to share information about a pending Proposal submission to WMATA and to seek their views. Developers should note that failure to comply with this requirement may result in a Proposal's being rejected. A list of the jurisdictional representatives, locally elected officials and community organizations associated with each Joint Development Site is available by calling Ms. Jo Ann Harrison at 202-962-2395.

## 1.17.  WMATA Facilities

WMATA Facilities are critical to the efficient operation of the transit system and must be accommodated in the site plan and are typically provided or replaced at the Selected Developer's expense. Under certain conditions, on a site-specific basis and where compatible with WMATA's revenue bond obligations, WMATA may consider an increase or reduction in the number of WMATA parking spaces. Any change in the number of parking spaces requires the specific approval of the WMATA Board of Directors.

## 2.1.  General

To be considered, a Developer must submit a complete response to this JDS. WMATA encourages creative and innovative Proposals which promote Transit-Oriented Development consistent with local land use policies. Proposals should be straightforward and contain a concise delineation of the Developer's capability to satisfy the requirements of this JDS. Failure to respond with the requisite information may result in a Developer's being eliminated from consideration.

## 2.2.  Proposal Submission Structure

Proposals must be submitted in two separate, 8.5"x11" bound sections with Section 1 containing Technical Information and Section 2 containing Economic Information.

The contents of each section must comply with Section 2.3 and Section 2.4 of this JDS. Proposals should include the identical titles and numbering for each subsection as set forth in this JDS.

## 2.3.  Proposal Contents: Section 1– Technical Information

A.  Transmittal Letter—a letter signed by an officer authorized to make a binding commitment for the Developer which states that the Proposal is valid for a minimum of 180 days from the date of submission and that if selected, the Developer will negotiate in good faith with WMATA.

B.  Completed Proposal Form (3 pages)—See ATTACHMENT A.

C.  Table of Contents.

D.  Executive Summary excluding all financial information (5 pages maximum).

E.  Development Team Information

   1.  A description of the Developer and the proposed Development Team and the role of each principal member.

the power and authority to enter into a Development Agreement and all final documentation as required by WMATA without the consent or joinder of any other party or authority.

F.  Development Entity

   1.  A description of the Developer's business entity and, if a different entity will be formed, details of the structure of this other entity.

   2.  A detailed description of how the Project's ownership and management will be structured.

G.  A proposed site plan and a description of land uses, including an explanation of how the Project complies with Transit-Oriented Development principles.

   Additionally, a full color visual of the site plan at least 2' by 3' in size must accompany the Proposal. The visual can be rolled up or mounted on poster board.

H.  An explanation of the anticipated impact that the Project will have, if any, on WMATA Facilities. If a reconfiguration or relocation of WMATA Facilities is being proposed, the Proposal must detail the location and general layout and access to the reconfigured or relocated WMATA Facilities. Additionally, Proposals must ensure the uninterrupted and unimpeded operation of WMATA Facilities throughout the construction period and after Project completion. Plans for interim WMATA Replacement Facilities during the construction period must be defined. All costs associated with a reconfiguration or relocation of WMATA Facilities will be borne solely by the Developer.

   PLEASE NOTE: A reconfiguration or relocation of WMATA Facilities (including parking) may trigger public hearing requirements under the WMATA Compact.

I.  The proposed Project schedule, starting in July 2005, in Microsoft Project or similar

for use in the Developer Selection process (assume five months after Proposal Due Date), which at a minimum includes the following tasks and milestones, if applicable:

1.  Term Sheet negotiations (assume 90 calendar days from designation as Selected Developer);

2.  Approval of Term Sheet by WMATA's Board of Directors and Term Sheet execution (assume 30 calendar days from conclusion of Term Sheet negotiations);

3.  Development Agreement and final documentation negotiations and execution (assume 120 calendar days from Term Sheet approval);

4.  Agreement(s) for the acquisition of parcels to be assembled with the Joint Development Site, if applicable;

5.  Concept plan preparation and approval, including interim WMATA Replacement Facilities plan (allow 30 calendar days for WMATA approval);

6.  WMATA Compact public hearing, if applicable (allow 180 calendar days);

7.  Development plan preparation and approval, including interim WMATA Replacement Facilities plan (allow 30 calendar days for WMATA approval);

8.  Local and other governmental approvals and actions (zoning, site plan, alley closings, grants, etc., as applicable);

9.  Project financing approval;

10. Schematic design and construction document preparation and approval (allow 25 business days for WMATA approval of 35% construction documents, 20 business days for WMATA approval of 65% construction documents, and 15 business days for WMATA approval of 100% construction documents);

11. Local permitting process;

12. Construction of interim WMATA Replacement Facilities;

13. Project construction period (per phase, if applicable);

14. Initial occupancy; and

15. Stabilization period.

J.   1. The existing zoning classification and, if a change will be sought, the proposed zoning category.

2. The permitted FAR (floor area ratio) or other density measure, and the proposed FAR or other density measure, as applicable.

K.  The proposed business relationship with WMATA and the proposed terms (lease, sale, etc.) including, but not limited to, the following:

Lease (WMATA preference is 60 years but lease cannot exceed 99 years.)

1.  Identification of the portion of the Joint Development Site to be leased by location and approximate land area. (NOTE: The leased premises will exclude all WMATA Reserved Areas and Interests.)

Sale

1.  Identification of the portion of the Joint Development Site proposed to be purchased in fee simple by location and approximate land area. (NOTE: The sale will exclude all WMATA Reserved Areas and Interests.)

2.  An explanation of why the Project could not be developed under a lease, and why a sale is more advantageous to WMATA than a long term lease.

L.  A market analysis and marketing strategy for the proposed uses of the WMATA joint development site.

M.  A summary (specific financial analysis required in Economic Section) of the Project's impact on the tax base of the local jurisdiction as follows:

1.  Identification of the property taxes, sales taxes, amount of fees and contributions and other local public income.

2.  Identification of the value of public facilities to be derived from the Project.

3.  The number of temporary jobs created during construction and the number of new permanent jobs created by the Project.

4.  Any other quantifiable economic benefits to the local jurisdiction to be derived from the Project.

N.  A statement identifying each of the community organizations that the Developer has met with and the meeting dates; the specific information that the Developer shared; the reaction of each community organization to the proposed development concept; the issues raised by each community organization; and how the Proposal addresses these issues. See Section 1.16.

O.  A statement describing the Developer's contact with local jurisdiction staff, (representatives' names and meeting dates) and the views and expectations of the local jurisdiction regarding the Project, including any existing or anticipated jurisdictional issues or concerns. See Section 1.16.

P.  A statement on whether the Project's feasibility is contingent on any local, state or federal government action or financial support (including a change in regulations; street or alley closing; funding, including guarantees and issuance of tax-exempt bonds; financing and credit enhancements; leasing of space; granting of access to the Joint Development Site; and the justification and process for obtaining government support).

Q.  Statements that:

1.  The Project is compatible with local land use requirements.

2.  The Project will conform to all applicable federal, state and local laws, regulations and ordinances including all federal and relevant local environmental regulations.

R.  A quantitative analysis of the Project's beneficial effect on WMATA's total daily transit ridership. To generate this data, the Developer must use the Development-Related Ridership Survey II by JHK & Associates, December 1989, which is available by calling Ms. Jo Ann Harrison at 202-962-2395.

The analysis must include the incremental transit trips in both peak and off-peak periods generated by the Project and the basis for such projections. (Peak periods are generally defined as 6 to 9 a.m. and 4 to 7 p.m., Monday through Friday.)

S.  A statement identifying the past, current or anticipated contractual or financial relationship of any member of the Development Team (including but not limited to the Developer, partners or co-venturers) with WMATA or any of its staff or Board Members. The Development Team must also disclose any contractual or financial relationship which may give the appearance of a conflict of interest.

T.  The following information about Developer's previous projects:

1.  Illustrative materials on three recent successful projects of similar or comparable scope for which substantial financing was obtained.

2.  The sources and amounts of debt and equity capital that were raised in previous projects.

U.  A list of any projects on which the Developer, its parent company or any member of the Development Team has defaulted or declared bankruptcy and an explanation of each default or bankruptcy.

V. Detailed information regarding any criminal indictments or felony convictions of the Developer or any principal, officer, director, partner, member, manager or equivalent of any person or entity constituting a member of the Development Team.

W. A statement indicating whether the Developer is willing to include Disadvantaged Business Enterprises (DBEs), as defined in Section 6, in its Project. WMATA encourages Developers to include DBEs and will assist Developers in identifying such firms.

X. If the proposed Project consists of an assemblage of the WMATA Joint Development Site with adjacent property, a statement identifying the adjacent property ownership, and if the property owner and the Developer are not the same, an executed agreement between the property owner and the Developer defining the property owner's participation, if any, in the Project.

Y. Any other information to assist WMATA in its evaluation of the Proposal, including a statement of why WMATA should select the Developer and its Development Team.

**2.4. Proposal Contents: Section 2—Economic Information**

A. Table of Contents

B. Executive Summary of economic information only.

C. The Developer's estimated fair market value of WMATA's land or interest, how the value was derived and the assumptions underlying the value.

D. If the proposed business relationship with WMATA is a Lease (the term must be specified and preferably will be 60 years but cannot exceed 99 years):

1. A statement that a nonrefundable option fee of $100,000 will be paid to WMATA for the right to negotiate a Term Sheet and Development Agreement upon designation as Selected Developer. This fee is separate and distinct from rent and from any Proposal Security or other security deposit.

2. The amount and timing of pre-development rent to be paid to WMATA during the interval period after the Development Agreement is executed but before the Project produces income (include the estimated length of this period).

