## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MONUMENT REALTY LLC, et al.,    )
             )
       Plaintiffs,    )
             )
    v.    )    Civil Action No. 1:07-cv-01821 (EGS)
             )    Judge Emmet G. Sullivan
WASHINGTON METROPOLITAN    )
AREA TRANSIT AUTHORITY,    )
             )
       Defendant.    )
             )

## PLAINTIFFS' REPLY TO THE JOHN AKRIDGE COMPANY'S OPPOSITION TO MOTION TO COMPEL COMPLIANCE WITH SUBPOENA DUCES TECUM

This lawsuit involves a number of challenges to the ongoing efforts of WMATA to convey the Southeast Bus Garage Property, including WMATA's efforts to convey the Property to Akridge for an apparent Bid Amount of $69,250,000. In that context, Monument is seeking documents and information from Akridge that includes the subject of this motion: "All documents concerning your financial closing commitment(s) or other financing you have arranged or are in the process of arranging to acquire the Property." That information is relevant and discoverable, and its production is not intended to and would not impose any undue burden upon Akridge. For these reasons, production of the information should be required.

Akridge contests having to produce this information for four basic reasons. First, Akridge contends that it has already produced responsive information in the form of its documentation concerning "the $300,000 check provided to WMATA at the time of the submission of Akridge's bid" and "the required $3,000,000 non-refundable deposit." (Opp. 2.) Second, Akridge suggests that the information is not relevant because WMATA did not possess

it when it deemed Akridge the successful bidder for the Property. (*See id.* 3-5.) Third, Akridge

argues that the information is not relevant to the issues that will be posed either by WMATA's

motion to dismiss or to Monument's request for preliminary injunctive relief. (*See id.* 5-6.)

Fourth, Akridge claims that the motion to compel is untimely and would create an undue burden

for Akridge. (*See id.* 6-7.) These arguments do not contest Monument's entitlement to the

information sought, particularly in light of the provisions of Fed. R. Civ. P. 26(b)(1), which

broadly permit discovery of "any matter, not privileged, that is relevant to the claim or defense of

any party."

Of course, in referencing responsive information that has already been produced, Akridge

concedes the relevance of the materials sought on this motion. At the same time, Akridge's

reference to separate payments of $300,000 and $3,000,000 to WMATA do not indicate that

Akridge is ready, willing, or able to consummate an acquisition involving a payment of

$69,250,000.

Akridge's reference to the "administrative record compiled by WMATA" (Opp. 3) is also

misplaced, at least in the context of this case. This lawsuit involves far more than a standard

"bid protest" in which the entity conducting the bid (WMATA or a government agency) has

reviewed the matter based on a clearly defined "administrative record." Here, the lawsuit

involves claims that go far beyond the procurement process that WMATA decided to follow with

respect to the Property. There are contract and tort claims that are independent of Monument's

challenges to the bidding process. (*E.g.,* First Amended Complaint, Counts I-III, IV-VII.)

Moreover, there does not appear to be a defined "administrative record" of the underlying events,

which involve several years of dealings, two separate invitations for bids issued by WMATA, a

joint development solicitation, and other matters. (*See id.* ¶¶ 9-104.)

WMATA has produced to Monument 208 pages of documents that it says comprise "what WMATA believes would be the 'administrative record.'" (Letter dated October 18, 2007 from Harvey A. Levin, Esq. to Louis E. Dolan, Esq. and Vernon W. Johnson, III, Esq., a copy of which is attached hereto and made a part hereof as Exhibit "A.") It is abundantly clear, however, that the information given to and reviewed by WMATA, and which forms the basis for WMATA's actions in this case, goes beyond those 208 pages. For example, there was correspondence between Akridge and WMATA, both before and after WMATA's decision to deem Akridge the successful bidder, about the Property and the disposition. (*See, e.g.,* Letter dated September 20, 2007 from Thomas W. Wilbur, Senior Vice President of Akridge, to Nat Bottigheimer of WMATA, a copy of which is attached hereto and made a part hereof as Exhibit "B.") That letter was not contained within the documents comprising "what WMATA believes would be the 'administrative record.'" Mr. Bottigheimer was actively involved in the disposition on behalf of WMATA. (*See* First Amended Complaint ¶¶ 103-104.) This letter, and other communications and information, were clearly part of what WMATA considered in making the decisions that Monument is contesting in this case. Exhibit "B" hereto, for instance, shows that Akridge was at least actively pursuing an effort to provide WMATA with benefits going beyond what the invitation for bids asked for (and thereby demonstrating that Akridge's bid submissions were not responsive, as a matter of law).

Monument is maintaining an overall challenge as to all of the actions taken by WMATA and the basis – or lack thereof – for such action. Akridge's ability, on its end, to complete the transaction WMATA has deigned to pursue is also relevant to WMATA's consideration of its stated sole bid criterion: "[T]he best net return to WMATA after leaseback monthly rent." (*See id.* ¶ 66.) Under these circumstances, there is no basis for limiting the Court's consideration to

slightly over 200 pages of documents that WMATA might "believe[] would be the 'administrative record.'"

In addition, the claims Monument advances in this case that go beyond a standard "bid protest" also make additional information both relevant and discoverable. The authorities relied upon by Akridge did not involve a case with similar claims and facts. *See China Trade Ctr., L.L.C. v. Washington Metropolitan Area Transit Authority,* 34 F. Supp. 2d 67 (D.D.C. 1999).

Furthermore, Akridge overstates the holding of *China Trade* by interpreting it to stand for the proposition that "a court's review of a challenge to WMATA decision making is limited to the administrative record compiled by WMATA." (Opp. 3.) In *China Trade*, this Court cited *Aero Corp. v. United States*, 38 Fed. Cl. 408, 411 (Fed. Cl. 1997) for the proposition that in reviewing a procurement decision "a court's review *ordinarily* is limited to the administrative record already in existence." 34 F. Supp. 2d at 70 (emphasis added) (citation omitted). In *Aero Corp.*, the Court of Federal Claims, however, expressly recognized that "the 'administrative record' [procurement decisions] is something of a fiction." 38 Fed. Cl. at 411. This is certainly the case here, given WMATA's uncertainty about what constitutes the "administrative record" and the clear evidence that WMATA considered information going beyond "what WMATA believes would be the 'administrative record.'"

Moreover, the Court of Federal Claims in *Aero Corp., supra,* cited *Esch v. Yeutter,* 876 F.2d 976, 991 (D.C. Cir. 1989) for the following proposition:

> [T]he court may consider [] evidence [outside the administrative record]:
> (1) when the agency's action is not adequately explained in the record before the
> court; (2) when the agency failed to consider factors which are relevant to its final
> decision; (3) when an agency considered evidence which it failed to include in the
> record; (4) when a case is so complex that a court needs more evidence to enable
> it to understand the issues clearly; (5) in cases where evidence arising after the
> agency action shows whether the decision was correct or not; (6) in cases where
> agencies are sued for a failure to take action; (7) in cases arising under the

National Environmental Policy Act; and (8) in cases where relief is at issue, especially at the preliminary injunction stage.

