**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

MONUMENT REALTY LLC, et al.,                )
                                            )
            Plaintiffs,                     )
                                            )
      v.                                    )
                                            )   Civil Action No. 1:07-cv-01821 (EGS)
                                            )   Judge Emmet G. Sullivan
WASHINGTON METROPOLITAN                     )
AREA TRANSIT AUTHORITY,                     )
                                            )
            Defendant.                      )
_____)

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

Dated:  January 2, 2008

NIXON PEABODY, LLP

Louis E. Dolan, Jr. (#442881)
Vernon W. Johnson, III (#423756)
401 9th Street, N.W.
Washington, D.C. 20001
202.585.8000
202.585.8080 (fax)
ldolan@nixonpeabody.com
vjohnson@nixonpeabody.com

Counsel for Plaintiffs

# TABLE OF CONTENTS

Table of Authorities ........................................................................................................ iii

I.   STATEMENT OF FACTS................................................................................... 1

   A.   Creation of the Anacostia Waterfront Corporation ..........................................1

   B.   WMATA's Defers to the District of Columbia's Planning Process ................2

   C.   District of Columbia Exercises Its Right of First Refusal...............................3

   D.   WMATA Agrees To Include its Properties in the AWC's RFEI.....................4

   E.   Monument Realty LLC Wins Rights as Master Developer ..............................4

   F.   Joint Task Force Created for the Development of the Ballpark District..........5

   G.   Joint Task Force Agrees to a Phased Disposition of the WMATA Properties ...............6

   H.   WMATA receives AWC's Memoranda of Understanding...............................9

   I.   Joint Task Force Meets With Monument Realty ...........................................10

   J.   Navy Yard Metro Station site Negotiations ..................................................11

   K.   Concessions by Monument for Bus Garage ...................................................13

   L.   WMATA Requests Guidance From the District on the Second Phase of the
        Disposition .....................................................................................................14

   M.   WMATA Changes Course and Imposes New Conditions ..............................15

   N.   WMATA Issues IFB 07-3 ..............................................................................19

   O.   The District (Again) Exercises Its Right to Purchase the Bus Garage...........21

   P.   Internal WMATA Deliberations Deviate From WMATA's Established Policy ...........23

   Q.   WMATA Seeks an Illegal Restraint on Further Alienation by the District ..................25

   R.   WMATA Returns Unopened Bids Under IFB 07-3........................................27

   S.   Akridge Retenders Bid Under IFB 07-3 to WMATA....................................27

   T.   WMATA Issues IFB 08-1 ..............................................................................27

   U.   Akridge Submits Conditional, Non-Responsive Bid .....................................28

   V.   WMATA's Ignores the "Sealed" Nature of the "Sealed Bid" Procedures and
        Engages in Extensive, Prohibited, Communications and Correspondence With
        the Eventual Winning Bidder: Akridge..........................................................30

   W.   WMATA and Akridge Enter into Prohibited Post-Bid Opening/Pre-Award
        Discussions......................................................................................................31

**II. ARGUMENT** ................................................................................................................ **34**

    A.    Monument's Contractual and Real Property Rights Prohibit WMATA From Selling the Bus Garage Out From Under the Plaintiffs ................................... 34

          1.    The District's Planning Process ...................................................... 35

          2.    The Direct Contract With WMATA ................................................. 41

          3.    WMATA's Obligations to Convey to the District for Fair Market Value ........... 46

    B.  WMATA's Sealed Bid Process Was Without Rational Basis and Was a Clear and Prejudicial Violation of Applicable Statutes and Regulations ........................... 47

          1.    The Secret Communications with Akridge ................................................. 50

          2.    The Akridge Bid was "Submitted Conditionally" ................................. 51

          3.    The Akridge Bid Contained an Unlawful Insertion, Known Colloquially as a "Sweetener" or a "Strengthener" That Further Rendered it Non-responsive as a Matter of Law ................................. 52

          4.    WMATA's Failure to Follow Its Own Procedures ............................... 58

# TABLE OF AUTHORITIES

**Cases**                                                                      **Page**

*Adler Construction, Inc.*,
    B-261506.2, 1995 U.S. Comp. Gen. LEXIS 832 (Nov. 7, 1995) ......................57

\* *Allworth v. Howard Univ.*,
    890 A.2d 194 (D.C. 2006) ...................................................................39

\* *Ammerman v. City Stores Co.*,
    394 F.2d 950 (D.C. Cir. 1968)..............................................................38

\* *BMX Elecs., Inc. v. Control Data Corp.*,
    929 F.2d 707 (D.C. Cir 1991) ..............................................................39

\* *Brewood v. Cook*,
    207 F.2d 439 (D.C. Cir. 1953)........................................................44, 45

\* *Burbach Broad. Co. of Del. v. Elkins Radio Corp.*,
    278 F.3d 401 (4th Cir. 2002) ...............................................................39

*Catholic Univ. of Am. v. United States*,
    49 Fed. Cl. 795 (2001) ........................................................................58

\* *CityFed Fin. Corp. v. Office of Thrift Supervision*,
    58 F.3d 738 (D.C. Cir. 1995) .................................................... 2 (Mot.)

*Colorado Container Corp.*,
    B-238670, 1990 U.S. Comp. Gen. LEXIS 543, 90-1 CPD ¶514
    (May 31, 1990).....................................................................................56

*Douglas v. Lyles*,
    841 A.2d 1 (D.C. 2004) .......................................................................47

\* *E.F. Matelich Constr. Co.*,
    1982 U.S. Comp. Gen. LEXIS at 4.................................................52, 57

\* *Elcon Enters., Inc. v. WMATA*,
    977 F.2d 1472 (D.C. Cir. 1992)......................................................49, 58

iii

*   *Ellipso, Inc. v. Mann*,
        480 F.3d 1153 (D.C. Cir. 2007) ............................................................................... 3 (Mot.)

*   *Flack v. Laster*,
        417 A.2d 393 (D.C. 1980) ..................................................... 2 (Mot.), 3 (Mot.), 45

    *Griffy's Landscape Maint. LLC v. United States*,
        46 Fed. Cl. 257 (2000) ...........................................................................................50, 53

    *Hackney v. Morelite Constr.*,
        418 A.2d 1062 (D.C. 1980) ....................................................................................38

*   *In re Carter Chevrolet Agency, Inc.*,
        B-229679, 1988 U.S. Comp. Gen. LEXIS 113, 88-1 Comp. Gen. Proc. Dec. ¶107
        (Feb. 3, 1988) ..........................................................................................................50

*   *In re Commc'ns Tech. Apps., Inc.*,
        1989 GSBCA LEXIS 251, at 10, 89-3 B.C.A. (CCH) P22,048 (1989)...........................50

*   *In re Outdoor Venture Corp.*,
        1989 U.S. Comp. Gen. LEXIS 673, at 1, 89-1 Comp. Gen. Proc. ¶571
        (June 16, 1989)........................................................................................................51

    *Jensen Corp.*,
        B-213677, 1984 U.S. Comp. Gen. LEXIS 1118, 84-1 CPD ¶544
        (May 22, 1984)........................................................................................................56

    *Miller-Long v. John Hanson Sav. & Loan, Inc.*,
        676 F. Supp. 298 (D.D.C. 1987) ..............................................................................47

*   *Mova Pharm. Corp. v. Shalala*,
        140 F.3d 1060 (D.C. Cir. 1998) ........................................................................ 2 (Mot.)

    *Novecon Ltd. v. Bulgarian-American Enter. Fund*,
        190 F.3d 556 (D.C. Cir. 1999) .................................................................................39

    *Potomac Assocs. v. Grocery Mfrs. of Am., Inc.*,
        485 A.2d 199 (D.C. 1984) ................................................................................ 2 (Mot.)

*   *Reid & Gary Strickland Co.*,
        B-239700, 1990 U.S. Comp. Gen. LEXIS 1001, at 4, 90-2 CPD ¶222
        (Sept. 17, 1990)........................................................................................................56

*   *Simpson v. Lee*,
        499 A.2d 889 (D.C. 1985) ................................................................................ 2 (Mot.)

*Tauber v. Quan,*
    2007 D.C. App. LEXIS 689 (D.C. 2007) ............................................................. 2 (Mot.)

\* *Teachers Ins. & Annuity Assoc. of Am. v. Tribune Co.,*
    670 F. Supp. 491 (S.D.N.Y. 1987) .....................................................................39

\* *Toyo Menka Kaisha, Ltd. v. United States,*
    597 F.2d 1371 (Ct. Cl. 1979) .....................................................................53, 56

*Wasteco Container Servs., Inc.,*
    B-240309, 1990 U.S. Comp. Gen. LEXIS 1181, 90-2 CPD ¶372
    (Nov. 7, 1990) .......................................................................................57

## OTHER AUTHORITIES

54 D.C. Reg. 7079-85 (July 27, 2007) ........................................................................1

*D.C. Code Ann.* §2-1223 ..........................................................................................1

*D.C. Code Ann.* §2-1223.01(1) ................................................................................35

*D.C. Code Ann.* §2-1223.02(b) ................................................................................35

*D.C. Code Ann.* §2-1223.04 .....................................................................................1

*D.C. Code Ann.* §2-1223.27 ................................................................................13, 35

*D.C. Code Ann.* § 9-1107.01 ...................................................................................58

Fed. R. Civ. P. 65 ................................................................................... 2 (Mot.)

\* Federal Acquisition Regulation Part 14 .............................................................. passim

\* WMATA Procurement Procedures Manual ...................................................... passim

I.    **STATEMENT OF FACTS**

A.    **Creation of the Anacostia Waterfront Corporation**

In the summer of 2004, Major League Baseball announced the relocation of the Montreal Expos baseball franchise to Washington, D.C.   In September 2004, District officials disclosed plans to build a publicly-financed baseball stadium on the Anacostia River waterfront near South Capitol Street, S.E.   In connection with this process, the District of Columbia formed the Anacostia Waterfront Corporation ("AWC") to be the City's master planner for the comprehensive development and revitalization of the Ballpark District. *D.C. Code Ann.* §§ 2-1223 *et seq.* (2004) (Repealed).[1]   The Ballpark District is a planning area in Southeast, adjacent to and including the new Washington Nationals baseball stadium, and bounded by the Southeast-Southwest Freeway to the North, South Capitol Street to the West, New Jersey Avenue, S.E. to the East, and the Anacostia River to the South. As Master Planner, AWC had the statutory authority to acquire, lease, and negotiate for real property. *Id.* § 2-1223.04.

From the outset, WMATA partnered with the District and AWC in their mission relating to the Ballpark District. Even before being formally asked by the District to participate, WMATA committed to "work within the context of the city directed planning effort" on the disposition of its properties in the Ballpark District, rather than proceeding with its own planning initiatives.  *E.g.,* Email from A. Lawson, WMATA's Government Relations Officer (Dec. 29, 2004), Exh. 2.[2]  WMATA's commitment to the District's planning process continued until mid-2007, when WMATA elected to chart a new and improper course, radically different from the

---

[1]    Effective October 1, 2007, AWC merged with the Office of the Deputy Mayor for Planning and Economic Development for the District of Columbia through enactment of the "Fiscal Year 2008 Budget Support Act of 2007." 54 D.C. Reg. 7079-85 (July 27, 2007).

[2]    *See* Exhibit 1 for a list of the names and affiliations of the key individuals referenced herein.

years of planning and preparation undertaken by the City, AWC, and the selected developers for the Ballpark District, in which WMATA had previously participated.

### B.     WMATA's Defers to the District of Columbia's Planning Process

WMATA deferred to the District's planning process in recognition of the changing nature of the Ballpark District and the impracticalities and safety concerns surrounding operating a bus garage and maintenance facility at the doorstep to the main gate of the new baseball stadium. WMATA also deferred because of WMATA's own internal policy and long-standing and recognized practice of being required to offer its excess real property on a priority basis to the jurisdictions responsible for creating it, *i.e.* the "Compact jurisdictions." (Deposition of Gary Malasky, Director of WMATA's Office of Property Development and Management ("Malasky Dep.") 18:7-19:3, Exh. 3.) This policy and practice was stated succinctly by Nathaniel Bottigheimer, WMATA's Contracting Officer responsible for the bid procedures followed by WMATA in this case, who reports directly to John C. Catoe, Jr., WMATA's General Manager. According to Mr. Bottigheimer, once WMATA decides to dispose of a property, it must first screen the property with the Compact jurisdiction to determine whether the Compact jurisdiction is interested. If so, the price is negotiated based on fair market value, with WMATA and the Compact jurisdiction obtaining appraisals and, if necessary, a third appraisal being obtained to resolve any significant discrepancies. (Deposition of Nat Bottigheimer ("Bottigheimer Dep.") 87:11-18, Exh. 4.)

This policy and procedure has long been recognized as an obligation owed by WMATA to its Compact jurisdictions and as a right the Compact jurisdictions enjoy. The Compact jurisdiction where the property is located has the right of first refusal to purchase the property at fair market value. *See, e.g.,* Email from G. Malasky to D. Tangherlini, Interim General Manager of WMATA (June 4, 2006), Exh. 5 ("The jurisdictional screening policy is . . . taken to mean

that the local jurisdiction in which the property is located would be advised of the proposed sale and offered the opportunity to purchase the property since they participated in a portion of the purchase price."). WMATA recognizes this as an obligation owed to the Compact jurisdictions. *See, e.g.,* Letter from G. Malasky to C. Lowe, Director of the District's Office of Property Management (Dec. 20, 2006), Exh. 6 ("The District has expressed an interest in purchasing the Stone Straw Building. . . . We are obligated to sell at fair market value.").

      **C.**     <u>**District of Columbia Exercises Its Right of First Refusal**</u>

      WMATA demonstrated its commitment to this policy on several occasions directly relating to its property holdings in the Ballpark District. In March 2005, WMATA issued a Joint Development Solicitation ("JDS") for the joint development of WMATA's Ballpark District holdings, including both its Navy Yard Metro Station site and the Bus Garage, with a selected private developer. The JDS required that any proposals for the properties must consider AWC's master plans for the area. After the JDS was issued, the District exercised its right of first refusal, requesting in April 2005 that WMATA withdraw these properties from the JDS in deference to the District's right to purchase the property and so that the properties could be included in the District's master planning process. *See* Letter from Mayor A. Williams to R. White, WMATA's General Manager (Apr. 8, 2005), Exh. 7. Mayor Williams stated that the District looked forward to meeting with WMATA to discuss the "necessary steps to determining the appropriate transactional value for the site; [and] determining a rational schedule to dispose each of the component sites to the District." *Id.* WMATA withdrew the properties from the JDS in accordance with Mayor Williams' request on May 11, 2005. See Letter from G. Malasky to Interested Parties (May 11, 2005), Exh. 8.

