IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MONUMENT REALTY LLC, *et al.*,<br><br>       *Plaintiffs*<br><br>v.<br><br>WASHINGTON METROPOLITAN AREA<br>TRANSIT AUTHORITY,<br><br>       *Defendant* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     Civil Action No. 1:07-CV-01821 (EGS) |

**OPPOSITION OF WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY
TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

/s/ Bruce P. Heppen
Carol B. O'Keeffe
General Counsel
Donald A. Laffert
Bruce P. Heppen
Associate General Counsel
Washington Metropolitan Area
Transit Authority
600 Fifth Street, N.W.
Washington, DC 20001
T: (202) 962-1499
F: (202) 962-2550
email: bheppen@wmata.com
email: dlaffert@wmata.com

    /s/ Harvey A. Levin
Harvey A. Levin (D.C. Bar No. 203869)
Katherine S. Nucci (D.C. Bar No. 358539)
Kathleen E. Sailer (E.D. Mo. Bar No. 534178;
Not admitted in DC)
THOMPSON COBURN LLP
1909 K Street, N.W. Ste. 600
Washington, D.C. 20006-1167
T: (202) 585-6942 (direct)
F: (202) 508-1013 (direct)
email: hlevin@thompsoncoburn.com


Counsel for Washington Metropolitan Area
Transit Authority

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 2

MATERIAL INDISPUTABLE FACTS ......................................................................... 5

ARGUMENT ................................................................................................................. 19

    I.    Plaintiffs Fail To Show A Likelihood Of Prevailing On Their
Claim Of An Exclusive Agreement To Negotiate With WMATA
For The Bus Garage Property, And/Or To Acquire The Bus
Garage Property From WMATA ....................................................................... 19

        1.    WMATA Never Offered To Enter Into Exclusive Negotiations
With Monument To Acquire, And Never Offered Monument The
Exclusive Right To Acquire, The Bus Garage Property .......................... 19

        2.    Plaintiffs Fail To Show Acceptance Of A Definite Offer ........................ 26

        3.    The Alleged Agreement Lacks Bargained-For Consideration ................. 26

        4.    Plaintiffs Fail To Demonstrate That WMATA Intended To Be
Bound By The Alleged Agreement ........................................................... 31

        5.    Plaintiffs Fail To Establish That Any WMATA Representative
Had Actual Authority To Bind WMATA To The Alleged
Agreement; In Fact, There Was No WMATA Board Authority, As
Would Be Required, To Make Any Binding Promise,
Representation, Commitment Or Agreement With Monument
Regarding The Bus Garage Property ........................................................ 33

        6.    Conclusion On Plaintiffs' Claim Of An Agreement For Exclusive
Negotiations To Purchase The Bus Garage Property ............................... 36

    II.    Plaintiffs Fail To Show A Likelihood Of Prevailing On Their
Claim Of Alleged Improprieties In WMATA's Selection Of The
Akridge Bid As The High Bid; WMATA's Acceptance Of
Akridge's Bid As The Highest, Responsive Firm Fixed-Price Bid
Was Proper And In Accordance With Applicable Law ...................................... 37

        1.    The Standard of Review: Highly Deferential .......................................... 38

        2.    The Definition of Responsiveness: An Unequivocal Offer To
Comply With The Material Terms And Conditions Contained In
The Solicitation ........................................................................................ 39

        3.    The Akridge Cover Letters Did Not Modify Akridge's Bid And
Did Not Render The Akridge Bid Nonresponsive ................................... 40

4.      The Alleged "Sweetener" Did Not Render Akridge's Bid Nonresponsive ........................................................................... 42

5.      MR Ballpark 7's Comparison Of WMATA's Treatment Of The MRB 7 Escalator Bid To WMATA's Treatment Of Akridge's Bid Is A False Comparison ......................................................... 44

6.      The Post-Bid-Opening Communications Were Not Impermissible And Did Not Harm Monument ........................................... 45

7.      Akridge And WMATA Did Not Engage In Post-Bid-Opening Discussions ....................................................................... 46

III.    Plaintiffs Fail To Show That They Will Suffer Imminent, Irreparable Harm ........................................................................ 50

IV.     Plaintiffs Fail To Show That The Balance Of Hardships Favors An Injunction .................................................................... 51

V.      Plaintiffs Fail To Show That The Public Interest Favors An Injunction ............................................................................. 52

VI.     Plaintiffs Have Unclean Hands And Are Not Entitled To Equitable Relief ........................................................................ 53

CONCLUSION............................................................................... 56

# TABLE OF AUTHORITIES

## CASES

*46th St. Rehab Dev. Co. v. U.S.*, No. 97-2267 (JGP) (D.D.C. Oct. 3, 1997) ............................ 50

*ABF Freight Sys. v. NLRB*, 510 U.S. 317 (1994) ....................................................... 55

*Abrams v. Unity Mut. Life Ins. Co.*, 70 F. Supp. 2d 846 (N.D. Ill. 1999) ................................. 32

*Aeroplate Corp. v. U.S.*, 67 Fed. Cl. 4, 11 (2005) ....................................................... 46

*Am. Fed. of Gov't Employees, AFL-CIO v. U.S.*, 104 F. Supp. 2d 58
    (D.D.C. 2000) ................................................................................... 53

*Am. Sci. & Eng'g, Inc. v. Kelly*, 69 F. Supp. 2d 227 (D. Mass. 1999) ........................................ 53

*Amalgamated Transit Union, AFL-CIO v. Brock*, 809 F.2d 909 (D.C. Cir. 1987) ..................... 52

*Amalgamated Transit Union, AFL-CIO v. Donovan*, 554 F. Supp. 589
    (D.D.C. 1982) ................................................................................... 52

*Amfac Resorts, L.L.C. v. U.S. Dep't of the Interior*, 142 F. Supp. 2d 54 (D.D.C.
    2001), judgment vacated in part by Nat'l Park Hospitality Ass'n v. Dep't
    of Interior, 538 U.S. 803 (2003) ................................................................. 33

*Art Metal Works v. Abraham & Straus*, 70 F.2d 641 (2d Cir. 1934) ........................................ 55

*Bean Dredging Corp. v. U.S.*, 22 Cl. Ct. 519 (1991) ................................................... 39

*Bell Atlantic Corp. v. Twombley*, 127 S. Ct. 1955 (2007) ........................................ 37

*Boks v. Charles E. Smith Mgmt., Inc.*, 453 A.2d 113 (D.C. 1982) ............................................ 26

*Carter Chevrolet Agency, Inc.*, B-229679, Feb. 3, 1988, 88-1 CPD ¶ 107 ................................ 49

*China Trade Ctr., L.L.C. v. WMATA*, 34 F. Supp. 2d 67 (D.D.C. 1999) ................................... 39

*City of Cincinnati v. U.S.*, 153 F.3d 1375 (Fed. Cir. 1998) ........................................ 33

*Communications Technology Applications, Inc.*, GSBCA No. 9978-P, 89-3 BCA
    ¶ 22048 ......................................................................................... 50

*Conn. Legal Servs., Inc. v. Heintz*, 689 F. Supp. 82 (D. Conn. 1988) ...................................... 53

*Covert Marine, Inc. v. Outboard Marine Corp.*, 1978 WL 1487
    (N.D. Ind. Sept. 25, 1978) ...................................................................... 32

*Deployable Hosp. Sys., Inc.*, B-260778, et al., Feb. 12, 1996, 96-1 CPD ¶ 113 ........................ 47

*E. Frye Enterprises, Inc.*, B-258699, B-258699.2, Feb. 13, 1995, 1995 WL 64152 ................... 46

*Emmett R. Woody*, B-213201, Jan. 26, 1984, 84-1 CPD ¶ 123 .................................................. 43

*Eplus Technology, Inc. v. Nat'l R.R. Passenger Corp.*, 407 F. Supp. 2d 758
(E.D. Va. 2005) ................................................................................................. 25

*Equal Rights Ctr. v. Post Props., Inc.*, 2007 WL 2128232 (D.D.C. July 25, 2007) ..................... 53

*FD Holding Corp. v. Danbury Bowlarama Corp.*, No. 1:98cv10113, 2000 U.S.
Dist. LEXIS 17284, 16-17 (D. Mass. Oct. 13, 2000) ............................................. 54

*Gaudiosi v. Mellon*, 269 F.2d 873 (3rd Cir. 1959) ................................................................. 55

*Ghahremani v. Uptown Partners, L.L.C.*, 2005 WL 3211463
(D.D.C. Nov. 13, 2005) .............................................................................. 26, 31

*Griffy's Landscape Maintenance LLC v. United States*, 46 Fed. Cl. 257 (2000) ....................... 49

*Grunseth v. Marriott Corp.*, 872 F. Supp. 1069 (D.D.C. 1995) ................................................ 29

*Harbert/Lummus Agrifuels Projects v. U.S.*, 142 F.3d 1429 (Fed. Cir. 1998) ........................... 34

*Hood v. District of Columbia*, 211 F. Supp. 2d 176 (D.D.C. 2002) .......................................... 32

*Idea Int'l, Inc. v. U.S.*, 74 Fed. Cl. 129 (2006) ..................................................................... 53

*Interstate Constr., Inc.*, B-281465, Feb. 10, 1999, 99-1 CPD ¶ 31 .......................................... 41

*JOGO Assocs. v. U.S. Dep't of Hous. & Urban Dev.*, No. 92-2451 (NHJ) (D.D.C.
Nov. 25, 1992) ........................................................................................... 50, 51

*Kilpatrick v. Paige*, 193 F. Supp. 2d 145 (D.D.C. 2002) ....................................................... 34

*Lashley's Landscaping, Lawn Growth & Maint. Co.*, B-181812, Sept. 24, 1974,
74-2 CPD ¶ 182 ......................................................................................... 43, 46

*Littlejohn v. WMATA*, No. 90-1724 (RCL), 1992 WL 122755
(D.D.C. May 28, 1992) ............................................................................. 33, 34, 35

*Mason Tenders Dist. Council v. JNG Const. Ltd.*, 2003 WL 22999453 (S.D.N.Y.
Dec. 19, 2003) ............................................................................................... 32

*McDonald v. Am. Red Cross*, 505 F. Supp. 2d 143 (D.D.C. 2007) .......................................... 31

*Med. Depot Supplies Corp.*, B-239342, Aug. 22, 1990, 90-1 CPD ¶ 149 ............................. 39, 43

*Metzler v. Harry Kaufman Co.*, 32 App. D.C. 434, 1909 WL 21487 (D.C. 1909) ..................... 24

*MG Indus., B-283010.3, Jan. 24, 2000, 2000 CPD ¶ 17* ............................................................ 47

*Miller v. Holzmann, 471 F. Supp. 2d 122 (D.D.C. 2007)* ........................................................ 32

*Mola Dev. Corp. v. U.S., 74 Fed. Cl. 528 (2006)* .............................................................. 2, 31

*Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488 (1942), rev'd in part on unrelated grounds, Ill. Tool Works Inc. v. Indep. Ink, Inc., 547 U.S. 28 (2006)* ........................................................................................................................ 55

*N. States Power Co. v. Fed. Transit Admin., 2001 WL 1618532 (D. Minn. May 24, 2001)* ................................................................................................ 52

*Nat'l Football League Players Ass'n v. Office & Prof'l Employees Int'l Union, Local 2, 947 F. Supp. 540 (D.D.C. 1996)* ............................................................ 24

*O. Ahlborg & Sons, Inc. v. U.S., 74 Fed. Cl. 178 (2006)* ........................................................ 2

*Paul v. Howard Univ., 754 A.2d 297 (D.C. 2000)* ................................................................ 2

*Peach State Meat Co. v. Excel Corp., 860 F. Supp. 849 (M.D. Ga. 1994)* ................................ 25

*Peirce-Phelps, Inc. v. Johnson, 1993 WL 308887 (E.D. Pa. Aug. 12, 1993)* ............................... 53

*PGBA, LLC v. U.S., 60 Fed. Cl. 196 (2004)* .......................................................................... 53

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co., 324 U.S. 806 (1945)* ...................... 55

*Qualls v. Rumsfeld, 357 F. Supp. 2d 274 (D.D.C. 2005)* ........................................................ 53

*Redwood Ctr. Ltd. P'ship v. Riggs Nat'l Bank of Washington, D.C., 737 F. Supp. 671 (D.D.C. 1990)* ............................................................................................ 31

*Routzahn v. Cromer, 150 A.2d 912 (Md. 1959)* .................................................................... 24

*Sisco v. GSA Nat'l Capital Fed. Credit Union, 689 A.2d 52 (D.C. 1997)* ................................. 26

*Somervell v. Baxter Healthcare Corp., 1998 WL 203145 (D.C. Cir. Mar. 13, 1998)* ............................................................................................ 28

*Spherix, Inc. v. U.S., 62 Fed. Cl. 497 (2004)* ...................................................................... 53

*Starflight Boats v. U.S., 48 Fed. Cl. 592 (2001)* .................................................................... 34

*Steele v. Isikoff, 130 F. Supp. 2d 23 (D.D.C. 2000)* .............................................................. 55

*Steven R. Perles, P.C. v. Kagy, 473 F.3d 1244 (D.C. Cir. 2007)* ............................................. 31

*Sun Ship, Inc. v. Hidalgo, 484 F. Supp. 1356 (D.D.C. 1980)* .................................................. 47

*Survivor Prods. LLC v. Fox Broad. Co.*, 2001 U.S. Dist. LEXIS 25511
(C.D. Cal. June 11, 2001) ............................................................ 54

*The Perkin-Elmer Corp.*, B-193146, Aug. 6, 1979, 79-2 CPD ¶ 80 ......................................... 39

*To Hedrick & Lane*, B-164384, Apr. 23, 1969, 1969 CPD ¶ 23 ................................. 43

*Transport Eng'g Co., Inc.*, B-185609, July 6, 1976, 76-2 CPD ¶ 10 ........................................ 41

*Trudeau v. Fed. Trade Comm'n*, 384 F. Supp. 2d 281 (D.D.C. 2005), aff'd, 456
F.3d 178 (D.C. Cir. 2006) ............................................................. 50

*Tutor-Saliba Corp. v. U.S. Army Corps of Eng'rs*, 1995 WL 520765
(D.D.C. Aug. 23, 1995) ........................................................ 38, 39

*U.S. Office Prods. Co. Sec. Litig.*, 251 F. Supp. 2d 77 (D.D.C. 2002) ...................................... 33

*Uniserv Inc.; Marine Transport Lines, Inc.*, B-218196, B-218196.3, June 19,
1985, 85-1 CPD ¶ 699 ............................................................. 47

*Virtual Def. & Dev. Intern., Inc. v. Republic of Moldova*, 133 F. Supp. 2d 9
(D.D.C. 2001) ..................................................................... 19, 25, 26

*Webster Univ. v. U.S.*, 20 Cl. Ct. 429 (1990) .................................................. 33, 38

*Wemhoff v. Bush*, 31 Fed. Appx. 204 (D.C. Cir. 2002) ......................................... 52

*William F. Klingensmith, Inc. v. District of Columbia*, 370 A.2d 1341
(D.C. 1977) ........................................................................ 26

*Wis. Gas Co. v. FERC*, 758 F.2d 669 (D.C. Cir. 1985) ......................................... 50

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                   )
MONUMENT REALTY LLC, *et al.*,                     )
                                                   )
            *Plaintiffs*                           )
                                                   )
v.                                                 )        Civil Action No. 1:07-CV-01821 (EGS)
                                                   )
WASHINGTON METROPOLITAN AREA                       )
TRANSIT AUTHORITY,                                 )
                                                   )
            *Defendant*                            )
_____)

**OPPOSITION OF WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY
TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Pursuant to Fed. R. Civ. P. 65 and Local Rule 7, Defendant Washington Metropolitan

Area Transit Authority ("WMATA"), by undersigned counsel, respectfully opposes Plaintiffs'

motion for preliminary injunction. Plaintiffs fail to show a likelihood of success on the merits;

Plaintiffs fail to show that they would suffer, and in fact they will not suffer, irreparable harm

absent an injunction; The balance of harms favors WMATA; and An injunction will gravely

harm the public interest.[1]

---

[1] In an obvious artifice to exceed the 60-page limitation on their Memorandum of Points and Authorities in Support of Plaintiffs' Motion for a Preliminary Injunction ("Plaintiffs' PI Memo"), already expanded from 45 pages at Plaintiffs' request, Plaintiffs do not brief the injunction requisites of irreparable harm, balance of harms and public interest. Rather, Plaintiffs refer to these elements in the motion itself. WMATA recalls that the Court previously cautioned the parties against this practice of not briefing points in their initial motions and reserving issues for a reply.

