# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MONUMENT REALTY LLC, et al.,   )
   )
      Plaintiffs,   )
   )
      v.   )     Civil Action No. 1:07-cv-01821 (EGS)
   )     Judge Emmet G. Sullivan
WASHINGTON METROPOLITAN   )
AREA TRANSIT AUTHORITY,   )
   )
      Defendant.   )
   )

## PLAINTIFFS' REPLY TO DEFENDANT'S OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

Dated:  January 16, 2008

NIXON PEABODY, LLP

Louis E. Dolan, Jr. (#442881)
Vernon W. Johnson, III (#423756)
401 9th Street, N.W.
Washington, D.C. 20001
202.585.8000
202.585.8080 (fax)
ldolan@nixonpeabody.com
vjohnson@nixonpeabody.com

Counsel for Plaintiffs

# TABLE OF AUTHORITES

## CASES

*3511 13th Street Tenants Ass'n v. 3511 13th Street Residences, LLC,*
   922 A.2d 439 (D.C. 2007) .................................................................................9, 11

*Allworth v. Howard Univ.,*
   890 A.2d 194 (D.C. 2006) ..........................................................................7

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
   401 U.S. 402 (1971).................................................................................18

*Indep. Mgmt. Co. v. Anderson & Summers, LLC,*
   874 A.2d 862 (D.C. 2005) .......................................................................13

*In re Northwest Ground Covers & Nursery,*
   B-201609, 1981 U.S. Comp. Gen. LEXIS 278, 81-1 Comp. Gen. Proc.
   Dec. ¶ 81 (Feb. 9, 1981)...........................................................................19

*In re Outdoor Venture Corp.,*
   1989 U.S. Comp. Gen. LEXIS 673, 89-1 Comp. Gen. Proc. ¶571
   (June 16, 1989)..........................................................................................19

*Irvin Indus. Canada, Ltd. v. United States Air Force,*
   924 F.2d 1068 (D.C. Cir. 1990) ..............................................................17

*James Madison Ltd. v. Ludwig,*
   82 F.3d 1085 (D.C. Cir. 1996) ................................................................18

*Kentron Hawaii, Ltd. v. Warner,*
   480 F.2d 1166 (D.C. Cir. 1973) ..............................................................17

*Leboeuf v. Abraham,*
   347 F.3d 315 (D.C. Cir. 2003) ................................................................17

*PanAmSat v. FCC,*
   198 F.3d 890 (D.C. Cir. 1999) ................................................................18

*Prestex, Inc. v. United States,*
   320 F.2d 367 (Ct. Cl. 1963) ....................................................................25

*Reuters Ltd. v. FCC,*
   781 F.2d 946 (D.C. Cir. 1986) ................................................................17

*SGS-92-X003 v. United States,*
74 Fed. Cl. 637 (2006) ..........................................................................4

*Silverman v. United States,*
230 Ct. Cl. 701 (1982) ..........................................................................4

*Tauber v. Quan,*
2007 D.C. App. LEXIS 689 (Dec. 20, 2007)................................................14

*Toyo Menka Kaisha, Ltd. v. United States,*
597 F.2d 1371 (Ct. Cl. 1979) ..........................................................21, 22

**STATUTES**

*D.C. Code Ann.* § 9-1107.01, sec. 9(b) ..........................................................3

## I.    PRELIMINARY INJUNCTIVE RELIEF BASED ON PLAINTIFFS' CONTRACTUAL AND REAL PROPERTY RIGHTS AND INTERESTS

### A.    The Evidence Offered by the Parties

The evidence offered by Monument to prove that it has contractual and real property rights and interests in the Bus Garage is credible, persuasive, and essentially uncontested. In response to it, WMATA chooses not to clash directly with the evidence, which is substantial and includes the parties' course of dealing over a two year period. Instead, WMATA attempts to avoid the evidence and to hide behind a plethora of documents that never deny the basic elements of Monument's proof. *Cf.* LCvR 7(b) (where a party fails to oppose a motion, this Court may treat it as conceded).

Plaintiffs have proven, for example, that: (1) it was WMATA's own characterization that "WMATA has been coordinating with AWC and their preferred developer, Monument, for the disposition of WMATA parcels in the ballpark district," (*see* Mem. Ex. 18 at 4)[1]; (2) WMATA's Mr. Malasky referenced "the basic framework we and the District has (sic) agreed to," (*see id.* Ex. 19); and (3) WMATA's agents conceded at relevant times that "we do sole source negotiations all the time and don't need Board approval for that." (*See id.* Ex. 29 at 1.) WMATA simply ignores these facts, and offers sweeping – often inadmissible – conclusory language, artfully crafted by counsel, denying the existence of the basic elements of an enforceable contract and otherwise claiming technical deficiencies in Monument's claims. WMATA thus leaves the basic facts proven by Plaintiffs unchallenged.

---

[1]    References to Plaintiffs' Memorandum of Points and Authorities are abbreviated herein as "Mem.," and references to WMATA's Opposition are abbreviated as "Opp."

WMATA has several of its agents sign voluminous recitations of conclusory protestations which simply deny, without any factual detail, that the legal elements of an enforceable contract were met in this case. This includes setting forth on the meaning, intent, import, and legal significance of documents (without providing a foundation to offer parol evidence, expert testimony on interpretation, knowledge rising above mere speculation, or other permissible bases for such testimony). (*See, e.g.,* Malasky Decl. ¶¶ 3(v) & n.2, 3(viii), 3(ix), 3(x); Maginnis Decl. ¶¶ 6, 24, 26-30; Bottigheimer Decl. ¶¶ 20 & n.2, 51.) Some of the testimony includes hearsay and speculation, to which Plaintiffs object. (*See, e.g.,* Maginnis Decl. ¶ 14.) The signature pages on the Malasky and Bottigheimer Declarations do not even match up with the text of the documents. Much of this "testimony" simply parrots the argument of counsel. (*Compare* Maginnis Decl. ¶¶ 32(i)-32(iv) *with* Opp. 16-17.) Where Plaintiffs have offered evidence of admissions and statements by these individuals, for the most part WMATA makes no effort to deny, explain, or refute it.

### B.     Plaintiffs' Rights and Interests

Plaintiffs' rights and interests in the Bus Garage stem from a factual scenario that is unique in our City's history. The District expressed its public policy goals through the adoption of the AWC Statute, setting forth a process to direct the development of the Ballpark District. WMATA then agreed to participate in and be bound by that process, first by agreeing at the request of then-Mayor Williams to withdraw its property from an already-published Joint Development Solicitation, and then to allow it to be included in the AWC's solicitation of requests for expressions of interest. (*See* Mem. Exs. 7, 8, 13.) The original agreement applied to three parties: WMATA, Monument, and AWC as the instrumentality of the District. Monument was bound with the other two parties, and consideration flowed in all directions.

Monument and the District (through AWC) initially entered into an agreement whereby Monument earned rights to carry out development in the Ballpark District. The starting point for that relationship was the award by AWC of development rights to Monument and its team in late 2005, culminating in the December 12, 2005 Letter of Intent ("LOI"). (*See* Mem. Ex. 10.) The relationship evolved beyond the LOI to tangible and enforceable contractual obligations, with consideration to the District that included affordable housing and other benefits that flowed from the requirements of the AWC Statute. (*See, e.g.,* Hines Decl., Mem. Ex. A ¶ 15.)

Ultimately, WMATA (through its Board member Jim Graham, also a member of the D.C. Council), ordained that the Navy Yard Metro Station site portion of the transaction would be carried out directly between WMATA and Monument. WMATA specifically "de-linked" the properties. This cemented WMATA's role in the tripartite arrangement between the parties. WMATA was bound by its agreement, notwithstanding its current protestations that its Board had to give some sort of undefined and eventual blessing to the transaction.

Throughout its Opposition, WMATA makes much of the fact that the approval of its Board was required no matter what a staff member did or said. (*See, e.g.,* Opp. at 34-35.) None of the documents presented by WMATA limits the WMATA staff's authority on this issue, however. Its Compact does not state that only the Board can authorize an agreement to negotiate exclusively for, or authorize the sale of, real estate – to the contrary, the Compact expressly provides the General Manager and others with the authority to bind WMATA. *D.C. Code Ann.* § 9-1107.01, sec. 9(b). In addition, WMATA's own Procurement Procedures Manual ("PPM") contains a chapter dealing expressly with the sale of WMATA's real property, which provides that the General Manager must authorize the disposition of the Property. (Mem. Ex. 52 at §1503.5.) In fact, the Board resolution cited by WMATA as prohibiting staff authority on this

issue does not do so and expressly states the opposite: that "the current approved Board approval requirements for real estate transactions remain unchanged." (Opp. Ex. A at 1.) Moreover, that document states that it pertains only to "procurement" transactions, a point WMATA has taken pains in this case to argue has nothing to do with the facts of this case, since this was a disposition of real property, not a procurement.

