**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

```
_____
                               )
MONUMENT REALTY LLC, et al.,    )
                               )
            Plaintiffs,         )
                               )   Civil Action No. 07-1821 (EGS)
        v.                      )
                               )
WASHINGTON METROPOLITAN AREA    )
TRANSIT AUTHORITY,              )
                               )
                               )
            Defendant.          )
_____)
```

## Memorandum Opinion

Monument Realty, LLC ("Monument"), and its affiliate MR
Ballpark 7, LLC ("MRB 7"), collectively referred to as
plaintiffs, commenced this action against the Washington
Metropolitan Area Transit Authority ("WMATA") alleging that WMATA
breached its contract to sell Monument real property, known as
the Southeast Bus Garage ("Bus Garage"), located in the District
of Columbia, and, in doing so, also committed fraud and breach of
fiduciary duty.  Plaintiffs also challenge WMATA's decision to
accept a competitive bid from the John Akridge Company
("Akridge") to purchase the Bus Garage.  Pending before the Court
is defendant's motion to dismiss the amended complaint pursuant
to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil
Procedure.  Defendant argues that plaintiffs fail to state a
claim upon which relief can be granted and that the Court lacks
subject matter jurisdiction because of WMATA's sovereign
immunity.  Upon consideration of the motion, the response and

reply thereto, supplemental memoranda, the arguments made at the hearing on January 23, 2008, and the applicable law, the motion is **GRANTED** in part and **DENIED** in part.

## I.   Background

### A.   Parties

Monument and MRB 7 are limited liability companies doing business in the District of Columbia. Amend. Compl. ¶¶ 1-2. MRB 7 was created by Monument on July 18, 2007 for the purpose of purchasing the Southeast Bus Garage, which is located in the Ballpark District of Washington, D.C.[1] Amend. Compl. ¶ 2.

WMATA was created in 1966, when Congress, acting pursuant to the Compact Clause of the Constitution, U.S. Const. art. I, § 10, cl. 3, approved the Washington Metropolitan Area Transit Authority Compact between Maryland, Virginia, and the District of Columbia ("Compact") to deal with growing traffic problems in the Washington area. *See* Pub.L. No. 89-774, 80 Stat. 1324 (1966) (codified as amended at D.C. Code Ann. § 1-2431 (1992)); H. Rep. No. 89-1914, at 5-6 (1966). Responsible for creating a coordinated public transportation system for the region, WMATA now operates an extensive Metrobus and Metrorail system running

---

[1] The Ballpark District is a planning area in Southeast, Washington, D.C., directly adjacent to and including the new Washington Nationals baseball stadium currently under construction. It is bounded by the Southwest-Southeast Freeway to the North, South Capitol Street to the West, New Jersey Avenue, S.E. to the East, and the Anacostia River to the South. *See* Amend. Compl. at 1-2. The property at issue is located at Lots 857 and 866, Square 700, commonly known as the Southeast Bus Garage, and includes an adjacent surface parking lot. *See* Amend. Compl. at 1.

throughout northern Virginia, the District, and two Maryland counties. *Beebe v. WMATA*, 129 F.3d 1283, 1285 (D.C. Cir. 1997). WMATA is the record owner of the real property at issue, the Bus Garage.

### B.    Procedural History

On October 26, 2007, plaintiffs filed a twelve-count amended complaint alleging that WMATA is liable for breach of contract, fraud, breach of fiduciary duty, failure to formulate and follow policies concerning the disposition of real property, and challenging WMATA's decision to award the bid for the Bus Garage to Akridge.[2]  Plaintiffs seek a declaratory judgment, specific performance, injunctive relief, and imposition of a constructive trust.  In response, WMATA filed a motion to dismiss all counts in the amended complaint based on plaintiffs' failure to state a claim upon which relief can be granted and arguing that WMATA's sovereign immunity precludes the Court from exercising subject

---

[2]  Plaintiffs' complaint contained the following counts: Count 1- Declaratory Judgment; Count 2- Specific Performance; Count 3- Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction; Count 4- Breach of Contract; Count 5- Imposition of Constructive Trust; Count 6- Breach of Fiduciary Duty; Count 7- Fraud; Count 8- WMATA breached its Compact by failing to formulate policies, procedures, rules or regulations governing the disposition of its real property; Count 9- WMATA's decision to award the contract for the purchase of its WMATA Bus Garage violated its own PPM or other unpublished internal procedures, was not rational, was arbitrary and capricious, an abuse of discretion, and/or not in accordance with laws; Count 10- WMATA acted irrationally in concluding that the Akridge bid offered the highest possible economic return, and the award to Akridge was illegal; Count 11- WMATA acted illegally in accepting the Akridge bid because the bid was "conditionally submitted"; Count 12- WMATA acted illegally in accepting the Akridge bid because the bid offered terms other than those sought by the IFB.

matter jurisdiction over the tort claims.[3]

### C.    Plaintiffs' Allegations

#### 1.    Master Development Plan for the Ballpark District

In response to Major League Baseball's 2004 announcement that the League was considering relocating the Montreal Expos baseball franchise to Washington, D.C., the District of Columbia government created the Anacostia Waterfront Corporation ("AWC"). Amend. Compl. ¶ 9. The AWC's mission was to develop and revitalize the underutilized public lands along the Anacostia River by: 1) developing a comprehensive "Master Development Plan" for the area surrounding the baseball team's new stadium ("the Ballpark District"); 2) acquiring property in the Ballpark District; and 3) conveying the acquired property to selected Master Developers. *Id.* ¶ 11.

WMATA owned several properties within the Half Street Area of the Ballpark District, including the Navy Yard Metro Station site and the Southeast Bus Garage, and the AWC sought to acquire and develop those properties as a part of its Master Development Plan. *Id.* ¶ 15. WMATA initially issued a Joint Development Solicitation ("JDS"), inviting real estate developers to jointly develop with WMATA the properties it owned in the Ballpark District. *Id.* ¶ 16. The District of Columbia, however,

---

[3] On January 2, 2008, plaintiffs filed a motion for a preliminary injunction. That motion will be addressed in a separate opinion.

requested that WMATA cancel the JDS and participate in the master development process. *Id.* ¶ 17. WMATA subsequently withdrew the JDS, and thereafter coordinated with the AWC in implementing the Master Development Plan. *Id.*

### 2. Monument Designated as Master Developer of the Half Street Area of the Ballpark District

In December 2005, the AWC designated Monument as Master Developer for the Half Street Area of the Ballpark District, and Monument and the AWC signed a Letter of Intent memorializing their respective rights and duties. *Id.* ¶ 23. As Master Developer, Monument was given the opportunity to negotiate exclusively to acquire and develop projects within the Half Street Area, once the properties had been acquired by the District of Columbia. *Id.* ¶¶ 23-24. At the time that Monument and the AWC entered their agreement, the District of Columbia did not own any properties in the Half Street Area, but was seeking to acquire those properties from WMATA.[4] *Id.* Ex. F. at 1.

