**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                    )
MONUMENT REALTY LLC, *et al.*,      )
                                    )
            Plaintiffs,             )
                                    )  Civil Action No. 07-1821 (EGS)
        v.                          )
                                    )
WASHINGTON METROPOLITAN AREA        )
TRANSIT AUTHORITY,                  )
                                    )
            Defendant.              )
_____  )

<u>**Memorandum Opinion**</u>

Monument Realty LLC ("Monument"), and its affiliate MR Ballpark 7 LLC ("MRB 7"), collectively referred to as plaintiffs, commenced this action against the Washington Metropolitan Area Transit Authority ("WMATA") alleging that WMATA breached its contract to sell Monument real property, known as the Southeast Bus Garage ("Bus Garage"), located in the District of Columbia. Plaintiffs also challenge WMATA's decision to award a competitive bid for the sale of the Bus Garage to the John Akridge Company ("Akridge"). Pending before the Court is plaintiffs' motion to enjoin the disposition of the Bus Garage. Upon consideration of the motion for a preliminary injunction, the response and reply thereto, supplemental memoranda, the arguments made at the hearing on January 23, 2008, and the applicable law, the motion is **GRANTED**.

I.    **Background**

  A.    **Parties**

Monument and MRB 7 are limited liability companies doing business in the District of Columbia.  Amend. Compl. ¶¶ 1-2.  MRB 7 was created by Monument on July 18, 2007 for the purpose of purchasing the Southeast Bus Garage, which is located in the Ballpark District of Washington, D.C.[1]  *Id.* ¶ 2.

WMATA was created in 1966, when Congress, acting pursuant to the Compact Clause of the Constitution, U.S. Const. art. I, § 10, cl. 3, approved the Washington Metropolitan Area Transit Authority Compact between Maryland, Virginia, and the District of Columbia to deal with growing traffic problems in the Washington area.  *See* Pub.L. No. 89-774, 80 Stat. 1324 (1966) (codified as amended at D.C. Code Ann. § 1-2431 (1992)); H. Rep. No. 89-1914, at 5-6 (1966).  Responsible for creating a coordinated public transportation system for the region, WMATA now operates an extensive Metrobus and Metrorail system running throughout northern Virginia, the District, and two Maryland counties. *Beebe v. WMATA*, 129 F.3d 1283, 1285 (D.C. Cir. 1997).  WMATA is the record owner of the real property at issue, the Bus Garage.

_____

  [1] The Ballpark District is a planning area in Southeast, Washington, D.C., directly adjacent to and including the new Washington Nationals baseball stadium currently under construction.  It is bounded by the Southwest-Southeast Freeway to the North, South Capitol Street to the West, New Jersey Avenue, S.E. to the East, and the Anacostia River to the South.  *See* Amend. Compl. at 1-2.  The property at issue is located at Lots 857 and 866, Square 700, commonly known as the Southeast Bus Garage, and includes an adjacent surface parking lot.  *See id.* at 1.

**B.    Procedural History**

On October 26, 2007, plaintiffs filed a motion for a temporary restraining order ("TRO"), a motion for a preliminary injunction, and a twelve-count amended complaint alleging that WMATA was liable for breach of contract, fraud, breach of fiduciary duty, failure to formulate and follow policies concerning the disposition of real property, and challenging WMATA's decision to award a bid to the John Akridge Company. Thereafter, WMATA filed a motion to dismiss all counts in the amended complaint.  The Court dismissed the tort claims based on WMATA's sovereign immunity, but denied the motion with respect to all other counts.[2]  *Monument Realty LLC, et al. v. Wash. Metro. Area Transit Auth.*, No. 07-1821 (EGS), slip op. at 41 (D.D.C. Feb. 27, 2008).

The motions for a TRO and a preliminary injunction were consolidated, and the parties subsequently engaged in limited discovery.  On January 2, 2008, plaintiffs filed an amended motion for a preliminary injunction.

---

[2] Plaintiffs informed the Court at the January 23, 2008 Motions Hearing that they had abandoned their argument that WMATA acted irrationally in concluding that the Akridge bid offered the highest possible economic return over MRB 7's escalating bid (Count 10).  Accordingly, the Court dismissed Count 10.

3

C.    **Factual Background**

1.    **Master Development Plan for the Ballpark District**

In response to Major League Baseball's 2004 announcement that the League was considering relocating the Montreal Expos baseball franchise to Washington, D.C., the District of Columbia government created the Anacostia Waterfront Corporation (AWC). Amend. Compl. ¶ 9.  The AWC's mission was to develop and revitalize the underutilized public lands along the Anacostia River by: 1) developing a comprehensive "Master Development Plan" for the area surrounding the baseball team's new stadium ("the Ballpark District"); 2) acquiring property in the Ballpark District; and 3) selling the acquired property to selected Master Developers.  *Id.* ¶ 11.

WMATA owned several properties within the Half Street Area of the Ballpark District, including the Navy Yard Metro Station site and the Southeast Bus Garage, and the AWC sought to acquire and develop those properties as a part of its Master Development Plan.  *Id.* ¶ 15.  WMATA initially issued a Joint Development Solicitation ("JDS"), inviting real estate developers to jointly develop with WMATA the properties it owned in the Ballpark District.  *Id.* ¶ 16.  The District of Columbia, however, requested that WMATA cancel the JDS and participate in the master development planning process.  *Id.* ¶ 17.  WMATA subsequently withdrew the JDS, and thereafter coordinated with the AWC in

4

implementing the Master Development Plan. *Id.*

### 2.  Monument Designated as Master Developer of the Half Street Area of the Ballpark District

In December 2005, the AWC designated Monument as Master Developer for the Half Street Area, and Monument and the AWC signed a Letter of Intent memorializing their respective rights and duties. *Id.* ¶ 23. As Master Developer, Monument was afforded the opportunity to negotiate exclusively to acquire and develop projects within the Half Street Area, once those properties had been acquired by the District of Columbia. *Id.* ¶¶ 23-24. At the time that Monument and the AWC entered their agreement, the District of Columbia did not own any properties in the Half Street Area, but was seeking to acquire those properties from WMATA.[3] *Id.* Ex. F. at 1.