3. The guaranteed base rent to be paid to WMATA throughout the term of the lease, including escalations. The description of escalations must include the method used to calculate escalations, their timing, and the projected amount of each escalation.

4. The method of adjusting the base rent if it does not commence by the date projected and/or on the final approved density is greater than that proposed.

WMATA expects that the present value of its financial return will not be diminished by delays in the development process.

5. How any environmental remediation costs will be handled.

6. WMATA's participating share of gross income from the Project.

7. WMATA's share of proceeds from a capital event such as an assignment of the leasehold interest, transfer of interest in the Developer's business entity, refinancing or sale of the Project, or any other capital event after construction.

8. Identification of any additional payments to WMATA based upon factors chosen by the Developer.

9. Provision for increasing rent once WMATA Replacement Facilities are amortized.

E. If the proposed business relationship with WMATA is a Sale:

1. A statement that a nonrefundable option fee of $100,000 will be paid to WMATA for the right to negotiate a Term Sheet and Development Agreement upon designation as Selected Developer. This fee is separate and distinct from the purchase price and from any Proposal Security, security deposit or pre-development fee.

2. The amount and timing of pre-development fees to be paid to WMATA during the interval period after the Development Agreement is executed but before WMATA realizes income from the sale (include the estimated length of this period).

3. The proposed purchase price for each portion of the Joint Development Site including:

   a. The schedule of purchase price escalations if the sale is not completed by the date projected.

   WMATA expects that the present value of its financial return will not be diminished by delays in the development process.

   b. The method of adjusting the purchase price if the final approved density is greater than that proposed.

4. How any environmental remediation costs will be handled.

5. Proposed business arrangement under which WMATA will retain an interest in any development rights in excess of those used by the development constructed pursuant to the Proposal. Under such an arrangement, WMATA will receive payments over and above the purchase price if, upon subsequent redevelopment of the Joint Development Site within 25 years of closing, the redeveloped density is greater than the original density.

6. Identification of any additional payments to WMATA based upon factors chosen by the Developer.

F. A summary table of the sources (including debt, equity and other financing) and uses of funds to design and construct the Project.

G. A 15 year pre-development, construction and operating period cash flow statement which starts in July 2005. It should include each separate phase of development and land use type by phase and contain at a minimum:

   1. The following assumptions:

      **Financing**
      Construction loan rate, term and amount
      Permanent loan rate, term and amount
      Loan-to-value ratio
      Equity as a percentage of total construction costs

      **Revenues**
      Office rent ($/GSF and #GSF)
      Retail rent ($/GSF and #GSF)
      Residential ($/DU and #DU)
      Parking
      Other revenues

      **Construction Costs**
      Total hard costs
      Total soft costs (also as a percentage of total hard costs)
      Cost of improvements on a unit basis ($/FAR SF for office and retail, $/DU, $/TH)
      Cost per structured parking space
      Cost per surface parking space
      Land value per SF
      Land value per FAR SF
      Ground rent to WMATA

      **Operating Costs**
      Operating Expenses (in $, $/GSF and as a percentage of revenues)

2. The following line items presented on an annual basis:

### Sources
Equity
Construction Financing
Permanent Financing
Other Financing
Total Financing

### Revenues
Office
Residential
Retail
Parking
Other Revenues
Total Gross Revenues
Total Net Revenues (less vacancy)

### Uses
WMATA Rent or Sales Price
(as applicable)
Construction Costs
Soft—by line item
Hard—by line item
Total
Operating Expenses (all non-debt Operating Costs, e.g.: direct costs, G&A, taxes, legal, marketing, commissions, etc.)
Net Operating Income
Debt Service (including any fees or expenses associated with loans)
Net Cash Flow (defined as revenue less operating expenses, debt service and ground rent to WMATA if applicable)
Percentage Rent to WMATA
Distributions to Investors
Free Cash Flow

### Returns
Developer's Internal Rate of Return
Return on Investment
Return on Equity
The pro forma (and any budgets in other parts of the Proposal) should clearly show all of the fees and income that the Developer, its partners, and affiliates receive from the Project. Those line items should be pulled from the pro forma and shown together on the spreadsheet as individual line items in a separate report. Annual replacement reserves (total, $/GSF and $/DU) should also be broken out and shown).

3. The analysis must be presented in current dollars with an escalation rate of 3%.

4. All financial models must be submitted to WMATA on disk as well as hard copy. All financial information must be linked in a single spreadsheet, and all files must be in Microsoft Excel and retain all cell relationships.

H. A detailed financial analysis, with assumptions given, of the Project's impact on the tax base of the local jurisdiction as follows:

1. Identification of the property taxes, sales taxes, amount of fees and contributions and other local public income.

2. Identification of the value of public facilities to be derived from the Project.

3. The number of temporary jobs created during construction and the number of new permanent jobs created by the Project.

4. Any other quantifiable economic benefits to the local jurisdiction to be derived from the Project.

I. Copies of Developer's balance sheets, income statements and sources and uses of funds statements for the past three fiscal years.

J. Statements regarding the Developer's financial creditworthiness and past development experience which can be verified, including the following:

The names and addresses of at least three commercial or institutional credit references and a letter authorizing each credit reference to respond to inquiries from WMATA. At least two of the references should be lending institutions.

## 2.5. Proposal Security

Each Proposal must be accompanied by Proposal Security in the amount of One Hundred Thousand Dollars ($100,000). (Alternative Proposals for the same Joint Development Site require only one Proposal Security.) Acceptable forms of Proposal Security include a proposal bond in the form set forth in ATTACHMENT B, a bank letter of credit in the form set forth in ATTACHMENT C, a cashier's check, certified check or money order. All Proposal Security must be drawn on a U.S.-based national bank and contain the following:

At top of Proposal Security document, insert the JDS Number _____and the Joint Development Site_____.

WMATA will hold all funds that can be deposited into a financial institution in an interest-bearing account, and interest will be paid on such funds. No later than 15 business days after WMATA identifies and designates the Selected Developer and Alternate Selected Developer(s) for a specific Joint Development Site, the Proposal Security will be returned to all Developers other than the designated Selected Developer and Alternate Selected Developers. WMATA shall retain the designated Selected Developer's Proposal Security until a Development Agreement is executed and provisions are made with respect to the disposition of the Proposal Security in the Development Agreement.

In the case of Alternate Selected Developers, the Proposal Security will be retained until a final selection is made. If an Alternate Selected Developer advises WMATA in writing that it does not want to be considered for the award and requests that its Proposal Security be returned, WMATA will return the Proposal Security within 15 business days.

## 2.6. Multiple or Alternative Proposals

A Developer may submit multiple Proposals. Each Proposal must be separately identified and submitted in accordance with the terms of this JDS and must include the requisite Proposal Security. If a Developer submits alternative Proposals for the same Joint Development Site, only one Proposal Security is required.

## 2.7. Submission of Proposal

A complete Proposal shall include the items set forth in Section 2.3. and Section 2.4. and the requisite Proposal Security. On or before the Closing Date, one original and 15 copies of the Proposal (marked Proposal in response to JDS Number____) must be submitted in a sealed package, addressed and mailed or delivered in person to:

Contracting Officer
Office of Property Development
and Management
Washington Metropolitan Area
Transit Authority
600 Fifth Street, NW
Washington, D.C. 20001

## SECTION 3.    PROPOSAL REVIEW, EVALUATION, DEVELOPER SELECTION AND POST DEVELOPER SELECTION PROCESS

## 3.1.  Proposal Review Process

WMATA will review and evaluate Proposals as follows:

A.  The Contracting Officer receives and processes all Proposals. Proposals that in WMATA's sole and non-reviewable discretion are deemed nonresponsive or not reasonably susceptible of being selected for award will be rejected and returned to the Developer with a written explanation. Please note that any Proposal that does not satisfy the requirements for jurisdictional officials and community organization participation may be rejected as technically unacceptable and returned to the Developer. WMATA reserves the right to accept or reject any Proposal without negotiation or discussion.

B.  The Contracting Officer designates an
    Evaluation Team composed of WMATA's
    Property Planning and Development (joint
    development) staff assisted by other
    WMATA staff, jurisdictional
    representative(s) and consultants, as
    appropriate. An analysis and evaluation
    of each Proposal deemed to be reasonably
    susceptible of being selected for award
    is conducted.

C.  The Evaluation Team may meet with
    all or select Developers for both an oral
    presentation and specific discussions
    about a Proposal. If such meetings are
    held, details on the oral presentation will
    be provided as part of the scheduling
    process. Such discussions will include
    identifying areas of the Proposal that
    require clarification or improvement
    including architectural and engineering
    designs and drawings, or do not comply
    with the JDS. Any oral explanation or
    instruction given by WMATA is not bind-
    ing on WMATA unless set forth in an
    Amendment to this JDS.

D.  If requested by WMATA, Developers
    submit Final Proposals. The Final Proposal
    may be significantly changed from the
    Initial Proposal submitted. WMATA re-
    serves the right to waive the Final Pro-
    posal submission requirement, to request
    further clarification of a Final Proposal or
    to request a Revised Final Proposal.

E.  The Evaluation Team completes its
    evaluation of the Proposal (Final Proposal,
    if applicable) and makes one of the
    following recommendations to the
    Contracting Officer:

    1.  Designate a Selected Developer for a
    Joint Development Site.

    2.  Rank all Developers who responded to
    a specific Joint Development Site, desig-
    nate the top-ranked Developer as the
    Selected Developer and one or more of
    the ranked Developers, in order of rank-

ing, as an Alternate Selected Developer.
If for any reason the negotiations be-
tween the Selected Developer and
WMATA do not result in the execution of
all final documentation, or are not pro-
gressing to WMATA's satisfaction, WMATA
may terminate the Selected Developer
designation and negotiate a Development
Agreement with the Alternate Selected
Developer, in ranked order.