*Aero Corp.*, 38 Fed. Cl. at 411; *see also Humane Soc. of the United States v. DOC*, 432 F. Supp. 2d 4, 14 (D.D.C. 2006) (citing *Esch v. Yeutter* approvingly). Further, it is more appropriate to resort to extra-record information where the procedural validity of WMATA's action is in serious question. *See Esch*, 876 F.2d at 991 (noting that particularly where "the procedural validity of the [agency's] action [] remains in serious question" such "extra-record information to enable judicial review to become effective" is more appropriate). This case plainly involves challenges to WMATA's actions which are both procedural and substantive.

Monument has challenged the procedural validity of WMATA's decision (First Amended Complaint ¶¶ 169-78, 179-99, 200-07, 208-15, 216-23.) Monument has alleged that WMATA failed to consider factors relevant to its final decision. (*See id.* ¶¶ 169-78, 179-99, 200-07, 208-15, 216-23.) Plaintiffs have also alleged that WMATA took into consideration evidence which it failed to include in the record. (*See id.* ¶¶ 200-07, 208-15, 216-23.)

In addition, in *China Trade* this Court made it clear that even if the reviewing court is bound to the administrative record, discovery is not limited to the confines of the administrative record. *China Trade*, 34 F. Supp. 2d at 72. There, the disappointed bidder alleged the procurement process was tainted by WMATA's bias and impermissible favoritism. *Id.* at 71. One of Plaintiff's allegations in support of the claim was that WMATA leaked information regarding Plaintiff's confidential proposal to the awardee and the Mayor of the District of Columbia. *Id.* at 72. WMATA conducted an investigation into the matter but concluded that no inappropriate conduct had occurred. *Id.* Plaintiff went on to argue that the investigation by WMATA was inadequate despite record evidence that WMATA had conducted "a full investigation and made an independent determination that no leak occurred." *Id.* Although this

Court rejected the Plaintiff's argument on this point, this Court also noted that "plaintiff was given the opportunity to pursue this matter in this discovery phase [but] chose not to do so." *Id.* In other words, the plaintiff was clearly afforded an opportunity at the discovery stage of the proceedings to access relevant, discoverable information not confined to the administrative record.

Akridge's reliance on *Commercial Drapery Contrs. v. United States*, is also misplaced because that case involved judicial review of claims under the Administrative Procedures Act, which by statute generally limits judicial review to the administrative record. 133 F.3d 1, 7 (D.C. Cir. 1998). *Drapery* did not involve a challenge to an agency's procurement procedures, but rather a decision flowing from an agency proceeding to suspend contracting with the plaintiffs until the completion of criminal proceedings, and to terminate an ongoing contract with the plaintiffs under a contractual provision allowing cancellation "for any reason." *Drapery*, 133 F.3d at 3. Because Drapery did not involve a challenge to the agency's procurement procedures, the administrative record was less of a "fiction" than in the standard procurement case. *See Aero Corp.*, 38 Fed. Cl. at 411 (noting that "the 'administrative record' in [procurement decisions] is something of a fiction.") In contrast to *Drapery*, this case partly involves challenges to WMATA's procurement decision and procedures, and does not fall under the Administrative Procedures Act but involves judicial review of the decisions of a tri-jurisdictional Compact entity.

Akridge also suggests that Monument has not challenged an objection to producing documents that were created after the commencement of this action on October 10, 2007. (Opp. 5.) That is incorrect. In filing this motion Monument is seeking the information encompassed

by Request Number 9 of subpoena duces tecum whether that information was generated before or after suit was filed.

Akridge also attempts to avoid production of the materials sought on this motion by suggesting that the information sought is not relevant to WMATA's motion to dismiss or to Monument's request for preliminary injunctive relief. (Opp. 5-6.) WMATA's motion to dismiss has been fully briefed and information outside of the First Amended Complaint would not normally be considered on such a motion. For Monument's motion for preliminary injunction, however, this information is clearly relevant.

First, whether Akridge is ready, willing, and able to complete the conveyance is relevant to Monument's claims that WMATA acted in an arbitrary manner in awarding the contract to Akridge (First Amended Complaint ¶¶ 200-07, 208-15, 216-23.) and WMATA's defense of its actions. *See* Fed. R. Civ. P. 26(b)(1) (discovery may be had of information "relevant to the claim or defense of any party"). If Akridge is incapable of closing on the acquisition, then WMATA would be incapable of completing the contested conveyance. In this light, WMATA's defense of its decision to award the contract to Akridge would be unsupportable.

Second, Akridge's ability to close on the Property is directly relevant to Monument's motion for preliminary injunction. The likelihood of irreparable harm is one of the four well-known factor Courts assess in considering requests for injunctive relief. *See Mova Pharmaceutical Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998). If Akridge is incapable of closing on the acquisition, then this would suggest that Monument's need for a preliminary injunction (at least for the immediate future) might be lessened.

Third, Monument has also challenged whether Akridge is a responsible, responsive bidder. (First Amended Complaint ¶¶ 200-07, 208-15, 216-23.) Akridge's ability to close on the

acquisition of the Property would also be relevant under the Federal Acquisition Regulations ("FAR"). The FAR require an affirmative finding of responsibility prior to awarding the contract to the lowest bidder. FAR 14.408-2. To be determined responsible, Akridge must have the ability and capacity to perform the contract. More specifically, the FAR requires a prospective contractor to have adequate financial resources to perform the contract. FAR 9.104-1. To the extent that Akridge is unable to fund the acquisition, this would support, among other things, Monument's allegation that WMATA acted arbitrarily in awarding the contract to Akridge by failing to properly assess responsibility. (First Amended Complaint ¶¶ 200-07, 208-15, 216-23.) Thus, such information is highly relevant to Monument's claims.

Fourth, although Akridge is correct that Plaintiffs argued initially that documents regarding MR Ballpark's finances, financial position and funding sources would be "outside the scope of issues to be presented on the preliminary injunction motion" (Opp. 5), Plaintiffs never argued that documents regarding MR Ballpark's ability to consummate settlement are totally irrelevant in this case. At the status conference on October 17, 2007, this Court also indicated that such information is "probably highly relevant." (See Trans. of October 17, 2007 Status Hearing, a copy of which is attached hereto and made a part hereof as Exhibit "C" at 27-28.)

Finally, Akridge's argument that the timing of this motion undermines its validity is incorrect. This case has been proceeding apace since it was filed in October. Plaintiffs have moved as expeditiously as possible under the circumstances, and have tried to work out issues with other parties and to focus requests for Court intervention so that they are narrow and discrete. In this instance, Monument seeks "All documents concerning your financial closing commitment(s) or other financing you have arranged or are in the process of arranging to acquire the Property." Monument has no desire to place an undue burden upon Akridge. If Akridge is

ready, willing, and able to finance the acquisition, then it would presumably have a financial

closing commitment or similar documentation.  Production of that documentation would be

sufficient to comply with Request No. 9, and Monument would even agree to an enhanced

"counsel only" protective order or other reasonable assurances to further address any

confidentiality concerns, over and above the Protective Order which is already in place.