D.      **WMATA Agrees To Include its Properties in the AWC's RFEI**

After the withdrawal of WMATA's Ballpark District properties from the JDS, WMATA, AWC, and the District discussed the District's desire to include these properties in a request for expression of interest ("RFEI") being prepared by AWC.  The RFEI solicited local and national developers with significant retail, mixed use, sports and entertainment, and city planning experience to compete to become the District's and AWC's designated master developer for the Ballpark District and to work with AWC and the District in the critical overall master planning and development process.  WMATA assented to AWC including WMATA's properties in the Ballpark District, encompassing both the Bus Garage and the Navy Yard Metro Station site, in AWC's RFEI issued in September 2005.  (Malasky Dep. 25:4-15, 27:7-18, Exh. 3.)  WMATA did not give AWC or the District any rights to negotiate for the disposition of its properties on its behalf.  (Malasky Dep.22:12-21, 24:18-25:2, Exh. 3.)

E.      **Monument Realty LLC Wins Rights as Master Developer**

In December 2005, AWC selected a team comprised of Monument Realty LLC and the Cordish Company to be Master Developer for the Half Street area of the Ballpark District, which specifically included the WMATA properties at issue here.  *See* Map of Half Street Area, Exh. 9.  AWC, Monument Realty LLC, and the Cordish Company signed a letter of intent ("LOI") memorializing their agreement.  *See* Letter of Intent (Dec. 12, 2005), Exh. 10.  The LOI granted the Monument team the exclusive right to negotiate with AWC for WMATA's property in the Ballpark District that AWC acquired or controlled.

At that time, AWC publicly acknowledged WMATA's partnership with AWC, stated that the Monument Master Development team gained exclusive rights to negotiate for WMATA's land within the Ballpark District, and affirmed specifically that it would be acquiring property from WMATA for disposition to the Master Developer team.  AWC Press Announcement

Question and Answer Sheet (Dec. 12, 2005), Exh. 11. Representatives of WMATA attended a press conference discussing the appointment of the Monument team as Master Developer, and immediately afterwards internally acknowledged these facts. *See* Email from A. Lawson to H. Bartlett, WMATA's Secretary and Chief of Staff, et al. (Dec. 12, 2005), Exh. 12. Although the LOI referred to Monument Realty LLC and the Cordish Company, WMATA at all times understood that Monument Realty was the master developer appointed under the RFEI process. *See, e.g.,* Email from G. Malasky to D. Tangherlini *et al.* (Mar. 15, 2006), Exh. 13 ("The Mayor designated AWC to represent the city, and AWC conducted a solicitation which resulted in Monument Realty being the selected developer for the WMATA properties."). Throughout the development process, WMATA continually referred to Monument Realty as the designated Master Developer and consistently worked with and met with Monument Realty in its capacity as Master Developer for this area of the Ballpark District without inquiring as to the involvement of the Cordish Company. (Declaration of R. Hines, Monument Realty's Executive Vice President ("Hines Decl.") ¶¶5-8, Exh. A.); *see also* Joint Task Force Meeting Notes (Apr. 14, 2006), Exh. 14 at ¶4 ("Gary Malasky (WMATA) briefed the group regarding a meeting earlier that week with Dan Tangherlini initiated by Monument. AWC's preferred developer confirmed their interest in the surrounding Navy Yard properties.").

### F.      Joint Task Force Created for the Development of the Ballpark District

In early 2006, a directive was issued by the District, AWC, and WMATA's Board of Directors and General Manager to establish a Joint Task Force to resolve issues surrounding the new baseball stadium and the development of the Ballpark District. Joint Task Force Meeting Notes (Mar. 17, 2006), Exh. 15 at ¶1. At the very first meeting of the Joint Task Force on March 17, 2006, Dan Tangherlini, WMATA's Interim General Manager, inquired whether the WMATA properties that had been pulled from the JDS at the District's request, including the

Bus Garage, should be re-solicited. In response, AWC stated that they had a contractual relationship with their preferred/designated developer, Monument Realty, and objected to a re-solicitation. *Id.* at ¶6. WMATA agreed to defer to AWC and the District and did not re-solicit the properties. *Id.* WMATA representatives, including John D. Thomas, Director of Construction, Takis Salpeas, Deputy General Manager for Planning, Development, Engineering and Construction, and Gary Malasky, were in attendance and knew of this directive. *See, e.g., Id.* (containing list of attendees).

Other areas of discussion for the Joint Task Force included the need to increase the capacity of the Navy Yard Metro Station to accommodate greater passenger loads for home baseball games, the sale of the Navy Yard Metro Station site and associated air rights to Monument, and the need to find a relocation site for the buses garaged at the Bus Garage, which WMATA asserted was a necessary precondition to its sale. WMATA recognized that it would be extremely difficult to complete the enhancements at the Navy Yard Metro Station by opening day, did not want to undertake this project itself, and specifically wanted to transfer the risk of timely completion to a third party to mitigate its own risks. (Malasky Dep. 44:1-6, 49:11-17, 50:5-8, Exh. 3.); *see also* Joint Task Force Meeting Notes (Apr. 28, 2006), Exh. 16 at ¶5.

**G.    Joint Task Force Agrees to a Phased Disposition of the WMATA Properties**

The need for WMATA to move expeditiously on the Navy Yard Metro Station improvements, coupled with the fact that WMATA had not yet identified or secured a relocation site for its Bus Garage operations, caused a subtle, but ultimately very important, change in WMATA's position. Previously, WMATA had contemplated that its properties in the Ballpark District would be developed or sold jointly. As of early 2006, however, WMATA's General Manager made an internal decision to "de-link" or "decouple" the disposition of the Navy Yard

Metro Station site from the Bus Garage. *See* Email from E. Maginnis, WMATA's Associate General Counsel, to A. Rifkind, counsel for AWC (May 30, 2006), Exh. 17, at 2.

This decision by WMATA was ultimately supported by the Joint Task Force, whose minutes reflect that on April 28, 2006, a consensus was formed to do a phased disposition of the WMATA properties, instead of the full disposition of all properties originally planned, with the first focus being on the Navy Yard Metro Station site ("the eastern parcels"), with the phase involving the Bus Garage to occur later. *See* Exh. 16 at ¶7A. Joint Task Force Status Update and Briefing (Jul. 7, 2006), Exh. 18. at p. 4 also reflects this phased disposition and that both phases were to go to AWC and their preferred developer, Monument.

In a May 21, 2006 e-mail, Mr. Malasky memorialized this agreement as a "basic framework" for a phased disposition of the parcels that included "splitting off the two Navy Yard Station properties and dealing with the bus garage later." Email from G. Malasky to L. Stoffregen (May 21, 2006), Exh. 19 at ¶2. This basic framework was also memorialized in a transcription of a telephone message from Mr. Malasky, which confirmed the phased disposition to AWC and Monument Realty, with phase 1 being the "splitting off [of the] west entrance [to the Navy Yard station] and parking lot next to it" and a "later deal will involve bus garage itself and parking lot on South Capitol Street." Telephone Message from G. Malasky (May 22, 2006), Exh. 20. Mr. Malasky has confirmed this basic framework agreement. (Malasky Dep.61:17-62:14, Exh. 3.)

The phased disposition process reflected in the "basic framework" agreement was also repeatedly memorialized and reflected in Joint Task Force documents. For example, a July 7, 2006 Joint Task Force Status Report reflects the following:

**Baseball Stadium Area**
**Development**

---

**WMATA OWNED PROPERTY:**

- WMATA has been coordinating with AWC and their preferred developer, Monument, for the phased disposition of WMATA parcels in the ballpark district.

    § Phase I: West entrance to the [Navy Yard] station and adjoining employee parking lot

    § Phase II: Remaining parcels south of M Street [including Bus Parking Lot and Bus Garage]

- Phase I property disposition must be completed in late 2006 or early 2007 to maintain schedule

Exh. 18 at 4; *see also* Exh. 16 at ¶7 ("There was a consensus among the Task Force for a phase[d] disposition of WMATA property with the goal being to expedite the development of the eastern parcels.").

Although the AWC award to Monument never contemplated the phased disposition of the WMATA parcels, AWC and later, Monument, reluctantly agreed to accommodate the basic framework agreement for a phased disposition. This was not Monument's preferred course, since it was far more economical and cost efficient to deal with the real estate transactions and development issues for all of the WMATA properties at once, but Monument reluctantly agreed to participate in a phased disposition process to accommodate WMATA's needs. (Hines Decl. ¶9, Exh. A.) Monument would never have agreed to this phased disposition had it been informed by WMATA that it had no right to negotiate for and acquire an interest in the Bus Garage that had now become the second phase of the process. (*Id.* ¶10, Exh. A.)

Monument agreed to proceed in this manner only because it and AWC had expressed to WMATA that it had exclusive rights in the Bus Garage, WMATA understood, and had done nothing to dissuade Monument and/or AWC from that belief. (*Id.* ¶¶18, Exh. A; Declaration of

A. Phillips, Monument's Vice President ("Phillips Decl.") ¶5, Exh. B.)  Indeed, the first time that Mr. Malasky recalls informing Monument that it did not have any rights to the Bus Garage was in a March 2, 2007 meeting – nearly a year into what had become a phased disposition process. (Malasky Dep. 91:22-93:11, 109:16-110:6, Exh. 3.)  Yet, contemporaneous notes of even that meeting do not reflect Mr. Malasky making such a statement.  *See* Handwritten Notes (Mar. 2, 2007), Exh. 21.   If WMATA contemplated disposition of the Bus Garage other than to Monument, it did not disclose this to AWC or Monument, all of its actions and statements were to the contrary, and nothing in its business records reflect this.  Indeed, AWC, WMATA, and Monument all confirmed their understanding that AWC or Monument would still acquire the Bus Garage, albeit at a later date.  (*See* Hines Dec. ¶¶9-10, Exh. A.)  During this time, AWC even advertised the Bus Garage as belonging to Monument, without objection from WMATA. *E.g.,* Navy Yard – AWC/WMATA MOU Briefing (Jun. 29, 2006), Exh. 22.

> **H.     WMATA receives AWC's Memoranda of Understanding**

Thus, in mid-2006, when AWC tendered a term sheet and, later, a Memorandum of Understanding for the acquisition of both the Navy Yard Metro Station site and the Bus Garage, WMATA told AWC that the Navy Yard site had to be the subject of a first MOU and that a later deal would be done for the Bus Garage.   (Malasky Dep. 55:16-57:5, 58:20-59:11, Exh. 3.) WMATA stated that adding the Bus Garage to the Navy Yard Metro Station phase of the disposition would unnecessarily complicate the transaction and jeopardize Board of Directors approval, since no relocation site for the Bus Garage had been secured.  *E.g.,* Handwritten Notes (undated), Exh. 23 at ¶2 ("Adding bus garage to scope [of MOU with AWC] doesn't help achieve goals of moving expeditiously."); Handwritten Notes (May 25, 2006), Exh. 24 ("Interest in getting station improvements done before stadium opens . . bus garage to be dealt with at later

time . . . Move forward on [Navy Yard] station and parcel next to it --- address bus garage to be

dealt [sic] detail in separate document"); Exh. 15.

When AWC insisted that the Bus Garage be included in the MOU, WMATA's Associate

General Counsel, Ed Maginnis, replied on May 30, 2006 only that "you have been warned that

insisting the bus garage be packaged in this MOU – without addressing the critical relocation

component – puts this at risk of Board rejection.  Gary [Malasky] and I have obviously done a

poor job of explaining how premature consideration of the bus garage issue is 'third rail'

politics."  Email from E. Maginnis (May 30, 2006), Exh. 25.  Similarly, Mr. Maginnis reported

that Mr. Malasky did not want to include a reference to the Bus Garage in the MOU due to

"concern that any mention of the bus garage, without some kind of corresponding plan [for

relocation] associated with it, could only cause negative [B]oard reaction."  *See* Email from E.

Maginnis to A. Rifkind (May 25, 2006), Exh. 26 at 2.  WMATA did not state that AWC and/or

Monument had no rights to the Bus Garage, because WMATA believed that AWC and

Monument did have such rights and acted accordingly.

## I.     Joint Task Force Meets With Monument Realty

During this time, representatives of Monument, including Monument's former Executive

Vice President Bill Krokowski and Vice President Amy Phillips, attended Joint Task Force

meetings.  At these meetings, Monument continued to express its interest in the WMATA

properties in the Ballpark District and its understanding that WMATA would dispose of those

properties in accordance with the process initiated by the District, *i.e.* to AWC or Monument, as

AWC's designated Master Developer.  (Phillips Decl. ¶5, Exh. B.); *see also* Joint Task Force

Meeting Notes (May 19, 2006), Exh. 27; (May 26, 2006), Exh. 28.  Notes from these meetings

show that WMATA automatically treated Monument Realty as developer of the Half Street Area

because of its status as AWC's designated Master Developer and because of its ownership of

10

properties in that area. *E.g.,* Exh. 27; Exh. 28.  (*See also* Malasky Dep. 33:18-34:6, 61:8-11 Exh. 3.) (acknowledging that Monument was AWC's selected developer).  Monument was not told that it had no rights to the Bus Garage.  (Malasky Dep. 91:22-93:11, 109:16-110:6, Exh. 3.)

Monument continued to take action in reliance upon, and consistent with, its rights to the Bus Garage.  At a Joint Task Force meeting held on May 26, 2006, for example, Monument revealed that it had made no progress in its ongoing efforts to secure a relocation site for the buses at the Bus Garage at a parcel owned by CSX Transportation just north of the Bus Garage. Exh. 28 at ¶8.  There is only one explanation why Monument was assisting WMATA in finding a relocation site – WMATA had said that it had to have a relocation site before it would sell the Bus Garage. The sooner a relocation site was located, the sooner Monument could acquire the site.  (Hines Decl. ¶11, Exh. A; Malasky Dep.67:9-68:10, Exh. 3.)  Indeed, at the same meeting, Monument, in response to a direct question from Mr. Salpeas at WMATA, stated it was willing to consider another alternative for moving forward immediately on its acquisition of the Bus Garage, which included Monument reimbursing WMATA for maintenance of the Bus Garage buses for an interim period.  Exh. 28 at ¶9.