The absence of any briefing – any factual or legal premise – on these three requisites in Plaintiffs' PI Memo is fatal to Plaintiffs' motion and should cause the Court to deny it. While WMATA relies on its recollection of the Court's prior direction, WMATA nevertheless, out of caution, addresses these three requisites in this Opposition. WMATA respectfully requests that the Court not entertain a first-time argument on these points from Plaintiffs in a reply and/or at oral argument.

## INTRODUCTION

In order to reach the goal of proving the existence of an enforceable contract, Plaintiffs must successfully run the gauntlet of elemental contract law.  Plaintiffs must show an offer, an acceptance, contemporaneous bargained-for consideration and a government representative having actual authority to bind WMATA in contract.[2]  Plaintiffs do not and cannot run this gauntlet successfully:

1. Plaintiffs do not and cannot show that WMATA offered Plaintiffs the right to negotiate exclusively for the Bus Garage Property or to acquire the Bus Garage Property from WMATA, or that Plaintiffs offered WMATA the right to negotiate exclusively with Plaintiffs for the Bus Garage Property.[3]

2. Plaintiffs do not and cannot show that Monument conveyed a proper, unequivocal acceptance of and to a WMATA offer of the right to negotiate exclusively for the Bus Garage Property or to acquire the Bus Garage Property from WMATA, or that WMATA conveyed a

---

[2] *See Paul v. Howard Univ.*, 754 A.2d 297, 311 (D.C. 2000), citing *Emerine v. Yancey*, 680 A.2d 1380, 1383 (D.C. 1996).  The first three elements apply equally to express contracts and implied-in-fact contracts.  ("[A]ll the necessary elements of an express contract - including offer, acceptance, and consideration - must be shown in order to establish the existence of an implied-in-fact contract.") (internal citation omitted).  *Id.*  When the government is a contracting party, however, "four elements must be met: (1) mutuality of intent to contract; (2) consideration; (3) lack of ambiguity in offer and acceptance; and (4) a government representative having actual authority to bind the United States in contract."  *Mola Dev. Corp, v. U.S.*, 74 Fed. Cl. 528, 542 (2006); *O. Ahlborg & Sons, Inc. v. U.S.*, 74 Fed. Cl. 178, 191 (2006) (same).

[3] In April 2007, well after the events that Plaintiffs allege give rise to their claim, three entities identifying themselves as MR Ballpark 2 LLC, MR Ballpark 3 LLC and MR Ballpark 4 LLC submitted to WMATA an unsolicited Letter of Intent for a Purchase and Sale Agreement for the Bus Garage Property.  This Letter of Intent did *not* reference any purported understanding of Monument or any commitment, arrangement or agreement of WMATA requiring WMATA to negotiate, exclusively or otherwise, with Monument for the sale of the Bus Garage Property or to sell the Bus Garage Property to or for the benefit of Monument.  WMATA did not enter into the April 2007 Letter of Intent, or any other letter of intent, for the sale of the Bus Garage Property.

proper, unequivocal acceptance of and to an offer from Plaintiffs for the right to negotiate exclusively for the Bus Garage Property.

3. Plaintiffs do not and cannot show that Plaintiffs offered WMATA and WMATA accepted contemporaneous, bargained-for consideration in exchange for the right to negotiate exclusively for the Bus Garage Property or to acquire the Bus Garage Property from WMATA.

Rather, the evidence shows categorically and indisputably that Plaintiffs had no such agreement with WMATA and Plaintiffs *knew* they had no such agreement with WMATA.  In the words of Monument Treasurer Deborah Volpicelli, responding to an inquiry from Monument's outside auditors, "**WMATA was completely free to make any deal they want with any party they wanted.**"[4]

Most important however, and the overriding consideration that requires denial of Plaintiffs' motion, is that **Plaintiffs do not show and cannot show acts by a WMATA representative with actual authority to bind WMATA to the alleged agreement -- because no WMATA person ever had that authority**.  Sale of the Bus Garage Property could not proceed without express Board approval, under previously established Board guidelines.[5]  The WMATA Board never authorized any person to offer Monument or any other private party, or authorized any person to accept a private party's offer of, the right to enter into exclusive negotiations to acquire the Bus Garage Property.   Furthermore, the Board never authorized any person to offer the right to Monument to acquire the Bus Garage Property or to agree to sell the Bus Garage Property to Monument.   Thus, *none* of Plaintiffs' alleged actions, inactions, statements or silence by WMATA representatives could or did bind WMATA, could or did create an

---

[4] *See* Note 10 below.

[5] *See* Resolution 2006-44, adopted September 21, 2006, Exhibit A.

enforceable right for Monument or could or did give rise to an enforceable obligation of WMATA.[6]

Plaintiffs' claims of improprieties in connection with the selection of the high bid of The John Akridge Company ("Akridge") for the award also are meritless.  But before even getting to the lack of merits of Plaintiffs' objections, Plaintiffs' claims fail because **MR Ballpark 7 LLC's $60 million bid was well short – almost $10 million short – of Akridge's certain and self-contained bid of $69.25 million.  Akridge's "advantage" was not in anything that WMATA did or did not do, but in the great disparity between the bids themselves.**[7]  Nothing that Plaintiffs argue impugns this basic and dispositive fact.

On the merits, as the indisputable evidence shows, (i) the Akridge bid, a fixed, firm $69.25 million, was not conditional; (ii) Akridge was not given any advantage; (iii) there were no improper "discussions" (a term of art in government contract law) relating to the Akridge bid; and (iv) there was no prejudice to Plaintiffs in anything that WMATA said or did in connection with the evaluation of bids in general or the selection of the Akridge bid in particular.

---

[6] It was not until May 24, 2007 that the Board authorized the sale of the Bus Garage Property. In its Resolution of that date, the Board

> *RESOLVED*, That the Board of Directors authorizes the General Manager to offer for sale the Southeastern Bus Garage and its bus parking lot.  The sale proceeds will be for the replacement of the Southeastern Bus Garage and the police training facility; ....

*See* Washington Metropolitan Area Transportation Authority Board Action/Information Summary, Exhibit B.

[7] Plaintiffs do not and cannot dispute that the Akridge bid was the high bid.  Furthermore, Plaintiffs have dropped all argument, and all pretense, that the escalator bid of MRB 7 was responsive, improperly not considered by WMATA or otherwise worthy of any consideration in this case.

Nor was there any unfairness or unequal treatment in WMATA's declining to consider the MR Ballpark 7 LLC ("MRB 7") escalator bid but considering and accepting Akridge's fixed, firm $69.25 million bid.  The sole bases on which WMATA evaluated bids were the criteria in the Invitation for Bids, *i.e.*, the bid price and leaseback charges.  As WMATA briefed in the Memorandum of Points and Authorities in Support of Washington Metropolitan Area Transit Authority's Motion to Dismiss First Amended Complaint (Dkt. No. 18; Nov. 9, 2007) and the Reply of Washington Metropolitan Area Transit Authority in Support of Motion to Dismiss First Amended Complaint (Dkt. No. 34; Nov. 29, 2007), the MRB 7 escalator bid was nonresponsive as a matter of law and impermissibly required WMATA to go outside the bid to integrate and to rely on other materials in order to ascertain the bid price (which WMATA could not do in any event because of the limitless nature of the escalator bid).  The Akridge $69.25 million bid, by comparison, was wholly self-contained.  The Akridge bid did not require WMATA to venture elsewhere to determine the amount WMATA would receive upon sale of the Bus Garage Property.  There is no disparate treatment, there is nothing impermissible under government contract law, and there is no validity in a comparison where WMATA declined to consider MRB 7's facially and patently unlawful bid but considered Akridge's wholly lawful and proper bid.

At bottom, this case is a charade, elaborate for sure but a charade nonetheless.  As WMATA shows, Plaintiffs' PI Memo bears out WMATA's previous analogy of the Complaint to Hans Christian Anderson's *The Emperor's New Suit*.

### MATERIAL INDISPUTABLE FACTS

Plaintiffs build their factual case largely on selective, often context-distorting, excerpts from documents.  WMATA sets out the facts and addresses Plaintiffs' distortions and errors in the accompanying Declarations of Gary Malasky (Exhibit C, the "Malasky Dec."), Edward

Maginnis (Exhibit D, the "Maginnis Dec.") and Nat Bottigheimer (Exhibit E, the "Bottigheimer Dec."). WMATA respectfully refers the Court to these Declarations without repeating them in this Opposition, as addressing and responding more fully to the often fanciful portrayal of facts in Plaintiffs' PI Memo.

For preliminary injunction purposes, it is important for the Court to know and to have in mind throughout the following indisputable facts.

**Material Indisputable Facts With Respect To Monument Realty's Claim Of An Agreement For The Bus Garage Property:**

**1.** Until August 24, 2007, near the end of the public bidding process,[8] Monument *never*, not in any conversation, not in any exchange of emails and not in any document, communicated to WMATA that Monument asserted or believed it had a right to negotiate exclusively with WMATA for the Bus Garage Property or to acquire the Bus Garage Property from WMATA. *See, e.g.*, the deposition of Plaintiffs' Rule 30(b)(6) designee Russell Hines (Exhibit F, the "Hines Dep.") at 23 & 54:

> Q      Do you know of any face-to-face communication in which anyone from Monument said to anybody from WMATA, we have a right to that garage or you must negotiate with us on that garage property?
>
> A      It wasn't – I don't know if they – I don't know if anyone from WMATA actually – or from Monument said those specific words. They certainly – people from Monument certainly said words very similar to that in the presence of WMATA employees.
>
> Q      Well, let me – I have gone through the documents, and I will not represent to you that I know everything in every document, but I have not been able to find a single document in WMATA – in the Monument documents in which Monument has asserted this exclusive right to WMATA prior to the bid

---

[8] In his post-Invitation for Bids, August 24, 2007 letter, Monument's Jeffrey Neal wrote to WMATA General Manager John Catoe and for the first time asserted a right to negotiate for and to acquire the Bus Garage Property from WMATA. Mr. Neal also threatened serious reprisals to WMATA and to the public fisc if WMATA did not withdraw the IFB and deal solely and directly with Monument (this letter is Exhibit 7 to and is quoted in the Bottigheimer Dec. ¶ 23). *See* Argument Point VI below.

process in 2007.  My question to you is, are you aware of any document in the Monument files in which Monument communicates to WMATA that Monument has a right to the bus garage property or a right to negotiate for the bus garage property or that WMATA has an obligation to –

A    I can't –

Q    -- negotiate with Monument?

A    I can't point to a specific document, but I can tell you that there will be – not only will there be testimony, but there's likely to be specific documents, because over an 18-month period, this was – this was something that was discussed in many, many, many meetings.  It was – this was a well-known fact that Monument had been awarded the AWC designation as master developer.  It was – it was the context in which all these meetings were had.

* * * *

Q    I'm not sure I understand the answer. All I'm really looking for is if you -- or if Monument is aware of any document coming from WMATA that recognizes or contains an obligation or a commitment or a promise from WMATA to negotiate the sale of the bus garage property to anyone?

A    There may be documents, e-mails or other documents that are of that nature. Again, I think -I'd point back to our response to the interrogatory. I mean, I've seen many, many documents at this point and I would not want to try to -- try to say that I can remember what every document said, but there are documents that are of that nature.

Q    Can you give me any examples?

A    I don't have a specific example.[9]

---

[9] These excerpts do not capture the whole effort to find, and the entire extent of Mr. Hines' inability to cite, a single document, person, statement or instance – because there was none – where Monument made any reference to a right, or even to Monument's belief, that Monument had a right to negotiate exclusively with WMATA or to acquire the Bus Garage Property from WMATA.  *See* Hines. Dep. at 21-26 & 54.

After having given this testimony, Mr. Hines's subsequent Declaration in support of Plaintiffs' motion (Exhibit A to Plaintiffs' PI Memo, the "Hines Dec.") adds *nothing* to this deposition testimony, further showing that until well after the Invitations for Bids, *Monument never communicated to WMATA that Monument asserted or believed it had a right to negotiate exclusively with WMATA for the Bus Garage Property or a right to acquire the Bus Garage Property from WMATA.*

*See also* all the exhibits to Plaintiffs' PI Memo; Malasky Dec. ¶¶ 3(iv), 38, 42, 44, 55, 57-59 & 64; Maginnis Dec. ¶¶ 4(iii), 6, 20, 23-24, 30, 32-33; Bottigheimer Dec. ¶¶ 24 & 51.

**2.** No person employed by or associated with WMATA offered, committed, represented, promised or agreed to convey any property to Monument or to a Monument affiliate except as set forth in the December 1, 2006 Sale and Development Agreement conveying the Navy Yard Metrorail Station.  *See* all the exhibits to Plaintiffs' PI Memo; Hines Dep. quoted immediately above; Malasky Dec. ¶¶ 3(i), 3(iii), 22(i), 56, 81 & 82(v)-(vi); Maginnis Dec. ¶¶ 4(ii), 5, 25-28 & 31; Bottigheimer Dec. ¶ 51.

**3.** No person employed by or associated with WMATA committed, represented, promised or agreed that WMATA would negotiate with Monument or with a Monument affiliate (exclusively or otherwise) for the sale of the Bus Garage Property to Monument or to a Monument affiliate.   *See* all the exhibits to Plaintiffs' PI Memo; Hines Dep. quoted above; Malasky Dec. ¶¶ 3(ii), 56, 66, 69 & 82(v); Maginnis Dec. ¶¶ 4(ii), 21-22, 25-28, 31-32 & 34; Bottigheimer Dec. ¶ 51; Exhibit G, the email trail dated February 21, 2007 between Deborah Volpicelli, Monument Treasurer, and Scott Barnard of Beers & Cutler;[10] Exhibit H, email dated May 30, 2007 from Monument principal Jeffrey Neal to chad.tiederman and to Jack Evans, *et*

---

[10] In this email trail, Monument's outside auditor inquired of Monument's Treasurer Ms. Volpicelli, as follows (emphasis added):

> We did not receive [*sic*] option or other contractual right in the DC land sale transaction.  *My understanding was that DC would tell WMATA to talk to us first but WMATA was under no obligation to do so.*
>
> I also understand that WMATA is a separate legal authority.

Ms. Volpicelli responded (emphasis added):

> The WMATA deal was one aspect but you correctly point out that *there is not [sic] direct line* to that and that all we ultimately got was a right to speak with them first.  *WMATA was completely free to make any deal they want with any party they wanted.*

*al.*;[11] Exhibit I, email dated June 26, 2006 from Monument's Amy Phillips to Monument's Bill Krokowski, Subject: "Fw: AWC/Monument Agreement" with accompanying draft agreement.[12]

**4.** No person employed by or associated with WMATA offered, committed, represented, promised or agreed to convey the Bus Garage Property to Monument or to a Monument affiliate. *See* all the exhibits to Plaintiffs' PI Memo; Hines Dep., quoted above; Malasky Dec. ¶¶ 3(iii), 56 & 82(iv)-(v); Maginnis Dec. ¶¶ 4(ii), 21-22, 25-28; Bottigheimer Dec. ¶ 51; Exhibit G; Exhibit H.

**5.** WMATA did not receive and did not accept an offer from Monument or a Monument affiliate for exclusive negotiation rights with Monument for the acquisition of the Bus Garage Property.   *See* Malasky Dec. ¶¶ 3(v), 66 & 82(iv); Maginnis Dec. ¶¶ 23, 25-28.