Further, even if the WMATA personnel with whom Monument dealt did not possess actual express authority, these individuals still had implied authority to bind WMATA. *See, e.g., SGS-92-X003 v. United States*, 74 Fed. Cl. 637, 652 (2006) (government official with implied actual authority can bind government "when such authority is considered to be an integral part of the duties assigned to a government employee"). Second, WMATA officials can ratify even an unauthorized act. *See, e.g., Silverman v. United States*, 230 Ct. Cl. 701, 710 (1982) ("By accepting the benefits . . . the FTC ratified such promise and was bound by it."). Such is the case here. The Bus Garage was part of the March 2005 JDS, and required Board approval for its inclusion. That property was never removed from the JDS until May 2007 when the Board approved its disposition separately. (*See* Mem. at 3, 20.) Because WMATA never formally removed the Bus Garage from the JDS, WMATA remained empowered to act under the JDS guidelines and the PPM provisions dealing with Joint Development Solicitation and property disposal. In addition, at Councilmember and Board Chairman Jim Graham's instruction, WMATA staff negotiated solely and directly with Monument for the disposition of the Navy Yard Metro Station site without formal Board approval, was told that "we do this all the time," and to negotiate the best deal they could and bring it forward to the Board. (*See* Mem. Ex. 29.) WMATA staff plainly had the authority to carry out negotiations for the disposition of the Navy Yard site and were thus empowered to conduct the same type of negotiations for the Bus Garage.

Hence, there is ample evidence proving that the WMATA Board can, and has, delegated authority to others within WMATA to discuss, negotiate, and contract for the disposition of real property. WMATA cannot rely on the conduct and representations of its staff for over two years and then hide behind the curtain of "authority" when it comes time to complete the deal.

And, although WMATA now claims that it was Monument that wanted the transaction done in phases (*see* Opp. at 23 n.17), there is ample evidence that WMATA understood, agreed, and even desired that the Navy Yard Metro Station site acquisition be finalized first and that the Bus Garage portion of the transaction occur later. (*See, e.g.,* Mem. Exs. 17 at 2, 19, 25.) All parties knew and understood that Monument had exclusive rights in the Bus Garage, such that WMATA was required to at least negotiate exclusively and in good faith with Monument for its disposition. Were this untrue, WMATA would deny it. Instead, WMATA tries to dance further around the issue by parsing out the elements of the cause of action, claiming that it never made or received an "offer" and received no "consideration" for its obligations.

As to the "offer," the District made the request that WMATA work within the AWC process to dispose of its properties in the Ballpark District. (*See* Mem. Ex. 7.) WMATA assented to that, which it does not deny. Rather, WMATA seems to claim that its "offer" was not specific enough to meet some nebulous standard applicable to government contracts. (*See* Opp. at 2 n.2.) WMATA itself agreed to the District's "request," in a letter from Mr. Malasky. (*See* Mem. Ex. 8.) (This letter is not one of the documents Mr. Malasky attempts to interpret in his Declaration.) That such an offer was in fact made is more than confirmed by Mr. Malasky himself, who recites the "basic framework agreement" reached with AWC for the District's and Monument's benefit, *i.e.* dealing with the disposition in phases (first the Navy Yard site and then the Bus Garage). That Monument offered and gave consideration for this is also indisputable:

5

Monument agreed to accommodate WMATA's desire for a phased disposition process, even though the original award by AWC had no such requirement and both AWC and Monument were aware of this and negotiated heavily, albeit unsuccessfully, with WMATA to complete the transaction in one phase. Monument also offered substantial consideration, accepted by WMATA and the District in closing on the sale of the Navy Yard site that never would have been offered if Monument had no rights to the Bus Garage. (Hines Decl., Mem. Ex. A ¶ 14.) Notably, WMATA on its own and through its efforts on the Joint Task Force, memorialized this basic framework agreement by, for example, stating that it was doing a phased disposition deal with AWC or its designated developer, Monument Realty, which involved the Navy Yard station site as the first phase and the Bus Garage as the second phase. (Mem. Ex. 18 at 4.) This information was held out by the District/WMATA Joint Task Force as being accurate, not only to persons within WMATA, but also to AWC, the District, the District Department of Transportation and ultimately, as late as February 2007, to WMATA's General Manager, John C. Catoe, Jr., the person to whom authority had been expressly delegated to complete such a transaction. (*Id.* Ex. 36 at 10.)

Other documents WMATA prepared show WMATA's agreement and its understanding of its obligations. (*See* Mem. Exs. 36, 38, 42.) In fact, WMATA on two occasions called off its own procurement plans at the District's request, so that the disposition of the Bus Garage would follow the AWC process. (*See id.* Exs. 8, 51.) On the second occasion, WMATA's own Board members made clear how WMATA was obligated to proceed. (*See id.* Exs. 49, 50.) WMATA conceded at the time that "WMATA is required to honor funding jurisdictions' requests to purchase excess WMATA property." (*Id.* Ex. 63.) Indeed, WMATA had these obligations, which explains why WMATA asked the District in early 2007 how the District wished to

proceed with respect to the second phase of the disposition process, and whether WMATA was to deal directly with Monument. WMATA cannot and does not dispute that it did so, on more than one occasion. (*Id.* Ex. 42.) The only reasonable explanation for WMATA's conduct is that WMATA was bound to an agreement to deal with the District and/or its designee, Monument.

There were obviously many different ways in which the transaction could ultimately have been consummated. This does not mean that there was no contract; the parties were all bound, but the precise mechanism by which their intentions would be carried out was not material to them. They all agreed that WMATA was required to participate, and was in fact participating in the District's planning process through AWC, that Monument was the appointed Master Developer, and that the purchase price would be for fair market value. Although the precise means and method were in flux, the ultimate goal of providing for the coordinated development of the Half Street Area by the Master Developer was always part and parcel of the deal, and the law imposes an obligation on the parties to act in good faith towards that goal. *See Allworth v. Howard Univ.*, 890 A.2d 194, 201 (D.C. 2006).

The precise reason why WMATA decided to breach its obligations may not ultimately be important for purposes of this motion for preliminary injunctive relief. Discovery has revealed, however, that throughout the summer of 2007, WMATA found what it believed to be a tension between its recognized obligation to convey to the District or Monument, and its perceived maximum windfall from the Bus Garage. WMATA knew that a specific, enforceable mechanism existed to determine fair market value. This would consist of an appraisal or appraisals, whereby fair market value could have been determined. (*See* Mem. Ex. 64.) (This document, written by Mr. Bottigheimer, is not one of those he chooses to characterize or interpret in his lengthy Declaration.) In fact, WMATA had in hand its own appraisal at the time.

(*See* Mem. Exs. 53, 56.)  WMATA chose to withhold it from the District, hoping to bluff the parties into paying at least $60 million or more for the Bus Garage (*see* Mem. Ex. 56.), while acknowledging that Monument's $54 million offer "looks good in light of this appraisal." (*See* Mem. Ex. 41.)  Plaintiffs were ready, willing, and able to perform their obligation to negotiate in good faith and were and are prepared to consummate the acquisition for any relevant purchase price.  (*See* Hines Decl., Mem. Ex. A ¶ 23.)  Had WMATA fulfilled its obligations, such a conveyance might have already been consummated.  Not content with merely driving up the price in this manner, however, WMATA then hung itself up in an effort to extract from the District *all* revenue that the District might have achieved in structuring the ultimate conveyance to Plaintiffs.  (*See* Mem. Exs. 60, 61.)  Finally, for reasons presently undisclosed, WMATA walked completely away from the transaction in July 2007: "Assignment of District's option to Monument: Told District no." (*See* Mem. Ex. 66.)

In over 50 pages of Declarations, WMATA provides no explanation for its actions.  Nor does WMATA explain what it meant by the "District's option" – which plainly must have referred to the District's absolute right to acquire WMATA's excess property despite WMATA's current attempt to distance itself from that right.  Although WMATA claims that a private party has no right to assert a claim that references WMATA's internal policy requiring a sale to the District, WMATA in the same breath admits that its internal policy did not prevent the District from assigning its rights to Monument – on the contrary, the policy promoted transactions with private developers.  (*See* Malasky Decl. ¶ 13.)  Clearly, WMATA was concerned about the money that it expected to receive and doubted that it could extract much more than the fair market value its longstanding policy would entitle it to receive.  None of this, however, would furnish any basis for WMATA to rescind its agreement and the related several year course of

dealing. WMATA states simply that a "required" conveyance (*see* Mem. Ex. 63) was not required, that the parties had no understanding, that the District had no option or other rights, and that Monument has no claims.