Plaintiffs allege that WMATA was aware that Monument had been awarded the right to negotiate exclusively with the AWC to purchase any properties the District of Columbia acquired within the Half Street Area of the Ballpark District. Amend. Compl. ¶¶

---

[4] On December 12, 2005, the AWC issued a press release that stated, "The team of Monument Realty, LLC . . . will . . . have the opportunity to enter into exclusive negotiations with AWC to develop different mixed-use projects on two publicly owned sites that AWC is presently seeking to acquire near the ballpark." Amend. Compl. Ex. F. at 1.

25-28.  Further, plaintiffs allege that, based on WMATA's policies and procedures, WMATA had an obligation to offer the District of Columbia the right of first refusal to purchase any property within the District of Columbia that WMATA intended to sell.  *Id.* ¶ 62.  In view of Monument's agreement with the District of Columbia, plaintiffs allege that Monument was an intended third-party beneficiary of WMATA's agreement to offer the District the right of first refusal to purchase WMATA-owned property located in the Ballpark District.

### 3.  WMATA's Agreement with Monument

In addition to plaintiffs' allegation that Monument was a third-party beneficiary of WMATA's agreement with the District of Columbia, plaintiffs also allege that a contractual relationship existed between Monument and WMATA.  According to plaintiffs, in May 2006, Monument and WMATA became frustrated at the slow pace of the AWC's progress in implementing the Master Development Plan and began engaging in direct negotiations to convey WMATA's property in the Half Street Area to Monument.  *Id.* ¶ 30.  Plaintiffs contend that, during these direct negotiations and at WMATA's request, Monument agreed that the conveyance could take place in three phases to accommodate WMATA's immediate need to sell the Navy Yard Metro Station site and to give WMATA time to determine how and where to relocate the Bus Garage.  *Id.* ¶ 30.

In December 2006, Monument implemented what it considered to

be Phase One of the multi-phased agreement with WMATA and submitted an unsolicited offer to WMATA to purchase the Navy Yard Metro Station. *Id.* ¶ 35. After receiving Monument's unsolicited offer, WMATA issued an Invitation for Bids ("IFB") for the Navy Yard Metro Station. *Id.* ¶¶ 34-36. Monument was the only developer to respond to the IFB. In December 2006, WMATA sold the Navy Yard Metro Station to Monument. *Id.* Plaintiffs allege that it was understood by the AWC, the District of Columbia, and WMATA that Monument would continue to have exclusive rights to negotiate for the remaining property owned by WMATA in the Ballpark District, namely the Bus Garage. *Id.* ¶¶ 38-39.

After purchasing the Navy Yard Metro Station, Monument began what it considered to be Phase Two, taking steps that conferred benefits to WMATA, including: agreeing to complete the WMATA Navy Yard Metro Station expansion in time for opening day of the 2008 Washington Nationals' baseball season; accommodating WMATA's employee parking requirements; closing alleyways in the Half Street Area to benefit WMATA; and ensuring the WMATA Bus Garage was not designated as a historical site, thereby enhancing the fair market value of the property. *Id.* ¶¶ 41-42. These benefits were allegedly given in reliance on, and in consideration for, Monument's right to negotiate exclusively to purchase WMATA's Bus Garage. *Id.* ¶¶ 40-45, 51-54.

In April 2007, Monument learned that WMATA had secured an

7

alternative location for the Bus Garage.  Because the
precondition to acquiring the Bus Garage had been satisfied,
Monument initiated Phase Three and delivered to WMATA an
unsolicited bid to purchase the Bus Garage.  *Id.* ¶¶ 55-56.

### 4. WMATA Issues IFBs for the Bus Garage

After receiving Monument's unsolicited bid to purchase the
Bus Garage, WMATA obtained authorization from its Board of
Directors to dispose of the property.  WMATA then issued IFB 07-
3, with a bid deadline of July 23, 2007, for the sale of the Bus
Garage.  *Id.* ¶¶ 59-60.  According to Monument, before the bidding
closed, the District of Columbia exercised its right of first
refusal and informed WMATA that it was interested in purchasing
the Bus Garage.  *Id.* ¶ 61.  In deference to the District's
request, WMATA withdrew the IFB and initially agreed to sell the
property to the District.  *Id.* ¶ 62.  Plaintiffs allege that
"when the District explained that it wanted to assign its rights
to Monument or have WMATA sell the property directly to Monument,
WMATA [] reneged on its commitments," and did not consummate the
sale.  *Id.* ¶ 62.

WMATA then issued IFB 08-1 for the sale of the Bus Garage,
with a bid deadline of August 28, 2007.  *Id.* ¶¶ 65-68.  The IFB
stated that the sole criterion for the winning bid would be: "The
bid which represents the best net return to WMATA after leaseback
monthly rent for WMATA's anticipated lease term (which may, in

WMATA's sole discretion be less than 36 months) is deducted from the Bid Amount." *Id.* ¶ 66.

Monument protested the issuance of the IFB, arguing that the IFB breached WMATA's agreement to negotiate exclusively with Monument for the sale of the Bus Garage. *Id.* ¶¶ 68, 82, 102; *see also id.* Ex. K. In order to protect its interest in the Bus Garage, however, Monument's affiliate, MRB 7, submitted two bids. *Id.* ¶¶ 68-70. The first bid was for the minimum price of $60 million, with no charge for leaseback rental. *Id.* ¶ 71. The second bid contained an escalating bid clause, in which MRB 7 agreed to pay $250,000 more than any other qualified bidder. *Id.* ¶ 72.

Two other bidders responded to the IFB, one of which was the John Akridge Company. *Id.* ¶ 75. Akridge submitted a bid for $69.25 million, and offered to charge $110,000 per month in rent for months 1-12 to lease back the Bus Garage, and $430,000 per month for months 13-36. *Id.* ¶ 76. Akridge also included in its bid an offer to commence negotiations with WMATA to temporarily relocate the Bus Garage onto Akridge property. Akridge's bid was accompanied by a cover letter from Akridge's counsel, stating that the bid was "submitted conditionally." *Id.* On September 24, 2007, WMATA staff publically posted its recommendation that the Board accept the Akridge bid. *Id.* ¶ 80.

After WMATA announced its recommendation to award the bid to

9

Akridge, plaintiffs filed another protest with WMATA objecting to the bid process itself and alleging that WMATA violated its Procurement Procedures Manual ("PPM"). Specifically, plaintiffs contend that WMATA improperly considered the Akridge bid on the grounds that the bid was submitted conditionally and offered terms other than those sought by the IFB, i.e. an offer to help WMATA relocate its Bus Garage, thereby rendering the bid nonresponsive. *Id.* ¶¶ 76-82.

In response to plaintiffs' concerns that WMATA breached its agreement with Monument, Carol O'Keeffe, WMATA's General Counsel, sent a letter to Jeffrey Neal, the president of Monument, denying the existence of a contractual obligation to sell the Bus Garage to Monument. *Id.* Ex. L. In response to plaintiffs' challenge to the bid process, representatives of WMATA allegedly denied that the PPM applied to the disposition of the Bus Garage. *Id.* ¶¶ 83-98, 103.