Plaintiffs allege that WMATA knew that Monument had been awarded the right to negotiate exclusively with the AWC to purchase any properties the District of Columbia acquired within the Half Street Area of the Ballpark District. Amend. Compl. ¶¶ 25-28. Further, based on WMATA's policies and procedures, WMATA had an obligation to first offer the District of Columbia the right to purchase the Bus Garage at fair market value. *See* Pls.'

---

[3] On December 12, 2005, the AWC issued a press release that stated, "The team of Monument Realty, LLC . . . will . . . have the opportunity to enter into exclusive negotiations with AWC to develop different mixed-use projects on two publicly owned sites that AWC is presently seeking to acquire near the ballpark." Amend. Compl. Ex. F. at 1.

Mem. 2 (citing Ex. 4, Bottigheimer Dep. 87:11-18).  According to
Nat Bottigheimer, WMATA's Contracting Officer, WMATA has a policy
of first offering to a Compact jurisdiction the opportunity to
purchase any property that WMATA decides to sell within that
Compact jurisdiction.  *Id.*  If the Compact jurisdiction expresses
an interest in purchasing the property, the price is negotiated
based on fair market value.  *See* Pls.' Mem. Ex. 6.  Plaintiffs
allege that Monument was an intended third-party beneficiary of
WMATA's legal obligation to sell WMATA-owned property located in
the District of Columbia to the District upon the City's request.

### 3.    WMATA's Agreement with Monument

In addition to plaintiffs' allegation that Monument was a
third-party beneficiary of WMATA's agreement with the District of
Columbia, plaintiffs also allege that a contractual relationship
existed between Monument and WMATA.  Beginning in May 2006,
Monument engaged in direct negotiations with WMATA to purchase
WMATA's property in the Half Street Area.  *Id.* ¶ 30.  *See also*
Pls.' Mem. 1-27.

The sale of WMATA's properties was scheduled in phases.  *See*
Pls.' Mem. Ex. 18 at 4 (Notes from July 7, 2006 District of
Columbia/WMATA Task Force Meeting: "WMATA has been coordinating
with AWC and their preferred developer, Monument, for the phased
disposition of WMATA parcels in the ballpark district.  Phase I:
West Entrance to the station and adjoining employee parking lot

[the Navy Yard Metro Station]; Phase II: Remaining parcels south of M Street [the Bus Garage]").

In December 2006, Monument submitted an unsolicited offer to WMATA to purchase the Navy Yard Metro Station.  Pls.' Mem. 11-12.  Thereafter, WMATA issued an Invitation for Bids ("IFB") for the Navy Yard Metro Station, and Monument was the only developer to respond.  Subsequently, WMATA sold the property to Monument.  *Id*.

In April 2007, believing that WMATA would now be in a position to proceed with the second sale, plaintiffs submitted an unsolicited bid to purchase the Bus Garage.  Pls.' Mem. Ex. 83.

### 4.    WMATA Issues IFBs for the Bus Garage

After receiving Monument's unsolicited bid to purchase the Bus Garage, WMATA obtained authorization from its Board of Directors ("Board") to dispose of the property.[4]  WMATA then issued IFB 07-3, with a bid deadline of July 23, 2007, for the sale of the Bus Garage.  *See* Pls.' Mem. 27.  Before the bid deadline, however, the District of Columbia informed WMATA via letter that it would exercise its right to purchase the Bus Garage.[5]  Pls.' Mem. Ex. 49.  In response to the District's

---

[4] On May 24, 2007 the Board passed a resolution authorizing the sale of the Bus Garage property.  *See* Def.'s Opp'n Ex. B. ("Resolved, That the Board of Directors authorizes the General Manager to offer for sale the Southeastern Bus Garage and its bus parking lot.  The sale proceeds will be for the replacement of the Southeastern Bus Garage and the police training facility; . . . .")

[5] *See* Pls.' Mem. Ex. 49 (June 27, 2007 letter from the Office of the Director for the District of Columbia to John Catoe, Jr., WMATA's General Manager, stating "Given the District's substantial interest in the development

7

letter, WMATA withdrew the IFB and initially agreed to sell that property to the City. *Id.* Ex. 51, 63.

According to WMATA, however, the District of Columbia subsequently decided not to purchase the Bus Garage, and WMATA then issued IFB 08-1, with a bid deadline of August 28, 2007. *See id.* Ex. 65; *id.* Ex. 70. In the IFB, WMATA invited interested parties to submit "sealed bids in accordance with the terms of this Invitation for Bids for Sale, with leaseback, of WMATA property." *Id.* Ex. 70 at 1. The IFB provided that the contract would be awarded to the bid that represented "the best net return to WMATA after leaseback monthly rent for WMATA's anticipated lease term (which may, in WMATA's sole discretion be less than 36 months) is deducted from the Bid Amount." *Id.* at 7. The IFB also stated that all questions concerning the IFB "will be answered publicly; that is, WMATA will post all questions and answers on its website." *Id.*

On August 24, 2007, Jeffrey Neal, Monument's president, sent a letter to John Catoe, WMATA's General Manager, stating that Monument would consider WMATA in breach of its agreement to sell the Bus Garage to Monument if WMATA awarded IFB 08-1 to another bidder. *See* Def.'s Opp'n Ex. E 7. The letter also stated that

---

of this area, I would like to request on behalf of the District that WMATA terminate the Invitation for Bids for Sale on these Ballpark District sites. The District further requests that WMATA enter into direct negotiations with the DC Office of the Deputy Mayor for Planning and Economic [Development] for the purchase of the WMATA sites.").

if WMATA breached its agreement, the construction on the Navy
Yard Metro site and the development of the Ballpark District
would be jeopardized, and WMATA's decision could lead to
litigation. *Id.* Notwithstanding the letter, Monument's
affiliate, MRB 7, submitted two bids in response to IFB 08-1.
Pls.' Mem. at 28.  The first bid was for the minimum price of $60
million, with no charge for leaseback rental.  Pls.' Mem. Ex. 71.
The second bid contained an escalating-bid clause, in which MRB 7
agreed to pay $250,000 more than any other qualified bidder. *Id.*

In addition to MRB 7, two other real estate developers, JBG
and the John Akridge Company, submitted bids in response to IFB
08-1.  Akridge, however, had also submitted a bid in response to
IFB 07-3, before WMATA withdrew that IFB.  Although Akridge urged
WMATA to limit its consideration of bids for IFB 08-1 to
developers who had submitted timely responses to IFB 07-3,
Akridge also submitted a bid in response to IFB 08-1.  Pls.' Mem.
Ex. 69.  In its bid, Akridge offered to pay $69.25 million to
purchase the Bus Garage, and proposed to charge WMATA $110,000
per month in rent for months 1-12, and $430,000 per month in rent
for months 13-36, to lease back the Bus Garage. *Id.* Ex. 72, 79.
Akridge also included in its bid an offer to commence
negotiations with WMATA to temporarily relocate the Bus Garage to

Akridge property.[6]  *Id.*  This additional offer, which was not

solicited by the IFB, is at the crux of plaintiffs' challenge to

WMATA's bid process to sell the Bus Garage.