    3.  Designate two or more candidates
    for the same site as Alternate Selected
    Developers and conduct simultaneous
    negotiations.

    In the case of alternatives 2 and 3, nego-
    tiations will be conducted by WMATA in
    accordance with Section 7.3.8 of the Joint
    Development Policies and Guidelines.

F.  The Contracting Officer makes a recom-
    mendation to WMATA's Real Estate Com-
    mittee and to the WMATA Board of
    Directors.

G.  Designation of a Selected Developer
    must be approved by the WMATA Board
    of Directors.

**3.2.  Proposal Evaluation Factors**
Each Proposal will be evaluated using FTA's
requirements for "Highest and Best Use" or
"Highest and Best Transit Use" (see
www.fta.dot.gov/library/policy/9300.1A/
appenB.htm) and the following criteria:

A.  Technical Criteria

    1.  Degree to which the Project reflects
    Transit-Oriented Development principles;

    2.  The market viability of the Project;

    3.  The experience and prior performance
    of the Developer and Development Team;

    4.  The innovation and creativity of
    the Project;

    5.  The compatibility of the Project with
    local Transit-Oriented Development plans
    and land use policies; and

6. Benefits accruing to the local jurisdiction.

B. Economic Criteria

1. Financial benefits accruing to WMATA;

2. Financial viability of the Project; and

3. Enhanced ridership.

### 3.3.    Post Developer Selection Process

A. A Developer designated by the WMATA Board of Directors as a Selected Developer will be required to send a letter to each of the community organizations with which its representatives met to inform them as to how the Proposal presented to WMATA addresses their issues or concerns. A copy of this letter must also be submitted to WMATA.

B. A Developer designated by the WMATA Board of Directors as a Selected Developer will be required to pay WMATA, in immediately available funds, a nonrefundable option fee for WMATA's granting to the Selected Developer the exclusive right to negotiate a Term Sheet and Development Agreement. The amount and timing of the nonrefundable option fee shall be as set forth in the Proposal (or Final Proposal, as the case may be), in accordance with Section 2.4.

C. A nonbinding Term Sheet, which summarizes the financial structure and other major business terms, will be negotiated followed by negotiation of the Development Agreement and any other final documentation pursuant to the following schedule:

Term Sheet (nonbinding):  Completed within the 90 days following designation of the Selected Developer by the WMATA Board of Directors.

Development Agreement: Executed within 120 days following Term Sheet approval by the WMATA Board of Directors.

In the event that this schedule is not met, the Selected Developer designation expires, the Proposal is no longer viable and WMATA may retain the Proposal Security (in addition to the nonrefundable option fee) in accordance with Section 5.2. WMATA may choose to re-establish the Selected Developer designation and provide a specific time frame to the Selected Developer for the completion of negotiations or to re-advertise the Joint Development Site.

### 3.4.  Disclosure and Use of Data

WMATA is required to brief its Board of Directors on all aspects of a Proposal. The proposed business terms of a Proposal will be held in confidence only until the Development Agreement and all final documentation have been approved and executed. WMATA reserves the right to review the zoning and land use aspects of any Proposal with local zoning, land use planning, transportation and environmental officials (and in the State of Maryland, with state officials). Additionally, at the sole discretion of the WMATA Board of Directors, such review may include conducting public hearings, town meetings and similar public forums.

### SECTION 4.    WMATA'S NONNEGOTIABLE REQUIREMENTS AND CONDITIONS

The following requirements and conditions are nonnegotiable and the concepts will be included in the Development Agreement and final documentation executed by the Selected Developer and WMATA. By submitting a Proposal in response to this JDS, a Developer is agreeing to accept and comply with these nonnegotiable requirements and conditions.

### 4.1. WMATA's Reserved Areas and Interests

The location of WMATA's Reserved Areas and Interests shall be determined by WMATA in its sole and absolute discretion. Additionally, the conveyance or lease of any WMATA property

shall be subject to a reservation by WMATA of a permanent, exclusive and irrevocable easement for vertical and horizontal support and as otherwise necessary for the operation and maintenance of present and future WMATA Facilities, WMATA Improvements and WMATA Reserved Areas and Interests.

## 4.2. WMATA's Approval Rights and Adjacent Construction Requirements

The following rights and requirements apply to all Projects:

A. Approval Rights

WMATA shall have the right to approve in its sole and absolute discretion:

1. Matters that affect the integrity, functionality, efficiency, safety, operation, maintenance, legal compliance, cost or profitability of WMATA's business, customers, operations or activities;

2. Matters that affect WMATA Facilities, WMATA Replacement Facilities, WMATA Reserved Areas and Interests, ingress/egress to WMATA Facilities, etc.;

3. Matters that affect any of WMATA's adjacent property;

4. The design and construction of interim and permanent WMATA Replacement Facilities; and

5. Matters that affect the Selected Developer's obligations as they relate to timing (changes in Project schedule) and performance (changes in what will be constructed, i.e., the product mix).

B. WMATA's Comment Rights

WMATA shall have the right to comment on the development plan/site plan and on other matters concerning the Project which do not affect the integrity, functionality, efficiency, safety, operation or maintenance of WMATA Facilities, WMATA Improvements or WMATA Reserved Areas and Interests. The Selected Developer shall be obligated to consider WMATA's comments in good faith and reasonably.

C. WMATA's Construction Requirements

In order to avoid adverse impact on WMATA Facilities, Projects must be built in compliance with WMATA's adjacent construction criteria as contained in WMATA's Adjacent Construction Design Manual, Revision I or as further revised, and WMATA's Manual of Design Criteria, which are available by calling Ms. Jo Ann Harrison at 202-962-2395. Additionally, Developers must comply with WMATA's requirements for the relocation and maintenance of operations during construction which include the uninterrupted and unimpeded operation of WMATA Facilities. WMATA will review and approve Developer plans in accordance with established WMATA procedures.

## 4.3. Relocation or Replacement of WMATA Facilities

If a Project requires the relocation or replacement of any WMATA Facility, on a permanent or interim basis, the cost shall be borne solely by the Selected Developer. No WMATA Facility may be taken out of service unless a permanent or interim replacement facility is already available, such that there will be no disruption to WMATA operations. Any exception to this requirement is subject to the specific approval of the WMATA Board of Directors. WMATA shall own and operate any permanent relocated or replaced WMATA Facility. Additionally, the configuration of the relocated or replaced WMATA Facility must be agreed to by WMATA in writing.

## 4.4. Selected Developer's Funding of WMATA Compact Public Hearing

A change in WMATA Facilities (including parking) may trigger a public hearing requirement under the Washington Metropolitan Area Transit Authority Compact, Public Law 89-774, 80 Stat. 1324, as may be amended

(WMATA Compact). The Selected Developer will be required to contribute Fifty Thousand Dollars ($50,000) towards the cost of the WMATA Compact public hearing, payable 60 calendar days prior to the date of the public hearing. If WMATA's actual public hearing costs are less than the aforestated amount, WMATA will credit the remaining funds to the outstanding amount that it is owed by the Selected Developer.

### 4.5.  No Subordination of WMATA's Fee Interest

WMATA will not subordinate its fee interest in its property. In a lease situation, WMATA will permit lenders to have a leasehold security interest in the Project, which security interest would be subordinate to WMATA's right to terminate the lease upon a default by the Selected Developer (subject to the lender's right to cure).

### 4.6.  Federal Transit Administration (FTA) Requirements

WMATA is subject to the requirements of the Federal Transit Administration of the U.S. Department of Transportation (FTA). The terms of the Development Agreement negotiated with the Selected Developer, as it pertains to WMATA property, are subject to FTA approval. While FTA may impose additional requirements which cannot be known until FTA reviews a specific Project, FTA requires that the Selected Developer comply with certain laws and regulations barring discrimination on the basis of race, color, national origin or disabilities; and further requires compliance with FTA requirements regarding conflicts of interest and debarment.

FTA also requires, as a covenant running with the land, that the entire Joint Development Project constitute a Transit-Oriented Development as defined in the latest applicable FTA Regulations. See FTA Circular 9300.1A, Appendix B, The Relationship Between Joint Development and Livable Communities on the FTA web site at www.fta.dot.gov/library/policy/IFT/iftb.html.

### 4.7.  Americans With Disabilities Act (ADA)

All Projects shall be constructed in compliance with Titles II and III of the Americans with Disabilities Act, 42 USCA Section 12101, et seq., as amended, and any regulations promulgated thereunder. Proposals must include a plan indicating how access from the Project to the Metro station will be provided for persons with disabilities. Additionally, it is WMATA's requirement that if a Project or any subsequent addition, modification or alteration triggers ADA-related improvements to the Metro station, the Selected Developer shall be responsible for the costs of such improvements. The only exceptions are when the ADA-related improvements predate the date of completion of the Project and are required to be made regardless of the Project, or constitute ADA-related improvements that WMATA is implementing at Metro stations in general as part of its systemwide improvements or alterations.

### 4.8.  Direct Connections

If a direct connection to a Metro station is part of the overall Project, then in accordance with Section 4.6, FTA may determine that the National Environmental Policy Act, 42 USCA 4321, et seq., as amended, is applicable to the Project. Additionally, the following laws and their implementing regulations are also applicable to a direct connection:

A.  Rehabilitation Act of 1973, 29 USCA Section 794;

B.  Architectural Barriers Act, 42 USCA Section 4151, et seq.; and

C.  Planning and Design for the Elderly and Handicapped, 49 USCA Section 5301, et seq.

**4.9 Davis-Bacon Act/Fair Labor Standards Act**

The construction of any WMATA Replacement Facility or WMATA Improvement must be built in compliance with the Davis-Bacon Act, 40 USC Section 276a, et seq., and overtime compensation must be paid in compliance with Section 64 of the WMATA Compact, and the Fair Labor Standards Act, 29 USCA Section 201, et seq. (1978), as amended.