Dated:  November 29, 2007                          Respectfully submitted,

                                                   NIXON PEABODY, LLP

                                                   */s/ Vernon W. Johnson, III*
                                                   _____

                                                   Louis E. Dolan, Jr. (#442881)
                                                   Vernon W. Johnson, III (#423756)
                                                   401 9th Street, N.W.
                                                   Washington, D.C. 20001
                                                   202.585.8000
                                                   202.585.8080 (fax)
                                                   ldolan@nixonpeabody.com
                                                   vjohnson@nixonpeabody.com

                                                   Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of November, 2007, a true and correct copy of the foregoing Plaintiffs' Reply to The John Akridge Company's Opposition to Motion to Compel Compliance With Subpoena Duces Tecum, with appended Exhibits "A" through "C," was served by ECF upon:

> Harvey A. Levin, Esquire
> Thompson Coburn LLP
> 1909 K Street, Suite 600
> Washington, D.C. 20006-1167
>
> Counsel for Defendant

I further certify that a true and correct copy of the foregoing pleadings and papers were served via hand delivery upon:

> Barbara S. Wahl, Esquire
> Joshua Fowkes, Esquire
> Arent Fox LLP
> 1050 Connecticut Avenue, NW
> Washington, DC  20036-5339
>
> Counsel for The John Akridge Company

*/s/ Vernon W. Johnson, III*

_____
Vernon W. Johnson, III

# Exhibit "A"

# THOMPSON COBURN

Thompson Coburn LLP
*Attorneys at Law*

Suite 600
1909 K Street, N.W.
Washington, D.C. 20006-1167
202-585-6900
FAX 202-585-6969
www.thompsoncoburn.com

Harvey A. Levin
202-585-6942
FAX 202-508-1013
hlevin@
thompsoncoburn.com

October 18, 2007

**VIA MESSENGER DELIVERY**

Louis E. Dolan, Jr., Esquire
Vernon W. Johnson, III, Esquire
Nixon Peabody, LLP
401 Ninth Street, N.W.
Washington, DC 20001

Re:    *Monument Realty LLC, et al. v. WMATA*

Dear Le and Vernon:

Enclosed please find the first installment of WMATA's document production, documents numbered W00001 through W00208.    These documents comprise what WMATA believes would be the "administrative record," including MR Ballpark 7 LLC's protests and WMATA's responses to the protests.

WMATA is continuing its document search, of course, and I will be producing responsive documents upon my receipt and review of them.

Please do not hesitate to call if you have any questions or concerns.

Very truly yours,

Thompson Coburn LLP

By    Harvey A. Levin

4607559

# Exhibit "B"



**Akridge**
REAL ESTATE SERVICES

September 20, 2007

Mr. Nat Bottigheimer
Assistant General Manager
Planning & Joint Development
WMATA – Room 5A-16
600 Fifth Street, NW
Washington, DC 20001

Dear Nat:

As mentioned in our bid and recent correspondence, we want to provide further clarification of the potential benefit to WMATA for pursuing the Akridge affiliated site in SW (SW Site) as a possible interim relocation site for the Southeast Bus Garage. We have made some cost and revenue assumptions for purposes of demonstrating the potential savings, however, the actual savings would obviously vary based on the actual amounts involved.

We have done preliminary studies which show that 80 to 100 buses can be located on the SW Site, including a temporary maintenance facility, for approximately $5M in capital cost. Expected annual rent for this space would be approximately $1M per year. We would need to discuss specific terms for this lease including term and termination rights.

We understand from WMATA documents that the dispersal plan (relocating the buses affected by the sale of the Southeast Bus Garage to six different garages) is currently the most viable option for WMATA. While we do not know the full cost to WMATA of pursuing the dispersal plan, we understand from WMATA documents that the minimum annual impact associated with the dead-heading cost for the dispersal plan is $4.2M or $12.6M over the expected three year relocation period.

Assuming Akridge is the selected bidder for the Southeast Bus Garage site and we are able to reach agreement regarding the terms for WMATA to lease the SW Site, there is the potential of material savings to WMATA. These savings could increase the net benefit to WMATA of Akridge's proposal for the Southeast Bus Garage site. Below is a representative example of the potential savings to WMATA (assuming only the $4.2M annual deadheading cost to WMATA):

| | |
|---|---|
| Cost for dispersal plan over three years: | $12.6M |
| Cost for creation of interim Maintenance facility (est): | ($ 5.0M) |
| Add back residual value of Maintenance Facility (est): | $ 1.0M |
| SW Site- on site improvements | ($ .8M) |
| Annual rent for SW Site – assumes 3 years | $ (2.5M) |
| Potential Net Savings to WMATA: | $ 5.3M |

JAC 000369



In addition to the potential cost savings referenced above, utilization of the SW Site would also mitigate air quality, congestion, road and safety impacts of having buses travel significant distances to be fueled and serviced.

We hope this adds further clarity regarding the potential benefit to WMATA for pursuing the SW Site. Please feel free to contact me if you have any questions.

Sincerely

Thomas W. Wilbur
Senior Vice President


cc:    Matt Klein
       Brian Connolly
       Adam Gooch

JAC 000370

# Exhibit "C"

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MONUMENT REALTY LLC, et al,      .
                                 .
            Plaintiffs,           .
                                 .   Civil Action No. 1:07-cv-01821
      v.                          .
                                 .
WASHINGTON METROPOLITAN          .   Washington, D.C.
AREA TRANSIT AUTHORITY,          .   Wednesday, October 17, 2007
                                 .   At about 2:05 p.m.
            Defendant.            .
                                 .

. . . . . . . . . . . . . .

TRANSCRIPT OF STATUS HEARING
BEFORE THE HONORABLE EMMET G. SULLIVAN
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiffs:       LOUIS E. DOLAN, JR., ESQ.
                          VERNON W. JOHNSON, III, ESQ.
                          Nixon Peabody, LLP
                          401 9th Street, NW
                          Washington, D.C.  20004-2128
                          (202) 585-8000


For the Defendant:        HARVEY A. LEVIN, ESQ.
                          Thompson Coburn, LLP
                          Suite 600
                          1909 K Street, N.W.
                          Washington, D.C.  20006-1167
                          202-585-6900

                          CAROL B. O'KEEFFE, ESQ.
                          Washington Metropolitan Area
                           Transit Authority
                          600 Fifth Street, NW
                          Washington, D.C.  20001
                          (202) 962-1499


Court Reporter:           JACQUELINE M. SULLIVAN, RPR
                          Official Court Reporter
                          U.S. Courthouse, Room 6720
                          333 Constitution Avenue, NW
                          Washington, D.C. 20001
                          202-354-3187


                    Jacqueline Sullivan, RPR
                    Official Court Reporter

2

```
1                     P R O C E E D I N G S
2              COURTROOM DEPUTY:  Civil Action 07-1821, Monument
3     Realty, et al, versus Washington Metropolitan Area Transit
4     Authority.
5              Will counsel please identify yourselves for the
6     record?
7              MR. JOHNSON:  Vernon Johnson from Nixon Peabody for
8     the plaintiffs.
9              MR. DOLAN:  Lewis Dolan with Nixon Peabody for the
10    plaintiffs.
11             MR. LEVIN:  Good afternoon, your Honor.  Harvey Levin,
12    and with me is co-counsel, Donald Laffert for WMATA, and I would
13    like to -- I'm sorry, I stole your thunder.  And I would like to
14    introduce your Honor to Carol O'Keeffe, who is the general
15    counsel of WMATA.
16             THE COURT:  All right.  Good afternoon.  No chance for
17    settlement of this case, is there?
18             MR. JOHNSON:  I would say it doesn't appear so, your
19    Honor.
20             THE COURT:  Let me invite principle counsel to the
21    microphone there.  I want you to focus your attention really on
22    65(a)(2) in a consolidation of the request for injunctive relief
23    for the merits determination.  It seems as though you're still
24    focused on a preliminary injunction, but let me hear from the
25    parties.  My preference would be, and I recognize I can do it
```

Jacqueline Sullivan, RPR
Official Court Reporter

1    without consent of counsel, my preference would be to just issue

2    one ruling in this case.  Is there some reason why I need to

3    discuss on the preliminary injunction stage and then a merits

4    determination after?