###  J.     Navy Yard Metro Station site Negotiations

Eventually, in July 2006, D.C. Councilmember and WMATA Director Jim Graham excluded AWC from the negotiating process relating to the disposition of the Navy Yard Metro Station site and insisted that WMATA deal directly with Monument Realty. In doing so, Mr. Graham stated that a sole source negotiation with Monument was acceptable, was "done all the time," and that staff should negotiate the best deal it could get with Monument and bring that forward for WMATA Board approval.  WMATA Meeting Notes (Jun. 29, 2006), Exh. 29.

With AWC expressly excluded from this phase of the disposition, WMATA and Monument agreed that Monument would submit an unsolicited offer for the Navy Yard Metro

Station site, as the first phase of the disposition process and that, although WMATA would advertise the unsolicited proposal, the advertisement would be drafted to require that any bidders provide a temporary parking solution within one block of the existing WMATA employee parking lot serving the Navy Yard Metro Station site, so that, in effect, there could be no other bidders.  Monument then prepared a Memorandum of Understanding for the acquisition and Navy Yard Metro Station improvements, that included disposition of the Bus Garage to Monument.  *See* Memorandum from H. Ackerman to G. Malasky (July 13, 2006), Exh. 30; (Hines Decl. ¶12, Exh. A.)

As with the AWC MOU, WMATA asked that the Bus Garage be removed from Monument's MOU – not because Monument did not have any rights to the Bus Garage, but to expedite Board of Directors' approval.  *See* Email from G. Malasky to A. Phillips (July 21, 2006), Exh. 31 at ¶2 ("We think that the reference to the bus garage proper does not belong in this agreement, and will unnecessarily complicate its approval.").

As the negotiations over the Navy Yard Metro Station progressed, WMATA never asserted that Monument would not eventually acquire the Bus Garage, and Monument continued to act in reliance on the AWC award and WMATA's participation in the District's planning process and the phased disposition of the parcels to Monument.  *See, e.g.,* Email from A. Phillips to E. Maginnis (Sept. 15, 2006), Exh. 32 (stating that Monument would proceed with closing the alleyways contained in Squares 700 and 701, which includes the Bus Garage, and e-mail from Mr. Malasky to Mr. Maginnis stating that he believed that WMATA should retain rights to use the alleyways until "there is a deal signed for the disposition."). The only disposition deal contemplated was a disposition deal with Monument because that was the only party in negotiations with WMATA.

### K.     Concessions by Monument for Bus Garage

As part of the Navy Yard Metro Station site negotiations, Monument provided substantial concessions and conferred benefits on WMATA and the District on the parties' prior understandings and agreements that this was a phased disposition process and that the deal included the disposition of the Bus Garage to Monument as the second phase. (*See* Hines Decl. ¶¶13-17, Exh. A.)  These concessions would not have been provided but for Monument's rights to the Bus Garage. (*Id.* ¶¶16-17, Exh. A.)  For example, Monument agreed to undertake and complete the Navy Yard Metro Station site improvements to enhance station capacity, which no other developer would have agreed to do on the timetable required by WMATA (which WMATA recognized), and which WMATA itself had expressed that it could not complete prior to opening day 2008, and did not want to undertake in any event.  (*Id.* ¶14, Exh. A.)  Monument proceeded with alleyway closings in Square 700 involving the Bus Garage, as well as provided an easement to WMATA so that they could continue to use the alleyway until the disposition of the Bus Garage was ultimately completed.  (*Id.* ¶13, Exh. A.); *see also* Facsimile from G. Malasky to A. Phillips (Oct. 30, 2006), Exh. 33.  Monument also agreed to WMATA imposing AWC's significant affordable housing requirements on adjacent property owned by Monument, as well as the District's Local Small Disadvantaged Business Enterprise ("LSDBE") and First Source requirements on the Navy Yard property and its adjacent property, which further evidences WMATA's agreement to be bound by the District's and AWC's planning and disposition process.  (*See* Hines Decl. ¶15, Exh. A); *D.C. Code Ann.* §§ 2-1223.27 (imposing affordable housing requirement) (Repealed).  Further, Monument worked to prevent any designation of the Bus Garage as an Historical Landmark for WMATA due to its property interest in the Bus Garage.  (Hines Decl. ¶13, Exh. A.)  During the negotiations surrounding these items, both WMATA and Monument believed that the Bus Garage would be part of the

second phase of the disposition. *See, e.g.,* Email from E. Maginnis to A. Phillips (Dec. 20, 2006), Exh. 34, p. 2-3 (agreeing that a square footage discrepancy in the Navy Yard Metro Station site acquisition in WMATA's favor would simply be made up in the next deal between WMATA and Monument); (Hines Decl. ¶¶16-17, Exh. A.)

Monument valued these concessions in excess of $5 million of the affordable housing concessions alone, and would never have offered them but for the agreements, understandings, and course of conduct of the parties that Monument would have the right to negotiate exclusively for and acquire the Bus Garage parcel.  (Hines Decl. ¶17, Exh. A.)  Monument and WMATA then proceeded to closing on the first phase of the disposition, the Navy Yard Metro Station site. Monument would not have closed on this acquisition but for the agreement of WMATA that Monument would have the exclusive right to negotiate for and acquire the Bus Garage.  (*Id.* ¶¶17-18, Exh. A.)

## L.    **WMATA Requests Guidance From the District on the Second Phase of the Disposition**

After closing of the Navy Yard Metro Station transaction in late December 2006, WMATA contacted the District and AWC to confirm that the District wished to proceed with the second phase of the disposition – the Bus Garage – to AWC or directly to its designated developer, Monument.  For example, on February 28, 2007, Jack Requa, WMATA's Chief Operating Officer, told Mr. Tangherlini, now in the Executive Office of the Mayor, that WMATA was "eager" to proceed with the relocation of the Bus Garage and asked "what the District's current interest [is] in how WMATA disposes of the property.  Does the administration desire that WMATA deal directly with the District, Monument or should WMATA place the property on the joint development listing?" Email from J. Requa to D. Tangherlini (Feb. 28, 2007), Exh. 35; *see, also*, Exh. 40, ¶ 2. .  At the same time, and consistent with Mr. Requa's

inquiry to the District, WMATA staff prepared a briefing for WMATA's General Manager, John C. Catoe, Jr., on the Bus Garage. The briefing papers, like Mr. Requa's statement to the Executive Office of the Mayor, stated that the sale of the Bus Garage may be:

- By sole source sale to the Anacostia Waterfront Commission's (AWC) Selected Developer, Monument Realty, or

- To the highest bidder as part of Joint Development process.

Briefing for the General Manager (Feb. 26, 2007), Exh. 36 at p. 10.

Thus, WMATA again recognized the District's development process, indicated that it was willing to follow the District's directive and that it could deal directly by sole source with Monument on the second phase of the disposition. At no point, however, did Mr. Malasky, Mr. Requa, or anyone else at WMATA inform Monument that it was now requesting guidance from the District on how the District wanted specifically to accomplish the conveyance to Monument. (Hines Decl. ¶¶19-22, Exh. A.) To the contrary, in a meeting as late as April 2007, WMATA continued to acknowledge the District's development process and Monument's status as AWC's designee to the District for the acquisition of the Bus Garage, once again confirming WMATA's understanding of the phased disposition. DDOT/WMATA April Monthly Meeting Notes (Apr. 4, 2007), Exh. 37.

M.    **WMATA Changes Course and Imposes New Conditions**

Not having heard anything from the District in early 2007, however, WMATA staff began to take a different view toward Monument and the District's development plans. Specifically, WMATA started expressing its concern regarding what it perceived to be construction delays at the Navy Yard Metro Station site caused by Monument that could, in WMATA's stated view, jeopardize on-time completion of the station improvements by opening day in 2008. For that reason, as well as its concern that following a sole source disposition

process to Monument may not net it sufficient funds to build a replacement garage at the site WMATA and the District had agreed upon at D.C. Village, WMATA staff began taking a radically different approach.

Thus, despite its own internal correspondence and communications with the District that it was urgently seeking and eager to vacate the Bus Garage and commence work on its replacement facility, *see, e.g.* Exh. 35, when approached by Monument with respect to completing the second phase of the disposition, WMATA disingenuously and dishonestly told Monument that "it was in no hurry to move forward on the Bus Garage" and wanted to "wait and see" how the Navy Yard station improvement construction was proceeding before proceeding on the Bus Garage. *See* Email chain from J. Requa to G. Malasky *et al.* (Feb. 22, 2007), Exh. 38 ("I told Amy [Phillips at Monument] that we were in no hurry to dispose of the bus garage, and that we wanted to wait and see how things went across the street [i.e. construction on the Navy Yard improvements] before deciding how to dispose of it."). Mr. Malasky admits that his statement to Ms. Phillips was less than forthright and was designed to force Monument to focus on completing the Navy Yard construction before WMATA would even discuss the second phase of the disposition. (Malasky Dep. 89:12-15, 90:19-91:9, Exh. 3.)

WMATA's General Counsel, Carol O'Keeffe, pinpointed the dishonest nature of Mr. Malasky's statement. She stated that it would be "hard to maintain the position that we are not eager to move the bus garage, since just about all communications from our bus ops people are that we are absolutely eager to move the bus garage and that the operations are not compatible with the stadium." Exh. 38. In response, Mr. Malasky asks "Has this ever been communicated to Monument?" *Id.* No doubt, Mr. Malasky was hoping to continue the charade of keeping Monument in the dark on WMATA's need to move quickly, so that WMATA could leverage the

Bus Garage disposition against Monument to its maximum advantage.  For his part, Mr. Requa responded to Mr. Malasky's disingenuous e-mail by providing more reasoned bases why WMATA could not move expeditiously, stating:

> We can provide eagerness anytime.  There are just a lot of steps before we can go.  Getting a replacement site comes first.  Getting full and sole use of Van St. could ease pressure on Half St. if we don't get out [of the Bus Garage] in time [by opening day].

*Id.*

As stated, Monument had previously tried to secure a relocation site for WMATA's benefit.  Thus, Mr. Malasky next put Monument on to the task of getting full and sole use of Van Street for bus operations on game days as Mr. Requa had suggested, in yet another apparent requirement for Monument to satisfy before WMATA would move forward.  At a March 2, 2007 meeting, in which street utilization and pedestrian plans for the area were discussed among Monument's Ms. Phillips and WMATA's Mr. Malasky and Heidi Ackerman, WMATA required that Monument's pedestrian plan "needs to present Van Street dedicated only to buses."  See Handwritten Notes (Mar. 2, 2007), Exh. 21; (Phillips Decl. ¶8, Exh. B.)  Monument showed Van Street as such in its pedestrian plan, complying with WMATA's requirement.  (Phillips Decl. ¶8, Exh. B.)

At about the same time, Mr. Malasky had a conversation with Monument's Mr. Krokowski in which Mr. Krokowski asked how Monument could move the Bus Garage disposition process forward.  Mr. Malasky advised Mr. Krokowski that WMATA's disposition of the Bus Garage to Monument was "on hold pending resolution of the [Navy Yard] station entrance" construction delay issues that WMATA perceived.  *See* Email from J. Thomas, WMATA's Senior Project Manager, to G. Malasky *et al.* (Mar. 16, 2007), Exh. 39. Mr. Malasky did not tell him Monument had no rights.  *Id.*  Although these issues had never before been a condition imposed on Monument's rights with respect to the Bus Garage, WMATA was

17

imposing yet another condition on Monument before fully performing. Taking WMATA at its word, though it disputed there was a delay or, if so, that it was Monument's fault, Monument provided a recovery schedule to WMATA that ensured the completion of the Navy Yard Metro Station improvements by Opening Day 2008, at a cost of in excess of $700,000 to Monument. (Hines Decl. ¶20, Exh. A.) WMATA never kept the deal, however, and failed to deal with Monument on the Bus Garage once these perceived issues were resolved to WMATA's satisfaction. Monument also sought to jump start the completion of the second phase by submitting an unsolicited offer in the amount of $54.4 million to WMATA for the Bus Garage. *See* Email from A. Lawson to E. Moneme (Apr. 23, 2007), Exh. 40. This was the same amount on a square footage basis as Monument had paid WMATA for the Navy Yard Metro Station site. This offer "looked good" to WMATA in comparison to WMATA's appraised value of $47.6 million. *See* Email from M. Meister to A. Talaia (May 25, 2007), Exh. 41.

Thus, the following is at least a partial list of items and conditions that were imposed on Monument by WMATA before WMATA would move forward with the second phase of the disposition process, the Bus Garage, with Monument. Despite attempting to or satisfying each of these conditions, WMATA never honored the deal, and refused to deal with Monument on a sole source basis as it said it could and would:

1.  Entering into a construction contract with a liquidated damages provision for completion of Navy Yard Metro Station improvements – a project that WMATA did not want to complete itself and knew that neither it nor any developer other than Monument could complete within the required timeframe (Completed by Monument);

2.  Entering into contract for the disposition of Navy Yard Metro Station site at fair market value with WMATA (when the true value was substantially less given that there were no other developers who could develop the property) and including affordable housing restrictions, LSDBE, and First Source requirements imposed by WMATA for the benefit of the District of Columbia and AWC on this property and Monument's adjacent properties (completed by Monument);

3.      Providing a replacement parking lot for Navy Yard Metro Station employees (completed by Monument);

4.      Obtaining a replacement lot for buses garaged at the Bus Garage (attempted by Monument);

5.      Full dedication of Van Street to WMATA's use on game days shown in submitted pedestrian plans (completed by Monument); and

6.      Entering into a recovery schedule for timely completion of the Navy Yard Metro Station improvements (completed by Monument).

The following is at least a partial listing of concessions offered by Monument on the agreements and understandings that WMATA would enter into good faith negotiations with respect to the second phase of the disposition of the WMATA parcels for the Bus Garage. WMATA accepted the benefits of these concessions and offers but failed to honor its commitment and agreement to negotiate with Monument on the conveyance of the Bus Garage:

1.      Alleyway closures for alleys directly abutting the Bus Garage that inured to the benefit of WMATA and its operations at the Bus Garage (enhancing the value of the Bus Garage property); and

2.      Preventing any historic preservation designation being placed on the Bus Garage.

**N.      <u>WMATA Issues IFB 07-3</u>**

In April 2007, Mr. Malasky reported that:

We have been waiting for a response from the District as to whether they will insist that we honor the Anacostia Waterfront Corp competition, and deal with their selected developer, Monument Realty, or whether we are free to offer the Southeastern Bus Garage on a competitive basis.  I understand that we finally have heard from the District (orally) that they favor a competition.