**6.** WMATA did not bargain for consideration, and did not receive bargained-for consideration, in exchange for a promise to negotiate exclusively with Monument or a Monument affiliate for the sale of the Bus Garage Property or in exchange for a promise to sell

---

[11] In complaining to DC Councilman Evans about hearing that WMATA intended to solicit offers for the Bus Garage Property, Mr. Neal stated: "In doing so, they will be ignoring our agreement with AWC (for what that's worth) ...."

[12] Monument's proposed draft agreement with The Anacostia Waterfront Corporation ("AWC"), which the parties never finalized, (i) expressly excluded the Bus Garage Property (*see* § 1.6); (ii) acknowledged that "WMATA and the Corporation [*i.e.*, AWC] shall have the right to designate to whom WMATA shall convey the Bus Garage Property (*see id.*); (iii) expressly disclaimed any responsibility for identifying a new site for the bus garage or any associated costs (*see id.*); and (iv) stated, "**Developer shall not negotiate directly with WMATA regarding the acquisition and/or development of the Bus Garage Property.**" (bold and underlining in original; *see id.*).

Furthermore, as Messrs. Malasky and Maginnis set forth in their Declarations, even in the separate, failed attempt to reach agreement on a Memorandum of Understanding between AWC and WMATA, which did not reference or involve Monument at all, AWC and WMATA limited their negotiations to the Navy Yard Metrorail Station property and deliberately excluded the Bus Garage Property. The proposed MOU between AWC and WMATA for the Navy Yard Metrorail Station property never emerged from staff-level negotiations and never reached the WMATA Board. *See* Malasky Dec. ¶¶ 25-29; Maginnis Dec. ¶¶ 11, 14-16.

the Bus Garage Property to Monument or to a Monument affiliate.  *See* Malasky Dec. ¶¶ 3(vi), 57, 72-74; Maginnis Dec. ¶¶ 24-28.

**7.** The DC Council formed the Anacostia Waterfront Commission ("AWC") as an instrumentality of the District of Columbia (AWC no longer exists).  AWC had no association with, no authority over and no ability to bind or commit WMATA.  WMATA is an independent, self-governing body created by an interstate Compact among Virginia, Maryland and the District of Columbia.  *See* Plaintiffs' First Amended Complaint ¶¶ 3 & 11; Malasky Dec. ¶¶ 23-24; WMATA Compact, Article III, Sections 3 & 5.

**8.** AWC did not assert that Monument or a Monument affiliate had a right, exclusive or otherwise, to negotiate directly with WMATA to acquire the Bus Garage Property from WMATA or that WMATA had an obligation to negotiate with Monument or a Monument affiliate or to sell the Bus Garage Property to Monument or to a Monument affiliate.  *See* all the exhibits to Plaintiffs' PI Memo; deposition of District of Columbia Rule 30(b)(6) designee Judith C. Greenberg (Exhibit J, the "Greenberg Dep.") at 99:

> Q    In your preparation or otherwise, have you seen any document in which the District or AWC grants or confers any rights on MR Cordish or Monument to acquire any WMATA property?
>
> MR. JOHNSON:        Objection to the form of the question.
>
> MR. FOLTZ:          You can answer.
>
> THE WITNESS:        No.
>
> BY MR. LEVIN:
>
> Q    Has anyone told you at any time that the District or AWC conferred upon MR Cordish or Monument any right to acquire WMATA properties?
>
> A    I don't think so.

*See also* Malasky Dec. ¶¶ 3(vii) & 28; the Letter of Intent dated December 12, 2005 among the

Anacostia Waterfront Commission, Monument Realty LLC, The Cordish Company and MR

Cordish LLC (the "AWC-MRC LOI"), Exhibit 10 to Plaintiffs' PI Memo, at ¶ A.4. & ¶ C.1.

(emphasis added):

> A.     <u>Background</u>
>
>        4.     <u>Development Parcels Acquisition and Disposition; Council Approval.</u>
>
> Monument and Cordish understand that the Corporation's ability to dispose of real property is subject to approval of the Council. *The Corporation's ability to make available to MR Cordish any Development Parcel within the Ballpark District for development is expressly contingent on the Corporation's acquisition of title or control of such Development Parcel.  As of the date of this LOI, the Corporation does not have ownership or control of any land within the Ballpark District.  The Corporation does not represent or warrant that the Corporation will obtain such title or achieve such control or that the Council will approve the disposition of any such Development Parcel to MR Cordish.*
>
>                        * * * *
>
> C.     <u>Development Parcels</u>
>
>        1.     MR Cordish shall be granted the right to enter into exclusive negotiation *with the Corporation* with respect to an LDA *for any future Development Parcel consisting of land acquired by the Corporation from WMATA.  MR Cordish shall be the developer of such parcel.*[;]

and the AWC December 12, 2005 Press Release (the "AWC Press Release") announcing, *inter*

*alia*, the selection of MR Cordish LLC (not Monument) as Master Developer, Exhibit 11 to

Plaintiffs' PI Memo, at  ¶¶ 7 & 8 (emphasis added):

> 7.     **What are developer teams being offered?**
>
> *The developer teams are being offered exclusive rights to negotiate with AWC for the disposition of public land that AWC will acquire within the District*.  The teams are also being offered the opportunity to participate in the planning of a Development Strategy for the District, and to work with AWC to create the pedestrian-oriented retail plan that will link each area of the District together.
>
> 8.     **What land does AWC have control over within the District?**

> *AWC currently has no control over lands within the District. The Mayor has assigned AWC with the task of acquiring the WMATA Navy Yard parcels (approximately 3 acres) and the excess land at the WASA O Street Pump Station Campus (approximately 6 acres). The teams selected will also provide services to AWC in discharging its responsibility to coordinate development in the area.*

**9.** WMATA was not part of and made no commitments with respect to AWC's selection of the two Master Developers. Particularly with respect to this case,

(i) WMATA did not make any promises, commitments, arrangements or agreements to sell or otherwise to dispose of the Bus Garage Property to any private person or entity;

(ii) WMATA did not participate in AWC's selection process; and

(iii) WMATA did not make any promises, commitments, arrangements or agreements with or for the benefit of AWC's selected Master Developers. *See* the AWC Press Release, Exhibit 11 to Plaintiffs' PI Memo; the AWC-MRC LOI, Exhibit 10 to Plaintiffs' PI Memo; Malasky Dec. ¶¶ 21-22 and Exhibit 1 thereto, Monument's deposition of Mr. Malasky as one of WMATA's two Rule 30(b)(6) designees (the "Malasky Dep.");[13] the Hines Dep. quoted above; and the Hines Dec.

---

[13] In part, Mr. Malasky testified as follows (emphasis added):

> Q    And do you recall what WMATA's position was with respect to including its properties within what I'll call the AWC process that was identified by Mayor Williams and subsequently developed?

> A    Well, there was a follow-up meeting, and at that meeting, we made it clear that – they mentioned something about doing an REOI, Expressions of Interest, and *we made it clear that WMATA had its own policies for disposing of properties, and if they wanted to include the properties in the Request for Expressions of Interest, they had to make it very clear that they had no authority over the properties that WMATA – the WMATA board had to approve any disposition of the properties, and WMATA had its own policies for dealing with that.*

> \* \* \* \*

**10.** There is no document in which WMATA offers, promises, commits or agrees that

Monument or a Monument affiliate has a right to negotiate with WMATA for the Bus Garage

Property or to acquire the Bus Garage Property from WMATA.  *See* all the exhibits to Plaintiffs'

---

Q       And my understanding of your testimony is that WMATA's position was that WMATA's properties located in the Ballpark District could be included within the AWC process and as a part of the Request for Expressions of Interest, but that AWC had no authority to sell or dispose of those properties without subsequent approval by WMATA.

MR. LEVIN:              Objection.

BY MR. DOLAN:

Q       Is that correct?

MR. LEVIN:              Object to the form of the question.

THE WITNESS:      Right.      First, what we were asked specifically was an REOI. There was no understanding that I had of any -- I'm not sure what you mean by process, but it was specifically a Request for Expressions of Interest, number one.  Number two, we made it clear that we had our own policies that the board had to approve and that they had to -- *they, AWC, had to make it clear they had no control in addition to authority to offer ability to consummate a sale or anything like that, that that was entirely up to WMATA and the WMATA board had to approve any action.*

\*\*\*\*

A       Well, this was an AWC process, not a WMATA process, and AWC didn't own any land.  It was always unclear to me just what they could possibly – what rights they could possibly give in this process.

And number one, beginning, this was an REOI, Expressions of Interest. You know, I didn't contemplate that they were going to make some kind of selection from an REOI. Often that's what it says, Expressions of Interest, and then you have a further -- further process.

But, you know, *we certainly had no control over what AWC said they were doing.  We were just quite clear what our process was and, you know, what -- what we were telling them that they could do.  As to how they characterize things or something, I had no participation, no control, no idea what they were saying.*

Malasky Dep. at 20, 24 & 49.

PI Memo; the Hines Dep. quoted above; the Hines Dec.; Malasky Dec. ¶¶ 3(viii), 49-54, 68 & 82(vi).

11. There is no document in which WMATA accepts an offer to negotiate with Monument or a Monument affiliate for the Bus Garage Property or accepts an offer from Monument to acquire the Bus Garage Property. *See* all the exhibits to Plaintiffs' PI Memo; Malasky Dec. ¶¶ 3(ix), 49-54 & 82(vi); the Hines Dep. quoted above; and the Hines Dec.

12. There is no document showing that WMATA bargained for consideration in exchange for a promise to negotiate exclusively with Monument or a Monument affiliate for the sale of the Bus Garage Property or in exchange for a promise to sell the Bus Garage Property to Monument or a Monument affiliate. *See* all the exhibits to Plaintiffs' PI Memo; the Hines Dep. quoted above; the Hines Dec.; Maginnis Dec. ¶¶ 25-28 & 35; Malasky Dec. ¶¶ 3(x), 49-54, 73-74 & 82(vi).

13. There is no document in which AWC promised Monument or a Monument affiliate ownership of or a right to acquire *any* WMATA property, including but not limited to the Bus Garage Property. *See* all the exhibits to Plaintiffs' PI Memo, including the AWC Press Release, Exhibit 11, and the AWC-MRC LOI, Exhibit 10; Greenberg Dep. at 99, quoted above; Malasky Dec. ¶¶ 49-54 & 82(vi); Malasky Dep. at 20, 24 & 49, quoted in Note 13 above; Maginnis Dec. ¶¶ 7-16 & 30; the Hines Dep. quoted above; and the Hines Dec.

14. There is no document in which AWC obligates itself to Monument or a Monument affiliate to acquire the Bus Garage Property for, and/or to make the Bus Garage Property available to, Monument or a Monument affiliate. *See* all the exhibits to Plaintiffs' PI Memo, including the AWC Press Release, Exhibit 11, and the AWC-MRC LOI, Exhibit 10; the Hines Dep. quoted above; the Hines Dec.; Greenberg Dep. at 99, quoted above; Malasky Dec. ¶¶ 19-20; Maginnis Dec. ¶¶ 7-16 & 30.

**15.** Monument had no obligation to purchase the Bus Garage Property. *See* the Hines Dep. at 49 & 51.[14]

**16.** Historically as a matter of comity, WMATA accords its funding signatory jurisdictions an opportunity to buy property that is to be offered for sale, provided that WMATA receives at least appraised value and subject to Board approval. This practice is not an obligation and not a promise or commitment to sell. Rather, WMATA accords the constituent jurisdictions the opportunity to submit a bid, subject to approval by the WMATA Board. This practice is for the benefit of, and offers the opportunity to, *only* the signatory jurisdiction, *not* any private party. WMATA has an entirely separate process for disposition of property to private parties. *See* Maginnis Dec. ¶ 36; Malasky Dec. ¶¶ 10-11; Bottigheimer Dec. ¶¶ 9, 14-16; WMATA Compact, Article II, Section 8(a).

**17.** No WMATA personnel were authorized to offer to, agree to or accept an offer to negotiate exclusively with Monument or any other private party for the sale of the Bus Garage

---

[14] Mr. Hines testified (emphasis added):

> Q    But theoretically, at least, the way you described the process, Monument could walk away from the deal? Monument had no obligation to purchase; is that right?

> A    We had -- yes, *we had no obligation to purchase the property*.

> ****

> Q    When the District stated its interest in the property, did Monument have an obligation to purchase it if the District were to get the property from WMATA?

> A    I think we're going down the same line of discussion. These were -- to the extent that there was a -- would be a contract put in place, it would be prudent for the District to also put in place a specific contract with Monument. These are discussions, letters between two bodies, initial discussions about a contract. *So at the time Monument had no obligation to do anything.*

Property.  *See* Malasky Dec. ¶¶ 67, 75-76, 80 & 82(iii); Bottigheimer Dec. ¶ 51; Greenberg

Dep. at pages 72-73 & 93.

> **Material Indisputable Facts With Respect To MR Ballpark 7's Claim Of Improprieties In WMATA's Selection Of The Akridge Bid As The High Bid:[15]**

**18.** Akridge's $69.25 million bid was the high bid for the Bus Garage Property,

exceeding the MR Ballpark 7 bid by $9,250,000.  *See* Bottigheimer Dec. ¶¶ 4, 30 & 40 and

Exhibits 10, 11 & 13 thereto.

**19.** With respect to the two cover letters accompanying the Akridge bid:

(i)  The cover letters do not reference, disturb or in any way affect Akridge's fixed, firm

bid price of $69.25 million for the Bus Garage Property or Akridge's fixed rental amounts for a

possible leaseback.

(ii) The letters did not address or impose conditions that would modify the material

requirements of the IFB.

(iii) The letters did not limit Akridge's liability to WMATA and did not limit WMATA's

rights under any provision of IFB No. 08-1.

(iv) The so-called "condition," as Plaintiffs characterize the letters' content, was not a

condition to the $69.25 million bid, but rather was Akridge's purported reservation of a right

with respect to IFB No. 07-3.  Akridge maintained that WMATA should not have withdrawn

IFB No. 07-3 and that WMATA should consider only the bids submitted in response to IFB

No. 07-3.    Akridge's expressed concern and reservation were, however, meritless and

meaningless.    IFB No. 08-1 had superseded IFB No. 07-3.    Thus, Akridge's purported

reservation of a right to rely on IFB No. 07-3 did not apply to or in any way affect the content

---

[15] Only MR Ballpark 7 has standing to challenge the bid and award process.  Monument Realty
was not a bidder.

of Akridge's bid in response to IFB No. 08-1.  *See* Bottigheimer Dec. ¶ 32 and Exhibits 8 & 9

thereto, also Exhibits 72 & 73 to Plaintiffs' PI Memo.

**20.** WMATA did not consider the two cover letters accompanying the Akridge bid in

connection with reviewing and evaluating the bids or in connection with the Board's award of

the Bus Garage Property to Akridge as high bidder.  *See* Bottigheimer Dec. ¶¶ 32-33 and

Exhibits 10, 11 & 13 thereto.

**21.** WMATA also did not consider the offer in the Akridge bid to negotiate for the use

of Akridge property as a temporary site during the Bus Garage relocation process.  With respect

to that offer:

(i) WMATA's sole criterion and sole consideration for evaluating the bids and for

selecting Akridge's bid as the highest bid was Akridge's fixed, firm and unequivocal bid price of

$69.25 million (with accompanying fixed leaseback price), which in fact was the high bid.

(ii) The offer to negotiate temporary space did not limit, reduce or modify Akridge's

obligation to pay $69.25 million for the Bus Garage Property.

(iii) The offer did not impose conditions that would modify the material requirements

of the IFB, did not limit Akridge's liability to WMATA and did not limit WMATA's rights

under any provision of IFB No. 08-1.  *See* Bottigheimer Dec. ¶¶ 34-36 & 38 and Exhibits 10,

11 & 13 thereto.

(iv) The offer to negotiate was immaterial to WMATA.  WMATA decided to disperse

buses to other garages during relocation rather than relocate buses to a single site or keep buses

in the vicinity.  Thus, there was no reason for, and nothing that served WMATA's ends in, the

Akridge offer to negotiate to relocate buses on a temporary site.  *See* Bottigheimer Dec. ¶ 37.