Ironically, the Bus Garage had become valuable through no action by WMATA. The District, by choosing to locate the baseball stadium a few blocks away, was primarily responsible for the increased property value. Monument, by its actions in discouraging a historic preservation designation, agreeing to complete the utilities and infrastructure on both sides of Half Street (including the side abutting the Bus Garage), and contributing to the design and promotion of the Half Street Area, made critical contributions to that as well. WMATA bore no role in the increase, but decided to hold out for the highest dollar return while, at the same time, ignoring the parties' extended course of dealing and contractual commitments. (WMATA eventually shot itself in the foot again, managing somehow to create a scenario wherein it ignored MR Ballpark 7's offer to best other offers by $250,000 and ending up with the Akridge Bid which was almost $10 million below Akridge's prior bid in response to IFB 07-3.)

WMATA also claims that it did not ask for nor receive consideration in exchange for its agreement with Plaintiffs. (*See* Opp. at 9-10.) It again cites the testimony of Mr. Malasky and Mr. Maginnis, and it also urges that all of the consideration paid and/or given by Plaintiffs to WMATA had nothing to do with the Bus Garage. (*See id.* at 26-30.) Under District of Columbia law, however, the threshold for consideration is quite low. Even return promises, without more, are sufficient consideration for the parties' respective obligations. *See 3511 13th St. Tenants Ass'n v. 3511 13th St. Residences, LLC,* 922 A.2d 439, 443-45 (D.C. 2007) (reversing grant of summary judgment finding contract of sale unenforceable for want of

consideration). Moreover, in this case, the consideration given by Monument went well beyond simply a promise in return for the promises made by WMATA.

Specifically, Plaintiffs took actions that they never would have taken, incurred expenses that they never would have incurred, and conferred benefits on WMATA that would never have been given absent the obligations concerning the Bus Garage. (*See* Hines Decl., Mem. Ex. A ¶¶ 13-17.) WMATA attempts to confuse the issue by suggesting that Monument's initial investment in the Ballpark District had nothing to do with the parties' agreement. (*See* Opp. at 29.) But Monument is not making such a claim. Rather, Plaintiffs gave additional consideration later, as part of the agreement whereby Plaintiffs would obtain the exclusive right to at least negotiate in good faith to acquire the Bus Garage. (*See* Hines Decl., Mem. Ex. A ¶¶ 13-17.) This is precisely the mutuality of obligation that WMATA suggests is lacking.

As one example of the additional consideration, Monument has proven that in January 2007 it moved forward with a zoning application to accommodate WMATA's employee parking requirements in Square 700 (where the Bus Garage is located). (*See* Phillips Decl., Mem. Ex. B ¶ 6.) WMATA knew of the application, since it had to support it. (*See id.*) At a hearing before the Zoning Commission, Monument Realty recited the parties' agreement, this was known to WMATA, and WMATA never objected to the statement, made under oath, that Monument had been "awarded the exclusive right to negotiate for the properties owned by WMATA and that land included two employee parking lots, the bus maintenance facility site and the Half Street Station area, all adjacent to properties that we already owned." (*See id.*) In fact, WMATA supported what Monument was doing. (*See id.*) In its lengthy submissions, WMATA makes no effort at all to refute any of this evidence.

10

Similarly, after the closing on the Navy Yard Metro Station site acquisition, when Monument sought to move forward on the Bus Garage, WMATA never said that Monument had no right to do so. Instead, WMATA extracted even more consideration from Monument, this time insisting upon an acceleration of the construction work within the Navy Yard Metro Station being undertaken by Monument and a recovery schedule and additional work at a cost of more than $700,000 to Monument. (*See* Hines Decl., Mem. Ex. A ¶¶ 19-20.)

WMATA knows that Monument undertook this considerable expense solely because WMATA extracted it as part of its effort to increase the cost of finalizing the Bus Garage aspect of the transaction. Even in its papers, WMATA argues only that "many of the alleged benefits" were solely in consideration of the acquisition of the Navy Yard Metro Station site. (*See* Opp. at 28.) Even WMATA does not claim that *all* of the alleged benefits can be swept into the Navy Yard Metro Station site transaction. This implicitly concedes that Plaintiffs gave consideration for WMATA's obligations relating to the Bus Garage, and that the consideration is more than sufficient under District of Columbia law. *See 3511 13th St. Tenants Ass'n*, 922 A.2d at 443-45.

In fact, and in law, it is this conduct by WMATA that further proves Monument's claim for breach of contractual rights. WMATA dealt with Monument as the designated Master Developer for over two years. WMATA and the District established the District/WMATA Joint Task Force, which they invited Monument to participate in, that specifically discussed Monument's efforts to secure a relocation site for the Bus Garage for WMATA's benefit and that finally resolved in the form of a "basic framework agreement" that the disposition would be done in two phases, the second phase involving the Bus Garage. WMATA then completed a sole source transaction with Monument on the Navy Yard site, later stating to the District that it could deal directly with Monument on the second phase for the Bus Garage, and all the while

extracting every benefit that it could think of from Monument. However, the crowning moment – which in and of itself creates enforceable contract rights – is that WMATA then on two separate occasions told Monument that it was "in no hurry" to move forward on the disposition of the Bus Garage, that WMATA was "on hold," and that it would "wait and see" how Monument fared in completing the interior construction work on the Navy Yard Metro Station site before negotiating with Monument on the Bus Garage. (Mem. Exs. 38, 39.) That work is now complete. (*See* Supplemental Declaration of F. Russell Hines hereto, Ex. F ¶¶ 3-4.)

WMATA was extracting even more consideration from Monument. There is no other reasonable explanation for these communications between WMATA and Monument, and, importantly, none has been offered by WMATA. Monument undertook these efforts and offered this consideration in response to WMATA's offer that if WMATA was satisfied with progress on the Navy Yard Metro Station interior construction work, it would negotiate with Monument for the disposition of the Bus Garage. Monument kept its end of the bargain; WMATA did not, electing instead to pull the rug out from under two years of carefully laid plans.

At the same time, WMATA feigns outrage at what it calls "threats" and other improper action by Monument. (*See* Opp. at 54.) Monument's response, however, is completely understandable and rational. Having given WMATA everything it asked for, and everything WMATA said it wanted, and then being shunned by WMATA, Monument had every reason to be upset. Notably, WMATA offers not a single iota of evidence to support any claim that Monument created "a stunted marketplace and . . . lost tax revenue." (*See id.* at 55.) The plain fact is that, when it became clear that WMATA was seeking to avoid its obligations, Monument spoke very strongly. This is precisely the reaction that one would expect in this situation, and it

was exactly what WMATA knew would happen months before when it was still successfully concealing its intentions. (*See, e.g.,* Mem. Ex. 38.)

WMATA claims that Monument never asserted its rights at the relevant times, which is incorrect. (*See, e.g.,* Phillips Decl., Ex. B ¶ 6.) There was no reason to have Monument or its counsel send abrasive warnings to WMATA before WMATA breached its contract. WMATA itself never repudiated its obligations or made any statement to Monument that Monument did not have the right to acquire the Bus Garage. (*See* Mem. Ex. 25.) (This document was authored by Mr. Maginnis and yet he makes no effort to explain it in his lengthy Declaration.) WMATA merely indicated that the Bus Garage had to be handled in a separate phase from the Navy Yard Metro Station site (*see id.* Exs. 19, 31), and then that WMATA was going to wait and see how Monument fared in the ongoing construction before proceeding further. (*See id.* Exs. 38, 39.) Under District of Columbia law, one may not so easily evade contractual obligations for the sale of real estate. *See, e.g., Indep. Mgmt. Co. v. Anderson & Summers, LLC,* 874 A.2d 862, 867 (D.C. 2005) (contract for sale of real estate is subject to standards of reasonableness).