## II. Standard of Review

### A. 12(b)(1)

On a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), the plaintiff bears the burden of establishing that the court has subject matter jurisdiction. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Sovereign immunity serves as a bar to the court's subject matter jurisdiction. 28 U.S.C. § 1330(a); *Auster v.*

*Ghana Airways Ltd.*, 2008 WL 268919, *4 (D.C. Cir. 2008) (citing *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 493-94 (1983)).  Because subject matter jurisdiction focuses on the court's power to hear the claim, however, the court must give the plaintiffs' factual allegations closer scrutiny when resolving a Rule 12(b)(1) motion than would be required for a Rule 12(b)(6) motion for failure to state a claim.  *Macharia v. United States*, 334 F.3d 61, 64, 69 (D.C. Cir. 2003).  Indeed, to determine whether it has jurisdiction over the claim, the court may consider materials outside the pleadings.  *Herbert v. Nat'l Acad. of Sciences*, 974 F.2d 192, 197 (D.C. Cir. 1992).

**B.    12(b)(6)**

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for dismissal of a complaint where the plaintiff fails "to state a claim upon which relief may be granted."  Fed. R. Civ. P. 12(b)(6).  As a general matter, the Federal Rules require only that a plaintiff provide "a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."  *See Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007) (citing Fed. R. Civ. Pro. 8(a)(2)).  In *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007), the United States Supreme Court discussed the standard of pleading that a plaintiff must meet in order to survive a motion to dismiss under Rule 12(b)(6).  The Court

11

stated that the facts alleged in the complaint "must be enough to raise a right to relief above the speculative level," *id.* at 1965, or must be sufficient "to state a claim for relief that is plausible on its face." *Id.* at 1974.  The Court referred to this as "the plausibility standard," *id.* at 1968, but emphasized that it was not imposing a heightened fact pleading of specifics or a probability requirement at the pleading stage.  *Id.* at 1973-74.

The court "must accept as true all of the factual allegations contained in the complaint." *Kassem v. Wash. Hosp. Ctr.,* 2008 WL 169784, *4 (D.C. Cir. 2008) (quoting *Erickson*, 127 S. Ct. at 2200).  *See also Twombly*, 127 S. Ct. at 1965; *Brown v. Dist. of Columbia*, 2008 WL 268899, *1 (D.C. Cir. 2008). "Detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion to dismiss, but a plaintiff must furnish "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action."  *Twombly*, 127 S. Ct. at 1964-65.  The complaint is construed liberally in the plaintiffs' favor, "with the benefit of all reasonable inferences alleged," *In re Sealed Case*, 494 F.3d 139, 145 (D.C. Cir. 2007), but the court need not accept inferences unsupported by facts in the complaint, nor must the court accept plaintiffs' legal conclusions.  *Kowal v. MCI Commc'n Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).  As the Supreme Court recently noted, "a well-pleaded complaint may proceed even if it strikes a savvy

12

judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Twombly*, 127 S. Ct. at 1965 (internal citations omitted).

The court is limited to considering facts alleged in the complaint, any documents attached to or incorporated in the complaint, matters of which the court may take judicial notice, and matters of public record. *See E.E.O.C. v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).

## III. Analysis

### A.    Breach of Contract

WMATA argues that plaintiffs' claim for breach of contract should be dismissed because the alleged agreement to negotiate exclusively with WMATA to purchase the Bus Garage is nothing more than an unenforceable agreement to negotiate, fails to comport with the statute of frauds, and was not entered into by a representative of WMATA who had the authority to bind WMATA. Plaintiffs raise at least two theories in support of their breach of contract claim.  On the one hand, plaintiffs allege that a contractual relationship arose directly between Monument and WMATA as a result of the parties' negotiations throughout WMATA's involvement in the Master Development Plan.  Alternatively, plaintiffs allege that Monument was an intended third-party beneficiary of WMATA's agreement to offer the District of Columbia the right of first refusal to purchase the Bus Garage.

Under either theory, the Court finds that plaintiffs have
adequately pled the existence of an enforceable agreement, and
thus WMATA's motion to dismiss the breach of contract claim is
**DENIED**.

### 1.    Agreement to Negotiate

WMATA argues that even if the Court accepts plaintiffs'
factual allegations as true, plaintiffs have articulated nothing
more than an agreement to negotiate, which is unenforceable at
law.  Under District of Columbia law, a valid and enforceable
contract requires both: (1) an intention of the parties to be
bound; and (2) agreement as to all material terms.  *Steven R.
Perles, P.C. v. Kagy*, 473 F.3d 1244 (D.C. Cir. 2007).  "A
contract must be sufficiently definite as to its material terms
(which include, e.g., subject matter, price, payment terms,
quantity, quality, and duration) that the promises and
performance to be rendered by each party are reasonably certain."
*Eastbanc, Inc. v. Georgetown Park Assoc. II, L.P.*, 2008 WL
145096, *4 (D.C. 2008) (citing *Rosenthal v. Nat'l Produce Co.*,
573 A.2d 365, 370 (D.C. 1990).  However, "[a]ll the terms
contemplated by the agreement need not be fixed with complete and
perfect certainty for a contract to [be enforceable]."
*Rosenthal*, 573 A.2d at 370 (quoting *V'Soske v. Barwick*, 404 F.2d
495, 500 (2d Cir. 1968)).  A contract is enforceable if it is
"sufficiently definite so that the parties can be reasonably

14

certain as to how they are to perform." *Eastbanc, Inc.*, 2008 WL
145096 at *4 (citing *Duffy v. Duffy*, 881 A.2d 630, 638 (D.C.
2005)).  Moreover, "the terms of the contract [must be] clear
enough for the court to determine whether a breach has occurred
and to identify an appropriate remedy...." *Affordable Elegance
Travel, Inc. v. Worldspan, L.P.*, 774 A.2d 320, 327 (D.C. 2001).

    WMATA relies on *Novecon v. Bulgarian-American Enterprise
Fund*, 190 F.3d 556 (D.C. Cir. 1999), to support its argument that
plaintiffs have articulated an unenforceable agreement to agree.
In *Novecon*, the court held that the parties were not bound by
preliminary agreements, unless the evidence presented clearly
indicates that they intended to be bound at that point.  *Id.* at
565.  *Novecon*, however, was decided on a motion for summary
judgment, and that court could consider evidence outside the
pleadings to determine the intent of the parties.  *Id.*  At this
stage of the proceedings, however, this Court must accept
plaintiffs' allegations as true in deciding defendant's motion to
dismiss.  *See Kassem,* 2008 WL 169784 at *4.