On August 28, 2007, WMATA staff opened the three bids

received in response to IFB 08-1, and on August 29, 2007,

Bottigheimer prepared a memorandum for the Board summarizing the

staff's recommendation.  In the memorandum, Bottigheimer

acknowledged that it was difficult to pick a winner, because

"after three years of rent [from leasing back the Bus Garage],

the high bidder's bid becomes the low bid, and the low bidder's

bid becomes the high bid."  Def.'s Opp'n Ex. E 10.  "As a result,

the best net return to WMATA depends on how long we anticipate

remaining in the Southeast Garage."[7]  *Id.*  Bottigheimer also

stated that the availability of alternatives and the costs of the

alternatives to remaining at the current Bus Garage were key

factors in estimating the amount of time WMATA would need to

remain at the Bus Garage, and thus were critical factors in

---

[6] The Akridge bid stated, "Akridge manages an Affiliate that owns and/or controls substantial portions of Square 664 and, if this bid is accepted, Akridge would immediately commence negotiations with WMATA to establish an arrangement pursuant to which WMATA would be able to use the Akridge Property as a temporary site for locating assets presently located on the Property during the period WMATA is contemplating relocation of the operations presently conducted at the Property."  Pls.' Mem. Ex. 72.

[7] MRB 7 bid $60 million, but would not charge anything to lease back the Bus Garage.  In contrast, Akridge bid $69.25 million, but would charge WMATA $110,000 per month for months 1-12 and $430,000 per month for months 13-36 to lease back the Bus Garage.  As Bottigheimer told the Board, the length of time WMATA leased the Bus Garage would determine which bid provided the highest net return.

determining which bid provided the best net return.  *Id.*

In a separate memorandum drafted by Bottigheimer on August 29, 2007, he stated:

> Analysis of the three bids reveals that acceptance of Akridge's bid would provide the best net return to [WMATA] as long as the leaseback period is from zero months to thirty-months.  If the leaseback period is thirty-one months to thirty-six months, Monument's bid would provide the best net return.  At no point would JBG's bid provide the best net return to the Authority.[8]

Def.'s Opp'n Ex. E 11.  Bottigheimer concluded that a leaseback period of less than thirty months was virtually certain, given the planned April 2008 opening of the baseball stadium, and thus in his view, Akridge's bid provided the best net return to WMATA. *Id*.  Although this memorandum was drafted on August 29, 2007, the recommendation to award the bid to Akridge was not publicized until it was posted on WMATA's website on September 21, 2007. Def.'s Opp'n 48.

On September 12, 2007, before WMATA made public its recommendation to award the contract to Akridge, Matthew J. Klein, Akridge's president, delivered a letter to Bottigheimer and Carol O'Keeffe, WMATA's General Counsel.  Pls.' Mem. Ex. 80. Klein's letter followed up on "an integral part of the Akridge Offer," namely "the opportunity to engage in discussions in

---

[8] The WMATA staff decided as a matter of policy not to consider MRB 7's escalator bid on the grounds that it was non-responsive, uncertain and ambiguous on its face.  Def.'s Opp'n 44.  Plaintiffs informed the Court at the January 23, 2008 motions hearing that they were abandoning their argument that WMATA's decision to disregard their escalator bid was improper.

11

connection with what Akridge believes is a potential for solving WMATA's stated need to relocate and maintain the buses presently housed at the Southeast Bus Garage location." *Id.* Klein stressed that Akridge's offer was "a serious offer and, if selected as purchaser, . . . one that Akridge [was] prepared to act on immediately." *Id.* Klein invited either O'Keeffe or Bottigheimer to contact him if they were interested in further discussing the offer. *Id.* In response to Klein's letter, Bottigheimer telephoned Klein later that day and left a voice mail message stating that WMATA had received the letter and was treating Akridge's proposal "as a serious offer." Pls.' Mem. Ex. 78.

On September 20, 2007, Klein sent another letter to Bottigheimer providing "further clarification of the potential benefit to WMATA for pursuing the Akridge affiliated site [] as a possible interim relocation site for the Southeast Bus Garage." Klein stated that Akridge's offer could result in potential material savings to WMATA of $5.3 million, which would increase "the net benefit to WMATA of Akridge's proposal for the Southeast Bus Garage."[9] *Id.* Ex. 81. The day after WMATA received this letter, its staff announced its recommendation on WMATA's

---

[9] The use of Akridge's alternative site would also guarantee that Akridge's bid was the highest offer because it would eliminate the need to lease back the Bus Garage from Akridge. As previously discussed, the longer WMATA had to lease back the Bus Garage, the less competitive Akridge's bid became.

12

website to award the bid to Akridge.  On September 27, 2007, the
staff presented its recommendation to the Board.  Def.'s Opp'n
48.

Following WMATA's announcement to award the bid to Akridge,
plaintiffs objected to the bid process and alleged that WMATA
violated its Procurement Procedures Manual ("PPM").
Specifically, plaintiffs argued that WMATA improperly considered
the Akridge bid on the grounds that the bid was submitted
conditionally and offered terms other than those sought by the
IFB, namely, an offer to help WMATA relocate its Bus Garage,
thereby rendering the bid nonresponsive.  Amend. Compl. ¶¶ 76-82.

## II.  Standard of Review for Injunctive Relief

In considering whether to grant an application for emergency
injunctive relief, a court must consider four factors:  (1)
whether there is a substantial likelihood that plaintiffs will
succeed on the merits of their claims, (2) whether plaintiffs
will suffer irreparable injury absent an injunction, (3) whether
an injunction would harm the defendants or other interested
parties (the balance of harms), and (4) whether the public
interest would be furthered by an injunction.  *See Serono Labs.,
Inc. v. Shalala*, 158 F.3d 1313, 1317-18 (D.C. Cir. 1998) (citing
*Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559
F.2d 841, 843 (D.C. Cir. 1977)).  The factors "must be viewed as
a continuum, with more of one factor compensating for less of

13

another." *Bradshaw v. Veneman*, 338 F. Supp. 2d 139, 141 (D.D.C. 2004). Thus, "[i]f the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." *Serono Labs.*, 158 F.3d at 1318.