**4.10. Other Laws, Regulations and Requirements**

Developers are responsible for being fully informed of and complying with the requirements of applicable federal, State of Maryland, District of Columbia, Commonwealth of Virginia, and local jurisdictional laws and regulations. Additionally, the Selected Developer shall be responsible for obtaining, at its own cost and expense, all requisite approvals, licenses and permits.

**4.11. WMATA's Indemnification Policy**

The terms of any Development Agreement and final documentation will require that the Selected Developer and its contractors and subcontractors (and subtenants, where applicable) indemnify WMATA against all claims, liabilities and costs of whatsoever kind and nature including environmental claims which may be imposed upon, or incurred by, or asserted against WMATA in connection with the Selected Developer's performance under the Development Agreement or related agreements.

**4.12. WMATA's Insurance Requirements**

The terms of any Development Agreement and final documentation will require that the Selected Developer, its contractors and subcontractors procure and maintain insurance coverage in amounts determined by WMATA, which may include, but is not limited to General Liability, All Risk Property, Builder's Risk, Worker's Compensation, Automobile Liability, Contractors' Pollution Legal Liability, Professional Liability, Rental Value Insurance, and Boiler and Machinery (during operations only).

**4.13. Guaranty**

WMATA will require a third party to guarantee some or all of the obligations of the Selected Developer, including but not limited to construction obligations.

**4.14. Payment, Performance and Completion Bonds**

WMATA requires that the Selected Developer secure and file with WMATA a payment bond equal to 100% of the value of each phase of the Project from a federally approved surety company, with sufficient assets. The payment bond must name WMATA for the benefit of laborers, subcontractors, material suppliers and others that have or may have claims or liens against the Project or the realty.

WMATA also requires the Selected Developer to secure and file with WMATA a performance bond equal to 100% of the value of each construction phase from a federally approved surety company with sufficient assets and which bond names WMATA for the completion of the planned construction in that phase.

Additionally, if there are WMATA Replacement Facilities being constructed, WMATA requires the Selected Developer to secure and file with WMATA a completion bond equal to 100% of the value of each construction phase from a federally approved surety company, with sufficient assets, and which bond names WMATA as the sole obligee for the completion of the planned construction in that phase.

All bonds must be in a form acceptable to WMATA and countersigned by a Commonwealth of Virginia, State of Maryland or District of Columbia resident agent of the surety, with a copy of the agent's license, as issued by the appropriate Insurance Commissioner.

**4.15. WMATA's Disclaimer of Liability**
WMATA disclaims all responsibility and liability for the completeness or accuracy of any information that it provides.

**4.16. Inspection of Accounting Records**
The Selected Developer will be required to permit WMATA, or any of its duly authorized representatives, at reasonable times and places, access to any books, documents, papers and records, including certified financial statements, which are directly pertinent to the Development Agreement. WMATA shall be permitted to audit, inspect, examine, copy and transcribe such books, documents, papers and records. The Selected Developer shall retain all records for three years after submission of any statement required for determining any variable payment obligations under the Development Agreement or related agreements.

**4.17. WMATA's Tax Exempt Status**
WMATA is tax exempt pursuant to the WMATA Compact. Any taxes, assessments or impositions on the Project or the real estate shall be assumed by the Selected Developer. In no event shall the Selected Developer assert or attempt to assert for its own benefit, an exemption or immunity available to WMATA under the WMATA Compact.

**4.18. Financing Requirement**
The Selected Developer shall be obligated to obtain the requisite financing to consummate the lease/sale of the WMATA Joint Development Site, and the development, construction and final completion of the Project by a reasonable date certain, or WMATA may terminate the Development Agreement.

# SECTION 5.   ADDITIONAL JOINT DEVELOPMENT REQUIREMENTS AND PROCEDURES

**5.1.   Assignment of Proposal, Change in Developer or Withdrawal of Developer**
WMATA considers the designation of Selected Developer to be in the nature of a personal services contract. The Selected Developer is designated because of the skills, experience, knowledge and financial standing of the Developer and the Development Team.

A Developer who submits a Proposal in response to this JDS may withdraw, assign its Proposal or change the composition of its Development Team only as follows:

A.  Withdrawal of Proposal

At any time prior to designation of the Selected Developer, a Developer may elect to withdraw its Proposal. Under such circumstances, WMATA shall return the Proposal Security without interest.

B.  Assignment of Proposal

At any time prior to designation of the Selected Developer, a Developer may request WMATA's approval to assign its Proposal to another development entity. No purported assignment is valid unless WMATA has given its prior written approval. The Developer and its proposed assignee shall submit all documents required by WMATA before the request will be considered. WMATA is under no obligation to approve the request. If WMATA refuses to grant approval, and the Developer does not want to proceed in accordance with its Proposal, WMATA will return the Proposal Security without interest. An assignment may be subject to the requirement of a Guaranty pursuant to Section 4.13.

C.  Change in Composition of Developer or Development Team

1.  Prior to designation of the Selected Developer, a Developer may change its

composition of the Development Team only with WMATA's prior written approval. If WMATA refuses to grant approval of the change, and the Developer does not want to proceed in accordance with its Proposal, WMATA will return the Proposal Security without interest.

2.   After designation as the Selected Developer, the Selected Developer must request WMATA's written approval to change its composition or the composition of its Development Team. If WMATA refuses to grant approval of the change and the Selected Developer does not want to proceed in accordance with its Proposal, WMATA may terminate the Selected Developer designation and retain the Proposal Security.

D.  Other Situations

An assignment or change in the composition of the Development Team which is not addressed above is at the sole discretion of WMATA's Contracting Officer. For any such assignment or change to be valid, WMATA's prior written approval is required. Any purported assignment occurring without WMATA's prior written approval shall be void.

## 5.2.    Termination of Selected Developer Designation

WMATA may terminate the Selected Developer designation for any of the following reasons and retain the Proposal Security and any other deposit held by WMATA (except as stated otherwise in subsections J and K):

A.  The Selected Developer fails to complete negotiations and finalize a Term Sheet within 90 days from designation as Selected Developer by the WMATA Board of Directors.

B.  The Selected Developer fails to negotiate and execute the Development Agreement within 120 days following the approval of the Term Sheet by the WMATA Board of Directors.

In the event that the foregoing schedule is not met, WMATA may terminate the designation of the Selected Developer and retain the Proposal Security without any liability or further obligation to the Selected Developer. The foregoing deadlines can only be extended by action of the WMATA Board of Directors in its sole and non-reviewable discretion.

C.  The Selected Developer or any individual or entity holding ownership in or comprising the Development Team declares bankruptcy.

D.  The ownership structure of the Selected Developer changes without WMATA's prior written approval. Structural changes include changes in percentages of ownership interests or changes in ownership of any entity holding an ownership interest in the Selected Developer.

E.  The Selected Developer assigns its designation or transfers its rights in a WMATA Joint Development Site without WMATA's prior written approval.

F.  The Selected Developer or any principal, officer, director, partner, member, manager or equivalent of any person or entity constituting a member of the Development Team is indicted for, or convicted of, a felony.

G.  The Selected Developer or any principal, officer, director, partner, member, manager or equivalent of any person or entity constituting a member of the Development Team is found not to have a satisfactory record of integrity and business ethics, in WMATA's sole and non-reviewable discretion.

H.  The Selected Developer provided materially incorrect or incomplete information in any of its submissions to WMATA, as determined in WMATA's sole and non-reviewable discretion.

I.  The Selected Developer does not comply with this JDS, its Proposal or the terms of the Development Agreement as negotiated by the parties.

J.  In accordance with Section 5.5, the Selected Developer conducts environmental due diligence and consequently modifies its Proposal in a manner which is unacceptable to WMATA.  Under such circumstances, WMATA shall return the Proposal Security with any interest that may have accrued, except for site restoration costs.

K.  WMATA determines (in its sole and non-reviewable discretion) that termination is in its best interest. Under such circumstances, WMATA shall return the Proposal Security with any interest that may have accrued.

### 5.3.  Metro Station Access Roads and Interior Maintenance Roads

WMATA's Metro station access roads and interior maintenance roads are owned, maintained and improved by WMATA. Any anticipated use of such roads by a Project must be addressed in the Proposal. WMATA reserves the right to reject shared use of its roads if detrimental to its operations.

### 5.4.  Developer's Research Obligations

A Developer is expected to be knowledgeable of all information which is reasonably ascertainable concerning the site size, and character, quality and quantity of surface and subsurface materials or obstacles on the Joint Development Site as well as the existing utilities on the Joint Development Site. This information is available from a visual inspection of the Joint Development Site, technical drawings and specifications (as built drawings) which WMATA will make available upon request, utility companies serving the area and local land records. WMATA disclaims all responsibility and liability for the completeness or accuracy of any information that it provides. All Joint Development Sites are subject to existing physical and legal conditions, whether of record or not.

Additionally, a Developer is expected to have knowledge of the conditions affecting construction on the Joint Development Site, which include but are not restricted to those bearing upon transportation, disposal, handling and storage of materials, availability of labor, water, electric power, roads, the conformation and conditions of the ground, and the character of equipment and facilities needed before and during prosecution of the work.