5            MR. JOHNSON:  Your Honor, I think that it's obviously

6    a complicated case with a long fact pattern, and there are a lot

7    of different types of relief, not only injunctive relief, but

8    damages, and depending on whether and to what extent the

9    plaintiffs get the injunctive relief that they're speaking,

10   there may or may not also be a damages claims in addition to

11   that, and so at least on our side of the table we didn't feel

12   that there really was a manageable way in the time that we have

13   to consolidate a resolution on the merits of all the disputes in

14   this case with the preliminary injunction motion.

15           THE COURT:  Well, I'll tell you there is a down side

16   to that.  If I'm inclined to go the separate route, preliminary

17   injunction first and forego a merits determination, recognizing

18   that a losing party can appeal, what I'll probably do is just

19   stay this matter regardless of what I do at the preliminary

20   injunction stage, which could be for a long period of time, but

21   it makes no sense at all in my view to have parallel proceedings

22   in the Circuit along with proceedings in the District Court, and

23   that's what happens when judges go the route of TRO, preliminary

24   injunction, I think I did that once 13 years ago and I said I

25   never would do that again because it's just too much time, it's

                        Jacqueline Sullivan, RPR
                        Official Court Reporter

1    too time consuming, it involves parallel proceedings in more

2    than one court, and quite frankly, more often than not the ends

3    of justice aren't served by doing it that way, but let me hear

4    from the defense counsel.

5            MR. LEVIN:  Thank you, your Honor.

6            There is one additional factor I think that comes into

7    play, which is we have filed a motion to dismiss.

8            THE COURT:  I read it, I've seen it.

9            MR. LEVIN:  And we are requesting that the Court give

10   that expedited consideration, agreed on an expedited briefing.

11   We believe the course, and it goes without saying, but we think

12   that it's a meritorious motion, and that by -- in addition to

13   what Mr. Johnson had to say, that there may not be any need

14   frankly for completing the case or for doing the complete kind

15   of discovery preparation it would take, and the other factor is

16   it really is going to be difficult to prepare this as a full

17   case for trial in the limited amount of time.  WMATA is under a

18   time constraint, both because of the process in which they've

19   got to consider the bid, but more importantly, WMATA has to move

20   this bus yard.  It's there and it has to be moved so that the

21   stadium can proceed, because we can't have busses driving in and

22   out with pedestrians trying to get to baseball games, and the

23   bus yard will get closed down to keep that from happening and

24   WMATA needs to sell this property to get the money to buy the

25   site to replace the bus yard and so the time frame is very

                    Jacqueline Sullivan, RPR
                    Official Court Reporter

1    critical and that's why we're ask for expedited consideration

2    from your Honor on the motion to dismiss, and I think that the

3    preliminary injunction will focus on the core issues of whether

4    or not there was an agreement, whether there is an enforceable

5    agreement, whether the parties have -- the plaintiffs have

6    standing and whether they're entitled to relief on this

7    alternate bid and may effectively resolve the merits without our

8    having to postpone it, so I think those are the considerations.

9             THE COURT:  Counsel?

10            MR. JOHNSON:  I think that's right, although I do

11   think that it's not likely that the PI process would resolve all

12   the issues that we have in the case because there are other

13   claims that we have, including tort claims, and assuming that

14   they survive the sovereign immunity challenge, which we believe

15   they will, those will be claims that will be adjudicated after

16   that, wouldn't really be part of the PI determination.

17            THE COURT:  It sound as if both sides have agreed on

18   at least a briefing schedule for this motion to dismiss.  I

19   don't really have any problems with that, I don't think.  The

20   motion was filed, I've taken a look at it.  And you plan to file

21   your response on the 24th; is that correct?

22            MR. JOHNSON:  That is correct.

23            THE COURT:  WMATA's reply by the 5th.  I don't know

24   whether a hearing will be necessary or not, so I'm encouraging

25   everyone, don't save your best argument for oral argument, there

                    Jacqueline Sullivan, RPR
                    Official Court Reporter

1     may not be one, but I will tentatively schedule a hearing, if I

2     have questions I'll proceed with the hearing, but if I don't

3     have any questions there's no need for the hearing if I'm going

4     to read your pleadings.  I'll schedule -- well, before I get to

5     that, whether or not there's a need for a hearing or not, what's

6     the parties' current position with respect to this whole issue

7     of approval by WMATA?  As I understand it, that's scheduled,

8     WMATA may approve this contract that it entered into with a

9     third party on the 29th or so, it could be approved.

10          MR. LEVIN:  That's correct, your Honor.

11          THE COURT:  What's your concern about that?  Is your

12    concern that your position somehow or another is not as strong

13    if WMATA proceeds with this next step and approves this Court

14    that it has already entered into with the third party?

15          MR. JOHNSON:  That's part of it.  It's a little bit --

16    there's a little bit more.

17          THE COURT:  If you have a winner, it's a winner now or

18    then, isn't it?

19          MR. JOHNSON:  I understand, but I think there is a

20    little more to it than that, because where we are right now, as

21    I understand it, the board of directors of WMATA has approved

22    the award to Acerage, the other bidder, but there's no contract

23    between Acerage and WMATA, at least not yet, and I think WMATA's

24    intent is to proceed to a contract and take a deposit of $3

25    million from Acerage and then there will be conditions precedent

1    in that contract, and specifically two items that require WMATA

2    board approval at the meeting that is tentatively right now

3    scheduled for November 29.  Our concern is that both if WMATA

4    signs a contract with Acerage and if the board grants this

5    approval and fulfills the conditions preceding in the contract,

6    that that is a significant change in the status quo insofar as

7    there's another party with a claimed interest in this property

8    that we're fighting over, and that is our concern, that we --

9           THE COURT:  Doesn't that party have that interest in

10    that property now, though, which brings me probably to one of

11    the next set of questions, whether or not that entity, Acerage,

12    is necessary or indispensable to resolution of this litigation,

13    and if so, who should bring it?

14           MR. JOHNSON:  Well, I think the answer is Acerage does

15    not have an interest right now because there is no contract.  It

16    would take the ratification of a contract and possibly

17    fulfillment of the conditions precedent, but I'm not sure about

18    that, but I think there would have to be a ratified contract in

19    order for one to argue that equitable title had passed and that

20    the parties holds an interest.  Right now that hasn't been the

21    case so they don't have an interest and this dispute can be

22    adjudicated fully without Acerage being in the case, and Acerage

23    knows about the case and hasn't attempted to intervene, so from

24    that I take it that there isn't a basis for Acerage to become

25    involved at this point.