Email chain from J. Requa to G. Malasky *et al.* (Apr. 19, 2007), Exh. 42.  Shockingly, however, although Mr. Malasky reported this alleged dramatic change in course, he is incapable of remembering either who it was in the District who allegedly made the statement that the District

favored a competition, or even who at WMATA reported to him that such a statement had apparently been made. (Malasky Dep. 100:7-101:11, Exh. 3.) In fact, Mr. Malasky was wrong.

Mr. Requa immediately corrected Mr. Malasky's incorrect and unfounded statement, stating specifically that "I would not say that the District favors a competition, but they will not put in writing that they favor Monument. Thus competition is the way to go." Exh. 42. Mr. Malasky knew that the Deputy Mayor's office wanted the Bus Garage to go to Monument. *See* Email from G. Malasky to N. Bottigheimer and M. Meister (June 1, 2007), Exh. 43.

Nonetheless, armed with only this pretext and fully cognizant that competition was now WMATA staff's preferred course of action – as Mr. Malasky revealed in his April 19, 2007 e-mail (Exh. 43) – Mr. Malasky unilaterally made the decision to begin advertising a competitive bid solicitation for the Bus Garage. (Malasky Dep., Exh. 3, 101:12-102:8, Exh. 3.) Thereafter, Mr. Lawson inquired of Emeka Moneme, who at the time held dual positions as a WMATA Board Member and Director of the District's Department of Transportation, whether "the District want[s] us to deal with Monument Realty on the SE Bus Garage Property or should we put it out for a competitive bid?" Email from E. Moneme to A. Lawson (Apr. 23, 2007), Exh. 44. Nonetheless, WMATA staff began implementing the plan it now preferred, advising Monument that the Bus Garage was going to be competitively bid. *See* Email from B. Krokowski to E. Moneme (May 30, 2007), Exh. 45.

WMATA began advertising the Bus Garage for sale in early June, 2007. Advertising, however, was not approved by the WMATA Board and, in fact, took several Board members by surprise. *See* Email from E. Moneme to J. Graham and D. Tangherlini (June 13, 2007), Exh. 46 ("Spoke with Catoe last night, and he was unaware as well. It appears [advertising] moved forward at a staff level, but did not go to the Board. We are going to address today."). On or

about June 7, 2007 WMATA issued its IFB No. 07-3 for the Bus Garage ("IFB 07-3") with a bid deadline set for July 23, 2007.

### O.     The District (Again) Exercises Its Right to Purchase the Bus Garage

On June 22, 2007, David Jannarone, in the Deputy Mayor's Office for Economic Development and Planning ("ODMPED"), called WMATA's Contracting Officer, Nat Bottigheimer, to notify WMATA that the Bus Garage had "already been awarded to Monument Realty as part of the [AWC] vision" and that the District wanted to formally exercise its right to purchase the Bus Garage to "arrang[e] for Monument to control the property [in] fulfill[ment] [of] the public purpose envisioned for the AWC plan."  *See* Email from N. Bottigheimer to J. Catoe (June 22, 2007), Exh. 47.  Mr. Bottigheimer recognized the District's right of first refusal and advised the District that it could ask WMATA to cancel IFB 07-3 and "negotiate a sale price based on competing appraisals."  Mr. Bottigheimer also advised Mr. Jannarone that a WMATA Board Member would have to send this request in writing to Mr. Catoe.  *Id.*  Three days later, Anabela Talaia of WMATA, who reports to Mr. Bottigheimer, stated that WMATA knew the District's request was coming and stated that the IFB 07-3 process should "continue as before." *See* Email from A. Talaia to B. Burns (June 25, 2007), Exh. 47.

On June 27, 2007, Mr. Moneme did as Mr. Bottigheimer advised, and sent a letter to Mr. Catoe formally requesting that IFB 07-3 be terminated so that WMATA could "enter into direct negotiations with [ODMPED] for purchase of the WMATA sites." *See* Letter from E. Moneme to J. Catoe (June 27, 2007), Exh. 49.  WMATA did not terminate IFB 07-3.  (Bottigheimer Dep. 27:17-20, Exh. 4.)  Nor is there any evidence that WMATA negotiated with ODMPED.  In fact, the reasonable inference to be drawn from the documents produced in discovery is that WMATA studiously avoided negotiating with ODMPED, since WMATA knew that ODMPED preferred

Monument and it was no secret that WMATA staff and Mr. Catoe now preferred a competitive process. Exh. 42.

On July 11, 2007, D.C. Councilmember Graham sent a letter to WMATA conveying his full support "for the request made by Director Moneme regarding the sale of [the Bus Garage]" and joining the District "in requesting that WMATA enter into direct negotiations with [ODMPED] for the purchase of [the Bus Garage]." *See* Letter from J. Graham to J. Catoe (July 11, 2007), Exh. 50. On July 16, 2007, WMATA posted a notice on its website stating that WMATA had received the District's request to purchase the Bus Garage, and that no action would be taken on the District's request until WMATA's Board of Directors met on July 26, 2007. *See* WMATA Website Real Estate Alert (July 16, 2007), Exh. 51. WMATA's notice also stated that WMATA would continue to accept bids in response to the IFB until the deadline on July 23, 2007. *Id.* Despite the notice, however, WMATA began to engage in internal discussions and negotiations over the terms of the sale of the Bus Garage even though Board approval was still pending. (Bottigheimer Dep., 126:6-13, Exh. 4.) Mr. Bottigheimer has no information who participated from the District in those discussions, however. (*Id.* 120:16-122:5.)

On July 23, 2007, Monument, the John Akridge Company, and one other bidder submitted bids in response to IFB 07-3. Despite the requirement in the IFB itself and the WMATA's Procurement Procedures Manual ("PPM") governing WMATA's sealed bid procedures, Exh. 52, that bids be opened immediately, WMATA did not do so, instead holding bids unopened and without amending or modifying the IFB or providing any notice to bidders. This was done at Mr. Bottigheimer's recommendation. (Bottigheimer Dep., 29:7-32:22, 35:19-36:2, Exh. 4.)

22

**P.**    **Internal WMATA Deliberations Deviate From WMATA's Established Policy**

According to a WMATA appraisal effective May 16, 2007, the fair market value of the Bus Garage was $47.6 million. *See* Relevant Portion of Appraisal in Summary Report (May 16, 2007), Exh. 53. As discussed, WMATA policy and practice required that WMATA use this number as a basis for determining fair market value in its negotiations with the District. Yet, Mark Meister of WMATA's Office of Property Development and Management, e-mailed Mr. Bottigheimer shortly after Mr. Moneme's June 22, 2007 request, stating that WMATA would be willing to sell the Bus Garage to the District for $60 million. Exh. 54. Several days later, a draft response letter to Mr. Moneme's request reiterated that "WMATA is willing to enter into a Purchase and Sales Agreement with the District with a sixty (60) day close and a purchase price of $60 million." *See* Email from A. Talaia to J. Requa (July 3, 2007), Exh. 54. Monument was prepared to meet these terms. (Hines Decl. ¶23, Exh. A.)

However, in apparent recognition of the fact that this price would be insufficient to allow WMATA to construct a replacement facility at D.C. Village, WMATA began changing its internal position, substantially deviating from its long-standing policy and practice. Commencing on or about July 11, 2007, WMATA began raising the "base asking price" for the Property, first to $65.1 million and then to $67.4 million. See Email from A. Talaia to N. Bottigheimer (July 11, 2007), Exh. 55. Mr. Bottigheimer stated during his deposition that based on his recollection the purchase price for the Southeastern Bus Garage was raised by WMATA from $60 million to $65.1 million and then to $67.4 million because of an "emerging policy" within WMATA that the District should pay for all costs of the garage relocation. (Bottigheimer Dep., 110:8-16, 125:17-21, Exh. 4.)

Not only were these numbers at least $12 million more than the Bus Garage's most recent appraised value, WMATA also was plainly not interested in following a policy of full disclosure

with the District, indicating that it would only disclose its appraised value "if and when" the District asked. *See* Email from M. Meister to N. Bottigheimer (June 28, 2007), Exh. 56. WMATA further deviated from its past practice by imposing a requirement that the District also lease the Bus Garage back to WMATA at no cost until such time as a temporary or permanent facility is completed. (Bottigheimer Dep., 114:9-14, Exh. 4.)   Yet, WMATA also "purpose[fully]" decided that in its negotiations with the District the "small detail of when we vacate [the Bus Garage] should be left silent" as the negotiations were "all about purchase price." Exh. 54; Email from A. Talaia to N. Bottigheimer *et al.* (June 28, 2007), Exh. 57.

WMATA continued internally to recognize the connection between the District's rights in the Bus Garage and Monument's rights in the Bus Garage.  For example, WMATA noted that the District's letter asked WMATA to work directly with the Deputy Mayor for Planning and Economic Development, Neil Albert, and that this request was "because Albert has the AWC responsibility and [] the link to Monument."  *See* Email from A. Talaia to J. Requa and N. Bottigheimer (July 3, 2007), Exh. 58.  WMATA had no interest in dealing with Mr. Albert, however, since it wanted to have a competitive bid process and believed that Monument was behind schedule on the Navy Yard station improvements.

On or about July 12, 2007, WMATA staff recommended that WMATA cancel IFB 07-3, enter into direct negotiations with the District, and "[a]chieve a sales price that covers the full replacement cost of the Southeastern Garage relocation (current estimated cost, $65 million) or market value, whichever is greater."  See WMATA Staff Report (July 12, 2007), Exh. 59.  On July 12, 2007, WMATA's executive committee approved terminating IFB 07-3 in favor of selling the Bus Garage to the District subject to yet another condition being imposed on the District for WMATA's benefit: that in the event the District subsequently sold the Bus Garage to

Monument, WMATA would capture any economic upside realized in that transaction by the District.  *See* WMATA's Southeastern Bus Garage Timeline, Exh. 60 (7/13 entry).

### Q.    WMATA Seeks an Illegal Restraint on Further Alienation by the District

A series of draft Board resolutions prepared for WMATA's upcoming July 26, 2007 Board Meeting at which the negotiations with the District were to be approved, reflect yet another new and emerging policy being developed within WMATA that was to be imposed on the District.  This new policy was WMATA's attempt to share in or keep all the profit realized by the District if it later resold the Bus Garage to Monument at a higher price.  See Proposed Board Resolutions (July 26, 2007), Exh. 61, ¶ 3, p. 2.  WMATA was seeking to establish a new policy relating to the disposition of its real property holdings to a Compact jurisdiction. (Bottigheimer Dep. 117:2-118:19, Exh. 4.)  This policy had not been adopted by WMATA's Board and had never before been tried by WMATA, as WMATA's Real Estate Committee acknowledged in subsequent public sessions in October, 2007.  *See* Minutes from WMATA's Planning, Development and Real Estate Committee (Oct. 11, 2007), Exh. 62 at 11:22-14:10.

Yet, at the same time, WMATA staff acknowledged that "WMATA is required to honor funding jurisdictions' requests to purchase excess WMATA property" and that the District was entitled to pay only fair market value for the Bus Garage—a value established through appraisals.  *See* Email from M. Meister to B. Burns (July 24, 2007), Exh. 63; Email from N. Bottigheimer to J. Requa et al. (July 23, 2007), Exh.  64.  In fact, WMATA was not prepared to honor its long-standing policy in its dealings with the District.

On July 25, 2007, according to WMATA, the District "changed its mind about buying [the Bus Garage] 24 hours before it goes to the Board."  See Email from A. Talaia to M. Meister (July 25, 2007), Exh. 65.  Later that same day, WMATA held a meeting with unknown persons regarding the request that WMATA negotiate with the Deputy Mayor's Office.  *See* Email from

A. Talaia to N. Bottigheimer (July 25, 2007), Exh. 66.  Although neither WMATA nor the District can identify a single person who attended the meeting, at least one of the topics discussed was apparently whether WMATA would allow the District to assign its rights to purchase the property to Monument.  *Id.*  This of course, would have the effect of circumventing the "new and emerging" policy that WMATA was trying to impose on the District in this transaction of maintaining for itself any economic benefit realized by the District if the property was resold to Monument.  Despite its prior statements to its own General Manager that it could do a direct deal with Monument and its similar prior statements to the District, WMATA now refused to deal directly with Monument.  (Bottigheimer Dep. 106:21-107:2, Exh. 4) ("We concluded that the sale must be to the District.  We did not place any conditions on the partners with whom the District would work subsequent to a sale to the District.").  Indeed, Mr. Bottigheimer testified that he was unaware of any document within WMATA that prohibits the District from assigning its right to purchase the property to Monument.  (*Id.* 108:3-18.)  Yet, WMATA, in response to this apparent request from the District to assign its right to Monument, "[t]old [the] District no." Exh. 66.

Later that evening, Mr. Moneme sent an email to Mr. Catoe noting that it is his "intention to move that Planning and Development Committee item VIII.C [Approval of Sale of Southeastern Bus Garage to the District] be removed from the agenda tomorrow."  *See* Email from E. Moneme to J. Catoe (July 25, 2007), Exh. 67.  The following day, the agenda item was removed. Mr. Moneme's e-mail indicates that at least one possible reason he withdrew the request was that WMATA would not permit the District to assign its option to purchase the Bus Garage to Monument.

### R.     WMATA Returns Unopened Bids Under IFB 07-3

On July 27, 2007, despite never having cancelled IFB 07-3 or providing any notice of cancellation of the bid, WMATA returned the unopened bids it had previously received in response to IFB 07-3 to the bidders and indicated that bidding would be reopened. *See, e.g.,* Letter from N. Bottigheimer to the John Akridge Development Company ("Akridge") (July 27, 2007), Exh. 68. WMATA never formally cancelled or amended IFB 07-3 and never provided notice or other documentation of any such cancellation or amendment to any of the bidders as required under WMATA's PPM, Exh. 52 (including §§ 514.1, 514.2, 514.3, 515.4 and 515.5). (*See* Bottigheimer Dep. 36:17-38:22, Exh. 4.)  WMATA's PPM states that any cancellation of an IFB must be in documented, in writing and provided to all bidders. Exh. 52 at §§515.4, 515.5. WMATA's PPM also requires that WMATA open the bids immediately after the bid deadline set forth in the IFB, which WMATA also failed to comply with. *Id.* §521.1.