**22.** With respect to the alleged improper post-bid-opening "discussions" with Akridge

(which, as WMATA briefs below, were not impermissible under procurement law), no one at

WMATA had any pre-award communications, and certainly no exchanges of communications, that:

(i) Affected the substance of the terms of Akridge's bid, particularly its fixed, firm, committed $69.25 million;

(ii) Afforded Akridge an opportunity to modify its bid or otherwise conferred an advantage on Akridge;

(iii) Altered Akridge's bid;

(iv) Limited, whether directly or indirectly or in any manner whatsoever, WMATA's right to enforce Akridge's bid; or

(v) Limited, conditioned or in any way modified Akridge's obligation to meet the terms of its bid generally and particularly to pay WMATA the promised $69.25 million.  *See* Bottigheimer Dec. ¶ 41.

**23.** Further with respect to the alleged improper post-bid-opening "discussions" with Akridge:

(i) WMATA determined the responsiveness of and evaluated Akridge's bid well in advance of any of the communications that Plaintiffs cite.

(ii) WMATA's Contracting Officer Nat Bottigheimer prepared his August 29, 2007 Memorandum to the Board with the evaluations well in advance of any of the communications that Plaintiffs cite, and that Memorandum went to the Board as written on August 29, 2007, without change.

(iii) (a) No WMATA staff member negotiated or altered the terms and conditions of IFB No. 08-1 for or with Akridge or any other bidder; (b) No WMATA staff member allowed Akridge or any other bidder an opportunity to change the terms of the bids; and (c) no WMATA staff member offered an advantage to any bidder not available to all bidders.

(iv) The Board considered the bids and selected the Akridge bid without any knowledge or consideration of the communications.  *See* Bottigheimer Dec. ¶¶ 42-43 & 50 and Exhibits 10, 11 & 13 thereto.

## ARGUMENT[16]

### I.     Plaintiffs Fail To Show A Likelihood Of Prevailing On Their Claim Of An Exclusive Agreement To Negotiate With WMATA For The Bus Garage Property, And/Or To Acquire The Bus Garage Property From WMATA

Plaintiffs fail to show that they can satisfy any of the elementary requirements for a contract: offer, acceptance, contemporary bargained-for consideration and, because Plaintiffs seek to establish a contract with a government body, agreement by a WMATA representative having actual authority to bind WMATA to a promise of exclusive negotiations for and/or acquisition of the Bus Garage Property.  *See* Note 2 above.

### 1.     WMATA Never Offered To Enter Into Exclusive Negotiations With Monument To Acquire, And Never Offered Monument The Exclusive Right To Acquire, The Bus Garage Property

Making an offer is the essential first step of contract formation.  *See Virtual Def. & Dev. Intern., Inc. v. Republic of Moldova*, 133 F. Supp. 2d 9, 17 (D.D.C. 2001) (*"Virtual Defense"*).  When making an offer, the offeror must manifest a willingness to enter into a bargain and must propose an arrangement that is "definite and certain," and the offer "must be made under circumstances evidencing the express or implied intent of the offeror that its acceptance shall constitute a binding contract."  *Id.* at 17-18.  Plaintiffs fail to show, because they cannot, *any*

---

[16]  WMATA incorporates by reference, and therefore does not repeat, WMATA's (i) Memorandum of Points and Authorities in Support of Washington Metropolitan Area Transit Authority's Motion to Dismiss First Amended Complaint (Dkt. No. 18; Nov. 9, 2007) (the "WMATA MTD Memo"); (ii) Reply of Washington Metropolitan Area Transit Authority in Support of Motion to Dismiss First Amended Complaint (Dkt. No. 34; Nov. 29, 2007) (the "WMATA MTD Reply"); and (iii) Reply of Washington Metropolitan Area Transit Authority to Supplemental Opposition to Motion to Dismiss (Dkt. No. 58; Dec. 13, 2007) (the "WMATA Supp. MTD Reply").

facts proving that WMATA made an offer to Monument to negotiate exclusively with Monument for the sale of the Bus Garage to Monument, or that Monument made an offer to WMATA to negotiate exclusively with WMATA for the sale of the Bus Garage to Monument**.**

*All* the facts, rather, belie any such offer from WMATA or Monument. The Court will search hopelessly and in vain in Plaintiffs' PI Memo and in Plaintiffs' exhibits for any reference to a Monument offer to WMATA (or a WMATA offer to Monument) for a right to acquire the Bus Garage Property or for anything even arguably approaching a Monument offer to WMATA (or a WMATA offer to Monument) seeking a right to exclusive negotiations. Plaintiffs cite *nothing* in the record where they even raised the prospect of negotiating with WMATA for the sale of the Bus Garage, let alone made an offer to WMATA asking for the right to exclusive negotiations for the Bus Garage Property. Plaintiffs cannot even show that they made an offer to *AWC* that Monument have the exclusive right to negotiate with WMATA for the Bus Garage Property -- because Monument did not make that offer to AWC either.

To the contrary, Plaintiffs knew and agreed that that they were *not* the negotiators with, and were *not* to be the acquirors from, WMATA. *See, e.g.,* the AWC December 12, 2005 Press Release and the December 12, 2005 Letter of Intent with AWC, quoted above; and Exhibit G, the email exchange between Monument Treasurer Deborah Volpicelli and Monument's outside auditors Beers & Cutler.

Plaintiffs' assertions that (1) WMATA "assented *to AWC* including WMATA's properties in the Ballpark District" and (2) the Letter of Intent between Plaintiffs and AWC "granted the Monument team the exclusive right to negotiate *with AWC* for WMATA's property in the Ballpark District that *AWC acquired or controlled*," Plaintiffs' PI Memo at 4 (emphasis added), certainly do not show an offer from Monument *to WMATA* for exclusive negotiation rights. If anything, these allegations demonstrate that *AWC* contemplated granting

Monument exclusive rights to negotiate *with AWC* to acquire WMATA's properties in the Ballpark District *if and when* AWC itself -- not Monument -- acquired or controlled such properties (as to which *AWC had no obligation to Monument to acquire*).

Nor do Plaintiffs show, as they cannot, that WMATA offered Monument an exclusive right -- or any right, for that matter -- to negotiate to acquire the Bus Garage Property.  The reason Plaintiffs cannot show a WMATA offer is that there was none.  *See* Malasky Dec. ¶¶ 3(ii), 66 & 82(iv)-(v); all exhibits to Plaintiffs' PI Memo.  Moreover, no one with WMATA was authorized to make that offer.  *See* Hines Dep. quoted above; Malasky Dec. ¶¶ 67, 75-76, 80 & 82(iii); Malasky Dep. quoted in part at Note 13 above; Argument Point I. 5. below.

Furthermore, WMATA made clear to AWC, and AWC made clear to the persons seeking to be designated and then designated Master Developers, that *WMATA alone controlled the disposition of its properties, that AWC did not and could not control the disposition of WMATA's properties and that AWC could not even represent that it could or would acquire rights in or to WMATA's properties.*  Thus, not just WMATA, but also AWC negated Plaintiffs' present claim of an agreement, from the outset.  *See* Exhibits 10 & 11 to Plaintiffs' PI Memo; Malasky Dec. ¶¶ 21-24; Malasky Dep. quoted in part at Note 13 above.

Plaintiffs may revert to arguing that they had some right arising out of WMATA's practice of according the District of Columbia, as a WMATA constituent jurisdiction, the opportunity to make an offer to acquire the Bus Garage Property.  That is a false premise, contrary to the practice, contrary to the WMATA Compact, without any legal (or factual) foundation and a premise that both WMATA and the District did not accept.  *See* Material Indisputable Facts With Respect To Monument Realty's Claim Of An Agreement For The Bus Garage Property No. 16; Maginnis Dec. ¶ 36; Bottigheimer Dec. ¶¶ 9, 14-16; Malasky Dec. ¶¶ 10-11; Greenberg Dep. at 99:

Q     In your preparation or otherwise, have you seen any document in which the District or AWC grants or confers any rights on MR Cordish or Monument to acquire any WMATA property?

MR. JOHNSON:     Objection to the form of the question.

MR. FOLTZ:     You can answer.

THE WITNESS:     No.

BY MR. LEVIN:

Q     Has anyone told you at any time that the District or AWC conferred upon MR Cordish or Monument any right to acquire WMATA properties?

A     I don't think so.

This route would be a dead end for Monument in any event, even were the Court to transform this politically based and politically limited policy, available only to the constituent bodies politic, into some kind of open-ended offer for a private party, for three reasons.  First, the offer would be far too nebulous and uncertain, failing the contractual requirement that an offer be "definite and certain."  Second, in July 2007, the District did request that WMATA rescind the IFB for the Bus Garage Property so that the District could purchase the Bus Garage Property *for itself, but the District made no offer, did not engage in any negotiations, formally withdrew its request and did not permit the WMATA Board to consider the request.  See* Bottigheimer Dec.  ¶¶ 7-8 & 19; Exhibit 67 to Plaintiffs' PI Memo, a July 25, 2007 email from DC Board Member Emeka Moneme to Jim Graham (the other DC Board Member), Board Chair Hewlett and DC Deputy Mayor Neil Albert and City Administrator Dan Tangherlini informing them of that withdrawal and stating, "I feel the preferable path on the sale of the SE Bus Garage site is for the District to allow the WMATA competitive process to move forward."

Third, if WMATA's allowing AWC to include WMATA properties as eligible for the development process *if AWC acquired them* were deemed an offer from WMATA to *private*

*parties*, a *non sequitur* on its face, it still was WMATA's offer to AWC that only AWC and/or

the District had the power to accept.[17]    *See Nat'l Football League Players Ass'n v. Office &*

*Prof'l Employees Int'l Union, Local 2*, 947 F. Supp. 540, 545 (D.D.C. 1996) ("no 'power of

acceptance' was created in NFLPA by the oblique suggestion of Local 2, which was made in a

---

[17] *See* Malasky Dep. at page 31:

> Q    So at this time, did you have an understanding that the city, as it states in the first paragraph of this e-mail, had granted exclusive rights to the team of Monument Realty, the Cordish Company and Trident Development Group with respect to developing a mixed use project that will incorporate the WMATA-owned parcels in the baseball stadium area?

> A    Well, this was an AWC process, not a WMATA process, and AWC didn't own any land.  It was always unclear to me just what they could possibly – what rights they could possibly give in this process.

> And number one, beginning, this was an REOI, Expressions of Interest. You know, I didn't contemplate that they were going to make some kind of selection from an REOI. Often that's what it says, Expressions of Interest, and then you have a further -- further process.

> But, you know, we certainly had no control over what AWC said they were doing.  We were just quite clear what our process was and, you know, what -- what we were telling them that they could do.  As to how they characterize things or something, I had no participation, no control, no idea what they were saying.

Plaintiffs' PI Memo also hammers on WMATA's desiring a "phased" disposition of its properties.  Even assuming its truth, WMATA cannot discern any material, substantive importance of that fact to any of the elements of an enforceable contract.  Plaintiffs' own evidence gives WMATA pause over Monument's veracity in taking that unqualified tack.  *See* Exhibit 14 to Plaintiffs' PI Memo, the April 14, 2006 Meeting Notes of the District of Columbia Coordination Task Force (emphasis added):

> 6. Nia Francis (AWC) stated that she sent a draft MOU to WMATA regarding disposition of the properties surrounding the Navy Yard Metrorail Station. Gary Malasky stated that he had not yet seen the MOU.  *Based on Monument's desire to have a phased disposition of property, Nia Francis will revise and resend the MOU.*

letter to the arbitrator and not to NFLPA") (internal citation omitted); *Routzahn v. Cromer*, 150 A.2d 912, 915 (Md. 1959) ("an offer made to one person cannot be accepted by another").[18]

Also, Monument's conduct belies an offer. As Mr. Hines testified, as all the documents show, as Plaintiffs' PI Memo shows and as all WMATA people confirm, *Monument never suggested, raised or asserted that it had made an offer, had received an offer, or had a right, to negotiate with WMATA, exclusively or otherwise, for the Bus Garage property.* Monument's silence cannot be an offer even less than WMATA's alleged acquiescence could be an acceptance. *See William F. Klingensmith, Inc. v. District of Columbia*, 370 A.2d 1341, 1343 (D.C. 1977) ("an offeror ordinarily lacks the power to make an offeree's silence result in an acceptance"); *Metzler v. Harry Kaufman Co.*, 32 App. D.C. 434, 1909 WL 21487, at *3 (D.C. 1909):

> Without regard to the question whether the acceptance must be in writing in order to complete the contract, it must, in all cases, be an affirmative act. Silence does not amount to acceptance. "Mental assent," as it has been termed, - that is to say, coming to a determination in one's mind to accept, - without communicating that assent, is insufficient.

---

[18] One can only imagine the kinds of factual and contractual chaos such a notion could engender. For example, Monument's evident position in this suit, necessary for it to proceed, is that notwithstanding AWC's clear designation of MR Cordish LLC as Master Developer, Monument possesses that sobriquet and any rights that flow from it. If Monument can wrest the Master Developer designation from MR Cordish, then so could the other members of the LLC and of the AWC-designated "team," The Cordish Company and Trident Development Company, LLC. That would mean that they equally could claim rights to the WMATA properties.

There are other and more mischievous scenarios that arise from converting WMATA's allowance to *AWC*, to include WMATA-owned properties as ones that AWC has an opportunity to acquire, into a firm offer to *private parties* of a right to acquire WMATA-owned properties. All the scenarios are irreconcilable with basic contract law, logic and common sense. But even were contract law, logic and common sense tossed aside, there still remains the impregnable barrier of WMATA's fully retained authority and control over the properties and any disposition process relating to the properties.

Nor do Monument's beliefs fill this contractual void.  *See Eplus Technology, Inc. v. Nat'l R.R. Passenger Corp.*, 407 F. Supp. 2d 758, 761 (E.D. Va. 2005) (plaintiff's "belief" that it had been awarded the contract was insufficient to show acceptance of an offer); *Peach State Meat Co. v. Excel Corp.*, 860 F. Supp. 849, 852 (M.D. Ga. 1994) (internal citations omitted):

> Codi argues that its belief and understanding of the affiliation it had with Excel created an exclusive relationship. The court disagrees. A unilateral belief or supposition that a contract exists is insufficient to support the formation of a contract. Both parties must mutually agree on the terms and conditions of each parties' obligations under the contract.[19]

Without an offer from WMATA to Monument for Monument to accept (and without an offer from Monument to WMATA for WMATA to accept), there is no contract.  *See Virtual Defense, supra*, 133 F. Supp. 2d at 17-18.

---

[19] The credibility of Plaintiffs' alleged belief is dubious.  Until WMATA decided to put the Bus Garage Property up for public bid in 2007, Plaintiffs said nothing, certainly not to WMATA, confirming the alleged belief.  Plaintiffs composed and reviewed many drafts of agreements with AWC, and Plaintiffs composed and reviewed many drafts of agreements with WMATA relating to their purchase of the Navy Yard Metrorail Station property from WMATA.  *None* of these agreements referenced their alleged belief.

Plaintiffs also employed a sophisticated, large law firm as outside counsel in their dealings with WMATA and AWC, and so far as WMATA knows, their outside counsel did not assert, document or raise an awareness of Plaintiffs' alleged belief.

Furthermore, it is not as if the concept of a written exclusivity agreement were unknown to Plaintiffs.  *See* Exhibit K, an April 3, 2006 email trail between Monument's Amy Phillips and Monument principal Jeffrey Neal, in which Ms. Phillips informs Mr. Neal about one Russell Urban (not associated with WMATA):

> I'm thinking that they'd REALLY like to do a deal…He called me before you even sent this.  He's sending me a draft Exclusivity Agreement this afternoon. I'll circulate.

### 2.    Plaintiffs Fail To Show Acceptance Of A Definite Offer

WMATA never offered Monument the right to negotiate exclusively for the Bus Garage or the right to acquire the Bus Garage Property from WMATA, so there was nothing for Monument to accept.  Likewise, Monument never made an offer to WMATA that contained a Monument right to negotiate exclusively with WMATA for the Bus Garage so there was nothing for WMATA to accept.  Thus, there was and could be no contract.  *See* Note 2 above; *Virtual Defense, supra*, 133 F. Supp. 2d at 17-18.