WMATA also urges that statements by Monument's Treasurer and Controller constitute unavoidable admissions that Plaintiffs do not have the rights that they claim. (*See* Opp. at 3.) This is an inaccurate interpretation of Ms. Volpicelli's statements. (*See* Declaration of Debra Volpicelli hereto, Ex. D ¶¶ 5-9.) Ms. Volpicelli was not involved in the negotiations or discussions with WMATA or any other party concerning the precise nature of Monument's rights in the Bus Garage. (*Id.* ¶¶ 4, 11.) The understanding that Ms. Volpicelli has is consistent with Plaintiffs' claims in this case. (*Id.* ¶ 10.) Furthermore, these communications involved the valuation of rights other than those Monument is claiming in this case, and valuations based on generally accepted accounting principles and tax considerations not relevant here. (*Id.* ¶¶ 6-9.)

13

C.    **The Applicable Four Part Test**

Monument has met each of the elements of the applicable test for obtaining preliminary injunctive relief to maintain the status quo pending determination of its contract and real estate claims. WMATA suggests, wrongly, that the elements are wanting. WMATA claims that the longstanding principles of District of Columbia law which recognize the uniqueness of real property interests are "worthless in the District," having been abolished by two slip opinions issued by this Court more than a decade ago. (*See* Opp. at 50.) Suffice it to say that the D.C. Court of Appeals has never adopted such a principle under the applicable substantive law. On December 20, 2007, the D.C. Court of Appeals reiterated in *Tauber v. Quan*, a dispute involving rights in commercial real estate, that "each parcel of land is unique." No. 04-CV-891, 2007 D.C. App. LEXIS 689, at *18 (D.C. Dec. 20, 2007). In this case, given the central location of the Bus Garage in the midst of the other properties owned by Monument in the Half Street Area, there is no credible argument to counter Monument's showing of irreparable harm and WMATA's effort to suggest that the crown jewel parcel of this development area, adjacent to the main gate of the new baseball stadium is not unique and irreplaceable is wrong.

The balance of the hardships also favors Monument. Although WMATA claims that Monument's injury "is monetary," it involves real property rights and interests which are deemed unique under the applicable substantive law, and are, in fact, unique. The loss of those rights and interests is undeniable. Indeed, WMATA is pursuing vigorously a disposition of those rights and interests to a party other than Monument. In contrast, the harm claimed by WMATA is speculative, uncertain, and not supported by a single item of evidence. (*See* Opp. at 51-52.) For example, although WMATA asserts that it and its "ridership" will "incur excess costs," no explanation or evidence is provided for that assertion. (*See id.*)

14

The public policy considerations in this case also weigh in favor of Monument.  Not only are vested property rights at stake, but WMATA itself, through its bungled procurement process, has left in excess of $10 million on the table at a time when it has imposed the single largest fare hike in its history.  Those are the public policy implications of WMATA's actions, not some imagined and unsupported concern over "baseball in Washington" or safety concerns for game-day pedestrians in the Ballpark District.

## II.    PRELIMINARY INJUNCTIVE RELIEF BASED ON IRREGULARITIES IN WMATA'S BID PROCESS

WMATA's conduct under IFB 07-3 and IFB 08-1 provides textbook examples of how a procuring agency should *not* conduct a sealed bid solicitation process. From the administrative record produced by WMATA, the inescapable conclusion is that WMATA was not permitted to consider the Akridge Bid under IFB 08-1 (the "Akridge Bid") for at least four reasons. First, the Akridge Bid stated on its face that WMATA could award Akridge a contract under IFB 08-1 if, and only if, WMATA did not award it a contract under IFB 07-3. WMATA's PPM *requires* that such a bid be rejected outright.   Second, the Akridge Bid was submitted conditionally, in a way that gave Akridge two bites at the apple.  Third, Akridge offered consideration not called for by WMATA that affected the analysis of the sole stated bid criterion.  WMATA's Contracting Officer confirmed in his testimony in this case that Akridge's offer in this regard was non-responsive, designed to strengthen the economic terms of the Akridge Bid, and that WMATA provided no other bidder the opportunity to offer similar consideration.  Therefore, Akridge's Bid had to be rejected outright by WMATA *as a matter of law*.  Instead of doing so, however, and for the fourth reason the Akridge Bid had to be rejected, Akridge and WMATA then engaged in a series of expressly prohibited correspondence, negotiations, communications, and discussions during the silent period imposed in the sealed bid process between bid opening and

final award. WMATA's PPM and the FAR forbid such communications, for obvious reasons, and even Mr. Bottigheimer admitted that WMATA was not permitted to have these conversations during this time. Yet WMATA did, which it does not deny. WMATA also raised previously the specter of being required to have similar discussions with MR Ballpark 7's representatives as a reason for not considering MR Ballpark 7's Alternate Bid; WMATA staked out the position in response to MR Ballpark 7's bid protest that such discussions were impermissible. (Mem. Exs. 89 at 5, 90 at 6.) Moreover, all communications with bidders, by the terms of WMATA's own bid documents, were supposed to be fully disclosed by WMATA. No discussions between Akridge and WMATA were disclosed prior to this litigation.

The PPM and FAR establish bright-line tests for a procuring agency's conduct in sealed bidding, which do not allow the agency to raise a "no harm, no foul" defense as WMATA is doing here. No analysis or investigation of this defense would be necessary had WMATA simply followed its own PPM and FAR. Yet WMATA did not. WMATA's Contracting Officer admits this many times over. For example, WMATA's Contracting Officer (who is also WMATA's Rule 30(b)(6) designee) admits that WMATA failed materially to follow the PPM and/or FAR in that it: Failed to open bids under IFB 07-3 at the bid deadline (PPM §521.1; FAR §14.101(c)); Failed to select a winning bidder at the bid opening under IFB 07-3 (PPM §521.1; FAR §14.101(e)); Failed to record within the administrative record any determination to cancel IFB 07-3 (PPM §515.5; FAR §§14.209(c), 14.403(d)); Failed to notify bidders of cancellation of IFB 07-3 (PPM §§514.1-515.4, 515.5; FAR §14.209(b)); Considered a bid by Akridge conditionally submitted under IFB 08-1 (PPM §525.4; FAR §14.404-2(d)(4)); Considered a bid submitted by Akridge containing offer of additional, material, consideration not permitted by bid solicitation documents (PPM §§516.1, 525.1; FAR §§14.301(a), 14.404-2(b)); and

Communicated and conversed with Akridge regarding the winning bid during the silent period (PPM §500.11; FAR §14.101(d)).

Although deference can be afforded to WMATA in making a final determination as to a contract award, that deference applies only where WMATA is not plainly in violation of its own governing regulations and statutory obligations. *Leboeuf v. Abraham*, 347 F.3d 315, 320 (D.C. Cir. 2003). Where, as here, WMATA has trampled the plain language of its governing rules and regulations in conducting its bid process and applied standards unevenly and unfairly as between the bidders, WMATA is not entitled to deference; in fact, it is subject to a heightened level of scrutiny. *Reuters Ltd. v. FCC*, 781 F.2d 946, 947-49 (D.C. Cir. 1986) (noting that "an agency must adhere to its own rules and regulations" and, where it does not, the "invocation of well-settled principles of judicial deference to agency interpretations [] is therefore quite beside the point."). WMATA's procurement decision cannot stand, because the process by which it was reached "involved a clear and prejudicial violation of applicable statutes or regulations." *Kentron Hawaii, Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973); *see also Irvin Indus. Canada, Ltd. v. United States Air Force*, 924 F.2d 1068, 1072 (D.C. Cir. 1990).

WMATA's PPM prohibits WMATA from considering the Akridge Bid. The PPM and the FAR dictate that a bid "shall be rejected if the bidder . . . conditions or qualifies a bid by stipulating that it is to be considered only if, before [the] date of award, the bidder receives (or does not receive) award under a separate solicitation." (Mem. Ex. 52 at §525.4(c)); FAR §14.404-2(d)(4).) The Akridge Bid included a statement that the bid Akridge had submitted under IFB 07-3 "is no longer valid and may no longer be accepted by WMATA." (Mem. Ex. 72.) WMATA's Contracting Officer and Rule 30(b)(6) designee Bottigheimer testified that this statement dictated that Akridge could only be awarded a contract under IFB 08-1 in the event it

was not awarded a contract under the separate solicitation. When asked about this, Mr. Bottigheimer stated unambiguously, "It is my understanding that they are saying that we cannot award them – we cannot make an award in connection with 07-3." (Mem. Ex. 4 at 58:4-6.)