    Plaintiffs contend that District of Columbia courts have
enforced preliminary agreements and agreements to negotiate, upon
finding that the parties agreed to the material terms and
demonstrated an intent to be bound.  Pls.' Opp'n 5.  *See BWX
Elec. v. Control Data Corp.*, 929 F.2d 707, 708 (D.C. Cir. 1991)
(finding the letter of intent to be an enforceable contract when

15

signed by the parties and provided that defendant agreed to
negotiate exclusively to sell his business to plaintiff, in
exchange for a non-refundable deposit); *Ammerman v. City Stores
Co.*, 394 F.2d 950, 953 (D.C. Cir. 1968) (finding an enforceable
contract when plaintiff, a department store, provided defendant,
a developer, assistance in acquiring a shopping center in
exchange for the promise that plaintiff would be given an
opportunity to become a tenant in the shopping center "with
rental terms at least equal to that of any other department
store"); *Eastbanc, Inc.*, 2008 WL 145096 (holding that defendant's
agreement to use his right of first refusal to assist plaintiff
purchase property, in exchange for interest in the entity formed
to purchase the property, was enforceable); *WDC Baseball Partners
LLC v. Dist. of Columbia, et al.*, Civil Action No. 2006 CA 008250
B (D.C. Sup. Ct. Nov. 30, 2007) (Leibovitz, J.) (finding an
enforceable contract establishing a binding commitment to
negotiate in good faith when: 1) plaintiffs and the District of
Columbia signed a letter of intent to immediately commence
negotiations; 2) parties negotiated an Exclusive Rights
Agreement, though it remained unsigned; 3) the Mayor had received
authorization from the D.C. Council to convey the property to
plaintiffs; and 4) plaintiffs expended money and effort in
reliance on the agreement).

Here, plaintiffs allege that Monument had an enforceable

agreement with the District of Columbia to negotiate exclusively
to purchase property acquired by the District in the Half Street
Area of the Ballpark District.  This agreement was memorialized
in the letter of intent between plaintiffs and the AWC and
provided that Monument would have the "opportunity to enter into
exclusive negotiations with AWC."  Amend. Compl. Ex. F at 1.
Moreover, plaintiffs allege that WMATA agreed to offer the
District of Columbia the right of first refusal to purchase any
property that WMATA intended to sell in the District, and that
WMATA knew the District intended to convey any property that it
acquired to Monument.  Plaintiffs also allege that Monument spent
considerable resources in reliance on these collective
agreements.  Based on these facts, plaintiffs argue that Monument
was a third-party beneficiary of the agreement between WMATA and
the District of Columbia, and thus is "entitled to enforce
WMATA's agreement with and obligations to offer the subject
property to the District at fair market value."  Pls.' Opp'n 17.

District of Columbia law recognizes that one who is not a
party to a contract may nonetheless sue to enforce the contract's
provisions if the contracting parties intend the third party to
benefit directly thereunder.  *See W. Union Tel. Co. v. Massman
Constr. Co.*, 402 A.2d 1275, 1277 (D.C. 1979); *Moran v. Audette*,
217 A.2d 653, 654 (D.C. 1966); *Aetna Cas. & Sur. Co. v.
Kemp-Smith Co.*, 208 A.2d 737, 738-39 (D.C. 1965).  Courts must

17

read the contract as a whole to determine whether the third party's benefit under the contract is intended or incidental.  *W. Union Tel. Co.*, 402 A.2d at 1277.  The absence of the third party's name from the contract is not fatal to his claim when the surrounding circumstances tend to identify the third-party beneficiary.  *Id.*

Plaintiffs' allegations arguably support an inference that enforceable agreements existed between Monument and the District of Columbia and between the District of Columbia and WMATA.  In order to determine whether Monument was an intended third-party beneficiary of the agreement between the District of Columbia and WMATA, the Court would need to consider that agreement and its terms, as well as evidence outside the pleadings.  *Id.*  At this stage of the proceedings, however, the Court must accept plaintiffs' factual allegations in the amended complaint as true.  *See E.E.O.C.*, 117 F.3d at 624.  Because plaintiffs have alleged facts to support an inference that Monument was an intended third-party beneficiary of the agreement between the District of Columbia and WMATA, they have adequately stated a breach of contract claim.

## 2.  Authority to Bind WMATA

WMATA next argues that plaintiffs' breach of contract claim fails because they do not identify anyone with the authority to contractually bind WMATA.  WMATA is a quasi-governmental agency,

and therefore only individuals with actual authority, not merely apparent authority, can bind WMATA to an agreement. *See Littlejohn v. WMATA*, 1992 WL 122755 (D.D.C. 1992)("Despite satisfying the two prongs that make up apparent authority, the court finds that WMATA is not bound by Morrison's representations to plaintiff because the doctrine of apparent authority does not apply to dealings with the government."). Agreements made by government employees beyond the scope of their actual authority do not bind the government. Parties bear the burden of determining whether the government agent does in fact have the requisite authority to contract on the government's behalf. *Gary v. United States,* 67 Fed. Cl. 202, 212 (Fed. Cl. 2005)("It is well established that the government is not bound by the acts of its agents beyond the scope of their actual authority. Anyone asserting the existence of a contractual relationship with the United States has the burden of discovering whether the government agent has contracting authority.") (internal citations omitted).

Plaintiffs argue that even in the absence of express actual authority, WMATA could be bound either by the actions of an individual with implied actual authority or if the unauthorized agreement was subsequently ratified. *See SGS-92-X003 v. United States*, 74 Fed. Cl. 637, 650 (Fed. Cl. 2007); *Silverman v. United States*, 230 Ct. Cl. 701, 710 (Fed. Cl. 1982).

19

Plaintiffs rely on *SGS-92-X003,* in which the Court of Federal Claims denied summary judgment based on the existence of genuine issues of material fact as to whether a law enforcement agent had authority to enter a contract to bind the federal government.  In that case an informant sued the government based on a promise made by a special agent to pay her a twenty-five percent commission for every drug bust in which she provided assistance.  *SGS-92-X003*, 74 Fed. Cl. at 639.  The government denied that the special agent who entered the agreement with plaintiff had the authority to do so, thus undermining the existence of a contract.  *Id.*

The *SGS-92-X003* court outlined four scenarios in which the government could be bound by the special agent's agreement: (1) if the special agent had express actual authority; (2) if the special agent had implied actual authority; (3) if an individual with authority subsequently ratified the agreement; or (4) if the institution itself subsequently ratified the agreement.  *Id.* at 651-654.