Finally, because interim injunctive relief is an extraordinary form of judicial relief, courts should grant such relief sparingly. *See Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004) ("A preliminary injunction is an extraordinary remedy that should be granted only when the party seeking relief, by a clear showing, carries the burden of persuasion."); *see also Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (a preliminary injunction is "an extraordinary and drastic remedy").

## III. Analysis

### A.    Irreparable Harm

The basis for injunctive relief in the federal courts has always been irreparable harm and the inadequacy of legal remedies. *Wis. Gas Co. v. FERC*, 758 2d 669, 674 (D.C. Cir. 1985). In *Wisconsin Gas*, the court of appeals identified the factors a court should consider in determining whether a party has demonstrated irreparable harm and the inadequacy of legal remedies. *Id.*

First, the injury must be both certain and great, actual and not theoretical. *Wis. Gas Co.*, 758 2d at 674; *see also Ashland Oil, Inc. v. FTC*, 409 F. Supp. 297, 307 (D.D.C. 1976), aff'd, 548

14

F.2d 977 (D.C. Cir. 1976) (citations and internal quotations
omitted) (the party seeking injunctive relief must show that
"[t]he injury complained of [is] of such imminence that there is
a 'clear and present' need for equitable relief to prevent
irreparable harm."). Second, the harm must be irreparable, in
that the harm cannot be remedied solely with monetary damages.
*Wis. Gas Co.*, 758 2d at 674. "Mere injuries, however
substantial, in terms of money, time and energy necessarily
expended in the absence of a stay are not enough." *Id.* The
possibility that adequate compensatory relief would be available
later during the ordinary course of litigation "weighs heavily
against a claim of irreparable harm." *Id.* When considering
these factors, the court must bear in mind whether the movant has
substantiated the claim that irreparable injury is "likely" to
occur.

With respect to the first factor, whether the injury is both
certain and great, actual and not theoretical, plaintiffs argue
that in the absence of injunctive relief, WMATA will sell the Bus
Garage to Akridge. Pls.' Mot. 2. On January 19, 2006, WMATA's
Board identified the Bus Garage as a priority for relocation, and
in August 2007, IFB 08-1 was issued to sell the Bus Garage.
Pls.' Mem. Ex. 83. On September 27, 2007, WMATA's staff proposed
to the Board that they adopt a resolution awarding IFB 08-1 to
Akridge, subject to WMATA acquiring "the replacement bus garage

15

property at the D.C. Village" from the District of Columbia, and the Board approving "the Southeast Bus Garage replacement project and amendment of the Mass Transit Plan in accordance with the WMATA Compact." *Id.*

WMATA has been working to satisfy those conditions. Once the conditions are met, WMATA has told the Court that it intends to sell the Bus Garage to Akridge.[10] Plaintiffs have therefore demonstrated that losing their alleged real property interest in the Bus Garage is an actual, not theoretical injury, and is both certain and great. Further, plaintiffs have shown that absent a preliminary injunction, the harm is imminent.

As to the second factor, plaintiffs contend that losing their interest in the Bus Garage is not merely an economic loss, because real property is considered unique and irreplaceable. Pls.' Mot. 2. "When land is the subject matter of the agreement, the legal remedy is assumed to be inadequate, since each parcel of land is unique." *Tauber v. Quan*, 2007 D.C. App. Lexis 689, *18 (D.C. 2007). WMATA counters that the loss of commercial property is an insufficient basis to establish irreparable harm because the law does not consider commercial property to be unique. Def.'s Opp'n 50. WMATA relies on two cases in support

---

[10] Counsel for WMATA represented at the January 23, 2008 motions hearing that WMATA is anxious to sell the Bus Garage to Akridge, and intends to place the issue on the Board's agenda as soon as WMATA finalizes its arrangements with the District of Columbia to relocate the Bus Garage to the D.C. Village.

of this proposition.  In both of those cases, the district court
found that the loss of commercial real estate was not irreparable
when developers sought to enjoin HUD from foreclosing on low-
income housing projects owned by those developers.  *See 46th St.
Rehab Dev. Co. v. United States*, No. 97-2267 (JGP), slip op. at 4
(D.D.C. Oct. 3, 1997); *JOGO Assocs. v. United States Dep't of
Hous. & Urban Dev.*, No. 92-2451 (NHJ), slip op. at 3-7 (D.D.C.
Nov. 25, 1992).

The Court is not persuaded by these decisions.  For example,
in *JOGO*, the court concluded that plaintiff's loss of the housing
project would only constitute economic harm, despite being real
property, because the property was not valued for its uniqueness,
but rather for the economic returns it provided plaintiffs.
Noting that "every parcel of real estate is unique," "certain
properties are sufficiently similar that the risk of
undercompensating the promisee in damages is slight."  *JOGO
Assocs.*, No. 92-2451 (NHJ), slip op. at 5.  The *JOGO* court found
that mass-produced housing developments were an obvious example
of the type of real estate that was sufficiently similar to other
properties and that the loss of those properties would not
necessarily constitute irreparable harm.  *Id.*  Critical to the
court's analysis was whether the buyers' "sole concern [was] not
anguish at the thought of losing the impossible-to-duplicate
estate," but rather was the economic loss that results from

17

losing the property. *Id.*

   To the contrary, the commercial property at issue in this case is not sufficiently similar to other properties, principally because of its prime location. The Bus Garage is located in the midst of properties already owned by Monument in the Half Street Area of the Ballpark District, adjacent to the main gate of the new baseball stadium, and centrally located within an area that the District of Columbia has sought to develop as a part of the Master Development Plan. Pls.' Rep. 14. Plaintiffs contend that losing the Bus Garage would frustrate Monument and the District of Columbia's coordinated development of the Ballpark District. *Id.* Because the Bus Garage is real property that is valued for its uniqueness, the Court concludes that the plaintiffs have established that the harm here cannot be remedied with monetary damages alone, and is thus irreparable. *Wis. Gas Co.*, 758 2d at 674. Therefore, the Court finds that the first prong of the preliminary injunction analysis weighs in plaintiffs' favor.