### 5.5.  Environmental Matters

WMATA has undertaken no comprehensive environmental investigations and makes no representations about the presence or absence of contaminated material or other environmental conditions that may affect development except as specifically identified in PART ONE. Interested Developers may request permission to perform a due diligence environmental site assessment prior to Proposal submission, after Proposal submission or after designation as the Selected Developer. Such due diligence site assessment and all associated costs shall be the sole responsibility of the Developer. Permission will be granted by WMATA subject to the execution of a Right of Entry Agreement with standard insurance and indemnity provisions.  A sample Right of Entry Agreement is available from Ms. Jo Ann Harrison at 202-962-2395.

WMATA shall be provided, in a timely manner, a copy of each test result and report addressing the environmental site investigation. If environmental contamination is found that requires a cleanup or remediation of the Joint Development Site under a governmental regulatory agency's review, the Developer may withdraw its Proposal (including its Final Proposal) but is responsible for site restoration costs. In the event that the due diligence environmental site assessment is performed after the designation of the Selected Devel-

opment Agreement, the Selected Developer and WMATA may negotiate the transaction based upon the levels of contaminated materials or other environmental conditions encountered which would substantially delay development or substantially increase the costs of excavation, removal or disposal of soil/materials or the treatment of groundwater. If the parties cannot agree upon the resolution of these issues, the Selected Developer may withdraw its Proposal but the Developer is responsible for site restoration costs, and WMATA has the corresponding right to terminate the Selected Developer designation in accordance with Section 5.2.J.

## 5.6. Protest Policy

The policy and procedure for the administrative resolution of protests involving the designation of a Selected Developer arising pursuant to this JDS are as follows:

A. Only an Interested Party may submit a protest. An Interested Party is defined as a Developer who submitted a Proposal pursuant to this JDS.

B. Protests must be submitted no later than 30 calendar days after WMATA's designation of the Selected Developer. Any protest submitted subsequent to this time may be deemed by WMATA's Contracting Officer to be untimely and denied on that basis unless the Contracting Officer concludes that the issue(s) raised by the protest involves fraud, gross abuse of the selection process, or otherwise indicates substantial prejudice to the integrity of the selection process.

C. The Interested Party wishing to file a protest shall submit a written document to WMATA's Contracting Officer which contains the following:

1. The name and address of the Interested Party;

2. The date of notification of the protest;

3. Identification of the provision(s) of this JDS, applicable Joint Development Policies and Guidelines or laws upon which the protest is based;

4. A statement of the specific relief requested; and

5. Any documents relevant to the protest.

D. WMATA's Contracting Officer shall carefully review the protest in consultation with WMATA staff. At the discretion of the Contracting Officer, a conference may be held with the Interested Party. The Contracting Officer shall have 30 calendar days to render a written decision on the merits of the protest. A determination by the Contracting Officer that a protest is meritorious may result in a change in the terms, conditions or format of this JDS in the form of an Amendment; the rejection of a Proposal; the cancellation of this JDS; or the termination of the designated Selected Developer.

E. This Protest Policy is not applicable to actions taken by WMATA in response to legal proceedings filed in the courts, or actions taken by WMATA in its sole and non-reviewable discretion.

## SECTION 6:   DEFINITIONS

**Alternate Selected Developer**
At the time WMATA designates the Selected Developer, WMATA may designate one or more of the other Developers who submitted a timely Proposal in the order of ranking as Alternate Selected Developer(s). In the event that WMATA revokes the Selected Developer designation, WMATA may, in its sole and non-reviewable discretion, commence negotiations with the Alternate Selected Developer(s) (in the order ranked) without issuing a new solicitation document. Alternatively, rather

than designating a Selected Developer, WMATA may designate two or more Alternate Selected Developers and conduct simultaneous negotiations. Under all circumstances, the designation of Alternate Selected Developer shall be viable until WMATA has executed a Development Agreement or one year has elapsed from the issuance of this Joint Development Solicitation (JDS), whichever is earlier.

## Contracting Officer

WMATA's Director of the Office of Property Development and Management or, if such position is vacant at the time in question, the person designated to act in such capacity at such time.

## Developer(s)

The entity submitting or contemplating the submission of a Proposal in response to this Joint Development Solicitation (JDS) which is potentially eligible to be designated the Selected Developer. The Developer may be any qualified individual or entity with real estate development-related experience and access to financing sufficient to undertake the proposed Project including real estate brokers, nonprofit organizations, public agencies, etc. Real estate brokers are invited to participate as the Developer or as a member of the Development Team as opposed to participating in a purely marketing role. WMATA will not pay any broker's commissions.

## Development Agreement

The legal document (lease, sales contract, combination lease/sale, master development agreement or other agreement) that constitutes the contract between WMATA and the Selected Developer.

## Development Team

The Developer and the principal persons and/or entities (including officers, directors, partners, members, managers or the equivalent of such persons and/or entities) identified by the Developer as the participants in the Project.

## Disadvantaged Business Enterprise (DBE)

For the purpose of Joint Development Projects, a DBE is a for-profit, small business concern that is owned and controlled (at least 51%) by one or more socially and economically disadvantaged persons. Socially and economically disadvantaged persons are persons who are citizens of the United States (or lawfully admitted permanent residents) and who are either:

A. Black Americans (meaning persons having origin in any of the Black racial groups of Africa);

B. Hispanic Americans (meaning persons of Mexican, Puerto Rican, Cuban, Dominican, Central or South American, or other Spanish or Portuguese culture or origin regardless of race);

C. Native Americans (meaning persons who are American Indians, Eskimos, Aleuts or Native Hawaiians);

D. Asian-Pacific Americans (meaning persons whose origins are from Japan, China, Taiwan, Korea, Burma (Myanmar), Vietnam, Laos, Cambodia (Kampuchea), Thailand, Malaysia, Indonesia, the Philippines, Brunei, Samoa, Guam, the U.S. Trust Territories of the Pacific Islands (Republic of Palau), the Commonwealth of the Northern Marianas Islands, Macao, Fiji, Tonga, Kiribati, Juvalu, Nauru, Federated States of Micronesia or Hong Kong);

E. Subcontinent Asian American (meaning persons whose origins are from India, Pakistan, Bangladesh, Bhutan, the Maldive Islands, Nepal or Sri Lanka); or

F. Women.

## Evaluation Team

WMATA staff assigned by the Contracting Officer to analyze the Proposals and make recommendations.

**Federal Transit Administration (FTA)**
The federal agency within the U.S. Depart-
ment of Transportation which administers the
federal rules and regulations governing joint
development programs and oversees other
aspects of real property purchased with
federal funds for transit purposes.

**Final Proposal**
If requested by WMATA, the final document
or compilation of documents submitted by
the Developer for analysis before the Evalua-
tion Team makes its recommendation.  See
definition of Proposal.

**Initial Proposal**
The initial document or compilation of docu-
ments submitted by the Developer in response
to this JDS. See definition of Proposal.

**Joint Development**
A creative program through which property
interests owned and/or controlled by WMATA
are marketed to office, retail/commercial,
recreational/entertainment and residential
developers with the objective of developing
Transit-Oriented Development projects. See
definition of Transit-Oriented Development.

**Joint Development Policies and Guidelines**
The procedures approved by the WMATA
Board of Directors which govern the
Joint Development Program and are
available at MetroOpensDoors.com/About us/
Business opportunities/Joint development
opportunities.

**Joint Development Project**
The development ideas, concepts and plans
that a Developer presents in its Proposal. Also
refers to the development plans of the Se-
lected Developer.

**Joint Development Site(s)**
The property areas and interests owned or
controlled by WMATA and approved by the
WMATA Board of Directors for inclusion in
the Joint Development Work Program.

**Joint Development Work Program**
A document prepared annually of Joint
Development opportunities associated with
WMATA-owned properties. The Joint Devel-
opment Work Program is drafted in coordina-
tion with the local jurisdictions and approved
by the WMATA Board of Directors.

**Project**
The joint development ideas, concepts and
plans that a Developer presents in its Pro-
posal. Also refers to the development plans of
the Selected Developer. Project is synonymous
with Joint Development Project.

**Proposal(s)**
The development-related documents submit-
ted in response to this Joint Development
Solicitation (JDS). The term Proposal can
include both the Initial Proposal and, if re-
quested by WMATA, the Final Proposal.

**Selected Developer**
The Developer with the exclusive right to
negotiate a Development Agreement with
WMATA. WMATA's designation of the Se-
lected Developer shall not become final and
binding until a Development Agreement has
been negotiated and executed by the parties.

**Term Sheet**
The nonbinding document which summarizes
the financial structure and other major busi-
ness terms of the Project.

**Transit-Oriented Development**
Those projects that integrate WMATA's transit
facilities, reduce automobile dependency,
increase pedestrian/bicycle originated transit
trips, foster safe station areas, enhance sur-
rounding area connections to transit stations,
provide mixed use including housing and the
opportunity to obtain goods and services near
transit stations, offer active public spaces and
promote and enhance ridership and sound
growth in the communities which WMATA
serves. See also FTA's definition at

**WMATA Compact**
Washington Metropolitan Area Transit Authority Compact, Public Law 89-774, 80 Stat. 1324, as may be amended.

**WMATA Facility or WMATA Facilities**
All improvements, structures, infrastructure components, tangible property and areas required, in the judgment of WMATA, for the use, operation, access, maintenance, repair, servicing, replacement or removal of structures and supports, any and all access, parking, operation and service facilities and areas relating to WMATA's operations or activities, including without limitation, the Metro station, tunnels, rails, tracks, bus stations, bus transfer areas, supervision kiosks, employee bathrooms, electric substations, conduits and lines, communications equipment and structures, pedestrian ways, waiting and shelter areas, facilities serving persons with disabilities, cooling towers, chiller plants, vent and fan shafts, bicycle rack and locker areas, storm water management facilities, landscaping, lighting and all other associated facilities.