Jacqueline Sullivan, RPR
Official Court Reporter

```
 1              THE COURT:  Right, but you just told me, if I

 2    understood you correctly, was that WMATA through some board

 3    approval has already put its imprimatur on an award to a

 4    contract of a third party.

 5              MR. JOHNSON:  I think that's correct, but that doesn't

 6    go as far as to give the contract right in the property.  That

 7    has to go to the next step.

 8              THE COURT:  And WMATA won't forebear from entering

 9    into that contract?

10              MR. JOHNSON:  We discussed that the other day, and my

11    understanding is WMATA is not giving us any assurances that that

12    will not happen at any time prior to November 29, and in fact, I

13    think it's likely that they would intend to do that before

14    November 29, which is one of the issues that we need to deal

15    with.  I mean, I'm hearing some sighing in the background.

16    Maybe I have that wrong, and if I do, I apologize.

17              THE COURT:  I need to know that.  You know, I think

18    that it's appropriate to know just what the defendant's position

19    is with respect to any forbearance on entering into a contract

20    on that.  I mean, I don't know whether it will impact their

21    interest if you have any interest at all or not, I just don't

22    know, so what's your position?

23              MR. LEVIN:  Very much of an interest, your Honor.  As

24    I said, WMATA needs the money, but one of the conditions of

25    getting the money will be the board's consideration and approval
```

                         Jacqueline Sullivan, RPR
                         Official Court Reporter

1    on November 29 of the contract to acquire the replacement site

2    from the District.  That is a condition within the contract

3    itself that will be offered to Acerage so that even if there is

4    a contract signed it still will have a contingency or a

5    condition precedent, I'm not sure --

6          THE COURT:  So equitable title couldn't pass in any

7    event unless the board approves it then; is that correct or not?

8          MR. LEVIN:  That's my understanding.

9          MS. O'KEEFFE:  Yes, that's correct.

10         MR. LEVIN:  Unless the board approves the acquisition

11   contract for the new site, the contract for the sale of the old

12   site will not go through.

13         THE COURT:  So we either have a lawsuit now or not

14   that.  If the contract doesn't go through then that has an

15   impact on this litigation, doesn't it?

16         MR. LEVIN:  If the contract doesn't go through?

17         THE COURT:  On the 29th, right.

18         MR. LEVIN:  On the 29th, then that would impact, yes.

19         THE COURT:  Do you agree with that?

20         MR. JOHNSON:  I think I do agree with that.

21         THE COURT:  Yes, I think you do, so what's the urgency

22   then?  I'm just trying to be realistic here.  No one ever has

23   enough time to deal with most matters we have to face on a daily

24   basis.  If there's some urgency then I'm going to focus on that

25   urgency, but it doesn't sound like there will be unless these

                    Jacqueline Sullivan, RPR
                    Official Court Reporter

1    contingencies are dealt with satisfactory to WMATA's judgment,

2    and we won't learn that until the 29th or so.  That's what it

3    sounds like.  I don't know.  I have to assume that no contract

4    has been, I don't want to use the word "executed."  Have you

5    entered into this conditional contract with the third party?

6         MR. LEVIN:  No, not yet.  Under the bid procedures

7    there's a 45-day due diligence period.

8         THE COURT:  When does that 45 days expire?

9         MR. LEVIN:  It's ongoing now, and I think that it's

10   timed at or around, but certainly before November 29, I believe.

11   Frankly, your Honor, one of the arguments that we would make

12   coming in here on November 21st your Honor has just hit on.  Is

13   where's the imminence and irreparability of harm as of November

14   21?

15        THE COURT:  Which get back to the original question

16   that I had last week:  Why don't I just focus on one decision,

17   but you're telling me that is not practical.  Whatever decision

18   the course reaches on the merit couldn't be reached on the paper

19   so to speak as distinguished from the trial of merits, is that

20   what you're telling me that this is, not one of those cases that

21   can be resolved as a matter of law and cross motions for summary

22   judgment then?

23        MR. LEVIN:  We believe it's a summary judgment case.

24        MR. JOHNSON:  And we believe it would require a trial.

25        THE COURT:  Well, I don't want to misjudge this thing,

Jacqueline Sullivan, RPR
Official Court Reporter

1    but it doesn't sound like that's imminent, that threat of

2    irreparable harm right this second as we talk, and even if worse

3    case scenario for plaintiffs there's this contract subject to

4    all these conditions.  It doesn't sound as though to me based on

5    my very limited knowledge about this case, it doesn't sound like

6    it's going to be imminent by any stretch of the imagination at

7    least until the 29th, but if I'm wrong you need to persuade me

8    that I'm wrong and I need to do something prior to the 29th;

9    otherwise, I'm going to focus on this briefing schedule almost

10   consistently with the manner in which it's been produced and

11   issue a ruling just as soon as the Court can.

12            MR. JOHNSON:  Well, the imminence in our view is that

13   if there is a contract that's signed that that contract confers

14   rights on another party the status quo has changed and all it

15   takes is the affirmative --

16            THE COURT:  Prior to the 29th?

17            MR. JOHNSON:  Right.

18            THE COURT:  Those are conditions preceding, though.

19   Does equitable title really pass pursuant to a contract that is

20   laden with conditions precedence unless and until the conditions

21   are fulfilled?

22            MR. JOHNSON:  It might because each party.  For one

23   thing, the parties have an obligation to work in good faith

24   towards the contract that they've signed, and I could foresee a

25   situation just taking it hypothetically where Acerage comes in

12

1     and says, yes, you had told me that you needed board approval

2     for these things on November 29, you didn't technically get

3     board approval, but there was no reason why you couldn't have

4     and you didn't act in good faith; otherwise you would have board

5     approval and I will ask the Court in equity to give me what I

6     should essentially have, and I think we've put ourselves in the

7     worst position by waiting because there's now another party who

8     claims an interest in the same property that we believe we have

9     an interest in, and that's the imminence in our --

10          THE COURT:  When you say "we" which one of the

11    plaintiffs have has an interest in this property?

12          MR. JOHNSON:  Both plaintiffs.

13          THE COURT:  But was one even in existence at the time

14    the award was made?

15          MR. JOHNSON:  Yes.

16          THE COURT:  Both were?

17          MR. JOHNSON:  Both were, correct.

18          THE COURT:  So one entity did not come into existence

19    until late summer?

20          MR. JOHNSON:  Whenever it was, and I don't have it

21    right in front of me.  It was before the award was made.

22          THE COURT:  It was?

23          MR. JOHNSON:  Yes.

24          MR. DOLAN:  That's correct.

25          THE COURT:  So what are you asking me to do then?

Jacqueline Sullivan, RPR
Official Court Reporter

1          MR. JOHNSON:  Well, I guess what we had talked about

2     and what we had envisioned was a schedule for doing some limited

3     directed discovery, and we do have a couple of issues between us

4     on categories of duties that we were talking about.  We had also

5     proposed a briefing schedule on both the motion to dismiss that

6     WMATA has now filed and the motion for a preliminary injunction,

7     and we have filed previously, and then a schedule to present

8     that for briefing to the Court, hopefully have a hearing and get

9     a ruling before that November 29th date when I think things

10    begin to happen that really make it almost irretrievable for us

11    in terms of the real property interest that we're protecting in

12    this case.  If they're described to someone else then we've been

13    irreparably harmed in a way that monetary damages cannot remedy

14    and that's what we're concerned about.  If WMATA were telling us

15    something isn't going to happen on November 29 or it's going to

16    happen after that, we wouldn't have the same urgency, but I

17    think with what we're being told we have the urgency of knowing

18    that there's another party that they are trying actively to

19    convey this property to and we want to maintain the status quo,

20    which is right now we have an interest in the property that

21    we're trying to protect.

22          THE COURT:  What's the likelihood of this board

23    approval being given prior to the 29th of November?