### S.     Akridge Retenders Bid Under IFB 07-3 to WMATA

Disagreeing with WMATA's actions regarding IFB 07-3, Akridge on July 30, 2007 retendered the bid it made under IFB 07-3 to WMATA and requested that WMATA reconsider its position and not reopen the bidding. *See* Letter from P. Wolfe of Williams & Connolly, counsel for Akridge, to N. Bottigheimer (July 30, 2007), Exh. 69 ("[E]nclosed please find the original bid and bid deposit submitted to WMATA by Akridge on July 23, 2007 for consideration in accordance with [IFB 07-3].").

### T.     WMATA Issues IFB 08-1

WMATA then initiated another invitation for bids, IFB No. 08-1, for the sale of the Bus Garage. IFB No. 08-1 established the sole criterion for the winning bid would be "[t]he bid which represents the best net return to WMATA after leaseback monthly rent for WMATA's anticipated lease term (which may, in WMATA's sole discretion be less than 36 months) is

deducted from the Bid Amount." IFB No. 08-1, Exh. 70. IFB No. 08-1 did not restrict or otherwise prohibit bidders from submitting a bid that included a so-called "relative" or "escalator" bid. *Id.* Moreover, nothing in any WMATA procurement manual, policy, rules, or regulations prohibited such a bid. Likewise, IFB 08-1 did not permit the offer of any additional consideration outside that which was requested in the bid solicitation. *Id.*

On August 28, 2007, Monument submitted two bids under IFB 08-1. The first bid was for the minimum bid price of $60 million, with no charge for the leaseback. Monument also submitted an alternate bid which offered to pay $250,000 more than any other qualified, responsive bid (the "Alternate Bid"), also without charge for the leaseback. *See* Monument's Alternate Bid in Response to IFB 08-1 (Aug. 28, 2007), Exh. 71. Both bids waived the forty-five day due-diligence study period. *See id.*

**U.      Akridge Submits Conditional, Non-Responsive Bid**

Also on August 28, 2007, Akridge submitted a bid in response to IFB 08-1. *See* Akridge Bid in Response to IFB 08-1 ("Akridge Bid"), Exh. 72. The Akridge Bid was submitted on three express conditions: First, according to a cover letter signed by Akridge's President Matthew Klein attached to the Akridge Bid, it was submitted on the condition that it could only be accepted if WMATA did not award a contract to Akridge under IFB 07-3, which Akridge contended was still live and which had never been formally cancelled by WMATA. *Id.* Second, the cover letter stated that the Akridge Bid was submitted on the conditions set forth in a side letter sent by Akridge's counsel to WMATA. *Id.* The side letter, which was outside the four corners of the bid solicitation documents, contained two conditions. It stated that the Akridge Bid was "made without prejudice to Akridge's contention outlined in [a] letter to [WMATA] of August 17, 2007, that the process by which Bid No. 07-3 . . . was cancelled was improper and a violation of WMATA's procurement regulations and the terms of the RFP for the Initial Bid

Request." *See* Letter from P. Wolfe to C. O'Keeffe (Aug. 28, 2007), Exh. 73. Akridge was preserving for itself the right to protest that it should have won under IFB 07-3 if it was not the successful bidder under IFB 08-1. The side letter also set forth a third condition, that the bid submitted by Akridge in response to IFB 07-3 (in the amount of $80,000,000, some $20 million more than the minimum bid amount), which WMATA was still in possession of, could not be treated as a bid under IFB 08-1 and must be returned.

Moreover, although the bid amount of the Akridge Bid was stated as $69,250,000.00, and contained a substantial, unbalanced, leaseback cost to WMATA in excess of $10,000,000 over the life of the potential leaseback term, the Akridge Bid contained an offer of consideration outside of anything requested or permitted within the four corners of IFB 08-1. Specifically, the Akridge Bid included an offer to negotiate favorable terms on which WMATA could lease a lot from Akridge on a nearby site owned or controlled by Akridge at Buzzard's Point in the District so that WMATA could quickly relocate its buses out of the Bus Garage and save money on the leaseback term. Specifically, the Akridge Bid stated:

> Akridge manages an Affiliate that owns and/or controls substantial portions of Square 664 (the "Akridge Property") and, if this bid is accepted, Akridge would immediately commence negotiations with WMATA to establish an arrangement pursuant to which WMATA would be able to use the Akridge Property as a temporary site for locating assets presently located on the Property during the period WMATA is contemplating relocation of the operations presently conducted at the Property.

Exh. 72 at 11. This offer of additional consideration was non-responsive according to WMATA's contracting officer. (*See* Bottigheimer Dep. 61:15-17, Exh. 4.)

Under WMATA's PPM and standard sealed bid procedures, WMATA was required to open the bids and select the successful bidder and any Alternate Bidders "immediately after the bid deadline." Exh. 52 at §521.1; Exh. 70 ¶5, p. 7. Although WMATA opened the bids received

under IFB 08-1 immediately, WMATA failed to select a winning bidder for a month, introducing a period of time rife with the possibility for foul play.

V.    **WMATA's Ignores the "Sealed" Nature of the "Sealed Bid" Procedures and Engages in Extensive, Prohibited, Communications and Correspondence With the Eventual Winning Bidder: Akridge**

During the bid process, both before and after bid opening, WMATA engaged in a number of discussions and communications with Akridge, including regarding Akridge's offer of additional consideration.  Post-bid opening discussions are expressly prohibited by the PPM. Exh. 52 at §§500.1, 500.11.  Moreover, any communications with bidders during any point in the bidding process were supposed to have been disclosed by WMATA according to its IFB.  Exh. 70 ¶¶C.5, D.5.  None of the communications and discussions with Akridge were disclosed.

The first evidence of Akridge's exchanges with WMATA is a letter from Akridge's counsel on July 25, 2007, complaining about the bidding process that WMATA was following, including its decision not to open the bids immediately. The letter threatened "the filing of a protest with respect to the manner in which the Bid Request was conducted" unless "a conversation with a representative of WMATA" obviated the need for a protest.  Letter from P. Wolfe to E. Hewlett, Chairwoman of WMATA's Board of Directors (July 25, 2007), Exh. 74.  In response, Ms. O'Keeffe called Akridge's counsel.  Email from C. O'Keeffe to N. Bottigheimer (July 26, 2007), Exh. 75.

On July 30, 2007, Akridge submitted another letter to WMATA arguing that "reopening the bidding process [by issuing IFB 08-1] will be unfair to those bidders who timely followed WMATA bidding procedures."  *See* Letter from P. Wolfe to N. Bottigheimer (July 30, 2007), Exh. 76.  Akridge requested that the bidding process not be reopened and resubmitted its $80,000,000 bid in response to IFB 07-3 to WMATA.  *Id.*  WMATA would hold that bid until it

was returned on August 29 at Akridge's request.  *See* Letter from N. Bottigheimer to Akridge (Aug. 29, 2007), Exh. 77.

On or about August 21, 2007, Bob Burns of WMATA left a voice message for a "Brian" at Akridge, keeping him appraised of the bid process and stating that "from [his] position in LAND, the real estate group, we're just still proceeding as normally with our bidding process, which will end next Tuesday, 28th."  *See* Voicemail Transcript from B. Burns (Aug. 21, 2007), Exh. 78, ¶ 2.  On August 24, 2007, WMATA responded to Akridge's letters dated July 30, 2007, August 3, 2007, and August 17, 2007.  *See* Letter from C. O'Keeffe to P. Wolff (Aug. 24, 2007), Exh. 79.

### W.   **WMATA and Akridge Enter into Prohibited Post-Bid Opening/Pre-Award Discussions**

On September 12, 2007, after the bids under IFB 08-1 had been opened on August 28 but while WMATA was still reviewing the bids before making a selection on September 27, Matthew Klein, President of Akridge, sent a letter to Mr. Bottigheimer and Ms. O'Keeffe regarding the offer of additional consideration contained in the Akridge Bid.  Akridge stated that the offer of additional consideration was an "integral part" of the Akridge Bid.  Akridge offered to open up "further discussions" and "negotiations" regarding "what Akridge believes is a potential for solving WMATA's stated need to relocate and maintain the buses presently housed at the Southeast Bus Garage location."  *See* Letter from M. Klein, President of Akridge, to N. Bottigheimer (Sept. 12, 2007), Exh. 80.  The letter emphasized additional benefits to WMATA if WMATA accepted the Akridge Bid.  *Id.*  Akridge described the facility as "well-situated," one that "has the potential to be adapted to address interior maintenance, de-coining and refueling functions," "is proximate and could be immediately available," and has a "commercial location." *Id.*  Akridge urged WMATA to consider the offer as a "serious offer."  *Id.*

In direct response to this letter, Mr. Bottigheimer called Mr. Klein and left a voicemail message, in which he acknowledged "the availability of the two-acre site in Southeast as a possible alternative" and thanked Mr. Klein and Akridge "for calling our attention to that aspect [of the bid] and I did want to say that we received it and are treating it as a serious offer." Exh. 78 at ¶3. In this same voice message, Bottigheimer, again during the bid consideration period, and during which, even WMATA agrees, conversations with bidders were strictly prohibited, (Bottigheimer Dep. 71:2-4, 77:16-21, Exh. 4), requested a meeting or a "time to discuss; sometime soon" several other items pending with Akridge, Exh. 78 at ¶3. Mr. Bottigheimer never indicated to Mr. Klein in his voice message, and does not recall ever telling Akridge, that WMATA would not consider the Akridge offer of additional consideration. (Bottigheimer Dep. 74:12-16, 82:16-18, Exh. 4.) Instead, Mr. Bottigheimer understood the offer as "an attempt to strengthen [Akridge's] bid," but did not ask any other bidders whether they could offer similar consideration outside the bid solicitation to WMATA. (*Id.* 64:18-19, 65:4-8, Exh. 4.)

On September 20, 2007, Akridge sent yet another letter to WMATA urging WMATA to consider the "material savings" it could realize from the offer of additional consideration impermissibly contained in the Akridge Bid if WMATA selected Akridge as the winning bidder. *See* Letter from T. Wilbur, Akridge's Senior Vice President, to N. Bottigheimer (Sept. 20, 2007), Exh. 81. Akridge decided to make "some cost and revenue assumptions for purposes of demonstrating the potential savings" to WMATA "for pursuing the Akridge affiliated site in SW [] as a possible interim relocation site for the Southeast Bus Garage." *Id.* Based on the cost and revenue assumptions, Akridge emphasized to WMATA that the Buzzard's Point facility Akridge was offering could result in a net savings to WMATA of $5.3 million. *Id.* The letter also states that "[i]n addition to the potential cost savings referenced above, utilization of the SW Site

would also mitigate air quality, congestion, road and safety impacts of having buses travel significant distances to be fueled and serviced."  *Id.*

Akridge was then given a private tour of the Bus Garage on September 26, 2007 between 2:00 and 4:00 p.m., one day before the contract was awarded to Akridge by the WMATA Board.  *See* Email from B. Burns (Sept. 26, 2007), Exh. 82; (*see also* Bottigheimer Dep. 76:16-17, Exh. 4.) ("I know that Akridge toured the site at some point.").  No other bidder was provided this opportunity, and this fact, as well as all of the foregoing facts relating to how WMATA handled the Akridge Bid and these communications, were disclosed only in discovery in this case.  WMATA never made these facts known to other bidders and did not disclose them publicly despite the requirement in its IFB that it do so.  (Bottigheimer Dep. 46:17-18, 49:16-21, Exh. 4.)

WMATA's Board of Directors voted to award the contract for the sale of the Bus Garage to Akridge.  *See* Board of Directors Resolution (Sept. 27, 2007), Exh. 83.  The next day, Adam Gooch of Akridge emailed Mr. Burns of WMATA asking for guidance on the following: "During the bid process we communicated to WMATA that we have an alternate facility on Buzzard Point that, with some improvements, could be a good solution for the Garage Replacement Project.  Do you know if WMATA is interested in pursuing this option or learning more about it?"  *See* Email from A. Gooch to B. Burns (Sept. 28, 2007), Exh. 84.  This inquiry was forwarded to WMATA's engineering department who, later that same day, noted that WMATA should give further study to the Buzzard's Point facility:

> If the alternate facility is 4 to 5 acres and contains drive-in warehouses that are to District Code, then ESVC [WMATA's engineering department] would study a brief description and site map.  Please refer Akridge to the September 14 presentation to the PD&RE committee on the re-assignment/alternatives analysis.

*See* Email from J. Dittmeier to B. Burns et al. (Sept. 28, 2007), Exh. 85.

Mr. Bottigheimer, more than a month later, prepared a draft letter to Akridge declining its offer of additional consideration, but Mr. Bottigheimer has no recollection whether the draft was ever finalized and sent or not. (Bottigheimer Dep. 82:12-85:2, Exh. 4.) He does not believe that he ever communicated to Akridge that WMATA would not consider Akridge's offer of additional consideration. (*Id.* 82:12-85:2.)

## II.  ARGUMENT

### A.  Monument's Contractual and Real Property Rights Prohibit WMATA From Selling the Bus Garage Out From Under the Plaintiffs

WMATA is not permitted to evade Monument's rights and interests by conveying the Bus Garage to Akridge. In at least three independent ways, WMATA has agreed to grant Monument rights and interests in the Bus Garage which are superior to any that WMATA could agree to convey to Akridge or anyone else. First, WMATA agreed to participate in and be bound by the District's planning process, under which AWC was designated as the District's Master Planner and Monument was selected as Master Developer for the Half Street Area. At all times, WMATA recognized and acted on these designations. Second, WMATA entered into a direct agreement with Monument Realty to negotiate exclusively with Monument to finalize and consummate the sale of the Bus Garage. This agreement came about as a result of WMATA expressly excluding AWC from the original negotiations, dealing directly with Monument, knowing Monument had contractual expectations in the Bus Garage as part of a phased disposition process, allowing Monument to provide consideration directly relating to the Bus Garage, and never telling Monument that it had no such rights and even acknowledging those rights. Third, WMATA had a longstanding commitment to make the Bus Garage available for sale to the District at fair market value, and the District assigned its rights to Monument (or would have done so absent WMATA's actions). But for WMATA's unilateral decision in 2007

to abrogate its obligations, the conveyance would have been consummated by now by WMATA and Monument, acting in good faith under their respective contractual requirements.