### 3.    The Alleged Agreement Lacks Bargained-For Consideration

Assuming for the sake of argument that either WMATA or Monument proposed a "definite and certain" offer of exclusive negotiation and/or acquisition to the other party, and assuming also that the other party understood there to be an offer and unequivocally accepted that offer, Plaintiffs cannot prevail on the merits because there is no bargained-for consideration.  Consideration is necessary to make a promise enforceable.  *See* Note 2 above; *Sisco v. GSA Nat'l Capital Fed. Credit Union*, 689 A.2d 52, 56 (D.C. 1997).  And that consideration, *i.e.*, the performance of an act or a return promise, "must be bargained for" -- must be "sought by the promisor in exchange for his promise" and must be "given by the promisee in exchange for that promise" -- to constitute sufficient consideration for there to be a contract.  *Id*.; *see Boks v. Charles E. Smith Mgmt., Inc*., 453 A.2d 113, 117 (D.C. 1982).  If there is no bargained-for consideration, the alleged contract lacks "an essential element required for both contract formation and the remedy of specific performance" and is unenforceable.  *Ghahremani v. Uptown Partners, L.L.C*., 2005 WL 3211463, at *16 (D.D.C. Nov. 13, 2005).  Plaintiffs never articulated an offer or acceptance, let alone articulated that anything Plaintiffs promised WMATA, Plaintiffs "sought … in exchange for [its] promise."   In fact, Plaintiffs never promised WMATA anything.

Monument argues that it conferred benefits on WMATA in and for the Navy Yard Metrorail Station property sale and that these alleged benefits created a contract.  Monument is wrong for many reasons.  First, the alleged "benefits" that Monument claims to have conferred on WMATA -- after the alleged agreement arose -- were not offered to WMATA in reliance on the offer and acceptance of a right to negotiate exclusively for the Bus Garage Property.  Rather, as the documents show, whatever Monument agreed to undertake in its agreements to purchase and construct improvements for the Navy Yard Metrorail Station property was part of, and consideration for, Monument's acquisition of the Navy Yard Metrorail Station property.  There was no offer, promise, representation, commitment or agreement to enter into negotiations for the Bus Garage Property or to sell the Bus Garage Property with or in connection with the Navy Yard Metrorail transaction.  *See* Malasky Dec. ¶¶ 49-57; Maginnis Dec. ¶¶ 24-28.[20]

Second, WMATA did not have, and could not have had, reason to know that Monument's acquiring the Navy Yard Metrorail Station property, closing the alleyways in the

---

[20] Once again, Monument's position invites questions regarding Monument's credibility. Monument is a sophisticated player in the real estate ownership and development business, and not just in the District of Columbia.  In the Ballpark District alone, Monument purchased over $80 million of real estate, most of it before the AWC designation.  *See* Plaintiffs' First Amended Complaint ¶¶ 10-12.  There were over 450 pages of documents comprising the Navy Yard Metrorail Station transaction closing binder, including the almost-50-page Sale and Development Agreement with the integration clause (the Agreement is an Exhibit to the Malasky and Maginnis Declarations).  Monument also had sophisticated outside counsel representing it in the transaction.  Yet there is *nothing* in the documentation of the transaction that evidences Monument's alleged belief or understanding that the alleged right to exclusive negotiations for, and/or to acquire, the Bus Garage Property was part of the deal and integral consideration.

Moreover, to give effect to Monument's position in these circumstances means that the contract documents do not define the contract and that there are no contractual limits on what the parties can import into the transaction and the transaction documents months or years after execution and closing.  Plaintiffs' position is simply antithetical to the law of contracts at its most fundamental level.

Ballpark District, entering into an easement agreement and opposing a designation of the Bus Garage Property as a historical landmark were undertaken with the expectation of compensation from WMATA in the form of an exclusive right to the Bus Garage Property. *See* Malasky Dec. ¶¶ 57-58, 72-74; Maginnis Dec. ¶¶ 23-24, 32-33. Monument never communicated to WMATA, or gave WMATA any reason to know, that Monument offered these "benefits" to WMATA in exchange for exclusive negotiation rights to the Bus Garage Property. *See* Maginnis Dec. ¶¶ 24, 32-33. Merely by performing these actions and alleging that such actions were undertaken for WMATA's benefit, Plaintiffs cannot create even a presumption that WMATA assented to Monument's belief that it held exclusive negotiation and/or acquisition rights in the Bus Garage Property, let alone succeed on the merits. *See Somervell v. Baxter Healthcare Corp.*, 1998 WL 203145, at *2 (D.C. Cir. Mar. 13, 1998) ("In any event, Baxter could not, merely by depositing the money into Somervell's account, create the presumption that Somervell accepted the terms of the agreement if she did not subsequently return the funds.").

Third, many of the alleged benefits relate expressly to the parties' agreement regarding the Navy Yard Metrorail Station property transaction and in every sense constitute consideration for the Navy Yard Metrorail Station Sale and Development Agreement and *only* the Navy Yard Metrorail Station Sale and Development Agreement. *See* Navy Yard Metrorail Station Sale and Development Agreement, an Exhibit to both the Malasky and Maginnis Declarations; Maginnis Dec. ¶¶ 25-28; Malasky Dec. ¶¶ 49-57.

Because Monument never made the exclusive negotiation rights to the Bus Garage Property a condition or an element of the Navy Yard Metrorail Station property transaction, Plaintiffs cannot rely on the "benefits" to WMATA emanating from that transaction to support its claim of breach of contract for exclusive rights to negotiate and/or acquire the Bus Garage

Property.  *See Grunseth v. Marriott Corp.*, 872 F. Supp. 1069, 1073 (D.D.C. 1995) ("There is no evidence in this record to prove the existence of such an implied contract … Plaintiff never made nondisclosure of his hotel receipts a condition of his stay at the Marriott hotel.").

Fourth, as WMATA briefed in the WMATA MTD Memo at 15-17, the merger and integration section of the Navy Yard Metrorail Station Sale and Development Agreement bars WMATA's argument.  *See* Malasky Dec. ¶¶ 53-54; Maginnis Dec. ¶¶ 27-28.[21]

Fifth, Monument's premise that it undertook its actions for WMATA's benefit is not correct.  These "benefits" in fact were for Monument and were self-serving.  Monument undertook them to increase its land ownership, to increase the value of its land within the Ballpark District and to further its own development efforts in the Ballpark District.  *See* Malasky Dec. ¶¶ 73-74.[22]

---

[21] These Declarations discuss the merger/integration section of the Sale and Development Agreement, which provides:

> 18.7  **Entirety And Amendments**.  This Agreement embodies the entire Agreement between the parties and supersedes all prior agreements and understandings, if any, relating to the Property.  This Agreement may be amended only by writing executed by the party against whom enforcement is sought.

It was and is WMATA's view and intention that this clause meant exactly what it states and that regarding or relating to the sale and development of the Navy Yard Metrorail Station property, except as explicitly set forth in the Agreement, there were no promises, expectations, inducements, reliance, undertakings or understandings relating to any expectation of or reliance on Monument's negotiating to acquire or acquiring the Bus Garage Property and/or WMATA's negotiating to sell or selling the Bus Garage Property to Monument or its affiliates.

[22] According to the First Amended Complaint, "Anticipating the potential for economic development in the Ballpark District, Monument began acquiring parcels of real property in the vicinity of the to-be-constructed baseball stadium, identifying the first group of properties for acquisition in October 2004.  In total, Monument invested approximately $80 million in land acquisitions in this area" (¶ 12), and "By May 2005, Monument already owned or had under control most of the privately held property surrounding the WMATA Bus Garage and Navy Yard Metro Station site." (¶ 19).  Monument would have this Court believe that its planning and investment reflected in these and other parts of the First Amended Complaint were mere larks -- that Monument's further expenditures and development efforts were not tied to its

Sixth, Monument, or more correctly MR Cordish LLC,[23] had committed to AWC to undertake much of what Monument now claims were benefits it conferred on WMATA. *See* the AWC-MRC Letter of Intent, Exhibit 10 to Plaintiffs' PI Memo, ¶ C.9: "MR Cordish is obligated to design and fund streetscape improvements along Half Street. MR Cordish's ability to comply with this paragraph is subject to MR Cordish's acquiring site control or to obtaining the cooperation of abutting landowners."

The final rub, the final insult, in Monument's imaginary contract claim is that *Monument itself had no obligation to perform. See* Hines Dep. at 49, 51:

> Q      But theoretically, at least, the way you described the process, Monument could walk away from the deal? Monument had no obligation to purchase; is that right?

> A      We had -- yes, we had no obligation to purchase the property.

> ****

> Q      When the District stated its interest in the property, did Monument have an obligation to purchase it if the District were to get the property from WMATA?

> A      I think we're going down the same line of discussion. These were -- to the extent that there was a -- would be a contract put in place, it would be prudent for the District to also put in place a specific contract with Monument. These are discussions, letters between two bodies, initial discussions about a contract. So at the time Monument had no obligation to do anything.

---

already significant purchases and other investments but solely were consideration to WMATA in exchange for the never-mentioned exclusive right to negotiate with WMATA to acquire the Bus Garage Property. The notion is patently incredible. One may add this argument to the reasons to question Monument's sincerity and the plausibility of its arguments.

[23] MR Cordish LLC, not Monument, was the AWC Designated Developer. *See* the December 12, 2005 Letter of Intent with AWC, Exhibit 10 to Plaintiffs' PI Memo, and the AWC December 12, 2005 Press Release, Exhibit 11 to Plaintiffs' PI Memo. Monument has no claim or rights as Designated Developer. *See* WMATA MTD Memo at 4-5 & 15.

A contract requires *mutuality of obligation*.  *Ghahremani v. Uptown Partners, L.L.C.*, *supra*, 2005 WL 3211463, at *16.  Here, Monument admits that there was no mutuality of obligation and therefore admits that there was no contract as a matter of law.

**4.    Plaintiffs Fail To Demonstrate That WMATA Intended To Be Bound By The Alleged Agreement**

For an enforceable agreement to exist, the parties both must (1) agree on all material terms and (2) "intend to be bound by the agreement."  *McDonald v. Am. Red Cross*, 505 F. Supp. 2d 143, 147 (D.D.C. 2007) (internal citations omitted); *see Steven R. Perles, P.C. v. Kagy*, 473 F.3d 1244, 1249 (D.C. Cir. 2007) ("Under District of Columbia law, a valid and enforceable contract requires both: (1) intention of the parties to be bound; and (2) agreement as to all material terms.") (internal citations omitted).  When dealing with the government or a government agency, "*unambiguous mutuality of intent to contract is a precondition for contract formation*," and generally, a plaintiff is required to show mutual intent through "objective evidence of an offer and a reciprocal acceptance."  *Mola Dev. Corp. v. U.S.*, 74 Fed. Cl. 528, 543 (2006) (emphasis added; internal citation omitted).

In this preliminary injunction proceeding, Monument is *required* to prove the intent of both parties to be bound as part of its showing that it is likely to prevail on the merits.  *See Redwood Ctr. Ltd. P'ship v. Riggs Nat'l Bank of Washington, D.C.*, 737 F. Supp. 671 (D.D.C. 1990) (denying motion for preliminary injunction).  Plaintiffs fail to show any facts that indicate WMATA's intent to be bound by the alleged agreement.  In fact WMATA -- acting through staff without authority to bind WMATA as a body politic -- did not and could not intend to be bound.  *See* Note 2 above; Malasky Dec. ¶¶ 67, 76, 80 & 82(iii); Argument Point I.5. below.

Plaintiffs' implicit argument that WMATA could have shown, but did not show, its intent *not* to be bound by the alleged agreement does not satisfy Plaintiffs' burden on the

element of intent. *See Mason Tenders Dist. Council v. JNG Const. Ltd*., 2003 WL 22999453, at *5 (S.D.N.Y. Dec. 19, 2003) (plaintiffs failed "to point to any conduct by [the principal] manifesting an intent to abide by the terms of the agreement"; the court found that a principal's failure to act after unauthorized action by an agent executing an agreement did *not* manifest the principal's intent to adopt the agreement); *see also Hood v. District of Columbia*, 211 F. Supp. 2d 176, 181 (D.D.C. 2002) ("[T]he plaintiffs fail to show even the existence of an oral agreement. The plaintiffs' sole evidence of a 'meeting of the minds' is the defendants' alleged statement that 'no problems were anticipated,' which one defense lawyer allegedly said a full six months before the parties reached the tentative agreement.").

In fact, WMATA's alleged silence and inaction prove the opposite -- that WMATA *did not* intend to be bound by the alleged agreement. *See Abrams v. Unity Mut. Life Ins. Co*., 70 F. Supp. 2d 846, 850 (N.D. Ill. 1999) ("His inaction establishes an intent not to be bound until execution of formal documents."); *Covert Marine, Inc. v. Outboard Marine Corp*., 1978 WL 1487, at *9 (N.D. Ind. Sept. 25, 1978) ("The only logical inference from such inaction is that plaintiff-distributors did not intend, even on the day the terms of the Final Judgment were agreed upon and the Judgment approved, to be bound by its terms.").

Furthermore, WMATA's issuing the two separate IFBs for the sale of the Bus Garage Property contradicts any claim by Plaintiffs that WMATA intended to be bound by the alleged agreement to negotiate exclusively with Monument for the sale of the Bus Garage Property. *See Miller v. Holzmann*, 471 F. Supp. 2d 122, 124 (D.D.C. 2007) ("Another factor in determining intent to be bound is the parties' conduct *after* they reach an alleged oral agreement"); *id.* at 125 (the parties' "behavior after the oral contract supposedly came into existence contradicts any claim that they considered themselves bound"); *In re U.S. Office*

*Prods. Co. Sec. Litig.*, 251 F. Supp. 2d 77, 96-97 (D.D.C. 2002) (actions indicated an intent not

to be bound).

> **5.    Plaintiffs Fail To Establish That Any WMATA Representative Had Actual Authority To Bind WMATA To The Alleged Agreement; In Fact, There Was No WMATA Board Authority, As Would Be Required, To Make Any Binding Promise, Representation, Commitment Or Agreement With Monument Regarding The Bus Garage Property**

To prove the existence of the alleged agreement, Plaintiffs must show that the WMATA

representative upon whose conduct Monument allegedly relied had actual authority to bind

WMATA.  *See Amfac Resorts, L.L.C. v. U.S. Dep't of the Interior*, 142 F. Supp. 2d 54,

73 (D.D.C. 2001), *judgment vacated in part by Nat'l Park Hospitality Ass'n v. Dep't of Interior*,

538 U.S. 803, 812 (2003); *City of Cincinnati v. U.S.*, 153 F.3d 1375, 1377 (Fed. Cir. 1998);

*Webster Univ. v. U.S.*, 20 Cl. Ct. 429, 432 (1990).