Likewise, there is no dispute that although the PPM required WMATA to cancel IFB 07-3 if it elected not to consider bids received under that solicitation, WMATA never did so. Review of this issue is limited to the administrative record, which includes "all materials compiled by the agency, that were before the agency at the time the decision was made." *James Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1095 (D.C. Cir. 1996), *citing Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419 (1971) (citations omitted). WMATA's post-hoc rationalization that IFB 07-3 was somehow "superseded" by IFB 08-1 is inadmissible as it is not part of the administrative record. (Opp. at 40.) *See also PanAmSat v. FCC*, 198 F.3d 890, 897 (D.C. Cir. 1999) ("We do not ordinarily consider agency reasoning that 'appears nowhere in the [agency's] order.'"). No cancellation is in WMATA's administrative record.

Although Mr. Bottigheimer's recollection on the point was not clear, the administrative record reflects that when WMATA opened the Akridge Bid on August 28, 2007, it still had the original $80 million bid by Akridge under IFB 07-3 ("[E]nclosed please find the original bid and bid deposit submitted to WMATA by Akridge on July 23, 2007 for consideration in accordance with the [first] Bid Request.") (Mem. Ex. 69 at 2, dated July 30, 2007.) The undisputed evidence also proves that WMATA held Akridge's $80 million original bid until after the second bids were opened and only then returned it to Akridge on August 29, 2007 at Akridge's request. (Mem. Ex. 77.)

WMATA's attempt to distance itself from its own conduct by arguing that the original bid had been "superseded" by the second bid, is nowhere found in the record and is otherwise

unavailing. The PPM and the FAR set forth specific requirements for the Contracting Officer to cancel bid solicitation 07-3. (*See, e.g.*, Mem. Ex. 52 at §515; FAR §14.209.) These requirements were not followed either in form or substance by WMATA. The PPM and FAR have no provisions for a "superseding" bid, and Akridge's Bid, conditioned on the non-award of the contract under the prior bid, was required to be rejected.

One key rationale for this requirement is to guard against post-bid opening withdrawal. *See In re Northwest Ground Covers & Nursery*, B-201609, 1981 U.S. Comp. Gen. LEXIS 278, at *3, 81-1 Comp. Gen. Proc. Dec. ¶ 81 (Feb. 9, 1981) ("[C]onditioning consideration of a bid upon the results of another procurement . . . would in effect reserve to the bidder the right to withdraw his bid from consideration after bid opening."). Even though the scenario did not play out in this way, the result here is no different. *See In re Outdoor Venture Corp.*, 1989 U.S. Comp. Gen. LEXIS 673, at *5 n.1, 89-1 Comp. Gen. Proc. ¶571 (June 16, 1989) (issue was not "moot" simply because the first contract had been awarded).

The Akridge Bid was submitted conditionally. (Mem. Ex. 73.) Akridge thereby reserved the right to contest that WMATA's actions with respect to IFB 07-3, including failing to open the bids at the bid deadline and selecting a winning bidder at that time, were improper and "a violation of WMATA's procurement regulations and the terms of the RFP for the Initial Bid Request." (*Id.* at 1.) With that placeholder firmly established, Akridge then submitted its bid under IFB 08-1, plainly attempting to reserve for itself two bites at the proverbial apple. If it did not win the award under IFB 08-1, it could challenge WMATA's bid procurement process under IFB 07-3 and claim that it would have won under that solicitation. Yet, preventing two bites at the apple was the precise reasoning WMATA used when determining not to consider MR Ballpark 7's Alternate Bid. (Mem. Ex. 90 at 5.)

The offer of additional consideration contained in the Akridge Bid was also fatal to its validity.  WMATA does not dispute that the offer of additional consideration was both non-responsive, and went to the heart of the Akridge Bid, *i.e.* the net benefit that WMATA would receive under the terms of the offer.  WMATA's Contracting Officer testified that "this response is not a response we contemplated, and it was nonresponsive to the form of our invitation for bids" and that "I understood that it was an attempt to strengthen the bid." (Mem. Ex. 4 at 61:12-17, 64:10-14, 64:18-19.)  The offer was a material element of Akridge's bid designed to "solve WMATA's stated need to relocate and maintain the buses presently housed at the Southeast Bus Garage location" and offer significant savings to WMATA. (Mem. Ex. 80 at 1.)

WMATA's determination to conduct a sealed bid process, not a competitive bid, mandated that WMATA follow established sealed bidding procedure.  WMATA's own adopted sealed bid procedures require that "to be considered for award, a bid shall be required to comply in all material respects with the IFB." (Mem. Ex. 52 at § 516.1.)  A bid that failed to conform to the essential elements of the IFB must be rejected. (Mem. Ex. 52 at § 525.1.)  Indeed, WMATA carried over that requirement to this specific solicitation: "[a]ll bids submitted must comply with this Invitation for Bids." (Mem. Ex. 70 at 1.)  Likewise, FAR requires that sealed bids must comply exactly with the literal requirements of the IFB.  FAR §14.301(a).  Any bid that fails to conform to the requirements of the IFB must be rejected.  FAR §14.404-2(b).  Indeed, WMATA stated that it disregarded MR Ballpark 7's Alternate Bid partly because considering it would introduce the principle that "what is not expressly prohibited [by the IFB] is allowed," which ultimately "would vitiate agencies' discretion and replace reason with anarchy." (*See* Mem. of Pts. & Auth. in Support of Mot. to Dismiss First Am. Compl. at 24.)  Yet WMATA considered the Akridge Bid despite this material non-conformity and therefore introduced a patently unfair

set of evaluation criteria on the bidders. Requiring bids to conform with the solicitation promotes fairness and objectivity, and provides all bidders with "an equal right to compete." *Toyo Menka Kaisha, Ltd. v. United States*, 597 F.2d 1371, 1377 (Ct. Cl. 1979); *see also* FAR §14.301(a); (Mem. Ex. 89 at 2). WMATA does not deny the recognized public policy interest in preserving the fairness and integrity of the sealed bid process

WMATA was not able to simply disregard or not consider this portion of the bid, since the bidder itself stated that the sweetener was an "integral" part of the bid (Mem. Ex. 80 at 1) and WMATA agreed that it was designed to strengthen the economic terms offered by Akridge (Mem. Ex. 4 at 64:16-19).

Although WMATA now argues that it did not consider the sweetener, its own Contracting Officer and Rule 30(b)(6) designee could not explain why he left a voicemail for the President of Akridge stating that WMATA received it and was treating it as a serious offer (Mem. Ex. 78 at 1; Opp. Ex. E.2 at 72:8-74:16), other than to admit that those conversations were prohibited (Ex. 4 at 71:1-4, 77:16-21). In any event, it is not necessary to assess WMATA's newfound protestations that it did not – it now says – consider the contents of the sweetener. The bright line parameters in the PPM and FAR were designed to promote fairness and integrity. Akridge was trying to game the system by offering something that other bidders had no knowledge of and that they were not invited or permitted to offer (Ex. 4 at 71:1-12), to Akridge's unique, albeit grossly unfair, advantage. The express requirements of FAR and the PPM require rejection of the Akridge Bid as a matter of law. They do so in order to obviate the necessity for precisely the type of analysis, weighing of the evidence, and determination of whether WMATA considered the bid or not, that WMATA is now asking the Court to undertake.

The sealed bid process prohibits post bid opening communications with bidders other than, at best, in a few limited exceptions not applicable here (such as to correct clerical errors or immaterial informalities or irregularities in the bid). FAR §§ 14.405, 14.407. These limited potential exceptions cannot seek to materially alter the terms of the bid or its quoted price, nor can they correct non-responsive information. *See Toyo Menka Kaisha*, 597 F.2d at 1377. The FAR defines an immaterial informality as "one that is merely a matter of form and not of substance." FAR § 14.405. WMATA does not and cannot reasonably contest that its post bid opening discussions with Akridge were material, as Akridge itself boasted that the offer could result in a net benefit of $5.3 million to WMATA. (Mem. Ex. 81.) Rather than rejecting the Akridge Bid outright as it was required to do, WMATA engaged Akridge in discussions and thereby allowed the bid process to become infected irretrievably with numerous material communications and correspondence, all of which took place during the silent period imposed by regulation between bid opening and final award of the contract. Because WMATA cannot deny that, it instead seeks to avoid the obvious problem by claiming that WMATA staff had already washed their hands of the issue the day after the bids were opened by concluding its recommendation. Therefore, WMATA's argument continues, staff could do as they pleased, including having any discussions with Akridge they chose to.