A government agent possesses express actual authority to contractually bind the government only when the constitution, a statute, or a regulation grants such authority to that agent in unambiguous terms.  *Id.* at 651 (citing *Tracy v. United States*, 55 Fed. Cl. 679, 682 (Fed. Cl. 2003).  In *SGS-92-X003*, plaintiff failed to identify any statutory or regulatory authority which

20

granted the special agent, in unambiguous terms, the authority to enter into the contract. *SGS-92-X003*, 74 Fed. Cl. at 651. Thus, the court found that there was no basis for express actual authority. *Id.*

A government official possesses implied actual authority "when such authority is considered to be an integral part of the duties assigned to a government employee." *Id.* at 652. Contracting authority is integral to an employee's duties when the employee cannot perform his assigned tasks without such authority and when the relevant agency's regulations do not grant the authority to other agency employees. *Id. See also Roy v. United States*, 38 Fed. Cl. 184, 190 n.18 (Fed. Cl. 1997) (noting that express actual authority to make and approve payments could be the predicate for the implied authority to contract). The *SGS-92-X003* court found that "the record is unclear as to whether the ability to promise an undercover informant commissions was essential to [the agent's] duties as head of DEA's Ft. Lauderdale Office, director of Operation Princess, and head of the South Florida Drug Task Force." *SGS-92-X003*, 74 Fed. Cl. at 652. Thus, a material issue of fact existed as to whether the special agent did in fact possess implied actual authority. *Id.*

The *SGS-92-X003* court found that the government could also be bound by the agreement if, despite an initial lack of authorization, the government subsequently ratified it. *Id.* at

21

654. Ratification is "the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him." *Id.* (citing *Schism v. United States*, 316 F.3d 1259, 1289 (Fed. Cir. 2002), cert. denied 539 U.S. 910 (2003), (quoting Restatement (Second) of Agency § 82 (1958))). Ratification can either be accomplished by an individual with authority to contract or by the institution when it seeks and receives the benefits from an otherwise unauthorized contract. *SGS-92-X003*, 74 Fed. Cl. at 654. *See also Janowsky v. United States*, 133 F.3d 888, 891-92 (Fed. Cir. 1998) (reversing grant of summary judgment where material issues of fact existed as to whether the FBI ratified a contract by allowing a sting operation to continue and receiving benefits from it); *Silverman*, 679 F.2d at 870-71 ("By accepting the benefits flowing from the senior FTC official's promise of payment, the FTC ratified such promise and was bound by it."). Thus, the *SGS-92-X003* court concluded that material issues of fact existed as to whether the agreement entered by the special agent had been subsequently ratified by either someone with authority or by the FBI itself. *SGS-92-X003*, 74 Fed. Cl. at 654.

In the present case, in addition to alleging that Monument was a third-party beneficiary of the agreement between WMATA and the District of Columbia, Monument also alleges an agreement with

22

WMATA for the right to negotiate exclusively to purchase the Bus Garage. This contract was negotiated directly through various agents of WMATA, including Gary Malasky, the now-former Director of WMATA's Office of Property Development and Management, and Nat Bottigheimer, a contracting officer for WMATA. Pls.' Opp'n 13-14. Without knowing the job duties and responsibilities of the individuals with whom plaintiffs allegedly negotiated, and the course of dealing between those individuals, the Court cannot determine at this juncture as a matter of fact or law that those individuals did not have implied actual authority to negotiate on WMATA's behalf. *See SGS-92-X003*, 74 Fed. Cl. at 652.

Plaintiffs further allege that Monument conferred substantial benefits on WMATA in consideration for exclusive negotiation rights to the Bus Garage. Even if the individuals with whom plaintiffs negotiated had neither express nor implied actual authority, accepting plaintiffs' factual allegations as true, WMATA could have subsequently ratified any unauthorized agreement by seeking and receiving a benefit from the contract. *See id.* at 654 (citing *Janowsky*, 133 F.3d at 891-92). At this stage of the proceedings, without considering evidence outside the pleadings, the Court cannot conclude that the alleged agreement between Monument and WMATA is necessarily unenforceable based on a lack of authority to bind WMATA. *See Kassem,* 2008 WL 169784 at *4.

23

### 3. Statute of Frauds

The statute of frauds provides that agreements for the sale of property, and agreements to negotiate to purchase property, must be in writing and signed by the obligated party. *See Ammerman*, 394 F.2d at 953, n.6 (citing D.C. Code Ann. § 28-3502); *Rosenkoff v. Finkelstein*, 195 F.2d 203, 204 (D.C. Cir. 1952). WMATA argues that the statute of frauds bars plaintiffs' breach of contract claim because plaintiffs failed to allege that an agreement to negotiate exclusively with WMATA existed in writing and was signed by an authorized representative of WMATA.

Plaintiffs allege that an unwritten agreement with WMATA is enforceable based on the doctrine of part performance.  The Court may refuse to allow the defendant to interpose a statute of frauds defense where the equitable doctrine of part performance, also known as promissory estoppel, is applicable. *Railan v. Katyal*, 766 A.2d 998, 1007-08 (D.C. 2001).  To bind a party to a contract under the theory of promissory estoppel, there must be evidence of a promise, the promise must reasonably induce reliance upon it, and the promise must be relied upon to the detriment of the promisee. *See Simard v. Resolution Trust Corp.*, 639 A.2d 540 (D.C. 1994).

Plaintiffs allege that as a result of direct negotiations between Monument and WMATA beginning in May 2006, WMATA agreed to sell Monument the Navy Yard Metro Station and the Bus Garage.

Monument agreed to allow the conveyance to take place in phases
to accommodate WMATA's immediate need to sell the Navy Yard Metro
Station site and to give WMATA time to determine how and where to
relocate the Bus Garage.  Amend. Compl. ¶ 30.  Pursuant to this
alleged agreement, Monument submitted an unsolicited offer to
purchase the Navy Yard Metro Station site in December 2006 and an
unsolicited offer to purchase the Bus Garage in May 2007.
Plaintiffs allege that in detrimental reliance on WMATA's
promise, Monument conferred benefits on WMATA including: agreeing
to complete the WMATA Navy Yard Metro Station expansion in time
for opening day of the 2008 Washington Nationals' baseball
season; accommodating WMATA's employee parking requirements;
closing alleyways in the Half Street Area to benefit WMATA; and
ensuring the WMATA Bus Garage was not designated as a historical
site, thereby enhancing the fair market value of the property.
*Id.* ¶¶ 41-42.  The Court finds that plaintiffs' allegations
support an inference that they have a viable defense to the
statute of frauds.

The Court also finds that plaintiffs have sufficiently pled
that Monument is a third-party beneficiary of the agreement
between WMATA and the District of Columbia.  *See supra* III.A.1.
To determine whether that agreement is governed by the statute of
frauds, the Court would need to consider evidence outside the
pleadings, which is inappropriate at this juncture.

25

Accepting the facts as pled and drawing all reasonable inferences in favor of plaintiffs, the Court concludes that it would be premature to dismiss plaintiffs' breach of contract claim at this stage of the proceedings. *See In re Sealed Case*, 494 F.3d at 145.