   **B.    Likelihood of Success**

   Courts do not employ a "probability requirement" to determine whether plaintiffs have demonstrated a likelihood of success, but rather "it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative

18

investigation." *Washington Metro. Area. Transit Comm'n*, 559 F.2d at 841 (citing *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir. 1953)).  The Court finds that plaintiffs have demonstrated a likelihood of success on their bid protest claim.

### 1.   Plaintiffs' Challenge to the Bid Process

The United States Court of Appeals for the District of Columbia Circuit has held that WMATA is treated as a federal agency for purposes of standing when a party seeks to challenge WMATA's procurement decisions in federal court.  *Elcon Enters. v. WMATA,* 977 F.2d 1472, 1479-80 (D.C. Cir. 1992).  It is well settled that "actions of a federal agency alleged to be arbitrary and capricious violations of the statutes and regulations governing the awards of federal contracts are subject to judicial review under § 706(2)(A) of the Administrative Procedure Act ("APA")."  *See Gull Airborne Instruments, Inc. v. Weinberger*, 694 F.2d 838, 841, n.2 (D.C. Cir. 1982) (citing *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289 (D.C. Cir. 1971); *Scanwell Lab., Inc. v. Shaffer*, 424 F.2d 859 (D.C. Cir. 1970)).  Accordingly, WMATA's procurement decisions must be made in accordance with the APA and applicable federal law.  *Elcon Enters.,* 977 F.2d at 1479-80.

To successfully challenge WMATA's bid process, plaintiffs must demonstrate that WMATA's decision to award the Bus Garage to Akridge had "no rational basis" or the process by which it was reached "involved a clear and prejudicial violation of applicable

statutes or regulations." *Elcon Enters.,* 977 F.2d at 1479-80
(citing *Kentron Hawaii, Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C.
Cir. 1973)). *See also Delta Data Sys. Corp. v. Webster*, 744 F.2d
197, 204 (D.C. Cir. 1984). A court may not set aside a
procurement decision on the grounds that the procuring agency
potentially or actually violated applicable law in some trivial
way; the violation must be clear and prejudicial*. See Irvin
Indus. Canada, Ltd. v. United States Air Force*, 924 F.2d 1068,
1072 (D.C. Cir. 1990); *Kentron*, 480 F.2d at 1169. This burden is
a "heavy" one. *Irvin Indus. Canada, Ltd.*, 924 F.2d at 1072.

This Court's refusal to demand any more of an agency's
procurement decision than substantial compliance with applicable
law and baseline substantive rationality is warranted, for
"[j]udges are ill-equipped to settle the delicate questions
involved in procurement decisions," *Delta Data*, 744 F.2d at 203,
and to require any more of such decisions would make courts "the
forum for all manner of objections." *M. Steinthal & Co.*, 455
F.2d at 1299.

### 2.  Prejudice

In order to succeed with a bid protest, plaintiffs must show
that they were significantly prejudiced by the errors in the
procurement process. *Bannum v. United States*, 404 F.3d 1346,
1353 (Fed. Cir. 2005). *See also Alfa Laval Separation, Inc. v.
United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999); *Data Gen.*

20

*Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996).  Prejudice
is a question of fact.  *Bannum*, 404 F.3d at 1353.  To establish
"significant prejudice," plaintiffs must show that there was a
"substantial chance" they would have received the contract award
but for WMATA's violation of applicable law during the sealed bid
process.  *See id.*; *Alfa Laval Separation*, 175 F.3d at 1367.
Plaintiffs satisfy their burden to demonstrate a substantial
chance of receiving the award when they are next in line to be
awarded the contract if the protest is sustained.  *See* Def.'s
Supp. Auth. 1-2 (citing *In re: Adrian Supply Co.*, B-243904, 91-2
CPD ¶ 140, 1991 WL 162535 (Comp. Gen. Aug. 7, 1991) ("The record
shows that [plaintiff] would not be in line for award even if its
allegations concerning Internec's bid were sustained.  Rather,
OHM International Corporation, the second low[est], responsive
and responsible bidder, would be next in line for the award.");
*In re: Applied Sys. Corp. – Recon.*, B-234159, 89-1 CPD ¶ 319,
1989 WL 240538 (Comp. Gen. Mar. 28, 1989) (same); *Motorola, Inc.*,
B-232843, 88-2 CPD ¶ 484, 1988 WL 228158 (Comp. Gen. Nov. 16,
1988) (same)).

Three bidders responded to IFB 08-1: Akridge, MRB 7, and
JBG.  WMATA's Contracting Officer, Bottigheimer, reported that
"analysis of the three bids reveals that acceptance of Akridge's
bid would provide the best net return to the Authority as long as
the leaseback period is from zero months to thirty-months.  If

the leaseback period is thirty-one months to thirty-six months, Monument's bid would provide the best net return.  At no point would JBG's bid provide the best net return to the Authority."  Def.'s Mem. Ex. E-11.  Bottigheimer's memorandum clearly suggests that if Akridge had not been awarded the bid, MRB 7 would have been next in line for the award.  Thus, plaintiffs have established that they are significantly prejudiced by the errors in WMATA's sealed bid process because there is a "substantial chance" they would have received the contract award but for WMATA's violations of applicable law during that process.  *See Bannum*, 404 F.3d at 1353; *Alfa Laval Separation*, 175 F.3d at 1367.

### 3.    Bid Responsiveness

Agencies must reject nonresponsive bids.  *Prestex Inc. v. United States*, 320 F.2d 367, 372 (Fed. Cir. 1963) (footnote omitted) ("Rejection of nonresponsive bids is necessary if the purposes of formal advertising are to be attained, that is, to give everyone an equal right to compete for Government business, to secure fair prices, and to prevent fraud.").  The rationale for enforcing the responsiveness requirement is "to avoid unfairness to other contractors who submitted a sealed bid on the understanding that they must comply with all of the specifications and conditions in the invitation for bids, and who could have made a better proposal if they imposed conditions upon

or variances from the contractual terms the government had specified." *Toyo Menka Kaisha, Ltd. v. United States*, 597 F.2d 1371, 1377 (Fed. Cir. 1979).