**WMATA Improvement(s)**
Those improvements, whether an interim replacement facility or a new facility, which will be designed and/or constructed by the Selected Developer for WMATA in a configuration acceptable to WMATA. Upon final acceptance by WMATA, a WMATA Improvement will become a WMATA Facility.

**WMATA Replacement Facility or WMATA Replacement Facilities**
A WMATA Improvement designed and/or constructed by the Selected Developer for WMATA in a configuration acceptable to WMATA that replaces any displaced or disrupted WMATA Facility and which will be turned over to WMATA.

**WMATA Reserved Areas and Interests**
Includes (a) all areas of, within or adjacent to the Joint Development Site containing any WMATA Facilities; (b) all areas of, within or adjacent to the Joint Development Site relating to the use, operation, access, maintenance, repair, servicing, replacement or removal of any WMATA Facilities; and (c) any and all easements and other reserved rights required by WMATA in connection with its use, operation, access, maintenance, repair, servicing, replacement or removal of any WMATA Facilities or WMATA operations and business generally, whether expressly provided for or reasonably contemplated. Such easements and other reserved rights shall include, without limitation, easements and reserved rights (whether at, above or below ground level) for (i) the construction, operation, maintenance, repair, replacement, removal or relocation of any and all existing tunnels and related facilities, (ii) all WMATA Facilities (including, without limitation, any replacement facilities) which have piling or other structural support within or adjacent to the Joint Development Site, (iii) any and all service facilities serving such tunnels or any WMATA Facilities, (iv) all underground power lines and other utilities, (v) horizontal and vertical support for all WMATA Facilities in, on and about the WMATA Joint Development Site including without limitation, structures, equipment or installations such as foundations, beams, columns, bracing and similar structural features which maintain vertical and horizontal support and are necessary for the maintenance, operation and protection of any and all WMATA Facilities and (vi) protections and approval rights satisfactory to WMATA in its sole and unreviewable discretion with respect to limits on loads and pressures which may affect WMATA Facilities, whether vertical or lateral.

# PART THREE. ATTACHMENTS



At the Cinema, Gallery Pl-Chinatown
Metro station. Completed in 2004.

**ATTACHMENT A**

Page 2 of 3

# REPRESENTATIONS AND CERTIFICATIONS

**REPRESENTATIONS**

1.    Developer's <u>existing</u> operation is as: (check or complete all applicable boxes)

[ ]   an individual

[ ]   a partnership

    [ ]   general

    [ ]   limited

Formed under the laws of _____

[ ]   a nonprofit organization

[ ]   a corporation, incorporated under the laws of_____

[ ]   a limited liability company (LLC) formed under the laws of _____

_____

[ ]   other, _____


2.    Developer's <u>proposed</u> operation as set forth in its proposal is as: (check or complete all applicable boxes)

[ ]   an individual

[ ]   a partnership

    [ ]   general

    [ ]   limited

To be formed under the laws of _____

[ ]   a nonprofit organization

[ ]   a corporation, incorporated under the laws of _____

[ ]   a limited liability company (LLC), to be formed under the laws of _____

_____

[ ]   other, _____

**ATTACHMENT A**

Page 3 of 3

**CERTIFICATIONS** *(check applicable box)*

1.  Debarred or Ineligible Contractors:

    Developer certifies that its existing operation [  ] is, [  ] is not included in the "List of Parties Excluded from Federal Procurement or Nonprocurement Programs" maintained by the U.S. General Services Administration.

2.  Contingent Fee:

    a.  Developer [  ] has, [  ] has not, employed or retained any company or persons (other than a full-time, bona fide employee working solely for the Developer) to solicit or secure a Development Agreement; and

    b.  Developer [  ] has, [  ] has not, paid or agreed to pay any company or person (other than a full- time, bona fide employee working solely for the Developer) any fee, commission, percentage or brokerage fee contingent upon or resulting from the award of a Development Agreement; and

    c.  Developer agrees to furnish information relating to the above as requested by WMATA's Contracting Officer.

3.  Covenant Against Gratuities:

    Neither Developer nor any of its employees, representatives or agents have offered or given gratuities or will offer or give gratuities (in the form of entertainment, gifts or otherwise) to any director, officer or employee of WMATA with the view toward securing favorable treatment in the designation of a Selected Developer or in any determination made with respect to Developer selection, or in the negotiation, amendment or performance of the Development Agreement.

The undersigned Developer certifies that the foregoing is true.


_____        _____
Date                                             Developer


                                                 _____
                                                 Authorized Representative

ATTACHMENT B

Page 1 of 3

# Washington Metropolitan Area Transit Authority

# PROPOSAL BOND

JDS Date: _____    Penal Sum of Bond: $100,000

JDS Number: _____    Date Bond Executed: _____

**Joint Development Site:** _____

*KNOW ALL PERSONS BY THESE PRESENTS,* that we, the Principal and Surety(ies) hereto, are firmly bound to the Washington Metropolitan Area Transit Authority (WMATA) in the above penal sum for the payment of which we bind ourselves, our heirs, executors, administrators, and successors, jointly and severally; Provided, that, where the Sureties are corporations acting as co-sureties, we the Sureties, bind ourselves in such sum "jointly and severally" as well as "severally" only for the purpose of allowing a joint action or actions against any or all of us, and for all other purposes each Surety binds itself, jointly and severally with the Principal, for the payment of such sum only as set forth opposite the name of such Surety, but if no limit of liability is indicated, the limit of liability shall be the full amount of the penal sum.

*THE CONDITION OF THIS OBLIGATION IS SUCH,* that whereas the Principal has submitted a Proposal in response to the JDS identified above, this Bond shall be valid for 360 days from the JDS Date written above.

If WMATA designates the Principal as the Selected Developer based upon the Proposal it submitted under the JDS Number written above, and WMATA terminates the Principal's designation as the Selected Developer in accordance with Section 5.2 of the aforesaid JDS, the Principal and the Surety(ies) named herein shall be liable to WMATA as aforesaid for the Penal Sum of this Bond.

Each Surety executing this instrument hereby agrees that its obligation shall not be impaired by any extension(s) of the time for WMATA's designation of the Selected Developer or the negotiation of a Development Agreement, notice of which extension(s) to the Surety(ies) being hereby waived, provided that such waiver shall apply only with respect to extensions aggregating not more than 120 calendar days in addition to the period originally allowed as stated above.

**ATTACHMENT B**

# Principal(s)

1.  Developer: _____

    Address: _____

    _____

    Signature of Authorized Representative: _____     Corporate Seal:

    Name and Title: _____

    State of Incorporation: _____

2.  Developer: _____

    Address: _____

    Signature of Authorized Representative: _____     Corporate Seal:

    Name and Title: _____

    State of Incorporation: _____

3.  Developer: _____

    Address: _____

    Signature of Authorized Representative: _____     Corporate Seal:

    Name and Title: _____

    State of Incorporation: _____

**ATTACHMENT B**

# Corporate Sureties

A.  Surety Name: _____  Liability Limit        (Seal)

                                            $ _____

    Address: _____

    Signature: _____

    Name and Title: _____

    State of Incorporation: _____

---

B.  Surety Name: _____  Liability Limit        (Seal)

                                            $ _____

    Address: _____

    Signature: _____

    Name and Title: _____

    State of Incorporation: _____

---

C.  Surety Name: _____  Liability Limit        (Seal)

                                            $ _____

    Address: _____

    Signature: _____

    Name and Title: _____

    State of Incorporation: _____

*Attach additional pages as needed.*

## Instructions

1.  This form is authorized for use in providing Proposal Security. It must be completed legibly. The name of each person signing this Proposal Bond should be typed in the space provided. WMATA may request documentation confirming the authorization of a person signing in a representative capacity.

2.  Sureties executing the Proposal Bond must be among those appearing on the U.S. Treasury Department's list of approved sureties and must be acting within the limitations set forth therein.

**ATTACHMENT C**

Page 1 of 2

[If issuing bank is located outside of Washington, D.C., Maryland or Virginia, then a confirming bank in one of those jurisdictions is required; both banks must be members of the Federal Reserve System.]

[Issuing Bank L/C Letterhead]

# IRREVOCABLE STANDBY LETTER OF CREDIT

Letter of Credit No. _____

Issue Date: _____, 2005

APPLICANT:

Name:_____

Address:_____

Re:  Issued in connection with JDS Number:_____

Joint Development Site:_____

Joint Development Solicitation (JDS) Dated: _____

BENEFICIARY:

Washington Metropolitan Area Transit Authority

600 Fifth Street, NW

Washington, D.C. 20001

Ladies and Gentlemen:

1.  We hereby open in your favor, at the request and for the account of the above-identified Applicant, our Irrevocable Standby Letter of Credit No. _____ in an aggregate amount of One Hundred Thousand and 00/100's US Dollars (USD 100,000.00), to be available for payment of your drafts drawn at sight on us, and accompanied, in the case of each draft, by your written certification to us signed by any person purporting to act on your behalf, stating:

> Applicant as the Selected Developer for the above-referenced Joint Development Site pursuant to that certain Joint Development Solicitation (JDS) dated _____, and issued by Beneficiary has been terminated as the Selected Developer in accordance with Section 5.2 of the JDS, and Beneficiary hereby certifies that the Sight Draft presented herewith constitutes an amount owed to Beneficiary under the JDS.