24          MR. LEVIN:  I'm not aware of any likelihood at this

25    time.  It's set for the 29th.


                    Jacqueline Sullivan, RPR
                    Official Court Reporter

14

1          Your Honor, one of the other terms of the preliminary

2     injunction, the other matter is going to be quite frankly that,

3     and I think your Honor is touching on it somewhat, is the

4     relative nature of the harm in asking Mr. Johnson on the one

5     hand he's described it very attenuated almost hypothetical

6     prospect of how they might be harmed, and it really is very

7     hypothetical.  On the other hand, if this transaction doesn't go

8     through and WMATA does not get the money it needs, they get

9     their preliminary injunction, the bond, the harm to WMATA in not

10    being able to move that bus yard in time for the stadium to be

11    constructed, the harm to the public is huge, and we will be

12    arguing for a bond that covers all of that, not just for the

13    purchase price, but the amount of potential damages from an

14    injunction if that transaction is shut down really is -- I mean,

15    astronomical is overstating it, but metaphorically it's quite

16    large and some of it is immeasurable when you think about what's

17    happening down there with the stadium.  This bus yard has to

18    move, this bus garage has to move.  And WMATA needs the money to

19    get that done.

20          THE COURT:  Why did it wait so long to sell it?  This

21    is bus yard adjacent to that stadium in southeast?

22          MR. LEVIN:  Yes.

23          THE COURT:  Why did you wait so long to sell it?

24          MR. LEVIN:  I believe in part because WMATA needed to

25    find a replacement property before they could go ahead, and I

                    Jacqueline Sullivan, RPR
                    Official Court Reporter

```
1    think that was a large part of the delay.
2            THE COURT:  All right.  It doesn't sound like anything
3    is going to happen before November the 29th.  That's not to say
4    that if you believe that a factual and legal predicate exists
5    for the grant of some legal relief prior to the 29th then you
6    should seek it, you should ask for it, but it doesn't sound as
7    though.  I mean, I'm not sitting here ruling as a matter of law.
8    I'm just telling you it doesn't sound as though that we're
9    dealing with that irreparable harm aspect, at least until
10   November the 29th.  I mean, if WMATA never approves this what
11   impact does that have on this lawsuit?
12           MR. JOHNSON:  Well, I think it has a lot of impact on
13   the lawsuit because I suppose depending on where that leads
14   everybody perhaps WMATA will be back at square one.
15           THE COURT:  Exactly, and I wish you well and say it's
16   good to see you again, but this lawsuit is not going to go
17   forward, is it?
18           MR. JOHNSON:  A good part of it at least would
19   probably not go forward.
20           THE COURT:  All right, because the acts that you're
21   seeking to restrain is nonexistent at that point.  I don't know
22   whether it's going to go forward or not.  I mean, the burden is
23   on this third party to essentially locate the place.
24           MR. LEVIN:  No.  The property is located.  It's a
25   totally separate transaction.
```

Jacqueline Sullivan, RPR
Official Court Reporter

```
 1              THE COURT:  At least to provide the funding for it.

 2         MR. LEVIN:  Yes.

 3              THE COURT:  So without the funding WMATA lacks the

 4    funds to buy it?

 5         MR. LEVIN:  That's my understanding.

 6              THE COURT:  All right.  You don't have a lot of time

 7    between now, sounds like you folks have already agreed on at

 8    least the basis for some limited discovery.  I'm not going to

 9    burden the magistrate judge with any discovery issues.  If you

10    anticipate some now tell me so I can resolve them now.

11         MR. LEVIN:  I have one, your Honor.  I might have been

12    a bit hasty in agreeing to the schedule.  I've been advised that

13    retrieving all of the response e-mails might not be possible

14    within the short time.  We're going to make every effort.  I

15    already have some documents I expect to start producing

16    tomorrow.  We will do our absolute best and I trust we'll be

17    able to work it out, but I wanted to bring that to your Honor's

18    attention and to the counsel's attention because --

19              THE COURT:  I mean, these aren't stored somewhere

20    else?  WMATA has a policy for retention of e-mails.

21         MR. LEVIN:  Yes, I understand that it's there and it

22    may be that they over retain e-mails and that WMATA might not

23    have the most modern of software programs to be able to review

24    and retrieve and it's going to take quite a bit of time and

25    effort to do so.
```

Jacqueline Sullivan, RPR
Official Court Reporter

17

```
 1              THE COURT:  All right.

 2              MR. JOHNSON:  And your Honor, there's two discovery

 3      issues that we wanted to point out.  One is, we did have a bit

 4      of a disagreement on scope of documents that were being

 5      requested, and there's a category in section d(4) of the joint

 6      submission where we were asking the Court for some guidance

 7      because we had objected to some of the things that WMATA is

 8      asking for from us in this limited discovery phase, and then we

 9      have also asked, and I think it's in the joint submission but I

10      wanted to make it clear, that there is limited discovery, we

11      wanted to take from 404(b) party and we want to do that on an

12      expedited schedule where they'd be required to object and then

13      respond much sooner than you normally would under Rule 45.

14              THE COURT:  Yes, I don't have any problems with that.

15      One of those parties is the third party, correct?

16              MR. JOHNSON:  Correct.

17              MR. LEVIN:  On the disputed items, your Honor, what

18      I've agreed to defer for the time being and only press if I

19      really think that we need it and will certainly try to work it

20      out only in any event that I think we need it and we can't work

21      it out would we ever come back to court.

22              THE COURT:  All right.  All right.  I don't have any

23      problems with that third-party discovery.  Now, is that entity

24      on notice of your intent to seek discovery?

25              MR. JOHNSON:  No.
```

                        Jacqueline Sullivan, RPR
                        Official Court Reporter

18

1          MR. LEVIN:  Yes.

2          MR. JOHNSON:  Are they?

3          MR. LEVIN:  Yes, I informed them.

4          THE COURT:  It shouldn't be any big secret.  I guess

5     I'm actually surprised that they don't have an attorney in the

6     courtroom, although I shouldn't rule out the two people sitting

7     in the last row.

8          MR. LEVIN:  I spoke with outside counsel for Acerage

9     yesterday.

10          THE COURT:  I'm surprised D.C. doesn't have anyone

11     here either, I guess.

12          MR. LEVIN:  And told them what had been planned, so

13     they're --

14          THE COURT:  It might be good just to, I mean, to give

15     them a call, give their counsel -- you know who the attorney is,

16     don't you?

17          MR. JOHNSON:  Well, we think we do.  It was somebody

18     Williams and Connolly.

19          MR. LEVIN:  I'll give you the name and the number.

20          THE COURT:  All right.  And what do you plan to do?

21     Just so I have a record, what do you plan to do with respect to

22     expedited discovery?  I mean, I think it has to be expedited to

23     have any meaningful impact on this case, so what do you plan to

24     do?

25          MR. JOHNSON:  We plan to serve each of them with

Jacqueline Sullivan, RPR
Official Court Reporter

1    subpoenas.

2           THE COURT:  For production of documents?

3           MR. JOHNSON:  Yes, sir, and what we would propose is

4    that there be a five-day opportunity to object and then

5    production within ten days.

6           THE COURT:  All right.  We don't have a lot of time,

7    but the ten, that will take us to the 27th or so.  You're going

8    to hand-serve that today?