### 1.    The District's Planning Process

The way in which development proceeded in the Ballpark District is unique in our City's history.  Recognizing that the development of the stadium would be a boon to certain areas of the City, the D.C. Council passed the AWC Statute to effect a mechanism to govern the development, to elucidate and confirm the public policy goals to be furthered as part of the development, and to ensure that the City's interests would be maximized as part of an orderly, coordinated, and planned development of the areas in the Ballpark District.

The D.C. Council obviously recognized that, depending upon where it chose to locate the new Ballpark, adjacent property owners would enjoy a windfall in the form of greatly increased property values solely as a result of their proximity to the stadium.  WMATA, for example, had owned the Bus Garage for nearly 30 years.  Once the Ballpark location was selected, the Bus Garage's value multiplied, essentially overnight.  2005 appraised values were in the mid-$30 million range.  The increase in value was not based on anything that WMATA had done, but resulted solely from the decision to locate the stadium a few blocks away and the value that Monument brought to the Half Street Area through its acquisitions, investments and development activities.  The AWC Statute, in recognition that such windfalls would arise, had provisions built into it to ensure that the citizens of the District (whose taxes were helping subsidize the attraction of Major League Baseball to the City) would not be left out of the related economic benefits.  *See, e.g., D.C. Code Ann.* §2-1223.27 (requiring a certain percentage of housing in property disposed of by AWC be affordable to moderate-income households).

The AWC Statute also embodied the public policy goals of the District to provide for the development, redevelopment, and revitalization of the Anacostia Waterfront.  *Id.* §2-1223.02(b).

35

This included the coordinated development of the areas within the Anacostia Waterfront, which included the Ballpark District and the Half Street Area. *See id.; see also id.* §2-1223.01(1). The idea was obviously to avoid a piecemeal development of the area around the Ballpark, and to provide for a coordinated development that would make the best use of the properties involved and result in the highest possible benefits for the City. Yet that piecemeal development is precisely the result WMATA's actions will now generate.

The genesis of Monument's rights was in late 2004, when WMATA, even before being specifically asked, stated that it would participate in the District's master planning process for the area. Then, in May 2005, WMATA assented to the disposition of the WMATA-owned properties in the Ballpark District through the District's planning process, embodied through AWC. In the first instance, WMATA's agreement was with the District, wherein WMATA indicated that it would "work within the context of the city directed planning effort," and that it would cease its independent planning initiatives for those properties. WMATA was fully engaged in the planning process.

Moreover, WMATA clearly understood, acknowledged, and agreed with the inevitable conclusion that the highest and best use for the areas in close proximity to the stadium is not as a bus garage. WMATA also saw the opportunity to capitalize on the increased property values by selling the Bus Garage and using the proceeds to construct and relocate to a modernized facility in another location. WMATA's decision also dovetailed with its longstanding internal policy and recognized practice of offering its excess real property holdings on a priority basis to the local jurisdictions, for fair market value. Thus, when WMATA issued the JDS in March 2005, Exh. 86, the District reminded WMATA of the need to operate through the AWC process, *see* Exh. 7. WMATA withdrew the JDS in accordance with the District's request.

As AWC moved forward with the process, it prepared the RFEI by which it would select master developers for the Ballpark District. WMATA again confirmed its agreement to work within the AWC process, informing AWC that it was authorized to include the Navy Yard Metro Station site and the Bus Garage in that RFEI.

Arising out of the RFEI, Monument won the designation of "Master Developer" for the Half Street Area of the Ballpark District, which included within it the Navy Yard Metro Station site and the Bus Garage. The award was well-publicized, and its meaning was confirmed by AWC in public statements: as a Master Developer, Monument Realty gained exclusive rights to negotiate for land within the Ballpark District; and, among other things, AWC would be taking title to WMATA-owned properties for conveyance to the Master Developers. *See* discussion *supra* Part I.E. Although WMATA has gone to great pains in this case to stress that it did not make any of the relevant public statements, and WMATA has tried to downplay the significance of the fact that its agents stood idly by while these statements were made and did not object to or otherwise contest these statements, correspondence obtained in discovery has revealed that WMATA did, in fact, recognize and accept the realities of the process it agreed to follow. *See, e.g.,* Exh. 12-14.

The course of dealing, in fact, was consistent with the December 2005 LOI entered into between Monument and AWC. Although WMATA was not a signatory to the LOI, it agreed to participate in the process outlined in the LOI and went along with the inclusion of its properties (including the Bus Garage) as being governed by the District's planning process implemented through AWC. The inescapable conclusion from that course of dealing is that all parties understood and agreed that Monument had the rights alleged, namely to negotiate with WMATA

for the Bus Garage and to acquire it. The parties' discussions and negotiations ultimately crystallized into an enforceable agreement – one that all parties recognized and acted on.

The Joint Task Force created in early 2006 was but another manifestation of WMATA's consent to be bound. Although the first focus of the Task Force meetings eventually came to be the development of the Navy Yard Metro Station site (both internally and externally), the Bus Garage was continually a topic of discussion. WMATA's agents were present at those times. Documents prepared contemporaneously by WMATA's agents provide further confirmation that WMATA knew that Monument was Master Developer and would spearhead the development of the Half Street Area of the Ballpark District. *See* Exh. 28. WMATA acknowledged that the Bus Garage had "already been awarded to Monument as part of [the AWC] vision." *See* Exh. 47. WMATA's later decision to ignore Monument's rights does not dictate that they are unenforceable, particularly where the parties acted on them over the course of many months, WMATA received substantial consideration that it would not otherwise have received as a result of those rights, and WMATA failed to tell Monument that it did not have those rights.

Nor is the validity of Monument's rights affected by the fact that they had their genesis in a general vision for the development of the Ballpark District and in preliminary discussions, negotiations and a course of conduct that later crystallized into enforceable rights. Under District of Columbia law, contractual obligations can arise even in the absence of a meeting of the minds on every material term. In fact, the remedy of specific performance, which Monument has requested, is available even in situations where material terms are omitted – since the Court has the power to supply such terms based on evidence of relevant custom and usage. *See Ammerman v. City Stores Co*., 394 F.2d 950, 955 (D.C. Cir. 1968); *Hackney v. Morelite Constr*., 418 A.2d 1062, 1068-69 (D.C. 1980). Notably in this case, however, any price term that

38

WMATA asked for the Bus Garage, whether the price of its own appraisal of $47.6 million, the $60 million or more that WMATA staff indicated would be required from the District in July, 2007 or the $69,250,000 that Akridge was ultimately willing to pay, would have been willingly met by Monument, as evidenced by its unsolicited offer for the Bus Garage in 2007 and in the bids it submitted to WMATA.  (Hines Decl. ¶¶ 23-24, Exh. A.)  Monument had waived the due diligence period and was ready, willing and able to close within the 60 days WMATA said that it would require, or less or more.  (*Id.* ¶23, Exh. A.)  There are no other material terms to closing.

At the very least, WMATA had an enforceable obligation to negotiate in good faith with Monument concerning the disposition of the Bus Garage.  WMATA stated to all parties that this was a two-phase disposition process.  WMATA then imposed repeated conditions on Monument to continuing these negotiations, telling Monument for example that it was "on hold" and wanted to "wait and see" how things progressed on the Navy Yard construction site before continuing.  Monument met even these additional conditions, but to no avail.  Agreements to negotiate are valid and enforceable under District of Columbia law.  *See, e.g., BMX Elecs., Inc. v. Control Data Corp.,* 929 F.2d 707, 708 (D.C. Cir 1991) (including consideration of a claim for breach of contract involving "an exclusive option to negotiate for the purchase of a business and a building").  An agreement to negotiate in good faith is both valid and enforceable.  *Id.* at 711; *see also Novecon Ltd. v. Bulgarian-American Enter. Fund*, 190 F.3d 556, 564 (D.C. Cir. 1999) (stating that parties had created an agreement to negotiate, obligating the parties to conduct good faith negotiations).

And although the issue has not been squarely addressed by the D.C. Circuit or the D.C. Court of Appeals, it is relatively well-recognized that even preliminary agreements, which leave open specific terms for discussion and resolution later, can give rise to enforceable rights.  *See,*

*e.g., Burbach Broad. Co. of Del. v. Elkins Radio Corp.*, 278 F.3d 401 (4th Cir. 2002) (finding that a preliminary agreement to negotiate was valid, even though the parties were still negotiating terms of their final deal and even though the parties intended to enter a final asset purchase agreement and stating that "[u]nder this duty to negotiate in good faith, a party is barred from renouncing the deal, abandoning the negotiations, or insisting on conditions that do not conform to the preliminary agreement."). WMATA's enforceable obligation stems in part from the obligation of good faith and fair dealing. *Id.* at 409; *see also Teachers Ins. & Annuity Assoc. of Am. v. Tribune Co.*, 670 F. Supp. 491, 499-503 (S.D.N.Y. 1987). It was on this basis, in part, that the Superior Court denied a motion to dismiss in the case of *WDC Baseball Partners LLC v. District of Columbia, et al. See* Plaintiffs' Supplemental Opposition to Motion to Dismiss First Amended Complaint and Exhibit "1" thereto. WMATA cannot now turn its back on two years of active participation in a process that had a designed result WMATA knew of and agreed to, particularly where it cannot point to a single instance of harm to it in honoring its commitment.

District of Columbia law imposes an implied covenant of good faith and fair dealing. *See Allworth v. Howard Univ.*, 890 A.2d 194, 201 (D.C. 2006). Here, WMATA clearly evaded the spirit and substance of its obligations, willfully deciding to ignore Monument's rights, dishonestly telling Monument that WMATA was in "no hurry" to move forward when it plainly was and was telling others so, and then imposing additional conditions relating to the Navy Yard Metro station internal improvements that Monument satisfied, while WMATA moved obstinately forward with a series of efforts to *not* negotiate with or convey the Bus Garage to Monument. Failure to honor "an agreed common purpose," and disregard for "the justified expectations" of the other party are actionable. *Id.*

### 2.    The Direct Contract With WMATA

In mid-2006, the tripartite arrangement involving the District through AWC, Monument, and WMATA evolved into a direct arrangement between WMATA and Monument.    The impetus for the change was WMATA.  WMATA expressed frustration at the delay in obtaining a memorandum of understanding from AWC, and with perceived inadequacies in the MOU when it was received, including, specifically, that it offered WMATA no help in solving the issue of where it would relocate its Bus Garage.  WMATA, in July 2006 made the decision to cut AWC out of the middle, and to deal directly with Monument to finalize and consummate what all parties had agreed by then was the first phase of a two phase transaction.  This was based in part on WMATA's internal decision to de-link or decouple the Navy Yard Metro Station from the Bus Garage.

In fact, WMATA insisted that the conveyance of the Navy Yard Metro Station site had to be consummated separately from the Bus Garage.  But the form of its insistence is revealing – WMATA never said that the Navy Yard Metro Station site and the Bus Garage had to be dealt with separately because Monument Realty had rights in the former but not the latter.  WMATA said no such thing.  Instead, WMATA stated simply that issues of timing were different for both properties: WMATA wanted to be sure that the Navy Yard Metro Station could be sold and improved before Opening Day in 2008, WMATA did not want to delay the overall transaction or complicate its approval by the WMATA Board by keeping the properties together, and WMATA had to wait to consummate the conveyance of the Bus Garage until it had identified a relocation site.  In fact, not only did WMATA *not* say that the properties were being de-linked or decoupled because Monument had rights in one but not the other, but information obtained in discovery has *confirmed* that WMATA knew and understood that Monument's rights would be complied with at a later date.  *See* Handwritten Notes from A. Altman (Sept. 22, 2005), Exh. 87; Meeting Notes

41

with Councilmember J. Graham (June 28, 2006), Exh. 88; Exh. 20; Exh. 18; Exh. 38.  AWC even advertised the Bus Garage belonged to Monument, and WMATA did not object.  *See* Exh. 22.

Having gone through almost two years within the District's planning process, and knowing that all of the other participants understood their agreement that Monument would acquire both the Navy Yard Metro Station site and the Bus Garage, it flies in the face of reason to believe that WMATA thought it could remain silent and need not correct the "misconceptions" of all of the others about Monument's rights and interests.  WMATA remained silent, and did not object, and the only probable explanation is that WMATA knew that what everyone else was saying was true.  Indeed, WMATA can cite not a single circumstance prior to March 2007 – when it was far too late – that any of its agents told Monument that it had no rights in the Bus Garage.  (Malasky Dep. 91:22-93:11, 109:16-110:6, Exh. 3.) Even that statement is dubious, since contemporaneous notes of the March 2007 meeting where such statements were allegedly made bear no recognition of such statements and instead reflect that the only two parties at the meeting, WMATA and Monument, discussed when a deal would be done for the Bus Garage disposition.  Exh. 21.

The parties all recognized that, at WMATA's insistence, the dispositions would be conducted in phases and the conveyance would be directly between WMATA and Monument. *See* Exh. 18.  Notably, although in this lawsuit WMATA has affected the canard that WMATA Board approval was required for all aspects of the rights claimed by Monument in this lawsuit, WMATA's own agents – in statements made contemporaneously with the underlying events – refuted those assertions.  *See, e.g.,* Exh. 29. In that context, WMATA and Monument consummated the conveyance of the Navy Yard Metro Station site.  This was carried out without

the direct involvement of AWC, but the conveyance included provisions addressing the affordable housing, LSDBE, First Source, and other requirements that would have applied had AWC been the direct conduit between WMATA and Monument.  Additionally, the conveyance included consideration given by Monument which was related to, and part of the consideration for, its rights with respect to the Bus Garage as part of the overall deal.  Monument never would have agreed to these concessions had it not had the right to negotiate for and consummate the acquisition of the Bus Garage, (Hines Decl. ¶ 17, Exh. A), and there is no other plausible explanation for why Monument would grant such concessions and undertake such actions but for its rights in the Bus Garage.