Thus, Plaintiffs must prove that Mr. Malasky, or some other unidentified WMATA

representative with whom Monument dealt, possessed *actual authority* to bind WMATA to the

alleged agreement.  *See Littlejohn v. WMATA*, No. 90-1724 (RCL), 1992 WL 122755, at *2

(D.D.C. May 28, 1992) (footnotes and citations omitted; emphasis added):

> [T]he court finds that WMATA is not bound by Morrison's representations to plaintiff because the doctrine of apparent authority does not apply to dealings with the government. … The United States Supreme Court has held that:
>
>> [w]hatever the form in which the Government functions, anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority.... And this is so even though ... the agent himself may have been unaware of the limitations on his authority.
>
> ... WMATA is a government agency. It is an agency and instrumentality of the District of Columbia, Maryland and Virginia that was created by a compact that was consented to and enacted by Congress. … *Consequently, the doctrine of apparent authority does not apply to WMATA and defendant is not bound by the settlement agreement that was entered into by Morrison and plaintiff*[;]

*see also Kilpatrick v. Paige*, 193 F. Supp. 2d 145, 152-53 (D.D.C. 2002) ("the burden falls on the plaintiff to establish that Dix had the proper authority to enter into a settlement agreement with the plaintiff, since Dix acted on behalf of a government agency"); *Harbert/Lummus Agrifuels Projects v. U.S.*, 142 F.3d 1429, 1432 (Fed. Cir. 1998) (internal citations omitted; emphasis added):

> The burden was on [plaintiff] to prove that the [contracting officer] had the authority to enter into the oral, unilateral contract. . . .The fact that [plaintiff] may have believed that the [contracting officer] had authority is irrelevant; *[plaintiff] must prove that the [contracting officer] had actual authority*[;]

*Starflight Boats v. U.S.*, 48 Fed. Cl. 592, 599 (2001):

> [E]ven if plaintiff believed that Brian had authority to bind the government in contract, plaintiff bore the burden of confirming through the government the exact reach of Brian's authority.  Therefore, plaintiff cannot meet the elements of an implied-in-fact contract with the government, specifically due to Brian's lack of actual authority to bind the government.[24]

Plaintiffs do not address the presence or absence of actual authority in either the Amended Complaint or the Motion for Preliminary Injunction, *because there was no Board authority to offer to Monument or to confer on Monument a right to negotiate exclusively for the Bus Garage Property or to acquire the Bus Garage Property from WMATA*.  No WMATA employee made any promise or commitment, or even a representation, to Monument affording Monument a right to exclusive negotiations with WMATA for the Bus Garage Property or a right to acquire that property from WMATA.  But even if a WMATA employee had made a

---

[24] The law is not just that Plaintiffs cannot rely on their "belief" that Mr. Malasky, or some other unidentified WMATA representative, had authority to bind WMATA to the alleged agreement.  *See Littlejohn v. WMATA*, *supra*, 1992 WL 122755, at *2; *Harbert/Lummus Agrifuels Projects*, *supra*, 142 F.3d at 1432; *Starflight Boats*, *supra*, 48 Fed. Cl. at 599.  Rather, as these cases make clear, *Plaintiffs must show affirmatively that the named WMATA representative lawfully possessed such authority*.  And that authority must be *actual*.  Furthermore, the doctrine of apparent authority, applicable in private contexts, does not apply when dealing with a government representative.

promise or commitment, *anything that any WMATA employee said or did is of no legal consequence.*

Nor do Plaintiffs identify the specific authorized WMATA representatives, again *because there were none*, because there was no WMATA-associated person who possessed Board-granted authority and who allegedly promised Monument a right to negotiate for and/or acquire the Bus Garage Property.  *See* Exhibit B, the May 24, 2007 Washington Metropolitan Area Transportation Authority Board Action/Information Summary, the first authorization "to offer for sale the Southeastern Bus Garage."  Until the Board passed that Resolution, no WMATA employee could have had any authority to make any representation, promise or commitment that could or did bind WMATA regarding the sale of the Bus Garage Property. *See also* Malasky Dec. ¶¶ 67, 76, 80 & 82(iii) .

From the very beginning, moreover, WMATA had informed AWC and the public at large that any commitment to dispose of the Bus Garage Property, and any disposition of the Bus Garage Property, required this approval.  *See* the AWC Press Release, Exhibit 11 to Plaintiffs' PI Memo, and the AWC-MRC Letter of Intent, Exhibit 10 to Plaintiffs' PI Memo. *See also* Malasky Dec. ¶¶ 17-22.

As a matter of law, to hold WMATA to the words of any employee, (i) that person had to have WMATA authority, (ii) Monument had the burden of ascertaining that such person had authority and (iii) Monument "t[ook] the risk of having accurately ascertained that he who purports to act for [WMATA] stays within the bounds of his authority."  *See Littlejohn v. WMATA, supra*, 1992 WL 122755, at *2.  As a matter of fact, Monument *knew and agreed to this* from the outset.  Monument ignored the law, ignored the facts and failed in its burden. Monument thus has no claim against WMATA and has only itself to blame for that.

**6.    Conclusion On Plaintiffs' Claim Of An Agreement For Exclusive Negotiations To Purchase The Bus Garage Property**

Plaintiffs' case fails every element of contract law.  The undeniable facts show that (i) WMATA never offered Monument the right to negotiate exclusively for or to acquire the Bus Garage Property from WMATA; (ii) Monument never proposed, articulated or even suggested that it sought, offered or had the right to negotiate exclusively with WMATA for the Bus Garage Property or to acquire the Bus Garage Property from WMATA; (iii) Neither Monument nor WMATA accepted a "definite and certain" offer from the other to engage in exclusive negotiations for the Bus Garage Property or to sell the Bus Garage Property; (iv) There was no bargained-for consideration and no mutuality of obligation; (v) No WMATA representative with whom Monument dealt had the ability or authority to bind WMATA to any such agreement; (vi) Monument's agreements to acquire the Navy Yard Metrorail Station and to undertake and complete the construction of the improvements are free of any connection to the Bus Garage Property and to an alleged agreement for exclusive negotiations for the Bus Garage Property; (vii) The District could not and did not confer any rights on Monument to negotiate exclusively with WMATA for the Bus Garage Property or to acquire the Bus Garage Property from WMATA; and (viii) Monument had no obligation owing back to WMATA, or to AWC, to negotiate for or to acquire the Bus Garage Property.

Plaintiffs' arguments extend the cliché of "making a silk purse out of a sow's ear" beyond its breaking point.  Plaintiffs want to make a silk purse out of nothing at all.  Plaintiffs' case for a preliminary injunction shows beyond any doubt that WMATA's motion to dismiss was and remains meritorious.  Plaintiffs did not plead, and cannot support, a complaint that

meets the plausibility threshold of *Bell Atlantic Corp. v. Twombley*, 127 S. Ct. 1955, 1969 (2007).  On every front, there was not and there is not an enforceable agreement.[25]

> **II.    Plaintiffs Fail To Show A Likelihood Of Prevailing On Their Claim Of Alleged Improprieties In WMATA's Selection Of The Akridge Bid As The High Bid; WMATA's Acceptance Of Akridge's Bid As The Highest, Responsive, Firm, Fixed-Price Bid Was Proper And In Accordance With Applicable Law**

Plaintiffs' bid for the Bus Garage Property fell almost $10 million short of Akridge's high bid.  Having underbid and lost so dramatically on the only criterion that mattered, Plaintiffs attack only the periphery of the Akridge bid (Plaintiffs cannot fault the $69.25 million heart of the bid) and of WMATA's consideration of that bid (likewise, Plaintiffs cannot fault the heart of that consideration, WMATA's focus on only the fixed bid amounts of the three bidders).  Plaintiffs argue that WMATA should have rejected the Akridge bid as nonresponsive for two reasons: (i) Because the accompanying cover letters used the words  "conditionally" and "conditional," respectively; and (ii) Because the bid contained an offer to negotiate a lease of Akridge-controlled property for the relocation of buses from the Bus Garage Property.  Plaintiffs further contend that WMATA and Akridge engaged in improper post-bid-opening discussions.

---

[25] Plaintiffs continue to rely on *Brewood v. Cook*, 207 F.2d 439 (D.C. Cir. 1953), and the Order in *WDC Baseball Partners LLC v. District of Columbia*, Civil Action No. 2006 CA 008250 B (Nov. 30, 2007).  WMATA addressed these cases previously, *Brewood* in the WMATA MTD Reply and *WDC Baseball Partners* in the WMATA Supp. MTD Reply.

Fundamentally, Plaintiffs' reliance on these two cases is unavailing because in both, the plaintiffs had executed written agreements from which the plaintiffs made their cases. The plaintiffs in these two cases did not want for offer, acceptance and contemporaneous bargained-for consideration. Here, in contrast, Plaintiffs do not and cannot prove these three elements, each of which is an indispensable prerequisite to Plaintiffs' arguments.

But as the attenuated thrust of Plaintiffs' arguments suggests, and under applicable government contract law, Plaintiffs cannot prevail on the merits.[26]

### 1.    The Standard of Review: Highly Deferential

Like Plaintiffs' contract argument, Plaintiffs' attack on the Akridge bid ignores the applicable foundational law.   Because this case involves an award by government agency procurement officials, judicial review is limited.   The Court must be "highly deferential to the contracting agency's final determination."   *Tutor-Saliba Corp. v. U.S. Army Corps of Eng'rs*, 1995 WL 520765, at *6 (D.D.C. Aug. 23, 1995):

> The D.C. Circuit stated that "[i]t is undisputable that the ultimate grant of a contract must be left to the discretion of a government agency; the courts will not make contracts for the parties."   *National Fed'n of Fed. Employees v. Devine*, 679 F.2d 907, 915 (D.C. Cir. 1981), (quoting *Scanwell Labs., Inc. v. Shaffer*, 424 F.2d 859, 869 (D.C. Cir. 1970)).

> Courts place such great weight on the discretion typically accorded to procurement officials because "[j]udges are 'ill-equipped to settle the delicate questions involved in procurement decisions.'   *Elcon Enters., Inc. v. Washington Metro. Area Transit Auth.*, 977 F.2d 1472, 1479 (D.C. Cir. 1992 (quoting *Kinnett Diaries, Inc. v. Farrow*, 580 F.2d 1260, 1271 (5th Cir. 1978)); *Delta Data Sys. Corp. v. Webster*, 744 F.2d 197, 203 (D.C. Cir. 1984 (same). …

> The Court's role in reviewing the present agency contract decision is limited to a determination of whether Plaintiff Tutor-Saliba has met the "heavy burden of showing that either (1) the procurement official's decision had no rational basis, or (2) the procurement procedure involved a clear and prejudicial violation of applicable statutes or regulations."   *Kentron Hawaii, Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973); *Elcon Enters., Inc. v. WMATA*, 977 F.2d at 1478-79; *Marwais Steel Co. v. Department of Air Force*, 871 F.Supp. 1448, 1451 (D.D.C. 1994).

WMATA procurement decisions merit the same standard and deference:

> WMATA procurement decisions, like those of administrative agencies, are entitled to a presumption of validity. *Birnberg v. WMATA*, 389 F.Supp. 340, 343 (D.D.C. 1975).   A court cannot overturn a procurement decision unless it

---

[26] Plaintiffs now wisely abandon any defense of the MRB 7 escalator bid.  As WMATA briefed in its WMATA MTD Memo at 19-25, the escalator bid was nonresponsive both legally and factually.

determines the decision has "no rational basis" or "involved a clear and prejudicial violation of applicable statutes or regulations." *Elcon Enters., Inc. v. WMATA*, 977 F.2d 1472, 1478 (D.C. Cir. 1992).

*China Trade Ctr., L.L.C. v. WMATA*, 34 F. Supp. 2d 67, 69 (D.D.C. 1999).

As demonstrated below, WMATA's determination that the Akridge bid was the highest, responsive, firm fixed-priced bid in response to IFB No. 08-1 was entirely rational and in conformance with applicable law.

> **2.     The Definition of Responsiveness: An Unequivocal Offer To Comply With The Material Terms And Conditions Contained In The Solicitation**

To be considered responsive under a sealed bidding solicitation, a bid must constitute an unequivocal offer to comply with the material terms and conditions contained in the solicitation. Only a deficiency or deviation that goes to the substance of the bid by affecting price, quality, quantity, or delivery of the article offered is a material deviation that requires the bid to be rejected as nonresponsive. *See Tutor-Saliba Corp.*, *supra*, 1995 WL 520765, at *8; *Med. Depot Supplies Corp.*, B-239342, Aug. 22, 1990, 90-1 CPD ¶ 149 at *2; *Bean Dredging Corp. v. U.S.*, 22 Cl. Ct. 519, 522 (1991) ("Responsiveness addresses whether a bidder has promised to perform in the precise manner requested by the government."). "Unless something on the face of the bid, or specifically a part thereof, either limits, reduces or modifies the obligation of the prospective contractor to perform in accordance with the terms of the invitation, it is responsive." *The Perkin-Elmer Corp.*, B-193146, Aug. 6, 1979, 79-2 CPD ¶ 80 at *2.

Plaintiffs do not argue, and have no grounds to argue, that WMATA should have preferred MR Ballpark 7's $60 million bid over Akridge's $69.25 million bid (an argument that would not be credible on its face). So Plaintiffs are left with arguing about tangential (at best) matters that do not alter the fact that MR Ballpark 7's bid just was not enough, in fact not even

close.  Thus, Plaintiffs cannot show that the matters Plaintiffs raise had any affect on the respective bid amounts or on WMATA's unimpeachable selection of the high bid.  Plaintiffs' arguments are, in short, immaterial.  Nevertheless, WMATA addresses them below and shows that the arguments also are meritless.

> **3.** **The Akridge Cover Letters Did Not Modify Akridge's Bid And Did Not Render The Akridge Bid Nonresponsive**

Plaintiffs contend that the two letters accompanying Akridge's bid rendered the bid nonresponsive.  This is factually and legally untrue.  Neither letter even addressed the terms and requirements of IFB No. 08-1.  Both, rather, purported to reserve a position with respect to the superseded IFB No. 07-3.[27]  On their face, without going further, it is impossible to discern how Plaintiffs legitimately can argue that a reservation with respect to a prior and superseded IFB renders Akridge's fixed, firm bid responding to the later and active IFB unlawfully conditional and nonresponsive.  There simply is an impassible disconnect, a gap in the logic, that makes no sense.   For present purposes, however, WMATA will indulge and address Plaintiffs' contention.

The Akridge letter submitted with the bid stated, "[t]his bid is submitted conditionally as set forth in the enclosed letter from our counsel, Williams & Connolly, LLP, to Carol B. O'Keeffe, WMATA's general counsel."   Bottigheimer Dec. Exhibit 8, also Exhibit 72 to Plaintiffs' PI Memo.  Though the letter used the word "conditionally," this letter did not, in any way, alter, limit, reduce or modify the obligation of Akridge to perform in accordance with the terms of IFB No. 08-1, particularly to pay the $69.25 million if Akridge were the successful bidder.  Nor did the Akridge letter, in any way, limit, reduce or modify WMATA's ability to

---

[27]  *See* Bottigheimer Dec. ¶¶ 21, 23 & 32(iv) (IFB No. 07-3 was superseded by IFB No. 08-1); Exhibit 79 to Plaintiffs' PI Memo, Letter from Carol O'Keeffe, WMATA General Counsel, to Paul M. Wolff, Akridge counsel, stating that "the initial solicitation [IFB No. 07-3] was canceled and the site was re-offered for sale [in IFB No. 08-1]."

enforce the bid and to compel Akridge to pay the $69.25 million if Akridge were the successful bidder.

The referenced Williams & Connolly letter objected to WMATA's cancellation of IFB No. 07-3 and urged WMATA to "make its award to one of the three parties who submitted bids in response to the Initial Bid Request [IFB No. 07-3]." As in the Akridge letter, the Williams & Connolly letter did not alter, limit, reduce or modify Akridge's obligation to perform or WMATA's ability to enforce the bid and to compel Akridge to pay the $69.25 million if Akridge were the successful bidder.[28] *See* Bottigheimer Dec. ¶¶ 32-33.

Ignoring the well-established principles regarding responsiveness of bids, Plaintiffs are left to fixate on the words "conditionally" and "conditional" in the two Akridge cover letters. This is a classic elevation of form over substance. Mere use of these words is meaningless. What is important is "[i]f in its bid [Akridge] attempts to impose conditions that would modify material requirements of the invitation, limit its liability to the government, or limit rights of the government under any contract clause." *Interstate Constr., Inc.*, B-281465, Feb. 10, 1999, 99-1 CPD ¶ 31; *see Transport Eng'g Co., Inc.*, B-185609, July 6, 1976, 76-2 CPD ¶ 10. The

---

[28] The only reference in the Williams & Connolly letter to IFB No. 08-1 was as follows: "In the interests of clarity, Akridge hereby advises WMATA that the conditional bid it is providing in response to the Second Bid Request shall constitute its only bid in response to the Second Bid Request and WMATA may not consider the bid Akridge made pursuant to the First Bid Request as an offer in response to the Second Bid Request." Exhibit 73 to Plaintiffs' PI Memo.

Williams & Connolly merely stated the obvious, namely, that WMATA could consider only the Akridge bid submitted in response to IFB No. 08-1, not the previously submitted bid in response to the cancelled and superseded IFB No. 07-3, as an offer in response to IFB No. 08-1. This statement of the obvious just as obviously did not limit, reduce or modify Akridge's obligation to perform, or WMATA's ability to enforce Akridge's bid, in accordance with the terms of IFB No. 08-1.