WMATA cannot insulate itself by making a recommendation and turning the matter over to its Board. Throughout this case, WMATA has emphasized the critical role of its Board, averring that the Board is the decision-maker and only the Board has the authority to decide who is entitled to negotiate for and acquire the Bus Garage. Absent express Board approval, nothing can be done (according to WMATA). In other words, until the Board acts, nothing is final. WMATA has used this argument as a basis for claiming that the Plaintiffs' Amended Complaint

should be dismissed and for asserting that Plaintiffs' request for important injunctive relief should be denied. Now, however, in trying to salvage the Akridge Bid, WMATA changes tunes, arguing that once WMATA staff made its recommendation to the Board on August 29, WMATA was absolved from further compliance with the plain language of the PPM and FAR and could have any discussions it wanted to. (Opp. at 47-49.) Thus, according to WMATA's current position, it is immaterial that it had these communications during the silent period, because WMATA staff had already made its recommendation.

WMATA's current argument is unavailing. First, the *sine qua non* (according to WMATA) for a binding decision, Board approval of a contract award, was not obtained until September 27, *after* the discussions, meetings, voicemails, and conversations took place. It was not until that date that WMATA staff could safely conclude that the Board would not ask it to undertake any additional analysis or further consideration of the bids. WMATA, albeit in a footnote, recognizes this fallacy in the argument. (*See* Opp. at 49 n.34.) The Contracting Officer himself prepared another, inconsistent, recommendation for the Board on August 29, 2007, the same date as the recommendation that WMATA does acknowledge. The inconsistent recommendation prepared by Mr. Bottigheimer indicated that the bids between Akridge and MR Ballpark 7 were a toss-up and requested a significant, extended, study period for staff's further consideration and determination. (*See* Opp. Ex. E. 10.)

Further, the PPM and the FAR require that the silent period run from the date of bid opening to the date of the *award*, not the date staff makes its recommendation. (Mem. Ex. 52 at §501.11; FAR §14.101(d)). Finally, WMATA has not testified that there is no possibility that WMATA may even *still* consider Akridge's offer of additional consideration. WMATA never formally advised Akridge that it would not consider the offer. (Mem. Ex. 4 at 82:12-18) ("I

don't recall ever telling [Akridge] that we wouldn't consider it. I don't recall telling them that we wouldn't or were not considering it."). Indeed, WMATA states only that WMATA *intends* to disburse buses to other facilities already in the WMATA system (Opp. at 44), not that it will do so or that it has done so. Moreover, WMATA's own engineering department considered the offer of the Akridge site as one viable alternative. (*See* Mem. Ex. 4 at 82:5-8) (Q: "So at this point, at least the engineering department at WMATA thinks this is a viable possible alternative, correct?" A: "Correct."). These secret discussions and conversations violated fundamental sealed bidding procedures, WMATA's PPM, WMATA's Compact, and WMATA own sworn position as to prohibited post bid-opening conduct. Allowing WMATA to have such discussions at a time when it refused to have discussions with MR Ballpark 7 on its Alternate Bid because they were "impermissible" (Mem. Exs. 89 at 4, 90 at 5) is the height of inequity.

WMATA's argument that it was permitted to have discussions with Akridge but not Monument because "discussions" in the context of the Akridge Bid do not really mean "discussions" is as disingenuous as WMATA's argument that Akridge's "conditional" bid was not really "conditional." This is particularly true in light of the fact that WMATA's Contracting Officer made no distinctions between "discussions," "conversations," and "communications" when under oath, instead simply and candidly admitting that "conversations with bidders after the date of opening of the bid and prior to the date of the award were expressly prohibited." (Ex. 4 at 77:16-21.) Argument of counsel and legal manipulation aside, WMATA understood that conversations were prohibited. Yet it had them anyway.

WMATA's assertion, without citation, that "discussions" in the context of negotiated procurement means the same as "discussions" within the context of sealed bidding (Opp. at 46 n.33) is incorrect and reads the "sealed" portion of "sealed bidding" out of the process.

Negotiated procurements, where discussion is permitted, are designed to permit agencies to use flexible procedures, allowing "persuasion, alteration of assumptions and positions, give-and-take, and may apply to price, schedule, technical requirements, type of contract, or other terms of a proposed contract." FAR § 15.306(d).   In stark contrast, sealed bidding is a rigid, rule-bound method of procurement that prohibits discussion to ensure the integrity of the bid process. There is, according to WMATA's Contracting Officer, only one criterion in a sealed bid process, price. (Mem. Ex. 4 at 65:9-15.)   Therefore, there is no need for discussions or conversation.   (*Id.*) Indeed, it is for this reason that none of the FAR sections, *see, e.g.,* FAR § 15.306(d),  defining "discussions" (dealing with negotiated procurements) are even referenced in Part 14 (dealing with sealed bidding), though Part 14 contains numerous other cross-references to Part 15.  *See e.g.,* FAR §§ 14.103-1; 14.105; 14.201-7; 14-408-2.

A central purpose in procuring through sealed bidding is to "give everyone an equal right to compete for Government business, to secure fair prices, and to prevent fraud." *Prestex, Inc. v. United States*, 320 F.2d 367, 372 (Ct. Cl. 1963).  The prohibition safeguards the integrity of the sealed bid process.  "Discussions" in sealed bidding must mean "discussions."  Indeed, according to WMATA's Contracting Officer, they include conversations, such as those WMATA admittedly had. Akridge's communications with WMATA went to the heart of the bid criteria and were prohibited. The prejudice to Monument and the other bidders is clear.

Dated: January 16, 2008

Respectfully submitted,

NIXON PEABODY, LLP


_____ /s/ Louis E. Dolan, Jr._____
Louis E. Dolan, Jr. (#442881)
Vernon W. Johnson, III (#423756)
401 9th Street, N.W.
Washington, D.C. 20001
202.585.8000
202.585.8080 (fax)
ldolan@nixonpeabody.com
vjohnson@nixonpeabody.com

Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of January, 2008, I caused a copy of the foregoing

Plaintiffs' Reply to Defendant's Opposition to Motion for Preliminary Injunction with appended

Exhibits D, E, F, and 92 were served via ECF upon:

Harvey A. Levin, Esquire
Thompson Coburn LLP
1909 K Street, Suite 600
Washington, D.C. 20006-1167

Counsel for Defendant

_____ /s/ Vernon W. Johnson, III_____
Vernon W. Johnson, III

# EXHIBIT 92

**Monument Realty LLC v. Washington Metropolitan Area Transit Authority – Chronology of Key Events**

| DATE | EVENT |
|---|---|
| 2004 | In 2004, the District of Columbia creates the Anacostia Waterfront Corporation ("AWC") as an independent instrumentality of the District of Columbia government. Its mission was the revitalization of underutilized public lands along the Anacostia River, and it had statutory authority to acquire and dispose of properties in the area. *See* D.C. Code Ann. §§ 2-1223 *et seq.* (2004) (Repealed). |
| September 2004 | District of Columbia officials disclose plans to build a publicly-financed baseball stadium costing in excess of $400 million on the Anacostia River waterfront near South Capitol Street, Southeast, Washington, D.C. for the Washington Nationals baseball team. |
| March 2005 | Washington Metropolitan Area Transit Authority ("WMATA") issues a Joint Development Solicitation ("JDS") for three parcels it owns in Squares 700 and 701 in the District, including the Navy Yard Metro Station site and the Southeast Bus Maintenance Facility and adjacent parking lot ("SEBUS"). (*See* Mem. at 3.)[1] |
| April 2005 | Mayor Anthony Williams requests that the JDS be canceled in deference to the District's right to purchase WMATA's property. WMATA pulls SEBUS and the Navy Yard Metro Station site from the JDS at the Mayor's request. (*See* Mem. at 3, Exh. 7-8.) |
| 09/16/2005 | AWC releases its Request for Expression of Interest for one or more developers to become Master Developer of the Ballpark District, an economic development area that includes Squares 700 and 701. WMATA assents to AWC including WMATA's properties in the Ballpark District, encompassing both SEBUS and the Navy Yard Metro Station site, in the RFEI. (*See* Mem. at 4; Malasky Dep. 22:12-21, 24:18-25:15, 27:7-18.) |
| October 2005 | Monument submits its proposal in response to the September 2005 RFEI by AWC. |
| 12/12/2005 | AWC and the Mayor's office announce the selection of the Monument/Cordish team as the Master Developer for the area of the Ballpark District that includes the WMATA properties. (Mem. at 4-5, Exh. 11.) |

[1]    "Mem." references the Memorandum of Points and Authorities in Support of Plaintiffs' Motion for a Preliminary Injunction. Exhibit and deposition transcript references, except where otherwise noted, are attachments to that Memorandum.