**B.    Bid Protest**

Plaintiffs challenge WMATA's decision to award the bid to purchase the Bus Garage to Akridge, and argue that the decision violated WMATA's Procurement Procedure Manual and was illegal, irrational, arbitrary, capricious, and an abuse of discretion. Specifically, plaintiffs argue that WMATA illegally considered the Akridge bid because it was submitted conditionally and the bid offered terms other than those sought by the IFB, thereby rendering the bid nonresponsive.[5]

The United States Court of Appeals for the District of Columbia Circuit has held that WMATA is treated as a federal agency for purposes of standing when a party seeks to challenge WMATA's procurement decisions in federal court. *Elcon Enters. v. WMATA,* 977 F.2d 1472, 1479-80 (D.C. Cir. 1992). "It is well settled that actions of a federal agency alleged to be arbitrary and capricious violations of the statutes and regulations

---

[5] Plaintiffs informed the Court at the January 23, 2008 Motions Hearing that they had abandoned their argument that WMATA acted irrationally in concluding that the Akridge bid offered the highest possible economic return over MRB 7's escalating bid (Count 10). Accordingly, Count 10 is dismissed.

governing the awards of federal contracts are subject to judicial review under § 706(2)(A) of the Administrative Procedure Act ("APA")." *See Gull Airborne Instruments, Inc. v. Weinberger*, 694 F.2d 838, 841, n.2 (D.C. Cir. 1982) (citing *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289 (D.C. Cir. 1971); *Scanwell Lab., Inc. v. Shaffer*, 424 F.2d 859 (D.C. Cir. 1970)). Accordingly, WMATA's procurement decisions must be in accordance with the APA and applicable federal law. *Elcon Enters.*, 977 F.2d at 1479-80 (applying the APA and applicable procurement law to a determine a bid protest claim against WMATA).

To successfully challenge WMATA's bid process, plaintiffs must demonstrate that WMATA's decision to award the Bus Garage to Akridge had "no rational basis" or the process by which it was reached "involved a clear and prejudicial violation of applicable statutes or regulations." *Elcon Enters.*, 977 F.2d at 1479-80 (citing *Kentron Hawaii, Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973)). *See also Delta Data Sys. Corp. v. Webster*, 744 F.2d 197, 204 (D.C. Cir. 1984). A court may not set aside a procurement decision on the grounds that the procuring agency potentially or actually violated applicable law in some trivial way; the violation must be clear and prejudicial. *See Irvin Indus. Canada, Ltd. v. United States Air Force*, 924 F.2d 1068, 1072 (D.C. Cir. 1990); *Kentron*, 480 F.2d at 1169. This burden is a "heavy" one. *Irvin Indus. Canada, Ltd.*, 924 F.2d at 1072.

This Court's refusal to demand any more of an agency's procurement decision than substantial compliance with applicable law and baseline substantive rationality is warranted, for "[j]udges are ill-equipped to settle the delicate questions involved in procurement decisions," *Delta Data*, 744 F.2d at 203, and to require any more of such decisions would make courts "the forum for all manner of objections." *M. Steinthal & Co.*, 455 F.2d at 1299.

Bid-responsiveness determinations focus on whether a bidder has unequivocally offered to perform, without exception, "the exact thing called for in a solicitation so that acceptance of the bid will bind the contractor to perform in accordance with all of the IFB's material terms and conditions." *In re: Walashek Indus. & Marine,* B-281577, 99-1 CPD ¶ 30, 1999 U.S. Comp. Gen. LEXIS 13, *3 (Comp. Gen. Jan. 29, 1999). *See also Toyo Menka Kaisha, Ltd. v. United States*, 597 F.2d 1371, 1377 (Fed. Cir. 1979). Where a bidder provides information within its bid that attempts to reduce, limit, or modify a material solicitation requirement, that bid is considered conditional and must be rejected as non-responsive. *In re: Antennas for Commc'n*, B-253950, 93-2 CPD ¶ 48, 1993 U.S. Comp. Gen. LEXIS 660, *1 (Comp. Gen. July 23, 1993). Conditions or limitations set forth in a cover letter can constitute a basis for rendering a bid non-responsive. *Id. See also In re: United States Coast Guard*, B-

28

252396, 93-1 CPD ¶ 286, 1993 U.S. Comp. Gen. LEXIS 348, *4 (Comp. Gen. March 31, 1993). Agencies must reject nonresponsive bids. *Prestex Inc. v. United States*, 320 F.2d 367, 372 (Fed. Cir. 1963) (footnote omitted) ("Rejection of nonresponsive bids is necessary if the purposes of formal advertising are to be attained, that is, to give everyone an equal right to compete for Government business, to secure fair prices, and to prevent fraud.").

Both parties rely on *Elcon Enterprises*, a case in which WMATA's procurement decisions were challenged by a disappointed bidder. In *Elcon Enterprises*, WMATA issued a Request for Proposal for Maintenance of Metrorail Elevators ("RFP"), which provided that WMATA would evaluate proposals using specific criteria.[6] *Elcon Enters.*, 977 F.2d 1472. Plaintiff challenged the bid, contending that WMATA acted arbitrarily and illegally by ignoring the recommendation of its staff to award the bid to plaintiff, holding a second round of bidding to reexamine the shortcomings in the submissions of the bidders, and awarding the decision to a competitor with whom WMATA had engaged in *ex parte* communications. *Id.* at 1480-1481. The court ultimately upheld WMATA's decision to award the contract to the competitor upon finding that plaintiff was unable to meet its "heavy" burden of identifying a statute or regulation that WMATA had clearly and

---

[6] In *Elcon Enterprises*, WMATA utilized competitive negotiation procedures, rather than the sealed bid process used in the case presently before the Court. *Elcon Enters.*, 977 F.2d at 1475.

prejudicially violated. *Id.* at 1483. The *Elcon Enterprises*
decision, however, was rendered at the summary judgment stage,
where the court was able to closely examine the evidence,
including the RFP, the proposals submitted in response, and the
*ex parte* communications, in order to determine whether applicable
laws had been violated.

Here, WMATA issued an IFB for the disposition of the Bus
Garage, which stated that the sole criterion for the winning bid
would be: "[t]he bid which represents the best net return to
WMATA after leaseback monthly rent for WMATA's anticipated lease
term (which may, in WMATA's sole discretion be less than 36
months) is deducted from the Bid Amount." Amend. Compl. ¶ 66.
Although Akridge's bid offered a fixed price to purchase the Bus
Garage and a monthly leaseback rental fee, as requested in the
IFB, the Akridge bid also included an offer to help WMATA
temporarily relocate its Bus Garage. Plaintiffs argue that
Akridge's extraneous offer rendered the bid nonresponsive because
the bid was no longer an unequivocal offer to perform, without
exception, the exact thing called for in a solicitation. *See In
re: Walashek Indus. & Marine,* B-281577, 99-1 CPD ¶ 30, 1999 U.S.
Comp. Gen. LEXIS 13 at *3. Additionally, the Akridge bid was
accompanied by a cover letter that stated the offer was submitted
conditionally. Procurement law provides that conditions or
limitations set forth in a cover letter can constitute a basis

30

for rendering a bid non-responsive.  *In re: Antennas for Commc'n*,
B-253950, 93-2 CPD ¶ 48, 1993 U.S. Comp. Gen. LEXIS 660 at *1.
*See also In re: United States Coast Guard*, B-252396, 93-1 CPD ¶
286, 1993 U.S. Comp. Gen. LEXIS 348 at *4.

Unlike the plaintiffs in *Elcon Enterprises*, plaintiffs here
have identified regulations that would indicate that WMATA
clearly and prejudicially violated applicable procurement law by
awarding the bid to Akridge, a nonresponsive bidder.  Because the
Court must accept plaintiffs' factual allegations as true at this
preliminary stage of the proceedings, the Court concludes that
plaintiffs have adequately pled facts to support their bid
protest claim.  *See Kassem,* 2008 WL 169784 at *4.