Bid responsiveness determinations focus on whether a bidder has unequivocally offered to perform, without exception, "the exact thing called for in a solicitation so that acceptance of the bid will bind the contractor to perform in accordance with all of the IFB's material terms and conditions." *In re: Walashek Indus. & Marine,* B-281577, 99-1 CPD ¶ 30, 1999 U.S. Comp. Gen. LEXIS 13, at *3 (Comp. Gen. Jan. 29, 1999). The "responsiveness" requirement derives from the statutory provision requiring an award be made to the offeror "whose bid conforms to the solicitation." *Ryan Co. v. United States*, 43 Fed. Cl. 646, 651 (Fed. Cl. 1999) (citing 41 U.S.C. § 253b(c) (Supp. 1997)). Moreover, 48 C.F.R. § 14.301 (1998) provides that "[t]o be considered for [an] award, a bid must comply in all material respects with the invitation for bids. Such compliance enables bidders to stand on an equal footing and maintain the integrity of the sealed bidding system." *Ryan Co.*, 43 Fed. Cl. at 651. *See also* 48 C.F.R. § 14.404-2(a)(1998); *Bean Dredging Corp. v. United States*, 22 Cl. Ct. 519, 522 (Fed. Cl. 1991) ("Responsiveness addresses whether a bidder has promised to perform in the precise manner requested by the government.").

Where a government contract is awarded under competitive

bidding, deviations from advertised specifications may be waived by the contracting officer, provided that the deviations do not go to the substance of the bid or work an injustice to other bidders. *Toyo Menka Kaisha, Ltd.*, 597 F.2d at 1377. A substantial deviation is defined as one which affects either the price, quantity, or quality of the article offered. *Id.* (citing *Albano Cleaners, Inc. v. United States*, 455 F.2d 556, 559 (Fed. Cir. 1972); *Mid-West Constr., Ltd. v. United States*, 387 F.2d 957, 961 (Fed. Cir. 1967); *Prestex Inc.*, 320 F.2d at 372). A sealed bid procurement requires the rejection of all offers taking exception to the solicitation requirements even where the exception may be attractive from a price or technical standpoint. *See In re: Carter Chevrolet Agency*, 1988 WL 228035, *1 (Comp. Gen. Feb. 3, 1988) (citing FAR § 14.404-2).

Here, WMATA issued a sealed IFB for the disposition of the Bus Garage stating that the *sole criterion* for the winning bid would be: "[t]he bid which represents the best net return to WMATA after leaseback monthly rent for WMATA's anticipated lease term is deducted from the Bid Amount." Pls.' Mem. Ex. 70 at 7. The bidders were invited to offer a purchase price for the Bus Garage and state how much they would charge WMATA monthly to lease back the Bus Garage. *Id.* Apart from identifying information, no additional information was requested in the IFB.

Akridge submitted a bid in response to IFB 08-1 offering to

purchase the Bus Garage for $69.25 million and a fixed amount for leaseback rental.  That bid also included an offer to "establish an arrangement pursuant to which WMATA would be able to use the Akridge Property as a temporary site" for relocating the Bus Garage.  Pls.' Mem. Ex. 72.  Akridge's offer to provide WMATA with a possible relocation site for the Bus Garage deviates from the exact requirement called for in the solicitation, i.e., a fixed purchase price and leaseback rental for the Bus Garage.

Although WMATA acknowledges that Akridge provided information beyond what was sought in the IFB, WMATA contends that Akridge's extraneous offer did not render the bid nonresponsive because the offer did not modify the material requirements of the IFB, such as price, quality, quantity or delivery terms.  Def.'s Opp'n 42.  According to the memorandum drafted by Nat Bottigheimer, WMATA's Contracting Officer, however, the best net return to WMATA depended on how long WMATA anticipated remaining in the Bus Garage, and to make that determination, WMATA had to consider the availability of alternatives and the cost of the alternatives.  Def.'s Opp'n Ex. E 10.  Akridge's departure goes to the core of the factors WMATA considered to determine which bid provided the best net return.[11] Akridge's offer could have affected WMATA's evaluation of which

---

[11] In fact, Akridge itself stressed that its offer to help relocate the Bus Garage to Akridge property would increase "the net benefit to WMATA of Akridge's proposal for the Southeast Bus Garage" by up to $5.3. million.  *See* Pls.' Mem. Ex. 81.

bid provided the highest net return.

No other bidders included an offer to help WMATA relocate its Bus Garage.  If an opportunity to include such an offer had been presented to other bidders, they too could have made a competitive proposal on all material elements of the contract. *Toyo Menka Kaisha, Ltd.*, 597 F.2d at 1377; *Ryan Co.*, 43 Fed. Cl. at 651.

### 4.    *Ex Parte* Communications

It is uncontested that WMATA chose to dispose of the Bus Garage through a sealed bid process, which is a typical choice an agency makes when the determination is based solely on price-related factors.  *See In re: Carter Chevrolet Agency*, 1988 WL 228035 at *1(citing 41 U.S.C. § 253l; FAR § 6.401) ("Sealed bidding procedures are to be used, if time permits, [when the] award is to be made on the basis of price and price-related factors, discussions are not necessary, and there is a reasonable expectation of receiving more than one sealed bid.").  A sealed bid procurement does not allow for discussions.  *See In re: Carter Chevrolet Agency*, 1988 WL 228035 at *1 (citing FAR § 14.404-2).

In the procurement context, "discussions" are defined as exchanges between the Government and offerors that are undertaken with the intent of allowing the offeror to revise its proposal. *Sun Ship v. Hidalgo*, 484 F. Supp. 1356, 1371-72 (D.D.C. 1980).

Equity demands that if one offeror is notified of such
"deficiencies" and is allowed to revise its proposal, all
offerors must be afforded an equal opportunity to revise their
proposals. *Id.* Thus, "in determining whether a communication . .
. constitutes a 'discussion' . . . the controlling test is
whether an offeror was given an opportunity to modify its
proposal as a result of the communication." *Id.* *See also In re:
MG Indus.*, B-283010.3, 2000 CPD ¶ 17, 2000 WL 151139, *6 (Comp.
Gen. Jan. 24, 2000) (citing FAR § 15.306); *In re: Uniserv Inc*, B-
218196, 85-1 CPD ¶ 699, 1985 WL 52991, *3 (Comp. Gen. June 19,
1985) ("We have defined 'discussions' as communications between
an agency and an offeror involving information essential for
determining the acceptability of a proposal. Providing an
offeror an opportunity to revise its proposal also constitutes
discussions.").