2.  Drafts drawn under this letter of credit (as same may have been or may be amended from time to time) shall be completely sufficient if in the form attached hereto as Exhibit A, and need not be endorsed on the letter of credit. We will accept any and all statements delivered pursuant to this credit as conclusive, binding and correct, without having to investigate or being responsible for the accuracy, truthfulness, correctness or validity thereof and notwithstanding the claim of any person to the contrary.

3.  This credit shall expire, unless extended as provided herein, at 5 p.m.. local time in Washington, D.C., on _____, 2006. If such date is a Saturday, Sunday, legal holiday or day on which we are not open for business on account of any other reason, the expiration date set forth above shall automatically be extended to our next regular business day. It is a condition of this credit that it will be automatically extended without amendment for an additional period of 12 months from the present and each future expiration date, unless, not less than 60 days prior to the then-relevant expiration date, we notify you by Registered Mail that we elect not to extend this credit for any additional period. Upon your receipt of such a notification, you may draw your sight draft on us prior to the then-relevant expiration date for the unused balance of this credit, which need be accompanied only by your signed written statement that you received notification of our election not to extend.

4.  All drafts drawn under this letter of credit must refer to the number and issue date of this credit, and must be marked "Drawn under [Issuer's Name] Irrevocable Standby Letter of Credit No. _____."

5.  We agree to honor each draft drawn under and in compliance with the terms of this credit, if duly presented at our offices at [must be the address of an office of the issuing bank in Washington, D.C., Virginia, or Maryland], [or, if a confirming bank is being used, at the offices of such confirming bank at a specified address in Washington, D.C., Virginia, or Maryland] at or before 5 p.m. local time in Washington, D.C. We agree to deliver payment in full of each such draft without any processing, check, or other fees whatsoever, to your offices as set forth hereinabove, Attn: General Counsel, not later than 36 hours after the time of presentment (not including Saturdays, Sundays, legal holidays, or any day on which we are not open for business on account of any other reason) by our Cashier's or Teller's check payable solely to the order of the "Washington Metropolitan Area Transit Authority."

6.  The original and/or any amendment of the credit under which drafts are presented by you need not be presented with any draft drawn thereunder in order to constitute a valid presentment, unless such draft is a full and/or final draft under this credit.

7.  Partial drawings under this letter of credit are permitted.

8.  This credit shall be governed by the Uniform Customs and Practices for Documentary Credits, UCP 500 (1993 Rev.), published by the International Chamber of Commerce, and to the extent not so governed in accordance with the statute and case law of the District of Columbia.

Very truly yours,

[name of issuing or confirming bank]

By:_____

Authorized Officer

Print name: _____

Print title: _____

Exhibit A: Sight Draft

**EXHIBIT A**

# SIGHT DRAFT

Date:_____

*AT SIGHT,* pay to the order of Washington Metropolitan Area Transit Authority, the sum of
_____ Dollars (USD _____).

For Value Received, and charge to the account of [name of Applicant].

Drawn under [name of issuing bank] Irrevocable Standby Letter of Credit No. _____, dated
_____[as amended by _____].

Washington Metropolitan Area Transit Authority, as Beneficiary under said Irrevocable Standby
Letter of Credit No. _, dated _____[as amended by _____], hereby certifies
to you that:

[insert certification language]

TO:      [name of issuing bank]            Washington Metropolitan Area Transit Authority

Address: _____    By: _____

_____            Print Name: _____

_____            Title: _____

Attn: Letter of Credit Department        600 Fifth Street, NW

                                          Washington, D.C. 20001

# SUMMARY REQUIREMENTS, WASHINGTON METROBUS MAINTENANCE AND STORAGE FACILITIES

I.  Introduction

WMATA bus maintenance and storage facilities form an integral, yet less visible, part of the bus system that provides transportation for thousands of D.C. area riders. Each of the ten WMATA garages is strategically located to control operating costs and designed to provide bus servicing and maintenance in accordance with WMATA's integrated comprehensive facility plan. These facilities provide running repairs and service and are supported by a "heavy" maintenance and overhaul shop.

II.  Description

Each bus maintenance/storage facility varies slightly in the services provided and the layout; however, each consists of the following elements.

a.  Bus Servicing—operations performed daily on each bus assigned to the facility and include coin/fare removal, fueling, interior vacuum cleaning and exterior washing.

b.  Maintenance—operations performed on a preventive maintenance (P/M) planned schedule and/or occurrence basis. This work is performed in a series of maintenance bays including pits, lifts and flat bays supported by a parts room, battery room, brake lathe shop, tire changing area, electronics room, tool box storage area, and various other shops.

c.  Storage—secure, well lighted exterior space adequate to park all of the assigned buses as well as a certain number of spare buses.

d.  Administration—areas for supervisory personnel, operators, lockers, and WMATA administration.

e.  Automobile parking—parking for operators, mechanics, administrators and visitors.

III.  Building Requirements:

WMATA has developed a comprehensive planning document entitled Bus Maintenance Facility Planning and Design Guidelines, dated October 19, 2001. Any proposed new bus garage must meet all of the requirements of this document. However, this summary presents the salient planning and spatial elements contained in that report.

| Buses* | 100 | 150 | 200 |
|---|---|---|---|
| Personnel | | | |
| —Maintenance | 45 persons | 65 persons | 88 persons |
| —Transportation | 230 persons | 345 persons | 460 persons |
| —Training/Supervision | 11 persons | 11 persons | 11 persons |
| Spaces | | | |
| —Administration | 2,200 SF | 3,180 SF | 4,400 SF |
| —Operations | 6,500 SF | 9,700 SF | 13,000 SF |
| —Maintenance | 28,000 SF | 42,000 SF | 56,000 SF |
| —Paint/Body | 8,000 SF | 8,000 SF | 8,000 SF |
| —Servicing | 10,000 SF | 18,250 SF | 18,250 SF |
| —Miscellaneous | 7,500 SF | 7,500 SF | 7,500 SF |
| —Bus Storage | 80 to 100,000 SF | 125 to 150,000 SF | 160 to 200,000 SF |
| —Employee Parking | 150 Cars | 200 Cars | 240 Cars |
| Total Site** | 210,000 SF | 300,000 SF | 380,000 SF |

*  Buses are 40'-0 buses in length, 102" in width and have a turning radius of approximately 60'-0.
**  Assumes 1 story building and efficient property shape

Clearances: The following vertical clearances are required.

| | |
|---|---|
| Service Lane(s) | 16'-0 Clear |
| Maintenance | 18'-0 Clear |
| Bus Storage | 14'-6 Clear |
| Office Areas | 9'-0 Clear |

Administration and Operations areas could be on a second floor; however, this is not a preferred solution. All maintenance and bus storage elements must be on the first, at grade, level and are not to be at a level below grade.

IV.  Special Site Requirements:

In addition to the building and general site size enumerated above there are some additional salient issues that should be recognized in a bus maintenance facility site.

Operation Location Efficiency: is the first and single most important factor in locating a bus maintenance facility. In doing so, the minimizing of deadhead time and miles is of critical importance. The time and miles necessary to reach the first stop and return from the last stop of a revenue-producing run is defined as deadheading. In the lifetime of a facility, these costs will dominate from an annual operating cost perspective.

Traffic: Volume of traffic on fronting streets and adjacent intersections should not be adversely affected by the buses. Sight distances for buses entering and exiting the site should be generous.

Circulation: Bus circulation on the site should be predominately counterclockwise and provide an opportunity to separate vehicles by type (i.e. buses from cars from deliveries etc.). Sufficient space must be provided for turning of articulated (60'-0) buses that "bend" in the middle. The maintenance area should be designed with a "drive through" traffic pattern to minimize the need for backing buses.

Utilities: Adequate utilities should be approximate to the facility and should not have to be relocated. These include sewer, water, electric, natural gas and drainage.

Topography: The site should be relatively flat but still have adequate drainage.

Neighborhood: Zoning and land use should be appropriate, and sites adjacent to residential areas, schools and churches should be avoided. Preliminary reviews with County/City planning agencies for potential plans for the proposed or adjacent property will assist in whether to proceed with potential bus use.



Washington Metropolitan Area Transit Authority

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| MONUMENT REALTY LLC, *et al.*, | ) | |
| *Plaintiffs* | ) | |
| v. | ) | Civil Action No. 1:07-CV-01821 (EGS) |
| WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, | ) | |
| *Defendant* | ) | |

**EXHIBIT 6**

**TO**

**REPLY OF WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY
IN SUPPORT OF MOTION TO DISMISS FIRST AMENDED COMPLAINT**

**LETTER OF INTENT**
**for a**
**Purchase and Sale Agreement**

The following constitutes a Letter of Intent ("LOI") dated April 3, 2007, between the Washington Metropolitan Area Transit Authority ("WMATA") and MR Ballpark 2 LLC, MR Ballpark 3 LLC and MR Ballpark 4 LLC (collectively, "Purchaser") for the purchase and sale agreement of WMATA property as specified herein.

**Background and Purpose:**

WMATA, an interstate compact agency owns Lots 857 and 866 in Square 700 in the southeast quadrant of the District of Columbia (collectively, the "Property"), comprising a total of 97,165 square feet of gross land area   The Property, in part, adjoins property owned by Purchaser and is one block north of the new ballpark ("Ballpark") currently under construction.  The Property is located in the Ballpark District.  WMATA is prepared to convey title to the Property for the consideration as herein stated.

The parties acknowledge that WMATA is working to address the transfer of its bus operations from the Property.  Purchaser agrees to cooperate to assist WMATA in connection with the relocation of the existing bus garage (the "Bus Garage") and WMATA's operations from the Property which WMATA has stated is a precondition to its willingness to convey the Property; provided, however, that Purchaser shall not be responsible for identifying the new site or for any associated costs incurred by WMATA.