9           MR. JOHNSON:  Yes.

10          THE COURT:  All right.  Just focus their attention on

11   dates certain though as opposed to giving them ten days after

12   service, because people get very creative when it comes time to

13   calculate time under the federal rules.  They'll come in with

14   holidays and Saturday and excluding time and this, that and the

15   other, and it will be January.  I'm not assigning any bad faith.

16   I don't think the attorneys are.  I'm just saying let's just

17   remove one issue, and that's the calculation of time under the

18   federal rules and local rules.  I certainly didn't mean to

19   impune their attorney.  I don't know who their attorney is.  I

20   just recognize we don't have a lot of time between now and the

21   29th of November, and actually that's after Thanksgiving,

22   correct?  It must be after.

23          MR. LEVIN:  The 29th is after.  It's the Thursday

24   after Thanksgiving.

25          THE COURT:  I was trying to look at your proposed

```
1    schedule.  I don't really have -- I recognize a need for
2    discovery.  I don't have a lot of time to, let's see.  Why do
3    you need until November the 7th to file your PI brief?
4    Basically your pleadings you file now ask for the injunctive
5    relief that you would then seek as well, isn't it?
6         MR. JOHNSON:  I think there's a lot of truth to that.
7    When we were figuring out what's, if we get all this information
8    in discovery, we want to have time to digest it and give the
9    Court a concise as possible submission for the PI, and the more
10   time you have to do that I think the better our chances will be.
11        THE COURT:  This proposed schedule has the Court
12   presiding over a hearing the day before Thanksgiving, so every-
13   one else is off to enjoy Thanksgiving wherever they want to go
14   in the world and my staff has to work, right?
15        MR. JOHNSON:  That's why we put "subject to Court
16   approval."
17        THE COURT:  Let make this a little more fair and
18   reasonable here.  I may have to widdle this down a little in
19   terms of time.  We want a meaningful opportunity to consider
20   your argument.  Both sides will take time and present their best
21   argument, and I'm going to have a meaningful opportunity to
22   consider it.  And there are a couple of holidays.  We've got
23   Veteran's Day coming up, we've got Thanksgiving coming up.
24   Let's see.  All right.  I may have to, and I will adjust the
25   following as follows:  Your PI motion is going to be due the 5th
```

Jacqueline Sullivan, RPR
Official Court Reporter

21

1    of November.  There's a holiday on the 12th.  I'm going to give

2    defendants until the 13th, that's the day after that holiday,

3    response will be due at noon on the 16th of November.  I'm

4    starting a criminal trial on the 19th.  Let's see what I can do.

5    Here's what I'm going to have to do then.  The hearing will have

6    to be the 16th.  How you carve up the time between that and the

7    hearing date, I'm starting that trial the 14th, is fine.  If you

8    want to take a few minutes now to talk among yourselves that's

9    fine, but the hearing is going to have to be the 16th of

10   November, which means that I'll either have to shorten the time

11   for discovery or accelerate the briefing schedule.  I'm going to

12   have to get the final brief in by the 14th because I'm juggling

13   a lot of matters then.  I'll be in trial as well, so the reply

14   brief will have to be on noon on the 14th.  I mean, I could just

15   look at this and say the 13th, the 7th and the 14th.  Or what I

16   could do is look at the 2nd of November as the filing date.  I

17   could do something like the 2nd, the 9th, and the 14th.  And

18   that actually sounds like that might be fairer to everyone,

19   including the Court.

20        MR. JOHNSON:  I was going to suggest if we get the

21   opposition on the 12th we could do our reply by the 14th.  It

22   wouldn't give us a lot of time, but, you know, presumably by

23   then --

24        THE COURT:  I'd rather give you the time.  I hate to

25   make it the 12th.  I mean, it's a holiday, but again, we don't

Jacqueline Sullivan, RPR
Official Court Reporter

```
 1    have a lot of time.  If you want to do it that's fine and I
 2    could actually probably give you until six o'clock or so on the
 3    14th and just require that their brief is filed earlier on the
 4    13th, say noon or so on the 13th.  We could do that.
 5              MR. JOHNSON:  That would be fine.
 6              THE COURT:  My preference would be to give you more
 7    time, but if you want to do it that way that's fine.  I need
 8    some time.  I don't want to back myself into a corner the day
 9    before Thanksgiving, but I want to have some time to consider
10    your arguments.  So the briefing schedule and PI would be your
11    motion for PI on, say, noon on the 2nd.  Actually, I'll make it
12    the 9th, noon on the 9th for a response, and then noon on the
13    13th for any reply, and that way it gives everyone some room, it
14    gives the Court some time, because I am starting a trial on the
15    14th, and I'll schedule a hearing.
16              What I'll probably do, Carol, is, let's see.  Actually
17    the hearing, maybe I should schedule the hearing on the 19th.
18    That gives everyone maybe another day or so, all right?  2nd,
19    9th, noon for your PI responsive PI, and the reply by the 13th
20    at noon.  I'll schedule a hearing on the PI for the 19th at ten
21    o'clock.  I'm not ruling out the possibility.  I'll issue an
22    oral ruling on the 19th or even a day before Thanksgiving.  I
23    just don't know.  It all depends on just how -- it just depends,
24    it depends on what the issues are and my assessment of just how
25    the issues should be resolved.  I don't want to micromanage
```

Jacqueline Sullivan, RPR
Official Court Reporter

1    discovery.  I mean, you have a block of time.  It sounds as if

2    you have at least up through the 1st now if not the 2nd and

3    query whether some of discovery will be produced subsequent to

4    the 2nd.  I just don't know.  I don't know.  I can envision a

5    couple of scenarios where that might be possible.  It gets,

6    albeit from plaintiff's point of view, you want your answers

7    prior to the 2nd.  All right.  Well, discovery is going to have

8    to be completed by the 31st, and if WMATA doesn't have the

9    software that it needs to retrieve it then someone is going to

10   have to hire some software people to come in and retrieve it.

11   We're not going to have a lot of time here.  If you want to play

12   hardball and not tell plaintiffs when you're going to sign this

13   contract then that's fine, but I'm not going to let you stay

14   here and tell me that one of the biggest corporations in the

15   city doesn't have the software that it necessarily needs to

16   enable it to retrieve e-mails, so if it doesn't, that's going to

17   have to hire someone and do it in a timely manner.

18           MR. LEVIN:  I understand, your Honor.

19           THE COURT:  All right.  So what else do I need to do

20   today?  This doesn't sound like the case is going to settle at

21   all.  I don't want to waste your time and a magistrate judge's

22   time talking about settlement, but if there's any chance let me

23   know now.  It doesn't sound like it.  Is there?

24           MR. JOHNSON:  My sense is that there's not.  I mean, I

25   guess if I got a different sense maybe we could let you know.


                    Jacqueline Sullivan, RPR
                    Official Court Reporter

1    We don't have much time.

2          THE COURT:  Why don't I just leave it at that.  If the

3    parties think that the case might settle let me know.  We have

4    some excellent magistrate judges.  We have some excellent

5    attorneys.  We do have resources to assist if you there's an

6    interest in it.  If not that's fine.  I don't want to waste

7    everyone's time of going down that avenue if there's no

8    inclination that settlement discussions might be fruitful.

9          All right.  Anything else we need to talk about?

10          MR. LEVIN:  Your Honor, I think I mentioned this

11    earlier, but the of possibility setting a tentative time on the

12    motion to dismiss.