WMATA was aware of this.  WMATA internal communications obtained in discovery show that, for instance, when Monument was moving forward with the pedestrian plan and parking plan for Half Street, Monument's agents referred specifically to their controlling the Bus Garage and stated that the amount of their investment in the street utilities and infrastructure turned on their control of the Bus Garage since it was across the street from the parcel Monument already owned and the District Department of Transportation ("DDOT") indicated that the developer of the Bus Garage side of the street would have this responsibility.  *See* Exh. 21; Phillips Dec. ¶¶ 8-9, Exh. B.  As a result, Monument, with the support of DDOT and WMATA, created the "interim conditions" plan to ensure the safe passageway of pedestrians down Half Street – a plan that arose and Monument pursued only because it was the designated developer for both sides of the street.  Phillips Decl. ¶¶ 8-9, Exh. B.  WMATA agreed to the inclusion of the west side of Half Street in these plans.  *Id.* ¶¶8-9, Exh. B.  WMATA continued to permit Monument to hold itself out to DDOT and others as the developer of both sides of Half Street, which included the Bus Garage.  *Id.* ¶¶8-9, Exh. B.  WMATA's agents acknowledged that

Monument had valid concerns that it was bearing the expense associated with the development of sidewalks and infrastructure because it had the right to acquire the entire block of Half Street and Van Street between M and N Streets (where the Bus Garage was located) and never told Monument to alter its investment plans.  (Malasky Dep. 91:16-93:11, Exh. 3.); *see also* Exh. 21. WMATA also clearly knew that, if it took the position that Monument did not have those rights before WMATA completely secured the benefits that Monument was offering, then Monument would not grant all of the valuable concessions it was providing.  *See* discussion *supra* Part I.K.

On its part, Monument would never have given these concessions had it not had the right to negotiate for and acquire the Bus Garage.  (Hines Decl. ¶¶17-18, Exh. A.)    Under the circumstances, District of Columbia law recognizes and contemplates that a valid, binding contract can exist.  For example, under similar circumstances, the D.C. Circuit affirmed this Court's grant of specific performance where the parties entered into both a written and an oral agreement for the sale of a tract of land containing ten separate lots.  *See Brewood v. Cook*, 207 F.2d 439, 440 (D.C. Cir. 1953).  Eight of the lots were sold under the written contract, and this Court ordered specific performance and conveyance of the two remaining lots under "a further agreement that the remaining two lots would also be conveyed to [appellees], at a price and on terms respecting taxes agreed upon, at such time as appellant's wife became reconciled to parting with all of the land."  *See id.*

This Court found, and the D.C. Circuit affirmed, that the buyer would not have purchased the original eight lots, and invested in their development, without the right to acquire the other two.  *See id.* at 440-42.  The acquisition of the first eight lots was a partial performance of the obligations concerning the sale of the entire tract, and the buyer would not have incurred the initial expense without the oral agreement conferring the rights in the entire tract.  *Id.* at 441-42.

That is the uncontroverted evidence in this case. Monument would never have made its multimillion dollar investment and development efforts in the Half Street Area, without the agreement concerning the Bus Garage. (Hines Decl. ¶¶16-18, Exh. A.) The D.C. Circuit confirmed in *Brewood* that these principles are well-recognized:

> That this resulted directly from the contract and is directly and immediately traceable to it, there can be no particle of doubt. Nothing is shown to account for it otherwise. It is just as obvious as the placing of a building on land by one who has a contract to purchase. Not only was this a part performance of the contract, but its circumstances lead inevitably to the contract as the reason.

*Brewood*, 207 F.2d at 442 n.5 (citations omitted).

WMATA had no right to simply change its mind and decide later not to honor its obligations to Monument because it thought it could do better elsewhere. In doing so, it hid behind false accusations of delay on the part of Monument in construction at the Navy Yard Metro Station, crafted misplaced concerns about raising enough funds to purchase and construct the replacement facility for the Bus Garage, and blatantly misstated to Monument that it was "it was in no hurry to move forward on the Bus Garage" (a position that WMATA's own General Counsel said would be difficult to maintain). *See* Exh. 38. WMATA used the charade of a delay in the completion of the Navy Yard Metro Station construction against Monument as a ruse to delay negotiations with Monument on the Bus Garage conveyance, twice claiming that negotiations were on hold with Monument until construction delay issues were resolved. Even when Monument solved these perceived issues, however, WMATA still failed to perform.

WMATA also clearly saw the possibility that if it conveyed the Bus Garage to AWC or the District, and the Bus Garage was later conveyed to Monument, AWC or the District might receive a benefit if Monument paid a higher price than was paid to WMATA. This led to the various efforts by WMATA to capture some, and eventually all, of the "upside." *See* discussion *supra* pp. 25-26. Whatever its motives, WMATA had no right, however, to simply walk away

from its obligations to Monument.  Nevertheless, WMATA began to pursue and continues to pursue a disposition of the Bus Garage to Akridge, not to Monument.

### 3.    WMATA's Obligations to Convey to the District for Fair Market Value

In addition to violating its obligations to Monument, WMATA has ignored its long-standing policy and practice of first offering its real estate for disposal to the local jurisdiction at fair market value.  In violating this policy and practice, which gives the District rights to the Bus Garage, and by seeking to create a new policy on the fly that would allow WMATA to require that the District pay significantly more than fair market value and that would allow WMATA to capture 100% of the economic upside for the period of a year after disposing of the Bus Garage to the District if the District resold it to Monument, WMATA violated Monument's rights to the Bus Garage as the District's assignee.  WMATA sought nothing less than an impermissible restraint on alienation.

There can be no doubt that WMATA's policy required it to offer the Bus Garage to the District at fair market value.  WMATA's policy certainly conferred upon the District "control" of the Bus Garage as the term was used in the LOI, as it gave the District a right of first refusal to acquire the Bus Garage for fair market value as determined by an appraisal process.  This fact was recognized multiple times by WMATA in the context of this case including when it pulled all of these properties from the JDS at the District's request. Nor can there be any doubt that the District bound itself to convey its interest in the Bus Garage to Monument. This fact is also recognized many times over by WMATA. Starting from the award to Monument as one of the Master Developers for the Ballpark District, continuing with the LOI confirming that any real estate over which AWC obtained "acquisition of title or control" would be disposed of in accordance with the AWC process, and enduring through part performance of the AWC process,

46

the vision established in 2004 fermented into tangible, enforceable contract and real property rights.

Whatever specific rights or control the District had, it had agreed to assign them to Monument. Such rights are freely assignable under the law. *See Flack v. Laster*, 417 A.2d 393, 399 (D.C. 1980). Moreover, whether the District held those rights when it agreed to the assignment does not affect the validity of its actions. *See Miller-Long v. John Hanson Sav. & Loan, Inc.,* 676 F. Supp. 298, 299 (D.D.C. 1987) (recognizing that the doctrine of after acquired title has long been recognized in the District of Columbia); *Douglas v. Lyles*, 841 A.2d 1, 5 (D.C. 2004) ("Further guidance on the general principle that one can validly contract to sell that which he does not yet own comes from the doctrine of after-acquired title, which holds that 'if a grantor purports to transfer ownership of real property to which he lacks legal title at the time of transfer, but subsequently acquires legal title to the property, the after-acquired title inures, by operation of law, to the benefit of the grantee.'") (citations omitted). At the very least, WMATA's actions in terminating the discussions and moving forward with a sealed bid process do not constitute good faith and fair dealing. Despite a course of dealing and actions that showed WMATA could and was willing to deal with Monument directly, once the District finally requested that WMATA do so, WMATA refused, plainly seeing this as a way to avoid its commitments to the planning process and Monument and an opportunity for WMATA to implement its preferred course of action at the time. WMATA can point to no document that says the District is not permitted to assign its rights to Monument. (Bottigheimer Dep. 108:3-18, Exh. 4.)

### B.     WMATA's Sealed Bid Process Was Without Rational Basis and Was a Clear and Prejudicial Violation of Applicable Statutes and Regulations

In breaching its obligations to Monument, WMATA chose to pursue a sealed bid process, under which IFBs were issued on two separate occasions, asking interested bidders to submit

sealed bids by a date certain, which would then be opened and evaluated on fair and impartial basis at a set date and time. By invoking the sealed bid process, WMATA represented that it would conduct the process in a manner that was fair and impartial to all bidders and that it would protect the sanctity of the sealed bid procedures. Yet it did neither. With the Invitations for Bid, WMATA included a Bid Form which was to be filled out and submitted by interested bidders. Exh. 70. Part of the sanctity and impartiality of the process was to be ensured by open communication of all inquiries and information with all interested parties and immediate opening of the bids and selection of the winning bidder, as required under the IFB and WMATA's PPM; indeed, WMATA stated that inquiries about the Invitations for Bid, and WMATA's responses to those inquiries, would be handled publicly. *Id. ¶C.5.* Questions had to be sent via email, and WMATA represented that it would "post all questions and answers on its website." *Id.* The assurances that there would be no secret communications between WMATA and prospective bidders, as happened here, was consistent with the way in which sealed bid processes are required to be conducted under WMATA's PPM and other applicable law.

For example, the Federal Acquisition Regulations ("FAR") contain distinct and specific procedural rules and protections governing sealed bid processes as does WMATA's PPM. WMATA relied on both FAR and its PPM when evaluating bids and rejecting MR Ballpark 7's Alternate Bid. Both of those sets of procedural regulations expressly prohibit post bid opening discussions with bidders prior to the award, FAR §14.101(d); PPM §500.11. WMATA agrees (Bottigheimer Dep. 71:2-3, 77:16-21**,** Exh. 4) and, in fact, stated in response to MR Ballpark 7's first bid protest that consideration of its Alternate Bid would require it to enter into precisely these prohibited discussions and therefore the Alternate Bid could not be considered. *See* Letter from N. Bottigheimer to L. Dolan and V. Johnson (Sept. 28, 2007), Exh. 89 at 4. WMATA

indicated that it followed the FAR in conducting IFB No. 08-1. WMATA also stated that, at a minimum, even if the PPM did not explicitly apply to the IFB's in this case, WMATA looked to the PPM for guidance. (Bottigheimer Dep. 22:14-23:7, Exh. 4.) Sealed bid procedures are very formal, in contrast with other types of disposition methods such as competitive negotiation. *See Elcon Enters., Inc. v. WMATA*, 977 F.2d 1472, 1483 (D.C. Cir. 1992).

In WMATA's actions in this case, there were at least four ways in which the bid process was conducted improperly, irretrievably, and unlawfully. First, during the entire sealed bid process, WMATA communicated extensively with Akridge, the purported winning bidder. Second, WMATA considered the Akridge Bid, Exh. 72, despite that it was expressly "submitted conditionally," which rendered it non-responsive as a matter of law. Third, WMATA accepted the Akridge Bid as responsive, despite the fact that it included an offer of additional consideration and benefits not asked for in the IFB, which Akridge promised was an integral part of its bid, and which WMATA acknowledges was intended to strengthen the economics of the Akridge Bid by saving WMATA several million dollars. Fourth, WMATA ran roughshod over its own express policies and procedures in conducting the sealed bid process. In all four instances, WMATA acted without a rational basis and in clear and prejudicial violation of applicable statutes and regulations. Monument was prejudiced as a result. Even if Monument did not have any real property or contract rights in the Bus Garage, the process was so irretrievably tainted that it must be invalidated and WMATA must be directed, at the very least, to rebid the Bus Garage. (Having rejected all of the other bids, WMATA may suggest that it has deprived itself of the option to simply make the award to MR Ballpark 7 which it declared was the second place bidder under its minimum bid.)

### 1.    The Secret Communications with Akridge

The extensive communications between Akridge and WMATA during the sealed bid process violated the rules of sealed bid procedures and prejudiced the other bidders.  Not only did WMATA represent that all questions and answers would be posted publicly, so that there would be no such private discussions, but this is the law for all dispositions by sealed bid.  *See* FAR §14.101(d) ("bids shall be evaluated without discussion").  The requirement that sealed bids must be evaluated without discussion is one of the key features distinguishing sealed bidding from other types of competitive procurement.  *See, e.g., In re Carter Chevrolet Agency, Inc.,* B-229679, 1988 U.S. Comp. Gen. LEXIS 113, 88-1 Comp. Gen. Proc. Dec. ¶107 (Feb. 3, 1988) (noting that "[a] sealed bid procurement does not allow for discussions").  WMATA's Compact and PPM also explicitly prohibit discussions during the sealed bid process.  Compact, § 73(a)(2)(A)(iii); PPM §500.11.  No discussions of any kind or for any reason are permitted after a bidder has submitted its bid.  *Griffy's Landscape Maintenance LLC v. United States*, 46 Fed. Cl. 257, 259 (2000*); In re Commc'ns Tech. Applications, Inc.,* 1989 GSBCA LEXIS 251, at *10, 89-3 B.C.A. (CCH) P22,048 (1989) (granting bid protest where winning bidder and agency communicated after opening of bids).  Agencies must evaluate the bid without discussions with the bidder, or the bid must be rejected.  *See In re Commc'ns Tech. Applications, Inc.,* 1989 GSBCA LEXIS at *10.

Here the discussions went to the heart of the bid criteria.  They focused on the net return WMATA would receive under the Akridge Bid.  Moreover, they rendered the actual net return uncertain because one of the key considerations for WMATA was how quickly it could vacate the Bus Garage, thus saving leaseback expenses.  Akridge sought to directly impact WMATA's net benefit by affecting that leaseback term.  Moreover, WMATA used the precise reasoning that Monument argues here, the impermissible nature of these discussions, as a reason it could not

50

consider MR Ballpark 7's Alternate Bid: it would require impermissible post-bid opening discussions with MR Ballpark 7 to ascertain the price offered.  Exh. 89 at 4.  Fundamental fairness dictates that WMATA cannot do for one bidder what it claims it is not permitted to do for another.  Such conduct is, by definition, arbitrary and capricious and must result in the Court setting aside the award to Akridge.

##      2.      The Akridge Bid was "Submitted Conditionally"

It is beyond dispute that the Akridge Bid, Exh. 72, was submitted conditionally, with reference to a side letter and other matters outside of the bid itself.  The relevant provisions of the FAR and WMATA's PPM dictate that such a bid had to be rejected:

> a bid shall be rejected if the bidder imposes conditions that would modify requirements of the IFB or limit the bidder's liability to the Authority.  For example, a bid shall be rejected if the bidder does the following: . . .

> [w]hen not authorized by an IFB, the bidder conditions or qualifies a bid by stipulating that it is to be considered only if, before date of award, the bidder receives (or does not receive) award under a separate solicitation.

*See* PPM §525.4; FAR §14.404-2(d)(4); *see also In re Outdoor Venture Corp.,* 1989 U.S. Comp. Gen. LEXIS 673, at *1, 89-1 Comp. Gen. Proc. ¶571 (June 16, 1989) (agency was required to reject bid under FAR §14.404-2(d)(4), due to letter from bidder stating that if it were awarded contract on another solicitation, it would be unable to accept award for solicitation in question).