Furthermore, IFB No. 07-3 was history. WMATA had returned all bids unopened (thus there were no bids responding to that earlier IFB that WMATA could have considered), had issued the new, superseding IFB No. 08-1 and in fact considered only bids responding to IFB No. 08-1. *See* Bottigheimer Dec. ¶¶ 13, 20-21, 23, 26 & 32(iv); and Note 27 above.

two cover letters do not do this. Nothing in the letters modified any requirements -- material or otherwise -- of the IFB, limited Akridge's liability to WMATA under the IFB or limited WMATA's rights under the IFB. As WMATA's contracting officer properly determined in the exercise of his duties and discretion, the two cover letters accompanying Akridge's bid had no effect on the responsiveness of Akridge's bid. *See* Bottigheimer Dec. ¶¶ 32-33.

### 4.    The Alleged "Sweetener" Did Not Render Akridge's Bid Nonresponsive

Akridge's $69.25 million bid also included the following:

> Akridge manages an Affiliate that owns and/or controls substantial portions of Square 664 (the "Akridge Property") and, if this bid is accepted, Akridge would immediately commence negotiations with WMATA to establish an arrangement pursuant to which WMATA would be able to use the Akridge Property as a temporary site for locating assets presently located on the Property during the period WMATA is contemplating relocation of the operations presently conducted at the property.

Exhibit 72 to Plaintiffs' PI Memo, p. 11. Plaintiffs attack this sentence as a "sweetener" or "strengthener" that invalidated the Akridge bid. Plaintiffs are wrong, for the following reasons.

First, neither Contracting Officer Bottigheimer nor the WMATA Board gave any consideration whatsoever to this sentence in evaluating Akridge's bid, both on its own and in comparison to the other bids. All that WMATA considered was Akridge's bid price and leaseback charge, the firm, liquidated monetary sums in the bid. *See* Bottigheimer Dec. ¶¶ 29-30, 32-40 and Exhibits 10, 11 & 13 thereto, the last of which also is Exhibit 83 to Plaintiffs' PI Memo (the WMATA Board Resolution approving the Akridge bid).

Second, this offer to negotiate did not render Akridge's bid nonresponsive. The offer did not impose conditions that would modify material requirements (*i.e.*, price, quality, quantity or delivery terms), did not alter material terms, did not limit Akridge's liability to WMATA and did not limit WMATA's rights under the IFB.

Third, this offer did not invalidate, alter, condition or deviate from Akridge's "unequivocal offer to comply with the material terms and conditions contained in the solicitation." *Med. Depot Supplies Corp.*, *supra*, B-239342, 90-1 CPD ¶ 149.  Specifically, the offer to negotiate did not alter, condition or diminish Akridge's firm bid amount, firm leaseback rental amount, Akridge's $300,000 bid deposit, Akridge's determination regarding due diligence or other material requirements of the IFB.

Fourth, Akridge's offering something *more* than the IFB required was not impermissible, improper or nonresponsive.  *See*, *e.g.*, *Emmett R. Woody*, B-213201, Jan. 26, 1984, 84-1 CPD ¶ 123; *To Hedrick & Lane*, B-164384, Apr. 23, 1969, 48 Comp. Gen. 685, 1969 CPD ¶ 23.

Fifth, Akridge's bid did not require WMATA to accept the offer to negotiate and did not condition Akridge's purchase price or leaseback rental on WMATA's agreement to engage in negotiations for a lease of the Akridge-controlled property.

Plaintiffs' final and equally weak challenge argues that Akridge's inability to quantify precisely the value of its alleged "sweetener" rendered its bid ambiguous.   But the offer to negotiate did not qualify or affect the $69.25 million bid price for the Bus Garage Property or the leaseback rental amounts.  The offer to negotiate was just that -- an offer to negotiate, only if Akridge's $69.25 million were the high bid and only after an award based on that fixed, firm offer of $69.25 million.  Furthermore, Akridge's bid did not condition WMATA's acceptance of the bid price and did not limit, reduce or in any way change the bid price or the leaseback rental amounts.   There was no ambiguity regarding the material terms of Akridge's bid.[29]

---

[29] Moreover, as set forth below, Akridge's post-bid-opening communications regarding the potential value of its offer is of no legal significance to determining whether Akridge's bid was responsive.  *See*, *e.g.*, *Lashley's Landscaping, Lawn Growth & Maint. Co.*, B-181812, Sept. 24, 1974, 74-2 CPD ¶ 182 at *2 ("*Lashley's Landscaping*").

In sum, under applicable government contract law, the alleged "sweetener" was a mere superfluous offer that WMATA was free to ignore, as WMATA did.

There is, however, another powerful reason why Akridge's offer to negotiate was not disqualifying. It was an irrelevancy. WMATA was not looking to lease or purchase property for the relocation of buses. WMATA intends to disperse buses to other WMATA bus facilities. *See* Bottigheimer Dec. ¶ 37.

> ### 5. MR Ballpark 7's Comparison Of WMATA's Treatment Of The MRB 7 Escalator Bid To WMATA's Treatment Of Akridge's Bid Is A False Comparison

While Plaintiffs have abandoned all pretense that MRB 7's escalator bid was responsive and that WMATA should have considered it, Plaintiffs indirectly re-invoke the escalator bid as providing a basis to nullify WMATA's consideration of the Akridge bid. Under applicable government procurement law, WMATA's consideration of the Akridge bid was well within WMATA's discretion (and otherwise lawful). Plaintiffs, however, want the Court to ignore, and indeed to override, applicable law by making an apples-to-oranges comparison of MRB 7's nonresponsive and impermissible escalator bid to the responsive and lawful Akridge bid, invoking a general plea of fairness. Plaintiffs argue that if WMATA did not consider the patently improper and nonresponsive escalator clause, WMATA should not have considered the Akridge bid because it included the offer to negotiate temporary replacement space for buses.

The comparison is a false one and the underlying theory unsupported and unsupportable. The two bids are not the same, in fact are not remotely alike. The escalator bid sought to put a never-ending, upward spiral on MRB 7's Minimum Bid of $60 million that required WMATA to use other bids to ascertain the bid amount. The escalator bid was nonresponsive, uncertain and ambiguous on its face. WMATA correctly declined to consider

the escalator, leaving MRB 7 with a bid of $60 million.[30]  The Akridge bid, on the other hand, was responsive, self-contained and fixed.  The extraneous offer to negotiate temporary replacement space did not change the numbers, and WMATA was free to ignore that part of the bid.  Thus relying on WMATA's declining to consider the escalator as somehow impugning WMATA's consideration of the Akridge bid is both legally unsupported and logically unsupported.[31]

### 6.    The Post-Bid-Opening Communications Were Not Impermissible And Did Not Harm Monument

Plaintiffs are wrong also in their argument that communications after the bid opening on August 28, 2007 and after WMATA staff had concluded their evaluation and made their recommendations somehow negated Akridge's high bid and forbade the WMATA Board from approving the formal award on September 27, 2007.  WMATA staff, including Contracting Officer Bottigheimer and General Counsel Carol O'Keeffe, had opened the bids on August 28,

---

[30] MRB 7's "Alternate Bid" left the $60 million Minimum Bid part of its original bid intact. The Alternate Bid had a base of $60 million with the following contingent escalator:

> In the event WMATA receives a bid, conforming to WMATA's Invitation to Bids, from a qualified bidder, which is more than Sixty Million Dollars and 00/100 ($60,000,000), in terms of purchase price and leaseback rental, then MR Ballpark 7 LLC's Bid Amount shall increase to such bidder's Bid Amount plus Two Hundred Fifty Thousand and 00/000 ($250,000).

Disregarding the nonresponsive escalator left MRB 7 with a $60 million bid, which WMATA evaluated and found to be less than the Akridge $69.25 million bid, according to the following provision of the Alternate Bid:

> If WMATA's rules and regulations regarding the acceptance of bids for the sale of real property do not permit WMATA to consider escalation clauses, then this addendum shall be disregarded and MR Ballpark 7 LLC's Bid Amount shall be as shown on the Bid Form above [*i.e.*, the Minimum Bid Price of $60 million].

[31] If anything, Plaintiffs' attempt at the comparison works in WMATA's favor.  In both cases, WMATA ignored the extraneous, nonresponsive pieces and evaluated the bids based on the firm numbers, MRB 7's $60 million and Akridge's $69.25 million.

deliberated on the bids on August 28 and 29 and concluded their deliberations and put their analysis and recommendations in writing on August 29, 2007. *See* Bottigheimer Dec. ¶¶ 29-30 and Exhibits 10 & 11 thereto. All the alleged offensive communications came *after* this work had been done and *after* staff was on record with the results of their work.[32]  Thus, none of the communications could have affected or did affect the responsiveness of the Akridge bid. "It is firmly established that '[b]id responsiveness is determined at the time bidding is opened[.]'" *Aeroplate Corp. v. U.S.*, 67 Fed. Cl. 4, 11 (2005) (citation omitted); *see Collins Siding Co.*, B-245732, B-245732.2, May 12, 1992, 92-1 CPD ¶ 439:

> Bid offering to furnish the exact thing called for in the invitation for bids was properly found responsive notwithstanding post-bid opening notice from bidder that it intended to supply non-conforming item; whether a bid is responsive, and therefore eligible for award, must be determined from contents of the bid itself at bid opening, without reference to information submitted after bid opening.[;]

*Lashley's Landscaping*, *supra*, B-181812, 74-2 CPD ¶ 182 at *2 ("post-bid opening telephonic and written communications are of no legal significance" to a responsiveness determination).

### 7.  Akridge And WMATA Did Not Engage In Post-Bid-Opening Discussions

Plaintiffs argue that Akridge and WMATA had communications after the submission of bids that constituted prohibited "discussions" during the sealed bid process. Again, Plaintiffs are wrong on a fundamental element of government contract law.[33]  "Discussions" is a "term of

---

[32] Additionally as WMATA discusses further below, WMATA had announced publicly the proposed selection of Akridge as high bidder on September 21, 2007, and the Board made the award at its regularly scheduled monthly meeting on September 27. *See* Bottigheimer Dec. ¶¶ 40 & 46 and Exhibit 13 thereto.

[33] Plaintiffs argue that WMATA had discussions that violated FAR 14.101(d) ("Bids shall be evaluated without discussions") and PPM 501.11 ("Bids shall be evaluated without discussions with bidders"). As Mr. Bottigheimer testified, WMATA used a sealed bid because price was the sole consideration, Bottigheimer Dep. at 65, and therefore discussions were unnecessary and immaterial. In this respect, sealed bids differ from procurements using negotiated procedures, which do allow for discussions. *See, e.g., E. Frye Enterprises, Inc.*, B-258699, B-258699.2, Feb. 13, 1995, 1995 WL 64152. The concept of the term "discussions" however, as used in FAR

art" in government procurement regulations.  "[T]he controlling test is whether an offeror was

given an opportunity to modify its proposal as a result of the communications."  *Sun Ship, Inc.

v. Hidalgo*, 484 F. Supp. 1356, 1371-72 (D.D.C. 1980); *see Uniserv Inc.*; *Marine Transport

Lines, Inc.*, B-218196, B-218196.3, June 19, 1985, 85-1 CPD ¶ 699 at *3:

> We have defined "discussions" as communications between an agency and an
> offeror involving information essential for determining the acceptability of a
> proposal.   Providing an offeror an opportunity to revise its proposal also
> constitutes discussions.   *See* Alan Scott Industries, et al., 63 Comp.Gen. 615
> (1984), 84-2 CPD ¶ 349.

*See also MG Indus.*, B-283010.3, Jan. 24, 2000, 2000 CPD ¶ 17 at *6 ("FAR 15.306(d) defines

'negotiations' or discussions as 'exchanges ... between the Government and offerors, that are

undertaken with the intent of allowing the offeror to revise its proposal,'" and holding that an

agency communication merely requested clarification and did not offer an opportunity to revise

the awardee's offer); *Deployable Hosp. Sys., Inc.*, B-260778, *et al*., Feb. 12, 1996, 96-1 CPD ¶

113 at *10 n.4 (agency's review of letter from awardee's bank did not constitute discussions,

which "occur when an offeror is given an opportunity to revise or modify its proposal, or when

information provided by an offeror is essential for determining the acceptability of its

proposal").

Akridge's September 12 and September 21 letters to WMATA regarding Akridge's offer

to negotiate a lease of the Akridge-controlled property, Exhibits 80 and 81 to Plaintiffs' PI

Memo, do not fall within these definitions of "discussions" or "negotiations."   The letters did

not attempt to modify Akridge's bid for the Bus Garage Property, nor did the letters provide

information that was essential for determining the acceptability of Akridge's bid.   The

WMATA staff had reached its determination two or more weeks earlier and the Contracting

---

14.101(d) with respect to sealed bid procurements and in FAR 15.306(d) with respect to
negotiated procurements, is the same.

Officer had memorialized that determination, that Akridge's bid was responsive and acceptable, in his August 29, 2007 Memorandum. *See* Bottigheimer Dec. ¶ 29 and Exhibit 11 thereto.

Two other communications inflame Plaintiffs, a September 12, 2007 voice mail message from Contracting Officer Bottigheimer and an Akridge site visit on September 26, 2007, five days after Akridge had learned that it was the awardee-in-waiting. Mr. Bottigheimer's voice mail message acknowledged receipt of Akridge's September 12 letter and stated that WMATA was "treating it [the availability of Akridge's two-acre site] as a serious offer," but as the applicable law shows, this mere message did not rise to the level of a prohibited discussion or negotiation. By September 12, Bottigheimer's work was done and memorialized in his August 29 Memoranda. *See* Bottigheimer Dec. ¶¶ 29-30 & 42 and Exhibits 10 & 11 thereto. As a practical matter, the Bottigheimer voice mail could not have crossed the line of impermissibility.

But timing alone understates the insignificance of this voice mail message. As Mr. Bottigheimer's two Memoranda showed, WMATA staff did not give the Akridge offer to negotiate for the lease of Akridge-controlled property any consideration at all.

In any event, Mr. Bottigheimer's message was gratuitous. The WMATA Board considered and selected Akridge without knowing of, let alone assessing, the Akridge offer to negotiate for a possible replacement site, selecting the Akridge bid based purely on price considerations.

On or about September 26, 2007, Akridge representatives toured the Southeastern Bus Garage facility. This incident is of even less significance than the voice mail message. On September 21, WMATA had announced publicly on its web site the recommended selection of Akridge and had posted the materials, including the Resolution for Board approval, for the September 27 Board meeting to formalize Akridge's award. Thus, when Akridge sought and

got a site visit on September 26, Akridge, Monument and every other interested person knew, or should have known, that WMATA had recommended Akridge to the WMATA Board as the successful bidder, subject to Board approval on the following day.  *See* Bottigheimer Dec. ¶ 46.[34]

Furthermore, there was nothing inherently wrong or prejudicial in allowing Akridge to tour the Bus Garage Property.  IFB No. 08-1 in fact "invited and encouraged" bidders to inspect the Bus Garage Property, though prior to submitting a bid, and provided further that inspections "will be scheduled through WMATA."   IFB No. 08-1 also offered bidders the opportunity to do other due diligence.   *See* Exhibit 70 to Plaintiffs' PI Memo, at page 2, ¶ A.6; Bottigheimer Dec. ¶ 45.

Finally, assessing the site visit under applicable government contract law shows that the site visit was neither prohibited nor impermissible.  The visit did not afford, nor could have afforded, an opportunity for Akridge to modify its bid.  That bid was cast in stone, as was the Bottigheimer recommendation and the proposed Board resolution approving the award to Akridge posted on WMATA's web site five days earlier.  Both the recommendation and the resolution relied on price alone and took no account of any other factor.  *See* Bottigheimer Dec., ¶¶ 41-50.[35]

---

[34] Of course, the Board had the sole discretion and authority not to approve the Akridge bid, but the recommendation and expectation of Akridge's selection were public and the expectation justified.