- 1 -

| DATE | EVENT |
|------|-------|
| 12/12/2005 | Monument signs a Letter of Intent with AWC that gives Monument the exclusive right to negotiate with AWC for the acquisition of the WMATA parcels in the Ballpark District, which AWC was to obtain from WMATA. (Mem. at 4–5, Exh. 10.) |
| Spring 2006 | WMATA, the District, and AWC form the District of Columbia/WMATA Joint Task Force for the purpose of resolving issues surrounding development of the Ballpark District, including disposition of WMATA properties located in Ballpark District in connection with AWC Process. Mem. at 5–6, Exh. 15–16. Shortly thereafter, Monument begins attending the Joint Task Force meetings as AWC's Master Developer for the Half Street Area of the Ballpark District. (*See* Mem. at 10–11, Exh. 27–28.) |
| May 2006 | WMATA decides to "de-link" SEBUS and the Navy Yard Metro Station site and to complete a phased disposition of the two properties, with the Navy Yard as the first phase and SEBUS as phase two. (*See* Mem. at 6–10, Exh. 15-17; 19, 20, 23–26; Malasky Dep. 61:17–62:14.) |
| Summer 2006 | After months of waiting for the AWC process to come to fruition with respect to obtaining WMATA's properties, Monument approaches WMATA directly regarding the acquisition of WMATA's Navy Yard Metro Station site and SEBUS. |
| 06/29/2006 | Councilmember and WMATA Board Chairman Jim Graham instructs WMATA staff to proceed in a sole source negotiation for the Navy Yard Metro Station site with Monument, stating that Board approval is not needed for sole source negotiations. (Mem. at 11, Exh. 29.) |
| 07/07/2006 | District of Columbia/WMATA Joint Task Force confirms phased disposition process with AWC or its designated developer, Monument Realty, including Navy Yard Metro Station site as first phase and SEBUS as second phase. (*See* Exh. 18 at 4.) |
| 12/20/2006 | Monument closes on first phase of acquisition process with WMATA, the Navy Yard Metro Station site, through a sole-source, negotiated purchase. Acquisition includes design/build agreement for interior metro station improvements and expansion required to accommodate increased capacity anticipated for home baseball games. |

- 2 -

| DATE | EVENT |
|---|---|
| February/March 2007 | WMATA informs Monument that WMATA is in "no hurry" to sell SEBUS and will "wait and see" how Monument's progress on the internal construction at the Navy Yard site is coming prior to negotiating a disposition of the SEBUS with Monument. In response, Monument accelerates construction and implements a recovery schedule at significant cost. (Mem. 16-18, Exh. 21, 35, 38-41.) |
| 02/26/2007 | In a briefing presentation for its General Manager, WMATA states that the sale of SEBUS may be to AWC's designated developer, Monument Realty, by sole source agreement. (See Exh. 36 at 10.) |
| 02/28/2007 | WMATA asks the District of Columbia to confirm that the District wants WMATA to continue dealing with AWC or its designated developer, Monument Realty, in connection with second phase of disposition of the WMATA parcels in the Ballpark District. (Mem. 14-15, Exh. 35-36, 40.) |
| 04/06/2007 | Monument sends an unsolicited offer of $80/SF (approx. $54.4 MM) to WMATA for SEBUS in an effort to complete the phased disposition of WMATA's properties. Internally, WMATA states that the offer looks good in light of the fair market value appraisal WMATA had just obtained. (See Exh. 41.) |
| 06/07/2007 | WMATA begins advertising SEBUS and subsequently issues Invitation for Bid ("IFB") 07-3 for the sale of SEBUS with a leaseback of up to thirty-six months. Bid closing date is set for July 23, 2007. (Mem. at 19-21, Exh. 46; Malasky Dep. 101:12-102:8.) |
| 06/22/2007 | David Jannarone of the Deputy Mayor's Office for Economic Development and Planning contacts WMATA to notify WMATA that SEBUS had "already been awarded to Monument Realty as part of the [AWC] vision" and that the District wanted to exercise formally its rights of first refusal to purchase the property for Monument. (Mem. at 21, Exh. 47.) |
| 06/27/2007 | Emeka Moneme, voting member of WMATA's Board of Directors from the District of Columbia, requests, on behalf of the District, that WMATA cancel the solicitation process for SEBUS and negotiate with the District for the sale of SEBUS to the District. (Mem. at 21, Exh. 49.) |
| 07/11/2007 | Jim Graham, D.C. Councilmember and WMATA Board member from the District, issues letter in support of the June 27, 2007 request of Emeka Moneme. (Mem. at 22, Exh. 50.) |

- 3 -

| DATE | EVENT |
|---|---|
| 07/13/2007 | WMATA's Planning, Development, and Real Estate Committee approves forwarding a recommendation to WMATA's Board of Directors to permit WMATA to enter into negotiations with the District for the sale of SEBUS, subject to inclusion of a proviso in the proposed Board resolution allowing WMATA to retain 100 percent of any increase in value realized by the District if the property is sold by the District within one year. |
| 07/23/2007 | WMATA receives three bids in response to IFB 07-3, which is never terminated or cancelled, including a bid by the John Akridge Company ("Akridge") in the amount of $80 million. These bids were returned, unopened, by WMATA later that month. (Mem. at 22, Exh. 22, Bottigheimer Dep. 29:7-32:22, 35:19-36:2.) |
| 07/25/2007 | Negotiations result in Eneka Monenne withdrawing his request to purchase SEBUS on the eve of the Board of Directors meeting where the recommendation of WMATA's Planning, Development, and Real Estate Committee was to be voted on. (Mem. at 25-26, Exh. 65-67.) |
| 07/27/2007 | WMATA returns unopened bids in response to IFB 07-3 four days after the bid deadline.. |
| 07/29/2007 | WMATA reissues its Invitation for Bids (under IFB No. 08-1) for sealed bids for the purchase of SEBUS. Bid closing is set for August 28, 2007. (Mem. at 27-28, Exh. 70.) |
| 07/30/2007 | On July 30, 2007, Akridge re-tenders its $80 million bid to WMATA and protests WMATA's actions under IFB 07-3. (Mem. at 27, Exh. 68-69.) WMATA and Akridge engage in undisclosed discussions regarding Akridge's bid in response to IFB 07-3. |
| 08/24/2007 | Monument Principal Jeff Neal sends letter to WMATA General Manager John C. Catoe, Jr. stating that Monument has rights to SEBUS and that Monument has accelerated construction on Navy Yard site to accommodate WMATA's requirements. (*See* Opp. Exh. E 7.)[2] |

- 4 -

2 "Opp." references the Opposition of Washington Metropolitan Area Transit Authority to Plaintiffs' Motion for Preliminary Injunction and its exhibits.

| DATE | EVENT |
|---|---|
| 08/28/2007 | MR Ballpark 7 LLC submits two bids under IFB 08-1: one for the minimum bid of $60,000,000 with a leaseback rate of $0.00 and an alternate bid offering $250,000 more than any other conforming, qualified bid received by WMATA. (Mem. at 28, Exh. 71.) |
| 08/28/2007 | Akridge submits a conditional, "sweetened" bid in the amount of $69,250,000 with an unbalanced leaseback rental schedule and an offer to negotiate for use by WMATA of a replacement parking lot at a favorable rate to WMATA. (Mem. at 28-29, Exh. 72.) Bid is accompanied by additional correspondence from Akridge establishing further conditions on terms of bid. (Exh. 73.) |
| 08/28/2007 | WMATA opens bids. |
| 08/28- 09/26/2007 | WMATA and Akridge engage in series of discussions regarding Akridge's bid, including written correspondence, voicemails, and site visits. (Mem. 31-33, Exh. 78, 80-81; Bottigheimer Dep. 64:18-19, 65:4-8, 71:2-4, 77:16-21, 74:12-16, 82:16-18.) |
| 08/29/2007 | WMATA's Contracting Officer sends an internal memo to WMATA General Manager, John C. Catoe, Jr., stating that "[t]he nature of the bids submitted makes it difficult at first blush to pick a winner" due to the uncertainty as to the leaseback term that WMATA will require. Later this same day, the Contracting Officer sends another internal memo to Catoe summarizing the three bids received, concluding that "[a]nalysis of the three bids reveals that acceptance of Akridge's bid would provide the best net return to the Authority as long as the leaseback period is from zero months (no leaseback) to thirty months." WMATA's Contracting Officer concludes that Monument's minimum bid is second highest. (Opp. Exh. E 10-11.) |
| 09/26/2007 | MR Ballpark 7 LLC files a pre-award Bid Protest with WMATA. WMATA rejects bid protest two days later. |
| 09/27/2007 | WMATA Board of Directors votes unanimously to award contract for sale of SEBUS to the John Akridge Company. (Mem. at 33, Exh. 83.) |
| 09/28/2007 | MR Ballpark 7 LLC files a post award Bid Protest with WMATA. WMATA rejects bid protest seven days later. |
| 10/10/2007 | MR Ballpark 7 and Monument file suit in U.S. District Court for the District of Columbia. |