## C.    Sovereign Immunity over Tort Claims

WMATA maintains that sovereign immunity shields it from
liability for the tort claims in this action, which include the
claims of fraud, breach of fiduciary duty, and failure to
formulate policies, procedures, rules or regulations governing
the disposition of its real property.  The Court agrees that
WMATA is not liable for these tort claims.

In signing the WMATA Compact, Maryland, Virginia, and the
District of Columbia conferred upon WMATA their respective
sovereign immunities.  *Beatty v. WMATA*, 860 F.2d 1117, 1126 (D.C.
Cir. 1988) ("[a]s a quasi-governmental entity created by its
signatory parties, WMATA is entitled to share the sovereign

31

immunity of those parties with respect to common law tort actions"); *see also Beebe*, 129 F.3d at 1287; *Morris v. WMATA*, 781 F.2d 218, 219 (D.C. Cir. 1986); *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 49-50 (1994).  Section 80 of the Compact waives this immunity for torts "committed in the conduct of any proprietary function," while retaining immunity for torts committed by its agents "in the performance of a governmental function."  D.C. Code Ann. § 1-2431(80).  Unless the limited waiver of immunity applies, "the district court lacks jurisdiction to enter a judgment against [WMATA]."  *Watters v. WMATA*, 295 F.3d 36, 39-40 (D.C. Cir. 2002).

To distinguish governmental from proprietary functions, courts ask whether the activity amounts to a "quintessential" governmental function, like law enforcement.  *Burkhart v. WMATA*, 112 F.3d 1207, 1216 (D.C. Cir. 1997).  If so, the activity falls within the scope of WMATA's sovereign immunity.  *Id.* (citing *Dant v. District of Columbia*, 829 F.2d 69, 74 (D.C. Cir. 1987)).  Because it is difficult to distinguish between public and private sector functions with any precision beyond obviously public activities like law enforcement, *Dant*, 829 F.2d at 74, immunity questions often turn on whether the activity is "discretionary," or "ministerial," a dichotomy employed by the Federal Tort Claims Act.  *Burkhart*, 112 F.3d at 1216.  Under certain conditions, liability for discretionary actions is shielded by sovereign

immunity, whereas sovereign immunity never shields ministerial actions. The distinction between "discretionary" and "ministerial" is as follows: "Generally speaking, a duty is discretionary if it involves judgment, planning, or policy decisions. It is not discretionary [i.e., ministerial] if it involves enforcement or administration of a mandatory duty at the operational level, even if professional expert evaluation is required." *Beatty*, 860 F.2d at 1127 (quoting *Jackson v. Kelly*, 557 F.2d 735, 737-38 (10th Cir. 1977)).

In *KiSKA Construction Corporation v. WMATA*, the United States Court of Appeals for the District of Columbia Circuit considered whether sovereign immunity barred a contractor's claim that WMATA fraudulently and negligently misrepresented a contract in its invitation for bids. *KiSKA Constr. Corp. v. WMATA,* 321 F.3d 1151 (D.C. Cir. 2003). In that case, WMATA issued an IFB soliciting bids for the 14th Street Tunnel Project. *Id.* at 1154. The IFB, however, did not disclose the results of an engineering report that projected significant cost-increasing obstacles a contractor would encounter while working on the project. *Id.* at 1156. Unaware of these obstacles, plaintiff submitted a bid and received the contract to build the 14th Street Tunnel. While attempting to complete the project, however, plaintiff encountered the cost-increasing obstacles predicted in the engineering report, doubling plaintiff's costs. *Id.* Plaintiff

33

then sued WMATA asserting claims under both tort and contract theories for failing to disclose the information from the engineering report in the IFB.  Resolving a motion for summary judgment, the district court dismissed the tort claims based on WMATA's sovereign immunity, and denied summary judgment on the contract claims.  *Id.* at 1154.

The court of appeals affirmed the district court's decision after applying the two-part discretionary function test.  *Id.* at 1159.  First courts ask whether any "statute, regulation, or policy specifically prescribes a course of action for [WMATA] to follow."  *Id.* (quoting *Cope v. Scott*, 45 F.3d 445, 448 (D.C. Cir. 1995)).  If a course of action is so prescribed, "sovereign immunity does not bar suits based on an employee's failure to follow the prescribed course of conduct."  *KiSKA Constr. Corp.,* 321 F.3d at 1159 (quoting *Burkhart*, 112 F.3d at 1217).  If the governing statutes or regulations leave room for the exercise of discretion, however, courts ask a second question: "whether the exercise of discretion is grounded in social, economic, or political goals."  *KiSKA Constr. Corp.,* 321 F.3d at 1159 (quoting *Beebe*, 129 F.3d at 1287).  "If the exercise of discretion is so grounded, and hence susceptible to policy judgment, the activity is governmental, thus falling within Section 80's retention of sovereign immunity."  *KiSKA Constr. Corp.,* 321 F.3d at 1159 (internal quotations omitted).

KiSKA argued that sovereign immunity should not shield WMATA
from liability for KiSKA's claims of fraudulent and negligent
misrepresentation because WMATA lacked the discretion to conceal
and/or misrepresent material information from contractors in its
IFB. *KiSKA Constr. Corp.,* 321 F.3d at 1159.  Although the
plaintiff was unable to identify a provision of the WMATA Compact
that specifically prescribed the content of WMATA's IFBs,
plaintiff argued that both contract cases and a Federal Transit
Administration ("FTA") circular specifically prescribed WMATA's
conduct and constrained WMATA's discretion.  *Id.* at 1160.

KiSKA further argued that the "general obligation to abide
by the covenant of good faith and fair dealing" found in the
contract cases supported its position that a government agency
has a duty to disclose pertinent facts to contractors with whom
the agency deals.  *Id.*  According to KiSKA, this obligation
"specifically prescribed the contents of the bid package" by
requiring WMATA to disclose all material information.  *Id.*  The
court of appeals, however, found that "[a]lthough the covenant of
good faith and fair dealing undoubtedly constrains WMATA's
behavior within the context of its contractual relationships,
KiSKA's misrepresentation claims sound in tort, not contract."
*Id.*  Agreeing with the district court, the appellate court held
that "the covenant of good faith and fair dealing is not the kind
of specific dictate that renders WMATA's acts merely

ministerial." *Id.* (internal quotations omitted).  The plaintiff
also relied on an FTA Circular, but the appellate court found
that the circular also failed to prescribe WMATA's discretion
with respect to the contents of the bid package.  *Id.*  Because
the plaintiff was unable to point to any statute, regulation or
policy that specifically prescribed the content of WMATA's IFBs,
the court of appeals found that WMATA had "broad discretion to
determine the contents of the tunnel project's bid package."  *Id.*

     The *KiSKA* court then turned to the second question, whether
the exercise of such discretion is grounded in social, economic,
or political policy.  *Id.* at 1161.  The court ultimately found
that WMATA's decision regarding what information to include in
its IFB was susceptible to policy judgment because it involved
consideration of budgetary constraints and economic expediency.
*Id.*  Thus, the *KiSKA* court upheld WMATA's sovereign immunity
defense with respect to the claims of fraudulent
misrepresentation and negligent misrepresentation.  *Id.  See also
Abdulwali v. WMATA*, 315 F.3d 302, 305 (D.C. 2003)("one constant
in our precedents is that the Transit Authority makes
discretionary choices when 'establishing plans, specifications or
schedules' regarding the Metro system.  We have drawn a
distinction between complaints alleging negligent design, which
the Transit Authority's immunity bars, and those alleging
negligent maintenance," to which sovereign immunity does not

apply)(internal citations omitted).