WMATA argues that neither Bottigheimer nor the WMATA Board
considered Akridge's offer to help relocate the Bus Garage to
Akridge property. Def.'s Opp'n 42 ("All that WMATA considered
was Akridge's bid price and leaseback charge, the firm,
liquidated monetary sums in the bid."). WMATA's argument is
belied by the evidence produced to date. For example, WMATA's
staff communicated with Akridge on at least three separate
occasions regarding the offer to relocate the busses to Akridge
property before the staff presented its recommendation to the

27

Board to award the bid to Akridge.  *See* Pls.' Mem. Ex. 80.
First, on September 12, 2007, Matthew J. Klein, the president of
Akridge, sent a letter to Bottigheimer and Carol O'Keeffe,
WMATA's General Counsel, following up on an "integral part of the
Akridge offer" to help WMATA relocate its Bus Garage and inviting
either Bottigheimer or O'Keeffe to contact him.  Later that day,
Bottigheimer called Klein and left a voice mail message stating
that WMATA was treating Akridge's proposal to help relocate the
Bus Garage "as a serious offer."  *Id.* Ex. 78.  A week later,
Klein wrote another letter to Bottigheimer, this time providing
"further clarification of the potential benefit to WMATA for
pursuing the Akridge affiliated site as a possible interim
relocation site for the Southeast Bus Garage."  *Id.* Ex. 81.  The
letter went on to state that "these savings could increase the
net benefit to WMATA of Akridge's proposal for the Southeast Bus
Garage site" by up to $5.3 million.  *Id.*  These communications
undermine and seriously impugn WMATA's denial that WMATA's staff
gave any consideration to Akridge's offer to help relocate the
Bus Garage.  Indeed these communications demonstrate that Akridge
was afforded the unique opportunity to modify its bid by
increasing its bid's value by up to $5.3 million.  *See* Def.'s
Opp'n 42.

At the January 23, 2008 Motions Hearing, the Court inquired
of WMATA's counsel whether it was plausible that the *ex parte*

communications between Akridge and Bottigheimer concerning Akridge's offer to help relocate the Bus Garage impacted WMATA staff's recommendation to the Board.   WMATA's counsel responded, "[Plaintiffs] can't show any penetration of the process, any impact, any effect. And should [Bottigheimer] have done this? You know, of course not.   What he should have done [was] just stay away and scatted it right back, but he didn't, but it didn't go anywhere, it didn't affect the memo."   Excerpt of Tr. of Prelim. Inj. Hr'g at 5-7, Jan. 23, 2008.   Notwithstanding counsel's attempts to minimize these *ex parte* communications, WMATA staff acknowledges treating Akridge's proposal as "a serious offer." *See* Pls.' Mem. Ex. 78.   As a result, Akridge had the opportunity to increase the value of its bid, while the other bidders did not.   These *ex parte* discussions viewed in the context of this sealed bid process indicate a clear and prejudicial violation of applicable procurement law.   *See* FAR § 14.404-2.

Accordingly, plaintiffs have demonstrated a likelihood of success on the merits of their claim that they were substantially prejudiced when WMATA considered Akridge's nonresponsive bid and participated in improper *ex parte* discussions with Akridge.   The Court finds the factor of likelihood of success on the merits weighs in plaintiffs' favor.[12]

---

[12] Having concluded that plaintiffs have demonstrated a likelihood of success on their challenge to the bid process, the Court need not reach the alternative issue of likelihood of success on the breach of contract claim.

**C.    Balance of Harms**

This factor requires the court to balance the relative harm each party would face if an injunction were granted. *See Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1317-18 (D.C. Cir. 1998). The Court finds that the balance weighs in plaintiffs' favor.

WMATA provides mass transportation for the District of Columbia metropolitan area. WMATA argues that the balance of harms weighs in its favor because it needs the proceeds from the sale of the Bus Garage to purchase a replacement garage facility in time for opening day of the baseball season in April 2008. *See* Def.'s Opp'n Ex. B. (May 24, 2007 Board Resolution). WMATA contends that delaying WMATA's ability to sell the Bus Garage will cause delays and disrupt bus transportation and transportation planning. WMATA also maintains it is harmed by the potential loss of a purchaser for the Bus Garage. Def.'s Opp'n 51.

Plaintiffs, on the other hand, argue that the balance of harms weighs in their favor because their claim involves the loss of unique and irreplaceable real property. Pls.' Rep. 13-14. *See* discussion *supra* Part III.A. Further, plaintiffs dispute WMATA's argument that a preliminary injunction would cause WMATA significant delay. In light of the significant amount of discovery already completed by the parties, this case shall proceed on an expedited basis towards a merits determination.

30

*Id.* Also, with respect to WMATA's concern that it would be harmed by the loss of a potential purchaser, presumably, if plaintiffs prevail in this lawsuit, plaintiffs would be a potential purchaser for the Bus Garage.

Both parties have identified substantial and credible harms. It is not insignificant that an injunction would prevent WMATA from selling the Bus Garage, thereby delaying its ability to purchase a replacement facility. On the other hand, plaintiffs' loss of unique and irreplaceable real property is also significant.

On balance, the Court finds that the harm alleged by plaintiffs is irreparable, whereas the harm alleged by WMATA is not. WMATA will still have the opportunity to sell the Bus Garage and purchase a replacement facility once this lawsuit is resolved. In the Court's view, the balance of harms weighs in favor of an injunction.

### D. Public Interest

Similarly, the Court concludes that, on balance, the public interest weighs in favor of an injunction. *See Serono Labs., Inc.*, 158 F.3d at 1317-18. Plaintiffs articulate three reasons why the public interest factor weighs in their favor.

First, they argue that the public interest supports protection of real property rights, which the Court recognizes is a valid public interest concern. *See* discussion *supra* Part

31

III.A.

Next, plaintiffs argue that the residents of the District of Columbia have an interest in the Ballpark District being developed in accordance with the vision of their elected officials.  After considering competitive proposals from various real estate developers, the AWC designated Monument as Master Developer of the Ballpark District, and together they decided on a coordinated approach to develop this area of the City.  *See* Pls.' Mem. Ex. 50 (Letter from District of Columbia Councilmember Jim Graham to WMATA's General Manager requesting IFB 08-1 be withdrawn because "the successful development of this site is important for the District's vision of the Ballpark District").  Plaintiffs and the District of Columbia therefore share a common interest in successfully developing the Ballpark District in accordance with the Master Development Plan.