On December 20, 2006, WMATA and MR Ballpark 5 LLC, an affiliate of Purchaser and Monument Realty LLC ("Monument Realty"), successfully closed on the purchase by MR Ballpark 5 LLC of Lots 107 through 118 inclusive, and 162 in Square 701 (the "Square 701 WMATA Parcels").  As a condition, in part, to MR Ballpark 5 LLC's purchase of the Square 701 WMATA Parcels, WMATA and MR Ballpark 5 LLC entered into an agreement whereby MR Ballpark 5 LLC is currently coordinating the design and construction of the Station Improvements to the existing Navy Yard Metro Station located thereon as part of MR Ballpark 5 LLC's redevelopment of Square 701 (the "Square 701 Project").  With construction of the Station Improvements and the Square 701 Project already underway, both WMATA and Monument Realty have enjoyed the benefits of this public-private partnership and Monument Realty hopes to expand this beneficial relationship to WMATA's holdings in Square 700.

Note that Purchaser also owns several parcels adjacent to the Property in Square 700 which will add value to the combination of these parcels in Square 700 as the Property is developed and allow both Square 700 and the entire Half Street development – Purchaser's development in Square 700 to the west and Purchaser's affiliates' development in Square 701 to the east – to be developed in an unified manner with a well-coordinated design intended to benefit the entire community.  Purchaser would like to begin the process of acquiring the Property now to better coordinate the design and

W001150



construction of Purchaser's and Purchaser's affiliates' developments within the Ballpark District, in particular those to be located in Square 700 and 701.

**Subject Property:**

The Property is comprised of Lots 857 and 866 in Square 700 in the District of Columbia totaling 97,165 square feet of land area or 680,155 square feet of developable floor area at 7.0 FAR, the maximum permissible for this zone.

**Consideration:**

Purchaser shall pay to WMATA the amount of $54,412,400 for the fee simple acquisition of the Property, which purchase price is equal to $80 per square foot of developable floor area based on a developable floor area of 680,155 square feet, subject to the following terms and conditions:

1) WMATA shall permit Purchaser access to the Property for customary due diligence activities prior to the conveyance of title. WMATA agrees that the exercise of such rights shall be subject to such conditions as WMATA may reasonably impose, including conditions regarding insurance, indemnities against liabilities caused by Purchaser, its agents and contractors, restrictions on invasive testing activities, and notice requirements.

2) WMATA shall cooperate in connection with pre-development activities for the Property and any other properties that are owned or controlled by Purchaser in Squares 700 and 701 and will be developed in conjunction with the Property (the Property and such other properties collectively, "Development Site"), including the closing of public alleys in Square 700, subdivision of the Property, and completion of zoning and land use entitlement.

3) Purchaser, by submission of this LOI, does not hereby forfeit any rights awarded to Purchaser by the public award received from AWC regarding the subject Property.

4) It shall be a condition precedent to either party's obligation to close on the conveyance of the property that WMATA and Purchaser are in substantial compliance with its obligations pursuant to this LOI.

5) The conveyance agreements shall provide that Purchaser shall comply, to the extent commercially reasonable and applicable, with the LSDBE, First Source hiring, workforce development, affordable housing and sustainable development requirements, in connection with the development and operation of the improvements to be constructed on the Property all as further set forth on <u>Exhibit A</u> hereto.

6) The Bus Garage has been referenced by Historic Preservation Review Board staff as being historically significant. In the event the full 7.0 FAR is not available to be placed on the Property, the purchase price shall be reduced by an

W001151

amount equal to $80 per square foot for every development square foot falling short of the full 7.0 FAR.

7) Since MR Ballpark 5 LLC will own the office building over the Navy Yard Metro Station in Square 701, and Purchaser will own the current WMATA Property in Square 700, in the event WMATA requires any additional facilities/improvements to support and/or maintain the Navy Yard Metro Station, Purchaser and MR Ballpark 5 LLC are willing to negotiate with WMATA in good faith to potentially place any of these facilities/improvements within the Square 701 Project or within the project to be developed within Square 700, including, if necessary, any connections (utility or other) from Square 700 to Square 701.

### Due Diligence / Inspection Period:

Commencing with the execution of the P&S Agreement (hereinafter defined) and continuing for a period of forty-five (45) days from the execution of the P&S Agreement (the "Inspection Period"), Purchaser shall conduct its due diligence review and inspection of the Property, related documents and other matters related to the purchase. Upon reasonable notice, WMATA will provide access to the Property for all physical inspections or appraisals required by Purchaser. Purchaser agrees to indemnify and hold harmless WMATA from any loss, liability, cost and expense, including reasonable attorneys' fees, by reason of such inspections. At any time prior to the date that is forty-five (45) days from the execution of the P&S Agreement, Purchaser shall be entitled to terminate the P&S Agreement for any reason; in which case, any deposit and any accrued interest thereunder shall be returned to Purchaser.

### Closing Date:

Provided all conditions to closing are satisfied, the closing under the P&S Agreement shall be the date (the "Closing Date") which is thirty (30) days from the date of expiration of the Inspection Period, or such other date as may be agreed between the parties.

### Additional Terms:

Purchaser understands the need for WMATA to continue its use of the Bus Garage facility, in whole or in part, for a period of time pending relocation of its operations therein. Purchaser also understands WMATA's desire to relocate the Bus Garage Facility as quickly as possible to avoid the traffic congestion which will occur once the new Ballpark opens in April 2008.

Accordingly, at WMATA's request, Purchaser would agree to a sale-leaseback structure which would allow WMATA to (a) lease the existing Bus Garage facility from Purchaser until the actual relocation takes place, and (b) use the proceeds from the sale of the Property towards the costs of constructing of a new bus operations facility and/or relocating the existing Bus Garage operations to an alternative site.

Note that, since the District currently plans to (a) use Van Street in Square 700 as an ingress/egress access route for all Ballpark patrons parking in the western parking

W001152



structure located on the northwest corner of the Ballpark footprint, and (b) close Half Street between Square 700 and 701 on game days, WMATA's ability to navigate buses in this immediate neighborhood during such times will be unworkable.

As such, in the event WMATA is unable to relocate the existing Bus Garage facility by Opening Day 2008, Purchaser is willing to cooperate with WMATA in good faith to assist WMATA in alleviating any difficulties and inconveniences faced by WMATA in connection with the foregoing plans. Until WMATA relocates the existing Bus Garage facility, Purchaser is in the best position to assist WMATA since it already owns most of the properties adjacent to WMATA's property in Square 700 – specifically, Lots 857 and 866. Both Purchaser and WMATA have aligned agendas and a common sense of urgency with respect to relocating the Bus Facility by Opening Day 2008.

**Other Obligations:**

Purchaser shall support the creation of a business improvement district that includes the Property and shall pay Purchaser's fair share of any amounts due and payable to such a business improvement district.

The parties agree that this LOI shall have no further force or effect if WMATA and Purchaser have not executed and approved a written purchase and sale agreement (the "P&S Agreement") for the conveyance of the Property on or before July 1, 2007. Notwithstanding the foregoing, the parties, each acting in their sole discretion, may jointly agree to extend the term of this LOI for one or more extension periods by written amendment to this LOI.

**Miscellaneous:**

A failure by either party to comply with the terms of this LOI, shall entitle either party, by written notice to the other party, to terminate this LOI.

Purchaser may take title to the Property through an affiliated entity that is controlled by Purchaser or its principals, provided that such affiliate shall assume all obligations of Purchaser under this LOI. Purchaser shall have the right to assign its rights under this LOI, subject to the approval of WMATA, and such approval shall not be unreasonably withheld, provided that such assignment shall not adversely impact the timeliness of the performance of Purchaser's obligations hereunder.

The parties agree to take reasonable steps to maintain the confidentiality of the terms of this LOI and all negotiations and discussions regarding the Property, except (i) to the extent disclosure to lenders, prospective lenders, agents, attorneys, accountants, engineers and public officials is reasonably necessary or (ii) as required by applicable law.

Notwithstanding the foregoing, the terms and conditions of this LOI are subject to cancellation or withdrawal at any time by either party and the fee conveyance, or any other obligation as set forth herein, shall not become binding until a Purchase and Sale Agreement is fully executed by both parties.

W001153

**WMATA:**

**Washington Metropolitan Area Transit Authority:**

By: _____

    Name:

    Title:

    Date:

**PURCHASER:**

**MR Ballpark 2 LLC,**

a Delaware limited liability company

By:    MR Ballpark 2 Holdings LLC,

        a Delaware limited liability company, its sole

        member

        By:    MR Ballpark 2 Capital LLC, a Delaware

            limited liability company, its managing

            member

            By: _____

            Name: F. Russell Hines

            Title: Authorized Signatory

            Date: 4/6/07

**MR Ballpark 3 LLC,**

a Delaware limited liability company

By:    MR Ballpark 3 Holdings LLC,

        a Delaware limited liability company, its sole

        member

        By:    MR Ballpark 3 Capital LLC, a Delaware

            limited liability company, its managing

            member

            By: _____

            Name: F. Russell Hines

W001154

Title: Authorized Signatory
Date: 4/6/07

**MR Ballpark 4 LLC,**
a Delaware limited liability company

By:    MR Ballpark 4 Holdings LLC,
a Delaware limited liability company, its sole
member

        By:    MR Ballpark 4 Capital LLC, a Delaware
limited liability company, its managing
member

            By:
            Name: F. Russell Hines
            Title: Authorized Signatory
            Date: 4/6/07

W001155