13          THE COURT:  Yes, right.  Why shouldn't I just

14    entertain all at one time?

15          MR. LEVIN:  From our point --

16          THE COURT:  What's the downside on that?

17          MR. LEVIN:  But from our point of view, we'd love to

18    have your Honor review the motion to dismiss earlier.

19          THE COURT:  I've already read it.  I'm not going to

20    draw any conclusions about the merits because I haven't done the

21    necessary research.  I haven't seen a necessary response to it.

22    I just read it over the lunch hour.

23          Let me hear from plaintiffs.

24          MR. JOHNSON:  Well, I think whatever is most efficient

25    for the Court to us is fine.  It would be fine to do them all

Jacqueline Sullivan, RPR
Official Court Reporter

25

1    and have them on the same hearing on November 19th if that's the

2    better way to proceed.  I know we don't have a lot of time and

3    we're squeezing an awful lot into a very short amount of time.

4    It will be fully briefed, and when the Court decides on the PI

5    motion I don't see any reason why it couldn't at the same time

6    look at the motion to dismiss.

7         THE COURT:  Do you know what?  I think I'll do it that

8    way, and if I need to make some adjustment that if I need to

9    give plaintiffs -- let's see here.  I'll leave the briefing

10   schedule in place.  I'm not going to rule out ruling on this

11   motion once it becomes right.  I'll tentatively schedule it for

12   a hearing on the same date that I'm hearing the request for PI,

13   but again, I'm not going to rule out the possibility of ruling

14   on the paper that's submitted, so don't save your best argument

15   for oral argument.  There may not be one.  I think under the

16   circumstances I'm going to require -- I do this sparingly -- but

17   I think this is an appropriate case, I'm going to ask counsel to

18   provide the Court with two copies of the principal points of

19   authorities that counsel rely on.  You don't need to provide

20   your opponents with the points of authority, but it would

21   certainly assist the Court because we have limited resources in

22   chambers.  I'll spell all this out in a scheduling order, but

23   essentially just two copies of whatever cases you principally

24   rely on and some authorities.

25         Anything else we need to talk about?


                    Jacqueline Sullivan, RPR
                    Official Court Reporter

26

1          MR. JOHNSON:  I don't think so.

2          THE COURT:  So we have parallel briefing schedules

3     here for the motion to dismiss and for the PI.  We have a

4     hearing date.  There will be a hearing date maybe for one, maybe

5     for all, maybe for nothing.  If I grant the motion there won't

6     be anything to have a hearing on.  I'll just wish everyone a

7     happy Thanksgiving in the future.  But I'll wait until the

8     response comes in.  I'm not going to be prejudging it.  I did

9     read it, though.  It's interesting.  I'll wait until the

10    response comes in.

11         Anything else we need to talk about?

12         Discovery disputes, you mention adding third-party

13    discovery.  I don't have any problems with that, but you need to

14    get your notice served because I'm not going -- I'm going to

15    view in disfavor any requests that they have for an extension of

16    some time, so in fairness to them, though, you need to get your

17    subpoena served today.

18         There was another discovery.

19         MR. LEVIN:  I think, your Honor, that was our request,

20    for documents that plaintiffs were reluctant to provide.  If we

21    feel we need to --

22         THE COURT:  There's not an awful lot of time now, so

23    if you need them tell me now, but if you're comfortable with

24    that, that's fine.  I want to be fair to everyone about that.

25    If you need the documents you'll get them.


                    Jacqueline Sullivan, RPR
                    Official Court Reporter

27

1          MR. LEVIN:  I think I really need to see their PI

2     motion, because if they are raising certain issues then we may

3     have to ask for --

4          THE COURT:  All right.

5          MR. LEVIN:  If I don't have to then I won't.

6          THE COURT:  Maybe what I should do is schedule another

7     status hearing just to deal with any of the issues that may come

8     up after the filing of the PI motion.  The PI motion is

9     currently scheduled to be filed on the 2nd, correct?

10          MR. JOHNSON:  Correct.

11          MR. LEVIN:  Yes.

12          THE COURT:  Then I'll schedule, maybe I'll schedule a

13     short status hearing for the 7th at 11:30.  Is that a bad date,

14     bad time for anyone, November the 7th?

15          MR. JOHNSON:  That's fine with plaintiffs.

16          MR. LEVIN:  Fine with us.

17          THE COURT:  And I'll entertain any additional requests

18     for discovery then, really using up the time then.  There's not

19     a lot of time left, but in fairness to you, if you want an

20     opportunity to assess the need for additional documents that's

21     fine.  I mean, I can tell you right now I think it's probably

22     highly relevant the documents that exist that are documents that

23     impact the relationship between the two plaintiffs.  I mean,

24     that's what you've asked for, haven't you?

25          MR. LEVIN:  Yes.

                    Jacqueline Sullivan, RPR
                    Official Court Reporter

28

```
1           THE COURT:  Why aren't they relevant, counsel?

2           MR. JOHNSON:  Well, I'm not sure why they would be.

3    The one company, and I think this is clear, is an affiliate of

4    the first, and it's created with members who are principals of

5    the first, and I'm not --

6           THE COURT:  Of any public filings for these

7    corporations?  These are corporations, right?

8           MR. JOHNSON:  These are limited liability companies.

9           THE COURT:  So they've publicly filed with the court

10   of dates, haven't they?

11          MR. JOHNSON:  They've publicly filed papers to become

12   corporations and they're authorized to do business in the

13   District of Columbia.

14          THE COURT:  I think they're relevant, so you shall

15   produce those.  I think they're relevant.  If there are other

16   documents you want just let me know on the 7th.  I think the

17   documents, especially the documents that exist, that impact the

18   relationship between the two plaintiffs, I believe are probably

19   admissible.

20          Anything else we need to talk about?  I'll put all

21   this scheduling in an order and issue electronically.  Everyone

22   signed up for electronic receipt of documents?

23          Anything else we need to talk about?

24          MR. JOHNSON:  No, sir.

25          MR. LEVIN:  Thank you.
```

Jacqueline Sullivan, RPR
Official Court Reporter

Case 1:07-cv-01821-EGS    Document 35-4    Filed 11/29/2007    Page 30 of 32

29

1          THE COURT:  All right.  Good to see everyone.

2          MR. LEVIN:  Thank you.

3          MR. DOLAN:  Thank you, your Honor.

4          THE COURT:  All right.

5          MR. JOHNSON:  Thank you, your Honor.

6          (Proceedings concluded at about 2:46 p.m.)

7                        * * * * * * *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    Jacqueline Sullivan, RPR
                    Official Court Reporter

```
1                           INDEX

2

3    WITNESSES:

4

5         None.

6

7

8

9

10

11

12                        EXHIBITS

13

14        None.

15

16

17

18

19

20

21

22

23

24

25
```

                    Jacqueline Sullivan, RPR
                    Official Court Reporter

31

```
1                              CERTIFICATE

2

3

4            I, JACQUELINE M. SULLIVAN, Official Court Reporter,

5    certify that the foregoing pages are a correct transcript from

6    the record of proceedings in the above-entitled matter.

7

8

9

10

11

12                              _____

13                              JACQUELINE M. SULLIVAN

14

15

16

17

18

19

20

21

22

23

24

25
```

Jacqueline M. Sullivan, RPR
Official Court Reporter