Akridge told WMATA that it could only consider its bid in response to IFB No. 08-01 if it did not receive the award under IFB 07-3.  Exh. 72 at 1 (bid submitted by Akridge in connection with 07-3 "may no longer be accepted by WMATA.").  WMATA does not dispute that this is precisely what the cover letter attached by Mr. Klein to the Akridge Bid meant. (Bottigheimer Dep. at 56:1-58:7, Exh. 4.)  Conditioning the bid in such a manner *requires* that the bid be rejected under PPM § 525.4 and FAR § 14.404-2(d)(4).  WMATA has no discretion

not to reject it. Here, at the time that Akridge submitted its bid under IFB 08-1, WMATA still retained Akridge's bid submitted in response to IFB No. 07-3 (which had been retendered to WMATA by Akridge) and had not canceled the first solicitation.

In addition, Akridge was clearly aware that its bid in response to IFB No. 08-01 was over $10 million less than its prior bid. Akridge was keeping its options open. In making its bid submission conditionally, it was holding onto the argument that, if it turned out that it was not deemed the high bidder under IFB No. 08-01, then the process should revert to the prior bid (which was higher, and therefore would have given Akridge a second chance to win the award). This sort of hedging of bets, and conditional submission, is completely prohibited and, as with the impermissible post bid opening communications, was another reason that WMATA used to reject MR Ballpark 7's Alternate Bid, reasoning that a bidder is not permitted two bites at the apple. *See, e.g.,* Letter from N. Bottigheimer to L. Dolan dated Oct. 5, 2007, at 5, Exh. 90.

It is clearly prejudicial to Monument for WMATA to allow Akridge to have multiple bites of the apple while rejecting Monument's Alternate Bid for that very same reason. *See E.F. Matelich Constr. Co.,* B-207600, 82-2 CPD ¶291, 1982 U.S. Comp. Gen. LEXIS 537, at *4 (Sept. 28, 1982). Again, using WMATA's own arguments, the Akridge Bid was impermissibly submitted with conditions, and had to be rejected.

> ### 3. The Akridge Bid Contained an Unlawful Insertion, Known Colloquially as a "Sweetener" or a "Strengthener" That Further Rendered it Non-responsive as a Matter of Law

In IFB No. 08-1, WMATA requested a fixed price for the sale of the Bus Garage and a fixed price for the leaseback. Exh. 70. In this case, WMATA has argued that its Bid Form "clearly calls for a fixed number, not a narrative." *See* Mem. of Pts. & Auth. in Support of Mot. to Dismiss First Am. Compl. at 21. WMATA has also argued that "where there is a dollar sign followed by a line to be completed, only a number fits." *See id.*; *see also id.* at p. 23 (arguing that

the IFB contained only one line for the bid "$ Bid Amount ____," which "clearly calls for a fixed number."). WMATA has further stated that it had no choice but to decline bids containing uncertainties. *See id.* at 24 (and authorities cited therein). In denying MR Ballpark 7's bid protest, WMATA stated similarly, and unequivocally, that "only firm bid prices" can be considered in *sealed* bid procedures. Exh. 89 at 2-3.

The FAR requires that sealed bids must comply exactly with the literal requirements of the IFB. FAR §14.301(a). Any bid that fails to conform to the requirements of the IFB must be rejected. FAR §14.404-2(b). WMATA's own sealed bid procedures contain the same provision. PPM, § 516.1 ("To be considered for award, a bid shall be required to comply in all material respects with the IFB."), § 525.1 (providing for rejection of a bid that "fails to conform to the essential requirements of the IFB"). For this sealed bid, WMATA required that "[a]ll bids submitted must comply with this Invitation for Bids . . .." Exh. 70 at 1. Indeed, WMATA stated that it disregarded Monument's Alternate Bid partly because it would introduce the principle that "what is not expressly prohibited [by the IFB] is allowed," which ultimately "would vitiate agencies' discretion and replace reason with anarchy." *See* Mem. of Pts. & Auth. in Support of Mot. to Dismiss First Am. Compl. at 24. Yet WMATA considered the Akridge Bid.

Requiring bids to conform with the solicitation promotes fairness and objectivity, and provides all bidders with "an equal right to compete." *Toyo Menka Kaisha, Ltd. v. United States*, 597 F.2d 1371, 1377 (Ct. Cl. 1979); see also FAR §14.301(a) ("Such compliance enables bidders to stand on equal footing and maintain the integrity of the sealed bidding process."); Exh. 89 at 2. The public policy "preserving the fairness and integrity" of the sealed bid process is "paramount." *Griffy's Landscape Maint.*, 46 Fed. Cl. at 261. In this case, however, the Akridge Bid contained an offer to provide an additional benefit to WMATA, beyond what was asked for

in the solicitation and beyond what any other bidder knew to provide. This additional consideration, sometimes known colloquially as a "sweetener" or "strengthener," rendered the Akridge Bid nonresponsive and should have prompted WMATA to reject it outright. (See Bottigheimer Dep. 61:15-17, Exh. 4.) (the additional consideration "is not a response [WMATA] contemplated, and it was nonresponsive to the form of our invitation for bids"). WMATA cannot seek refuge in a position that it could simply disregard this portion of the bid and consider the remainder, since the bidder itself stated that the sweetener was an "integral" part of the bid, Exh. 80, and WMATA agreed that it was designed to strengthen the economic terms offered by Akridge. (Id. 64:16-19, Exh. 4.)

Not only did WMATA not reject the bid outright as it was required to do, it permitted Akridge to continue to tout the benefits of the sweetener in its secret discussions with Akridge that otherwise compromised the integrity of the sealed bid process. In the correspondence, including a letter to WMATA sent after the opening of the bids on August 28, Akridge emphasized repeatedly the importance of the added sweetener, calling it "an integral part" of the bid, "a serious offer," and "one that Akridge is prepared to act on immediately." Exh. 80. Akridge specifically noted its reference to materials outside the four corners of the bid solicitation in formulating that offer as well, namely, Real Estate Committee Board Action Item III-A. Id. Akridge continued to press the point, without protest from WMATA, peddling "the potential for material savings to WMATA" of several million dollars. Exh. 81. In fact, WMATA told Akridge that it was actively considering this sweetener in its evaluation of the bids. Exh. 78.

These discussions took place before IFB 08-1 was issued, after IFB 08-1 was issued but before bid opening, after bid opening but before the contract award, and after the contract award

resulting in significant prejudice to Monument.  During the bid evaluation period, Mr. Bottigheimer phoned the President of Akridge on September 12, 2007, acknowledging specifically "the availability of the two-acre site in Southeast as a possible alternative" and thanking Akridge "for calling our attention to that aspect and I did want to say that we received it and are treating it as a serious offer."  *See* Exh. 78 (emphasis supplied); (Bottigheimer Dep. 75:8-22, Exh. 4.)  These discussions were had even though WMATA, through Mr. Bottigheimer himself, stated that sealed bidding required rejection of Monument's Alternate Bid as ambiguous because the alleged ambiguity could "only have been resolved through impermissible post-opening discussions with [Monument]."  *See* Exh. 89 at 4.  WMATA impermissibly and unfairly conducted discussions during the bid evaluation period with Akridge but at the same time refused to engage Monument in discussions to resolve any perceived ambiguities in its Alternate Bid, resulting in direct prejudice to Monument.

WMATA never informed the other bidders of the discussions with Akridge, and did not tell them that additional benefits would be considered as part of the process or that they would have the additional opportunity to clarify or enhance their bids.  It therefore gave Akridge an advantage not available to, or even known by, the other bidders.  Monument was prejudiced, since it would have, and could have, added such additional consideration if it had known about the offer or the discussions between Akridge and WMATA.  (Hines Decl. ¶24, Exh. A.)

In addition, the sweetener injected by Akridge rendered its bid ambiguous on its face.  As Akridge itself made clear in a September 20, 2007 letter to WMATA (issued after the bid submissions, but before the award), that the "sweetener" could save WMATA money, but Akridge could not state how much:

> Assuming Akridge is selected bidder for the Southeast Bus Garage site and we are
> able to reach an agreement regarding the terms for WMATA to lease the SW Site,

> there is *the potential of materials savings* to WMATA.  These savings *could increase the net benefit* to WMATA of Akridge's proposal for the Southeast Bus Garage site.

Exh. 81 (emphasis added).  Akridge itself recognized (and purposefully pointed out to WMATA) that the amounts set forth in its bid were indefinite, as they did not necessarily represent the monetary value WMATA would receive if it accepted Akridge's bid nor would they necessarily be accepted.  *See id.*  The sweetener made the bid materially ambiguous, since the sweetener prevented the bid from containing the required fix price, to permit it to be assessed and weighed objectively against the competing bids.

Nevertheless, WMATA not only considered Akridge's ambiguous bid, but ultimately accepted it – despite its own admissions both in this litigation and elsewhere that it was prohibited from doing so.  The legal authorities applicable to sealed bid procedures further confirm that sealed bids that contain material modifications or variances from the solicitation must be rejected.  *See, e.g., Toyo Menka Kaisha, Ltd.,* 597 F.2d at 1371 (rejecting bid as non-responsive because it materially deviated from the IFB on price, quality, and quantity);  *Jensen Corp.,* B-213677, 1984 U.S. Comp. Gen. LEXIS 1118, 84-1 CPD ¶544 (May 22, 1984) (rejecting as non-responsive a bid that offered equipment different from that requested in IFB);  *Colorado Container Corp.,* B-238670, 1990 U.S. Comp. Gen. LEXIS 543, 90-1 CPD ¶514 (May 31, 1990) (rejecting a bid as non-responsive because the bidder qualified its bid).

In addition, bids that are ambiguous or susceptible to more than one reasonable interpretation must be rejected.  *See, e.g., Reid & Gary Strickland Co.*, B-239700, 1990 U.S. Comp. Gen. LEXIS 1001, at *4, 90-2 CPD ¶222 (Sept. 17, 1990) ("Where . . . a bid on its face is subject to two or more reasonable interpretations, under one of which it will be found non-responsive, such a bid is ambiguous and must be rejected.") (citation omitted).  Ambiguous bids

include those that do not offer a fixed price, when a fixed price is required by the IFB, as WMATA has stated in this instance. *Id.* (rejecting bid for failure to state a fixed price as required by the IFB); *Wasteco Container Servs., Inc.,* B-240309, 1990 U.S. Comp. Gen. LEXIS 1181, 90-2 CPD ¶372 (Nov. 7, 1990) (rejecting bid that did not offer fixed price as required by IFB); *see generally Adler Construction, Inc.,* B-261506.2, 1995 U.S. Comp. Gen. LEXIS 832 (Nov. 7, 1995) (noting that a bid that is ambiguous must be rejected as non-responsive).

Non-responsive and ambiguous bids are rejected not only because they violate the explicit rules for sealed bid processes, but also because they prejudice the rights of the other bidders. The test for whether another bidder has been prejudiced is an easy one: "The test of prejudice . . . is whether it is reasonably clear that another bidder, given the benefit of a similarly relaxed requirement . . . would have bid in such a manner that it would have been in line for the award." *E.F. Matelich Constr. Co.,* 1982 U.S. Comp. Gen. LEXIS at *4. Here, WMATA had no choice but to reject the Akridge Bid as nonresponsive.

WMATA cannot seriously argue otherwise, since it has stated that it rejected Monument's Alternate Bid because it did not contain a firm, fixed price. *See* Mem. of Pts. & Auth. in Support of Mot. to Dismiss First Am. Compl. at 19 ("WMATA properly rejected the alternate bid for failing to provide an independent, firm, fixed-price."). WMATA asserted that it could not "ascertain the amount of the alternate bid without consulting and integrating materials outside the bid itself." *Id.* However, that is exactly what it proceeded to do: contemplate a non-responsive and ambiguous bid with no fixed price, as Akridge itself admitted in a letter to WMATA. WMATA cannot reject one bid as ambiguous, but accept another bid clearly ambiguous under the same rationale – such behavior is *per se* arbitrary and capricious and negates the policies of fairness and objectivity required of sealed bids.

### 4. WMATA's Failure to Follow Its Own Procedures

WMATA failed to follow its own procedures in disposing of the Bus Garage, making its decision to make the award to Akridge per se arbitrary and capricious. WMATA's Compact *requires* WMATA to adopt policies and procedures relating to its contracting and procurement practices. *D.C. Code Ann.* § 9-1107.01, sec. 73(g) ("The Board shall adopt policies and procedures to implement this Section"). Procurement transactions include the disposition of real property. *See Catholic Univ. of Am. v. United States*, 49 Fed. Cl. 795, 799-800 (2001). Presumably, WMATA adopted its Procurement Procedures Manual ("PPM"), which explicitly outlines the requirements for disposal of real property in Chapter 15, which explicitly states that agreements to sell real property are "procurement transactions." *See* Exh. 52 §1500.3.

Nonetheless, WMATA has repeatedly stated that its PPM did not apply to the disposal of the Bus Garage. At the WMATA Board hearing approving the award to Akridge, WMATA represented that its PPM does not apply to its disposition, and that WMATA did not follow the PPM. *See* Minutes of WMATA Board Meeting (Sept. 27, 2007) 46:3-14, Exh. 91; *see also* Exh. 89 at 1; Exh. 90 at 1. Furthermore, WMATA violated its internal policy regarding property disposal to local jurisdictions. The District was entitled to purchase the Bus Garage from WMATA at fair market value without enduring WMATA's hard bargaining tactics to eke out from the District as much money as possible. The D.C. Circuit has made it clear that WMATA's procurement decisions may be set aside under such circumstances. *See Elcon v. WMATA*, 977 F.2d 1472, 1478 (D.C. Cir. 1992) (noting that procurement decisions may be set aside if they have "no rational basis" or if "the process by which they were reached involved a clear and prejudicial violation of applicable statutes or regulations.").

Dated: January 2, 2008                              Respectfully submitted,

                                                    NIXON PEABODY, LLP


                                                    _____/s/ Louis E. Dolan, Jr.____
                                                    Louis E. Dolan, Jr. (#442881)
                                                    Vernon W. Johnson, III (#423756)
                                                    401 9th Street, N.W.
                                                    Washington, D.C. 20001
                                                    202.585.8000
                                                    202.585.8080 (fax)
                                                    ldolan@nixonpeabody.com
                                                    vjohnson@nixonpeabody.com

                                                    Counsel for Plaintiffs