[35] The cases Plaintiffs cite to support their contention that WMATA engaged in prohibited post-bid-opening discussions are inapposite.  In *Carter Chevrolet Agency, Inc.*, B-229679, Feb. 3, 1988, 88-1 CPD ¶ 107, the Comptroller General denied Carter's protest on the ground that the agency's decision to use negotiation procedures was justified where offerors were expected to take a variety of exceptions to the specifications and discussions were necessary to resolve those matters.  In *Griffy's Landscape Maintenance LLC v. United States*, 46 Fed. Cl. 257 (2000), the Court of Federal Claims held that the agency's failure to inquire into the absence of insurance information in the protester's bid was arbitrary and capricious.  The Court ruled that obtaining missing point of contact information would not have constituted discussions but

### III.    Plaintiffs Fail To Show That They Will Suffer Imminent, Irreparable Harm

Irreparable harm "is the *sine qua non* of the preliminary injunction inquiry." *Trudeau v. Fed. Trade Comm'n*, 384 F. Supp. 2d 281, 296-97 (D.D.C. 2005), *aff'd*, 456 F.3d 178 (D.C. Cir. 2006).  This District sets a high standard for establishing this harm.  *See Equal Rights Ctr. v. Post Props., Inc.*, 2007 WL 2128232, at *2 (D.D.C. July 25, 2007).  Plaintiffs must demonstrate injury that is "both certain and great; it must be actual and not theoretical." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).

Plaintiffs' PI Memo does not address this element.  In the motion, however, Plaintiffs rely on the nostrum that real estate is unique and rest on that nostrum.  But Plaintiffs' invocation of this nostrum is worthless in this District.  *See 46th St. Rehab Dev. Co. v. U.S.*, No. 97-2267 (JGP), slip op. at 4 (D.D.C. Oct. 3, 1997):

> The plaintiffs have also failed to demonstrate that they are likely to suffer irreparable injury. Although the subject property is real property, it is commercial property. Such commercial property is not unique. The loss here, if any, is an economic loss. *See Geneva Limited Partners v. Kemp*, 779 F.Supp. 1237, 1241 (N.D. Calif. 1990).

*See also JOGO Assocs. v. U.S. Dep't of Hous. & Urban Dev.*, No. 92-2451 (NHJ), slip op. at 3-7 (D.D.C. Nov. 25, 1992) (citations omitted):

---

rather would have been permissible "clarifications" of the mistaken omission from the bid.  *Id*. at 259-60.

*Communications Technology Applications, Inc.*, GSBCA No. 9978-P, 89-3 BCA ¶ 22048, involved a two-step sealed bidding procurement for the development of course materials to train pilots and radar intercept officers.  After an award to Eagle Technology, Eagle informed the Navy that Eagle could not provide the Subject Matter Expert personnel that it had proposed and upon which the award had been based.  The Navy and Eagle then engaged in numerous discussions that the Board deemed proscribed because they constituted "a renegotiation of the list of all SMEs to be employed by Eagle" in which the Navy "sought to rectify the situation by allowing Eagle to amend its technical proposal."  In contrast here, Akridge's bid did not become unacceptable, the post-bid-opening communications did not afford Akridge the opportunity to modify its bid and Akridge's bid was not changed.

The idea that each parcel of real estate is necessarily unique developed in agrarian England, and has lost some of its force in modern America. … Courts have, therefore, slowly come to realize that whether a parcel of land is "unique" should be irrelevant when "the plaintiff's sole concern is not anguish at the thought of losing the impossible-to-duplicate estate, but only to recover expected profits from its resale, lease, hypothecation or other use." … Courts have thus refused to grant the remedy of specific performance "when the buyer's purpose in acquiring the property was speculation or investment." …

This judicial recognition that real property is not always "unique" has led many courts to find that parties who sought to enjoin transfers of interests in land did not face irreparable harm. The central question, once again, is whether the property is held for personal use or merely for profit. …

JOGO has not alleged any peculiar sentimental or personal attachment to Old Mill Stream, nor has it introduced any evidence that might permit the Court to find that the project is somehow "unique" for JOGO. Instead, JOGO relies solely on the outmoded presumption that all real property is unique, a presumption that the Court rejects as a justification for injunctive relief. JOGO's interest in Old Mill Stream is purely commercial. The greatest possible harm that JOGO could suffer upon losing the property, therefore, is a financial loss. The property itself is fungible. The Court accordingly finds that money damages would be adequate to compensate JOGO for any injury it might suffer as a result of the foreclosure.

Monument's interest in the Bus Garage Property "is purely commercial." Monument's complaint is that it spent money it otherwise would not have spent. That is a classic damages claim and denies Plaintiffs the right to an injunction. *See* Hines Dep., Exhibit F, at pages 121-24 & 137-38.

### IV.    Plaintiffs Fail To Show That The Balance Of Hardships Favors An Injunction

Plaintiffs fail to address the balance of hardships, but that balance tips in WMATA's favor. Plaintiffs' risk is monetary and is always compensable. On the other hand, WMATA and its ridership have far more teetering in this balance: delays in and disruption of bus transportation and transportation planning, potential loss of a purchaser, disruption in stadium-opening plans and delays in commercial development in the Ballpark District. None of the harms that an injunction would impose on WMATA and the riding public is compensable if WMATA prevails on the merits of Plaintiffs' injunction claims. Thus, the

balance is really Plaintiffs' delayed gratification versus WMATA's and the public's irretrievable

loss.  This balance favors WMATA.

**V.     Plaintiffs Fail To Show That The Public Interest Favors An Injunction**

The public interest is another element with which Plaintiffs show no concern.   In

creating WMATA, Congress established the public interest:

> [A] coordinated system of rapid rail transit, bus transportation service, and
> highways is essential in the National Capital Region for the satisfactory
> movement of people and goods, the alleviation of present and future traffic
> congestion, the economic welfare and vitality of all parts of the Region, the
> effective performance of the functions of the United States Government located
> within the Region, the orderly growth and development of the Region, the
> comfort and convenience of the residents of the Region, and the preservation of
> the beauty and dignity of the Nation's Capital ….

Act of Nov. 6, 1966, Pub. L. No. 89-774, 80 Stat. 1324.  Granting Plaintiffs an injunction will

interfere with WMATA's plans for a "coordinated" transportation system, thereby harming the

public interest.  *See Amalgamated Transit Union, AFL-CIO v. Donovan*, 554 F. Supp. 589,

600 (D.D.C. 1982) ("Such concerns as the viability of the mass transit system's continued

uninterrupted operation outweigh the interests of plaintiffs herein in the context of this

preliminary injunction request."), *rev'd on other grounds*, *Amalgamated Transit Union, AFL-

CIO v. Brock*, 809 F.2d 909 (D.C. Cir. 1987); *see also N. States Power Co. v. Fed. Transit

Admin.*, 2001 WL 1618532, at *12 (D. Minn. May 24, 2001) (granting injunction to require

plaintiff to relocate its facilities in connection with a light rail transit project because public

interest favored uninterrupted completion of project that likely would "affirmatively impact

such public interest issues as metropolitan traffic congestion and urban sprawl[,] … create[]

new jobs for the metropolitan area and encourage[] thoughtful housing and urban development

strategies.").

This Circuit accepts preventing delays in other public projects as a valid public interest.

*See*, *e.g.*, *Wemhoff v. Bush*, 31 Fed. Appx. 204, 205 (D.C. Cir. 2002) (determining that a delay

in the construction of a WWII monument would not serve the public's interest). Also, cases generally denying injunctions that would interfere with public functions and public services are legion. *See, e.g., Spherix, Inc. v. U.S.*, 62 Fed. Cl. 497, 507-08 (2004); *PGBA, LLC v. U.S.*, 60 Fed. Cl. 196, 221 (2004); *Am. Sci. & Eng'g, Inc. v. Kelly*, 69 F. Supp. 2d 227, 237-38 (D. Mass. 1999); *Peirce-Phelps, Inc. v. Johnson*, 1993 WL 308887, at *7 (E.D. Pa. Aug. 12, 1993); *Conn. Legal Servs., Inc. v. Heintz*, 689 F. Supp. 82, 93 (D. Conn. 1988).

Granting Plaintiffs an injunction also will cause WMATA to incur excess costs that WMATA's ridership in particular, and the constituent jurisdictions' taxpayers in general, will have to bear. Tithing the public with these costs also is contrary to the public interest. *See Am. Fed. of Gov't Employees, AFL-CIO v. U.S.*, 104 F. Supp. 2d 58, 79 (D.D.C. 2000) (stating, a "burden on the public fisc" is a valid interest); *Idea Int'l, Inc. v. U.S.*, 74 Fed. Cl. 129, 143 (2006).

Granting Plaintiffs an injunction also will contravene the "public interest in avoiding a restraint on the alienability of land and property …." *Equal Rights Ctr., supra*, 2007 WL 2128232, at *3, citing *Christopher Phelps & Assocs., LLC v. Galloway*, 477 F.3d 128 (4th Cir. 2007).

Furthermore, the public interest compels denying an injunction "when the relief is not likely deserved under law." *Qualls v. Rumsfeld*, 357 F. Supp. 2d 274, 287 (D.D.C. 2005).

## VI.    Plaintiffs Have Unclean Hands And Are Not Entitled To Equitable Relief

In his August 24, 2007 letter to WMATA,[36] Monument's owner Jeffrey Neal expressly threatened that if WMATA sold the Bus Garage Property to anyone other than Monument,

---

[36] This letter, Exhibit 7 to the Bottigheimer Dec., is dated four days before the final due date for bids under IFB No. 08-1, August 28, 2007, and was the first time that Monument informed WMATA of Monument's belief that it had a right to negotiate with WMATA for the Bus Garage Property and to acquire that Property from WMATA.

Monument "will immediately slow" development of the Half Street area, including the Navy Yard Metrorail Station property.  Evidently not satisfied with this single threat, Mr. Neal also stated that Monument's not getting the Bus Garage Property "jeopardizes current construction activities in Square 701 [*i.e.*, the Navy Yard Metrorail Station property"], and Monument declared that its meeting the agreed-on construction schedule was "of little consequence" to it if WMATA did not sell the Bus Garage Property to Monument.  At his brashest, Mr. Neal pointedly threatened that Monument's construction slowdown would affect the "anticipated public tax revenues."  Clearly Monument anticipated harming the public fisc and would not let that harm stand in the way of Monument's hegemonic quest for the Ballpark District.

Monument's threats, attempted intimidation, coercion and near extortion constitute "unclean hands" that prohibit the Court's exercise of equitable jurisdiction in Plaintiffs' favor. *See FD Holding Corp. v. Danbury Bowlarama Corp.*, No. 1:98cv10113, 2000 U.S. Dist. LEXIS 17284, 16-17 (D. Mass. Oct. 13, 2000) (property sellers refused to participate in a closing unless the buyer increased the agreed-upon purchase price and threatened to ruin the buyer financially by placing a development project in default unless the buyers acceded to demands for increased rent; the court concluded that the sellers conduct had an "extortionate flavor" and that they lacked clean hands); *Survivor Prods. LLC v. Fox Broad. Co.*, 2001 U.S. Dist. LEXIS 25511 (C.D. Cal. June 11, 2001) (leaving intact defendant's unclean hands defense where plaintiffs allegedly attempted to secure exclusive rights to reality-based programming through threats, intimidation and baseless litigation tactics).[37]

---

[37] WMATA anticipates that Monument may argue that it did not actually inflict any injury on WMATA or the public, but that is unimportant.  *See Gaudiosi v. Mellon*, 269 F.2d 873, 881-82 (3rd Cir. 1959):

> No principle is better settled than the maxim that he who comes into equity must come with clean hands and keep them clean throughout the course of the

Monument's threats are particularly offensive because Monument directed its threats at a public body and more importantly, in Monument's express references to a stunted marketplace and to lost tax revenue, directed its threats to the public at large.

> Where a suit involves the public interest as well as the private interests of the litigants, [the unclean hands] doctrine assumes even wider and more significant proportions.  For if an equity court properly uses the maxim to withhold its assistance in such a case it not only prevents a wrongdoer from enjoying the fruits of his transgression but averts an injury to the public.

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co*., 324 U.S. 806, 815 (1945).  "[I]t is a principle of general application that courts, and especially courts of equity, may appropriately withhold their aid where the plaintiff is using the right asserted contrary to the public interest." *Morton Salt Co. v. G. S. Suppiger Co*., 314 U.S. 488, 492 (1942), *rev'd in part on unrelated grounds*, *Ill. Tool Works Inc. v. Indep. Ink, Inc*., 547 U.S. 28 (2006).

Accordingly, Monument's unclean hands "closes the door of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant."  *ABF Freight Sys. v. NLRB*, 510 U.S. 317, 329-30 (1994), citing *Precision Instrument*, *supra*, 324 U.S. at 814; *see Steele v.*

---

litigation, and that if he violates this rule, he must be denied all relief whatever may have been the merits of his claim.

Plaintiffs' contention that defendants were not "injured" by reason of the sending of the April 30, 1958 telegrams is irrelevant to the issue. As Judge Learned Hand in his dissenting opinion in *Art Metal Works v. Abraham & Straus*, [70 F.2d 641, 646 (2d Cir. 1934)], so aptly stated:

> The doctrine (of unclean hands) is confessedly derived from the unwillingness of a court, originally and still nominally one of conscience, to give its peculiar relief to a suitor who in the very controversy has so conducted himself as to shock the moral sensibilities of the judge. It has nothing to do with the rights or liabilities of the parties; indeed the defendant who invokes in [sic] need not be damaged, and the court may even raise it *sua sponte*.

*Isikoff*, 130 F. Supp. 2d 23, 34 (D.D.C. 2000) (holding that one who seeks relief in equity must do equity and act in good faith).

### CONCLUSION

In 60+ pages and almost 100 exhibits, Plaintiffs cannot show a single instance where they asserted a right, understanding or even expectation that WMATA had to negotiate with them for the Bus Garage Property or that WMATA had any obligation to sell the Bus Garage Property to them. Plaintiffs cannot even show that they recognized a right internally. To the contrary, according to Monument Treasurer Deborah Volpicelli, "WMATA was completely free to make any deal they want with any party they wanted." Nor can Plaintiffs show that WMATA knew of, let alone agreed to, any such right.

Plaintiffs also cannot show that WMATA did anything wrong in awarding the Bus Garage Property to the high bidder. Akridge was the high bidder, exceeding MRB 7's bid by almost $10 million. No matter how Plaintiffs want to portray the award process, WMATA considered only the bid prices and did not afford Akridge any improper advantage or allowance.

Furthermore, Plaintiffs have not shown irreparable injury, advantage in the balance of harms, or supporting public interest. To the contrary, all three of these injunction requisites favor WMATA.

Accordingly, WMATA respectfully prays that the Court deny Plaintiffs' motion for preliminary injunction and grant WMATA such other and further relief as is proper.

Respectfully submitted,

/s/ Bruce P. Heppen
Carol B. O'Keeffe
General Counsel
Donald A. Laffert
Bruce P. Heppen
Associate General Counsel
Washington Metropolitan Area
Transit Authority
600 Fifth Street, N.W.
Washington, DC 20001
T: (202) 962-1499
F: (202) 962-2550
email: bheppen@wmata.com
email: dlaffert@wmata.com

    /s/ Harvey A. Levin
Harvey A. Levin (D.C. Bar No. 203869)
Katherine S. Nucci (D.C. Bar No. 358539)
Kathleen E. Sailer (E.D. Mo. Bar No. 534178;
Not admitted in DC)
THOMPSON COBURN LLP
1909 K Street, N.W. Ste. 600
Washington, D.C. 20006-1167
T: (202) 585-6942 (direct)
F: (202) 508-1013 (direct)
email: hlevin@thompsoncoburn.com


Counsel for Washington Metropolitan Area
Transit Authority

**CERTIFICATE OF SERVICE**

I hereby certify that on this 14th day of January 2008, a true and correct copy of the foregoing Opposition was served by ECF and by hand delivery on:

> Louis E. Dolan, Jr., Esquire
> Vernon W. Johnson, III, Esquire
> NIXON PEABODY, LLP
> 401 Ninth Street, N.W.
> Washington, D.C.  20001

> _____/s/ Harvey A. Levin