- 5 -

| DATE | EVENT |
|---|---|
| 10/22/2007 | MR Ballpark 7 LLC files its second post award Bid Protest with WMATA asserting that the Akridge bid, which was just produced to MR Ballpark 7, was non-responsive. WMATA never responded. |
| 01/15/2008 | Monument completes interior construction work on Navy Yard Metro Station site. *See* Supplemental Declaration of F. Russell Hines, Exhibit F to Plaintiffs' Reply Brief. |

- 6 -

# EXHIBIT D

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MONUMENT REALTY LLC, et al.,    ) | |
|      ) | |
|     Plaintiffs,    ) | |
|      ) | |
| v.    ) | Civil Action No. 1:07-cv-01821 (EGS) |
|      ) | Judge Emmet G. Sullivan |
| WASHINGTON METROPOLITAN    ) | |
| AREA TRANSIT AUTHORITY,    ) | |
|      ) | |
|     Defendant.    ) | |

## DECLARATION OF DEBRA VOLPICELLI

Debra Volpicelli, being duly sworn, deposes and states as follows:

1.  My name is Debra Volpicelli. I am over the age of eighteen and competent to testify in this case. I make this declaration based on my personal knowledge.

2.  I am Treasurer and Controller of Monument Realty LLC, one of the Plaintiffs in this case. I have served in that role at Monument Realty since April 19, 1999.

3.  As Treasurer and Controller of Monument Realty, I am involved in accounting and financial issues for the Company. I am not involved in negotiating or finalizing contracts or other aspects of real estate development, acquisition, or other projects in which the Company is involved.

4.  In the context of Monument Realty's business activities in the Ballpark District of Washington, D.C., I was not involved in any of the contract negotiations or other aspects of those activities. My sole role was to deal with accounting and financial issues arising out of those transactions.

5.  In February 2007, for example, I was involved in communications with the Company's outside accounting firm, Beers & Cutler, about valuing certain interests held by

affiliates of the Company in the Ballpark District.  Some of those communications were by email

and have been labeled as pages MON00006678 through MON0006682.

6.    These communications were not addressing the valuation of Monument Realty's

rights associated with the purchase of any WMATA properties.  At the time, and as reflected in

those emails, the main issue we were dealing with was how to value the Company affiliate's option

to purchase certain development rights from the District of Columbia.  Specifically, the Company

affiliates had the right for a certain period of time to purchase 172,557 square feet of development

rights from the District and to move them to a property owned by the Company or an affiliate,

assuming that there was a property or properties that could accommodate those rights.  We were

trying to determine, solely for accounting purposes, how to value those option rights.  The option

price was $21.00 per square foot; therefore, the value of the option rights would be the fair market

value of the development rights less $21.00 per square foot.  As part of this process, we considered

whether the fair market value was as high as $100.00 per square foot (which we understood was a

possible range for their fair market value) or as low as $30.00 per square foot (which is the price the

Company's affiliate originally paid to purchase the property that was subsequently sold to the

District in the transaction in which the option was acquired).

7.    In addition, we considered the risks associated with the exercise of the option rights.

For example, if there was a possibility that we could not move them, in whole or in part, it would be

reasonable to reduce the value of the option for accounting purposes.  As with any prudent investor,

the Company's goal was to reduce the potential tax liability using generally accepted accounting

principles.

8.    Solely in that context, we discussed whether the real estate known as the "Bus

Garage Property" was a possible property to which some of those development rights could be

2

moved. I understood that the Company had been awarded the right to negotiate exclusively for the purchase of the WMATA properties, including the Bus Garage Property, but otherwise I did not know, and I do not know, exactly what the Company's rights are or are claimed to be in the Bus Garage Property.

9.      I chose to value the option concerning the 172,559 square feet of development rights in recognition of the fact that we might not exercise the option with the District for lack of sufficient land to accommodate the development rights. For example, if the Company chose not to acquire the Bus Garage Property for reasons associated with the market, or if the option expired before the Company acquired the Bus Garage Property, then we might not have another property or properties to which the development rights could be relocated. Because of those risks, among others, we lowered our estimated value of the option rights, but we did not assign them a zero value.

10.     As indicated above, my general understanding at the time was that we did not own the Bus Garage Property but that the Company had the exclusive right to negotiate for the purchase of the Bus Garage Property and other WMATA properties. I do not recall the exact source of my information, although I did review the December 12, 2005 Letter of Intent signed with the Anacostia Waterfront Corporation and the Special Warranty Deed that referenced the purchase option with the District. I wrote an email on February 21, 2007, shown on page MON0006681, saying, among other things, that "all we got was a right to speak with them first." This was consistent with my understanding, which was that WMATA was the owner of the Bus Garage Property and we had the exclusive right to negotiate with WMATA concerning the Bus Garage Property. My subsequent comments reflected my understanding that, had WMATA first negotiated with Monument Realty and had those negotiations not resulted in the purchase of the Bus Garage

3

Property by Monument Realty, for whatever reason or reasons, then "WMATA was completely free to make any deal they wanted with any party they wanted."

11.     I was never involved in any discussions with WMATA or the District of Columbia about what rights the Company may have or claim in the Bus Garage Property. Other than to make accounting-related decisions, I was not involved significantly in such discussions with anyone in or outside of the Company (including the Company's affiliates). Beyond what I have expressed here, I simply do not know exactly what contract or other rights the Company has or claims in the Bus Garage Property.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on January 15, 2008.

Debra Volpicelli

# EXHIBIT E

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| MONUMENT REALTY LLC, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. 1:07-cv-01821 (EGS) |
| | ) | Judge Emmet G. Sullivan |
| WASHINGTON METROPOLITAN | ) | |
| AREA TRANSIT AUTHORITY, | ) | |
| | ) | |
| Defendant. | ) | |

## SUPPLEMENTAL DECLARATION OF LOUIS E. DOLAN, JR.

I, Louis E. Dolan, Jr., depose and state as follows:

1.      My name is Louis E. Dolan, Jr.  I am over the age of eighteen and competent to make this declaration.  I make this declaration based on my personal knowledge.

2.      I am a partner with the law firm of Nixon Peabody LLP, located at 401 9th Street, N.W., Suite 900, Washington, D.C. 20009.  I represent Plaintiffs Monument Realty LLC and MR Ballpark 7 LLC in this action.

3.      Exhibit 92 is a chronology of key events in this case prepared by counsel for Plaintiffs for use by the Court in aid of its deliberations.  This chronology is based on exhibits introduced as evidence in this case, as indicated in the chronology.  The chronology is offered in evidence pursuant to Federal Rule of Evidence 1006.  Duplicates of the documents referenced in the chronology have been provided to the Defendant.

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.  Executed on January 16, 2008.

Louis E. Dolan, Jr.

# EXHIBIT F

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

———————————————————

MONUMENT REALTY LLC, et al.,    )
    )
      Plaintiffs,    )
    )
    v.    )
    )    Civil Action No. 1:07-cv-01821 (EGS)
    )    Judge Emmet G. Sullivan
WASHINGTON METROPOLITAN    )
AREA TRANSIT AUTHORITY,    )
    )
      Defendant.    )
———————————————————)

**<u>SUPPLEMENTAL DECLARATION OF F. RUSSELL HINES</u>**

F. Russell Hines, being duly sworn, deposes and states as follows:

1.     My name is F. Russell Hines. I am over the age of eighteen and competent to testify in this case. I make this declaration based on my personal knowledge.

2.     I am Executive Vice President of Monument Realty LLC, one of the Plaintiffs in this case. I have served in that role at Monument Realty since October 1998.

3.     On two separate occasions in 2007, WMATA advised Monument that it was "on hold" with respect to negotiating with Monument for disposition of the Southeast Bus Garage and that it wanted to "wait and see" whether Monument completed construction on the interior of the Navy Yard Metrorail Station site before negotiating with Monument. WMATA claimed as late as September 27, 2007 when it declared the John Akridge Company the winning bidder, that Monument was seven weeks behind schedule with respect to that construction.

4.     On January 15, 2007, Monument's affiliate, MR BP Office #1, LLC advised WMATA that its construction activities required to be completed by Monument had been completed and turned the project over to WMATA for final completion.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on January 16, 2008.

_____
F. Russell Hines