In the present case, plaintiffs allege the torts of fraud, breach of fiduciary duty and failure to implement policies to govern the disposition of the Bus Garage.  This Court must determine if WMATA's sovereign immunity bars recovery for these claims.

### 1.    Does Any Statute, Regulation, or Policy Specifically Prescribe a Course of Action for WMATA to Follow?

Plaintiffs contend that WMATA committed fraud and breached its fiduciary duty by omitting information and failing to correct plaintiffs' understanding that they had the right to negotiate exclusively with WMATA to purchase the Bus Garage.  Amend. Compl. ¶¶ 144-45.  Plaintiffs claim that a relationship of trust was established with WMATA during the course of their business dealings and that WMATA "owed a fiduciary duty to plaintiffs to act in good faith, to engage in open and fair dealing with plaintiffs, and to act with the utmost candor and disclosure, loyalty, and due care."  *Id*.  Plaintiffs further allege that WMATA committed fraud by actively seeking and obtaining services from plaintiffs, and benefitting from plaintiffs' labors and expenditures, all the while making various intentional misrepresentations and/or omissions to plaintiffs regarding the nature of plaintiffs' rights in the Bus Garage.  Amend. Compl. ¶¶ 150-51.  By disregarding plaintiffs' alleged interest in the Bus

37

Garage, and instead pursuing a competitive bid process, plaintiffs contend that WMATA breached the fiduciary duty and committed fraud.

To determine whether WMATA's decision to disregard an alleged agreement to negotiate exclusively with plaintiffs and instead pursue other means of disposing of the Bus Garage is protected by sovereign immunity, the Court must first consider whether any statute, regulation, or policy specifically prescribes a course of action for WMATA to follow. *KiSKA Constr. Corp.*, 321 F.3d at 1159. Plaintiffs are unable to point to any statute that specifically prescribes WMATA's conduct while engaging in these negotiations. Plaintiffs argue that either WMATA's Compact or plaintiffs' alleged "express or implied" agreement with WMATA specifically prescribes WMATA's conduct, therefore making it non-discretionary. Pls.' Opp'n 38. Plaintiffs cite to no provision of the Compact, however, that even mentions, much less specifically prescribes, WMATA's course of conduct while engaging in negotiations for the sale of real estate. Similarly, plaintiffs' argument that the alleged agreement itself specifically prescribes WMATA's conduct is also unavailing, because an agreement is not the equivalent of a statute, regulation or policy.

WMATA also contends that sovereign immunity bars plaintiffs' claim that WMATA breached its Compact by failing to formulate

38

policies, procedures, rules or regulations governing the disposition of its real property. Plaintiffs identify WMATA's Compact as a statute that "requires WMATA to establish policies and procedures relating to its contracting and procurement practices, which includes the disposition of WMATA's real property." Pls.' Opp'n 24. Plaintiffs maintain that WMATA's authority to sell its real estate derives from Article 12(d) of its Compact. *See* D.C. Code Ann. § 9-1107.01, sec. 12(d). The Compact states that WMATA's Board "shall adopt policies and procedures to implement this section of the Compact." *See* D.C. Code Ann. § 9-1107.01, sec. 73(g).

Although plaintiffs are correct that the Compact requires WMATA to adopt policies and procedures to implement section 12(d), the statute does not specify the policies and procedures WMATA must implement. Plaintiffs concede that WMATA adopted its PPM to comply with that statute, and Chapter 15 of the PPM explicitly outlines the requirements for disposal of real property. Pls.' Opp'n 25. Because the Compact does not "circumscribe WMATA's discretion with respect to the contents" of the PPM, WMATA retains discretion to determine which policies and procedures it should include in its PPM, as well as the content of those policies and procedures. *KiSKA Constr. Corp.*, 321 F.3d at 1160. Thus, the Compact leaves room for the exercise of discretion in fashioning the scope and breadth of WMATA's

39

policies concerning the disposition of real estate.

> **2.    If the Governing Statutes or Regulations Leave Room for the Exercise of Discretion, is the Exercise of Discretion Grounded in Social, Economic, or Political Goals?**

The Court next asks whether that discretion is grounded in social, economic, or political goals. *KiSKA Constr. Corp.,* 321 F.3d at 1161.  WMATA argues that the complained-of conduct involves its decision of where, when and how to relocate a bus garage and invokes typical social, economic and political policy considerations.  Def.'s Mot. 39.  Among these considerations are "the cost of acquiring a new site, the costs of relocation, the costs of changes in the transportation system to accommodate the move, assessing the interests and concerns of residents and businesses in the areas under consideration for the new location, etc."  *Id*.  Plaintiffs contend that the inquiry is narrower, and that if the Court finds that discretion exists, it is only the discretion to implement policies under Compact Section 73(g), or to follow the disposition of real property procedures in the PPM, which plaintiffs contend do not implicate public policy considerations.  Pls.' Opp'n 36.  The Court is not persuaded by plaintiffs' argument.

That WMATA has discretion in deciding how to dispose of its real property is demonstrated by the options WMATA explored to determine the best approach to dispose of its property in the Ballpark District, including negotiating with the Compact

Jurisdiction, engaging in sole source negotiations, initiating a competitive negotiation process, creating a Joint Development Strategy, and soliciting bids through a sealed bid process. Considering these options, WMATA presumably weighed the issues of cost and expediency to determine which alternative would provide WMATA with the best net return. These considerations invoke economic, social and political goals. Thus in this case, WMATA's sovereign immunity divests this Court of subject matter jurisdiction with respect to the claims of fraud, breach of fiduciary duty, and failure to implement policies, procedures, rules or regulations governing the disposition of its real property. Accordingly, those claims shall be dismissed.

## IV. Conclusion

Based on the foregoing, WMATA's motion to dismiss is **GRANTED** with respect to Count 6 (breach of fiduciary duty), Count 7 (fraud), Count 8 (WMATA breached its Compact by failing to formulate policies, procedures, rules or regulations governing the disposition of its real property), and Count 10 (WMATA acted irrationally in concluding that the Akridge bid offered the highest possible economic return, and the award to Akridge was illegal), and **DENIED** as to all remaining counts. An appropriate order accompanies this memorandum opinion.

**Signed:      Emmet G. Sullivan**
**             United States District Judge**
**             February 27, 2008**

41