Finally, plaintiffs argue that the public has an interest in ensuring that WMATA follows its procurement procedures.  The United States Court of Appeals for the District of Columbia Circuit has recognized that the public has an interest in preserving the fairness and integrity of the government's procurement systems.  *See Scanwell Lab., Inc. v. Shaffer*, 424 F.2d 859, 864 (D.C. Cir. 1970) ("The public interest in preventing the granting of contracts through arbitrary or capricious action can properly be vindicated through a suit

32

brought by one who suffers injury as a result of the illegal
activity, but the suit itself is brought in the public interest
by one acting essentially as a private attorney general."). *See
also Cardinal Maint. Serv., Inc. v. United States*, 63 Fed. Cl.
98, 111 (Fed. Cl. 2004) (granting permanent injunction "will also
promote the integrity of the procurement process by holding the
government accountable for its actions"); *CW Gov't Travel, Inc.
v. United States*, 61 Fed. Cl. 559, 576 (Fed. Cl. 2004) ("There is
an overriding public interest in preserving the integrity of the
federal procurement process by requiring government officials to
follow procurement statutes and regulations."). Pls.' Mot. 3.

    WMATA argues that the public interest factor weighs in its
favor because it is a public body that provides transportation
services to the Washington, D.C. metropolitan area. WMATA
alleges that an injunction would harm WMATA, and thereby the
public, by causing WMATA to incur excess costs as a result of a
deferral of the sale of the Bus Garage until the conclusion of
this litigation. Def.'s Opp'n 52-53. WMATA argues that the
delay would impact WMATA's finances, and ultimately have a
negative financial impact on its ridership and the constituent
jurisdictions' taxpayers. The Court recognizes that a burden on
the public fisc raises significant public interest concerns.
However, as noted in a case relied on by WMATA, a "burden on the
public fisc might be justified if the plaintiffs were likely to

33

succeed" on the merits. *Am. Fed'n of Gov't Employees, AFL-CIO v. United States*, 104 F. Supp. 2d 58, 79 (D.D.C. 2000). In this case, especially where plaintiffs have demonstrated a likelihood of success on the merits with respect to their bid protest claim, the public interest weighs in plaintiffs' favor.

### E.    Unclean Hands

The unclean hands doctrine derives from the equitable maxim that "he who comes into equity must come with clean hands," and it "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief." *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945). Equity does not require blamelessness with respect to other matters, but it does require that one seeking relief must have acted fairly and without fraud or deceit as to the controversy at issue. *Id.* at 814-815. WMATA argues that plaintiffs should be denied equitable relief based on the doctrine of "unclean hands." In other words, WMATA contends that Monument's own misconduct in this matter negates any right to injunctive relief. Def.'s Opp'n 53-54.

Courts have discretion to deny equitable relief where there is a direct link between plaintiffs' unethical behavior and the underlying obligation that formed the basis of the lawsuit. *See Steele v. Isikoff*, 130 F. Supp. 2d 23, 34 (D.D.C. 2000) (denying equitable relief based on the doctrine of unclean hands because

34

plaintiff lied to obtain the underlying promise for which she sought relief); *Ross v. Fierro*, 659 A.2d 234, 240 (D.C. 1995) (denying the defense of unclean hands when the alleged wrongful actions were not the cause of the obligation from which defendant sought to be relieved); *Int'l Tours & Travel v. Khalil*, 491 A.2d. 1149, 1155 (D.C. 1985) ("Unless the amount owed the plaintiff is the direct result of the unethical behavior, . . ., the clean hands doctrine does not bar the plaintiff's recovery.").

WMATA argues that an August 24, 2007 letter sent from Jeffrey Neal, Monument's president, to WMATA constitutes unclean hands, for which the Court should deny equitable relief. Prior to the deadline for submitting bids for IFB 08-1, Neal sent a letter to WMATA stating that Monument would consider WMATA to be in breach of its agreement to sell the Bus Garage to Monument if WMATA awarded the bid to anyone other than Monument. *See* Def.'s Opp'n Ex. E 7. The letter also provided that if WMATA breached the parties' agreement, the construction on the Navy Yard Metro site and the development of the Ballpark District would be jeopardized, and WMATA's decision would likely result in litigation. *Id.*

WMATA characterizes this letter as "threats, attempted intimidation, coercion and near extortion." Def.'s Opp'n 54. Upon examining the letter, however, the Court finds that this letter was essentially a demand letter sent to preserve

35

Monument's rights and interest in the Bus Garage by demonstrating its objection to the issuance of the IFB and warning WMATA that litigation could ensue if WMATA failed to honor what plaintiffs believed to be a preexisting legal obligation.  Further, there is no link between plaintiffs' letter and the underlying challenge to the bid process on which the injunction is grounded.  Because WMATA fails to demonstrate any link between plaintiffs' allegedly unethical behavior and the obligation owed to plaintiffs, this Court will not deny plaintiffs the equitable relief they seek. *See Steele*, 130 F. Supp. 2d at 34; *Ross*, 659 A.2d at 240; *Int'l Tours & Travel*, 491 A.2d at 1155.

    **F.   Conclusion**

    A party seeking a preliminary injunction assumes the burden of demonstrating either a combination of probable success and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tips sharply in its favor. *Washington Metro. Area. Transit Comm'n*, 559 F.2d at 223 (quoting *Charlie's Girls, Inc. v. Revlon, Inc.*, 483 F.2d 953, 954 (2d Cir. 1973)).  Having considered the four factors for emergency injunctive relief, this Court is persuaded that the plaintiffs have met that burden.  Plaintiffs have demonstrated a substantial likelihood that they will succeed on their bid protest claim; that they will suffer irreparable harm absent an injunction; and that the balance of harms and the public interest weigh in their

36

favor.  Based on the foregoing, plaintiffs' motion for a preliminary injunction enjoining WMATA's sale of the Bus Garage is **GRANTED** until further order of the Court.  An appropriate order accompanies this memorandum opinion.


**Signed:     Emmet G. Sullivan**
**United States District Judge**
**February 28, 2008**